# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

STATE OF LOUISIANA, *et al.*,

     *Plaintiffs*,

        v.

JOSEPH R. BIDEN, JR., in his official
capacity as President of the United States of
America, *et al.,*

     *Defendants*.

Civil Action No. 22-cv-1213

**DEFENDANTS' RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT IN
SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS[1]

I.      The Campaign Of Public Threats Against Social-Media Platforms To Pressure
        Them To Censor More Speech on Social Media. ............................................................1

        A.      Threats From Federal Elected Officials Pressuring Platforms to Censor
                Speech. ..........................................................................................................4

        B.      Public Threats from President Biden and His Aides Pressuring Platforms to
                Censor..........................................................................................................19

II.     The White House's Public and Private Pressure Campaign on Platforms. .....................31

        A.      Pressure in Private from Rob Flaherty, Andy Slavitt, and White House
                Officials........................................................................................................34

        B.      Public Pressure and Threats From Press Secretary Jennifer Psaki. ..................123

        C.      Flaherty's Profane Attack: "Are You Guys F**king Serious?".........................138

        D.      President Biden on Social-Media Platforms: "They're Killing People."............141

        E.      The Social-Media Platforms Are Cowed into Collusion on Censorship. ...........169

        F.      White House Pressure and Collusion Continue Throughout 2022. ....................188

        G.      Pressure to Expand the Topics of Social-Media Censorship.............................200

III.    The Pressure Campaign from Surgeon General Murthy and His Office.......................212

        A.      The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms..............213

        B.      Surgeon General Works in Tandem with the White House and Virality
                Project..........................................................................................................223

        C.      The Surgeon General Pressures Social-Media Platforms in Private...................253

        D.      The Surgeon General's Public Pressure Campaign. ..........................................293

---

[1] This Table of Contents provides the Arabic number of the first response to the proposed finding of fact at the start of each section.

E.      MISSING...........................................................................................................

F.      The Surgeon General's Collaboration with the Virality Project. .......................330

G.      The Surgeon General's "Angry" and "Tense" Meetings With Platforms...........338

H.      The Surgeon General Leverages Public Pressure to Increase Censorship. .........346

I.      The Surgeon General and White House Hammer Facebook.............................386

J.      The Surgeon General Threatens Regulation to Increase Censorship.................400

K.      The White House and Surgeon General Continue Oversight of Censorship. .....424

IV.      The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.................426

A.      The CDC's Regular Communication with Social Media Platforms...................427

B.      CDC's and Census's Pressure and Collusion With Facebook/Meta. ................435

C.      CDC's and Census's Pressure and Collusion with Google/YouTube. ..............531

D.      CDC's and Census's "BOLO Meetings." ........................................................550

E.      CDC's and Census's Pressure and Collusion with Twitter...............................563

F.      CDC Endorses the States' Theory of Standing..................................................590

V.      Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.................596

A.      Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.........598

B.      Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine......................757

C.      Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration. ......777

D.      NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci. ............809

E.      CDC and NIH Procure the Censorship of Speech on Ivermectin......................826

F.      Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates..............828

G.      Dr. Fauci and the White House Cause the Censorship of Alex Berenson. .........840

VI.      The FBI's Censorship Campaign of Pressure and Deception........................................853

A.      FBI's and CISA's Regular "USG-Industry" Disinformation Meetings..............861

B.      The FBI's Regular Bilateral Meetings with Social-Media Platforms................867

C.      The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.......880

D.      The FBI Routinely Flags Speakers and Content for Censorship. ......................905

E.      The FBI Demands Information on Censorship from the Platforms...................929

F.      The FBI Flags Accounts and URLs for Censorship on a Monthly Basis ...........931

G.      Pressure from Congress Induces Platforms to Increase Censorship. .................945

H.      The FBI's Censorship Activities Are Ongoing. ................................................966

VII.    CISA's Censorship: Pressure, "Switchboarding," and Working Through Nonprofits. ....................................................................................................968

A.      CISA "Switchboards" by Flagging Government-Reported "Misinformation."................................................................................972

B.      CISA Organizes the "USG-Industry Meetings" on Misinformation. ................978

C.      CISA Is Deeply Embedded in the Election Integrity Partnership. ....................991

D.      CISA Uses Switchboarding to Pressure Platforms to Censor Speech. .............1076

E.      CISA's Many Misinformation Meetings with Platforms...............................1083

F.      CISA Worked with FBI to Suppress the Hunter Biden Laptop Story. .............1088

G.      CISA's Ongoing and Expanding Censorship Efforts. ....................................1094

VIII.   The State Department's Global Engagement Center's Censorship Efforts.................1123

IX.     The Election Integrity Partnership and Virality Project – Federal Collaborators.........1135

A.      The Election Integrity Project Is a Formidable Censorship Cartel...................1136

B.      The EIP Targets Plaintiff Jim Hoft and *The Gateway Pundit*. ........................1207

C.      The EIP Induces Major Changes in Platform Censorship Policies. .................1217

D.      The Virality Project Expands EIP's Censorship Work with Federal Officials.................................................................................1236

E.      The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups. ................................................................................................ 1266

X.      Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs ....... 1366

        A.      Defendants Gravely Injure the Individual Plaintiffs. ...................................... 1367

        B.      Defendants Gravely Injure Similarly Situated Speakers and Listeners. ........... 1412

        C.      Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri. ......... 1427

                1.      Fundamental policies favoring freedom of speech for their citizens. ... 1427

                2.      Direct censorship of the States and their political subdivisions. ........... 1428

                3.      The States' interest in following the uncensored discourse of their citizens. ........................................................................................... 1431

                4.      States' interest in fair, unbiased, open processes to petition state government. ....................................................................................... 1438

                5.      State quasi-sovereign interests. ......................................................... 1441

## <u>DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>

Defendants object to Plaintiffs' attempt to "incorporate by reference the evidence, documents, and exhibits previously filed in this case," Plaintiffs' Proposed Findings of Fact (Pls.' PFOF) at 1, where those materials are not specifically cited in Plaintiffs' Memorandum in Support of Motion for a Preliminary Injunction, Dkt. 15; Plaintiffs' Supplemental Brief in Support of Motion for a Preliminary Injunction, Dkt. 214; and Plaintiffs' Proposed Findings of Fact, Dkt. 214-1. As the Fifth Circuit has recognized, "[j]udges are not like pigs, hunting for truffles buried in the record." *United States v. Del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) (quotation omitted). Plaintiffs' suggestion that the Court and Defendants scour the docket in this case to address "evidence, documents and exhibits" not specifically referenced in Plaintiffs' lengthy preliminary injunction filings that may—in their view—bear on preliminary injunction issues is inappropriate. Accordingly, Defendants' response appropriately is focused on the "evidence, documents, and exhibits" Plaintiffs expressly have identified in support of their preliminary injunction motion.[2]

## I.    The Campaign Of Public Threats Against Social-Media Platforms To Pressure Them To Censor More Speech on Social Media.[3]

1.    Federal officials, including Defendants, have made a long series of public statements since at least 2018 demanding that social-media platforms increase their censorship of speech and speakers disfavored by these officials, and threatening adverse consequences – such as repeal or reform of Section 230 immunity under the Communications Decency Act, antitrust scrutiny or enforcement, increased regulation, and other measures – if the platforms do not increase censorship. The private communications between government officials and social-media platforms

---

[2] Defendants object to each of Plaintiffs' PFOFs to the extent that PFOF attributes to a deponent a legal characterization or conclusion contained in a question by counsel for Plaintiffs, on the ground that even when the deponent gave an affirmative response to such a question, any legal characterization or conclusion remained one by Plaintiffs, not testified to as fact by the deponent.

[3] If Plaintiffs intend their headings to be proposed findings of fact, Defendants dispute them because they are argumentative and lack evidentiary support. Defendants respond to Plaintiffs' arguments in their opposition to Plaintiffs' preliminary injunction motion.

addressing disinformation, misinformation, and censorship set forth herein were made against the backdrop of these public threats.

**RESPONSE:**  Disputed. The proposed finding of fact (PFOF) is argumentative, lacks

citation to any evidence, and is contradicted by the record for all the reasons discussed below and

in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction (Opposition), to which

the Court is respectfully referred.

2.   The immunity provided by Section 230 of the Communications Decency Act is extremely valuable for social-media platforms, so threatening to amend or repeal that immunity is highly motivating to them. One commentator has aptly described Section 230 immunity as "a hidden subsidy worth billions of dollars," stating: "Digital platforms enjoy a hidden subsidy worth billions of dollars by being exempted from any liability for most of the speech on their platforms (Section 230)."  Glenn Decl. Ex. 11, Doc. 10-1 at 140. Another commentator has observed, "imperiling Section 230 is a fearsome cudgel against ever untouchable companies."  Glenn Decl. Ex. 13, Doc. 10-1 at 206.

**RESPONSE:** Dispute the statement that "threatening to amend or repeal [Section 230] is

highly motivating" to social-media platforms as a vague characterization for which the PFOF cites

no supporting evidence. Undisputed that Glenn Decl. Ex. 11, at 140, is accurately quoted, but note

that Plaintiffs cite no evidence of record to support the economic validity of the "commentator's"

"descri[ption]" of Section 230's value to social-media companies. Defendants further note that

Glenn Ex. 11, Dkt. 10-1 at 51 n.123, cites to a letter signed by State Attorney Generals of both

political parties (including the Attorney Generals of Louisiana and Missouri) asking members of

Congress to revise Section 230 to impose liability for violations of state criminal law. *Id.* at 51,

n.123. The final sentence is disputed because Plaintiffs' partial quotation to an April 12, 2019

article lacks context. The full statement in the article reads as follows: "Whatever the political

motivations, imperiling Section 230 is a fearsome cudgel against even tech's most seemingly

untouchable companies." Glenn Decl. Ex. 13, Doc. 10-1 at 206. Defendants also note that the cited

April 2019 article also observed that both Democratic and Republican legislators had expressed

interest in amending Section 230. *Id.* Finally, note that irrespective of any interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Declaration of Dr. Stuart Gurrea at ¶¶ 1-81 ("Gurrea Decl.") (Ex. 1).

3.   The threat of antitrust scrutiny or enforcement is also a major motivator to social-media platforms. For example, Facebook CEO Mark Zuckerberg has stated that the threat of antitrust enforcement is "an 'existential' threat" to his platform. Glenn Decl. Ex. 12, Doc. 10-1 at 202.

**RESPONSE:** Disputed. The first sentence lacks citation to or support in the evidence of record. The second sentence does not accurately reflect Mr. Zuckerberg's statement, lacks appropriate context, and fails to support the first sentence of the PFOF. The New York Times article referenced in Glenn Decl. Ex. 12, Dkt. 10-1 at 202, discusses lawsuits brought by the Federal Trade Commission ("FTC") and "more than 40 states" accusing Facebook of "buying up its rivals to illegally squash competition" and calling for "the deals to be unwound[.]" Notably, among the States that brought the antitrust lawsuit were Louisiana and Missouri. *See New York v. Facebook, Inc.*, 549 F. Supp. 3d 6 (D.D.C. 2021) (No. 20-cv-3589), 2020 WL 7348667, at *4 (naming Louisiana and Missouri as plaintiffs). It is in the context of this antitrust lawsuit that Mr. Zuckerberg is quoted as stating that the breakup of the company is an "existential" threat. Glenn Decl. Ex. 12, Dkt. 10-1 at 202. This article has nothing to do with any threats of antitrust enforcement based on Facebook's content moderation policies. Accordingly, this PFOF is irrelevant to any issue in this case. Note also that irrespective of concerns about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. at ¶¶ 1-81 (Ex. 1).

**A.  Threats From Federal Elected Officials Pressuring Platforms to Censor Speech.**

4.  Then-Speaker of the House Nancy Pelosi stated on April 12, 2019: "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed."  Glenn Decl. Ex. 13, Doc. 10-1, at 205 ("When asked about Section 230, Pelosi referred to the law as a 'gift' to tech companies that have leaned heavily on the law to grow their business…. 'It is a gift to them and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy… I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed.'").

**RESPONSE:**  Undisputed, but further note that this PFOF is immaterial to any issue in

this case and the concerns about Section 230 were bipartisan, *see* Glenn Decl. Ex. 13, Dkt. 10-1,

at 205 ("In recent months, a handful of Republicans in Congress have [also] taken aim at the law.").

Note also that irrespective of interest expressed in Section 230 reform, social media companies,

by virtue of their business model, have powerful economic incentives to moderate content on their

platforms to retain users and thereby maximize advertising revenues, and have been doing so since

well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

5.  Senator Richard Blumenthal stated on Nov. 17, 2020: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. …  And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."  Glenn Decl. Ex. 16, at 1; Doc. 10-1, at 225.

**RESPONSE:** Undisputed, but further note that this PFOF is immaterial to any issue in this

case and the concerns about Section 230 were bipartisan. The concerns stated by Senator

Blumenthal were widely shared by his Republican colleagues at that November 17, 2020, hearing.

*See* Ex. 14 at 2[4] (*Censorship and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*,

116th Cong. 4 (2020) (Senator Graham: "And I think section 230 has to be changed because we

_____

[4] Throughout this document, citations to "Ex. [number]" that are not preceded by a name are Defendants' exhibits filed concurrently with their Opposition to Plaintiffs' Motion for Preliminary Injunction Motion and the instant Response to Plaintiffs' Proposed Findings of Fact.

can't get there from here without change."); *id.* at 10 (Senator Cornyn: "We'll, I'm glad to hear both of our witnesses today say that section 230, that they are open to reform because I think it's fair to say the internet has outgrown section 230."); *id.* at 19 (Senator Cruz: "At the same time that big tech exercises massive power, it also enjoys massive corporate welfare. Through the effect of section 230, special immunity from liability that nobody else gets, Congress has given big tech, in effect, a subsidy while they become some of the wealthiest corporations on the face of the planet."); *id.* at 45 (Senator Blackburn: "My colleagues and I have ask[ed] you all repeatedly through the years for greater transparency and to accept responsibility you have chosen to do neither so it is going to be up to us to change existing law and to hold you to account on behalf of the American people section 230 the reforms that we are going to put in place will take away this liability shield that you have turned into an opaque wall . . .). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

6.   Senator Mazie Hirono tweeted on Feb. 5, 2021: "Sec 230 was supposed to incentivize internet platforms to police harmful content by users. Instead, the law acts as a shield allowing them to turn a blind eye. The SAFE TECH ACT brings 230 into the modern age and makes platforms accountable for the harm they cause."  Glenn Decl. Ex. 55, at 1; Doc. 10-1, at 723.

**RESPONSE:**   Undisputed, but immaterial to any issue in this case. Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

7.   Defendants' political allies have repeatedly used congressional hearings as forums to advance these threats of adverse legislation if social-media platforms do not increase censorship of speakers, speech, content, and viewpoints they disfavor. They have repeatedly used such hearings to berate social-media firm leaders, such as Mark Zuckerberg of Facebook, Jack Dorsey of Twitter, and Sundar Pichai of Google and YouTube, and to make threats of adverse legal consequences if censorship is not increased. Such hearings include, but are not limited to, an antitrust hearing before the House Judiciary Committee on July 29, 2020; a Senate Judiciary Committee hearing on November 17, 2020; and a House Energy and Commerce Hearing on March 25, 2021.

**RESPONSE:**   Disputed as argumentative characterizations lacking any citation to or support in the evidence of record. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

8.   The March 25, 2021 Joint Hearing of the Communications and Technology Subcommittee with the Subcommittee on Consumer Protection and Commerce, the Joint Statement of Democratic Committee Chairs stated: "This hearing will continue the Committee's work of holding online platforms accountable for the growing rise of misinformation and disinformation. ... For far too long, big tech has failed to acknowledge the role they've played in fomenting and elevating blatantly false information to its online audiences. Industry self-regulation has failed. We must begin the work of changing incentives driving social media companies to allow and even promote misinformation and disinformation."  Glenn Decl. Ex. 17, at 1-2; Doc. 10-1, at 228-29.

**RESPONSE:** Undisputed, but further note that this PFOF is immaterial to any issue in this case. Defendants further note that interest in holding a hearing on this topic was bipartisan. Ex. 169 at 6 (*Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Hearing before the H. Comm. on Energy & Commerce*, 117th Cong. (2021)) (Ranking Member Bilirakis: "I've been thinking about this hearing since our side first requested this hearing last year," and "[t]he conclusion is my constituents simply don't trust you anymore."). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful

economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

9. At the same hearing, entitled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation," Representative Schakowsky stated: "[S]elf-regulation has come to the end of its road…. [Congress] is preparing to move forward with regulation and legislation. The regulation we seek … must hold platforms accountable when they are used to … spread misinformation…. All three of the companies that are here today run platforms that are hotbeds of misinformation and disinformation." Jones Decl., Ex. A, at 1, 5. She also stated: "Self-regulation has not worked. They must be held accountable for allowing misinformation and disinformation to spread." *Id.* at 7.

**RESPONSE:** Disputed to the extent this PFOF selectively quotes from Representative Schakowsky's statements and takes her statements out of context. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the March 25, 2021 hearing transcript for the complete quote and context of Representative Schakowsky's statement, *see* Ex. 169 at 5, and further note that the concerns raised by Representative Schakowsky were shared by Republican committee members, *id.* at 7 (Ranking Member Bilirakis: "The fear you should have coming into this hearing today isn't that you are going to be [upbraided] by a member of Congress—it's that our committee knows how to get things done when we come together. We can do this with you or without you and we will."). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

10. At the same hearing, Representative Doyle stated: "despite repeated promises to tackle this crisis, Facebook, Google, and Twitter instead routinely make minor changes in response to the public relations crisis of the day. … It is now painfully clear that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms. And therefore, it is time for

Congress and this committee to legislate and realign these companies' incentives. … I question whether existing liability protections [*i.e.*, Section 230] should apply … That is why you are here today, Mr. Zuckerberg, Mr. Pichai, and Mr. Dorsey…. Your business model itself has become the problem." *Id.* at 10-11.

**RESPONSE:** Disputed to the extent this PFOF selectively quotes from Representative Doyle's statement and takes his comments out of context. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the March 25, 2021 hearing transcript for the compete quote and context of Representative Doyle's statement, Ex. 169 at 7, and further note that the concerns expressed by Representative Doyle were shared by his Republican colleagues. *Id.* at 8-9 (Ranking Member Rodgers stating that "big tech is a . . . destructive force" and asking the social media companies in attendance at the hearing "why do you think you still deserve [section 230] protections today?"). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

11. At the same hearing, Representative Rush accused the platforms of allowing "[m]isinformation, outlandish conspiracy theories, and incendiary content" to spread, and stated to the three CEOs of Google, Facebook, and Twitter: "There is only one comparison that remotely approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past." *Id.* at 13. He also stated to Jack Dorsey, "I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way." *Id.* at 14.

**RESPONSE:** Disputed to the extent this PFOF selectively quotes Representative Rush and takes his comments out of context. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the March 25, 2021 hearing transcript for the complete quote and context for his statements, Ex. 169 at 21, and further note that Representative Rush's concerns about how social media platforms were handling content on their platforms were shared by his

Republican colleagues, as well as former President Trump. *Id.* at 22 (Representative Upton stating "it sounds like everybody on both sides of the aisle is not very happy. I think we all believe that there is a lot of responsibility that should be shared for some of the issues that we've raised today by the three [witnesses], and I would just offer—or speculate, I guess you could say, that we're going to see some changes in Section 236—230."); *id.* (Representative Upton noting that former President Trump vetoed the Defense bill because "he wanted the total repeal" of section 230 and "didn't get it."). Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

12. At the same hearing, Representative Upton stated: "we are going to see some changes in Section 230." *Id.* at 15.

**RESPONSE:**  Disputed to the extent this PFOF selectively quotes Representative Upton's statement. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the transcript of the March 25, 2021 hearing for Representative Upton's complete comments, in context. *See* Ex. 169. Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

13. At the same hearing, Representative Eshoo demanded of Jack Dorsey, "why haven't you banned the 12 accounts that are spewing its deadly COVID misinformation?" *Id.* at 17.

**RESPONSE:** Disputed to the extent it mischaracterizes Representative Eshoo's question as a "demand," and selectively quotes his testimony. Defendants refer the Court to the transcript

of the March 25, 2021 hearing for Representative Eshoo's complete comments. *See* 169.

Defendants further note that in response to Representative Eshoo's question, Twitter's former CEO

Jack Dorsey explained that "we won't take it down because it didn't violate our policy." *Id.* at 24.

In addition, this PFOF is immaterial to any issue in this case. And note also that irrespective of

interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media

companies, by virtue of their business model, have powerful economic incentives to moderate

content on their platforms to retain users and thereby maximize advertising revenues, and have

been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

14. At a hearing of the Antitrust subcommittee of the House Judiciary Committee on July 29, 2020, Representative Cicilline said to Mark Zuckerberg: "Mr. Zuckerberg. When a television station runs a false political advertisement, they're held liable for that. Why should Facebook or any other platform be different? … It's hard to understand why Facebook shouldn't be responsible for those business decisions. … Facebook gets away with it because you're the only game in town. There's no competition forcing you to police your own platform. Allowing this misinformation to spread can lead to violence. And frankly, I believe it strikes at the very heart of American democracy. … American democracy has always been at war against monopoly power. … These companies, as exist today, have monopoly power. Some need to be broken up, all need to be properly regulated and held accountable. … The names have changed, but the story is the same. Today, the men are named Zuckerberg, Pichai, Cook, and Bezos." Jones Decl., Ex. B, at 9-11.

**RESPONSE:** Disputed because Plaintiffs' PFOF does not accurately cite to the transcript

of the July 29, 2020, hearing, and misleadingly quotes different questions to suggest a single

statement. This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the

July 29, 2020 hearing transcript for an accurate transcription of the exchange cited in this PFOF.

*See* Ex. 170 at 34, 45 (*Online Platforms and Market Power, Part 6: Examining the Dominance of*

*Amazon, Facebook, Google, and Apple: Hearing Before the Subcomm. on Antitrust*, *Commercial,*

*& Administrative Law*, 116th Cong. (2020)). Note also that irrespective of any concern about

antitrust enforcement, social media companies, by virtue of their business model, have powerful

economic incentives to moderate content on their platforms to retain users and thereby maximize

advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

15. On November 17, 2020, at a hearing of the Senate Judiciary Committee, Senator Blumenthal stated: "Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited hugely by … promoting hate speech and voter suppression. … The destructive incendiary misinformation is still a scourge on both your platforms and on others. … [W]hat appears on your platform … is voter suppression and incendiary malicious misinformation. … [A] series of hearings on big tech is long overdue on antitrust issues … and Section 230. I have urged, in fact, a breakup of the tech giants because they've misused their bigness and power. Breaking off, for example, WhatsApp and Instagram [both Meta platforms]…. And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad…. [F]oreign disinformation campaigns intended to interfere in our democracy…. What we've seen here are fighting words and hate speech that certainly deserve no free expression protection. … Change is going to come, no question. Change is on the way and I intend to bring aggressive and targeted reform to Section 230." Jones Decl., Ex. C, at 2-3. Soon thereafter, he demanded that Mark Zuckerberg (who was testifying before the committee) "commit to … robust contend modification playbook in this coming election, including fact-checking, labelling, reducing the spread of misinformation" to "tak[e] action against dangerous disinformation" and "malign tactics." *Id.* at 4; *see also, e.g., id.* at 9 (Senator Coons demanding that Jack Dorsey explain why "you don't have a standalone climate change misinformation policy")

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF selectively quotes from Senator Blumenthal's statements during a November 17, 2020, Senate Judiciary Subcommittee hearing and mischaracterizes his and Senator Coons' questions as "demands." This PFOF is also immaterial to any issue in this case. Defendants refer the Court to the complete transcript of the November 17, 2020, hearing for an accurate transcription of Senator Blumenthal's statement. *See* Ex. 170. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

16. On March 11, 2022, Representative Ro Khanna, the Chairman of the House Oversight and Reform Committee who is leading "an investigation of oil industry 'misinformation' and held two

days of hearings on the oil industry, tweeted: "Facebook is preventing us from taking action on climate change by allowing climate misinformation to spread. Congress must step up and hold them accountable."  Jones Decl., Ex. D. He also tweeted: "Misinformation being spread on social media is undermining our efforts to tackle climate change. As chair of the House Oversight Environment Subcommittee, I will be holding a hearing to hold social media companies accountable." *Id.*

    **RESPONSE:** Undisputed, but immaterial to any issue in this case. Defendants note that on May 29, 2020, then-President Trump tweeted "Revoke 230!" Ex. 31 (Trump tweet). Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

    17. On April 20, 2022, twenty-two Democratic members of Congress sent a letter to Mark Zuckerberg of Facebook (n/k/a "Meta Platforms, Inc."), demanding that Facebook increase censorship of "Spanish-language disinformation across its platforms" and threatening Congressional action if Facebook did not do so. The letter claimed that "disinformation" was a threat to democracy, and it made explicit threats of adverse legislative action if Facebook/Meta did not increase censorship: "The spread of these narratives demonstrate that Meta does not see the problem of Spanish-language disinformation in the United States as a critical priority for the health of our democracy. The lack of Meta's action to swiftly address Spanish-language misinformation globally demonstrates the need for Congress to act to ensure Spanish-speaking communities have fair access to trustworthy information."  Glenn Decl. Ex. 18; Doc. 10-1, at 244-46.

    **RESPONSE:**  Disputed to the extent this PFOF takes the cited April 20, 2022, letter out of context, is immaterial to any issue in this case, and is an argumentative characterization rather than a statement of fact. Specifically, Plaintiffs' PFOF fails to mention that the impetus for the Senators' concern was Russian propaganda: "[s]ince the beginning of the year, Russian state-controlled outlets have made a concentrated effort to target Spanish-speaking communities to spread false-narratives leading up to, and in the aftermath of, the invasion of Ukraine." Glenn Decl. Ex. 18, Dkt. 10-1 at 244; *id.* ("Kremlin-owned outlets are winning the information war with Spanish speakers.") *id.* at 245 ("These lies are designed to undermine a resolute global response

necessary to stand against the Russian government's aggression."). Defendants refer the Court to the letter for an accurate statement of its contents. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

18. Comments from two Members of the House of Representatives summarize this campaign of pressure and threats: "In April 2019, Louisiana Rep. Cedric Richmond warned Facebook and Google that they had 'better' restrict what he and his colleagues saw as harmful content or face regulation: 'We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable.' New York Rep. Jerrold Nadler added: 'Let's see what happens by just pressuring them.'"  Glenn Decl. Ex. 14, at 2-3; Doc. 10-1, at 218-19.

**RESPONSE:**  Disputed to the extent Plaintiffs' PFOF is argumentative and relies on hearsay and journalistic characterization contained in an opinion article rather than citing to evidence of record. In addition, this PFOF is immaterial to any issue in this case. Note also that irrespective of interest expressed in Section 230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

**B.  Public Threats from President Biden and His Aides Pressuring Platforms to Censor.**

19. Then-candidate and now-President Biden has led this charge. He has tripled down on these threats of adverse official action from his colleagues and allies in senior federal-government positions. His threats of adverse government action have been among the most vociferous, and among the most clearly linked to calls for more aggressive censorship of disfavored speakers and speech by social-media companies.

**RESPONSE:** Disputed. Plaintiffs' PFOF is an argumentative mischaracterization lacking citation to or support in the evidence of record.

20. For example, on January 17, 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that Section 230 of the CDA should be "revoked" because social-media companies like Facebook did not do enough to censor supposedly false information in the form of political ads criticizing him—*i.e.*, core political speech. He stated: "The idea that it's a tech company is that Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms."  He also stated, "And it should be revoked. It should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."  Glenn Decl. Ex. 19, at 27; Doc. 10-1, at 275.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF selectively quotes from statements by then-candidate Biden and then improperly mischaracterize those partial quotes. Defendants refer the Court to the entirety of then-candidate Biden's statement concerning Section 230 reform for a full and accurate understanding of its contents. Then-candidate Biden was answering a question concerning a letter his campaign had sent to Facebook "regarding an ad that falsely claimed that [he] blackmailed Ukrainian officials to not investigate [his] son." *See* Glenn Decl. Ex. 19, at 29; Dkt. 10-1, at 275. Then-candidate Biden responded to the question by stating, among other things, that technology companies should be held to the same standards as traditional media and that "we should be setting standards not unlike the Europeans are doing relative to privacy." *Id.* Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

21. Candidate Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even *criminal prosecution* for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability…. Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen."  *Id.* In other words, Biden's message—not long before he became President of the United States—was that if Facebook did not censor political ads against him, Zuckerberg should go to prison. These two threats echoed the same threats made by numerous political allies of the President since 2019, cited above.

14

**RESPONSE:**  Disputed to the extent Plaintiffs' PFOF selectively and misleadingly quotes from then-candidate Biden and improperly seeks to characterize those partial quotes in an argumentative and rhetorical fashion, such as by referring to his comments as "threats" and characterizing statements as "core political speech." Defendants refer the Court to the entirety of then-candidate Biden's statement concerning Section 230 reform. *See* Glenn Decl. Ex. 19, at 29; Dkt. 10-1, at 275. The assertion that Mr. Biden stated "Zuckerberg should go to prison" if in future "Facebook did not censor political ads against him" is unsupported and plainly refuted by the cited excerpt: Mr. Biden stated only that Mr. Zuckerberg "should be submitted to civil liability and his company to civil liability, just like you would be here at The New York Times" for past acts. Mr. Biden stated that whether those past acts "amounted to . . . a criminal offense" was "a different issue," without any reference to Facebook's future handling of negative political ads about Mr. Biden. Note also that irrespective of interest expressed in Section 230 reform, social media companies, by virtue of their business model, have powerful economic incentives to moderate content on their platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

22. During the presidential campaign, now-Vice President Harris made similar threats against social-media firms to pressure them to engage in more aggressive censorship of speakers, content, and viewpoints she disfavors. For example, in addition to the statements cited above, she stated in 2019: "We will hold social media platforms responsible for the hate infiltrating their platforms, because they have a responsibility to help fight against this threat to our democracy. And if you profit off of hate—if you act as a megaphone for misinformation or cyberwarfare, if you don't police your platforms—we are going to hold you accountable as a community."  Glenn Decl. Ex. 20, at 1; Doc. 10-1, at 284.

**RESPONSE:**  Disputed to the extent Plaintiffs' PFOF reflects argumentative characterization of facts rather than facts, lacks evidentiary support, and is immaterial to the claims in this case. Specifically, Defendants dispute that the quoted statement from then-candidate Kamala Harris constitutes a "threat[] against social-media firms to pressure them to engage in

15

more aggressive censorship of speakers, content, and viewpoints she disfavors." Defendants

further note that the quoted statement by then-candidate Harris was made in the context of a

discussion about "the growth of domestic terrorism in the United States (and elsewhere), and how

those attackers used or embraced radically violent ideas on social media." Glenn Decl. Ex. 20, at

1; Doc. 10-1, at 284. Defendants refer the Court to the cited statement for a full and accurate

understanding of its contents. Additionally, note that irrespective of interest expressed in Section

230 reform, or any concern about antitrust enforcement, social media companies, by virtue of their

business model, have powerful economic incentives to moderate content on their platforms to

retain users and thereby maximize advertising revenues, and have been doing so since well before

2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

23. In or around June 2020, the Biden campaign published an open letter and online petition (ironically, on Facebook) calling for Facebook to engage in more aggressive censorship of core political speech and viewpoints that then-Candidate Biden disfavored. The open letter complained that Facebook "continues to allow Donald Trump to say anything — and to pay to ensure that his wild claims reach millions of voters. Super PACs and other dark money groups are following his example. Trump and his allies have used Facebook to spread fear and misleading information about voting…. We call for Facebook to proactively stem the tide of false information by no longer amplifying untrustworthy content and promptly fact-checking election-related material that goes viral. We call for Facebook to stop allowing politicians to hide behind paid misinformation in the hope that the truth will catch up only after Election Day. There should be a two-week pre-election period during which **all** political advertisements must be fact-checked before they are permitted to run on Facebook. … Anything less will render Facebook a tool of misinformation that corrodes our democracy." Glenn Decl. Ex. 23, at 1; Doc. 10-1, at 299.

**RESPONSE:** The first sentence is disputed. Plaintiffs' PFOF reflects Plaintiffs'

argumentative characterization of facts rather than facts, lacks evidentiary support, and is

immaterial to the claims in this case. Specifically, the assertion that Mr. Biden's campaign

"call[ed] for Facebook to engage in more aggressive censorship" is refuted by the cited portions

of the statement themselves, which referred only to common content moderation measures such as

fact-checking and declining to amplify content found to be untrustworthy. The PFOF is also

refuted by a portion of the petition that Plaintiffs omit, such as the campaign's emphasis that these were intended only as "*recommendations* to fix the problems in Facebook's platform that pose a threat to free and fair elections," Glenn Decl. Ex. 23, at 1; Dkt. 10-1, at 299 (emphasis added). Defendants refer the Court to the cited document for a full and accurate understanding of its contents. In any event, this PFOF is immaterial to the issues presented in this case.

24. The online petition demanded that Facebook "[p]romote real news, not fake news," "[q]uickly remove viral misinformation," and "[e]nforce voter suppression rules against everyone—even the President [Trump]."  Glenn Decl. Ex. 24, at 2; Doc. 10-1, at 304. The petition complained that Facebook "continues to amplify misinformation and lets candidates pay to target and confuse voters with lies."  *Id.* at 304. It demanded that Facebook "promote authoritative and trustworthy sources of election information, rather than rants of bad actors and conspiracy theorists," "promptly remove false, viral information," and "prevent political candidates and PACs from using paid advertising to spread lies and misinformation – especially within two weeks of election day."  *Id.* at 305.

**RESPONSE:**  Disputed to the extent Plaintiffs' PFOF argumentatively mischaracterizes the cited statements from the petition as "demand[s]." Additionally, the PFOF is immaterial to any issue in this case. Rather than "demanding" that Facebook take particular action, as reflected in the document, the Biden-Harris campaign "asked Facebook to take action—responsible action, action that is critical to the health of our democracy." Glenn Decl. Ex. 24, at 2; Dkt. 10-1, at 305. Defendants refer the Court to the cited document for a full and accurate understanding of its contents.

25. On September 28, 2020, the Biden-Harris campaign sent a letter to Facebook accusing it of propagating a "storm of disinformation" by failing to censor the Trump campaign's political speech, including social-media political ads. Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 312. The letter accused Facebook of allowing "hyper-partisan" and "fantastical" speech to reach millions of people, and it demanded "more aggressive" censorship of Trump. *Id.*

**RESPONSE:** Disputed because Plaintiffs' PFOF argumentatively mischaracterizes the cited document. The PFOF is also immaterial to any issue in this case. Specifically, the cited document does not "accuse[]" Facebook of "failing to censor the Trump campaign" or "demand[]

'more aggressive' censorship." *See* Glenn Decl. Ex. 25, at 3; Doc. 10-1, at 310-12. Defendants

refer the Court to the cited document for a full and accurate understanding of its contents.

26. On December 2, 2020—during the presidential transition—Biden's former chief of staff and top technical advisor, Bruce Reed, publicly stated that "it's long past time to hold the social media companies accountable for what's published on their platforms." Glenn Decl. Ex. 26, at 1; Doc. 10-1, at 314-15. This comment specifically referred to the amendment or repeal of Section 230 of the Communications Decency Act. *See id.* He also wrote: "Washington would be better off throwing out Section 230 and starting over."  *Id.*

**RESPONSE:** Disputed to the extent that Plaintiffs' PFOF is irrelevant to any issue in this

case and is lacking in context. Defendants refer the Court to the cited document for a full and

accurate understanding of its contents. *See* Dkt. 10-1 at 314-15. Note also that irrespective of

interest expressed in Section 230 reform, social media companies, by virtue of their business

model, have powerful economic incentives to moderate content on their platforms to retain users

and thereby maximize advertising revenues, and have been doing so since well before 2020. *See*

Gurrea Decl. ¶¶ 1-81 (Ex. 1).

27. On July 16, 2021, President Biden stated that social-media companies are "killing people" by not censoring enough misinformation. Waldo Ex. 14, at 1.

**RESPONSE:**  Disputed because Plaintiffs' PFOFs fails to include President Biden's full

statement, lacks context, and argumentatively characterizes the statement. In response to the

question "[On COVID misinformation,] what's your message to platforms like Facebook?,"

President Biden responded "They're killing people. I mean, it really—they—look, the only

pandemic we have is among the unvaccinated, and that—and they're killing people." Ex. 45 at 2

(Question from Reporter to President Joseph R. Biden, Jr., in Washington, D.C. 2 (July 16, 2021))

(transcript of exchange). President Biden later explained that he had just read that twelve

individuals were responsible for sixty percent of misinformation concerning COVID-19

vaccines—a statistic advanced by the non-profit Center for Countering Digital Hate—and clarified

that "Facebook isn't killing people. These twelve people are out there giving misinformation.

Anyone listening to it is getting hurt by it. *It's* killing people." Ex. 43 at 2-3 (Question from

Reporter to President Joseph R. Biden, Jr., in Washington, D.C. 2 (July 19, 2021)) (emphasis

added). He further said, "[m]y hope is that Facebook, instead of taking [the comment] personally

that somehow I'm saying Facebook is killing people . . . would do something about the

misinformation . . . . That's what I meant." *Id.* at 2-3.

28. On January 3, 2022, an audio clip of President Biden played on Alyssa Milano's podcast stated: "The unvaccinated are responsible for their own choices, but those choices had been shulled [sic] by dangerous misinformation on cable TV and social media. You know, these companies … are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now."  Waldo Ex. 39, at 5 (Audio Tr. 4).

**RESPONSE:** Undisputed.

29. In September of 2022, the White House convened the "United We Stand" summit at which the President put social media companies on notice that Section 230 protections were at risk. "Tech platforms currently have special legal protections under Section 230 of the Communications Decency Act that broadly shield them from liability. This immunity extends beyond what the First Amendment requires and what newspapers and other media receive. It also effectively permits hate-fueled content mobilizing users to violence to be amplified on large tech platforms. President Biden has long urged fundamental reforms to Section 230, and …he reiterates his call for Congress to fundamentally reform Section 230."  Jones Decl., Ex. E, at 9.

**RESPONSE:** Disputed to the extent the first sentence of Plaintiffs' PFOF reflects

argument rather than facts and lacks evidentiary support. Plaintiffs' PFOF is further disputed to

the extent it takes statements in this document out of context and is immaterial to any issue in this

case. Defendants further note that the summit included, among others, "bipartisan federal, state

and local officials" and involved "bipartisan panels and conversations on countering hate-fueled

violence, preventing mobilization to violence, and fostering unity." Jones Decl., Ex. E, at 2. Note

also that irrespective of interest expressed in Section 230 reform, social media companies, by

virtue of their business model, have powerful economic incentives to moderate content on their

platforms to retain users and thereby maximize advertising revenues, and have been doing so since well before 2020. *See* Gurrea Decl. ¶¶ 1-81 (Ex. 1).

30. President Biden also stated in the same document: "Americans deserve to know how the algorithms that drive large tech platforms may amplify divisions and contribute to hate-fueled violence, among other critical harms. Consistent with those same principles for accountability, President Biden supports *requiring* platform transparency sufficient to allow the public and researchers to understand how and why such decisions are made, their potential effects on users, and the very real dangers these decisions may pose." *Id.* (emphasis added).

**RESPONSE:** Undisputed, but note that President Bident's views about platform transparency and Section 230 echo the views of Republican members of Congress. *See, e.g.,* Ex. 14 (*Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election* (Nov. 17, 2020) at 3 (Senator Graham: "My hope is that we change section 230 to incentivize social media platforms to come up with standards that are transparent and opaque [sic], that will allow us to make judgments about their judgments, that the fact checkers be known, that the community standards, who sets them, what are their biases, and give some direction to these companies because they have almost an impossible task.").

## II.    The White House's Public and Private Pressure Campaign on Platforms.

31.    Many White House officials are involved in communicating with social-media platforms about misinformation, disinformation, and censorship. In response to a third-party subpoena, Facebook/Meta identified at least the following White House officials as engaged in such communications: Special Assistant to the President Laura Rosenberger, White House Partnerships Manager Aisha Shah, White House Counsel Dana Remus, and White House officials Andy Mr. Slavitt, Rob Flaherty, and Clarke Humphrey. Doc. 84, ¶ 379. Defendants' discovery reveals many others. *See infra.*

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the referenced communications as regarding "censorship." The evidence does not support that characterization.

*See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.[5] Further disputed because this PFOF is

unsupported by the evidence; it cites only to the operative Complaint, which alleges that the listed

officials "may have" communicated with Facebook/Meta regarding "content moderation." Dkt. 84

¶ 379.

32.     In response to a third-party subpoena, YouTube identified White House officials
Benjamin Wakana and Rob Flaherty as engaged in such communications, and Defendants'
discovery reveals others. Doc. 84, ¶ 380. Defendants' discovery reveals others. *See infra*.

**RESPONSE:** Disputed for the same reasons listed in Response to Pls.' PFOF ¶ 31.

33.     In response to a third-party subpoena, Twitter has disclosed the following White
House officials as engaged in such communications: Deputy Assistant to the President and
Director of Digital Strategy Rob Flaherty, White House Senior Advisor Andrew Mr. Slavitt, NSC
staffer Katy E. Colas, Deputy Assistant to the President Joshua Geltzer, White House Digital
Director Clarke Humphrey, Deputy Director of the Office of Digital Strategy Tericka Lambert,
Press Secretary for the First Lady Michael LaRosa, NSC Director of Counterterrorism John
Picarelli, Chief of Staff for the Office of Digital Strategy Hoor Qureshi, Director of Strategic
Communications and Engagement Courtney Rowe, White House Associate Counsel Michael
Posada, Associate Director for Communications Marissa Sanchez-Velasco, Deputy Director of
Digital Strategy Christian Tom, and Strategic Director of Digital Communications Benjamin
Wakana. Jones Decl., Ex. F, at 1. Defendants' discovery has revealed others. *See infra*.

**RESPONSE:** Disputed for the same reasons listed in Response to Pls.' PFOF ¶ 31. Further

disputed because this PFOF is unsupported by the evidence; the document listing these names is

titled "Twitter Final Production Agreement Second Supplemental Response to Request Number

5," but it does not state what "Request Number 5" entailed or include any other context. Jones

Decl., Ex. F, at 1.

### A. Pressure in Private from Rob Flaherty, Andy Mr. Slavitt, and White House Officials.

34.     The Biden White House's demands for censorship began almost immediately upon
taking office. On January 23, 2021, three days after Inauguration Day, at 1:04 a.m., Clarke

---

[5] "Defs.' PFOF" refers to Defendants' Proposed Findings of Fact, contained in Defendants'
Opposition to Plaintiffs' Motion for Preliminary Injunction filed concurrently with these
responses. "Defs.' Arg." and "Arg." refer to the Argument section of the same document
(Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction).

Humphrey of the White House emailed Twitter, copying Rob Flaherty, with the subject line: "Flagging Hank Aaron misinfo." Doc. 174-1, at 1. The email stated: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP." *Id.* Humphrey then linked to a Tweet by anti-vaccine activist Robert F. Kennedy Jr., who is also a principal target of the Virality Project and a member of the so-called "Disinformation Dozen." *Id.* Humphrey added: "And then if we can keep an eye out for tweets that fall in this same ~genre that would be great." *Id.*

> **RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the White House as "demand[ing]" "censorship." The evidence does not support this characterization. In the cited email Humphrey was "wondering if" the "process" for removal could be instituted. *See* Doc. 174-1, at 1. Further disputed because the cited email does not support the assertion that "Robert F. Kennedy Jr., . . . is also a principal target of the Virality Project and a member of the so-called 'Disinformation Dozen.'" The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

35.    "Flagging Hank Aaron misinfo" refers to the claim by anti-vaccine speakers that COVID-19 vaccines may have contributed to baseball legend Hank Aaron's death. *See, e.g.,* https://www.usatoday.com/story/news/factcheck/2021/01/26/fact-check-hank-aaron-death-unlikely-result-covid-19-vaccine/6699577002/.

> **RESPONSE:** Undisputed. *But see* Response to PFOF ¶ 34.

36.    Twitter responded to Humphrey within 4 minutes, at 1:08 a.m. on January 23, 2021, stating: "Thanks. We recently escalated this." Doc. 174-1, at 2.

> **RESPONSE:** Undisputed. *But see* Response to Pls.' PFOF ¶ 34.

37.    The White House's demands for censorship continued relentlessly, and their tone was arrogant, demanding, and peremptory. On Saturday night, February 6, 2021, at 9:45 p.m., Rob Flaherty emailed Twitter to demand the immediate removal of a parody or impostor account linked to Finnegan Biden, Hunter Biden's adult daughter. Doc. 174-1, at 4. He stated: "Please remove this account immediately." *Id.* He also stated: "I have tried using your form three times and it won't work—it is also ridiculous that I need to upload my id to a form [to] prove that I am an authorized representative of Finnegan Biden." *Id.*

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the White House as making "demands for censorship [that] continued relentlessly," and as adopting a "tone [that] was arrogant, demanding, and peremptory." The evidence does not support these characterizations. In the February 6, 2021 email, Mr. Flaherty simply expressed frustration with Twitter's process for reporting impersonation accounts. Doc. 174-1, at 4. The e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

38.     Two minutes later, at 9:47 p.m., Twitter responded, "Thanks for sending this over. We'll escalate for further review from here." *Id.* Flaherty shot back, the same minute, "Cannot stress the degree to which this needs to be resolved immediately." *Id.* Forty-five minutes later, at 10:32 p.m., Twitter responded, "Update for you – account is now suspended." *Id.* at 3-4.

**RESPONSE:** Undisputed, except to the extent the statement argumentatively characterizes Mr. Flaherty's response as having been "shot back." Defendants further note that the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

39.     The next day, Sunday, Feb. 7, 2021, Twitter emailed Flaherty and described steps he could take to "streamline the process" for the White House's demands for Twitter censorship. *Id.* at 3. Twitter offered to enroll White House officials in Twitter's Partner Support Portal for expedited review of flagging content for censorship, recommending that Flaherty "**Designate a list of authorized White House staff for Twitter's Partner Support Portal**." *Id.* (bold in original). Twitter stated: "We sent over instructions about this on January 28th and also discussed this with Christian [Tom] during our call on February 4th. This is the same system we had in place for the previous two administrations for their support issues, *as well as the transition and campaign teams.* Once you assign and we enroll these authorized reporters, whenever they submit a ticket through the Help Center it will be prioritized automatically, without having to contact our team, and you won't need to add your personal information. To enroll your designated reporters to the Partner Support Portal, we simply need the list of @usernames (up to 10) that are registered with a White House email address." *Id.* at 3 (italics added; underlines omitted).

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes Flaherty

and/or the White House as making "demands for Twitter censorship" or "flagging content for

censorship." The evidence does not support these characterizations. The e-mail chain cited in this

PFOF refers to Flaherty's inquiry as a "request" for "expedited help." *See* Dkt. 174-1 at 3. The

cited e-mail also contains no evidence of threats or pressure by the White House to censor speech,

or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 &

II.B.1.b & II.B.2.

40.     Twitter noted that it had been recently bombarded with such requests for censorship
from the White House: "we would prefer to have a streamlined process strictly with your team as
the internal liaison. That is the most efficient and effective way to ensure we are prioritizing
requests. In a given day last week for example, we had more than four different people within the
White House reaching out for issues." *Id.* at 3.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the

White House as "bombard[ing]" Twitter with "requests for censorship." The cited evidence does

not support these characterizations. In the cited e-mail, Twitter's representative stated only that

multiple White House staff had recently been "reaching out for issues." Dkt. 172-1 at 3. She did

not say what those "issues" were. *Id.* The cited e-mail also contains no evidence of threats or

pressure by the White House to censor speech, or communications that Twitter regarded (or acted

on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

41.     The next day, Monday, February 8, 2021, Facebook emailed Rob Flaherty,
Courtney Rowe, and Clarke Humphrey of the White House to explain how it had recently
expanded its COVID-19 censorship policies. Doc. 174-1, at 7-8. Facebook stated: "We wanted to
make sure you saw our announcements today about running the largest worldwide campaign to
promote authoritative COVID-19 vaccine information and expanding our efforts to remove false
claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general
during the pandemic." *Id.*

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's announcement as concerning "COVID-19 censorship policies." The cited evidence does not support that characterization. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

42.     Under the heading "**Combating Vaccine Misinformation**," Facebook provided a detailed list of expanded censorship policies: "We are expanding our efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines and vaccines in general during the pandemic. Since December [*i.e.* during the Biden transition], we've removed false claims about COVID-19 vaccines that have been debunked by public health experts. … [W]e are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines. … Groups, Pages and accounts on Facebook and Instagram that repeatedly share these debunked claims may be removed altogether. We are also requiring some admins for groups with admins or members who have violated our COVID-19 policies to temporarily approve all posts within their group. …. On Instagram, in addition to surfacing authoritative results in Search, in the coming weeks we're making it harder to find accounts in search that discourage people from getting vaccinated…." *Id.* at 7-8 (bold in original).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's announcement as concerning "censorship policies." The cited e-mail does not support that characterization, which is lacking critical context. Facebook announced that it was making these changes "following consultations with leading health organizations, including the World Health Organization (WHO)." Dkt. 174-1 at 8. The full announcement is available online. *See* Ex. 173 (*Reaching Billions of People With COVID-19 Vaccine Information*, Meta (Feb. 8, 2021), https://perma.cc/KPC5-7273).  The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. In fact, the email shows that Facebook adopted these policies on its own initiative. Dkt. 174-

1 at 8. Any assertion to the contrary is unsupported by to the evidence as a whole. Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

43.     This was not nearly enough for the White House. Within 19 minutes of receiving this email, Flaherty responded, pressing Facebook for more information about how strict the new policies are. *Id.* at 7. Quoting Facebook's email in italics, he wrote: "This line, of course, stands out: *that repeatedly share these debunked claims may be removed altogether. Can you share more about your framework here? May, of course, is very different than 'will.'* Is there a strike policy, ala Youtube? Does the severity of the claims matter?" *Id.* at 7. He also asked for specific data on the application of the censorship policies: "And as far as your removal of claims, do you have data on the actual number of claims - related posts you've removed?  Do you have a sense of how many are being flagged versus how many are being removed? Are there actions (downranking, etc) that sit before removal? How are you handling things that are dubious, but not provably false?" *Id.*

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes Facebook's announcement as "not nearly enough" for the White House, Flaherty as "pressing" Facebook for more information about "how strict the new policies are," and Flaherty asking for data on "the application of the censorship policies."  In the quoted email, Flaherty asked if Facebook "[c]an . . . share more about" its content-moderation "framework."  The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

44.     The next day, February 9, 2021, Flaherty followed up with Facebook with a demand for more information and an accusation (to be repeated) that Facebook's failure to censor speech on its platforms causes "political violence": "All, especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'  I am seeing that you will no longer promote civic and health related groups, but I am wondering if the reforms here extend further? Are there other growth vectors you are controlling for?" *Id.* at 6. Flaherty suggested an oral meeting to discuss: "Happy to put time on the calendar to discuss further."  *Id.*

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Flaherty's e-mail as a "demand" and an "accusation" regarding a failure to "censor speech." Those characterizations are

not supported by the cited e-mail or the evidence as a whole. Flaherty instead referred to "the Journal's reporting on [Facebook's] internal work on political violence" and said he was "curious" to know additional information. Dkt. 172-1 at 6. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

45.    Facebook responded on February 9, 2021, with a detailed answer to each of Flaherty's questions about the enforcement of its new policies. *Id.* at 5-6. Facebook also noted that "We are happy to discuss these and additional questions as per your recent note." *Id.* at 5. Among other things, Facebook reported that it would "suspend the entire Page, Group, or account" in case of repeat violations; that it "will begin enforcing this policy immediately," *id.* at 5; that for vaccine-skeptical content that does not violate Facebook's policies, Facebook will "reduce its distribution and add strong warning labels with more context, so fewer people see the post," *id.* at 6; and that Facebook was working to censor content that does not violate its policies in other ways by "prevent[ing] posts discouraging vaccines from going viral on our platforms; address[ing] content that experts believe dissuades people from getting the vaccine, but does not violate our misinformation policies, through the use of information labels; and prevent[ing] recommendations for Groups, Pages, and Instagram accounts that repeatedly push content discouraging vaccines," *id.* at 6.

**RESPONSE:** Disputed. This PFOF contains several mischaracterizations and omissions of critical context from Facebook's e-mail to Flaherty. *See* Dkt. 174-1 at 5-6. Facebook did not use the word "censor" or indicate that it would act against content that "does not violate its policies." Rather, Facebook said: "Content which does not qualify for removal may be eligible to be fact-checked by our network of over 80 fact-checking organizations. *When one of our independent fact-checking partners debunk a post*, we reduce its distribution and add strong warning labels with more context, so fewer people see the post. We do not remove the content, but are focusing on improvement efforts that will help us to better address content that contributes to unfounded hesitancy towards the COVID-19 vaccine." *Id.* (emphasis added). The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or

communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

46.     Facebook advised Flaherty that it was relying on advice of "public health authorities" to determine its censorship policies: "In consultation with leading health organizations, we continuously expand the list of false claims that we remove about COVID-19 and vaccines during the pandemic. We remove claims *public health authorities* tell us have been debunked or are unsupported by evidence." *Id.* at 6 (emphasis added).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's policies as "censorship policies." The evidence does not support that characterization. Further, per Facebook's initial announcement, "public health authorities" includes the World Health Organization. *See* Dkt. 174-1 at 8; *see also* Response to Pls.' PFOF ¶ 42. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

47.     Facebook also promised Flaherty that it would aggressively enforce the new censorship policies: "We will begin enforcing this policy immediately, with a particular focus on Pages, Groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." *Id.* at 5.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Facebook's message as "promis[ing] Flaherty that it would aggressively enforce the new censorship policies." That characterization is unsupported by the cited e-mail; Facebook was not making a personal promise to Flaherty. Rather, Facebook had already posted identical language on its website one day earlier: "We will begin enforcing this policy immediately, with a particular focus on Pages, groups and accounts that violate these rules, and we'll continue to expand our enforcement over the coming weeks." Ex. 20 (Guy Rosen, *An Update on Our Work to Keep People Informed and Limit*

*Misinformation About COVID-19*, Meta (Apr. 16, 2020) (updated Feb. 8, 2021), https://perma.cc/5GAL-5BSQ). The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

48.    Facebook then followed up to "see when you would like to have a meeting arranged to speak to our misinformation team reps about the latest updates. They also have a more detailed misinformation analysis prepared based on the discussions/questions from the previous meetings during the transition time period." *Id.* at 5.

**RESPONSE:** Undisputed. But the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

49.    This email makes clear that Flaherty, as part of the Biden transition team, had already engaged in "previous meetings" and "discussions/questions" with Facebook about censorship of COVID-19 misinformation on its platforms during the Presidential transition period from November 2020 to January 2021. *Id.*

**RESPONSE:** Disputed because this PFOF mischaracterizes the cited e-mail. The e-mail does not mention "censorship" or any prior meetings with Flaherty. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

50.    On February 24, 2021, Facebook emailed Rob Flaherty with the subject "Misinfo Themes," stating: "Following up on your request for COVID-19 misinfo themes we are seeing. All the below claims violate our updated Covid and vaccine misinformation policies that we announced earlier this month, and we are removing these claims from our platforms," and she identified "Vaccine Toxicity," "False Claims About Side Effects of Vaccines," "Comparing the Covid Vaccine to the Flu Vaccine," and "Downplaying Severity of COVID-19." Jones Decl. Ex. G, at 1-2. Flaherty responded by inquiring for details about Facebook's actual enforcement practices and for a report on misinformation that was not censored: "Can you give us a sense of

volume on these, and some metrics around the scale of removal for each?  Can you also give us a sense of misinformation that might be falling outside your removal policies?  Goes without saying, just because it's on your list for removal hasn't historically meant that it was removed, so I want to get a sense of the state of play here!" *Id.* at 1. Facebook promised to discuss this at an upcoming oral meeting: "Hope to cover a lot of that on Monday … Can definitely go into detail on content that doesn't violate like below but could contribute to vaccine hesitancy." *Id.*

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited e-mail.

Flaherty did not ask for "a report," including a "report" about "censor[ed]" information, and

Facebook did not "promise" him anything, as the e-mail states. The PFOF also omits that Facebook

noted: "still working on data we can share, etc,," indicating that Facebook was still deciding what

to share with the White House. Jones Decl. Ex. G, at 1. The cited e-mail contains no evidence of

threats or pressure by the White House to censor speech, or communications that Facebook

regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

51.    On March 1, 2021, White House officials Rob Flaherty and Clarke Humphrey, along with Joshua Peck of HHS, participated in a meeting with Twitter about misinformation. Jones Decl., Ex. H, at 1. The same day, after the meeting, Twitter emailed these officials and assured the White House that it would increase censorship of "misleading information" on Twitter: "Thanks again for meeting with us today. As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service …. We have also introduced a strike system that determines when further enforcement is necessary. … As we said, we are committed to working with stakeholders in the public, private and non-profit sectors to address the reliability of covid information online and look forward to continued dialogue about joint efforts." *Id.* at 1.

**RESPONSE:** Disputed to the extent this PFOF (i) omits critical context and (ii) includes

an argumentative mischaracterization that Twitter "assured the White House that it would increase

censorship." Twitter sought this meeting with the White House to provide an "update on our work

to combat covid misinformation while also sharing reliable covid information." See Ex. 174 at 2

(February 2021 email chain (Twitter) (MOLA_DEFSPROD_00017794)). On the same day as the

meeting, Twitter announced updates to its policies. *See* Ex. 175 (Twitter Safety, *Updates to our*

*work on COVID-19 vaccine misinformation*, Twitter Blog (Mar. 1, 2021), https://perma.cc/99TM-QWLD). Twitter's thank you e-mail to the White House includes identical language from the announcement and says "[y]ou can read more about the announcement on our blog." Jones Decl., Ex. H, at 1. The announcement now includes a heading: "Effective November 23, 2022, Twitter is no longer enforcing the COVID-19 misleading information policy." Ex. 175 at 1. The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Twitter regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

52.     From at least May 28, 2021 to July 10, 2021, a senior Meta executive repeatedly copied Mr. Slavitt on his emails to Surgeon General Murthy in which he assured the Surgeon General and the White House that Meta was engaging in censorship of COVID-19 misinformation according to the White House's demands. Doc. 71-4. Among other things, the Meta executive insisted that "We've expanded penalties for individual Facebook accounts that share misinformation." *Id.* at 9.

**RESPONSE:** Disputed on the basis that the cited document does not support the broad generalization that a Meta executive "repeatedly" "assured [Dr. Murthy] and the White House that Meta was engaging in censorship of COVID-19 misinformation to the White House's demands." To the contrary, there is no evidence that the White House or OSG requested or demanded such changes. Meta posted the quoted text online two days before e-mailing the White House, in a post that was unrelated to COVID-19: "**Expanding Penalties For Individual Facebook Accounts.** Since launching our fact-checking program in late 2016, our focus has been on reducing viral misinformation. We've taken stronger action against Pages, Groups, Instagram accounts and domains sharing misinformation and now, we're expanding some of these efforts to include penalties for individual Facebook accounts too." Ex. 176 at 3 (Facebook, *Taking Action Against People Who Repeatedly Share Misinformation*, Meta (May 26, 2021), https://perma.cc/M75G-

YQB8). The cited e-mail also contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

53.     On March 12, 2021, referring to previous oral communications with the White House and HHS, Facebook emailed Flaherty "[f]ollowing up on our commitment to share our survey data on vaccine uptake." Doc. 174-1, at 9. Facebook provided the White House with a detailed report and summary on the topic, and noted that the information had evidently been requested by or on behalf of "White House / HHS" officials: "Hopefully, this format works for the various teams and audiences within the White House / HHS that may find this data valuable." *Id.*

**RESPONSE:** Disputed to the extent this PFOF omits critical context. Facebook had been conducting a survey on vaccine uptake in partnership with Carnegie Melon since April 2020; Facebook shared the results of that survey, which it also made public, with HHS and White House officials. *See* Ex. 177 (*COVID-19 Symptom Survey*, Meta (Mar. 12, 2021) (MOLA_DEFSPROD_00017641)). The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

54.     On March 15, 2021, at 3:20 a.m., Flaherty sent an email to Facebook acknowledging, "[g]ood insights here," but then immediately pivoted to demand more and different data, linking a recent Washington Post article accusing Facebook of allowing the spread of information about vaccine hesitancy and QAnon, stating: "I'm more interested in the data that was outlined in the Washington Post (https://www.washingtonpost.com/technology/2021/03/14/facebook-vaccine-hesitancy-qanon) And what interventions you are testing/their effectiveness." *Id.* at 9. This would become a standard tactic of the White House – linking to articles critical of Facebook in the press, and then demanding more information or actions based on those articles.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes Flaherty as "demand[ing]" information or data or that his response reflected a "standard tactic," of "demanding more information or actions" based on press articles. Neither the cited e-mail nor any other evidence supports those characterizations. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b

& II.B.2. Flaherty simply said on this occasion that he was "more interested" in a different kind of information. Dkt. 174-1 at 9. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

55.     The day before, Sunday, March 14, 2021, at 11:13 p.m., Flaherty had emailed a link to the same article to Facebook ("https://www.washingtonpost.com/technology/2021/03/14/face book-vaccine-hesistancy-qanon"), copying White House COVID-19 official Andrew Mr. Slavitt, with no more text in the email and the subject line: "You are hiding the ball." *Id.* at 12.

**RESPONSE:** Undisputed. However, the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

56.     The next morning, Facebook responded by stating, "there is a misunderstanding on what this story is covering with respect to research that's happening – I will call to clear up. Certainly not hiding the ball." *Id.* at 11-12.

**RESPONSE:** Undisputed. However, the cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

57.     Flaherty responded in accusatory fashion, referring to a series of at least three previous oral conversations in which the White House had demanded more information from Facebook about its censorship policies. *Id.* at 11. Flaherty made clear that the White House was seeking more aggressive action on "borderline" content—*i.e.*, content that *does not clearly violate Facebook's own censorship policies* but the White House demands action against anyway. Flaherty wrote: "I don't think this is a misunderstanding … I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy, and the degree to which borderline content--as you define it-- is playing a role." *Id.* at 11. Flaherty also referred to a series of meetings, including one-on-one meetings with Facebook ("1:1"): "I've also been asking for what actions you have been taking to mitigate it as part of your 'lockdown' - which in our first conversation, was

said to be in response to concerns over borderline content, in our 1:1 convo you said was not out of any kind of concern over borderline content, and in our third conversation never even came up." *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the cited e-mail in multiple ways, including (i) referring to prior "demand[s] [for] more information" or "seeking more aggressive action, regarding "censorship," (ii) using the term "borderline content" to mean content that does not violate Facebook's policies, and (iii) describing Mr. Flaherty's tone as "accusatory." Mr. Flaherty sought clarification regarding information about the "biggest" vaccine hesitancy issues that he "asked" Facebook for, and about which he had received inconsistent answers. *See* Dkt. 174-1 at 11. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

58.     Flaherty followed with a series of accusations that Facebook was deceiving and prevaricating with the White House about its "borderline" (*i.e. not* violative) content: "You said you would commit to us that you'd level with us. I am seeing in the press that you have data on the impact of borderline content, and its overlap with various communities. I have asked for this point blank, and got, instead, an overview of how the algorithm works, with a pivot to a conversation about profile frames, and a 45-minute meeting that seemed to provide you with more insights than it provided us." *Id.* He accused Facebook of being the "top driver[] of vaccine hesitancy," demanded action against "borderline" content, and stated that the White House wanted to be directly involved in those efforts: "I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us." *Id.*

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Flaherty's e-mail, which principally sought greater information concerning vaccine hesitancy on Facebook, as making "accusations," "demand[ing]" greater action against "borderline" content, and seeking "direct[ ]" White House involvement in Facebook's efforts. Dkt. 174-1 at 11. The cited e-mail

34

contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

59.     Facebook responded on March 15, respectfully disputing the Washington Post's reporting, but then saying to Flaherty: "We obviously have work to do to gain your trust. You mention that you are not trying to play 'gotcha' with us—I appreciate the approach you are taking to continued discussions. We are also working to get you useful information that's on the level. That's my job and I take it seriously--I'll continue to do it to the best of my ability, and I'll expect you to hold me accountable." *Id.* at 10-11.

**RESPONSE:** Disputed to the extent that this PFOF omits critical context. Facebook also said: "I understand why you'd read the WaPo piece and come away feeling like we are not leveling with you" and disputed the article's accuracy at length. Dkt. 174 at 11. The cited e-mail contains no evidence of threats or pressure by the White House to censor speech, or communications that Facebook regarded (or acted on) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

60.     The same day, March 15, 2021, Andrew Mr. Slavitt (who was copied on these exchanges between Facebook and Flaherty) weighed in, once again accusing Facebook of dishonesty in a series of oral meetings: "It would [be] nice to establish trust. I do feel like relative to others, interactions with Facebook are not straightforward and the problems are worse – like you are trying to meet a minimum hurdle instead of trying to solve the problem and we have to ask you precise questions and even then we get highly scrubbed party line answers. We have urgency and don't sense it from you all. 100% of the questions I asked have never been answered and weeks have gone by." *Id.* at 10.

**RESPONSE:** Disputed to the extent this PFOF characterizes Mr. Slavitt of accusing Facebook of "dishonesty" rather than expressing his "feel[ing]" that Facebook had not conveyed information about Facebook's content moderation policies and practices with the level of detail and clarity he had hoped for. Regardless, the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on)

communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

61.     Mr. Slavitt then made an ominous statement threatening unspecified Executive action against Facebook in retaliation for Facebook's perceived lack of cooperation with the White House's demands on censorship of "borderline" (*non-violative*) content: "*Internally we have been considering our options on what to do about it.*" *Id.* at 10 (emphasis added).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Mr. Slavitt's general remark about internal White House consideration of "options" as "ominous," "threatening" or referring to "retaliation" or "Executive action." The reference to "Facebook's perceived lack of cooperation with the White House's demands on censorship of 'borderline' (non-violative) content)," is also disputed as a mischaracterization of the record. In the cited e-mail, Mr. Slavitt was referring to Facebook's perceived lack of transparency about its content moderation practices and policies. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

62.     On March 16, 2021, Facebook responded to Mr. Slavitt, again disputing the Washington Post's reporting and respectfully explaining its position, but also promising to share information about vaccine hesitancy in "real time": "We are absolutely invested in getting you the specific information needed to successfully manage the vaccine roll out." *Id.* Facebook promised to increase information-sharing and proposed a detailed oral meeting on the topic: "But I understand your point regarding how we communicate, and that we need to share information with you in a way that prioritizes what we are seeing in as close to real time as possible. I'd like to set up a conversation with our research leads to walk your team through ongoing research we are currently conducting and our approach; and then we can prioritize sharing results as quickly as possible." *Id.* Facebook also offered to speak to Mr. Slavitt by phone at any time. *Id.*

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is

36

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

63.     On March 19, 2021, Facebook had an oral meeting with White House officials, including Flaherty and Mr. Slavitt. Doc. 174-1, at 15. On Sunday, Facebook sent a follow-up summary of the meeting to Andrew Mr. Slavitt ("Thanks for taking the time to connect on Friday"), which noted that the White House (1) demanded a "Consistent Product Team [Point of Contact]" at Facebook, (2) demanded "Sharing Additional Data" from Facebook, (3) had asked about "Levers for Tackling Vaccine Hesitancy Content," and (4) asked about censorship policies for the Meta platform WhatsApp. *Id.*.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's email as reflecting "demands" by Flaherty, rather than requests to identify a point of contact from Facebook's Content Product Team or the sharing of additional data. The email (which Plaintiffs do not quote) does not support this characterization. Nor does the cited evidence support the PFOF's characterization of Mr. Slavitt asking about WhatsApp "censorship policies." Rather, the evidence establishes that Mr. Slavitt asked Meta about WhatsApp's content moderation policy, a policy that all users agree to when they sign up for WhatsApp. Regardless, the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

64.     In the follow-up email, Facebook noted that, in direct response to White House demands, it was censoring, removing, and reducing the spread of content that did not violate its policies: "You also asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include *the additional changes that were approved late last week* and that we'll be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines *that does not contain actionable misinformation*. This is *often-true content* … but it can be framed as sensation, alarmist, or shocking. *We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content*." *Id.* at 15 (emphases added).

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Facebook's email as reflecting "demands" by the White House, or that Facebook was "censoring" content that "did not violate its policies" in "response" to such "demands." Facebook's email expressly states that "[y]ou asked us about our levers for reducing virality of vaccine hesitancy content," and further states that Facebook was adopting additional policy changes "that were approved late last week and that we'll be implementing over the coming weeks." Dkt. 174-1 at 15. This PFOF also argumentatively characterizes the cited e-mail by emphasizing various phrases. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

65.     Facebook also provided the White House with a detailed report on its censorship policies on WhatsApp: "WhatsApp's approach to misinformation focuses on limiting the virality of messages, preventing coordinated abuse, and empowering users to seek out reliable sources of information both in and out of the product. Our product includes features to limit the spread of viral content, such as forward limits and labels, privacy settings to help users decide who can add them to groups, and simple ways for users to block accounts and make reports to WhatsApp if they encounter problematic messages. Additional limitations we placed in April 2020 on forwarding of messages that have been forwarded many times reduced these kinds of messages by over 70%." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes WhatsApp's content moderation policies described above, to which all users agree, as "censorship policies." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

66.     On March 22, 2021, Flaherty responded to Facebook, demanding much more detailed information and action about "sensationalized" content on its platforms. *Id.* at 14. Flaherty

noted that White House officials were demanding a plan from Facebook to censor non-violative content, *i.e.*, "looking out for your game plan on tackling vaccine hesitancy spread on your platform." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request as a "demand" for "much more detailed information and action" about "sensationalized content" or a "plan from Facebook to censor nonviolative content." Mr. Flaherty's email (which in large part Plaintiffs do not quote) does not support this characterization. Rather than "demand" anything, Mr. Flaherty's email reflects that he was asking Facebook about "the universe and scale of the problem" and what Facebook thought "the biggest issue is." Dkt. 174-1 at 14. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

67. In this email, Flaherty badgered Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content that does not violate Facebook's content-moderation policies, such as truthful but "sensational" content: "Again, as I've said, what we are looking for is the universe and scale of the problem. You noted that there is a level below sensational stories that get down-ranked, which took the form of general skepticism. … [T]he problem does not sit in 'microchips'-land, and … it seems plausible that the things that drive the most actual hesitancy sit in 'sensational' and 'skeptical.'" *Id.*. Flaherty demanded more information and greater censorship of such non-violative "sensational" and "skeptical" content: "If you're down ranking sensational stuff—great—but I want to know how effective you've seen that be from a market research perspective. And then, what interventions are being taken on 'skepticism?' … [W]hat are you trying here, and again, how effective have you seen it be. And *critically*, what amount of content is falling into all of these buckets? Is there wider scale of skepticism than sensationalism? I assume given the Carnegie data and the studies I've seen in the press that you have this. … As I've said: this is not to play gotcha. It is to get a sense of what you are doing to manage this." *Id.* (italics in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Flaherty as "badger[ing] Facebook with a series of detailed requests for information about this issue of censoring vaccine-skeptical content," as inquiring about information concerning "content that does not violate

Facebook's content-moderation policies," and as "demand[ing] . . . greater censorship" of information that does not violate Facebook's content moderation policies. As he stated, Mr. Flaherty was trying to ascertain "the universe and scale of the problem" and "what [Facebook was] doing to manage [it]." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

68.    Flaherty also badgered Facebook for more information on Meta's censorship policies on the WhatsApp platform, pushing for greater censorship there: "On whatsapp, which I may seem like I'm playing gotcha, but I guess I'm confused about how you're measuring reduction of harm. If you can't see the message, I'm genuinely curious—how do you know what kinds of messages you've cut down on? Assuming you've got a good mousetrap here, that's the kind of info we're looking for above: what interventions you've taken, and what you've found to work and not work? And how effective are you seeing the good information on Whatapp be? Are you doing cross platform campaign work to try to reduce people's exposure on whatsapp?" *Id.* at 14.

**RESPONSE:** Disputed to the extent the PFOF argumentatively mischaracterizes Mr. Flahery as "badgering" Facebook for information on Meta's "censorship" policies and "pushing" for "more censorship." Mr. Flaherty's email plainly states he is "looking for" more information about "interventions [WhatsApp has] taken," and says nothing about taking additional measures. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

69.    Flaherty concluded with an accusation of past dishonesty against Facebook and proposed frequent oral meetings to address the White House's issues: "You've given us a commitment to honest, transparent conversations about this. We're looking for that, and hoping we can be partners here, even if it hasn't worked so far. I know Andy [Mr. Slavitt] is willing to get on the phone with [a Facebook official] a couple of times per week if its necessary to get all of this." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's email as accusing Facebook of "dishonesty." The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

70.    Flaherty's statement that the White House is "hoping we can be partners here, even if it hasn't worked so far," reinforced Mr. Slavitt's previous implied threat that the White House would take some unspecified action against Facebook if it did not cooperate with the White House's demands on censorship of vaccine-hesitant content, especially *non-violative* content, on Facebook's platforms. *Id.*

**RESPONSE:** Disputed. The PFOF mischaracterizes the quoted remark ("hoping we can be partners . . .") as a threat, mischaracterizes prior statements by Mr. Slavitt as a "previous implied threat" of retaliation, and refers to White House "demands [for] censorship" for which neither this PFOF nor any other provides evidence. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

71.    Facebook then agreed with Flaherty and Mr. Slavitt to schedule a meeting that Wednesday at 4:00 pm to discuss these issues. *Id.* at 13.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

72.    On April 9, 2021, Facebook sent Flaherty an email to respond to a long series of detailed questions from Flaherty about how the Meta platform WhatsApp was censoring COVID-19 misinformation. Doc. 174-1, at 17-21. All Flaherty's questions were designed to probe and

pressure Facebook toward more aggressive censorship. *See id.* Facebook began by "noting some of the key differences between a private messaging app like WhatsApp, and social media like Facebook and Instagram. Approximately 90 percent of the messages sent on WhatsApp are one-to-one, and the majority of group chats include fewer than ten people. WhatsApp does not promote content, and users do not build audiences or discover new people as they would on social media." *Id.* at 18. Flaherty responded to this: "Very aware. [Smiley face]."   In other words, the White House was demanding information about speech on a *private* messaging app used for one-to-one private communication, and demanding greater censorship of speech on that app—and it was "very aware" that it was doing so. *Id.*

> **RESPONSE:** Disputed. This PFOF mischaracterizes the cited emails by Mr. Flaherty,
>
> from which Plaintiffs do not quote (apart from the two words, "Very aware"). The emails include
>
> no questions about "censorship," say nothing that could be taken as "prob[ing] [or] pressure[ing]
>
> Facebook towards more aggressive censorship," or as demanding "greater censorship of speech
>
> on [WhatsApp]." The cited e-mail also contains no evidence that the White House threatened or
>
> pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications
>
> with the White House as such. Any assertion to that effect is unsupported by and contrary to the
>
> evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

73.     Facebook noted that "WhatsApp seeks to control the spread of misinformation and inform users through deliberate, content-agnostic product interventions – things like labeling and limiting message forwards."  *Id.* at 18. Facebook noted that the message-forwarding limits are "intended" to censor COVID misinformation, and that they actually reduced such speech by 70 percent, and Facebook admitted that these are "somewhat blunt tools" that prevent its users from sending many other forms of speech as well: "The forward limits … are intended to reduce their spread. As mentioned in my earlier note, when WhatsApp rolled out the limitation for highly forwarded messages to one chat at a time in April 2020, this resulted in a 70% reduction of those messages globally. Of course, not all forwards are misinformation, so these are by nature somewhat blunt tools, but they are important ones – and ones that many other messaging services don't provide." *Id.*

> **RESPONSE:** Disputed to the extent the PFOF argumentatively mischaracterizes
>
> WhatApp's application of its content-moderation policies, to which all users agree, as
>
> "intend[ing]" to "censor" information. The cited e-mail also contains no evidence that the White
>
> House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on)

communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

74.     After presenting Facebook with a series of questions (presented in bold and in red type in the email, *see id.* at 18-20), Flaherty summed up by demanding insight into Facebook's internal information: "I guess I have the same question here as I do on Facebook on Instagram. Do you guys think you have this under control? You're obviously going to say yes to that, so I guess the real question is, as ever: how are you measuring success? Reduction in forwarding? Measured impact across Facebook properties?" *Id.* at 20.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's question as a "demand." The evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

75.     Facebook responded by emphasizing that it was "reducing viral activity on our platform" through message-forward limits and other speech-blocking techniques as well: "On WhatsApp, reduction in forwards is just one of the signals that we use to measure how well we are doing in reducing viral activity on our platform. We also ban accounts that engage in mass marketing or scam behaviors - including those that seek to exploit COVID-19 misinformation. Our efforts in this space are more comprehensive than anything that our peers in private messaging or SMS do, and we are constantly innovating to stay ahead of future challenges." *Id.* at 20.

**RESPONSE:** Disputed to the extent that this PFOF characterizes Facebook's application of its technology as using "speech-blocking techniques." Defendants also note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

76.     Facebook also offered to meet with the White House "Monday or anytime next week" to discuss its censorship efforts, to which Flaherty responded, "Hoor should be trying to land a time." *Id.* at 17.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's offer to meet with the White as one to "discuss its censorship efforts" as opposed to application of Facebook's content-moderation policies, to which all users agree. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

77.    Flaherty responded to Facebook's long, detailed account of its censorship efforts on WhatsApp by expressing dissatisfaction with the response and demanding ever-more detailed information, stating that he "couldn't care less" about Facebook's "product safari": "Will say I'm really mostly interested in what effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise. Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting, at the end of the day, *I care mostly about what actions and changes you're making to ensure sure you're not making our country's vaccine hesitancy problem worse*. I definitely have what I believe to be a non-comprehensive list of products you're building but I still don't have a good, empirical answer on how effective you've been at reducing the spread of vaccine-skeptical content and misinformation to vaccine fence sitters in the now-folded 'lockdown.'" *Id.* at 17 (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's application of WhatsApp's content moderation policies, to which its users agree, as "censorship efforts," argumentatively emphasizes phrased in the cited email, and mischaracterizes Mr. Flaherty as "demanding," rather than asking for additional information about the "effects the interventions and products you've tested have had on increasing vaccine interest within hesitant communities, and which ones have shown promise." Dkt. 174-1 at 17. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect

is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

78.     Flaherty then accused Facebook of being responsible for the riot at the Capitol on January 6, 2021, by not censoring enough speech online, and suggested that Facebook would be similarly responsible for COVID-related deaths if it did not engage in more online censorship here: "In the electoral context, you tested and deployed an algorithmic shift that promoted quality news and information about the election. This was reported in the New York Times and also readily apparent to anyone with cursory social listening tools. You only did this, however, after *an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform.* And then you turned it back off. *I want some assurances, based in data, that you are not doing the same thing again here.*"  *Id.* (emphases added).

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Flaherty as accusing Facebook of being responsible for the January 6, 2021, insurrection at the Capitol "by not censoring enough speech," and as accusing Facebook of being "similarly responsible" for COVID-19 related deaths if it did not engage in more online "censorship." In addition, the PFOF argumentatively emphasizes various phrases in the cited email. The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

79.     Facebook responded by promising ever-more-detailed information to the White House's demands: "Understood. I thought we were doing a better job [of] responding to this – and we are working to get the data that will more clearly show the universe of the Covid content that's highest in distribution with a clear picture of what percentage of that content is vax hesitancy content, and how we are addressing it. I know [a Facebook official] told Andy [Mr. Slavitt] that would take a bit of time to nail down and we are working on that universe of data. I will make sure we're more clearly responding to your questions below." *Id.* at 17.

**RESPONSE:** Disputed to the extent the PFOF characterizes the request for information from Facebook as a "demand." The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor

speech, or that Facebook regarded (or acted on) communications with the White House as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

80.    The meeting that Facebook offered with the White House on Monday, April 12 or thereafter occurred on Wednesday, April 14, because Flaherty emailed Facebook that day stating: "Since we've been on the phone…"  *Id.* at 22.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the

White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or

acted on) communications with the White House as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 &

II.B.1.b & II.B.2.

81.    In this Wednesday, April 14, 2021 email, with the subject line "tucker," Flaherty noted that the White House was tracking COVID-related content in real time, and he demanded the censorship of currently-trending posts of content from two prominent Fox News hosts, Tucker Carlson and Tomi Lahren: "Since we've been on the phone – the top post about vaccines today is tucker Carlson saying they don't work. Yesterday was Tomi Lehren [*sic*] saying she won't take one. This is exactly why I want to know what 'Reduction' actually looks like – if 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!"  *Id.* at 22. Facebook responded: "Thanks—I saw the same thing when we hung up. Running this down now."  *Id.* In a separate email chain to Flaherty and Courtney Rowe the same day, Facebook also assured the White House, "running down the question on Tucker and working on getting you report by end of week."  *Id.* at 23.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as

"demand[ing] the censorship of currently-trending posts of content from two prominent Fox News

hosts, Tucker Carlson and Tomi Lahren," rather than seeking information from Facebook about

the effectiveness of its content-moderation policies and the effectiveness of the tool

(CrowdTangle). The cited e-mail also contains no evidence that the White House threatened or

pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications

with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

82.     Tucker Carlson has 1.2 million followers on his personal Facebook account and 3.8 million followers on his show's account, Jones Decl., Ex. I, at 1-2, so censoring Carlson's content would affect the free-speech rights of millions of people in a single stroke.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as seeking to censor Tucker Carlson's account, *see* Response to Pls.' PFOF ¶ 81, above, or the application of Facebook's content-moderation polices, to which users agree, as censorship. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

83.     In the meantime, Facebook was offering to cooperate closely with the White House to "amplify" its preferred messages. On April 13, 2021, Facebook emailed Andy Mr. Slavitt about the temporary halt of the Johnson & Johnson vaccine, stating: "Re the J+J [*i.e.*, Johnson & Johnson] news, we're keen to amplify any messaging you want us to project about what this means for people – it obviously has the risk of exacerbating vaccine hesitancy, so we're keen to get ahead of the knock-on effect. Don't hesitate to tell me – or via your teams – how we can help to provide clarity/reassurance via Facebook." Doc. 174-1, at 31-32. Facebook then forwarded the same offer to Courtney Rowe and Rob Flaherty of the White House digital communications team. *Id.* at 31.

**RESPONSE:** Disputed to the extent this PFOF refers vaguely to "preferred messages," rather than the Johnson & Johnson vaccine that is mentioned in the cited email. Defendants also note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

84.     Flaherty responded the same day, April 13, with a series of detailed requests about how Facebook could amplify the White House's preferred messages, including: "Some kind of thing that puts the news in context if folks have seen it (like your current 'COVID news' panel)

that has 3-4 pieces of info (eg: Adverse events are very rare – 6 cases out of nearly 7 million, the FDA and CDC are reviewing so it health care providers know how to treat any of the rare events, this does not affect pfizer or moderna, which vaccinate via a different mechanism)"; "CDC is working through an FAQ that we'd love to have amplified in whatever way possible – maybe through the COVID info panel"; and "[a] commitment from you guys to make sure that a favorable review reaches as many people as the pause, either through hard product interventions or algorithmic amplification." *Id.* at 30-31. Flaherty also block-quoted a White-House-approved message on the vaccine pause for Facebook to amplify. *Id.* at 31.

**RESPONSE:** Disputed to the extent this PFOF refers vaguely to "preferred messages," rather than the topics discussed in the cited email. Defendants also note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

85.    Flaherty then concluded by demanding that Facebook monitor any "misinformation" relating to the Johnson & Johnson vaccine pause, and asking Facebook to provide a detailed report to the White House within 24 hours of how it was doing so: "More broadly: we share [Facebook's] concern about knock-on effects and are curious to get a read from your CMU data about what you're seeing and with whom. *Moreover, I want to make sure you have eyes on what might be spinning off the back end of this – that the news about J&J doesn't spin off misinformation. Would be great to get a 24 hour report-back on what behavior you're seeing.*" *Id.* at 31 (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request ("would be great to get") as a "demand," mischaracterizes his request for information as a request for a "detailed" report, and argumentatively emphasizes phrases in the cited email. The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

86.     The same day, April 13, 2021, Facebook responded with a detailed report on misinformation on its platforms about this issue. Doc. 174-1, at 24-30. Facebook noted that there was an oral meeting about misinformation with the White House scheduled the next day: "I'm looking forward to the meeting tomorrow [*i.e.*, Wednesday, April 14] and hoping we can spend some time responding to Rob's feedback from last week as well as further discussing the J&J news and how we can hopefully partner together." *Id.* at 24.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

87.     Facebook also noted that it had recently had a telephone call with Courtney Rowe about how it was censoring misinformation, and had agreed to provide a detailed report on its relevant censorship enforcement policies: "Courtney – as we discussed, we also wanted to send over some examples of content we see on our platform that we remove (misinformation & harm) as well as content we take other actions on, but do not remove (vaccine hesitancy). I have included some examples at the bottom of this email and happy to setup time to talk through this more with you as well, if helpful." *Id.* at 24. Facebook then provided a six-page report on censorship with explanations and screen shots of sample posts of content that it censors and does not censor. *Id.* at 24-30.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Rowe's call with Facebook as concerning "censoring misinformation," that Facebook had agreed to provide a detailed report on its "censorship enforcement policies," or that "Facebook . . . provided a six-page report on censorship" with "sample posts of content that it censors and does not censor." The cited evidence refers to Facebook content-moderation policies, to which all users agree. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

88.    First, Facebook responded to Flaherty's request for government-message-amplification by agreeing to cooperate with the White House on those demands. *Id.* at 24. Regarding Flaherty's demand that Facebook monitor and report on "misinformation" related to the Johnson & Johnson vaccine pause, Facebook agreed to both monitor and report to the White House: "We will look to get you insights as soon as we have them. We are going to be watching to see how this plays out over the next couple of days. [A Facebook official] is joining [the call] tomorrow and plans to share a couple things we are seeing emerge from the CMU survey and what we are going to be watching over the next few days. Also, we are proactively monitoring and seeing what themes emerge from content on-platform and happy to share out when we have stuff collected." *Id.* at 24-25.

**RESPONSE**: Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request as a "demand," and it mischaracterizes the nature of Mr. Flaherty's request and Facebook's response. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

89.    Facebook then provided a detailed report to Courtney Rowe's request for specific examples of posts that are censored on its platforms. First, as to "VACCINE HESITANCY" content, Facebook explained that this content does not violate Facebook's content-moderation policies, but Facebook assured the White House that Facebook still censors such non-violative content by suppressing it in news feeds and algorithms. *Id.* at 25. Facebook admitted that such content is often "true" and sometimes involves core political speech or advocacy (*e.g.*, "discussing choice to vaccinate in terms of personal and civil liberties"): "The following examples of content are those that *do not violate our Misinformation and Harm policy*, but may contribute to vaccine hesitancy or present a barrier to vaccination. This includes, for example, content that contains sensational or alarmist vaccine misrepresentation, disparaging others based on the choice to or to not vaccinate, *true but shocking claims or personal anecdotes*, or *discussing the choice to vaccinate in terms of personal and civil liberties* or concerns related to mistrust in institutions or individuals." *Id.* at 25 (emphases added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Rowe as "request[ing] . . . specific examples" of "censored" posts, *see* Pls.' PFOF ¶ 88, and Facebook as "censoring" content or explaining that the content in question did not violate its content-moderation policies. The cited evidence does not support these characterizations. In fact, Facebook's content-moderation policies at the time expressly covered misinformation of a "sensationalist" nature as

50

discussed in this PFOF. *See* Ex. 23 at 6-9 (Mark Zuckerberg, *A Blueprint for Content Governance and Enforcement*, Facebook (Nov. 15, 2018), https://perma.cc/ZK5C-ZTSX). This PFOF also argumentatively emphasizes phrases in the cited e-mail and makes improper legal conclusions about the evidence, to which no response is required. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

90.     Facebook assured the White House that it censors such true, political, non-violative content through "a spectrum of levers" that includes concealing the content from other users, deboosting the content, and preventing sharing through "friction": "We utilize a spectrum of levers for this kind of content…. Actions may include reducing the posts' distribution, not suggesting the posts to users, limiting their discoverability in Search, and applying Inform Labels and/or reshare friction to the posts." *Id.* Facebook then provided the White House with a series of sample posts, all of which content originated from Children's Health Defense, the anti-vaccine organization headed by Robert F. Kennedy Jr. (who would soon be identified as one of the so-called "Disinformation Dozen"). *Id.* at 25-27.

**RESPONSE:** Disputed to the extent the PFOF characterizes Facebook's application of its content-moderation policies, to which all users agree, as "censorship." In addition, this PFOF selectively quotes from Facebook's email. The sentence, in full, reads: "We utilize a spectrum of levers for this kind of content *that is both proportionate and also helps our users make informed decisions*." Dkt. 174-1 at 25 (emphasis added). Thus, the cited evidence does not support Plaintiffs' characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

91.     Next, under the heading "Examples of Content Removed for Violating our Misinformation & Harm Policy," Facebook provided the White House with "examples of posts

we have removed for violation of our Misinformation & Harm Policy." *Id.* at 27. Facebook then provided a list of screen shots of posts it had removed from the platform entirely, again all of which originated from Children's Health Defense, Robert F. Kennedy Jr.'s group. *Id.* at 28-30.

**RESPONSE:** Undisputed, but note that the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

92.     As noted below, Facebook's explanation that it was removing violative posts by Children's Health Defense and censoring even its posts that did not violate Facebook's policies turned out to be not nearly enough to satisfy the White House.

**RESPONSE:** Disputed as a mischaracterization, without citation to or support in the record, of the evidence in the preceding PFOFs, and in those that follow, including the assertions that Facebook "censor[ed]" posts or that it took actions on posts that did not violate its policies. As noted in Defendants' responses to Plaintiffs' PFOFs, the evidence cited above, and below, does not support these characterizations. In fact, Facebook's content-moderation policies at the time expressly covered the information discussed in the email discussed in PFOFs ¶¶ 90-91. *See* Ex. 23 at 6-9. The PFOF also contains no evidence, and alludes to none, that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

93.     Separately from Flaherty's demands about Tucker Carlson, on April 14, 2021, Andy Mr. Slavitt also emailed a high-level Facebook executive—Facebook's President of Global Affairs, former Deputy Prime Minister of the United Kingdom Nick Mr. Clegg—with a sarcastic message expressing the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship policies: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No progress since we spoke. Sigh." Doc. 174-1, at 35. Mr. Clegg promptly responded to Mr. Slavitt with an apology and promise to immediately address the censorship of Tucker Carlson: "OK –

sorry to hear about call today, will dig in now." *Id.* The subject line of Mr. Slavitt's email, reproduced in the "Re:" line of later messages, was "Tucker Carlson anti-vax message." *Id.* at 34.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's question as a "demand," that Mr. Slavitt expressed "the White House's displeasure both with Facebook's failure to censor Tucker Carlson and with Facebook's perceived failure to allow the White House to micromanage its censorship polices," or that Mr. Clegg promised to address "the censorship of Tucker Carlson." The cited evidence does not support these characterizations. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

94.     Late evening of the same day, April 14, 2021, at 10:51 p.m., Nick Mr. Clegg provided Mr. Slavitt with a detailed report about the Tucker Carlson post, explaining that Tucker Carlson's content did not violate Facebook policies (due to the federal government's own information about its accuracy) but assuring the White House that Facebook would censor it anyway. *Id.* at 34. Mr. Clegg denied that Carlson's content was the top post on Facebook, but then stated, "Regardless of popularity, the Tucker Carlson video does not qualify for removal under our policies. Following the government's decision yesterday, we are allowing claims that the Johnson and Johnson vaccine causes blood clots…. That said, the video is being labeled with a pointer to authoritative COVID information, it's not being recommended to people, and it is being demoted." *Id.* at 34.

**RESPONSE:** Disputed to the extent the PFOF is intended to suggest that Facebook agreed to "censor" the Tucker Carlson post or take actions that were inconsistent with its content moderation policies. The cited evidence does not support such a characterization. Facebook emphasized that the post did not qualify for removal under its policies, and the actions it did take regarding the post were, in fact, consistent with its content-moderation policies at the time. *See* Ex. 23 at 6-9. Thus, the cited e-mail contains no evidence that the White House threatened or pressured Facebook to censor speech, including the Tucker Carlson post, or that Facebook

regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

95.    Mr. Clegg also stated that Facebook was "v[ery] keen" to provide a more detailed report on its censorship practices in response to White House demands: "I'm v keen that we follow up as we'd agreed, and I can assure you the teams here are on it." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Clegg as being interested in discussing "censorship practices" and misleadingly references unspecified "White House demands." The cited evidence does not support this characterization. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

96.    Brian Rice of Facebook then forwarded the same report on the Tucker Carlson post to Rob Flaherty. *Id.* ("Making sure you receive--").

**RESPONSE:** Undisputed, but further note that the cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

97.    Less than twenty minutes later, at 11:29 p.m. on April 14, 2021, Flaherty responded to Rice with a sarcastic response badgering Facebook for a more detailed explanation of why it had not removed Tucker Carlson's content outright, demanding greater censorship, and accusing Facebook of causing an "insurrection" by not censoring enough speech on its platforms: "I guess this is a good example of your rules in practice then – and  a chance to dive in on questions as they're applied. How was this [*i.e.* Tucker Carlson' post] not violative?  The second half of the segment is raising conspiracy theories about the government hiding that all vaccines aren't effective. It's not about just J&J. What exactly is the rule for removal vs demoting? Moreover: you say reduced and demoted. What does that mean? There's 40,000 shares on the video. Who is seeing

it now? How many? How effective is that? And we've gone a million rounds on this in other contexts so pardon what may seem like deja vu – but on what basis is 'visit the covid-19 information center for vaccine resources' the best thing to tag to a video that says the vaccine doesn't work?" Doc. 174-1, at 33. Flaherty concluded ominously by reiterating his accusation that Facebook had caused the January 6 riot by not censoring enough speech on its platforms: "Not for nothing but last time we did this dance, it ended in an insurrection." *Id.* at 34.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's inquiries, which concerned the application of Facebook's content-moderation policies, as "badgering" Facebook, "demanding greater censorship," and "ominously" "accusing Facebook of causing an 'insurrection' by not censoring enough speech on its platform." The cited evidence does not support these characterizations. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

98.     Six minutes later, at 11:35 p.m. on April 14, Flaherty followed up with another email accusing Facebook of providing incorrect information through CrowdTangle and demanding an explanation: "And sorry – if this was not one of the most popular posts about the vaccine on Facebook today, then what good is crowdtangle? [A Facebook official] said that Tomis [*i.e.*, Tomi Lahren's] video was the most popular yesterday based on your data, which reflected what CT [*i.e.*, CrowdTangle] was showing. Tuckers video was top on CT today. What is different about this video, then?" *Id.* at 33.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request for clarification of the referenced post's CrowdTangle ranking as accusing Facebook of "providing incorrect information" or "demanding" an explanation. The cited evidence does not support these characterizations. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

99.     On Friday, April 16, Flaherty then sent an email expressing his displeasure with the timing of Facebook's response and demanding immediate answers, snapping at Rice: "These questions weren't rhetorical." *Id.* at 33. Facebook apologized and promised an immediate response: "Hey Rob – understood and sorry for the delay. The team has been heads-down since our conversation to produce the report we discussed on Wednesday afternoon. We are aiming to get you something tonight ahead of the weekend." *Id.* Facebook then proposed another oral meeting: "schedule a call to discuss. Would that work?" *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Flaherty's follow-up email as "demanding immediate answers" or "snapping." The cited evidence does not support this characterization—Mr. Flaherty waited two days without a response from Facebook before sending his April 16 email. The cited e-mail also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

100.     On Tuesday, April 21, 2021, Facebook sent an additional response to the same email chain, indicating that there had been a phone call with Flaherty ("thanks for catching up earlier") and providing another, more detailed report on its censorship of Tucker Carlson in response to each of Flaherty's queries question-by-question. *Id.* at 36. Facebook again reported that Tucker Carlson's content had not violated its policies, stating that "we reviewed this content in detail and it does not violate those policies," but reported that Facebook had been censoring it anyway and would continue to censor it even though no fact-check had reported it false: "The video received 50% demotion for seven days while in the queue to be fact checked, and *will continue to be demoted even though it was not ultimately fact checked*." *Id.* (emphasis added). These circumstances raise a compelling inference that Facebook continued to demote Tucker Carlson' content, in violation of its own policies and practices, due to the White House's pressure.

**RESPONSE:** Disputed to the extent the PFOF (i) mischaracterizes Facebook's actions concerning the Tucker Carlson post as "censorship" and (ii) asserts that the post did not violate Facebook's content-moderation policies. The cited evidence does not support these characterizations. Rather, Facebook indicated that the post did not violate Facebook's *removal* policy. Dkt. 174-1, at 34 ("[t]he Tucker Carlson video does not qualify for *removal* under our policies.") (emphasis added). Accordingly, Facebook did not remove it. The actions Facebook took

regarding the Tucker Carlson post were entirely consistent with Facebook's other content moderation policies concerning borderline content. *See* Ex. 23 at 6-9. This PFOF is also disputed because it asserts that Facebook demoted the referenced content "due to the White House's pressure." Neither the cited e-mail, nor any cited in the preceding PFOFs, contain evidence that the White House threatened or pressured Facebook to demote the Tucker Carlson post, or that Facebook demoted it for any reason other than its own policies concerning borderline content. Nor does this or any of the preceding PFOFs indicate that the White House threatened or pressured Facebook to censor any other speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

101.    In the same time frame, the White House was exerting similar pressure on other major social-media platforms. It had meetings with YouTube and Twitter about misinformation on April 21, 2021 as well.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the White House, without citation to or support in the record, as "exerting similar pressure" on other social-media platforms. Plaintiffs cite no evidence that the White House threatened or pressured Facebook, YouTube, Twitter, or any other social-media companies to censor speech, or that the companies regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

102.    On April 21, Rob Flaherty, Andy Mr. Slavitt, and Kelsey Fitzpatrick of the White House, along with an official at HHS, participated in a meeting with several Twitter officials. Doc. 71-7, at 86. The meeting's subject was "Twitter Vaccine Misinfo Briefing." *Id.* The meeting invite noted: "White House Staff will be briefed by Twitter on vaccine misinfo. Twitter to cover trends seen generally around vaccine misinformation, *the tangible effects seen from recent policy changes*, what interventions are currently being implemented *in addition to previous policy changes*, and ways the White House (and our COVID experts) can *partner* in product work." *Id.* (emphases added).

**RESPONSE:** Undisputed, but further note that the cited documents, concerning a briefing about misinformation trends, contain no evidence that the referenced "policy changes" were made due to threats or pressure by the White House. The cited documents also contain no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

103.    The next day, April 22, Twitter employees noted in internal communications that the White House officials, during this meeting, had posed "one really tough question about why Alex Berenson hasn't been kicked off the platform."  Jones Decl., Ex. J, at 2-3. The Twitter employee noted that the White House's questions were "pointed" and "mercifully we had answers." *Id.* Another internal Twitter communication noted that the White House "really wanted to know about Alex Berenson. Andy Mr. Slavitt suggested they had seen data viz that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public." *Id.*

**RESPONSE:** Undisputed, but further state that during that meeting Mr. Slavitt expressed his view that Twitter was not enforcing its content guidelines with respect to Alex Berenson's tweets, and Twitter disagreed with that view. *See* Defs.' Supp. Rog. Resp. Related to Robert Flaherty at 57 (Ex. 36). Several weeks later a Twitter employee followed-up with Mr. Flaherty and told him that Twitter would not be removing Mr. Berenson because he had not violated Twitter's policies at that time. *Id.* The cited documents contain no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

104.    Later, on July 16, 2021, Twitter suspended Alex Berenson for the first time. *Id.* On August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

**RESPONSE:** Disputed to the extent that Twitter did not permanently deplatform Berenson (and note that Twitter did not take this action until almost three months after the April 22, 2021, meeting with White House officials). As the relied-upon exhibit states, "Twitter restored" Mr. Berenson's account in December 2021." Jones Decl., Ex. J, at 3. In addition, as noted immediately above, Twitter informed Messrs. Mr. Slavitt and Flaherty in April 2021 that it was not going to remove Mr. Berenson from Twitter because he had not violated its terms of service at that time. Ex. 36 at 57 (Flaherty Rog. Resps.). The cited documents also contain no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

105.    On April 21, 2021, Flaherty, Andy Mr. Slavitt, Kelsey Fitzpatrick of the White House, and Jessica Scruggs of HHS had a similar meeting with YouTube, to which at least six YouTube officials were invited. Jones Decl., Ex. K, at 1. The calendar invite stated that the purpose of the meeting was: "White House staff to get briefed by YouTube on general trends seen around vaccine misinformation. As well as, the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work." *Id.*

**RESPONSE:** Disputed to the extent this PFOF suggests the meeting with YouTube was similar to the meeting referenced above. Defendants also note that the cited documents contain no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

106.    Just after midnight on April 22, 2021, Rob Flaherty emailed a list of Google officials about YouTube, copying Andy Mr. Slavitt, Clarke Humphrey, and Kelsey Fitzpatrick of the White House. Doc. 174-1, at 39. He began by referring to the oral meeting with Google/YouTube officials on April 21: "Thanks again for the conversation today." *Id.* Flaherty also referred to an earlier, "first conversation," indicating that there had been multiple meetings with YouTube. *Id.*

**RESPONSE:** Undisputed, but note that the cited documents contain no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

107.   Flaherty then noted that the White House had asked YouTube (like Facebook) to monitor and report on the speech on its platforms, stating that the White House expected a report from them: "We'll look out for the top trends that you've seen in terms of misinformation around the vaccine." *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Flaherty as "expecting" a report from YouTube (or Facebook) or suggests that Flaherty requested YouTube (or Facebook) to "monitor and report" on the substance of all "speech on its platforms." The cited evidence does not support this characterization. The cited document also contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

108.   Flaherty then provided a "recap" of their oral conversation, stating that concern about misinformation on YouTube was "shared at the highest (and I mean highest) levels of the [White House]": "To recap: … we remain concerned that Youtube is 'funneling' people into hesitance and intensifying people's hesitancy…. we want to be sure that you have a handle on vaccine hesitancy generally and are working toward making the problem better. *This is a concern that is shared at the highest (and I mean highest) levels of the WH*, so we'd like to continue a good-faith dialogue about what is going on under the hood here. I'm the on the hook for reporting out." *Id.* (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF selectively quotes and omits portions of Mr. Flaherty's email and argumentatively emphasizes aspects of the email. The omitted sentence states: "We certainly recognize that removing content that is unfavorable to the cause of increasing

vaccine adoption is not realistic—or even good—solution." Dkt. 174-1 at 39. Thus, the cited email contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

109.     Citing an article "highlighting the Youtube misinformation that is spreading through the Vietnamese community," Flaherty stated: "Clearly, more work to be done here. Would love to get some insights from you on how you are tackling this problem across all languages." *Id.*

**RESPONSE:** Disputed to the extent the PFOF selectively quotes and omits portions of Mr. Flaherty's email. The omitted sentence states: "I think this brings up the question that I had in our first meeting about your capabilities around misinformation in non-english-speaking communities." Dkt. 174-1 at 39. Disputed also to the extent the PFOF suggests that Mr. Flaherty's request for general information about how YouTube was addressing misinformation "across all languages" constitutes a request of any kind for censorship. The cited document contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

110.     Flaherty then stated, "A couple of other things it would be good to have from you all," and provided a five-bullet list of detailed demands for YouTube's internal data about the spread of misinformation on its platform, including: "the top trends that you're seeing in terms of misinformation/hesitance inducing content," and "[a] deeper dive on reduction and its effectiveness," among others. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's requests as "demands." The cited evidence does not support this characterization. The cited email, concerning Mr. Flaherty's requests to YouTube for data, also contains no evidence that the White House

threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

111.   Flaherty indicated that the White House was coordinating with the Stanford Internet Observatory, which was then operating the Virality Project, discussed in detail below, noting in the first bullet point: "Stanford has mentioned that it's recently Vaccine Passports and J&J pause-related stuff, but I'm not sure if that reflects what you' re seeing." *Id.* This reference raises the inference that the White House's "COVID experts" ("our COVID experts") mentioned in the calendar invite for the meeting, Jones Decl., Ex. K, at 1, are, in fact, "Stanford" personnel associated with the Virality Project, and that the White House was working with "Stanford" to "partner with" platforms "on product work."

**RESPONSE:** Disputed to the extent the PFOF characterizes the White House as "coordinating" with the Stanford Internet Observatory, and dispute as well the asserted "inference" that the White House's COVID experts were "Stanford" personnel," or that the White House was working with the Virality Project to "partner with" platforms. The evidence contradicts that characterization. As Mr. Flaherty has explained, he is unaware of any direct involvement by federal agencies or employees in either the Election Integrity Partnership or the Virality Project. *See* Ex. 36 at 32 (Flaherty Rog. Resps.). Rather, Mr. Flaherty specifically recalls a single meeting in or around March 2021 and a follow-up conversation with Renee DiResta, who was involved in the Virality Project, to discuss her research on misinformation and disinformation, including the work of the Virality Project, to address COVID-19-related misinformation and disinformation. *Id.* Ms. DiResta suggested to Mr. Flaherty that the Federal Government create a "Mythbusters" webpage as part of a strategy to address misinformation and disinformation before it had a large impact. *Id.* Ms. DiResta further suggested that the primary role of the Federal Government in combating misinformation and disinformation related to the COVID-19 vaccines was to provide expert information." *Id.* at 32-33. The cited email also contains no evidence that the White House

threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

112.    As with Facebook, many of Flaherty's demands related to so-called "borderline" content, *i.e.*, often-truthful content that does not violate platform policies but that the White House disfavors. *See* Doc. 174-1, at 39. Among other things, he praised YouTube for reducing distribution of such content: "I believe you said you reduced watch time by 70% on 'borderline' content, which is impressive." *Id.* But then, again, he followed up with a long series of demands for more information: "How does that track with vaccine-related content specifically…? What has the comparative reduction in watch time on 'borderline' vaccine topics been after your interventions? And what has the increase in watch time been on authoritative information?... Related to the second bullet: to what extent have your ranking interventions been effective there? And, perhaps more critically, to what degree is content from people who have been given a 'strike' still being recommended and shown in prominent search positions? … [H]ow did you arrive on info-panels as the best intervention? And to what extent are people clicking through after exposure to vaccine-hesitant content? …  What are the general vectors by which people see the 'borderline' content – or really just vaccine-skeptical content? Is it largely through recommendations? Search?" *Id.* Notably, Flaherty's "most critical[]" question implied that YouTube should be censoring more content from disfavored *speakers*, *i.e.*, those who have been given a "strike" for previous anti-vaccine content. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demanding" anything or as "impl[ying]" that YouTube should "censor" anything. Also disputed to the extent the PFOF suggests that YouTube's policies did not cover "borderline" content. The cited evidence does not support these characterizations. In fact, in January 2019 YouTube announced that it was taking steps to "reduce the spread of content that comes close to—but doesn't quite cross the line of—violating our Community Guidelines. To that end, we'll begin reducing recommendations of borderline content and content that could misinform users in harmful ways—such as videos promoting a phony miracle cure for a serious illness, claiming the earth is flat, or making blatantly false claims about historic events like 9/11." YouTube Team, *Continuing our work to improve recommendations on YouTube*, YouTube Official Blog 2 (Jan.

25, 2019) (Ex. 24). YouTube explained that its change to its content moderation policy "reflects our commitment and sense of responsibility to improve the recommendations experience on YouTube." *Id.* at 3. The cited email also contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

113.    Flaherty emphasized that the White House wanted to make sure YouTube's "work extends to the broader problem" of people viewing vaccine-hesitant content. *Id.* at 39-40. And he proposed regular meetings to push YouTube to disclose its "internal data" to the White House: "We've worked with a number of platform partners to track down similar information based on internal data, including partners of similar scale. I am feeling a bit like I don't have a full sense of the picture here. We speak with other platforms on a semi-regular basis. We'd love to get in this habit with you. Perhaps bi-weekly? Looking forward to more conversation." *Id.* at 40.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's suggestion of further meetings as "push[ing] YouTube to disclose its 'internal data' to the White House." The cited email also contains no evidence that the White House threatened or pressured Google/You Tube to censor speech, or that Google/You Tube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

114.    On April 23, 2021, Flaherty sent Facebook an email that included a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" prepared by an unidentified third party. Jones Decl., Ex. L, at 1. The "Brief" had two major headings with several bullet points under each: "Facebook plays a major role in the spread of COVID vaccine misinformation," and "Facebook's policy and enforcement gaps enable misinformation's spread." *Id.* The "Brief" recommended much more aggressive censorship of Facebook's platforms, calling for "progressively severe penalties … and comprehensive enforcement for pages, accounts, and groups that repeatedly post COVID vaccine misinformation," and stating that "[b]ans for COVID-19 misinformation should be cross-platform and enforced at the entity-level, not the account level." *Id.* It called for Facebook to stop distributing even non-violative anti-vaccine content "in News Feed or in group recommendations" to "significantly reduce the reach of low-quality domains," and it stated that "[v]accine misinformation monitoring and enforcement must adjust as disinformers evade enforcement…." *Id.* at 1-2. And it called for specific censorship of disfavored speakers: "Warning screens before linking to domains known to promote vaccine misinformation

64

would dissuade users from following links to of-platform misinformation and hurt the vaccine-misinformation business model Facebook enables." *Id.* at 2.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "Brief" as recommending "censorship" on Facebook's platforms or calling for Facebook to "stop distributing even non-violative" content about COVID-19. The cited evidence does not support this characterization. In addition, the cited email by Mr. Flaherty expressly states: "Don't read this as White House endorsement of these suggestions[.]" Jones Decl., Ex. L, at 1. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

115.    Reproducing this pro-censorship "Brief" in the text of his email to Facebook, Flaherty wrote: "Here's the crux of their recs. Don't read this as White House endorsement of these suggestions (or, also, as the upper bound of what our thoughts may be). But – spirit of transparency – this is circulating around the building and informing thinking." *Id.* at 1.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "Brief" as "pro-censorship." The cited evidence does not support this characterization. Rather, the information Mr. Flaherty passed along to Facebook reflected the author's concerns about Facebook's "policy and enforcement gaps," and suggested possible ways to address those gaps. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

116.    On May 1, 2021, Nick Mr. Clegg of Facebook sent an email to Andy Mr. Slavitt indicating that the White House had recently met with Facebook to "share research work" and make more demands, stating: "Thanks to your team for sharing the research work with us…." *Id.* at 41. At the beginning of the email, Mr. Clegg apologized to the White House for not catching

and censoring three pieces of vaccine content that went viral, even though the content did not violate Facebook's policies, and promising to censor such non-violative content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral and this has exposed gaps in our operational and technical process." *Id.* at 42.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the purpose of the referenced meeting as "mak[ing] more demands," and to the extent it mischaracterizes Mr. Clegg's email as "apologiz[ing]" for not "censoring" "content [that] did not Facebook's policies," as "promising to censor non-violative content more aggressively," and as acknowledging that three pieces of vaccine content did not violate Facebook's "polices." The cited evidence does not support these characterizations. Facebook has a borderline content policy designed to address materials that do not violate its Community Standards. *See* Ex. 23 at 6-9. Also dispute any insinuation that Facebook demoted the three pieces of vaccine content for any reason other than Facebook's own policy. The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

117.    Mr. Clegg then promised to be more vigilant and censor such non-violative content to prevent it from going viral in the future, and offered to report back to the White House in detail about its efforts to do so: "The teams have spent the last 24 hrs analysing these gaps and are making a number of changes starting next week, including setting up more dedicated monitoring for Covid vaccine content on the cusp of going viral, applying stronger demotions to a broader set of content, and setting up daily review and analysis so that we have a better real-time view of what is being seen by lots of people. I will be checking on this closely to make sure that these additional steps show results - the stronger demotions in particular should deliver real impact. Please let me know if you'd like to discuss any of this in more detail." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Clegg as promising to "censor" "non-violative" content in the future. The cited evidence does not support this characterization. Facebook has a borderline content policy designed to address materials that do

not violate its Community Standards. *See* Ex. 23 at 6-9. The cited email also contains no evidence that Facebook intended to take the "additional steps" mentioned for reasons other than its own policies. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

118.    Mr. Clegg then listed in bold the demands that the White House had made in its recent meeting, with a detailed response to each. *Id.* at 42. First, the White House had demanded that Facebook address "**Non-English mis/disinformation circulating without moderation**," and Facebook promised to take steps to do so. *Id.* (bold in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the document as listing White House "demands" and Mr. Clegg "promis[ing]" anything. The cited evidence does not support this characterization. Rather, the email reflects Mr. Clegg providing information in response to a third-party research report that Mr. Flaherty passed along. Mr. Flaherty emphasized that Facebook should not interpret the third-party report he passed along "as a White House endorsement." Jones Decl. Ex. L, at 1. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

119.    Second, the White House had commanded Facebook: "**Do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation**." *Id.* (bold in original). Facebook assured the White House that it was taking strong steps to censor such content, and promised to increase its efforts to do so in the future: "Much of the research you shared called on us to ensure that our systems don't amplify vaccine hesitancy content and this is top of mind for us. In addition to the changes I mentioned above, we have already removed all health groups from our recommendation feature on Facebook, and on Instagram we filter vaccine-related accounts from our 'accounts you may follow feature'. We also remove accounts that may discourage vaccination from search features. We currently enforce on hash tags we know are shared to promote vaccine hesitancy content and are working to improve our automated systems here." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the referenced document, which as noted was prepared by a third-party, as a White House "command[]" to Facebook to do anything. Also disputed to the extent the PFOF mischaracterizes Facebook as "assur[ing]" the White House that it would "censor" content, or as "promis[ing]" to do so in the future. The cited evidence does not support this characterization, nor any insinuation that the "changes" Facebook described in the e-mail were taken for any reason other than its own policies. The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

120.    Third, the White House had demanded that Facebook "**Monitor[] events that host anti-vaccine and COVID disinformation**." *Id.* (bold in original). Facebook promised to monitor social-media "events" on its platforms more closely and take more aggressive action to censor them: "we are working to improve automatic detection for events hosting anti-vaccine and COVID content. Our viral monitoring efforts will also help us detect events that are gaining views on Facebook, and we do remove events coordinating in-person gatherings that involve or encourage people who have COVID-19 to join." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the referenced document, which was prepared by a third-party, as a White House "demand[]" of Facebook, and mischaracterizes Facebook as "promis[ing]" to "censor" content on its platform. The cited evidence does not support this characterization, nor the insinuation that Facebook decided to take the referenced actions for any reason other than its own policies. Further disputed to the extent the PFOF argumentatively mischaracterizes that Facebook "promised to monitor social-media 'events' on its platforms more closely and take more aggressive action to censor them." The cited email speaks for itself. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications

with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

121.     Fourth, the White House had demanded censorship of the so-called "Disinformation Dozen" in the private meeting with Facebook, raising the concern that "**12 accounts are responsible for 73% of vaccine misinformation**." *Id.* (bold in original). Facebook responded that it was scrutinizing those speakers and censoring them whenever it could, but that most if their content did not violate Facebook's policies: "we continue to review accounts associated with the 12 individuals identified in the CCDH 'Disinformation Dozen' report, but many of those either do not violate our policies or have ceased posting violating content. Our 'Dedicated Vaccine Discouraging Entity' policy is designed to remove groups and pages that are dedicated to sharing vaccine discouraging content and we continue to review and enforce on these where we become aware of them." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the referenced document, which was prepared by a third party, as a White House "demand[ ]"for "censorship" of anything (and that the White House made any "demand" in a "private meeting"), and mischaracterizes Facebook as "scrutinizing" and "censoring" the "Disinformation Dozen." The cited evidence does not support these characterizations—it supports only that Facebook would "continue to review" accounts associated with the 12 individuals identified. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

122.     Mr. Clegg then noted that he realized the White House would not be satisfied with these answers and was demanding greater censorship: "I realise that our position on this continues to be a particular concern for you." *Id.* Mr. Clegg then suggested that too much censorship might be counterproductive and might drive vaccine hesitancy: "Among experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a cover-up." *Id.* Brian Rice also forwarded Nick Mr. Clegg's email to Rob Flaherty. *Id.* at 41.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Clegg's email as suggesting that he believed the White House was "[dis]satisfied" and "demanding greater censorship," or that he considered application of Facebook's content-moderation policies to be "censorship." The cited evidence does not support these characterizations. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

**B.    Public Pressure and Threats From Press Secretary Jennifer Psaki.**

123.    The White House was evidently quite unhappy with this response and the results of its pressure campaign behind closed doors. A few days later, the White House took its pressure campaign public. On May 5, 2021, Jen Psaki publicly reminded Facebook and the other platforms of the threat of legal consequences hanging over its head if it did not censor misinformation more aggressively. At the May 5, 2021 White House Press Briefing, Jen Psaki stated about social-media censorship: "The President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections. And we've seen that over the past several months, broadly speaking."  Glenn Decl. Ex. 29, at 15, Doc. 10-1, at 353.

**RESPONSE:** Disputed to the extent that, beyond the quoted language, the PFOF reflects numerous unsupported mischaracterizations, including (1) that the White House was conducting a "pressure campaign," "behind closed doors" or otherwise; (2) that the White House was "evidently quite unhappy" with Mr. Clegg's May 1, 2021 response to Mr. Slavitt's email; (3) that the White House had engaged and was continuing to engage in a "pressure campaign"; and (4) that the White House was "threatening legal consequences" if social media companies did not "censor misinformation more aggressively." Plaintiffs cite to no record support in this or any other PFOF for these assertions. Plaintiffs also selectively quote from the May 5, 2021 White House Press Conference. Ms. Psaki stated during that press conference "I'm not placing any blame on any

individual or group; we've seen it from a number of sources." Glenn Decl. Ex. 29 at 15. She further

stated that "Well, look, I think we are, of course, a believer in First Amendment rights. I think

what the decisions are that the social media platforms need to make is how they address the

disinformation, misinformation—especially related to life-threatening issues COVID-19 and

vaccinations that are—continue to proliferate on their platforms." *Id.* The cited White House press

conference contains no evidence that the White House threatened or pressured any social media

company to censor speech, or that any social media company regarded (or acted on) the statements

by the White House as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

124.    Psaki also stated that President Biden "also supports better privacy protections and
a robust anti-trust program. So his view is that there's more that needs to be done to ensure that
this type of misinformation; disinformation; damaging, sometimes life-threatening information is
not going out to the American public."   *Id.* She thus linked the threat of a "robust anti-trust
program" to the White House's demand that "more … needs to be done" by "the major platforms"
to prevent "misinformation" and "disinformation" from "going out to the American public," *i.e.*,
its demand for censorship. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as "link[ing]"

a "threat" of anti-trust enforcement to any White House "demand" for "censorship." The cited

evidence does not support this characterization. Ms. Psaki stated during the May 5, 2021, White

House press conference that the White House supports First Amendment rights and that "what the

decisions are that the social media platforms need to make is how they address the disinformation,

misinformation—especially related to life-threatening issues like COVID-19 and vaccinations that

are—continue to proliferate on their platforms." Glenn Decl. Ex. 29 at 15. The cited White House

press conference also contains no evidence that the White House threatened or pressured any social

media company to censor speech, or that any social media company regarded (or acted on) the

statements by the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

125.    The next day, May 6, 2021, Flaherty privately responded to Facebook's most recent email, badgering Facebook again for more explanations about why it was not censoring more aggressively. Regarding Nick Mr. Clegg's apology for not catching and censoring three viral posts earlier, Flaherty linked to one and noted: "For one, it's still up and seems to have gotten pretty far. And it's got 365k shares with four comments. We've talked about this in a different context, but how does something like that happen? The top post, the one from the Wisconsin news station, has 2.1 million comments."  Doc. 174-1, at 41.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "badgering" Facebook "again" about why it was not "censoring more aggressively," and characterizes Mr. Clegg statement as an "apology" for not "catching" and "censoring" three viral posts. The cited evidence does not support this characterization. Rather, the cited email reflects that Mr. Flaherty had "two questions," one of which was whether, with respect to one of the three widest reach posts, Mr. Flaherty was "looking at one instance of sharing (so, one of the 365,000 shares) or is this genuinely a post that has been shared nearly 400,000 times but only four people commented on it." Dkt. 174-1 at 41. Mr. Flaherty asked Mr. Clegg for his "assessment of what is going on here[.]" *Id.* The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

126.    Flaherty also demanded more information about Facebook's efforts to demote "borderline" content: "Won't come as a shock to you that we're particularly interested in your demotion efforts, which I don't think we have a good handle on (and, based on the below, it doesn't seem like you do either). Not to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quickly?" *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's request for information about Facebook's content moderation efforts as a "demand[]." The cited evidence

does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

127.    Flaherty then criticized Facebook's censorship efforts for vaccine-related posts in Facebook groups related to other topics: "Also, health groups: sure. But it seems more likely that anti-vax stuff is moving in groups that are not about health but are ... mom centric, or other spaces. Strikes me as the issue here is less from single-use anti-vaccine accounts and more about people who ... do other things and are also vaccine hesitant." *Id.* (ellipses in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "criticiz[ing] Facebook's censorship efforts." The cited evidence does not support this characterization. Rather, the cited email reflects Mr. Flaherty asking a question about how Facebook's dedicated vaccine hesitancy policy operated. Dkt. 174-1 at 41. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

128.    Flaherty tied this criticism to his criticism of Facebook's failure to censor the "Disinformation Dozen": "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen - they're being deemed as not dedicated – so it feels like that problem likely carries over to groups." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as criticizing Facebook's "failure to censor" the "Disinformation Dozen." The cited evidence does not support this characterization. Rather, the cited email reflects Mr. Flaherty asking a question about how Facebook's dedicated vaccine hesitancy policy operated. Dkt. 174-1 at 41. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

129.    On May 10, 2021, Facebook sent an email to Rob Flaherty and Courtney Rowe of the White House digital team, touting its efforts to promote vaccination on its platforms. Doc. 174-1, at 46. Among other things, Facebook reported that "Since January, we've provided more than $30 million in ad credits to help governments, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages." *Id.*

**RESPONSE:** Undisputed, except to note that Ms. Rowe was part of the White House COVID-19 Response Team, not the digital team. In addition, the cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

130.    The next day, May 11, 2021, Flaherty responded with a one-line, snarky email stating: "Hard to take any of this seriously when you're actively promoting anti-vaccine pages in search." *Id.* He included a link to a news report about this topic on Twitter. *Id.*

**RESPONSE:** Disputed to the extent the PFOF characterizes Mr. Flaherty's response as "snarky." The cited evidence does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

131.    The next day, May 12, 2021, Facebook responded, assuring Flaherty that it had censored the accounts mentioned in the news reports: "Thanks Rob - both of the accounts featured in the tweet have been removed from Instagram entirely…. We're looking into what happened." *Id.* at 45.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's response as representing that it had "censored" the accounts mentioned in the news reports, or insinuates that

Facebook removed the account for any reason other than its own policies. The cited evidence does not support these characterizations. Rather, Facebook explained that both of the accounts featured in the tweet were removed from Instagram "for breaking our polices." Dkt. 174-1 at 45. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

132.    Facebook then assured Flaherty it was working on processes to suppress disfavored speech from search results on its platforms and remove anti-vaccine accounts: "We are continuing to develop technology to improve the quality of search results at scale across Instagram - this is a continual process built on new technology to address adversarial accounts…. We also remove accounts that may discourage vaccination from search by developing and using this new technology to find accounts on Instagram that discourage vaccines, and remove these accounts from search altogether. We've also removed accounts that primarily discourage vaccination from appearing where we recommend new accounts to follow, such as accounts you may like, and suggested accounts." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's statement as "assuring" Mr. Flaherty that it was working on processes to "suppress disfavored speech." The cited evidence, concerning application of Facebook content moderation policies to which all users agree, does not support this characterization. In addition, Plaintiffs omit the following sentence from their quoted passage: "Our goal is to not recommend accounts likes those shown in the tweet in the search, which again shouldn't have been on our platform to begin with." Dkt. 174-1 at 45. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

133.    Facebook acknowledged that its censorship efforts were not enough and promised the White House they would increase them: "We clearly still have work to do to [sic], but wanted

to ensure you were aware of the authoritative resources we're pointing people to first as we continue investing in removing accounts from search that may discourage vaccination." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's actions as "censorship efforts" or that Facebook "promised" the White House anything. The cited evidence, concerning application of Facebook content moderation policies to which all users agree, does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

134.    The same day, May 12, 2021, Flaherty responded sarcastically, indicating that promoting pro-vaccine speech was not enough for the White House, which demanded the removal or deboosting of anti-vaccine speech: "Sure. They're first connected to authoritative information, but then you, as of last night, were presenting an anti-vaccine account with less than 1000 followers alongside, at level, with those pinned accounts!" *Id.* at 45.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as responding "sarcastically," "indicating that promoting pro-vaccine speech was not enough for the White House," or that the White House "demanded" the removal of any content. The cited evidence does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

135.    Flaherty then accused Facebook of not doing enough to censor anti-vaccine content in search results and dissembling to deceive the White House: "'[R]emoving bad information from search' is one of the easy, low-bar things you guys do to make people like me think you're taking action. If you're not getting *that* right, it raises even more questions about the higher bar stuff." *Id.* at 45. Flaherty continued, accusing Facebook of dishonesty: "You say in your note that you remove accounts that discourage vaccination from appearing in recommendations (even though you're

using 'primarily' to give yourself wiggle room). You also said you don't promote those accounts in search. Not sure what else there is to say." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as (1) "accusing" Facebook of "dishonesty," or not doing enough to "censor" anti-vaccine content, or (2) as accusing Facebook of "dissembling" to deceive the White House. The cited evidence does not support this characterization. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

136.    Flaherty then compared Facebook unfavorably to other platforms to pressure them to suppress anti-vaccine content in search results: "Youtube, for their warts, has done pretty well at promoting authoritative info in search results while keeping the bad stuff off of those surfaces. Pinterest doesn't even show you any results other than official information when you search for 'vaccines.' I don't know why you guys can't figure this out." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as putting "pressure" on Facebook to "suppress anti-vaccine content." The cited evidence does not support this characterization. Rather, the cited email reflects Mr. Flaherty's frustration that other social media companies were successfully promoting authoritative information in their search results while keeping harmful information off the "surface," and inquiring why Facebook was having challenges doing the same. Dkt. 174-1 at 45. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

137.    On May 28, 2021, a senior executive of Meta sent an email to Mr. Slavitt and Murthy reporting that Facebook had expanded its censorship policies, evidently to satisfy federal officials' demands made at a recent oral meeting. The email stated that a "key point" was that

"We're expanding penalties for individual Facebook accounts that share misinformation."  Doc. 71-4, at 9.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook as reporting that it had expanded its "censorship" policies. Also disputed that the expansion of Facebook's terms of service was done to satisfy federal officials' "demands" at meetings, an assertion for which the PFOF does not even purport to cite evidence. Rather, the email reflects Facebook sharing with Mr. Slavitt several "policy updates" that it had publicly announced the day before, and there is no suggestion that these changes to Facebook's terms of service, to which all users agree, was done at the urging of anyone in the federal government. Dkt. 71-4 at 9. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

### C. Flaherty's Profane Attack: "Are You Guys F**king Serious?"

138.    At some time prior to July 15, 2021, the White House's Facebook account experienced an issue that slowed its growth in followers. Doc. 174-1, at 56. On July 15, 2021, Facebook emailed a White House staffer and reported that "the technical issues that had been affecting follower growth on @potus have been resolved…. you should start to see your numbers trend back upwards…. Thanks for your patience as we investigated this."  *Id.* The White House staffer asked Facebook, "Could you tell me more about the technical issues affecting audience growth?"  *Id.* at 55. Facebook responded, "from what we understand it was an internal technical issue that we can't get into, but it's now resolved and should not happen again."  *Id.* The White House staffer then simply added Rob Flaherty to the email chain without further comment. *Id.*

**RESPONSE:** Undisputed.

139.    The same minute he was added to the email chain, 3:29 p.m. on July 15, 2021, Flaherty exploded at Facebook: "Are you guys fucking serious? I want an answer on what happened here and I want it today."  *Id.* at 55.

**RESPONSE:** Undisputed, but note that the cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on)

78

communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

140.    Facebook immediately raced to placate Flaherty, assuring him that the problem was from a "bug in our recommendation surface" that had been resolved two months earlier. *Id.* at 55. Facebook followed up with a longer explanation stating that the President's account had been affected because Facebook "take[s] aggressive steps to reduce the spread of vaccine hesitancy and vaccine misinformation on our platforms and we deploy technology to do so. As part of our efforts on Instagram, we have measures to help ensure we don't recommend people follow accounts that promote vaccine hesitancy at scale. For two weeks in April (April 14-28) this measure was impacted by over-enforcement on a signal we used …." *Id.* at 54. In other words, the White House's Instagram account had been inadvertently swept into the net of censorship that it had insisted that Facebook impose on private speakers' accounts. Evidently the White House is not amused when its own accounts are subject to the same treatment that it demands the platforms impose on thousands of ordinary Americans whose viewpoint the White House disfavors.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes (1) Facebook's response to Mr. Flaherty's statement as "racing to placate" him; and (2) the White House as insisting that Facebook "impose" a "net of censorship" on anyone. The cited evidence does not support this characterization. In addition, the last sentence of the PFOF is an argumentative mischaracterization rather than a factual statement. Defendants respond to Plaintiffs' arguments in their opposition to Plaintiffs' preliminary injunction motion. The cited email also contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

### D.    President Biden on Social-Media Platforms: "They're Killing People."

141.    That same day, July 15, 2021, the White House held a joint press conference with Jen Psaki and Surgeon General Murthy. Dr. Murthy participated in the White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation. Waldo Ex. 10. Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis." *Id.* at 1.

**RESPONSE:** Undisputed.

142.    Among other things, Dr. Murthy stated that "Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users." *Id.* at 2.

**RESPONSE:** Undisputed, but note the cited press briefing contains no evidence that either

the White House or the Surgeon General threatened or pressured any social media company to

censor speech, or that any social media company regarded (or acted on) statements by the White

House, or Dr. Murthy, as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF §§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House);

Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (OSG).

143.    Dr. Murthy announced: "we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that

the White House or the Surgeon General threatened or pressured any social media company to

censor speech, or that any social media company regarded (or acted on) statements by the White

House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF §§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House);

Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (OSG).

144.    At the July 15 press conference, Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation. Waldo Ex. 10, at 5.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Dr. Murthy's request as a

"demand." The cited evidence does not support this characterization. Dr. Murthy stated during the

press briefing that "we are asking [social media companies] to step up. We know they have taken

some steps to address misinformation, but much, much more has to be done. And we can't wait

longer for them to take aggressive action because it's costing people their lives." Waldo Ex. 10 at

5. The cited press briefing contains no evidence that the White House or the Surgeon General threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF §§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (OSG).

145.    Dr. Murthy also stated that platforms "have to do more to reduce the misinformation that's out there ...." *Id.* at 6.

**RESPONSE:** Undisputed, but note the cited press briefing contains no evidence that the White House or the Surgeon General threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

146.    At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in regular touch with these social media platforms, and those engagements typically happen through members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

**RESPONSE:** Undisputed.

147.    Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.* at 10.

**RESPONSE:** Undisputed that Ms. Psaki made this statement during the July 15, 2021 press briefing, but further note that she clarified the next day that her reference to "flagging . . . problematic posts" was meant simply to reflect the Government's practice of "regularly making sure social media platforms are aware of the latest narratives dangerous to public health" and "engag[ing] with them to better understand the enforcement of social media platform policies." Ex. 37 at 6 (*Press Briefing by Press Secretary Jen Psaki*, The White House (July 16, 2021)). She

emphasized that the Government does not "take anything down" or "block anything" and that platforms themselves, as "private-sector compan[ies]," "make[] decisions about what information should be on their platform[s]." *Id.* In addition, the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

148.    Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

149.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns." Waldo Ex. 10, at 11.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

150.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.* at 11.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

151.    And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact."  Waldo Ex. 10, at 11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki's comments as "criticizing" Facebook. The cited evidence does not support this characterization. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

152.    Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are."  *Id.* at 11.

**RESPONSE:** Undisputed, but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

153. The next day, July 16, 2021, President Biden stated of Facebook and other platforms that "they're killing people" by failing to censor enough misinformation: "Mr. Biden was asked what his message was to social media platforms when it came to Covid-19 disinformation. 'They're killing people,' he said. 'Look, the only pandemic we have is among the unvaccinated, and that — and they're killing people.'"  Glenn Decl. Ex. 33, at 1; Doc. 10-1, at 436.

**RESPONSE:** Undisputed that President Biden made the quoted statement on July 16, 2021, in response to a question from a reporter, but dispute that he was referring to a failure by social-media companies "to censor enough misinformation" as unsupported by the cited evidence. Defendants refer the Court to the transcript of this exchange, rather than the journalistic characterizations cited by Plaintiffs. *See* Ex. 45 at 2 (transcript). Further note that President Biden clarified this statement three days later. *See* Ex. 43 (transcript). He explained that he had just read that twelve individuals were responsible for sixty percent of misinformation concerning COVID-19 vaccines—a statistic advanced by the non-profit Center for Countering Digital Hate—and clarified that "Facebook isn't killing people. These twelve people are out there giving misinformation. Anyone listening to it is getting hurt by it. *It's* killing people." *Id.* at 2 (emphasis added). He further said, "[m]y hope is that Facebook, instead of taking [the comment] personally that somehow I'm saying Facebook is killing people . . . would do something about the misinformation," thus repeating his message that social media companies—like every other sector in society—ought to do more to curb the harmful spread of misinformation on their platforms. *Id.* at 2-3. The cited comment from President Biden contains no evidence that he threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) his statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

154.    President Biden's statement came after "weeks" of pressuring Facebook to give federal officials access to Facebook's internal data: "White House officials … singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

**RESPONSE:** Disputed. The PFOF is contradicted by the evidence. Federal officials did not "pressure" Facebook or any other social media company to do anything. *See* Defs' Resp. to PFOF ¶¶ 33-153; Defs' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2. Even the cited commentary (from a New York Times article) referred to the White House's contacts with Facebook only as "attempts" to obtain more detailed information from the company. This PFOF contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

155.    Surgeon General Murthy had been directly involved in those meetings with Facebook, including "tense" meetings and a meeting where he "angrily" demanded that Facebook do more to censor misinformation. *Id.* at 437.

**RESPONSE:** Disputed. *See* Declaration of Max Lesko, Chief of Staff, Off. of the Surgeon Gen. ¶ 13 ("Lesko Decl.") (Ex. 63). This PFOF contains no evidence that the White House or Dr. Murthy threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) statements by the White House or Dr. Murthy as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

156.    When the President stated, "They're killing people," Psaki reinforced the same message: "'Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result,' Jen Psaki, the White House press secretary, said before Mr. Biden made his comments. 'And we have responsibility as a public health matter to raise that issue.'" *Id.* at 436.

**RESPONSE:** Disputed. The quoted language is accurate, but the PFOF argumentatively mischaracterizes the President and Ms. Psaki's statements as being related or "reinforc[ing]" a particular message. Further disputed to the extent that the quoted language omits critical context: Ms Psaki said, "**We don't take anything down. We don't block anything. Facebook and any private-sector company makes decisions about what information should be on their platform.** Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result. And we have a responsibility, as a public health matter, to raise that issue. **The responsibility we all have — the government, media platforms, public messengers — to give accurate information**." Ex. 37 at 12 (emphasis added). Note also that the cited article contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

157.    That same day, July 16, 2021, at a White House press conference, Psaki stated that "we're in regular touch with social media platforms … about areas where we have concern. … [W]e are … regularly making sure social media platforms are aware of the latest narratives dangerous to public health that we and many other Americans seeing — are seeing across all of social and traditional media. And we work to engage with them to better understand the enforcement of social media platform policies." Glenn Decl. Ex. 34, at 6; Doc. 10-1, at 444.

**RESPONSE:** Undisputed, but note that the PFOF fails to contain the full quotation for context. Ms. Psaki stated during the July 16, 2021 press briefing that "Well, I would say first, it shouldn't come as any surprise that we are in regular touch with social media platforms—just like we're in regular touch with all of you  and your media outlets—about areas where we have concern, information that might be useful, information that may or may not be interesting to your viewers." Glenn Decl. Ex. 34, at 6. She continued: "You all make decisions, just like the social media platforms make decisions, even though they're a private-sector company and different, but just as

an example." *Id.* The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

158.    Psaki then described a "false narrative that remains active … flowing on the internet quite a bit, in other places as well," and stated, "we want to know that the social media platforms are taking steps to address it. That is inaccurate, false information… And that is an example of the kind of information that we are flagging or raising."  Glenn Decl. Ex. 34, at 7; Doc. 10-1, at 445.

**RESPONSE:** Undisputed but note that the PFOF fails to contain the full quotation for context. Ms. Psaki stated during the July 16, 2021 press briefing that "So let me give you an example, just to illustrate it a little bit. The false narrative that remains active out there about COVID-19 vaccines causing infertility—something we've seen out there, flowing on the internet quite a bit, in other places as well—which has been disproven time and time again. This is troubling, but a persistent narrative that we and many have seen, and we want to know that the social media platforms are taking steps to address it. That is inaccurate, false information. If you are a parent, you would look at that information and then that would naturally raise concerns, but it's inaccurate. And that is an example of the kind of information that we are flagging or raising." Glenn Decl. Ex. 34, at 7. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

159.    Psaki also demanded additional "steps" "for Facebook or other platforms," including "to measure and publicly share the impact of misinformation on their platform and the audience it's reaching, also with the public."  *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as making "demands" to Facebook or other platforms. The cited evidence does not support this characterization. As reflected in the transcript of the press briefing, Ms. Psaki stated: "Well, I think, as I noted yesterday . . . there are more steps that everyone can take. And I would just note, again, this is a responsibility of officials speaking, of course, on behalf of government; it's the responsibility of members of the media; it's the responsibility of citizens and civic leaders and people who are trusted voices in communities around the country. That has a broad definition. Social media platforms is one of them." Glenn Decl. Ex. 34, at 7. She further stated: "So a couple of the steps that we have—you know, that could be constructive for the public health of the country we are providing for—for Facebook or other platforms to measure and publicly share the impact of misinformation on their platforms and the audience it's reaching, also with the public, with all of you to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id.* The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

160.    She called on the platforms "to create robust enforcement strategies that bridge their properties and provide transparency about rules." *Id.* She stated that platforms should coordinate on censoring disfavored speakers: "You shouldn't be banned from one platform and not others if you — for providing misinformation out there." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as suggesting that social media platforms should "coordinate on censoring disfavored speakers." The cited evidence does not support this characterization. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

161.    Psaki also stated that the platforms should be "[t]aking faster action against harmful posts. As you all know, information travels quite quickly. If it's up there for days and days and days when people see it, you know, there's — it's hard to put that back in a box."   Glenn Decl. Ex. 34, at 8; Doc. 10-1, at 446.

**RESPONSE:** Undisputed but note that the cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

162.    Psaki was asked whether the censorship Facebook was already doing, which included "remov[ing] 18 million pieces of COVID misinformation" and "connect[ing] more than 2 billion people to reliable information," was "sufficient," and she responded, "Clearly not, because we're talking about additional steps that should be taken."  *Id*.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook's application of its terms of service, to which all users agree, as "censorship." In addition, Ms. Psaki added: "Obviously, those are steps they have taken. They're a private-sector company. They're going to make decisions about additional steps they can take. It's clear there are more that can be taken." Glenn Decl. Ex. 34, at 8; Dkt. 10-1, at 446. The cited press briefing contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

163.    "[A] few hours after Biden's comment" that social-media platforms are "killing people" by not censoring misinformation, "Twitter suspended [Alex Berenson's] account for the first time."  Jones Decl., Ex. J, at 3. Later, on August 28, 2021, Twitter permanently deplatformed Berenson. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes President Biden's statement as accusing social-media platforms of "killing people," *see* Resp. to Pls.' PFOF ¶ 154; mischaracterizes the President's statement as advocating for "censoring" misinformation; and insinuates that Mr. Berenson's temporary suspension from Twitter had anything to do with President Biden's statement. The cited evidence does not support these characterizations and assumptions. In addition, Twitter did not "permanently deplatform[ ]" Mr. Berenson. As he acknowledges in the cited document, Twitter restored his account in December 2021. Jones Decl., Ex. J, at 3. Apart from the timing, there is no record evidence that Twitter suspended his account in response to the President's comments. There is no evidence to support the inferences that (i) those responsible for content moderation at Twitter were aware of the President's statement at the time Twitter suspended Mr. Berenson's account; (ii) Twitter would have reacted to the President's statement about a different platform (Facebook); or (iii) Twitter's reaction would have been to suspend Berenson's account, particularly considering that he was not referenced by the President. To the contrary, the record demonstrates that Twitter's staff responsible for "implementation of [its[ rules" was "cordoned off" from the Twitter staff who would have been made aware of the President's statement or any subsequent communication about it with the White House (which, in any event, is absent from the record). *See* Ex. 10 at 2 (*Protecting Speech from Government Interference & Social Media Bias, Part 1:  Twitter's Role in Suppressing the Biden Laptop Story: Hearings Before the H. Comm. on Oversight & Accountability*, 118th Cong.  (2023) (opening statement of Yoel Roth, Former Head of Trust & Safety,Twitter, Inc.)).

164.    Four days later, July 20, 2021, the White House explicitly threatened to amend or repeal the liability protections of § 230 of the Communications Decency Act if social-media companies did not increase censorship of disfavored speakers and viewpoints. Glenn Decl. Ex. 35; Doc. 10-1, at 474-75  -  *'They Should Be Held Accountable': White House Reviews Platforms' Misinformation Liability*, USA TODAY (July 20, 2021), *at*  https://www.usatoday.com

/story/news/politics/2021/07/20/white-house-reviews-section-230-protections-covid-misinform ation/8024210002/. The White House communications director, Kate Bedingfield, announced that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms." *Id.* "We're reviewing that, and certainly, they should be held accountable," she said. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the White House as "explicitly threatening to amend or repeal" Section 230 "if social-media companies did not increase censorship of disfavored speakers and viewpoints." The cited evidence does not support that characterization. Ms. Bedingfield was asked on the television news program Morning Joe what the Biden Administration plans to do about COVID-19 misinformation on social media. Ms. Bedingfield explained that the "most important" thing was for people to obtain information from trusted sources like their doctors, but with respect to social media platforms, "we all have a responsibility here," including platforms and "news outlets." Ex. 46 at 3-5 (Interview by Mika Brzezinski with Kate Bedingfield, Commc'ns Dir., White House, in Washington, D.C. 4 (July 20, 2021)) (interview transcript). The interviewer followed up by asking Ms. Bedingfield whether President Biden would support amending Section 230 so that the platforms could no longer rely on its legal protection. *Id.* Bedingfield answered, "[w]ell, we're reviewing that," before noting that the President had emphasized that "the people creating the content" are responsible for it. *Id.* at 5-6. As Ms. Bedingfield explained, "[i]t is a big and complicated ecosystem, and everybody bears responsibility to ensure that we are not providing people with bad information about a vaccine that will save their lives." *Id.* at 6. Ms. Bedingfield did not threaten any action or make any demands during this interview.

165.   The White House communications director "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.*

**RESPONSE:** Undisputed that this PFOF accurately quotes the *USA Today* article, but disputed on the ground that the PFOF relies on hearsay and journalistic characterization of the interview rather than evidence of record. Defendants refer the Court to review the interview transcript, available at Ex. 46, and Defendants' response to PFOF ¶ 164. Defendants further note that the cited article quotes the White House Press Secretary, Jen Psaki, as stating: "The White House has not asked Facebook to take down any individual social media post," and that "[i]t's up to social media platforms to determine what their application is of their own rules and regulations." The cited article contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

166.    Media reported that, in connection with this threat, "Relations are tense between the Biden administration and social media platforms, specifically Facebook, over the spread of misinformation online." *Id.*; *see also, e.g.,* Glenn Decl. Ex. 36; Doc. 10-1, at 477-81: *White House says social media networks should be held accountable for spreading misinformation*, CNBC.com (July 20, 2021), *at* https://www.cnbc.com/2021/07/20/white-house-social-networks-should-be-held-accountable-for-spreading-misinfo.html.

**RESPONSE:** Disputed on the ground that the first sentence is based on hearsay and journalistic characterization rather than evidence of record. Also disputed to the extent the PFOF suggests that any tensions between the Biden Administration and social media companies were caused by an alleged "threat" concerning Section 230. The cited evidence does not support this characterization. First, Ms. Bedingfield did not make any threats concerning section 230. *See* Defs' Resp. to PFOF ¶ 164. Second, the article reports that relations were tense between the Biden Administration and social media platforms over the spread of misinformation online, not because of the Administration's statements concerning Section 230. Glenn Decl. Ex. 36, at 1; Dkt. 10-1 at 477. The cited article contains no evidence that the White House threatened or pressured any social

media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

167.    When "asked … whether these companies should be held liable for publishing false information that causes people harm, Kate Bedingfield said the administration is reviewing policies. That could include amending the Communications Decency Act, or Section 230 of the act. 'We're reviewing that and certainly they should be held accountable,' Bedingfield said. 'And I think you heard the president speak very aggressively about this. He understands that this is an important piece of the ecosystem.'" *Id.* at 478.

**RESPONSE:** Disputed on the ground that this PFOF is based on hearsay and journalistic characterization rather than evidence of record. Defendants refer the Court to review the transcript of Ms. Bedingfield's interview, available at Ex. 46. Defendants further note that the cited article contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

168.    The same day, Tuesday, July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually one of ours." Fauci Ex. 57, at 1-2. Facebook responded one minute later, stating, "Yep, on it!" Fauci Ex. 57, at 1. The next day, Facebook responded again, stating, "This account has been removed. Thank you for flagging!" *Id.*

**RESPONSE:** Undisputed, but note that Facebook acknowledged that "[i]t's definitely a fake account." Fauci Ex. 57, at 1. Fake accounts violate Facebook's terms of service, to which all users agree. *See* Ex. 56 (*Account Integrity & Authentic Identity*, Meta, https://perma.cc/DCR9-9FBY). In addition, posts that improperly impersonate federal officials potentially constitute federal crimes. *See* 18 U.S.C. § 912 ("Whoever falsely assumes or pretends to be an officer or employee acting under the authroirty of the United States or any department, agency or officer thereof, and acts as such . . . shall be fined under this title or imprisoned not more than three years,

or both."). Further note that Mr. Humphrey was on the White House COVID-19 Response Team; he was not a member of the Communications Office. Moreover, this PFOF contains no evidence that the White House threatened or pressured any social media company to censor speech, or that any social media company regarded (or acted on) the White House's statements as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

### E. The Social-Media Platforms Are Cowed into Collusion on Censorship.

169.    The threats and public pressure on July 15 and 16—including the President's comment, "they're killing people"—got immediate results, as Facebook scrambled to assuage the White House's wrath and accede to all its censorship demands.

**RESPONSE:** Disputed. This PFOF lacks citation to or support in the evidence of record, including for the claim that "threats" and "public pressure" regarding "censorship demands," of White House "wrath," that Facebook "immediate[ly]" "scrambled to assuage the White House[]" and "accede" to its "demands," or the contention that social media companies took any particular action based on any statement by the White House, or any other Defendants. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

170.    After this series of public statements, responding to "White House pressure," Facebook censored the accounts of the 12 specific disfavored speakers whom Psaki accused of spreading health misinformation. Glenn Decl. Ex. 37; Doc. 10-1, at 483-85: *Facebook takes action against 'disinformation dozen' after White House pressure*, CNN.com (Aug. 18, 2021), *at* https://www.cnn.com/2021/08/18/tech/facebook-disinformation-dozen/index.html. Psaki had "hammered the platform in July for allowing the people identified in the report to remain on its platform." *Id.* at 483. After they were singled out for censorship by the White House, Facebook "removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." *Id.*

**RESPONSE:** Disputed on the ground that this PFOF is based on hearsay and journalistic characterization rather than evidence of record. Also disputed o the extent the PFOF

mischaracterizes the White House as "singl[ing] out" "disfavored speakers" for "censorship," or Facebook as "responding to pressure" or "censoring" accounts. The cited evidence does not support these characterizations. Rather, the record reflects that more than a month after the White House press briefings, Facebook removed certain posts for violating its content moderation policies, to which every user agrees as part of the company's terms of service. Facebook explained that "[a]ny amount of COVID-19 vaccine misinformation that violates our policies is too much by our standards—and we have removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies." Pls. Decl., Ex. 37 (Dkt. 10-1 at 483). Facebook also explained that it was not completely banning the "Disinformation Dozen" from its platform because the content did not always violate its content moderation policies: "the remaining accounts associated with these individuals are not posting content that breaks our rules[.]" *Id.* The article further notes that the "Disinformation Dozen" was initially identified in March 2021 by the nonprofit Center for Countering Digital Hate, which "called on Facebook to shut down pages operated by these people." *Id.* The cited article contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

171.   Other platforms responded to the pressure as well, as Twitter suspended Alex Berenson within a few hours of President Biden's July 16 comments and deplatformed him Berenson on August 28, 2021. Jones Decl., Ex. J, at 3.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Defendants as "pressuring" anyone, that other platforms "responded" to the alleged pressure, or that Twitter's decision to suspend Mr. Berenson was the result of statements made by Defendants. The cited

evidence does not support that characterization. *See* Defs' Resp. to PFOF ¶ 163. The cited

document contains no evidence that the White House threatened or pressured Twitter to censor

speech, or that Twitter regarded (or acted on) communications with the White House as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

172.    On July 17, 2021, another Facebook official sent an email to Anita B. Dunn, the
political strategist and Senior Advisor to the President in the White House, begging for assistance
in getting back into the White House's good graces. Doc. 174-1, at 49. The Facebook official, who
evidently had a prior relationship with Dunn, wrote: "Would love to connect with you on the
President's comments on Covid misinfo and our work there. Really could use your advice and
counsel on how we get back to a good place here. … As I hope you know, we've been doing a
significant amount of work to … fight the misinfo … Obviously, yesterday things were pretty
heated, and I'd love to find a way to get back to pushing together on this - we are 100% on the
same team here in fighting this and I could really use your advice." *Id.* Dunn looped in Rob
Flaherty to schedule a call. *Id.* at 48. Facebook then wrote: "Thanks Anita, and thanks Rob. I
appreciate the willingness to discuss. We'd love to find a way to get things back to a productive
conversation." *Id.* Facebook also noted, with a similarly conciliatory tone: "We had a conversation
with the Surgeon General's office yesterday to discuss the advisory in more detail and hope to
continue to work to address concerns." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Facebook as "begging" or

seeking to "get[] back into the White House's good graces." The cited document does not support

that characterization. The cited document contains no evidence that the White House threatened

or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications

with the White House as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

173.    The next Monday, July 19, 2021, YouTube emailed Flaherty to announce "a few
new ways in which we are making it easier for people to find authoritative information on health
topics on YouTube." *Id.* at 51-2. On July 20, 2021, Flaherty responded, linking to a Tweet of
"borderline" content and stating, "I'm curious: Saw this tweet. [Linking the Tweet]. I think we had
a pretty extensive back and forth about the degree to which you all are recommending anti-
vaccination content. You were pretty emphatic that you are not. This seems to indicate that you
are. What is going on here?" *Id.* at 51.

**RESPONSE:** Undisputed but further note that the cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

174.   YouTube responded by assuring Flaherty that it "reduce[s]" the recommendation of anti-vaccine speech even when it does not violate YouTube's policies: "it is important to keep in mind that borderline content accounts for a fraction of 1% of what is watched on YouTube in the United States. We use machine learning to reduce the recommendations of this type of content, including potentially harmful misinformation. In January 2019, we announced changes to our recommendations systems to limit the spread of this type of content which resulted in a 70% drop in watchtime on non-subscribed recommended content in the U.S. and our goal is to have views of nonsubscribed, recommended borderline content below 0.5%." *Id.* at 51.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes YouTube as "assuring" the White House that it reduces recommendations for speech that did not violate its policies. The cited email does not support that characterization. Rather, the YouTube employee expressly mentioned borderline content, Dkt. 174-1, at 51, which is subject to moderation under YouTube's policies, *see* Ex. 24 (announcing, in 2019, that YouTube would start moderating borderline content). The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

175.   This was not enough for Flaherty, who demanded more information: "I see that's your goal - what is the actual number right now?" *Id.* at 50. YouTube responded that it would check for more information, and stated: "Per our COVID-19 medical misinformation policy, we will remove any content that contradicts local health authorities' or the World Health Organization's (WHO) medical information about COVID-19. To date, approximately 89% of videos removed for violations of this policy were removed with 100 views or less. With regards to the specific videos you referenced, the content was not in violation of our community guidelines." *Id.* at 50.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty's follow-up question as a "demand." The cited email does not support that characterization. The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

176.    Flaherty responded, expressing surprise that YouTube was not censoring the disfavored content: "So this actually gets at a good question - the content [that the Tweet] points out isn't defined as 'borderline' and therefore isn't subject to recommendation limitations?" *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes YouTube (or Facebook) of "assuring" Mr. Flaherty of anything. Neither the cited email nor evidence cited by any other PFOF supports that characterization. Rather, the cited email reflects YouTube's explaining to Mr. Flaherty how its policies and guidelines operate, including those related to borderline content. Dkt. 174-1 at 50. The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

177.    YouTube, like Facebook before it, assured Flaherty that it would "limit the visibility" and "reduce the spread" such content, even though it does not violate YouTube's policies: "the content was not in violation of our policies and therefore not subject to removal. But for all content on YouTube, we apply our 4R framework we have previously described to raise authoritative voices while reducing visibility on borderline content. External evaluators use these guidelines which are then used to inform our machine learning systems that limits the spread of borderline content." *Id.* at 50.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes YouTube (or Facebook) of "assuring" Mr. Flaherty of anything. Neither the cited email nor evidence cited by any other PFOF supports that characterization. Rather, the cited email reflects YouTube's explaining to Mr.

Flaherty how its policies and guidelines operate, including those related to borderline content. Dkt. 174-1 at 50. The cited email contains no evidence that the White House threatened or pressured YouTube to censor speech, or that YouTube regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

178.    On October 28, 2021, the same day as a Washington Post article about Facebook employee Frances Haugen's allegations about misinformation on Facebook, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point."  Waldo Ex. 35, at 1-2; *see also infra.*

**RESPONSE:**  Undisputed but note that the PFOF lacks context. Before the email referenced in this PFOF, Mr. Flaherty had engaged with Facebook employees to understand their policies concerning misinformation and disinformation, how those policies are enforced on the platform. *See* Ex. 36 at 62 (Flaherty Rog. Resps.). For example, Mr. Flaherty had been asking Facebook employees for more transparent information about their algorithms and how they were promoting misinformation or disinformation and had raised questions about research from the Center for Countering Digital Hate (CCDH) indicating that a small number of users were responsible for a significant percentage of COVID-19 vaccine-related misinformation spreading on social media platforms, including Facebook. *Id.* In response to Mr. Flaherty's inquiries, Facebook informed him that although misinformation and disinformation was a problem it was taking proactive steps to address, Facebook did not share Mr. Flaherty's concerns about the scope of the problem on Facebook, and it disputed the CCDH research. *Id.* Mr. Flaherty understood the referenced Washington Post article to indicate that Facebook was doing more intensive internal research into the problem of misinformation and disinformation than they had revealed in Facebook's conversations with him, and that this research had confirmed that a small number of users were responsible for a significant percentage of COVID-19 vaccine-related misinformation

spreading on Facebook. *Id.* The email referenced in this PFOF reflects Mr. Flaherty conveying his frustration to Facebook employees who had reportedly been less than transparent with him and the broader public about their full understanding of the problem of misinformation and disinformation on the platform. *Id.* The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

179.   On November 4, 2021, Meta reported to Rowe, Flaherty, and other White House officials that "we updated our misinformation policies for COVID-19 vaccines to make clear that they apply to claims about children…." Doc. 71-3, at 15.

**RESPONSE:** Undisputed but note for context that Meta explained that this update to its misinformation policies concerning children was the result of the FDA and CDC having approved of vaccines for children. Dkt. 71-3 at 15. The cited email contains no evidence that the White House threatened or pressured Meta to censor speech, or that Meta regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

180.   On November 30, 2021, Christian Tom of the White House emailed Twitter stating, "Would you mind looking at this video and helping us with next steps to put a label or remove it?" Doc. 174-1, at 65. He included a link to a Tweet of an unflattering, comedic video of First Lady Jill Biden reading to children, which had been clearly edited to make it sound as if she was profanely heckled while reading to them. *Id.* The subject line of the message was "Doctored video on Twitter of the First Lady." *Id.* Twitter responded within six minutes: "Happy to escalate with the team for further review from here." *Id.*

**RESPONSE:** Dispute characterization that the video had been "clearly edited" as unsupported by the cited evidence. Disputed also to the extent this PFOF argumentatively mischaracterizes the video in question as "comedic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "comedic."

Defendants further note for context that this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

181.    That evening, Twitter emailed back, stating, "Update for you - The team was able to create this event page for more context and details." *Id.* at 64. The "event page" explained the context of the parody video but did not censor it; it alerted users that the video had been edited for "comedic" effect. *See A video of first lady Jill Biden reading to children was manipulated to include profanity, according to fact-checkers*, TWITTER (Nov. 30, 2021), https://twitter.com/i/events/1465769009073123330.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the video in question as "comedic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "comedic." Further, note that the content that this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

182.    Christian Tom promptly emailed back, asking that Twitter actually censor the comedic video, not just provide an event page explaining that it was comedic: "Will you apply the 'Manipulated Media' disclaimer to the video asset itself?"  Doc. 174-1, at 64.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the video in question as "comedic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "comedic." Further disputed to the extent

the PFOF mischaracterizes Mr. Tom as asking Twitter to "censor" the video. The cited email does not reflect that characterization. Rather, this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

183.    The next morning, December 1, 2021, Tom emailed Twitter again, arguing that Twitter should apply a label to the video under its content-moderation policies: "Just wanted to follow-up here. It looks like from the rubric that this fits the first two criteria, which means it is 'likely' to be labeled:" and linking Twitter's "manipulated media" policy. *Id.* at 63-4.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Tom as "arguing" with Twitter to apply its content moderation policy. The cited email does not reflect that characterization. Rather, this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

184.    Twitter wrote back the same morning, explaining that the comic, parody video of Jill Biden was not subject to labeling under its policy because it was not likely to cause harm, but noting again that Twitter had created a special page to explain that the video was edited: "After escalating this to our team, the Tweet and video referenced will not be labeled under our synthetic and manipulated media policy. Although it has been significantly altered, the team has not found it to cause harm or impact public safety. The team was able to create this Twitter Moment (here) and event page for more context and details." *Id.* at 63.

**RESPONSE:** Disputed to the extent this PFOF argumentatively mischaracterizes the video in question as "parody" and "comic." Twitter did not indicate in the cited evidence (either the e-mail exchange or the Twitter "event page") that the video was deemed "parody" or "comic" under their rules. Further, note for context that this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

185.    The same day, Christian Tom emailed back, disputing Twitter's interpretation of its own content-moderation policy and looping in Michael DeRosa, the First Lady's press secretary. *Id.* Michael DeRosa then emailed as well, disputing and demanding information about Twitter's application of its own policy. *Id.* at 62. Tom and DeRosa continued to press Twitter for further explanation and action on December 9, 13, and 17. *Id.* at 60-61. Twitter provided another, more detailed explanation of its decision on December 17. *Id.* at 59-60. Tom emailed back the same day, again disputing Twitter's application of its own policy and pressing Twitter again on the issue. *Id.* at 58-59. He added Rob Flaherty to the email chain for the first time. *Id.* at 58.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Tom as "disputing" Twitter's interpretation of its content moderation policy rather than simply asking for clarification concerning how Twitter applies its policy. In addition, disputed to the extent the PFOF mischaracterizes Mr. DeRosa as "disputing and demanding" information about Twitter's content moderation policy, and as "press[ing]" Twitter (together with Mr. Tom) for information. The cited email chain does not support those characterizations. The cited email does not reflect that characterization. Rather, this email chain reflects the White House staffer requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The email chain further reflects the White House staffers

asking questions to seek to understand how Twitter applies its content moderation policy. *Id.* The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

186.    Nine minutes later, on December 17, 2021, Flaherty wrote to Twitter, angrily accusing Twitter of dishonestly misapplying its own policies: "New to the thread here, but this all reads to me like you all are bending over backwards to say that this isn't causing confusion on public issues. If the AP deems it confusing enough to write a fact check, and you deem it confusing enough to create an event for it, how on earth is it not confusing enough for it to at least have a label? Total Calvinball." *Id.* at 58. ("Calvinball" refers to a game in the cartoon "Calvin and Hobbes" where the participants make up the rules of the game as they go along.)

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "angrily accusing Twitter of dishonestly misapplying" its policies. The cited email does not support that characterization. Rather, this email chain reflects the White House requesting that Twitter consider the application of its terms of service, to which all users agree, to the doctored video it had identified. Dkt. 174-1 at 58-65. The email chain further reflects the White House asking questions to seek to understand how Twitter applies its content moderation policy. *Id.* The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

187.    A senior-level Twitter executive then emailed Flaherty proposing to resolve the matter by phone. *Id.* After that phone conversation, it appears that the Tweet that prompted the exchange is no longer available. *See id.* at 65 (linking to https://twitter.com/ ArtValley818_/status/1465442266810486787?s=20, which is no longer available).

**RESPONSE:** Disputed to the extent the PFOF assumes a phone conversation occurred, or that the Tweet was removed because of any such call or any action by the White House. The PFOF

fails to cite record evidence to support those assumptions. In addition, it appears that the individual's Twitter account was suspended on October 12, 2022—ten months after the email exchange reflected in the PFOF. *See* Ex. 181 at 1 (Art Taking Back (@Arttakingback), Instagram (Oct. 12, 2022)) (stating "[t]his just happened" and posting a screenshot of a notice that a Twitter account, @ArtValley818_, has been suspended). This PFOF contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

### F.    White House Pressure and Collusion Continue Throughout 2022.

188.    During January 2022, Facebook reported to Rowe, Manning, Flaherty, and Mr. Slavitt that it has "labeled and demoted" "vaccine humor posts whose content could discourage vaccination." It also reported to the White House that it "labeled and demoted" posts "suggesting natural immunity to COVID-19 infection is superior to immunity by the COVID-19 vaccine." Doc. 71-3, at 10-11.

**RESPONSE:** Undisputed, but further note that Facebook's actions with respect to these posts is entirely consistent with its borderline content moderation policies, to which all users agree. *See* Ex. 23 at 6-9. The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

189.    Twitter emailed back within an hour and offered to discuss, to which Flaherty responded: "Happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue." *Id.*

**RESPONSE:** Disputed. First, this assertion appears to relate to Section II.E of the PFOFs, rather than Section II.F, and does not appear to refer to the document cited, Dkt. 71-3 at 10-11, but instead appears to refer to the document found at Dkt. 174-1 at 68, which is an August 11, 2022,

email chain. It is unclear what the PFOF is referring to when it states that "Twitter emailed back within an hour," because it does not specify "within an hour" of what event. Moreover, the PFOF lacks context. In an August 11, 2022, email chain, a White House staffer had raised a question concerning a note that Twitter added to one of President Biden's tweets because of Twitter's view that it was factually inaccurate. *Id.* at 69. In response to the White House's questions, a representative at Twitter identified its "Birdwatch product feature" and offered a meeting to walk Mr. Flaherty through the product. *Id.* In response to that invitation, Mr. Flaherty stated that he would be "happy to talk through it but if your product is appending misinformation to our tweets that seems like a pretty fundamental issue." *Id.* The cited email contains no evidence that the White House threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

190.    Separately, Jesse Lee of the White House emailed Twitter in response to the same report, accusing Twitter of "calling the President a liar" and offering to talk by phone to resolve the complaint: "this note is factually inaccurate. This is a very technical question but you don't have it right, and you are in effect calling the President a liar when his tweet is actually accurate. I'm happy to discuss this with whoever is the right person," and providing his cell phone number. *Id.* at 69. Twitter then reached out by phone to resolve it. *Id.*

**RESPONSE:** See Defendants' response to Pls.' PFOF ¶ 189.

191.    On September 18, 2021, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Meta provide an explanation "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been." Doc. 71-3, at 24.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demanding" anything from Meta. The cited exhibit does not support that characterization. In addition, the PFOF lacks context. On September 18, 2021, a representative of Facebook emailed the White House and noted a Wall Street Journal article "about the spread of COVID-19

misinformation in comments on Facebook." Dkt. 71-3 at 24. Facebook stated that the story was "largely based on cherry-picked leaked documents," and "doesn't accurately represent the problem or the solutions we have put in place to make comments or posts about COVID and vaccine safer." *Id.* Facebook offer to schedule a call to discuss this issue, and Mr. Flaherty responded that he would be "[h]appy to talk about it," and "[w]ould be interested to see, as we have long asked for, how big the problem is, what solutions you're implementing, and how effective they've been." *Id.* Note further that the cited exchange about a September 2021 news article furnishes no evidence concerning the White House's response to misinformation "throughout 2022," much less evidence of "pressure" or "collusion." The cited email contains no evidence that the White House threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

192.    On February 1, 2022, Psaki was asked at a White House press conference whether the Administration was satisfied with Spotify's decision to affix advisory warnings to Joe Rogan's immensely popular podcast, which featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines, or whether the government "think[s] that companies like Spotify should go further than just, you know, putting a label on" disfavored viewpoints and speakers. Psaki responded by demanding that Spotify and other platforms "do[] more" to block disfavored speech: "[O]ur hope is that all major tech platforms … be vigilant to ensure the American people have access to accurate information on something as significant as COVID-19…. So, this disclaimer – it's a positive step. But we want every platform to continue *doing more* to call out … mis- and disinformation while also uplifting accurate information." Glenn Decl. Ex. 38, at 15-16; Doc. 10-1, at 501-2 (emphasis added). She stated that Spotify's advisory warnings are "a good step, it's a positive step, but *there's more that can be done*." *Id.* at 502 (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF states that Joe Rogan's podcast "featured speakers that contradicted the Administration's messaging about COVID-19 and vaccines," because this is not supported by the cited evidence. Further disputed to the extent the PFOF mischaracterizes Ms. Psaki as "demanding" anything or that the concerns she expressed had to do

with "disfavored speech." The cited evidence does not support this characterization. As Ms. Psaki explained during the press conference, "I mean, look at the facts, right? You are 16 times more likely to be hospitalized if you're unvaccinated and 68 times more likely to die than someone who is boosted if you're unvaccinated. That's pretty significant. And we think that is something that unquestionably should be the basis of how people are communicating about it." Glenn Decl. Ex. 38, at 16; Dkt. 10-1 at 502. The cited statements during a White House press conference contain no evidence that the White House threatened or pressured Spotify or any social media platform to censor speech, or that Spotify or any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

193.    On April 25, 2022, Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"  Glenn Decl. Ex. 40; Doc. 10-1, at 528.

**RESPONSE:**  Undisputed but note that the PFOF omits that there was more than one question posed at this time. The complete question posed is as follows: "And just a quick one on the breaking news. Twitter agreeing to let Elon Musk purchase—make his—go through with his purchase. Do you have a response to that? And does the White House have any concern that this new agreement might have President Trump back on the platform?" Glenn Decl. Ex. 40; Dkt. 10-1 at 528.

194.    Psaki responded by reiterating the threats of adverse legal consequences to Twitter and other social media platforms, specifically referencing antitrust enforcement and Section 230 repeal: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress."  *Id.* at 528-29.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki's response to the reporter's question as a "threat[] of adverse legal consequences." The cited evidence does not support this characterization. In addition, the PFOF selectively quotes Ms. Psaki's response. The complete response to the reporter's question is as follows: "Well, I'm not going to comment on a specific transaction. What I can tell you as a general matter: No matter who owns or runs Twitter, the President has long been concerned about the power of large social media platforms, what they ha--the power they have over our everyday lives; has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress. In terms of what hypothetical policies might happen, I'm just not going to speak to that at this point in time." Glenn Decl. 40, at 3-4; Dkt. 10-1 at 528-29. The cited statements during a White House press conference contains no evidence that the White House threatened or pressured any social media platform to censor speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

195.    At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?"  She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "I would say our concerns are not new. We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable."  *Id.* at 534.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as "specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech." The cited evidence does not support that characterization. Nothing in Ms. Psaki's

comments could reasonably be construed as a "legal threat" or requesting that social media companies "censor" speech. Rather, Ms. Psaki conveyed that companies need to be responsible for applying their terms of service, to which all users agree, to ensure that misinformation and disinformation about a deadly pandemic responsible for the deaths of thousands of Americans is properly handled. The cited statements during a White House press conference contain no evidence that the White House threatened or pressured any social media platform to censor speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

196.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation?  Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?"  *Id.* at 549.

**RESPONSE:** Undisputed.

197.    Psaki responded by reaffirming that senior officials within the White House and/or the Administration are continuing to coordinate directly with social-media platforms to censor disfavored speakers and content on social media, and directly linking these efforts to the repeated threat of adverse legal action: "we engage regularly with all social media platforms about steps that can be taken that has continued, and I'm sure it will continue. But there are also reforms that we think Congress could take and we would support taking, including reforming Section 230, enacting antitrust reforms, requiring more transparency. And the President is encouraged by the bipartisan support for — or engagement in those efforts."  *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki as suggesting that individuals in the White House and/or the Administration were "coordinat[ing]" with social media companies "to censor disfavored speakers and content on social media," or that she "directly link[ed] these efforts to the repeated threat of adverse legal action." The cited evidence does not support that characterization. The cited statements during a White House press conference contain no evidence that the White House threatened or pressured any social media platform to censor

speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

198.    On June 13, 2022, Flaherty demanded that Meta continue to produce periodic "COVID-19 insights reports" to track so-called "misinformation" regarding COVID-19 on Meta's social-media platforms, expressing the specific concern that COVID vaccines for children under 5 would soon be authorized. Doc. 71-3, at 6.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Flaherty as "demanding" anything from Meta. The cited evidence does not support that characterization. In response to a statement by Meta that it would "plan to discontinue" providing its "COVID-19 insight reports" to Mr. Flaherty, Mr. Flaherty stated that "I would normally say we are good to discontinue but it would be helpful to continue to get these as we start to ramp up under 5 vaccines. The cited email contains no evidence that the White House threatened or pressured Meta to censor speech, or that Meta regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

199.    Meta got the message. It agreed to continue sending its censorship-tracking reports, and on June 22, 2022, Meta assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines for children under 5 years old—a highly controversial topic—would be censored. Doc. 71-3, at 5.

**RESPONSE:** Dispute the insinuation in the remark, "Meta got the message," that Mr. Flaherty intended or that Meta perceived his request as any kind of pressure or threat. This PFOF is also disputed to the extent the PFOF mischaracterizes Meta's "insight reports" as "censorship-tracking reports," or that Meta "assured" Mr. Flaherty that Meta was "expanding its censorship of COVID-19 'misinformation'" or "ensur[ing] that speech critical or skeptical COVID-19 vaccines for children under 5 years old . . . would be censored." The cited evidence does not support this

characterization. First, Meta's "insight reports" reflected the results of the application of its content moderation policies, to which all users agree. Second, the cited email reflects that Meta was notifying Mr. Flaherty and others at the White House about its "policy updates" following the early childhood vaccine approvals. Dkt. 71-3 at 5. Meta noted that "[a]s of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older (with the exception of the claim that the COVID vaccines have full FDA approval since children have only emergency use."). *Id.* The cited email contains no evidence that the White House threatened or pressured Meta to censor speech or adopt its new policy, or that Meta regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

### G.   Pressure to Expand the Topics of Social-Media Censorship.

200.    Since this lawsuit was filed, Defendants have expanded their social-media censorship activities and pressured social-media platforms for censorship in new areas of online discourse, including areas such as climate change, gender, abortion, and economic policy.

**RESPONSE:** Disputed. This PFOF cites no evidence in support of the assertions made. Neither this PFOF nor any of Plaintiffs' other PFOFs contain evidence that the White House, or any other Defendants, threatened or pressured (or intend to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

201.    For example, on June 14, 2022, White House National Climate Advisor Gina McCarthy spoke at an Axios event titled "A conversation on battling misinformation." Jones Decl. Ex. M, at 1.

**RESPONSE:** Disputed to the extent the PFOF suggests that this is an "example" of the contentions contained in PFOF ¶ 200. Neither this PFOF nor any of Plaintiffs' other PFOFs contain evidence that the White House, or any other Defendants, threatened or pressured (or intend to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

202.    During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* at 2. "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'" *Id.* "McCarthy responded by slamming social media companies: 'We have to get tighter, we have to get better at communicating, and frankly, *the tech companies have to stop allowing specific individuals over and over again to spread disinformation*.'" *Id.* (emphasis added). "She suggested further that 'we have to be smarter than that and *we need the tech companies to really jump in*.'" *Id.* at 3 (emphasis added). "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?' McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'" *Id.*

**RESPONSE:** Disputed to the extent this PFOF relies upon mischaracterizations of Ms. McCarthy's comments contained in an online news article, rather than on Ms. McCarthy's comments themselves. The cited statements by Ms. McCarthy during an Axios event contain no evidence that the White House threatened or pressured (or intends to threaten or pressure) any social media platform to censor speech, or that any social media company regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

203.    Like Psaki and others, McCarthy explicitly tied these demands for censorship of climate-change-related speech to threats of adverse legislation: "McCarthy also praised Congress directly for pushing social media companies to censor Americans: 'We do see Congress taking action on these issues, we do see them trying to tackle the misinformation that's out there, trying to hold companies accountable.'" *Id.* at 4.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki, Ms. McCarthy, or "others" associated with the White House as "explicitly" tying "demands for censorship" to "threats of adverse legislation." The cited evidence, editorial comment contained in an online news article, does not support those characterizations. The cited statements by Ms. McCarthy during an Axios event contain no evidence that the White House threatened or pressured (or intends to threaten or pressure) any social media platform to censor speech, or that any social media company regarded (or acted on) her communications as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

204.    On June 16, 2022, the White House announced a new task force to address, among other things, "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." Jones Decl., Ex. N, at 1.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited document and takes selected quotes out of context. On June 16, 2022, President Biden issued a "Memorandum on the Establishment of the White House Task Force to Address Online Harassment and Abuse." Jones Decl., Ex. N, at 1. In discussing White House policy, the memorandum notes that "Online harassment and abuse take many forms, including the non-consensual distribution of intimate digital images; cyberstalking; sextortion; doxing; malicious deep fakes; gendered disinformation; rape and death threats; the online recruitment and exploitation of victims of sex trafficking; and various forms of technology-facilitated intimate partner abuse." *Id.* The memorandum further observes that "[i]n the United States and around the world, women and LGBTQI+ political leaders, public figures, activities, and journalists are especially targeted by sexualized forms of online harassment and abuse, undermining their ability to exercise their human rights and participate in democracy, governance, and civic life." *Id.* Accordingly, the President directed "the Director of the White House Gender Policy Council and the Assistant to the President for National Security

Affairs to lead an interagency effort to address online harassment and abuse, specifically focused on technology-facilitated gender-based violence, and to develop concrete recommendations to improve prevention, response, and protection efforts through programs and policies in the United States and globally." *Id.* at 2. The Memorandum charges the Task Force with "work[ing] across executive departments, agencies, and offices to assess and address online harassment and abuse that constitute technology-facilitated gender-based violence." *Id.* at 3. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

205.    The June 16 Memorandum decries "online harassment and abuse"—vague terms that, on information and belief, are deliberately adopted to sweep in constitutionally protected speech. *Id.* In particular, the Memorandum defines "online harassment and abuse" to include "gendered disinformation," a deliberately broad and open-ended term. *Id.* § 1. The Memorandum announces plans to target such "gendered disinformation" directed at public officials and public figures, including "women and LGBTQI+ political leaders, public figures, activists, and journalists." *Id.* The Memorandum creates a Task Force co-chaired by the Assistant to the President for National Security Affairs, which includes the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security, among others. *Id.*

**RESPONSE:** Disputed to the extent the PFOF contends "on information and belief" that the phrase "online harassment and abuse" is intended to "sweep in constitutionally protected speech." The PFOF cites to no record evidence to support this "belief." Defendants refer to their response to PFOF ¶ 204, as well as the memo cited in this PFOF, for context as to the scope of the Task Force's mandate to address online harassment and abuse. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with

the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

206.    The Task Force is charged with "developing programs and policies to address … *disinformation campaigns* targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists in the United States and globally." *Id.* § 4(a)(iv) (emphasis added). The Memorandum calls for the Task Force to consult and coordinate with "technology experts" and "industry stakeholders," *i.e.*, social-media firms, to achieve "the objectives of this memorandum," *id.* § 4(b). Those "objectives," of course, include suppressing so-called "disinformation campaigns" against "public and political figures." *Id.* § 4(a)(iv).

**RESPONSE:** Disputed to the extent the PFOF selectively quotes from the cited Memorandum. Defendants refer to their response to PFOF ¶ 204, as well as the memo cited in this PFOF, for context as to the scope of the Task Force's mandate to address online harassment and abuse. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

207.    The Memorandum again threatens social-media platforms with adverse legal consequences if they do not censor aggressively enough to suit federal officials: "the Task Force shall … submit periodic recommendations to the President on *policies, regulatory actions, and legislation on technology sector accountability* to address systemic harms to people affected by online harassment and abuse." *Id.* § 5(c) (emphasis added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Memorandum as "threatening" social media platforms with "adverse legal consequences" if they "do not censor aggressively enough." The selected citation to the document does not support that characterization. The Memorandum states: "Prior to issuing its Initial Blueprint and 1-Year Report, the Co-Chairs of the Task Force shall consolidate any input received and submit periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability

to address systemic harms to people affected by online harassment and abuse." Jones Decl., Ex. N, at § 5(c). Nothing in this statement contains evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

208.   Relatedly, on May 27, 2022, HHS Assistant Secretary Rachel Levine demanded that social-media platforms censor "misinformation" about "gender-affirming care." Jones Decl., Ex. O, at 1. In a public address to health officials, Levine "spoke about the need for government to 'address health information directly' and specified that includes encouraging Big Tech to combat health misinformation 'beyond COVID-19.'" *Id.* Levine stated: "So I'd like to just talk briefly about another area of substantial misinformation that is directly impacting health equity in our nation, and that is the health equity of sexual and gender minorities. There is substantial misinformation about gender-affirming care for transgender and gender diverse individuals… The positive value of gender-affirming care for youth and adults is not in scientific or medical dispute … And we need to use our clinicians' voice to collectively advocate for our tech companies to create a healthier, cleaner information environment." *Id.* at 1-2.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Levine as "demanding" that social media companies "censor" anything. The cited evidence does not support that characterization. In addition, this PFOF selectively quotes Ms. Levine's statements as characterized in a news article, which in turn selectively quotes Ms. Levine and provides editorial comments concerning her statements. The cited statements by Ms. Levine during an address to the Federation of State Medical Boards contains no evidence that the White House or any other Defendants threatened or pressured (or intend to threaten or pressure) any social media platform to censor speech, or that any social media company regarded (or acted on) communications by the White House or other Defendants as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

209.   On July 8, 2022, the President signed an Executive Order on protecting access to abortion. Jones Decl., Ex. P, at 1.

**RESPONSE:** Undisputed but note that, on July 8, 2022, the President signed an Executive Order on protecting access to covers access to "reproductive healthcare services," not just abortions. Jones Decl., Ex. P, at 1. This PFOF contains no evidence that the White House threatened or pressured (or intends to threaten or pressure) social media companies to censor speech, or that the companies regarded (or acted on) communications with the White House, or any other Defendants, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

210.    Section 4(b)(iv) of the order states: "The Secretary of Health and Human Services shall, in consultation with the Attorney General and the Chair of the FTC, consider options to address deceptive or fraudulent practices related to reproductive healthcare services, including online, and to protect access to accurate information." *Id.* This is a plain reference to the online advertising practices of pro-life pregnancy resources centers, which the President's political allies were then attacking. Jones Decl., Ex. Q, at 1-2.

**RESPONSE:** Disputed to the extent the PFOF states that the quoted language from the Executive Order is a "plain reference to the online advertising practices of pro-life pregnancy resource centers, which the President's political allies were then attaching." This characterization of the Executive Order and its impetus is unsupported by the cited documents. In addition, the regulation of deceptive and fraudulent commercial speech does not violate the First Amendment, and Plaintiffs do not contend otherwise. Any such argument would be foreclosed by Supreme Court and Fifth Circuit precedent. *Gibson v., Texas Dep't of Ins.-Div. of Workers' Comp.*, 700 F.3d 227, 234-35 (5th Cir. 2012) ("The Supreme Court has stated that laws aimed at prohibiting deceptive commercial speech are unlikely to implicate the prohibition on prior restraints.") (quoting *Friedman v. Rogers*, 440 U.S. 1, 10 (1979)); *Bates v. State Bar of Arizona*, 433 U.S. 350, 383 (1977) ("Advertising that is false, deceptive, or misleading of course is subject to restraint."). This PFOF contains no evidence that the White House threatened or pressured (or intends to

threaten or pressure) social media companies to censor speech, or that the companies regarded (or

acted on) communications with the White House as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 &

II.B.1.b & II.B.2.

211.     On August 11, 2022, Flaherty emailed Twitter to dispute a note added by Twitter
to one of President Biden's tweets. Doc. 174-1, at 68. The subject line of Flaherty's email was a
link to a Tweet criticizing Twitter's note: "Joe Weisenthal on Twitter: 'Wow, this note that twitter
added to Biden's tweet is pure gibberish. Imagine adding this, and thinking this is helpful to the
public's understanding in any way.'"  *Id.*  Linking to a tweet about gas prices, Flaherty wrote:
"Happy to connect you with some economists who can explain the basics to you guys."  *Id.*
Flaherty copied Jesse Lee, Senior Advisor to the National Economic Council at the White House,
on the email. *Id.*

**RESPONSE:** Undisputed but note that the PFOF lacks context. The concern expressed by

Mr. Flaherty was that Twitter affixed a "factually inaccurate" note to President Biden's tweet and

wanted Twitter to explain how this had happened. Dkt. 174-1 at 68-69. Also note that Mr. Lee is

the Senior Communications Advisor to the National Economic Council. The cited email contains

no evidence that the White House threatened or pressured (or intends to threaten or pressure)

Twitter to censor speech, or that Twitter regarded (or acted on) the White House's communications

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2

### III.     The Pressure Campaign from Surgeon General Murthy and His Office.

212.     Throughout 2021 and 2022, Surgeon General Vivek Murthy and his Office engaged
in a pressure campaign in parallel with, and often overlapping with, the White House's pressure
campaign on social-media platforms. Surgeon General Murthy and his staff were often included
in the same meetings and communications with White House officials and social-media platforms,
and joined White House officials pressuring them to increase censorship in public and in private.

**RESPONSE:** Disputed. Neither this PFOF, or any others, contain evidence that the

Surgeon General, the Office of the Surgeon General (OSG), or the White House, are now or have

ever been engaged, together or separately, in a "pressure campaign" against social-media platforms

to have them "increase censorship." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

A.    **The Surgeon General: Using the "Bully Pulpit" to Pressure Platforms.**

213.    Eric Waldo is the Senior Advisor to the Surgeon General of the United States, Vivek Murthy, and was formerly a Chief Engagement Officer in the Office of the Surgeon General ("OSG"). Waldo Dep. 11:15-12:2.

**RESPONSE:** Disputed. Mr. Waldo left OSG in January 2023. *See* Defs.' Notice Regarding Substitution of Official-Capacity Defendants at 2 ("Notice of Substitution") (Dkt. 263).

214.    As "the engagement team leader" for OSG, Waldo was "the one in charge of maintaining the contacts and the relationships with representatives of social media platforms." *Id.* at 51:11-17.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

215.    Dr. Murthy was directly involved in editing and approving the final work product of the Surgeon General's Office, including the Surgeon General's July 15, 2021 health advisory on misinformation and the Surgeon General's March 3, 2022 RFI to social-media platforms. *Id.* at 14:20-22, 15:16-19, 16:9-10, 17:1-6, 187:24-188:3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

216.    Calling for an "all-of-society approach" to misinformation was a pervasive theme of the Surgeon General's communications, including the health advisory and the RFI. *Id.* at 19:25,

26:8, 88:9, 89:13, 101:2, 117:13, 122:15, 211:22, 246:25, 251:9, 332:22. This theme echoes the repeated call for an "all-of-society approach" in the Virality Project's public report. *See infra*.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Surgeon General as "echo[ing]" the Virality Project's public report. The Surgeon General's Advisory predates the Virality Project's report. *See* Defs.' PFOF § II.B. This PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

217.    Before the Surgeon General's health advisory on misinformation was published on July 15, 2021, OSG and Waldo "did pre-rollout calls with Twitter, Facebook, [and] Google/YouTube." *Id.* at 20:7-11.

**RESPONSE:** Disputed. The call with Facebook occurred on July 16, 2021. *See* Waldo Dep. 90:6-19. Moreover, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

218.    The Surgeon General uses his "bully pulpit" to call for censorship of health misinformation: "Dr. Murthy continued from a communications perspective to talk about health misinformation using his bully pulpit." *Id.* at 25:23-25.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General as "call[ing] for censorship of health misinformation." Neither the cited testimony nor the evidence as a whole supports the assertion that merely "talk[ing] about health misinformation" constituted a "call for censorship," much less a threat or pressure to censor speech, or that social-media

companies regarded it (or acted on it) as such.  Any implicit assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

219.   Waldo admits that the Surgeon General is directly advocating to social-media platforms to take stronger actions against health "misinformation": "[T]he Surgeon General has the ability … to talk to the relevant stakeholders and say we want you to be aware of this issue and that we think you have a role to play to improve the health outcomes, yes." *Id.* 28:10-14. As part of this role, the Surgeon General "call[s] out social media platforms in the [health] advisory." *Id.* at 28:18-19.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General

as "directly advocating to social-media platforms." The evidence does not support that inference;

the full extent of Dr. Murthy's direct communications about misinformation with platforms is

described at Defs.' PFOF § II.B. As shown therein, the record contains no evidence that the

Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to

censor speech, or that the companies regarded (or acted on) communications by OSG as such. *Id.*

220.   The Surgeon General's "bully pulpit," Waldo agrees, involves putting public pressure on social-media platforms: "I think the bully pulpit … is really the fact that he commands attention, including being able to …  speak with the press, speak with the public, and … we think of the Surgeon General as the nation's doctor."  *Id.* at 29:9-15.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General

as "putting public pressure on social-media platforms." Mr. Waldo did not agree with that

characterization, *see* Waldo Dep. 29:4-19, and the evidence does not support that inference, or that

social-media companies regarded (or acted on) communications by OSG as such. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

221.   A goal of the Surgeon General's use of the "bully pulpit" includes to "reduce the dissemination of health misinformation." *Id.* at 30:5-10. This includes making "recommendations of specific steps the social media platforms are … called out to take to reduce the spread of misinformation on the platforms." *Id.* at 31:3-8.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the Surgeon General's

communications as anything more than making non-binding recommendations to social media

platforms. The Advisory is the best evidence of what the Advisory says, and it contains no evidence

that it was intended to threaten or pressure social-media companies to censor speech, or that the

companies regarded (or acted on) the Advisory as such. Any implicit assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c

& II.B.2.

222.    OSG reinforces its public "message of calling out the social media platforms to take steps to reduce the spread of misinformation on their platforms" through private communications with platforms: "[W]hat we're saying publicly, we're also … said that privately to them as well." *Id.* at 32:5-8, 12-14. This includes during "rollout calls." *Id.* at 32:19-20.

**RESPONSE:**  This PFOF contains no evidence that OSG threatened or pressured social-

media companies to censor speech, or that the companies regarded (or acted on) communications

by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2. The cited testimony indicates only

that the Advisory's "message," which is evident from the Advisory and the Surgeon General's

public statements, was echoed at a "high level" in private meetings between OSG and the

companies. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

**B.      Surgeon General Works in Tandem with the White House and Virality Project.**

223.    On the day of the health misinformation advisory rollout, July 15, 2021, "Press Secretary … Jen Psaki had already made remarks specifically about Facebook, and then," the next day, "President Biden made his remarks that social media and Facebook were killing people." *Id.* at 33:19-25. "Facebook … was upset about how the rollout had gone." *Id.* at 33:6-8. Waldo's initial rollout call with Facebook, as a result, was affected by the Administration's public attacks on Facebook: "I wouldn't call it the most productive call." *Id.* at 34:4-6.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the Press Secretary's and

the President's remarks as "public attacks" by the Administration "on Facebook." The PFOF also

mischaracterizes Mr. Waldo's testimony regarding the July 16, 2021, rollout call between OSG

and Facebook. He did not testify (nor is there any other evidence) that the call was not "productive"

because of the Press Secretary's or the President's remarks. *See* Waldo Dep. 113:3-114:5 (OSG "didn't think there was much change" that Facebook would make or that Facebook would be "transparent"). And this PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

224.    After this public pressure, Facebook's senior executive, Nick Mr. Clegg, reached out to request "deescalat[ion]" and "work[ing] together" as a direct result of that public pressure on Facebook: "Then later, with our call, we had a call with Nick Mr. Clegg from Facebook, and at his request, and … his intentions were to sort of I think deescalate and just find ways that we could work together, given how Facebook … was treated in that rollout day." *Id.* at 34:7-13.

**RESPONSE:** Disputed. This PFOF contains unsupported mischaracterizations about "public pressure" on Facebook and unsupported assertions that Facebook contacted OSG as "a direct result of that public pressure." Mr. Clegg's requests for this meeting are in evidence; that evidence speaks for itself. *See* Waldo Exs. 17, 18; *see also* Defs.' PFOF § II.B. In addition, this PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) the Advisory or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

225.    In the call with Nick Mr. Clegg, Surgeon General Murthy reiterated his demand for Facebook to do more to censor "misinformation" on its platforms: "[O] n the call with Nick Mr. Clegg, the Surgeon General did … reiterate the idea that, you know, as we described in the advisory, that we think there's more … that Facebook and other social media companies can do, and … we reiterated that." *Id.* at 35:7-12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the Surgeon General's reiteration of the Advisory's themes as a "demand" for "censor[ship]."  There is no

evidence to support that characterization; the Advisory provides "recommendations." *See* Defs.' PFOF § II.B. This PFOF also contains no evidence that the Surgeon General's "bully pulpit" that Facebook regarded (or acted on) the Surgeon General's remarks as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

226.    Murthy also asked Mr. Clegg and Facebook specific questions about requiring Facebook to share data with outside researchers about the scope and reach of misinformation on its platforms, again echoing the key recommendation of the Virality Project: "[T]he most specific questions were about understanding the data around the spread of misinformation and how we were measuring that, and … how we could have external researchers validate the spread of misinformation and -- and helping us as a field understand the depth of the problem." *Id.* at 35:20-36:2.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes (i) the Surgeon General's Advisory (or any of his communications) as "requiring" anything of companies and (ii) the Surgeon General as "echoing" the Virality Project. There is no evidence to support those characterizations. *See* Defs.' Resps. to Pls.' PFOF ¶ 225 (Advisory), ¶ 216 (Virality Project). In addition, this PFOF contains no evidence that the Surgeon General's inquiries about data sharing were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) the Surgeon General's inquiries as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

227.    One such "external researcher" that OSG had in mind was "Renee DiResta, from the Stanford Internet Observatory," a leading organization of the Virality Project, which hosted a "rollout event" for the advisory featuring Dr. Murthy on the day the advisory was announced. *Id.* at 36:19-23.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes OSG as having Ms. DiResta "in mind" or knowing at all about the Virality Project. When asked what "external researchers" meant, Waldo referred to the Advisory, *see* Waldo Dep. 36:7-16, which he was not involved in crafting, *see* Waldo Dep. 37:2-5. In addition, this PFOF contains no evidence that the

Surgeon General's inquiries about data sharing were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) the Surgeon General's inquiries as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

228.   Waldo admits that there was "coordination" between OSG and Renee DiResta of the Virality Project on the launch of the Surgeon General's health advisory: "I know there was coordination with [DiResta] with respect to the launch … there was a panel, a public sort of virtual town hall that we hosted -- with the Sanford [sic] Internet Observatory that Dr. Murthy spoke at, and that was part of the launch day. So certainly there would have been coordination … with her." *Id.* at 38:1-7.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes OSG as coordinating with the Virality Project. *See* Response to Pls.' PFOF ¶ 216. This PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

229.   Kyla Fullenwider is the OSG's key "subject matter expert" who "worked on the advisory" and had significant substantive input on both the Surgeon General's July 15, 2021 health advisory on misinformation, and the Surgeon General's March 3, 2022 RFI to social-media platforms on the spread of misinformation. *Id.* at 39:1-4, 59:16-23. Kyla Fullenwider is not a direct employee of the OSG, but works for a non-profit contractor named "US Digital Response," Waldo Dep. 85:13-15.

**RESPONSE:** Disputed. Fullenwider is an HHS employee. *See* Lesko Decl. ¶ 17 (Ex. 63). Also dispute the characterization of the Surgeon General's RFI has having been issued "to social media platforms." The RFI, which was published in the Federal Register, was issued to the general public. *See* Waldo Ex. 42.

230.   Kyla Fullenwider "did a follow-up call with Renee DiResta" about the health advisory. *Id.* at 38:25-39:4.

**RESPONSE:** Disputed. Waldo speculated that Fullenwider "maybe did a follow-up call with Renee after the event" at Stanford. Waldo Dep. 39:3-4. In any event, this PFOF contains no evidence that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

231.    After the launch of the health advisory, Waldo and Fullenwider "did a call" with Renee DiResta "that was more of a brainstorm around … public-facing events that we could do to talk about this issue" of stopping health misinformation. *Id.* at 40:13-17.

**RESPONSE:** Disputed to the extent that this PFOF describes a call that is different from the call in Pls.' PFOF ¶ 230. *See* Waldo Dep. 40:9-17. This PFOF also contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

232.    Fullenwider and DiResta "most likely" discussed misinformation in these calls. *Id.* at 41:4-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

233.    Waldo and OSG also received a briefing from the Center for Countering Digital Hate about the so-called "Disinformation Dozen."  *Id.* at 43:1-48:1. CCDH gave "a presentation about the Disinformation Dozen and sort of how they were measuring … that those were the folks primarily responsible for a lot of misinformation online."  *Id.* at 47:2-5.

**RESPONSE:** Disputed. Mr. Waldo could not remember the group that gave the presentation, which was given to HHS. Waldo Dep. 45:2-18. In addition, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

234. Rafael Campos of OSG "helped create the event with … the Stanford Internet Observatory for the launch," and likely had communications with Stanford and Professor DiResta in the lead-up to the event. *Id.* at 48:12-14, 49:1-2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's "bully pulpit" was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

235. The OSG anticipated that the social-media platforms would feel pressured by the advisory: "we didn't think they would be happy about this -- you know, the content of the advisory." *Id.* at 54:24-55:1.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes Mr. Waldo as testifying that OSG "anticipated" that the platforms would "feel pressured" by the Advisory. Neither the cited passage nor any other portion of Mr. Waldo's testimony supports that assertion. Nor does the evidence as a whole support the allegation that the Surgeon General's Advisory was used to threaten or pressure social-media companies to censor speech, or that the companies regarded (or acted on) the Advisory or any other communications by OSG as such. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

236. Waldo is aware of "at least one call … that the Surgeon General [Murthy] had with Facebook during the transition," i.e., between President Biden's election and his assuming office.

*Id.* at 55:8-10. The call involved a "Facebook individual": "Dr. Murthy had mentioned that he had been on a call with that person [from Facebook] during the transition." *Id.* at 79:11-18, 56:5-6. Waldo identified the individual as "a data person from the Facebook team." *Id.* at 56:10. The purpose of that call was "again, about that issue of trying to understand the reach of the mis- and disinformation and understanding … how far it was spreading." *Id.* at 56:15-19.

**RESPONSE:** Disputed to the extent that the PFOF suggests that Dr. Murthy had more than one call with Facebook during the transition. Mr. Waldo testified that Dr. Murthy had "at least one call" with Facebook before June 20, 2021, and he thought that call occurred during the transition. Waldo Dep. 55:2-17. In addition, this PFOF contains no evidence that the call, which concerned the "reach" and "spread" of mis- and disinformation, was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) on this or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

237.    "Data about misinformation" was "a topic of conversation" in that call, and the participants discussed "Facebook" being "un[]clear" or "unable to present … the depth or reach of the misinformation, that they didn't have that data." *Id.* at 80:1-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the discussion concerning uncertainty about the "depth or reach of the misinformation" was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) on this or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

238.    DJ Patil may have participated in that transitional call. Patil was the "chief data scientist in the Obama administration, and he was a special government employee at the White House for part of the first year" of the Biden Administration. *Id.* at 81:6-13. Patil was also "on the call with Dr. Murthy and [Waldo] and Nick Mr. Clegg … in his capacity as a White House official." *Id.* at 81:24-82:3.

**RESPONSE:** Undisputed.

239.    Waldo "connected [Patil] to another research data person … a Facebook data person." *Id.* at 82:13-16.

**RESPONSE:** Undisputed. This occurred after the July 23, 2021 call between OSG and Facebook. *See* Waldo Dep. 82:9-16. Mr. Waldo was "not sure if they ever connected." *Id.*

240.   The purpose of this follow-up was to demand more information from Facebook about monitoring the spread of misinformation on its platforms: "[T]he problem was we were still in this piece of not understanding the reach and depth … of the misinformation … on Facebook. And … this person was going to try to explain to [Patil] the data challenges in doing so." *Id.* at 83:4-9.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the follow-up as a "demand" rather than an attempt to "better understand" the "nature of the data," as Mr. Waldo testified. Waldo Dep. 83:1-2. This PFOF also contains no evidence that the follow-up was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) on this or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

241.   Kyla Fullenwider is the "main" or key staffer for the OSG on misinformation and disinformation. *Id.* at 58:21-24. Ann Kim is listed on the OSG's org chart, Waldo Ex. 2, as the person who "[d]irects mis- and dis-information engagement," Waldo Ex. 2, but that is solely "because Kyla Fullenwider reported up to Ann Kim. And since Kyla, I think, was our main subject matter expert or continued to do work on mis- and disinformation, maybe that was why that was put under Anne's list of duties." Waldo Dep. 58:20-24. Fullenwider, therefore, is the OSG's "main subject matter expert" on "mis- and disinformation," who "directs mis- and dis-information engagement" for the OSG. *Id.* at 58:13-59:7.

**RESPONSE:** Disputed. Mr. Waldo testified that he was speculating on these issues, including the currentness of the organizational chart and whether Fullenwider was the "main" subject-matter expert on misinformation. *See* Waldo Dep. 58:17-24.

242.   Fullenwider works for the nonprofit U.S. Digital Response, and is not directly employed by the OSG, though she was acting in an official capacity on behalf of OSG. Waldo Ex. 3, at 32; Waldo Dep. 85:10-86:8.

**RESPONSE:** Disputed. *See* Resp. to Pls.' PFOF ¶ 229.

243.   U.S. Digital Response is not a government agency but a non-profit organization: "U.S. Digital Response (USDR) is a nonprofit, nonpartisan organization that helps governments,

nonprofits, and public entities respond quickly to critical public needs." *About U.S. Digital Response*, U.S. Digital Response (last visited Feb. 17, 2023), https://www.usdigitalresponse.org/about.

**RESPONSE:** Undisputed.

244.    Ann Kim has no direct involvement in mis- and disinformation. Waldo Dep. 58:25-59:3. But Kyla Fullenwider "was definitely working on mis- and disinformation." *Id.* at 59:6-7. Fullenwider "was working with Daniel [Tartakovsky] on the design of … the advisory. And then … Kyla was continuing to help us think about were there additional ways we might engage." *Id.* at 59:12-15. Further, "Kyla … was the principal designer of options around follow-up with respect to data." *Id.* at 59:16-18. And when "the Surgeon General's office put out an RFI around misinformation data" on March 3, 2022, "Kyla worked on that." *Id.* at 59:18-22. Kyla "was the subject matter expert who was chiefly creating options for the Surgeon General … to consider how we would continue to … talk about mis- and disinformation with respect to data." *Id.* at 60:6-10.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's Advisory or RFI was used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory, RFI, or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

245.    Kyla Fullenwider also participated in the "rollout calls" to the social-media platforms announcing the Surgeon General's health advisory on misinformation. *Id.* at 62:24-63:4.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Surgeon General's Advisory or "rollout calls" were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory, "rollout calls," or other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

246.    Waldo was also "on some e-mails and at least one call with Rob Flaherty" when he "would communicate with Facebook." *Id.* at 64:9-11. This included a call with Rob Flaherty and the OSG: "[B]efore our call with Nick Mr. Clegg, … I had a call with Rob." *Id.* at 65:1-2. By then, Flaherty had been "separately communicating with Facebook," and he was "giving us a heads-up on his experiences … in communicating with … Facebook." *Id.* at 65:4-9.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these communications were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these or other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

247.    In August 2021, Waldo joined a call with Rob Flaherty and Brian Rice of Facebook, who was in charge of Facebook's relationship with federal officials. *Id.* at 66:10-14, 124:24-125:2.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Brian Rice as being "in charge of Facebook's relationship with federal officials." Mr. Waldo testified that Mr. Rice was, "I think, the main sort of like staff level liaison." Waldo Dep. 125:2-3. In any event, this PFOF contains no evidence that this call was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this call or other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

248.    In that August 2021 call, "Brian Rice from Facebook had requested a call to give us an update on some sort of internal action they were doing. … Facebook had either found something or removed something and was letting us know about it." *Id.* at 66:16-23.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that this call was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this call or other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

249.    Andy Mr. Slavitt of the White House also communicated with Nick Mr. Clegg. *Id.* at 67:14-21. When Andy Mr. Slavitt left the White House, he offered Surgeon General Murthy as a direct contact for Nick Mr. Clegg. *Id.* at 68:4-7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these contacts were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted

on) these or any other communications as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

250.    In addition, "Dr. Murthy has certainly had conversations with Dr. Fauci." *Id.* at 69:21-22. Waldo claims that he does not know the nature of those conversations. *Id.* at 69:23-25. "Dr. Murthy would have directly communicated with Dr. Fauci, to my knowledge." *Id.* at 70:13-15.

**RESPONSE:** Disputed to the extent the PFOF implies Mr. Waldo did not testify truthfully ("Waldo claims…"). Defendants further note that this PFOF contains no evidence that any conversations between Dr. Murthy and Dr. Fauci had anything to do with misinformation or social media platforms.

251.    Waldo is "certain that Dr. Murthy has connected" with Dr. Francis Collins. *Id.* at 71:2-9.

**RESPONSE:** Undisputed. Defendants further note that this PFOF contains no evidence that any communications between Dr. Murthy and Dr. Collins had anything to do with misinformation or social media platforms.

252.    Waldo was involved in collecting information to respond to Plaintiffs' interrogatories on behalf of OSG. *Id.* at 73:19-74:11.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo may not have known that the information was being collected specifically to respond to Plaintiffs' interrogatories in this case. *See* Waldo Dep. 73:11-74:1.

## C.    The Surgeon General Pressures Social-Media Platforms in Private.

253.    The first meeting with social-media platforms relating to misinformation that OSG identified in response to interrogatories was a brief introductory call with Nick Mr. Clegg on May 25, 2021: "On May 25, 2021, from 4:30 to 5:00 pm ET, Dr. Vivek Murthy from OSG and Andy Mr. Slavitt from the White House met remotely with Nick Mr. Clegg from Facebook. The purpose of the call was to introduce Dr. Murthy to Mr. Clegg."  Waldo Ex. 3, at 32; *see also* Waldo Dep. 78:24-79:10. The next meeting disclosed was the first "rollout call" relating to the advisory on July 12, 2021. Waldo Ex. 3, at 32. As noted below, this interrogatory response failed to disclose several previous meetings between Dr. Murthy and Facebook.

**RESPONSE:** Disputed to the extent that this PFOF suggests that OSG's response to Plaintiffs' interrogatories was incomplete. Neither this PFOF, nor any others, contain any evidence that OSG has failed to identify meetings between *OSG* (including the time Dr. Murthy has served as Surgeon General) and Facebook that fits the parameters of Plaintiffs' discovery requests. *See also* Lesko Decl. ¶ 12 (Ex. 63). And in any event, this PFOF contains no evidence that these meetings were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these meetings or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

254.    OSG had pre-rollout calls with Twitter and YouTube on July 12 and July 14, 2021, and a rollout call with Facebook the day after the rollout on July 16, 2021. *Id.* at 32; Waldo Dep. 85:10-90:5.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these meetings were used to threaten or pressure social media companies to censor speech, or that social media companies regarded these meetings or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

255.    Kyla Fullenwider handled the substantive communications with the social-media platforms in the rollout calls; Waldo's role was to "connect them to our subject matter expert." Waldo Dep. 86:24-25.

**RESPONSE:** Undisputed, except to clarify the ambiguous term "substantive communications": Mr. Waldo testified that "Kyla would have walked them through the high-level view" of the Advisory. Waldo Dep. 86:20-21. In any event, this PFOF contains no evidence that these meetings were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these meetings or any other communications by

134

OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

256.    The July 16 call with Facebook was "the same day" that President Biden stated of Facebook that "They're killing people" by not censoring enough misinformation. *Id.* at 90:24, 93:3-5.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the evidence in adding the phrase "by not censoring enough misinformation." That is not supported by the cited deposition testimony or the quote from President Biden. *See.* Ex 45 at 2 (transcript of President Biden's full quote). In any event, this PFOF contains no evidence that the July 16 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

257.    At that July 16 call, Kyla Fullenwider "was able, at a high level, to walk over the … recommendations section for … technology companies," which demand greater censorship of misinformation. *Id.* at 91:14-16.

**RESPONSE:** Disputed, to the extent that the PFOF mischaracterizes the Advisory's recommendations as "demand[ing] greater censorship of misinformation." The Advisory does no such thing. *See* Waldo Ex. 11 at 13. Moreover, the Advisory does not make "demands"—as the quoted deposition testimony shows, these were "recommendations," and no PFOF (including this one) contains evidence that OSG made non-voluntary "demands" of a social media or technology company. In any event, this PFOF contains no evidence that the July 16 meeting or Advisory was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

258.    The Facebook call "was definitely a slightly awkward call" because "President Biden made his comment about social media companies and Facebook killing people … right before, or even potentially during the call," and Waldo observed that "the Facebook team looked a little sad." *Id.* at 92:24-93:6.

**RESPONSE:** Undisputed, with the caveat that Mr. Waldo clarified in his testimony that the President's comment was not discussed during the call. Waldo Dep.93:7-9. He was thus speculating about whether the "Facebook team" was "sad" about the President's comment. In any event, this PFOF contains no evidence that the July 16 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

259.    On July 23, 2021, Waldo, Dr. Murthy, and DJ Patil of the White House had a call with Nick Mr. Clegg and Brian Rice of Facebook. Waldo Ex. 3, at 32-33. Nick Mr. Clegg requested the meeting "to deescalate" and "reset the tone" because the "Facebook team were feeling … that they had been uniquely called out." Waldo Dep. 95:4-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

260.    After the meeting, Nick Mr. Clegg "did share definitely over e-mail more information about what they were doing to reduce mis- and disinformation, COVID mis- and disinformation on the platform." *Id.* at 96:13-17.

**RESPONSE:** Disputed to the extent that the cited deposition testimony does not support the PFOF's characterization that information was shared "[a]fter the meeting." Also disputed to

the extent that Mr. Waldo was recalling the contents of an e-mail that is in the record. *See* Waldo Ex. 19. The e-mail is the best evidence of what the e-mail said. Mr. Waldo was asked about documents in his deposition before being showed those documents; unsurprisingly, in his testimony he may have conflated two different emails. *See* Waldo Ex. 25; Waldo Ex. 21 at 1, 4-5. In any event, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

261.    There was also "a follow-up e-mail sometime the next couple of weeks where … Nick or Brian shared … here's additional work we're doing, here's how we're responding to the advisory." *Id.* at 97:7-11.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the evidence by asserting that this "follow-up e-mail" was different from the e-mail described in Plaintiffs' PFOF ¶ 260. Mr. Waldo testified that Nick Mr. Clegg sent one email on July 23, after his meeting with OSG, which was on week after OSG's initial meeting with Facebook. Waldo Dep. 97:1-11. The e-mail, which is in the record, *see* Waldo Ex. 21 at 1, 4-5, is the best evidence of what the e-mail said. In any event, this PFOF contains no evidence that OSG meetings with Facebook were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

262.    This follow-up email provided "a catalog of … both removal of misinformation and other steps to tamp down mis- and disinformation." *Id.* at 97:16-22.

**RESPONSE:** Undisputed, but see Defs. Response to PFOF ¶¶ 260-61.

263.    Waldo believes that these were "new steps that they had taken in the week or so since … they felt uniquely called out on July 15th and 16th." *Id.* at 97:23-98:3. The email was in

response to a request from OSG "asking for, can you let us know, like, what you're doing in addition" to combat misinformation, "and so this was responding to that." *Id.* at 98:5-7.

**RESPONSE:** Undisputed that the testimony reads as such. However, as discussed in Defendants' response to PFOF ¶¶ 260-61, the PFOFs and deposition testimony conflate two different emails. *See* Waldo Ex. 25; Waldo Ex. 21 at 1, 4-5. The emails themselves are better evidence than Mr. Waldo's recollection over a year later. In any event, this PFOF contains no evidence that the communications between OSG and Facebook were used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these communications or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

264.    On the July 23 call with Facebook, "Dr. Murthy raised the issue of wanting to have a better understanding of the reach of the mis- and disinformation on … the social media platform." *Id.* at 98:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

265.    Waldo likens the problem of mis- and disinformation on social media to "eating, like, a piece of uranium," and compares misinformation to "cancer." *Id.* at 99:1-101:8.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The testimony, read in full and in context, makes clear that the Surgeon General is "trying to understand not just the harm direction but the harm magnitude" such that the problem of misinformation could be like "eating a cookie or eating []a piece of uranium." Waldo Dep. 99:1-8. Similarly, Mr. Waldo's testimony is agnostic on whether the spread of misinformation is like "cancer": "I mean, again, you might say

spread – you might learn, we don't know, this is why you need research. We don't know – you know, maybe actually there isn't as much harm as we think, maybe the spread is actually not the problem. … I don't know if spread is actually harmful." Waldo Dep. 101:15-23. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

266.   The OSG's health advisory advances the view that the spread of misinformation is "very harmful." *Id.* at 101:24-102:7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Advisory was used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

267.   Waldo agrees that the health advisory "provides specific examples to technology companies what they could do more of to reduce the spread of health mis- and disinformation." *Id.* at 104:16-18.

**RESPONSE:** Undisputed. However, the Advisory is the best evidence of what the Advisory says. And in any event, this PFOF contains no evidence that the Advisory was used to threaten or pressure technology companies to censor speech, or that technology companies (or acted on) regarded the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

268.   Waldo uses the word "poison" to describe health misinformation, as did Dr. Murthy in announcing the Health Advisory. *Id.* at 105:4; Waldo Ex. 10, at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

269.    In the July 23, 2021 call with Nick Mr. Clegg, Dr. Murthy "didn't retreat … from the message of the advisory, which explicitly calls for social media platforms to do more to control the reach of misinformation on their platforms," and "continued … to discuss that message." Waldo Dep. 107:21-108:5.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

270.    In addition, in that call, the OSG asked Facebook to report back on "what they were doing in response to the advisory, if they were taking any actions." *Id.* at 109:2-4.

**RESPONSE:** Disputed as a mischaracterization of the testimony, which states that OSG asked Facebook "whether or not they would share what they were doing in response to the advisory." Waldo Dep. 109:2-4. The fact that OSG did not assume that Facebook would share any information—and indeed, asked "whether" it would do so—affirmatively supports Defendants' assertion that the July 23 meeting was not used to threaten or pressure Facebook to censor speech, and that Facebook did not regard (or acted on) this meeting or any other communications by OSG as such. Plaintiffs' implicit assertion otherwise is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

271.    In addition, Patil was "also asking the data impact questions." *Id.* at 109:24.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the July 23 meeting was used to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

272.     OSG perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook, and that Facebook was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business." *Id.* at 113:13-15.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted testimony speaks for itself and does not support Plaintiffs' assertion that OSG "perceived that OSG's and the White House's public statements criticizing Facebook put economic pressure on Facebook." Mr. Waldo testified that OSG declined to have further calls with Facebook because "we thought that it was just more of a PR stunt for them to meet with us to sort of keep Dr. Murthy from saying other – you know, any other things that might be viewed as bad for their business." Waldo Dep. 113:8-15. Mr. Waldo further testified that "there was a recognition that [OSG] didn't think that there was much change that they were going to make in response to the []advisory … and we didn't think they were going to be transparent with us about that." Waldo Dep. 113:24-114:5. That testimony makes clear that Mr. Waldo's point was to explain why *OSG* did not think it was a "good use of Dr. Murthy's time" to engage with Facebook further. In sum, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

273.    Waldo agrees that the events of July 15 and July 16 put unique pressure on Facebook: "when you add the press conference remarks plus President Biden's remarks, it made it seem as though … there was more attention on Facebook." *Id.* at 116:2-5.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted testimony speaks for itself and does not support Plaintiffs' assertion that "the events of July 15 and July 16 put unique pressure on Facebook." Mr. Waldo was asked whether he knew why there was "a focus on Facebook" in that July time frame. Waldo Dep. 113:19-22. He responded that he thought the "focus on Facebook" resulted from "random luck or bad luck" because Facebook "was raised at the press conference" and "in the President's remarks" (which were made in response to a question about Facebook). Waldo Dep. 116:2-9. Mr. Waldo also testified that the Advisory "didn't call out individual organizations" and that OSG did not believe there was a "problem of misinformation [that] was particularly acute on Facebook as compared to other platforms." Waldo Dep. 116:5-16. He did not testify as to any "unique pressure." This PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

274.    The OSG's "subject matter experts" – Kyla Fullenwider, Daniel Tartakovsky, and DJ Patil of the White House – believed that misinformation "was a problem across multiple platforms." *Id.* at 116:15-16.

**RESPONSE:** Undisputed, except to clarify that DJ Patil was not an employee of OSG or one of OSG's "subject mater experts." In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

142

275.   On July 30, 2022, Waldo had a meeting with Google and YouTube representatives, in which the representatives reported to OSG on what actions they were taking that were consistent with or in response to the health advisory: "The topics discussed included YouTube/Google following up on the announcement of the OSG Advisory to share more of the work it was doing around health mis- and disinformation."  Waldo Ex. 3, at 33.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent Plaintiffs

assert "representatives reported to OSG on what actions they were taking that were consistent with

or in response to the health advisory." The quoted language, which speaks for itself, does not

support that proposition. Moreover, Mr. Waldo testified as follows about the content of the

meeting: "I don't recall specifically, but [] the general tone was let us tell you what we're doing

about this issue. ***I didn't – I didn't get the impression that it was new things. I got the impression***

***that it was work that they were already doing.***" Waldo Dep. 120:10-15 (emphasis added); *see also*

Waldo Dep. 121:15-25 ("I think I would remember [] if it was the something new."). Thus, the

evidence directly contradicts Plaintiffs' characterization. In any event, this PFOF contains no

evidence that OSG threatened or pressured Google/YouTube to censor speech, or that

Google/YouTube regarded (or acted on) any communications by OSG as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

276.   When the OSG's health advisory issued, Twitter's policy handle publicly endorsed the OSG's call for greater censorship of health misinformation: "[T]he Twitter policy handle … either retweeted or quote tweeted and said something like, we agree. … [W]e do need an all-society approach, and here's what we're doing."  Waldo Dep. 122:11-16.

**RESPONSE:** Disputed as a mischaracterization to the extent that Plaintiffs assert

"Twitter's policy handle publicly endorsed the OSG's call for greater censorship of health

misinformation." The quoted testimony, which speaks for itself, says nothing about a "call for

greater censorship," and OSG made no such call "for greater censorship." *See* Waldo Ex. 11 (OSG

Advisory, which speaks for itself). Thus, this PFOF contains no evidence that the OSG Advisory

was used to threaten or pressure Twitter to censor speech, or that Twitter regarded (or acted on) the Advisory or any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

277.    On August 10, 2021, Waldo and Rob Flaherty had a call with Facebook in which Facebook reported back to federal officials on its actions to remove misinformation, including the details of "an operation [Facebook] uncovered that is related to vaccine misinformation." Waldo Ex. 3, at 33 (alteration in original). According to Waldo, "Brian Rice had requested a call with me and Rob [Flaherty] and, during the call, flagged that Facebook … had done some sort of internal operation where … they discovered some misinformation pieces happening and had taken some corrective action." Waldo Dep. 124:13-21.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent Plaintiffs assert Facebook "reported back." Neither the quoted language from Defendants' interrogatory responses (Waldo Ex. 3), the underlying email referenced in that response, *see* Ex. 182 (MOLA_DEFSPROD_00007276), nor the deposition testimony supports the proposition that Facebook was "report[ing] back." In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

278.    Brian Rice was Facebook's "main … staff level liaison" with the federal officials. *Id.* at 125:2-3.

**RESPONSE:** Undisputed.

279.    Facebook emailed Waldo and Flaherty "a COVID report list that had … some sort of report from Facebook on a biweekly basis." *Id.* at 126:11-16.

**RESPONSE:** Undisputed. However, there is no evidence that this report was the result of or reflective of efforts by OSG or other federal officials to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal

officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

280.   On September 14, 2021, Waldo had another meeting with Google/YouTube representatives, "to discuss a new policy we [YouTube] are working on as well as provide an update on our overall efforts to combat harmful COVID-19 misinformation on the platform." Waldo Ex. 3, at 33. This was the "second update by [Google/Youtube] to [OSG] following the health advisory of stuff they're doing to combat harmful COVID-19 misinformation through YouTube." Waldo Dep. 129:7-12.

**RESPONSE:** Disputed as a mischaracterization and incomplete account of the evidence to the extent Plaintiffs imply that "following the health advisory" means *because* of or *in response to* the health advisory. Mr. Waldo testified that he largely did not recall the topic of conversation and that the "new policy" could have been "unrelated" to misinformation. Waldo Dep. 129:24-130:16; *see also* Defs.' Resp. to PFOF ¶ 275 (identifying Plaintiffs' mischaracterization of a previous meeting, which Mr. Waldo explained involved Google/YouTube pre-existent efforts to combat misinformation). In any event, this PFOF contains no evidence that the OSG Advisory was used to threaten or pressure Google/YouTube to censor speech, or that Google/YouTube regarded (or acted on) the Advisory or any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

281.   On May 28, 2021, a few days after meeting with Andy Mr. Slavitt and Dr. Murthy for the first time (and almost two months before OSG issued the Health Advisory and had the related meetings with Waldo and others), Nick Mr. Clegg emailed Dr. Murthy and stated that, "[a]s promised," he was sending a report of misinformation on Facebook. Waldo Ex. 4, at 1. Mr. Clegg also "highlighted a few policy updates we announced yesterday regarding repeat misinformation," including "expand[ing] penalties for individual Facebook accounts that share misinformation," "add[ing] more context about pages that repeatedly share false claims," and "redesign[ing] notifications when they share content that a fact-checker later rates." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, to the extent Plaintiffs state that Mr. Clegg was "sending a report of misinformation on Facebook." The email, Waldo Ex.

4, reads: "As promised, I'm sending our latest report that includes topline performing posts for the weeks of 5/3-5/9 and 5/9-5/15." In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

282.    These "policy updates" about increasing censorship were announced on May 27, 2021, two days after Nick Mr. Clegg's meeting with Dr. Murthy and Andy Mr. Slavitt on May 25, 2021. Waldo Dep. 138:2-7.

**RESPONSE:** Disputed to the extent that Plaintiffs characterize the "policy updates" as pertaining to "increasing censorship." None of the updates, which concerned content moderation policies to which all Facebook users had to agree, mentions "censorship" or even the removal of posts. Two of the three updates quoted in Waldo Ex. 4 make clear that content will remain accessible ("added context" and "redesigned notifications"), and the third is ambiguous as to what the "expand[ed] penalties" are. Defendants further note that the evidence does not establish that the policy updates were *created* or *implemented* after May 25, only that they were *announced* thereafter. The commonsense inference is that Facebook was working on these technical changes prior to the May 25 call. Moreover, although the Clegg e-mail notes that the policies were announced on May 27, they were actually announced on May 26, and they were not unique to health misinformation—Facebook announced cross-substantive policy changes that would address "false or misleading content about COVID-19 and vaccines, climate change, elections, or other topics." Facebook, *Taking Action Against People Who Repeatedly Share Misinformation*, Meta (May 26, 2021), https://perma.cc/M75G-YQB8. Thus, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

283.    Mr. Clegg plainly indicated that there had been prior conversations in which Mr. Slavitt and Dr. Murthy had demanded "defensive work" to remove misinformation: "We're . . . committed to addressing the defensive work around misinformation that you've called on us to address." Waldo Ex. 4, at 2. These prior conversations were not disclosed in OSG's responses to interrogatories, which noted the first meeting with Dr. Murthy was a mere introductory meeting with Mr. Clegg on May 25, 2021. Waldo Ex. 3, at 32.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent Plaintiffs

assume that "there had been prior conversations in which Mr. Slavitt *and* Dr. Murthy had

demanded 'defensive work' to remove misinformation." (Emphasis added). First, the statement

does not establish that these conversations involved Mr. Slavitt *and* Dr. Murthy. *See* Defs.' Resp.

to PFOF ¶ 249 (making clear that Mr. Slavitt had been in prior contact with Mr. Clegg, and that

he introduced Dr. Murthy as a contact upon leaving the White House). This refutes Plaintiffs'

incorrect suggestion that OSG's responses to Plaintiffs' interrogatories were incomplete. *See also*

Defs. Resp. to PFOF ¶ 253. Second, the cited email from Facebook does not say that Mr. Slavitt

(or any other federal official) "demanded" "defensive work." It says (somewhat confusingly):

"We're also committed to addressing the defensive work around misinformation that you've called

on us to address." Waldo Ex. 4. In any event, this PFOF contains no evidence that OSG or other

federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or

acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

284.    On June 14, 2021, Nick Mr. Clegg emailed Dr. Murthy another ("the latest") "Facebook bi-weekly covid content report," which he indicated was "as promised/discussed," and offered "[a]s always" to "jump on a call at any point … to delve into any further details as needed." Waldo Ex. 5, at 1.

**RESPONSE:** Undisputed, except to note that Mr. Clegg's email was dated June 12, 2021.

However, there is no evidence that this report was the result of or reflective of efforts by OSG to

threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) any

communications by OSG as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

285.    The "Facebook bi-weekly covid content report," *id.*, contained a report of "the most engaged posts … with respect to both accurate and inaccurate information."  Waldo Dep. 140:8-10. Rob Flaherty of the White House also received these reports. *Id.* at 140:21-24.

**RESPONSE:** Undisputed. However, there is no evidence that this report was the result of

or reflective of efforts by OSG or other federal officials to threaten or pressure Facebook to censor

speech, or that Facebook regarded (or acted on) any communications by OSG or other federal

officials as such. Any implicit assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

286.    Waldo admits that Facebook sending these biweekly reports to Dr. Murthy and Flaherty "had preexisted" and "predates the meeting" on May 25, 2021 – further indicating that OSG failed to disclose key meetings between Dr. Murthy and social media platforms in its interrogatory responses. *Id.* at 142:10-11.

**RESPONSE:** Disputed as a mischaracterization of the evidence. Read in context, it is clear

that Mr. Waldo is testifying that the reports ***existed*** prior to May 25, ***not*** that they were sent to Dr.

Murthy prior to May 25. *See* Waldo Dep. 142:8-11. Mr. Waldo testified "based on just a plain

reading" of the email (Waldo Ex. 5), which says nothing about when Mr. Clegg started sending

the reports to Dr. Murthy or OSG, but instead just makes clear that the reports are "bi-weekly"

(which raises the inference that they were likely in existence more than the couple of weeks

between May 25 and June 12, when the email was sent). Again, as explained throughout, Plaintiffs

are wrong that OSG's interrogatory responses are incomplete. *See also* Defs.' Resp. to PFOF

¶ 253. In addition, the question asked by Plaintiffs' counsel was ambiguous—for example, it did

not specify that he was asking about when **Dr. Murthy** was sent the reports, as opposed to other

federal officials or Mr. Slavitt. And having failed to seek clarification of the witness's answer,

Plaintiffs cannot now rely on that answer to support a proposition to which it does not speak. In

any event, there is no evidence that these reports were the result of or reflective of efforts by OSG

or other federal officials to threaten or pressure Facebook to censor speech, or that Facebook

regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

287.   On July 6, 2021, Waldo emailed contacts at Twitter to set up the "rollout call"
before the health advisory and stated: "As you know, one of the issues Dr. Murthy has been
thinking about is how to help stop the spread of health misinformation as we continue to tackle
COVID19 and beyond. I know you and your teams are working hard and thinking deeply about
this issue. We'd love to chat over zoom to connect and discuss what's on the horizon for our
teams."  Waldo Ex. 6, at 2; Waldo Dep. 145:15-146:22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened

or pressured Twitter to censor speech, or that Twitter regarded (or acted on) any communications

by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

288.   On July 6, 2021, Waldo sent an identical email to Facebook. Waldo Ex. 7, at 3-4.
The purpose of these emails was to set up calls to announce the Surgeon General's forthcoming
health advisory on misinformation. Waldo Dep. 149:11-16. Because of scheduling conflicts, the
"rollout call" with Facebook was not scheduled until July 16, the day after the advisory was
announced and the same day President Biden stated of Facebook that "they're killing people."  *Id.*
at 149:11-17.

**RESPONSE:** Undisputed, except to the extent that the PFOF mischaracterizes President

Biden as "stat[ing] of Facebook that 'they're killing people.'" *See* Defs.' PFOF § II.A; Ex 45 at ;

*see also* Ex. 43 at 2-3 (President Biden clarifying his previous comment). However, this PFOF

contains no evidence that OSG threatened or pressured Facebook to censor speech, or that

Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

289.    On July 6, 2021, Waldo also sent an email to YouTube with a similar statement to set up a rollout call with YouTube. Waldo Ex. 8, at 3. Waldo's emails make clear that OSG's message and purpose was to "stop the spread of misinformation" on social-media platforms. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence. First, the purpose of the email was to "connect[] with people at Google, slash, YouTube." Waldo Dep. 151:7-11. Second, this email (and the emails cited in previous exhibits), which speaks for itself, did not "make clear that OSG's message and purpose was to 'stop the spread of misinformation' on social-media platforms" to the extent Plaintiffs are implying that OSG's message and purpose was demanding censorship. The email states: "As you know, one of the issues Dr. Murthy has been thinking about is how to help stop the spread of health misinformation as we continue to tackle COVID19 and beyond." Waldo Ex. 8 at 3. Mr. Waldo described that call as "giving [Google/YouTube] a high-level update that we're going to have this advisory come out and that we want them to take a look at it." Waldo Dep. 153:24-154:1. In any event, this PFOF contains no evidence that OSG threatened or pressured Google/YouTube to censor speech, or that Google/YouTube regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

290.    In these calls, "we had Kyla [Fullenwider] on the call and giving them a high-level update that we're going to have this advisory come out and that we want them to take a look at it." Waldo Dep. 153:23-154:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used these calls to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these calls or any other communications by OSG as such. Any

implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

291.    On July 10, 2021, Nick Mr. Clegg emailed Dr. Murthy, attaching another bi-weekly Covid content report, and stated, "I understand ... that my team is meeting with yours next week to delve deeper into our [C]ovid misinformation efforts."  Waldo Ex. 9, at 1. Waldo understands that this refers to the July 16 rollout meeting. Waldo Dep. 155:12-18.

**RESPONSE:** Undisputed. Defendants further note that Mr. Clegg's email makes clear that Facebook's "misinformation efforts" were Facebook's ("our") *own*, and that they preceded the Advisory. *See also* Waldo Dep. 157:15-16 (Plaintiffs' counsel understanding the email to refer to "*Facebook's* COVID misinformation efforts" (emphasis added)). Thus, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

292.    In the July 16, 2021 meeting with Facebook, Kyla Fullenwider went over the advisory, and then "asked additional questions ... related to Facebook's efforts to combat health misinformation," including "some questions about, again, the research side.… [S]ome questions came up about CrowdTangle, if I recall correctly which was a … data port for … some ways to understand the Facebook, again, impact and research of the misinformation." *Id.* at 157:21-159:9.

**RESPONSE:** Undisputed, except to note that Mr. Waldo qualified his testimony due to lack of definitive recollection ("I think"; "I'm not exactly positive"). In any event, this PFOF contains no evidence that OSG used the July 16, 2021 meeting to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this meeting or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### D.     The Surgeon General's Public Pressure Campaign.

293.     On July 15, 2021, Dr. Murthy participated in a White House press conference with White House Press Secretary Jennifer Psaki to announce the Surgeon General's Health Advisory on Misinformation. Waldo Ex. 10. Psaki announced of Dr. Murthy that "[t]oday, he published an advisory on health misinformation as an urgent public health crisis." *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the press

conference or Advisory was used to threaten or pressure social media companies to censor speech,

or that social media companies regarded (or acted on) the press conference, Advisory or any other

communications as such. Any implicit assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

294.     At the press conference, Dr. Murthy described misinformation as "one of the biggest obstacles that's preventing us from ending this pandemic," and stated: "Today, I issued a Surgeon General's Advisory on the dangers of health misinformation. Surgeon General Advisories are reserved for urgent public health threats…. [T]oday we live in a world where misinformation poses an imminent and insidious threat to our nation's health." *Id.* at 2. He stated that "misinformation takes away our freedom to make informed decisions about our health and the health of our loved ones." *Id.* at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used this

press conference or the Advisory to threaten or pressure social media companies to censor speech,

or that social media companies regarded (or acted on) the press conference, Advisory, or any other

communications by OSG as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

295.     Dr. Murthy's definition of "misinformation" incorporates the notion that the definition changes over time: "Health misinformation is false, inaccurate, or misleading information about health, according to the best evidence at the time." *Id.* at 2. Waldo agrees that this definition "contemplate[s] that what constitutes misinformation might change over time," and that "something that we now think is misinformation may later turn out to be accurate information … [a]nd vice versa." Waldo Dep. 164:17-165:7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used this

press conference or the Advisory to threaten or pressure social media companies to censor speech,

or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

296.    Dr. Murthy stated that those who question mask mandates and decline vaccination are following misinformation: "During the COVID 19 pandemic, health misinformation has led people to resist wearing masks in high-risk settings. It's led them to turn down proven treatments and to choose not to get vaccinated. This has led to avoidable illnesses and death. Simply put, health [mis]information has cost us lives." Waldo Ex. 10, at 2.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The quoted language, which speaks for itself, does not state that "those who question mask mandates and decline vaccination are following misinformation." In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

297.    Dr. Murthy placed specific blame on social-media platforms for the spread of misinformation: "Now, health misinformation didn't start with COVID-19. What's different now, though, is the speed and scale at which health misinformation is spreading. Modern technology companies have enabled misinformation to poison our information environment with little accountability to their users. They've allowed people who intentionally spread misinformation — what we call 'disinformation' — to have extraordinary reach." *Id.* at 2. Dr. Murthy described social-media companies as enabling the spread of "poison" in our "information environment." *Id.*

**RESPONSE:** Undisputed except to observe that the Advisory and press conference explicitly call for an "all-of-society approach" with "recommendations for everyone," Waldo Ex. 10 at 2, which includes but is not limited to social-media platforms. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

298.    He blamed the platforms' algorithms and features for the spread as well: "They've designed product features, such as 'Like' buttons, that reward us for sharing emotionally charged content, not accurate content. And their algorithms tend to give us more of what we click on, pulling us deeper and deeper into a well of misinformation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

299.    Echoing the language of the Virality Project, Dr. Murthy stated, "we need an all-of-society approach to fight misinformation." *Id.* at 2.

**RESPONSE:** Disputed to the extent the Plaintiffs assert that Dr. Murthy's statement "echo[ed] the language of the Virality Project." No evidence is cited for that assertion, and the Virality Project report that Plaintiffs rely on, Waldo Ex. 28, post-dates the press conference by the better part of a year (April 2022 versus July 2021). In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

300.    Dr. Murthy announced: "we're saying we expect more from our technology companies. We're asking them to operate with greater transparency and accountability. We're asking them to monitor misinformation more closely. We're asking them to consistently take action against misinformation super-spreaders on their platforms." *Id.* at 3. Both the call for "transparency and accountability" and the request for increased monitoring and greater censorship of "super-spreaders" mirror the Virality Project report. *See infra.*

**RESPONSE:** Disputed to the extent Plaintiffs assert that Dr. Murthy's statements "mirror the Virality Project report." No evidence is specifically cited for that assertion (Plaintiffs' "infra" cross-reference is insufficiently specific, and any assertions will be addressed in Defendants' responses to the relevant PFOFs), and the Virality Project report that Plaintiffs rely on, Waldo Ex. 28, post-dates the press conference by the better part of a year (April 2022 versus July 2021). Furthermore, the statement, which speaks for itself, does not "request" "greater censorship of 'super-spreaders.'" Defendants further state that the quoted language is only one of six points that Dr. Murthy made at this portion of the press conference; read in context, it is clear that neither Dr. Murthy's press conference statements nor the Advisory are solely focused on technology companies. *See* Waldo Ex. 28 at 3. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

301.   Both Dr. Murthy's public statements and his health advisory repeatedly use the word "accountable" and "accountability" to refer to the social-media platforms—again, echoing the Virality Project report. *See id.* at 2, 3, 5; Waldo Ex. 11, at 14, 16.

**RESPONSE:** Disputed as a mischaracterization of the evidence. Some of the uses of "accountable" are not references solely (or at all) to social media platforms. *See* Waldo Ex. 10 at 5 ("[A]ll of us have to ask: How we can be more accountable and responsible for the information that we share?"); Waldo Ex. 11 at 16 ("We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable."). And again, Plaintiffs wrongly assert that the statements and Advisory "echo[] the Virality Project": No evidence is cited for that assertion, and the Virality Project report, Waldo Ex. 28, post-dates the press conference and

Advisory by nearly a year (April 2022 versus July 2021). In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press conference, Advisory, or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

302.    Waldo agrees that the word "accountable" carries with it the threat of consequences; he concedes that "accountability includes accepting the consequences for when you do something wrong … or inappropriate."  Waldo Dep. 171:4-8. Thus, the OSG's repeated reference to holding social-media platforms "accountable" entails an implied threat of adverse consequences if the platforms do not censor more health misinformation. *See id.*

**RESPONSE:** Disputed as a mischaracterization of the testimony. First, Mr. Waldo did not agree that the definition of "accountable" carries any "threat." Second, the quoted definition of "accountable" was supplied by Plaintiffs' counsel, *see* Waldo Dep. 171:4-6 ("Q: Does accountability include accepting the consequences for when you do something wrong or inappropriate?"), and Mr. Waldo responded that "that's a fair and modern use of the word accountable," *id.* at 171:7-8. In the specific context of the Surgeon General's Advisory, however, Mr. Waldo testified to his view that "accountability" means "accountability to the . . . public around this public health emergency." *Id.* at 175:5-11. Thus, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded any communications (or acted on) by OSG as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

303.    The Surgeon General's use of the word "accountable" also echoes the repeated use of the word "accountable" by elected federal officials, including President Biden and his political allies, to threaten adverse legal consequences against social-media platforms if they do not increase censorship of disfavored speakers, speech, and viewpoints. *See, e.g.,* Jones Decl., Ex. R (quoting

White House Communications Director Kate Bedingfield: "We're reviewing [amending Section 230 of the Communications Decency Act], and certainly [the social media companies] should be held accountable. I think you've heard the president speak very aggressively about this.").

**RESPONSE:** Disputed as unsupported by the cited evidence. This PFOF cites to a single instance of a statement by a White House official, not "repeated use of the word 'accountable.'" Moreover, in the cited interview, the White House Communications Director was asked whether the President would support amending Section 230 so as to "hold the [social media companies] accountable in a real way," and she demurred on the Section 230 question while noting that "certainly [the companies] should be held accountable." Ex. 46 at 5. However, on July 19, 2021, President Biden clarified the meaning of "accountable:" "When you say hold accountable, I just want to – I'm not trying to hold people accountable. I'm trying to make people look at themselves, look in the mirror, think about that misinformation going to your son, your daughter, your relatives, someone you love. That's all I'm asking." Ex. 43 at 3. Moreover, this PFOF cites no evidence to support the proposition that the Surgeon General's use of the word "accountable" "echoes" the use of the word by other "elected federal officials," in the sense of intentionally choosing to repeat that word because it has been previously used. In addition, the cited evidence says nothing about OSG (or other federal officials) seeking to have social media platforms "increase censorship of disfavored speakers, speech, and viewpoints." In short, Plaintiffs characterization of written statements—which speak for themselves—is unsupported. Thus, this PFOF contains no evidence that OSG or any other federal official threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal official as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

304.    Waldo agrees that Murthy's comments entail that "there's an obligation ... or certainly an imperative to do more. So ... not only stop but reduce or take some sort of mitigating

efforts so that the misinformation and disinformation is not leading to poor health results for people." Waldo Dep. 172:21-173:1.

**RESPONSE:** Disputed to the extent Plaintiffs imply that "obligation" or "imperative," as used in this context, means a legally binding obligation as opposed to a voluntary, but moral, imperative. OSG has no regulatory or enforcement authority, both generally and with respect to social media platforms. Lesko Decl. ¶ 3 (Ex. 63). On its face, the Advisory contains non-binding recommendations for technology companies—and others—that do not constitute an obligation. *See, e.g.*, Waldo Ex. 11 at 12; Waldo Ex. 10 at 2 (Dr. Murthy stating at press conference, "And that's why this advisory that I issued today has recommendations for everyone."). Thus, this PFOF contains no evidence that "Dr. Murthy's comments" threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) this or any other statements by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

305.    Dr. Murthy's call for greater "transparency" is a call for platforms to engage in the kind of data-sharing that Dr. Murthy, Rob Flaherty, DJ Patil, and Kyla Fullenwider, among others, demanded in private meetings with Facebook. *Id.* at 174:15-23. Again, this echoes the key recommendation of the Virality Project.

**RESPONSE:** Disputed. First, this PFOF mischaracterizes this testimony to the extent that it states OSG and other federal officials "demanded" data-sharing. Plaintiffs' counsel's own questions belie that characterization: "We're *asking* them to do things" (Waldo Dep. 174:12-13) and "data sharing[] was *raised* in these private calls" (*Id.* at 174:17-18) (emphases added). Second, the PFOF cites no evidence for the proposition that Dr. Murthy's comments "echoes the key recommendation of the Virality Project"; in any event, as explained above, the Virality Project report that Plaintiffs rely on post-dates the Advisory and July press conference by the better part of a year. In short, this PFOF contains no evidence that "Dr. Murthy's call for greater

'transparency'" threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) this or any other statements or communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

306.    Waldo agrees that Dr. Murthy's call for greater "accountability" includes a demand to "take more proactive steps to stop the spread of misinformation." *Id.* at 176:1-4.

**RESPONSE:** Disputed as a mischaracterization of the testimony to the extent it frames Dr. Murthy's statement as a "demand." Plaintiffs' counsel's question reads: "In other words, we're ***asking*** them to take more proactive steps…" Waldo Dep. 176:1-3 (emphasis added). In any event, this PFOF contains no evidence that "Dr. Murthy's call for greater 'accountability'" threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) this or any other statements or communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

307.    Dr. Murthy also demanded that the platforms do "much, much more" and "take aggressive action" against misinformation: "We know that the dramatic increase in the speed — speed and scale of spreading misinformation has, in part, been enabled by these platforms. So that's why in this advisory today, we are asking them to step up. We know they have taken some steps to address misinformation, but much, much more has to be done. And we can't wait longer for them to take aggressive action because it's costing people their lives."  Waldo Ex. 10, at 5.

**RESPONSE:** Disputed as a mischaracterization of the testimony to the extent it frames Dr. Murthy's statement as a "demand." The quoted language, which speaks for itself, says "we are ***asking*** them to step up" (emphasis added). And the Advisory contains non-binding recommendations, not "demands." *See* Defs.' PFOF § II.B. In any event, this PFOF contains no evidence that OSG used this press conference or the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the press

conference, Advisory, or any other communications by OSG as such. Any implicit assertion to
that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.
§§ II.B.1.c & II.B.2.

308.    Dr. Murthy also stated that platforms "have to do more to reduce the
misinformation that's out there so that the true voices of experts can shine through." *Id.* at 6.

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that OSG used
this press conference or the Advisory to threaten or pressure social media companies to censor
speech, or that social media companies regarded (or acted on) the press conference, Advisory, or
any other communications by OSG as such. Any implicit assertion to that effect is unsupported by
and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

309.    After the advisory, OSG asked Facebook, Google/YouTube, and Twitter "as a
follow-up what actions they might have taken in response to the advisory." Waldo Dep. 181:15-
21.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo testified "I think [we asked]
Facebook and Twitter, maybe Google." Waldo Dep. 181:19-20. However, this PFOF contains no
evidence that OSG used the Advisory to threaten or pressure social media companies to censor
speech, or that social media companies regarded (or acted on) the Advisory, or any other
communications by OSG as such. Any implicit assertion to that effect is unsupported by and
contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

310.    At the same press conference on July 15, 2021, Jennifer Psaki stated: "we are in
regular touch with these social media platforms, and those engagements typically happen through
members of our senior staff, but also members of our COVID-19 team." Waldo Ex. 10, at 10.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials
pressured or threatened social media companies to censor speech, or that social media companies
regarded (or acted on) any communications by federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

311.    Psaki stated: "We've increased disinformation research and tracking within the Surgeon General's office. We're flagging problematic posts for Facebook that spread disinformation." *Id.*

**RESPONSE:** Undisputed, with the caveat that Mr. Waldo testified that he did not "know

what [Ms. Psaki was] referring to," but it most likely meant the "research done by the policy team

in the creation of the advisory." Waldo Dep. 186:5-19. He was "not familiar with any . . . increase

in tracking" of "disinformation." *Id.* at 186:18-19. In any event, this PFOF contains no evidence

that OSG or other federal officials pressured or threatened social media companies to censor

speech, or that social media companies regarded (or acted on) any communications by OSG or

other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White

House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

312.    "Regarding the Administration's "asks" to social-media platforms, Psaki stated: "There are also proposed changes that we have made to social media platforms, including Facebook, and those specifically are four key steps: One, that they measure and publicly share the impact of misinformation on their platform. Facebook should provide, publicly and transparently, data on the reach of COVID-19 — COVID vaccine misinformation. Not just engagement, but the reach of the misinformation and the audience that it's reaching." *Id.* at 11. Again, this echoes the key recommendation of the Virality Project report. It also echoes Dr. Murthy's call for "transparency" and the repeated private demands that Facebook give external researchers like Renee DiResta of the Virality Project access to its internal data. Waldo Dep. 191:17-21.

**RESPONSE:** Disputed as a mischaracterization of, and unsupported by, the cited

evidence. First, to the extent "echo" implies intentionally repeating a prior statement, the PFOF

makes no sense: the Virality Project report post-dated the press conference by the better part of a

year (April 2022 vs. July 2021). Second, the cited portion of Mr. Waldo's deposition says nothing

about "repeated private demands that Facebook give external researchers like Renee DiResta of

the Virality Project access to its internal data." In short, this PFOF contains no evidence that OSG or other federal officials pressured or threatened Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

313.    Psaki also stated: "Second, that we have recommended — proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So, about — I think this was a question asked before — there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms All of them remain active on Facebook, despite some even being banned on other platforms, including Facebook — ones that Facebook owns."  Waldo Ex. 10, at 11.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

314.    Psaki stated: "Third, it's important to take faster action against harmful posts. As you all know, information travels quite quickly on social media platforms; sometimes it's not accurate. And Facebook needs to move more quickly to remove harmful, violative posts — posts that will be within their policies for removal often remain up for days. That's too long. The information spreads too quickly." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

162

315.   Waldo agrees that the Surgeon General's advisory calls for platforms to "move faster" and take "more aggressive" action against supposed misinformation. Waldo Dep. 194:20-21.

**RESPONSE:** Disputed to the extent the PFOF says "against supposed misinformation." Plaintiffs' counsel's question in the deposition referred to "harmful posts" and Mr. Waldo answered: "I don't recall that level of specificity within the advisory, but the -- certainly the advisory overall has recommendations for technology companies, including -- I think there's more vague language of sort of that that says something to the extent of move faster or -- or, you know, more aggressive, but I don't think it -- this level of specificity." Waldo Dep. 194:14-22. The Advisory is the best evidence of what the Advisory says; Mr. Waldo's attempt to recall the contents of a public document that he was not looking at has minimal probative value. In any event, it is unclear what purpose it serves to cite Mr. Waldo's "agreement" (based on an amorphous recollection) when the Court can look to the Advisory itself to understand what it does (and does not) say. In short, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

316.   And Psaki stated, publicly criticizing Facebook: "Finally, we have proposed they promote quality information sources in their feed algorithm. Facebook has repeatedly shown that they have the levers to promote quality information. We've seen them effectively do this in their algorithm over low-quality information and they've chosen not to use it in this case. And that's certainly an area that would have an impact."  Waldo Ex. 10, at 11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Psaki's explanation of the White House's proposal as a "criticiz[m]" of Facebook. The cited statement does not support that characterization. In any event, this PFOF contains no evidence that federal officials pressured

or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

317.   Psaki concluded: "So, these are certainly the proposals. We engage with them regularly and they certainly understand what our asks are." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

318.   On the same day, July 15, 2021, Surgeon General Murthy issued his advisory, "Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment."  Waldo Ex. 11, at 1 (the "Health Advisory"); Waldo Dep. 196:21-197:1.

**RESPONSE:** Undisputed.

319.   The Health Advisory describes censorship of health misinformation as a "moral and civic imperative": "Health misinformation is a serious threat to public health. … Limiting the spread of health misinformation is a moral and civic imperative that will require a whole-of-society effort."  Waldo Ex. 11, at 2. The "whole-of-society effort" echoes the language of the Virality Project.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the evidence. First, the Advisory says nothing about "censorship of health misinformation." Second, Plaintiffs provide no evidence for the last sentence of the PFOF; and as already noted, the Virality Project report post-dates the Advisory by the better part of a year. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by

OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

320.    The Health Advisory states: "Misinformation has caused confusion and led people
to decline COVID-19 vaccines, reject public health measures such as masking and physical
distancing, and use unproven treatments." *Id.* at 4.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used the

Advisory to threaten or pressure social media companies to censor speech, or that social media

companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any

implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

321.    The Health Advisory specifically blames social-media platforms for the spread of
misinformation: "In recent years, the rapidly changing information environment has made it easier
for misinformation to spread at unprecedented speed and scale, especially on social media and
online retail sites, as well as via search engines." *Id.* at 5. According to the Advisory,
"misinformation is often framed in a sensational and emotional manner that can connect viscerally,
distort memory, align with cognitive biases, and heighten psychological responses such as anxiety.
People can feel a sense of urgency to react to and share emotionally charged misinformation with
others, enabling it to spread quickly and go 'viral.'" *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory, which

speaks for itself (and contradicts the PFOF, as evidenced by the quoted language from the

Adivsory). In particular, the Advisory does not "specifically blame social-media platforms," but,

as stated in the quoted passage, attributes the "speed and scale" at which misinformation can now

spread to the "changing information environment" as a whole. *See, e.g.*, Waldo Ex. 11 at 6 ("each

of us has a role to play" in addressing misinformation); *id.* at 12 ("Addressing health

misinformation will require a whole-of-society effort."). In any event, this PFOF contains no

evidence that OSG used the Advisory to threaten or pressure social media companies to censor

speech, or that social media companies regarded (or acted on) the Advisory or any other

communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

322.    In addition, the Advisory blames "product features" of platforms: "[P]roduct features built into technology platforms have contributed to the spread of misinformation. For example, social media platforms incentivize people to share content to get likes, comments, and other positive signals of engagement. These features help connect and inform people but reward engagement rather than accuracy, allowing emotionally charged misinformation to spread more easily than emotionally neutral content." *Id.*

**RESPONSE:** Disputed, to the extent the PFOF mischaracterizes the Advisory, which speaks for itself. In the quoted passage, the Advisory does not "blame[]" social-media platforms for the spread of misinformation, but merely identifies certain features of technology platforms as "contribut[ing]" factors. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

323.    The Advisory also faults platforms' "algorithms": "algorithms that determine what users see online often prioritize content based on its popularity or similarity to previously seen content. As a result, a user exposed to misinformation once could see more and more of it over time, further reinforcing one's misunderstanding." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory, which in the quoted passage does not "fault[]" platforms but merely describes the manner in which their content-recommendation algorithms function. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

166

324.    The Health Advisory specifically called for platforms to enact "policy changes" to reduce the spread of misinformation: "**Implement product design and policy changes on technology platforms** to slow the spread of misinformation." *Id.* at 7 (bold in original).

**RESPONSE:** Undisputed, except to clarify that "called for" does not mean a binding or non-voluntary demand. The Advisory contains "recommendations." *See* Waldo Ex. 11 at 3 (Dkt. 210-12) ("A Surgeon General's Advisory is a public statement that calls the American people's attention to a public health issue and provides recommendations for how that issue should be addressed."). In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

325.    The Health Advisory also explicitly threatened future "legal and regulatory measures" to combat misinformation: "**Convene federal, state, local, territorial, tribal, private, nonprofit, and research partners** to explore the impact of health misinformation, identify best practices  to prevent and address it, issue recommendations, and find common ground on  difficult questions,  including *appropriate legal and regulatory measures that address health misinformation* …." *Id.* at 7 (bold in original, italics added).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory, which issued no threats and suggested an "area[] of action" that included "conven[ing]" "*private*" "partners"—i.e., social media platforms and technology companies—to find "*common ground*" on possible "legal and regulatory measures." In addition, the omitted section of the quotation states: "including appropriate legal and regulatory measures that address health misinformation *while protecting user privacy and freedom of expression*." Waldo Ex. 11 at 7. Moreover, OSG does not have any regulatory or enforcement authority. Lesko Decl. ¶ 3 (Ex. 63). In short, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory

or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

326.    Under the heading "What Technology Platforms Can Do," the Health Advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of "misinformation," including the following: "[M]ake meaningful long-term investments to address misinformation, including product changes. Redesign recommendation algorithms to avoid amplifying misinformation, build in "frictions" … to reduce the sharing of misinformation, and make it easier for users to report misinformation. Give researchers access to useful data to properly analyze the spread and impact of misinformation. Strengthen the monitoring of misinformation. … [A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video. Prioritize early detection of misinformation 'super-spreaders' and repeat offenders. Impose clear consequences for accounts that repeatedly violate platform policies. Evaluate the effectiveness of internal policies and practices in addressing misinformation and be transparent with findings. Publish standardized measures of how often users are exposed to misinformation and through what channels, what kinds of misinformation are most prevalent, and what share of misinformation is addressed in a timely manner. Communicate why certain content is flagged, removed, downranked, or left alone." *Id.* at 12.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the Advisory. The Advisory's identification of modifications that platforms voluntarily could make to their content-recommendation algorithms, and additional steps they voluntarily could take to ensure enforcement of their content moderation policies, to which all users must agree, did not constitute a "call" for platforms to "increase and enable greater social-media censorship" There are also minor alterations to the text and missing ellipses that are not reflected in the PFOF. *See* Waldo Ex. 11 at 12. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

327.    Waldo agrees that the Advisory calls for platforms to provide "a method for users to flag problematic posts so that they could be reviewed for content modulation, policy violations." Waldo Dep. 200:25-201:5.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Waldo as agreeing that the Advisory "call[ed]" on the platforms to do anything. Immediately prior to the quoted language, Mr. Waldo emphasized the voluntary nature of all the items in the Advisory: "[I]t suggests that these are things they can do. … It's a recommendation." Waldo Dep. 200:16-19. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

328.    Waldo agrees that "clear consequences" for repeat violators include "things like issuing strikes against them, suspensions … and sometimes permanent deplatforming." *Id.* at 205:6-13.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Mr. Waldo's testimony. Mr. Waldo was asked whether "clear consequences for repeat violator of policies usually includes things like issuing strikes against them, suspensions, . . . and sometimes permanent deplatforming." Waldo Dep. 205:6-10. He answered: "Those are examples of . . . current policies in place by social media companies, correct." Waldo Dep. 205:11-13. He did not testify that the Advisory was recommending any of those particular actions. In any event, this PFOF contains no evidence that OSG used the Advisory to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the Advisory or any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

329.    In its conclusion, the Health Advisory states: "We need institutions to recognize that this issue is their moral and civic responsibility, too, and that they are accountable." Waldo

Ex. 11, at 16. Waldo agrees that the word "accountable" is repeated in the Surgeon General's remarks and the Advisory itself. Waldo Dep. 206:3-11.

**RESPONSE:** Undisputed. Defendants further state that immediately prior to the quoted

language the Advisory states: "[A]ll of us, in every sector of society, have a responsibility to act"

and "address[ing] misinformation" is also "an individual responsibility." In any event, this PFOF

contains no evidence that OSG used the Advisory to threaten or pressure social media companies

to censor speech, or that social media companies regarded (or acted on) the Advisory or any other

communications by OSG as such. Any implicit assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### F. The Surgeon General's Collaboration with the Virality Project.

330.    Also on January 15, 2021, Surgeon General Murthy participated in a separate launch event hosted by Stanford Internet Observatory, which was then operating the Virality Project. Waldo Ex. 12, at 1; Waldo Dep. 206:12-207:9.

**RESPONSE:** Disputed to the extent that the cited evidence does not support the

proposition that the Stanford Internet Observatory ("SIO") was "then operating the Virality

Project." Furthermore, "January 15" appears to be a typo; it should read "July 15, 2021."

Defendants further note that OSG understood the July 15 event to be an event hosted by SIO, not

the Virality Project. *See* Lesko Decl. ¶ 15 (Ex. 63). Indeed, the event's public announcement—

submitted by Plaintiffs into evidence—does not reflect any affiliation with the Virality Project.

*See* Waldo Ex. 12 at 1-2. In any event, this PFOF contains no evidence that OSG used this event

to threaten or pressure social media companies to censor speech, or that social media companies

regarded (or acted on) the event, or any other statements by OSG, as such. Any implicit assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B,

Arg. §§ II.B.1.c & II.B.2.

331.    In his public comments with Stanford Internet Observatory, Dr. Murthy stated: "We're asking technology companies to operate with greater transparency and accountability so that misinformation doesn't continue to poison our sharing platforms, and we know the government can play an important role, too."  Waldo Ex. 12, at 8 (Audio Tr. 6). This reiterates the key words "poison" and "accountability."

**RESPONSE:** Disputed to the extent the phrase "[t]his reiterates the key words 'poison' and 'accountability'" is an argumentative assertion with no cited evidentiary support. Defendants further state that immediately prior to the quoted language in Waldo Ex. 12, which purports to be a transcript of some portions of the SIO event, Dr. Murthy emphasizes that "this surgeon general advisory has recommendations for *everyone*" and goes on to include "clinicians," "educators," "researchers" and "journalists" (not just "technology companies"). *Id.* at 8 (emphasis added). In any event, this PFOF contains no evidence that OSG used this event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the event, or any other statements by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

332.    Waldo describes government's "important role" as including "bringing stakeholders … together with urgency around a common vision for a healthy information environment … the government can help bring together stakeholders … what I would call the convening power of a bully pulpit." Waldo Dep. 209:15-22. This would include bringing social-media platforms around to the government's "common vision" for censorship. *Id.* at 209:24-210:8.

**RESPONSE:** Disputed to the extent that the last sentence of the PFOF is an argumentative mischaracterization of the cited testimony, which makes no reference to imposing a unilateral Government "vision" on the platforms about anything, much less "censorship."  Rather, Mr. Waldo simply agreed to the proposition—as framed by Plaintiffs' counsel in his own question—that "you'd want them [the platforms] to share the urgency to have a common vision for a health information environment[.]" Waldo Dep. 210:4-8. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media

companies regarded (or acted on) any other communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

333.   Dr. Murthy was asked, "do you believe a rapid response initiative like the Virality Project could be implemented at the federal level to combat health misinformation on a national scale from the top down?" and he answered that "having a federal organized effort to combat misinformation" is "a really, really interesting idea."  Waldo Ex. 12, at 10 (Audio Tr. 8).

**RESPONSE:** Disputed as an incomplete account of the cited evidence. In between the selectively excerpted quotes, the transcript (which purports to be an incomplete transcript of only portions of the SIO event) contains the following statement ascribed to Dr. Murthy: "Well, that's a really interesting question, Taylor, and I do think that it could be really interesting to look at the idea in having . . . a federal organized effort to combat misinformation the way you're talking about. I think [of it] almost [like] a myth buster's effort to help people bring sort of direct information [and counter] things they may be hearing that are false[.]" Waldo Ex. 12 at 10 (alterations made to fix numerous errors in the transcript, which includes a note on page 3 that it "should not be considered verbatim" due to "the quality of the recorded media"). In any event, this PFOF contains no evidence that OSG used the SIO event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the event, or any other statements by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

334.   Dr. Murthy stated: "[T]echnology companies have a really important role. They must step up and play to slow the spread of misinformation on their sites wh[ether] that's by either sharing data with people and researchers about what interventions they're making and the impact that's having or whether it's by changing their algorithms and making other alterations to their platform to identify misinformation early and slow its spread and avoid sending more information of misinformation to people who are consuming it."  *Id.* at 11 (Audio Tr. 9).

**RESPONSE:** Disputed to the extent that Waldo Ex. 12, which purports to be an incomplete transcript of only portions of the SIO event, contains numerous errors. Defendants state further that the PFOF presents a misleadingly incomplete account of the exhibit, which also ascribes to Dr. Murthy the statements "there are steps all of us can take to address [health misinformation] as individuals" and "[e]ducators and healthcare professionals have a really important role they can play[]." Waldo Ex. 12 at 11. In any event, this PFOF contains no evidence that OSG used the SIO event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the event, or any other statements by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

335.    Waldo agrees that "the purpose of the data sharing is so that outside people come in and … assess how well they're doing with their own internal policies to combat the spread of misinformation." Waldo Dep. 211:6-11.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the evidence. Mr. Waldo was being asked about what the incomplete transcript of the SIO event says. He was not expressing a view (either for himself or OSG) on "the purpose of data sharing." In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

336.    Dr. Murthy expressly stated that he had been coordinating with Renee DiResta and the Virality Project and planned to continue to do so: "Well, thank you, Renee, for those kind words. … I do want to say thank you to you personally because you have been a leader in this effort long before many people recognize[d] what was happening with COVID misinformation. You were there looking at the data, looking at the numbers, speaking out, raising the flags, saying there's something here we've got to address and do so urgently. I have personally learned a lot from your work and from our conversations together, and so I just want to say thank you to you for everything you've done for being such a great partner for moderating our event today, and just

for being a partner in the future, because I know we have lots and lots more that we've got to do together."  Waldo Ex. 12, at 12 (Audio Tr. 10).

**RESPONSE:** Disputed as a mischaracterization of the evidence, particularly to the extent Plaintiffs assert that Dr. Murthy stated he had been "coordinating with . . . the Virality Project." The exhibit, which purports to be an incomplete transcript of only portions of the SIO event, speaks for itself, and the quoted language does not support Plaintiffs' characterization. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

337.    Dr. Murthy also stated that his team had been "partnered with" the Stanford Internet Observatory over "many months": "myself, my team, we're committed to working with you, Renee, with others … who we've been … partnered with over the last many months…." *Id.* at 13 (Audio Tr. 11).

**RESPONSE:** Disputed as a mischaracterization of the evidence. The exhibit, which purports to be an incomplete transcript of only portions of the SIO event, speaks for itself, and it does not support Plaintiffs' characterization. It is unclear whether Dr. Murthy is referring to "Renee" or "others" as those OSG has "partnered with over the last many months," and the transcript does not mention SIO. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### G.     The Surgeon General's "Angry" and "Tense" Meetings With Platforms.

338.     On July 16, 2021, the New York Times reported that President Biden publicly stated about Facebook, "They're killing people" by allowing misinformation to spread on its platforms. Waldo Ex. 14, at 1.

**RESPONSE:** Disputed inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. In addition, Plaintiffs' PFOFs fails to include President Biden's full statement and lacks context. In response to the question "On COVID misinformation, what's your message to platforms like Facebook?," President Biden responded "They're killing people. I mean, they're really—they—look, the only pandemic we have is among the unvaccinated, and that—and they're killing people." Ex. 45 at 2. President Biden later clarified that "Facebook isn't killing people; these 12 people are out there giving misinformation. Anyone listening to it is getting hurt by it. *It's* killing people . . . the outrageous misinformation about the vaccine. That's what I meant."  Ex. 43 at 2-3. He continued, "My hope is that Facebook—instead of taking it personally—that somehow I'm saying Facebook is killing people, that they would do something about the misinformation—the outrageous misinformation about the vaccine. That's what I meant." *Id.* In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

339.     The article reported that "this week, White House officials went further and singled out social media companies for allowing false information to proliferate. That came after weeks of failed attempts to get Facebook to turn over information detailing what mechanisms were in place to combat misinformation about the vaccine, according to a person familiar with the matter." *Id.*

**RESPONSE:** Undisputed that the cited article reads as such, but note that the article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

340.    The same article reported that Jennifer Psaki stated, "We raised for them in our direct channels, of which every administration has always had with every social media platform, that we're seeing this trend." *Id.* at 2.

**RESPONSE:** Undisputed, but Defendants note that the quoted statement comes from a publicly available transcript of a White House press briefing that is in evidence. *See* Ex. 37 (July 16, 2021, Press Briefing transcript). During the press briefing Ms. Psaki also stated: "We don't take anything down. We don't block anything. Facebook and any private-sector company makes decisions about what information should be on their platform. Our point is that there is information that is leading to people not taking the vaccine, and people are dying as a result. And we have a responsibility, as a public health matter, to raise that issue. The responsibility we all have — the government, media platforms, public messengers — to give accurate information." *Id.* In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2.

341.     The article reported that there had been a series of "talks" between Surgeon General Murthy and Facebook "since January" of 2021—none of which were disclosed in OSG's interrogatory responses: "Since January, senior White House officials, including the surgeon general, Dr. Vivek Murthy, have been in talks with the social media company to stop the spread of false stories about vaccination side effects and other harms." *Id.* at 2. In these "talks," federal officials demanded Facebook's internal data on misinformation on its platforms: "Despite repeated requests by the White House, Facebook has not shared even basic data on how much vaccine misinformation exists and if the company's efforts to stop its spread are working, according to the person familiar with the talks." *Id.* at 2.

**RESPONSE:** Disputed inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterizations of statements and events for which Plaintiffs cite no supporting evidence. Also dispute Plaintiffs' characterization of the article as representing that "officials *demanded* Facebook's internal data on misinformation on its platforms." (emphasis added). The quoted language refers to "requests." Further dispute Plaintiffs' assertion that OSG's interrogatory responses are incomplete. In addition to the article's inherent unreliability, it refers to "senior White House officials" who were allegedly in talks with companies since "January" of 2021. The article does not say specifically that Dr. Murthy—who was only confirmed as Surgeon General in March 2021—was involved in multiple talks with Facebook beginning January 2021. Second, to the extent the article can be read to suggest that meetings took place between OSG personnel and Facebook personnel prior to July 19, 2021 (the date of the article's last update), which meetings were not disclosed in OSG's interrogatory responses, the article is mistaken. *See* Lesko Decl. ¶¶ 12-13 (Ex. 63). In sum, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

342.    "When administration officials presented data from CrowdTangle, a content tracking tool owned by Facebook, that showed vaccine misinformation was soaring, company officials dismissed its accuracy." *Id.* at 2.

**RESPONSE:**    Disputed inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. In any event, this PFOF contains no evidence that OSG or any other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or any other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

343.    In one meeting, Dr. Murthy "angrily" demanded that Facebook censor misinformation instead of just promoting reliable information: "In another meeting with Dr. Murthy, … Dr. Murthy angrily said that while the company [Facebook] promoted its efforts to encourage vaccination, it did not do enough to defend against bad information." *Id.* at 2.

**RESPONSE:**    Disputed first, inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. Disputed also because the first sentence mischaracterizes the quoted language from the article, which does not state that Dr. Murthy "demanded that Facebook censor misinformation instead of just promoting reliability information." The article on its face is suspect; as Mr. Waldo testified, the exchange it describes does not match Dr. Murthy's character. Waldo Dep. 223:21-224:2 ("[F]]rankly, I'm doubtful that . . . I worked with Dr. Murthy for over a year and a half and I've never seen him get angry or even express anger [or] frustration in any way that would be noticeable. So I'm skeptical of this reporting." (cleaned up)); *see also* Lesko Decl. ¶ 13 (Ex. 63) ("I am not aware of any meeting that involved Dr. Murthy 'angrily' stating anything. There is no meeting before July 19, 2021 (the last

date the article was updated), that satisfies both the condition that (i) it involved Dr. Murthy and Facebook employees; and the condition that (ii) it could be characterized as 'tense,' 'defensive[]' or 'angr[y].' I have confirmed my understanding with the Surgeon General. **To the extent the article can be read to suggest otherwise, it is wrong**." (emphasis added)). In all events this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

344.    In another "tense" meeting in "late spring," Dr. Murthy repeated similar demands: "In one tense meeting in the late spring, according to the person familiar with the matter, a Facebook official responded defensively, 'How do you know if your efforts are working?'" *Id.* at 2.

**RESPONSE:** Disputed first inasmuch as the cited article constitutes a combination of unsubstantiated hearsay and journalistic characterization regarding statements and events for which Plaintiffs cite no supporting evidence. Also disputed because the first sentence mischaracterizes the quoted language from the article, which makes no reference to Dr. Murthy making "demands" of any kind, or even suggest that Dr. Murthy attended the particular meeting in question. *See also* Defs.' Resp. to PFOF ¶¶ 341, 343, 344 (citing evidence that refutes the article's suggestion that any "tense" meeting occurred as described in the article). In all events this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

345.    Waldo agrees that this news report "does not accurately describe … that introductory call between Nick Mr. Clegg, Andy Mr. Slavitt, and Dr. Murthy on May 25th of 2021," which is the only meeting involving Dr. Murthy disclosed in OSG's interrogatory

responses. Waldo Dep. 219:17-21; 222:14-23. In those responses, OSG did not disclose Dr. Murthy's "tense" and "angry" meetings with Facebook during the spring of 2021.

**RESPONSE:** Disputed to the extent that Plaintiffs assert that OSG's interrogatory responses failed to disclose meetings involving the Surgeon General and Facebook during Spring 2021. As explained above, *see* Defs.' Resp. to PFOF ¶¶ 341, 343, 344, it appears that either Plaintiffs are misreading the article, the article is mistaken, or both. Indeed, Mr. Waldo testified that he was "skeptical of this reporting," Waldo Dep. 224:1-2, and as Max Lesko, Chief of Staff for OSG, explains in his declaration submitted herewith, the article is inaccurate, Lesko Decl. ¶ 13 (Ex. 63). Defendants further note that OSG's interrogatory responses disclose more than one meeting involving Dr. Murthy, so Plaintiffs assertion that May 25 was "the only meeting involving Dr. Murthy [that was] disclosed" is flatly incorrect. *See* Waldo Ex. 3 at 32-33. In sum, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

## H.    The Surgeon General Leverages Public Pressure to Increase Censorship.

346.    On July 21, 2021, five days after the July 16 meeting where "the Facebook folks … had sad faces," *id.* at 226:15-16, Facebook emailed Waldo and Kyla Fullenwider, stating: "We wanted to follow up with you on a few questions you asked in the meeting focused on CrowdTangle, data on the online interventions, and Facebook's borderline content policies," Waldo Ex. 16, at 1. This referred to the July 16 meeting with Waldo and Fullenwider. Waldo Dep. 227:3-8.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

347.    In the email, Facebook reported back to OSG on "interventions that the team mentioned, some of which specifically create frictions in how people consume information." Waldo Ex. 16, at 1. These include limiting forwarded WhatsApp messages, placing "warning labels on fact checked content," and creating "friction when someone goes to share these posts on Facebook." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs mischaracterize the email as "report[ing] back to OSG." Indeed, the email indicates that OSG asked about ***data*** on the online interventions—that is, information about interventions that pre-date the Surgeon General's Advisory. *See* Waldo Ex. 16 at 1 ("Here are some examples of interventions *we have put in place during COVID-19.*" (emphasis added)). In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

348.    Facebook also reported to OSG a series of censorship policies and actions, including the following: "We remove COVID-19 content that contributes to the risk of imminent physical harms, including numerous false claims about the COVID-19 vaccine. We permanently ban pages, groups, and accounts that repeatedly break our rules on COVID-19 misinformation. We also reduce the reach of posts, pages, groups, and accounts that share other false claims that do not violate our policies but may present misleading or sensationalized information about COVID-19 and vaccines."  *Id.* at 1. Evidently, OSG's inquiry at the July 16 meeting about "borderline content" related to the censorship of such content. *See id.* Waldo agrees that Fullenwider asked Facebook to report back about censorship at the July 16 meeting: "The response indicates that it's about COVID policies including removal, banning and reducing the reach." Waldo Dep. 232:9-11, 233:12-234:1.

**RESPONSE:** Disputed as a mischaracterization of the evidence, in several respects. First, Facebook's email referred to various of its content moderation policies and practices, to which all users agree, and makes no reference to "censorship policies and actions."  Second, nothing in the e-mail suggests that OSG had inquired about "censorship" of "borderline content," or that OSG had inquired about content moderation of borderline content at all. Third, Mr. Waldo emphatically did not agree that "[Ms.] Fullenwider asked Facebook to report back about censorship," or to report

about anything else. Mr. Waldo specifically testified—in a passage adjacent to the quoted testimony—that he did *not* remember Ms. Fullenwider asking about those topics, Waldo Dep. 232:12-17, and he explained that those topics may have been included "not because [Ms. Fullenwider] asked" but because Facebook was thinking about Ms. Psaki's statements at the press conference, *id.* at 233:3-12. Defendants also note that the email appears to be describing Facebook policies and actions that pre-date the Surgeon General's Advisory. In any event, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

349.    On July 16, 2021, Nick Mr. Clegg emailed Dr. Murthy and stated, "Dear Vivek, Reaching out after what has transpired over the past few days following the publication of the misinformation advisory and culminating today in the President's remarks about us." Waldo Ex. 17, at 1-2. He then stated, "I know our teams met today to better understand the scope of *what the White House expects of us on misinformation* going forward." *Id.* at 2 (emphasis added). Facebook understood the purpose of the meetings was to understand the White House's expectations on misinformation. *See id.*

**RESPONSE:** Undisputed that the email reads as such. But Mr. Clegg was not involved in that meeting, and Mr. Waldo (who was present at the meeting) specifically testified that Mr. Clegg's understanding was wrong: "Q. Yeah. Was that his under— was that your understanding that the meeting related to what the White House expects from Facebook on misinformation going forward[?] A. No." Waldo Dep. 236:21-25. Mr. Waldo did not know how or why Mr. Clegg had that understanding. *Id.* at 237:1-4. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

350.    Mr. Clegg indicated that there had been a history of prior discussions with Dr. Murthy and the White House in which federal officials demanded greater censorship—both more stringent policies and greater enforcement—which were not disclosed in OSG's interrogatory responses: "Certainly we understand (and have understood for some time) that there is disagreement on some of the policies governing our approach and how they are being enforced." *Id.* at 2. Mr. Clegg asked for a meeting with Dr. Murthy, who did not immediately respond. *Id.* at 1-2.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence. The email does not refer to a "history of prior discussions with Dr. Murthy," such that (as previously explained) Plaintiffs' assertion that OSG's interrogatory responses are incomplete is completely unfounded. *See also* Lesko Decl. ¶¶ 12-13 (Ex. 63). Nor does the cited language support the assertion that Dr. Murthy or White House officials had "demanded" anything of Facebook, much less "censorship" of any kind—this is an apparent reference to (and mischaracterization of) Facebook's content moderation policies, to which all users must agree. It is also unclear what Plaintiffs mean to suggest by asserting that "Dr. Murthy" "did not immediately respond" to Mr. Clegg's request for a meeting; he responded on the Monday following Mr. Clegg's Friday evening email. *See* Waldo Ex. 17 at 1. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

351.    On July 18, 2021, having received no response to his email requesting a meeting, Mr. Clegg texted Dr. Murthy stating, "I imagine you and your team are feeling a little aggrieved – as is the FB team, it's not great to be accused of killing people – but as I said by email I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits." Waldo Ex. 18, at 1.

**RESPONSE:** Disputed to the extent that Plaintiffs speculate as to Mr. Clegg's motivations ("having received no response to his email…"). In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

352.   On July 19, Dr. Murthy responded by email and agreed to a meeting, which was scheduled for July 23, 2021. Waldo Ex. 17, at 1; Waldo Dep. 241:1-14.

**RESPONSE:** Undisputed.

353.   At the July 23, 2021 meeting, "Dr. Murthy asked Mr. Clegg about … the research questions about understanding the reach of the data in terms the impact of the … health misinformation. And … DJ [Patil] had some questions about also on the data side and Nick [Mr. Clegg] offered to connect DJ with a data person from Facebook." Waldo Dep. 242:8-16.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

354.   Later on June 23, 2021, after the meeting between Dr. Murthy and Nick Mr. Clegg, Mr. Clegg sent a follow-up email to Dr. Murthy stating: "Dear Vivek, if I may, thanks again for taking the time to meet earlier today….. I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen'…." Waldo Ex. 19, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

355.    Mr. Clegg's reference to "just this past week" refers to the one-week period between this July 23 email and rollout of the Advisory on July 15 and the President's comment "They're killing people" on July 16. *Id.*; Waldo Dep. 244:14-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

356.    It is evident that Dr. Murthy and federal officials pressured Facebook for specific censorship actions in the July 23 meeting, because the same day as the meeting, Mr. Clegg reported back to them a series of new censorship actions and policies. First, Mr. Clegg reported enforcement actions against the "Disinfo Dozen" whom Jennifer Psaki had publicly demanded censorship: "We removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)."  Waldo Ex. 19, at 1. Mr. Clegg reported that Facebook was secretly censoring accounts associated with the Disinfo Dozen even if they had not violated Facebook's policies: "We are also continuing to make 4 other Pages and Profiles, which have not yet met their removal thresholds, more difficult to find on our platform." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited evidence. The cited email says nothing to indicate, as Plaintiffs surmise, that Dr. Murthy or other federal officials (including Ms. Psaki), "pressured Facebook" to take the actions reported, none of which involved "censorship" as opposed to decisions by Facebook regarding application of its own content moderation policies, to which all users agree, or "publicly demanded censorship." Furthermore, the quoted language does not indicate that Facebook "was secretly censoring accounts" that "had not violated Facebook's policies" rather than applying its policies intended for "borderline content" that did not meet the standards for complete "removal." *See* Defs. PFOF

§ I.D. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

357.     Mr. Clegg also reported that Facebook had amended its censorship policies to make them more restrictive: "We also expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing." *Id.*

**RESPONSE:** Disputed to the extent that Plaintiffs mischaracterize Facebook as "amend[ing] its [content moderation] policies to make them more restrictive," rather than merely updating the group of "false claims" to which the policies are applied in light of "recent trends of misinformation" it had observed. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

358.     Mr. Clegg also committed to "do more" to censor misinformation in response to federal officials' demands: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.* Dr. Murthy, evidently, demanded that Facebook "do more" against misinformation on it platforms in the July 23 phone call. *See id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Clegg's remark about "do[ing] more" makes no reference to "censor[ing]" but is an apparent reference to application of the aforementioned content moderation policies, which are Facebook's own, and to which all Facebook users agree. Plaintiff cites no evidence for its supposition that "Dr. Murthy . . . [had] demanded" that Facebook take the actions to which Mr. Clegg referred. Indeed, that assertion is contradicted by the statements of Plaintiffs' counsel at Mr. Waldo's deposition.

There, counsel described Mr. Clegg's reference to "your call for us to do more" as an allusion to the July 15, 2021, Health Advisory: "Q: All right. He goes on to say: We hear your call for us to do more. Right? And I think we said a moment ago, that's a pretty fair description *of the health advisory,* right, a call for Facebook and others to do more, right? A: Yes." Waldo Dep. 250:24-251:6 (emphasis added). In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

359.    Mr. Clegg further agreed to accede to federal officials' demands that Facebook make its internal data on misinformation available to federal officials and researchers like Renee DiResta of the Virality Project: "We will reach out directly to DJ to schedule a deeper dive on how to best measure Covid related content and how to proceed with respect to the question around data." *Id.* at 1-2.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language does not support Plaintiffs' assertion that "federal officials" had made "demands" of Facebook of any kind, nor that Facebook intended to make, or did make, "internal data" available to the Virality Project, or anyone else. At most, the email indicates Facebook's willingness to have a "deeper" discussion about the "question around data." In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2.

360.    Mr. Clegg also pledged to report back to Dr. Murthy repeatedly so that federal officials could monitor Facebook's "progress" on censoring misinformation: "We'd also like to begin a regular cadence of meetings with your team so that we can continue to update you on our progress. You have identified 4 specific recommendations for improvement and we want to make

sure to keep you informed of our work on each." *Id.* at 2. Mr. Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms. *Id.*

    **RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. As to the first sentence, Mr. Clegg's offer to provide "updates" does not constitute accession to "monitor[ing]" by federal officials. As to the second sentence, the cited evidence does not support Plaintiffs' assertion that "[Mr.] Clegg also promised to continue sending federal officials regular updated reports on the spread of misinformation on Facebook's platforms." Mr. Waldo also testified that it was unclear what "4 specific recommendations" Mr. Clegg is referring to, and whether those came from OSG. *See* Waldo Dep. 253:13-25. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

    361.    Mr. Clegg concluded by promising that Facebook would "strive" to meet federal officials' expectations on censorship: "we will strive to do all we can to meet our shared goals." *Id.*; *see also* Waldo Dep. 245:6-247:4.

    **RESPONSE:** Disputed as a mischaracterization of the evidence. Neither the email itself, nor the cited deposition testimony, supports Plaintiffs' insinuation that by reference to "striv[ing] to meet our shared goals," Mr. Clegg meant acquiescing to unilateral "expectations" of federal officials regarding "censorship" ("expectations" as to which Plaintiffs also furnish no evidence). This PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

362.    Waldo agrees that Mr. Clegg's statement "We hear your call for us to do more" in the July 23 email is an accurate understanding of the Surgeon General's message from the July 15 press conference, the Health Advisory, and the July 15 rollout at Stanford Internet Observatory: "Yes. I think, as we've established, the advisory and … the remarks, and the event with the Stanford Internet Observatory, Dr. Murthy is calling on … social media companies to do more to address the problem of health mis- and disinformation."  Waldo Dep. 251:6-12.

**RESPONSE:**  Undisputed, except to note that Plaintiffs have selectively quoted the testimony, which reads: "Dr. Murthy is calling on – for an all-society approach, including social media companies, to do more to address the problem of health mis- and disinformation during the height of a historic pandemic costing American lives that can be saved." Waldo Dep. 251:9-13. Defendants further note that this PFOF contradicts Plaintiffs' PFOF ¶ 358. In any event, this PFOF contains no evidence that OSG used the July 15 press conference, the Advisory, or the SIO event to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these, or any other, communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

363.    After the July 23 email, Waldo connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials. *Id.* at 252:9-19.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Mr. Waldo testified only that "I think I looped [Mr. Rice] with DJ," Waldo Dep. 252:12-13, not that he "connected Brian Rice of Facebook with DJ Patil to discuss data-sharing to monitor social-media misinformation between Facebook and federal officials." In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

364.    Additionally, on the July 23 call with Nick Mr. Clegg, the OSG specifically asked Facebook to report back on any additional steps they were taking in response to the Health Advisory to increase censorship of misinformation on their platforms. Waldo Ex. 21, at 1. On August 6, 2021, Waldo emailed Brian Rice and Nick Mr. Clegg of Facebook and stated, "I know on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." *Id.* Waldo noted that "we are asking all platforms for this type of update." *Id.* Waldo asked for a report from Facebook within two weeks: "Would you be able to send something over within two weeks?" *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited email. Mr. Waldo's inquiry about whether Facebook could send "an update" of "any new/additional steps" Facebook was taking "with respect to health information" does not constitute a request for a "report" about "increase[d] censorship of misinformation" on Facebook's platforms. In sum, this PFOF contains no evidence that OSG used the July 23 call or this August 6 email to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) these, or any other, communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

365.    In the same email, Waldo connected Facebook with DJ Patil of the White House "on next steps for connecting on data." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

366.    Facebook responded that it was planning "additional steps" to increase censorship of misinformation, and promised to report back to the Surgeon General in 2 weeks: "Our teams have been working on additional steps—we will have something back to you within two weeks outlining our approach." *Id.* Facebook also followed up with Patil to schedule the meeting about using Facebook's internal data to monitor speech on its platforms. *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language says nothing about "increas[ing] censorship of misinformation" as opposed to application of Facebook's own content moderation policies, to which all users agree. In addition, the cited email does not show that Facebook followed up with Patil to "schedule [a] meeting about using Facebook's internal data to monitor speech on its platforms" or that such meeting occurred. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

367.   Waldo admits that, during the July 23 call, "we asked for an update," and that it was probably Dr. Murthy who asked for it. Waldo Dep. 256:20-23.

**RESPONSE:** Disputed to the extent Plaintiffs say "probably." Mr. Waldo's deposition testimony reads: "I didn't recall if I asked for it or Dr. Murthy . . . Dr. Murthy perhaps asked for it." Waldo Dep. 256:20-23. However, this PFOF contains no evidence that OSG used the July 23 call to threaten or pressure Facebook to censor speech, or that Facebook regarded (or acted on) this, or any other, communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

368.   Waldo does not dispute that he asked "all platforms" to provide a similar "update" on new or additional steps to censor misinformation in light of the Advisory, and that "all platforms" means "Facebook, Twitter, Instagram, and YouTube, and Google." *Id.* at 257:10-258:9.

**RESPONSE:** Disputed to the extent that neither the email (Waldo Ex. 21) nor the cited testimony supports the assertion that Mr. Waldo asked "all platforms" for updates on steps to "censor misinformation in light of the Advisory," as opposed to updates regarding application of

their own respective content moderation policies, to which all users agree. Furthermore, the testimony makes clear that Mr. Waldo does not specifically recall whether he sent such a request to Instagram, Twitter, or YouTube/Google. *See* Waldo Dep. 257:10-258:9. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

369.    On July 19, 2021, a few days after the President's "They're killing people" comments, Rob Flaherty of the White House emailed Dr. Murthy to put him in touch with an operative for the Democratic National Committee who works on misinformation and disinformation issues. Waldo Ex. 22, at 3. Flaherty wrote: "Vivek – wanted to link you with Jiore Craig, who's been a critical leader of the DNC's misinfo work for a long time, but also has been helping us think through mis/dis on the COVID side. I thought it would be great for you both to connect as OSG charts out next steps." *Id.* Eric Waldo followed up to schedule a Zoom meeting on July 22 between Ms. Craig of the DNC and key members of the OSG's staff. *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

370.    On August 18, 2021, Facebook again reported back to OSG about additional censorship actions against misinformation "superspreaders." Waldo Ex. 24, at 1. Facebook stated, "Eric and DJ – flagging this post for you and for Surgeon General Murthy. This details how we are approaching content from the disinfo dozen." *Id.* Facebook sent the same update to Rob Flaherty of the White House on the same day. *Id.* at 2.

**RESPONSE:** Disputed as a mischaracterization of the evidence. First, the document says nothing about "censorship actions," but rather describes a range of actions (such as "moving [] posts lower" or "not recommending them," as well as no action at all) taken pursuant to Facebook's own content moderation policies, to which all users agree. Second, demonstrating Facebook's

exercise of independent judgment in this matter, the bulk of the post from Facebook vigorously disputes the claim that "12 people are responsible for 73% of online vaccine misinformation on Facebook"—including by noting that "any amount of COVID-19 vaccine misinformation that violates **our policies** is too much by **our** standards"—and that it has not removed accounts that "are not posting content that breaks our rules." Waldo Ex. 24 at 1 (emphases added). In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

371.    The post was entitled, "How We're Taking Action Against Vaccine Misinformation Superspreaders." *Id.* at 1. The post detailed a long list of censorship actions taken against the "Disinfo Dozen," including removing over three dozen pages, groups and accounts linked with them; imposing additional penalties on another two dozen pages, groups, and accounts linked with them; applying penalties to some of their website domains so that third parties posting their content will be deamplified; and removing the remaining violating content. *Id.* at 1.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The email, Waldo Ex. 24, speaks for itself, and is the best source to consult to understand its contents. *See also* Defs.' Resp. to PFOF ¶ 370.

372.    As Waldo acknowledges, this was the "second report that Facebook has sent [OSG] after that July 23rd meeting where they're reporting back about actions taken against the Disinfo Dozen." Waldo Dep. 268:12-16.

**RESPONSE:** Undisputed that this is an accurate account of the deposition testimony. However, the e-mail itself does not state that Facebook was "reporting back about actions taken." Waldo Ex. 24 at 1. To the contrary, the e-mail states that Facebook was "flagging" a public post from Facebook's website. *Id.* The post itself describes a "debate" among "people" about the Disinformation Dozen, which stemmed from a "report" that Facebook vigorously disputes in its post. *Id.* Accordingly, as explained above, *see* Defs.' Resp. to PFOF ¶ 370, this email underscores

that Facebook acted independently in its approach to misinformation, including its analysis of the third-party "report" about the Disinformation Dozen and the "debate" surrounding that report. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

373.   On August 20, 2021—two weeks after the August 6 email in which Waldo had requested a report within two weeks on Facebook's new or additional steps to remove misinformation in light of the Health Advisory—Nick Mr. Clegg sent a long, detailed email to Dr. Murthy, Waldo, and DJ Patil, detailing Facebook's additional censorship actions taken as a result of the Advisory. Waldo Ex. 25, at 1-3.

**RESPONSE:** Disputed as a mischaracterization of the evidence, particularly to the extent that Plaintiffs describe the email as "detailing … censorship actions" as opposed to actions taken by Facebook pursuant to its own content moderation policies, to which all users agree. Furthermore, the bulk of the email does not describe new actions by Facebook but instead "historic actions in these areas," underscoring the independent judgment Facebook exercised in its approach to misinformation. The email also does not appear to have been sent in response to the Advisory, but instead alludes to the White House's "four recommendations." In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

374.   In the August 20 email, Mr. Clegg noted that Dr. Murthy had "asked for an update on existing and new steps that Facebook is taking." *Id.* at 1. Mr. Clegg noted that Facebook was taking new steps in response to the pressure from the White House and Surgeon General since July 15 and 16: "In this update, we describe … further policy work to enable stronger action against persistent distributors of vaccine misinformation." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The cited email in fact contradicts Plaintiffs' assertion that Facebook took "new steps in response to pressure from the White House and the Surgeon General." The email states the following (without Plaintiffs' selective quotes and omissions): "The White House described four ***recommendations*** to social media platforms in July, which cover access to authoritative information, enforcement and speed of enforcement, and transparency. ***Those are priorities we have shared throughout the COVID-19 pandemic***. In this update, ***we describe both our historic actions in these areas***, as well as new information on boosting access to authoritative information, and further policy work to enable stronger action against persistent distributors of vaccine information." Waldo Ex. 25 at 1 (emphases added.) Thus, the email indicates that Facebook took actions in the "areas" "recommend[ed]" by the White House pursuant its own priorities that it has held "throughout the COVID-19 pandemic," (and makes no reference to the Surgeon General's Advisory at all). Furthermore, the bulk of the email describes "historic actions" or "new information" about pre-July actions, as opposed to "new steps" post-dating the Advisory and press conference. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

375.    In a lengthy section headed "Limiting Potentially Harmful Misinformation," Mr. Clegg provided five bullet points and four sub-bullet points detailing expanded efforts of censorship by Facebook taken in response to the Advisory. *Id.* at 2. These included, among others, " expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform." *Id.* at 2. Mr. Clegg also included a report of additional actions taken against the Disinfo Dozen. *Id.* Mr. Clegg also

reported that Facebook "continue[s] to experiment with signals that we can use … to demote content that we predict will contain low quality information." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. This particular section—like the entirety of the email—discusses adaptation and application of Facebook's own content moderation policies, to which all users agree, and says nothing about "expanded efforts of censorship," says nothing about the Advisory, nor makes any assertion that Facebook has taken any actions "in response to the Advisory." As explained above, Defs.' Resp. to PFOF ¶ 374, the email as a whole contradicts Plaintiffs' position; indeed, with respect to the Disinformation Dozen, the email specifically notes that Facebook "removed" some of their content "for violating our policies," but "[t]he ***remaining*** accounts associated with these individuals ***are not posting content that breaks our rules***." Waldo. Ex. 25 at 2 (emphasis added). In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

376.     In another long section entitled "Increasing Transparency," Mr. Clegg detailed a list of actions taken by Facebook to share data about the reach of misinformation on its platforms, per federal demands. *Id.* at 2-3; *see also* Waldo Dep. 269:20-277:8 (reviewing the content of the August 20 email in detail).

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The referenced section of the email says nothing about "federal demands" (of which there is no evidence), and contrary to describing "actions taken by Facebook to share data," the email simply identifies other data sources and/or vaguely remarks that it is "in internal discussions" or "looking at ways" to provide information. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted

on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

377.    Waldo agrees that this email is "a report back to [OSG's] request for report in two weeks related to actions they took in respect to the advisory."  Waldo Dep. 270:19-23.

**RESPONSE:** Undisputed that this is an accurate account of the deposition testimony. However, the e-mail itself does not state that Facebook was "reporting back about actions taken," nor does it mention the Advisory. Waldo Ex. 24 at 1. T In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

378.    Waldo responded to Mr. Clegg by stating that "we look forward to continuing to move forward together with urgency and solutions during these extraordinary times."  Waldo Ex. 25, at 1. The phrase "urgency and solutions" was intended to push Facebook to increase its anti-misinformation efforts: "I was hoping that Facebook would continue to move. Urgency means, you know, that they would take this seriously, and solutions means that they would also come with real solutions to the problems and not just pretend to solve problems."  Waldo Dep. 277:23-278:3.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Waldo testified that he "hop[ed]" Facebook "would continue to move"—***not*** that he intended to "push Facebook to increase its anti-misinformation efforts." In sum, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

379.    Three days later, on August 23, 2021, Rob Flaherty of the White House emailed Facebook, asking for a report on how they intended "to promote" the FDA's approval of the Pfizer

vaccine and noting that the White House "[would] appreciate a push" of the vaccine information using specific "suggested language from [the White House]." Waldo Ex. 27, at 2. Facebook responded the same day with an additional report on new steps to remove vaccine misinformation: "We're … updating our misinformation policies to remove the specific claims that 'there are no FDA-approved vaccines' and 'the Pfizer vaccine is not FDA-approved.' We'll also continue to look for claims that are no longer accurate given the approval today." *Id.* at 1. Facebook forwarded this report on increasing censorship to Waldo at OSG as well. *Id.*; *see also* Waldo Dep. 280:1-281:24.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Flaherty's initial email did not "ask[ ] for a report" but reads: "Now that FDA has approved Pfizer, I'm making the rounds to get a sense from the various platforms how (or if) you guys are planning to promote it in any way." Ex. 27 at 2. Facebook responded, not by agreeing to use the White House's "[s]uggested language," but by informing the White House that it would be "amplify[ing] authoritative partner content" related to the vaccine approval using different language. *Id.* at 1. Moreover, Facebook notes its independent decision to update its misinformation policies, which was not mentioned in the White House's initial email. *Id.* Thus, the email demonstrates Facebook's exercise of independent discretion on how or whether to "promote" FDA approval of the Pfizer vaccine, and how or whether to address misinformation related to that approval. *See id.* ("We'll also continue to look for claims that are no longer accurate given the approal today."). In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

380.    On September 18, 2021, Facebook sent Eric Waldo and Rob Flaherty another bi-weekly report, and also noted that "I'm sure you also saw yesterday's story in the WSJ about the spread of COVID-19 misinformation in comments on Facebook," which Facebook disagreed with and offered to discuss. Waldo Ex. 30, at 1. Flaherty responded, "Happy to talk about it, Brian. Would be interested to see, as we have long asked for, how big the problem is, what solutions

you're implementing, and how effective they've been." *Id.* Facebook promised, "we will circle back over the next few days to brief." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other

federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or

acted on) any communications by OSG or other federal officials as such. Any implicit assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg.

§§ II.B.1.c & II.B.2.

381.    On September 29, 2021, Google emailed Eric Waldo to "share an update we recently made to YouTube's policies pertaining to vaccine-related misinformation." Google reported: "We just announced that we will be introducing a new policy that prohibits content that includes harmful misinformation about the safety, efficacy, or ingredients for currently administered vaccines…" Waldo Ex. 31, at 1.

**RESPONSE:** Undisputed, except to clarify that the email may have come from YouTube

personnel (not Google personnel) and speaks to YouTube policies (not necessarily Google

policies). *See* Waldo Ex. 31 at 1 (signature block of sender indicates he works for YouTube). In

any event, this PFOF contains no evidence that OSG threatened or pressured Google/YouTube to

censor speech, or that Google/YouTube regarded (or acted on) any communications by OSG as

such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

382.    On October 19, 2021, Rob Flaherty emailed Facebook, copying several White House officials and Eric Waldo, and asked Facebook to "connect on what the admin's plans are for the 5-11 vaccine rollout." Waldo Ex. 32, at 1. The "5-11 vaccine rollout" refers to the approval of vaccines for children ages 5 to 11 years old. Waldo Dep. 298:20-23.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo testified that the "5-11 vaccine

rollout" refers to authorization (not "approval") of the vaccine for children ages 5 to 11. In any

event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured

Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG

or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

383.    Flaherty requested that Facebook report on its censorship plans for claims on social media about the authorization of vaccines for children ages 5 to 11: "We'd like to talk about what we're seeing as the biggest headwinds we're going to face, and discuss what you all are planning as we move into this next phase. We remain concerned about mis- and disinformation on feed and groups, and the wide reach of hesitancy-inducing content across your platform."  Waldo Ex. 32, at 1.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language does not ask Facebook to "report on its censorship plans" but rather alludes to Facebook's own "plan[s]" regarding application of its content moderation policies, to which all users agree, following authorization of COVID-19 vaccines for children aged 5 to 11. In sum, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

384.    Facebook responded, agreeing to the meeting: "we'd welcome the opportunity. Adding Felicia on our end to help coordinate."  Waldo Ex. 32, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

385.    Waldo states that he does not recall whether this meeting occurred or if he participated, but he agrees that the meeting probably occurred: "Probably. If they added schedulers, usually those meetings happen."  Waldo Dep. 300:14-23.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

## I.     The Surgeon General and White House Hammer Facebook.

386.    On October 28, 2021, the Washington Post ran a story based on information from Frances Haugen reporting that "Facebook researchers had deep knowledge of how coronavirus and vaccine misinformation moved through the company's apps, according to documents disclosed by Facebook whistleblower Frances Haugen."  Waldo Ex. 33, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

387.    In response to the article, on October 29, Surgeon General Murthy issued a series of Tweets from his official Twitter account demanding that Facebook increase censorship and give outside researchers access to its data. Waldo Ex. 33, at 1. In the Tweet thread, Dr. Murthy stated: "I was deeply disappointed to read this story. Health misinformation has harmed people's health and cost lives. In the Surgeon General's Advisory on Health Misinformation, I stated clearly that tech platforms have a responsibility to improve our health information ecosystem. What continues to be lacking from Facebook and other tech companies is transparency and accountability. Only the companies understand the full extent of misinformation's spread and impact – yet they have not yet shared this data with independent researchers and the public. Without this critical data, it is much harder to design the right interventions or hold the platforms accountable. … We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake."  *Id.* Dr. Murthy repeated the mantras "transparency" and "accountability," threatening that the federal government would "hold the platforms accountable" for misinformation. *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted tweets, Waldo Ex. 33 at 1, do not support the assertion that Dr. Murthy "demand[ed] that

Facebook increase censorship" or provide access to all internal "data."   Nor do the Tweets "threaten[] that the federal government" would do anything to Facebook or any other platforms. Shorn of Plaintiffs' mischaracterization, this PFOF contains no evidence that OSG or other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

388.    This Tweet thread reflects Dr. Murthy's own words, as he "made the final and substantial edits" to the Tweets. Waldo Dep. 303:25-304:17.

**RESPONSE:** Undisputed. However, neither this PFOF nor the referenced tweet thread contains no evidence that OSG or other federal officials threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

389.    Waldo agrees that the Twitter thread demands "transparency and accountability around health misinformation, especially vis-à-vis the social media organizations," and "demands that Facebook and the other platforms do more" to "stop[] health misinformation." *Id.* at 305:6-22. "Lots of work went into" crafting that message, according to Waldo. *Id.* at 306:7-8.

**RESPONSE:** Undisputed that Mr. Waldo's deposition testimony is accurately quoted, but note that Mr. Waldo did not agree that the thread "demands" anything; he stated that "the tweet thread speaks for itself." Waldo Dep. 305:4-5. In any event, this PFOF contains no evidence that the Surgeon General used these Tweets to threaten or pressure Facebook or any other social media company to censor speech, or that Facebook or other social media companies regarded (or acted on) these Tweets, or any other communications by the Surgeon General or OSG, as such. Any

implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

390.    On October 28, 2021, the same day as the Washington Post article, Rob Flaherty emailed Brian Rice of Facebook a hyperlink to the article. The only text in the email was the subject line, which stated: "not even sure what to say at this point."  Waldo Ex. 35, at 1-2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

391.    Facebook responded to Flaherty by stating, "nothing in the story is inconsistent with what we briefed on," and providing its account of the facts underlying the story. *Id.* at 1. Facebook then forwarded this response to Waldo and the OSG, noting that "I saw the Surgeon General's reaction on Twitter," and asking for "a longer conversation next week" about the issue. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

392.    Waldo describes both the Surgeon General's public Tweet threat, and Rob Flaherty's private email to Facebook, as different ways of "hitting up Facebook" about the Frances Haugen article: "this was one of the most popular articles in all of news that week, so I'm not surprised that people who care a lot about this issue were certainly hitting up Facebook about it." Waldo Dep. 307:13-22.

**RESPONSE:** Disputed as a mischaracterization of deposition testimony. It does not refer to a "public Tweet ***threat***." *See also* Defs.' Resp. to PFOF ¶ 387. In any event, this PFOF contains

no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

393.    On October 28, 2021, Nick Mr. Clegg also emailed Dr. Murthy and asked for a meeting to discuss the "intense debate that's been prompted by the documents disclosed by a former employee."  Waldo Ex. 36, at 2. Waldo responded on behalf of the OSG, stating that "we have seen the recent public reports around Facebook and misinformation. We are certainly concerned about what we are seeing, given our emphasis on health misinformation in our advisory and the ongoing conversations our teams have been having. As has been the case, you'll continue to see us raising the issue of health misinformation in public and in private as a critical public health issue." *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

394.    Regarding his reference to "in private," Waldo admits that this refers to "closed-door meetings" with platforms like Facebook: "in the government, you're not always just doing a panel that's open press, you're meeting with stakeholders … in closed-door meetings…."  Waldo Dep. 312:13-16. The Surgeon General's Office was continuously pushing for action against health misinformation "in public and private" meetings with stakeholders: "talking about health mis- and disinformation was in our talking points of when we talked to stakeholders in public and private." *Id.* at 313:8-11.

**RESPONSE:** Disputed to the extent that Plaintiffs' mischaracterize Mr. Waldo as testifying that "in private" refers to "'closed-door meetings' with platforms like Facebook" and that "[t]he Surgeon General's Office was continuously pushing for action against health misinformation." Mr. Waldo explained that the reference to "in private" meant "nonpublic meetings" with all kinds of stakeholders, such as "the PTA [Parent Teacher Association]," where OSG would speak generally about its work by noting, "[y]ou saw us issue an advisory on health mis- and disinformation. You saw, you know, coming soon, youth mental health, workplace

mental health, clinical burnout, social isolation and loneliness." Waldo Dep. 312:12-313:11. In any event, this PFOF contains no evidence that OSG threatened or pressured social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

395.    The next day, October 29, 2021, Facebook sent a long email to Rob Flaherty, Eric Waldo, and several other White House officials referring back to an October 25 meeting about vaccines for children ages 5-11. Waldo Ex. 37, at 3-4; Waldo Dep. 315:8-316:15. The email reported to the White House and OSG a "detailed description of [Facebook's] plans" for the approval of vaccines for children. *Id.* at 4. The plans included immediately updating policies to censor claims relating to vaccination of children: "As discussed, soon as the EUA is issued, we will also be able to apply claims from our current misinfo policies for COVID-19 vaccines to include claims about child vaccinations." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The email does not refer to "updating policies to censor claims"; rather, it discusses the application of Facebook's existing "misinfo policies for COVID-19 vaccines," to which all users agree, to claims about newly authorized "child vaccinations." Note also that the email refers to emergency use authorization (not approval) of the vaccine for children. In any event, this PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2 (Surgeon General).

396.    Facebook also noted that it was relying directly on the CDC to decide what to censor: "We were able to make this change based on the conversation we had last week with the CDC.… There are several claims we will be able to remove as soon as the CDC debunks them." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence to the extent this PFOF is intended to suggest that Facebook removed any claims "debunk[ed]" by CDC without exercising its own judgment regarding application of its content moderation policies. As discussed below, *see* Defs.' Resp. to Pls.' PFOF ¶¶ 491-92, 502 (among others), Facebook relied on CDC only to provide scientific information, but Facebook itself determined what its misinformation policies should be and how to enforce them. Moreover, the email, without Plaintiffs' selective quotation, states: "We were able to make this change based on the conversation we had last week with the CDC, expected language from the EUA, and previous conversations with health authorities." Waldo Ex. 37, at 3. In any event, this PFOF contains no evidence that OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

397.    Facebook then asked federal officials to provide a federal health authority to dictate what content would be censored on Facebook's platforms: "We expect the approval of COVID vaccines for kids aged 5-11 will be another significant peak of new misinformation claims. Our policy allows us to take action against this content once those claims have been debunked and confirmed harmful by a public health authority. We're committing to addressing these quickly; to do so effectively, we will need a channel to a health expert with whom we can discuss these claims in real time. Is this something we could partner on, and if so, would your team be able to connect us with a point person?"  *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited email, which says nothing about requesting a "federal health authority" to "dictate what content would be censored on Facebook's platforms." Rather, it requests identification of a "health expert" with whom it "can discuss" claims regarding children's vaccines "in real time" to determine what action it can take regarding under its own ("[o]ur") policy. In sum, this PFOF contains no evidence that OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that

Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

398.    On November 4, 2021, Facebook followed up again to OSG and the White House with additional reports of censoring misinformation: "Last Friday, we updated our misinformation policies for COVID-19 vaccines to make clear they apply to claim about children," identifying a list of specific claims. *Id.* at 1.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited email, which does not discuss "censoring misinformation" but updating Facebook's "misinformation policies," to which all users agree, to make clear they apply to claims regarding vaccines for children. In sum, this PFOF contains no evidence that OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

399.    Facebook made clear that the CDC was serving as the "health expert" who was dictating what could be said on Facebook's platforms "in real time": "We're grateful to our partners at the CDC for helping get these debunked in advance of the announcement, and we look forward to staying connected on emerging COVID misinformation trends." *Id.* at 1, 3.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The cited email says nothing to suggest that CDC was "dictating what could be said on Facebook's platforms," rather than Facebook's own misinformation policies. The email clearly refers to CDC as a "partner[ ]" providing information that Facebook would take into consideration when making decisions regarding application of its policies. *See* Defs.' Resps. to Pls.' PFOF ¶¶ 397-98. As discussed extensively in connection with Plaintiffs' factual assertions against CDC, *see infra*, Facebook relied on CDC only to provide scientific information—here, information in relation to

claims that "the COVID vaccine gives children Bell's Palsy, causes blood clots in children, and causes multiple sclerosis in children," Waldo Ex. 37—but Facebook itself "decide[s]" what its misinformation policies will be and how to enforce them. In sum, this PFOF contains no evidence that OSG, CDC, or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG, CDC, or other federal officials, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

### J.     The Surgeon General Threatens Regulation to Increase Censorship.

400.    On December 21, 2021, Dr. Murthy gave a podcast on the Omicron variant in which he again publicly threatened to hold the social-media platforms "accountable" for not censoring misinformation: "number one, we have to track down where this misinformation is coming from and understand how to hold platforms accountable, new technology platforms that are driving so much of the misinformation spread…. [B]y allowing this misinformation to proliferate on their sites, they're subjecting people in the United States and around the world to extraordinary harm, and they're doing so with little accountability at this moment and really with very little transparency. That can't be allowed to continue because it's putting everyone's health at risk." Waldo Ex. 38, at 4 (Audio Tr. 7).

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language, which comes from what purports to be a transcript of a portion of an interview with Dr. Murthy, does not constitute a "threat[ ]" by the Surgeon General, who has no regulatory or law-enforcement authority, to do anything, or specify how or by whom technology platforms should be held "accountable" for the proliferation of misinformation on their sites. In sum, this PFOF contains no evidence that the Surgeon General used these podcast remarks to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

401.     Dr. Murthy demanded "aggressive action" from the platforms to censor speech: "I do think that part of what they have to do, the platforms is take aggressive action against people who are intentionally spreading misinformation." *Id.*

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. The quoted language, a statement of opinion from what purports to be a transcript of a portion of an interview with Dr. Murthy, does not constitute a "demand[ ]" by Dr. Murthy that platforms take action any kind, aggressive or otherwise, much less that they "censor speech" as opposed to applying their own content moderation policies, to which all users agree. In sum, this PFOF contains no evidence that the Surgeon General used these podcast remarks to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

402.     Waldo agrees that this message is "consistent with his previous statements as well as the content within the advisory itself." Waldo Dep. 321:22-24.

**RESPONSE:** Undisputed. However, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

403.     As Waldo concedes, Dr. Murthy's threat to hold platforms "accountable" and his demand for "aggressive action" to censor misinformation "is consistent with the messaging we've reviewed all day today of the advisory, the rollout, the public statements" by OSG. *Id.* at 322:22-24.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the evidence. Mr. Waldo did not "concede[ ]" that Dr. Murthy had made any "threat" or "demand" of any kind. The deposition transcript states: "Q. And he also says: I do think that part of what they have to do, the platforms, is take aggressive action against people who are intentionally spreading misinformation. Right? A: Yes, that's what he says in this podcast. Q: Okay. And does that reflect kind of the – that kind of reflect or re-emphasize the message in the health advisory? A. I think this is consistent with the messaging we've reviewed all day today." Waldo Dep. 322:19-24. In sum, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

404.    On January 3, 2022, Dr. Murthy participated in Alyssa Milano's podcast. Waldo Ex. 39, at 1. In the podcast, Dr. Murthy stated that the "sophistication with which this misinformation is spreading is truly unprecedented, and a lot of has been enabled by technology platforms in the social media which enable the spread, and … the platforms need to do a lot more is step up, to be accountable for making their spaces safer." *Id.* at 3 (Audio Tr. 2). He also stated, "finally, I just want to come back to the technology companies for a moment here, because unless those platforms step up and make their spaces safer and reduce the amount of misinformation on their site, it's going to be pretty tough to get a full handle on this spread of misinformation." *Id.* at 5 (Audio Tr. 4).

**RESPONSE:** Undisputed that the exhibit, which purports to be transcript of a portion of an interview with Dr. Murthy, reads as such; however, the exhibit does not establish the date of the interview. Defendants further note that Dr. Murthy also stated, "So we laid out steps that individuals [could] take, that technology companies could take, that healthcare workers, educators, government, and other stakeholders can take because it turns out there's an important role for all of us. Waldo Ex. 39 at 4 (Audo Tr. 3:3-8). In sum, as explained extensively throughout, Plaintiffs

have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

405.   Immediately after these comments, the podcast broadcast public comments by President Biden, stating: "Joe Biden: The unvaccinated are responsible for their own choices, but those choices had been shulled [*sic*] by dangerous misinformation on cable TV and social media. You know, these companies … are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters. It's wrong. It's immoral. I call on the purveyors of these lies and misinformation to stop it. Stop it now." *Id.*

**RESPONSE:** Undisputed that the exhibit, which purports to be a transcript of a portion of a podcast involving Dr. Murthy, contains the quoted passage (except the alterations added by Plaintiffs). The full, accurate transcript of the President's remarks—including the context in which they arose—is available on the White House's website. *See* Ex. 156 (Remarks by President Biden on the Fight Against COVID-19, in Washington D.C. (Dec. 21, 2021), https://perma.cc/H94K-WN7Q). In any event, this PFOF contains no evidence that OSG or other federal officials pressured or threatened social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.A, Arg. §§ I.B.1 & II.B.1.b & II.B.2 (White House); Defs.' PFOF § II.B, Arg. § II.B.1.c & II.B.2 (Surgeon General).

406.   Waldo agrees that this podcast is "aligned with … the advisory and the other public statements we've seen so far." Waldo Dep. 327:8-10.

**RESPONSE:** Undisputed, except to clarify that Mr. Waldo stated that *Dr. Murthy*'s statements on the podcast "seem[] aligned with . . . the advisory and the other public statements

we've seen thus far." Waldo Dep. 37:2-10. Mr. Waldo was not asked about the President's comments until after this question was asked. *See id.* at 327:16-22. In any event, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

407.    Dr. Murthy also called for the platforms to "go after people who are superspreaders of misinformation on these sites," which Waldo agrees is "entirely consistent … with the messages that Dr. Murthy was sharing about health mis- and disinformation." *Id.* at 329:23-330:18.

**RESPONSE:** Undisputed, except to note that the first quote comes from Waldo Ex. 39 at 6, and reads in full: "We're also asking them to go after people who are super spreaders of misinformation on these sites …" (Audio Tr. 5:7-8). In any event, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

408.    On February 14, 2021, Dr. Murthy participated in a panel discussion hosted by the Rockefeller Foundation. Waldo Ex. 41. Dr. Murthy stated, "what feels different in this moment compared to ten years ago or [twenty] years ago is this speed, scale, and sophistication with which this misinformation is spreading and much of it has been enabled, in fact, by technology platforms, and we talk to people about where they're encountering misinformation. It's off and on social media channels and other tech platforms. … We need certainly technology companies to step up and do more, to help reduce this spread of misinformation, and to be transparent with the public about how much misinformation is being transacted on their sites and whether their methods of addressing it are working or not. We do not have enough transparency on that front and that is hindering us in our response of misinformation." *Id.* a 6-7 (Audio Tr. 9-10).

**RESPONSE:** Undisputed that the exhibit, which purports to be a transcript of a portion of a panel discussion involving Dr. Murthy, reads as such (with minor alterations). However, Dr. Murthy emphasizes that the Advisory "call[s] for a broad all of society response" and outlines steps that others besides platforms can take—"nurses and doctors and others in the healthcare professions," "educators and the education community" and even "we, as individuals …." Waldo Ex. 41 at 7-8 (Audio Tr. 10:23-11:6). In any event, this PFOF contains no evidence that the Surgeon General used the remarks to pressure or threaten social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

409.    Waldo agrees that this is "a consistent message with what we've seen in previous public statements, interviews, as well as the advisory itself."  Waldo Dep. 331:23-25.

**RESPONSE:** Undisputed. However, as explained extensively throughout, Plaintiffs have adduced no evidence that these remarks, other remarks, or the Advisory itself, were used to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) any communications by OSG as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

410.    In the same panel, Dr. Murthy stated that there is a role for government to set "safety standards" when it comes to misinformation, which directly suggests government regulation and foreshadowed the OSG's forthcoming Request for Information (RFI): "And, of course, there's a role for government here as well to set safety standards, to push for transparency and accountability, particularly from platforms."  Waldo Ex. 41, at 8 (Audio Tr. 11). Dr. Murthy then immediately foreshadowed the OSG's forthcoming Request for Information (RFI) as a step toward government "setting safety standards": "There are steps we are working now that we will be – you know, have more to say about it in the … coming weeks and months ahead, to try to, in fact, gather even more information about the impact of health misinformation on health professionals of the public and also in the role that technology companies may be playing on that on that front."  *Id.*

Less than a month later, the OSG issued a formal RFI for information about misinformation on social media platforms.

**RESPONSE:** Disputed to the extent the PFOF implies that the establishment of "safety standards" necessarily entails "government regulation," neither of which has ensued from OSG's Request for Information. Note also that OSC has no authority to issue or enforce regulations of any kind. *See* Lesko Decl. ¶ 3 (Ex. 63). In any event, this PFOF contains no evidence that the Surgeon General used the remarks to pressure or threaten social media companies to censor speech, or that social media companies regarded (or acted on) these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

411.   On March 3, 2021, the OSG issued a formal RFI in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation on social media. Waldo Ex. 42 (87 Fed. Reg. 12712). The RFI is entitled, "Impact of Health Misinformation in the Digital Information Environment in the United States Throughout the COVID–19 Pandemic Request for Information (RFI)." *Id.* at 1.

**RESPONSE:** Disputed to the extent Plaintiffs suggest that the RFI was limited to "seeking information from social-media platforms and others about the spread of misinformation on social media." The RFI, Waldo Ex. 42, seeks information from all "interested parties" about, *inter alia*, "how COVID-19 misinformation has affected quality of patient care during the pandemic" and "how COVID-19 misinformation has impacted individuals and communities." *Id.* In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

412.   "Kyla [Fullenwider] was the primary driver on the RFI from a content expert perspective."  Waldo Dep. 338:22-23. Though she was employed at U.S. Digital Response, "she was doing work on behalf of the Surgeon General." *Id.* at 340:8-9. Kyla Fullenwider is also responsible for receiving and reviewing the responses to the RFI. *Id.* at 362:6-10. "Kyla was the subject matter expert who was guiding this RFI process."  *Id.* at 362:15-17.

**RESPONSE:** Disputed. Ms. Fullendwider was not "employed at U.S. Digital Response" in March 2022; she was employed by OSG. *See* Lesko Decl. ¶ 17 (Ex. 63). And Mr. Waldo testified that he believed Ms. Fullenwider was "the one running point on this," not that she was "responsible for receiving and reviewing the response to the RFI." Waldo Dep. 362:6-10. Otherwise, the PFOF accurately quotes Mr. Waldo's testimony as to *his* understanding of Ms. Fullenwider's role. In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media companies to censor speech, or that social media companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

413.   The RFI defines "technology platforms" very broadly, indicating that the Surgeon General is expanding its attempts to control the spread of so-called "misinformation": "Technology platforms include the following: General search engines, content sharing platforms, social media platforms, e-commerce platforms, crowd sourced platforms, and instant messaging systems."  Waldo Ex. 42, at 2; *see also* Waldo Dep. 341:14-342:7.

**RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. The quoted language does not "indicat[e] that the Surgeon General is expanding its attempts to control the spread of so-called 'misinformation.'" In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

414.    Under the heading "Information About Technology Platforms," the RFI seeks a long series of detailed information about misinformation on such platforms, including "Information about how widespread COVID–19 misinformation is on individual technology platforms," Waldo Ex. 42, at 2; "any aggregate data and analysis on the prevalence of COVID–19 misinformation on individual platforms including exactly how many users saw or may have been exposed to instances of COVID–19 misinformation," *id.* at 2-3; and "[a]ny aggregate data and analysis on how many users were exposed, were potentially exposed, or otherwise engaged with COVID–19 misinformation," *id.* at 3.

**RESPONSE:** Undisputed, except to note that Plaintiffs' characterization of the RFI as "seeking a long series of detailed information" is argumentative (not factual), and that responses to the RFI were purely voluntary. *See* Lesko Decl. ¶ 6 (Ex. 63); Waldo Ex. 42 at 2 ("Please feel free to respond to as many topics as you choose."). In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

415.    The RFI also seeks detailed information about censorship policies and how they are enforced: "Information about COVID–19 misinformation policies on individual technology platforms," and "[a]ny aggregate data and analysis of technology platform COVID–19 misinformation policies including implementation of those policies and evaluations of their effectiveness." *Id.* at 3.

**RESPONSE:** Undisputed except to note that the quoted language sought information about "COVID-19 misinformation policies," not "censorship policies." In any event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

416.     The RFI also seeks detailed information about disfavored *speakers* on social-media platforms, requesting "[i]nformation about sources of COVID–19 misinformation," including "[i]nformation about the major sources of COVID–19 misinformation associated with exposure." *Id.* at 3. The RFI makes clear that "source" refers to *speakers* on platforms: "By source we mean both specific, public actors that are providing misinformation, as well as components of specific platforms that are driving exposure to information." *Id.* at 3.

**RESPONSE:** Undisputed except to note that the quoted language sought information

regarding "major sources" of misinformation, and says nothing about information, "detailed" or

otherwise, about "disfavored speakers." Notably, the RFI stressed that "all information should be

provided at a level of granularity that preserves the privacy of users" and that no "personally

identifiable information should be submitted in response to this RFI." Waldo Ex. 42 at 2. In any

event, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media

or technology companies to censor speech, or that social media or technology companies regarded

(or acted on) the RFI, or any other communications or issuances by OSG, as such. Any implicit

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.B, Arg. §§ II.B.1.c & II.B.2.

417.     Especially in light of Dr. Murthy's prior public statements about the government "setting safety standards" for misinformation, Waldo Ex. 41, at 8 (Audio Tr. 11), the RFI carries a clear implied threat of future regulation against the social-media and other technology platforms.

**RESPONSE:** Disputed as argumentative and unsupported by the cited evidence. As noted

above, Defs' Resp. to Pls.' PFOF ¶ 410, Dr. Murthy's passing reference, during a panel discussion,

to the establishment of "safety standards" does not necessarily imply the promulgation of binding

"government regulation[s]," which OSG has no authority to issue or enforce, and which in fact did

not result from the publication of the RFI. In sum, this PFOF contains no evidence that OSG used

the RFI to threaten or pressure social media or technology companies to censor speech, or that

social media or technology companies regarded (or acted on) the RFI, or any other

communications or issuances by OSG, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

418.    Contemporaneous media coverage portrayed the RFI as a "demand" for information from platforms. *See, e.g.,* Waldo Ex. 44, at 1 (Brad Dress, *Surgeon General Demands Data on COVID-19 Misinformation from Major Tech Firms*, The Hill (Mar. 3, 2022, 11:24 am)).

**RESPONSE:** Dispute as unsupported that any implication that the single news article cited by Plaintiffs is representative of the "media coverage" of the RFI. Undisputed that the headline of the cited article referred to the RFI as a "demand," but that is also irrelevant. The sole pertinent evidence of what the RFI contains is the RFI itself. In any event, the body of the article undercuts its sensationalized headline, stating that "Dr. Murthy has reportedly asked for" and "is requesting" information. In sum, this PFOF contains no evidence that OSG used the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the RFI, or any other communications or issuances by OSG, as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

419.    Max Lesko, the Surgeon General's Chief of Staff, also sent the RFI to several major tech platforms with a formal letter requesting that they respond. Waldo Dep. 348:20-22. He sent nearly identical letters to Facebook, Google, LinkedIn, Twitter, YouTube, and Microsoft. Waldo Exs. 46, 47, 48, 49, 50, 51. Each letter was directed to the CEO of the platform over General Murthy's signature. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used these letters or the RFI to threaten or pressure social media or technology companies to censor speech, or that social media or technology companies regarded (or acted on) the letters, the RFI, or any other communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

420.    Each letter stated, "The proliferation of health misinformation during the pandemic has been both extensive and dangerous. … It is clear that we must do everything we can to address this threat." *Id.* Each letter referred to the July 15, 2021 Health Advisory, noting that "a large proportion of health misinformation is spread through technology platforms," and "my Advisory includes a call for technology companies to join this broader effort to create a safer, healthier information environment." *Id.* Each letter advised the social-media platforms of the RFI, and formally "request[ed] that your company contribute to the RFI…. Specifically, I am requesting responses from companies about the extent and spread of COVID-19 misinformation on their technology platforms, policies to address COVID-19 misinformation and their effectiveness, [and] sources of COVID-19 misinformation…." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that OSG used these

letters or the RFI to threaten or pressure social media or technology companies to censor speech,

or that social media or technology companies regarded (or acted on) the letters, the RFI, or any

other communications or issuances by OSG, as such. Any implicit assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c

& II.B.2.

421.    On May 3, 2022, Facebook notified the White House and OSG that it had "filed a response to the Surgeon General's rfi on Covid misinformation and would be happy to discuss at the appropriate time." Waldo Ex. 54, at 2. To date, the OSG has never made this or any other the responses to its RFI public.

**RESPONSE:** Disputed to the extent that Plaintiffs assert "the OSG has never made this or

any other [of] the responses to its RFI public." OSG posted the responses it received, including

Facebook's and the responses of the other social media companies that answered the RFI (not all

of them did), in April 2023. *See* Lesko Decl. ¶ 6 (Ex. 63). They are available at

https://www.regulations.gov/comment/HHS-OASH-2022-0006-0002. *See also* Ex. 70 (RFI

Responses Compiled, Dep't of Health & Hum. Servs (Apr. 7, 2023) (excerpt containing Twitter,

Google, and YouTube's responses). In any event, this PFOF contains no evidence that OSG used

the RFI to threaten or pressure social media or technology companies to censor speech, or that

social media or technology companies regarded (or acted on) the RFI, or any other

communications or issuances by OSG, as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

422.    Shortly after the RFI was issued, on March 11, 2022, GQ magazine published an interview with Dr. Murthy. Waldo Ex. 52. In this interview, Dr. Murthy stated, "we all have a responsibility to do everything we can to reduce the spread of misinformation… Whether you have one million followers on social media, or you've got 10 followers, we all have platforms and people in our lives who trust us." *Id.* at 6. He called on platforms like Spotify (which was then being criticized for hosting Joe Rogan's podcast) to censor health misinformation: "If you're running a platform, whether it's a Spotify or another social media platform, you've got to think about, how do I create a healthy information environment here? How do I create rules and a culture that promotes accurate information?" *Id.* He emphasized that "a platform has the ability, the opportunity, and the responsibility to create rules and a culture that supports the dissemination of accurate information and that reduces the spread of misinformation." *Id.* at 7.

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent that Plaintiffs

assert the Surgeon General "called on platforms like Spotify . . . to censor health misinformation."

The interview says nothing about "censor[ing]" information. Dr. Murthy was asked: "What would

you like to see a company like Spotify do in the case of someone like Joe Rogan, who has a huge

platform, . . . and is sometimes having guests on who offer up COVID misinformation?" Waldo

Ex. 52 at 6. Dr. Murthy responded: "I believe we all have a responsibility to do everything we can

to reduce the spread of misinformation. We all have different abilities, different platforms. So if

you are a parent and you have kids who listen to you, then you have a responsibility to help ensure

that they have access to accurate information. If you're a manager at an office and you've got

people who listen to you and are looking to you for information about workplace health policies,

you've got to make sure you give them information-designed policies that are based on solid

scientific evidence. Whether you have one million followers on social media, or you've got 10

followers, we all have platforms and people in our lives who trust us. That means we all have to

be responsible about how we speak about science and about health, particularly when it comes to

COVID. That's at the heart of this. If you're running a platform, whether it's a Spotify or another

social media platform, you've got to think about, how do I create a healthy information environment here?" *Id.* Dr. Murthy went on to say: "**This is different from censorship. This debate often can go down the pathway of, do you support censorship or not? To me, that misses the mark. In America, we believe in certain rights. One of those is free speech. The rights that we support and honor and cherish in America are one of the many reasons that my parents and generations of immigrants came to this country.**" *Id.* at 7 (emphasis added). In any event, this PFOF contains no evidence that the Surgeon General used this interview to threaten or pressure social media companies to censor speech, or that social media companies regard these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

423.    Echoing his prior comments about "setting safety standards" by government, Dr. Murthy compared censorship "rules" for misinformation to speed limits: "We have speed limits on the road because we know that sometimes if you drive too fast, that can have an impact on somebody else's health and wellbeing. If we're going to live together in a society, we've got to take steps and observe certain rules to help protect other people. That's true here as well. Platforms have an opportunity to help shape that environment in their own way. We all do. That's our responsibility at a time like this."  *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. The quoted language does not refer to "censorship 'rules,'" and in fact, the full passage contradicts Plaintiffs' characterization: "***This is different from censorship***. This debate often can go down the pathway of, do you support censorship or not? To me, that misses the mark. In America, we believe in certain rights. One of those is free speech. The rights that we support and honor and cherish in America are one of the many reasons that my parents and generations of immigrants came to this country. But we also live in a society. That means we need common rules for the common good. We have speed limits …." Waldo Ex. 52 at 7 (emphasis added). In any event, this PFOF contains

no evidence that the Surgeon General used this interview to threaten or pressure social media companies to censor speech, or that social media companies regard these remarks, or any other communications, by the Surgeon General as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

## K.     The White House and Surgeon General Continue Oversight of Censorship..

424.     On June 22, 2022, Facebook again emailed Waldo, Rob Flaherty, and other White House officials with an update on Facebook's increased censorship. Waldo Ex. 53, at 1. In the email, Facebook stated that it "[w]anted to ensure that you were aware of our policy updates following the early childhood vaccine approvals. As of today, all COVID-19 vaccine related misinformation and harm policies on Facebook and Instagram apply to people 6 months or older…." *Id.* Facebook indicated that it had again relied on the CDC to dictate what claims people can post on Facebook: "We expanded these policies in coordination with the CDC and ensured that we also included false claims that might be connected to children…." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence. The email says nothing about "increased censorship," nor does it indicate that Facebook "relied on the CDC to dictate what claims people can post on Facebook." As the quoted language states, the email was providing "updates" on Facebook's and Instagram's "misinformation policies," and explained they were made "in coordination with" CDC to ensure inclusion of "false [vaccine] claims that might be connected to children." Even more to the point, the email does not refer to, or provide evidence of, any "oversight" by federal officials of Facebook's policies. This PFOF contains no evidence that OSG or other federal officials threatened or pressured Facebook to censor speech, or that Facebook regarded (or acted on) any communications by OSG or other federal officials as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

425.     Throughout this period, at the federal officials' request, Facebook continued to send bi-weekly "Covid Insights Reports" reporting on COVID-19 related misinformation on its platforms to the White House and OSG. *See, e.g.,* Waldo Ex. 54, at 2-4. In the spring of 2022,

Facebook repeatedly asked the federal officials if it could discontinue or reduce the frequency of these reports, which it had been sending for over a year. *Id.* at 2. Finally, on June 13, 2022, Facebook notified the White House and OSG that "we will plan to discontinue these unless we hear from you that this information continues to be valuable."  *Id.* at 1. Rob Flaherty responded the same day, requesting that Facebook continue to send the reports and further asking Facebook to report on how it would handle misinformation for early-childhood (under age 5) vaccines: "It would be helpful to continue to get these as we start to ramp up under 5 vaccines. Obviously, that has a potential to be just as charged. Would love to get a sense of what you all are planning here." *Id.* Facebook continued to send the reports as requested, including two reports on July 17, 2022, and promised to continue sending them. *Id.*

  **RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. It is

unclear what Plaintiffs mean by "throughout this period," and the cited evidence does not support

the assertion that the reports were always initiated at "federal officials' request" or that they had

been sent for "over a year." Furthermore, Plaintiff overstate the nature of Facebook's requests to

"discontinue or reduce the frequency of the report[s]." *See, e.g.*, Waldo Ex. 54 at 2 ("Also flagging

that it would help to hear from you if these reports continue to provide useful context or if you'd

like to follow up with a discussion as to how we can be helpful during this phase of the pandemic.")

Indeed, Mr. Waldo testified that he was not aware that anyone from OSG—or any federal

official—actually did anything with the reports, Waldo Dep. 141:14-16, and for his part he "didn't

spend a lot of time looking at the[] reports," *id.* at 140:18-19. In any event, this PFOF contains no

evidence that OSG or other federal officials threatened or pressured Facebook to censor speech,

or that Facebook regarded (or acted on) any communications by OSG or other federal officials as

such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a

whole. *See* Defs.' PFOF § II.B, Arg. §§ II.B.1.c & II.B.2.

## IV. The CDC and the Census Bureau: BOLO and Authoritative Fact-Checking.

  426. In addition to the public and private pressure campaigns from the White House and the Surgeon General's Office, the CDC and the Census Bureau have engaged in a long censorship campaign together, enabled by the White House's pressure on platforms to cooperate with the federal government. Working closely with Census, the CDC flags supposed "misinformation" for

censorship on platforms (sometimes using the acronym "BOLO," "Be On the Lookout"), and exercises full authority to dictate what health claims will be censored on social media platforms.

**RESPONSE:** Disputed. Neither this PFOF, or any that follow, contain evidence that the CDC and the Bureau of the Census ("Census Bureau") are now or have ever been engaged, together or separately, in a "long censorship campaign" or otherwise have ever "dictated what health claims will be censored on social media platforms." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

### A.   The CDC's Regular Communication with Social Media Platforms.

427.   Carol Crawford is the division director for the division of Digital Media within the CDC Office of the Associate Director for Communication. Crawford Depo. 11:7-9.

**RESPONSE:** Undisputed.

428.   According to Crawford, her "division provides leadership for CDC's web presence. We provide leadership for CDC's social media presence." *Id.* 11:14-16. Crawford is "the director of that work. I determine strategy, objectives, oversee work." *Id.* 11:21-22.

**RESPONSE:** Undisputed.

429.   Before April 2022, Crawford was "the branch chief of the Digital Media Branch within the Division of Public Affairs, and most of the roles that our division currently performs, web and social media, were in that branch." *Id.* 15:3-6.

**RESPONSE:** Undisputed.

430.   Crawford is "the main person that was the CDC point of contact to talk to Facebook, Twitter and the platforms since our job was to lead digital media." *Id.* 249:1-4.

**RESPONSE:** Undisputed.

431.   Crawford has regular contact with social-media platforms, especially about COVID-19 issues: "We started regular contact with the [platforms] at the beginning of the COVID outbreak to exchange information about COVID, and most of the contact since then has been around COVID or other high-priority things, but mostly COVID." *Id.* 16:13-17.

**RESPONSE:** Disputed that the CDC or the Census Bureau "has regular contact with social-media platforms" in the present day. The cited testimony, which concerns only CDC, not

the Census Bureau, relates to regular contact that Crawford and her office had with specific social-media companies between early 2020 to approximately April 2022. Crawford Dep. 16:8-17 (describing contacts in her prior role); *id.* 13:7-15 (describing the role change "in March or April of 2022"). Today, CDC has "regular contact" only with Google, through bi-weekly meetings that largely focus on issues unrelated to COVID-19 or misinformation. Declaration of Carol Crawford, Director of CDC's Division of Digital Media ¶ 11 ("Crawford Decl.") (Ex. 80). Contact with other social media companies is ad hoc. *Id.* Moreover, this PFOF contains no evidence that CDC or the Census Bureau attempted to use these "exchange[s] [of] information about COVID" to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

432.    Crawford had only "very occasional" contacts with the platforms before COVID-19, *id.* 17:8-9; but then she and the CDC "started talking to some of them in February and March of 2020," at the beginning of the pandemic. *Id.* 18:5-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the CDC or the Census Bureau attempted to use these contacts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

433.    At this time, CDC leaders were asking Crawford's group if they were in contact with the platforms: "there were a lot of people asking staff, or other staff, are we -- were we in contact with the groups, and do we have any arrangements." *Id.* 18:19-23.

**RESPONSE:** Disputed as a mischaracterization of the testimony. Crawford testified that "a lot of people" were asking if CDC was "in contact" with social media companies, but she did not specify whether those people were CDC leaders or anyone else specific. Crawford Dep. 18:16-22. In any event, this PFOF contains no evidence that the CDC or the Census Bureau attempted use contacts with social-media to dictate to, threaten or pressure, collude with, or encourage them to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

434.     Crawford communicated with platforms by email, phone, and in meetings and calls. *Id.* 20:1-19. She "had points of contact at several of them, and we would have meetings when we needed to talk. So we arranged calls." *Id.* 20:17-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

**B.     CDC's and Census's Pressure and Collusion With Facebook/Meta.**

435.     On February 6, 2020, Facebook emailed State Department officials, noting that "Facebook has taken proactive as well as reactive steps to control information and misinformation related to Corona virus which includes … removal of misinformation." Crawford Ex. 2, at 4. The email was forwarded to Crawford, who reforwarded to her contacts at Facebook. *Id.* at 3. Facebook proposed to Crawford that "Facebook team would create a Coronavirus Page serving up content that exists on other organizations' FB pages including the CDC," and would direct users to "curated content from trusted sources." *Id.* at 3.

**RESPONSE:** Undisputed. However, the cited evidence reflects only a proposal by Facebook to make users aware of information from CDC that CDC posted to its own Facebook

226

page.  It is not evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

436.    On February 7, 2020, Crawford agreed to the proposals, and she also proposed that "There could be times we might want to address widespread myths like mask use or new issues." *Id.* at 2. She discussed with Facebook the same day. *Id.* at 1.

**RESPONSE:**  Undisputed, but note that the quoted email exchange concerned the placement of proactive messages at the top of Facebook's News Feed to inform users about how to protect themselves from the coronavirus, Crawford Ex. 2 at 2-3. This PFOF contains no evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

437.    On March 3, 2020, Facebook emailed Crawford and noted that Facebook intended to "support governments … with their response efforts on COVID-19," including the "goal" to "remove misinformation."  Crawford Ex. 3, at 1.

**RESPONSE:**  Undisputed, but note that in the quoted email exhibit Facebook informed CDC that it had "just shared [*its*] ongoing work to support governments and non-profits with their response efforts on COVID-19" (with a hyperlink to a live webpage), and that *Facebook's* "goal [was] to . . . remove misinformation." Crawford Ex. 3 at 1. This PFOF contains no evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms,

or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

438.    Crawford "talked pretty regularly" with Facebook "around this time," *i.e.*, March 2020. 37:7-9.

**RESPONSE:** Undisputed, except to the extent the PFOF suggests that Crawford talked to Facebook about "remov[ing] misinformation," *see* Pls.' PFOF ¶ 437, which contradicts Crawford's testimony that she didn't "recall . . . discussing misinformation with [Facebook] around this time[.]" Crawford Dep. 37:13-15. The fact that Crawford "talked pretty regularly" with Facebook is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

439.    Crawford recalls having discussions of misinformation with Facebook "in the fall of 2020." Crawford Dep. 38:7-8. These included discussions of how to combat "growing" misinformation about COVID-19: "I can recall us generally saying things to the effect of … misinformation is really growing, or … what do you think we could be doing to address it? That kind of conversation." *Id.* 38:11-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that these discussions about "combat[ing] and "address[ing]" misinformation concerned removing or suppressing information, that the CDC attempted in these discussions to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

440.    On January 25, 2021, Facebook emailed Crawford the first of an ongoing, biweekly series of CrowdTangle reports, which report on "top engaged COVID and vaccine-related content overall across Pages and Groups." Crawford Ex. 6, at 2. The email emphasized in bold the anti-vaccine content listed in the report, including "Reports of healthcare workers refusing the vaccine," "Posts about alleged vaccine-related deaths," and "News and reports of severe vaccine side effects." *Id.* Facebook indicated that it was sending this report in response to a prior conversation with Crawford in which such data was requested: "I am following up on our conversation several weeks ago about providing more detailed reporting from our CrowdTangle team." *Id.*

**RESPONSE:** Undisputed, except to the extent that the third sentence of the PFOF implies

that Facebook prepared the referenced report at Crawford's request. Facebook states in the cover

e-mail that it was sending the report as a "follow[] up on our conversation . . . about providing

more detailed reporting," *id.*, but not that the more detailed report had been created at Crawford's

"request[]." In any event, Facebook's act of sharing its CrowdTangle reports with CDC is not

evidence that the CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude

with, or encourage Facebook to remove or suppress certain health claims on their platforms, or

that Facebook regarded (or acted on) any communications with CDC or the Census Bureau as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

441.    Crawford responded that the report "looks wonderful and much appreciated." *Id.* at 1. She said that she "will be extending our distribution list" for the report. *Id.* at 1. She also noted, "One group we'll be adding" to the distribution list for the CrowdTangle reports "is the Census group who hopefully will soon start their project with us." *Id.* And she stated, "the wide group of those looking at misinfo will want this." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the

Census Bureau used  CrowdTangle reports in an attempt to dictate to, threaten or pressure, collude

with, or encourage social-media companies to remove or suppress certain health claims on their

platforms, or that the companies regarded (or acted on) communications with CDC or the Census

Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

442.    CrowdTangle is "a social media listening tool for Meta properties … [l]ike Instagram and Facebook." Crawford Dep. 50:3-6. "[S]ocial media listening reports show themes … of discussion on social media channels." *Id.* 52:10-12. The CrowdTangle report is "a search of content on social media, and a summary of the higher volume conversations." *Id.* 53:8-10. It is "a report of the most talked about topics on social media during this time period." *Id.* 54:13-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau used  CrowdTangle reports in an attempt to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

443.    The CrowdTangle reports that Facebook regularly emailed to CDC were only one of two forms of access to CrowdTangle. Since "March or April 2020," Facebook had also allowed CDC to "directly log into CrowdTangle and run our own reports or searches." *Id.* 77:9-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau used CrowdTangle or CrowdTangle reports in an attempt to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

444.    According to Crawford, the CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC's use of CrowdTangle reports to understand social-media content that it "might need to adjust [its own] communications materials for" had anything to do with dictating to, threatening or pressuring, colluding with, or encouraging social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these efforts as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

445.     Crawford confirms that the CDC had privileged access to CrowdTangle from early 2020, and government officials used the non-public "social media listening tool" to monitor and track private speech about COVID-19 on social media: "we had access to go in directly to CrowdTangle and run in reports … from early 2020. … And I mentioned that our research team … searched in it and looked in it to create their reports, and I believe other teams did too." *Id.* 147:12-18.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the record to the extent the PFOF purports to assert that CDC was using CrowdTangle or other "social media listening tool[s]" to "monitor" or "track" private speech in order to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these or any other actions by CDC as doing so. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

446.     The CDC also used other "social media and listening tools" to monitor Americans' speech on social media: "we did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the record to the extent the PFOF purports to assert that CDC was using CrowdTangle or other "social media listening tools" to "monitor" or "track" private speech to dictate to, threaten or pressure, collude

with, or encourage social-media companies to remove or suppress certain health claims on their

platforms, or that the companies regarded (or acted on) these or any other communications with

CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

447.    The CDC's "listening tools" included "Meltwater reports," where "Meltwater is
sort of like CrowdTangle but for all the platforms." *Id.* 154:13-16. But CrowdTangle is superior
to Meltwater for monitoring Facebook and Instagram because it provides privileged access to some
online speech: "CrowdTangle can see more on the Meta properties. So it's nicer if you're just
looking at Meta properties. Meltwater gives you social media at large." *Id.* 154:24-155:2.

**RESPONSE:** Undisputed, except that the non-quoted portion of the second sentence is

disputed as argumentative and lacking support in the cited testimony. In any event, this PFOF

contains no evidence that CDC or the Census Bureau used Meltwater reports or other social-media

listening tools to attempt to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) these or any other actions by CDC or the Census Bureau as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.C., Arg. § II.B.4.a. & f.

448.    Related to the bolded categories of supposed misinformation in Facebook's
CrowdTangle report, Crawford claims that she does not have specific recollection about the issues,
but she admits that "I do recall generally discussing misinformation with Facebook around this
time." *Id.* 58:11-13.

**RESPONSE:** Undisputed. *See* Crawford Dep. 58:4-11. However, general discussions

about misinformation are not evidence that CDC or the Census Bureau attempted to dictate to,

threaten or pressure, collude with, or encourage social-media companies to remove or suppress

certain health claims on their platforms, or that the companies regarded (or acted on) these or any

other communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

449.    Crawford added Census Bureau officials to the distribution list for the CrowdTangle reports because "[t]hey were going to start working with the CDC regarding misinformation." *Id.* 58:19-20; *see also id.* 61:11-12 ("At some point I recall adding Census to the distr[ibution]").

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the Census

Bureau's work with CDC "regarding misinformation" involved efforts to dictate to, threaten or

pressure, collude with, or encourage social-media companies to remove or suppress certain health

claims on their platforms, or that the companies regarded (or acted on) any actions by or

communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a.

& f.

450.    From then on, Facebook regularly sent Crawford biweekly "CrowdTangle content insights report[s]." Crawford Ex. 7, at 1-4. With each report, Facebook would highlight in bold the high-engagement misinformation-related issues for the CDC from the two-week period. *Id.* In each email, Facebook would introduce these misinformation-related posts by noting something like, "However, posts falling into the following themes also garnered high engagement." *Id.*

**RESPONSE:** Defendants dispute the phrase "[f]rom then on" in the first sentence as

vague. The record shows that Facebook sent Crawford biweekly CrowdTangle reports beginning

in January 2021. Crawford Ex. 6 at 2. Otherwise, dispute as a mischaracterization the implication

that the reports were limited to misinformation, *see* Crawford Ex. 7 at 1 (including in the summary

of highly engaged content "posts . . . about celebrating health care workers" and posts "shar[ing]

news that kids over 12 can be vaccinated," with "posts includ[ing] varied stances on

support/opposition to the idea"), and dispute as unsupported the implication that the reports

highlighted misinformation issues "for the CDC." This PFOF contains no evidence that

Facebook's act of sharing CrowdTangle reports with CDC or CDC's use of those reports had

anything to do with efforts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any actions by or communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

451.    The CrowdTangle reports survey content that is not publicly available, such as "personal Group posts."  *Id.* at 2.

**RESPONSE:** Disputed. The cited exhibit does not contain any information about the public or non-public nature of the contents of CrowdTangle reports, including "personal Group posts." Even if accurate, this PFOF contains no evidence that CDC's use of those reports had anything to do with efforts to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any actions by or communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

452.    Crawford is "sure that general discussions" with Facebook addressed "that there was a lot of information on vaccines, which is one of the bolded words [in the CrowdTangle Reports], for example. I am sure that did occur."  Crawford Dep. 64:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC's "general discussions" with Facebook about "information on vaccines" involved efforts to dictate to, threaten or pressure, collude with, or encourage Facebook to remove or suppress certain health claims on its platform, or that the company regarded (or acted on) any actions by or communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

453.    On January 27, 2021, Facebook sent Crawford a recurring invite to a "Facebook weekly sync with CDC (CDC to invite other agencies as needed)."  Crawford Ex. 36, at 1. A large number of Facebook and CDC officials were included on the invite, including Liz Lagone, Facebook's content-moderation officer who communicated with the CDC. *See Id.* The agenda for the recurring meeting included "Misinfo collab status."   *Id.* It also included "CDC needs/questions."  *Id.*

**RESPONSE:** Undisputed. However, neither the number of persons invited to these "weekly sync[s]" nor the agenda item concerning misinformation is evidence that the CDC (or the Census Bureau) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) these weekly meetings as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

454.    Crawford confirms that CDC frequently had weekly meetings with Facebook: "There were definitely times that we were talking weekly."  Crawford Dep. 226:20-21; *see also, e.g.,* Crawford Ex. 39, at 1 (recurring calendar invite for a meeting with the same agenda and participants on May 6, 2021).

**RESPONSE:** Disputed as a mischaracterization of the cited testimony, which states that CDC "might have" been having "weekly meetings with Facebook" during April 2021, because "[t]here definitely were times that [CDC and Facebook] were talking weekly. Crawford Dep. 226:6-21. Regardless, the frequency of meetings between CDC and Facebook provides no evidence that CDC (or the Census Bureau) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

455.    On March 10, 2021, Crawford sent Facebook an email seeking information about "Themes that have been removed for misinfo."  Crawford Ex. 44, at 3. She stated, "We mentioned

this on the call last week and you said you'd be sending something as other had asked – is that available yet by chance?"  *Id.* She clarified: "You mentioned that WH and HHS had asked so you'd get it to us," and responded "Yes" to Facebook's question, "Are you looking for types of COVID-19 misinfo we remove?"  *Id.*

**RESPONSE:** Undisputed. However, Crawford's inquiry about "[t]hemes" Facebook had

"removed for misinfo" is not evidence that CDC (or the Census Bureau) had attempted to dictate

to, threaten or pressure, collude with, or encourage Facebook to remove or suppress certain health

claims on its platform, or that the company regarded (or acted on) any communications with CDC

(or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

456.    Facebook noted, that "[w]e are setting up a meeting with WH/HHS to discuss more likely later this week or early next. Perhaps a CDC rep could participate…."  Crawford Ex. 44, at 2. Crawford noted, "They want to see what you guys proactively have removed that might not be in those [CrowdTangle] reports…. My guess is a short meeting with Lis Wilhelm['s] vaccine confidence team is what is needed if FB is willing to do it."  Crawford Ex. 44, at 2.

**RESPONSE:** Undisputed. However, discussions about "what [Facebook] proactively has

removed" are not evidence that CDC (or the Census Bureau) attempted to dictate to, threaten or

pressure, collude with, or encourage social-media companies to remove or suppress certain health

claims on their platforms, or that the companies regarded (or acted on) any communications with

CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

457.    In this exchange, CDC was "wondering if [Facebook] had info on the types of posts that were removed and the themes because they were worried that we could only see the live posts and so we wouldn't know if there was also confusion about other areas that had been removed." Crawford Dep. 258:6-11. CDC had "asked on the meeting if they had this data, like, because we wanted it. And I think she said, Oh, we did something like this for the White House or HHS."  *Id.* 260:6-9.

**RESPONSE:** Undisputed. However, CDC's inquiry about and desire to receive "info" and

data about the types and themes of posts Facebook had proactively removed, *see* Pls.' PFOF ¶ 456,

is not evidence that CDC (or the Census Bureau) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC (or the Census Bureau) as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

458.    From this, Crawford understood that HHS and the White House were having similar meetings with Facebook: "I do think that they did have meetings with the agencies." *Id.* 261:10-11.

**RESPONSE:** Disputed as a mischaracterization of the testimony, in which Crawford states that she "do[es]n't know" "in relation to this email" whether "Facebook was having the same kinds of meetings CDC was having with them with White House and HHS," but she "th[ought] that [Facebook] did have meetings with the agencies." Regardless, the occurrence of any such meetings is not evidence that CDC (or the Census Bureau, HHS, or the White House) attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any such meetings as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

459.    On March 25, 2021, Crawford and other CDC officials met with Facebook. Ex. S, at 1. The day before the meeting, March 24, 2021, Facebook emailed Crawford and noted, "[a]s we discussed last week, we will present on COVID-19 misinformation on this session/meeting and have some of our team that is focused on that workstream provide a briefing on the current policies and approach as well as the current trends we are identifying." *Id.* at 2. The official also noted that Facebook would have a "Misinformation Manager" and Liz Lagone, a content-moderation official for Facebook who "will be leading from our side on misinformation briefing for your team. They all work on our COVID-19 policies." *Id.* at 1. Crawford responded, attaching a Powerpoint slide deck and stating, "This is a deck Census would like to discuss and we'd also like to fit in a discussion of topic types removed from Facebook." *Id.* She also noted that two Census Bureau officials (Zack Schwartz and Jennifer Shopkorn) and two Census Bureau contractors (Sam Huxley and Christopher Lewitzke) would attend the meeting. *Id.*

**RESPONSE:** Undisputed. In any event, the existence of this meeting is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

460.    The "deck Census would like to discuss" was attached to the email, *id.* at 3-16, and it contained an overview of "Misinformation Topics" including "concerns about infertility, misinformation about side effects, and claims about vaccines leading to deaths." *Id.* at 4. "These topics were selected due to high volume, continued public discussion, and high-profile coverage," according to the slide deck. *Id.* For each topic, the deck included sample slides and a statement from the CDC debunking the supposedly erroneous claim. *Id.* at 6-14. The slides were clearly designed to convince Facebook that such content should be censored. For example, with respect to claims of infertility, the deck provided screen shots of six specific posts on Facebook and Instagram, summarized similar claims, and stated: "According to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines." *Id.* at 6-8. It also noted that "Several of Facebook's fact check partners have covered this claim." *Id.* at 6. The deck provided a similar debunking treatment for claims about other side effects from COVID vaccines, *id.* at 9-11, and claims about vaccines leading to deaths, *id.* at 12-14—in each case, providing six sample posts from real Facebook users as examples of the type of claim, and providing information designed to ensure that the claim would be censored. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence to the extent plaintiffs assert the "slides were clearly designed to convince Facebook that such content should be censored" or "provid[ed] information designed to ensure that the claim would be censored," rather than to provide examples of health-related topics on which CDC could provide Facebook information to evaluate or rebut the claims circulating on its platform. Moreover, as Ms. Crawford testified, CDC was aware that social media companies had a range of actions they could take with respect to content on their platforms, including no action at all—and that there was no consequence from CDC for inaction. Crawford Dep. 88:3-22. Moreover, plaintiffs inaccurately describe the precise contents of the slide deck: there are not six sample posts from Facebook for each of the

topics. Ultimately, the contents of this document are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

461.    On March 30, 2021, Facebook sent Crawford an email with the subject line, "This week's meeting."  Crawford Ex. 8, at 3. Crawford confirms that she was engaging in weekly meetings with Facebook during this time period, as well as other time periods during the COVID-19 pandemic: "we were meeting weekly during parts, so I imagine we were."  Crawford Dep. 68:9-10.

**RESPONSE:** Undisputed. However, the occurrence and frequency of these meetings are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

462.    The email indicates that CDC and Facebook were repeatedly discussing misinformation during these weekly meetings, as Facebook stated to Crawford: "I wanted to surface any misinfo questions your team may have for the team that I had briefing last time. They are available to attend again, but also want to make sure we are answering any of your team's questions."  Crawford Ex. 8, at 3.

**RESPONSE:** Disputed as a mischaracterization of the evidence. This single exchange about discussing "misinfo questions that" the CDC might have does not support the assertion that CDC and Facebook were "repeatedly discussing misinformation during these weekly meetings." In fact, meetings between CDC and Facebook normally focused on other matters, even though the topic of misinformation was sometimes discussed as well. Crawford Decl. ¶¶ 5-6, 8 (Ex. 80). In

any event, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

463.    Crawford admits that these weekly meetings involved CDC meeting with Facebook's *content-moderation* teams: "I do recall [Facebook] bringing in people from their Trust and Safety or Misinformation teams … to talk to us about misinformation at some weekly meetings." Crawford Dep. 68:24-69:3.

**RESPONSE:** Disputed as a mischaracterization of the testimony, which (as quoted) states that the meetings involved "Trust and Safety" or "Misinformation" teams—not "*content-moderation* teams." In any event, these meetings are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

464.    Crawford admits that, in these meetings with Facebook content-moderation team, CDC inquired about how Facebook was censoring COVID-19 misinformation: "we had asked questions about what they were seeing in terms of misinformation and inquired about any activities they were undertaking. And I believe this was an offer to sort of get back to us on any of those questions." *Id.* 69:9-13.

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony, which does not mention "censoring" or a "content-moderation team," and does not support the assertion that CDC was inquiring about "censoring COVID-19 misinformation." In any event, these meetings are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with,

or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

465.    In response, Crawford noted that she was also communicating with Facebook through an alternative channel. Crawford Ex. 8, at 2 ("I added this part in yellow to our chain on turn.io"). She asked Facebook if they "have thoughts on how we can meet regularly with Census? … am I correct that your team is going to consider how you might want to engage with the CDC/Census team routinely and get back to us?" *Id.* at 2-3. She noted to Facebook: "I know you all have experience with Census already." *Id.* at 3.

**RESPONSE:** Disputed to the extent that the PFOF ambiguously and incoherently starts with the phrase "[i]n response" and does not explain what Crawford was "respon[ding]" to. Also disputed because the PFOF mischaracterizes turn.io as "an alternative channel" through which Crawford was communicating with Facebook; in fact, turn.io was simply a "project that [CDC was] working on with WhatsApp," through which people "could look up ZIP codes to find vaccines." *See* Crawford Dep. 70:3-25. The quoted portion of the email exhibit ("I added this part in yellow to our chain on turn.io") references another email chain in which Facebook and CDC were discussing the turn.io project. In any event, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

466.    At this time, CDC had recently executed an Interagency Agreement with the Census Bureau to assist the CDC in addressing misinformation: "We had entered an IAA with Census to help advise on misinformation." Crawford Dep. 71:3-4. Pursuant to this agreement, the Census Bureau provided reports to the CDC on misinformation that the Census Bureau tracked on social media: "they provided reports on misinformation that they were seeing to us." *Id.* 71:15-17.

"Census did provide [CDC] with the key themes they were seeing around misinformation during the times that they were looking at it." *Id.* 72:16-19.

**RESPONSE:** Undisputed. However, the existence of this IAA is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

467.    An IAA is "an agreement between two agencies to conduct some kind of work between them." *Id.* 109:23-24. Under this IAA, CDC was "only engaging" with Census "on COVID misinformation." *Id.* 110:12-13. CDC was "learning about how [Census] operated a general misinformation team." *Id.* 110:13-14. The IAA "let [CDC] partner with Census to learn how they handled misinformation and help us with the COVID misinformation. … They seemed to have more knowledge than we did." *Id.* 111:3-6.

**RESPONSE:** Undisputed. However, neither the existence of this IAA, nor the general reference to "handl[ing] misinformation," is evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

468.    Facebook replied that "it would be great to have questions that may not have been answered from your team on misinfo. That team is very busy so it's a good opportunity to di[g] deeper on that topic and especially if there are areas that are still unclear or the teams have concerns about." Crawford Ex. 8, at 2.

**RESPONSE:** Undisputed, except to clarify that Facebook's reply pertains to the language quoted in PFOF ¶ 465. In any event, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C.,

Arg. § II.B.4.a. & f.

469.    Crawford responded that CDC "would like to have more info … about what is being done on the amplification-side," and that CDC "is still interested in more info on how you analyze the data on removals, etc." *Id.* at 2. She also noted that Census Bureau was "hoping to go over the deck they had and discuss how to engage on a more regular basis." *Id.*

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the

Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-

media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

470.    Following up, Crawford noted that Census would like to discuss the following topics: "It looks like the posts from last week's deck about infertility and side effects have all been removed. Were those re-evaluated by the moderation team or taken down for another reason?" *Id.* at 1. This remark plainly indicates that, in the last week of March 2021, the Census Bureau was sharing "decks" of posts about COVID-19 misinformation with Facebook, which Facebook then "removed," and CDC was following up to inquire whether the censorship occurred because those posts were "re-evaluated by [Facebook's] moderation team" because of Census's flagging, or for another reason. Crawford testified that she "cut and pasted" the Census Bureau's inquiries on these points. Crawford Dep. 76:10.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The testimony refers to

a single deck—not multiple "decks" as asserted in plaintiffs' mischaracterization. Moreover, Ms.

Crawford testified that she could not recall why this question was asked, Crawford Dep. 76:2-13,

which does not support plaintiffs' assertion that "CDC was following up to inquire whether the

censorship occurred because of Census's flagging." This PFOF also contains no evidence that

CDC asked Facebook to remove the posts; Ms. Crawford's question, "Were those [posts] re-

evaluated by the [Facebook] moderation team or taken down for another reason?" indicates to the

contrary. In any event, this communication is not evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

471.    Crawford also asked Facebook to give the Census Bureau direct access to log in to Facebook's CrowdTangle tool: "Can we add the Census Team to CrowdTangle?"  Crawford Ex. 8, at 1. As Crawford noted, Facebook had "allowed [CDC] to directly log into CrowdTangle and run our own reports or searches," and she was asking Facebook to let Census "log in to CrowdTangle" as well. Crawford Dep. 77:4-14.

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

472.    In the same email, Crawford inquired of Facebook, "One of the main themes we're seeing and from the CrowdTangle report is local news coverage of deaths after receiving the vaccine. What's the approach for adding labels to those stories?"  Crawford Ex. 8, at 1. Thus, the CDC inquired of Facebook what its "approach" was to censoring local news stories about vaccine-related deaths. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, which says nothing about Facebook "censoring local news stories." In fact, it shows the *opposite*—that Facebook was allowing the news stories to circulate, while potentially (in its independent discretion) deciding to add labels to them: the exhibit explicitly states that one option is "No label." Crawford Ex. 8 at 1; *see also* Crawford Dep. 77:1-2 ("I don't think we were asking them to add labels, from what I'm reading here. We were asking them what their approach for labels [was]."). This communication

is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

473.    Crawford asked Facebook "[h]ow should we best engage regularly going forward on the Census/CDC reports."  Crawford Ex. 8, at 1. Crawford notes that Census had already been working with Facebook to address census-related misinformation: "we generally discussed, you know, how we should talk about misinformation because they had already been working with Census, on their own Census misinformation, and I wanted to know what was best for them for engaging on any topics that we might want to discuss."  Crawford Dep. 77:19-24.

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

474.    Facebook answered that "[w]e are working on a proposal of how to set up a sharing partnership on the misinform[ation] items."  Crawford Ex. 8, at 1.

**RESPONSE:** Undisputed. However, this communication is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

475.    Crawford also had three-way meetings with Facebook, CDC, and Census about misinformation: "there were meetings where Census, myself and Facebook were on calls," in

which they "had general conversations about what were opportunities to address misinformation." Crawford Dep. 83:6-12. In those conversations, specific topics like the removal of specific posts discussed in Exhibit 8 "were probably discussed," but Crawford claims she does not "have specific memory of it." *Id.* 83:12-14.

**RESPONSE:** Disputed as a mischaracterization of the testimony and evidence. Ms. Crawford testified only that "things like in this chain were probably discussed"; that does not equate to testimony that "topics like the removal of specific posts" were discussed. It is unclear what, if any, portion of the topics in Exhibit 8 would have been discussed, and the PFOF's assertion about what was probably discussed in these conversations relies on unfounded speculation from testimony in which Ms. Crawford makes clear she does not have much memory of the conversations. In any event, these conversations are not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any meetings with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

476.    On April 13, 2021, Facebook followed up by emailing Crawford and proposing to enroll CDC and Census Bureau officials in a special misinformation reporting channel to Facebook. Crawford Ex. 10, at 2. With a subject line "CV19 misinfo reporting channel," Facebook wrote, "We're working to get our COVID-19 misinfo channel up for CDC and Census colleagues," and asked Crawford to confirm "if the below emails are correct for onboarding to the reporting channel and if there are others you'd like to include." *Id.* Facebook provided nine emails, including five CDC officials and four Census officials or contractors, to "onboard" into the COVID-19 "misinfo reporting channel." *Id.*

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes the document as pertaining to a "special" reporting channel. That term is vague and overstates the importance of the evidence. Moreover, Crawford later clarified: "I guess I can't say I know that" the reporting channel was provided to "official groups" and "I might be wrong." Crawford Dep. 96:12-16. In

any event, the existence of this reporting channel is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any contact with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

477.    The officials who work for Reingold, including Christopher Lewitzke, "were contractors working with Census." Crawford Dep. 101:10.

**RESPONSE:** Disputed as a mischaracterization of the testimony. As the quoted language states, individuals who worked for Reingold were Census "contractors," not "officials."

478.    Crawford states that this email refers to the fact that Facebook "has a portal or reporting channel where you can report misinformation or threats or things from a specific log-in that I believe they only provide to … federal agencies." *Id.* 91:23-92:2. The portal allows federal officials to "log onto Facebook as an administrator, and it's something that they make available to you as a federal agency." *Id.* 95:17-19. Crawford understands that this "wasn't something that was generally available" to the public but was only provided to federal officials. *Id.* 96:15-16.

**RESPONSE:** Disputed as an incomplete account of the testimony. Crawford clarified: "I guess I can't say I know that" it was provided to "official groups" and "I might be wrong." Crawford Dep. 96:12-16. In any event, the existence of this reporting channel is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any contact with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

479.    Crawford recalls that a CDC official logged into this portal and used it to report "two or three posts." *Id.* 92:17.

**RESPONSE:** Undisputed. Defendants state further that any member of the public can report posts to social media companies. *See* Defs.' PFOF § II.A. This lone instance of a single CDC official reporting two or three posts—as to which there is no evidence of what, if any, action Facebook took—is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any contact with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

480.   On April 23, 2021, Crawford emailed Facebook and stated that the Wyoming Department of Health had "mentioned … that the algorithms that Facebook and other social media networks are apparently using to screen out postings by sources of vaccine misinformation are also apparently screening out valid public health messaging, including WY Health communications." Crawford Ex. 38, at 2. When she did not hear back, on April 28, she emailed Facebook again, "Anything you all can do to help on this?"  *Id.* Facebook then responded and addressed the problem. *Id.* at 1-2. The government is not amused when government-induced censorship sweeps in the government's own speech.

**RESPONSE:** Disputed to the extent the final sentence mischaracterizes the evidence. The email makes clear that the algorithms being applied were developed by "Facebook and other social media networks" and were not "government-induced." Furthermore, in vaguely referring to "the government" the last sentence—which is rhetoric meriting no response except as noted herein--appears to conflate a Wyoming state agency with the federal government. In any event, this exchange is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

481.    On May 6, 2021, Crawford emailed Facebook a table containing a list of 16 specific postings on Facebook and Instagram, with a link and the text of each post. Crawford Ex. 9, at 1-3. Crawford wrote, "As mentioned, here are two issues that we are seeing a great deal of misinfo on that we wanted to flag for you all … These are just some example posts. … Our census team is copied here, has much more info on it if needed."  Crawford Ex. 9, at 1. Crawford copied Jennifer Shopkorn of the Census Bureau and Christopher Lewitzke, a Census Bureau contractor, on the email. *Id.*

**RESPONSE:** Undisputed. Defendants note that the "two issues" being referenced are "vaccine shedding and microchips." *See* Crawford Ex. 9 at 1. Note further that when Plaintiffs' counsel asked Ms. Crawford in reference to this exhibit, "What was the expectation of what Facebook would do when something was flagged?" Ms. Crawford responded, "I don't recall having a specific recollection of what I thought that they would do" and that the "consequence" was "nothing" if Facebook "didn't do anything with your flagging of these items." Crawford Dep. 88:3-22. Ms. Crawford also added, "I didn't believe we were asking them to remove content specifically." *Id.* at 90:5-12. In any event, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

482.    Crawford "flag[ged]" these posts for Facebook "[b]ecause we had had conversations with Facebook about ways that we could address misinformation, and … one suggestion … that came up in that conversation was to let them know if we were seeing major themes that CDC had scientific information on, or had web content that would address."  Crawford Dep. 87:15-21.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 481.

483.    When Crawford would "flag" such content for Facebook and other platforms, she knew that they would evaluate and possibly censor the content under the content-moderation policies: "I do know that the platforms have a variety of ways to address misinformation. They might tag it as something that people should look more into. I think … that they have the ability

to control how often some of these things show up in peoples' feeds. And I do know that removing them is an option that they could consider." *Id.* 88:7-14.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted testimony speaks for itself and does not demonstrate that Ms. Crawford "knew that [the platforms] would evaluate and possibly censor the content under content-moderation policies." Indeed, the quoted testimony is preceded by Ms. Crawford's statement that "I don't recall having a specific recollection of what I thought that they would do." Crawford Dep. 88:5-6. Additionally, note that Ms. Crawford testified that when she "flag[ged]" misinformation themes or example posts for Facebook, she was merely "[p]ointing out" "major themes that CDC" was noticing online "that CDC had scientific information on, or had web content that would address" those themes. *Id.* at 87:13–88:2. In any event, the testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

484.   CDC's "goal" in flagging misinformation for possible removal from Facebook "is to be sure that people have credible health information so that they can make the correct health decisions…. There were a lot of things circulating that were not accurate information about COVID. And so we were trying to point out and make the credible information more available to users." *Id.* 88:25-89:6.

**RESPONSE:** Disputed as a mischaracterization of the testimony, to the extent the PFOF asserts that CDC was "flagging information for possible removal from Facebook." The quoted testimony speaks for itself and makes clear that CDC was "flagging these items" in order to "be sure that people have credible health information" and "make the credible information more available to users." Crawford Dep. 88:23-89:6. In any event, the testimony is not evidence that

250

CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

485.    CDC and Census used "the social [media] listening tools," such as CrowdTangle, to identify misinformation that was "flagged" to Facebook for possible censorship. *Id.* 90:18-23. Regarding the table of 16 posts she "flagged" in her May 6, 2021 email, she stated, "these probably came from the social listening tools … that can consolidate examples. And we provided some examples of what we meant." *Id.* 90:18-23.

**RESPONSE:** Disputed as a mischaracterization of the testimony, to the extent that the PFOF asserts that CDC and Census were flagging information "to Facebook for possible censorship." As explained above, *see* Response to Pls.' PFOF ¶¶ 481-84, the evidence does not support that proposition. In any event, the testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

486.    On May 10, 2021, Crawford emailed Facebook with the subject line, "COVID BOLO Misinformation meetings." Crawford Ex. 40, at 3. She wrote: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. … Are there direct POCs on your end I should include on the invite?  Happy to chat if better. THANKS!" *Id.*

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C.,

Arg. § II.B.4.a. & f.

487.    On May 18, 2021, Facebook emailed Crawford noting that a Facebook official "has an agenda item" for the "CDC call this week."  Crawford Ex. 11, at 2. This official, according to Crawford, is a member of Facebook's "Trust and Safety team, or the Misinformation team." Crawford Dep. 103:9.

**RESPONSE:**  Undisputed. However, this email is not evidence that CDC or the Census

Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain health claims on their platforms, or that the companies

regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C.,

Arg. § II.B.4.a. & f.

488.    The Facebook official noted that Facebook's "Content Policies … determine what we may remove or reduce and inform."  Crawford Ex. 11, at 2. She noted that "we currently remove false claims about face masks," and wanted to discuss "whether there is still a high risk of harm from mask misinformation," as well as "false claims about the efficacy of social distancing or the existence of COVID-19."  *Id.*

**RESPONSE:**  Undisputed, but this evidence affirmatively demonstrates that Facebook

operated independently of CDC, as it asserts that Facebook was applying its own policies to

"determine what [it] may remove or reduce and inform." Thus, this email is not evidence that CDC

or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage

social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

489.    Crawford admits that the CDC provided "scientific information" that Facebook would use to decide whether to "remove" or "reduce and inform," *id.*, content under its policies: "What we did provide was scientific information that I did assume that they might use to do those things," *i.e.*, "remove or reduce and inform." Crawford Dep. 105:17-19.

**RESPONSE:** Disputed as a mischaracterization and incomplete account of the testimony.

As the quoted language shows, Ms. Crawford did not "admit" that Facebook "would use" information provided by CDC; she speculated that Facebook "might" use it. Furthermore, Ms. Crawford made clear that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this evidence affirmatively demonstrates that Facebook operated independently of CDC, as it asserts that Facebook was applying its own policies to "determine what [it] may remove or reduce and inform." Thus, this testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

490.    The next day, May 19, 2021, Facebook emailed Crawford and noted that, for the weekly call that week, "here are some of the COVID content items that [Facebook's content-moderation official] will be flagging for you/CDC team." Crawford Ex. 11, at 1. She then provided a list of twelve specific claims, including such claims as "COVID-19 has a 99.96% survival rate," "COVID-19 vaccines cause bell's palsy," and "[p]eople who are receiving COVID-19 vaccines are subject to medical experiments." Crawford Ex. 11, at 1-2.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

491.    Facebook raised these twelve claims to get CDC's guidance on whether they violated Facebook's policies: "They were wanting our feedback on whether these things were true or false statements that they were seeing. Did the CDC have science around this, did we have content on our website." Crawford Dep. 106:10-13. CDC would respond to debunk such claims if it had information: "[I]f we knew, if we had something or we had science on these items, we would point to it or provide them an answer." *Id.* 106:19-21.

**RESPONSE:** Disputed as a mischaracterization of the testimony. The quoted language

speaks for itself, and it neither establishes that Facebook raised these twelve claims to get CDC's

guidance "on whether they violated Facebook's policies," nor does it establish that CDC "would

respond to debunk such claims." Ms. Crawford emphasized that "[CDC] did not discuss the

development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford

Dep. 105:12-17. In any event, the testimony is not evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies

to remove or suppress certain health claims on their platforms, or that the companies regarded (or

acted on) any communications with CDC or the Census Bureau as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. §

II.B.4.a. & f.

492.    In response, Crawford indicated that "Census team members" would join the call, and that she might not be able to address or debunk all 12 claims on the call, because "[t]here may be some facts we have to get back to the group on after the meeting." Crawford Ex. 11, at 1.

**RESPONSE:** Undisputed. Defendants state further that Ms. Crawford emphasized that

"[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of

[Facebook's] policies." Crawford Dep. 105:12-17. This email is not evidence that CDC or the

Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-

media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

493.    On the call referred to in the email, CDC discussed with Facebook these twelve claims and who at CDC might be able to address their veracity. Crawford Dep. 106:23-107-3.

**RESPONSE:** Undisputed. Defendants state further that Ms. Crawford emphasized that

"[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of

[Facebook's] policies." Crawford Dep. 105:12-17. This testimony is not evidence that CDC or the

Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-

media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

494.    According to Crawford, "Sometimes in these meetings they would ask do we know if this is true or false, which is what they were doing [in Exhibit 11]. And then if we knew, the communicators knew the answer, we would provide it. If not, I would say, we would say, I'll have to get back to you later, we'll talk to our SMEs," *i.e.* subject-matter experts. *Id.* 116:7-12.

**RESPONSE:** Undisputed. Defendants state further that Ms. Crawford emphasized that

"[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of

[Facebook's] policies." Crawford Dep. 105:12-17. This testimony is not evidence that CDC or the

Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-

media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

495.    Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation: "Census was at least periodically checking on things that they had flagged, or they had seen come up." *Id.* 117:19-21.

**RESPONSE:** Disputed as a mischaracterization of the testimony; the quoted language speaks for itself and does not state "Census Bureau officials would follow up to monitor whether Facebook was actually removing the content that federal officials had flagged as misinformation." In any event, this testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

496.    After the meeting, on May 24, Facebook's content-moderation official emailed Crawford, stating, "Thanks so much again for you and team's help in debunking a few COVID-19 and vaccine misinformation claims for us." Crawford Ex. 15, at 2. She then provided a list of the twelve claims with CDC's input on each, noting "Debunked" for each claim that the CDC had debunked in the meeting. *Id.* at 2-3. Among other things, she noted that CDC "[d]ebunked" claims like "Face masks contain … harmful particles," and even plainly evaluative statements like "People who are receiving COVID-19 vaccines are subject to medical experiments." *Id.* at 2-3.

**RESPONSE:** Undisputed, except to note that the PFOF selectively quotes the exhibit; the truncated sentence reads in full, "Face masks contain harmful nano worms or harmful particles." In any event, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

497.     On June 2, 2021, Crawford emailed the Facebook content-moderation official back with further input on the claims from CDC's subject-matter experts. Crawford Ex. 16, at 2. She noted several times that CDC's "web content to debunk is in clearance," meaning that CDC was preparing web content that would debunk those claims. *Id.*

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

498.     The next day, on June 3, 2021, the Facebook content-moderation official emailed Crawford to clarify that "web content to debunk is in clearance" means that "we should consider these debunked by the CDC now," and Crawford answered that "Yes they are debunked and we will also have content on it soon."  Crawford Ex. 16, at 1. As Crawford stated, "We reported to Facebook that they were debunked at this time."  Crawford Dep. 135:2-3.

**RESPONSE:** Undisputed. However, this PFOF does not contain evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

499.     Crawford knew that Facebook would apply its content-moderation policies to claims that the CDC debunked: "I knew that they had options … which is to inform people, to maybe reduce it in the algorithm, or to remove it…. [T]hey probably had other options, but I knew of at least those." *Id.* 138:18-22.

**RESPONSE:** Disputed as a mischaracterization of the testimony. As the quoted language states, Ms. Crawford "knew that [Facebook] had options," not that she "knew that Facebook *would* apply its content-moderation policies to claims." Again, Ms. Crawford emphasized that "[CDC]

did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this testimony is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

500.    On July 26, 2021, the same Facebook content-moderation official emailed Crawford, asking for CDC to debunk three more COVID-related claims. The subject line of the email was, "FB Misinformation Claims Help Debuning."  Crawford Ex. 17, at 1. Crawford understood that "Debuning" was "Debunking" misspelled. Crawford Dep. 139:1-2.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

501.    In this email, Facebook's content moderator wrote to Crawford: "Our Misinformation Policy Team has identified some claims that we were hoping your team could **help us understand if they are false and can lead to harm**?"  Crawford Ex. 17, at 1 (bold in original).

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

502.    Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm. *See, e.g.,* Crawford Ex. 26, at 4 (Facebook's content-moderation official, Liz Lagone, noting that "We remove … posts on the grounds that the claim is false and that it is harmful," where "harmful" includes cases where "if people believed it, it might make them less likely to get vaccinated."). So it was clear that Facebook's "Misinformation Policy Team" was asking CDC to advise whether these claims should be removed under Facebook's content-moderation policy. Crawford admits that she understood that CDC's guidance would "benefit" Facebook's expansion and application of its censorship "policy" to these claims, acknowledging that Facebook was asking her about these claims "[b]ecause CDC would have credible health information about the claims or scientific information that would benefit their policy making." Crawford Dep. 140:1-3.

**RESPONSE:** Disputed. The cited evidence does not support the categorical assertion that "Facebook's content-moderation policy called for it to remove claims that are false and can lead to harm." The selectively quoted language from Crawford Ex. 26, when read in full, pertains to only a specific set of claims (those that "claim that COVID-19 vaccines kill people or lead to death"), and not all posts that are false and can lead to harm. Nor does Crawford Ex. 17 support the argumentative assertion that Facebook was "asking CDC to advise whether the claims should be removed under Facebook's content-moderation policy." Nor does the heavily spliced deposition testimony relate in any way to "Facebook's expansion and application" of—in Plaintiffs' characterization—a "censorship policy." Ms. Crawford testified that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. This PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

503.    The three claims included: "Spike protein in COVID-19 vaccines is dangerous/cytotoxic," "Guillain-Barre Syndrome (GBS) is a possible side effect of the COVID vaccine," and "Heart inflammation is a possible side effect of all COVID-19 vaccines." Crawford Ex. 17, at 1.

**RESPONSE:** Undisputed that Facebook asked CDC in July 2021 whether the three claims

listed in this PFOF "are false and can lead to harm." However, this PFOF contains no evidence

that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or

encourage social-media companies to remove or suppress certain health claims on their platforms,

or that the companies regarded (or acted on) any communications with CDC or the Census Bureau

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

504.    Facebook also asked Crawford if "your team was aware of any global source of truth/database for vaccine adverse effects including possibly vaccine-related deaths." Crawford Ex. 17, at 1.

**RESPONSE:** Undisputed, except to note that the quoted language ends with a question

mark, not a period. In any event, this PFOF contains no evidence that CDC or the Census Bureau

attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies

to remove or suppress certain health claims on their platforms, or that the companies regarded (or

acted on) any communications with CDC or the Census Bureau as such. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. §

II.B.4.a. & f.

505.    Crawford responded, "Got it, let me get back to you shortly and thank you much for asking!" Crawford Ex. 17, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

506.    Crawford does not recall her specific response to this inquiry, but she admits that "generally" she referred them to the CDC's subject-matter experts and responded to Facebook with the CDC's view on the scientific questions, as she did with similar requests. Crawford Dep. 140:16-141:4.

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

507.    On July 20, 2021, Facebook emailed Crawford another biweekly "CrowdTangle content insights report" on COVID-19. Crawford Ex. 18, at 1. One of the misinformation-trending topics that Facebook flagged in bold in the email was "**Door-to-Door Vaccines**," which stated that "The highest interaction Page posts for this topic convey concern from political opponents about the Biden Administration's strategy to ramp up vaccination efforts in communities with low vaccination rates by going 'door-to-door' to educate and encourage more Americans to get vaccinated." *Id.* The same topic, in the same time frame, was emphasized in the Virality Project report as a prime example of viral vaccine-related "misinformation," when in fact it involved only expressions of political opinion. Scully Ex. 2, at 39, 54-55.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The CrowdTangle content insight report does not describe the topic of "door-to-door vaccines" as a "misinformation-trending topic," but instead describes it as "highly engaging content." Crawford Ex. 18 at 1. Other "highly engaging content" listed in the same email was "Reopening of Institutions" and "Olympics

and COVID-19." *Id.* The PFOF is also disputed, because Scully Ex. 2 does not support the assertion that "the same topic, in the same time frame, was emphasized in the Virality Project report." Scully Ex. 2 is dated April 26, 2022, while Crawford Ex. 18 is from nearly one year ***prior*** (July 20, 2021). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

508.    The same email also noted posts "expressing skepticism about vaccinating children." Crawford Ex. 18, at 1. Earlier CrowdTangle reports in the same email chain had flagged for the CDC highly engaged content about "**Vaccine Side Effects** … especially for children and pregnant women," "**Vaccine Refusal**," and "**Vaccination Lawsuits** … lawsuits over compulsory vaccination related to employment." *Id.* at 2-3 (bold in original).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

509.    Facebook noted that the CrowdTangle reports were confidential and not to be disclosed further: "As always, please do not share." *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

510.   Facebook continued to send biweekly CrowdTangle reports, which flagged in bold high-engagement topics such as "**Proof of Vaccination Requirement**," "**COVID-19 and Unvaccinated Individuals**" (addressing "concerns that the recent uptick in hospitalizations and deaths is being driven up by unvaccinated individuals"), and "**COVID-19 Mandates**," as well as "allowing people to return to … religious services."  Crawford Ex. 19, at 1-3 (bolds in original).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

511.   On August 19, 2021, Facebook asked Crawford for a "VAERS Policy Consultation" meeting for the CDC to give Facebook guidance on how to address VAERS-related misinformation: "Our Health Policy folks would like to meet with your VAERS experts for a consultation meeting regarding VAERS and misinformation."  Crawford Ex. 20, at 1. Crawford responded, "I'm sure we can do this, and I'm glad you're asking."  Crawford Ex. 20, at 1.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The quoted language from the exhibit—which speaks for itself—does not support plaintiffs' characterization that this was a meeting for the CDC to give Facebook guidance "on how to address" VAERS-related misinformation. In her deposition, Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

512.   "VAERS" is the HHS's Vaccine Adverse Event Reporting System, *see* https://vaers.hhs.gov/. At that time, the CDC was greatly concerned about VAERS-related "misinformation" on social-media, because users cited and discussed VAERS data and reports to raise concerns about the safety of vaccines in ways that the CDC thought misleading, as Crawford recounted: "the topic of VAERS was an area that was widely discussed on social media, and there was a lot of areas of confusion about what VAERS data was. There was myths about VAERS data, and there was misinformation about VAERS data. So it was always one of the things that rose to the top in terms of volume of discussion of people were very confused about VAERS." Crawford Dep. 150:21-151:3. So it is not surprising that Crawford was "glad" Facebook was "asking" for a meeting in which the CDC would give Facebook guidance on how to censor "misinformation" about VAERS. Crawford Ex. 20, at 1.

**RESPONSE:** Disputed as an argumentative mischaracterization of the deposition testimony, which speaks for itself. The testimony does not establish that "CDC would give guidance on how to censor 'misinformation' about VAERS," or that Ms. Crawford was "glad" to give guidance on censoring misinformation about VAERs. In her deposition, Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

513.   Crawford also followed up with Facebook by providing written CDC-provided materials for Facebook to use in addressing VAERS-related "misinformation" on its platforms: "If of use, we just published a new video and I've attached some recent talking points that may also inform your efforts." Crawford Ex. 20, at 1. Plainly, the "efforts" Crawford wished to "inform" were Facebook's efforts to remove VAERS-related "misinformation" from its platforms.

**RESPONSE:** Disputed as an argumentative mischaracterization of the deposition testimony, which speaks for itself. The testimony does not establish that "the 'efforts' Crawford wished to 'inform' were Facebook's efforts to remove VAERS-related 'misinformation' from its platforms." Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

514.    The CDC also had a meeting with Facebook about VAERS-related misinformation: "We did have a session with the VAERS experts with Facebook." Crawford Dep. 151:8-9. In the meeting, the CDC had "two experts for VAERS and a couple of their communication experts on the line with Facebook's team," which consisted of "their misinformation and policy type team" that the content-moderation official "was part of." *Id.* 151:20-24. In the meeting, the CDC "offered the [subject-matter expert] just to answer their questions about what VAERS was and what it wasn't. And my recollection is [Facebook] asked a lot of questions like … who can report something on VAERS and things like that during the session." *Id.* 152:1-6.

**RESPONSE:** Undisputed. However, this meeting is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) the meeting with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

515.     On September 1, 2021, Crawford emailed Facebook and stated: "BOLO for a small but growing area of misinfo. One of our lab alerts … was misinterpreted and was shared via social media." Crawford Ex. 21, at 1. ("BOLO" stands for "Be on the lookout."  Crawford Dep. 153:21.). She explained what the CDC viewed was misinformation, and then stated, "I've attached some example Facebook posts and another document with the facts around the issue."   Crawford Ex. 21, at 1.

**RESPONSE:** Undisputed. However, this email is not evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

516.     Plainly, Crawford was flagging these posts and related posts for possible censorship under Facebook's content-moderation policy. She admits that the CDC's "BOLO" alerts were provided to "assist" the platforms with their enforcement decisions under their policies: "Similar to all the other BOLOs, we still thought it was good to point out if we had facts around something that was widely circulating as a cause of misinformation to the platforms to assist them in whatever they were going to do with their policy or not do."  Crawford Dep. 153:23-154:3.

**RESPONSE:** Disputed as a mischaracterization of the testimony, which does not support the argumentative assertion that Ms. Crawford was flagging posts for "possible censorship," as opposed to simply "point[ing] out whether [CDC] had facts around something that was widely circulating as a cause of misinformation . . . to assist [the platforms] in whatever they were going to do with their policy or not do." Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to,

threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

517.    When asked what she "expected [Facebook] to do once they were on the lookout" for the supposed misinformation that the CDC had flagged, Crawford responded: "I knew that they had various options. They could have just used it to inform people. They could have considered it in their algorithm, I believe. I did understand that potentially removing posts was something that they might do."  Crawford Dep. 155:15-20. So she provided the information knowing it would happen and wanting it to happen.

**RESPONSE:** Disputed as an argumentative mischaracterization, unsupported by and contrary to the cited testimony, to the extent the PFOF is intended to assert that Ms. Crawford knew that Facebook would remove posts and that she wanted certain posts removed. The quoted language, which speaks for itself, shows that Ms. Crawford only knew that Facebook "had various options" for addressing misinformation on its platform, which included simply "inform[ing] people" about additional facts concerning the matter asserted. The quoted language also shows that Ms. Crawford did not know which options Facebook would pursue in response to information shared with it by CDC. Defendants state further that Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with

CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

518.    On November 2, 2021, Facebook's content-moderation official sent Crawford and other CDC officials an email stating, "thanks so much for confirming the ability for the claims in question last week having the risk of causing vaccine refusals."  Crawford Ex. 22, at 1. Again, that is one of the criteria Facebook used to justify removal of content from its platforms. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated."). The content-moderation official also stated, "thank you all so much for your input over the last week on our many questions about vaccine misinformation relative to the EUA."  Crawford Ex. 22, at 1. ("EUA" refers to the FDA's "emergency use authorization to the Pfizer vaccine for children."  *Id.*)

**RESPONSE:** Disputed as a mischaracterization of the cited evidence. Crawford Ex. 26, which is dated February 2022, pertains to a limited set of claims and Facebook's *then*-current policy: "Under our current policy, we remove posts that claim that COVID-19 vaccines kill people or lead to death. We remove these posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated." Crawford Ex. 22, as stated, dates from four months prior. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

519.    The content-moderation official also stated: "I wanted to share that as a result of our work together, when the FDA gave emergency use authorization to the Pfizer vaccine for children last week, we immediately updated our policies globally to remove additional false claims about the COVID-19 vaccine for children (e.g. 'the COVID vaccine is not safe for kids')." Crawford Ex. 22, at 1. She also noted, "We also launched a new feature on Instagram, where accounts that repeatedly post content that violates our policies on COVID-19 or vaccine misinformation may now lose the ability to be tagged or mentioned or may see pop-ups asking if they'd like to delete certain posts that may violate our policies."  Crawford Ex. 22, at 1. Thus, Facebook noted that, "as a result of our work together" with the CDC, Facebook had updated its

content-moderation policies to increase censorship of vaccine-related claims in significant ways. *Id.*

    **RESPONSE:** The final sentence is disputed as an argumentative mischaracterization of the evidence. The email speaks for itself and does not support the assertion that Facebook "updated its content-moderation policies to increase censorship of vaccine-related claims" on account of CDC rather than its own independent decision-making. Defendants further state that Ms. Crawford testified that she "interpret[ed]" the email's statement referring to "our work together" as referencing "the ongoing work" of CDC "provid[ing] the facts to [Facebook]." Crawford Dep. 160-8-9. *See also id.* at 159:8-10 ("They were looking for CDC, who would have the scientific facts, to provide them with scientific facts."). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

    520.    The content-moderation official went on to ask the CDC to debunk additional claims: "**we have identified a number of additional claims we would like to get your team's assessment on … Would it at all be possible to get input by Monday, November 8th?**" Crawford Ex. 22, at 1 (bold and underline in original). She requested, "For each of the following new claims, which we've recently identified on the platform, **can you please tell us if: 1. The claim is false; and 2. If believed, could this contribute to vaccine refusals?**" *Id.* (bold in original). Again, these are the two precise criteria that Facebook relied on to remove content from its platforms. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated."). She then included a new list of ten specific claims about the COVID-19 vaccines for the CDC to debunk. Crawford Ex. 22, at 1-2.

    **RESPONSE:** Disputed as a mischaracterization of the cited evidence. Crawford Ex. 26, which is from February 2022, pertains to a limited set of claims and Facebook's *then*-current policy: "Under our current policy, we remove posts that claim that COVID-19 vaccines kill people

or lead to death. We remove these posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated." Crawford Ex. 22, as stated, dates from four months prior. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

521.    Crawford understood, again, that this request was made to "inform their policies," *i.e.*, inform Facebook's application of its content-moderation policies to these claims: "It was still my interpretation that she was asking to inform their policies."  Crawford Dep. 159:7-8.

**RESPONSE:** Undisputed, but note that regardless of Ms. Crawford's "interpretation" of the reason for Facebook's request, she emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22; *see also id.* at 159:8-10 ("They were looking for CDC, who would have the scientific facts, to provide them with scientific facts."). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

522.    Crawford also admits that she was "happy" when the CDC's information to Facebook caused "less spread of misinformation" on Facebook and other platforms, *i.e.*, that she

desired that outcome: "I'm happy that providing the scientific information led to less spread of misinformation." *Id.* 161:23-25.

**RESPONSE:** Undisputed, while noting that whatever "outcome" Ms. Crawford may have personally (and unilaterally) "desired" is irrelevant when, as she emphasized, "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." Crawford Dep. 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22. Also note that in full the relevant testimony reads: "I never felt that my role, or CDC's role, was to determine what to do with the scientific information that we provided. But I'm happy that providing the scientific information led to less spread of misinformation." *Id.* at 161:20-25. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

523.   Crawford also understood that Facebook was, in fact, removing content from its platforms based on the CDC's information: "I understand that she's removing claims … that are not scientifically accurate." *Id.* 162:21-22.

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony, which speaks for itself and does not establish that Facebook was removing content "based on the CDC's information," as opposed to a multitude of other (unspecified) factors, including Facebook's independent judgment regarding the application of its established content moderation policies. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress

certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

524.    Crawford responded to Facebook, "Thank you so much for the feedback on what you've been able to do. This is very good to know." Crawford Ex. 22, at 1. She also stated, regarding Facebook's request that the CDC debunk the ten new claims, that "I'm going to work on this one …. I hope we can do it by Monday, I will keep you posted." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

525.    The following Monday, November 8, 2021, Crawford followed up with a response from the CDC addressing seven of the ten claims Facebook had asked CDC to evaluate. Crawford Ex. 23, at 1-2. The CDC rated six of the seven claims "**False**." *Id.* (bold in original). Crawford also noted in the response email, without citing any support, that "It appears that any of these could potentially cause vaccine refusal." Crawford Ex. 23, at 1. Under Facebook's policies, a claim that is both false and could contribute to vaccine refusal was subject to removal. Crawford Ex. 26, at 4 ("We remove … posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated.").

**RESPONSE:** Undisputed except to note that Crawford Ex. 26, which is from February 2022, pertains to a limited set of claims and Facebook's *then*-current policy: "Under our current policy, we remove posts that claim that COVID-19 vaccines kill people or lead to death. We remove these posts on the grounds that the claim is false and that it is harmful because if people believed it, it might make them less likely to get vaccinated." (Emphasis added). Crawford Ex. 23, as stated, dates from four months prior. In any event, this PFOF contains no evidence that CDC or

the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

526.    On February 3, 2022, Facebook's content-moderation official sent Crawford another email, stating that she "wanted to **share updates we made as a result of our work together**" and "**ask for your assessment on a few things**." Crawford Ex. 26, at 1 (bold in original). She described the "updates" as follows: "On February 2nd, we launched several updates to our COVID-19 Misinformation and Harm Policy based on your [*i.e.* CDC's] inputs." *Id.* These "updates" included "[r]emoving claims that COVID-19 vaccines cause heart attacks," and "[t]aking steps to reduce the distribution of content that our systems predict likely violates our COVID-19 and vaccine misinformation policies, but has not yet been reviewed by a human; if at any point this content is confirmed to violate the policy then it will be removed from the platform." Crawford Ex. 26, at 1. Crawford responded, "the update is very helpful, thank you for including that!" *Id.*

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

527.    Facebook's content-moderation official also included, under the heading "**NEW: For CDC Input**," another request that "For each of the following new claims, **can you please tell us if: 1. The claim is false; and 2. If believed, could this claim contribute to vaccine refusals**?" Crawford Ex. 26, at 1 (bold and underline in original). She then provided a long, detailed list of claims and sub-claims about COVID-19 for CDC's input. *Id.* at 2-4.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

528.    Among other things, Facebook asked the CDC to pre-refute claims based on events that had not occurred yet. Facebook asked Crawford to address "How FDA EUA authorization for children under 5 might impact our policies."   Crawford Ex. 26, at 1. Facebook noted, "We understand that the FDA is considering giving emergency use authorization for the COVID-19 vaccine for children under five in the coming weeks. We are considering how our existing policies on COVID-19 vaccines … should apply to claims about children 6 months to 4 years once the vaccine is approved for use. Can you please assess for each claim whether it is false for children in this age range and if believed, likely to contribute to vaccine hesitancy or refusals?  *Please let us know if it is easiest to set up a time to meet and discuss each one.*"  Crawford Ex. 26, at 2 (italics in original). There followed a long, detailed list of claims about the vaccines, for which Facebook sought CDC's input on their falsity as to children under 5. *Id.* at 2-3.

**RESPONSE:** Disputed that "Facebook asked the CDC to 'pre-refute' claims based on

events that had not occurred yet." The cited email shows that Facebook was asking whether already

extant claims about vaccines that were considered "false" and "if believed, likely to contribute to

vaccine hesitancy or refusals"—for example, claims that the vaccine causes "magnetism" or

"[a]lter[s] DNA"—would be "false" and "likely to contribute to vaccine hesitancy or refusals"

when considered in relation to the upcoming "emergency use authorization for COVID-19

vaccines for children under five." *See* Crawford Ex. 26 at 2-3. In any event, this PFOF contains no

evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with,

or encourage social-media companies to remove or suppress certain health claims on their

platforms, or that the companies regarded (or acted on) any communications with CDC or the

Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

529.    For this long list of claims, Crawford understood that Facebook would use the CDC's input to "determine" Facebook's censorship policy for such claims: "I know that they're using our scientific information to determine their policy."  Crawford Dep. 170:19-20.

**RESPONSE:** Disputed as a mischaracterization and incomplete account of the testimony. The testimony does not support the assertion that Facebook was using CDC's input to "determine" a so-called "censorship policy" or that Ms. Crawford understood Facebook to be doing so. Rather, Ms. Crawford testified that Facebook was "asking [CDC] about the science" relating to claims that the COVID-19 vaccine "kill[s] people or lead[s] to death" and that Facebook "us[ed] [CDC's] scientific information to determine their policy."   Crawford Dep. 170:13-21. Ms. Crawford emphasized that "[CDC] did not discuss the development of [Facebook's] policies, or the enforcement of [Facebook's] policies." *Id.* at 105:12-17. Further, Facebook exercised its own discretion in deciding how (and whether at all) to deal with claims that violate its own policies, including whether to remove posts, take some other action, or take no action at all. *Id.* at 88:3-22; *see also id.* at 159:8-10 ("They were looking for CDC, who would have the scientific facts, to provide them with scientific facts."). In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

530.    Regarding Facebook's request for CDC's input on these many new claims, Crawford responded, "I will talk to the Vaccine program and see what we can do."  Crawford Ex. 27, at 1. The next day, February 4, 2022, she followed up, stating, "I'm heading out today but do you have a minute to discuss this by chance?  Call anytime," and provided her phone number. Crawford Ex. 27, at 1. Crawford also changed the subject line of the email to state, "Have 5 minutes to chat? [re]: Vaccine Misinformation Questions for CDC."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the

companies regarded (or acted on) any communications with CDC or the Census Bureau as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.C., Arg. § II.B.4.a. & f.

### C. CDC's and Census's Pressure and Collusion with Google/YouTube.

531.    On March 18, 2021, Crawford emailed contacts at Google, stating: "As I believe we discussed previously, CDC is now working with Census to leverage some of their infrastructure to help identify and address COVID vaccine mis-info." Crawford Ex. 28, at 1. She went on, "As I understand it from the Census team … when they were doing this for the Census project last year, they meet regularly with a Google/YouTube Trust team." *Id.* A "Trust team" is a content-moderation team. Crawford then asked, "Is it possible for us to start up regular meetings on this topic or maybe use our existing meeting time." *Id.* The subject line of this email was "COVID Misinfo Project." *Id.* Google and Crawford then set up a time to talk and discuss the project. *Id.*

**RESPONSE:** Undisputed, except the statement that a "Trust Team" is "a content moderation team," which is unsupported by the record. Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

532.    Crawford states that this email refers to "the work of the IAA with Census to help consult and work with us on the COVID misinformation…" Crawford Dep. 175:6-8. Her reference to Census's infrastructure referred to "the fact that Christopher [Lewitzke, the Census contractor] ran those reports and looked for misinformation on those areas for us." *Id.* 175:11-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

533.    Crawford's reference to Census's previous project referred to their work on combating misinformation about the 2020 Census. *Id.* 175:18-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

534.    Crawford does not remember the specific call referenced in this email, but she admits that, "This was in 2021. So we had been meeting pretty regularly with Google by this time." *Id.* 179:5-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

535.    On March 23, 2021, Crawford sent a calendar invite for a meeting on March 24 that included herself and five other CDC employees, four Census Bureau employees and contractors (including Zachary Schwartz, Christopher Lewitzke, and Jennifer Shopkorn), and six Google/YouTube officials. Jones Decl., Ex. T, at 1-2. The subject of the meeting was "COVID Misinformation: CDC/Census/Google." *Id.* at 1. The invite stated: "CDC/Census to meet with Google regarding our misinformation efforts." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

536.    At the meeting, CDC and Census presented a slide deck similar to the one that Census prepared for the meeting with Facebook on March 25, 2021, discussed above. *See id.* 3-16. The slide deck was entitled, "COVID Vaccine Misinformation: Issue Overview." *Id.* at 3. As with the Facebook slide decks, this one stated of "Misinformation Topics" that "[t]hese topics were selected due to high volume, continued public discussion, and high-profile coverage." *Id.* at 4. It noted that these topics included "infertility, misinformation about side effects, and claims of vaccines leading to deaths." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

537.    For each topic, the slide deck included a description of a common claim, specific examples of videos on YouTube and social-media postings making the disfavored claim, and a putative refutation by the CDC. *Id.* at 6-14. For infertility, the slide deck stated that "[c]ommon claims about the COVID vaccine's side effects include that it causes infertility in women and men, miscarriages, and stillbirth," and it provide screen shots of specific videos on YouTube and social-media posts making this claim. *Id.* at 6-8. The deck asserted that "[a]ccording to CDC there is no evidence that fertility problems are a side effect of any vaccine, including COVID-19 vaccines." *Id.* at 6. Regarding supposed misinformation about side effects, the deck stated, "speculation and misinformation about side effects after taking the COVID vaccine have been prevalent on social media since the first vaccines were approved," and it provided screen shots of an example video on YouTube and social-media posts making such claims, along with a putative refutation by the CDC. *Id.* at 9-11. Regarding the topic "Death from Vaccines," the slide deck stated that "[v]accine-hesitant groups spreading misinformation and conspiracy theories about alleged vaccine-related deaths erode trust in the COVID-19 vaccine and the public health system," and it provided a sample video on YouTube and social-media posts linking the vaccines to deaths, along with a putative refutation by the CDC: "According to CDC, VAERS has not detected patterns in cause of death that would indicate a safety problem with COVID-19 vaccines." *Id.* at 12-14. As with the

similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform.

**RESPONSE:** Disputed to the extent this PFOF asserts that "[a]s with the similar Facebook slide deck, the evident purpose of this presentation was to induce YouTube to censor these claims on its platform." That is a mischaracterization unsupported by the cited document. This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

538.    On March 25, 2021, Kate Galatas of the CDC emailed the group attending the meeting and stated: "Many thanks, again, for the time yesterday. This is such important shared work we are doing in the mis/dis information space, and we deeply appreciate your contributions. Please find attached the slide deck referenced during the meeting, and we ask that you treat it close hold and not for further distribution. We are looking forward to our future collaboration efforts!" *Id.* at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

539.    On March 29, 2021, Crawford followed up with Google, inquiring "Are you all open to using our regular 4pm meetings to go over things with Census or what is preferred?" Crawford Ex. 29, at 2. Google responded: "We would like to follow up on our discussion with your colleague, Cynthia, on vaccine information a few months ago. Specifically, we plan to share a new list of common vaccine misinformation claims and would love it if Cynthia or other vaccine experts could join." *Id.* He also stated that "we can save a few minutes … to discuss potential next steps regarding the Census…" *Id.* The subject line of this email was "Follow up on mis-info conversation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

540.    Crawford recalls that Census was asking for regular meetings with platforms specifically focused on misinformation: the statement "is in reference to discussing how to engage on an ongoing basis about misinformation and the Census suggestion that we have regular meetings with them just on that topic." Crawford Dep. 184:14-18. The exchange was "about how to engage more regularly about misinformation, or … whatever Census had done with Google and YouTube, should we have a similar structure with CDC." *Id.* 185:11-14.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f

541.    Regarding the request for input on the "new list of common vaccine misinformation claims," Crawford responded, "I've arranged for a few SMEs [subject-matter experts] to join the call, including Cynthia." Crawford Ex. 29, at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

542.    A few days later, on April 2, 2021, Google emailed Crawford stating, "Thanks again for your time this week. Attached are some of the claims we discussed for your reference." Crawford Ex. 29, at 1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

543.    Crawford's reference to the "4pm meeting" refers to a regular biweekly meeting with Google, which still continues to the present day: "I still have a 4:00 p.m. meeting every other Monday with Google."  Crawford Dep. 180:6-7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

544.    Crawford also has "similar regular meetings with … Meta and Twitter." *Id.* 180:11-16. She admits that she has ongoing meetings with Google and Facebook/Meta that continue to the present: "we had regular meetings with Google, and we had regular meetings with Meta…. you know, the frequency changed…. I mean, Google we meet every other week. Right now with Meta it's more ad hoc." *Id.* 180:16-21.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

545. Crawford also "had a regular meeting with Pinterest for a short period of time, and we had … just more ad hoc meetings on occasion with Twitter." *Id.* 180:23-181:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

546. Crawford states that these meetings "were mostly about things other than misinformation; though misinformation was discussed in the meetings." *Id.* 181:22-24.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

547. On April 12, 2021, Google/YouTube followed up with an email to Crawford, stating, "For tomorrow's call, would it be possible to include Cynthia or other COVID-19 treatment SMEs [subject-matter experts] to follow up on some additional questions?" Crawford Ex. 30, at 1. Crawford responded, "Can you give me an idea of what topics we'll be covering? But yes, I'll ask them to attend." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

548.    Crawford notes that it "wasn't uncommon" for Google/YouTube to ask her to bring subject-matter experts to meetings to go over such topics. Crawford Dep. 188:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

549.    On May 10, 2021, Crawford emailed her Google contacts and invited them to attend in the BOLO meetings: "We would like to establish COVID BOLO meetings on misinformation and invite all platforms to join the meetings. We are aiming for our first one on Friday at noon. We have heard through the grapevine that [an official] at YouTube would want to join. Are there other POCs on your end I should include on the invite?"  Crawford Ex. 40, at 1. The subject of the email was "COVID BOLO meetings on misinformation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

### D.    CDC's and Census's "BOLO Meetings."

550.    On May 11, 2021, Crawford followed up with an email stating, "We would like to invite digital platforms to attend a short 'Be On The Lookout' meeting on COVID. Please let us know if you have questions and feel free to forward this message to anyone in your organization that should attend." Crawford Ex. 40, at 2. Google responded by asking that Crawford include the YouTube official in the meeting, and Crawford noted that she "was going to ask about" him at the 4:00pm recurring meeting. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

551.    Crawford testified that she wanted to include YouTube on the BOLO meetings because they hosted the most content: "people from YouTube would occasionally be on our regular meetings, depending on what we talked about. And because YouTube has the most content, like, hosting, … they were a part of the BOLO meetings…" Crawford  Dep. 244:21-245:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

552.    The Census officials "were arranging" the BOLO meetings, and "they drafted the slides" for the meetings. *Id.* 246:12-20.

**RESPONSE:** Disputed that the cited testimony states that Census Bureau officials were "arranging" the BOLO meetings as opposed to potentially arranging or keeping track of an invite list. Ms. Crawford testified that she did not "remember keeping a list of who attended" the

meetings, but that "Census might have" a list "because this is something they were arranging." Crawford Dep. at 246:11-15. Undisputed that Census Bureau officials "drafted the slides" but note that CDC edited the slides with CDC content. *Id.* at 210:15-25. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

553. Crawford ran the BOLO meetings. *Id.* 265:13. She "opened up the meeting, introduced myself, gave context for why we were doing the BOLO meeting in brief. And then I believe that Christopher [Lewitzke] went through the slide decks, and I occasionally piped in on them." *Id.* 265:15-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

554. The "slide decks" shown at the meetings were "similar to the table" of 16 Facebook posts that Crawford previously emailed to Facebook, but "they were more like this is a theme, and then there'd be maybe a little info about what the theme was and then maybe a couple of example posts. And then there would be a slide maybe with CDC links or information related to that theme." *Id.* 266:1-6.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

555.    The first BOLO meeting was held on May 14, 2021. Jones Decl., Ex. U, at 1. The slide deck for that meeting was entitled "COVID Vaccine Misinformation: Hot Topics." *Id.* at 2-10. It contained a list of five "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**"). *Id.* at 4-8.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

556.    Crawford also emailed similar slide decks for BOLO meetings scheduled for May 28 and June 18, 2021, though the latter was canceled due to the new Juneteenth holiday.  Jones Decl., Exs. V and W. In the cover email to the May 28 slides, Crawford requested secrecy: "Please do not share outside your trust and safety teams."  Jones Decl., Ex. V, at 1. Just like the May 14 BOLO slides, these slides contained lists of "Hot Topics" with an "ADVISORY" in red noting that platforms should "**Be On the Lookout**" for "**Potential Misinformation**" on each topic, and provided specific examples of social-media posts for each topic, "Associated Link(s) and Hashtag(s)" for each topic, and the CDC's position on each topic (listed as "**The Facts**"). Jones Decl., Ex. V, at 4-6; *id.* Ex. W, at 4-6.

**RESPONSE:** Undisputed, except to the statement that the cover email "requested secrecy" is meant to suggest implications that are unspecified and not supported by the cited document. Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

557.    In conducting the BOLO meetings, Crawford described CDC's goal as follows: "our goal is to be sure that credible information about COVID was out there. A lot of people seek information on platforms. We thought that by giving the platform scientific information it might help in our goals to being sure that credible information could be found."  Crawford Dep. 266:16-21. Of course, the BOLO meetings did not address identifying and promoting "credible information," but flagging information that the CDC thinks is *not* credible for potential removal. Crawford effectively admits this; when asked if CDC's goal includes that "incredible information would not be found," she agreed that "I did want the credible information to be found in advance of the uncredible information."  *Id.* 266:22-267:4.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence, which does not suggest that CDC's goal was to identify misinformation for "potential removal" but instead that it was "to be sure that credible information" on topics of misinformation "was out there" and "could be found."  This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

558.    Crawford believes that the third BOLO meeting was cancelled because Juneteenth was declared a new federal holiday, and "that is why we didn't end up having it and we sent the materials out via email."  *Id.* 248:17-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

559.    On October 28, 2021, Google emailed Crawford stating, "do you have time to connect early next week on anticipated guidance on vaccines for [children ages] 5-11?  It would be great to connect as the CDC plans communications on authoritative information for pediatric vaccines."  Crawford Ex. 42, at 2.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

560.    Crawford responded: "Yes, we can discuss pediatric vaccines early next week but let me give you some general info: ACIP is likely to vote on this on Nov 2. CDC is likely to start posting final information on Nov 3 (possibly late Nov 2), if that helps to know. There will be many updates so the changes might span over a few days. We are also looking ahead and misinformation and hope to have a BOLO type meeting later that week with platforms that are interested." Crawford Ex. 42, at 1. ("ACIP" is the "Advisory Council for Immunization Practices."  253:21-22.)

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

561.    On June 29, 2022, Google/YouTube emailed Crawford and her deputy, stating: "The YouTube Policy team is requesting evidence-based input on the claims below. In the past, the CDC has reviewed COVID information claims and commented TRUE or FALSE + add any additional context needed."  Crawford Ex. 43, at 1. YouTube then presented two claims, relating to the safety and effectiveness of administering progesterone to reverse chemical abortion. *Id.* ("**CLAIM**: High doses of progesterone is a **safe** method of reversing chemical abortion … **CLAIM**: High doses of progesterone is an **effective** method of reversing chemical abortion….") (bold in original). Crawford responded, "I'll check on this but I think I'll probably end up needing to refer you to another agency. I'll get back to you."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies

to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

562.    Regarding this exchange, Crawford notes that the CDC's "focus is not solely on COVID. We're focusing on other topics. I think [YouTube] thought that we might be able to help with this topic as well."  Crawford Dep. 256:5-8. Thus, Crawford admits that the CDC is continuing to engage with social-media platforms to provide information that will lead to the censorship of health-related claims on social media, and that it is willing to expand its focus to other health topics beyond COVID-19.

**RESPONSE:** Disputed to the extent the second sentence is a mischaracterization of and unsupported by the cited testimony. In the cited passage Ms. Crawford merely voiced her impression that YouTube thought CDC "might be able to help with this topic," Crawford Dep. 256:5-8, namely, assessing the truth or falsity of claims about the safety and effectiveness of progesterone to reverse chemical abortions, *see* Pls.' PFOF ¶ 561, and says nothing about promoting "the censorship of health-related claims on social media." As Ms. Crawford also explained at her deposition (but Plaintiffs omit) the request from Google/YouTube concerned a subject that the CDC did not deal with, and she did not think any action was taken on this request. Crawford Dep. 256:9-16. In short, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

**E. CDC's and Census's Pressure and Collusion with Twitter.**

563.    On April 8, 2021, Twitter emailed Crawford stating, "I'm looking forward to setting up regular chats; my team has asked for examples of problematic content so we can examine trends. All examples of misinformation are helpful…."  Crawford Ex. 32, at 1. The subject line of this email was "Request for problem accounts."  *Id.* Crawford responded, "Yes, we'll get that to you early next week."  *Id.*

**RESPONSE:**  Undisputed, except to note that the PFOF only selectively quotes from Twitter's email. What the email stated in full was "All examples of misinformation are helpful, but in particular, if you have any examples of fraud—such as fraudulent covid cures, fraudulent vaccine cards, etc, that would be very helpful." Crawford Ex. 32 at 1. Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

564.    Crawford believes that Twitter sent this email in response to her inquiry, "Is there a good way that we should start engaging on misinformation?"  197:19-20.

**RESPONSE:**  Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

565.    Crawford responded on April 14, 2021, "The Census team put this spreadsheet together with four example areas," which included the topics, "Vaccines aren't FDA approved," "Fraudulent cures," "VAERS data taken out of context," and "Infertility."  Crawford Ex. 33, at 1. The attachment was called, "Twitter CDC Examples 4-13-21.xlsx."  *Id.* The spreadsheet contained a "list [of] things that [Census] saw that were being stated as misinformation."  Crawford Dep. 203:24-204:1. "Infertility" referred to "people claiming that getting the vaccines led to infertility." *Id.* 204:17-18.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

566.    Crawford believes that Twitter "was asking for these examples in this email because he was wondering … what would come up in BOLO meetings, or what we would be discussing." *Id.* 204:22-24.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

567.    On May 10, 2021, Crawford emailed Twitter, stating "We wanted to point out two issues we are seeing a great deal of misinfo about…." Crawford Ex. 34, at 4. She then provided a list of "sample posts" that included 12 Tweets reproduced verbatim. She stated, "Our census team is copied here, has much more info on it if needed." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

568.    In the same email on May 10, 2021, Crawford wrote, "Also, we are standing up a BOLO COVID misinformation meeting and inviting all tech platforms. We are shooting for 12pm EST on Friday for our first meeting. I'll include you on the invite…."  Crawford Ex. 34, at 4.

**RESPONSE:** Undisputed, except to note that the last sentence states in full: "I'll include you on the invite but if you'd like to propose an alternative approach or would like me to include others, just let me know." Crawford Ex. 34 at 4. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

569.    Crawford agrees that she was "sending this to [Twitter] so that he would be on the lookout for those things appearing on Twitter."  Crawford Dep. 208:25-209:3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

570.    Crawford notes that "the BOLO format … was used previously," *id.* 209:12-13, because Census had done "BOLO meetings … for their own work," *id.* 209:23-24. The platforms had done BOLO meetings for Census "in relation to the 2020 census."  *Id.* 210:5-9.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

571.     Regarding the BOLO meetings, Census officials "explained" to Crawford "how they did it." *Id.* 210: 16. "In fact, they drafted the slide deck" for the CDC BOLO meetings with social-media platforms. *Id.* 210:16-17. Census "drafted it and showed me how they thought that we should do it, and that … we would give examples, we would give the science, and then … people could follow up separately." *Id.* 210:18-22.

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that "I believe we changed some of the format of the PowerPoint, what we did for the CDC of course[.]" Crawford Dep. 210:15-25. In any event, this PFOF contains no evidence that CDC or the Census Bureau attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain health claims on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

572.     Crawford believes that regular meetings with Twitter were not set up, but that "I know they participated in the BOLO meetings." *Id.* 198:15-16.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

573.     Regarding the BOLO meetings, Crawford remembers that two occurred and a third one was scheduled but cancelled due to a holiday, and "in lieu of a meeting" she sent "a Powerpoint." *Id.* 198:24-199:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

574.     Twitter responded to Crawford's May 10, 2021 email flagging 12 specific Twitter posts as examples of trending misinformation, stating: "Thanks for sharing this – agree these are important trends to note; a quick scan shows that at least some of these have been previously reviewed and actioned."  Crawford Ex. 34, at 3. He then stated: "I will now ask the team to review the others."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

575.     Crawford understood that "asking the team to review the others" meant referring Crawford's flagged posts and issues to Twitter's content-moderation team for possible censorship: "I interpreted it as Twitter made decisions about the areas of misinformation based on whatever policy they had."  Crawford Dep. 211:17-19.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited testimony. Ms. Crawford expressed only her belief that Twitter would "ma[ke] decisions" about the "areas of [trending] misinformation" CDC had identified "based on whatever policy [Twitter] had," without reference to specific posts or the nature of the decisions Twitter might make, or apparent familiarity with the specific terms of Twitter's "policy." Also disputed to the extent this PFOF is meant to suggest that the independent decisions of social-media companies to apply their content-

moderation policies, to which all users agree, constitutes "censorship." This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

576.   As with Facebook, Crawford understood that her flagging of posts would result in Twitter censoring at least some of these materials in different ways, including removing posts: "similar to Meta that they probably had multiple options. I am sure some were removed. I am sure some … were flagged. I see flags all the time on the Twitter posts. I am sure some were just maybe … maybe they weren't distributed as much on peoples' feeds." *Id.* 212:10-16.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited testimony. As reflected therein, Crawford could only speculate which of "multiple options" Twitter might have chosen regarding the flagged posts. Also disputed to the extent this PFOF is meant to suggest that the independent decisions of social-media companies to apply their content-moderation policies, to which all users agree, constitutes "censorship." This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

577.   In the same email, Twitter offered to enroll CDC officials in its "Partner Support Portal" to provide expedited review of content flagged for censorship: "Carol, remind me: did you have a chance to enroll in our Partner Support Portal?  In the future, that's the best way to get a spreadsheet like this reviewed."  Crawford Ex. 34, at 3.

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. However, this PFOF is disputed to the

extent it is meant to suggest that the independent decisions of social-media companies to apply their content-moderation policies, to which all users agree, constitutes "censorship." Regardless, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

578.    Crawford understood that Twitter's Partner Support Portal was "similar to what I described for Meta. It's an offering where you log in and you can report misinformation or threats or problematic posted content in this portal, and it puts it in a system for review." Crawford Dep. 212:3-7.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

579.    On May 10, 2021, Twitter noted to Crawford, "I'd be glad to enroll you in our Partner Support Portal, which allows you a special, expedited reporting flow in the Twitter Help Center. It worked very well with Census colleagues last year." Crawford Ex. 34, at 3.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

580.    Crawford responded by asking for instructions on how to enroll in the Partner Support Portal, and Twitter offered to enroll any Twitter accounts she identified. Crawford Ex. 34, at 3. Crawford provided her personal Twitter account to enroll. *Id.*

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. Moreover, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

581.    Then, on May 24, Census Bureau contractor Christopher Lewitzke followed on the same email chain with Twitter, asking about "the partner support portal enrollment for CDC." Crawford Ex. 34, at 2. Lewitzke indicated that they planned to report COVID misinformation to Twitter using existing Census accounts already enrolled in the portal, not CDC accounts, stating: "would there be any issues or complications stemming from flagging COVID misinformation on the portal using the existing census.gov accounts that have access?  We'll want to have at least some CDC accounts whitelisted, but that backup may be helpful short-term."  *Id.* He then stated: "Let us know any next steps we can take to make sure CDC is all set with the portal."  *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

582.    Crawford confirms that Census had used similar portals to report misinformation to platforms in the past: "I did know from discussions with them that one technique I think that they used was using portals … for their work to report [mis]information." Crawford Dep. 213:16-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

583.    Twitter emailed Crawford on May 27, 2021, noting that she should be fully enrolled. Crawford Ex. 34, at 1. A screen shot of the portal proclaims, in very large, bolded type, "**Report any issue to get priority service**." *Id.* (bold in original, font greatly reduced).

**RESPONSE:** Undisputed, except to note that Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. Moreover, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

584.    Crawford believes that she attempted to use Twitter's Partner Support Portal "every now and then," but that she never solved technical issues that prevented her from reporting anything. Crawford Dep. 215:9-22.

**RESPONSE:** Disputed in part as misleading. Ms. Crawford testified that Twitter's Partner Support Portal "was not a priority for me," and that "I wasn't thinking that we would probably want to use this portal on a regular basis." Crawford Dep. 215:6-15. She explained that she "wanted to look at it and see what it []looked like," so "every now and then I would try to get on it," but she could not log in. *Id.* Ms. Crawford testified that she never used the "Partner Support Portal." Crawford Dep. 211:24-212:7. Regardless, this PFOF contains no evidence that CDC or the Census

Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

585.    Christopher Lewitzke is "a Census contractor." *Id.* 217:5-6.

**RESPONSE:** Undisputed.

586.    On September 2, 2021, Crawford emailed Twitter, stating, "A quick BOLO for a small but growing area of misinfo." Crawford Ex. 35, at 1. To Twitter, she claimed that "one of our Lab alerts … was misinterpreted and was shared via social media." Crawford Ex. 35, at 1. She stated, "I've attached some example Twitter posts and another document with the facts around the issue." *Id.* The subject line of the email was "BOLO: CDC lab alert & misinformation." *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

587.    This report was very similar to the report Crawford provided Facebook the day before, September 1, 2021. Crawford Ex. 21, at 1. "The only difference is this email is going to Twitter." Crawford Dep. 220:7-8.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

588.     By sending these emails to Facebook and Twitter flagging what the CDC believed was a misinterpretation of a CDC lab alert on social media, CDC intended to prevent the disfavored message from spreading on social media: "We saw this confusion about this alert brewing and more posts were going up with confusion, and we thought it would be a good idea to provide the platforms with the facts *before it became something bigger*." *Id.* 220:13-17 (emphasis added). In other words, CDC wished to cause the disfavored viewpoint to be censored before it could be viewed or repeated by others—a quintessential prior restraint.

**RESPONSE:** Disputed as a mischaracterization of and unsupported by the cited testimony. Ms. Crawford testified only that CDC wished "to provide the platforms with the facts" about CDC's lab alert, and said nothing about an intent to "prevent the disfavored message from spreading on social media" or "cause [a] disfavored viewpoint to be censored[.]" This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

589.     CDC specifically flagged this information to the platforms, knowing that they would evaluate it for potential censorship under their content-moderation policies: Crawford "knew their policy teams or their trust teams or misinfo teams … would evaluate it." *Id.* 220:21-23. And Crawford "knew that removal was one of the options that they had, yes." *Id.* 220:25-221:1.

**RESPONSE:** Disputed to the extent this PFOF is meant to suggest that the independent decisions of social-media companies to apply their content-moderation policies, to which all users agree, constitutes "censorship." This PFOF contains no evidence that CDC or the Census Bureau sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any

communications with CDC or the Census Bureau as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.C., Arg. § II.B.4.a. & f.

**F.      CDC Endorses the States' Theory of Standing.**

590.    Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." *Id.* 53:10-12.

**RESPONSE:** Irrelevant. Whether States have a legally cognizable interest in following

the discourse of their citizens on social media in order to craft responsive messaging and policies

is a question of law, not dependent on the views of an individual government employee. Moreover,

the Plaintiff States have not established a concrete and particularized injury to this asserted interest

that can fairly be attributed to Defendants' actions. *See* Defs.' Arg. § II.A; Defs.' MTD Br. 16-43,

Dkt. 128-1.

591.    Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

592.    CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

593.    Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18. Thus, Crawford was concerned that, if the platforms "were deleting content," she might not know "what the themes were" of "myths or [mis]information," which would prevent her from "updat[ing the CDC's] communication activity" to address those myths and misinformation. *Id.* Accordingly, Crawford wanted to know, "would

[CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:21-76:1.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

594.    Crawford inquired of Facebook "about the data that we could get so we had a full picture on confusion so that we could adjust communication materials, or ways that we were communicating" about COVID-19. *Id.* 81:10-13. In other words, Crawford wanted to know about speech that was censored, as well as speech that was left up, on social-media platforms so CDC could get "a full picture" and "adjust communication materials" to address people's actual concerns. *Id.*

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

595.    The CDC "did searches in CrowdTangle, the same way we do searches in other social media and listening tools that we have to create, to understand what's being discussed in the environment, to update our communication material." *Id.* 148:11-15.

**RESPONSE:** *See* Response to Pls.' PFOF ¶ 590.

## V.    Dr. Fauci's Campaigns to Censor Disfavored Viewpoints on Social Media.

596.    Dr. Fauci, cooperating frequently with NIH Director Dr. Francis Collins, engaged in a series of campaigns to discredit and procure the censorship of viewpoints he disfavored on social media, beginning at least in early 2020. Once he became Chief Medical Advisor in the Biden Administration in early 2021, his censorship efforts coordinated with and reinforced those of federal officials in the White House, the Office of the Surgeon General, the CDC, and elsewhere.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Neither this PFOF, nor any that follow, contain evidence that Dr. Fauci attempted to "procure the censorship of viewpoints he disfavored on social media," whether alone or in cooperation or coordination with others. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

597.    Until his recent retirement, Dr. Anthony S. Fauci was the director of the National Institute for Allergy and Infectious Diseases at the National Institutes of Health and the Chief Medical Advisor to President Biden. Fauci Dep. 10:8-16. At the time of his deposition, Dr. Fauci had been the director of NIAID for over 38 years. *Id.* at 10:25-11:1.

**RESPONSE:** Undisputed.

## A.    Dr. Fauci's Conspiracy and Campaign to Suppress the Lab-Leak Theory.

598.     First, in early months of 2020, Dr. Fauci worked closely with Dr. Francis Collins and Jeremy Farrar to orchestrate a campaign to discredit and suppress the opinion that SARS-CoV-2, the virus that causes COVID-19, leaked from a laboratory at the Wuhan Institute of Virology—an opinion that has recently been confirmed as likely true. Early in the pandemic, Dr. Fauci was aware that NIAID, under his direction, had funded dangerous gain-of-function research on coronaviruses at that laboratory, and he sought to discredit and suppress the lab-leak theory to deflect the scandal and blame associated with potential responsibility for the deaths of millions in the ensuing pandemic. He engaged in a campaign of deception to discredit the theory, and as a result of his efforts, the lab-leak theory was heavily censored on social media.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by and without citation to the evidence. Additionally, the use of the phrase "lab-leak theory" in this PFOF and any others throughout this document is disputed as erroneously suggesting that there is only one theory concerning how SARS-CoV-2, the virus that causes COVID-19, may have emerged from a laboratory in Wuhan, China (assuming it did, in fact, emerge from a laboratory rather than in nature). In fact, multiple diverging "lab-leak" theories have emerged. One theory is that SARS-CoV-2 was intentionally engineered in a laboratory and deliberately or accidentally released. Another is that SARS-CoV-2 was inadvertently created in a lab during serial passage experiments and accidently spread beyond the lab. Yet another is that SARS-CoV-2 naturally occurred in the wild, was being studied in a lab, and was accidentally spread beyond the lab by infected researchers. In any event, neither this PFOF, or any that follow, contain evidence that Dr. Fauci "orchestrate[d] a campaign or sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

599.     On December 30, 2011, Dr. Fauci co-authored an op-ed with Dr. Francis S. Collins in the Washington Post entitled *A Flu Virus Risk Worth Taking*. Fauci Ex. 1, Fauci Dep. 13:13-20.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

600.    In this op-ed, Dr. Fauci and Dr. Collins advocated for creating potentially dangerous viruses in laboratories, writing that "important information and insights can come from generating a potentially dangerous virus in a laboratory." Fauci Ex. 1, at 1. According to Fauci and Collins, "[u]nderstanding the biology of … virus transmission has implications for outbreak prediction, prevention and treatment," and "[i]dentifying threatening viruses can also facilitate the early stages of manufacturing vaccines that protect against such a virus in advance of an outbreak." *Id.* at 2. They further argued that "identifying the molecular Achilles heel of these viruses can allow scientists to identify novel antiviral drug targets that could be used to prevent infection … or better treat those who become infected." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the cited op-ed, which discussed "taking this H5N1 [virus] and studying it in different ways that could potentially make it more dangerous but only under very strict conditions," Fauci Dep. 14:25–15:5, a risk that Dr. Fauci testified was "worth taking if the benefit is the protection of the American and global public." *Id.* 15:16-18; *see also* Fauci Ex. 1. Moreover, the second sentence is disputed to the extent it removes a phrase (as noted by the ellipses) from the quoted portion of the article and thereby misrepresents its contents; the first quoted portion should read: "Understanding the biology of *influenza* virus transmission has implications for outbreak prediction, prevention and treatment." Fauci Ex. 1, at 2 (emphasis added to note removed word from Plaintiffs' PFOF). Additionally, the last quoted sentence of the PFOF should read "*determining* the molecular Achilles heel . . ." (not "identifying"). *Id.* (emphasis added to note corrected word). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

601.    Dr. Fauci and Dr. Collins acknowledged the significant risks associated with such research, writing that "[s]afeguarding against the potential accidental release or deliberate misuse of laboratory pathogens is imperative." *Id.* But they believed that those risks were contained, writing that "engineered viruses … are maintained in high-security laboratories." They further

state that "scientists, journal editors, and funding agencies involved are working together to ensure that access to specific information that could be used to create dangerous pathogens is limited to those with an established and legitimate need to know." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the cited op-ed, for the reasons stated in response to Plaintiffs' PFOF ¶ 600. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

602.    Thus, long before the COVID-19 pandemic, Dr. Fauci and Dr. Collins were highly visible, public advocates for laboratory experiments that involve "generating a potentially dangerous virus in a laboratory." *Id.* at 1.

**RESPONSE:** Disputed as a mischaracterization of the cited article and the views of Dr. Fauci and Dr. Collins. The cited op-ed is specific to the study of the H5N1 influenza virus and does not "advocate[ ]" generally for laboratory experiments that involve "generating a potentially dangerous virus in a laboratory." *See* Fauci Ex. 1. Indeed, the op-ed itself explains that "[t]he question is whether the benefits of such research outweigh the risks. The answer is not simple." *Id.* at 2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

603.    Such research of "generating a potentially dangerous virus in a laboratory" is commonly called "gain-of-function" research. Dr. Fauci testified that "[g]ain of function is a very potentially misleading terminology, and that was one of the reasons why several years ago outside groups, not the NIH … did away with the terminology 'gain of function' because it can often be very confusing and misleading." Fauci Dep. 16:3-10. But Dr. Fauci confirms that "the NIH" did not "d[o] away" with that terminology, *id.*, and Dr. Fauci's own internal email uses the phrase "SARS Gain of Function" to describe the research on bat coronaviruses that was conducted by Dr. Shi Zhengli and others at the Wuhan Institute of Virology, partly funded by Dr. Fauci's NIAID through the subgrants from the EcoHealth Alliance, discussed below, *see* Fauci Ex. 6, at 8.

305

**RESPONSE:** Disputed that Dr. Fauci's email produced on page 8 of Exhibit 6 shows that

Dr. Fauci used the phrase "SARS Gain of Function" to describe any research. The phrase "SARS

Gain of Function" appears only in the filename of an attachment and Dr. Fauci testified that he did

not know who named the file in such a manner. Fauci Dep. 57:1-16. Undisputed as to the remaining

allegations. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by

threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

604.    On June 1, 2014, Dr. Fauci's NIAID funded a grant to the EcoHealth Alliance for
the five-year period June 1, 2014, to May 31, 2019. Fauci Ex. 2, at 2. The title of the project was
"Understanding the Risk of Bat Coronavirus Emergence." *Id.* at 1. The project's Abstract stated,
"This project will examine the risk of future coronavirus (CoV) emergence from wildlife using in-
depth field investigations across the human-wildlife interface in China, molecular characterization
of novel CoVs and host receptor binding domain genes, mathematical models of transmission and
evolution, and in vitro and in vivo laboratory studies of host range." *Id.*

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that

Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

605.    The Abstract noted that one of the project's "three specific aims" would be to
"[t]est predictions of CoV inter-species transmission" by engaging in two forms of research to
enhance the bat coronaviruses' transmissibility to humans: "reverse genetics," *i.e.*, genetic
manipulation of the viruses to render them more transmissible; and "virus infection experiments"
using "humanized mice," *i.e.*, repeatedly infecting humanized mice with bat coronaviruses to
provoke mutations that render them more infectious to human cells (a process known as "serial
passage," *see* https://en.wikipedia.org/wiki/Serial_passage). *Id.* at 1. Specifically, the Abstract
stated: "Predictive models of host range (i.e.[,] emergence potential) will be tested experimentally
using *reverse genetics*, pseudovirus and receptor binding assays, and *virus infection experiments
across a range of cell cultures* from different species and humanized mice." *Id.* (emphases added).

**RESPONSE:** Disputed as a mischaracterization of the Abstract, which does not cite

Wikipedia, does not state that the research will "enhance the bat coronaviruses' transmissibility to

humans," and does not state that the research will make any virus more transmissible or infectious. In fact, the Abstract states that the "project will examine the risk of future coronavirus (CoV) emergence from wildlife," and "aims to understand what factors increase the risk of the next CoV emerging in people." Fauci Ex. 2 at 1. Defendants also dispute Plaintiffs' purported definitions of "reverse genetics" and "serial passage," which Plaintiffs have apparently obtained from Wikipedia. "Reverse genetics" are not exclusively associated with making viruses more transmissible, and Dr. Fauci testified that "reverse genetics" "is very broad terminology." Fauci Dep. 24:22-25. Dr. Fauci also testified that "serial passage" could be used to "decrease function." Fauci Dep. 116:4-7. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress the lab-leak theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

606.   Dr. Fauci attempted to argue that "reverse genetics" is so vague that it might not refer to gain-of-function research. *See* Fauci Dep. 23:18-20 ("I'm not really quite sure what they're referring to. Reverse genetics can mean many things."). But Dr. Fauci admits that "reverse genetics" means "[m]anipulation of a virus, recombination, things like that." *Id.* at 23:19-21. In 2015, in an article reporting on research performed pursuant to this grant, Dr. Ralph Baric and Dr. Shi Zhengli wrote that they used "reverse genetics" to "generate[] and characterize[] a chimeric virus" that was more infectious and more virulent in humans. Fauci Ex. 4, at 1. Dr. Fauci's own internal email describes that article as addressing "SARS Gain of Function." Fauci Ex. 6, at 8.

**RESPONSE:** Undisputed that Dr. Fauci testified that "reverse genetics" "is is a very broad term that could have multiple applications." Fauci Dep. 24:6-10. Disputed that the cited article described using reverse genetics to make "'a chimeric virus' that was more infections and more virulent in humans." The article speaks for itself, and it does not demonstrate an increased infectivity or virulence in humans. The last sentence is disputed for the reasons stated in response to Plaintiffs' PFOF ¶ 603. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

607.    Dr. Fauci admits that "EcoHealth has a subaward from their original grant that goes to Shi Zhengli at the Wuhan Institute of Virology." Fauci Dep. 36:4-6. He agrees that EcoHealth and Shi Zhengli of the Wuhan Institute of Virology "work together on research that's directly funded by NIAID." Fauci Dep. 36:7-13.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as a mischaracterization of Dr. Fauci's testimony, which provides that "the funding goes to EcoHealth which awards a subaward." Fauci Dep. 36:9-10. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

608.    Dr. Fauci also attests that Dr. Peter Daszak likely has access to the genetic sequences of chimeric viruses that Shi Zhengli created during her research funded by EcoHealth using NIAID funds: "I don't know absolutely for sure, but I would imagine that if Peter Daszak is collaborating scientifically with Shi Zhengli, that it is likely, given the norms of scientific collaboration, that he would have access to data," and "they are collaborators, since he has a subaward to the Wuhan Institute that I believe goes to Dr. Shi." Fauci Dep. 37:1-13. Daszak, therefore, is likely in possession of genetic evidence demonstrating whether SARS-CoV-2 originated from NIAID-funded research at the Wuhan Institute of Virology.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Dr. Fauci does not testify that Dr. Daszak had access to "genetic sequences of chimeric viruses"; instead, he states that he thought it likely that Dr. Daszak "would have access to data" that is "generated by Shi Zhengli pursuant to their research together." Fauci Dep. 37:1-13. Moreover, Dr. Fauci was asked whether Dr. Daszak would have had access to data, not whether Dr. Daszak currently has possession of certain data. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

609.    Dr. Fauci claimed that he had never seen this grant award before his deposition, and that he was only "vaguely" aware of NIAID's funding of EcoHealth Alliance. *Id.* at 18:10-12 ("I'm vaguely familiar with the fact that EcoHealth Alliance has been doing research on trying to understand the bat coronavirus emergence."); *id.* at 19:7-8 ("I have no recollection of the initiation of this grant."). Dr. Fauci admits that "NIAID has funded EcoHealth Alliance," 20:5-6, but he contends that he is completely unfamiliar with this project. *Id.* at 20:8-9 ("[T]his is the first time that I have seen this piece of paper."). But this very grant project was flagged for Dr. Fauci in an email from his subordinate on January 27, 2020, at the beginning of the pandemic. Fauci Ex. 5. Given the public and Congressional scrutiny of this particular project and its relation to the origins of the COVID-19 pandemic, Dr. Fauci's testimony on these points is not credible.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the cited testimony. Dr. Fauci testified that he "d[id] know" in general that "NIAID has funded EcoHealth Alliance," Fauci Dep. 20:3-6, but that he had "no recollection of the initiation of th[e] [sub]grant" in question, *id.* at 18:24-19:8, which is unsurprising since he "d[id] not individually approve grants," *id.*, and received the cited email three years before his deposition, Fauci Ex. 5. Moreover, the piece of paper that was shown to Dr. Fauci as Exhibit 2 is not the "grant award." Rather, it is a summary of the grant award that is publicly available on reporter.nih.gov, and there is no reason for Dr. Fauci to be familiar with a printout from the website. Fauci Ex. 2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

610.    Peter Daszak is listed as the "Contact PI/Project Leader" for the grant award "Understanding the Risk of Bat Coronavirus Emergence." Fauci Ex. 2, at 1. The "Awardee Organization" is the EcoHealth Alliance. *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

611.    Dr. Fauci claims that he is not acquainted with Peter Daszak and does not know how to pronounce Daszak's name, Fauci Dep. 20:13 ("I'm not sure"), and that he "do[es]n't even remember meeting him," *id.* at 21:1-2, but that he has seen a photo of himself with Daszak at a public event as the only evidence that they have met. *Id.* at 21:2-8.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Dr. Fauci testified that he thought he had "met Daszak once or twice," so he would "not exactly characterize him as an acquaintance," and he could not "remember meeting him," but acknowledged that they had met since they were photographed together. Fauci Dep. 20:15-21:20. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b..

612.    In fact, Dr. Fauci has exchanged cordial emails with Daszak on a first-name basis, and he participated in a podcast with him on February 9, 2020, in which they both sought to discredit the lab-leak theory of COVID's origins. Fauci Ex. 15, 16, 30. Dr. Fauci's attempt to deny or downplay his acquaintance and familiarity with Daszak is not credible.

**RESPONSE:** Disputed as argumentative and a mischaracterization of the cited evidence. The referenced podcast with Dr. Daszak took place nearly three years before Dr. Fauci's deposition, in in February 2020, *see* Fauci Exs. 15, 16, and was one of "many podcasts" in which he has participated, Fauci Dep. 142:1-6. His single cited email exchange with Dr. Daszak occurred in April 2020. Fauci Ex. 30. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

613.     On October 17, 2014, the U.S. Government entered a "research funding pause" on gain-of-function research on coronaviruses, in a document entitled "U.S. Government Gain-of-Function Deliberative Process and Research Funding Pause on Selected Gain-of-Function Research Involving Influenza, MERS, and SARS Viruses."  Fauci Ex. 3, at 1 (the "GoF Pause" or "Pause").

**RESPONSE:** Disputed as a mischaracterization of the cited document to the extent the "research funding pause" applied only to "*selected* gain-of function research involving influenza, MERS, and SARS viruses." Fauci Ex. 3 (emphasis added) (capitalizations removed). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

614.     Contrary to Dr. Fauci's testimony that the "pause" was an occasion to jettison the term "gain-of-function," the Pause provided a simple and clear definition of "gain of function" research, defining "Gain-of-function studies" as "research that improves the ability of a pathogen to cause disease."  Fauci Ex. 3, at 2. The research on bat coronaviruses described in Fauci Ex. 2 meets this simple definition.

**RESPONSE:** Disputed as argumentative and without support in the cited evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

615.     The Pause applied to funding for all "research such as this until a new U.S. Government research policy could be adopted."  Fauci Dep. 27:17-19; Fauci Ex. 3, at 2-3.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence to the extent Plaintiffs suggest that the purported "pause" covered any "gain-of-function" research not specifically discussed in the cited document. *See* Fauci Dep. 27:10-19; Fauci Ex. 3. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

616.    The Pause provided an exception in Footnote 1, which stated: "An exception from the research pause may be obtained if the head of the USG funding agency determines that the research is urgently necessary to protect the public health or national security."  Fauci Ex. 3, at 2 n.1.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

617.    Dr. Fauci testified that he does not recall whether NIAID ever invoked that exception during the years that the Pause was in place (2014-2017). Fauci Dep. 28:22-29:3. He testified that authorization for funding under the exception would "not usually rise up to the office of the director, but is handled at the level of staff and deputy." *Id.* at 29:1-2. He testified that such approval for projects "urgently necessary to protect the public health or national security" could have come from "any of a number of people. It could have been people at the program level. It could have been my deputy. It could have been program managers and division directors." *Id.* at 30:16-19.

**RESPONSE:** Disputed to the extent the first sentence is contradicted by the record. Dr. Fauci testified that he recalled that "exceptions were given to a couple experiments." Fauci Dep. 28:22-25. Undisputed that Dr. Fauci did not recall personally giving the ultimate sign-off to such exceptions, which would have been "eight years ago." *Id.* at 28:22–29:12. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

618.    This testimony contradicts the plain language of the exception, which states that "*the head of the USG funding agency*" must "determine[] that the research is urgently necessary

to protect the public health and national security" to allow continued funding for gain-of-function research on coronaviruses. Fauci Ex. 3, at 2 n.1. At all relevant times, Dr. Fauci was the "head of the USG funding agency," *i.e.*, the Director of NIAID, and he was responsible for authorizing funding for gain-of-function research on the ground that it was "urgently necessary to protect the public health or national security."

**RESPONSE:** Disputed as argumentative, speculative, and a legal conclusion unsupported by the record. Plaintiffs cite no law or regulation that would have prevented the head of the USG funding agency from delegating this responsibility to one or more subordinate officials, as is common practice in U.S. Government agencies. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) ("When a statute delegates authority to a federal officer or agency, subdelegation to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." (citing cases)). Also disputed that Dr. Fauci was the head of the USG funding agency, since the funding agency was the National Institutes of Health (NIH), and not NIAID. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

619.     Dr. Fauci states that he does not recall whether NIAID ever authorized continued funding for Peter Daszak or EcoHealth Alliance pursuant to the exception to the Pause in footnote 1. Fauci Dep. 30:3-12.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

620.     In fact, Dr. Fauci testified that "I don't recall" or "I do not recall" 174 times in his deposition, and testified that he could not recall or remember using variations on that phrase 212 times. *See* Fauci Dep. 22:21-352:17-18. This contrasts sharply with his public statements about the very same issues that, during his deposition, he professed near-complete loss of memory. *See,*

*e.g.,* Jones Decl., Ex. X, at 1 ("I remember it very well"). It also contrasts sharply with his clear, specific recollection of unrelated events from the same time frame. *See, e.g.,* Fauci Dep. 353:20-354:16. Dr. Fauci's repeated claims to not remember or not recall key events and people are not credible.

**RESPONSE:** Disputed as an argumentative mischaracterization of Dr. Fauci's testimony that is unsupported by the cited evidence. The quoted newspaper article, Jones Decl., Ex. X, reports that Dr. Fauci remembered "very well" that a group of scientists on a February 1, 2020, call decided that the origins of SARS-CoV-2 "really needed to be looked into carefully." That statement does not "contrast[] sharply" with Dr. Fauci's unsurprising inability to remember details about whether a particular person called him in January 2020, *see* Fauci Dep. 35:9-15, whether Dr. Fauci remembers one particular email out of the thousands he received in January 2020 alone, *id.* 40:2-12, who Dr. Fauci copied on an email sent on February 1, 2020, *id.* at 55:5-8; *see also* Fauci Dep. Ex. 6, at 8, what specific day in 2020 he "became aware" of an article, Fauci Dep. 61:1-6, whether anyone expressed concern during a February 1, 2020 phone call about "social media conspiracy theories," *id.* 78:10-24, whether Dr. Fauci recalls receiving a draft article on February 4, 2020, *id.* at 124:9-14, or whether he remembers other details of communications that took place three years ago. Dr. Fauci's inability to recall such minute and irrelevant details during his testimony does not imply any lack of credibility. In any event, his memory of these irrelevant matters is itself irrelevant and furnishes no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

621. Dr. Fauci's chief deputy is Dr. Hugh Auchincloss, who is the Principal Deputy Director of NIAID. *Id.* at 30:20-25.

**RESPONSE:** Undisputed that at the time of the deposition, Dr. Hugh Auchincloss was Dr. Fauci's chief deputy and the Principal Deputy Director of NIAID. However, this PFOF is

irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

622.    In December 2015, during the research "Pause" on gain-of-function funding, Nature Medicine published an article entitled, "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence."  Fauci Ex. 4, at 1. Dr. Ralph Baric of the University of North Carolina was listed as the corresponding author, and Dr. Shi Zhengli of the Wuhan Institute of Virology was listed as a co-author. *Id.* at 1 & n.8.

**RESPONSE:** Disputed as an incomplete characterization of the "Pause" to the extent the "Pause" applied only to gain-of-function research projects that may be reasonably anticipated to confer attributes to influenza, MERS, or SARS viruses such that the virus would have enhanced pathogenicity and/or transmissibility in mammals via the respiratory route. Fauci Ex. 3. The research funding pause did not apply to characterization or testing of naturally occurring influenza, MERS, and SARS viruses, unless the tests are reasonably anticipated to increase transmissibility and/or pathogenicity. *Id.* Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

623.    The 2015 Nature Medicine article clearly described gain-of-function research on bat coronaviruses. The Abstract states: "Here we examine the disease potential of a SARS-like virus, SHC014-CoV, which is currently circulating in Chinese horseshoe bat populations. Using the SARS-CoV reverse genetics system, we generated and characterized a chimeric virus expressing the spike of bat coronavirus SHC014 in a mouse-adapted SARS-CoV backbone." Fauci Ex. 4, at 1. Notably, the article uses the same phrase as the EcoHealth grant, "reverse genetics," to describe creating "a chimeric virus."  *Id.*

**RESPONSE:** Disputed that the 2015 Nature Medicine article describes gain-of-function research. The 2015 Nature Medicine Article speaks for itself. Also disputed as an incomplete

characterization of the "Pause" to the extent the "Pause" applied only to gain-of-function research projects that may be reasonably anticipated to confer attributes to influenza, MERS, or SARS viruses such that the virus would have enhanced pathogenicity and/or transmissibility in mammals via the respiratory route. Fauci Ex. 3. The research funding pause did not apply to characterization or testing of naturally occurring influenza, MERS, and SARS viruses, unless the tests are reasonably anticipated to increase transmissibility and/or pathogenicity. *Id*. Moreover, the article itself clearly explains that "[e]xperiments with the full-length and chimeric SHC014 recombinant viruses were initiated and performed before the GOF research funding pause…" Fauci Ex. 4 at 5. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

624.    The article reports that the "chimeric virus" created from a "SARS-like" bat coronavirus had become highly transmissible in human tissue: it could "replicate efficiently in primary human airway cells and achieve *in vitro* titers equivalent to epidemic strains of SARS-CoV." *Id*. It had also become more virulent: "Additionally, *in vivo* experiments demonstrate replication of the chimeric virus in mouse lung with notable pathogenesis." *Id*. There were no available treatments for this lab-created "chimeric" virus: "Evaluation of available SARS-based immune-therapeutic and prophylactic modalities revealed poor efficacy; both monoclonal antibody and vaccine approaches failed to neutralize and protect from infection with CoVs using the novel spike protein." *Id*.

**RESPONSE:** Disputed. The article does not address transmissibility in any way, nor does it say that the chimeric virus became more virulent. The article speaks for itself. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

625.     The article noted that the authors had then "synthetically re-derived an infectious full-length SHC014 recombinant virus and demonstrate robust viral replication both in vitro and in vivo." *Id.* The article concluded that "[o]ur work suggests a potential risk of SARS-CoV re-emergence from viruses currently circulating in bat populations" – and this conclusion was based on creating a more transmissible (to humans) and more virulent (to humans) SARS-like coronavirus in a lab. *Id.*

**RESPONSE:** Disputed. The authors do not state that they created a virus that is more transmissible and virulent in humans. The article speaks for itself. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

626.     The article acknowledged that NIAID was the principal funder of this research, and that it had received funding from the EcoHealth Alliance, Daszak's group: "Research in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) … and by USAID-EPT-PREDICT funding from EcoHealth Alliance." *Id.* at 5.

**RESPONSE:** Disputed as a mischaracterization of the cited evidence, which does not support the proposition that NIAID was the "principal funder." The "acknowledgements" section of the article reports that the "[r]esearch in this manuscript was supported by grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH) under awards U19AI109761 (R.S.B.), U19AI107810 (R.S.B.), AI085524 (W.A.M.), F32AI102561 (V.D.M.) and K99AG049092 (V.D.M.), and by the National Natural Science Foundation of China awards 81290341 (Z.-L.S.) and 31470260 (X.-Y.G.), and by USAID-EPT-PREDICT funding from EcoHealth Alliance (Z.-L.S.)." Fauci Ex. 4 at 5. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. See Defs.' PFOF § II.E., Arg. § II.B.3.b.

317

627.     The article also noted that the NIH had reviewed and approved the research under the GoF Pause: "Experiments with the full-length and chimeric SHC014 recombinant viruses were initiated and performed before the GOF research funding pause and have since been reviewed and approved for continued study by the NIH."  *Id.* "GOF" is short for "gain-of-function."

**RESPONSE:** The quoted text is accurate, but Defendants dispute that the NIH "reviewed and approved the research under the GoF Pause," which assertion is not supported by the quoted text. The text merely states that the research was initiated and performed before the GOF pause but it does not state that the research would have been considered "gain of function" research subject to the pause. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

628.     Dr. Fauci testified that he first became aware of this Nature Medicine article "likely … several months" after the outbreak of the COVID-19 pandemic, and that "it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID."  Fauci Dep. 31:17-20, 32:7-9. In fact, Dr. Fauci attached this article to a confidential midnight email to his principal deputy, Hugh Auchincloss, on January 31, 2020, and directed Auchincloss to read it immediately and take unspecified actions on it on a Saturday morning. Fauci Ex. 6, at 8. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The first sentence is undisputed, except to note that Dr. Fauci repeatedly stated that he was only estimating when, roughly two years ago, he believed he became aware of the article but that he was "not a hundred percent certain" when he did in fact become aware of it. *See* Fauci Dep. at 31:15-32:9; *id.* ("Q. When did you first become aware of [the article]? A. I believe – again, I read a lot of articles – I believe it was brought to my attention in the context of questions that were raised by members of Congress about experiments that were funded by the NIAID. Q. So would that have been in and around 2021 time frame, do you know, when you first became aware of it? A. It certainly was after the beginning of the COVID-19 outbreak. Q. How long after the beginning would you estimate? A. I don't recall. Q. Would it have been right at the

beginning of the outbreak or months into it or years into it? A. You know, years is where we are right now. So it wouldn't have been years. So it likely would have been several months, though I'm not a hundred percent certain."). The second sentence is undisputed, except to the extent that Plaintiffs describe communications as "confidential"; that characterization is not supported by the email, which is not marked "confidential" and does not otherwise indicate that it is to be held in confidence. The third sentence is disputed as argumentative. That Dr. Fauci could not remember precisely when or how he learned of an article—among the many articles he read —does not demonstrate a lack of credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

629.    Dr. Fauci testified that he does not believe he has ever met Dr. Ralph Baric, the corresponding author of the 2015 Nature Medicine article. Fauci Dep. 32:16-19 ("I know who he is, I doubt I've ever met him. I may have met him at one of the meetings where there are thousands of scientists saying hi to each other…"); *see also id.* at 33:25-34:1. In fact, Dr. Fauci's official calendar shows a one-on-one meeting with Dr. Ralph Baric on February 11, 2020, during the events described herein. Fauci Ex. 17, at 1. A contemporaneous Slack message on February 18, 2020 reports that Dr. Baric "sat in Fauci's office talking about the outbreak and chimeras," *i.e.*, lab-created chimeric viruses. Jones Decl., Ex. Y, at 1. And Dr. Fauci testified that Dr. Baric may be the source of the phrase "SARS Gain of Function" in the attachment to his midnight email to Hugh Auchincloss. Fauci Dep. 57:11-12. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The PFOF accurately quotes Dr. Fauci's deposition testimony stating that he "doubt[s] he ever met" Dr. Ralph Baric. Otherwise, disputed as argumentative and unsupported by the record. Dr. Fauci's calendar does not show a one-on-one meeting with Dr. Baric; rather, Fauci Ex. 17 shows a "hold" for a meeting with Dr. Baric but does not indicate all the individuals who would have attended. Additionally, the February 18, 2020 slack message between Vineet Menachery and Matt Frieman (and not Dr. Fauci), neither of whom was (or is) a NIAID employee or is alleged to have attended the alleged February 11 meeting, is hearsay, is not

"contemporaneous" to that meeting or proof that Dr. Fauci met one-on-one with Dr. Baric.

Additionally, whether Dr. Baric was the source of a phrase used in the title of a document attached

to an email is not probative of whether Dr. Fauci met Dr. Baric. Regardless, even assuming that

Dr. Fauci met Dr. Baric one-on-one, that would not render incredible his testimony that he

"doubt[s] [he] ever met him." In any event, this PFOF is irrelevant and contains no evidence that

Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

630.    Dr. Fauci professed to be ignorant of the identity of Dr. Shi Zhengli, the notorious
"Bat Woman" of the Wuhan Institute of Virology. When asked if he knows who she is, he stated,
"I'm not a hundred percent certain. I get sometimes confused with Asian names." *Id.* at 33:9-10,
18-19. Yet Dr. Shi Zhengli, the so-called "bat woman," is world-renowned as the researcher who
may have caused the COVID-19 pandemic, and has been so since the beginning of the pandemic,
*see, e.g.,* Jones Decl., Ex. Z, at 1, and the name "Shi" is included in the title of the article that Dr.
Fauci forwarded to Dr. Hugh Auchincloss after midnight on February 1, 2020. Fauci Ex. 6, at 8.
Dr. Fauci's testimony is not credible on this point.

**RESPONSE:** Disputed as argumentative and a mischaracterization of Dr. Fauci's

testimony. Dr. Fauci did not "profess to be ignorant of the identity of Dr. Shi Zhenghli." In fact,

when asked if he knew who Shi Zhengli was, Dr. Fauci testified: "I believe, if I'm correct, that

this is a scientist who is at the Wuhan Institute of Virology, I believe. I'm not a hundred percent

certain. I get sometimes confused with Asian names, but I believe this is the person who is a

scientist at the Wuhan Institute." Fauci Dep. 33:7-12. In response to the question whether he was

"aware generally that there's someone called Shi Zhengli who's described in the media as the bat

woman who does research on bat coronaviruses at the Wuhan lab," Dr. Fauci responded, "Yea, is

that her? I don't know if that's the same person. Like I said, when you're dealing with Asian

names, sometimes the first name is last and the last name is first. So I . . . believe this is the person

from Wuhan." *Id.* at 33:13-21. Dr. Fauci's testimony that he believed he knew who Dr. Shi

Zhenghli is but was not "a hundred percent certain" does not show a lack of credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

631.    Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either December 31, 2019 or "the first couple days of 2022." Fauci Dep. 34:8-11.

**RESPONSE:** Disputed. Dr. Fauci testified that he first became aware of the outbreak of COVID-19 either December 31, 2019 or "the first couple days of 2020," not 2022. Fauci Dep. 34:8-11. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

632.    Dr. Fauci recounts that he first became aware of concerns that the SARS-CoV-2 virus that causes COVID-19 "might have been genetically engineered or originated in a laboratory" when "[t]here was a phone call in late January of 2020, I believe, from Jeremy Farrar. There was one other person on the phone. I believe it was [K]ristian [Andersen], who piped me in on a three-way call, saying that they looked at the virus and there was some concern about the molecular configuration or makeup of the virus that made them think there was a possibility that there could have been a manipulation of the virus." *Id.* at 34:12-35:1.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

633.    Dr. Fauci states that he does not believe that anyone ever raised the concern to him before that late January call, and he specifically attests that he does not recall Dr. Robert Redfield, then-Director of the CDC, raising the concern to him in mid-January 2020. *Id.* at 35:2-15. Dr. Fauci's recollection conflicts with that of Dr. Redfield, who specifically recalls raising this issue to Dr. Fauci earlier in January 2020, and having his concerns fall on deaf ears: "Dr. Robert

Redfield, a virologist and the director of the Centers for Disease Control and Prevention (CDC), had urged Fauci privately to vigorously investigate both the lab and natural hypotheses. He was then excluded from the ensuing discussions—learning only later that they'd even occurred. 'Their goal was to have a single narrative,' Redfield [said]." Jones Decl., Ex. AA, at 7.

**RESPONSE:** The summary of Dr. Fauci's testimony (i.e., the first sentence of the PFOF) is undisputed. The remainder of this PFOF quotes from a *Vanity Fair* article and is disputed as hearsay, speculation, and journalistic characterization unsupported by citation to evidence of record. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

634.   "In mid-January of 2020, … Redfield expressed his concerns in separate phone conversations with three scientific leaders: Fauci; Jeremy Farrar, the director of the U.K.'s Wellcome Trust; and Tedros Adhanom Ghebreyesus, director general of the World Health Organization (WHO). Redfield's message, he says, was simple: 'We had to take the lab-leak hypothesis with extreme seriousness.'" *Id.* at 23. Dr. Fauci disputes this account and states that this conversation did not happen: "To my recollection, no." Fauci Dep. 35:9-12.

**RESPONSE:** Disputed to the extent the first two sentences of this PFOF quote from a *Vanity Fair* article and contain hearsay, speculation, and journalistic characterization unsupported by citation to evidence of record. The third sentence is disputed to the extent it suggests that Dr. Fauci was asked during his deposition about Dr. Redfield's account as reported by *Vanity Fair*; he was not shown the article or asked about Dr. Redfield's recollection of events. Undisputed that Dr. Fauci testified that "to [his] recollection" Robert Redfield did not "call him in mid January 2020 and raise" a concern about the virus being genetically engineered or originating in a laboratory. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

635.    On January 27, 2020, Dr. Fauci and several other senior NIAID officials received an email from Greg Folkers, who is his "immediate chief of staff in my office group," *id.* at 38:2-4; the email provided "Talking Points for NIAID Director Dr. Fauci." Fauci Ex. 5. The email stated that "when talking about CoV … we have on our team (Vincent and folks we fund, Peter Daszak, Ralph Baric, Ian Lipkin, etc.) probably the world's experts on non-human coronaviruses. … EcoHealth group (Peter Daszak et al) has for years been among the biggest players in coronavirus work, also in collaboration Ralph Baric, Ian Lipkin, and others." *Id.* at 1. It also flagged the ongoing NIAID grant to Daszak and its work with Wuhan Institute of Virology: "NIAID has funded Peter's group for coronavirus work in China for the past five years through R01 1R01AI110964: 'Understanding the Risk of Bat Coronavirus Emergence.' That's now been renewed." *Id.* It noted that "[t]he results of the work to date include … Found SARS-related CoVs that can bind to human cells (published in *Nature*) and that cause SARS-like disease in humanized mouse models"—a clear reference to the 2015 *Nature Medicine* article. *Id.* Three days later, Dr. Fauci would attach that *Nature Medicine* article to a midnight email to Hugh Auchincloss. Fauci Ex. 6, at 8.

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

636.    Like so many other things, Dr. Fauci testifies that he does not recall receiving this email. Fauci Dep. 40:5-6.

**RESPONSE:** Disputed to the extent Plaintiffs' editorial remark, "[l]ike so many other things," is intended to suggest a lack of credibility on Dr. Fauci's part, which is unsupported by the cited evidence in this or any other of Plaintiffs' PFOFs, for the reasons already discussed above. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress the lab-leak theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

637.    Dr. Fauci states that he first became aware of the concern that the virus might be bioengineered and lab-created in a call with Dr. Kristian Andersen of Scripps and Jeremy Farrar of the Wellcome Trust on January 31, 2020. Fauci Dep. 43:17-25. In that call, according to Dr. Fauci, "Jeremy and [K]ristian said they had looked at -- or at least [K]ristian did, possibly Jeremy -- and maybe one other scientist -- and said that it is possible that there may have been a manipulation because it was an unusual virus." Fauci Dep. 44:3-9. A phone call was arranged for the next day, Saturday, February 1, 2020, to discuss the possibility. *Id.* at 44:15-17.

**RESPONSE:** Undisputed, and note that the purpose of the February 1 was "bring[ing]

together a group of highly qualified international evolutionary virologists to discuss the issue" of

the virus's origin, including potential manipulation, "and to see what the way forward would be to

try to clarify that." Fauci Dep. 44:9-13. However, this PFOF is irrelevant and contains no evidence

that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary

to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

638.    According to contemporaneous emails, Eddie Holmes and Bob Garry were involved in this call with Dr. Fauci and Kristian Andersen as well. Fauci Ex. 7, at 2. Eddie Holmes, who was then raising serious concerns that the virus had leaked from a lab, would go on to be the lead drafter of a key article discrediting the lab-leak theory.

**RESPONSE:** The first sentence is disputed on the basis that the email is unclear whether

Dr. Garry and Dr. Holmes were involved in the call as opposed to discussions about the origins of

COVID-19 generally. The second sentence is disputed as unsupported by citation to any evidence

of record. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by

threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

639.    After the January 31 call with Farrar and Andersen, in the evening of the same day, Dr. Fauci forwarded them an article that was skeptical of the lab-leak theory, stating that "it is of interest to the current discussion." Ex. 6, at 1. Andersen responded, stating that he was not convinced by the article because "one has to look really closely at all the sequences to see that some of the features look (potentially) engineered," and that "after discussion earlier today, Eddie

[Holmes], Bob [Garry], Mike [Laribee], and myself *all find the genome inconsistent with expectations from evolutionary theory*." *Id.* (emphasis added); *see also* Fauci Dep. 51:3-8.

**RESPONSE:** Disputed as a mischaracterization of the email. Andersen does not respond by stating that he was "not convinced of the article." Instead, he said that "[i]t's a great article," but goes on to discuss some of the problems with determining the virus's origin. Additionally, Plaintiffs only partially quote various portions of the email. The first partially quoted sentence reads in full: "The unusual features of the virus make up a really small part of the genome (<0.1%) so one has to look really closely at all the sequences to see that some of the features (potentially) look engineered." Fauci Ex. 6 at 1. The final paragraph of the email, which reads in full: "We have a good team lined up to look very critically at this, so we should know much more at the end of the weekend. I should mention that after discussions earlier today, Eddie, Bob, Mike, and myself all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." *Id.* Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

640.   A few hours later, shortly after midnight, at 12:29 a.m. on February 1, 2020, Dr. Fauci sent an email to his principal deputy, Hugh Auchincloss. Fauci Ex. 6, at 8. The subject line of the email said "IMPORTANT." *Id.* The email stated: "Hugh: It is essential that we speak this AM. Keep your cell phone on. … Read this paper as well as the e-mail that I will forward to you now. You will have tasks today that must be done. Thanks, Tony." *Id.*

**RESPONSE:** Undisputed. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

641.   The "this paper" that was attached to the email was the 2015 *Nature Medicine* article entitled "A SARS-like cluster of circulating bat coronaviruses shows potential for human emergence," Fauci Ex. 4, co-authored by Dr. Ralph Baric and Dr. Shi Zhengli and funded by NIAID and the EcoHealth Alliance. Fauci Ex. 6, at 8; Fauci Dep. 55:23-56:25. As an attachment to Dr. Fauci's email, this article was called "Baric, Shi et al – Nature Medicine – SARS Gain of Function.pdf."  Fauci Ex. 6, at 8.

**RESPONSE:** Undisputed, except to note that NIAID was among many sources of funding for the research summarized by the cited article. *See* Resp. to Pls.' PFOF ¶ 626. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

642.   Dr. Fauci claims that he can recall virtually nothing about sending this urgent, confidential email to his principal deputy in the middle of the night of the day when he found out that highly qualified researchers were concerned that SARS-CoV-2 might have leaked from a laboratory. *See* Fauci Dep. 55:15-63:21 ("I don't recall … I don't know for sure … I can't say that I recall that in particular … I don't recall. I'm not sure exactly why those words got in there … I don't recall … I don't recall … I don't precisely recall … I don't recall if I did … I might have, but I don't recall. … I don't recall. … I don't recall … I don't recall. … I don't recall … I really don't recall … I actually don't recall why I forwarded it to him … I don't recall why I did that … I don't remember … I don't recall speaking to him."). This contrasts starkly with Dr. Fauci's public claim to "remember … very well" key events of the same day. Jones Decl., Ex. X, at 1. Dr. Fauci's claim to an amazing loss of memory about this urgent clandestine email to his confidential deputy is not credible.

**RESPONSE:** Disputed as an argumentative misrepresentation of Dr. Fauci's testimony and the nature of the email. Plaintiffs' assertion that Dr. Fauci's testimony is not credible is contradicted by an accurate presentation of the testimony, in which he recalled a number of important details surrounding the email. Dr. Fauci testified "I don't recall, but I believe—and again, I would say I don't precisely recall, but there was some recollection or someone told you that, you know, we do fund research in China, particularly surveillance research—I think you referred to it when you gave me one of the exhibits about the surveillance of what might be out in

the community among bats. And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.' And that's what I was referring to when I said you will have tasks today to give me some information because this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." Fauci Dep. 57:19-58:12. Further dispute Plaintiffs' mischaracterization of the email as "clandestine," which assertion is unsupported by any record evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

643.    Dr. Fauci admits, however, that he wanted Auchincloss to find out what coronavirus research NIAID was funding in China before his call later that afternoon with scientists about the lab-leak concerns raised by Andersen and Farrar: "And at my recollection, I brought to Hugh's attention, saying, 'We have to speak in the morning, because I want to find out what the scope of what it is that we are funding so I'll know what we're talking about.'" Fauci Dep. 58:1-5. In particular, Dr. Fauci wanted to find out what EcoHealth Alliance was doing: "this was the first that I had heard about specifics of what EcoHealth and what other people were doing, and I wanted my staff to say get me up to date. So that's what I meant by you have work to do." *Id.* at 58:6-12.

**RESPONSE:** Undisputed, but also note that the cited testimony about the email further refutes Plaintiffs' allegation that Dr. Fauci claimed to recall "virtually nothing" about it, Pls.' PFOF ¶ 642. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

644.    Regarding the "tasks that must be done," Dr. Fauci admits that "I wanted to be briefed on the scope of what our collaborations were and the kind of work that we were funding in China. I wanted to know what the nature of that work was." *Id.* at 59:12-15.

**RESPONSE:** Undisputed, but also note that the cited testimony about the email further refutes Plaintiffs' allegation that Dr. Fauci claimed to recall "virtually nothing" about it, Pls.' PFOF ¶ 642. However, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

645.     The tone of the email and Dr. Fauci's own testimony strongly support the inference that Dr. Fauci sent the email to Auchincloss because he was concerned that NIAID, under his leadership, was funding research in China that might have led to the creation and leak of SARS-CoV-2, and he wanted to know the full extent of NIAID's exposure before his call later that day with scientists and funding authorities. *See also* Fauci Dep. 58:18-25. If it became public that NIAID had funded the creation of SARS-CoV-2, Dr. Fauci and his agency potentially faced an enormous crisis of public credibility and accountability.

**RESPONSE:** Disputed as argumentative and without support in the cited evidence. Neither the email nor the cited testimony from Dr. Fauci supports the PFOF's inference. Dr. Fauci testified that "this [was] the first that I had heard of what we may or may not be funding through EcoHealth and others, and I wanted to get a better scope of just what the terrain [was] of what we were doing in collaboration with different scientists[.]" Fauci Dep. 58:18-25. He elaborated, "that's what I was referring to when I said you will have tasks today"; Dr. Fauci said that he was asking for "information," because he "wanted [his] staff to . . . get [him] up to date." *Id.* at 58:6-12. Thus, the PFOF's characterization of the email's "tone" is not supported by this testimony or the contents of the email itself. Defendants further dispute the use of the phrase "funding authorities" to the extent it is meant to suggest that any individual (including Dr. Fauci or Dr. Collins) has the exclusive authority to make determinations about what research should be funded and that they personally made any funding decisions regarding the research at issue. Additionally, the final sentence of the PFOF is disputed as a conclusory and speculative assertion without

328

support from the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

646.    Immediately after sending Auchincloss the 2015 *Nature Medicine* article, Dr. Fauci also forwarded Auchincloss another article about the possibility that SARS-CoV-2 had leaked from a lab—the Jon Cohen article that he had sent to Kristian Andersen and Jeremy Farrar earlier that evening. Fauci Ex. 6, at 9. This email confirms that Dr. Fauci was deeply concerned about the prospect that NIAID, under his watch, might have funded the creation of the virus causing the global pandemic.

**RESPONSE:** Undisputed expect to the extent the second sentence is argumentative, conclusory, and speculative, and without support in the cited evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

647.    Dr. Fauci denies that, when he sent this email to Auchincloss, he was then concerned that NIAID might have funded the creation of the virus that caused the COVID-19 pandemic. When asked, "Were you concerned at that time that the work that you had funded in China might have led to the creation of the coronavirus?" Dr. Fauci responded: "I wasn't concerned that it might have." Fauci Dep. 59:16-19. In light of the tone and content of his emails at the time, and Dr. Fauci's other testimony, this statement is plainly not credible.

**RESPONSE:** Undisputed as to the first three sentences. Disputed as to the last sentence, which is an argumentative mischaracterization contradicted by the evidence (as discussed in response to Plaintiffs' earlier unfounded attacks on Dr. Fauci's credibility) and without citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

648.    According to Dr. Fauci, when he participated in the secret call with the scientists and funding authorities later that afternoon on Saturday, Feb. 1, 2020, he did not share with them that NIAID had been funding "SARS Gain of Function" research in China leading to the outbreak of COVID-19. Fauci Dep. 63:22 ("I don't believe I did.").

**RESPONSE:** Disputed as argumentative and as a mischaracterization of the nature of the call—which was not "secret"—and the relevance of NIH-funded research to the matters discussed on the call. The PFOF cites no evidence for the conclusory assertion that the call was "secret," and in fact the evidence shows that the February 1, 2020, call was an initial discussion with the goal of involving "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, in an "open" and "neutral" inquiry into the "evolutionary origins of 2019-nCoV," Fauci Ex. 8, at 5. Further disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.' PFOF ¶ 645. Also disputed as to the implication that NIAID had been funding "SARS Gain of Function research." Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

649.    In fact, once again, Dr. Fauci claims that he does not recall what he said on the clandestine February 1, 2020 phone call. *Id.* at 64:17 ("I don't recall").

**RESPONSE:** Disputed. The call was not "clandestine." *See* Resp. to Pls.' PFOF ¶ 648. Disputed also as a mischaracterization of Dr. Fauci's testimony. Dr. Fauci explained at length that he was "relatively silent on that call" and "certainly was not one of the people actively engaged in the discussion. I was relatively quiet because I wanted to hear what they had to say." Fauci Dep. 64:17-20. He further testified, again at length: "The only thing I do remember is that there was

330

what appeared to me to be good faith discussion back and forth between people who knew each other, people who had interacted with each other, so they had mutual respect for each other's opinion. I got that impression in listening and I was in a total listening mode because, as I mentioned, these were evolutionary virologists who were talking about the specifics of what detail made them suspicious that it could have been a manipulation and the other side would counter and show that this is compatible with a natural evolution and they were going back and forth. The tenure of it ended that we need more time and I believe that in one of the e-mails you asked me about a little bit ago that they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences." Fauci Dep. 77:11-78:9. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

650.     At 1:19 p.m. on Saturday, Feb. 1 – about forty minutes before the secret conference call to discuss the lab-leak concern – Dr. Fauci also forwarded the "Baric, Shi et al – Nature Medicine – SARS Gain of Function" article to Lawrence Tabak of the NIH, saying only "Here it is."  Fauci Ex. 6, at 15. Lawrence Tabak was then "the deputy director of the National Institutes of Health," the principal deputy to then-NIH Director Dr. Francis Collins. Fauci Dep. 65:8-11.

**RESPONSE:** Disputed as argumentative and as a mischaracterization of the nature of the call, which was not "secret." *See* Resp. to Pls.' PFOF ¶ 648. The remaining allegations are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

651.     Dr. Fauci testified that "I don't recall why" he sent the 2015 *Nature Medicine* article to Lawrence Tabak, but he admits that it was likely to get it into the hands of Dr. Francis Collins,

who was about to participate in the 2:00 p.m. secret conference call with Dr. Fauci and the other scientists. *Id.* at 66:15-17. Dr. Fauci claims that this was "to make sure *everyone* was aware of what the discussions were," *id.* at 66:13-15, but that is not credible in light of his testimony that he did not alert any of the *other* scientists on the call to the concern that NIAID was funding "SARS Gain of Function" research in China. *Id.* at 63:22.

**RESPONSE:** Disputed as argumentative and as a mischaracterization of the nature of the call, which was not "secret." *See* Resp. to Pls.' PFOF ¶ 648. Further disputed as argumentative and a mischaracterization of Dr. Fauci's testimony, wherein "everyone" clearly refers to relevant NIH leadership and not everyone on the call. Additionally, disputed because the PFOF makes claims about Dr. Fauci's motives and intentions, without supporting evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

652.    The more compelling inference is that Dr. Fauci wanted Dr. Collins to know that NIAID and NIH faced enormous exposure if the lab-leak theory turned out to be true or publicly accepted. Dr. Collins, along with Dr. Fauci, had publicly championed gain-of-function research since at least 2011, and NIH had jointly funded Dr. Shi Zhengli's work at the Wuhan Institute of Virology through NIAID and the National Institute of Aging. Fauci Ex. 4, at 5 (referring to "grants from the National Institute of Allergy & Infectious Disease and the National Institute of Aging of the US National Institutes of Health (NIH)").

**RESPONSE:** Disputed. This entire paragraph makes unsupported arguments, inferences, and speculative assumptions that are contradicted by the evidence, as discussed above. Further disputed that Dr. Collins and Dr. Fauci "publicly championed gain-of-function research since at least 2011." *See* Resp. to Pls.' PFOF ¶ 603. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

653.    On Saturday, Feb. 1, 2020, at 11:47 a.m., Hugh Auchincloss emailed Dr. Fauci in response to his 12:29 a.m. email. The subject line stated only "Continued." Auchincloss stated: "The paper you sent me [*i.e.*, the 2015 *Nature Medicine* article on 'SARS Gain of Function'] says the experiments were performed before the gain of function pause but have since been reviewed and approved by NIH. Not sure what this means since Emily is sure that no Coronavirus work has gone through the P3 framework. She will try to determine if we have any distant ties to this work abroad." Fauci Ex. 6, at 16. At 5:51 p.m., Dr. Fauci responded: "OK. Stay tuned." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

654.    "Emily" in Auchincloss's email "is Emily Erbelding, the Director of the Division of Microbiology and Infectious Diseases at NIAID," who "would have been the one who was closest to the ground in understanding what we were doing in funding China." Fauci Dep. 70:14-18. The "P3 framework" refers to the special approval process required for funding of gain-of-function research on coronaviruses that may cause pandemics, as "P3" stands for "potential pandemic pathogens." *See* National Institutes of Health, Office of Science Policy, *Gain of Function Research*, at https://osp.od.nih.gov/policies/national-science-advisory-board-for-biosecurity-nsabb/gain-of-function-research/ ("Certain gain-of-function studies with the potential to enhance the pathogenicity or transmissibility of potential pandemic pathogens (PPPs) have raised biosafety and biosecurity concerns…"). Thus, Auchincloss and Dr. Fauci had evidently discussed the concern that NIAID had funded the creation of "potential pandemic pathogens" at the Wuhan Institute of Virology, and Dr. Fauci was concerned about NIAID's "ties to this work abroad." Fauci Ex. 6, at 16.

**RESPONSE:** The first two sentences are undisputed. The last sentence is disputed as an assumption about what Drs. Fauci and Auchincloss "evidently discussed" without support in the cited evidence. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

655.    Dr. Fauci admits that this email confirms that he "wanted to be briefed as to the extent of our involvement with funding in China," Fauci Dep. 71:2-4—in particular, NIAID's funding of the Wuhan Institute of Virology, as a global SARS-like pandemic emerged from Wuhan.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

656.    Dr. Fauci also admits that he may have raised the concern with Auchincloss that Dr. Baric's and Dr. Shi Zhengli's research reflected in the 2015 *Nature Medicine* article may have been illegally funded in violation of the GoF Pause in effect from 2014 to 2017. Fauci Dep. 71:14-20 ("Q: Did you raise a specific concern with Hugh that the research reflected in the Baric, Shi Nature Medicine paper may have been inconsistent with the pause on -- gain-of-function funding research?  A. That is possible.").

**RESPONSE:** Disputed. Dr. Fauci was not asked whether he was concerned that research may have been "illegally funded…" As the quoted testimony demonstrates, Dr. Fauci was asked whether he raised a concern that the research was inconsistent with a policy. He stated: "That is possible. As I've said, again, very consistent with what I've been saying, I wanted to make sure I had a good feel for the scope of what we were doing regarding research that we fund in China. Since that was not something that was on my radar screen . . . [as] this is a $120,000 a year grant in a $6.3 billion portfolio." Fauci Dep. 71:20-72:2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

657.    On Saturday, Feb. 1, 2020, Jeremy Farrar sent an email organizing a secret conference call at 2:00 pm EST to a group of scientists and science-funding authorities. Fauci Ex. 6, at 17-18. The first thing that Farrar noted in the email, in bold, was "**Information and discussion is shared in total confidence and not to be shared until agreement on next steps.**" *Id.* at 17 (bold in original).

**RESPONSE:** Disputed as to Plaintiffs' characterization that the February 1, 2020 conference call was "secret." *See* Response to Pls.' PFOF ¶ 648. Further disputed as a

mischaracterization of the document to the extent the PFOF suggests that the quoted line was uniquely emphasized by Dr. Farrar. In fact, the entirety of the instructions for the call-in, including the date and length of time, was in bolded typeface. *See* Fauci Ex. 6 at 17. Further disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.' PFOF ¶ 645. The remaining allegations are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

658.    Separately, Farrar sent just Dr. Fauci an email on the morning of Feb. 1 to ensure that he could join the call, stating "Could you join?"  Fauci Ex. 7, at 12. In that email, Farrar listed the participants and stated, "My preference is to keep this a really tight group. … Obviously ask everyone to treat in total confidence."  *Id.* He also stated that the purpose of the call was "To listen to the work of Eddie, Bob and Kristian have done. Question it. And think through next steps."  *Id.*

**RESPONSE:** Undisputed, except to the extent the PFOF is suggesting that Dr. Farrar would not have moved forward with the call if Dr. Fauci could not join. The email states: "If you cannot make it, we will phone you afterwards to update." Fauci Ex. 7 at 12. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

659.    Dr. Fauci described the call as an open debate about the lab-leak theory among "a larger group of evolutionary virologists," Fauci Dep. 58:19-20, but in fact the call included a heavy representation of international government and science-funding authorities—including Dr. Fauci, Director of NIAID; Dr. Francis Collins, Director of NIH; Jeremy Farrar, head of the Wellcome Trust, the United Kingdom's "predominant" science-funding authority; Paul Schreier, the Chief Operating Officer of the Wellcome Trust who is responsible for "research funding" there; and Sir Patrick Vallance, the chief medical advisor to the U.K. government. Fauci Ex. 6, at 18; *see also* Fauci Dep. 75:11-76:15. All these people had a strong vested interest in avoiding a major scandal about international science-funding practices—such as the concern that Western governments may have funded the creation of a deadly virus that escaped from a lab and infected millions of people.

As funding authorities who control the distribution of massive amounts of research funding, they also had powerful influence over the research scientists on the call.

**RESPONSE:** Disputed in that this paragraph makes inferences and assumptions that are not supported by evidence. That some participants on the call led research agencies and may be involved in funding decisions made by those research agencies does not contradict Dr. Fauci's testimony that the call involved an open debate about the origins of COVID-19 among "a larger group of evolutionary virologists." It would be reasonable for high-level international authorities in science to have a discussion about the origins of COVID. Moreover, the PFOF's assumption about the interests of the participants on the call is conclusory and speculative and lacks any citation to the record. In fact, the record shows an open debate about potential origins of COVID-19 based on the limited information available at the time, and a goal among participants to urge "a body like the [World Health Organization] . . . to ask or commission a group of scientists from around the world to ask the neutral question[:] 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" Fauci, Ex. 8, at 5. Further disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.' PFOF ¶ 645. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

660.    Dr. Fauci took steps to ensure that Dr. Francis Collins would be included on the call "since he's the director of NIH." Fauci Dep. 75:4-6. Dr. Fauci evidently spoke with Dr. Collins before the call, as he emailed Farrar before the call stating, "Jeremy: Francis will be on the call. He is trying to phone you." Fauci Ex. 7, at 17. Farrar then emailed Dr. Collins stating, "Francis Call me on [redacted]." Fauci Ex. 7, at 19.

**RESPONSE:** Disputed that "Dr. Fauci evidently spoke with Dr. Collins before the call." Dr. Fauci testified: "I believe I sent him an e-mail or somehow connected him with the pending

phone call." Fauci Dep. 75:7-10. The remaining facts are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

661.    Like the 12:29 a.m. email to Auchincloss, Dr. Fauci repeatedly claimed that he could not recall virtually any details about the 2:00 p.m. secret conference call with scientists and funding authorities about the lab-leak theory. Fauci Dep. 63:19-67:11 ("I don't recall bringing this up … I don't recall … I don't recall … I don't recall when it was … I don't recall … I don't believe that Larry was, but he could have been … I don't recall"); Fauci Dep. 73:20-74:14 ("I don't recall a discussion about confidentiality or not … I may have. I don't recall."); Fauci Dep. 77:13-15 ("Do you remember anything that anybody said on the call?  A: No."); Fauci Dep. 78:10-83:10 ("I don't recall whether that was discussed … I don't recall anything from that phone call that said that … I'm not sure if I discussed it … I have a vague recollection that there was a concern … It is certainly possible, but I don't specifically remember … I don't specifically recall.").

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony, in which Dr. Fauci recalled quite a bit about this phone call. Dr. Fauci testified: "The only thing I do remember is that there was what appeared to me to be good faith discussion back and forth between people who knew each other, people who had interacted with each other, so they had mutual respect for each other's opinion. I got that impression in listening and I was in a total listening mode because, as I mentioned, these were evolutionary virologists who were talking about the specifics of what detail made them suspicious that it could have been a manipulation and the other side would counter and show that this is compatible with a natural evolution and they were going back and forth. The ten[or] of it ended that we need more time and I believe that in one of the e-mails you asked me about a little bit ago that they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences." 77:11-78:9. Further disputed as a mischaracterization of the nature of the call as "secret." *See* Resp. to Pls.' PFOF ¶ 648. Also disputed as to the use of the phrase "funding authorities." *See* Resp. to Pls.'

PFOF ¶ 645. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

662.    This testimony to near-complete lack of memory about the call stands in stark contrast to Dr. Fauci's public statements a year and a half after the call occurred, when FOIA releases of Dr. Fauci's emails finally revealed to the public that this secret call had occurred. Then, Dr. Fauci stated, "I remember it very well."  Jones Decl., Ex. X, at 1. Dr. Fauci's testimony about lack of recall is not credible.

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony for the reasons stated in response to Plaintiffs' PFOF ¶ 661. Further disputed as a mischaracterization of the nature of the call as "secret." *See* Resp. to Pls.' PFOF ¶ 648. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

663.    Notwithstanding his repeated testimony that he cannot recall specifically what was said on the call, Dr. Fauci provided a self-justifying and innocent account of the call, describing it as a good-faith discussion among scientists trying to get to the truth without any preconceived biases. *See, e.g.,* Fauci Dep. 77:16-18 ("[T]here was what appeared to me to be good faith discussion back and forth between people who knew each other"); Fauci Dep. 79:23-80:1 ("I think the general feeling among the participants on the call is that they wanted to get down to the truth and not wild speculation about things."); Fauci Dep. 80:9-10 ("I don't think there was any other concern than sticking with the truth and sticking with data").

**RESPONSE:** Disputed to the extent Plaintiffs suggest that Dr. Fauci's recollection of the call is not credible, for the reasons discussed above. *See* Resps. to Pls.' PFOF ¶¶ 649, 661. Moreover, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

664.     Dr. Fauci thus seeks to have his cake and eat it too—he claims both to remember little or nothing of what was said on the call, and to clearly remember that the entire discussion was done in good faith and without any bias. In any event, subsequent communications and events make clear that Dr. Fauci's testimony on this point is not credible, as discussed in detail below, as an aggressive plot to discredit the lab-leak theory commenced immediately after the call.

**RESPONSE:**  Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

665.     Almost an hour into the 2:00 pm call, at 2:56 p.m., Jeremy Farrar sent a cryptic email to Fauci, Collins, Vallance (all science funders) and Mike Ferguson, stating, "Can I suggest we shut down the call and then redial in?  Just for 5-10 mins?"  Dr. Fauci responded, "Yes."  Fauci Ex. 7, at 26. Dr. Fauci claims he cannot recall whether this occurred. Fauci Dep. 92:1-93:6.

**RESPONSE:**  Disputed as to Plaintiffs' characterization that Jeremy Farrar's email was "cryptic," as the email makes a clear suggestion to "shut down the call and then redial in." The remaining facts are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

666.     Dr. Fauci testified that the call participants concluded that they needed more time to take a much closer look at the biology of the virus and genetic sequences before coming to a conclusion about the virus's origins, and they planned to take more time to continue their inquiry afterward. *See* Fauci Dep. 78:3-9 ("The ten[or] of it ended that we need more time … they said we need some time to more carefully look at this to see if we can come to a sound conclusion based on further examination of the sequences."); Fauci Dep. 80:24-25 ("The plan was to go and spend more time carefully looking at it."). In fact, Eddie Holmes and Kristian Andersen began drafting an article concluding that the lab-leak hypothesis was baseless and rooted in animus immediately after the call ended, and Dr. Fauci received an initial draft of this article by the next Tuesday morning. *See infra*. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as Plaintiffs provide no evidence or citation to the record regarding when Eddie Holmes and Kristian Andersen began drafting an article, what the article concluded, or what research or information (perhaps obtained well after the call) the article was based on. The third sentence is disputed as argumentative. Plaintiffs' conclusory assertion that Dr. Fauci's testimony is not credible is unsupported by the speculation and surmise that precedes it. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

667.    Dr. Fauci testified that his next interaction with the call's participants was when Kristian Andersen sent him a preprint of that article attacking the lab-leak theory. Fauci Dep. 82:19-83:1. In fact, before the preprint, Holmes and Farrar had sent Dr. Fauci at least *four* drafts of the article to review. *See infra.* Dr. Fauci's testimony is not credible on this point.

**RESPONSE:** Disputed as argumentative and a mischaracterization of Dr. Fauci's testimony, as Dr. Fauci testified that, while he did not recall what communications he had had in between the call and the preprint, he and Jeremy Farrar "know each other reasonably well" and he would not be surprised if they had additional communications. Fauci Dep. 82:12-3:10. Also disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as would be expected of a scientific research paper). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

668.    Dr. Fauci states that he cannot remember if he had further discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding this call on Feb. 1, 2020. Fauci Dep. 83:2-10; 85:8-23, 90:25-91:15, 92:1-21. In fact, Dr. Fauci sent Jeremy Farrar a lengthy email that is entirely redacted at 12:38 a.m. on Saturday, Feb. 1, 2020, Fauci Ex. 7, at 1; Farrar emailed Fauci on Jan. 30 stating "Tony Perfect timing – thank you. Great to catch up," and provided Sir Patrick Vallance's phone number, Fauci Ex. 7, at 4; Fauci emailed Farrar and Vallance on Jan. 30, stating "Thanks, Jeremy. Great chatting with you and Patrick. Will stay in close touch," Fauci Ex. 7, at 4; Jeremy Farrar sent Dr. Fauci an email on Friday, Jan. 31, stating "Tony  Really would like to speak with you this evening  It is 10pm now UK  Can you phone me on [redacted]," Fauci Ex. 7, at 3; Farrar and Sir Patrick Vallance had a three-way call with Dr. Fauci on Jan. 30, 2020, Fauci Ex. 7, at 4; Farrar emailed Fauci and Collins after the call referring to "Conversations with you and Tony, and Patrick and others," Fauci Ex. 7, at 34; among others. Dr. Fauci had extensive discussions with Jeremy Farrar, Francis Collins, and Patrick Vallance surrounding the 2:00 p.m. February 1, 2020 secret conference call, and his testimony to the contrary is not credible.

**RESPONSE:** Disputed as an argumentative mischaracterization of Dr. Fauci's testimony that is unsupported by the cited evidence. The "further communications" cited by Plaintiffs actually *pre-date* the 2:00pm February 1, 2020, phone call: an email at 12:38 a.m. on Saturday, Feb. 1, 2020, Fauci Ex. 7 at 1, emails on January 30 and 31, a phone call on January 30. Moreover, it is not surprising that Dr. Fauci is unable to recall minute and irrelevant details like an email stating "Tony Perfect timing – thank you. Great to catch up," nearly three years ago during the midst of a global pandemic. The PFOF thus does not cast doubt on Dr. Fauci's credibility. Further disputed as a mischaracterization of the nature of the call as "secret." *See* Resp. to Pls.' PFOF ¶ 648. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

669.    After the call, Francis Collins emailed Farrar and stated, "Hi Jeremy, I can make myself available at any time 24/7 for the call with Tedros. Just let me know. Thanks for your leadership on this critical and sensitive issue."  Fauci Ex. 7, at 34. Farrar responded, "We are altogether as you know!"  Fauci then chimed it: "Thanks, Jeremy. We really appreciate what you are doing here."  Fauci Ex. 7, at 34. "Tedros" refers to the director of the World Health Organization. Fauci Dep. 95:6-7.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

670.    After the call, Dr. Fauci described the scientists as engaging in a careful investigation of the virus: "[K]ristian and a few of the others carefully got together and looked at it and examined the pros and the cons and the ups and downs, and came to the conclusion that their initial concern about the molecular basis of the concern was unwarranted and that what they saw was quite compatible and, in fact, suggestive of a natural evolution."  Fauci Dep. 81:8-15. In fact, Eddie Holmes and Kristian Andersen immediately began drafting an article attacking the lab-leak theory with no further investigation, which was sent to Dr. Fauci in less than three days. *See infra.* Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as unsupported by the evidence and lacking any citation to the record regarding when Eddie Holmes and Kristian Andersen began drafting an article, or the type of research or investigation they conducted before drafting it. Moreover, the second sentence is disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as would be expected of a scientific research paper). The third sentence is disputed as argumentative and unsupported by the evidence cited in the PFOF, which does not cast doubt on Dr. Fauci's credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

671.    Farrar emailed Dr. Tedros of the World Health Organization and two senior WHO officials, along with Dr. Fauci and Dr. Collins, indicating that he had just spoken to the senior WHO officials and "[f]ully agree with your summary."  Fauci Ex. 8, at 1. Farrar emphasized the "urgency and importance" of the lab-leak question because of the "[g]athering interest evident in the scientific literature and in mainstream and social media to the question of the origin of this

virus," and thus it was "[c]ritical" to "get ahead of the science and the narrative of this" instead of "reacting to reports which could be very damaging."  Fauci Ex. 8, at 1. He also wrote, "I am sure I speak for Francis [Collins] and Tony [Fauci] when I say we are here and ready to play any constructive role in this," as they "[d]o think this is an urgent matter to address."  *Id.*

**RESPONSE:** Disputed because the PFOF plucks isolated quotations from their context and thus does not accurately portray the email's contents. The email included a list of items summarizing discussions regarding the virus's origins and encouraging the convening of an international body to consider the issue further, including: "Has to be framed as 'To understand the source and evolution of the 2019n-CoV'"; "Appreciate the urgency and importance of this issue in the midst of a very troubling epidemic"; and "Critical that responsible, respected scientists and agencies get ahead of the science and the narrative of this and are not reacting to reports which could be very damaging." Fauci Ex. 8, at 1. As earlier emails stated, delaying looking into the issue further could cause the discussions surrounding the virus's origins to become "more polari[z]ed," with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

672.    Thus, Farrar, joined by Fauci and Collins, sent a message to the WHO that they wanted to "get ahead" of potentially damaging "narrative[s]" that might emerge "in mainstream and social media" about the origins of the virus. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, which is an email from Jeremy Farrar, not Drs. Fauci or Collins. Moreover, the selectively quoted language misconstrues

the email; the quoted portion of the email reads in full: "Critical that responsible, respected scientists and agencies get ahead of the science and the narrative of this and are not reacting to reports which could be very damaging." Fauci Ex. 8 at 1. As earlier emails stated, delaying looking into the issue further could cause the discussions surrounding the virus's origins to become "more polari[z]ed," with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

673.    Later that day, on Feb. 2, Farrar separately emailed Fauci and Collins, stating "Tedros and Bernhard have apparently gone into conclave…they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward."  Fauci. Ex. 8, at 2. He also stated, "Meanwhile…." And linked to an online article speculating about the lab-leak origins of the virus—again indicating that Fauci, Farrar, and Collins were concerned about controlling online discourse about the lab-leak theory. *Id.*

**RESPONSE:** Disputed as a mischaracterization of the evidence, which is an email from Jeremy Farrar, not Drs. Fauci or Collins, which email was sent *earlier* that day, not later. *See* Fauci Ex. 8 at 1-2. Moreover, this short email from Jeremy Farrar does not explicitly or implicitly show that Drs. Farrar, Fauci, or Collins may have been concerned "controlling online discourse about the lab-leak theory," as opposed to ensuring that the question of the virus's origins was analyzed objectively and urgently and was not overwhelmed by uninformed speculation. As earlier emails stated, delaying looking into the issue further could cause the discussions surrounding the virus's

344

origins to become "more polari[z]ed," with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. The article Dr. Farrar sent appears to report on claims that the "coronavirus contains hiv insertions." Fauci Ex. 2 at 2. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

674.   The day after the conference all, Sunday, Feb. 2, Dr. Fauci, Jeremy Farrar, and Dr. Collins shared a series of emails (1) acknowledging that there were very serious arguments in favor of the lab-leak theory, and (2) repeatedly expressing concern about the lab-leak theory's involvement on "social media."  The group, including Dr. Fauci, repeatedly expressed concern about postings about the lab-leak theory on social media. *See* Fauci Ex. 8.

**RESPONSE:** Disputed as a mischaracterization of Fauci Ex. 8, which reflects a back-and-forth discussion among various scientists regarding the potential origins of COVID-19 based on the evidence then-available. Within this chain of emails, a few individuals reference "distortions on social media," without describing what those are (and not referencing a so-called "lab-leak theory"), as a reason to "move quickly," Fauci Ex. 8 at 2, on having "a body like the WHO . . . ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins of 2019-nCoV, important for the epidemic and for future risk assessment and understanding of animal/human coronaviruses,'" *id.* at 5. Dr. Fauci evidently agreed with moving quickly, stating "[l]ike all of us, I do not know how this evolved, but given the concerns of so many people and the threat of further distortions on social media, it is essential that we move quickly. Hopefully, we can get WHO to convene." *Id.* at 2. This is Dr. Fauci's sole

reference to "distortions on social media" or to social media at all in the email chain. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

675.    First, after the Feb. 1 call, still on Feb. 1, Farrar sent an email to the group expressing concern that "[t]here will be media interest and there is already chat on Twitter/WeChat" about the lab-leak theory, and stating: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene" to address the lab-leak question. Fauci Ex. 8, at 9.

**RESPONSE:** Disputed that Dr. Farrar's email expresses concern about online discussions about a so-called "lab-leak theory" or with a body convening solely for the purpose of "address[ing] the lab-leak question." The first sentence that the PFOF only selectively quotes reads in full: "I do know there are papers being prepared, there will [be] media interest and there is already chat on Twitter/WeChat." Fauci Ex. 8 at 9. The second selectively quoted sentence follows Dr. Farrar's urging that '[w]e on this call are not the only ones with scientific expertise in this area" and that understanding the origins of COVID-19 would "need a broader range of input" and an "expert group to explore this, with a completely open mind." *Id.* Dr. Farrar then states: "In order to stay ahead of the conspiracy theories and social media I do think there is an urgency for a body to convene such a group and commission some work to – (draft) 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" *Id.* at 9-10. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

676.    The next day, Feb. 2, Farrar then expressed concern that "these questions are being asked by politicians, starting in the scientific literature, [and] certainly on social and main stream media. If, and I stress if, this does spread further, pressure and tensions will rise. [I] fear these questions will get louder and more polarized and people will start to look to who to blame. … I am concerned if this is not done quite quickly it will be reacting to what may be lurid claims." Fauci Ex. 8, at 7.

**RESPONSE:** Undisputed, except to note that these concerns are immediately preceded by Dr. Farrar's statement that his "view" on the origins of the COVID-19 virus "is completely neutral," and "[t]he evolutionary origins on this virus are clearly important." Fauci Ex. 8 at 7. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

677.    Another call participant then agreed that "this needs to be discussed urgently," in part "because of the lurid claims on Twitter." Fauci Ex. 8, at 6. He also noted that "if the evolutionary origins of the epidemic were to be discussed, I think the only people with sufficient information or access to samples to address it would be the teams working in Wuhan." *Id.*

**RESPONSE:** Disputed as a mischaracterization of the email, which was not focused on Twitter. The participant stated: "Perhaps this needs to be discussed urgently, not only because of the lurid claims on Twitter but because if it is in a non-human host, pre-adapted, it may threaten control efforts through new zoonotic jumps…" Fauci Ex. 8 at 6. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

678.    The same day, Farrar acknowledged "this is a very complex issue," and again expressed concern about "social and main stream media": "As discussed on the phone this discussion is not limited to those on this email, it is happening wider in the scientific, social and main stream media." Fauci Ex. 8, at 5.

**RESPONSE:** Undisputed, but note that Dr. Farrar's same email stated: "I believe the best way forward is for a body like the WHO has to ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses'; and "That should be done in an open way and quite quickly so that the world can see it is being done, it can respect the report when it is available and I think that will help with the growing interest of this question." Fauci Ex. 8 at 5. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

679.    Dr. Collins then responded to Farrar and Dr. Fauci only, stating that "a confidence-inspiring framework … is needed, or the voices of conspiracy will quickly dominate, doing great potential harm to science and international harmony."  Fauci Ex. 8, at 5.

**RESPONSE:** Undisputed, but note that Dr. Collins' email opened by stating: "Though the arguments from Ron Fouchier and Christian Drosten are presented with more forcefulness than necessary, I am coming around to the view that a natural origin is more likely." Fauci Ex. 8 at 5. Additionally, as Dr. Fauci testified, the concern among participants in the call was that the discussions surrounding the virus's origins might become "more polari[z]ed" over time, with people "try[ing] to deflect issues by blaming someone somewhere," which "may only increase tension and reduce cooperation." *Id.* at 7. Such cooperation, Dr. Fauci testified, was "necessary to really continue to pursue what actually happened in order to prepare for and prevent similar things from happening in the future." Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

680.     Farrar then shared notes with Fauci, Collins and Tabak (Collins' deputy) from "Mike Farzan (discoverer of SARS receptor)," which stated that Farzan "is bothered by the furin cleavage site [a virus feature that looks bioengineered] and has a hard time explaining that as an event outside the lab," and that "acquisition of the furin site would be highly compatible with the idea of continued passage of virus in tissue culture," *i.e.*, serial passage. Fauci Ex. 8, at 4. Farzan suggested that "a likely explanation" of the virus was serial passage of SARS-like coronaviruses in human cell lines, and he stated that "I am 70:30 or 60:40" in favor of laboratory origins. Fauci Ex. 8, at 3-4.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

681.     Farrar also shared notes from "Bob" [Garry] that he had "aligned" the new virus "with the 96% bat CoV sequenced at WIV [Wuhan Institute of Virology]," and viewed the lab-origin theory as highly likely: "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature. Do the alignment of the spikes at the amino acid level – it's stunning." Fauci Ex. 8, at 4.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

682.     Having shared these notes, Farrar noted, "On a spectrum if 0 is nature and 100 is release – I am honestly at 50! My guess is that this will remain grey, unless there is access to the Wuhan lab – and I suspect that is unlikely!" Fauci Ex. 8, at 3. Both Farrar and Collins expressed concerns that the WHO might move too slowly for their liking. *Id.*

**RESPONSE:** Undisputed, except the characterization that Drs. Farrar and Collins expressed concerns that the WHO might move "too slowly for their liking." That interpretation is unsupported by the entirety of the email chain, which shows multiple participants expressing

concerns that the issue of COVID-19's origins needed to be addressed by a broader group objectively and urgently, Fauci Ex. 8 at 1-3, 5-6, and to get ahead of polarization that could undermine efforts "to pursue what actually happened in order to prepare for and prevent similar things from happening in the future," Fauci Dep. 102:17-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

683.    Then, still on February 2, 2020, Dr. Fauci wrote to Farrar, Collins, and Lawrence Tabak (Dr. Collins' principal deputy), stating: "Like all of us, I do not know how this evolved, but given the concerns of so many people and *the threat of further distortions on social media*, it is essential that we move quickly. Hopefully, we can get the WHO to convene."  Fauci Ex. 8, at 2 (emphasis added).

**RESPONSE:** Undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

684.    Dr. Fauci claimed that he is completely dissociated from social media, stating: "I don't do social media so I'm not familiar with them," Fauci Dep. 98:15-16; and "You know, I'm so dissociated from social media. I don't have a Twitter account. I don't do Facebook. I don't do any of that, so I'm not familiar with that," Fauci Dep. 99:5-8; *see also, e.g.,* Fauci Dep. 103:12-14; 210:3-8; 213:10-16; 241:6-9; 241:21-242:1; 301:10-11 ("I don't pay attention to things related to social media accounts."); *id.* at 312:7-9 ("I can repeat it for the hundredth time, I really don't get involved in social media issues."); *id.* at 356:15-16 ("I'm not a social media person.").

**RESPONSE:** Undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

685.    In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including

with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory in his contemporaneous email, Fauci Ex. 8, at 2; and Dr. Fauci's communications staff had repeatedly emailed Twitter to try to remove postings critical of Dr. Fauci, *see infra*. Dr. Fauci's professed ignorance of social media is not credible. His communications and conduct make clear that he is keenly aware and deeply concerned about what he believes are "distortions on social media." Fauci Ex. 8, at 2.

**RESPONSE:** Disputed that Dr. Fauci's daughter's past employment as a software engineer at Twitter (*see* Fauci Dep. 100:3-7 (stating that his daughter "used to" work at Twitter)), his podcasts or interviews that appear on social medial, his one isolated reference to "distortions on social media," and the work of a handful of staff out of the nearly 2,000 staff employed by Dr. Fauci in 2020, *see* Nat'l Inst. of Allergy & Infectious Diseases, Congressional Justification FY 2022 (2021) https://perma.cc/L7M4-GLBF, somehow make Dr. Fauci an expert on social media or show that Dr. Fauci was "keenly aware and deeply concerned about" "distortions on social media." Further disputed that Dr. Fauci's communications staff "repeatedly emailed Twitter to try to remove postings critical of Dr. Fauci" rather than occasionally asking Twitter (without Dr. Fauci's awareness) to remove fake accounts that falsely impersonated Dr. Fauci (which may violate federal law, *see* 18 U.S.C. § 912). *See* Resp. to Pls.' PFOF ¶¶ 810-11. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

686.    Dr. Fauci also testified that "I don't recall anything about social media" in his discussions with Farrar about the origins of the virus. Fauci Dep. 102:17-18. In light of the contemporaneous emails repeatedly raising concerns about discussions of the lab-leak theory on social media, this claim is not credible.

**RESPONSE:** The testimony quoted in the first sentence is undisputed, but otherwise the PFOF is disputed as an argumentative mischaracterization of the record, unsupported by any citation. The record does not show "emails" from Dr. Fauci "repeatedly raising concerns about

discussions of the lab-leak theory on social media." That unsupported assertion does not cast doubt on Dr. Fauci's credibility. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

687.     Dr. Fauci admits that he was "concerned about … there being misinformation or disinformation that would interfere with our trying to save the lives of people throughout the world, which happens when people spread false claims." Fauci Dep. 103:18-22. He states that "misinformation and/or disinformation can lead to loss of life … and that troubles me." Fauci Dep. 104:15-17. This includes the spread of misinformation and disinformation on social media, because "that's part of the way information is disseminated." Fauci Dep. 104:22-23.

**RESPONSE:** Undisputed. However, Dr. Fauci went on to say, "My way of countering false information, and I've been on the record multiple times as saying that, is that my approach is to try [] and flood the system with the correct information as opposed to interfering with other people's ability to say what they want to say." Fauci Dep. 357: 7-18. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

688.     After Dr. Fauci's email about "the threat of further distortions on social media," Farrar emailed back indicating that the WHO might not move quickly to address the lab-leak theory, and stating to Fauci and Collins: "they need to decide today in my view. If they do prevaricate, I would appreciate a call with you later tonight or tomorrow to think how we might take forward." Fauci Ex. 8, at 2. He also stated: "Meanwhile…." And linked to an online posting expressing concerns about the lab-leak theory – indicating his dominant concern about online speech discussing the lab-leak theory. *Id.*

**RESPONSE:** Disputed to the extent the PFOF is meant to indicate that Dr. Farrar's concern was that the WHO might not move quickly "to address the lab-leak theory." Dr. Farrar repeatedly stated his aim was urging "a body like the WHO . . . to ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins

of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" Fauci Ex. 8 at 5. Otherwise, undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

689.   Soon thereafter, Farrar emailed Dr. Tedros of the WHO and two senior WHO officials, copying Fauci and Collins. Fauci Ex. 8, at 1. Farrar urged the WHO to quickly establish a working group to address the lab-leak theory, and reiterated that they should "[a]ppreciate the urgency and importance of this issue," given the "[g]athering interest evident in the science literature and in mainstream and social media to the question of the origin of this virus," and pressing them to "get ahead of … the narrative of this and not reacting to reports which could be very damaging." Fauci Ex. 8, at 1.

**RESPONSE:** Disputed that Dr. Farrar urged the WHO to establish a working group "to address the lab-leak theory." As the exhibit states, Dr. Farrar sought to urge "a body like the WHO . . . to ask or commission a group of scientists from around the world to ask the neutral question 'To understand the evolutionary origins of 2019-nCoV, important for this epidemic and for future risk assessment and understanding of animal/human coronaviruses.'" Fauci Ex. 8 at 5. Otherwise, undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

690.   Fauci claims that he does not believe there was any further communication between him and Farrar about this issue, despite Farrar's urgent request for a follow-up call if the WHO did not act immediately. Fauci Ex. 8, at 2; Fauci Dep. 109:22-110:7. In light of their subsequent communications, this testimony is not credible.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. The PFOF's unsupported assertion does not cast doubt on the credibility of Dr. Fauci's testimony.

Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

691. By the early morning of February 4, 2020, Eddie Holmes had already sent a draft research paper attacking the lab-leak theory to Jeremy Farrar. Fauci Ex. 9, at 1. Holmes noted to Farrar that, in the draft, he "[d]id not mention [the virus's] other anomalies as this will make us look like loons." Fauci Ex. 9, at 1. To complete the draft between the afternoon of Saturday, Feb. 1, and the early morning of Tuesday, Feb. 4, Holmes must have started working on it almost immediately after the Feb. 1 conference call.

**RESPONSE:** Disputed to the extent the PFOF relies on unsupported assumptions regarding when Eddie Holmes began drafting the referenced article, as Plaintiff's provide no evidence or citation to the record regarding when Eddie Holmes began drafting. Also disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as scientific would be expected for a scientific research paper to do). Further disputed to the extent the PFOF is intended to suggest that Dr. Holmes was the sole author of the draft, which is contradicted by the email stating, "Here's *our* summary so far. Will be edited further." Fauci Ex. 9 at 1. The quoted text of the email is undisputed, but note also that Dr. Holmes states that the papers "[a]s it stands . . . is excellent basic science . . . which is a service in itself." *Id.* Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

692. Farrar forwarded this draft to Fauci and Collins at 2:01 a.m. on Tuesday morning, February 4, 2020, in an attachment called "Summary." Fauci Ex. 10, at 3. He noted, "Please treat

in confidence – a very rough first draft from Eddie and team – they will send on the edited, cleaner version later." *Id.*; *see also* Fauci Ex. 12, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

693.    Dr. Collins responded: "I note that Eddie is now arguing against the idea that this is the product of intentional human engineering," Fauci Ex. 10, at 3, a dramatic reversal of Holmes's position a few days earlier that Holmes and Andersen "find the genome inconsistent with expectations from evolutionary theory." Fauci Ex. 6, at 1. The paper's conclusion was also profoundly at odds with Holmes's statement, in the email sending the draft paper itself, that they would "look like loons" if the paper discussed the virus's other "anomalies" that strongly suggested a lab origin. Fauci Ex. 9, at 1.

**RESPONSE:** Undisputed as to the contents of the cited emails. Disputed to the extent that the PFOF claims there was a "dramatic reversal" of Holmes's position or that the paper was "profoundly at odds" with Holmes's statement. As Dr. Andersen explained in a January 31, 2020 email, he, Holmes, and others tentatively "all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." Fauci Ex. 6 at 1. It would not be "dramatic," therefore, for opinions to have changed based on further analyses, as Dr. Andersen had indicated might happen. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

694.    Collins also noted that Holmes had not ruled out the possibility of a lab-created virus through serial passage. Fauci Ex. 10, at 3. Farrar responded, stating "Eddie would be 60:40 lab side. I remain 50:50." *Id.* Eddie, however, had already drafted a paper that *refuted* the lab-leak theory, even though he evidently still believed was the better explanation. *See id.*

**RESPONSE:** Disputed as a mischaracterization of the cited emails. Dr. Collins did not note "that Holmes had not ruled out the possibility of a lab-created virus through serial passage." Rather, Dr. Collins noted that "that Eddie is now arguing against the idea that this is the product of *intentional human engineering*. But repeated tissue culture passage is still an option…" Fauci Ex. 10 at 3 (emphasis supplied). Farrar then responded "'Engineered' probably not. Remains very real possibility of accidental lab passage in animals…. Eddie would be 60:40 lab side." It is entirely consistent for Eddie to be 60:40 that there was an accidental lab-leak, while refuting the idea that there was intentional human engineering. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

695.    Regarding the possibility of serial passage, Dr. Fauci noted that "Serial passage in ACE2-transgenic mice" was a possibility for the virus's origin, Fauci Ex. 10, at 2— notably, serial passage in humanized mice as was used in the 2015 *Nature Medicine* study. (Like so many other things, Dr. Fauci claims he does not recall this statement that he wrote. Fauci Dep. 115:22-116:12.) Collins responded, "Surely that wouldn't be done in a BSL-2 lab?" and Farrar answered, "Wild West…." Fauci Ex. 10, at 2. This exchange indicates that that Fauci, Farrar, and Collins were concerned that the coronavirus had been created in Wuhan by serial passage through humanized mice in a low-security [BSL-2] lab and then escaped from that low-security lab—*i.e.*, the precise concerns surrounding the NIAID-funded research at WIV. *Id.*; *see also, e.g.,* Jones Decl., Ex. BB< at 14 ("In the above exchange, the health officials [Fauci, Farrar, and Collins] seem to be contemplating the possibility that the repeated passage of a coronavirus through genetically modified mice in an insufficiently secure lab could have resulted in the accidental emergence and release of SARS-CoV-2.").

**RESPONSE:** Disputed as a mischaracterization of the cited emails. Dr. Fauci's email simply stated "?? Serial passage in ACT2-transgenic mice," Fauci Ex. 10 at 2, and did not express any sort of opinion that it was a possibility for the virus's origin. Moreover, this email exchange does not indicate what Drs. Fauci, Farrar, and Collins may have been contemplating when they wrote those emails. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci

sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

696.    Later in the evening of the same day, Tuesday, Feb. 4, Farrar sent Fauci and Collins a second version of draft, entitled "Summary," with the note "Tidied up."  Fauci Ex. 12, at 7. Dr. Fauci claims he does not remember receiving these drafts. Fauci Dep. 127:4-10.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

697.    The next day, February 5, 2020, Farrar sent Fauci and Collins a third version of the draft, still entitled "Summary," with a note: "Tony and Francis The revised draft from Eddie, copied here."  Fauci Ex. 12, at 8.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

698.    Two days later, on February 7, 2020, Farrar sent Fauci and Collins a fourth version of the same draft, entitled "Summary.Feb7.pdf," with the note in the subject line, "Revised draft." Fauci Ex. 11, at 2. This draft made clear that Holmes and his co-authors planned to aggressively discredit the lab-leak theory. It stated in bold in the beginning "Overview" section: "**Analysis of the virus genome sequences clearly demonstrates that the virus is not a laboratory construct or experimentally manipulated virus**."  Fauci Ex. 11, at 3 (bold in original).

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed as argumentative and a mischaracterization of the paper, which was not drafted for the purpose of "aggressively discredit[ing]" a so-called "lab-leak theory," but instead to present findings on research into the origins of the COVID-19 virus. The third sentence is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

699.    This was the *fourth* updated draft that Farrar sent to Fauci and Collins of the paper discrediting the lab-leak theory in the first week since the Feb. 1 secret conference call. The draft advocated that genetic evidence "clearly demonstrates" that the lab-leak theory is false. *Id.*

**RESPONSE:** Disputed that the referenced conference call was "secret." *See* Resp. to Pls.' PFOF ¶ 648. The remaining allegations are undisputed. Notably, Plaintiffs have not cited any evidence that Drs. Fauci or Collins provided substantive input on the paper, and in fact Dr. Fauci's testimony confirms that he had "very little input" into the drafts of the paper. Fauci Dep. 196:1-8. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

700.    Dr. Fauci claims that he did not have any involvement in Farrar's efforts to push the WHO to assemble a working group to address the lab-leak theory. Fauci Dep. 110:4-7 ("So I really would doubt that there was any further communication between me and the WHO about this. This was fundamentally Jeremy's lane, if you want to call it that."); *id.* at 125:17-19 ("I didn't have any direct involvement with the WHO, not to my recollection."); *id.* at 131:14-15 ("This was mostly a Jeremy-led thing"). But in fact, Dr. Fauci sent multiple emails to Farrar urging for the inclusion of a long list of specific scientists in the WHO's working group. Fauci Ex. 13, at 1-2, 6.

**RESPONSE:** Disputed as a mischaracterization of the testimony and emails. Dr. Fauci did not testify that he "did not have any involvement" in the effort to convene a WHO working group; rather, as the quoted testimony shows, Dr. Fauci testified that he "doubt[ed] that there was any further communication *between me and the WHO* about this," Fauci Dep. 110: 4-7 (emphasis added), and he did not believe that he had "*direct* involvement with the WHO," *id.* at 125:17-19 (emphasis added). More generally, as to his "involvement" with the WHO, Dr. Fauci testified:

"The context of this email exchange and the theme of the discussion, although I, myself, did not directly get involved in interactions with WHO on this, was that we all felt that given the convening power and the status of the WHO, that we wanted to get them involved because we wanted to make sure that this was an open and transparent discussion that involved international global health authority. So it is perfectly consistent and compatible that I would say we really need to get WHO moving on getting the convening involved because was wanted an open convening so that evidence and data could be openly discussed. That was the theme of everything that was going on at the time." *Id.* at 126:5-18. Also disputed that Dr. Fauci sent multiple emails "urging for the inclusion of a long list of specific scientists" in any working group. Exhibit 13 includes an email from Dr. Fauci stating simply, "I will list below a number of names for potential members of the working group." Fauci Ex. 13 at 2. The list was sent in response to an email from Dr. Farrar stating that the WHO planned to "set up the Group who will 'look at the origins and evolution of 2019n-CoV'" and that the WHO "ha[d] asked for names to sit on that Group – please do send any names." *Id.* at 3. Dr. Fauci then later followed up to say, "Jeremy: I left out an important name of the coronavirus evolution working group. Please include her: Pardis Sabeti at the Broad Institute of MIT and Harvard. Thanks, Tony." *Id.* at 1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

701.    On Feb. 5, 2020, Farrar emailed Fauci and Collins, stating that he believed that the WHO would assemble a working group to address the lab-leak theory, and urging Fauci and Collins to provide names of scientists to participate in the group. Fauci Ex. 13, at 7. Farrar stated that the WHO "have asked for names to sit on that Group – please do send any names." *Id.* He then stated, "We can have a call this week with a core group of that *to frame the work of the Group* including – if you could join?" *Id.* (emphasis added). And then he stated, "With names to be put forward into the Group from us and *pressure on this group from your and our teams* next week." *Id.* (emphasis added). Plainly, Farrar intended, with Fauci and Collins' assistance, to stack the

WHO's group with their hand-picked scientists, have an advance call "to frame the work of the Group," and to put "pressure on this group from [Fauci's and Collins'] and our teams next week," *id.*—to influence and control the outcome of the WHO Group's deliberations.

**RESPONSE:** Disputed as a mischaracterization of the cited emails, for the reasons stated in response to Plaintiffs' PFOF ¶ 700. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

702.    Fauci and Collins did not dispute this plan. On the contrary, Fauci responded by providing Farrar with a detailed list of eight scientists to include in the WHO's group "in addition to the individuals who were on the call with us last Saturday."  Fauci Ex. 13, at 2, 6. Fauci then followed up to his own email with an additional scientist, stating she is "an important name for the coronavirus evolution working group. Please include her." *Id.* at 1. Fauci's attempts to downplay his involvement with the plan to create and control a WHO working group on COVID-19's origins to discredit the lab-leak theory, therefore, are not credible.

**RESPONSE:** Disputed as a mischaracterization of the cited emails, for the reasons stated in response to Plaintiffs' PFOF ¶ 700. The PFOF's unsupported assertions—which are contradicted by the record as a whole—do not cast doubt on the credibility of Dr. Fauci's testimony. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

703.    Dr. Fauci testified that he, Farrar, and Collins "wanted to get them [the WHO] involved because we wanted to make sure that this was an open and transparent discussion," Fauci Dep. 126:9-12, is not credible in light of the contemporaneous email from Farrar to Fauci and Collins plotting to "frame the work of the Group" and put "pressure on this group from your and our teams next week."  Fauci Ex. 13, at 3.

**RESPONSE:** Disputed as a mischaracterization of the testimony and cited emails, for the reasons stated in response to Plaintiffs' PFOF ¶ 700. The PFOF's unsupported assertions—which

are contradicted by the record as a whole—do not cast doubt on the credibility of Dr. Fauci's testimony. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

704.   Dr. Fauci claims he does not recall any discussions about framing the work of the Group, or putting pressure on the Group. Fauci Dep. 137:1-21.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

705.   On February 9, 2020, Dr. Fauci participated in a joint podcast with Dr. Peter Daszak of the EcoHealth Alliance to discuss the outbreak of COVID-19. Fauci Ex. 15, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

706.   Peter Daszak was then involved in organizing a statement for the Lancet seeking to discredit the lab-leak theory, similar to the article then being drafted by Eddie Holmes, of which Dr. Fauci had received four drafts the previous week. *See* Jones Decl., Ex. CC, at 1. Just a few days later, The Lancet would publish a statement of scientists organized and co-signed by Daszak and Jeremy Farrar, which stated: "We stand together to strongly condemn conspiracy theories suggesting that COVID-19 does not have a natural origin." *Id.* Thus, at that time, Daszak was working in parallel with Dr. Fauci, and together with Jeremy Farrar, to produce a published article discrediting the lab-leak theory. *Id.*

**RESPONSE:** Disputed that Dr. Fauci was working with Dr. Daszak to produce the referenced article merely because they participated on a podcast together. Also disputed that the "statement for the Lancet" was "similar" to the "article then being drafted by Eddie Holmes" and

several other virologists. The former is a policy "[s]tatement in support of the scientists, public health professionals, and medical professionals of China combatting COVID-19," Jones Ex. CC, at 1, while the latter is a research paper discussing the scientific data supporting a particular hypothesis of the COVID-19 virus's origins, Fauci Ex. 24. The accuracy of the quoted text of the policy statement is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

707.    During the podcast, both Dr. Fauci and Daszak made comments seeking to discredit the lab-leak theory. Fauci Ex. 16, at 1. Fauci, when asked "Do you have any sense of where [the virus] probably came from?" answered, "Well I think ultimately we know that these things come from an animal reservoir. I heard these conspiracy theories and like all conspiracy theories … they [are] just conspiracy theories…. I think the things you are hearing are still in the realm of conspiracy theories without any scientific basis for it." *Id.* Daszak was asked, "Is it your sense that it's almost certain it came from an animal-to-human transmission?" and he responded: "All the evidence says that is what happened. … It looks to me and to most scientists like it's a bat virus that got into people either in the market or in rural China and just unfortunately has the capacity to spread." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

708.    On February 11, 2020, Dr. Fauci had a meeting at NIAID with Dr. Ralph Baric, the corresponding author of the 2015 *Nature Medicine* article about NIAID-funded gain-of-function research in Wuhan that Dr. Fauci sent to Hugh Auchincloss after midnight on Feb. 1. Fauci Ex. 17, at 1 (Dr. Fauci's official calendar, Feb. 11, 2020, at 2:30 p.m. – "Meeting with Dr. Ralph Baric"). Dr. Fauci does not dispute that he met with Dr. Ralph Baric that day, but (like so many other things) he claims that he does not recall the meeting or what they discussed. Fauci Dep. 149:9-10, 149:21-23. As noted above, given that Dr. Fauci was deeply concerned about Baric's research at the time, Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Undisputed that Dr. Fauci may have met with Dr. Baric that day, but the remainder of the PFOF is disputed as argumentative and unsupported by the evidence. It is not unreasonable for Dr. Fauci to not specifically remember a meeting that occurred nearly three years earlier during the midst of a global pandemic. Further, the claim that "Dr. Fauci was deeply concerned about Baric's research at the time" is unsupported by any citation to the record, and the conclusory assertion does not cast doubt on Dr. Fauci's credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

709.    On Feb. 11, 2020, Ian Lipkin wrote an email referring to the draft paper about the origins of COVID-19 stating that, while the paper was "well-reasoned and provides a plausible argument against genetic engineering," it "does not eliminate the possibility of an inadvertent release following adaptation through selection in culture at the institute in Wuhan. Given the scale of the bat CoV research pursued there and the site emergence of the first human cases we have a nightmare of circumstantial evidence to assess." Fauci Ex. 18, at 1. Dr. Fauci states that he does not recall this email but that "it's entirely possible that Ian wrote this to me," because "Ian communicates with me." Fauci Dep. 153:15-17.

**RESPONSE:** Disputed that Fauci Ex. 18 is an email, as it appears to be an excerpt from another document and does not contain a To:, From:, cc:, date, or subject lines as one would typically see in an email. It is also unclear whether the statement from Ian Lipkin is in reference to the draft paper that is the subject of this PFOF or something else. Undisputed as to the quoted testimony. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

710.    Dr. Fauci testified that it is "molecularly" impossible that SARS-CoV-2 originated from NIAID-funded research: "molecularly, that could not have happened." *Id.* at 157:21-22. But separately, he repeatedly testified that molecular virology is not his field, so his certainty on this one key point is not credible. *Id.* at 64:8-9 ("that's not my field, evolutionary virology"); *id.* at 117:19-20 ("I'm hesitant to go there because that's not my area of expertise"); *id.* at 127:12-13 ("it was an area that was not my area of expertise"); *id.* at 160:7-9 ("Did I fully understand the molecular virology of it?  Unlikely, because I'm not an evolutionary virologist.").

**RESPONSE:** Undisputed as to the accuracy of the quoted testimony, but disputed as to the conclusion that Dr. Fauci's opinion is not credible. The quoted pieces of testimony relate to separate issues. First, Dr. Fauci testified about whether it was possible that the virus could have developed from research being conducted in a lab in Wuhan, China, that NIAID partially funded. Fauci Dep. 156:10-157:22. Dr. Fauci testified that it would be "molecularly impossible" for "the viruses that were studied under the auspices and funding of the subaward to the Wuhan Institute . . . to become SARS-Cov-2," "even if people tried to manipulate them[.]" *Id.* He explained: "If you look at the molecular makeup of SARS-CoV-2 and you look at the viruses that were studied under the auspices and funding of the subaward to the Wuhan Institute, those bat viruses evaluated *by anyone with even a reasonable acquaintance with evolutionary virology* would tell you that given those viruses that they worked on, reported on, and published on was so far removed from SARS-CoV-2, that it would be molecularly impossible, even if people tried to manipulate them to become SARS-CoV-2 they wouldn't become SARS-CoV-2." *Id.* at 156:16-157:3 (emphasis added). He explained, in other words, that it did not require "expertise" in evolutionary virology, only "a reasonable acquaintance," to conclude that NIAID-funded research did not give rise to COVID-19. Second, Dr. Fauci testified that during the February 1, 2020 call with a group of international virologist, who were discussing theories relating to the actual origins of SARS-CoV-2, he was "relatively quiet" because "evolutionary virology" "is not [his] field." *Id.* at 64:8-9, 19-20. Relatedly, Dr. Fauci testified that he has "very little input" into several

virologists' draft research paper analyzing the virus's origins because that "is not [his] area of expertise." *Id.* at 127:9-13. Thus, he explained that when Dr. Farrar forwarded him a draft of the research paper, he would have "look[ed] through it," but he likely would not have "fully understood the molecular virology of it," because he's "not an evolutionary virologist"; therefore, it is "[u]nlikely" that he would have "ma[d]e any substantive comments on it." *Id.* at 160:7-12. Third, Dr. Fauci was separately asked whether "serial passage in ACE2 transgenic mic [is] generally done at BSL-2," and he answered as to his views "in general," but caveated that he was "hesitant to go there because that's not [his] area of expertise." *Id.* at 117:15-23. In other words, Dr. Fauci did not disclaim all knowledge of evolutionary virology, only that he was not an expert in that field. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

711.    On February 17, 2020, the preprint version of the paper drafted by Eddie Holmes attacking the lab-leak theory was released. Fauci Ex. 19. The paper was entitled, "The Proximal Origins of SARS-CoV-2." *Id.* at 12. Its listed authors were Kristian Andersen, Andrew Rambaut, Ian Lipkin, Edward Holmes, and Robert Garry. *Id.* All these authors, except possibly Ian Lipkin, had been participants in the secret phone conference at 2:00 p.m. on Saturday, Feb. 1, 2020. Fauci Dep. 161:7-10.

**RESPONSE:** Disputed as a mischaracterization of the nature of the call as "secret." *See* Response to Pls.' PFOF ¶ 648. Also disputed that the record clearly shows that all of the listed authors except for potentially Ian Lipkin were on the call, as the email chain regarding the call does not include Robert Garry or Ian Lipkin. Fauci Ex. 6 at 17. Also disputed to the extent the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as scientific would be expected for a scientific research paper to do). Undisputed as to the remaining

allegations. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

712.    These authors had a financial interest in supporting NIH's preferred narrative. "Garry and Andersen have both been recipients of large grants from NIH in recent years, as has another 'Proximal Origin' author, W. Ian Lipkin of Columbia University."  Jones Decl., Ex. BB.

**RESPONSE:** Disputed in that the PFOF makes inferences and assumptions not supported by the evidence. The NIH does not have a "preferred narrative" regarding the origins of the virus, and Plaintiffs cite no evidence to support their assertion to the contrary. Additionally, NIH does not award grants to individuals. Rather, NIH awards grants to institutions, like universities. The grant supports the research activities carried out by personnel identified by the institution under the scope of the grant. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

713.    These authors were stunningly recent converts to the theory of natural origin. On February 11, Ian Lipkin had sent an email about the same paper stating that "we have a nightmare of circumstantial evidence to assess."  Fauci Ex. 18, at 1. On February 4, Holmes had written to Farrar that he avoided discussing the virus's "other anomalies as this will make us look like loons." Fauci Ex. 9, at 1.

**RESPONSE:** Undisputed as to the quoted text of the cited emails. Disputed to the extent that there was a "stunning[]" reversal of anyone's opinion on the origin of the virus. As Dr. Andersen explained in his January 31, 2020, email, he, Dr. Holmes, and others "all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." Fauci

Ex. 6, at 1. It would not be "stunning," therefore, for opinions to have changed based on further analyses. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

714.    On February 2, Bob Garry had written to Farrar, "I really can't think of a plausible natural scenario … I just can't figure out how this gets accomplished in nature. Do the alignment of the spikes at the amino acid level – it's stunning."  Fauci Ex. 8, at 4. On January 31, Andersen had written to Dr. Fauci that the virus's "features (potentially) look engineered," and that "after discussion earlier today, Eddie [Holmes], Bob [Garry], … and myself all find the genome inconsistent with expectations from evolutionary theory."  Fauci Ex. 6, at 1.

**RESPONSE:**  Undisputed as to the quoted text of the cited emails. However, as Dr. Andersen explained in his January 31, 2020, email, he, Dr. Garry, Dr. Holmes, and others "all find the genome inconsistent with expectations from evolutionary theory. But we have to look at this much more closely and there are still further analyses to be done, so those opinions could still change." Fauci Ex. 6 at 1. It would not be unreasonable, therefore, for opinions to have changed based on further analyses. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

715.    The preprint version of "The Proximal Origin of SARS-CoV-2" asserted a very different conclusion. It stated that "this analysis provides evidence that SARS-CoV-2 is not a laboratory construct nor a purposefully manipulated virus."  Fauci Ex. 19, at 2. It stated that "genomic evidence does not support the idea that SARS-CoV-2 is a laboratory construct."  *Id.* at 6.

**RESPONSE:**  Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

716.    Dr. Fauci does not dispute that this preprint was sent to him. Fauci Dep. 160:3-4 ("It is likely that this was sent to me"). Dr. Fauci admits that he reviewed the preprint when it was sent to him. *Id.* at 160:7 ("Did I look through it?  Yes."). And Dr. Fauci admits that he was aware of what their conclusion was about the lab-leak theory. *Id.* at 162:13-15 ("I am certain that having looked at it, I was aware of what their conclusion was.").

**RESPONSE:** Undisputed. Notably, Plaintiffs have not cited any evidence that Drs. Fauci or Collins provided substantive input on the paper. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

717.    This was the *fifth* version of the paper that was sent to Dr. Fauci to review, after four drafts sent to him on Feb. 4, 5, and 7. *Id.* at 160:13-16.

**RESPONSE:** Undisputed that the paper was sent to Dr. Fauci. Notably, Plaintiffs have not cited any evidence that Drs. Fauci or Collins provided substantive input on the paper. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

718.    On March 6, 2020, Kristian Andersen emailed Dr. Fauci, Dr. Collins, and Jeremy Farrar, stating, "Dear Jeremy, Tony, and Francis, Thanks again for your advice and leadership as we have been working through the SARS-CoV-2 'origins' paper. We are happy to say that the paper was just accepted by Nature Medicine and should be published shortly …. To keep you in the loop, I just wanted to share the accepted version with you, as well as a draft press release. We're still waiting for proofs, so please let me know if you have any comments, suggestions, or questions about the paper or the press release."  Fauci Ex. 22, at 1. He also wrote: "Tony, thank you for your straight talk on CNN last night – it's being noticed."  *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

719. Thus, Andersen thanked Dr. Fauci, Collins, and Farrar for their "advice and leadership" about the paper, sent them the final draft, and asked for their input both on the draft and on their public messaging about the draft. *Id.*

**RESPONSE:** Disputed that Andersen thanks Drs. Fauci and Collins for their advice and leadership on the paper specifically, as opposed to (as the email says) their "advice and leadership *as we have been* working through the SARS-CoV-2 'origins' paper." Fauci Ex. 22 at 1. Dr. Fauci testified that he provided "[v]ery little" input on the paper, Fauci Dep. 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. Also disputed that Dr. Fauci provided "advice and leadership" on "public messaging about the draft," which assertion is unsupported by the record and is contradicted by the testimony from Dr. Fauci cited above. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

720. This was the *sixth* version of the paper that was forwarded to Dr. Fauci for review and input. *Id.*

**RESPONSE:** Undisputed that the paper was sent to Dr. Fauci. Notably, Plaintiffs have not cited any evidence that Drs. Fauci or Collins provided substantive input on the paper. Regardless,

this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

721.    Dr. Fauci responded: "Kristian: Thanks for your note. Nice job on the paper. Tony." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

722.    Dr. Fauci denies that he provided "advice and leadership" in the preparation of the paper. Fauci Dep. 171:11-13. In light of the extensive meetings and correspondence detailed above, that testimony is not credible.

**RESPONSE:** Disputed as argumentative and unsupported by the evidence. Dr. Fauci testified that he provided "[v]ery little" input on the paper, Fauci Dep. 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. None of the cited evidence casts doubt on Dr. Fauci's credibility. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

723.    On March 17, 2020, *Nature Medicine* published the online version of *The Proximal Origin of COVID-19*. Fauci Ex. 24, at 3. The print version appeared in the April 2020 volume of the journal. *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

724.    The final, published version of the article makes even stronger claims attacking the lab-leak theory than the preprint version. In its opening, the article states: "Our analyses *clearly show* that SARS-CoV-2 is not a laboratory construct or a purposefully manipulated virus." Fauci Ex 24, at 1 (emphasis added). Similarly strong language, leaving no room for doubt, occurs throughout the article: "the genetic data *irrefutably show* that SARS-CoV-2 is not derived from any previously used viral backbone," *id.* at 1 (emphasis added). "This *clearly shows* that the SARS-CoV-2 spike protein optimized for binding to human-like ACE2 is the result of natural selection," *id.* at 2 (emphasis added). "[T]he evidence shows that SARS-CoV-2 is not a purposefully manipulated virus," *id.* at 3. "[W]e do not believe that any type of laboratory-based scenario is plausible." *Id.* at 3. "SARS-CoV-2 originated via natural selection." *Id.* at 3.

**RESPONSE:** Undisputed, except to the extent that the PFOF characterizes a scientific paper as "attacking" any theory rather than examining the scientific data and adopting a particular hypothesis about the virus's origin based on that data (as scientific would be expected for a scientific research paper to do). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

725.    Thus, between the preprint version and final version of the article, the article substantially beefed up its conclusion that the lab-leak theory is implausible and should be discredited. Dr. Fauci claims he does not "recall specific conversations" about that conclusion with the authors, but he admits that he is "sure" that he discussed that conclusion with them: "we read the preprint and, therefore, we knew what the conclusion was, and I'm sure that that conclusion was discussed. So I would not be surprised at all following the initial preprint that I discussed the conclusion of these authors that this is not a laboratory construct or a purposely manipulated virus." Fauci Dep. 181:3-10; *see also id.* at 181:18-22. Based on all these circumstances, it is likely that

371

Dr. Fauci encouraged the authors to express a stronger and more unequivocal conclusion against the lab-leak theory than reflected in the preprint.

**RESPONSE:** The assertion that the final version "substantially beefed up" certain conclusions is disputed as an argumentative and conclusory assertion without citation to the record. The accuracy of the quoted testimony is undisputed. The final sentence is disputed as a conclusory and speculative assertion that is unsupported by any citation to the record and is contradicted by (1) Dr. Fauci's testimony that he had "very little" input into the drafts, Fauci Dep. 127:10-13, and (2) the absence of any emails showing that Dr. Fauci provided substantive input into the paper. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

726.    Once the article "The Proximal Origin of SARS-CoV-2" was released, both Dr. Fauci and Dr. Collins took steps to push it into prominence. First, on March 26, 2020, Dr. Collins published a blog post on the article on the "NIH Director's Blog" entitled "Genomic Study Points to Natural Origin of COVID-19."  Fauci Ex. 25, at 1.

**RESPONSE:** Undisputed that Dr. Collins published the referenced blog post. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

727.    Dr. Collins used strong language relying on the study to attack and discredit the lab-leak theory as "outrageous" and "debunk[ed]": "Some folks are even making outrageous claims that the new coronavirus causing the pandemic was engineered in a lab and deliberately released to make people sick. A new study debunks such claims by providing scientific evidence that this novel coronavirus arose naturally."  Fauci Ex. 25, at 2. Dr. Collins stated that the study shows that "the coronavirus that causes COVID-19 almost certainly originated in nature," and that "this study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 25, at 3.

**RESPONSE:** Undisputed, except to the extent that the PFOF is meant to indicate that Dr. Collins used "strong language" to "discredit" any and all theories regarding the potential that the COVID-19 virus originated in a lab and then leaked, either accidentally or intentionally. Dr. Collins used strong language when expressing his views about the claims that the COVID-19 virus may have been "engineered in a lab and *deliberately released* to make people sick." Fauci Ex. 25 at 2 (emphasis added). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

728.   In his blog post, Dr. Collins did not disclose that he and Dr. Fauci had been part of the group that organized the study, nor that he and Dr. Fauci had reviewed six versions of the study before it was published. Fauci Ex. 25.

**RESPONSE:** Disputed that Dr. Collins or Dr. Fauci either "organized the study" or reviewed six versions of the study before it was published. As Dr. Fauci testified, Jeremy Farrar and Kristian Anderson organized the study and reached out to Dr. Fauci. Fauci Dep. 43:17-25. Dr. Fauci testified that he provided "[v]ery little" input on the paper, *id.* at 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

729.    As was evidently intended, Dr. Collins's blog post immediately fueled media coverage attacking the lab-leak theory as a "conspiracy theory."  For example, the next day, March 27, 2020, ABC News ran a story entitled, "Sorry, conspiracy theorists. Study concludes COVID-19 'is not a laboratory construct.'" Fauci Ex. 26. The article quoted Bob Garry—who on January 31 had found "the genome inconsistent with the expectations of evolutionary theory," Fauci Ex. 6, at 1, and on February 1 had told Farrar that "I just can't figure out how this gets accomplished in nature … it's stunning," Fauci Ex. 8, at 4—as stating that "[t]his study leaves little room to refute a natural origin for COVID-19."  Fauci Ex. 26, at 3-4.

**RESPONSE:** Undisputed as to the contents of the exhibits. Disputed to the extent that Plaintiffs make inferences about the "evident[ ] inten[t]" of Dr. Collins' post without any support in or citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

730.    Dr. Fauci testified that he could not remember any contact from Dr. Collins about "The Proximal Origin of SARS-CoV-2" after Dr. Collins' blog post on March 26, 2020. Fauci Dep. 186:19-187:6. In light of their subsequent communications and Dr. Fauci's actions, this testimony is not credible.

**RESPONSE:** Disputed as argumentative and without citation to or support in the evidence. The PFOF does not specify what "communications" or "actions" it is referring to and thus lends no support for the conclusory assertion that Dr. Fauci's testimony is not credible. Regardless, it would be unsurprising that an individual could not recall specific communications from nearly three years ago regarding a specific article that was published in the midst of a global pandemic. Moreover, Dr. Fauci testified that he would not be surprised if Dr. Collins and Dr. Fauci mentioned the article to the other. Fauci Dep. 187:1-6. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

731.    In fact, Dr. Collins emailed Dr. Fauci about the article on Thursday, April 16, 2020. Fauci Ex. 27. The email linked to a Fox News piece by Bret Baier alleging that sources were "increasingly confident" that SARS-CoV-2 originated in a lab, and it stated: "Wondering if there is something NIH can do to help put down this very destructive conspiracy, with what seems to be growing momentum." Fauci Ex. 27, at 1. Dr. Collins stated, "I hoped the Nature Medicine article on the genomic sequence of SARS-CoV-2 [*i.e.*, "The Proximal Origin of COVID-19] would settle this. … Anything more we can do?" Fauci Ex. 27, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

732.    Dr. Fauci responded to Dr. Collins at 2:45 a.m. the next day, Friday, April 17, stating only: "Francis: I would not do anything about this right now. It is a shiny object that will go away in times. Best, Tony." Fauci Ex. 27, at 2.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

733.    Dr. Fauci testified that he did not take "any steps to increase the visibility of the article after this" email exchange with Dr. Collins. 191:21-22; *see also* 195:10-17. That testimony is incorrect and not credible.

**RESPONSE:** Undisputed that Dr Fauci testified that he did not recall taking "any steps to increase the visibility of the article after this" email exchange with Dr. Collins, Fauci Dep. 191:21-22, and that he testified that he did not go out of his way to promote the article, *id.* at 195:10-17, but that he did likely discuss the article with people because it was a topic of considerable concern, *id*. Disputed that Dr. Fauci's testimony is incorrect or not credible, as that assertion is wholly conclusory and unsupported by any citation to the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or

otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

734.    In fact, that same day, Dr. Fauci took matters into his own hands to make the lab-leak theory "go away."  At the joint press conference on April 17, 2020, with President Trump, Vice President Pence, and Dr. Fauci, a reporter asked, "Mr. President, I wanted to ask Dr. Fauci: Could you address the suggestions or concerns that this virus was somehow manmade, possibly came out of a laboratory in China?"  Fauci Ex. 28, at 2. Dr. Fauci responded: "There was a study recently that we can make available to you, where a group of highly qualified evolutionary virologists looked at the sequences there and the sequences in bats as they evolve. And the mutations that it took to get to the point where it is now is [pause for emphasis] *totally consistent* with a jump of a species from an animal to a human."  *Id.*; *see also id.* 199:18-25 (Dr. Fauci conceding that, "when you said that sentence about totally consistent, you pause and use that phrase, 'totally consistent' with emphasis" – "Right."); *see also* Video of April 17, 2020 White House Coronavirus Task Force Briefing, *at* https://www.youtube.com/watch?v=brbArpX8t6I (exchange starting at 1:38:32 of video).

**RESPONSE:** Disputed that Dr. Fauci responding to a question from the press at a press

conference is somehow taking "matters into his own hands," or that the answer was an attempt to

make the so-called lab-leak theory "go away." On the contrary, Plaintiffs' PFOF shows that Dr.

Fauci did not even mention the article until he was asked about the origins of the virus by a reporter

in a public forum. Also dispute that Dr. Fauci "conced[ed]" that he paused to emphasize the phrase

"totally consistent." Dr. Fauci testified that he did not "remember a pause of a statement [he] made

in one of the dozens and dozens and dozens of press conferences" during which he has spoken.

Fauci Dep. 200:1-5. Undisputed, however, that the quoted statements were made during the press

conference. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by

threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

735.    Dr. Fauci then feigned ignorance and unfamiliarity with the authors of the study: "the paper will be available – I don't have the authors right now, but we can make that available to you."  Fauci Ex. 28, at 2. Presenting himself as unconnected with the paper, Dr. Fauci did not reveal (1) that he was part of a group that had launched the paper in a clandestine phone call on

Saturday, Feb. 1; (2) that he had extensively corresponded with Jeremy Farrar about the paper and its conclusions; (3) that the authors of the paper had sent six versions to him, Jeremy Farrar, and Dr. Collins to review; (4) that he had likely urged the authors to beef up their conclusion attacking the lab-leak theory between the preprint and published versions of the paper; (5) that the authors had personally thanked him for his "advice and leadership" in drafting the paper; or (6) that Dr. Collins had emailed him the day before to ask him to push the paper publicly or take other steps to discredit the lab-leak theory.

**RESPONSE:** Disputed as argumentative, lacking evidentiary citations, and a mischaracterization of the evidence. As Dr. Fauci testified, Jeremy Farrar and Kristian Anderson organized the study and reached out to Dr. Fauci. Fauci Dep. 43:17-25. Dr. Fauci testified that he provided "[v]ery little" input into the paper, *id.* at 196:1-8, that he "did not have substantive input into the paper," and that in thanking him for his advice and leadership "Jeremy is being courteous, as he is wont to be. I mean 'advice' could be—and 'leadership' could be we really got to get information out. Thank you for the effort you've put into it. Advice and leadership, to my recollection, had very little to do with substantive input into the paper." *Id.* at 171:16-22. Also disputed that Dr. Fauci's answer that he did not have the multiple authors of the paper before him at the moment was somehow intended to "feign ignorance" with any of the authors. Further disputed as a mischaracterization of the nature of the call as "clandestine." *See* Resp. to Pls.' PFOF ¶ 648. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

736.     Dr. Fauci does not dispute that he was referring to "The Proximal Origin of SARS-CoV-2" in his public remarks at the April 17, 2020, White House press briefing. Fauci Dep. 201:2-6 ("I assume it was the Nature Medicine paper…. I think it was.").

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

737.    Dr. Fauci testified that he did not make that paper available to any reporters after the press conference. *Id.* at 201:7-9 ("Not to my knowledge.). That testimony is not credible.

**RESPONSE:** Disputed as argumentative, but the quoted testimony is undisputed. However, the question posed to Dr. Fauci is unclear as to whether it was asking Dr. Fauci whether he personally made the paper available to reporters present for the live press conference before they left the White House, or whether he has ever, since the press conference, provided the paper to a reporter. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

738.    In fact, over the weekend following the press conference, Dr. Fauci personally responded to an inquiry from a reporter specifically asking for the study he had referred to at the April 17, 2020 press conference, and provided a link to "The Proximal Origin of SARS-CoV-2." Fauci Ex. 29, at 1. On Sunday, April 19, a reporter emailed the White House press office asking, "Dr. Fauci said on Friday he would share a scientific paper with the press on the origin of the coronavirus. Can you please help me get a copy of that paper?" *Id.*

**RESPONSE:** Disputed as a mischaracterization of the email exchange. The inquiry was sent not to Dr. Fauci, but to Katie Miller, who works for the Vice President. Fauci Dep. 202:12-14. Ms. Miller then likely forwarded the email to Dr. Fauci and asked him to respond. *Id.* at 202:12-12. It would not be unreasonable for Dr. Fauci to respond to a request from the Vice President's office. Also note that Dr. Fauci provided links to several papers, including the one referenced in the PFOF. *See* Fauci Ex. 29 at 1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress

any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

739.    Dr. Fauci personally responded to this reporter, stating, "Bill: Here are the links to the scientific papers and a commentary about the scientific basis of the origins of SARS-CoV-2." Fauci Ex. 29, at 1. He then provided three links. The first was a link to the online version of "The Proximal Origin of SARS-CoV-2." The second and third were links to a paper and an online statement by Eddie Holmes, whom Dr. Fauci knew had begun secretly drafting the paper that became "The Proximal Origin of SARS-CoV-2" immediately after the clandestine Feb. 1 conference call with Dr. Fauci, Jeremy Farrar, and others. Fauci Ex. 29, at 1. The second link to a paper authored by Holmes was "a commentary on [The Proximal Origin of SARS-CoV-2] in the journal *Cell*." Fauci Dep. 202:25-203:1; *see also id.* at 203:2-16.

**RESPONSE:** Undisputed that Dr. Fauci provided links to the reporter. Disputed as to the nature of the call and efforts to draft the paper—neither was not clandestine or secret, and the PFOF cites no evidence supporting those characterizations. *See also* Resp. to Pls.' PFOF ¶ 648. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

740.    On April 18 and 19, 2020, Dr. Fauci exchange cordial emails with Peter Daszak of the EcoHealth Alliance, who steers NIAID funds to finance bat coronavirus research with Dr. Shi Zhengli at the Wuhan Institute of Virology. On Saturday, April 18, Daszak emailed Dr. Fauci, calling him "Tony," and stating: "As the PI of the R01 grant publicly targeted by Fox News reporters at the Presidential press briefing last night, I just wanted to say a personal thank you … for standing up and stating that the scientific evidence supports a natural origin for COVID-19 … not a lab release from the Wuhan Institute of Virology." Fauci Ex. 30, at 1. Daszak also wrote: "Once this pandemic's over I look forward to thanking you in person and let you know how important your comments are to us all." *Id.* Dr. Fauci responded on April 19: "Peter: Many thanks for your kind note." *Id.*

**RESPONSE:** Undisputed, but further note that as Dr. Fauci testified, "Many thanks for your kind note" is a standard response. Fauci Dep. 206:20-25 ("That's a very typical response of mine. I can show you 45,000 e-mails that say thank you for your kind note."). Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion,

encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

741.    Dr. Fauci's and Dr. Collins's efforts to orchestrate and publicize "The Proximal Origin of SARS-CoV-2" as a method of discrediting the lab-leak theory were highly effective. "The Proximal Origin of SARS-CoV-2" became one of the most widely read and most publicized scientific papers in history, with pervasive media coverage using it to discredit the lab-leak theory. "The paper has been accessed online more than 5.7 million times and has been cited by more than 2,000 media outlets. … It became one of the best-read papers in the history of science." Jones Decl., Ex. BB, at 3.

**RESPONSE:** Disputed that Dr. Fauci and Dr. Collins are responsible for the fact that the article is widely read, and it is unsurprising that a scientific paper about the origins of a global pandemic would be widely read during the pandemic. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

742.    As a direct result of these efforts, speech and speakers advocating for the lab-leak theory of COVID-19's origins were extensively censored on social media platforms.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

743.    Twitter took aggressive censorship action against such speech and speakers. For example, on September 16, 2020, Twitter suspended the account of a Chinese virologist who claimed coronavirus was made in a lab. Fauci Ex. 31, at 1. "Twitter has suspended the account of a Chinese scientist who suggested that the novel coronavirus was created in a lab … despite inconclusive evidence." Fauci Ex. 31 at 2.

**RESPONSE:** Disputed on the ground that this PFOF is based on a news article containing hearsay and journalistic characterization rather than record evidence. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship."  Disputed also that one isolated example of such application supports the allegation that Twitter took "aggressive. . . action against such speech and speakers." In any event, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

744.    Facebook, likewise, took aggressive steps to censor the lab-leak theory on social media, even going so far as to formalize this policy as part of its official content-moderation policy. Fauci Ex. 32, at 3 (Facebook announcing that "we are expanding the list of false claims we will remove to include additional debunked claims about the coronavirus and vaccines," including "COVID-19 is man-made or manufactured"). Facebook noted that "we already prohibit these claims in ads," and promised "to take aggressive action against misinformation about COVID-19 and vaccines."  *Id.* Facebook promised to "begin enforcing this policy immediately, with a particular focus on Pages, groups or accounts that violate these rules …. Groups, Pages, and accounts on Facebook that repeatedly share these debunked claims may be removed altogether." *Id.*

**RESPONSE:** Undisputed that on May 26, 2021, Facebook announced that it had updated its policies to expand "the list of false claims" it would "remove" from the platform, which list included claims that "COVID-10 is man-made or manufactured." Fauci Ex. 32 at 3. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction,

urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

745.    Like Twitter, Facebook censored even high-profile speakers who raised questions about the origins of COVID-19 or advanced the lab-leak hypothesis. For example, Facebook censored an article by award-winning British journalist Ian Birrell who raised "the question of the origins of the Covid-19 virus within Wuhan" and criticized the natural-origin theory of the virus. Fauci Ex. 33, at 1.

**RESPONSE:**   Undisputed that the cited news report states that an article by Ian Birrell "was labelled misinformation' by Facebook "for asking questions about China." Fauci Ex. 33 at 1. Disputed, however, on the ground that this PFOF is based on a news article containing hearsay and journalistic characterization rather than record evidence. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

746.    Dr. Fauci claims that he is not aware of any suppression of speech about the lab-leak theory on social media: "I'm not aware of suppression of speech on social media to my knowledge.… I don't recall being aware of suppression of anything." Fauci Dep. 208:10-14. He claims that this ignorance is because he does not pay any attention to anything said on social media: "This is not something that would be catching my attention because, you know, the social media and Twitter, I told you, I don't have a Twitter account. I don't tweet. I don't do Facebook. I don't do anything. So social media stuff, I don't really pay that much attention to." *Id.* at 210:3-8. As noted above, Dr. Fauci's emails and actions reflect extensive concern about what is said on social media, and his attempt to cast himself as someone with no knowledge of social media is not credible.

**RESPONSE:** Disputed that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship."  Undisputed as to the quoted text of the cited testimony and emails, but disputed as to Plaintiffs characterization of the

testimony and emails as "reflect[ing] extensive concern about what is said on social media." The PFOF does not cite any record evidence for this assertion. The only email cited by earlier PFOFs is one in which Dr. Fauci makes a single reference to "distortions on social media" as one reason to urge the WHO to act quickly on convening a larger group to objectively analyze the origins of COVID-19, *see* Pls.' PFOF ¶¶ 674, 685 (citing Fauci Ex. 8, at 2), which falls far short of illustrating "extensive concern" about anything relating to social media. No none of Plaintiffs' PFOFs points to any evidence of "actions" by Dr. Fauci reflecting a "concern" about anything relating to social media. Accordingly, the record does not cast doubt on the credibility of Dr. Fauci's testimony on this point. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

747.    Further, Dr. Fauci's emails and interrogatory responses show a close relationship with the CEO and founder of Meta (Facebook/Instagram), Mark Zuckerberg.

**RESPONSE:** Disputed. The PFOF neither cites to nor is supported by evidence of record. Dr. Fauci's emails and NIAID's interrogatory responses show a small amount of contact over a lengthy period of time in 2020, largely about facilitating three public-facing Facebook events to publicize information about COVID-19, *see* Ex. 187 at 58-60, and do not indicate a "close relationship" with Mr. Zuckerberg. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

748.    On February 27, 2020, Mark Zuckerberg emailed Dr. Fauci directly to inquire about the development of the COVID-19 vaccine and offer the assistance of the Chan-Zuckerberg foundation. Fauci Ex. 23, 1. Zuckerberg already had Dr. Fauci's email, called Dr. Fauci by his first name "Tony," and wrote as if he had a preexisting acquaintance with Dr. Fauci. *Id.* Dr. Fauci, likewise, responded to Zuckerberg on a first-name basis and with the familiar tone of an acquaintance. Fauci Ex. 23, at 2.

**RESPONSE:** Undisputed that Mark Zuckerberg emailed Dr. Fauci on February 27, 2020, and that Mr. Zuckerberg already had Dr. Fauci's email address, but note that Dr. Fauci's email address is published on the NIAID website and available to the public. *See* Fauci Dep. 206:7-11, 18-19. Disputed that Dr. Zuckerberg emailed "to inquire about the development of the COVID-19 vaccine." Mr. Zuckerberg states that he was "glad to hear [Dr. Fauci's] statement that the covid-19 vaccine will be ready for human trials in six weeks" and asks if there are "any resources our foundation can help provide to potentially accelerate this or at least make sure it stays on track[.]" Fauci Ex. 23 at 1. Also disputed that Dr. Fauci and Mark Zuckerberg had a preexisting acquaintance and that referring to each other on a first-name basis suggested a preexisting acquaintance or any familiarity. Fauci Dep 173:19-20 ("You know, a lot of people call me Tony who have never even met me before."). Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

749.    Dr. Fauci claims that he does not recall whether he had already met Mark Zuckerberg. Fauci Dep. 173:17-174:5 ("I meet thousands of people. I'm not sure I ever met him in person."). But in fact, Dr. Fauci still refers to Mark Zuckerberg by his first name. *Id.* at 289:9-16.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

750.    On March 15, 2020, Mark Zuckerberg sent Dr. Fauci a lengthy email to offer close coordination between Dr. Fauci and Facebook on COVID-19 messaging. In the email, Zuckerberg thanked Dr. Fauci for his leadership, and "share[d] a few ideas of ways to help you get your message out." Fauci Ex. 23, at 3. Zuckerberg made three proposals: (1) Facebook was about to launch a "Coronavirus Information Hub" visible at the top of the page to all Facebook users to "get authoritative information from reliable sources," and Zuckerberg offered to include "a video from you" as a "central part of the hub," *id.*; (2) Zuckerberg was "doing a series of livestreamed Q&As from health experts" for his 100 million followers and wanted Dr. Fauci to do one of these videos, *id.*; and (3) Zuckerberg advised Dr. Fauci that Facebook had "allocated technical resources and millions of dollars of ad credits for the US government to use for PSAs to get its message out over the platform," and he wanted Dr. Fauci to recommend "a point person for the government response," *id.*

**RESPONSE:** The assertion that the email "offer[ed] close coordination" on COVID-19 messaging is disputed as a mischaracterization of the email, which in fact simply offers "a few ideas of ways to help [Dr. Fauci] get [his] message out," and ends by saying, "[a]gain, I know you're incredibly busy, so don't feel the need to respond if this doesn't seem helpful." Fauci Ex. 23 at 3. Otherwise, undisputed. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

751.    Dr. Fauci responded the next day, telling "Mark" that "[y]our idea and proposal sound terrific," that he "would be happy to do a video for your hub," and that "your idea about PSAs is very exciting." Fauci Ex. 23, at 4. He copied his Special Assistant to put Zuckerberg in touch with the right point person for the government to arrange specially subsidized government messaging about COVID-19 on Facebook. *Id.*

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed, because Dr. Fauci in fact copied the "Director of my Communications and Government Relations group," who could "put [Mr. Zuckerberg's] people in contact with the best person who could be the US Government point of contact for the PSAs." Fauci Ex. 23 at 4. (Dr. Fauci also copied his Special Assistant for Mr. Zuckerberg to contact to "arrange for the video." *Id.*). Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

752.    Zuckerberg replied the same day, stating "[w]e'd love to move quickly to help the effort and support getting these messages out."  Fauci Ex. 23, at 6.

**RESPONSE:**  Undisputed. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

753.    Dr. Fauci claims that the U.S. Government did not accept Facebook's offer of free ad credits to support the Government's COVID-19 messaging. Fauci Dep. 177:22-178:4 ("I don't believe that there was any money that was given from the Zuckerberg to the United States government to do PSAs. It's possible, but it certainly didn't happen to my knowledge. I don't recall money being given for PSAs."). But at the time, Dr. Fauci described the proposal as "very exciting" and immediately followed up on Zuckerberg's offer. Fauci Ex. 23, at 4. Separate emails from Facebook to the White House corroborate these ad credits. *See, e.g.,* Doc. 174-1, at 46.  Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Undisputed that Dr. Fauci testified that he did not "recall money being given for PSAs." Fauci Dep. 178:1-2. As Dr. Fauci also testified, he did not "have the authority to accept outside money like that. It would have to go through a different channel." *Id.* at 177:19-21. Dr. Fauci's excitement at Zuckerberg's "idea about the PSAs" is not incompatible with the possibility that the Government would ultimately not accept the ad credits and thus does not undermine Dr. Fauci's credibility. Moreover, the document cited does not "corroborate" that ad credits were made to the United States Government. It states that "[s]ince January, [Facebook has] provided more than $30 million in ad credits to help *governments*, NGOs and other organizations reach people with COVID-19 vaccine information and other important messages." Dkt. 174-1, at 45 (emphasis added). Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

754.   Dr. Fauci and Zuckerberg have "interacted on Facebook Zoom-type podcasts." Fauci Dep. 175:17-18. Dr. Fauci did "[t]hree live stream Facebook-type Q and As" about COVID-19 with Zuckerberg. Fauci Dep. 177:2-4.

**RESPONSE:** Undisputed. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

755.    Dr. Fauci's interrogatory responses reveal extensive direct communications between Dr. Fauci and Zuckerberg. *See* Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020).

**RESPONSE:** Disputed that 13 "communications" (three of which are publicly available interviews, and one of which was simply a missed call) over a nine-month period is "extensive direct communications." *See* Scully Ex. 12 at 53-54. Regardless, this PFOF—which pertains to "get[ting] [Dr. Fauci's] message out" rather than "censoring" anyone else's—contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

756.    Reviewing the foregoing facts about Dr. Fauci's communications with Farrar, Eddie Holmes, and others, former Director of the CDC Robert Redfield "had a dawning realization. He concluded there'd been a concerted effort not just to suppress the lab-leak theory but to manufacture the appearance of a scientific consensus in favor of a natural origin. 'They made a decision, almost a P.R. decision, that they were going to push one point of view only' and suppress rigorous debate, said Redfield. 'They argued they did it in defense of science, but it was antithetical to science.'" Jones Decl., Ex. AA.

**RESPONSE:** Disputed on the ground that this PFOF is based on a news article containing hearsay and journalistic characterization rather than record evidence. Also disputed as a mischaracterization of the cited article, which states that Dr. Redfield expressed his purported "dawning realization" after "[r]eading the *Lancet* statement," not upon reading any of the "communications with Farrar" and others discussed above, and thus Dr. Redfield's opinion is without foundation in the evidence and is therefore irrelevant. *See* Jones Decl., Ex. AA at 27. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress any theory on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

**B.    Dr. Fauci's Efforts to Suppress Speech on Hydroxychloroquine.**

757.    On May 22, 2020, The Lancet published an online article entitled "Hydroxychloroquine or chloroquine with or without a macrolide for treatment of COVID-19: a multinational registry analysis."   Fauci Ex. 35, at 1. The article purported to analyze 96,032 patients to compare cohorts who did and did not receive hydroxychloroquine or chloroquine to treat COVID-19. *Id.* The study concluded that hydroxychloroquine and chloroquine were "associated with decreased in-hospital survival and an increased frequency of ventricular arrhythmias when used for COVID-19." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

758.    On May 27, 2020, Dr. Fauci publicly cited this study to claim that hydroxychloroquine is "not effective against coronavirus." Fauci Ex. 34, at 1. Dr. Fauci "became the first Trump administration official to say definitively that hydroxychloroquine is not an effective treatment for the coronavirus." *Id.* at 2. "'The scientific data is really quite evident now about the lack of efficacy,' Fauci … said on CNN." *Id.*

**RESPONSE:** Disputed that Ex. 34 shows that Dr. Fauci publicly cited to the study referenced in Plaintiffs' PFOF ¶ 757, as the article quotes Dr. Fauci stating that "[t]he scientific data is really quite evident now about the lack of efficacy," without referring to any particular study. Fauci Ex. 34 at 2. And as Dr. Fauci testified, "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work." Fauci Dep. 219:19-220:1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on

social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

759.    Dr. Fauci's comments were based on the May 22 Lancet study. *Id.* at 3 ("Fauci's comments come days after the Lancet published a 96,000-patient observational study that concluded that hydroxychloroquine had no effect on Covid-19 and may even have caused some harm.").

**RESPONSE:** Disputed as unsupported on the face of the quoted statement from the cited news article. Note also that the record shows that Dr. Fauci's comments were based on "information coming from a number of studies." Fauci Dep. 219:19-220:1; Resp. to Pls.' PFOF ¶ 758. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

760.    The Lancet article was an observational study, not a randomized trial. At the time, "[t]here [wa]s no data yet from randomized, controlled clinical trials of hydroxychloroquine – the gold standard for evaluating potential treatments." Fauci Ex. 34, at 4. "But Fauci was unequivocal on [May 27, 2022], saying that 'the data are clear right now.'" *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes the article from Politico at Fauci Ex. 34, which describes the Lancet article as "a 96,000-patient observational study that concluded that hydroxychloroquine had no effect on COVID-19 and may have even caused some harm." Fauci Ex. 34 at 3. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

761.    Just a few days later, The Lancet retracted the May 22, 2022 study. Fauci Ex. 35, at 1. An article reporting on the retraction noted that the study's authors "were unable to confirm that the data set was accurate," that "several concerns were raised with respect to the veracity of the data," the study may have "include[ed] more cases than possible," and that "[a] first-year

statistics major could tell you about major flaws in the design of the analysis." Jones Decl., Ex. DD, at 2-3.

**RESPONSE:** Undisputed that the PFOF accurately quotes The Lancet's retraction. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

762.    Thus, Dr. Fauci's initial dismissal of hydroxychloroquine was based on a purely *observational* study – not a randomized, controlled trial – and one that was retracted for glaring errors just days later.

**RESPONSE:** Disputed that Dr. Fauci was solely relying on the study in The Lancet. Dr. Fauci testified that "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work." Fauci Dep. 219:19-220:1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

763.    Dr. Fauci testified that he did not recall that The Lancet study he cited to discredit the efficacy of hydroxychloroquine had been retracted. Fauci Dep. 223:7 ("I don't recall it being retracted.").

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony, which explained that "I don't recall it being retracted. I might have at the time heard that it was retracted, but it wasn't the only paper that was on hydroxychloroquine." Fauci Dep. 223:7-10. Also disputed that the Lancet study, as opposed to "a number of studies," was the source of Dr. Fauci's views about the efficacy of hydroxychloroquine. *See* Resp. to Pls.' PFOF ¶ 758. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement,

deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

764.    Dr. Fauci stepped up his public campaign to discredit hydroxychloroquine by insisting that its effectiveness could only be judged by undergoing rigorous, randomized, double-blind, placebo-based studies, notwithstanding his previous reliance on the less-than-rigorous observational study in The Lancet that was subsequently retracted. On July 31, 2020, Dr. Fauci testified before the House Select Subcommittee on Coronavirus Crisis, during which he stated: "The point that I think is important, because we all want to keep an open mind, any and all of the randomized placebo-controlled trials, which is the gold standard of determining if something is effective, none of them had shown any efficacy by hydroxychloroquine. Having said that, I will state, when I do see a randomized placebo-controlled trial that looks at any aspect of hydroxychloroquine, either early study, middle study, or late, if that randomized placebo-controlled trial shows efficacy, I would be the first one to admit it and to promote it. But I have not seen yet a randomized placebo-controlled trial that's done that. And in fact, every randomized placebo-controlled trial that has looked at it, has shown no efficacy. So, I just have to go with the data. I don't have any horse in the game one way or the other, I just look at the data." *See* https://www.youtube.com/watch?v=RkNC5OQD2UE.

**RESPONSE:** Disputed that Dr. Fauci's opinion on hydroxychloroquine was solely based on the study in the Lancet, as opposed to "a number of studies." *See* Resp. to Pls.' PFOF ¶ 758. The accuracy of the quoted testimony is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

765.    Despite his insistence before a congressional committee that randomized, placebo-controlled trials were the determining factor for his opinion regarding the effectiveness of hydroxychloroquine in the treatment of COVID-19, Dr. Fauci quietly admitted that such rigorous studies are not actually required to determine the efficacy of a therapeutic drug. Dr. Fauci was asked, "Do you recall saying in connection with the discussion of hydroxychloroquine that a randomized double blind placebo based study is the gold standard?" Fauci Dep. 244:8-11. He replied, "That is the gold standard for everything. *It isn't always needed*, but for the most part, it's the gold standard." *Id.* at 244:12-14 (emphasis added).

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony. Dr. Fauci did not testify that randomized, placebo-controlled trials were not required to determine the efficacy of a therapeutic drug. Dr. Fauci testified that "That is the gold standard for everything. It isn't always needed, but for the most part, it's the gold standard." Fauci Dep. 244:12-14. When Dr. Fauci testified that such trials were not always needed, Plaintiffs did not ask Dr. Fauci to explain when they were not needed or whether they were needed to determine the efficacy of a therapeutic drug, and there is nothing in the record to indicate that Dr. Fauci was speaking about showing the efficacy of a therapeutic drug. There is no inconsistency between Dr. Fauci's testimony to the congressional committee and Dr. Fauci's deposition testimony, both of which said that randomized placebo-controlled studies were the "gold standard." Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

766.   Dr. Fauci's sudden reversal concerning the critical standards for scientific studies to determine the effectiveness of hydroxychloroquine demonstrated a lack of candor to the House Select Subcommittee on Coronavirus Crisis. Indeed, Dr. Fauci misled the Committee when he failed to disclose that randomized, double-blind, placebo-based studies are not always needed and that he previously relied on the *observational,* i.e., non-randomized, non-double-blind, non-placebo-based study in The Lancet to form an opinion about that drug's efficacy in the first place. Dr. Fauci lacks credibility on this point.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. There is no inconsistency between Dr. Fauci's testimony to the congressional committee and Dr. Fauci's deposition testimony, both of which said that randomized placebo-controlled studies were the "gold standard." *See* Resp. to Pls.' PFOF ¶ 765. Moreover, Plaintiffs assume without any basis in evidence that Dr. Fauci's opinion on

hydroxychloroquine was based solely on the study in The Lancet when Dr. Fauci testified that: (1) "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work," Fauci Dep. 219:22-220:1; (2) that the study in The Lancet "wasn't the only paper that was on hydroxychloroquine," *id*. 223:7-10; and (3) that his "opinion on the effect of hydroxychloroquine was based on accumulating data from a number of studies," *id*. at 223:14-18. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

767.    Despite mounting evidence against his position, Dr. Fauci testified that his opinion against hydroxychloroquine was based on other studies as well as the retracted article in The Lancet, but he could not identify any of those studies. Fauci Dep. 223:12-18 ("I don't recall specifically what those studies are now.").

**RESPONSE:** Disputed that there was "mounting evidence" against Dr. Fauci's position. On the contrary, "[t]here was information coming from a number of studies, some of which were negative studies that showed it did not work. And others were positive studies to show that it did not work," Fauci Dep. 219:22-220:1. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

768.    Dr. Fauci did not retreat from his hard public stance against hydroxychloroquine. On July 26, 2020, a group called "America's Frontline Doctors" held a press conference at the U.S. Capitol criticizing the government's response to the COVID-19 pandemic and touting the benefits of hydroxychloroquine in treating the coronavirus. Fauci Ex. 38, at 5.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

769.    Dr. Fauci responded to this event with highly visible public statements condemning the use of hydroxychloroquine. For example, he stated on "Good Morning America," that "[t]he overwhelming prevailing clinical trials that have looked at the efficacy of hydroxychloroquine have indicated that it is not effective in coronavirus disease."  Fauci Ex. 36, at 5. Dr. Fauci made these comments in direct response to the public claims of America's Frontline Doctors. Fauci Dep. 227:7-228:13. He also stated on MSNBC's "Andrea Mitchell Reports" that the video of the press conference by America's Frontline Doctors constituted "a video out there from a bunch of people spouting something that isn't true."  Fauci Ex. 37, at 3.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

770.    Dr. Fauci also stated that "the cumulative data on trials, clinical trials that were valid, namely clinical trials that were randomized and controlled in a proper way, … showed consistently that Hydroxychloroquine is not effective in the treatment of coronavirus disease or COVID-19." Fauci Ex. 37, at 3. But two months earlier, he had said "the data are clear right now" when no such studies existed. Fauci Ex. 34, at 4.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed to the extent it alleges that "no such studies existed" at the time of Dr. Fauci's statement, which is based only on a news report from Politico rather than evidence of record. In any event, the two statements from Dr. Fauci are not incompatible. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

771.     Social-media platforms reacted by aggressively censoring the video of America's Frontline Doctors. Facebook removed the video when it was "the top-performing Facebook post in the world," and "had accumulated over 17 million views by the time of its censorship by Facebook."  Fauci Ex. 38, at 3, 4. Further, "Facebook's decision to censor the livestream was quickly followed by YouTube, the Google-owned video-sharing platform."  *Id.* at 6. "The video had 80,000 views on YouTube prior to its removal."  *Id.* "Following Facebook and YouTube's removal of the video, Twitter followed suit…." *Id.*; *see also* Fauci Ex. 36, at 3 (noting that "Twitter … removed the video, saying it was 'in violation of our COVID-19 misinformation policy'").

**RESPONSE:** This PFOF is disputed on numerous grounds. First and foremost, Plaintiffs cite no evidence to support their naked assertion that any action taken by any social media company regarding the video by America's Frontline Doctors was taken in "react[ion]" to anything stated by Dr. Fauci. Second, disputed that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship."  Third, disputed on the ground that this PFOF is based on news articles containing hearsay and journalistic characterization, rather than record evidence. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

772.     Dr. Fauci professed to be unaware of whether 17 million views of a video on Facebook are a large number of views: "I don't know what 17 million views means. What's the denominator? Is 17 million a large amount? Is it a small amount? I don't go on social media, so I don't know what 17 million views means."  Fauci Dep. 236:7-11. It is common sense that 17 million views are a large number of views. Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Disputed as argumentative and unsupported by the cited testimony, but the text of the quoted testimony is undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did

so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

773.    Dr. Fauci does not deny that he or his staff at NIAID may have communicated with Facebook regarding the censorship of the America's Frontline Doctors video. Instead, he claims that he does not recall whether they communicated with Facebook about it, and that it is possible that they did so. Fauci Dep. 238:2-5 ("I don't recall anybody communicating with them about that. Could have been, but I don't recall anybody -- I don't recall anybody communicating with the social media people."); *see also id.* at 238:6-10. He also does not deny that other federal officials may do so, but he claims that "I don't recall any of that" and "it just doesn't ring a bell to me right now." *Id.* at 238:21-239:7. He claims he doesn't "pay attention" to whether his staff or other federal officials communicate with social-media platforms about censorship because "I have a really important day job that I work at." *Id.* at 238:19-20.

**RESPONSE:** Disputed as a mischaracterization of the quoted testimony, in which Dr. Fauci was not asked about him "or his staff at NIAID" communicating with Facebook "regarding censorship" of the video (or any other content). Rather, Dr. Fauci was asked in general whether he "recall[s] anyone at NIAID communicating with social media people," to which he responded: "To my recollection, I don't recall. But I don't know everything that everybody does. But I don't recall anybody communicating with social media." Fauci Dep. 238:6-10. Otherwise, the accuracy of the quoted text of the depositions is undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

774.    Nevertheless, regarding the decision by YouTube and Twitter to follow Facebook in censoring the video, Dr. Fauci admits that "Yes, I knew of that." *Id.* at 239:8-13.

**RESPONSE:** Disputed. This testimony was incorrectly transcribed and corrected in Dr. Fauci's errata sheet. The correct quotation, in response to Plaintiffs' counsel asking "Can you turn one page forward in this exhibit, in that first full paragraph that goes all the way across the page.

'Facebook's decision to censor the Livestream was quickly followed by YouTube, the Google-owned video sharing platform'?" was "Yeah, I see that." Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censor[ship]." Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

775.   A few days later, on August 1, 2020, the web host provider for America's Frontline Doctors shut down their website. *Id.* at 242:14-243:8; Fauci Ex. 39. Dr. Fauci testifies that he does not recall this occurrence. Fauci Dep. 243:13-18.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on hydroxychloroquine on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

776.   On November 18, 2022, a meta-analysis of 449 studies on the efficacy of hydroxychloroquine considered "449 HCQ COVID-19 studies, 351 peer reviewed, 371 comparing treatment and control groups." Fauci Ex. 40, at 1. The meta-analysis concluded that "[l]ate treatment and high dosages may be harmful, while early treatment consistently shows positive results." *Id.* It also noted that "[n]egative evaluations" of hydroxychloroquine "typically ignore treatment delay." *Id.* And it noted that "HCQ/CQ was adopted for early treatment in all or part of 41 countries." *Id.*

**RESPONSE:** Undisputed that the PFOF accurately summarizes and quotes the referenced document. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on

hydroxychloroquine on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

### C.   Dr. Fauci's "Devastating Takedown" of the Great Barrington Declaration.

777.   Dr. Fauci recommended Dr. Clifford Lane of NIAID to participate in a WHO mission to China in February 2020. Fauci Dep. 139:15.

**RESPONSE:** Undisputed.

778.   On April 3, 2020, the NIH Record wrote a report on Lane's trip entitled "NIAID's Lane Discusses WHO COVID-19 Mission to China. Fauci Ex. 20, at 1. Lane praised China's response to the pandemic, especially their reliance on lockdowns and "extreme … social distancing": "The Chinese were managing this in a very structured, organized way,' he explained. 'When we got there, the outbreak was already coming under control in China. The measures they put in place appeared to be working…. It demonstrated their successful response…. From what I saw in China, we may have to go to as extreme a degree of social distancing to help bring our outbreak under control." *Id.* at 5-6.

**RESPONSE:** Undisputed, except to the extent the PFOF asserts that Lane "praised China's response to the pandemic," which is a characterization that is unsupported by the article's reporting of Lane's observations reflected in the quoted text of the article. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

779.   Dr. Fauci discussed this conclusion with Lane when he returned from China: "Dr. Lane was very impressed about how from a clinical public health standpoint, the Chinese were handling the isolation, the contact tracing, the building of facilities to take care of people, and that's what I believed he meant when he said were managing this in a very structured, organized way." Fauci Dep. 165:4-11.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

780.   Dr. Fauci admits that Lane "did discuss with me that the Chinese had a very organized way of trying to contain the spread in Wuhan and elsewhere. … he mentioned that they had a very organized, well-regimented way of handling the outbreak." *Id.* at 166:1-7.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

781.   Dr. Fauci came to agree with Dr. Lane's rosy assessment of China's draconian response to the outbreak: "Dr. Lane is a very astute clinician, and I have every reason to believe that his evaluation of the situation was accurate and correct." *Id.* at 166:24-167:1.

**RESPONSE:** Disputed as the Plaintiffs' characterization that Dr. Lane's assessment was "rosy," which is unsupported by the article reporting on Lane's observations or Dr. Fauci's testimony, but the quoted testimony is accurate. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

782.   On Feb. 22, 2020, Dr. Lane sent an email stating, "China has demonstrated that this infection can be controlled, albeit at great cost."  Fauci Ex. 21, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

783.    On October 4, 2020, Plaintiffs Dr. Jay Bhattacharya of Stanford and Dr. Martin Kulldorff of Harvard, along with Dr. Sunetra Gupta of Oxford, published online the "Great Barrington Declaration," which was one-page treatise opposing reliance on lockdowns and advocating for an approach to COVID-19 called "focused protection."  Fauci Ex. 41.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

784.    The Great Barrington Declaration criticized the social-distancing and lockdown approaches to the pandemic endorsed by government experts such as Dr. Fauci and Cliff Lane: "As infectious disease epidemiologists and public health scientists we have grave concerns about the damaging physical and mental health impacts of the prevailing COVID-19 policies, and recommend an approach we call Focused Protection."  *Id.* It was very critical of such government policies: "Current lockdown policies are producing devastating effects on short and long-term public health. The results (to name a few) include lower childhood vaccination rates, worsening cardiovascular disease outcomes, fewer cancer screenings and deteriorating mental health – leading to greater excess mortality in years to come, with the working class and younger members of society carrying the heaviest burden. Keeping students out of school is a grave injustice. Keeping these measures in place until a vaccine is available will cause irreparable damage, with the underprivileged disproportionately harmed."  *Id.* It called for an end to lockdowns: "The most compassionate approach that balances the risks and benefits of reaching herd immunity, is to allow those who are at minimal risk of death to live their lives normally to build up immunity to the virus through natural infection, while better protecting those who are at highest risk. We call this Focused Protection."  *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

785.   The Declaration called for an end of government-imposed lockdowns and an immediate return to normal life for those who are low-risk: "Those who are not vulnerable should immediately be allowed to resume life as normal. Simple hygiene measures, such as hand washing and staying home when sick should be practiced by everyone to reduce the herd immunity threshold. Schools and universities should be open for in-person teaching. Extracurricular activities, such as sports, should be resumed. Young low-risk adults should work normally, rather than from home. Restaurants and other businesses should open. Arts, music, sport and other cultural activities should resume. People who are more at risk may participate if they wish, while society as a whole enjoys the protection conferred upon the vulnerable by those who have built up herd immunity." *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes the Declaration. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

786.   The Declaration was thus highly critical of the lockdown policies defended by Dr. Fauci and Dr. Cliff Lane of NIAID since Dr. Lane's trip to China at the beginning of the pandemic. The Declaration was "going against the global political consensus, which holds that lockdowns are key to minimising mortality to Covid-19." Fauci Ex. 48, at 3. After it was posted online, it rapidly gathered signatures from doctors and scientists, as well as members of the public.

**RESPONSE:** Disputed that Drs. Fauci or Lane "defended" "lockdowns," which term is vague and subject to various interpretations, as opposed to social distancing. As Dr. Fauci testified, in his view "the lockdowns" put in place in China "were the types of lockdowns that were really quite extreme. They would essentially lock people in their homes, which was extreme to do that." *See* Fauci Dep. 168:12-15. He further testified, "It was my opinion that social distancing would be very important…." *Id.* at 168:25-169:3. The last sentence is disputed as without citation to and unsupported by evidence of record. The remaining allegations are undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington

Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

787.   Four days later, on October 4, 2020, Dr. Francis Collins emailed Dr. Fauci and Cliff Lane, citing the Great Barrington Declaration. Fauci Ex. 42, at 1. Dr. Collins stated: "Hi Tony and Cliff, See https://gbdeclaration.org. This proposal from the three fringe epidemiologists who met with the Secretary seems to be getting a lot of attention – and even a co-signature from Nobel Prize winner Mike Leavitt at Stanford. There needs to be a quick and devastating published take down of its premises. I don't see anything like that on line yet – is it underway?  Francis." *Id.*

**RESPONSE:** Undisputed. Regardless, this PFOF—which pertains to responding to rather than "censoring" anyone's views regarding COVID-19—is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

788.   This email seeking Dr. Fauci's assistance in a "quick and devastating … take down" of the Great Barrington Declaration" is strikingly similar to Dr. Collins' email to Dr. Fauci on April 16, 2020, asking Dr. Fauci's "help [to] put down this very destructive conspiracy," *i.e.*, the lab-leak hypothesis. Fauci Ex. 27, at 1. In both cases, Dr. Collins sought Dr. Fauci's aid in discrediting and silencing an online narrative that federal officials disfavored, and in both cases, Dr. Fauci promptly and effectively complied.

**RESPONSE:** Disputed that Dr. Collins was attempting to "silenc[e] an online narrative that federal officials disfavored," and that Dr. Fauci "aid[ed]" in any such effort. That is an argumentative mischaracterization manifestly contradicted by the cited evidence and unsupported by any evidence of record. Rather than "silencing" a viewpoint he disagreed with, Dr. Collins was seeking only to respond to it. In the quoted email at exhibit 42, Dr. Collins does not "seek[]" Dr. Fauci's assistance in a 'quick and devastating . . . take down'" of the Great Barrington Declaration but rather states: "There needs to be a quick and devastating published take down of [Declaration's] premises. I don't see anything like that on line yet – is it underway?" Fauci Ex. 42

at 1. As Dr. Fauci testified about that email: "I don't know specifically what [Dr. Collins] meant. But knowing Francis [Collins], he is a scholar. He's likely talking about writing a scholarly article to contest some of the premise. That's what I would imagine Francis is referring to. That would be his style. That if someone writes an article that he disagrees with, that he would write a counterargument to challenge the premise…" Fauci Dep. 258:18-25. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

789.    Dr. Collins' question to Dr. Fauci in the email, "Is it underway?" implies that Dr. Collins expected Dr. Fauci to be already working on a "quick and devastating … take down" of the Declaration, or to be aware of others working on one. Fauci Ex. 42, at 1. Dr. Fauci denies that Dr. Collins had any reason to think that Dr. Fauci might be working on a refutation of the Great Barrington Declaration, because "[t]his is not something I would be involved in," because "I have a very important day job that is running a $6.4 billion institute." Fauci Dep. 260:11-20. Given Dr. Fauci's immediately subsequent attempts to refute and discredit the Great Barrington Declaration, this testimony is not credible.

**RESPONSE:** Disputed as to Plaintiffs characterization of Dr. Collins' alleged expectation, which is unsupported speculation. Moreover, when asked at his deposition if Dr. Collins "ha[d] any reason to think that [Dr. Fauci] might be working on . . . some kind of refutation of the Great Barrington Declaration," Dr. Fauci said "Absolutely not. . . . No. This is not something I would be involved in." Fauci Dep. 260:11-17. As Dr. Fauci further testified: "I don't know what [Dr. Collins] meant. I think he was just speaking bluntly. I don't think he was specifically pointing to us to have known if there was something online. He scours the online better than we do. He's got an entire staff that does that. So I think it was just a casual comment, 'Hey, you guys. Did you see anything online yet.'" *Id.* at 258:21-259:7. Also dispute the assertion that Dr. Fauci took "immediate[] subsequent attempts to refute and discredit" the Declaration, which is an

argumentative assertion unsupported by any citation to the record and thus does not support the assertion that Dr. Fauci's testimony is not credible. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

790. The same day as Dr. Collins' email, October 8, 2020, Dr. Fauci wrote back to Dr. Collins, stating "Francis: I am pasting in below a piece from *Wired* that debunks this theory. Best, Tony." Fauci Ex. 43, at 1. Dr. Fauci followed up the same day with an email to Dr. Collins linking to an article by Gregg Gonsalves which Dr. Fauci called "[a]nother refutation of the herd immunity approach." Fauci Ex. 44, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

791. Dr. Fauci has known Gregg Gonsalves for decades, since the 1980s. Fauci Dep. 265:16-19. Dr. Fauci does not deny that he may have contacted Gregg Gonsalves before Gonsalves wrote this piece attacking the Great Barrington Declaration, but claims he does not recall. *Id.* at 268:8-19 ("I don't recall. I might have.").

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

792. Dr. Fauci and Dr. Collins followed up with a series of public media statements attacking the Great Barrington Declaration. On October 14, 2020, the Washington Post ran a story entitled, "Proposal to hasten herd immunity to the coronavirus grabs White House attention but

appalls top scientists." Fauci Ex. 45, at 1. In the article, Dr. Collins described the Great Barrington Declaration and its authors as "fringe" and "dangerous": "This is a fringe component of epidemiology. This is not mainstream science. It's dangerous." *Id.* at 3.

**RESPONSE:** The first sentence of the PFOF is disputed as lacking any record citation; the remainder of the PFOF does not reference any statement by Dr. Fauci that "attack[s] the Great Barrington Declaration," or a "series of public media statements" by either Dr. Fauci or Dr. Collins. The remainder of the PFOF describing the news report of one public statement by Dr. Collins is undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

793.     Dr. Fauci consulted with Dr. Collins before he told the Washington Post that the Great Barrington Declaration represented a "fringe" and "dangerous" idea. Fauci Dep. 272:4-7.

**RESPONSE:** Disputed. As corrected by the errata, *see* Ex. 184 at 11 (Fauci Dep. Errata (Dec. 19, 2022)), Dr. Fauci did not say that he consulted with Dr. Collins on this point. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

794.     Dr. Fauci endorsed these comments in an email to Dr. Collins on October 13, 2020, stating, "[w]hat you said was entirely correct." Fauci Ex. 46, at 1.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

795.    Dr. Fauci admits that Dr. Collins could have been concerned about the spread of the ideas in the Declaration on social media when he called it "fringe" and "dangerous."  Fauci Dep. 274:19-20.

**RESPONSE:** Disputed as a mischaracterization of Dr. Fauci's testimony. Dr. Fauci testified that "I don't see a connection here with what he's saying and things being spread on social media, but perhaps, since a lot of things get spread on social media, I'm sure that – I'm not sure, but that could have been something that he was concerned with." Fauci Dep. 274:15-20. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

796.    The next day, October 15, 2020, Dr. Fauci echoed Dr. Collins' comments, calling the Declaration "nonsense" and "dangerous."  Fauci Ex. 47, at 1. Describing the proposal as "letting infections rip as it were," Dr. Fauci stated: "Quite frankly that is nonsense, and anybody who knows anything about epidemiology will tell that that is nonsense and very dangerous." *Id.* at 3.

**RESPONSE:** Undisputed. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

797.    Dr. Fauci testified that "it's possible that" he coordinated with Dr. Collins on their public statements attacking the Great Barrington Declaration. Fauci Dep. 279:23-24.

**RESPONSE:** Disputed. Dr. Fauci testified that "I don't believe so, but I don't – no, I'm not – that's not our style to be coordinating things. I don't know – it's possible we discussed it,

depending on what your coordination is." Fauci Dep. 279:21-24. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

798.    Dr. Fauci also testified of himself and Dr. Collins that "that's not our style to be coordinating things." *Id.* at 279:22-23. In light of the extensive coordination with Dr. Collins about the lab-leak theory, and the coordination about the Great Barrington Declaration, that testimony is not credible.

**RESPONSE:** The quoted testimony is undisputed, but the remainder of the PFOF is disputed as argumentative and lacking any citation to or support in the record. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

799.    Shortly after Dr. Collins' email to Dr. Fauci seeking a "quick and devastating … take down" of the Great Barrington Declaration, the Declaration and its authors, Drs. Bhattacharya and Kulldorff, experienced extensive censorship on social media. *See infra.* In October 2020, Google deboosted the search results for the Declaration, so that "most users in English-speaking countries, when they google 'Great Barrington Declaration,' will not be directed to the declaration itself but to articles that are critical of the declaration." Fauci Ex. 48, at 4.

**RESPONSE:** The description of Dr. Collins's email as "seeking a 'quick and devastating . . . take down'" is disputed as a mischaracterization of the email, for the reasons stated in the response to Plaintiffs' PFOF ¶¶ 788-89. Also disputed that "Drs. Bhattacharya and Kulldorff[] experienced extensive censorship on social media," which assertion is vague and unsupported by any citation to the record. Also disputed that social media companies' application of their own content moderation policies, to which all users agree, constitutes "censorship." The

PFOF's assertions regarding Google's "deboost[ing]" the Declaration are disputed as based on a

news article containing hearsay and journalistic characterization rather than record evidence. U

Also disputed to the extent the PFOF implies that Dr. Collins's email and Google's alleged actions

are somehow related. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great

Barrington Declaration on social media, nor evidence that any social media company did so at his

instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

800.    In the same time, "[c]ensorship of the declaration … also spread to Reddit. The two
most popular subreddits for discussion of the coronavirus – r/COVID-19 and r/coronavirus – have
both removed links to the Great Barrington Declaration. The moderators of r/coronavirus, a forum
with 2.3million members, have declared it to be 'spam'."  Fauci Ex. 48, at 4-5.

**RESPONSE:** Disputed that a social media company's application of its own content

moderation policies, to which all users agree, constitutes "censorship." The PFOF's assertions

regarding Reddit's actions are disputed as based on a news article containing hearsay and

journalistic characterization rather than record evidence. Regardless, this PFOF contains no

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress speech about the Great Barrington Declaration on social media, nor evidence

that any social media company did so at his instruction, urging, or request. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

801.    In October 2020, YouTube updated its terms of service regarding medical
"misinformation," reporting "COVID-19 medical misinformation policy updated to prohibit
content about vaccines contradicting consensus from health authorities."  Fauci Ex. 49, at 3.
"Health authorities" include federal officials like Dr. Fauci and Dr. Collins. *See id.* This October
2020 update specifically stated that claims which are "not allowed on YouTube" include "[c]laims
that achieving herd immunity through natural infection is safer than vaccinating the population,"

which is listed on the same footing as "[c]laims that COVID-19 vaccines contain a microchip or tracking device."  Fauci Ex. 50, at 3-4.

**RESPONSE:** Disputed that Fauci Ex. 49 mentions Dr. Fauci or Dr. Collins. Undisputed as to the remaining allegations. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

802.    Pursuant to this censorship policy of YouTube, the authors of the Great Barrington Declaration had content removed from YouTube, including a video of a roundtable discussion with Governor Ron DeSantis of Florida. *See infra.*

**RESPONSE:** Disputed as lacking citation to or support by any evidence of record. Disputed also that a social media company's content moderation policies, to which all users agree, are "censorship" policies. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

803.    Facebook, likewise, adopted censorship policies against the Great Barrington Declaration. Meta's policy on "Misinformation about vaccines" states that: "We remove misinformation primarily about vaccines when *public health authorities* conclude that the information is false and likely to directly contribute to imminent vaccine refusals."  Fauci Ex. 51, at 4 (emphasis added).

**RESPONSE:** Disputed that the cited "Misinformation Policy details" at Fauci Exhibit 51 adopts a "censorship polic[y] against the Great Barrington Declaration." Disputed also that a social media company's own content moderation policies, to which all users agree, constitute "censorship" policies. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat,

coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great

Barrington Declaration on social media, nor evidence that any social media company did so at his

instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the

evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

804.   Facebook/Meta views Dr. Fauci as a "public health authority" who may dictate what people may post about COVID-19 on its platforms (Facebook and Instagram, among others), because Mark Zuckerberg and Dr. Fauci were collaborating on multiple public appearances and videos for Facebook. *See supra*; Scully Ex. 12, at 33, 53-54 (identifying 13 communications between Dr. Fauci and Zuckerberg, including emails, phone calls, virtual meetings, and live broadcasts, over a nine-month period in 2020). Indeed, in his March 15, 2020 email to Dr. Fauci, Mark Zuckerberg described Dr. Fauci as an "expert[]," a "health expert[]" and "reliable source[]" for "authoritative information" about fighting COVID-19. Fauci Ex. 23, at 3.

**RESPONSE:** The first sentence is disputed as argumentative, unsupported by the record,

and logically incoherent. Plaintiffs have introduced no evidence that Facebook/Meta has ever

viewed Dr. Fauci as possessing authority to "dictate" what may be posted about COVID-19 on

social media, and certainly no evidence for the bizarre allegation that a sophisticated corporate

entity like Facebook/Meta came to this patently erroneous belief because of so-called collaboration

between Mr. Zuckerberg and Dr. Fauci on three public Facebook videos. Undisputed that the

March 15, 2020 email at Fauci Exhibit 23 is accurately quoted. Regardless, this PFOF contains no

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress speech about the Great Barrington Declaration on social media, nor evidence

that any social media company did so at his instruction, urging, or request. Any assertion to that

effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. §

II.B.3.b.

805.   Dr. Fauci claims that he would not have paid any attention to the Great Barrington Declaration because he is too busy and important to pay attention to such matters: "this is not something that I would have been paying a lot of attention to. I was knee deep in trying to do things like develop a vaccine that wound up saving the lives of millions of people. That's what I was doing at the time."   Fauci Dep. 256:13-17. Given Dr. Fauci's direct involvement in publicly

attacking the Great Barrington Declaration and collecting sources for Dr. Collins to "take [it] down," this statement is not credible. In fact, on November 1, 2020, Greg Folkers, Dr. Fauci's staffer at NIAID, sent Dr. Fauci a list of articles attacking the Great Barrington Declaration—including one co-authored by Gregg Gonsalves—with the statement "As discussed. I have highlighted the three I found the most useful."  Fauci Ex. 52, at 1. The list of articles were all harshly critical of the Declaration—using phrases like "dangerous," "false promise," "ethical nightmare," and "could kill millions."  *Id.* Thus, four weeks after the Declaration was published, Dr. Fauci and his staffers were still "discuss[ing]" and looking up articles on ways to attack it. *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization of the record to the extent the PFOF asserts that Dr. Fauci claimed he was "too busy and important," or that he was "too busy and important to pay attention to" "the great Barrington Declaration." The quoted testimony concerns Dr. Fauci's recollection of the authors of the Declaration meeting with the former Secretary of HHS. In the quoted testimony, Dr. Fauci is responding to the question, "Do you recall Dr. Bhattacharya, Gupta, and Dr. Kulldorff meeting with Secretary Azar?" Fauci Dep. 256:4-5. Dr. Fauci responds, "You know, I don't. I think after the fact, I would have known because Francis [Collins] said they did," *id.* at 256:6-8, in the October 8, 2020 email from Dr. Collins to Dr. Fauci that Dr. Fauci was shown during his deposition, *id.* at 254:3-14, 255:10-15. Dr. Fauci goes on to say, in relation to the October 8, 2020 email from Dr. Collins: "It is very likely, although I'm not 100 percent sure that the meeting of the . . . authors of the declaration with the Secretary, [that] this was very likely the first time it was brought to my attention, although I can't say for sure. I would imagine – again, getting back to context, this is not something that I would have been paying a lot of attention to. I was knee deep in trying to do things like develop a vaccine that wound up saving the lives of millions of people. That's what I was doing at the time. So an e-mail like this may not have necessarily risen to the top of my awareness and interest." *Id.* at 256:6-20. Further disputed as an argumentative mischaracterization of the record is the assertion that Dr. Fauci was "direct[ly] involve[d] in publicly attacking" the Declaration, which lacks any record citation. Undisputed that Greg Folkers sent Dr. Fauci articles that were critical of the Declaration, but

disputed that the articles were collected "for Dr. Collins," which assertion is unsupported by any citation showing that Dr. Fauci sent those articles to, or discussed them with, Dr. Collins. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

806.   Dr. Kulldorff points out that, regardless of disagreements over the policy, describing the Declaration as "fringe" and "nonsense" is fundamentally dishonest, as the Declaration reflects principles of pandemic preparedness that were widely accepted before COVID-19: "the Great Barrington Declaration is merely a restatement of the principles of public health. Lockdown … is a 'terrible experiment' that throws those principles 'out of the window' by focusing solely on one disease at the expense of all other health problems. 'Most countries in Europe had a pandemic-preparedness plan that did not recommend lockdowns, but instead proposed a risk-based strategy to protect those at high risk, which is actually the same as the focused protection we put forward in the Great Barrington Declaration. What we are proposing is, therefore, nothing revolutionary', [Kulldorff] said."  Fauci Ex. 48, at 6.

**RESPONSE:**  Undisputed that the quoted statements were made by Dr. Kulldorff. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

807.   Regarding the censorship of the Great Barrington Declaration on social media, Dr. Fauci repeatedly testified that he was oblivious to it: "I don't pay much attention to what goes on in social media … it is highly unlikely that … I paid any attention to this thing of Google censoring the Great Barrington Declaration … I would not have paid much attention to it."  Fauci Dep. 281:15-282:2, 283:7-10. In light of his contemporaneous statements and emails, this statement is not credible.

**RESPONSE:** Disputed as argumentative and unsupported by citation to or evidence in the record the assertion that Dr. Fauci's "contemporaneous statements and emails" somehow undermine the credibility of his testimony that he does not "pay much attention to what goes on in

social media." *See, e.g.*, Resp. to Pls.' PFOF ¶¶ 684, 746, 773, 805. The quoted testimony is undisputed. Regardless, this PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress the Great Barrington Declaration on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

808.    Like so many other topics, Dr. Fauci repeatedly testified that he could not recall virtually anything about his involvement in seeking to squelch the Great Barrington Declaration. He testified at least 33 times that he could not recall his involvement in this matter. *See* Fauci Dep. 251:11, 252:20, 255:6, 255:9, 256:3, 257:5, 258:12, 263:1, 263:15, 263:21, 264:17, 264:20, 264:22, 265:2, 265:6, 268:10, 268:18, 270:24, 282:19-20, 284:22-23, 290:13, 290:21, 291:13, 291:16, 292:15, 292:24, 293:15, 293:24, 295:9, 295:25, 296:21, 297:2-3, 297:14. For the reasons discussed above, these claims to almost total loss of memory are not credible.

**RESPONSE:** Disputed that Dr. Fauci's testimony that he could not recall matters such as "the moment [he] became aware of [The Great Barrington Declaration]," Fauci Dep. 252:19-20; *see also id.* at 251:11, when he first "read the Great Barrington Declaration," *id.* at 255:3-9, receiving one email on October 8, 2020, *id.* at 263:11-22, and other minutia from years ago amounts to a "claim[] to almost total loss of memory," rendering Dr. Fauci's testimony not credible. The PFOF is further disputed because it relies on the counterfactual assumption that Dr. Fauci was part of an effort to "squelch the Great Barrington Declaration," and then implies that he is dishonest for not "recall[ing]" that alleged effort. *But see* Resp. to Pls.' PFOFs ¶¶ 788-89. Regardless, this PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech about the Great Barrington Declaration on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

**D.    NIAID Flags Social-Media Accounts for Censorship Under Dr. Fauci.**

809.    As noted above, Dr. Fauci testified that he is not aware of any NIAID or NIH staff contacting social media platforms to ask them to remove content. In fact, NIAID and NIH staff—including staffers in Dr. Fauci's senior circle—sent several messages to social-media platforms asking them to remove content lampooning or criticizing Dr. Fauci. Dr. Fauci's testimony to the contrary is not credible.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record.

810.    On March 14, 2020, a Twitter employee reached out to CDC officials, including Carol Crawford, and asked if a particular account associated with Dr. Fauci is "real or not." Fauci Ex. 53, at 2. Scott Prince of NIH responded, "Fake/Impostor handle. PLEASE REMOVE!!!" *Id.* Twitter responded that it would take action promptly and "circle back ASAP." *Id.* An HHS official then asked if Twitter could pre-block similar parody accounts: "Is there anything else that you can also do to block other variations of [Dr. Fauci's] name from impersonation so we don't have this happen again?" *Id.* at 1. Twitter replied: "We'll freeze this @handle and some other variations so no one can hop on them." *Id.*

**RESPONSE:** Undisputed, except as to the assertion that "an HHS official" asked Twitter to "pre-block similar parody accounts" to the extent that assertion is meant to suggest that the official asked for anything more than is reflected in the quoted text regarding the impersonating Dr. Fauci account. Also dispute the characterization of the account in question as a "parody account," and that HHS asked Twitter to pre-block "parody account[s]," on the basis that it lacks citation to and support in the record. Additionally note that it is not unusual for members of the public, or victims themselves, to report imposter accounts or doctored content to social media platforms. Twitter, Facebook, and YouTube each prohibit imposter accounts and provide mechanisms for the public to report violations of their imposter rules. *See* Ex. 56 (*Account Integrity & Authentic Identity*, Meta, https://perma.cc/DCR9-9FBY); Ex. 57 (*Authenticity on Twitter*, Twitter Help Center, https://perma.cc/6NVT-PS59); Ex. 58 (*Impersonation policy*, YouTube Help, https://perma.cc/R5BD-X6JB). Additionally, willfully impersonating a federal official is a federal crime. *See* 18 U.S.C. § 912; *see also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or

suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

811.    Likewise, on April 21, 2020, Judith Lavelle of NIAID emailed Facebook, copying Scott Prince of NIH and Jennifer Routh of Dr. Fauci's communications team, and stated: "We wanted to flag a few more fake Dr. Fauci accounts on FB and IG for you. I have also reported them from @niaid and my personal FB account." Fauci Ex. 55, at 3. She listed eight accounts that she considered fake. One of these was called "Dr.FauciTheHero," and she stated, "I think this one may be fine as a fan page but could use a reminder to be a bit more clear," *id.* at 4—thus noting that she was seeking the censorship only of speech about Dr. Fauci that the government disfavors, while "a fan page" was fine.

**RESPONSE:** Disputed that Judith Lavelle "was seeking the censorship only of speech about Dr. Fauci that the government disfavors." As the text quoted by Plaintiffs make clear, Ms. Lavelle was seeking the removal of accounts that were impersonating Dr. Fauci. Ms. Lavelle noted that she thought the account called "Dr.FauciTheHero" might "be fine" because it may have been simply a "fan page" and not an impersonating page. As explained in the response to Plaintiffs' PFOF ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

812.    Both Jennifer Routh and Judith Lavelle are members of Dr. Fauci's communications staff. Fauci Dep. 308:14-21.

**RESPONSE:** Undisputed.

813.    The fact that Lavelle stated they were flagging "a few *more*" accounts indicates that NIAID's flagging social-media accounts for censorship was not an isolated incident but an ongoing practice. Fauci Ex. 55, at 3.

**RESPONSE:** Disputed as to Plaintiffs' characterization that this email represents "flagging social-media accounts for censorship" or that this reflects an "ongoing practice" to flag accounts "for censorship." *See* Resp. to Pls.' PFOF ¶ 811. And as explained in the response to Plaintiffs' PFOFs ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

814.    Lavell then followed up flagging yet another account, saying "Apologies one more," and adding Greg Folkers of Dr. Fauci's personal staff to the email chain reporting these accounts to Facebook for censorship. Fauci Ex. 55, at 3.

**RESPONSE:** Disputed as to the characterization of Greg Folkers, a NIAID employee, as a member of Dr. Fauci's "personal staff." Also disputed as to Plaintiffs' characterization that this email represents reporting "accounts . . . for censorship" rather than for removal for impersonating a federal official. *See* Resp. to Pls.' PFOF ¶ 811. As explained in the response to Plaintiffs' PFOFs ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

815.    The same day, Facebook responded, "Flagged this for the fake accounts team and they have confirmed that all but two accounts were removed for impersonation of Dr. Fauci. I guess two of the accounts are fan accounts."  Fauci Ex. 55, at 3.

**RESPONSE:** Undisputed. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

816.    The Facebook employee then added, "Also want to intro you all to [two more Facebook employees] who have been working hard to manage any fake accounts for NIH across the board. She can work with you directly if anything like this comes up."  Fauci Ex. 55, at 2. Lavelle responded that "our team will be sure to reach out if we identify any more impersonations," *id.*, and Facebook answered that Lavelle of NIAID should "feel [free] to flag to us the various imposter accounts," Fauci Ex. 55, at 1. Again, this response indicates an ongoing and widespread practice of NIH reporting supposedly "fake" accounts for censorship.  *Id.*

**RESPONSE:** Disputed as to Plaintiffs characterization that this email represents an "ongoing and widespread practice" of reporting "accounts for censorship" rather than a discussion about an efficient way to "manage any fake accounts for NIH" impersonating a federal official. *See* Resp. to Pls.' PFOF ¶ 811. As explained in the response to Plaintiffs' PFOF ¶ 810, the request that a social media company remove impersonating accounts, which may violate federal law, is not unusual. *See also* Resp. to Pls.' PFOF ¶ 168. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

817.    Dr. Fauci testifies that he does not remember for certain, but he "likely" asked his communications staff to do something about these impersonation or parody accounts. Fauci Dep. 302:6-10 ("I vaguely remember somebody mentioning something about an imposter account. … And I likely would have said, 'Well, how can they do that?'"). He also agrees that his communications staff would do so on their own. *Id.* at 301:1-4 ("I have a communication staff that I'm sure, if they found out it was a false and misleading account, that they would want it to be removed."); *see also id.* at 301:23-25; 304:19-21.

**RESPONSE:** Disputed as a misrepresentation of the testimony, in which Dr. Fauci does not state that he "'likely' asked his communications staff to do something about" any accounts. Instead, Dr. Fauci testified that if his Courtney Billet from his communications staff "found out that [there] was an imposter handle, . . . she would have asked [Twitter] to take it down herself, possibly without even telling me except to say, 'There's an imposter account on you. We'll take care of it.'" Fauci Dep. 301:23-302:2. Dr. Fauci further testified: "I vaguely remember somebody mentioning something about an imposter account. I didn't even know what an imposter account was. And I likely would have said, 'Well, how can they do that?'" *Id.* at 302:6-10. Further disputed as to the reference to "parody accounts." Although Plaintiffs repeatedly suggest the possibility that some accounts were "parody" accounts, they have introduced no such evidence and the communications from NIAID staff clearly show that NIAID staff were only seeking the removal of accounts impersonating Dr. Fauci. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

818.   Dr. Fauci believes it is "totally appropriate" for his communications staff to contact social-media platforms and seek the removal of such accounts. *Id.* at 312:19-21; *see also id.* at 310:14-16.

**RESPONSE:** Undisputed. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

819.    He thinks so because "impersonating me is a bad thing."  *Id.* at 303:20; *see also id.* at 304:11-13; 309:23-310:1 ("fake accounts are bad things, I believe"); 311:20-21. Dr. Fauci specifically believes that removing accounts associated with him is "a good thing" because "those accounts are bad."  *Id.* at 329:12-16.

**RESPONSE:** Undisputed that Dr. Fauci testified that impersonating him, a federal official, is a "bad thing." It is also a federal crime. *See* 18 U.S.C. 912 ("Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both."). *See* Resp. to Pls.' PFOF ¶ 168. Disputed that Dr. Fauci testified that he believes generally "that removing accounts associated with him is 'a good thing.'" He testified: "So they removed a spurious, fake account, which I think was a good thing . . . because those accounts are bad." Fauci Dep. 329:12-16. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

820.    Dr. Fauci does not know whether some of the so-called "fake accounts," which he calls "bad things," that his staff flagged for censorship may actually be parody accounts. *Id.* at 311:7-9.

**RESPONSE:** Disputed as a mischaracterization of the evidence. The record is devoid of any evidence or suggestion that any of the accounts were "parody accounts." Although Plaintiffs repeatedly suggest the possibility that some accounts were parody accounts, they have introduced no such evidence and the communications from NIAID staff clearly show that NIAID staff were only seeking the removal of accounts impersonating Dr. Fauci. Moreover, Dr. Fauci did not testify about the removal of any "parody" accounts but instead testified that, based on the email he was

shown for the first time during his deposition, it looked like his communications staff was "trying
to get rid of fake accounts" on Facebook "because fake accounts are bad things, I believe." Fauci
Dep. 309:24–310:1. This PFOF contains no evidence that Dr. Fauci sought by threat, coercion,
encouragement, deception, or otherwise, to censor or suppress speech on social media, nor
evidence that any social media company did so at his instruction, urging, or request. Any assertion
to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E.,
Arg. § II.B.3.b. & f.

821.    Moreover, it was not just NIAID staff, but also White House staff, who flagged
content about Dr. Fauci for removal from social-media platforms. As noted above on Tuesday,
July 20, 2021, Clarke Humphrey of the White House communications office emailed Facebook
asking for the removal of an Instagram account associated with Dr. Fauci, saying it "is not actually
one of ours." Fauci Ex. 57, at 1-2. Facebook responded one minute later, stating, "Yep, on it!"
Fauci Ex. 57, at 1. Courtney Billet, Dr. Fauci's communications director at NIAID, then weighed
in, asking Facebook to disclose whether "there's a federal email address attached to whomever set
this account up," so that she could ascertain whether the account was set up by "some federal
employee outside our official comms offices."  Fauci Ex. 57, at 1. The next day, Facebook
responded, stating, "This account has been removed. Thank you for flagging!"  Fauci Ex. 57, at 1.

**RESPONSE:** Disputed that "NIAID staff" and "White House staff" generally "flagged
content about Dr. Fauci for removal from social-media platforms" as argumentative and
unsupported by citation to or evidence in the record. As the cited email chain shows, the White
House flagged an Instagram account for removal because it was "a fake account." Fauci Ex. 57, at
1. Fake accounts violate Facebook's terms of service, to which all users agree, *see* Ex. 56 at 2-3,
and posts that improperly impersonate federal officials potentially constitute federal crimes, *see*
18 U.S.C. § 912. *See* Resp. to Pls.' PFOF ¶ 168. Also note that Clarke Humphrey was a member
of the COVID-19 Response Team, not the White House communications office. Moreover, this
PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception,
or otherwise, to censor or suppress speech on social media, nor evidence that any social media

company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

822.    NIAID's communications with social-media platforms were not limited to flagging impostor or parody accounts. On October 30, 2020, for example, a NIAID staffer wrote an email connecting Google/YouTube with Jennifer Routh of NIAID's "Office of Communications and Government Relations," so that NIAID and the "Google team" could "connect on vaccine communications – specifically misinformation…." Fauci Ex. 56, at 2. Routh then added Courtney Billet ("director of the Office of Communications and Government Relations at NIAID") and two other senior NIAID officials to the communications chain with YouTube. Fauci Ex. 56, at 1.

**RESPONSE:** Disputed that these communications indicate that NIAID was communicating with social media companies on misinformation. The first email in the chain cited at Exhibit 56 explicitly notes that Google had reached out to connect on vaccine communications, including on misinformation, and a NIAID employee responded by reaching out to NIAID's Office of Communications and Government Relations to try to point Google in "the right direction HHS Comms team wise"—in other words, to connect Google with someone *outside of NIAID*. Fauci Ex. 56 at 1. Jennifer Routh responded and added other individuals who could connect Google with contacts outside of NIAID, noting "[m]y colleagues may have a better sense of the various leads for various HHS-wide comms efforts focused on vaccine communication." *Id.* This PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

823.    Likewise, in response to a third-party subpoena, Twitter has disclosed that Dina Perry, a Public Affairs Specialist for NIAID, communicates or has communicated with Twitter about misinformation and censorship. Jones Decl., Ex. F, at 1.

**RESPONSE:** Undisputed that Dina Perry's name appears in Exhibit F and that she was a NIAID employee, but disputed to the extent the PFOF mischaracterizes the response as disclosing

that Dina Perry communicates or has communicated with Twitter about "misinformation and censorship." Exhibit F is a document entitled "Twitter Final Production Agreement Second Supplemental Response to Request Number 5," and it does not disclose the request to which Twitter is responding. Therefore, it is impossible to determine why Twitter disclosed her name, but the document certainly provides no evidence for the assertion that Dina Perry "communicates or has communicated with Twitter about misinformation and censorship." This PFOF also contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

824.   NIAID did not disclose Dina Perry in response to interrogatories seeking the identities of NIAID officials who communicate with social-media platforms about misinformation, disinformation, and censorship. Scully Ex. 12, at 17-18.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes NIAID's interrogatory responses as not disclosing the identities of NIAID officials who communicate with social-media platforms about "misinformation, disinformation, and censorship." NIAID's interrogatory responses do not support that characterization. *See* Defs' Resp. to PFOF ¶¶ 823, 1083. The cited response was to Plaintiffs' interrogatory requesting disclosure of NIAID officials who are communicating or have communicated with any social media platform "regarding Content Modulation and/or Misinformation." Scully Ex. 12 at 13. NIAID's response referred Plaintiffs "to the documents being produced in response to" specific requests for production, and further identified "the custodians whose e-mails were collected" for purposes of responding to the requests for production. *Id.* at 17-18. While Dina Perry was not identified as a *custodian* whose emails were searched, her name and email address were disclosed in NIAID's production of documents.

825.   Dr. Fauci testified that he has never "contacted a social media company and asked them to remove misinformation from one of their platforms." Fauci Dep. 151:21-24 ("No, I have not."). He also testified that no one on his staff at NIAID has "ever reached out to a social media platform to ask them to take content down or to block content in any way. *Id.* at 152:7-15 ("To my knowledge, no."). In light of the repeated attempts of Dr. Fauci's staff to have content related to Dr. Fauci removed from social media, Dr. Fauci's testimony on this point is not credible.

**RESPONSE:** Disputed as argumentative and lacking citation to or support in the record

for all the reasons discussed above. The quoted testimony, however, is undisputed. When asked

whether anyone on his staff has "ever reached out to a social media platform to ask them to take

content down or to block content in any way," Dr. Fauci responded "To my knowledge, no. But

again, I don't know everything that goes on, but certainly nothing that I was made aware of that

they were doing." Fauci Dep. 152:7-15. The handful of requests from NIAID communications

staff to remove impersonating accounts, and the response to Google's request for a point of contact

to discuss information about vaccines, none of which Dr. Fauci was personally involved in or had

knowledge of, do not cast doubt on the credibility of his testimony. This PFOF contains no

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to

censor or suppress speech on social media, nor evidence that any social media company did so at

his instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

**E.     CDC and NIH Procure the Censorship of Speech on Ivermectin.**

826.   On September 13, 2021, Facebook emailed Carol Crawford of the CDC to ask the CDC to identify whether the claim that "Ivermectin is effective in treating COVID" is "false, and if believed, could contribute to people refusing the vaccine or self-medicating," which were the qualifications for censoring that claim on Facebook's platforms. Fauci Ex. 58, at 2. Facebook noted that it was currently rating this claim as "*not false*," *i.e.*, Facebook was *not* censoring the claim that Ivermectin is effective in treating COVID-19, because there was "no consensus" of its efficacy for treatment. *Id.* at 3.

**RESPONSE:** Disputed. The email, which speaks for itself, does not support Plaintiffs'

assertion about "the qualifications for censoring that claim on Facebook's platforms" or its

argumentative assertion that "Facebook was *not* censoring the claim that Ivermectin is effective in treating COVID-19, because there was 'no consensus' of its efficacy for treatment." The email contains no information about what Facebook planned to do with CDC's responses to its questions or what "qualifications" the company had in place for moderating content on its platform. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." This PFOF contains no evidence that Dr. Fauci, CDC, or NIH sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

827. The next day, the CDC responded, advising Facebook that the claim that "Ivermectin is effective in treating COVID" is "***NOT ACCURATE***" (bold and italics in original) and thus should be censored on Facebook's platforms. Fauci Ex. 58, at 1. To support this claim, the CDC cited NIH's "Ivermectin | COVID-19 Treatment Guidelines." *Id.* Thus, the CDC cited the NIH's treatment guidelines for Ivermectin as authority to urge Facebook to censor claims about using Ivermectin to treat COVID-19. *Id.* CDC also cited NIH to call for the censorship of two related claims about Ivermectin, and noted that "[t]hese responses are based on the independent advice of … NIH," which had "opined that there are not data that indicate ivermectin is effective in the ways described above." *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization of the emails. In addition to citing to NIH treatment guidelines, CDC also cited to www.idsociety.org and explained that "These responses are based on the independent advice of two national bodies of infectious diseases SME's expert in the treatment of COVID-19: NIH and the IDSA, which have opined that there are not data that indicate ivermectin is effective in the ways described above." Fauci Ex. 58 at 1. Furthermore, the emails say nothing about whether claims "should be censored on Facebook's platform," nor did they "call for the censorship of two related claims about Ivermectin." Disputed also that a social media company's application of its own content moderation policies, to which

all users agree, constitutes "censorship."  This PFOF contains no evidence that Dr. Fauci, CDC, or NIH sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b. & f.

### F.    Dr. Fauci's Double Standard on Acceptable Speech: Mask Mandates.

828.    "Sylvia Burwell is the former Secretary of the Department of Health and Human Services [under President Obama] and the current president of American University."  Fauci Dep. 313:9-11. "Sylvia has, over the past couple of years, asked [Dr. Fauci] advice about personal safety during the COVID-19 pandemic."  *Id.* at 313:17-19.

**RESPONSE:** Undisputed, but irrelevant to the issues presented in this case.

829.    On February 4, 2020, Sylvia Burwell wrote Dr. Fauci an email stating that she was traveling and wondering if she should wear a mask in the airport. Fauci Dep. 313:21-314:5; *see also* Jones Decl., Ex. EE, at 1. Dr. Fauci responded, stating: "Masks are really for infected people to prevent them from spreading infection to people who are not infected, rather than protecting uninfected people from acquiring infection. The typical mask you buy in the drugstore is not really effective in keeping out virus, which is small enough to pass through material. … I do not recommend that you wear a mask…."  Fauci Dep. 314:9-19; *see also* Jones Decl., Ex. EE, at 1.

**RESPONSE:** Undisputed, but irrelevant to the issues presented in this case.

830.    Dr. Fauci agrees that he "made several statements that are similar to that at that time frame."  Fauci Dep. 315:12-14.

**RESPONSE:** Undisputed, but note for clarity that the "time frame" referred to is February 2020. Fauci Dep. 315:12-18. Also irrelevant to the issues presented in this case.

831.    He states that, at that time, there were "no studies" on the efficacy of masking to stop the spread of COVID-19. *Id.* at 316:8-13.

**RESPONSE:** Undisputed, but note for clarity that the "time frame" referred to is February 2020. Fauci Dep. 315:12-18. Also irrelevant to the issues presented in this case.

832.    In fact, on March 31, 2020, Dr. Fauci forwarded studies showing that masking is ineffective. Fauci Dep. 318:24-319:7.

**RESPONSE:** Disputed. Plaintiffs do not cite to a specific email and did not introduce the alleged email as an exhibit during the deposition. When asked about the alleged email, Dr. Fauci responded: "Yeah, I don't recall that, so I'm not able to answer that accurately, I believe." Fauci Dep. 319:6-7. Also irrelevant to the issues presented in this case.

833.    Dr. Fauci's position on masking dramatically changed by April 3, 2020, when he became an advocate for universal mask mandates. *Id.* at 317:14-20.

**RESPONSE:** Disputed as to the characterization that any change in position was "dramatic," and to the characterization of the testimony as showing the Dr. Fauci was an advocate for "universal mask mandates," as the meaning of that term is not discussed or defined in the deposition of the PFOF. Also irrelevant to the issues presented in this case.

834.    Dr. Fauci states that his position on masking changed in part because "[e]vidence began accumulating that masks actually work in preventing acquisition and transmission." Fauci Dep. 317:5-6.

**RESPONSE:** Undisputed, but irrelevant to the issues presented in this case. Dr. Fauci was asked to identify any studies that were done between February 2020 and April 3, 2020, that supported his change of position on the efficacy of masking, and he could not identify any. *Id.* at 318:8-10.

835.    Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any. *Id.* at 322:1-5. IN fact, it is obvious that there were none.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony. Dr. Fauci was asked during his deposition, "How many studies were done between February of 2020 . . . and April 3 of 2020, what studies were done . . . ," and he responded, "I could find those and – and get them for you, but I don't have them in my fingertips right now." Fauci Dep. 317:21-318:10. Also irrelevant to the issues presented in this case.

836.     Dr. Fauci was asked if there were any "placebo-based, double-blind, randomized studies of the efficacy of masking that were done between February and April 2020," and he could not identify any. *Id.* at 322:1-5. In fact, it is obvious that there were none.

**RESPONSE:** Undisputed that during his deposition, Dr. Fauci could not recall specifically whether any placebo-based, double-blind, randomized studies on the efficacy of masking were conducted between February and April 2020. Dr. Fauci stated: "I'd have to go back and take a close look at the literature. I don't recall." Fauci Dep. 322:4-5. And as noted in response to Plaintiffs' PFOF ¶ 835, although Dr. Fauci did not identify specific studies, Dr. Fauci stated, "I could find those and – and get them for you, but I don't have them in my fingertips right now." Fauci Dep 318:8-10. The second sentence is disputed as an argumentative and conclusory assertion unsupported by the evidence and without citation to the record. The PFOF is also irrelevant to the issues presented in this case.

837.     Dr. Fauci's position on masking, therefore, directly contradicts his insistence on randomized, double-blind, placebo-based clinical trials for alternative COVID-19 treatments like hydroxychloroquine and ivermectin. At best, Dr. Fauci's dramatic change in position on masking was based on observational studies—the same kind of studies that he dismissed, in the very same time frame, as inadequate to support the use of hydroxychloroquine to treat COVID-19. At worst, it was based on no evidence at all—and Dr. Fauci identified none.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Also irrelevant to the issues presented in this case.

838.     Dr. Fauci believes it can be dangerous to give ordinary people access to scientific information: "If information is clearly inadequate and statistically not sound, there can be a danger in people who don't have the ability or the experience of being able to understand that it's a flawed study." *Id.* at 323:5-9.

**RESPONSE:** Disputed as an argumentative mischaracterization of the testimony, in which Dr. Fauci only expresses concern with "people who don't have the ability or the experience of being able to understand" that a study may be "flawed" because the "information is clearly inadequate and statistically not sound." Fauci Dep. 323:5-9. Also irrelevant to the issues presented

in this case. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

839.    Dr. Fauci believes that it is "disturbing" when "unwitting" people believe what he thinks is misinformation: "I think honest debate is important, but when it goes beyond debate and leads people who are unwitting about these things to do things that are clearly detrimental to their life and their safety, I find that disturbing." *Id.* at 358:13-17.

**RESPONSE:** Disputed as an argumentative mischaracterization of the testimony to the extent the PFOF asserts that Dr. Fauci was opining on people believing "what he thinks is misinformation." the accuracy of the quoted text of the testimony is undisputed. Also irrelevant to the issues presented in this case. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.3.b.

### G.    Dr. Fauci and the White House Cause the Censorship of Alex Berenson.

840.    Alex Berenson is a former New York Times science reporter and prominent critic of government messaging about COVID-19 vaccines who was deplatformed from Twitter on August 28, 2021, after months of pressure from White House and federal officials.  Fauci Ex. 59, at 4.

**RESPONSE:** Disputed as an argumentative mischaracterization of the evidence. There is no evidence to support the reference to "months of pressure from White House and federal officials," and the cited email does not offer any factual support for that argumentative assertion. This PFOF also relies on a characterization contained in a self-serving opinion article written by Alex Berenson rather than any evidence of record. Additionally, as noted at Resp. to Pls.' PFOF ¶ 103, Twitter informed Messrs. Mr. Slavitt and Flaherty in April 2021 that it was not going to

remove Mr. Berenson from Twitter because he had not violated its terms of service at that time. The document cited by this PFOF contains no evidence that the White House, Dr. Fauci, or any other federal official, threatened or pressured Twitter to censor speech, or that Twitter regarded (or acted on) communications with the White House as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

841.    As Berenson notes: "On July 16, 2021, President Biden complained publicly that social media companies were 'killing people' by encouraging vaccine hesitancy. A few hours after Biden's comment, Twitter suspended by account for the first time." Fauci Ex. 59, at 4.

**RESPONSE:** Undisputed that the article quoted at Exhibit 59, which is an article written by Alex Berenson, is accurately quoted. However, disputed to the extent the PFOF mischaracterizes President Biden's statement as accusing social-media platforms of "killing people," *see* Resp. to Pls.' PFOF ¶ 154, and insinuates that Mr. Berenson's temporary suspension from Twitter had anything to do with President Biden's statement. The cited article does not support these characterizations and assumptions. *See* Resp. to Pls.' PFOF ¶ 163. Moreover, this PFOF contains no evidence that Dr. Fauci or the White House sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

842.    Dr. Fauci, who was then Chief Medical Advisor to President Biden, played a key role in procuring the censorship of Alex Berenson. Shortly before President Biden's comments, Dr. Fauci engaged in public attacks on Alex Berenson in attempt to discredit him and silence his government-skeptical opinions.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the evidence and without citation to the record. Neither the PFOF nor the article cited above, contains

evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

843.    On July 11, 2021, appearing on CNN's "State of the Union," Dr. Fauci described Alex Berenson's comments on vaccine skepticism as "horrifying." Fauci Ex. 60, at 1. Responding to applause for a speech given by Berenson at a conference, Dr. Fauci stated: "It's horrifying. I mean, they are cheering about someone saying that it's a good thing for people not to try and save their lives." *Id.* In response to Berenson's views, Dr. Fauci stated, "it's almost frightening to say, … we don't want you to do something to save your life." *Id.* Dr. Fauci also stated, "I don't think that anybody who is thinking clearly can get that." *Id.*

**RESPONSE:** Disputed to the extent the PFOF asserts that Dr. Fauci "described Alex Berenson's comments" as horrifying as unsupported by the cited news article, which reports instead that Dr. Fauci said it was "horrifying" that people were "cheering about someone saying that it's a good thing for people not to try and save their lives." Fauci Ex. 60 at 1. Moreover, while the article states that Dr. Fauci "was responding to a clip of conservative author Alex Berenson, who spoke at CPAC on Saturday," the article does not state that Dr. Fauci specifically named Alex Berenson in any of his statements or even that Alex Berenson was identified by name at all during the CNN "State of the Union" interview that was the subject of the news article. *See id.* at 1-2. Further disputed to the extent Plaintiffs' PFOF relies on hearsay and journalistic characterization contained in an opinion article rather citing to evidence of record. However, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

844.    Dr. Fauci's public comments as the President's Chief Medical Advisor specifically criticizing Alex Berenson were made at a time when other White House officials like Andrew Mr.

Slavitt were *privately* pressuring Twitter to deplatform Berenson since April 21, 2020. *See, e.g.,* Fauci Ex, 58, at 7 (internal Twitter communications on April 22, 2020, indicating that White House officials "had one really tough question about why Alex Berenson hasn't been kicked off from the platform," and "yes, they really wanted to know about Alex Berenson. Andy Mr. Slavitt suggested they had seen data vis that had showed he was the epicenter of disinfo that radiated outwards to the persuadable public.").

**RESPONSE:** Disputed that Dr. Fauci made public comments "specifically criticizing Alex Berenson" as an argumentative mischaracterization lacking citation to or support from the record. The article cited in the immediately preceding PFOF, at Fauci Ex. 60, states instead that Dr. Fauci found it "horrifying" that people were "cheering about someone saying that it's a good thing for people not to try and save their lives." Fauci Ex. 60 at 1. Moreover, while the article states that Dr. Fauci "was responding to a clip of conservative author Alex Berenson, who spoke at CPAC on Saturday," the article does not state that Dr. Fauci specifically named Alex Berenson in any of his statements or even that Alex Berenson was identified by name at all during the CNN "State of the Union" interview that was the subject of the news article. *See id.* at 1-2. Also disputed as an argumentative mischaracterization of the evidence that "White House officials like Andrew Mr. Slavitt were privately pressuring Twitter to deplatform Berenson" at any point in time. *See* Resp. to Pls.' PFOF ¶ 103 (noting also that several weeks after meeting with Mr. Slavitt and Mr. Flaherty, Twitter informed Mr. Flaherty that it would not be removing Mr. Berenson because he had not violated Twitter's policies at that time). The PFOF also contains typographical errors; the exhibit reflects alleged communications dated April 22, 202*1*. In any event, the PFOF contains no evidence that Dr. Fauci (or the White House) sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media, nor evidence that any social media company did so at their instruction, urging, or request. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

845.   Dr. Fauci does not deny that he may have discussed Alex Berenson with other White House or federal officials, but claims he does not recall whether he did so. Fauci Dep. 343:16-23.

**RESPONSE:** Undisputed. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

846.   Dr. Fauci believes that misinformation and disinformation "contribute to the deaths" of people: "misinformation and disinformation, particularly that encourages people to avoid lifesaving interventions, can certainly result in the unnecessary death of people whose lives would have been saved. So when misinformation and disinformation leads people to avoid a lifesaving intervention, that is equivalent to contributing to the death of that person." *Id.* at 345:8-15. "I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly. *Id.* at 346:1-3.

**RESPONSE:** Undisputed, except to note that Dr. Fauci was testifying about health-related misinformation and disinformation that "encourages people to avoid lifesaving interventions." Fauci Dep. 345:8-15; *id.* at 346:1-3. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

847.   Dr. Fauci also believes that misinformation and disinformation on social media are "contrary to public health" and "the enemy of public health": "If social media is propagating disinformation that leads to the death of people by encouraging them to avoid lifesaving interventions, I believe that's contrary to public health." *Id.* at 346:5-7, 346:10-13.

**RESPONSE:** Undisputed, except to note that Dr. Fauci was testifying about health-related misinformation and disinformation that encourages people "to avoid lifesaving interventions." Fauci Dep. 346:10-13. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

848.    Dr. Fauci admits that it is "certainly possible" that he discussed the view that "disinformation or misinformation on social media platforms are killing people" with others in the federal government, but claims he cannot remember whether he did so. *Id.* at 345:3-25.

**RESPONSE:** Undisputed, but note that Dr. Fauci testified: "You know, when you say 'anyone in the government,' I have often said that misinformation and disinformation is the enemy of public health. Could I have said it to someone in the government? It is certainly possible that I did because I do feel strongly that misinformation and disinformation, when it leads to people avoiding lifesaving interventions, can be deadly." Fauci Dep. 345:21-346:3. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

849.    Dr. Fauci testified that the first time he heard of Alex Berenson was when Berenson publicly claimed that the White House demanded that Twitter deplatform him in 2022: "it's the person who says that the White House demanded Twitter ban me months before the company did so. I had never heard of who Alex Berenson was before this … I don't even know who he is." *Id.* at 335:1-7. In light of Dr. Fauci's public attacks on Alex Berenson in 2021, this testimony is not credible.

**RESPONSE:** Disputed that Dr. Fauci "public[ly] attack[ed] Alex Berenson" in 2021, for the reasons stated in response to Plaintiffs' PFOF ¶¶ 840-45. Further disputed as an argumentative mischaracterization of the cited testimony. When Dr. Fauci was asked in his deposition if he had "ever heard of Alex Berenson," he responded: "I've heard of him. I'm not sure – *I'm trying to remember what context*, but now you've put this [exhibit] in front of me, . . . it – it's the person who says that the White House demanded Twitter ban . . . [him] months before the company did so. I had never heard of who Alex Berenson was before this, but – I mean, not before this but I had

heard that there was an issue that he was complaining that he was being banned. I don't even know

who . . . he is." Fauci Dep. 334:23-335:7 (emphasis added). The exhibit before Dr. Fauci at the

time of this testimony was an article written by Alex Berenson asserting that his Twitter account

had been removed allegedly because of pressure from the White House. *See* Fauci Ex. 59. That

Dr. Fauci did not recall viewing and responding to a clip of Alex Berenson during a July 2021

interview reported about at a different exhibit shown later in his deposition, *see* Fauci Ex. 60, does

not undermine the credibility of his testimony. Indeed, when Dr. Fauci was shown the news article

at exhibit 60, he stated that the article "does jog my memory to who he is because at the time, they

were talking about this CPAC were people were cheering on not taking a lifesaving intervention."

Fauci Dep. 340:25, 341:12-24. In any event, the PFOF contains no evidence that Dr. Fauci sought

by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social

media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

850.    Former FDA Commissioner Scott Gottlieb also emailed Twitter to pressure them
to remove Alex Berenson's content, invoking Dr. Fauci in his email. Sending Twitter a link to a
post by Berenson entitled "The Arrogance of Dr. Fauci," Gottlieb wrote: "This is why Tony needs
a security detail," Fauci Ex. 62, at 1—thus implying that Berenson's criticism of Dr. Fauci was
endangering Dr. Fauci's life.

**RESPONSE:** The first sentence is disputed as an argumentative mischaracterization of the

email cited in the article attached at Exhibit 62, in which Scott Gottlieb does not ask or demand

that Twitter take any action with respect to any particular content on Twitter but instead sends a

link to a Substack article written by Berenson and states, "This is what is promoted on Twitter.

This is why Tony needs a security detail." Fauci Ex. 62 at 1. Further disputed as to Plaintiffs' guess

at what Dr. Gottlieb may have been "implying." The PFOF contains no evidence that Dr. Fauci

sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech

on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

851.    Dr. Fauci does not deny that he may have discussed this issue with Gottlieb before Gottlieb sent this email to Twitter, but he claims he does not recall whether he did so. Fauci Dep. 349:7-19, 352:12-18.

**RESPONSE:** Disputed as a mischaracterization of the testimony, in which Dr. Fauci is not asked about the timing of any discussions he may or may not have had with Gottlieb. Dr. Fauci was asked, "did you ever have discussions with Scott Gottlieb about needing a security detail because of the things that people posted about you on the Internet?" He responded: "I don't recall having discussions with him, but it is possible in a discussion I had with him that – it's no secret that I have a security detail. My life has been threatened multiple times. So I might have discussed that I need a security detail with him, but I –that doesn't ring a bell as something – unless there was a reason for me to – I don't usually talk to people about my security detail." Fauci Dep. 349:7-19. In any event, the PFOF contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

852.    After testifying over 200 times during his deposition that he could not remember or could not recall events related to the case, Dr. Fauci was shown an email chain between him and Dr. Ezekial Emanuel from May 2, 2020 that had no direct connection to issues in the case. Fauci Ex 63. Unlike his convenient lack of memory as to case-related communications, Dr. Fauci was immediately able to provide a detailed, specific account of the context and communications with Dr. Emanuel relating to that email chain. Fauci Dep. 353:20-354:16.

**RESPONSE:** Disputed as an argumentative mischaracterization of the testimony. As explained, *see, e.g.*, Resp. to Pls.' PFOF ¶¶ 684, 746, 773, 805, 807, the issues about which Dr. Fauci testified he could not remember or recall are immaterial to the case and largely concern minutia such as who Dr. Fauci copied on an email or if Dr. Fauci specifically remembered reading

an email several years ago, which are reasonable details for any witness to be unable to recall. Moreover, Dr. Fauci's testimony relating to the "context" of the exchange between him and Dr. Emmanuel in May 2020 concerned, broadly, the subject of clinical trials about the effectiveness of remdesivir, and did not concern details about the dates, times, or other details of Dr. Fauci's particular communications with Dr. Emanuel about that subject. Fauci Dep. 353:15-354:16.  In any event, the PFOF is irrelevant and contains no evidence that Dr. Fauci sought by threat, coercion, encouragement, deception, or otherwise, to censor or suppress speech on social media. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.E., Arg. § II.B.1.b., II.B.3.b. & f.

## VI.      The FBI's Censorship Campaign of Pressure and Deception.

853.    In parallel with the censorship of health "misinformation" and related issues achieved by the White House, the CDC, Surgeon General Murthy, Dr. Fauci, and others, *see supra* Parts I-V, federal national-security and law-enforcement agencies flex their considerable muscle to pressure and induce social-media platforms to censor disfavored speech and viewpoints about elections and other topics. The FBI's Foreign Influence Task Force (FITF) and the Cybersecurity and Infrastructure Security Agency's (CISA) "Mis, Dis, and Malinformation Team" play key roles in this efforts – in cooperation with non-profit agencies working in close collaboration with the government, such as the CISA-funded "Center for Internet Security" and the formidable censorship cartel calling itself the "Election Integrity Partnership" and the "Virality Project."

`         **RESPONSE**: Disputed. The assertions that any Defendant engaged in "censorship," that any Defendant agency "flexed [its] considerable muscle" and "pressure[d] and induce[d]" platforms "to censor," and that any Defendant was acting in "cooperation" with any "censorship cartel," are argumentative mischaracterizations unsupported by and contrary to the record as a whole. *See generally* Defs.' Arg. § II.B.

854.    Elvis Chan is the Assistant Special Agent in Charge of the Cyber Branch for the San Francisco Division of the Federal Bureau of Investigation. Chan Dep. 8:11-13.

**RESPONSE:** Undisputed.

855.    In this role, Chan is "one of the primary people" who communicates with social-media platforms about disinformation on behalf of the FBI. *Id.* 105:3-4 ("I would say I'm one of

the primary people with pass-through information" for platforms). There are many other points of contact between the FBI and social-media platforms, however. *Id.* 105:3-7 ("[W]e have agents on the different cyber squads and our private sector engagement squad who also relay information to the companies.").

**RESPONSE:** Undisputed subject to clarification. The other points of contact that ASAC Chan described do not necessarily communicate with social media platforms about "disinformation." Chan Dep. 105:3-18. And the assertion that there are "many" points of contact in the context of disinformation is a subjective characterization.

856.    Chan graduated from the Naval Postgraduate School in 2021 with an M.A. in Homeland Security Studies. *Id.* 10:16-17. In connection with his master's degree, Chan authored a publicly available thesis entitled, "Fighting Bears and Trolls: An Analysis of Social Media Companies and U.S. Government Efforts to Combat Russian Influence Campaigns During the 2020 U.S. Elections." *Id.* 11:3-16; Chan Ex. 1, at 1. This thesis overtly relied only on publicly available documents, but it also reflected Chan's personal knowledge and experience of working with social-media platforms during the 2020 elections. *See id.*

**RESPONSE:** Disputed. The cited material does not support the statement that the thesis reflected ASAC Chan's "personal knowledge and experience of working with social-media platforms during the 2020 elections." The exhibit cited is Mr. Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government." ASAC Chan testified that his thesis contained his academic research conclusions, not his personal characterizations. Chan Dep. 151:6-8.

857.    Chan's thesis discussed "hack-and-dump activity," also known as "hack-and-leak" operations, as well as "Russian malign influence … on the social media platforms and on fake news websites that the Russians have created." Chan Dep. 13:7-21.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is Mr. Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

858.    Chan's thesis relied on research performed by persons and entities comprising the Election Integrity Partnership, including Graphika, *id.* 145:1-6; and Renee DiResta of the Stanford Internet Observatory, *id.* 51:20-52:7, 85:4-12. Chan communicated directly with DiResta "about Russian disinformation," and had "[a] lot of conversations about Russian disinformation" with DiResta. *Id.* 52:5-7, 52:24-25.

**RESPONSE:** Disputed. The assertion that Graphika and other persons and entities on which Chan's thesis relied were part of the Election Integrity Partnership is not supported by the cited material. The exhibit cited is Special Agent Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

859.    Chan also knows Alex Stamos, the head of the Stanford Internet Observatory, from the time when Stamos participated on behalf of Facebook in the USG-Industry meetings. *Id.* 54:2-19. Chan and Stamos were involved in meetings about "malign-foreign-influence activities" on Facebook while Stamos was the chief security officer for Facebook. *Id.* Chan has also discussed "protecting platforms from hacking" with Stamos. *Id.* 55:12-13. And Chan's "colleagues at FBI headquarters regularly meet with researchers much more frequently than I do." *Id.* 57:15-18.

**RESPONSE:** Disputed. The assertion that Chan knows Alex Stamos from Stamos' participation in the USG-Industry meetings (as opposed to bilateral meetings) is not supported by the cited testimony or the record.

860.    According to Chan, the FBI engages in "information sharing" with social-media platforms about content posted on their platforms, which includes both "strategic-level information" and "tactical information." *Id.* 16:16-19.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

### A. FBI's and CISA's Regular "USG-Industry" Disinformation Meetings

861.    The FBI participates in a CISA-organized "industry working group" with Facebook, Twitter, and Google/YouTube, as well other social-media platforms. *Id.* 18:21-24. The social-media platforms that participate are Facebook, Microsoft, Google, Twitter, Yahoo! (a.k.a. Verizon Media), Wikimedia Foundation, and Reddit. *Id.* 23:24-24:3. On the U.S. Government side, the meetings are attended by representatives of CISA, the Department of Homeland Security's Intelligence & Analysis division ("I&A"), the Office of the Director of National Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), and Elvis Chan on behalf of FBI-San Francisco when he is available. *Id.* 24:9-19; *see also* Chan Ex. 6, at 37. Chan later confirmed that "DOJ National Security Division" attends these "USG-Industry" meetings as well. Chan Dep. 171:6-8.

**RESPONSE:** Undisputed subject to clarification. The cited material supports the assertion

that the entities and individuals mentioned have in the past participated in such meetings, not that

they all necessarily continue to participate in all such meetings. This PFOF contains no evidence

that the FBI used pressure or deception to induce social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

862.    Chan participates in the meetings because most social-media platforms are headquartered in San Francisco, and "FBI field offices are responsible for maintaining day-to-day relationships with the companies that are headquartered in their area of responsibility." *Id.* 24:21-25:4. As a result, Chan serves as a frequent conduit for communication between federal officials, especially FBI officials but also others, and social-media platforms. *See id.*

**RESPONSE:** Disputed. The assertion that ASAC Chan "serves as a frequent conduit for

communications between" social media platforms and federal officials other than FBI officials is

not supported by the cited testimony or the record. This PFOF contains no evidence that the FBI

used pressure or deception to induce social-media companies to remove or suppress information

on their platforms, or that the companies regarded (or acted on) any communications with the FBI

as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

863.    Matt Masterson attended, and Brian Scully attends, the USG-Industry meetings on behalf of CISA. They are "regular attendees" and "one of them is usually emceeing the meeting."

*Id.* 25:15-18. "For the 2020 election cycle, Mr. Masterson was … primarily the facilitator. Ahead of the 2022 midterm elections, Mr. Scully has been the primary facilitator." *Id.* 26:19-22.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

864.   Chan also "participate[s] in the preparation meetings" for the USG-Industry meetings. *Id.* 27:24-25.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that he was not involved in preparing for the meetings, as he did not provide any agenda items. Chan Dep. 27:22-25. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

865.   At these CISA-led "USG-Industry" meetings, "the disinformation content was shared by the social media companies. They would provide a strategic overview of the type of disinformation they were seeing on their respective platforms," and the FBI "provided strategic unclassified overviews of the activities that we saw [Russian actors] doing." *Id.* 156:9-157:1.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

866.   The "USG-Industry" meetings "are continuing" at the time of Chan's deposition on November 23, 2022, and Chan assumes that they will continue through the 2024 election cycle. Chan Dep. 284:23-285:6. Online "disinformation" continues to be discussed between the federal agencies and the social-media platforms at these meetings. Chan Dep. 285:7-286:16.

**RESPONSE:** Disputed. The assertion that the election-related meetings "are continuing" is unsupported by the record. ASAC Chan testified that he does not "know . . . for a fact" that the election-related meetings would occur 2024 although he "would assume so." Chan Dep. 285:3-6. In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

### B. The FBI's Regular Bilateral Meetings with Social-Media Platforms.

867.     The USG-Industry group meetings are not the only censorship-related meetings between the FBI and social-media platforms. Chan also "hosted … bilateral meetings between each of the companies I mentioned"—*i.e.*, Meta/Facebook, Twitter, Google/YouTube, Yahoo!/Verizon Media, Microsoft/LinkedIn, Wikimedia Foundation, and Reddit, *see id.* 23:24-24:3—"and the Foreign Influence Task Force." *Id.* 39:4-8.

**RESPONSE:** Dispute the characterization of the USG-Industry group meetings and the bilateral meetings as "censorship-related meetings." That is an argumentative mischaracterization without citation to or support in the record. In addition, while the testimony at Chan Dep. 23:24-24 mentions companies that attended USG-Industry group meetings, a more accurate list of companies that participated in bilateral meetings with the FBI is at Chan Dep. 41:16-42:7. In addition, this PFOF contains no evidence that any of the referenced meetings are or were "censorship-related," and any assertion that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

868.     During these bilateral meetings, the FBI's FITF would also "bring in field offices that had cyber investigations" of "state-sponsored actors that the FBI was investigating that we believe were capable of hack-and-dump campaigns" during the 2020 election cycle. *Id.* 39:10-16.

In other words, in the bilateral meetings, the FBI repeatedly raised the concern about the possibility of "hack and dump" operations during the 2020 election cycle during FITF's bilateral meetings with each of at least seven major social-media platforms. *Id.*

**RESPONSE:** Disputed. The assertion that the FBI "repeatedly" raised the concern about the possibility of hack and dump operation during the 2020 election cycle "with each of at least seven major platforms is unsupported by the cited evidence or the record. ASAC Chan "warned the companies on more than one occasion, although" he "cannot recollect how many times." Chan Dep. 175:11-14. In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

869.    These bilateral meetings between FBI and social-media platforms are continuing—they occurred during the 2020 election cycle, and they continued during the 2022 election cycle. *Id.* 39:18-40:1. "They occur at roughly a quarterly cadence," but "the cadence increase[s] as elections get close," so that the meetings "become monthly as the election nears and then weekly very close to the elections." *Id.* 40:2-20. These meetings will continue quarterly, monthly, and then weekly leading up to the 2024 election as well. *Id.* 41:5-15. The meetings also occurred "[o]n a quarterly cadence" during the 2018 election cycle. *Id.* 42:18-24.

**RESPONSE:** Disputed. The assertions that all "bilateral meetings" concern the "election cycle" and that meetings at which an election may be discussed "are continuing" and that they "will continue quarterly, monthly, and then on a weekly basis leading up to the 2024 election" is unsupported by the record. ASAC Chan testified that he "hosted . . . bilateral meetings between each of the companies" and FITF, including "field offices that had investigations related to malign foreign influence by state-sponsored actors," and "field offices that" were conducting pertinent cyber investigations as to such actors, not that all such bilateral meetings were election-related. Chan Dep. 39:4-12. ASAC Chan testified that he does not "know . . . for a fact" that bilateral meetings at which an election may be discussed would occur 2024 although he "would assume

so." *Id.* at 285:3-6. In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

870.    The companies with which FITF conducts these regular bilateral meetings include "Facebook, Google, Twitter, Yahoo!, Reddit, and LinkedIn," as well as "Apple and Wikimedia Foundation." *Id.* 41:24-42:7. Apple was "added because they are a cloud infrastructure company; and we believe that tactical information, specifically indicates that we shared with them related to foreign-state-sponsored actors, might pop up on … any screening they do on iCloud." *Id.* 42:12-17.

**RESPONSE:** Disputed. The assertion that all "these regular bilateral meetings" concern the "election cycle" is unsupported by the record. ASAC Chan testified that he "hosted . . . bilateral meetings between each of the companies" and FITF, including "field offices that had investigations related to malign foreign influence by state-sponsored actors," and "field offices that" were conducting pertinent cyber investigations as to such actors, not that all such bilateral meetings were election-related. Chan Dep. 39:4-12. The testimony at Chan Dep. 42:12-17 is misquoted, as the transcript reads "specifically indicators" (not "specifically indicates"). In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

871.    In these meetings, FBI officials meet with senior social-media platform officials in the "trust and safety or site integrity" role, *i.e.*, those in charge of enforcing terms of service and content-moderation policies for the platforms. *Id.* 43:5-44:1. In other words, the FBI meets with the officials responsible for censoring speakers and content on the platforms—those "directly involved in the enforcement of terms of service for these various platforms," which "includes … content modulation of content on the platforms." *Id.* 49:19-50:2.

**RESPONSE:** Disputed. The assertion that FBI "meets with the officials responsible for censoring" on platforms is an argumentative mischaracterization unsupported by the record. Rather, the FBI meets, as ASAC Chan testified, with social-media personnel who "will at least inform" the personnel responsible for the companies' content moderation policies—to which all users agree—and their application. Chan Dep. 49:15-18. In addition, it is unclear which meetings this PFOF describes with the phrase "these meetings." In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

872.     The FBI's "quarterly meetings" with social media platforms to "probe" questions about censorship of disinformation began as early as "in the 2017 time frame." *Id.* 87:24-88:14, 89:19-20.

**RESPONSE:** Disputed. The assertion that FBI asks "questions about censorship of disinformation" on social media platforms is an argumentative mischaracterization unsupported by the record. In the testimony cited, ASAC Chan testified that the FBI asked social media companies about the algorithmic tools they use to detect "bots" Russian and other foreign actors use to amplify their influence efforts and that the companies have not disclosed the details of those tools. Chan Dep. 87:2-88:14. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

873.     A large number of FBI officials attend each regular bilateral meeting about disinformation with each of those seven social-media platforms. In addition to Chan and Laura Dehmlow, who is the head of FBI's Foreign Influence Task Force (FITF), "between three to ten"

FITF officials attend each meeting, as well as "one field office comprised of two representatives" from each of "one to three field offices." *Id.* 109:21-22, 110:7-14. Frequently the number of FBI agents attending each meeting "could be as high as a dozen." *Id.* 110:17-18.

**RESPONSE:** Disputed. The assertion that the meetings the cited testimony describes are "about disinformation" on platforms is an argumentative mischaracterization unsupported by the record. Those meetings concern foreign malign influence operations, which the FBI is statutorily responsible for investigating, and which include state-sponsored cyber activities as well as disinformation campaigns. *See* Chan Dep. 39:4-16; *see generally* Knapp Decl ¶¶ 10-49 (Ex. 157). In addition, the assertion that "each" bilateral meeting is always attended by all the persons mentioned and that the FBI attendees are all "agents" is unsupported by the record. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

874.    Likewise, large numbers of officials from the social-media platforms attend these regular bilateral meetings with the FBI about disinformation. "[A] similar amount" of people attend each meeting from the platforms, and "for the three larger companies – specifically Google/YouTube, Facebook, and Twitter – it would be equal numbers or higher numbers than the FBI." *Id.* 110:21-25.

**RESPONSE:** Disputed. The assertion that the meetings the cited testimony describes are "about disinformation" on platforms is an argumentative mischaracterization unsupported by the record. Those meetings concern foreign malign influence operations, which the FBI is statutorily responsible for investigating, and which include state-sponsored cyber activities as well as disinformation campaigns. *See* Chan Dep. 39:4-16; *see generally* Knapp Decl. ¶¶ 10-49 (Ex. 157). The assertion that a similar number of personnel from companies other than Google/YouTube, Facebook, and Twitter attended the meetings is unsupported by the cited testimony or the record. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce

social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

875.    In addition to all these meetings, on February 4, 2019, there was a meeting between Facebook, Google, Microsoft, and Twitter and the FBI's FITF, ODNI, and CISA to discuss election issues. Elvis Chan attended, as did Director Krebs, Matt Masterson, and possibly Brian Scully of CISA. Representatives of the social-media companies at the meeting included those from the "trust and safety" or content-modulation teams, and "the social media companies were focused on discussing disinformation." *Id.* 151:9-154:6.

**RESPONSE:** Undisputed subject to clarification. The cited testimony states that the meeting was about election "security" and that ASAC Chan believed a representative of FITF attended but he was not completely sure. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

876.    Discovery obtained from LinkedIn contains 121 pages of emails between Elvis Chan and other FBI officials and LinkedIn officials setting up numerous meetings to discuss disinformation issues during the 2020 and 2022 election cycles. Chan Ex. 2. Chan confirms that he has a similar set of communications setting up a similar series of meetings with each of "six or seven other social-media platforms as well"—he has "similar types of correspondence" with the others, including Facebook, Twitter, Google/YouTube, etc. Chan. Dep. 288:4-17.

**RESPONSE:** Disputed. The assertion that the meetings the cited testimony describes are "about disinformation" on platforms is an argumentative mischaracterization unsupported by the record. Those meetings concern foreign malign influence operations, which the FBI is statutorily responsible for investigating, and which include state-sponsored cyber activities as well as disinformation campaigns. *See* Chan Dep. 39:4-16; *see generally* Knapp Decl. ¶¶ 10-49 (Ex. 157). The record shows that ASAC Chan had (past tense), not "has" (present tense) similar types of

correspondence regarding those meetings. Chan Dep. 288:10-17. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

877.    These emails confirm that Chan and the other FBI officials regularly met with senior officials at social-media platforms with responsibility for *content moderation*. *See* Chan Ex. 2, at 3; Chan Dep. 292:7-293:8. The FBI meets with "director level and … their direct reports" from the "trust and safety and site integrity" teams. Chan Dep. 293:4-8.

**RESPONSE:** Undisputed. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

878.    The FBI communicates with social-media platforms using two alternative, encrypted channels—the self-deleting messaging app Signal, and the encrypted messaging service Teleporter. Chan Dep. 295:7-296:9.

**RESPONSE:** Disputed. The assertion that the FBI "communicates" (present tense) with social media platforms using Signal is not supported by the record. Chan Dep. 298:20-21. The testimony this PFOF cites concerns communications from the FBI election command post, not communications in general. *Id.* at 295:7-12. As to Signal communications, the FBI turned off the self-deleting functionality and saved the information. *Id.* at 297:23-298:7. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

879.    For each election cycle, during the days immediately preceding and through election day, the FBI maintains a command center around the clock to receive and forward reports of "disinformation" and "misinformation," and the FBI requests that the platforms have people available to receive and process those reports at all times: "FBI headquarters, they just ran 24 hours a day for their command post, I believe from Friday to Tuesday. FBI San Francisco ran from, I believe, 8:00 o'clock in the morning to perhaps 10:00 o'clock at night every day except the election, when we ran until midnight." Chan Dep. 301:14-20. In advance of the elections, the FBI "ask[ed] the companies when they intended to have personnel on what days monitoring their platform for any threats that they saw." Chan Dep. 301:21-24.

**RESPONSE:** Disputed. The assertion that the FBI "request[ed]" that social media companies have personnel available to receive reports "at all times" is unsupported by the cited testimony or the record. ASAC Chan testified that the FBI simply asked the companies "when" their personnel would be monitoring their platforms. Chan Dep. 301:21-24. In addition, the assertion that the (sole) purpose of the FBI command center is to forward reports of "disinformation and misinformation," and that the stated facts apply to "each" election cycle, is not supported by the cited evidence or the record. The FBI's election command center communications with social media companies concern election-related time, place, and manner disinformation. *See generally* Knapp Decl. ¶¶ 21-24 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

## C.    The FBI's Deceptive Information Censors the Hunter Biden Laptop Story.

880.    Elvis Chan, other FBI officials, and other federal officials repeatedly warned industry participants to be alert for "hack and dump" or "hack and leak" operations prior to the 2020 election, even though they had no investigative basis to issue such warnings. These warnings provided the justification for the platforms to censor the Hunter Biden laptop story that the New York Post broke on October 14, 2020. *See id.* at 232:1-234:3. These "hack and leak" or "hack and dump" warnings were issued many times, both in the "USG-Industry" meetings and in the FBI's bilateral meetings with social-media platforms.

**RESPONSE:** Disputed. The assertions that FBI "had no investigative basis to issue such warnings," that these warnings "provided the justification" for any action taken by the platforms, and that platforms "censor[ed] the Hunter Biden laptop story," are argumentative mischaracterizations unsupported by the cited testimony or the record. *See* Defs.' Arg. § II.B.3.b.i. FBI did have a factual basis for the 2020 warnings based on the Russian effort to influence the 2016 presidential election and the concerns of multiple officials in the Trump Administration that those efforts were continuing in 2020. *See* Defs.' Arg. § II.B.3.b.i. Neither this PFOF, nor any other, contains evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

881.    Hack and leak operations were discussed at the USG-Industry meetings. *Id.* 172:3-5. At the USG-Industry meetings, Elvis Chan and other FBI officials "warned the social media companies about the potential for a 2016-style DNC hack-and-dump operation." *Id.* 172:23-173:1.

**RESPONSE:** Disputed to the extent that the assertion that FBI officials other than ASAC Chan definitely provided the stated warning is unsupported by the record. *See* Chan Dep. 175:17-20 (Chan recalled other senior officials "likely mentioned the possibility of hack-and-dump operations"). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

882.    During these meetings, Chan "warned the companies about a potential for hack-and-dump operations from the Russians and the Iranians on more than one occasion." *Id.* 175:10-13. Laura Dehmlow, the head of FITF, also "mentioned the possibility of hack-and-dump operations." *Id.* 175:17-20.

**RESPONSE:** Disputed to the extent that the assertion that Laura Dehmlow definitely mentioned the possibility of hack-and-dump operations is unsupported by the record. *See* Chan Dep. 175:17-20 (Chan recalled other senior officials, "to include Section Chief Dehmlow, likely mentioned the possibility of hack-and-dump operations"). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

883.    The prospect of hack-and-leak operations was also repeatedly raised "[a]t the FBI-led meetings with FITF and the social-media companies." *Id.* 177:24-25. It was also raised at the "CISA-hosted USG-industry" meetings. *Id.* 178:1-6, 180:24-25. "[T]he risk of hack-and-leak operations were raised at both sets of meetings, both at CISA-organized USG-industry meetings and the FITF-organized direct meetings between the FBI and social media platforms." *Id.* 181:6-11. Chan himself raised the warnings "regularly" at the bilateral FITF-platform meetings. *Id.* 185:16-18. Laura Dehmlow raised the warning at the USG-Industry meetings "that the FBI is concerned about the potential for hack-and-leak or hack-and-dump operations from foreign state-sponsored actors." *Id.* 187:1-4. And Chan himself "recollect[s] mentioning the potential for hack-and-dump operations during the CISA-hosted USG-industry meetings." *Id.* 189:4-7. Chan confirms that he raised these concerns "to the social media platforms on multiple occasions in two sets of meetings in 2020," including "the USG-industry meetings organized by CISA" and "the FITF organized meetings with the individual social media platforms." *Id.* 204:2-12.

**RESPONSE:** Disputed. The assertion that Laura Dehmlow definitely mentioned the possibility of hack-and-dump operations is unsupported by the record. *See* Chan Dep. 175:17-20 (Chan recalled other senior officials, "to include Section Chief Dehmlow, likely mentioned the possibility of hack-and-dump operations"). Although examining counsel sometimes referred to warnings about the "prospect" of hack-and-leak operations, Chan described the warnings to be about the "possibility" or "potential" of a hack-and-leak operation. *Id.* at 178:1-6; 189:2-7; 190:8-13; 192:9-15; 206:20-207:10. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

884.    In the same time frame in 2020, as federal officials were repeatedly raising these concerns about hack-and-leak operations, some social media platforms updated their policies to provide that posting hacked materials would violate their policies and could result in censorship: "some social media companies adjusted or updated their terms of service or their community standards to say that they would not post any hacked materials." *Id.* 205:6-9. According to Chan, the "impetus" for these more restrictive censorship policies was the repeated concern raised by Chan, the FBI, and federal national-security officials about the risk of "a 2016-style hack-and-leak operation: "the impetus was in case there was a 2016-style hack-and-leak operation." *Id.* 205:14-21. The FBI's repeated warnings, therefore, induced social-media platforms to adopt more restrictive censorship policies on hacked materials, *see id.*, which would then be used to censor the Hunter Biden laptop story.

**RESPONSE:** Disputed. The assertions that FBI conduct was the "'impetus' for . . . more restrictive censorship policies," and that FBI "induced . . . platforms to adopt more restrictive censorship policies," are argumentative mischaracterizations unsupported by the record. Rather, ASAC Chan testified that he "believe[s]" platforms "independently . . . had similar concerns" regarding recurrence of "2016-style" operations. Chan Dep. 205:14-17, 21-22; *see also* Ex. 2 at 11, 25. In addition, the record does not support the assertion that the social media companies updated their policies in 2020. ASAC Chan testified that the updates occurred "before the 2020 elections, but I can't remember when." *Id.* at 205:12-17. The FBI does not pressure or coerce companies into taking any action, but rather relies on the companies to take whatever action they deem appropriate in light of their terms of service. *See, e.g.*, Knapp Decl. ¶¶ 15, 23 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

885.   Chan denies that the FBI urged the platforms to change their terms of service to address hacked materials, but he admits that the FBI repeatedly inquired of the social-media platforms *whether* their policies would allow for or require the censorship of hacked materials. The FBI "wanted to know if they had changed their terms of service or modified it, and we wanted to know what they had changed," and thus the platforms "advise[d]" the FBI that "they had changed" their policies "to reflect the ability to pull down content that results from hack operations." *Id.* 206:5-13.

**RESPONSE:** Disputed. The assertion that the FBI "repeatedly" inquired "whether their policies would allow for or require the censorship of hacked materials" is unsupported by the cited testimony or the record. ASAC Chan testified that in his opinion the rationale for the FBI's inquiry about the terms of service applicable to hack-and-leak activities was to assess what "hypothetical" "legal remedy such as like a seizure warrant or something" might be appropriate to pursue if the social media company did not have its own applicable term of service, but that ASAC Chan "can't ever recollect discussing this because it never came up." Chan Dep. 249:15-21, 250:7. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

886.   Again, Chan testified that, in meeting with platforms like Facebook, the FBI "asked, 'If you receive a whole -- if you see a trove of potentially hacked materials, what are you going to do about it?' Which would be our way of asking them how their terms of service would handle a situation like that." Chan Dep. 247:25-248:4. The FBI "ask[ed] how they would handle it if potentially hacked materials appeared." Chan Dep. 248:5-8. Chan believes they asked that question of Twitter, Facebook, and YouTube, and the social-media platforms responded, as he "remember[s] the social media companies having terms-of-service policies to handle this sort of situation." Chan Dep. 248:14-16. Both Facebook and Twitter, for example, "said that they would remove hacked materials if they were able to validate that it was hacked." Chan Dep. 252:24-253:4. These conversations happened "ahead of the 2020 elections." Chan Dep. 253:6-7.

**RESPONSE:** Disputed that the FBI actually asked the question stated in the first sentence of this PFOF. ASAC Chan in fact testified that he did not recall "any of us saying" the first sentence of this PFOF, but rather he thought that was "what we would have said." *See* Chan Dep. 247:16-

248:4. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

887.    The FBI asked the platforms how their policies would handle a hack-and-leak operation at the same time as repeatedly warning them about such operations—thus effectively inducing them to adopt such policies. Chan Dep. 248:23-249:2.

**RESPONSE:** Disputed. The assertion that the FBI's conduct was "effectively inducing" platforms "to adopt. . . policies" is an argumentative mischaracterization unsupported by the record. The FBI does not pressure or coerce companies into taking any action, but rather relies on the companies to take whatever action they deem appropriate in light of their terms of service. *See* Knapp Decl. ¶¶ 15, 23 (Ex. 157). The assertion that social media companies altered their content moderation policies because of FBI "induce[ment]" rather than their own concerns is disputed as unsupported by the record for the reasons set forth in response to Plaintiffs' PFOF ¶ 884. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

888.    The FBI inquired about the platforms' hacked-materials policies because "internally we wanted to know what actions that we would need to take, whether we would need to take a legal remedy such as like a seizure warrant" to remove supposedly hacked materials. Chan Dep. 249:17-20.

**RESPONSE:** Disputed. ASAC Chan testified that the quoted statement was "just my personal opinion" concerning a "hypothetical" and that he could not "ever recollect discussing this because it never came up." Chan Dep. 249:15-21, 250:7.

889.    Chan was not the only FBI official to ask the platforms about their censorship policies for hacked materials. Instead, this question was posed repeatedly by multiple FBI officials: "I would say we take turns asking. When I say 'we,' I mean either myself or the members of the Foreign Influence Task Force …. Wherever it seemed like an organic follow-up question, we would ask 'How would your terms of service apply to this situation or that situation?'" Chan Dep. 250:14-20.

**RESPONSE:** Disputed that a social media company's own content moderation policies for "hacked materials" or other content, and to which all users agree, constitute "censorship policies." In addition, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

890.    When asked, "did anyone within the FBI discuss or suggest with you that you should raise the prospect of Russian hack-and-leak operations with social media platforms in 2020?" Chan repeatedly responded with a stock answer, "I do not recollect." *Id.* 189:14-23; 189:8-191:21, 203:13-15 ("I cannot recollect." … "I do not recollect." … "I do not recollect." … "I don't recollect." … "I don't recollect." … "I do not recollect.").

**RESPONSE:** Disputed. The assertion that ASAC Chan's lack of recollection as to particular internal discussions "within the FBI" was a "stock answer" is argumentative mischaracterization unsupported by the cited testimony or the record. ASAC Chan's inability to remember any internal FBI discussions about communicating with social media companies about "the prospect of Russian hack-and-leak operations" more than two years before his deposition is unsurprising given that meeting with social media companies is only one of ASAC Chan's many official responsibilities. ASAC Chan's inability to recall that detail during his testimony does not imply any lack of credibility. ASAC Chan also testified that while he did not initially "recollect any specific person discussing . . . with me" the "prospect of a Russian hack-and-leak operation before the 2020 election," he immediately thereafter testified that "However, based on both my

experience as well as my knowledge of active investigations, I would have believed -- as my own assessment, I believe that there was the potential for hack-and-leak operations ahead of the 2020 elections." Chan Dep. 203:13-21. In any event, any internal FBI discussions by definition were not discussions with any social media company and therefore cannot constitute evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

891.    These responses are not credible because they are stock responses, and it is facially implausible that Chan does not recall whether other federal officials discussed warning platforms about "hack-and-leak" operations during 2020, especially after the fiasco of censorship of the Hunter Biden laptop story. These "I do not recollect" responses also contradict Chan's testimony later in the deposition that he "regularly" communicated with FITF and FBI's cyber division about the possibility of a hack-and-leak operation: "I believe that we internally discussed the potential for hack-and-leak operations, and so I regularly was in communication with the cyber division of the FBI as well as with the Foreign Influence Task Force to see if they had heard of anything that I had not heard of. So I would say that the people that I communicate with, everyone was vigilant, but no one -- I believe that in general people at the FBI were concerned about the potential for hack-and-leak operations, but that we had not seen any investigations that led in that direction or that would lead us in that direction." *Id.* 206:23-207:10. He specifically admitted that he recalls discussing hack-and-leak operations with FITF officials "Ms. Dehmlow, Mr. Olson, Mr. Cone, and Mr. Giannini." *Id.* 207:19-23. It is not credible that the *only* aspect of his internal discussions with the FBI about hack-and-leak operations that he does not recall is whether someone from the FBI suggested or directed him to raise the issue with social-media platforms.

**RESPONSE:** Disputed. The assertions that ASAC Chan's lack of recollection as to particular internal discussions "within the FBI" consisted of "stock responses" or is "facially implausible" or "contradict[ed]" by or "not credible" based on other testimony, and that there was a "fiasco of censorship of the Hunter Biden laptop story," are argumentative mischaracterizations unsupported by the record. ASAC Chan's inability to remember any internal FBI discussions about communicating with social media companies about "the prospect of Russian hack-and-leak operations" more than two years before his deposition is unsurprising given that meeting with

social media companies is only one of ASAC Chan's many official responsibilities. ASAC Chan's inability to recall that detail during his testimony does not imply any lack of credibility. ASAC Chan also testified that while he did not initially "recollect any specific person discussing . . . with me" the "prospect of a Russian hack-and-leak operation before the 2020 election," he immediately thereafter testified that "However, based on both my experience as well as my knowledge of active investigations, I would have believed -- as my own assessment, I believe that there was the potential for hack-and-leak operations ahead of the 2020 elections." Chan Dep. 203:13-21. In any event, any internal FBI discussions by definition were not discussions with any social media company and therefore cannot constitute evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

892.    Further, as revealed on the video of Chan's deposition, his demeanor in answering questions on this point changes and becomes evasive. Chan's demeanor when testifying on this point undermines his credibility.

**RESPONSE:** Disputed. The assertions that ASAC Chan's "demeanor" in answering questions as to particular internal discussions "within the FBI" was "evasive" or "undermines his credibility" are argumentative mischaracterizations lacking specific citation to or support in the record.

893.    The FBI and other federal officials had no specific investigative basis for these repeated warnings about possible "hack-and-dump" operations. As Chan admits, "[t]hrough our investigations, we did not see any similar competing intrusions to what had happened in 2016. So although from our standpoint we had not seen anything, we specifically, in an abundance of caution, warned the companies in case they saw something that we did not." *Id.* 174:7-13. As Chan admits, "we were not aware of any hack-and-leak operations that were forthcoming or impending" when he and other federal officials warned about the "risk of hack-and-leak operations, especially before the general election." *Id.* 192:19-24.

**RESPONSE:** Disputed. The assertion that Defendants "had no specific investigative basis for . . . repeated warnings" is an argumentative mischaracterization unsupported by the record. FBI did have a factual basis for the 2020 warnings based on the Russian effort to influence the 2016 presidential election and the concerns of multiple officials in the Trump Administration that those efforts were continuing in 2020. *See* Defs.' Resp. to PFOF ¶ 880. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

894.    Matt Masterson and Brian Scully of CISA also raised the concern about the threat of hack-and-leak operations in the 2020 election cycle to the social-media platforms during the "USG-Industry" meetings that occurred quarterly, then monthly, then weekly leading up to the 2020 election. *Id.* 212:3-22.

**RESPONSE:** Dispute the assertion that Mr. Masterson and Mr. Scully definitely raised "the concern" described in this PFOF or that they raised it at every meeting is unsupported by the record. ASAC Chan testified that he "did not recall any specific situations where" Messrs. Masterson and Scully expressed the concern, although he "believe[s]" that "is something that they may have discussed." Chan Dep. 212:17-19. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

895.    Yoel Roth, then-Head of Site Integrity at Twitter, provided a formal declaration to the Federal Election Commission containing a contemporaneous account of the discussion of the threat of "hack-and-leak operations" at the meetings between the FBI, other federal law-enforcement and national-security agencies, and the social-media platforms. His declaration states: "Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security.

During these weekly meetings, the federal law enforcement agencies communicated that they expected 'hack-and-leak operations' by state actors [*i.e.*, Russians or other foreign governments] might occur in the period shortly before the 2020 presidential election, likely in October. I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter. These expectations of hack-and-leak operations were discussed throughout 2020. *I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden*." Chan. Ex. 8, ¶¶ 10-11, at 2-3 (emphasis added). Yoel Roth executed this declaration on December 17, 2020, shortly after the events described, and submitted it to the Federal Election Commission in a formal enforcement proceeding, so it has the force of a statement under oath. *Id.* at 4.

**RESPONSE:** Not disputed that Plaintiffs have accurately quoted from Mr. Roth's declaration. Note however, that in February 8, 2023, testimony before the House of Representatives Committee on Oversight and Accountability about the meetings mentioned in Mr. Roth's declaration, Mr. Roth clarified that the FBI was not the source of warnings to Twitter about "a hack-and-leak operation . . . involv[ing] Hunter Biden." *See* Ex. 2 at 37 (*Protecting Speech from Government Interference and Social Media Bias, Part 1: Twitter's Role in Suppressing the Biden Laptop Story: Hearing Before the H. Comm on Oversight & Accountability*, 118th Cong. 1 (2023)) ("My recollection is that a representative of another tech company may have mentioned [the Hunter Biden hack-and-leak operation], but those meetings were several years ago. I truly don't recall."); *id.* at 43 ("I want to be clear that my statement to the FEC does not suggest that the FBI told me it would involve Hunter Biden. That's a popular reading of that declaration, but it was not my intent."); *id.* at 46 ("My recollection is it was mentioned by another technology company in one of our joint meetings, but I don't recall specifically whom.").

896.    Chan's account of these meetings largely matches Roth's account, *see, e.g.,* Chan Dep. 218:5-220:15, but there are two key discrepancies between Roth's and Chan's accounts. First, Roth recounts that the FBI and national-security officials communicated to Twitter that they "*expected*" that there would be one or more hack-and-leak operations by Russia or other "state actors." *Id.* at 2. Chan testified that he believed they used words like "concern" instead of "expected." Chan. Dep. 220:20-24, 224:5-17, 226:5-12, 227:3-6. Second, Roth specifically recalls that federal officials told him that "there were rumors that a hack-and-leak operation would involve Hunter Biden." Chan Ex. 8, ¶ 11, at 3. Chan testified that "in my recollection, Hunter Biden was

not referred to in any of the CISA USG-Industry meetings."  Chan Dep. 213:8-10; *see also id.*
227:24-228:1, 228:21-23, 229:9-11 229:15-20.

**RESPONSE:** Disputed. This PFOF repeatedly mischaracterizes statements from Mr.

Roth's December 2020 declaration to give the appearance of discrepancies between his

recollection of the meetings and ASAC Chan's. First, Mr. Roth did not state in his declaration that

the FBI or other national-security officials told Twitter that they "'*expected*' that there would be"

more hack-and-leak operations. As quoted in the preceding PFOF, ¶ 895, Mr. Roth stated that they

"expected 'hack-and-leak operations' by state actors *might* occur" (emphasis added), consistent

with ASAC Chan's use of the word "concern" to express the tenor of what was communicated to

the companies. Second, Mr. Roth did not state in his declaration that he "*specifically recalls that*

*federal officials told him that* 'there were rumors that a hack-and-leak operation would involve

Hunter Biden'" (emphasis added). Rather, he stated that he "learned in these meetings *that there*

*were rumors* that a hack-and-leak operation would involve Hunter Biden" (emphasis added),

without specifying from whom he heard this rumor, a Government representative or a

representative from another social media company. The so-called "discrepancies" are immaterial,

in any event, as set forth in response to Plaintiffs' PFOF ¶ 895, as Mr. Roth clarified in his February

2023 congressional testimony that neither the FBI nor other government agencies were the source

of warnings to Twitter about "a hack-and-leak operation . . . involv[ing] Hunter Biden." *See* Defs.'

Resp. to PFOF ¶ 895. At any rate, this PFOF contains no evidence that the FBI used pressure or

deception to induce social-media companies to remove or suppress information on their platforms,

or that the companies regarded (or acted on) any communications with the FBI as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF

§ II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

897.    On these points, Roth's declaration is more credible than Chan's testimony, for at

least four reasons. First, Roth's declaration was executed much closer in time to the events

described—just two months later—while Chan's testimony occurred over two years later. Indeed, as noted above, Chan himself admitted that he "could not recollect" key details about the federal officials' course of conduct in warning social-media platforms about a supposed "hack and dump" operation, so there is no reason to think that Chan's recollection is more reliable on these similarly specific details.

**RESPONSE:** Disputed for the reasons stated in response to Plaintiffs' PFOF ¶ 896. As explained therein, the asserted "discrepancies" between Mr. Roth's declaration and ASAC Chan's testimony are neither substantiated, nor material.

898.    Second, Roth had no incentive to color or shade his account of communications from federal officials when he submitted this Declaration to the FEC, while Chan has strong incentives to shade his testimony on these points to deemphasize the FBI's involvement in censoring the Hunter Biden laptop story. Indeed, if the FBI and other federal officials warned social-media platforms about a hack-and-leak operation *involving Hunter Biden*—when the FBI had received Hunter Biden's laptop from the Delaware repair-shop owner and thus *knew* that it was not hacked, *see* Doc. 106-3, at 5-11 —that raises a compelling inference that the FBI deliberately gave misleading information to social-media platforms to induce them to wrongfully censor the Hunter Biden laptop story.

**RESPONSE:** Disputed. First, the PFOF does not even specify what "incentives" ASAC Chan supposedly had to "shade" his deposition testimony, much less cite evidence to support a suggestion that he was anything but truthful. Second, the PFOF's assumption that "the FBI and other federal officials warned social-media platforms about a hack-and-leak operation *involving Hunter Biden*" is unsupported by the evidence on which Plaintiffs rely, as explained in response to Plaintiffs' PFOF ¶ 896. Third, in any event, Mr. Chan has no internal knowledge of the relevant ongoing FBI investigation, Chan Dep. 214:8-16, about which the FBI does not publicly comment. Therefore, fourth, Plaintiffs cite no evidence, and there is none, "that the FBI deliberately gave misleading information to social-media platforms to induce them to wrongfully censor the Hunter Biden laptop story." In short, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

899.    Third, Chan's testimony on a closely related point—whether Chan was instructed by an FBI official to warn social-media platforms about "hack and leak" operations—is not credible. Chan's minor disagreements with Roth's account are not credible for similar reasons. For example, Chan claims to have extremely specific recollection of the FBI's word-choice in meetings that occurred over two years earlier—disputing that the FBI used the word "expected," *id.* 220:20-24, 223:12-22, 224:5-17, 226:5-12, 227:3-6, and affirmatively asserting with confidence that "Hunter Biden" was never mentioned, *id.* 213:8-10, 227:24-228:1, 228:21-23, 229:9-11 229:15-20—while at the same time claiming that he could not recollect whether he discussed the same issues with the FBI internally *at all, Id.* 189:14-23; 189:8-191:21, 203:13-15.

**RESPONSE:** Disputed. First, as explained in response to Plaintiffs' PFOFs ¶¶ 890-91, ASAC Chan's inability to remember any internal FBI discussions about communicating with social media companies about "the prospect of Russian hack-and-leak operations" more than two years before his deposition does not imply any lack of credibility; in any event, any internal FBI discussions by definition were not discussions with any social media company and therefore cannot constitute evidence in support of Plaintiffs' claims. Second, the supposed "disagreements" between Mr. Roth's declaration and ASAC Chan's deposition testimony, in addition to being immaterial, are based on Plaintiffs' own mischaracterizations of Mr. Roth's statements, as explained in response to Plaintiffs' PFOF ¶ 896. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

900.    Fourth, Chan's demeanor while testifying by videotape on this point is evasive and undermines his credibility.

**RESPONSE:** Disputed. The description of Special Agent Chan's "demeanor" as "evasive" is an argumentative mischaracterization lacking specific citation to or support in the record. This

PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

901.    Two additional points support the credibility of Roth's account over Chan's. First, Brian Scully's testimony, unlike Chan's, did not dispute or quibble with any aspect of Roth's near-contemporaneous account of these conversations—Scully merely contended that he could not remember. Scully Dep. 247:18-248:2.

**RESPONSE:** Disputed. First, the assumption of a disagreement between Mr. Roth's declaration and ASAC Chan's testimony that requires an assessment of "credibility" is itself unsupported by the record, as explained in response to Plaintiffs' PFOF ¶ 896. Second, Mr. Scully's lack of recall regarding a reference to Hunter Biden during the USG-Industry meetings *supports* ASAC Chan's testimony that "in [his] recollection, Hunter Biden was not referred to in any of [those] meetings."  Chan Dep. 213:8-10; *see also id.* at 227:7-229:11. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

902.    Second, Roth's account directly matches the less detailed but even more contemporaneous account provided by Mark Zuckerberg in his testimony before Congress on October 28, 2020. Zuckerberg's testimony confirms that, as Yoel Roth recounted, the FBI conveyed a strong risk or expectation of a foreign hack-and-leak operation shortly before the 2020 election: "So you had both the public testimony from the FBI and in private meetings alerts that were given to at least our company … that suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion, that it might be part of a foreign manipulation attempt." Chan Ex. 9, at 56 (emphasis added). Indeed, Chan did not dispute Zuckerberg's account: "I don't remember the exact framing of our discussions with them [*i.e.*, Facebook]."  Chan Dep. 247:14-15. And again, Chan did not dispute the fundamental details of Zuckerberg's account; he admitted that he "hosted several private meetings with Facebook where the concern about a hack-and-leak operation was raised" in 2020. Chan Dep. 246:17-20.  Though Chan did state that "I would not have framed it like Mr. Zuckerberg did," Chan essentially concedes the accuracy of Zuckerberg's account.  Chan Dep. 255:14-15.

**RESPONSE:** Disputed. First, Mr. Zuckerberg's testimony makes no reference to an "alert" from the FBI, or any other Government agency, of a hack-and-leak operation *involving Hunter Biden's laptop*, and thus his testimony more closely aligns with ASAC Chan's. Second, Plaintiffs omit from their PFOF Mr. Zuckerberg's further testimony that "one of the threats that the FBI has alerted our companies and the public to, was *the possibility of* a hack and leak operation in the days or weeks leading up to this election," Chan Dep. Ex. 9 at 56, again consistent with Mr. Chan's testimony regarding the nature of the message the Government conveyed in the USG-Industry meetings. *See also* Dkt. 96 at 2 (October 25, 2022 letter by Meta's counsel representing to the Court that "ASAC Chan at no point in time advised Meta 'to suppress the Hunter Biden laptop story.' Nor did any of his colleagues."). This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

903.     After the Hunter Biden story broke on October 14, 2020, Laura Dehmlow of the FBI refused to comment on the status of the Hunter Biden laptop in response to a direct inquiry from Facebook, even though the FBI had the laptop in its possession since late 2019 and knew that its contents were not hacked. Chan Dep. 213:11-215:5.

**RESPONSE:** Disputed. The cited testimony is that after the *New York Post* story broke, ASAC Chan recalls Ms. Dehmlow saying the FBI had no comment in response to a question from a Facebook analyst whether the FBI had any information they could share about the relevant investigation. The cited testimony does not state that Ms. Dehmlow "refused to comment on the status of the Hunter Biden laptop" or that there was "a direct inquiry" about the laptop (as opposed to a general inquiry prompted by the *New York Post* story). Furthermore, the FBI has consistently declined to comment on or provide details about any relevant investigation. This PFOF contains

no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

904.   When the Hunter Biden laptop story broke on October 14, 2020, it was widely censored on social media, including by Twitter and Facebook, pursuant to their hacked-materials policies. For example, Twitter's Site Integrity Team "blocked Twitter users from sharing links over Twitter to the applicable New York Post articles and prevented users who had previously sent Tweets sharing those articles from sending new Tweets until they deleted the Tweets" sharing the Hunter Biden laptop story. Chan Ex. 8, at 3. "Facebook, according to its policy communications manager began 'reducing its distribution on the platform,' pending … a third-party fact check. Twitter went beyond that, blocking all users, including the House Judiciary Committee, from sharing the article on feeds and through direct messages. Twitter even locked the New York Post account entirely, claiming the story included hacked materials and was potentially harmful." Chan Ex. 9, at 2.

**RESPONSE:** Disputed. Plaintiffs omit Twitter's 2022 and prior representations to Congress about its conduct as to the "Hunter Biden Laptop Story." Plaintiffs' assertions that the "Hunter Biden Laptop Story" "was widely censored on social media" are argumentative mischaracterizations unsupported by the record. Twitter's then-chief executive, Jack Dorsey, represented to Congress in 2020 that, after the *New York Post*'s release of its articles, Twitter enforced its Hacked Materials Policy, which prevented sharing certain links from that newspaper's Twitter account, "publicly or privately," but "[r]eferences to the contents of the materials or discussion about the materials were not restricted under the policy." Ex. 137 at 6 (*Breaking the News: Censorship, Suppression, and the 2020 Election: Hearing Before the S. Comm. on the Judiciary*, 116th Cong. 6 (2020) (statement of Jack Dorsey, CEO, Twitter), 2020 WL 13568471). As a former attorney for Twitter, Vijaya Gadde, represented to Congress in 2023, the New York Post's tweets about the article fell within the Hacked Materials Policy because they contained "embedded images that looked like they may have been obtained through hacking," and the result of Twitter's initial decision was to "block[]" tweets and linked-to articles "embedding those source

materials," which did not prevent other "tweeting [about], reporting, discussing, or describing the contents of" the laptop. Ex. 2 at 5. But "Twitter then "changed its policy within 24 hours and admitted its initial action was wrong. This policy revision immediately allowed people to tweet the original articles with the embedded source materials." *Id*. Thus, Twitter changed tacks, and it "quickly updated our policy to limit its scope to only cover the removal of materials shared by hackers directly," and subsequently restored the New York Post's account. Ex. 137 at 6.

### D.   The FBI Routinely Flags Speakers and Content for Censorship.

905.   According to Chan, during the 2020 election cycle, "the U.S. government and social media companies effectively impeded [foreign] influence campaigns primarily through information sharing and *account takedowns*, respectively." Chan Ex. 1, at i (emphasis added).

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government."

906.   According to Chan, the FBI's "information sharing" includes both "strategic information," which "discusses the tools, tactics or processes" used by foreign-influence campaigns, and "tactical information," which means identifying specific "indicators or selectors," which are both "a term of art" that refers to "IP addresses, email accounts, social media accounts, … website domain names, and … file hash values." Chan Dep. 29:15-30:7.

**RESPONSE:** Undisputed.

907.   In other words, according to Chan, the FBI "shares information" with social-media platforms that includes information about specific IP addresses, email accounts, social-media accounts, and website domain names that the FBI believes should be censored, and this sharing of information leads social-media platforms to engage in "account takedowns" based on the FBI's information. *See id.* According to Chan, this combination of "information sharing" and "account takedowns" "effectively impeded [foreign] influence campaigns" during the 2020 election cycle. Chan Ex. 1, at i.

**RESPONSE:** Disputed. The assertion that FBI provided foreign influence information to platforms about accounts FBI "believes should be censored" is an argumentative mischaracterization unsupported by the cited testimony or the record. Rather, ASAC Chan testified

that the FBI provided the companies information enabling them to "discover fake Russian accounts" on their platforms, Chan Dep. 32:16-24, "so that they can protect their platforms as they deem appropriate, and they can take whatever actions they deem appropriate without any suggestion or interference from the FBI," *id.* at 34:7-12, including "taking them down," *id.* at 32:24, 33:17. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

908.    Chan testified that the FBI shares this information with social-media platforms so that they can "protect their platforms"—indeed, "protect their platforms" was a stock phrase in Chan's testimony. Chan Dep. 32:19, 34:7-12, 35:8-10, 36:25, 87:22-23, 274:14. As Chan's testimony makes clear, however, the phrase "protecting their platforms" is a euphemism for "censoring speech that federal officials disfavor." For example, Chan admits that "protect their platforms" means "knocking down accounts or knocking down misinformation content." Chan Dep. 273:12-17. Chan's thesis and testimony make clear that the FBI's purpose in "information sharing" with social-media platforms is to induce them to censor speech that the FBI dislikes and wants to see censored. For example, Chan testified that "my purpose is to share the information with them so they can protect their platforms as they deem appropriate," but he immediately admitted that "one way to protect their platforms is to take down these accounts." *Id.* 35:9-14. Thus, Chan admits that the FBI's "purpose" in "information-sharing" includes "to take down these accounts" that the FBI believes are Russian-influenced. *Id.*

**RESPONSE:** Disputed as an argumentative mischaracterization and misrepresentation of the cited evidence that is unsupported by the record. Mr. Chan did not testify or in any way suggest "that the FBI's purpose in 'information sharing' with social-media platforms is to induce them to censor speech that the FBI dislikes" or that "federal officials disfavor." First, he explained that the FBI shares technical information with the companies (such as Internet Protocol (IP) addresses and other "selectors") suggesting the presence on their platforms of malign foreign-influence and foreign state-sponsored accounts, principally Russian accounts, *not* information about accounts the Government "disfavor[s]" or "dislikes." *See, e.g.,* Chan Dep. 32:16-24, 33:12-17, 36:9-11,

42:12-17. Second, the FBI's purpose was not to induce the companies to "censor" speech but, as noted above, ASAC Chan explained that the FBI shared information about possible malign foreign-influence accounts on their platforms "so that they can protect their platforms as they deem appropriate . . . take whatever actions they deem appropriate without any suggestion or interference from the FBI," *id.* at 34:7-12.

Note further that ASAC Chan's master's thesis also provides no support for the misrepresentations contained in this PFOF. As ASAC Chan explained when questioned about his thesis, "so looking at that sentence [from the thesis] and from my recollection, the FBI part of it is the information sharing portion, and then the social media company portion is to decide if it violates their terms of service. And if it does violate their terms of service, one of the actions they could take is to knock down accounts or to knock down content.' *Id.* at 273:16-274:5; *see also id.* at 274:12-17.

Note still further, as attested in the Declaration of Larissa Knapp, submitted herewith, the Foreign Influence Task Force's sharing of information with social media platforms is not based on the political or other speech of U.S. persons. Knapp Decl. ¶ 16 (Ex. 157). A decision by the FITF to share information with a U.S. social media platform about a foreign malign actor's social media activity is not based upon the content or particular viewpoint expressed in a posting but rather on the fact that the account is part of a covert effort by a foreign malign actor. *Id.* This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

909.   Chan admits that the purpose and predictable effect of "tactical" information-sharing—*i.e.*, the FBI flagging specific accounts, websites, URLs, IP addresses, web domain

names, etc., to social-media platforms for censorship—is that the platforms will take action against such specific content and accounts under their content-moderation policies: "from what I have observed and what they have told me when we have provided them with high confidence of Russian selectors, that they have been able to discover fake Russian accounts and take them down." *Id.* 32:20-24.

**RESPONSE:** Disputed as an argumentative mischaracterization of the cited evidence.

First, ASAC Chan did not "admit[ ]" or even suggest that the FBI has ever "flagg[ed] specific

accounts, websites, URLs," and the like "to social-media platforms for censorship."  He testified

repeatedly and consistently that FBI shares information with social media companies about

possible malign foreign-influence accounts so the companies may ascertain for themselves

whether the accounts are foreign-based and inauthentic, and, if so, "protect their platforms as they

deem appropriate, and . . . take whatever actions they deem appropriate without any suggestion or

interference from the FBI." *See* Chan Dep. 31:21-35:10. This PFOF contains no evidence that the

FBI used pressure or deception to induce social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

910.    According to Chan, the social-media platforms "take the information that we share, they validate it through their own means. And then if they determine that these are accounts being operated by Russian state-sponsored actors, then they have taken them down." *Id.* 33: 12-17.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the FBI used

pressure or deception to induce social-media companies to remove or suppress information on

their platforms, or that the companies regarded (or acted on) any communications with the FBI as

such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See*

Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

911.    Chan admits that, during the 2020 election cycle, the U.S. Government engaged in "information sharing with the social media companies to expose Russia's different operations and shut down its accounts."  Chan Ex. 1, at xvii. In other words, Chan admits that the purpose of

469

federal officials' "information sharing" was to "shut down … accounts" on social media that the Government disfavored. *Id.*; *see also* Chan Dep. 37:17-38:2.

**RESPONSE:** Disputed as an argumentative mischaracterization unsupported by the record, for the reasons stated in response to Plaintiffs' PFOF ¶¶ 907-09. Note further that the FITF's sharing of information with social media platforms is not based on the political or other speech of U.S. persons. A decision by the FITF to share information with a U.S. social media platform about a foreign malign actor's social media activity is not based upon the content or particular viewpoint expressed in a posting but rather on the fact that the account is part of a covert effort by a foreign malign actor. *See* Knapp Decl. ¶ 16 (Ex. 157). This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

912.    In addition to social-media platforms, Chan and the FBI also "share indicators" with state and local government election officials, such as "county registrars or county clerk's offices"—who are also state actors subject to the First Amendment. Chan "would share indicators with them," and "share the same type of information that I shared with social media companies," including "IP addresses and domain names, so that they could see if they were popping up anywhere on their networks." *Id.* 50:11-51:6. In other words, the FBI feeds information to state and local election officials so that they can make their own reports of supposed "misinformation" and "disinformation" to social-media platforms, creating a First Amendment feedback loop. The FBI seeds concerns with the state and local election officials, who then identify supposed "disinformation" and "misinformation" based on the FBI's information, and then report it to the social-media platforms through CISA and the FBI.

**RESPONSE:** Not disputed that ASAC Chan testified that in 2020 the FBI San Francisco Office provided to registrars and clerk's offices in 16 California counties the same type of information regarding foreign malign actors that it provides to social media companies, "to see if they were popping up anywhere on their [the counties'] networks." Chan Dep. 50:11-51:6. The remainder of this PFOF—including the allegation that the FBI was "seed[ing] concerns" with other

officials, so they would identify "mis-" or "disinformation" to report to social media platforms, and that the FBI "create[ed] a First Amendment feedback loop"—is disputed as argumentative assertions for Plaintiffs cite no evidence whatsoever, and there is none. The FITF's work includes information and intelligence sharing with federal, state, and local government agencies, as well as with U.S. private sector entities. *See* Knapp Decl. ¶¶ 10-20 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

913.    Chan contends that Russian "state-sponsored actors … have created fake social media accounts," which "have either generated disinformation themselves or they have amplified existing content from current users of social media platforms." *Id.* 60:1-7.

**RESPONSE:** Undisputed.

914.    These supposedly Russian-controlled accounts "make their own content," such as "mak[ing] their own Facebook postings," and they "try to find what are the hot-button or current issues in the news … and then they will try to either generate content themselves related to that or they will amplify existing content." *Id.* 60:13-22. This is supposedly done with the goal to "sow discord in the American online environment." *Id.* 61:12-13.

**RESPONSE:** Undisputed subject to clarification. The FBI shares the information only if it has high confidence that the account is attributed to a foreign state actor, not merely if it is "supposedly" attributed to a foreign state actor. Chan Dep. 112:24-113:6.

915.    Chan agrees that "the goal there is … they post messages that they anticipate will be divisive and try and get Americans to engage with them." *Id.* 61:14-18.

**RESPONSE:** Undisputed.

916.    As Chan agrees, "engagement" with a social-media posting includes viewing the content, liking or disliking it, reposting it, commenting on it, and/or reposting it with commentary. *Id.* 61:19-63:13. All of these are First Amendment-protected activities. In this way, according to Chan, "the Russians are trying to get people to engage on their divisive content." *Id.* 63:19-64:1.

471

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction.

917.    According to Chan, over 126 million Americans "engaged" with Russian-originated content on Facebook, and 1.4 million Americans engaged with such content on Twitter, during the 2016 election cycle. *Id.* 66:2-25. All of this was First Amendment-protected activity. Chan credits federal government efforts during the 2020 election cycle with preventing the vast majority of such "engagement" by American citizens with Russian-originate content on social media during the 2020 election cycle. Chan Ex. 1, at v ("This thesis finds that the Russians shifted their tactics from 2016 to 2020. Still, the U.S. government and social media companies effectively impeded their influence campaigns primarily through information sharing and account takedowns, respectively."). Thus, the federal officials' "information sharing" activities prevented an enormous amount of First Amendment-protected activity from occurring.

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. (Note also that the exhibit cited is Special Agent Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

918.    Chan's thesis and testimony provide clear examples of how supposedly Russian-originated "disinformation" on social media becomes intertwined with, and inseparable from, First Amendment-protected forms of expression by American citizens. Chan identifies a supposedly Russian-originated political ad on Facebook that features a picture of Hillary Clinton with a black X painted over her face, advertising an event called "Down with Hillary!" and stating, "Hillary Clinton is the co-author of Obama's anti-police and anti-Constitutional propaganda." Chan Ex. 1,

at 29. None of this is "disinformation" in any meaningful sense—it is actually expression of political opinions. The posting notes that it received 763 reactions and 78 comments on Facebook, which Chan agrees are "engagements by users." *See id.*; *see also* Chan Dep. 67:1-68:20. Chan contends that the underlying ad was "Russian-originated content masquerading as something posted by an American," *id.* 67:6-10—*i.e.*, just the sort of content that the FBI would flag for censorship to social-media platforms through "tactical information-sharing." But once the FBI induces Facebook to pull down the ad from the platform, the First Amendment-protected "engagements" by Americans—likes, dislikes, re-posts, comments, etc.—are all obliterated as well. This is the collateral damage to *Americans'* freedom of speech in the FBI's war on so-called Russian "disinformation."

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. The assertions that the FBI provides foreign influence information to platforms to "flag" content "for censorship" and "induces" any platform to "pull it] down" are disputed as argumentative mischaracterization unsupported by the record for the reasons already stated above. (Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

919.    Chan's thesis provides similar examples of supposedly Russian-originated content with heavy engagement by Americans. For example, it reproduces two supposedly Russian-originated political ads containing a secure-borders message ("Secured Borders: Every man should stand for our borders! Join!") and a pro-Second Amendment message ("Defend the 2nd: The community of 2nd Amendment supporters, gun-lovers & patriots"). Chan Ex. 1, at 32. Again, these are expressions of political opinion, not "disinformation" in any meaningful sense. The former posting garnered 134,943 "likes," and the latter posting garnered 96,678 "likes"—each of which is a First Amendment-protected expression of support for the underlying, supposedly Russian-

originated, political message. *See id.* Another similar ad, targeting black voters, simply stated "Black Matters: Join us because we care. Black matters!" and it drew 223,799 "likes" from ordinary users. *Id.* at 32; Chan Dep. 80:12-20. Chan admits that these are "high" levels of "engagement" from ordinary users. Chan Dep. 83:21.

**RESPONSE:** Disputed. The assertion that "engagement" with the activity of foreign

malign actors is "First Amendment-protected" is an unsupported legal conclusion Defendants

address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion

for a preliminary injunction. The assertion that the "likes" described in this PFOF are from

"ordinary users" is unsupported by the record. (Note also that the exhibit cited is ASAC Chan's

thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views

expressed in" it "are those of the author and do not reflect the official policy or position of the

Department of Defense, the FBI, or the U.S. Government.")

920.    Chan also reports that "IRA employees used social media bots, i.e., computer programs which control social media accounts, to amplify existing content."  Chan Ex. 1, at 30. To "amplify existing content" means to do "things like liking it or reposting it."  Chan Dep. 71:20-24.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis

submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in"

it "are those of the author and do not reflect the official policy or position of the Department of

Defense, the FBI, or the U.S. Government."

921.    Based on research, Chan estimates that "over 100,000 real people had their postings amplified by [Russian]-controlled social media bots."  *Id.* 87:2-6.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis

submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in"

it "are those of the author and do not reflect the official policy or position of the Department of

Defense, the FBI, or the U.S. Government."

922.    In addition, the "indicators" that the FBI targeted for censorship included supposedly Russian-aligned websites that hosted First Amendment-protected content posted by

Americans. For example, Chan identified a supposedly Russia-generated website called "PeaceData," which "hire[d] unwitting freelance journalists, including Americans, to write articles for the site." *Id.* 141:24-142:3. "[A]t least 20 freelance journalists, which includes Americans, had been duped into writing articles for the site." *Id.* 142:4-9. The FBI identified this site as Russia-generated to the social-media platforms, and as a result, the platforms "identified accounts that were foreign-associated … that were directing users to those platforms" and "t[ook] actions against those accounts." *Id.* 143:10-20. The speech of the American freelance journalists was thus suppressed due to FBI inducement.

**RESPONSE:** Disputed as argumentative mischaracterization omitting material context from the cited testimony. ASAC Chan explained that the "PeaceData" website was created by the Russian Internet Research Agency, that it was "intended to sow . . . disinformation and discord among . . . left-leaning voters in the United States," and that social media companies did not take it down but instead "discredited" it and identified foreign-associated fake accounts on their platforms that directed users to the "PeaceData" site. *See* Chan Dep. 141:10-144:12; *see also* Ex. 129 (Press Release, Dep't of Just., Grand Jury Indicts Thirteen Russian Individuals and Three Russian Companies for Scheme to Interfere in the United States Political System (Feb. 16, 2018), 2018 WL 920088), explaining that IRA, or Internet Research Agency, is a Russian company indicted for "committing federal crimes while seeking to interfere in the United States political system, including the 2016 Presidential election"). The assertion that social media companies took action as to "PeaceData" "as a result" of the FBI's identification is unsupported by the record. *See* Chan Dep. 143:10-18 ("[w]hat" companies "conveyed to" ASAC Chan "is that they identified accounts that were foreign-associated. . . . Internet Research Agency-associated, that were directing users on those platforms to the PeaceData website" and that the companies took action against certain accounts). The assertions that FBI "targeted" accounts "for censorship" or that FBI "inducement" resulted in "speech" being "suppressed" are argumentative mischaracterizations unsupported by this PFOF or the record as a whole. (Note also that the testimony cited in this PFOF concerned ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at

page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

923.     Similarly, Chan identified a website called "NAEBC" as a Russia-generated website. According to Chan, the Russians "used various social media accounts to engage with real users and convince them to post on the NAEBC site, which met with some success." *Id.* 144:13-145:2. Thus, "the NAEBC site also included content drafted and written by real users that had posted on that site." *Id.* 145:3-6. "The FBI flagged the NAEBC site to social-media platforms as a … Russian-originated source." *Id.* 146:12-15. On that basis, "the companies were able to discover Russian-controlled accounts that were used to try to redirect users to those websites," and the platforms "said they had taken down those accounts." *Id.* 146:16-147:7. The FBI thus induced the platforms to censor the speech of "real users" on a supposedly fake Russian website.

**RESPONSE:** Disputed. The assertion that FBI "induced the platforms to censor the speech" is an argumentative mischaracterization unsupported by the cited testimony or the record as a whole, as explained above. (Note also that the testimony cited in this PFOF concerned ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")  In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

924.     Chan admits that "Russia's influence operations" are deeply intertwined with First-Amendment-protected speech by ordinary social-media users, as he describes: "Many factors are at play when trying to measure the effects of Russia's influence operations. First-order effects include real users interacting with inauthentic content, Russian-bot amplification of divisive

organic content, and IRA-controlled accounts communicating directly with real users."  Chan Ex. 1, at 94.

**RESPONSE:** Disputed.  ASAC Chan did not testify that he "admits that 'Russia's influence operations' are deeply intertwined with First-Amendment protected speech," and the underlying assertion that "engagement" with the activity of foreign malign actors is "First Amendment-protected" is an unsupported legal conclusion. Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. (Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.") In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

925.    During the days surrounding the 2020 election, the FBI's command post also routed reports of domestic "disinformation" to social-media platforms for censorship to social-media. "During FBI San Francisco's 2020 election command post, which I believe was held from the Friday before the election through election night, that Tuesday at midnight, information would be provided by other field offices and FBI headquarters about disinformation …. These were passed to FBI San Francisco's command post, which I mentioned to you before I was the daytime shift commander, and we would relay this information to the social media platforms where these accounts were detected."  Chan Dep. 162:12-24.

**RESPONSE:** Disputed. The PFOF's assertion that FBI "routed reports . . . for censorship" is argumentative mischaracterization unsupported by the record. The FBI's election command post communications with social media companies concern election-related time, place, and manner disinformation. *See generally* Knapp Decl. ¶¶ 21-24 (Ex. 157). Plaintiffs omit ASAC Chan's testimony that the election command post information sharing concerned posts with

"disinformation, specifically about the time, place or manner of elections in various states."  Chan Dep. 162:12-19. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

926.    The FBI made no attempt to distinguish whether these reports of "election disinformation" "whether they were American or foreign." *Id.* 163:1-3. "[M]any field offices" of the FBI "relayed this information to us." *Id.* 163:7-11.

**RESPONSE:** Undisputed subject to clarification. Plaintiffs omit ASAC Chan's testimony that the election command post information sharing concerned posts with "disinformation" as to "time, place, or manner of election." Chan Dep. 163:1-3. This PFOF omits the words "type of" from the quotation from Chan Dep. 163:7-11. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

927.    "[T]hose reports would come to FBI San Francisco … and then FBI San Francisco would relay them to the various social media platforms where the problematic posts had been made," in order "to alert the social media companies to see if they violated their terms of service…. which may include taking down accounts." *Id.* 165:3-17.

**RESPONSE:** Undisputed, except to note language the PFOF omits from the quoted testimony, namely, that if the companies determined the posts violated their terms of service, "*they would follow their own policies*, which may include taking down accounts." Chan Dep. 165:16-17 (emphasis added). The FBI's election command post communications with social media companies concern election-related time, place, and manner disinformation. *See generally* Knapp

Decl. ¶¶ 21-24 (Ex. 157). In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

928.    The FBI has about a "50 percent success rate" in getting reported disinformation taken down or censored by the platforms, *i.e.*, "that some action had been taken because it was a terms-of-service violation." *Id.* 167:7-14.

**RESPONSE:** Disputed. The assertion that the FBI "has about a '50 percent success rate' in getting reported disinformation taken down or censored" by the platform is an argumentative mischaracterization and misrepresentation of the cited testimony unsupported by the record. The testimony at Chan Dep. 167:7-14 concerns disinformation as to the time, place, or manner of an election, and ASAC Chan testified "from my recollection" that about 50 percent of the time a social media platform would take some action on such a post based on the platform's terms of service. This PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

### E.    The FBI Demands Information on Censorship from the Platforms.

929.    Regarding the algorithms that platforms use to detect inauthentic activity and to censor content, the FBI has "probed them to ask for details" about those algorithms, "so that we could make sure we were sharing the most effective and actionable type of information with them," *id.* 88:5-7, 20-22—in other words, to maximize the chances that disfavored speech would be censored as a result of the FBI's "information sharing."

**RESPONSE:** Disputed. ASAC Chan testified that the FBI "would ask," not demand, that the social media companies share details about their algorithms, noting also that the companies

"would not share any of that information with us." Chan Dep. 88:10-14. In additional testimony that Plaintiffs disregard, ASAC Chan also explained that the FBI "stopped asking" for information about the companies' algorithms "in the 2017 time frame" once it "found that none of them were willing to share" that information. *Id.* at 89:19-23. The assertion that the FBI sought this information (six years ago) "to maximize the chances that disfavored speech would be censored" is not supported by ASAC Chan's testimony, who explained that the purpose was to avoid providing the companies information that "would not be useful" to them in evaluating whether the content in question violated their policies. *Id.* at 89:1-7. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

930.    The FBI "would … ask them what their terms of service or community standards were." *Id.* 90:21-23. But Chan contends that "we never told the companies to modify their terms of service or community standards." *Id.* 92:5-7.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that FBI "would just broadly ask" platforms "what their terms of service or community standards were." Chan Dep. 90:21-23.

### F.    The FBI Flags Accounts and URLs for Censorship on a Monthly Basis

931.    The FBI gives "tactical information" to social-media platforms, where "tactical information includes identifying specific social media accounts and URLs" to be evaluated for censorship. *Id.* 96:24-97:2. Chan estimates that this occurs "one to five times per month." *Id.* 97:17-18. This includes such "tactical" information-sharing at most quarterly meetings. *Id.* 98:18-19.

**RESPONSE:** Disputed. The assertion that FBI "gives" information "to be evaluated for censorship" is an argumentative mischaracterization unsupported by the record, for the reasons discussed above. *See* Defs.' Resp. to Pls.' PFOF ¶¶ 907-09.

932.    To flag such specific accounts, URLs, and content to the platforms, Chan "would typically … send an email to the recipients at the companies" notifying them that he would be using "a secure file transfer application within the FBI that is called Teleporter," and "the Teleporter email contains a link for them to securely download the files from the FBI." *Id.* 98:20-11. The Teleporter files contain "different types of indicators," *i.e.*, specific social-media accounts, web sites, URLs, email accounts, etc. that the FBI wants the platforms to evaluate under their content-moderation policies. *Id.* 99:15.

**RESPONSE:** Disputed. The cited testimony does not mention flagging "content" or "content moderation" policies. The FBI's purpose in sending the information described in this PFOF to the companies is "so that they can protect their platforms as they deem appropriate, and they can take whatever actions they deem appropriate without any suggestion or interference from the FBI." Chan Dep. 34:7-12. *See* Defs.' Resp. to Pls.' PFOF ¶¶ 907-09.

933.    Each such communication may contain any number of such "indicators," ranging "from one account or one selector to many, like a whole spreadsheet full of them." *Id.* 100:16-17.

**RESPONSE:** Undisputed.

934.    Chan "estimate[s] that during 2020 [he] shared information with the companies between one to five or one to six times per month." *Id.* 100:21-24. Each such incident of information-sharing included flagging a number of specific "indicators" that ranged anywhere from one to "hundreds" of specific accounts, web sites, URLs, etc... *Id.* 101:4-7.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that the count of indicators shared at one time in 2020 was "maybe hundreds," not that the information shared concerned "hundreds" of "specific accounts." Chan Dep. 101:4-7.

935.    During the 2022 election cycle, Chan shared such information with the platforms "one to four times per month." *Id.* 101:13-14. Each such incident involved flagging a number of specific "indicators" that ranged anywhere from one to "in the tens, in the dozens" of specific accounts, web sites, URLs, etc. *Id.* 101:17-19.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan testified that the count of indicators shared at one time in 2022 was "in the tens, in the dozens," not that the information shared concerned "specific accounts." Chan Dep. 101:17-19.

936.    "[I]n general" these flagging communications would go to all seven social-media platforms identified above, but sometimes there would be "company-specific information" that

would go to a particular company. *Id.* 102:3-9. "[M]ost of the time we would share with that list of [seven] companies." *Id.* 102:14-15.

**RESPONSE:** Undisputed.

937.    When it made such communications, the FBI would request that the platforms report back to the FBI their specific actions taken toward the accounts that the FBI specifically flagged for possible censorship. *Id.* 102:18-25. "[A]t every quarterly meeting we try to follow up to ask if information we shared has been relevant if we have not received a response yet." *Id.* 103:5-9. Sometimes, but not always, the platforms report back to the FBI on what accounts they have removed based on the FBI's information, in which case the FBI documents the report to "help[] us fine-tune the information we're sharing." *Id.* 103:14-22.

**RESPONSE:** Disputed that the FBI "flagged" accounts "for possible censorship." The FBI

shared the information described in the cited testimony with the companies "so that they c[ould]

protect their platforms as they deem appropriate, and . . . take whatever actions they deem

appropriate without any suggestion or interference from the FBI." Chan Dep. 34:7-12. *See* Defs.'

Resp. to Pls.' PFOF ¶¶ 907-09. In addition, disputed that a social media company's application of

its own content moderation policies, to which all users agree, constitutes "censorship." In any

event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-

media companies to remove or suppress information on their platforms, or that the companies

regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i

& II.B.4.b.

938.    Including Chan, at least *eight* FBI agents in the San Francisco field office are involved in reporting disinformation to social-media platforms—Chan himself, two GS-14 supervisors who report to Chan, and roughly five FBI field agents in two different squads within the office. *Id.* 105:19-108:18. All these agents share both "strategic" and "tactical" information with social-media platforms about supposed malign-foreign-influence content on platforms, and they are "involved in following up to find out if their tactical information was acted on." *Id.* 108:8-10.

**RESPONSE:** Undisputed subject to clarification. In countering foreign malign influence

operations, the FBI shares information with a social media company only if the FBI, with high

confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6. The indicators shared are in the nature of IP addresses, email accounts, social media accounts, website domain names, and file hash values. *Id.* 29:15-30:7.

939.    In addition, a significant number of FBI officials from FBI's Foreign Influence Task Force (FITF) also participate in regular meetings with social-media platforms about supposed disinformation. *Id.* 108:19-110:14. These include "three to ten" FITF officials at bilateral meetings with social-media platforms. *Id.* 110:7-8.

**RESPONSE:** Undisputed that the number of FBI personnel attending the bilateral meetings with social media companies ranged from three to ten. In countering foreign malign influence operations, the FBI shares information with a social media company only if the FBI, with high confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6.

940.    The FBI uses both its criminal-investigation authority and its national-security authority to gather information about supposed malign-foreign-influence activities and content on social-media platforms. This specifically includes using "the Foreign Intelligence Surveillance Act … the PATRIOT Act, [and] Executive Order 12333 that allows us to gather national security intelligence" to investigate content on social media. *Id.* 111:13-112:8.

**RESPONSE:** Undisputed subject to clarification. In countering foreign malign influence operations, the FBI shares information with a social media company only if the FBI, with high confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6.

941.    In one case in 2020, for example, a single "Teleporter message was sent" to platform(s) "with a spreadsheet with hundreds of accounts," all of which the FBI was flagging for the platforms as supposed malign-foreign-influence accounts. *Id.* 112:9-14.

**RESPONSE:** Undisputed subject to clarification. In countering foreign malign influence operations, the FBI shares information with a social media company only if the FBI, with high

confidence, attributes the pertinent activity observed on the platform to a foreign state actor, not merely if the activity is "supposed" malign foreign influence. Chan Dep. 112:24-113:6.

942.    Chan expressed a high degree of confidence that the FBI's identification of "tactical information" (*i.e.*, specific accounts, URLs, sites, etc.) to social-media platforms was always accurate, and that the FBI never misidentified accounts, content, web sites etc. as operated by malign foreign actors when in fact they were operated by American citizens. He testified that "we only share information that we have a high confidence that is attributed to a foreign-state actor," and that "[i]n my experience, it has always been correct." *Id.* 112:15-113:16.

**RESPONSE:** Undisputed, with clarification. ASAC Chan did not testify for a fact that the FBI was "always accurate" and "never misidentified accounts, content, web sites etc. as operated by malign foreign actors when in fact they were operated by American citizens." He testified that "*[i]n [his] experience*, [the FBI] has always been correct." Chan Dep. 112:15-113:12.

943.    But there are substantial reasons to think that Chan is wrong. For example, Chan reports that the FBI induced Twitter to remove accounts and Tweets related to the #ReleaseTheMemo hashtag in 2019, which supported Congressman Devin Nunes' investigation regarding Russia collusion. *Id.* 149:13-21; Chan Ex. 1, at 71 (noting that 929,000 Tweets removed by Twitter as supposedly Russian disinformation included thousands of Tweets amplifying the #ReleaseTheMemo hashtag). In fact, recent reporting indicates that Twitter was aware that the accounts pushing #ReleaseTheMemo were *not* Russian-controlled inauthentic accounts, but core political speech by ordinary American citizens that the FBI conspired to suppress.

**RESPONSE:** Disputed. This PFOF cites no evidence that ASAC Chan was wrong when he testified that "in [his] experience," the FBI had not erred in identifying accounts as being operated by malign foreign actors. Chan Dep. 112:15-113:12. The exhibit cited, ASAC Chan's thesis submitted for postgraduate studies, and the cited testimony did not connect Twitter's decisions as to any tweets bearing "#ReleaseTheMemo" with any communication from the FBI to Twitter, nor does the PFOF cite any other evidence that the FBI provided information to Twitter relating to "#ReleaseTheMemo." Moreover, the PFOF's assertion, that ASAC Chan's testimony is contradicted by unspecified "recent reporting" about actions that Twitter took concerning #ReleaseTheMemo, lacks citation to or support in any evidence of record. (Note also that the exhibit cited, ASAC Chan's thesis, expressly states, at page i, that "[t]he views expressed in" it

"are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")

944.    The FBI's flagging accounts for censorship often leads to the censorship of additional accounts. According to Chan, the FBI "may share, for example, one account with them, but then they may find ten connected accounts and take all of them down." *Id.* 113:23-114:1.

**RESPONSE:** Dispute the assertions that the FBI "flagg[ed] accounts for censorship" and that FBI's information sharing "often lead[] to" additional "censorship" by social media companies as argumentative mischaracterizations unsupported by the record for the reasons stated above. *See* Resp. to Pls.' PFOF ¶¶ 907-09. Disputed also that a social media company's application of its own content moderation policies, to which all users agree, constitutes "censorship." In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

### G.    Pressure from Congress Induces Platforms to Increase Censorship.

945.    According to Chan, the social-media platforms were far more aggressive in taking down disfavored accounts and content in the 2018 and 2020 election cycles than they were in the 2016 cycle. *Id.* 115:18-116:6.

**RESPONSE:** Disputed for at least two reasons. First, ASAC Chan did not state that "the social-media platforms were far more aggressive in taking down" accounts in 2018 and 2020. He appeared only to agree with the statement by Plaintiffs' counsel that "in 2018 and 2020 there were many more account takedowns." Chan Dep. 115:18-24. The suggestion that the accounts taken down by the companies were "disfavored" by the FBI or the Government is an argumentative mischaracterization not supported by the record, as explained above in response to Plaintiffs' PFOF ¶ 908. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that

the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

946.    Based on his personal observation, experience, and research, Chan concludes that "pressure from Congress, specifically HPSCI and SSCI," induced the social-media platforms to adopt more aggressive censorship policies in 2018 and 2020. *Id.* 116:1-3. "HPSCI" stands for the House Permanent Select Committee on Intelligence, and "SSCI" stands for the Senate Select Committee on Intelligence. *Id.* 116:11-14.

**RESPONSE:** Disputed. ASAC Chan did not testify that "'pressure from Congress' . . . induced the social-media platforms to adopt more aggressive [content moderation] policies in 2018 and 2020." Rather, he testified that pressure from congressional committees "*may* have had a part [in] it," and also that the companies may have "felt this"—"this" presumably meaning the presence of malign foreign actor accounts on their platforms—"may have damaged their brands." Chan Dep. 116:1-6 (emphasis added). Moreover, ASAC Chan did not base this testimony "on his personal observation, experience, and research." He repeated three times that he was providing only his "personal opinion." *Id.* at 115:22-24, 116:6, 117:3-4. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

947.    This "pressure from Congress" took multiple forms. First, those Congressional committees called "the CEOs for the companies … to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai." *Id.* 116:20-117:2. These CEOs were called to testify about disinformation on their platforms "more than once." *Id.* 117:5-6. Chan believes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns." *Id.* 117:7-14. Chan believes this based on conversations with social-media platform employees. *Id.* 117:15-118:2.

**RESPONSE:** Undisputed subject to clarification. First, as noted above, ASAC Chan emphasized that his testimony on this point was "just [his] personal opinion" and "how [he]

interpreted" what he was told during conversations with social-media platform employees. Chan Dep. 117:13-14, 118:16. Second, ASAC Chan did not testify that these employees attributed the companies' greater number of account takedowns to congressional "pressure." To the contrary, he testified that the company employees "would not reveal the types of discussion that they had with . . . House and Senate staffers[.]" *Id.* at 117:22-24. They only "indicate[d] that they had to prepare very thoroughly for these types of meetings and . . . that it felt like a lot of pressure." *Id.* 117:24-118:2. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

948.    Chan identifies specific congressional hearings that placed such pressure on social-media platforms to adopt more restrictive censorship policies: "On April 10–11, 2018, the Senate Commerce Committee and Senate Judiciary Committee held hearings on consecutive days with Mark Zuckerberg to discuss Russia's influence campaigns on Facebook and its countermeasures to combat them…. The Senate committees also used this as an opportunity to hold Facebook accountable for its actions and *exert pressure for positive change*." Chan Ex. 1, at 50 (emphasis added). "On July 17, 2018, the House Judiciary Committee held a hearing with senior executives from Facebook, Google, and Twitter so they could provide updates on their companies' efforts for content filtering to stop foreign influence campaigns on their platforms." *Id.* On September 5, 2018, the Senate Intelligence Committee held a hearing with senior executives from Facebook and Twitter to discuss their companies' efforts to stop foreign influence campaigns and illegal transactions on their platforms." *Id.*

**RESPONSE:** Largely undisputed, subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government." In addition, the PFOF cites no evidence that social media companies altered their content moderation policies because of the "pressure" exerted by the hearings mentioned in the PFOF. Disputed that a social media company's own

content moderation policies, to which all users agree, constitute "censorship policies." The

assertion that any policies became "more restrictive' is unsupported by the record. In any event,

this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

949.    Chan links these Congressional hearings to "constructive change," *i.e.*, more
aggressive censorship policies by the platforms: "On October 31, 2017, the Senate Judiciary
Committee held a hearing with senior executives from Facebook, Google, and Twitter to discuss
the extent of the Russian disinformation campaigns on their respective platforms."  Chan Ex. 1, at
48. "This public hearing … provided politicians with the occasion to exert pressure on the
companies to make constructive changes to their platforms."  *Id.* at 48-49. According to Chan, this
"constructive change" means the adoption of more restrictive censorship policies. Chan Dep.
133:9-23.

**RESPONSE:** Disputed. In the cited portion of his thesis, which referred only to a July

2017 Senate Judiciary Committee hearing, ASAC Chan did not opine that the hearing had induced

"constructive change," only that it was an "occasion to exert pressure on the companies to makes

constructive changes to their platforms."  Chan Ex. 1 at 48-49. Second, ASAC Chan did not testify

that constructive change "means . . . more restrictive censorship policies."   That is an

argumentative mischaracterization of his testimony. Rather, he testified, "The reason I said it was

constructive was that it appeared the social media companies were able to detect and counter

foreign-malign-influence operations on their platforms[.]"  Chan Dep. 133:14-18  In any event,

this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

(Note also that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and

expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")

950.    In addition, Congress put pressure on the platforms to adopt and enforce more aggressive censorship policies and practices by sending high-level congressional staff from HPSCI and SSCI to meet with the social-media platforms directly and threaten them with adverse legislation. According to Chan, "staffers from both of those committees have visited with … those [social-media] companies," and after these meetings with congressional staffers, employees of the social-media platforms "would indicate that they had to prepare very thoroughly for these types of meetings … and they indicated that it felt like a lot of pressure." *Id.* 117:19-119:2.

**RESPONSE:** Disputed. The assertion that congressional committee staff "put pressure on the platforms" regarding "more aggressive censorship policies and practices" and "threaten[ed] them with adverse legislation" is an argumentative assertion unsupported by ASAC Chan's testimony or the record as a whole. ASAC Chan testified that social media company employees "would not reveal [to him] the types of discussion that they had" with congressional staff, and would only "indicate that they had to prepare very thoroughly for these types of meetings and . . . that it felt like a lot of pressure." Chan Dep. 117:22-118:2. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

951.    The Congressional staffers had such meetings with "Facebook, Google, and Twitter."   Employees from those three companies "experienced these visits from congressional staffers as exercising a lot of pressure on them." *Id.* 118:12-16.

**RESPONSE:** Undisputed, except to the extent that the reference to "such meetings" is intended to mean meetings to "put pressure on the platforms to adopt and enforce more aggressive censorship policies" and to "threaten them with adverse legislation," assertions for which there is no support in the record. *See* Defs.' Resp. to Pls.' PFOF ¶ 950. In any event, this PFOF contains

no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

952.    In those meetings, the Congressional staffers discussed potential legislation with the social-media platforms, and before or after they met with those three companies, the Congressional staffers "discussed with [Chan] … legislation that they were thinking about doing." *Id.* 118:17-120:3.

**RESPONSE:** Disputed. ASAC Chan testified that "legislation that" congressional committees "were thinking about doing" is what the committee staff "discussed with" ASAC Chan, Chan Dep. 118:23-119:7, and that he could only "infer[ ]" from his discussions with committee staff that the staff also discussed that legislation when they met (separately) with the social media companies. *Id.* at 119:8-120:1; *see also id.* at 120:9-13, 121:3-5. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

953.    It is Chan's opinion that the social-media platforms' "changes in takedown policies" to make them more restrictive "resulted from that kind of pressure from Congress."  *Id.* 118:17-20.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan agreed, in his "personal opinion," that "changes in [social media companies'] takedown policies resulted from that kind of pressure from Congress." Chan Dep. 118:17-20. He did not describe the changes as "more restrictive." Note also, that ASAC Chan testified that pressure from congressional committees only "*may* have had a part [in] it," and also that the companies may also have "felt this"—"this" being an evident reference to the presence of malign foreign actor accounts on their platforms—"may

have damaged their brands." *Id.* at 116:1-6 (emphasis added). In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

954.    Chan's opinion is the result of discussing these meetings with participants on both sides—both the Congressional staffers and employees of Facebook, Twitter, and Google. Chan "and FBI San Francisco personnel would meet with the congressional staffers, typically before they met or after they met with the social media companies," because "they wanted an FBI opinion about what they had heard from the social media companies." *Id.* 119:23-120:3.

**RESPONSE:** Undisputed subject to clarification. ASAC Chan made clear that (i) neither he nor others from the FBI were present when congressional staff met with social media company employees, rather, the staff met separately with the companies, Chan Dep. 119:23-120:1, 121:3; *see also id.* at 118:23-25; (ii) that congressional staff did not inform him whether they intended to discuss potential legislation with the companies' employees, *id.* 120:9-121:2; and (iii) that the company employees "would not reveal [to him] the types of discussion that they had" with congressional staff, *id.* at 117:22-24. In any event, this PFOF contains no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

955.    To the best of Chan's recollection, these meetings between Congressional staffers and social-media platforms were an "annual occurrence" that began in 2017 and recurred annually after 2017. *Id.* 120:7-8. "The staffers had separate meetings with each of the companies." *Id.* 121:4-5. "[A]fter those meetings, the staffers would come to [Chan] and ask [his] opinion of potential legislation." *Id.* 121:6-9.

**RESPONSE:** Undisputed, *but see* Defs.' Resp. to Pls.' PFOF ¶ 954, above.

956.    Chan also discussed these meetings with the social-media platform employees who participated, as he "talk[s] with the social media platform personnel regularly," and he understood from them that "the congressional staffers put a lot of pressure on them" in the meetings. *Id.* 122:18-25. He spoke directly to the personnel who participated in the meetings. *Id.* 123:21-24. Senior officials from the social-media platforms, including Yoel Roth of Twitter, Steven Siegel of Facebook, and Richard Salgado of Google, participated in the meetings with Congressional staffers. *Id.* 123:25-125:7.

**RESPONSE:** Disputed. ASAC Chan did not testify that "'congressional staffers put a lot of pressure'" on social media company employees "in the meetings."  Rather, Plaintiffs' counsel asked him, "they had kind of just made statements to you *that indicated* that they felt that *these meetings, these annual meetings* with congressional staffers put a lot of pressure on them, right?," Chan Dep. 122:20-24 (emphasis added), to which ASAC Chan replied, "That was *my interpretation* of their comments. *I don't recollect any of them using the specific word "pressure,"* but that was how I *interpreted* our conversations," *id*. at 122:25-123:3 (emphasis added). *See also* response to Pls.' PFOF ¶ 954, above. Also clarify that ASAC Chan testified that at Twitter his pertinent discussions were with Yoel Roth or Angela Sherrer. Chan Dep. 124:14-18. In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

957.    The Congressional staffers involved in the meetings were "senior-level staffers," including "a director-level" staffer, "the committee counsel or a senior counsel for the committee," and "one or two other … line-level staffers." *Id.* 123:6-13.

**RESPONSE:** Undisputed.

958.    According to Chan, "intense pressure from U.S. lawmakers and the media … eventually force[d] the social media companies to examine what had taken place on their platforms [in 2016] and strive to ensure that it did not happen in the future." *Id.* 127:3-23; Chan Ex. 1, at 42.

**RESPONSE:** Undisputed subject to clarification. The exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in"

it "are those of the author and do not reflect the official policy or position of the Department of

Defense, the FBI, or the U.S. Government."

959.    These steps included actions by the social-media platforms to take more aggressive
enforcement against violations of their terms of service, but also policy changes to the terms
of service themselves to make their policies more restrictive: "the policy changes specifically to their
terms of service or community standards."  Chan Dep. 129:17-19. These involved "more robust or
more aggressive content-modulation policies," that "clarify that certain things actually violate their
policies and can be taken down."  *Id.* 130:4-18.

**RESPONSE:**  Disputed. The assertion that any policies became "more restrictive" is

unsupported by the record. ASAC Chan testified that the "policy changes" mentioned in this PFOF

were made "to address foreign malign influence," as Plaintiffs' counsel noted during the

deposition. Chan Dep. 129:1-4.

960.    Chan notes that "Facebook and Twitter faced more Congressional scrutiny … as
their senior executives testified before Congress on three separate occasions before the midterm
elections," Chan Ex. 1, at 46, and he concludes that "political pressure from Congress was a
contributing factor" leading social-media platforms to adopt more restrictive content-moderation
policies. Chan Dep. 132:7-9. Chan believes that these more restrictive censorship policies that
include "account takedowns" are "constructive change," *id.* 133:2-23.

**RESPONSE:** Disputed as an argumentative mischaracterization of the cited testimony.

When asked whether congressional pressure (i.e., testimony at congressional hearings) "*may have*

*led* to [the social media companies] changing *their terms of service* to be more robust and to

prevent certain kinds of content from being posted," Chan Dep. 132:1-5 (emphasis added), ASAC

Chan responded "my personal opinion is that political pressure from Congress was *a contributing*

*factor*," *id.* at 132:7-9. In addition, ASAC Chan did not state that he regards "censorship policies"

as "constructive change."  What he referred to as "constructive change" was political "pressure[ ]

on the social media companies to make changes to their platforms to address malign foreign

influence." *Id*. at 132:21-133:8. The assertion that any policies became "more restrictive" is

unsupported by the record. Note further that the exhibit cited is ASAC Chan's thesis submitted for

postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those

of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government." In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

961.    These policy changes, induced by "political pressure from Congress," resulted in a dramatic increase in censorship on social-media platforms, including for example that "zero [Twitter] accounts were taken down during the 2016 cycle but 3,613 Twitter accounts were taken down during the 2018 cycle." *Id.* 133:24-134:5. Likewise, 825 accounts were removed from Facebook and Instagram based on publicly available reports, but according to Chan, the actual number was much higher. *Id.* 147:8-148:18. In 2019, Twitter announced the takedown of "422 accounts which made 929,000 tweets." *Id.* 149:9-12. "[S]ome subset of that amount was due to information [the FBI] provided." *Id.* 150:12-14.

**RESPONSE:** Disputed that platform "policy changes" were "induced by" political pressure from Congress for all the reasons stated in response to Plaintiffs' PFOF ¶¶ 946-56. Also dispute that social media companies' content moderation policies, to which all users agree, and the application thereof constitute "censorship on social-media platforms." Undisputed that the PFOF quotes accurately from ASAC Chan's thesis regarding publicly reported numbers of accounts removed from Twitter, Facebook, and Instagram, but note that these were malign foreign influence accounts. Chan Dep. 133:24-134:9, 147:8-21; *see* Chan Dep. Ex. 1 at 70 (422 accounts taken down by Twitter were controlled by the IRA, or Internet Research Agency, a Russian company indicted for "committing federal crimes while seeking to interfere in the United States political system, including the 2016 Presidential election," Ex. 129). The assertion that "according to Chan, the actual number" of accounts removed from Facebook and Instagram was "much higher" than 825 is not supported by the cited testimony, in which ASAC Chan testified only that FBI information sharing accounted for just a "subset" of the removed accounts. Chan Dep. 148:19-149:8 (Note also

that the exhibit cited is ASAC Chan's thesis submitted for postgraduate studies, and expressly states, at page i, that "[t]he views expressed in" it "are those of the author and do not reflect the official policy or position of the Department of Defense, the FBI, or the U.S. Government.")  In any event, this PFOF contains no evidence *that the FBI* used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

962.    When meeting with social-media platforms, Chan "typically meet[s] with the trust and safety individuals and then their associated attorneys." *Id.* 135:16-18.

**RESPONSE:** Undisputed.

963.    Samaruddin K. Stewart ("Sam") of the State Department's Global Engagement Center "would meet with social media companies … primarily with policy individuals." *Id.* 135:2-15.

**RESPONSE:** Undisputed.

964.    Sam Stewart would offer "different types of software made by vendors that they would pilot to see if they could detect malign foreign influence on social media platforms." *Id.* 135:25-136:3. Chan believed that the Global Engagement Center's products "might accidently pick up U.S. people information." *Id.* 138:10-12.

**RESPONSE:** Disputed. ASAC Chan clearly testified that he "[did] not think the State Department was providing th[e] vendors' programs to the [social media] companies." Rather, it was hosting "webinars" to "provid[e] a venue where different vendors could show off their products" for "all sort of audiences" including but not limited to social media companies. Chan Dep. 137:5-9, 139:20-140:9. ASAC Chan did not state that he "believed" that type of software "might accidentally pick up U.S. people information," but that he "would be concerned" that it might. *Id.*. 138:10-13. He also made clear that he "do[esn't] know what outside vendors any of the . . . social media companies use." *Id*. at 137:2-4. Moreover, this PFOF is irrelevant and contains

495

no evidence that the FBI used pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

965.    Elvis Chan knows and has worked with Peter Strzok and Lisa Page. *Id.* 234:19-240:5. He also knows and has worked with James Baker, the former general counsel of the FBI who went on to become deputy general counsel of Twitter and encouraged Twitter to keep censoring the Hunter Biden laptop story. *Id.* 239:13-16.

**RESPONSE:** ASAC Chan's professional acquaintances with Mr. Strzok, Mr. Baker, and Ms. Page as described in his testimony, and which have nothing to do with the events alleged in this case, are irrelevant. The assertion that Mr. Baker, as Twitter's General Counsel, "encouraged Twitter to keep censoring the Hunter Biden laptop story" lacks citation to or support in the record and disregards his testimony to Congress to the contrary. Ex. 2 at 4-5.

**H.    The FBI's Censorship Activities Are Ongoing.**

966.    Chan urges the public to report supposed misinformation on social media directly to the platforms, or else report it to the FBI or DOJ so that they can report it to the platforms, and boasts that the platforms are "very aggressive" in taking down misinformation. As he stated in a public podcast just before the 2020 election: "If you're also seeing something related to the election on your social media platform, all of them have portals where you can report that sort of information. They're being very aggressive in trying to take down any disinformation or misinformation, and then, lastly, if they see anything on election day or before election day, you can always report it to FBI.gov or justice.gov … We take all of these very seriously." Chan Ex. 13, at 3, 9:9-19. FBI San Francisco, when it receives such reports, "would then relay those to social media platforms," so that "the social media platforms will assess those in connection with their terms of service." Chan Dep. 267:13-23. Chan characterizes the platforms as "very aggressive" in taking down disinformation because they "[adjusted] their policies to be able to handle foreign-malign-influence operations." *Id.* 270:23-25.

**RESPONSE:** Disputed as a misleading juxtaposition of ASAC Chan's October 28, 2020, podcast (Chan Dep. Ex. 13) with his November 29, 2022, deposition testimony more than two years later. ASAC Chan did not testify, as the PFOF insinuates, that the FBI San Francisco Office relays all reports of election-related mis- or disinformation to social media companies. He instead

testified without ambiguity that the election command post in the FBI San Francisco Office—which is stood up only on the day of or several days preceding an election, Chan Dep. 167:15-25—relays only those reports of mis- or disinformation about "the time, place, or manner of an actual election"—such as, for example, "Political Party A vote[s] on Tuesday, Political party B vote[s] on Wednesday"—and only does so after those reports have been investigated by a local FBI Field Office and reviewed by officials at FBI Headquarters and the Department of Justice in Washington, D.C. *See generally id.* at 264:21-270:25. The FBI's ongoing activities regarding mis- and disinformation on social media platforms are further described in the Declaration of Larissa L. Knapp (Ex. 157), filed today. In any event, this PFOF contains no evidence that the FBI used or now uses pressure or deception to induce social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

967.    The FBI continues the same efforts in 2022 and later election cycles that it pursued in 2020. As Chan publicly stated, "post 2020, we've never stopped … as soon as November 3rd happened in 2020, we just pretty much rolled into preparing for 2022."  Chan Ex. 15, at 2, 8:2-4. Chan stated: "[W]e are also really engaged with the technology companies that are out here … We're also working with the social media companies to make sure that any foreign disinformation that's coming out … if we can identify them, we can share that information with them so they can knock down accounts, knock down disinformation content," and he noted that they are "having conversations with all of those organizations as they're building up to November of [2022]."  Chan Ex. 15, at 2-3, 8:15-9:4.

**RESPONSE:** Not disputed that the PFOF quotes accurately from ASAC Chan's June 29, 2022, podcast, in which he principally discussed issues of ransomware, Chan Dep. Ex. 15 at 2:7-7:19, and threats to and vulnerabilities in election infrastructure, *id.* at 8:11-22, 9:7-10:23. Regarding his remarks about sharing information with social media companies concerning election-related disinformation on their platforms, *id.* 8:22-9:4, *see* Resp. to Pls.' PFOF ¶ 966. The FBI's ongoing activities regarding mis- and disinformation on social media platforms are further

described in the Declaration of Larissa L. Knapp (Ex. 157), filed today. In any event, this PFOF

contains no evidence that the FBI used or now uses pressure or deception to induce social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with the FBI as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.H, Arg. §§ II.B.3.b.i & II.B.4.b.

## VII.   CISA's Censorship: Pressure, "Switchboarding," and Working Through Nonprofits.

968.    CISA, the Cybersecurity and Infrastructure Security Agency within the Department of Homeland Security, serves as a "nerve center" for federal censorship efforts. CISA meets routinely with social-media platforms about censorship in at least five different sets of standing meetings, CISA pressures platforms to increase censorship of speech that federal officials disfavor, and CISA serves as a "switchboard" by "routing disinformation concerns to social-media platforms" for censorship. CISA also seeks to evade the First Amendment by outsourcing many of its censorship activities to nonprofit agencies that it collaborates closely with, including the CISA-funded Center for Internet Security and its "EI-ISAC" ("Election Infrastructure – Information Sharing & Analysis Center") for state officials, and the massive censorship cartel calling itself the "Election Integrity Partnership."

**RESPONSE:** Disputed. Neither this PFOF, or any that follow, contain evidence that CISA

functions as a "nerve center for federal censorship efforts," meets with, "pressures," or "rout[es]

disinformation concerns" to social-media companies for purposes related to censorship, "seeks to

evade the First Amendment" "outsourc[es] . . . censorship activities" to non-governmental

organizations, or has ever done so. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.; *see also* Defs.' Resp. to Pls'

PFOF ¶¶ 969-1122.

969.    Brian Scully is the chief of the so-called "Mis, Dis, and Malinformation Team" or "MDM Team" within the Cybersecurity and Infrastructure Security Agency (CISA) in the Department of Homeland Security (DHS). Scully Depo. 15:14-20. Before the Biden Administration, the MDM Team was known as the "Countering Foreign Influence Task Force," or CFITF.

**RESPONSE:** Undisputed.

970.     Lauren Protentis is the "Engagements Lead" for the MDM Team, and she is in charge of "outreach and engagement to key stakeholders, interagency partners, [and] private sector partners," including "social media platforms." Scully Depo. 18:2-18. During relevant periods in both 2020 and 2022, however, Protentis was on maternity leave, and during those times, Scully performs her role as chief engagement officer for communicating with other federal agencies, private-sector entities, and social-media platforms about misinformation and disinformation. Scully Depo. 18:19-20:10.

**RESPONSE:** Undisputed, except that Ms. Protentis was not on the MDM team in 2020 and was on maternity leave from September 2022 until January 2023; she was not on maternity leave in 2020. *See* Scully Dep. 18:19-25, 75:18-21.

971.     Both Scully and Protentis have done or are doing extended details at the National Security Council where they work on misinformation and disinformation issues. Protentis began a one-year detail at the NSC in January 2023, as soon as she came back from maternity leave, and she will deal with mis- and disinformation issues for the NSC as part of her detail. Scully Depo. 19:15:20:5.

**RESPONSE:** Undisputed.

A.     **CISA "Switchboards" by Flagging Government-Reported "Misinformation."**

972.     Scully admits that, during 2020, the MDM team "did some switchboard work on behalf of election officials." Scully Depo. 16:23-25. "Switchboard work" or "switchboarding" is a disinformation-reporting system that CISA provides that allows state and local election officials (who are government officials subject to the First Amendment) "to identify something on social media they deemed to be disinformation aimed at their jurisdiction. They could forward that to CISA and CISA would share that with the appropriate social media companies." Scully Depo. 17:3-8.

**RESPONSE:**  Undisputed, except to clarify that CISA did not perform such work in 2022. Scully Dep. 21:19-25; Hale Decl. ¶ 78 (Ex. 97). However, this PFOF contains no evidence that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

973.     In reporting perceived misinformation to the platforms, CISA and the state and local officials have "an understanding that if the social media platforms were aware of

disinformation that they might apply their content moderation policies to it," and "the idea was that they would make decisions on the content that was forwarded to them based on their policies." Scully Depo. 17:15-21.

**RESPONSE:**   Undisputed. However, this PFOF contains no evidence that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

974.   CISA's "switchboarding" activity causes social-media speech to be censored that otherwise would not have been censored: Scully agrees that "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Scully Depo. 17:22-18:1.

**RESPONSE:**   Disputed as unsupported by, and a mischaracterization of, the cited testimony to the extent this PFOF is meant to imply that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. Mr. Scully testified only that where disinformation was brought to the attention of social media companies the companies would "make decision[s] on the content that was forwarded to them based on their policies." Scully Dep. 17:15-18:1.

975.   Scully contends that "we didn't do switchboarding in 2022."  Scully Depo. 21:24-25.  But he admits that this decision was made in late April or early May 2022. Scully Depo. 22:15-23. This lawsuit was filed, specifically challenging CISA's "switchboarding" activity, on May 5, 2022. Doc. 1.

**RESPONSE:** Undisputed.

976.   Throughout the 2022 election cycle and through the present date, CISA continues to publicly state on its website that the MDM Team "serves as a switchboard for routing disinformation concerns to appropriate social media platforms": "The MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate

disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms." Scully Ex. 24, at 3; *see also* Cybersecurity and Infrastructure Security Agency, "Mis, Dis, Malinformation," https://www.cisa.gov/mdm (visited Feb. 4, 2023).

**RESPONSE:**  Disputed as contradicted by, and a mischaracterization of, the record. Mr. Scully explained during his deposition that this statement was inaccurate and should be changed to indicate that CISA's switchboarding efforts are no longer occurring. Scully Dep. 366:21-367:4. CISA's website subsequently has been updated. *See* Ex. 141 (*Foreign Influence Operations and Disinformation*, Cybersecurity & Infrastructure Sec. Agency, https://perma.cc/F46N-KZDU). CISA did not engage in switchboarding for the 2022 election cycle and has no intention to engage in switchboarding for the next election. Hale Decl. ¶ 78 (Ex. 97).

977.    According to Scully, "switchboarding is CISA's role in forwarding reporting received from election officials, state/local election officials, to social media platforms."  Scully Depo. 23:24-24:2.

**RESPONSE:** Undisputed, except to clarify that CISA did not perform such work in 2022. Scully Dep. 21:19-25. However, this PFOF contains no evidence that CISA used "switchboarding" to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

## B.    CISA Organizes the "USG-Industry Meetings" on Misinformation.

978.    The MDM Team continues to communicate regularly and extensively with social-media platforms about misinformation and disinformation, including during the 2022 election cycle. These communications include at least "two general types of communications, one, we did regular sync meetings between government and industry, so federal partners and different social media platforms." Scully Depo. 21:2-6. This is "a coordinated meeting. Facebook was the industry lead, so [Scully] would have coordination calls with them prior to the meetings, just to set the agenda for meetings…"  Scully Depo. 21:6-10. These meetings are described in CISA's interrogatory responses as "USG-Industry" meetings. Scully Ex. 12, at 38-40.

**RESPONSE:** Disputed to the extent this PFOF asserts the MDM Team "continues" to communicate regularly and extensively with social media companies because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

979.    In addition, the MDM Team received regular reports from social-media platforms about any changes to their censorship policies or their enforcement actions on censorship: "if a platform was putting out a … public report on policies or activities" relating to disinformation and censorship," CISA would "get a briefing on that or at least get an awareness that it was going out." Scully Depo. 21:11-16.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited testimony. Mr. Scully did not testify that CISA received "regular" reports from social media companies about any changes to their "censorship policies" or their "enforcement actions on censorship." *See* Scully Dep. 21:11-16. Moreover, this PFOF contains no evidence that CISA's receipt of these reports had anything to do with threatening or pressuring social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

980.    The USG-Industry meetings increase in frequency as each election nears. In 2022, they were "monthly" as the election approached, and then in October, they became "biweekly," so that there were two "biweekly meetings … prior to the [2022] election."  Scully Depo. 24:16-21.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on

their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

981.    "DOJ, FBI, ODNI, and … DHS" participate in these meetings on the federal government's side. Scully Depo. 25:23. DHS's participation includes at least two components: CISA, typically represented by Scully and Geoff Hale, Scully's supervisor; and the Office of Intelligence and Analysis ("I&A"). Scully Depo. 25:11-26:13. Scully's role is to "oversee" and "facilitate the meetings." Scully Depo. 25:14-16. On behalf of CISA, Kim Wyman, Allison Snell, and Lauren Protentis also participate in the meetings. Scully Depo. 28:4-13.

**RESPONSE:** Disputed to the extent this PFOF asserts current "participa[tion] in these meetings" by any agency or individual, because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

982.    On behalf of FBI, FITF Chief Laura Dehmlow and Elvis Chan participate in these "USG-Industry" meetings, and "periodically other people would be on from different parts of FBI," while "Laura [Dehmlow] was usually who [CISA] coordinated through." Scully Depo. 29:14-30:12.

**RESPONSE:** Disputed to the extent this PFOF asserts current "participa[tion] in these meetings" by any agency or individual, because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). In addition, Special Agent Chan only participated in "some" of these meetings. Scully Dep. 29:22-30:1. Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their

platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

983.   These "USG-Industry" meetings have been occurring "for years," and "the first meeting we had … between federal and … industry was in 2018."  Scully Depo. 31:10-16.

**RESPONSE:** Disputed to the extent this PFOF suggests that the meetings are still "occurring," because the meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

984.   In addition, prior to each "USG-Industry" meeting, CISA hosts at least two planning meetings before the main meeting: a bilateral planning meeting between CISA and Facebook, and an interagency meeting with the federal agencies that participate. Scully Depo. 36:21-37:13.

**RESPONSE:** Disputed to the extent this PFOF suggests the meetings are still taking place because the USG-Industry meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

985.   Even though the 2022 meetings were still quite recent at the time of his deposition, Scully professed that "I don't recall specifics, so I'll just say that upfront" about the discussions at these meetings. Scully Depo. 37:19-20; *see also* Scully Depo. 39:23-25.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the record. When Mr. Scully was asked what ODNI "specifically" said during 2022 meetings, and whether ODNI ever raised a specific threat advisory, he responded that "I don't recall specifics, so I'll just say that up front." Scully Dep. 37:14-24. He further explained that "generally speaking . . . it was higher level, kind of strategic of what a threat actor may be considering or thinking." *Id.* Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

986.    The social-media platforms attending these meetings include "Facebook, Twitter, Microsoft, Google, Reddit, … [and] LinkedIn," as well as "others." Scully Depo. 38:15-20. For example, Wikimedia Foundation participated in "some." Scully Depo. 39:2-6.

**RESPONSE:**  Disputed to the extent this PFOF suggests the meetings are still taking place because the meetings, which began in 2018, ended in 2022; there is no plan to continue these meetings in 2023. *See* Scully Dep. 32:9-11; Hale Decl. ¶ 69 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

987.    Scully agrees that "concerns about misinformation and disinformation on social media platforms [were] discussed in these meetings in the 2022 timeframe."  Scully Depo. 39:7-11. This includes federal officials reporting on disinformation concerns that they believe will affect speech on social media; for example, the "intelligence community" would report on "information operations": "the intelligence community, if their reporting included foreign actors who were potentially going to use information operations, they might mention that in their briefings."  Scully Depo. 39:19-23.

**RESPONSE:**  Undisputed, except to the extent the second sentence states "[t]his includes federal officials reporting on disinformation concerns that they believe will affect speech on social media." That vague and ambiguous statement is not supported by the cited portion of Mr. Scully's deposition. Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

988.    The social-media platforms, likewise, would report back to federal officials about disinformation "trends" on their platforms, and provide additional information to the federal government not included in their public reports about such trends: "the platforms, they might share some high-level trend information from public reporting that they put out. So a lot of the platforms do their own regular reports on what they're seeing on their platforms and … what actions they're taking. And so the platforms, themselves, would share that type of information…. they would share essentially what they were getting ready to make public or what they had already made public… and then potentially provide some additional context around that."  Scully Depo. 40:4-22. The government would ask for additional information about their observations of disinformation trends on social media, and the platforms would provide it: "they would share that, and if the government had questions or was looking for additional context they would often talk about that, they would generally talk about any new tactics that they were seeing."  Scully Depo. 41:1-5.

**RESPONSE:** The first sentence is disputed as a mischaracterization of the testimony cited in the balance of the PFOF. Moreover, this PFOF contains no evidence that CISA sought or used the referenced information to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F, Arg. § II.B.4.c.

989.    Scully admits that the discussion of foreign-originated misinformation is ultimately targeted at preventing domestic actors' from engaging in certain government-disfavored speech. He states that "my recollections for the time period we're talking about here, from September 2022 to the election in 2022, I recall most of it was foreign based. But … often what you see overseas essentially makes its way to the United States."  Scully Depo. 41:6-12.

**RESPONSE:**  The first sentence is disputed as a mischaracterization of the testimony cited in the second and third sentences, and as suggesting that the USG-Industry meetings, which ended in 2022, are still taking place. *See* Scully Dep. 32:9-11. There is no plan to continue these meetings in 2023. *See id.*; Hale Decl. ¶ 78 (Ex. 97). This PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

990.    At the various meetings, the platforms discuss misinformation and disinformation as "coordinated inauthentic behavior," which is subject to removal under their terms of service, but Scully admits that "coordinated inauthentic behavior" concerns CISA because it "could lead to mis and disinformation, for sure."  Scully Depo. 42:12-14.

**RESPONSE:** Disputed as a mischaracterization of the cited testimony, and as suggesting that the meetings, which ended in 2022, are still taking place. *See* Scully Dep. 32:9-11. There is no plan to continue these meetings in 2023. *See id.*; Hale Decl. ¶ 78 (Ex. 97). Mr. Scully testified that although coordinated inauthentic behavior "could lead to mis or disinformation . . . it's not always mis or disinformation." Scully Dep. 41:16-42:8. Rather, coordinated inauthentic behavior "could be an indicator" of mis- or disinformation. *Id.* at 42:15-19. Moreover, this PFOF contains no evidence that CISA used these meetings to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

## C.    CISA Is Deeply Embedded in the Election Integrity Partnership.

991.    Scully admits that CISA has established relationships with researchers at "Stanford" and the "University of Washington," as well as "Graphika."  Scully Depo. 46:23, 48:1-

4. CISA's coordination with these researchers has continued since before the 2020 election cycle. Scully Depo. 47:22-25. Detailed additional information about these entities and their collaboration with CISA in the "Election Integrity Partnership" (or "EIP") is provided below. *See infra.*

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the Election

Integrity Partnership (EIP), *infra*, nor the record as a whole, contains evidence that CISA was

"pervasive[ly] entwine[d]" with the EIP, Pls.' Supplemental Preliminary Injunction Brief at 41

(Dkt. 214) ("PI Supp."); *see also* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

992.     Stanford Internet Observatory, University of Washington, the Atlantic Council, and Graphika are all involved in the EIP. Scully Depo. 48:1-22.

**RESPONSE:** Undisputed.

993.     When EIP was starting up, Scully admits that CISA's "involvement" with the EIP included at least the following collaborations: (1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP. Scully Depo. 49:8-10. (2) CISA "received some briefings on the work that they were doing."  Scully Depo. 49:13-14. (3)  CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was." Scully Depo. 49:18-21. (4) CISA "connected them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Depo. 50:5-6. (5) CISA also "connected them [EIP] with some of the election official groups," *i.e.*, "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are groups of state and local government officials. Scully Depo. 50:6-10.  (6) And CISA "facilitated some meetings between those three."  Scully Depo. 50:10-11.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited actions as

"collaborations" between CISA and the EIP. The cited evidence does not support that

characterization. CISA did not launch the EIP, and it is not a government organization. *See* Hale

Decl. ¶ 56 (Ex. 97). In addition, the PFOF mischaracterizes the funding of CIS. DHS has provided

financial assistance to CIS through a series of cooperative agreement awards, managed by CISA,

to provide certain, specified cybersecurity services to state, local, tribal and territorial

governmental organizations through the MS- and EI-SACs. *Id.* ¶ 50. In the approved scope of work

for the cooperative agreements, DHS has limited the use of federal funds and any required non-

federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *See id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *See id.* ¶ 51. Nor did CISA fund CIS or the MS- or the EI-ISAC for any of the work CISA provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or election cycle. *See id.* ¶ 77. In addition, CISA does not now fund and has never funded the EIP. *See id.* ¶ 57. Further, Defendants note that Louisiana is a member of NASS and both Louisiana and Missouri are members of NASED. *See id.* ¶ 33. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

994.    The CISA interns who originated the idea of the EIP "worked for the Stanford Internet Observatory, as well … which was part of the [Election Integrity] Partnership."  Scully Depo. 51:7-8, 22-24.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

995.    According to Scully, the "gap" that the EIP was designed to fill, was that state and local election officials lack the resources to monitor and report on disinformation that affects their jurisdictions: "One of the gaps that we identified from 2018 is, as you know, most election officials their offices are fairly low staff, low resourced, and so there was no – they didn't have capabilities to try to identify disinformation targeting their jurisdictions, and so was essentially the gap is that most election offices throughout the country just didn't have that capacity or capability to be monitoring so that they could identify anything that would be potentially target their jurisdictions, so that was the gap."  Scully Depo. 57:6-17.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

996.   Scully and other CISA officials identified the "gap" as a problem to CISA interns who were simultaneously working for the Stanford Internet Observatory: "So we had a conversation with the interns, and they were asking questions about kind of needs that the election officials have, generally. One of the gaps that we identified from 2018 is, as you know, most election officials their offices are fairly low staff, low resourced, and so … they didn't have the capabilities to try to identify disinformation targeting their jurisdictions." Scully Depo. 57:2-11.

**RESPONSE:** Undisputed, except that the cited testimony does not support the statement that the Stanford students interning at CISA "were simultaneously working for the Stanford Internet Observatory" and that Mr. Scully or "other CISA officials" "identified the 'gap.'" *See* Defs.' Resp. to Pls' PFOF ¶ 1019. In addition, any student who interned at CISA should have performed only CISA work during their internship with the Agency, and they should not have performed any CISA work outside of their CISA internship, including while interning at the Stanford Internet Observatory or supporting the EIP. Hale Decl. ¶ 61 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

997.   Thus, Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place, as they "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6. Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9. Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13. And CISA's involvement did not end there, as Scully admits that "we had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17. In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." Scully Depo. 52:18-20.

**RESPONSE:** Undisputed, except to extent the statement that "Scully and other CISA officials were involved in originating and brainstorming about the creation of the EIP in the first place" mischaracterizes the record. Mr. Scully explained that after he identified the "gap" in election officials' resources, "I don't think they were necessarily thinking about more of a partnership." Scully Dep. 57:24-6. Rather, Mr. Scully explained that "I think the conversation was more along the lines of this may be something that the Stanford Internet Observatory could look into, and then I think they went back and talked to their folks at the Stanford Internet Observatory and the idea was formed from there." *Id.* at 57:24-58:12. CISA did not found, fund, or have any role in the management or operations of the EIP. Hale Decl. ¶¶ 52, 56-57 (Ex. 97); Ex. 122 at 7 (University of Washington statement) (noting that "CISA did not found, fund, or otherwise control EIP."). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

998.    The EIP continued to operate during the 2022 election cycle. Scully Depo. 53:4-5. At the beginning of the 2022 election cycle, the EIP "gave us [CISA] a briefing, early on, about what they were thinking about," which occurred in "May/June of 2022." Scully Depo. 53:14-19. Scully and Geoff Hale of CISA received the briefing from Renee DiResta and another EIP official. Scully Depo. 53:22-54:7. In that briefing, the EIP officials "walked through what their plans were for 2022, [and] some of the lessons learned from 2020." Scully Depo. 54:11-13. Their plans for 2022 were that "they were going to do something similar to what they did in 2020 in terms of trying to support election officials." Scully Depo. 54:16-18. They planned to "work with state and local election officials." Scully Depo. 54:22-25.

**RESPONSE:** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

999.    CISA followed EIP's public reporting during the 2022 election cycle, and in particular, Scully relied on "at least one public report … that I thought was pretty good," which was "about specific disinformation" and "was basically how to think about whether or not a narrative poses risks." Scully Depo. 56:12-17.

**RESPONSE:** Undisputed, except that the record does not support that Mr. Scully "relied" on EIP's public report rather than simply reviewed it. Scully Dep. 56:6-21. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1000.   Scully admits that CISA has "an established relationship" with the EIP and the Stanford Internet Observatory personnel who lead it. Scully Depo. 55:24-25.

**RESPONSE:** Undisputed. Defendants note that CISA did not found, fund, or have any role in the management or operations of the EIP. *See* Hale Decl. ¶¶ 52, 56-57 (Ex. 97); Ex. 122 at 7 (noting that "CISA did not found, fund, or otherwise control EIP."). In addition, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1001.   The Center for Internet Security is a "non-profit that oversees the multi-state ISAC and the election infrastructure subsector information sharing and analysis center, that's what ISAC stands for." Scully Depo. 59:13-16. In other words, CIS oversees the "Multi-State Information Sharing and Analysis Center," or "MS-ISAC," and the "Election Infrastructure Information Sharing and Analysis Center," or "EI-ISAC." Scully Depo. 60:9-20. Both of these are organizations of state and/or local government officials, organized for information sharing. Scully Depo. 60:3-11, 60:25-61:6.

**RESPONSE:** Undisputed, but further note that both Louisiana and Missouri are members of the MS-ISAC. *See* Hale Decl. ¶ 46 (Ex. 97). Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1002.   CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials. Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC").

**RESPONSE:** Disputed. CISA does not fund the CIS; rather, DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SAC. *See* Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *See id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *See id.* at ¶ 51. Nor did CISA fund CIS or the MS- or the EI-ISAC for any of the work CISA provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or election cycle. *See id.* at ¶ 77. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1003.   CISA directed election officials to the Center for Internet Security, which CISA funds, as an alternative route for reporting misinformation to social-media platforms, because CISA found the "switchboarding" role to be resource-intensive. Scully Depo. 62:16-24.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as funding the Center for Internet Security. The record does not support that characterization and it is contradicted by the facts. *See* Defs.' Resp. to PFOF ¶ 1002. In addition, this PFOF mischaracterizes CISA as "direct[ing] election officials to" CIS. The record does not support that characterization; rather, the testimony states that "[election officials] seemed to settle on the [CIS.]" Scully Dep. 62:16-24. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence

that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1004.   CISA connected the Center for Internet Security with the EIP because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected."  Scully Depo. 62:24-63:1. Thus, CISA originated and set up the collaborations between local government officials and the CIS, and between the EIP and the CIS. *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as "originat[ing] and set[ting] up the collaborations between local government officials and the CIS." Scully Dep. 62:16-24. The record does not support that characterization and it is contradicted by the facts. As home to the MS-ISAC and EI-ISAC, CIS had its own independent relationship with state and local government officials. Hale Decl. ¶ 44 (Ex. 97); *see* Defs.' Resp. to PFOF ¶ 1002**.** Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1005.  The Center for Internet Security worked closely with CISA in reporting misinformation to social-media platforms, as CISA served as a pass-through for reports from CIS to the platforms: CIS officials "were receiving reporting directly from election officials. In the early part of 2020, they would forward what they were receiving election officials to us at CISA, and then we would push that to the social media platform; as 2021 moved along, CIS more frequently provided that directly to the platforms, themselves. And so I would say early on in the process, the switchboarding generally came through CISA. Later on in the process, it was more of a mixed bag of how the switchboarding worked."  Scully Depo. 63:23-64:10.

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes CIS as "work[ing] closely with CISA in reporting misinformation," and does not support the implication that "CISA served as a pass-through for reports from CIS to the platforms" for all reports of misinformation to social media platforms, throughout the 2020 election or for any of the election cycles that followed. The cited evidence does not support that characterization. Indeed, as the quoted testimony of Mr. Scully reflects, as 2021 progressed CIS frequently provided information that it

received from state and local officials directly to social media platforms and did not involve CISA

at all. Scull Dep. 63:23-64:10; Hale Decl. ¶ 75 (Ex. 97). Neither this PFOF nor those concerning

the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly]

entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

    1006.   In addition to CIS and CISA, EIP also reported supposed misinformation to social-media platforms. Scully Depo. 64:13-14. CISA and CIS coordinated directly with each other on reporting misinformation. Scully Depo. 64:18-20.

    **RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP,

*infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

    1007.   CISA served a mediating role between CIS and the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms: "There was a point where one of the platforms was concerned about too much kind of duplicate reporting coming in, and so we did have some conversations with EIP and CIS on how to kind of better manage that activity to make sure we weren't overwhelming the platforms."  Scully Depo. 64:21-65:1.

    **RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited testimony as

stating that CISA served in a "mediating role" between the CIS, the EIP, and social media

platforms in coordinating the efforts of CIS and EIP. The cited testimony does not support that

characterization. Rather, CISA had conversations with CIS to try and avoid providing social media

companies with duplicative information. Scully Dep. 66:1-8; Hale Decl. ¶ 76 (Ex. 97). Neither this

PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA

was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. §

II.B.4.c. & e.

    1008.   There was also direct email communication between EIP and CISA about misinformation reporting. Scully Depo. 66:9-12.

    **RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony

as stating that the communications between EIP and CISA were *about* misinformation reporting.

The cited testimony does not support that characterization. Rather, the cited testimony notes that Mr. Scully believed "there was direct e-mail communication between EIP and CISA." Scully Dep. 66:9-12. Neither the deposition question nor the answer specifies the subject or content of conversations between the EIP and CISA. Neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1009.  When CISA reported misinformation to platforms, CISA would "generally copy the Center for Internet Security," which was coordinating with EIP. Scully Depo. 67:20-68:6.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Mr. Scully's testimony as indicating that CISA copied CIS because CISA was coordinating with the EIP. The testimony does not support that characterization. Rather, the testimony states that CISA did not coordinate with CIS if it was reporting something to a social media platform because CIS was coordinating with EIP, but rather, CISA coordinated with CIS because "most of the reporting received from an election official came through CIS." Scully Dep. 68:2-19. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1010.  Alex Stamos and Renee DiResta of the Stanford Internet Observatory briefed Scully about the EIP's report, "The Long Fuse," in "late spring, early summer 2021." Scully Depo. 70:1-10. Scully also reviewed portions of the report. *See id.*; Scully Ex. 1 (EIP Report).

**RESPONSE.** Undisputed. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1011.  Dr. Kate Starbird of the University of Washington, who works with the EIP, is also on the MDM Subcommittee for CISA. Scully Depo. 72:19-73:4. Kate Starbird of the University

of Washington serves on CISA's CSAC MDM Subcommittee, as well as working with the EIP. Scully Ex. 59, at 1.

**RESPONSE:** Disputed to the extent this PFOF indicates that the "MDM Subcommittee for CISA" and "CISA's CSAC MDM Subcommittee" are two distinct groups and to the extent this PFOF indicates that Dr. Starbird continues to serve on the CSAC's MDM Subcommittee. There is no organization or group called "the MDM Subcommittee for CISA." Rather, at one time the CISA Cybersecurity Advisory Committee (CSAC) had a subcommittee known as the Protecting Critical Infrastructure from Misinformation (MDM) Subcommittee. Dr. Starbird served on the CSAC MDM Subcommittee while it was operational; however, the CSAC MDM Subcommittee was directed to stand down in December 2022 because it had completed its work and provided its recommendations to CISA. *See* Ex. 187 at 43. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1012.   Alex Stamos and Renee DiResta, who quarterback the EIP, also have roles in CISA. Renee DiResta of the Stanford Internet Observatory—a key player in the EIP—also serves as a "Subject Matter Expert (SME)" for the CISA's Cybersecurity Advisory Committee's MDM Subcommittee. *Id.*; Scully Depo. 361:19-362:6. Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, serves on the CISA Cybersecurity Advisory Committee, along with Kate Starbird. Jones Decl., Ex. FF, at 3, 12-13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence by suggesting that Ms. DiRestra's inclusion on a list of "potential subject matter experts to potentially brief" meant that she had any role, formal or otherwise, at CISA. Scully Dep. 361:3-326:6. The cited evidence does not support this characterization. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1013.   CISA had extensive communications to coordinate with the EIP when it was starting up during the 2020 election cycle: "we had conversations with Stanford about the gap. They gave us some briefings on what they were doing, how they were doing it. Prior to the election, we had some conversations with them to facilitate and coordinate meetings, as I mentioned. And then when they put public reporting out, if we had questions about it, we would probably have conversations with them around that, as well." Scully Depo. 74:17-75:1.

**RESPONSE:**  Disputed to the extent this PFOF mischaracterizes CISA's handful of conversations with Stanford as "extensive" communications with the EIP. The cited evidence does not support that characterization. Indeed, the cited transcript reflects that CISA only had a handful of meetings with the EIP between 2020 and 2022. Scully Dep. 74:17-75:1; Hale Decl. ¶¶ 52-54, 60, 62 (Ex. 97). Indeed, CISA did not found, fund, or have any role in the management or operations of the EIP. *Id.* ¶¶ 52, 56-57; Ex. 122 at 7. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1014.   In addition to Scully, Matt Masterson was involved in communicating with the EIP. Scully Depo. 75:6-11. In addition, Scully "wouldn't be surprised" if Geoff Hale participated in some conversations with EIP. Scully Depo. 76:1-2.

**RESPONSE:**  Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1015.   The then-Director of CISA, Director Krebs, "had a relationship with Alex Stamos," the head of the Stanford Internet Observatory, while CISA was coordinating with the EIP, and Director Krebs "may have had conversations in that context" about the EIP. Scully Depo. 76:8-10. In fact, when he left CISA in late 2020, Director Krebs "joined Alex Stamos," and "they started a business together," called the "Krebs/Stamos Group."  Scully Depo. 76:5-23.

**RESPONSE:**  Disputed to the extent that this PFOF mischaracterizes CISA's communications with EIP as "coordinat[ion]" and mischaracterizes any conversation between former Director Krebs and Mr. Stamos as involving the EIP. The cited evidence does not support

those characterizations. Mr. Scully testified that he did not believe that former Director Krebs and Mr. Stamos "necessarily had conversations in relation to EIP." Scully Dep. 76:5-12. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1016.   Scully believes that "Director Krebs may have participated in a couple of meetings that I'm aware of, that Stamos was also in."  Scully Depo. 77:20-22, 78:3-11.

**RESPONSE:** Undisputed, but note that those meetings occurred while Mr. Stamos was still working at Facebook, rather than the Stanford Internet Observatory, and the discussion did not involve the Election Integrity Partnership. Scully Dep. 78:1-18. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1017.   According to Scully, "generally speaking, the reporting that CISA received came through the Center for Internet Security."  Scully Depo. 79:19-21.

**RESPONSE:** Disputed. Mr. Scully testified that CISA generally received reporting in three ways. First, CISA received reports of potential misinformation from the Center for Internet Security. Scully Dep. 118:22-119:15. Second, on occasion election officials would send reports of potential misinformation to CISA Central, which is CISA's operations center. *Id.* at. 119:20-25. Third, election officials would send reports of potential misinformation directly to a CISA employee. *Id.* Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1018.   Matt Masterson and Scully presented questions to the EIP about their "public reporting," which consisted of "regular blog posts on what they were seeing" about supposed

election-related misinformation. Scully Depo. 81:19-82:16. Masterson was also involved in at least one of the initial discussions with the Stanford Internet Observatory about starting up the EIP. Scully Depo. 81:24-82:4. Masterson spoke to Stanford about "clarifying the gap that election officials faced for the folks at the Stanford Internet Observatory early on in the process." Scully Depo. 83:22-25.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1019.   The idea of the "gap" came from Scully and CISA, which he "shared with the interns." Scully Depo. 84:8-22.

**RESPONSE:**   Disputed to the extent the PFOF mischaracterizes Mr. Scully as coming up with the idea of the "gap." The cited evidence does not support that characterization. Mr. Scully disclaimed that he came up with the idea of the "gap"; rather, the "gap" was identified as part of lessons learned from 2018. Scully Dep. 84:10-18 (stating that "I don't know that I would say that that was . . . something that we came up with on our own."). Mr. Scully shared this lesson learned with the Stanford students. *Id.* 84:19-22. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1020.   Matt Masterson "was in the meeting where we talked about the gap with [Alex] Stamos, in particular. And I believe Stamos mentioned that [*i.e.*, the collaboration that became the Election Integrity Partnership] as an option during that call." Scully Depo. 85:21-24.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1021.   Matt Masterson left CISA in January 2021. He started at Microsoft in early 2022. In the intervening year, immediately after leaving CISA, Masterson "was a fellow at the Stanford Internet Observatory." Scully Depo. 88:21-89:8. Thus, both the CISA Director (Krebs) and the political appointee directly involved in the establishment of the EIP (Masterson) went to work with Alex Stamos of Stanford Internet Observatory immediately after the 2020 election cycle.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes Mr. Masterson as being "directly involved in the establishment of the EIP." The evidence does not support that characterization. Rather, the evidence reflects that Mr. Masterson had extremely limited involvement with Stanford concerning the EIP. Scully Dep. 83:15-25 (stating that Mr. Masterson's role concerning the EIP was simply to clarify for the Stanford Internet Observatory the gap in resources that election officials faced). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1022.   Alex Stamos consulted with CISA in part because "he knew he would need us helping him connect with election officials." Scully Depo. 100:17-18.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes Mr. Scully's understanding as fact when the cited testimony states, "I *think* he knew he would need us helping him connect with election officials." Scully Dep. 100:17-18 (emphasis added). In addition, Mr. Stamos "didn't ask CISA to play any role in the concept he was putting together." *Id.* at 100:13-18. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1023.   Scully believes that there was at least "a fifth call" between CISA and Alex Stamos in 2020. Scully Depo. 101:4.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1024.   Scully put Stamos in touch with NASED and NASS, and "facilitated some meetings between … them [EIP] and election officials." Scully Depo. 101:15-102:10. Scully "facilitated meetings … some meetings between EIP and CIS" because "they didn't have relationship" and

"didn't know each other. So [CISA] just facilitated getting them together to talk and figure out how they were going to work together."  Scully Depo. 102:14-20. The purpose of these meetings was "to set up a direct line of communication between CIS and EIP."  Scully Depo. 103:7-10.

**RESPONSE:** Undisputed, but note that Plaintiff Louisiana is a member of the NASS, and Plaintiffs Missouri and Louisiana are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1025.   Scully also put EIP in contact and facilitated meetings between EIP (*i.e.*, folks at the Stanford Internet Observatory, which organized EIP) and representatives of NASED and NASS, the organizations of state and local election officials. Scully Depo. 103:11-104:19. These occurred in July or August 2020. Scully Depo. 104:24-25.

**RESPONSE:** Undisputed, but note that Plaintiff Louisiana is a member of the NASS, and Plaintiffs Missouri and Louisiana are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1026.  Scully believes that the Center for Internet Security, which CISA funds, "forward[ed] messages that election officials sent them" reporting misinformation "to EIP." Scully Depo. 106:10-16.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes CISA's funding of CIS. DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The

DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1027.   Scully agrees that "EI-ISAC is a part of CIS and we do fund the EI-ISAC."  Scully Depo. 110:20-23.

**RESPONSE:** Undisputed, but note that neither DHS nor CISA funded CIS or the EI-ISAC for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or 2022 election cycles. Hale Decl. ¶¶ 51, 77-78 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1028.   Scully agrees that CISA collaborated with the EIP. Scully Depo. 111:15-18.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony. In response to the question, "[d]id [CISA] have conversations with representatives of the EIP?," Mr. Scully responded: "[y]es. If that's considered collaboration, then I guess we collaborated with the EIP." Scully Dep. 111:11-18. CISA has engaged with the EIP as it does with other nongovernmental organizations in the election community. Hale Decl. ¶ 62 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1029.   CISA probably had "between two and four" conversations with the EIP about its public reports on disinformation trends on social media. Scully Depo. 113:20-24. "[I]f we had a question about jurisdiction[s] being targeted or a new [disinformation] tactic or things like that, we would just ask them … questions about that sort of thing."  Scully Depo. 114:17-21. Scully "was following the public reports" from the EIP during 2020. Scully Depo. 115:16-17.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited testimony by omitting portions of that testimony that provide context. The omitted portion of the testimony noted that the referenced conversations "were just fairly brief conversations, based on blog posts." Scully Dep. 114:15-21; Hale Decl. ¶ 60 (Ex. 97) (noting that while the EIP briefed CISA on EIP's plans for the 2022 election cycle, the briefing was at a high-level and did not address if or how the EIP may interact with CIS."). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1030.   CISA received misinformation reports principally from three sources: first, from the Center for Internet Security; and second, "sometimes election officials would send them in to CISA central, which is CISA's kind of ops center block room type setup. And then the third way was they would just send direct to a CISA employee, … often Matt Masterson, who had relationships with many of the election officials."  Scully Depo 119:7-11, 119:22-120:5.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1031.   CISA coordinated with the Center for Internet Security on reporting misinformation to platforms: "we would let them know when we reported something to a platform … to avoid duplication," and "most of the reporting that I recall in 2020 came through CIS. And so we just wanted to let them know that we were acting on what they sent us. For reporting that didn't come through CIS, we would often let them know after we had shared it with the platforms that we had shared something with the platforms for their arrangement."  Scully Depo. 120:23-121:9.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infr*a, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1032.   CIS and EIP also "had a relationship. They shared information." Scully Depo. 121:20-21.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1033.   According to Scully, "CISA does not do attribution. We didn't do analysis of what we received from election officials. So we would not know what percentage" of misinformation reports "were foreign derived."   Scully Depo. 122:25-123:3. CISA thus forwards reports of "misinformation" to social-media platforms "without assessing whether they were originated from foreign or domestics sources."   CISA would not "take steps to see whether this came from foreign or domestic sources," but "would just pass it along to the social-media platforms." Scully Depo. 123:4-18.

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that CISA threatened or pressured any social media company to censor speech, or that any social media company regarded any communications by CISA as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1034.   Scully was aware that social-media platforms changed their content-moderation policies to be more restrictive of election-related "misinformation" during the 2020 election cycle, because the platforms reported on those changes to federal officials "in our regular sync meetings," *i.e.*, the "USG-Industry" meetings. Scully Depo. 127:18-19. In those meetings, "that would be one of their briefing points, that they were making significant changes" to policies for censoring election-related speech. Scully Depo. 128:4-6.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony. Rather than report on all changes to their content moderation policies during the USG-Industry meetings, social media platforms would report on "significant changes." Scully Dep. 127:4-128:7. Mr. Scully explained that this information "wasn't an essential part of the conversation," and that he was unaware of anyone in the federal government asking or encouraging social media companies to change their content moderation policies to address election integrity. *Id.* at 127:4-

128:12. Also disputed to the extent Plaintiffs characterize social-media companies' content moderation policies, to which all users must agree, as "policies for censoring." Moreover, this PFOF contains no evidence that CISA threatened or pressured any social media company to censor speech, or that any social media company regarded any communications by CISA as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1035.   During 2020, Matt Masterson was "a senior election security person at CISA," and he was a "political appointee."  Scully Depo. 129:23-130:4. Masterson was "familiar with the switchboarding work that we were doing." Scully Depo. 131:8-10. And "when he would receive emails" reporting misinformation, "he forwarded them to us."  Scully Depo. 131:13-14.

**RESPONSE:**  Undisputed, but note that this PFOF contains no evidence that CISA threatened or pressured any social media company to censor speech, or that any social media company regarded any communications by CISA as such. Any implicit assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1036.   Scully understands that the Virality Project was "Stanford's attempt to mimic the EIP for COVID."  Scully Depo. 134:10-11.

**RESPONSE:**  Undisputed, but note that neither this PFOF nor those concerning the Virality Project (VP), *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1037.   The Virality Project "sent [Scully] some of their public reports."  Scully Depo. 134:13-14.

**RESPONSE:**  Undisputed, but note that neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the

VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1038.  Scully was aware that Alex Stamos and Renee DiResta of the Stanford Internet Observatory were involved in the Virality Project. Scully Depo. 134:21-22.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1039.  Scully "did have some conversations where they were … asking me … for any connections I had with HHS or CDC." Scully Depo. 135:10-12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited testimony. Mr. Scully testified that he had conversations with someone "associated with the Virality Project" but did not recall who these conversations were with. Scully Dep. 134:17-135:12. Mr. Scully further testified that he did not provide the VP with these connections as he did not have "any relevant point of contact[] to provide them." *Id.* at 135:6-19. Moreover, neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1040.  In addition, Scully recalls "some informal … conversations that I may have had with Alex, in particular, and maybe Renée, as well," about the Virality Project. Scully Depo. 136:3-6.

**RESPONSE:** Undisputed, but note that Mr. Scully stated that these conversations were "not substantial," and that Mr. Stamos and Ms. DiResta simply told him generally that the VP was something they were working on. They "did not get into any details" about the VP during these conversations. Scully Dep. 135:20-136:22. Moreover, neither this PFOF nor those concerning the

VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1041.   Alex Stamos gave Scully an "overview what they planned to do in the Virality Project" that "was similar to what they did … with the EIP."  Scully Depo. 136:19-22.

**RESPONSE:**  Undisputed, but note that neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1042.   Scully also had conversations with Renee DiResta about commencing the Virality Project. Scully Depo. 139:5-14.

**RESPONSE:**  Undisputed, but note that Mr. Scully testified that this "wasn't a lengthy conversation. It was just, hey, we're doing something here, I believe." Scully Depo. 139:5-14. Moreover, neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1043.   With respect to the EIP, Alex Stamos and Renee DiResta "shared … lessons learned," and "what some of their big takeaways were" with Scully. Scully Depo. 141:6-8.

**RESPONSE:**  Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1044.   CrowdTangle is a "Facebook-owned social media monitoring service."  Scully Depo. 144:23-24.

**RESPONSE:**  Undisputed.

1045.   According to the Virality Project report, "as voting-related mis-and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and

Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states." Scully Ex. 2, at 150. Scully understands that this refers to the Center for Internet Security, which operates the EI-ISAC through CISA-provided funding, and that "it was Center for Internet Security" that engaged in direct communications with the EIP and played a critical role in sharing information with the EIP. Scully Depo. 147:17-25.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the CIS and EI-ISAC funding mechanism, as well as the EI-ISAC's involvement in the EIP. Regardless of Mr. Scully's "understanding," the cited evidence does not support that characterization. First, DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Second, Mr. Scully testified that he was not aware of whether the EI-ISAC served a role in sharing information with the EIP during 2020. Scully Dep. 147:13-25. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1046.   During the summer of 2020, CISA was "piloting a capability that would allow us to monitor narratives online," Scully Depo. 151:13-15—*i.e.*, the work that the EIP eventually did and does.

**RESPONSE:** Disputed to the extent the PFOF seeks to assert an equivalence between the work the EIP performed and the pilot project Mr. Scully described, because the PFOF fails to cite

to any record evidence supporting such a comparison. In addition, Mr. Scully explained that the purpose of the pilot project was "to predict the likely impact of narratives on stakeholders." Scully Dep. 151:20-152:9. Mr. Scully explained that "we were trying to understand . . . if we could predict the likely impact of MDM narrative in terms of increasing risks to critical infrastructure by a better understanding [of] the information environment, so the pilot was essentially trying to test that theory out." *Id.* at 151:20-152:14; 153:24-154:8. This pilot project was never operationalized or used by CISA. *Id.* at 155:14-22. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1047.   In his public statements, Alex Stamos has identified the EIP's "partners in government" as "most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with." Scully Ex. 6, at 4. Scully agrees that "CISA and DHS were partners of the EIP." Scully Depo. 369:1-11.

**RESPONSE:** Undisputed, but note that Mr. Scully testified that "[CISA] generally describe[s] any external organization that we have a relationship with as a partner." Scully Depo. 396:6-11; Hale Decl. ¶ 62 (Ex. 97) (noting that CISA has engaged with the EIP as it does with other nongovernmental organizations in the election community). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1048.   According to Stamos, "[t]he Election Integrity Partnership started with our team in Stanford sending a group of interns to go work with the cyber security and infrastructure security agency at the DHS to work election security. And what these interns found is, there's a lot of opportunity for them to contribute to the technical components of election security. They also found that there was a lack of capability around election disinformation. This is not because CISA didn't care about disinformation, but at the time they lacked both kind of the funding and the legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Scully Ex. 6, at 4.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF relies on the statement of nongovernmental third party for the legal conclusion that CISA lacked the "legal authorizations to go do the kinds of work that would be necessary to truly understand how election disinformation was operated." Defendants address Plaintiffs' legal conclusion and arguments in their brief in response to Plaintiffs' motion for a preliminary injunction. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1049.  Stamos says that the EIP is "a project between four different institutions to try to fill the gap of the things that the government cannot do themselves."  Scully Ex. 6, at 4.

**RESPONSE:** *See* Defendants' response to Pls' PFOF ¶ 1048.

1050.  Stamos states that CISA was one of "four major stakeholders" in the EIP: "There are kind of four major stakeholders that we operated with that we worked beside at EIP. Our partners in government, most particularly those in CISA and DHS, but also in all of the local and state governments with whom we operated with."  Scully Ex. 6, at 4.

**RESPONSE:** Undisputed, but note that Mr. Scully testified that "[CISA] generally describe[s] any external organization that we have a relationship with as a partner." Scully Dep. 396:6-11; Hale Decl. ¶ 62 (Ex. 97) (noting that CISA has engaged with the EIP as it does with other nongovernmental organizations in the election community). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1051.  EIP had access to data for monitoring social-media speech that the federal government does not have:  The EIP "also worked with the major platforms, Facebook, Twitter, YouTube, TikTok, Reddit, NextDoor and the like. … [S]ome of those cases we had agreements for access of data. In other cases, we had to have individual analysts go work with them."  Scully Ex. 6, at 5.

**RESPONSE:** Disputed because the PFOF's statement that the "EIP had access to data for monitoring social-media speech that the federal government does not have" is not supported by the cited evidence. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1052.   According to Stamos, there was very little foreign disinformation in 2020: "We find very little evidence that there's any foreign involvement at all. In fact, the vast majority of election disinformation in 2020 came from Americans who had verified accounts and very large follower accounts."  Scully Ex. 6, at 6.

**RESPONSE:** Undisputed to the extent that this was the conclusion that Mr. Stamos reached based on the work performed by the EIP.

1053.   According to Stamos, its founder, the EIP targeted "large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context. So they're doing so online, on social media, but they're also doing so on cable news, doing so on the radio, through a variety of different outlets and are able to amplify their message and to motivate their followers to go try find evidence of the incorrect claims that they're making."  Scully Ex. 6, at 7.

**RESPONSE:** Disputed because the PFOF mischaracterizes the cited evidence. Mr. Stamos did not state that the EIP was "target[ing]" anything. Rather, Mr. Stamos simply explained a trend EIP's research had observed and noted that "one of the big changes [from the 2016 election] that we point out in our report is that this information is much less about massive amplification. . . . It's a much more important factor now is that there are large follower account political partisans who are spreading misinformation intentionally, doing so in a multi-media context." Scully Ex. 6 at 7. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1054.   According to Renee DiResta, "in August 2020, students from the Stanford Internet Observatory were doing an internship with CISA and they identified a massive gap in the

capability of federal, state, and local governments to become aware of, to analyze, and to rapidly respond to mis and disinformation, both foreign and domestic, targeting the 2020 election." Scully Ex. 7, at 4. The EIP was designed to fill that "gap" in the governments' capability to "rapidly respond to mis- and disinformation … targeting the 2020 election." *Id.*

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1055.   As DiResta notes, the EIP was designed to get around "unclear legal authorities, including very real First Amendment questions," that would arise if CISA or other government agencies were to monitor and flag misinformation for censorship on social media. Scully Ex. 7, at 4. As she states, "that gap had several components. The federal government wasn't prepared to identify and analyze election mis- and disinfo. …There were unclear legal authorities, including very real First Amendment questions." *Id.*

**RESPONSE:** Disputed to the extent the PFOF relies upon a statement by a non-governmental third-party witness to support a conclusion about CISA's "legal authorities." Defendants respond to Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for a preliminary injunction. In addition, Ms. DiResta explained that there were a number of reasons for the EIP, including that "a trusted nonpartisan partnership with expertise in the way that misinformation moved on public platforms with analysts capable of understanding public conversations and a broader ability to explore publicly available data was needed." Scully Ex. 7 at 4-5. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1056.   DiResta agrees that "the vast majority of voting related misinformation in the 2020 election was domestic."  Scully Ex. 7, at 6.

**RESPONSE:** Undisputed to the extent that this was the conclusion that Ms. DiResta reached based on the work performed by the EIP. However, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was

"pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1057.   The Virality Project was immediately established on the heels of the EIP: "Following the success of EIP and the certification of the 2020 election, SIO [Stanford Internet Observatory] … almost immediately we recognized the need to ramp back up. This time to support government health officials' efforts to combat misinformation and targeting the COVID-19 vaccines. In February 2021, we formally established the Virality Project drawing on the same partners from EIP and adding a few more, and much like EIP, it focused on realtime observation, analysis, and understanding of cross platform vaccine-related misinformation." Scully Ex. 7, at 7.

**RESPONSE:** Disputed to the extent the PFOF does not provide the entire quote from Ms. DiResta. The complete first sentence of her statement reads: "Following the success of EIP and the certification of the 2020 election, SIO ramped down its monitoring analysis capability because we thought that we were done with that work." Scully Ex. 7 at 7. Moreover, neither this PFOF nor those concerning the VP, *infra*, nor the record as a whole, contains evidence that CISA was pervasively entwined with the VP such that VP's conduct can be regarded as state action. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1058.   The CISA-funded Center for Internet Security coordinated with EIP regarding online misinformation and reported it to CISA. For example, on October 1, 2020, CIS emailed Scully about alleged misinformation, noting that "the impact seems to be escalating. Our hope is the platforms can do more to take down the misinformation. The EIP has been tracking this spread under ticket EIP-243 and has more examples." Scully Ex. 9, at 1. Scully forwarded this report to social media platforms. *Id.*

**RESPONSE:** Disputed to the extent the PFOF's characterization of CISA's funding of the CIS is misleading. First, DHS, not CISA, provides funding to CIS. *See* Hale Decl. ¶ 50 (Ex. 97). Second, the DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. In fact, DHS expressly rejected CIS's request for government funding to perform that work during the 2022 election cycle. *Id.* ¶ 79. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence

that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1059.   EIP had advised Scully that it was using a ticketing system to track misinformation narratives. Scully Depo. 159:1-5.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1060.   Scully forwarded this report tracked under EIP-243 to Twitter, as well as Facebook and YouTube, because "people generate traffic … by posting it across platforms," and he "would sometimes share across other platforms that we thought there might be … relevant content showing up on their platforms."  Scully Depo. 160:2-5; Scully Ex. 9, at 1, 7, 12.

**RESPONSE:** Disputed to the extent that this PFOF mischaracterizes the cited exhibits as forwarding reports tracked under "EIP-243." The cited documents do not support that characterization. Rather, the emails use a subject line indicating that CIS had an independent case number (Report # CIS-MIS000024) associated with the report it received from the office of the California Secretary of State. Scully Ex. 9 at 1, 7, 12. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1061.   Scully asked social-media platforms to report back how they were handling reports of misinformation and disinformation received from CISA. *See* Scully Ex. 9, at 11 (asking Twitter "to see if there's anything you can share about how you're approaching" misinformation reported by CISA). According to Scully, "periodically … we would ask if the decision was made and if we can share back."  Scully Depo. 164:15-17.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited evidence. Mr. Scully testified that CISA would ask social media companies to report back how they had addressed the content reported "if the election official asked," because sometimes the election

officials "wanted to know if a decision was made[.]" Scully Dep. 163:17-164:5. Mr. Scully further testified that "if the platform was open to sharing if they had made a decision or not, we would just push [the platform's response] back to the election officials so they were aware … of where the platform landed. *Id.* at 163:23-164:17. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1062.   CISA maintained a "tracking spreadsheet" of its misinformation reports to social-media platforms during the 2020 election cycle. Scully Depo. 165:14-166:13. After Scully's deposition, CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to Compel. Jones Decl., Ex. GG.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited document. The "tracking spreadsheet" of approximately 145 items included, among other things, (1) reports from state, local, tribal and territorial election officials that CISA forwarded to social media platforms; (2) reports that CISA had been made aware of but had taken no action on, and (3) materials not reported to social media platforms but instead referred to law enforcement as the underlying material may have constituted criminal behavior such as threats directed towards election officials and infrastructure. Jones Decl., Ex. GG. Defendants further dispute the PFOF's characterization that CISA produced this "tracking spreadsheet" in response to Plaintiffs' Motion to Compel. The tracking spreadsheet was neither the subject of Plaintiffs' document production requests nor their motion to compel. *See* Ex. 185 at 1 (E-mail from Joshua E. Gardner to John Sauer (Feb. 14, 2023, 8:11 AM)). Rather, Defendants produced the "tracking spreadsheet" to Plaintiffs in the spirit of cooperation because they requested it outside of discovery or motions practice. *Id.* Moreover, this

PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1063.  At least six members of the MDM team "took shifts" in reporting supposed misinformation to social-media platforms, including Scully, Chad Josiah, Rob Schaul, Alex Zaheer, John Stafford, and Pierce Lowary. Scully Depo. 166:9-168:11, 183:14-16.

**RESPONSE:**  Undisputed, but clarify that CISA forwarded reports of potential misinformation that it received from election infrastructure stakeholders, including officials in Plaintiffs states Louisiana and Missouri, *see* Hale Decl. ¶ 70 (Ex. 97); Ex. 100 (MOLA_DEFSPROD_00007488); Ex. 101 (MOLA_DEFSPROD_00007647); Ex. 102 (MOLA_DEFSPROD_00010719); Ex. 103 (MOLA_DEFSPROD_00008681), to social media platforms. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1064.   At the time, Pierce Lowary and Alex Zaheer were simultaneously serving as interns for CISA and working for the Stanford Internet Observatory, which was then operating the Election Integrity Partnership. Scully Depo. 168:22-171:16, 183:20-22. Thus, Zaheer and Lowary were simultaneously engaged in reporting misinformation to social-media platforms on behalf of CISA, and in reporting misinformation to social-media platforms on behalf of the EIP. *Id.*

**RESPONSE:**  Disputed to the extent the PFOF mischaracterizes the cited evidence. Messrs. Lowary and Zaheer both interned for CISA and were Stanford students associated with the Stanford Internet Observatory (SIO); however, as Mr. Scully explained during this deposition,

"when [the intern] was on duty, he was only working for us." Scully Dep. 168:20-169:2; Hale Decl. ¶ 61 (Ex. 97). Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1065.   Zaheer and Lowary were also two of the four Stanford interns who originated the idea of the EIP. Scully Depo. 171:14-16, 184:22-24, 185:12-14.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1066.   Zaheer "was one of the people that were working the ticketing system" for EIP. Scully Depo. 181:21-23. Likewise, Lowary "did both SIO and CISA push forwarding" at the same time during the fall of 2020. Scully Depo. 183:14-16.

**RESPONSE:** Undisputed, but note that neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1067.   CISA's misinformation reporting to platforms "ramped up as we got closer to the election." Scully Depo. 174:1-2. On election night, they "were up until at least midnight," and "if we received anything we would push it forward." Scully Depo. 175:12-14. Close to the election, they would "monitor their phones" for disinformation reports even during "off hours." Scully Depo. 175:16-17. "[T]he expectation [was] … that they would be responsible for forwarding something" to the platforms. Scully Depo. 175:19-21.

**RESPONSE:** Undisputed, but clarify that CISA forwarded reported information it received from election infrastructure stakeholders, including from Plaintiffs Louisiana and Missouri. Hale Decl. ¶ 70 (Ex. 97); Ex. 100 (MOLA_DEFSPROD_00007488); Ex. 101 (MOLA_DEFSPROD_00007647); Ex. 102 (MOLA_DEFSPROD_00010719); Ex. 103 (MOLA_DEFSPROD_00008681). Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media

companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1068.   Alex Zaheer, when switchboarding for CISA, forwarded detailed a report of supposed "misinformation" from the Election Integrity Partnership (EIP) to CISA's reporting system, which called for "swift removal of … posts and continued monitoring of the user's account" because that user had "claimed (1) that mail-in voting is insecure, [and] (2) conspiracy theories about election fraud are hard to discount." Scully Ex. 9, at 62. Scully forwarded this report to Twitter, which reported back that it had taken action pursuant to its civic integrity policy. *Id.* at 61; *see also* Scully Depo. 199:6-200:17.

**RESPONSE:** Disputed to the extent it mischaracterizes the cited evidence. Mr. Zaheer forwarded to CISA's Countering Foreign Influence Task Force (CFITF), for the CFITF's situational awareness, a report that the EIP had sent to Twitter. Scully Ex. 9 at 62. That report noted that a Twitter user had claimed that alleged ballots were being sent to New York City residents that were pre-filed out in favor of Biden, and that voters were encouraged to turn those ballots in as-is. *Id.* The EIP report "recommended Twitter remove this post immediately, as it contains a message that intends to mislead and potentially cast doubt on the legitimacy of mail-in voting in a critical pre-election period." *Id.* Mr. Scully forwarded this report to Twitter and noted that there was "[n]o need to respond." *Id.* at 61. Twitter nevertheless responded to Mr. Scully and informed him that Twitter decided to apply "a contextual label pursuant to our policy on Civic Integrity." *Id.* at 61. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1069.   According to Scully, forwarding such reports of misinformation from the EIP to social-media platforms "was our standard practice." Scully Depo. 200:25. In fact, CISA's tracking spreadsheet contains at least eleven entries of "switchboarded" reports of misinformation that CISA received directly from "EIP" and forwarded to social-media platforms for review under their

policies. Jones Decl., Ex. GG, at 4-5, Column C ("From"), Lines 86-96, 115, 123 (all listing "EIP"). CISA also used EIP tracking numbers for those reports. *See id.* Column D. One of these notes that content was reported to Twitter for censorship because "EIP … saw article on The Gateway Pundit." *Id.* at 4 (Column F, Line 94).

**RESPONSE:** Disputed to the extent the PFOF mischaracterize the reports sent to Twitter as advocating for "censorship." The cited evidence does not support that characterization. Rather, the evidence reflects that both CISA and EIP flagged information for social media companies so the companies could independently decide whether the information violated their terms of service. In addition, to the extent the PFOF suggests that CISA forwarded each of the "at least eleven entries" it received from the EIP to social media companies, the cited evidence does not support that statement. As reflected in rows 86-96 and 123 of the spreadsheet, these are instances where CISA was notified about EIP reporting to social media platforms, and do not indicate that CISA separately forwarded this information to social media platforms. Jones Decl., Ex. GG at 5-6. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1070.   CIS routinely reported misinformation by sending the notice simultaneously to both CISA and to the EIP, using the EIP's misinformation-reporting email "tips@2020partnership. atlassian.net." Scully Ex. 9, at 33, 52, 58; Scully Ex. 10, at 1. Scully Ex. 11, at 1-2 (indicating that "tips@2020partnership.atlassian.net" is the reporting email for the EIP); Scully Depo. 229:18-230:25 (Scully admitting that this email is the EIP reporting email).

**RESPONSE:** Disputed to the extent the PFOF's characterization that CIS "routinely" reported misinformation to both CISA and to the EIP is unsupported by the cited evidence. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1071.  State officials, likewise, simultaneously reported supposed "misinformation" to CISA, CIS, and the EIP. *See, e.g.,* Scully Ex. 9, at 59 (Colorado state official reporting misinformation to "EI-ISAC, CISA and Stanford Partners").

**RESPONSE:** Undisputed, but note that some states, like Louisiana, reported potential misinformation directly to CISA without reporting this information to CIS and the EIP. *See, e.g.,* Ex. 100 (MOLA_DEFSPROD_00007488). Moreover, neither this PFOF nor those concerning the EIP, *infra,* nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1072.  State officials sometimes indicated that they were reporting misinformation to platforms for censorship precisely *because* federal officials at FBI and CISA had warned them about it. *See, e.g.,* Scully Ex. 9, at 59 (noting that Colorado was reporting two Twitter accounts, one with 14 followers and one with 2 followers, because "[t]hese are concerning to us here in Colorado because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes state officials as reporting misinformation to platforms for "censorship." The cited evidence does not support that characterization. Rather, the cited document reflects that an individual from the office of the Colorado Department of State flagged for EI-ISAC, CISA, and "Stanford Partners" two accounts "that could be used to imitate official accounts," and that he "wanted to flag them for consideration." Scully Ex. 9 at 59. The Colorado Department of State expressly stated that it was "not the originator of the above information and is forwarding it, unedited, from its original source. The Department does not seek the ability to remove or edit what information is made available on social media platforms. The Department makes no recommendations about how the information it is sharing should be handled or used by recipients of this email." *Id.* at 60. Accordingly, this PFOF reflects a state official asking Twitter to make the independent judgment as to whether the identified accounts violate Twitter's terms of service—terms to which all users agree. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or

pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1073. One platform complained to Scully that it was receiving duplicate reports of misinformation from the EIP and Center for Internet Security, and asked if CISA could be designated reporter for the group: "Hey Brian, can we talk about CIS Misinformation reporting duplicate reports to EIP?  Possible to have just you escalate?"  Scully Ex. 9, at 63. Scully coordinated with CIS and EIP to set forth a coordinated reporting process involving agreed roles for all three of them—CISA, CIS, and EIP. *Id.*; Scully Depo. 209:14-212:12. Scully admits that there was "an agreement for EIP and CIS and CISA to coordinate and let each other know what they were reporting to platforms like Twitter."  Scully Depo. 212:7-12.

**RESPONSE:** Undisputed, but note that neither this PFOF—which relates to an agreement among CISA, CIS, and EIP to inform one another of the misinformation each *independently* decided to report—nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1074. State and local officials reported misinformation to the FBI in parallel with their reports to CIS and CISA. *See, e.g.,* Scully Ex. 10, at 10. This is because CISA "tell[s] election officials to report what they saw to either DHS or the FBI, and it would end up where it needed to be."  Scully Depo. 215:8-14.

**RESPONSE:** Disputed to the extent the PFOF implies that state and local officials regularly reported misinformation to the FBI in parallel with their reports to CIS or CISA. The evidence cited does not support that implication. For example, the compilation of emails from state and local officials reflected in Scully Ex. 10 contains numerous emails that do not include the FBI. *See generally* Scully Ex. 10. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the

companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1075.   The Center for Internet Security, likewise, sometimes used EIP ticket numbers on the misinformation reports it sent to CISA for forwarding to platforms. *See, e.g.*, Scully Ex. 10, at 27 (reporting supposed misinformation in Pennsylvania under ticket number "EIP-664"); Scully Depo. 217:16-218:19. As noted, CISA's "tracking spreadsheet" used similar EIP ticket numbers at least 13 times for misinformation reports sent to platforms. Jones Decl., Ex. GG, at 4-5.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as suggesting that CISA sent 13 reports to social media companies that it received from the EIP. *See* Defs' Resp. to PFOF ¶ 1069. Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

## D.   CISA Uses Switchboarding to Pressure Platforms to Censor Speech.

1076.   CISA and Scully did not just forward misinformation reports to platforms; in addition, they also engaged in fact-checking for the platforms. For example, regarding a report about election security in Pennsylvania, Facebook asked Scully if he could please "confirm" two factual aspects of the report, and Scully responded with an explanation of why the government believed that the report was misinformation violating Facebook's terms of service. Scully Depo. 218:22-219:24; Scully Ex. 10, at 25-27; Scully Depo. 222:20-224:20; Scully Ex. 10, at 35-37 (Scully engaging in his own research to debunk an election-integrity claim on Twitter and reporting to Twitter, which relied on his research to label the Tweet).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's actions as constituting "fact checking." The evidence does not support that characterization. Rather, Mr. Scully testified that if a social media platform requested additional information *from an election official* CISA would try to support that request. Scully Dep. 219:25-220:13. This typically would involve CISA either asking a state or local official for a public statement that it could provide to the social media company or finding the public statement itself and providing it to the social media company. *Id.* at 219:25-222:15. Moreover, this PFOF does not support Plaintiffs' contention that

CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1077.   Scully admits that CISA commonly engaged in such informal fact-checking for the platforms: "if social media platforms needed additional information from an election official we would try to support that. … "[G]enerally speaking, we would do what we did here, which is if the -- if the jurisdiction made a public statement or if there was additional information the jurisdiction could provide, and the platforms asked for it, that we would try to facilitate getting the information they asked for."  Scully Depo. 220:6-20. CISA would do its own research as well as relaying statements from public officials to help debunk postings for social-media platforms. Scully Depo. 221:1-4 ("If it was a public statement, I'm sure we pulled it ourselves. If there was not a public statement, I would imagine we would go back to the election official."); Scully Depo. 221:23-222:19.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence. Mr. Scully's follow-up inquiries to state or local election officials, or reviews of public statements they had issued upon the requests of social media companies for additional information were neither "common[]" nor did they constitute "informal fact-checking" by CISA. The evidence does not support those characterizations. *See* Defs.' Resp. to PFOF ¶ 1076. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1078.   In presenting such "debunking" information to platforms to urge them to remove content, CISA always assumed—without any independent research—that the *government* official was a reliable source, and that the social-media user was unreliable, even for first-hand accounts: "if there was a public statement that was put out by the jurisdiction, we would … defer to that." Scully Depo. 221:9-12. CISA would not "take any steps to find out" if the private citizen's account

might actually be truthful, and CISA would not "do further research to figure out who was telling the truth," but would simply "relay … the official statement from the jurisdiction" to the platforms for censorship. Scully Depo. 221:13-22.

      **RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's purpose, in responding to social media companies' request for additional information, as an effort to "urge them to remove content" or to "censor" anyone. Disputed also that Mr. Scully made assumptions about the reliability of any source. The cited evidence does not support those characterizations. Rather, as reflected throughout Scully Ex. 10, CISA would forward information from state and local election officials to social media companies so that those companies could independently determine whether certain content violated their terms of service. *See generally Id.* CISA made no recommendations about how social media companies should handle or use information that it forwarded from state and local election officials. *Id.* Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

      1079.  CISA's fact-checking activity included both relaying "debunking" information from state and local officials—always assuming without question that the state and local officials were truthful, not the social-media speakers—and performing its own fact-checking when the claim related to federal activities. For example, "[t]here was also one time when I believe it was Facebook had a question about DHS immigration and customs enforcement having agents going places where we also provided a response back on a specific piece."  Scully Depo. 220:8-13.

      **RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as acting as a "fact-checker." The cited evidence does not support that characterization. *See* Defs.' Resps. to PFOF ¶¶ 1076-78. CISA did not "perform its own fact-checking." Rather, as Mr. Scully explained, there was "one time" when, in response to a question from Facebook "about DHS immigration and

customs enforcement agents going places," CISA "provided a response back on a specific piece." Scully Depo. Tr. 219:25-220:13. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1080.   CIS and CISA's "switchboarding" activities reached, not just public postings, but private postings on social-media platforms. *See, e.g.,* Scully Ex. 10, at 45-46 (reporting a "post on a private FB page," *i.e.*, a "(private) Facebook post that Trump already won AZ").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's switchboarding activities as reaching private postings on social media. The cited evidence does not support that characterization. Rather, the cited evidence reflects that the Arizona Secretary of State's Office reported to CIS a private Facebook account that indicated that former President Trump had already won Arizona. Scully Ex. 10 at 45-46. CIS forwarded the Arizona Secretary of State's email to CISA for CISA's situational awareness, and CISA did not forward that email to any social media company. *Id.* Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1081.   Social-media platforms treated CISA as a privileged reporter of misinformation, frequently responding with great promptness to CISA's reports of misinformation, immediately "escalating" the content for moderation, and reporting back the censorship action taken. For example, on November 10, 2020, at 7:23 pm, Scully reported offending Tweets, and Twitter responded within two minutes, "Thanks Brian. We will escalate."  Shortly after midnight the same night, at 12:11 a.m., Twitter followed up with a report on censoring the Tweets. Scully Ex. 10, at

59. On November 13, 2020, Scully reported an offending tweet at 11:20 pm, and Twitter responded at 11:21 pm, "Thanks Brian. We will escalate."  Scully Ex. 18, at 26; Scully Depo. 291:15-294:3.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes these two exchanges with one platform as establishing that CISA was regularly treated as a "privileged reporter of misinformation" by social media platforms, or that social media companies were engaged in "censorship" when they applied their terms of service—terms to which all users agree. The cited evidence does not support those characterizations. In the first example cited, Twitter made its decision about information CISA flagged from the Washington Secretary of State's Office five hours after CISA had flagged the information, and the cited evidence reflects that Twitter independently applied its content moderation policies and reported that "[a]ll Tweets have been labeled, with the exception of two from @SeattleSuze. Those two Tweets were not found to violate our policies." Scully Ex. 10, at 59. In the second example cited, CISA forwarded to Twitter a report received from Dominion Voting. Scully Ex. 18 at 26. Although Twitter promptly acknowledged receipt of CISA's email, there is no indication in the document about the length of time it took Twitter to apply its terms of service in this circumstance. *Id.* As Mr. Scully testified during his deposition, the social media companies "were prompt in letting me know they had received any e-mail that I sent them[.]" Scully Dep. 293:22-294:3. Moreover, this PFOF does not support Plaintiffs' contention that CISA attempted to dictate to, threaten or pressure, collude with, or encourage social-media companies to remove or suppress certain election-related claims on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1082.   CISA's censorship partners also originated their own reports for censorship. CIS and the EIP sometimes reached out to state and local officials to invite them to debunk and report speech that CIS and EIP had observed on social media. For example, on December 1, 2020, the

Center for Internet Security emailed local government officials stating, "The EI-ISAC, and our partners at the Election Integrity Partnership (EIP), are tracking a social-media post that is gaining traction very quickly." Scully Ex. 11, at 4. The CIS asked the local officials to debunk the post so that "we can work with the social media platforms to have the posts removed as misinformation. Please let us know as soon as possible." *Id.* The local officials responded with information disputing the posts, and CIS promptly forwarded the dispute to CISA and EIP: "Brian [Scully] and EIP, misinformation tweet … a [local official] confirmed the misinformation." *Id.* at 2. Scully then forwarded the report to Twitter, which responded within three hours, "We have labeled the tweet and are taking steps to limit trending on this." *Id.* at 1; Scully Depo. 228:5-231:7.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CIS and EIP as "censorship partners" with CISA. The cited evidence does not support that characterization. When CIS forwarded information it had received from Gwinnett County, Georgia election officials to CISA, CISA forwarded the information to Twitter and, in accordance with CISA's protocol, stated that neither CISA nor DHS was the originator of the information, that CISA had not originated or generated the information, and that CISA "affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, towards social media companies based on decision about how or whether to use this information." Scully Ex. 11 at 1. The exhibit reflects that Twitter ultimately independently applied its terms of service— to which all users agree—to label the Tweet and limit its trending. *Id.* Moreover, neither this PFOF nor those concerning the EIP, *infra*, nor the record as a whole, contains evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

### E. CISA's Many Misinformation Meetings with Platforms.

1083.    In its interrogatory responses, CISA disclosed five sets of recurring meetings with social-media platforms that involve discussions of misinformation, disinformation, and/or censorship of speech on social media. Scully Ex. 12, at 38-40.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's interrogatory responses as identifying meetings in which "censorship" of speech was discussed. CISA's interrogatory responses do not support that characterization. As CISA's interrogatory responses clearly state, CISA identified, "based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery," the "meetings taking place with Social-Media Platforms relating to Misinformation," and further noted that they "include, but are not limited to" five sets of then-recurring meetings. Scully Ex. 12 at 38-40. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1084.   Scully provided the information in the interrogatory responses regarding CISA's meetings with social-media platforms regarding misinformation and censorship. Scully Depo. 232:24-233:3. In doing so, Scully failed to disclose a long series of *bilateral* meetings between CISA and social-media platforms. *See, e.g.,* Scully Depo. 238:11-13 ("we had some Twitter-only calls, as well, that [Yoel Roth] participated in"); Scully Depo. 238:21-22 ("we had some briefings from [Twitter] on some of their public reports" about misinformation); Scully Depo. 239:8-12 (agreeing that there were "briefings in those bilateral meetings with Twitter as relating to misinformation and disinformation on social media"); Scully Depo. 239:20-240:3 (admitting that CISA conducted "bilateral meetings with other social media platforms, like this, where misinformation was discussed"); Scully Depo. 241:4-22 (admitting to a series of bilateral meetings with social-media platforms beginning in 2018 and continuing through 2020); Scully Depo. 241:7-14 (testifying that "in 2018 … in our initial stages of trying to build those relationships, we would go meet with each platform one-on-one"); Scully Depo. 241:20-22 (admitting that, "prior to starting the switchboarding work, in 2020, we had conversations with each platform individually").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's interrogatory responses as disclosing meetings with social-media platforms regarding "censorship." CISA's interrogatory responses do not support that characterization. *See* Defs.' Resp. to PFOF ¶ 1083. Further disputed to the extent the PFOF mischaracterizes all of the cited contacts with social-media

companies, *e.g.* "some Twitter-only calls," as "a long series of bilateral meetings." The cited evidence does not support that characterization. Defendants further note that CISA's interrogatory responses clearly stated that its response CISA was "based on a reasonable inquiry under the circumstances of abbreviated, expedited discovery," and that the "meetings taking place with Social-Media Platforms relating to Misinformation . . . include, but are not limited to" the five sets of then-recurring meetings identified. Scully Ex. 12 at 38-40. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1085.   None of these many bilateral meetings with social-media platforms about misinformation was disclosed in CISA's interrogatory responses. Scully Ex. 12, at 38-40; Scully Depo. 243:6-21.

**RESPONSE:** Disputed. *See* Defs.' Resp. to PFOF ¶ 1084.

1086.   In its interrogatory responses, CISA describes the "USG-Industry" meetings as follows: "A recurring meeting usually entitled USG – Industry meeting, which has generally had a monthly cadence, and is between government agencies and private industry. Government participants have included CISA's Election Security and Resilience subdivision, DHS's Office of Intelligence and Analysis, the FBI's foreign influence task force, the Justice Department's national security division, and the Office of the Director of National Intelligence. Industry participants generally include Google, Facebook, Twitter, Reddit, [and] Microsoft but, have also included Verizon Media, Pinterest, LinkedIn, and the Wikimedia Foundation as well. The topics discussed include, but are not limited to: information sharing around elections risk, briefs from industry, threat updates, and highlights and upcoming watch outs."  Scully Ex. 12, at 38-39.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1087.   In fact, the CISA's description of the "USG-Industry" meeting as having "a monthly cadence" is misleading. The meetings became biweekly and weekly close to elections, when they were most needed: "from summer of 2018 … to early 2020 they were quarterly. Sometime in 2020 they became monthly and then as we got closer to the election in 2020 they became weekly."  Scully Depo. 234:7-11.

**RESPONSE:**  Disputed to the extent the PFOF mischaracterizes CISA's interrogatory response as "misleading." The cited evidence does not support that characterization. CISA's interrogatory response characterized "the recurring meeting usually entitled USG-Industry meeting" as "generally" having a monthly cadence. Scully Ex. 12 at 38. As Mr. Scully explained during his deposition, the weekly "meetings" "were mostly just touch points in case anything kind of popped up. We didn't have an agenda for those, just an opportunity for folks to share, if they had any questions or anything like that." Scully Dep. 234:2-19. Mr. Scully further testified that "a lot of" the weekly "meetings" involved discussions of cybersecurity, as well as "a little bit on any physical threats that were occurring." *Id.* at 235:11-18. During these weekly "meetings" CISA would "generally provide updates on any election security-related issues," other agencies would provide any strategic, unclassified intelligence reporting that they had and thought was relevant, and platforms likely provided general trends that they were seeing on their platforms. *Id.* at 234:20-235:10. CISA never flagged or reported potential disinformation for social media or technology companies during or in connection with these meetings. Hale Decl. ¶ 68 (Ex. 97). Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

### F.      CISA Worked with FBI to Suppress the Hunter Biden Laptop Story.

1088.   Scully claims that he does not recall whether or not "hack and leak" or "hack and dump" operations were raised at the USG-Industry meetings, but he does not dispute that they may have been raised: "I don't recall a specific incident of that [*i.e.*, discussions of "hack and dump" or "hack and leak" operations], but it's definitely possible. It's a tactic that had been used in the past." Scully Depo. 236:6-12. Scully does not dispute that he may have raised it: "Me, personally, I don't recall myself raising that, but it's possible." Scully Depo. 236:15-16. He does not dispute that Laura Dehmlow of FBI's FITF may have raised the concern: "Again, I don't know. It was a tactic that had been used globally, previously. So it wouldn't surprise me if there was some discussion of that somewhere in these meetings." Scully Depo. 236:20-23.  He does not dispute that Elvis Chan and/or Matt Masterson may have raised the concern. Scully Depo. 237:10-22.

**RESPONSE:**   Undisputed, but further note that Mr. Scully testified that he had no recollection of hack-and-leak operations being raised by the government during the USG-Industry meetings. Scully Dep. 236:24-237:1. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1089.   Scully also does not dispute Yoel Roth's account of the communications to social-media platforms from federal officials about hack-and-leak operations and the possibility of a hack-and-leak operation involving Hunter Biden in Paragraphs 10-11 of Yoel Roth's Declaration dated December 17, 2020. Scully Ex. 13, at 2-3; Scully Depo. 245:23-248:11. Scully does not dispute that federal officials repeatedly raised the concern that they "expected hack and leak operations by state actors" in the USG-Industry meetings, Scully Depo. 245:23-247:17 ("it's certainly possible, because it was a common tactic … I would definitely not be surprised if these were included in the conversations"); and Scully does not dispute Roth's statement that Roth learned in these meetings that "there were rumors that a hack and leak operation would involve Hunter Biden," Scully Depo. 247:18-248:7.

**RESPONSE:** Undisputed, but further note that Mr. Scully testified that he had no recollection of hack-and-leak operations being raised by the government during meetings with social media platforms. Scully Dep. 236:24-237:1. He also testified that he had no recollection of Hunter Biden being mentioned during these meetings. *Id.* at 247:24-248:2. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1090.   Contemporaneous emails confirm that CISA officials were warning of "hack and leak" operations during the USG-Industry and other meetings with social-media platforms during 2020. For example, on September 16, 2020, Facebook employees emailed Scully and other CISA officials a draft of a joint industry statement, which stated: "For several years, tech companies have worked together with … U.S. government agencies … to counter election threats across our platforms…. At today's meeting, we specifically discussed: … (2) Ways to counter targeted attempts to undermine the election conversation before, during, and after the election. This includes *preparing for so-called 'hack and leak' operations* attempting to use platforms and traditional media for unauthorized information drops."  Scully Ex. 16, at 1 (emphasis added). This email confirms that "preparing for so-called 'hack and leak' operations" was discussed at the USG-Industry meeting on Sept. 16, 2020, which included CISA, FBI's FITF, DOJ's National Security Division, ODNI, and Google, Microsoft, Facebook, Twitter, Reddit, Verizon Media, Pinterest, LinkedIn, and Wikimedia Foundation. Scully Ex. 16, at 1; *see also* Scully Depo. 253:14-255:13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence as reflecting that CISA officials were warning of hack-and-leak operations during the USG-Industry meetings and other meetings. The cited evidence does not support that characterization. The cited email only indicates that "preparing for possible so-called 'hack and leak' operations" was discussed, but it does not indicate who raised this issue. Scully Ex. 16 at 1. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove

or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. Defs.' PFOF § II.F., Arg. § II.B.4.c.

1091.  Likewise, the agenda for the July 15, 2020 USG-Industry meeting included, as a "Deep Dive Topic," a 40-minute discussion of "Hack/Leak and USG Attribution Speed/Process." Scully Ex. 17, at 16. According to Scully, "attribution" in this context means identifying the hacker and leaker, and "USG" means "United States Government."  Scully Depo. 274:4-275:10.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's testimony. Mr. Scully testified that he did not know what the term "attribution" was referring to in Scully Ex. 17. Scully Dep. 275:11-20. Defendants further note that the cited exhibit reflects a "proposed agenda" and does not reflect whether a discussion about "Hack/Leak and USG Attribution Speed/Process" actually took place during this or any other meeting. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1092.   Like Elvis Chan, Scully was not aware of any "pending investigations, at that time, into possible hack and leak operations."  Scully Depo. 255:9-13.

**RESPONSE:** Disputed to the extent the PFOF does not provide any support for Special Agent Chan's state of awareness concerning possible hack and leak operations. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1093.   At the USG-Industry meeting, CISA asked platforms to report back on "Themes / narratives / approaches you anticipate for races you think will be targeted."  Scully Ex. 15, at 1.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence as reflecting that CISA asked platforms to report back to it about anything. The cited exhibit is a "tentative agenda" where one of the identified "Industry Prompts" is "[t]hemes/narratives/approaches you anticipate for races that you think will be targeted." Scully Ex. 15 at 1. This exhibit does not reflect whether this topic actually was discussed during a meeting or whether this topic was discussed at the request of CISA. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

### G.     CISA's Ongoing and Expanding Censorship Efforts.

1094.   In the spring and summer of 2022, Lauren Protentis requested the social-media platforms to prepare "one-pagers" for state and local election officials to address their content moderation rules. *See* Scully Ex. 17, at 1 (including "One-Pager Reminder" on the agenda for the April 2020 USG-Industry meeting); Scully Depo. 260:3-261:11 ("we had asked industry to provide a one-page summary of their content moderation rules that we could share with election officials").

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

Defs.' PFOF § II.F., Arg. § II.B.4.c.

1095.   The purpose of these "one-pagers" was to provide a summary of the platforms' content moderation rules to state and local government officials who would be reporting misinformation to the platforms. Scully Depo. 260:3-261:11.

**RESPONSE:** Undisputed, but further note that the reason for the one-pagers was that

CISA was receiving substantial numbers of questions from election officials about how different

platforms made decisions about their terms of service. Scully Dep. 260:12-21. The one-pagers

were "a way to help the platforms be more transparent with election officials." *Id.* Moreover, this

PFOF contains no evidence that CISA used any meetings or communications with social media

platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to

remove or suppress information on their platforms, or that the companies regarded (or acted on)

any communications with CISA as such. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1096.   Lauren Protentis of CISA repeatedly lobbied the social-media platforms to include in their "one-pagers" for state and local officials a description of how to report perceived misinformation to the platform for censorship. *See, e.g.,* Scully Ex. 18, at 41 (Protentis requesting that Facebook update its one-pager to include its "steps for flagging or escalating MDM content" to "make this a comprehensive product on both the critical needs for officials—account security and MDM concerns"); *id.* at 44 (Protentis asking Microsoft to create a one-pager for election officials to "provide steps to … report MDM"); *id.* at 45 (Protentis requesting that Twitter update its one-pager for government officials to include information about "how to report disinformation"). Scully agrees that Protentis was "trying to make sure that election officials have the information they need if they want to report" disinformation. Scully Depo. 300:23-25.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Ms. Protentis as

"repeatedly lobb[ying]" social-media platforms to include in their one-pagers a description of how

to report misinformation to the platforms for "censorship." The cited evidence does not support

that characterization. The cited evidence reflects that Ms. Protentis asked Facebook, Microsoft and

Twitter *once* each to develop a one-pager describing their content moderation policies. *See* Scully

Ex. 18 at 41, 44, 45. Defendants further note that the platforms' content moderation polices—to which all users agree—are available on each platform's website. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1097.   CISA also set up an "operation center" on and around Election Day that engaged in "switchboarding" reports of election-day misinformation to platforms: "CISA regularly set up an operation center on election day, around the election. And the platforms and some of the other agencies do the same."  Scully Depo. 262:16-19. This "operation center" received "switchboard reporting" in 2018 and 2020. Scully Depo. 263:15-18. It was also communicating with platforms and other federal agencies, including "connectivity with FBI, DOJ, NEI, I&A."  Scully Depo. 264:18. When these reports came in, CISA would "perform the same misinformation routing function and pass that along to the platforms."  Scully Depo. 265:1-7.

**RESPONSE:** Undisputed, but further note that most of the operation center's activities on Election Day involved "cyber-related" matters. Scully Dep. 262:23-263:9. Defendants further note that CISA did not perform any switchboard-related activities during the 2022 midterm elections. *Id.* at 265:8-12. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1098.   The CISA-funded Center for Internet Security continued to report misinformation and disinformation to platforms for censorship in 2022: "CIS was up and running [in 2022]." Scully Depo. 266:2. Scully understands that "CIS continued to receive disinformation/ misinformation reports from state and local election officials during the 2022 election cycle, and relay them directly to social media platforms."  Scully Depo. 266:5-13.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA's funding of the CIS as relating to efforts to "report misinformation and disinformation" or that the purpose of any such reporting was for "censorship" rather than to allow social-media companies to make independent decisions regarding the application of their own content-moderation policies. The cited evidence does not support that characterization. DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1099.  Scully also believes that NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Depo. 268:25-269:3.

**RESPONSE:** Disputed. The cited testimony does not support this PFOF. Mr. Scully testified that he did not know for certain whether NASS and NASED routed disinformation concerns directly to social-media platforms in 2022. Scully Dep. 268:25-269:3. Defendants further

observe that Plaintiff Louisiana is a member of the NASS, and that both Plaintiffs Louisiana and

Missouri are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). Moreover, this PFOF contains no

evidence that CISA used any meetings or communications with social media platforms to dictate,

to threaten or pressure, collude with, or encourage social-media companies to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as

a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1100.   Scully agrees that foreign-originated social-media content typically becomes repeated from domestic sources: "We often see what happens overseas send up showing up domestically." Scully Depo. 279:9-11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes Mr. Scully's testimony.

Mr. Scully did not testify that foreign-originated social media content typically becomes repeated

domestically. Rather, he testified that CISA often sees tactics used oversees appear in the United

States. Scully Depo. Tr. 279:2-11.

1101.   CISA has also teamed up directly with the State Department's Global Engagement Center (GEC) to seek removal of social-media content; for example, on one occasion, the GEC enlisted CISA's aid to seek the removal of "a YouTube channel run by Americans falsely claiming" that a certain State Department special envoy was "Patient Zero" for COVID-19. Scully Ex. 18, at 2. Scully forwarded the report to Facebook, which reported within minutes that it had "flagged for our internal teams." Scully Ex. 18, at 1.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA and the GEC as

"team[ing] up" or "seek[ing] removal" of social-media content. The cited evidence does not

support that characterization. Rather, the cited email reflects that more than three years ago, on

March 25, 2020, GEC shared with CISA a "disinfo campaign on YouTube targeting a DS Officer,

claiming she brought COVID-19 to [Wuhan, China] during an athletic competition." Scully Ex.

18 at 2. Mr. Scully forwarded the GEC's email to Facebook and noted that "[r]esponding to this

request is voluntary and CISA will not take any action, favorable or unfavorable, based on

discussions about whether or not to respond to this follow-up request for information." *Id.* at 1. The cited evidence does not indicate what action, if any, Facebook may have taken in connection with this post. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1102.   CISA flagged obvious parody and joke accounts for censorship, including a Colorado parody account with 56 followers whose handle stated, "dm us your weed store location (hoes be mad, but this is a parody account)," and one with 27 followers whose handle stated, "Smoke weed erry day."  Scully Ex. 18, at 11-12. The government official who reported these stated that "these are concerning to us … because of recent FBI/CISA warnings about impersonation accounts spreading false information about the election."  Scully Ex. 18, at 11. In other words, the government official sought to censor these accounts *before* they posted any election-related speech, because (according to "FBI/CISA"), they *might* engage in misleading election-related speech. *See id.* Scully forwarded these reports to Twitter for censorship. Scully Ex. 18, at 10.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes CISA as flagging accounts for "censorship" rather than to allow social media companies to make independent decisions about the application of their own contend moderation policies, to which all users must agree. The cited evidence does not support Plaintiffs' characterization. The Colorado Secretary of State's Office notified CISA of three Twitter accounts that were "impersonating the Colorado state government." Scully Ex. 18 at 10. CISA then shared this information with Twitter and noted that "it neither has nor seeks the ability to remove or edit what information is made available on social media platforms," and that it "makes no recommendations about how the information it is sharing should be handled or used by social media companies." *Id.* CISA further stated that it "will not take any action, favorable or unfavorable, toward social media companies based on decisions about how or

whether to use this information." *Id.* Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1103.   Platforms report to CISA when they update their content-moderation policies to make them more restrictive. On September 10, 2020, for example, Twitter reported to Masterson and Scully that it was "updating our Civic Integrity Policy" to "label or remove false or misleading information intended to undermine public confidence in an election or other civic process."  Scully Ex. 18, at 9. This includes censorship of "Disputed claims that could undermine faith in the process itself, e.g. unverified information about election rigging, ballot tampering, vote tallying, or certification of election results."  Scully Ex. 18, at 9. The EIP had successfully lobbied platforms to adopt such changes ahead of the 2020 election. *See infra.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as reflecting "censorship" or EIP "lobb[ying]" platforms to adopt changes to their policies ahead of the 2020 election cycle. Also disputed to the extent the PFOF implies that social-media companies regularly report policy updates to CISA. The evidence does not support those characterizations. The evidence reflects a single occasion on which just one company, Twitter, informed CISA of an update to its Civic Integrity Policy—a policy to which all users agree—and which Twitter had already publicly announced. Scully Ex. 18 at 9. Plaintiffs' claim that the EIP "had successfully lobbied platforms to adopt such changes ahead of the 2020 election" lacks any record support.

1104.   CISA pushed for the censorship of content that CISA's Director particularly disfavored, including supposed disinformation about CISA itself, and about the so-called "Hammer and Scorecard" narrative that attributed election interference to federal intelligence agencies. For example, Scully requested censorship of a "disinfo report about CISA and Director Krebs."  Scully Ex. 18, at 19. And on November 10, 2022, Scully reported to platforms that "Director Krebs is particularly concerned about the hammer and scorecard narrative that is making the rounds," and asked for information about their tracking and "amplification" of the narrative. Scully Ex. 18, at 22, 24. Twitter and Facebook promptly reported back on their efforts to censor the narrative. Scully Ex. 18, at 21 (Facebook reporting that "our teams are labelling and

downranking the content as identified"); *id.* at 24 (Yoel Roth of Twitter explaining Twitter's attempts to censor the narrative, and asking CISA "Let us know if there are especially high-profile examples of tweets sharing the conspiracy that *haven't* been labeled" so Twitter can censor them). *See also* Scully Depo. 286:3-289:25.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as suggesting that CISA "pushed for censorship of content." The record does not support that characterization. Rather, the cited evidence reflects that on November 5, 2020, Mr. Scully shared with Facebook a disinformation report about CISA and Director Krebs. Scully Ex. 18 at 19. Mr. Scully's email notes that it "affirms that it neither has nor seeks the ability to remove or edit what information is made available on social media platforms. CISA makes no recommendations about how the information it is sharing should be handled or used by social media companies. Additionally, CISA will not take any action, favorable or unfavorable, towards social media companies based on decisions about how or whether to use this information." *Id.* On November 10, 2020, Facebook informed CISA that "our teams have confirmed that we have third-party fact checker verification that the 'Hammer and Scorecard' narrative is false and our system is labeling and downranking the content as identified." *Id.* at 21. On November 10, 2020, Twitter noted that it "broadly labeled the conspiracy theory several days ago pursuant to our policies." *Id.* at 24. Twitter further asked CISA to identify any "especially high-profile examples of tweets sharing the conspiracy that haven't been labeled," because it had to turn off "the automated labeling" due to attempts by "a 4chan-driven troll campaign" to "reverse engineer" Twitter's labelling logic, resulting in the labels showing up on unrelated tweets. *Id.* Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'
PFOF § II.F., Arg. § II.B.4.c.

1105.   CISA also purposely debunks online narratives, knowing that the social-media platforms will use its debunks as censorship. For example, Yoel Roth emailed CISA about the Hammer and Scorecard narrative stating: "We've tracking the Hammer/Scorecard issue closely, particularly since Director Krebs' tweet on the subject (which was pretty unambiguous as far as debunks go)."   Scully Ex. 18, at 24. Scully admits that CISA was aware that "social-media platforms were following the rumor page posted by CISA and using that as a debunking method for content on their platforms."   Scully Depo. 290:13-17 ("We had a sense they were doing that, yeah.").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the platforms' actions as "censorship." The cited evidence does not support that characterization. Rather, the evidence reflects that Facebook decided to label the "Hammer and Scorecard" narrative as a "conspiracy" "pursuant to [Facebook's] policies"—policies to which all users agree as part of Facebook's terms of service. Scully Ex. 18 at 24. With respect to CISA's rumors page, Mr. Scully rejected the claim that the page was designed to allow social media companies to debunk misinformation; rather, he explained that the "point of the page is just to provide accurate information about rumors that we were hearing." Scully Dep. 290:12-23. Notably, like CISA, both Louisiana and Missouri also have websites that seek to provide factually accurate information about elections. *See* Ex. 114 (Missouri Secretary of State Election Security Website); Ex. 116 (Louisiana Secretary of State website posting accurate information about voting and elections). Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1106.   CISA publicly states that it is expanding its efforts to fight disinformation heading into the 2024 election cycle. Scully Ex. 27, at 1. On August 12, 2022, Director Easterly was reported to be "beef[ing] up [CISA's] efforts to fight falsehoods," and "has taken several specific steps to fight the problem."  *Id.*

**RESPONSE:** Undisputed that an August 12, 2022, article in Cyberscoop reported that CISA was "beef[ing] up its efforts to fight falsehoods that could undermine the democratic process. Scull Ex. 27 at 1. The steps identified in the article included hiring Kim Wyman, former Secretary of State of Washington, to "bolster its election work," as well as another team member to run CISA's information operations team. *Id.* at 2. The article also notes that CISA "is reaching out to secretaries of state to work more closely with local election officials to equip them with tools to beat back disinformation." *Id.* The article purports to quote CISA Director Easterly as saying that "[w]hile it's not CISA's role to police social media . . . her team has 'discussions with platforms, but they're more to understand large trends, not specific tweets.'" *Id.* When shown this article during his deposition, Mr. Scully explained that he was unaware of any current efforts by CISA to expand its efforts to fight election disinformation going into the 2024 election cycle. Scully Dep. 302:17-21. Indeed, CISA anticipated and publicly stated that the MDM Team would grow, the size of the team supporting this mission generally has remained constant, and the scope of the mission has not expanded. Hale Decl. ¶¶ 12-13 (Ex. 97). CISA's current efforts to build resilience to disinformation include providing broad guidance on disinformation tactics, sharing accurate information, and amplifying the voices of state and local election offices on issues of election security through CISA's social media platforms. *Id.* at ¶¶ 12-19.

1107.   In January 2022, Director Easterly asked Facebook for a "briefing from us on 2022 election approach."  Scully Ex. 28, at 2. Easterly responded to an email by Facebook and directed her staff to set up the meeting. *Id.* Scully does not know what was discussed at the meeting. Scully Depo. 309:12-19.

**RESPONSE:** Undisputed, but further note that Mr. Scully did not know if "the meeting actually ever occurred." Scully Dep. 309:12-16. Moreover, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1108.   Director Easterly also exchanged text messages with Matt Masterson on February 26, 2022, when he was recently employed by Microsoft. Scully Ex. 29, at 2-3. In those texts, referring to a previous unidentified group call, Easterly told Masterson that she is "Just trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful." Scully Ex. 29, at 2. She stated that CISA is "looking to play a coord role so not every D/A [*i.e.*, department and agency] is independently reaching out to platforms which could cause a lot of chaos." Scully Ex. 29, at 2. Masterson responded, agreeing with Easterly, and stating, "Platforms have got to get comfortable with gov't. It's really interesting how hesitant they remain." Scully Ex. 29, at 3. (Scully notes that "D/A" is "one of our common abbreviations for department and agency." Scully Depo. 316:23-24.)

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1109.   Scully agrees with Director Easterly that, when multiple federal agencies contact platforms independently, "it does create challenges and provides the platforms opportunities to play departments off each other." Scully Depo. 317:6-9. For CISA to play a "coordinating" role among the agencies, therefore, allows federal officials to keep better influence and control over the platforms.

**RESPONSE:** Disputed to the extent the second sentence of the PFOF is characterization rather than facts and lacks any evidentiary support or citation. As Mr. Scully explained during his

deposition, other than the USG-Industry synch meetings, CISA "didn't attempt to play a substantial role in terms of coordinating" among federal agencies. Scully Dep. 317:10-19. Mr. Scully further explained that "it's always up to the platforms what level of engagement they want to have with us." *Id.* at Tr. 318:3-12.

1110.   According to a September 2022 leaked draft copy of DHS's "Quadrennial Homeland Security Review, DHS's capstone report outlining the department's strategy and priorities in the coming years, the department plans to target 'inaccurate information' on a wide range of topics, including "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine." Scully Ex. 30, at 4.

**RESPONSE:** Disputed to the extent the PFOF relies upon an article from The Intercept that purports to describe a leaked copy of a draft DHS document. Plaintiffs have not identified any official, final document from DHS that purports to reflect an intention to "target 'inaccurate information' on a wide range of topics." Nor do Plaintiffs identify any specific efforts to effectuate this alleged goal. In any event, the final version of the Quadrennial Homeland Security Review was released in April 2023, and nothing in that document supports Plaintiffs' claim that DHS "plans to target 'inaccurate information'" on any of these topics. *See* Ex. 186 (Dep't of Homeland Sec., The Third Quadrennial Homeland Security Review (2023)). Moreover, this PFOF contains no evidence that DHS used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with DHS as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

1111.   Scully agrees that DHS has discussions about targeting misinformation regarding the efficacy of COVID-19 vaccines, Scully Depo. 322:9-21 ("our building critical infrastructure help in public health is one of the sectors of critical infrastructure, so we engage with CDC and HHS to help them"); about the origins of the COVID-19 pandemic, Scully Depo. 323:16-17 ("We did some work on the … bio-lab narratives"); and regarding Ukraine, Scully Depo. 324:5-10 ("We

saw this with COVID. … We saw this around Ukraine. And so, again, just helping people
understand … these disinformation narratives…."). In particular, CISA participated in a "Unified
Coordination Group" regarding Russia's invasion of Ukraine, which addressed misinformation:
"there was a … Unified Coordination Group, when Russia invaded Ukraine, to coordinate DHS
activities related to the crisis. As a part of that there was an MDM component, and a member of
the MDM team was detailed to lead the MDM component of the Russian/Ukraine work."  Scully
Depo. 325:5-12. Scully believes that this group communicated with social-media platforms as well
(again, not disclosed in CISA's interrogatory responses). Scully Depo. 327:1-18.

      **RESPONSE:** Disputed to the extent the PFOF is not supported by the cited evidence. Mr.

Scully testified that he was not aware of discussions anywhere in DHS about addressing

misinformation about the origins of the COVID-19 pandemic. Scully Dep. 322:5-8. Mr. Scully

further testified that CISA—not DHS—engaged with CDC and HHS to understand trends in

spreading health misinformation and put out a product sometime in mid-2020 for infrastructure

stakeholders concerning COVID-related misinformation. *Id.* at 322:9-323:8. Mr. Scully described

the work CISA did with CDC and HHS as involving "bio-lab narratives, so this is essentially

foreign governments," and helping to build resilience to misinformation by identifying false

narratives. *Id.* at 323:9-324:10. This work involved providing support to the Healthcare and Public

Health Sector through the production of two public guidance documents: CISA Insights" COVID

Disinformation Activity and a COVID-19 Toolkit. Declaration of Geoff Hale, Lead for Election

Security and Resilience, Nat'l Risk Mgmt. Ctr., CISA ¶ 17 ("Hale Decl.") (Ex. 97). Mr. Scully

further testified that CISA has not, to his knowledge, done any resilience work related to racial

justice misinformation, and further stated that he was unaware of anyone at DHS engaged in such

work. *Id.* at 324:11-19. He similarly testified that he was unaware of anyone at CISA or DHS

having any involvement in building resilience to misinformation concerning the U.S. withdrawal

from Afghanistan. *Id.* at 324:20-325:2. Mr. Scully stated that DHS had stood up a Unified

Coordination Group (UCG) when Russian invaded Ukraine, and the purpose of the group was to

coordinate DHS activities related to the crisis. *Id.* at 325:3-12. Part of the UCG's work involved a

misinformation component, and a member of CISA's MDM Team was detailed to lead that component of the work, which involved providing situational awareness reports based on publicly available third-party reporting and support to build resilience to disinformation related to the crisis. *Id.*; Hale Decl. ¶ 18 (Ex. 97). However, that work only last about two months, and the UCG was operational from January 2022 to April 2022. *Id*. Mr. Scully testified that he thought there may have been one call in February 2022 between the UCG and the critical infrastructure community, including social media companies, but he was not sure because he was not involved in that call. Scully Dep. 326:13-328:3. Moreover, this PFOF contains no evidence that DHS or CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with DHS or CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1112.   As of August 12, 2022, DHS's Office of Inspector General continued to call for a more aggressive, not less aggressive, approach to combating disinformation. Scully Ex. 31, at 1 (OIG calling for DHS to adopt a "Unified Strategy to Counter Disinformation Campaigns").

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited evidence. The August 12, 2022 DHS Office of Inspector General (OIG) report did not call for "a more aggressive" approach to combatting disinformation. Rather, the OIG report called for coordination among DHS components to combat disinformation campaigns. Scully Ex. 31 at 1. Moreover, this PFOF contains no evidence that DHS used any meetings or communications with social media platforms to threaten or pressure social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with DHS as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

1113.   DHS's OIG reports that CISA is expanding, not contracting, its efforts to fight disinformation. OIG reports that CISA's "MDM team focuses on disinformation activities targeting elections and critical infrastructure. According to a CISA official, the MDM team counters all types of disinformation, to be responsive to current events."  Scully Ex. 31, at 9. "An official from the MDM team stated that, through this work, CISA is building national resilience to MDM, such as COVID-19 vaccine hesitancy and foreign influence activities."  *Id.* at 10. OIG further reports that, "[a]ccording to selected Intelligence Community officials, the Office of the Director of National Intelligence and the U.S. Department of Justice worked with CISA and I&A to counter disinformation related to the November 2020 elections. For example, according to an Office of the Director of National Intelligence official, prior to the November 2020 elections, CISA and I&A joined in weekly teleconferences to coordinate Intelligence Community activities to counter election-related disinformation. The Office of the Director of National Intelligence official stated the teleconferences continued to occur every 2 weeks after the 2020 elections and were still taking place as of the time of this audit." *Id.* at 11. Further, OIG reports that "CISA and I&A also work with the U.S. Department of State's (State Department) Global Engagement Center on countering disinformation." *Id.* at 11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the OIG report as noting that CISA is "expanding, not contracting, its efforts to fight disinformation." The cited evidence does not support that characterization. The OIG report notes "the MDM team counters all types of disinformation, to be responsive to current events," and provides two illustrative examples of that work. Scully Ex. 31 at 9. The first example was that "the MDM team developed the COVID-19 Disinformation Toolkit to raise awareness about the pandemic." *Id.* The second example was that in April 2022, CISA released the *Social Media Bots Infographic Set* which "was designed to help Americans understand how automated programs simulate human behavior on social media platforms." *Id.* at 10. Neither of these examples involve communications with social media companies, much less requests that those companies take any particular actions on any particular content on their sites. Notably, although DHS concurred in OIG's recommendation that DHS take a unified approach to addressing misinformation, DHS explained that its concurrence was "subject to the Department's consideration of the ongoing review" the DHS Secretary asked the bipartisan "Homeland Security Advisory Council to conduct in May 2022 of the Department's work to address disinformation that threatens homeland security," with a focus on "how the Department

can most effectively and appropriately address disinformation that poses a threat to our country

while protecting free speech, privacy, civil rights, and civil liberties[.]" *Id.* at 21. Accordingly,

there is no record evidence that OIG's recommendations have been adopted or implemented.

Moreover, this PFOF contains no evidence that DHS used any meetings or communications with

social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media

companies to remove or suppress information on their platforms, or that the companies regarded

(or acted on) any communications with DHS as such. Any assertion to that effect is unsupported

by and contrary to the evidence as a whole.

1114.   On November 21, 2021, Director Easterly reported that CISA is "beefing up its
misinformation and disinformation team in the wake of a divisive presidential election that saw a
proliferation of misleading information online." Scully Ex. 23, at 1. "I am actually going to grow
and strengthen my misinformation and disinformation team," Easterly stated publicly. *Id.* She
stated that she "had a meeting with 'six of the nation's experts' in the misinformation and
disinformation space." *Id.* And she "stressed her concerns around this being a top threat for CISA
… to confront." *Id.* "One could argue that we're in the business of protecting critical infrastructure,
and the most critical infrastructure is our cognitive infrastructure," Easterly said. *Id.* "We now live
in a world where people talk about alternative facts, post-truth, which I think is really, really
dangerous if people get to pick their own facts," Easterly said. *Id.* at 2. Evidently, Easterly thinks
that *government officials* should help Americans "pick their own facts" for them. *Id.*

**RESPONSE:** Disputed to the extent the PFOF states "[e]vidently, Easterly thinks that

government officials should help Americans 'pick their own facts' for them," because this is

characterization and argument rather than a factual statement supported by the cited evidence.

Furthermore, to date CISA has neither increased the size of its MDM Team nor increased its efforts

to build resiliency to misinformation. Hale Decl. ¶¶ 12-13 (Ex. 97). Moreover, this PFOF contains

no evidence that CISA used any meetings or communications with social media platforms to

dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or

suppress information on their platforms, or that the companies regarded (or acted on) any

communications with CISA as such. Any assertion to that effect is unsupported by and contrary to

the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1115.   According to Scully, CISA has an expansive mandate to address all kinds of
misinformation that may affect "critical infrastructure" indirectly: "mis, mal-information threatens
critical infrastructure in a number of ways, it could be operational impact, so in the case of the
elections, disrupting election operations …. So a multitude of ways that disinformation could
impact critical infrastructure, like I said … there's financial, there's reputational, there's just a
multitude of ways that this disinformation could affect critical infrastructure."   Scully Depo.
340:10-341:1. This could include, for example, "misinformation" that undermines confidence in
any kind of national institution, including banks and financial services industry: "from mis, dis
and mal-information, a reputational risk could come about if the integrity or the public confidence
in a particular sector was critical to that sector's functioning. So I think the financial services would
probably be a good example. So if there's a loss of confidence by the American public in financial
services, financial systems of the United States, that could create national security concerns."
Scully Depo. 341:17-342:2. This is a breathtakingly broad—even limitless—interpretation of
CISA's mandate to protect "critical infrastructure," which would allow CISA to target virtually
any kind of core political speech as "mis, dis and mal-information" that "create national security
concerns" by undermining "public confidence in a particular sector."   *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the evidence as supporting

the proposition that CISA "has an expansive mandate to address all kinds of misinformation that

may affect 'critical infrastructure' indirectly." The cited evidence does not support that

characterization. Rather, CISA's authority is based upon*, inter alia*, 6 U.S.C. § 652, which charges

CISA with leading the national effort to understand, manage, and reduce risk to the nation's cyber

and physical infrastructure. Mr. Scully explained during his deposition that when he was

discussing the financial services sector, he was engaging in "a lengthy hypothetical" at Plaintiffs'

counsel's urging and told the questioning attorney that he did not "like getting into hypotheticals."

Scully Dep. 343:23-344:2. In addition, the PFOF's statement that "[t]his is a breathtakingly

broad—even limitless—interpretation of CISA's mandate" allowing CISA "to target speech" is

characterization and argument rather than a factual statement, and in any event, nothing in this

PFOF or any other supports the suggestion that CISA "targets" speech for censorship. Moreover,

this PFOF contains no evidence that CISA used any meetings or communications with social

media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1116.   In fact, CISA is "working with Treasury to develop a product to help the financial services sector understand MDM risks to the sector."  Scully Depo. 355:22-24.

**RESPONSE:** Undisputed, but further note that CISA has been working with the U.S. Department of Treasury on a guide that would be public to help the Financial Services Sector understand what disinformation is, how disinformation could impact the sector, and how to mitigate the risks to the sector. Hale Decl. ¶ 19 (Ex. 97). The guide is still in development, although work is not currently being done to complete it because other, urgent tasks have taken priority. *Id.* Furthermore, this PFOF contains no evidence that CISA used any meetings or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1117.   Scully has publicly stated that CISA is "trying to reduce the amount that Americans engage with disinformation," where "engaging with disinformation" means "amplifying it, re-tweeting it, resending it, things like that."  Scully Depo. 346:7-24; Scully Ex. 49.

**RESPONSE:** Undisputed, but further note that Mr. Scully explained that CISA seeks to reduce engagement with disinformation through "public awareness and public engagement and things like that[.]" Scully Dep. 347:22-348:1. Mr. Scully further explained that although some people believe "the government should be the ones taking things down, or the government should be asking the platforms to do certain things . . . that's not necessarily the right spot for government to be." *Id.* at 348:11-25. Moreover, this PFOF contains no evidence that CISA used any meetings

or communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1118.   On June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." Scully Ex. 46, at 1. "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally." *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources." *Id.* at 2. Scully agrees with this report that CISA is trying to make its "resilience activity … as broad as possible so it's applicable anywhere that someone may come across MDM." Scully Depo. 358:7-11.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited document as "calling for an extremely broad view of CISA's mandate." The cited evidence does not support that characterization. Moreover, CISA's Cybersecurity Advisory Committee is "an independent advisory body," that "provides strategic and actionable recommendations to the CISA Director on a range of cybersecurity issues, topics and challenges." *See* Ex. 119 at 1 (CISA Cybersecurity Advisor Committee). Plaintiffs have provided no evidence that the Committee's recommendations were actually accepted by CISA. In addition, the PFOF mischaracterizes Mr. Scully's testimony. Mr Scully testified that CISA's resilience work is intended to be useful regardless of medium, whether it be on cable news or the internet. Scully Dep. 358:5-11. It is in this context that Mr. Scully explained that CISA's work is intended to be "as broad as possible," and that CISA is "agnostic of where" the misinformation is coming from; "we just want people to be able to understand where—what it is, how it works, and things they can do to mitigate those risks." *Id.* 358:5-23. Moreover, this PFOF contains no evidence that CISA used any meetings or

communications with social media platforms to dictate, to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with CISA as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

1119.   In September 2022, the Center for Internet Security is still working on a "portal" for government officials to report election-related misinformation to social-media platforms. Scully Ex. 19, 21. "[W]ork on the online 'portal' for election officials to flag misinformation to social-media platforms … continues today."  Scully Ex. 21, at 4. Scully states that "my understanding is that [CIS] did do something along those lines, I just don't know the extent of it." Scully Depo. 365: 3-6.

**RESPONSE:**  Undisputed, but note that this PFOF relates to the work of a nongovernmental third party and CIS's proposed portal was intended for use by "state-level election offices and national associations (NASS, NASED)," rather than the federal government. Scully Ex. 19. Louisiana is a member of NASS and both Louisiana and Missouri are members of the NASED. Hale Decl. ¶ 33 (Ex. 97). In addition, Mr. Scully testified that he did not know whether or when the CIS portal would be completed. Scully Depo. Tr. 364:14-365:9.

1120.   As of January 2023 and today, CISA's website continues to proclaim, "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms and law enforcement. This activity began in 2018, supporting state and local election officials to mitigate disinformation about the time, place, and manner of voting. For the 2020 election, CISA expanded the breadth of reporting to include other state and local officials and more social media platforms. This activity leverages the rapport the MDM team has with the social media platforms to enable shared situational awareness."  Scully Ex. 24, at 3; *see also* www.cisa.gov/mdm (visited Feb. 10, 2023). CISA thus proclaims that it is "expand[ing] the breadth of reporting," not retreating from it. *Id.*

**RESPONSE:** Disputed. The webpage to which this PFOF cites has been removed. As Mr. Scully explained during his deposition, the document on CISA's website suggesting that switchboarding work was ongoing was inaccurate and would need to reflect that the work is no longer occurring. Scully Dep. 366:21-367:4. In addition, CISA did not engage in switchboarding

for the 2022 election cycle and has no intention to engage in switchboarding for the next election. Hale Decl. ¶ 78 (Ex. 97).

1121.   Regarding misinformation reports, CISA "would generally share whatever we received from the election officials with the FBI, in case there was an ongoing investigation related to whatever it was that we forwarded to them."  Scully Depo. 366:17-20.

**RESPONSE:** Undisputed.

1122.   CISA engaged in switchboarding and colluding with social-media platforms to promote censorship in other ways as well.

**RESPONSE:** Disputed because the PFOF is argumentative and lacks any evidentiary support. CISA did not engage in switchboarding or "collude" with social-media companies to "promote censorship" in any way. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c.

## VIII.   The State Department's Global Engagement Center's Censorship Efforts.

1123.   The State Department's Global Engagement Center ("GEC") also conducts numerous meetings with social-media platforms about disinformation.

**RESPONSE:** Disputed because this PFOF fails to cite to any evidentiary support and is contrary to the record. *See* Pls.' PFOF ¶ 1124 and Defendants' response thereto. Moreover, this PFOF contains no evidence that the GEC sought to threaten or pressure, collude with, or encourage social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1124.   The GEC's "front office and senior leadership engage with social media companies." Kimmage Dep. 29:12-13. These senior leadership meet with social-media platforms "[e]very few months, can be quarterly, but sometimes less than quarterly." *Id.* at 32:9-10. According to Daniel Kimmage, Principal Deputy Coordinator of the GEC, these meetings focus on the "tools and techniques" of spreading disinformation on social media, and it "would be rare" for them to discuss specific "content that's posted on social media that might be of concern to the GEC." *Id.* at 30:9-31:3.

**RESPONSE:** Undisputed, except to note that the referenced "tools and techniques" focused on "our adversaries. So malign actors like . . . Russia and China, how they are using propaganda and disinformation." Kimmage Dep. 30:9-14. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1125.   In addition, the GEC's "Technology Engagement Team does engage with social media companies" as well. *Id.* at 29:11-12. The Technology Engagement Team meets with social media companies "[m]ore frequently" than the senior leadership, which meets with them "every few months." *Id.* at 37:9-15.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1126.   Kimmage recalls at least two meetings with Twitter. *Id.* at 129:22-25. At such meetings, the GEC would bring "between five and ten" people, including "the acting coordinator, me, in that capacity, then one or more of the deputy coordinators, team chiefs from the Global Engagement Center, and working-level staff with relevant subject matter expertise." *Id.* 130:24-131:13. These GEC staff meet with the platforms' content-moderation teams, *i.e.*, the people responsible for censorship on the platforms. *Id.* at 133:1-20, 135:1-11.

**RESPONSE:** Undisputed, except to the extent this PFOF mischaracterizes social media companies' content-moderation teams as being responsible for "censorship" on their platforms rather than making independent decisions to apply their terms of service, to which all users agree. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1127.   In such a meeting, "the GEC would provide an overview of what it was seeing in terms of foreign propaganda and disinformation. And Twitter would, to the extent that they felt comfortable sharing information, would discuss similar topics." 136:8-13.

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the GEC attempted use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1128.   In addition to meeting with Twitter, the GEC's senior leadership had similar meetings with Facebook and Google as well during the same time frames. *Id.* at 139:22-140:6. These meetings were also with Facebook and Google's content-moderation or trust and safety teams, *i.e.*, the people responsible for censoring content on their platforms. *Id.* at 141:17-143:3.

**RESPONSE:** Undisputed, except to the extent this PFOF mischaracterizes social media companies' content-moderation teams as being responsible for "censorship" on their platforms rather than independent decisions to apply terms of service, to which all users agree. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1129.   The GEC brought similar numbers of people to the meetings with Facebook and Google. *Id.* at 143:16-17 ("I believe the lineup would have been similar.").

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1130.   In addition to the senior-leadership and TET meetings, the GEC also maintained a Senior Advisor as a permanent liaison in Silicon Valley, Samaruddin K. Stewart, for the purpose of meeting with social-media platforms about disinformation. *Id.* at 159:24-160:13; Kimmage Ex. 9, at 2. Stewart set up a series of meetings with LinkedIn to discuss "countering disinformation" and to "explore shared interests and alignment of mutual goals regarding the challenge." Kimmage Ex. 9, at 2. Like the senior-leadership meetings, Stewart scheduled these meetings with the head of the trust and safety team, *i.e.*, the person responsible for censorship on the platform. *See id.* at 7 (meeting with the "Head of Threat Prevention, Trust & Safety" at LinkedIn). Kimmage confirms that Stewart set up similar meetings with other social-media platforms. Kimmage Dep. 160:12-13.

**RESPONSE:** Undisputed, except to note that (1) Mr. Stuart met with social media companies to discuss countering disinformation by foreign state and non-state actors, such as propaganda from a foreign terrorist organization, Kimmage Dep. 163:16-23; (2) similarly, Mr. Stuart requested to meet with representatives of LinkedIn because he was "tasked with building relationships with technology companies, academia, researchers, media, and interagency in the area with interest in countering disinformation and foreign state and non-state propaganda," Kimmage Ex. 9 at 2, and (3) this PFOF mischaracterizes the head of LinkedIn's trust and safety as being responsible for "censorship" on its platform rather than independent decisions to apply its terms of service, to which all users agree. In addition, this PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1131.   On March 25, 2021, the GEC set an email to Rob Schaul of CISA flagging "a disinfo campaign on YouTube targeting a [diplomatic security] officer" on a "Youtube channel run by Americans."  Kimmage Ex. 11, at 2. Brian Scully of CISA forwarded the disinformation report to Twitter, Facebook, and YouTube. *Id.* at 1, 3, 7. Facebook responded, "Thank you so much for this!  Have flagged for our internal teams." *Id.* at 1.

**RESPONSE:**  Undisputed, with the clarification that when Mr. Scully forwarded the

information received from the GEC to Twitter, Facebook, and YouTube he expressly noted that

CISA "is not the originator of this information," and "[r]esponding to this request is voluntary and

CISA will not take any action, favorable or unfavorable, based on decisions about whether or not

to respond to this follow-up request for information." Kimmage Ex. 11 at 3, 5, 7. This PFOF

contains no evidence that the GEC attempted use direct or indirect contacts with social-media

companies to threaten or pressure, collude with, or encourage them to remove or suppress

information on their platforms, or that the companies regarded (or acted on) any communications

with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence

as a whole. *See* Defs.' PFOF § II.G**.**

1132.   The GEC also coordinated with the Election Integrity Partnership. George Beebe of the GEC was in contact with the EIP. Kimmage Dep. 202:10-24. Kimmage admits that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership." *Id.* at 214:11-19. In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP. *Id.* 214:23-215:5.

**RESPONSE:**  Disputed to the extent that this PFOF mischaracterizes the cited testimony

as evidence that the GEC "coordinated" with the Election Integrity Partnership for any purpose.

Rather, the evidence shows that during the 2020 election cycle, the GEC discovered certain posts

and narratives on social media and digital media that originated from, were amplified by, or likely

to be amplified by foreign malign influence actors—like Russia, the People's Republic of China,

Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020

election. Declaration of Leah Bray, Deputy Coordinator, Glob. Engagement Ctr., U.S. Dep't of

State ¶ 5 (Bray Decl.) (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and the social media companies in turn would make a separate independent decision about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* Moreover, this PFOF contains no evidence that the GEC attempted to use contacts with the EIP for the purpose of threatening or pressuring, colluding with, or encouraging social-media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G**.**

1133.   Kimmage states that the GEC's work against disinformation "equips … technology companies to better understand" disinformation "so that they can take whatever actions they would take to stop the spread." *Id.* 280:24-281:3.

**RESPONSE:** Disputed to the extent this PFOF mischaracterizes the cited testimony. What Mr. Kimmage stated was: "The Global Engagement Center has an important function, it's laid out in its congressional legislation to identify and—and track what foreign propaganda and disinformation actors are doing, and releasing, for example, a public report on what Russian propaganda is promoting that doesn't, in and of itself, stop it, but it equips people, it equips, you know, potentially technology companies to better understand it so that they can take whatever actions they would take to—to—to stop the spread." Kimmage Dep. 280:9-281:3. This PFOF contains no evidence that the GEC attempted to use contacts with social-media companies to threaten or pressure, collude with, or encourage them to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

1134.   On October 17, 2022, at an event at Stanford University, Secretary of State Blinken was asked, "Stanford is one of the leading institutions to combat misinformation research and pointing out propaganda narratives and how they spread. How do you envision the cooperation between the State Department and institutions like Stanford in combatting the spread of propaganda?"  Kimmage Ex. 16, at 5. Secretary Blinken responded, mentioning the GEC and noting that State is engaging in "collaborations" and "build[ing] out … partnerships" with Stanford: "Stanford is doing remarkable work on that, and it's one of the things that we want to make sure that we're benefitting from, because this is a day-in, day-out battle for us, combating misinformation and disinformation around the world. We have at the State Department itself a big focus on this. We have something called the Global Engagement Center that's working on this every single day. But that work is both inspired by work that's being done in academia, including here at Stanford, as well as where appropriate collaborations. …So we're trying to build out these kinds of partnerships to make sure that we're looking at every place that is actually developing answers, including Stanford, and then integrating that into what we do."  *Id.*

**RESPONSE:** Disputed in part as follows. The question posed to Secretary of State Blinken, in its entirety, was as follows: "Mr. Secretary, Stanford is one of the leading institutions to combat misinformation research and pointing out propaganda narratives and how they spread. How do you envision the cooperation between the State Department and institutions like Stanford in combating the spread of propaganda, *and how does this fit with the recently released National Security Strategy*?" Kimmage Ex. 16 at 5 (emphasis added). In addition, this PFOF contains no evidence that the GEC attempted to threaten or pressure, collude with, or encourage social media companies to remove or suppress information on their platforms, or that the companies regarded (or acted on) any communications with the GEC as such. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G.

## IX.    The Election Integrity Partnership and Virality Project – Federal Collaborators.

1135.  Federal officials also work through nonprofit organizations to achieve their censorship goals. Most notably, federal officials at CISA and the GEC, and state officials through the CISA-funded EI-ISAC, work in close collaboration with the Stanford Internet Observatory and other nonprofit organizations to achieve censorship and attempt to evade the First Amendment.

Moreover, the Surgeon General's Office and other federal officials collaborate closely with the Stanford Internet Observatory and the same entities under the aegis of the "Virality Project."

**RESPONSE:** Disputed. Plaintiffs have presented no evidence that Defendants now have or have ever harbored "censorship goals" as alleged in this matter. Any such assertion is unsupported by and contrary to the record as a whole. Further disputed Plaintiffs' contention that CISA funded the EI-ISAC for any work concerning election security-related disinformation, as this is contradicted by the record. CISA did not fund the MS- or EI-ISACs for any of the work they provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or 2022 election cycles. Hale Decl. ¶¶ 78-79 (Ex. 97). Also unsupported are the allegations in this PFOF that federal officials "work in close collaboration with" or "collaborate closely" with the Stanford Internet Observatory, the Virality Project, or any other organizations to "achieve censorship and evade the First Amendment," for which the PFOF cites no evidence.

## A.     The Election Integrity Project Is a Formidable Censorship Cartel.

1136.   According to its website, "[t]he Election Integrity Partnership (EIP) was formed in July 2020 as a coalition of research entities focused on supporting real-time information exchange between the research community, election officials, *government agencies*, civil society organizations, and *social media platforms*."   *The 2020 Election Integrity Partnership*, Election Integrity Partnership (last visited Feb. 22, 2023) (emphasis added), https://www. eipartnership.net/2020. The EIP's "objective was to detect and *mitigate the impact* of attempts to prevent or deter people from voting or to delegitimize election results." *Id.* (emphasis added). As discussed further herein, "mitigate[ing] the impact" means pushing social-media platforms to censor supposed "misinformation."

**RESPONSE:** Disputed to the extent that the PFOF mischaracterizes "mitigat[ing] the impact" of attempts to prevent or deter people from voting or to delegitimize election results to mean "pushing social-media platforms to censor supposed 'misinformation.'" That characterization is not supported by any cited evidence. The EIP provided public factual findings to government agencies and social media platforms, but had no control over content moderation,

censorship, or labeling posts. *See* Ex. 74 at 2 (*Background on the SIO's Projects on Social Media*, Stanford Internet Observatory (Mar. 17, 2023)) ("SIO Statement"); Ex. 125 at 3 (*A Statement from the Election Integrity Partnership*, Election Integrity Partnership (Oct. 5, 2022). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1137.   "In March 2021 [the EIP] published [its] final report. This page displays an archive of the work carried out by the EIP and its partners during the 2020 U.S. election."  *Id.*  The EIP report is publicly available, it provides a detailed account of the EIP's activities in the 2020 election, and it is Exhibit 1 to the deposition of Brian Scully. Scully Ex. 1 (containing Stanford Internet Observatory et al., Election Integrity P'Ship, *The Long Fuse: Misinformation and the 2020 Election* (v1.3.0 2021), https://www.eipartnership.net/report [https://purl.stanford.edu/tr171 zs0069]).

**RESPONSE:** Undisputed.

1138. The EIP was created "in consultation with CISA [the Cybersecurity and Infrastructure Security Agency at the Department of Homeland Security] and other stakeholders." *Id.* at 20 (2).[6]  After "consultation with CISA," the EIP "assembled" a "coalition … with like-minded partner institutions."  *Id.*

**RESPONSE:** Disputed because the PFOF mischaracterizes the cited evidence. The cited report states that "[t]he initial idea for the [EIP] came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at [CISA] at [DHS.]" Scully Ex. 1, at 20 (2). The report further states that the Stanford University students "approached SIO leadership in the early summer, and in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partners." Scully Ex. 1 at 20 (2). As Mr. Scully explained during his deposition, the only "consultation" CISA had concerning the EIP was (1) a discussion with the Stanford students where he confirmed that a "gap" existed in local and state officials' resources to identify misinformation targeting their jurisdictions; and (2) a subsequent discussion with Alex

---

[6] Citations of this exhibit are formatted "Scully Ex. 1, at [page of exhibit] ([page of report])."

Stamos, who worked for the SIO and was one of the founders of EIP, where Mr. Scully stated his

agreement with the interns that there was a gap in resources. Scully Dep. 84:10-22; 87:16-21; 98-

2-8. CISA did not found, fund, or have any role in the management or operations of the EIP. Hale

Decl. ¶¶ 52 (Ex. 97); Ex. 122 at 7 (*Addressing false claims and misperceptions of the UW Center*

*for an Informed Public's research*, Univ. of Wash. (Mar. 16, 2023)). Moreover, this PFOF does

not contain evidence that CISA collaborated with or was "pervasive[ly] entwine[d]" with the EIP,

PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole.

*See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1139.   CISA interns originated the EIP: "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security." *Id.*

**RESPONSE:** Disputed to the extent the evidence does not support the implication that the

students originated the idea for the EIP in their role as CISA interns rather than as Stanford

students. Moreover, this PFOF does not contain evidence that CISA collaborated with or was

"pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported

by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1140.   The EIP agrees with Scully that the EIP was formed to fill in a perceived "gap" in the ability of the government to "monitor and correct" misinformation: "Responsibility for election information security is divided across government offices: CISA has authority to coordinate on cybersecurity issues related to the election, the FBI to investigate cyber incidents and enforce election laws, and intelligence agencies to monitor for foreign interference. Yet, no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation." *Id.*

**RESPONSE:** Disputed. The gap identified by Mr. Scully involved local and state officials'

resources to identify misinformation targeting their jurisdictions. Scully Depo. Tr. 84:10-22. When

asked about this portion of the EIP report during his deposition, Mr. Scully stated: "To be honest,

I don't know what they're referencing, . . . so I don't want to speculate on what they're trying to

say there." Scully Depo. Tr. 91:13-24. And when asked whether Mr. Scully believed "there's a similar gap with respect to the ability of federal government agencies to respond to mis and disinformation on social media," he responded: "I think the federal government certainly would have the capability, if it chose to use it, and had the authority to do it." Scully Dep. 93:18-94:1. And when Mr. Scully was further asked whether "there was a gap in the federal government's ability to, you know, take any kind of action to correct mis and disinformation on social media," he responded "Yeah, I don't know that there's a gap in the federal government's ability to do it." *Id.* at 94:10-18. In any event, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1141. The EIP acknowledges that the federal government directly targeting misinformation posted Americans would "likely" violate the First Amendment and exceed agencies' lawful authority: "This is especially true for election disinformation that originates from within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." *Id.* As noted below, the EIP's founders publicly admit that virtually all the misinformation targeted by EIP was domestic in origin, not foreign, and thus subject to the First Amendment.

**RESPONSE:** Disputed. The EIP report did not "acknowledge" that "the federal government directly targeting misinformation posted [by] Americans would 'likely' violate the First Amendment and exceed agencies' lawful authority." Rather, the EIP report stated that "no government agency in the United States has the explicit mandate to monitor and correct election mis- and dis-information. This is especially true for election disinformation that originates from within the United States, which would likely be excluded from law enforcement under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." In addition, to the extent the EIP report is offering a legal opinion about CISA's

or any other agency's statutory authorities, Defendants respond to those legal arguments in their brief in opposition to Plaintiffs' preliminary injunction motion. Finally, the last sentence of Plaintiffs' PFOF is legal argument and characterization rather than a statement of fact and is unsupported by any cited evidence.

1142.   The EIP specifically notes CISA and the FBI in discussing the need to fill this "gap" in their ability to police "election misinformation originating from domestic sources": "none of these federal agencies has a focus on, or authority regarding, election misinformation originating from domestic sources within the United States. This limited federal role reveals a critical gap for non-governmental entities to fill. Increasingly pervasive mis- and disinformation, both foreign and domestic, creates an urgent need for collaboration across government, civil society, media, and social media platforms." *Id.* at 9 (v).

**RESPONSE:** Undisputed to the extent this is the conclusion of the EIP. To the extent the EIP report is offering a legal opinion about CISA's or the FBI's statutory authorities, Defendants respond to those legal arguments in their brief in opposition to Plaintiffs' preliminary injunction motion. In addition, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1143.   "As a result" of the First Amendment and lack of legal authority, according to the EIP, "during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing mis- and disinformation targeting their voting operations." *Id.* at 20 (2). The EIP was deliberately formed to fill this "gap."

**RESPONSE:** Disputed. The EIP report noted that "as a result" of the EIP's belief that "no government agency in the United States has the explicit mandate to monitor and correct election mis- and dis-information . . . during the 2020 election, local and state election officials, who had a strong partner on election-system and overall cybersecurity efforts in CISA, were without a clearinghouse for assessing misinformation and disinformation targeting their voting operation."

Scully Ex. 1 at 20 (2). To the extent the EIP report is offering a legal opinion about CISA's or any

other agency's statutory authorities, Defendants respond to those legal arguments in their brief in

opposition to Plaintiffs' preliminary injunction motion. In any event, this PFOF does not contain

evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with

the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the record

as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1144.   The EIP "was formed between four of the nation's leading institutions focused on understanding misinformation and disinformation in the social media landscape: the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensic Research Lab." *Id.*

**RESPONSE:** Undisputed.

1145.   The EIP makes clear that its "aim" was not just to observe but to "defend[]" the public from misinformation: "With the narrow aim of defending the 2020 election against voting-related mis- and disinformation, it bridged the gap between government and civil society, helped to strengthen platform standards for combating election-related misinformation, and shared its findings with its stakeholders, media, and the American public." *Id.* at 9 (v).

**RESPONSE:** Undisputed.

1146.   The EIP's statement that it "helped to strengthen platform standards for combating election-related misinformation" refers to the fact that the EIP successfully pushed virtually all major social-media platforms to adopt or increase censorship policies targeted at election-related "misinformation" during the 2020 election cycle. *See id.*

**RESPONSE:** Disputed to the extent the PFOF refers to social media platforms' terms of

service, to which all users agree, as "censorship policies," and further disputed because the cited

evidence does not support the claim that "the EIP successfully pushed virtually all major social-

media platforms to adopt or increase" their policies.

1147.   The EIP notes that its efforts to push social-media platforms to adopt more restrictive censorship policies were highly effective, both in procuring changes in policies and censoring speech: "Many platforms expanded their election-related policies during the 2020 election cycle. … Platforms took action against policy violations by suspending users or removing content, downranking or preventing content sharing, and applying informational labels." *Id.* at 12 (viii).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "push[ing] social media platforms to adopt "more restrictive censorship policies." The cited evidence does not support that characterization. Nothing in this cited portion of the document suggests that platforms' expansion of their content moderation policies (to which all users agree) during the 2020 election cycle was the result of a "push" by EIP—or anyone else, for that matter.

1148.   Alex Stamos, the director of the Stanford Internet Observatory who founded the EIP, has publicly stated that the EIP successfully pushed social-media platforms to adopt more restrictive policies about election-related speech in 2020: "My suggestion, if people want to get the platforms to do stuff is, first, you've got to push for written policies that are specific and that give you predictability; right? And so this is something we started in the summer, in August, is as Kate [Starbird] talked about Carly Miller led a team from all four institutions to look at the detailed policies of the big platforms and to measure them against situations that we expected to happen. Now we're not going to take credit for all of the changes they made, but there -- we had to update this thing, like, eight or nine times; right? And so like putting these people in a grid to say, you're not handling this, you're not handling this, you're not handling this, creates a lot of pressure inside of the companies and forces them to kind of grapple with these issues, because you want specific policies that you can hold them accountable for."  Scully Ex. 4, at 7 (Audio Tr. 4).

**RESPONSE:** Disputed because there is no "Scully Ex. 4," and it is unclear what source the PFOF purports to cite.

1149.   Alex Stamos notes that the EIP then pressured the platforms to aggressively enforce the new policies that the EIP had pushed them to adopt: "The second is, when you report stuff to them, report how it's violating those written policies; right? So there's two steps here. Get good policies, and then say, this is how it's violated it."  *Id.*

**RESPONSE:** See Defs.' Resp. to PFOF ¶ 1148.

1150.   Other EIP participants have also publicly stated that the EIP induced social-media platforms to adopt much more aggressive censorship policies on election-related speech. On March 3, 2021, at an EIP-hosted conference on the release of the EIP report, Emerson Brooking of the Atlantic Council's DRFLab, an EIP participant, stated: "I think the EIP really helped push the envelope with things like just the notion that … this delegitimization of electoral processes that we were seeing in the summer and early fall that this should be against content moderation policies on these platforms, and begin to take proactive steps there…."  Scully Ex. 5, at 6 (Audio Tr. 2). He also stated, "after November 3rd, we saw that market shift where content moderation actions that … we could hardly contemplate a few weeks before began to be taken. There was a much stronger emphasis on cracking down on the sort of content we've been tracking from the beginning."  *Id.*

**RESPONSE:** Disputed because there is no "Scully Ex. 5," and it is unclear what source the PFOF purports to cite.

1151.  The EIP treats "Government" and Social-Media "Platforms" as two of its "Four Major Stakeholders," providing input to the EIP and receiving feedback from the EIP. Scully Ex. 1, at 26 (8) & fig.1.2 (graphic showing "Government" as the EIP's first "Major Stakeholder," submitting information to EIP's "Intake Queue" and receiving feedback on the EIP's "Mitigation"—*i.e.*, censorship—efforts).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes EIP's mitigation efforts as "censorship." The cited evidence does not support that characterization. The EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3. Defendants further note that the EIP explained what it meant when it referred to the "government" as one of its "four major stakeholder groups" in its report: "Given the decentralized nature of election administration, government entities at the local, state, and federal level are all responsible in some way for election security and thus for countering election-related mis- and disinformation." Scully Ex. 1, at 30 (12). Defendants further note that CISA never submitted any information to EIP's "Intake Queue." *See* Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 74 at 3 (stating that the EIP did not receive requests from CISA to eliminate or censor tweets); Ex. 122 at 7 ("CISA did not

send content to the EIP to analyze, and the EIP did not flag content to social media companies on behalf of CISA."). In addition, CISA generally did not share information with the EIP and did not have communications with EIP about specific disinformation concerns. Scully Depo. Tr. 73:25-74:2; 75:2-5; 106:3-9. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1152.   The EIP organizes its misinformation reports under groups called "tickets," and it notes that "[t]ickets were submitted by … trusted external stakeholders…" *Id.* at 26 (8). "Trusted external stakeholders" include "government": "External stakeholders included government, civil society, social media companies, and news media entities." *Id.* at 30 (12). Thus, it is clear that "government" submitted "tickets," *i.e.*, reports of misinformation to be processed for censorship on social media, to the EIP. *See id.* at 26, 30 (8, 12).

**RESPONSE:** Disputed, s*ee* Defs.' Resp. to PFOF ¶ 1151.

1153.   And it is clear that the "government" partners who submit tips to the EIP are CISA, the State Department's Global Engagement Center (GEC), and the Elections Infrastructure Information Sharing & Analysis Center (EI-ISAC), an organization of state and local government officials coordinated by the Center for Internet Security (CIS) pursuant to funding from CISA, *see EI-SAC*, Center for Internet Security (last visited Feb. 22, 2023) ("The EI-ISAC is federally funded by CISA."), https://www.cisecurity.org/ei-isac.   Specifically, the "Government" "stakeholders" listed under the EIP's "Four Major Stakeholder Groups" are CISA, GEC, and the EI-ISAC. Scully Ex. 1, at 30 (12).

**RESPONSE:** Disputed. First, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 122 at 7; Ex. 125 at 2; Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). Second, the EI-ISAC is not a "government" partner; rather, the EI-ISAC is a voluntary organization managed by CIS with membership open to all state, local, tribal, and territorial organizations and private sector entities that support election officials. Hale Decl. ¶ 48 (Ex. 97). Third, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by

foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* Fourth, DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* at ¶ 51. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1154.   These "Government" stakeholders report misinformation to the EIP: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.*

**RESPONSE:** Disputed. First, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 122 at 7; Ex. 125 at 2;

Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets).

Second, during the 2020 election cycle, the GEC discovered certain posts and narratives on social

media and digital media that originated from, were amplified by, or likely to be amplified by

foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their

proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray

Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21

occasions. *Id.* The EIP then made an independent determination as to whether to send this

information to social media companies, and social media companies in turn made separate

independent decisions about what actions, if any, to take based on their own policies and under

their respective terms of service with account holders and users on their sites. *Id.* Third, the EI-

SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Fourth, the EI-

ISAC is not a government entity. *See* Defs.' Resp. to Pls' PFOF ¶ 1153. Moreover, this PFOF does

not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly]

entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

   1155.   The CISA-funded EI-ISAC and CISA itself worked in collaboration with the EIP
to report misinformation to social-media platforms: "[T]he EI-ISAC served as a singular conduit
for election officials to report false or misleading information to platforms. By serving as a one-
stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and
countering election misinformation while CIS and its partners reported content to the proper social
media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a
subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to
counter election misinformation." *Id.* at 31 (13).

   **RESPONSE:** Disputed. First, DHS has provided financial assistance to CIS through a

series of cooperative agreement awards, managed by CISA, to provide certain, specified

cybersecurity services to state, local, tribal and territorial governmental organizations through the

MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative

agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* at ¶ 51. Second, the EI-SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Third, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. Ex. 122 at 7; Ex. 125 at 2; Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1156.   The EIP report mentions *The Gateway Pundit*, the website operated by Plaintiff Jim Hoft, 47 times. *See id.* at 51, 74, 76, 101, 103, 110, 112, 145, 150-51, 153, 155-56, 172, 175, 183, 194-95, 206-09, 211-12, 214-16, 226-27.[7]

**RESPONSE:** Disputed. The EIP report mentions *The Gateway Pundit* 43 times. *See generally* Scully Ex. 1.

1157.   The EIP boasts that it "used an innovative internal research structure that leveraged the capabilities of the partner organizations through a tiered analysis model based on 'tickets' collected internally and from our external stakeholders. Of the tickets we processed, 72% were related to delegitimization of the election," *i.e.*, core political speech. *Id.* at 10 (vi).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the phrase "delegitimizing of the election" as equating to "core political speech." The cited evidence, which does not include any of the referenced posts, does not support that characterization, which in any event is a legal

---

[7] Report pages 33, 56, 58, 83, 85, 92, 94, 127, 132-33, 135, 137-38, 154, 157, 165, 176-77, 188-91, 193-94, 196-98, 208-09.

conclusion. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion.

1158.   The EIP admits that the speech it targets for censorship is domestic, grassroots speech by American citizens: "The production and spread of misinformation was multidirectional and participatory. Individuals participated in the creation and spread of narratives. Bottom-up false and misleading narratives started with individuals identifying real-world or one-off incidents and posting them to social media. Influencers and hyperpartisan media leveraged this grassroots content, assembling it into overarching narratives about fraud, and disseminating it across platforms to their large audiences. Mass media often picked up these stories after they had reached a critical mass of engagement. Top-down mis- and disinformation moved in the opposite direction, with claims first made by prominent political operatives and influencers, often on mass media, which were then discussed and shared by people across social media properties." *Id.* at 11 (vii). In other words, virtually everything it targets is quintessential First Amendment-protected political speech.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "target[ing]" speech for "censorship" or that "virtually everything it targets is quintessential First Amendment-protected speech." The EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3. Finally, the last sentence is a legal conclusion, and Defendants respond to Plaintiffs' legal arguments in their response to Plaintiffs' preliminary injunction motion.

1159.   This included censorship of highly visible political figures: "The primary repeat spreaders of false and misleading narratives were verified, blue-check accounts belonging to

partisan media outlets, social media influencers, and political figures, including President Trump and his family." *Id.* at 12 (viii).

**RESPONSE:** Disputed. The EIP did not "censor[]"; the EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3.

1160.   One key point that the EIP emphasizes is that it wants greater "access" to platforms' internal data to achieve greater monitoring of Americans' speech on social media. The EIP complains that "***Lack of transparency and access to platform APIs hindered external research into the effectiveness of platform policies and interventions***." *Id.* (emphasis added). "API" stands for "Application Programming Interface," so the EIP wants greater direct access to platforms' internal data about so-called "misinformation" on their platforms. *See id.* This directly echoes the repeated demands from the White House and the Surgeon General that social-media platforms provide access to their internal data about misinformation on their platforms, both to government and "researchers." The relevant "researchers" include Stanford Internet Observatory and the other constituents of the EIP and the Virality Project, who are working hand-in-glove with federal officials.

**RESPONSE:** Disputed. The EIP report does not reflect that "it wants greater 'access' to platforms' internal data." Rather, the EIP report simply lists "[l]ack of transparency and [API] access" as a limitation on the effectiveness of EIP's research. Scully Ex. 1 at 12 (viii). Further disputed that the White House or Surgeon General "demanded" anything from social media platforms, or that the Stanford Internet Observatory worked "hand-in-glove" with federal officials. The PFOF provides no record support for these statements, which are unsupported by the record

as a whole. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1161.   The EIP contends that not enough censorship was achieved during 2020 as a result of their lack of direct access to platforms' APIs: "Many platforms expanded their election-related policies during the 2020 election cycle. However, application of moderation policies was inconsistent or unclear." *Id.*

**RESPONSE:**  Disputed to the extent the PFOF mischaracterizes the EIP as "contend[ing] that not enough censorship was achieved during 2020 as a result of their lack of direct access to platforms' APIs." The cited evidence does not support that characterization. Rather, the cited document reflects that one of the EIP report's "key takeaways" was the observation that "[m]any platforms expanded their election-related policies during the 2020 election cycle. However, application of moderation policies was inconsistent or unclear." Scully Ex. 1 at 12 (viii). Nothing in the cited exhibit reflects a desire by the EIP to "censor" anything. The EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3.

1162.   The EIP recommends that platforms increase enforcement of censorship policies: "Impose clear consequences for accounts that repeatedly violate platform policies. These accounts could be placed on explicit probationary status, facing a mixture of monitoring and sanctions." *Id.* at 14 (x).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes social media platforms' terms of service—to which all users agree—as "censorship policies." The cited evidence does not support that characterization.

1163.   The EIP report acknowledges the contributions of Alex Stamos, Renee DiResta, Kate Starbird, Matt Masterson, Pierce Lowary, and Alex Zaheer. *Id.* at 16 (xii). All of these individuals have or had formal roles in CISA.

**RESPONSE:** Disputed in part. Mr. Stamos, Ms. DiRestra, Mr. Lowary, and Mr. Zaheer contributed to the EIP report in their capacity as "students, staff, and researchers" for the Stanford Internet Observatory, and Ms. Starbird contributed in her capacity as an employee of the University of Washington Center for an Informed Public. *Id.* In addition, Mr. Masterson, who provided "additional feedback" on the EIP report, was not a CISA employee at that time. Scully Ex. 1, at 16 (xii). Finally, the PFOF provides no support for the statement that each of these individuals "have or had formal roles in CISA," or even explains what is meant by a "formal role." Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1164.   The EIP is partially funded by the federal government: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." *Id.* at 17 (xiii).

**RESPONSE:** Undisputed, but note that CISA does not and has never funded the EIP. Hale Decl. ¶ 57 (Ex. 97). Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1165.   In addition, the Atlantic Council, one of the four nonprofit organizations in the EIP, is partially government-funded. Kimmage Dep. 294:8-18.

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1166.   "The initial idea for the Partnership came from four students that the Stanford Internet Observatory (SIO) funded to complete volunteer internships at the Cybersecurity and Infrastructure Security Agency (CISA) at the Department of Homeland Security."  Scully Ex. 1, at 20 (2).

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1167.   "The students approached SIO leadership in the early summer, and, in consultation with CISA and other stakeholders, a coalition was assembled with like-minded partner institutions."  *Id.*

**RESPONSE:** Undisputed that the PFOF accurately quotes a portion of the EIP report, but further note that the "consultation" by CISA was limited to a conversation with the students and a follow-up discussion with Alex Stamos where Mr. Scully verified the students' understanding that there was a gap in local and state election officials' resources to handle election misinformation. Scully Dep. 98:2-8; Hale Decl. ¶¶ 53-54 (Ex. 97). Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI

Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole.

*See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1168.   "The Election Integrity Partnership (EIP) was officially formed on July 26, 2020—100 days before the November election—as a coalition of research entities who would focus on supporting real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms." *Id.*

**RESPONSE:** Undisputed.

1169.   As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept." *Id.* at 21 (3). In other words, the Stanford Internet Observatory "present[ed]" the "EIP concept" to CISA two weeks before the EIP was formed. *Id.*

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that CISA or

any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41.

Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.'

PFOF § II.F., Arg. § II.B.4.c. & e.

1170.   The SIO's EIP team was "led by … Research Manager Renee DiResta … and Director Alex Stamos." *Id.* at 22 (4). The University of Washington's "contributing team" was "led by … Kate Starbird." *Id.*

**RESPONSE:** Disputed in part, as the PFOF omits other individuals from SIO and the

University of Washington that the EIP report identified as leading the EIP project. Scully Ex. 1, at

22 (4). The other individuals from SIO who "led" the EIP effort included Assistant Director Elena

Cryst and CTO David Thiel. *Id.* The other individuals from the University of Washington who

contributed to the EIP included Emma Spiro and Jevin West. *Id.*

1171.   Alex Stamos and Kate Starbird are members of CISA's Cybersecurity Advisory Committee. *See CISA Cybersecurity Advisory Committee*, Cybersecurity & Infrastructure Security Agency (last visited Feb. 24, 2023), https://www.cisa.gov/resources-tools/groups/cisa-cybersecurity-advisory-committee. Starbird chairs CISA's Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation." *See* CISA Cybersecurity Advisory Committee, Subcommittee Factsheet 1 (April 13, 2022), https://www.cisa.gov/sites/default/files/publications/CSAC%20Subcommittee%20Factsheet_April%2013%202022.pdf. Renee DiResta gives lectures on behalf of CISA. *See* CISA, *Cybersecurity Summit 2021:*

*Responding to Mis, Dis, and Malinformation*, YouTube (Oct. 27, 2021), https://www.youtube.com/watch?v=yNe4MJ351wU.

**RESPONSE:** Disputed in part. Ms. Starbird does not currently chair the CISA Subcommittee on "Protecting Critical Infrastructure from Misinformation and Disinformation" as the Subcommittee was directed to stand down in December 2020 because it had completed its tasking and provided its recommendations to CISA. Ex. 187 at 43. In addition, the PFOF mischaracterizes Ms. DiResta as someone who "gives lectures on behalf of CISA," as opposed to Ms. DiResta being a speaker at a CISA event. The cited evidence does not support the PFOF's characterization.

1172. One of the EIP's goals was to "flag policy violations to platforms." Scully Ex. 1, at 24 (6).

**RESPONSE:** Undisputed, but further note that although the EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2; Ex. 122 at 5-6; Ex. 125 at 3. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3.

1173. As noted above, the EIP describes "Government" as one of "four major stakeholders," who both provided input into the "intake queue" for "tickets" (*i.e.*, reporting misinformation) and received feedback on "mitigation" (*i.e.*, censorship). *Id.* at 26 (8).

**RESPONSE:** Undisputed, but note that CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 122 at 7; Ex. 125 at 2; Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). CISA generally did not share information with EIP. Scully Depo. Tr. 73:25-74:2; 106:3-9. CISA did not have communications with EIP about specific disinformation concerns. Scully Depo. Tr. 75:2-5. CISA was not aware of when EIP would send reports to social media platforms. Scully Dep. 106:21-107:10. Moreover, the EI-SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Furthermore, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* In addition, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1174.   The EIP tracked misinformation using "tickets," which tracked "informational event[s]" that could encompass many social-media postings: "The EIP tracked its analysis topics and engaged with outside stakeholder organizations using an internal ticketing workflow management system. Each identified informational event was filed as a unique ticket in the system." *Id.*

**RESPONSE:** Undisputed.

1175.   "Tickets were submitted by both trusted external stakeholders (detailed in Section 1.4 on page 11) and internal EIP analysts." *Id.* "Section 1.4" on pages 11-12 of the report identifies government as a trusted external stakeholder: "Trusted external stakeholders" include "government, civil society, social media companies, and news media entities." *Id.* at 29-30 (11-12). Page 12 specifically identifies CISA, the EI-ISAC, and the State Department's GEC as the EIP's "Government" stakeholders. *Id.* at 30 (12) fig.1.3.

**RESPONSE:** Disputed to the extent the PFOF suggests that CISA submitted "tickets" to EIP. CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 122 ("CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA."); Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). Moreover, the EI-SAC did not ask the EIP to censor or eliminate social media posts. Ex. 74 at 3. Furthermore, during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* This PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1176.   A "ticket" could encompass many individual postings: "A single ticket could map to one piece of content, an idea or narrative, or hundreds of URLs pulled in a data dump." *Id.* at 27 (9).

**RESPONSE:** Undisputed.

1177.   The EIP's managers both report misinformation to platforms and communicate with government partners about their misinformation reports: "The manager had the ability to tag platform partners on a ticket for action. They also communicated with the EIP's partners in government, and could request further information from election officials if necessary," thus serving as a conduit for a back-and-forth about misinformation reports between government officials and platforms. *Id.* at 27-28 (9-10).

**RESPONSE:** Disputed. CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 122 ("CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA."); Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). CISA generally did not share information with the EIP. Scully Dep. 73:25-74:2; 106:3-9. CISA did not have communications with the EIP about specific disinformation concerns. *Id.* at 75:2-5. CISA generally was not aware of when the EIP would send reports to social media platforms. *Id.* at 106:21-107:10. This PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1178.   The scope of the EIP's monitoring of Americans' speech on social media is enormous: "Team members from each of these tiers were divided into on-call shifts. Each shift was four hours long and led by one on-call manager. It was staffed by a mix of Tier 1 and Tier 2 analysts in a 3:1 ratio, ranging from five to 20 people. Analysts were expected to complete between two to five shifts per week. The scheduled shifts ran from 8:00 am to 8:00 pm PT for most of the nine weeks of the partnership, ramping up only in the last week before the election from 12-hour to 16- to 20-hour days with all 120 analysts on deck." *Id.* at 28 (10).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "scope" of EIP's "monitoring" as "enormous." The cited evidence does not support that characterization.

1179.  The "Government" stakeholders flag misinformation to the EIP for censorship: "Government and civil society partners could create tickets or send notes to EIP analysts, and they used these procedures to flag incidents or emerging narratives to be assessed by EIP analysts." *Id.* at 30 (12).

**RESPONSE:** Disputed. The PFOF mischaracterizes the purpose of the flagging of information to the EIP as "censorship." The EIP provided public factual findings to government agencies and social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. *Id.*; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2. Moreover, CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA. Ex. 125 at 2 ("CISA did not send any examples of potential misinformation to EIP"); Ex. 122 ("CISA did not send content to the EIP to analyze, and the EIP did not flag content to social media platforms on behalf of CISA."); Ex. 74 at 3 (stating that EIP did not receive requests from CISA to eliminate or censor tweets). During the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated from, were amplified by, or likely to be amplified by foreign malign influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP

on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* In short, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1180.   Of the "Four Major Stakeholder Groups" who participated in the EIP, the first listed is "Government," which includes three government entities: the Elections Infrastructure ISAC, CISA, and the State Department's GEC. *Id.*

**RESPONSE:** Undisputed that the EIP report lists the Election Infrastructure ISAC, CISA, and the State Department's GEC as "major stakeholders," but dispute that the EI-ISAC is a government entity. *See* Defs.' Resp. to Pls' PFOF ¶ 1153. Further note that CISA did not found, fund, or have any role in the management or operation of the EIP. Hale Decl. ¶ 52 (Ex. 97); Ex. 122 at 7. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1181.   The EIP reports that CISA, CIS, and the EI-ISAC collaborated with the EIP in reporting misinformation: "In this election cycle, the EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and countering election misinformation while CIS and its partners reported content to the proper social media platforms. Additionally, the Countering Foreign Influence Task Force (CFITF), a subcomponent of CISA, aided in the reporting process and in implementing resilience efforts to counter election misinformation." *Id.* at 31 (13).

**RESPONSE:** Disputed, *see* Defs.' Resp, to PFOF ¶ 1155.

1182.   The EI-ISAC jointly reports misinformation flagged by state and local election officials to CISA and to the EIP: "Content reported by election officials to the EI-ISAC was also routed to the EIP ticketing system. This allowed analysts to find similar content, ascribe individual content pieces to broader narratives, and determine virality and cross-platform spread if applicable. This analysis was then passed back to election officials via the EI-ISAC for their situational awareness, as well as to inform potential counter-narratives. Additionally, if an internally generated EIP ticket targeted a particular region, analysts sent a short write-up to the EI-ISAC to share with the relevant election official. This allowed the state or local official to verify or refute the claim, and enabled analysts to properly assess whether or not the content violated a platform's civic integrity policies. In this way, the EIP demonstrated the upside of using the EI-ISAC coordinating body to connect platforms with authoritative voices to determine truth on the ground and help election officials effectively counter viral falsehoods about election infrastructure." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the cited portion of the EIP report as stating that the EI-ISAC reported misinformation flagged by state and local election officials to CISA. The cited portion of the report does not support that characterization. During the 2020 election cycle, CISA received information regarding state and local election officials concerns about misinformation in three different ways. Scully Dep. 119:5-120:5. The first was from CIS. *Id.* at 119:5-120:5. The second was that election officials would send information to CISA Central, which is CISA's operations center. *Id.* at 119:5-120:5. The third was that election officials would directly email CISA employees. *Id.* at 119:5-120:5. Moreover, this PFOF does not contain evidence that CISA was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1183.   The EIP created established channels for reporting misinformation to platforms for censorship: "The EIP established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* at 35 (17).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as establishing channels for reporting misinformation to platforms for "censorship." The cited evidence does not support that characterization. The EIP did not ask social media companies to "censor" anything. Rather, the EIP provided public factual findings to social media platforms, but had no control over

content moderation, censorship, or labeling posts. Ex. 74 at 2. Social media platforms then examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. *Id.*; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1184.   The EIP receives real-time reports on censorship actions from the platforms, who communicate directly with EIP managers about censorship through the EIP's system: "Analysts conducted their initial assessment on all tickets, and, if content in a ticket appeared to be a violation of a platform's published content policies, an analyst or manager added the platform representative to the ticket. If questions arose, a manager communicated with the platform representative in the ticket comments. Analysts put the ticket back in the queue and updated the ticket to note if the content in question received a moderation action." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as receiving "real-time reports on censorship" from social media platforms. The cited report does not support that characterization. First, the cited portion of the report does not reflect that social media companies provided "real-time" reports to the EIP. Second, the cited report does not reflect that social media platforms engaged in censorship. Rather, social media platforms would examine any reports sent to them by the EIP to determine if the content was violative of their policies, to which all users agree, and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media

platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1185.   Virtually all major social-media platforms participate directly in the EIP: "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.*

**RESPONSE:**  Undisputed that the PFOF accurately quotes a portion of the report. Plaintiffs' statement that this reflects "[v]irtually all major social-media platforms" is a characterization of fact rather than a factual statement, and the report identifies other social media platforms that the EIP did not work with. Scully Ex. 1 at 35-36 (17-18).

1186.   In the 2020 election cycle, the EIP "processed 639 in-scope tickets. 72% of these tickets were related to delegitimizing the election results." *Id.* at 45 (27).

**RESPONSE:**  Undisputed, but note that of the EIP's 639 tickets, only 363 tickets tagged "an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." Scully Ex. 1 at 55 (37).

1187.   The EIP had a high level of success in pushing the platforms to censor speech: "35% of the URLs we shared with Facebook, Instagram, Twitter, TikTok, and YouTube were either labeled, removed, or soft blocked." *Id.* "In total, we believe the four major platforms we worked with all had high response rates to our tickets." *Id.* at 55 (37). "We find, overall, that platforms took action on 35% of URLs that we reported to them." *Id.* at 58 (40).

**RESPONSE:** Disputed. The record evidence does not support the PFOF's statement that the EIP "push[ed]" platforms to "censor speech." Rather, the EIP provided public factual findings to social media platforms but had no control over content moderation or labeling posts. Ex. 74 at 2. Social media platforms then examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. *Id.*; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently

made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1188.   The Center for Internet Security, which runs the EI-ISAC using funding from CISA, is a major reporter of misinformation to the EIP: "16% of tickets were filed by the Center for Internet Security (CIS), an election official community partner, in the form of tips." *Id.* at 46 (28); *see also* Center for Internet Security, *EI-ISAC* (last visited Feb. 24, 2023), https://www.cisecurity.org/ei-isac.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the nature (and limitations on) CIS's funding by DHS or CISA. DHS has provided financial assistance to CIS through a series of cooperative agreement awards, managed by CISA, to provide certain, specified cybersecurity services to state, local, tribal and territorial governmental organizations through the MS- and EI-SACs. Hale Decl. ¶ 50 (Ex. 97). In the approved scope of work for the cooperative agreements, DHS has limited the use of federal funds and any required non-federal cost-share to cybersecurity services intended to detect, prevent, respond to, mitigate, and recover from cyber threats, vulnerabilities, and risks. *Id.* The DHS approved scope of work for the cooperative agreements has never funded CIS to perform disinformation-related work, including the reporting of potential election security-related disinformation to social media platforms. *Id.* ¶ 51. Nor did CISA fund CIS or the MS- or the EI-ISAC for any of the work CISA provided in relation to the reporting of potential election security-related disinformation to social media or technology companies during the 2020 or election cycle. *Id.* ¶ 77. In addition, the PFOF's characterization of CIS as a "major reporter" of misinformation is not supported by the cited portion of the report. Rather, as noted in the cited portion of the report, "[t]ickets were primarily created by members of the four core EIP organizations," and only 16% of tickets received by EIP came from CIS. Scully Ex. 1 at 46 (28). Of those 16% of tickets submitted by CIS, which amounted to 101 tickets, "[m]ost . . . originated from election officials." Scully Ex. 1, at 60 (42). In addition, "the CIS tickets were (1) more likely

to raise reports about fake official election accounts (CIS raised half of the tickets on this topic);
(2) more likely to create tickets about Washington, Connecticut, and Ohio, and (3) more likely to
raise reports that were about how to vote and the ballot counting process[.]" *Id.* This PFOF contains
no evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with
the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence
as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1189.   The EIP "prioritize[es] … swing states over non-swing states." Scully Ex. 1, at 46
(28).

**RESPONSE:** Undisputed that during the 2020 election cycle the EIP reported that, due to
"finite staff and time," it prioritized "monitoring some content over others," including
"prioritization of swing states over non-swing states." Scully Ex. 1 at 45 (28).

1190.   The EIP's "dataset included 639 distinct, in-scope tickets." *Id.* A "ticket" could be
extremely broad, "map[ping] to" and entire "idea or narrative." *Id.* at 27 (9). For example, the
"SHARPIEGATE" ticket was submitted on November 4, 2020, to "try and consolidate all the
content" regarding the Sharpiegate story from "a variety of different states across Twitter, FB,
TikTok, and Youtube." *Id.* at 47 (29) fig.2.1.

**RESPONSE:** Undisputed, and further noted that "Sharpiegate" involved allegations that
voters were forced to use sharpie markers and that the markers were intentionally meant to make
votes ambiguous to sway the election. Scully Ex. 1 at 47 (29) fig. 2.1. As noted in the report, this
was not true because the "ballots are designed such that sharpie ink will not comprise the
selection." *Id.* Further note that of the EIP's 639 tickets, only 363 tickets tagged "an external
partner organization to either report the content, provide situational awareness, or suggest a
possible need for fact-checking or a counter-narrative." Scully Ex. 1 at 55 (37).

1191.   The EIP includes extensive collaboration with a "government partner" in its
Sharpiegate ticket. *Id.* at 48 (30). Its internal ticket-management software ("Jira") simultaneously
allowed the "government partner" to communicate directly with the "platform partner" to debunk
the online claim. *Id.* at 48 (30) fig.2.2.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the "government partner's" involvement in the Sharpiegate ticket as "extensive." The cited report does not support that characterization. In addition, although it is unclear whether the report is referring to a state, local, or federal "government partner," in context it appears to refer to an Arizona election official. Scully Ex. 1 at 48 (30) fig. 2.2. Moreover, this PFOF does not contain evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1192.  The EIP reports that it repeatedly flagged *The Gateway Pundit*, Plaintiff Jim Hoft's website, as a purveyor of social-media misinformation: "The top misinformation-spreading websites in our dataset were … thegatewaypundit[.]com, a far-right news website. 65% of these tickets involved an exaggeration of the impact of an issue within the election process." *Id.* at 51 (33) (alteration in original).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP report. The EIP report notes that the "top misinformation-spreading websites" in the EIP dataset were thedonaldwin and thegatewaypundit.com, and that "many of these tickets involved an exaggeration of the impact of an issue within the election process." Scully Ex. 1 at 51 (33).

1193.  The EIP does not claim that most of *The Gateway Pundit*'s content was false, only that it involved the "exaggeration of the impact of an issue within the election process." *Id.*

**RESPONSE:** Disputed. The EIP report is replete with examples of false information from the Gateway Pundit. *See* Scully Ex. 1 at 74 (56) (describing narrative pushed by Gateway Pundit of incident of discarded mail to sow doubt about mail-in voting and "falsely assigning deliberate intent to purported Biden-supporting USPS workers"); *id.* at 76 (58) (noting that the Gateway Pundit retweeted and quoted an individual and "spread[] the false narrative that this was an intentional dumping of ballots with implications on the 2020 election, and reinforcing the larger narrative that mail-in voting was not secure."); *id.* at 110 (92) (noting that the Gateway Pundit

amplified the false narrative concerning the "disproven theory claiming that the software glitch that caused the erroneous vote count in Michigan was in fact the deliberate work of the 'Hammer and Scorecard' program"); *id.* at 112 (94) (noting that the Gateway Pundit published a story making the false claim that Dominion Voting Systems used the same software as SolarWinds, which had been subject to a cyberattack); *id.* at 214-15 (196-97) (noting that the Gateway Pundit "spread false narratives of election fraud built upon misinterpretations of statistics and was active in spreading the false Dominion conspiracy theory"). Ultimately, based on the Gateway Pundit's repeated violations of its terms of service, Twitter made the independent decision, based on its terms of service, to suspend the account on February 6, 2021. Scully Ex. 1 at 206 (188)

1194.   As noted above, the EIP Report cites *The Gateway Pundit* 47 times. *See supra* paragraph 1156 and accompanying citation.

**RESPONSE:** Disputed. The EIP Report cites The Gateway Pundit 43 times. *See generally* Scully Ex. 1.

1195.   The EIP "coded tickets based on whether they … had an element of foreign interference. Interestingly … less than 1% related to foreign interference."  Scully Ex. 1, at 53 (35). Thus, virtually all the speech targeted for censorship comes from American speakers.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "target[ing] speech for "censorship." The cited evidence does not support that characterization. The EIP provided public factual findings to social media platforms, but had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. *Id.*; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and

the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

1196.   The EIP targeted speech for censorship or debunking in most tickets: "Of our 639 tickets, 363 tickets tagged an external partner organization to either report the content, provide situational awareness, or suggest a possible need for fact-checking or a counter-narrative." *Id.* at 55 (37).

**RESPONSE:** Disputed. The EIP did not target speech for censorship, nor did "most" tickets involve flagging information for social media companies. The EIP provided public factual findings to social media platforms, but had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2. Rather, social media platforms examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2. In addition, 363 out of 639 tickets being tagged for an external partner cannot credibly be characterized as "most."

1197.   "[G]roups that reported tickets include the State Department's Global Engagement Center…" *Id.* at 60 (42). Daniel Kimmage testified that George Beebe of the GEC was in contact with the EIP. Kimmage Dep. 202:10-24. Kimmage attests that the GEC had "a general engagement with the EIP. … the GEC was engaging with the partnership." *Id.* at 214:11-19. In addition to Mr. Beebe, Adele Ruppe, who "liaised on election-related issues," may have engaged with the EIP. *Id.* 214:23-215:5.

**RESPONSE:** Undisputed, but note that during the 2020 election cycle, the GEC discovered certain posts and narratives on social media and digital media that originated, or were likely to have originated from, were amplified by, or likely to be amplified by foreign malign

influence actors—like Russia, the People's Republic of China, Iran, and their proxies—that sought to spread propaganda or disinformation about the 2020 election. *See* Bray Decl. ¶ 18 (Ex. 142). The GEC flagged these posts and narratives for the EIP on approximately 21 occasions. *Id.* The EIP then made an independent determination as to whether to send this information to social media companies, and social media companies in turn made separate independent decisions about what actions, if any, to take based on their own policies and under their respective terms of service with account holders and users on their sites. *Id.* Moreover, this PFOF does not contain evidence that the GEC or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.G., Arg. § II.B.4.c. & e.

1198.   In addition, left-wing advocacy groups like "MITRE, Common Cause, the DNC, the Defending Digital Democracy Project, and the NAACP" submitted tickets to the EIP. Scully Ex. 1, at 60 (42).

**RESPONSE:** Disputed to the extent the PFOF characterizes these organizations as "left-wing advocacy groups." The cited evidence provides no support for that characterization. Moreover, as the EIP has explained, "[t]he EIP exclusively tracked and reported on false, misleading, and unsubstantiated claims about election processes and procedures. In 2020, those claims were far more prominent among supporters of President Trump (and the president himself) than other political groups." Ex. 122 at 8.

1199.   The EIP indicates that the "misinformation" it targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020 … was participatory. In other words, these dynamics were not simply top-down from elites to their audiences, but were bottom-up as well, with members of the 'crowd' contributing in diverse ways—from posting raw content, to providing frames for that content, to amplifying aligned messages from both everyday members of the crowd and media (including social media) elites. Repeatedly, our data reveal politically motivated people sincerely introducing content they mistakenly believed demonstrated real issues with election integrity…" *Id.* at 181

(163). "Well-meaning, though often politically motivated, individuals repeatedly introduced this content into the broader information sphere, often via social media…" *Id.* at 182 (164).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP report as indicating that the misinformation it "targeted during the 2020 election cycle was core political speech of American citizens protected by the First Amendment." The cited portion of the EIP report does not support the characterization that the EIP "targeted" speech (for "censorship" or otherwise). Moreover, the PFOF's characterization is a legal conclusion, and Defendants address legal arguments in their opposition to Plaintiffs' preliminary injunction motion. In addition, the quoted language omits important context: "Our analysis demonstrates that the production and spread of misinformation and disinformation about Election 2020—*including false narratives of a 'stolen election'*—was participatory." (Omitted language is reflected in italics). Scully Ex. 1, at 181 (163).

1200.   EIP analysts collected data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* at 199-200 (181-82).

**RESPONSE:** Undisputed, but for proper context note that the complete statement reads as follows: "To identify the repeat spreaders, we draw from three complementary views; one from our ticketing and analysis process (described in Chapters 1 and 2); a second through Twitter data EIP partners collected contemporaneously; and a third through CrowdTangle and Facebook search functionality, collected after EIP's realtime analyses ended." Scully Ex. 1 at 199-200 (181-82).

1201.   The EIP's tickets encompassed almost 5,000 URLs: "Through our live ticketing process, analysts identified social media posts and other web-based content related to each ticket, capturing original URLs (as well as screenshots and URLs to archived content). In total, the EIP processed 639 unique tickets and recorded 4,784 unique original URLs." *Id.* at 200 (182).

**RESPONSE:** Undisputed, but note that of the 639 unique tickets processed by the EIP, only 363 tickets "tagged an external partner organization to either report the content, provide

situational awareness, or suggest a possible need for fact-checking or a counter-narrative." Scully Ex. 1 at 55 (37).

1202.   These tickets and URLs encompass millions of social media posts, including almost 22 million posts on Twitter alone: "In total, our incident-related tweet data included 5,888,771 tweets and retweets from ticket status IDs directly, 1,094,115 tweets and retweets collected first from ticket URLs, and 14,914,478 from keyword searches, for a total of 21,897,364 tweets." *Id.* at 201 (183).

**RESPONSE:** See Defs.' Resp. to PFOF ¶ 1201.

1203.   The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms …. The collection resulted in 859 million total tweets." *Id.* at 200-01 (18283). Thus, the EIP had privileged access to Twitter's internal data about speech on its own platform.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes EIP's access to Twitter's API as "privileged access." The cited document does not support that characterization. As the EIP report states: "Facebook, Twitter, Reddit, and Instagram have reasonably accessible APIs that made it easier for our team to find misinformation on their platforms." Scully Ex. 1 at 51 (33).

1204.   The EIP did not have privileged access to Facebook's internal data, however: "To understand how the information ecosystem looks from the perspective of Facebook and Instagram, we collected public posts through the CrowdTangle API from Facebook Groups, Facebook Pages, Facebook verified profiles and public Instagram accounts." *Id.* at 201 (183). This explains the White House's and Surgeon General's insistence in 2021 that Facebook grant "researchers" such as Renee Diresta access to Facebook's internal data.

**RESPONSE:** The last sentence is disputed because it consists of speculative argument and characterization lacking any cited record support.

1205.   The EIP treats as "misinformation" truthful reports that the EIP believes "lack[] broader context." *Id.* at 203 (185).

**RESPONSE:** Disputed. The portion of the document referred to in the PFOF discusses "repeat spreaders of false and misleading narratives," not "misinformation." Scully Ex. 1 at 199 (181). The EIP report provides a table with the ten most prominent incidents (by Twitter spread)

and includes the following incident concerning Pennsylvania poll watchers: "This incident centered on narratives that a GOP-affiliated poll watcher was wrongfully denied entry to a Pennsylvania polling station. This content was then reframed to ***falsely*** claim that this was evidence of illegal actions taking place in the polling station. While the video does show a poll watcher being denied, it lacked broader context as to the reason for denial, which was not politically motivated." Scully Ex. 1 at 203 (185).

1206.   The EIP admits that it focuses on speech from the "political right" because it believes that the right spreads misinformation: "Influential accounts on the political right … were responsible for the most widely spread of false or misleading information in our dataset. Right-leaning accounts also more frequently augmented their misinformation posts with narrative-related hashtags … which persisted across multiple incidents and were shared millions of times in our dataset." *Id.* at 204-05 (186-87).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "focusing" on speech from the "political right." The cited document does not support that characterization. Rather, the EIP report reflects that it examined both "left-leaning" and "right-leaning" tweets and social media posts. Scully Ex. 1 at 202 (184). The EIP report found that "influential accounts associated with the U.S. right shared more incidents than the left both by absolute number (151 vs. 119 tickets) and by the total number of times there were retweeted in these incidents (17.8 million vs. 1.9 million retweets)." *Id.* Based on this data, the EIP report concluded that "[o]ur analysis suggests that the primary 'influencers' in the online production and dissemination of false and misleading narratives about the 2020 election were verified, blue-check accounts belonging to partisan media outlets, social media influencers, and political figures. Though false narratives occasionally gained traction on the political left, almost all of the most prominent repeat spreaders—i.e., the accounts that seeded and disseminated multiple false claims and narratives— belonged to conservative and/or pro-Trump individuals and organizations. Members of the Trump campaign, including President Trump and his adult sons, played a significant role in the spread of

these narratives, which converged around false and misleading claims of voter fraud and sought to
undermine trust in the results of the election." Scully Ex.1 at 222-23 (204-05)

### B.      The EIP Targets Plaintiff Jim Hoft and *The Gateway Pundit*.

1207.   According to the EIP, "[t]he 21 most prominent repeat spreaders on Twitter …
include political figures and organizations, partisan media outlets, and social media all-stars. …
[A]ll 21 of the repeat spreaders were associated with conservative or right-wing political views
and support of President Trump." *Id.* at 205 (187).

**RESPONSE:** Undisputed, but note that the PFOF omits a portion of the quoted statements.

The first quoted sentence reads in full: "The 21 most prominent repeat spreaders on Twitter—

***accounts that played a significant role in disseminating multiple false or misleading narratives***

***that threaten election integrity***—include political figures and organizations, partisan media

outlets, and social media all-stars." Scully Ex. 1 at 205 (187) (emphasis added to reflect the omitted

portion of quote). The second quoted sentence reads in full: "***Perhaps a reflection on both the***

***nature of information threats to election integrity and our process for identifying them (see***

***Chapter 2 for a note on the limitations of our approach,*** all 21 of the repeat spreaders were

associated with conservative or right-wing political views and support of President Trump, ***and all***

***featured in the politically 'right' cluster in our network graph in Figure 5.1 on the facing page.***"

*Id.* (emphasis added to reflect the omitted portion of quote).

1208.   The EIP lists *The Gateway Pundit* as the second-ranked "Repeat Spreader[] of
Election Misinformation" on Twitter, ranking it above Donald Trump, Eric Trump, Breitbart
News, and Sean Hannity. *Id.* at 206 (188) tbl.5.2. In the 2020 election cycle, the EIP flagged *The
Gateway Pundit*'s speech in 25 incidents with over 200,000 retweets. *Id.*

**RESPONSE:** Undisputed.

1209.   The EIP claims that "[f]ar-right hyperpartisan media outlets also participated in a
wide range of [Twitter] incidents, including The Gateway Pundit, which ranked #2 in the dataset."
*Id.* at 206 (188).

**RESPONSE:** Undisputed.

1210.   In addition, the EIP lists *The Gateway Pundit*'s website as the domain cited in the most "incidents"—its website content was tweeted by others in 29,207 original tweets and 840,740 retweets. *Id.* at 207 (189) tbl.5.3. *The Gateway Pundit* ranks above Fox News, the New York Post, the New York Times, and the Washington Post on this list. *Id.*

**RESPONSE:** Undisputed.

1211.   In fact, the EIP dedicates an entire subsection of its report to *The Gateway Pundit*. *Id.* at 214-16 (196-98). The EIP reports that "The Gateway Pundit was among the most active spreaders of election-related misinformation in our analyses. … It appeared as a top repeat spreader through its website, its Twitter account, its YouTube channel, and its Instagram account." *Id.* at 214 (196).

**RESPONSE:** Undisputed.

1212.   The EIP report notes that "Twitter suspended [*The Gateway Pundit*'s] account on February 6, 2021," indicating that *The Gateway Pundit*'s deplatforming on Twitter was the result of the EIP's efforts. *Id.*

**RESPONSE:** Disputed to the extent the PFOF claims that The Gateway Pundit's deplatforming on Twitter "was the result of the EIP's efforts," as the PFOF cites to no record evidence to support that claim. Indeed, the evidence is to the contrary. The EIP report notes that Twitter suspended the Gateway Pundit and supports that statement with a citation to a February 6, 2021, article in Forbes entitled "Twitter suspends 'Gateway Pundit' Jim Hoft." Scully Ex. 1 at 214 (196), 227 (209). The cited Forbes article quotes a spokesperson for Twitter as follows: "The account was permanently suspended for repeated violations of our civic integrity policy." Ex. 165 at 2 (AJ Dellinger, *Twitter suspends 'Gateway Pundit' Jim Hoft*, Forbes (Feb. 6, 2021)). The Forbes article further states that "Hoft and his publication have been widely criticized for spreading false information, including promoting conspiracy theories regarding the outcome of the 2020 presidential election." *Id.*

1213.   The EIP states that "The Gateway Pundit was highly active throughout the election lifecycle, including during the weeks leading up to the election, when it repeatedly spread content—in distinct information incidents—that sought to undermine trust in mail-in voting specifically and the eventual election results more generally." *Id.*

**RESPONSE:** Undisputed, and further note that the EIP report found that the Gateway Pundit "participated in seeding and spreading misleading information about ballots being harvested, chased, dumped, stolen and miscounted. It spread false narratives of election fraud built upon misinterpretations of statistics and was active in spreading the false Dominion conspiracy theory." Scully Ex. 1 at 214-15 (196-97).

1214.   According to the EIP, "[o]n Twitter, The Gateway Pundit's account was highly retweeted across 26 different incidents (#2 among repeat spreaders). Evidence from our data suggest that its prominence was due both to production of its own material and to amplification (via original and quote tweets) of other partisan content." *Id.* at 215 (197).

**RESPONSE:** Undisputed.

1215.   According to the EIP, "[o]f all the domains linked to in our Twitter data, The Gateway Pundit's website was connected to the largest number of incidents (46) while also garnering the most related original tweets (29,207) and retweets (840,750). Their YouTube channel appeared in five incidents, and their 13 incident-related videos had more than 4 million views on YouTube." *Id.* at 215-16 (197-98).

**RESPONSE:** Undisputed.

1216.   According to the EIP, "[t]he Gateway Pundit['s] … Instagram account was tied for #2 among repeat spreaders, appearing in 10 incidents for 20 posts that received more than 132,000 engagements." *Id.* at 216 (198).

**RESPONSE:** Undisputed.

C.      **The EIP Induces Major Changes in Platform Censorship Policies.**

1217.   The EIP notes that "during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public…." *Id.* at 229 (211).

**RESPONSE:** Undisputed, but note that the selectively quoted statement leaves out the reason for the changes to the companies' content moderation policies. The sentence in full reads,

"***Recognizing the heightened rhetoric and the use of mis- and dis-information*** during the 2020 election, all of the major platforms made significant changes to election integrity policies, both as

the campaigns kicked off and through the weeks after Election Day—policies that attempted to slow the spread of specific narratives and tactics that could potentially mislead or deceive the public, ***though the efforts were not always successful.***" Scully Ex. 1 at 229 (211) (emphasis added reflects the omitted portions of the quotation). In addition, the PFOF cites to no evidence to support the claim that the EIP "induce[d]" these reported changes to platforms' terms of service.

1218.   The EIP notes that "[m]ajor social media platforms such as Facebook, Twitter, YouTube, Pinterest, and TikTok introduced changes to their community standards in the months leading up to the election and in the aftermath." *Id.* at 230 (212).

**RESPONSE:** Undisputed, but note that the PFOF cites to no evidence to support the claim that the EIP "induce[d]" these reported changes to platforms' terms of service.

1219.   In particular, starting just over a month after the EIP launched, in "September 2020," "[a] number of platforms announced the first updates to election-specific policies: making large additions; adding more clarity and specificity; or stating clearly that they will label or remove content that delegitimizes the integrity of the election." *Id.*

**RESPONSE:** Undisputed, but note that the PFOF cites to no evidence to support the claim that the EIP "induce[d]" these reported changes to platforms' terms of service.

1220.   The policy changes reflected that the EIP and the platforms anticipated that they would have to target speech by *domestic* speakers, not supposed "foreign disinformation," during the 2020 election: "[M]uch of the misinformation in the 2020 election was pushed by authentic, domestic actors, and platforms shifted their focus to address downstream harms related to the content itself. As a result, most subsequent updates introduced policies related to specific content categories." *Id.* at 231 (213).

**RESPONSE:** Disputed to the extent the PFOF's mischaracterizes the policy changes by social media companies as reflecting that the EIP anticipated that it would have to "target speech by *domestic* speakers rather than foreign actors." The cited part of the EIP report does not support that characterization. The quoted language does not discuss the EIP at all, let alone refer to it as "targeting" speech by anyone. Nor does the quoted language reflect that social media companies were "targeting" speech as opposed to applying their terms of service, to which all users agree.

1221.   The EIP lobbies platforms to "remove" so-called "repeat spreaders" like *The Gateway Pundit*, and complains that they are not removed often enough: "Despite what appeared to be clear policy to penalize or remove repeat spreaders and high-profile disinformation actors, platforms appeared to shy away from using this particular intervention. In some cases, this was a result of a variety of 'newsworthiness' exceptions, which allowed some high-profile repeat spreaders, including politicians, to evade bans. Yet many of the repeat spreaders we saw were not politicians"—including *The Gateway Pundit*, among many others. *Id.* at 233 (215).

**RESPONSE:** Disputed. The PFOF's mischaracterization of the EIP "lobbying" platforms to do anything is not supported by the cited portion of the EIP report. Rather, the portion of the report cited in the PFOF simply reflects EIP reporting on the various policies and types of actions social media platforms take to address content and offers no recommendations or judgments about those polices. Scully Ex. 1 at 233 (215).

1222.   The EIP indicates that it will continue its censorship activities in future elections: "The next election will have its own unique set of misinformation narratives, yet many of the tactics, dynamics, and basic structures of these narratives will likely remain the same." *Id.* at 243-44 (225-26).

**RESPONSE:** Disputed. Although the PFOF accurately quotes a sentence from the EIP report, that sentence says nothing about EIP's intentions for future elections. Rather, the section of the EIP report cited in the PFOF concerns "platform policy moving forward." Scully Ex. 1 at 234 (225).

1223.   The EIP reinforces this intention by calling for even more aggressive, more expansive censorship of social-media speech, including into other areas such as "public health": "Doing nothing is not an option. … Not pursuing structural policy change will accelerate our country's slide toward extremism, erode our shared national and inclusive identity, and propel yet more individuals toward radicalization via mis- and disinformation. The problem is larger than elections: it spans politics, self-governance, and critical policy areas, including public health." *Id.* at 251 (233). The EIP acted on this statement promptly by forming the "Virality Project" in 2021. *See infra*.

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as "reinforcing this intention" to "continue its censorship activities in future elections" by "calling for even more aggressive, more expansive censorship of social-media speech." The cited evidence does not

support that characterization. Rather, the quoted language reflects the EIP's recommendation for the pursuit of "structural policy changes" to avoid "our country's slide towards extremism," as exemplified by the role mis- and disinformation played in the "violent insurrection at the United States Capitol on January 6, 2021." Scully Ex. 1 at 251 (233).

1224.   The EIP proclaims that the "EIP's novel structure, enabling rapid-response analysis and a multistakeholder reporting infrastructure, could prove effective to many information spaces blighted by pervasive misinformation," in addition to election-related speech. *Id.* at 259 (241).

**RESPONSE:** Undisputed.

1225.   The EIP calls for more aggressive penalties to enforce censorship on social media, in language that was copied and parroted by the demands of Jen Psaki and the Surgeon General: "Establish clear consequences for accounts that repeatedly violate platform policies." *Id.* at 256 (238). "Prioritize quicker action on verified or influential accounts if they have already violated platform policies in the past." *Id.* at 257 (239).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the EIP as calling for more "aggressive penalties to enforce censorship on social media," and mischaracterizing Ms. Psaki and the Surgeon General "parroting" the content of this report. The cited report does not support those characterizations. Rather, the EIP report offers a list of "recommendations" for social media companies, including ones relating to "repeat offenders." Nothing about these recommendations suggest "aggressive censorship"; rather, this reflects a recommendation for social media platforms to consistently apply their terms of service, to which all users agree. Furthermore, the PFOF provides no evidence that Ms. Psaki or the Surgeon General's views were taken from the EIP or its report.

1226.   The EIP even advocates for an express system of pre-publication approval for disfavored speakers—the ultimate prior restraint: "Consider implementing holding areas for content from high-visibility repeat spreaders, where content can be evaluated against policy before posting." *Id.*

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes one of the EIP's recommendation as advocating for the "the ultimate prior restraint." The cited evidence does not

support that characterization, which in any event is a legal conclusion rather than a factual statement. Defendants address legal arguments in their opposition to Plaintiffs' preliminary injunction motion. In addition, the recommendation cited in the PFOF simply recommends that social media platforms apply their terms of service, to which all users agree, to "high-visibility repeat spreaders." Scully Ex. 1 at 257 (239).

1227.   The EIP proclaims that it offers "a whole-of-society response," in words parroted by the Surgeon General's Health Advisory. *Id.* at 259 (241).

**RESPONSE:** Undisputed that both the EIP's report and the Surgeon General's advisory urge a "whole-of-society" response, but further note that the PFOF's characterization that the Surgeon General "parroted" the EIP's response is unsupported by the cited evidence.

1228.   The EIP boasts that "[t]he EIP, in its structure and its operations … *united government, academia, civil society, and industry*, analyzing across platforms, to address misinformation in real time." *Id.* (emphasis added).

**RESPONSE:** Undisputed, but note that this PFOF does not contain evidence that any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F & G., Arg. § II.B.4.c. & e

1229.   The EIP states that "[t]he lessons from EIP should be both learned and applied. The fight against misinformation is only beginning. The collective effort must continue." *Id.* at 25960 (241-42).

**RESPONSE:** Undisputed.

1230.   The EIP specifically advocates for a broader role for CISA in federal efforts to combat election-related "misinformation." *Id.* at 252-53 (234-35).

**RESPONSE:** Disputed. The EIP did not recommend that CISA have a "broader role" in "efforts to combat election-related 'misinformation.'" Rather, the EIP made three recommendations concerning CISA. Scully Ex. 1 at 252-53 (234-35). First, the EIP recommended

that the Executive Branch "[s]trenghten interagency coordination by elevating election security as a national security priority and reaffirming the critical infrastructure designation for election systems, allowing [CISA] to further prioritize resources and support to state and local officials." *Id.* Second, the EIP recommended that the Executive Branch "[s]olidify clear interagency leadership roles and responsibilities," and that "CISA should remain the lead on domestic vulnerabilities and coordination with state and local election officials." *Id.* The third EIP recommendation concerning CISA was to "[c]reate standards and mechanisms for consistent disclosure of mis- and disinformation from foreign and domestic sources, including via CISA's Rumor Control and joint interagency statements related to foreign-based threats." *Id.* Furthermore, the PFOF cites to no evidence that CISA ever took any action on the EIP recommendation. In addition, this PFOF contains no evidence that CISA or any Defendant collaborated with or was "pervasive[ly] entwine[d]" with the EIP, PI Supp. at 41. Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF § II.F., Arg. § II.B.4.c. & e.

1231.   Alex Stamos, the director of the Stanford Internet Observatory who launched the EIP, publicly states that virtually all the speech targeted by the EIP is by domestic speakers engaging in core political speech. He has publicly stated: "almost all of this is domestic: right? … It is all domestic, and the second point on the domestic, a huge part of the problem is well-known influencers …. you have … a relatively small number of people with very large followings who have the ability to go and find a narrative somewhere, pick it out of obscurity and … harden it into these narratives."  Scully Ex. 4, at 5 (Audio Tr. 2).

**RESPONSE:** Disputed because there is no "Scully Ex. 4." Accordingly, the PFOF provides no record support for this statement.

1232.   Likewise, on October 3, 2020, at a CISA-hosted cybersecurity conference, Clint Watts of the EIP stated that election misinformation "is overwhelmingly more domestic than foreign this time around in 2020."  Scully Ex. 3, at 4 (Audio Tr. 2).

**RESPONSE:** Disputed because there is no "Scully Ex. 3." Accordingly, the PFOF provides no record support for this statement.

1233.   At the same conference, Alex Stamos stated: "The bigger issue in 2020, is going to be domestic … we have set up this thing called the [E]lection [I]ntegrity [P]artnership, so we went and hired a bunch of students. We're working with the University of Washington, Graphika, and DFRLab, and the vast, vast majority of the contact we see we believe is domestic. You know, some of it you can't tell, but a lot of it is coming from domestic blue checkmark verified elites; right? And so I think a much bigger issue for the platforms is elite disinformation. The stuff that is being driven by people who are verified that are Americans who are using their real identities." *Id.* at 5 (Audio Tr. 3). He also stated, "the truth is, that the vast majority of these problems or the kind of problems in the information environment are domestic problems." *Id.* at 6 (Audio Tr. 4).

**RESPONSE:** *See* Defs.' Resp. to PFOF ¶ 1232.

1234.   Alex Stamos has noted that the fear of government regulation pushes the platforms to respond to government pressure and increase censorship. On November 10, 2020, at a conference hosted by the Atlantic Council, Alex Stamos stated: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places that are both economically highly important and that have *huge potential regulatory impact*, most notably right now that would be the United States and Europe."  Scully Ex. 4, at 6 (Audio Tr. 3) (emphasis added).

**RESPONSE:** *See* Defs.' Resp. to PFOF ¶ 1231. In addition, disputed to the extent the PFOF state that Mr. Stamos has "noted that the fear of government regulation pushes the platforms to respond to government pressure and increase censorship." That characterization is not supported by the Mr. Stamos' alleged quotation.

1235.   On November 17, 2021, at a conference hosted by the Digital Publics Symposium, Kate Starbird of CISA's Subcommittee and the University of Washington's Center for an Informed Public, an EIP participant, stated: "Now fast forward to 2020, we saw a very different story around disinformation in the U.S. election. It was largely domestic coming from inside the United States. …  Most of the accounts perpetrating this …  they're authentic accounts. They were often blue check and verified accounts. They were pundits on cable television shows that were who they said they were … a lot of the major spreaders were blue check accounts, and it wasn't entirely coordinated, but instead, it was largely sort of cultivated and even organic in places with everyday people creating and spreading disinformation about the election." Scully Ex. 8, at 4 (Audio Tr. 2). She also stated: "So we see this – the disinformation campaign was top down … but this campaign was also bottom up with everyday people sharing their own experiences, their own misperceptions of being disenfranchised or finding what they thought to be evidence of voter fraud." *Id.* at 5 (Audio Tr. 3). These are the voices that the EIP silenced.

**RESPONSE:** *See* Defs.' Resp. to PFOF ¶ 1231. Further disputed to the extent the PFOF mischaracterizes Ms. Starbird as a member of CISA's Subcommittee. CISA's Cybersecurity

Advisory Committee (CSAC), a federal advisory committee governed by the Federal Advisory Committee Act, had its inaugural meeting on December 10, 2021, during which the Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee and other subcommittees were announced. Ex. 65 at 3-4 (CISA Cybersecurity Advisory Committee, December 10, 2021, Meeting Summary (2021)). In addition, CISA's CSAC Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee disbanded in December 2022 after completing its taskings. Ex. 187 at 43. Further disputed to the extent the PFOF characterizes the EIP as "silenc[ing]" voices. The EIP did no such thing. Rather, the EIP provided public factual findings to social media platforms, and had no control over content moderation, censorship, or labeling posts. Ex. 74 at 2; Ex. 122 at 6; Ex. 125 at 3. Social media platforms then examined any reports sent to them by the EIP to determine if the content was violative of their policies and did not act in cases where the platforms determined their existing policies were not violated. Ex. 74 at 2; Ex. 125 at 3; Ex. 122 at 6 (stating that EIP's "researchers made independent decisions about what to pass on to platforms, just as the platforms made their own decisions about what to do with our tips"). Content moderation decisions were independently made by social media platforms, and the EIP did not make recommendations to the platforms about what actions they should take. Ex. 74 at 2.

### D. The Virality Project Expands EIP's Censorship Work with Federal Officials.

1236. Soon after the 2020 election cycle, beginning in early 2021, the same four entities that launched the Election Integrity Partnership established a similar program to address COVID-19-vaccine-related "misinformation" on social media, which they called the "Virality Project." *See* Scully Ex. 2 (containing Stanford Internet Observatory, et al., The Virality Project, *Memes, Magnets, and Microchips: Narrative Dynamics Around COVID-19 Vaccines* (v.1.0.1 2022), https://purl.stanford.edu/mx395xj8490).

**RESPONSE:** Undisputed, except to clarify that in addition to the four entities that founded the Election Integrity Partnership, the Virality Project was co-founded by the National Conference

on Citizenship's Algorithmic Transparency Institute and the New York University's Tandon School of Engineering and Center for Social Media and Politics. Scully Ex. 2 at 1-2.

1237.   The Virality Project's final report, dated April 26, 2022, lists Renee DiResta as the principal Executive Editor, and lists Renee DiResta, Kate Starbird, and Matt Masterson as contributors. Scully Ex. 2, at 4 (i).[8]  Current and former CISA interns Jack Cable, Isabella Garcia-Camargo, Pierce Lowary, and Alex Zaheer are listed as "researchers and analysts" who participated in social-media "monitoring" for the project. Id.

**RESPONSE:** Disputed in part. First, Plaintiffs' claim that Jack Cable, Isabella Garcia-Camargo, Pierce Lowary and Alex Zaheer are "current" CISA interns is contradicted by the record. Mr. Cable worked at CISA as an election security technical advisor from June 2020 to January 2021. Scully Dep. 195:17-21. Ms. Garcia-Camargo was a CISA intern in the summer of 2020. Id. at 186:3-9. Messrs. Lowary and Zaheer also interned at CISA in during the 2020 election cycle. Id. at 185:12-19. Mr. Zaheer is currently employed by CISA as a junior analyst. Id. at 43:14-22. The Virality Project issued its report in 2022, well after these individuals interned at CISA. Scully Ex. 2, at unnumbered pages 2-3. In addition, Matt Masterson was not a CISA employee at the time the Virality Project issued its report. Mr. Masterson left CISA in January 2021, Scully Dep. 88:21-25. Finally, the Virality Project's final report lists three executive editors: Renee DiResta, Elena Cryst, and Lily Meyersohn. Scully Ex. 2, at 4(i).

1238.   The same four entities that operated the EIP launched the Virality Project ("VP") in 2021: Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Forensics Research lab. Id. at 8-9 (1-2). Three new nonprofit entities were added as well. Id.

**RESPONSE:** Undisputed.

1239.   According to its report, "[t]he VP team developed technology to identify emerging narratives, to understand what communities they appeared within, and to gauge their scope, speed, and spread. In addition, the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit or action the spread of misleading vaccine-related

---

[8] Citations of this exhibit are formatted "Scully Ex. 2, at [page of exhibit] ([page of report]).

content." *Id.* at 9 (2). As discussed below, like the EIP, the VP took action to push "platforms [to] limit or action the spread of misleading vaccine-related content." *Id.*

**RESPONSE:** Disputed in part. Plaintiffs mischaracterize the Virality Project report, which did not discuss actions to "push" social media companies to limit or action the spread of misinformation. Rather, the Virality Project report states that "the analysts assessed social media platforms' published policies to understand how (if at all) platforms might limit the spread of misleading vaccine-related content." Scully Ex. 2 at 9(2); *see also* Ex. 74 at 3-4 (stating that "[r]ather than attempting to censor speech, the VP's goal was to share its analysis of social media trends so that social media platforms and public health officials were prepared to respond to widely shared narratives," and that "[d]ecisions to remove or flag tweets were made by Twitter.").

1240.   According to the VP, "[v]accine mis- and disinformation was largely driven by a cast of recurring actors," including "long-standing anti-vaccine influencers and activists, wellness and lifestyle influencers, pseudomedical influencers, conspiracy theory influencers, right-leaning political influencers, and medical freedom influencers." *Id.*

**RESPONSE:** Undisputed, except to note that the Virality Project report also notes that the recurring actors included "[f]oreign actors in China, Russia, and Iran," which "took a full-spectrum propaganda approach, spanning both media and social media, to influence vaccine conversations in the U.S. and around the world." Scully Ex. 2 at 9(2).

1241.   Like the EIP, the VP admits that the speech it targets is heavily speech by "domestic actors," *i.e.*, American citizens: "Foreign … actors' reach appeared to be far less than that of domestic actors." *Id.*

**RESPONSE:** Disputed. Plaintiffs' characterization of the VP or the EIP as "target[ing]" speech is unsupported by the evidence cited or by the record as a whole.

1242.   Like the EIP, the VP indicates that it pushes platforms to adopt more aggressive censorship policies on COVID vaccine-related content: "While online platforms have made progress in creating and enforcing vaccine related policies, gaps still exist." *Id.* at 10 (3).

**RESPONSE:** Disputed. Plaintiffs statement that either the EIP or the VP "pushes platforms to adopt more aggressive censorship policies on COVID vaccine-related content" is unsupported by the evidence cited and by the record as a whole. The portion of the report Plaintiffs cite to addresses "key takeways" from its project, one of which was that "[w]hile online platforms have made progress in creating and enforcing vaccine-related policies, gaps still exist." Scully Ex. 2 at 10(3).

1243.   Like the EIP, the VP notes that it did not only observe and report on misinformation but took action to stop the spread of misinformation: "Detection, however, was only part of the work. The Virality Project also sought to relate its findings to the public and to stakeholders in public health, government, and civil society." *Id.*

**RESPONSE:** Disputed. Plaintiffs' statement that "[l]ike the EIP, the VP notes" that it "took action to stop the spread of misinformation" is not supported by the quotation in the cited document or by the record as a whole.

1244.   The VP indicates that it should increase the efficiency of having "government partners" share "tips" of misinformation with entities like the VP, stating that "[r]esearch institutions" should "[s]treamline a tip line process to make it easy for civil society and government partners to share observations. Establish a feedback loop to discuss what types of analysis or tips are most relevant." *Id.*

**RESPONSE:** Disputed because is mischaracterizes the cited evidence. The Virality Project report recommended that "research institutions that study social media" could "help civil society and government partners better understand the dynamics of emerging narratives through their visibility into public data platforms," including by "[s]treamlin[ing] a tip line process to make it easy for civil society and government partners to share observations." Scully Ex. 2 at 10(3). Regardless, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1245.  The VP strives to "[d]evelop and maintain clear channels of communication that enable federal, state, and local agencies to understand and learn from what might be happening in other regions. Federal Information Sharing and Analysis Centers (ISAC) are one path forward." *Id.* at 11 (4).

**RESPONSE:** Disputed because it mischaracterizes the evidence. The quoted passage does not relate to what the Virality Project "strives" to do, but rather reflected one of its "key recommendations" for what "federal, state, and local leaders" should do. Scully Ex. 2 at 11(4). Regardless, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals."  Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1246.  The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence housed within the Cybersecurity and Infrastructure Security Agency." *Id.*

**RESPONSE:**  Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1247.  The VP states that social-media "[p]latforms owe the public *transparency and accountability* as they face the challenges of deciding what to surface, what to curate, and how to minimize the virality of harmful false claims. Tech platform policies against public health misinformation should be clear and precise, and their enforcement should be consistently applied." *Id.* (emphasis added). The Surgeon General copied this messaging verbatim in his Health Advisory, which he launched at the VP.

**RESPONSE:** The first sentence is undisputed. The second sentence is disputed, as the Surgeon General's advisory pre-dates the Virality Project report; he therefore could not have "copied" it. *See* Waldo Ex. 11 at 1 (Surgeon General's Health Advisory, dated 2021); Scully Ex. 2 at 2 (Virality Project report dated 2022). Furthermore, Dr. Murthy spoke at an event hosted by the Stanford Internet Observatory in July 2021 in connection with the rollout of the Advisory; the Office of the Surgeon General did not understand it to be a Virality Project event. Lesko Decl. ¶ 15

(Ex. 63). This PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals."  Any assertion to that effect is unsupported by and contrary to the evidence as a whole. See Defs.' Arg. § II.B.4.e.ii.

1248.   The VP calls for more aggressive censorship of COVID-19 "misinformation," stating: "To these ends, platforms should: Consistently enforce policies, particularly against recurring actors," and "Continue to improve data sharing relationships with researchers." *Id.* The emphasis on "data sharing relationships" is directly echoed in the White House's and the Surgeon General's demands that platforms share their internal data with researchers.

**RESPONSE:** Disputed to the extent Plaintiffs characterize the Virality Project's recommendation as calling for "more aggressive censorship," which is unsupported by the cited evidence or the record as a whole. Rather, the record reflects that the Virality Project recommends to social media companies that they "consistently enforce" their content moderation policies, to which all users agree. Scully Ex. 2 at 11(4). Furthermore, the Virality Project "did not censor or ask social media platforms to remove any social media content regarding coronavirus side effects." Ex. 74 at 3. "Decisions to remove or flag tweets were made by Twitter." *Id.* at 4. In addition, Plaintiffs' claim that the White House and Surgeon General's comments "echo" the Virality Project has the timing backwards, as the Virality Project's 2022 report post-dates the Surgeon General's Health Advisory and the White House's comments. *See* Waldo Ex. 11 at 1 (Surgeon General's Health Advisory, dated 2021); Scully Ex. 2 at 2 (Virality Project report dated 2022). This PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals."  Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1249.   The VP boasts that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and specifically cites the Surgeon General's Health Advisory on this point. *Id.* at 11 (4) & 13 (6) n.5 (citing Off. U.S. Surgeon Gen., *Confronting Health Misinformation: The U.S. Surgeon General's Advisory on Building a Healthy Information Environment* (July 15, 2021), https://hhs.gov.sites.default.files.surgeon.general-misinformation-advisory.pdf).

632

**RESPONSE:** Undisputed, but note that of the 62 sources cited in the Surgeon General's Advisory, it cites to the Virality Project's research only once. Waldo Ex. 11 at 22. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1250.  "Over the course of its seven months of work, the Virality Project observed narratives that questioned the safety, distribution, and effectiveness of the vaccines." *Id.* at 11 (4).

**RESPONSE:** Undisputed.

1251.  Like the EIP, the VP states that "[t]he enormity of the challenge demands a *whole-of-society response*," *id.* at 12 (5) (emphasis added), and calls for more federal agencies to be involved through "cross-agency collaboration," *id.* The Surgeon General adopted and echoed the VP's call for a "whole-of-society" response.

**RESPONSE:** Disputed in part because it mischaracterizes the record. The Virality Project report did not call for "more government agencies to be involved." In fact, the Virality Project recommended that, "[m]oving forward, there is a need for a *non-governmental* independent research entity to spearhead VP-style collaboration around emerging mis- and disinformation." Scully Ex. 2 at 12(5) (emphasis added). In addition, Plaintiffs' claim that the Surgeon General adopted the Virality Project's recommendation for a "whole-of-society" approach has the timing backwards, as the Virality Project's 2022 report post-dates the Surgeon General's Health Advisory. *See* Waldo Ex. 11 at 1 (Surgeon General's Health Advisory, dated 2021); Scully Ex. 2 at 2 (Virality Project report dated 2022). Regardless, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals."  Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

633

1252.   The VP admits that "it was not always clear what *was* misinformation; in the case of the novel coronavirus, it was often simply not yet clear what was true or where scientific consensus lay," *id.* at 14 (7), and that "[g]round truth about COVID-19 was rapidly evolving, and even institutional experts were not always aligned on the facts," *id.* at 15 (8).

**RESPONSE:** Undisputed, except Plaintiffs' cut off the second of the two sentences they cite, thereby taking the sentence out of context. The remainder of the cited sentence stated that "however, communicating the most accurate information possible was critically important because of the potential significant impact on individual and community health." Scully Ex. 2 at 15(8).

1253.   According to the VP, "[v]iral posts that claimed to have the answers to the public's most pressing questions appeared online; fact-checkers struggled to evaluate them, and platforms wrestled with whether to leave them up or take them down. Social media influencers of varying backgrounds debated the merits and efficacy of masking, providing detailed breakdowns of their analyses in public posts." *Id.*

**RESPONSE:** Undisputed.

1254.   The VP attributes opposition to mask mandates and lockdowns to right-wing political ideology: "In the months before vaccines or treatments emerged, governments worldwide turned to preventative measures such as masking requirements and lockdowns. In the US, these measures were quickly framed as affronts to liberty by facets of the US right-wing political spectrum, turning individual responses to the virus into a function of political identity." *Id.*

**RESPONSE:** Undisputed.

1255.   The VP suggests that it flagged for censorship COVID-related posts with enormous engagement on social media, reporting for example that "[b]efore the major social media platforms began to take down [one] video—which was in violation of their COVID-19 misinformation policies—[it] amassed tens of millions of views and was shared into a wide variety of communities." *Id.* at 16 (9).

**RESPONSE:** Disputed because this PFOF mischaracterizes the record. The Virality Project report does not state that it "flagged for censorship" or took any action regarding the video described in the report. Rather, the report simply conveys the fact that "major social media platforms" took down the video. Scully Ex. 2 at 16(9).

1256.   The speech that the VP decries is all quintessential First Amendment–protected speech. *See, e.g., id.* ("Several prominent anti-vaccine activists began to post regularly about COVID-19; their followings began to increase, despite prior platform efforts to reduce the spread

of false and misleading claims from anti-vaccine figures. As the possibility of a vaccine became more of a reality as 2020 progressed, anti-vaccine activists focused on preemptively undermining uptake. Several of the vaccines in development used relatively novel mRNA technology, which afforded an opportunity to present them as untested, unsafe, rushed, or risky, even to audiences who had taken all previously recommended vaccines.").

**RESPONSE:**  Plaintiffs' proposed finding is legal argument rather than a statement of fact. Defendants address Plaintiffs' legal arguments in its opposition to Plaintiffs' preliminary injunction motion.

1257.  "It was against this backdrop" of widespread First Amendment–protected speech on social media "that the Virality Project (VP) came together. A collection of research institutions had previously collaborated through the Election Integrity Partnership (EIP) to identify and understand the spread of election mis- and disinformation in the US during the 2020 presidential campaign. In December 2020, these partners jointly observed that the same tactics used to great effect during the 2020 election were already in use to expand the spread of COVID-19 vaccine mis- and disinformation." *Id.*. The VP used the same tactics as the EIP to engage in "rapid response" to misinformation: "The Project's broad array of institutions enabled information sharing and *rapid response* when false and misleading information percolated across social platforms." *Id.* (emphasis added).

**RESPONSE:**  Undisputed except the attempt for Plaintiffs' characterization of the Virality Project using the "same tactics as the EIP," which is not supported by the cited evidence or the record as a whole.

1258.  The VP was overtly biased against "anti-vaccine" viewpoints from the beginning: "The Project's original framing document articulated the threat: **A surge of anti-vaccine disinformation will pose significant challenges to the rollout and public adoption of COVID-19 vaccines in the United States**." *Id.* (bold in original).

**RESPONSE:**  Undisputed except for the characterization of the Virality Project as being "overtly biased" against "anti-vaccine" viewpoints, which is not supported by the cited evidence or the record as a whole.

1259.  Just like the EIP, the VP boasts that it is a "multistakeholder collaboration" that includes "government entities" among its key stakeholders: "The Virality Project adopted *a multistakeholder collaboration with civil society organizations, social media platforms, and government entities* to respond to mis and disinformation around the novel vaccines." *Id.* at 17 (10) (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1260.   "The research institutions that comprised the Election Integrity Partnership—the Stanford Internet Observatory, the University of Washington's Center for an Informed Public, the Atlantic Council's Digital Forensic Research Lab, and Graphika—along with new partners the National Conference on Citizenship (NCoC)'s Algorithmic Transparency Institute and New York University's Center for Social Media and Politics and Tandon School of Engineering—all elected to participate in this new initiative: the Virality Project." *Id.*

**RESPONSE:** Undisputed.

1261.   The VP report complains that "the internet has no editorial gatekeepers." *Id.* at 18 (11).

**RESPONSE:** Undisputed, except for the characterization of the VP's observation as a complaint, which is unsupported by the cited evidence or the record as a whole.

1262.   The VP decries the influence of "social media influencers" such as "Doctors" and "Mommy Bloggers." *Id.* at 19 (12).

**RESPONSE:** Undisputed, except for Plaintiffs' characterization of the VP's observation as "decry[ing]" certain parties' "influence." In addition, Plaintiffs omit material context. The Virality Project report states that scholars have "documented the unique actors and tactical mechanisms by which anti-vaccine activists have expanded their activities on social media specifically," and that "[t]heir mechanisms rely on a set of social media influencers" that a scholar "divided into five distinct groups," including: "The Doctors, The Celebrity, The Organizers, The 'Mommy Bloggers,' and The Opportunists." Scully Ex. 2 at 19 (12).

1263.   According to the VP, "[t]hese influencers have adopted the best practices of communication in the internet age, and their effectiveness in drawing in online users is made evident by the mass followings they have acquired across social media sites: platforms as varied as Pinterest, Instagram, and YouTube…" *Id.*

**RESPONSE:** Undisputed.

1264.   The VP targets misinformation "tactics" that involve speech that the VP does not contend is false or even falsifiable. It states that speakers "use tactics that have persisted over time, many of which have been used in service of spreading mis- and disinformation in contexts beyond the vaccine conversation; for example, the Election Integrity Partnership observed several of these tactics during the lead-up to the 2020 US election." *Id.*

**RESPONSE:** Undisputed that the VP report contains the quoted language. Dispute Plaintiffs' insinuation that the Virality Project "targets" for censorship "speech that the VP does not contend is false or even falsifiable" as a characterization unsupported by the cited evidence or the record as a whole.

1265.   These "tactics" include such things as "**Hard-to-Verify Content:** Using content that is difficult to fact-check or verify, such as personal anecdotes"; "**Alleged Authoritative Sources:** Using or pointing to information from an alleged public health official, doctor, or other authoritative source"; "**Organized Outrage:** Creating events or in-person gatherings, or using or co-opting hashtags"; and "**Sensationalized/Misleading Headlines:** Using exaggerated, attention-grabbing, or emotionally charged headlines or click-bait." *Id.* (bold in original). Notably, none of these "tactics" involves false speech, and all are protected by the First Amendment.

**RESPONSE:** Undisputed, except as follows. First, Plaintiffs do not provide the full definition of "Hard-to-Verify Content," which includes "deep fakes, content discussing information from a 'friend-of-a-friend,' or opaque scientific information or analysis (either original or doctored in a misleading way." Waldo Ex, 2 at 19 (12). The last sentence is legal argument rather than a statement of fact. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion.

### E.   The Virality Project Targets Plaintiff Jill Hines and Health-Freedom Groups.

1266.   According to the VP report's taxonomy, Plaintiff Jill Hines, the founder of Health Freedom Louisiana, constitutes a "medical freedom influencer[]" who engages in the "tactic" of "**Organized Outrage**" simply because she "create[ed] events or in-person gatherings" to oppose mask and vaccine mandates in Louisiana. *See id.* at 9, 19 (2, 12) (bold in original). But this "tactic" is First Amendment–protected activity.

**RESPONSE:** Disputed. The Virality Project report does not mention either Ms. Hines or Health Freedom Louisiana. If Plaintiffs contend that the Virality Project's general description of

individuals who engage in the tactics of "Organized Outrage" encompasses the conduct of Ms. Hines or Health Freedom Louisiana, this is argument and a characterization of the facts lacking evidentiary support. In addition, the second sentence states a conclusion of law rather than a fact. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for preliminary injunction.

1267.   Another "tactic" decried by the VP is "**Group super-spreader:** An individual account sharing posts into multiple online groups."  Id. at 20 (13) (bold in original). This is also quintessential First Amendment expression.

**RESPONSE:** The first sentence is undisputed except Plaintiffs' characterization that the VP report "decrie[s]" the referenced tactic. That characterization is unsupported by the cited evidence or the record as a whole. The second sentence states a conclusion of law rather than a fact. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for preliminary injunction.

1268.   The VP report repeatedly emphasizes the problem of "health freedom" or "medical freedom influencers" like Plaintiff Jill Hines. It identifies "Liberty" as a "trope" of social-media disinformation: "*Liberty*: Individuals have the right to '**health freedom**'; no government or employer should be able to tell people what to put in their bodies." *Id.* (italics in original) (bold added).

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF omits context, as the description of "health freedom" is made in the context of a discussion of a 2017 article identifying the types of claims made by the "anti-vaccine movement." Waldo Ex. 28 at 20(13).

1269.   The VP also identifies political and religious opinions—including well-established and widespread views—as "themes" and "tropes" of anti-vaccine "misinformation," such as: "*Distrust of industry*: Vaccines are produced by profit-motivated pharmaceutical companies that have repeatedly concealed harm in pursuit of profit"; "*Religiosity*: Vaccines contain materials that are objectionable on religious grounds"; and "*Conspiracy*: … Governments have covered up information proving vaccines are dangerous, [and] Doctors and politicians who advocate for vaccines have been bought off by 'Big Pharma.'"  *Id.*

**RESPONSE:** Undisputed to the extent that Plaintiffs' PFOF quotes from the VP report. Dispute Plaintiffs' characterizations of the quoted themes as "well-established and widespread views" as unsupported by the cited evidence or the record as a whole. Also note that whether those views are "well-established" or "widespread" is immaterial to this case.

1270.  Like the EIP, the VP agrees that government pressure pushes social-media platforms to adopt more aggressive censorship policies: "Platforms had started adapting their policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and *government inquiries*…" *Id.* at 21 (14) (emphasis added).

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF characterizes the report's reference to "government inquiries" as "government pressure [that] pushes social-media platforms to adopt more aggressive censorship policies." That characterization is unsupported by the cited evidence or the record as a whole. Plaintiffs also selectively quote the Virality Project report. The complete sentence Plaintiffs quote from is as follows: "Platforms had started adapting their policies to address vaccine misinformation in early 2019, spurred by public outcry, negative press coverage, and government inquires *resulting from measles outbreaks across the world*." Waldo Ex. 28 at 21(14) (emphasis added).

1271.   The VP boasts that its "analysts had to develop a nuanced and nimble understanding of what content constituted policy violations"—evidently because it was flagging content to platforms for censorship in real time. *Id.* at 21-22 (14-15).

**RESPONSE:** Disputed to the extent Plaintiffs assert that the Virality Project "evidently" "was flagging content to platforms for censorship in real time." That assertion is unsupported by the cited evidence or the record as a whole. Rather, than "attempting to censor speech, the VP's goal was to share its analysis of social media trends so that social media platforms and public health officials were prepared to respond to widely shared narratives." Ex. 74 at 3-4. "Decisions to remove or flag tweets were made by Twitter." *Id.* at 4.

1272.   The VP extensively monitored and tracked Americans' speech about COVID-19 and vaccines on social media: "To surface in-scope content, VP's team of analysts were divided into topical detection teams, referred to as pods…. These pods … enabled analysts to develop and ensure sustained familiarity with how the COVID-19 vaccine conversation was evolving within particular communities on public platforms." *Id.* at 22 (15).

**RESPONSE:** Dispute Plaintiffs' characterization that the "VP extensively monitored and tracked Americans' speech about COVID-19 and vaccines on social media." That assertion is unsupported by the cited evidence or the record as a whole.

1273.   This monitoring involved VP analysts reading and searching Americans' social-media accounts in real time: "Analysts in each pod assessed emerging narratives that were within scope … , surfacing content both via qualitative observation of the pages and accounts, and by using lists of common terms associated with vaccine hesitancy and long-standing anti-vaccine rhetoric." *Id.*

**RESPONSE:** Dispute Plaintiffs' characterization that VP analysts were reading and searching Americans' (public-facing) social-media accounts "in real time." That assertion is unsupported by the evidence cited or the record as a whole.

1274.   The VP states that "Anti-vaccine activists and influencers, including those discussed in the Center for Countering Digital Hate's 'Disinformation Dozen' Report … surfaced the greatest amount of content …" *Id.* at 23 (16).

**RESPONSE:** Undisputed.

1275.   This covert monitoring of Americans' online speech about vaccine was extensive, sophisticated, and adaptive: "At the beginning of the project, analysts used broad search terms ("vaccine," "jab") to surface relevant content and incidents (specific events or stories), but gradually began to incorporate a combination of machine learning and hand coding to identify additional recurring narratives relevant to the four in-scope categories. This included terms related to medical freedom under "Vaccine Distribution," or severe adverse effects and death under "Vaccine Safety," among others. As narratives and new keywords emerged throughout the analysis period, analysts continually refined their searches." *Id.*

**RESPONSE:** Dispute Plaintiffs' characterization of searches that VP analysts conducted of public-facing social-media accounts as "covert monitoring of . . . speech." That characterization is unsupported by the cited evidence or the record as a whole.

1276.   This mass-social-media-surveillance project included federal agencies as key "stakeholders": "The Virality Project established a nonpartisan, multi-stakeholder model consisting of health sector leaders, federal health agencies, state and local public health officials, social media platforms, and civil society organizations. These stakeholders provided tips, feedback, and requests to assess specific incidents and narratives, and each entity type brought specific expertise to bear on understanding COVID-19 vaccine hesitancy." *Id.* at 24 (17).

**RESPONSE:** Dispute Plaintiffs' insinuation that the Virality Project conducted or that federal agencies participated in a "mass-social-media-surveillance project." That characterization is unsupported by the cited evidence or the record as a whole. In addition, the Office of the Surgeon General never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media. Lesko Decl. ¶ 16 (Ex. 63). Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1277.   Thus, the VP's "multi-stakeholder model" included government agencies and officials, including "federal health agencies" and "state and local public health officials," working alongside "social media platforms" to combat vaccine-related "misinformation." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' PFOF Defs.' Arg. § II.B.4.e.ii.

1278.   The government "stakeholders" such as "federal health agencies" and "state and local public health officials" were among those who "provided tips" and "requests to assess specific incidents and narratives," *i.e.*, flagging content for social-media censorship. *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." The Office of the Surgeon General never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media. Lesko

Decl. ¶ 16 (Ex. 63). Any assertion to that effect is unsupported by and contrary to the evidence as

a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1279.   The VP emphasizes the role of "Federal government agencies" in the VP, including the CDC and the Office of Surgeon General: "**Federal government agencies** served as coordinators for national efforts. The Virality Project built strong ties with several federal government agencies, most notably the Office of the Surgeon General (OSG) and the CDC, to facilitate bidirectional situational awareness around emerging narratives. The CDC's biweekly "COVID-19 State of Vaccine Confidence Insights" reports provided visibility into widespread anti-vaccine and vaccine hesitancy narratives observed by other research efforts." *Id.* (bold in original).

**RESPONSE:** Undisputed that the PFOF accurately quotes portions of the Virality Project

report. However, this PFOF contains no evidence that Defendants worked or collaborated with the

Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and

contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1280.   Social media platforms served as stakeholders alongside federal and state officials: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—*acknowledging content flagged for review and acting on it in accordance with their policies*. On occasion, platforms also provided information on the reach of *narratives previously flagged by VP*, which provided a feedback loop leveraged to inform the Project's understanding of policies and ongoing research." *Id.* at 25 (18) (bold in original) (italics added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants

worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1281.   Thus, the VP openly proclaims that it "flagged" "content … for review" to platforms to "act[] on it in accordance with their policies." *Id.* Government officials provided "tips" to the VP about misinformation on social media, and the VP flagged it for platforms for censorship.

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that

Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg.

§ II.B.4.e.ii.

1282.   The VP emphasizes the importance of federal officials and social-media platforms in its collaboration on censorship: "As the effort progressed, *input from these partners was crucial* in defining the VP's output formats and in surfacing where the impacts of vaccine mis- and disinformation were being felt offline." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' PFOF is intended to suggest that

Defendants worked with the Virality Project "in [a] collaboration on censorship." Any assertion

to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. §

II.B.4.e.ii.

1283.   The VP engaged in continuous, ongoing communication with federal officials, platforms, and other stakeholders: "The Virality Project delivered 31 weekly briefings focused on increasing situational awareness and enabling the stakeholders working on countering vaccine mis- and disinformation to develop the most effective possible response." *Id.*

**RESPONSE:** Disputed that the Virality Project was "engaged in continuous, ongoing

communication with federal officials." That assertion is unsupported by the cited evidence or the

record as a whole. In addition, this PFOF contains no evidence that Defendants worked or

collaborated with the Virality Project to achieve "censorship goals."  Any assertion to that effect

is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1284.   The VP boasts that it "provided strategic insights" to federal officials in combating misinformation: "Briefings directly informed counter-messaging efforts by public health stakeholders … and public health officials (for example, the CDPH), and *provided strategic insights to government entities such as the OSG, CDC, and the Department of Health and Human Services*." *Id.* (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants

worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1285.   Further, the "Stanford Internet Observatory and the Virality Project also hosted Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the rollout of the Surgeon General's advisory on health misinformation." *Id.* at 27 (20).

**RESPONSE:** Disputed to the extent the Office of the Surgeon General did not understand the seminar to be a Virality Project event rather than an event hosted by the Stanford Internet Observatory. Lesko Decl. ¶ 15 (Ex. 63). Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1286.   Like the EIP, the VP used "tickets" to track social-media narratives, where each "ticket" could encompass many postings: "As part of the Virality Project, analysts created tickets documenting URLs of in-scope content. In total, 911 tickets were created, tracking both specific pieces of misinformation and broader narratives. At the end of the monitoring period, analysts had created 845 tickets tracking specific vaccine misinformation incidents (events or pieces of content) and 66 tickets tracking broad narratives." *Id.* at 34 (27).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1287.   The VP aimed, not just to track, but to "respond to" misinformation: "The Virality Project operated with a team of analysts drawn from across the partner organizations. Workflows were designed to detect, analyze, and *respond to* incidents of COVID-19 vaccine-related disinformation in online ecosystems." *Id.* (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1288.   "From February to August 2021, VP analysts *systematically monitored activity across social media platforms* to document emerging narratives and trends in public discourse while also tracking the popularity and spread of older content." *Id.* (emphasis added).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1289.   "The [VP] used the Jira Service Desk software to log mis- and disinformation incidents that were determined to be in scope for specific areas of the public COVID-19-related conversation. For each single incident of anti-vaccine mis- or disinformation surfaced during monitoring, an analyst filed a ticket that provided a brief description of the incident, including engagement numbers at the time of creation and links to relevant social media posts." *Id.* at 35 (28).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1290.   The VP boasts that it targeted online speech for censorship before it could go viral, thus imposing massive prior restraints on the amplification of targeted content: "Tickets also enabled analysts to quickly tag platform or health sector partners to ensure their situational awareness of high-engagement material that appeared to be going viral, so that *these partners could determine whether something might merit a rapid public or on-platform response* (such as a label)." *Id.* at 37 (30) (emphasis added).

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Plaintiffs' reference to "prior restraints" constitutes a legal conclusion rather than a factual statement. Defendants respond to Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1291.   The VP reported the content in 174 "tickets" to social-media platforms for censorship: "Managers gave all incident analyses a final review for quality-control purposes, to determine appropriate next steps and to make a final decision about whether tickets should be shared with external stakeholders. *Of the 911 incidents monitored, 174 were referred to platforms for potential action*." *Id.* (emphasis added).

**RESPONSE:** Dispute Plaintiffs' characterization of the purpose of the Virality Project's reporting as "censorship" rather than the application of social-media companies' own content-moderation policies, to which all users agree. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1292.   Like the EIP, the VP appears to have had direct access to Twitter's and YouTube's internal data about speech spreading on its platform, but not Facebook's: "The engagement data or video view data for links associated with each ticket was collected differently depending on the social media platform in question: Facebook and Instagram: CrowdTangle API; Twitter: Twitter API…" *Id.* at 38 (31).

**RESPONSE:** Disputed. Plaintiff's assertion that the Virality Project had "direct access to Twitter's and YouTube's internal data" is unsupported by the evidence cited. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1293.   Like the Surgeon General and the White House, the VP complains that the platforms must make their internal data more available to VP: "Due to limited transparency from social media platforms, engagement is the closest proxy researchers can use to understand what content users are seeing on social media platforms. Metrics such as impression counts are generally unavailable to outside researchers." *Id.*

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Plaintiffs' characterization of that observation as a "complaint" is unsupported by the cited evidence. In addition, the quoted portion of the Virality Project report does not reflect that the Virality Project "complain[ed]" that social media platforms should make their internal data available to the Virality Project, as opposed to researchers in general. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve

"censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1294.   The VP's monitoring tracked content with about 6.7 million engagements on social media per week, or over 200 million over the seven months of the reported project: "Average weekly engagement with content tracked across all Virality Project tickets was 6.7 million." *Id.* at 39 (32).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1295.   The vast majority of speech flagged and tracked by the VP was not false or incorrect speech: "The most commonly employed tactics were Hard-to-Verify Content and Alleged Authoritative Source." *Id.* at 41 (34); *see also id.* at 42 (35) fig.2.6 (showing predominance of these two "tactics").

**RESPONSE:** Disputed as unsupported by the cited evidence. The labels given to the referenced tactics, "Hard-to Verify Content and Alleged Authoritative Source," say nothing about the truth or falsity of the speech in those categories, which in any event is immaterial to this case. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1296.   According to the VP, "[o]f the engagement captured by tickets, more than a third came from content primarily spread by accounts that demonstrated recurring success making content go viral; we refer to them here as 'recurring actors.'" *Id.* at 41 (34).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1297.   The VP boasts that it induced "platform action" against such "recurring actors" in 2021: "Recurring actors drove a majority of engagement in the first half of the study period, but fell off in importance after that, most likely due to platform action against certain users beginning in the late spring of 2021." *Id.* at 43 (36).

**RESPONSE:** Disputed. The quoted statement does not state or support the assertion that the Virality Project "induced" the referenced "platform action."  Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1298.  Like Jennifer Psaki at the White House, the VP repeatedly cites the Center for Countering Digital Hate's report on the "Disinformation Dozen."  *Id.* at 23 & 32 n.43, 43 & 48 n.7, 111 & 129 n.179.[9]

**RESPONSE:**  Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1299.  "Four distinct weeks during the monitoring period had incidents observed by Virality Project analysts that generated more than 10 million engagements."  *Id.* at 43 (36).

**RESPONSE:**  Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1300.   One of these "Viral Incidents" tracked by the VP was: "In July, posts went viral expressing outrage at attempts by the Biden administration to engage in vaccine outreach."  *Id.* at 45 (38). This incident did not involve any vaccine-related misinformation at all, but core political speech: "the Biden administration used the phrase 'door-to-door' to describe a push for on-the-ground community-led efforts to persuade more Americans to get vaccinated. Prominent Republican politicians miscast this as a forced vaccination campaign by 'Needle Nazis' and a prelude to the government knocking on the door to take away guns." *Id.* at 46 (39).

**RESPONSE:** Undisputed that the Virality Project report contained the quoted statements. Plaintiffs' assertion that the referenced posts "did not involve any vaccine-related misinformation at all" is unsupported by the cited evidence; the posts in question are not before the Court. In

---

[9] Report pages 16 & 25 n.43, 36 & 41 n.7, 104 & 122 n.179.

addition, Plaintiffs' reference to "core political speech" constitutes a legal conclusion rather than a factual statement. Defendants respond to Plaintiffs' legal arguments in their opposition to Plaintiffs' preliminary injunction motion. This PFOF, concerning certain posts that the Virality Project "tracked," contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals."  Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1301.  The VP boasts that censorship enforcement was effective, especially in "deplatforming" key actors: "The decline of content from recurring actors midway through the monitoring period potentially reflects a policy impact, as deplatforming these actors led to an apparent reduction in false or misleading content."  *Id.* at 47 (40).

**RESPONSE:** Disputed that the Virality Project's initiative constituted "censorship enforcement." In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1302.  The VP tracked and flagged "Claims that [supposedly] misrepresent … vaccine mandates," not just misinformation about the vaccines. *Id.* at 50 (43).

**RESPONSE:** Disputed. The record reflects only that the Virality Project "followed" claims in this category, not that it "flagged" any of them. Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1303.  According to the VP, "content" that "leveraged decontextualized statistics from the US Department of Health and Human Services' Vaccine Adverse Event Reporting System (VAERS) database" is misinformation. *Id.* at 51 (44).

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in

vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1304.   According to VP, it was also misinformation when true adverse health events from vaccines were "shared absent context": "Rare incidents documenting verified adverse health events, including blood clotting and heart inflammation, were shared absent context, often in an effort to present them as common and significant risks."  *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1305.   According to the VP, discussing "breakthrough" cases and "natural immunity" was also misinformation: "False and misleading narratives related to efficacy sought to undermine the perceived benefits of vaccines. These narratives included stories of people diagnosed with COVID-19 after being vaccinated—"breakthrough" cases, particularly in the time of the Delta variant—to promote the idea that the vaccines aren't effective. Later, the idea that natural immunity from infection is superior to immunity from vaccination became a political talking point raised repeatedly by right-leaning political influencers, despite inconclusive scientific evidence." *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1306.   According to VP, misinformation also included "discussions of vaccine passports and mandates (including months before any state or federal officials began advocating for them)." *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1307.   The VP also counts as misinformation "claims that the government was headed toward mandating an unsafe vaccine." *Id.* The government did, of course, eventually mandate the vaccines for most Americans.

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, the second sentence lacks evidentiary support. Nor do Plaintiffs cite evidence to support any suggestion that vaccines mandated by the Government were "unsafe." In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1308.   The VP also treated Americans' "long-standing mistrust of pharmaceutical companies' profit motives" as part of anti-vaccine misinformation. *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality

Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1309.  "Conspiracy Theories" that "assign blame to … government" are also misinformation to be tracked and censored, according to VP. *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1310.  According to VP, "personal anecdotes" about "vaccine injuries and severe side effects—ranging from rashes, to blood clots, to death" are also misinformation."  *Id.* at 52 (45).

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1311.  "Personal anecdotes often made their way into mainstream media coverage after gaining traction online. Distortions of official government statistics—most often from VAERS, described in more depth later in this section—were used both to reinforce the personal anecdotes and for focused misinformation solely discussing the statistics."  *Id.*

**RESPONSE:** Undisputed.

1312.  According to VP, "652trip[ing] both individual stories and official statistics of important context" is misinformation. *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as part of a category "of narratives that have remained prevalent in vaccine hesitancy conversations over a long period of time[.]" Waldo Ex. 28 at 50-51 (43-44). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1313.   According to VP, "adverse event stories" were objectionable because they were "employed to push back against vaccine mandates."  *Id.* at 52-53 (45-46).

**RESPONSE:** Disputed to the extent the PFOF mischaracterizes the VP report as labeling "adverse event stories" as "objectionable." The cited evidence does not support that characterization. Rather, as reflected in the cited report, "individual accounts of adverse events" was one of the "case studies" that "illustrate how persistent narratives that predated COVID-19 vaccines were adapted to the pandemic response, and demonstrates how they formed, spread, and were framed both online and offline." Scully Ex. 2 at 52-53 (45-46). In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1314.   Like the White House and Dr. Fauci, the VP treats Alex Berenson as a major malefactor in spreading COVID-19 vaccine "misinformation."  *See id.* at 54, 57 (47, 50).

**RESPONSE:** Disputed. Plaintiffs' PFOF is not supported by the cited report. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1315.   Like the White House and Rob Flaherty, the VP flagged and tracked Fox News host Tucker Carlson as a spreader of vaccine misinformation: "*In May 2021, Tucker Carlson*

*misrepresented VAERS data on his talk show*, decontextualizing it while claiming that 3,362 Americans had died following COVID-19 vaccinations between December 2020 and April 2021, equating to roughly 30 people every day." *Id.* at 57 (50) (emphasis added).

**RESPONSE:** Disputed. The assertion that the White House, Mr. Flaherty, or the Virality Project "flagged and tracked" Mr. Carlson "as a spreader of vaccine misinformation" is unsupported by the cited statement or by the record as a whole. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See See* Defs.' Arg. § II.B.4.e.ii.

1316.   Health Freedom groups, like Plaintiff Jill Hines's group Health Freedom Louisiana, are particular targets of the VP's tracking and censorship activities.

**RESPONSE:** Disputed. Plaintiffs' PFOF lacks any evidentiary support.

1317.   The VP report includes an entire section on such groups: "Section 3.2.2 – Government Overreach and Medical Freedom Narratives." *Id.* at 59 (52).

**RESPONSE:** Undisputed, except to the extent Plaintiffs' PFOF suggests that the cited section discusses the work of Plaintiff Jill Hines' group Health Freedom Louisiana, which is not supported by the record.

1318.   According to the VP, "[o]ne of the primary long-standing themes of anti-vaccine distribution narratives is that mass vaccine distribution constitutes a government overreach. The movement sees vaccine mandates, including, historically, school vaccine requirements, as an assault on 'health freedom' or 'medical freedom.'" *Id.*

**RESPONSE:** Undisputed.

1319.   According to the VP, "[i]n 2020, following the emergence of COVID-19, these same health freedom groups expanded their vaccine protests to social distancing, masks, and other prevention measures." *Id.* This includes Plaintiff Jill Hines.

**RESPONSE:** Undisputed, except to the extent Plaintiffs' PFOF contends that Plaintiff Jill Hines was encompassed in this discussion, because that contention is not supported by the record.

1320.  The VP describes the role of Facebook groups—also employed by Jill Hines—in organizing health freedom groups to oppose vaccine mandates: "groups emerged on platforms such as Facebook during the pandemic, with names specifically related to COVID-19 or mRNA vaccines, to assist in discoverability; some grew their numbers into the tens of thousands." *Id.*

**RESPONSE:** Undisputed, except to the extent Plaintiffs' PFOF contends that Plaintiff Jill Hines was encompassed in this discussion, because that contention is not supported by the record.

1321.  The VP focused, not just on misinformation about vaccines, but political speech and political organizing against "vaccine passports and vaccine mandates": "During the VP's period of analysis, narratives about government overreach and medical freedom focused on two areas of controversy: vaccine passports and vaccine mandates." *Id.*

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as "one of the primary long-standing themes of anti-vaccine distribution narratives[.]" Waldo Ex. 28 at 59 (52). Disputed also because the quoted statement does not support the assertion that the Virality Project "focused" on "political speech and political organizing."

1322.  The VP treats as misinformation political speech and political opinions on these topics: "This amplification hinged upon misleading framing that suggested the implementation of any form of vaccine passport would be compulsory. In reality, the plans for many programs were entirely optional. Other framing from domestic right-leaning political actors created a portrait of governments as prying or snooping into citizens' private matters." *Id.* at (60) 53.

**RESPONSE:** Disputed because the Virality Project did not label this category as "misinformation," but rather as "one of the primary long-standing themes of anti-vaccine distribution narratives[.]" Waldo Ex. 28 at 59 (52). Also disputed because Plaintiffs' PFOF takes the quoted statement out of context because the "amplification" being referred to was "Russian state media outlet RT public[ing] these debates through a series of Facebook posts that called passports into question[.]" *Id.* at 59 (52). In addition, the quoted statement also does not support the assertion that the Virality Project treated "political speech and political opinions" as "misinformation."

1323.   The VP views virtually all conservative speech opposing government-imposed COVID mandates as misinformation: "Activists pushed the idea that through a passport system, governments and 'Big Tech' were limiting the public's freedoms—situating the conversation within a larger set of narratives surrounding pandemic public health regulations like mask mandates, lockdowns, and social distancing." *Id.*

**RESPONSE:** Disputed because Plaintiffs' assertion is unsupported by the quoted statement or the record as a whole.

1324.   Like the EIP, the VP specifically flagged Jim Hoft's *The Gateway Pundit* as a purveyor of misinformation and COVID "conspiracy theories: "Headlines sometimes hawked conspiracy theories: one Gateway Pundit headline, "The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport," was a nod to groups such as Qanon…. The article alleged collusion between Big Tech and Big Pharma that would threaten 'individual rights.'" *Id.* at 60-61 (53-54) & 68 (75) n.49 (citing Joe Hoft, *The Great Reset: Big Tech and Big Pharma Join Forces to Build Digital COVID Vaccination Passport*, Gateway Pundit (January 17, 2021), https://thegatewaypundit.com/great-reset-big-tech-big-pharma-joining-forces-build-digital-covid-vaccination-passport).

**RESPONSE:** Disputed. The quoted statement does not support the assertion that the Virality Project "specifically flagged" Mr. Hoft as a "purveyor of misinformation."

1325.   Other right-leaning speakers flagged by the VP include One America News Network, Breitbart News, and others. *Id.* at 60 (53).

**RESPONSE:** Disputed. The cited portion of the Virality Project report does not support the assertion that the Virality Project "flagged" messages by these speakers.

1326.   The VP attributes political successes such as state-level bans on vaccine passports to such supposed misinformation. *Id.* at 61 (54).

**RESPONSE:** Disputed. The cited portion of the Virality Project report does not support the assertion that the Virality Project attributed political success to "misinformation."

1327.   The VP attributes opposition to vaccine mandates by employers to such supposed misinformation: "The backlash to COVID-19 vaccine requirements for employment and other activities parallels the conversation about vaccine passports. It, too, relies on and attempts to exacerbate distrust in public health officials and government institutions." *Id.*

**RESPONSE:** Disputed to the extent that, as discussed above, the record does not support the assertion that the Virality Project characterized the referenced online "conversation[s]" as "misinformation."

1328.   According to VP, even truthful information about vaccine effects on health that are still being studied constitutes misinformation: "In early 2021, users on Twitter, Facebook, and Reddit reported unverified reproductive side effects, ranging from abnormal menstrual cycles to miscarriages and infertility. … At the time there was no medical consensus on the vaccine's effect on reproductive health, yet anti-vaccine activists presented the theory as fact and evidence of harm. Research is ongoing…." *Id.* at 66-67 (59-60).

**RESPONSE:** Disputed. The quoted statement does not support the assertion that the Virality Project described "truthful information about vaccine effects on health" as misinformation; nor does it support the assertion that the reports of "unverified reproductive side effects" were, in fact, accurate.

1329.   According to VP, even "videos that appeared to be created satirically" are misinformation when they "were taken seriously." *Id.* at 68 (61).

**RESPONSE:** Disputed to the extent this assertion mischaracterizes the cited report. The Virality Report stated: "The Magnet Challenge illustrates how novel online tactics like participatory online video 'challenges' [even when satirical] can be combined with ongoing anti-vaccine tropes about strange reactions and dangerous ingredients to successfully spread misinformation online." Waldo Ex. 28 at 68 (61).

1330.   Alex Berenson is mentioned 49 times in the Virality Project report. *Id.* at 54, 57, 71, 73, 96-97, 122-23, 188-90, 195, 207-08.[10]

**RESPONSE:** Undisputed.

1331.   "Health freedom" or "medical freedom" groups are discussed dozens of times in the VP report. The word "freedom" occurs 100 times, almost always in direct connection with a discussion of "health freedom" or "medical freedom" groups, influencers, or content. *See id.* at 6,

---

[10] Report pages 47, 50, 64, 66, 89-90, 115-16, 181-83, 188, 200-01.

9, 20, 23, 59-62, 66, 70, 74, 77, 82, 84-86, 93-96, 105, 117-18, 121-22, 130-31, 137-38, 141, 143, 187, 197-98, 201, 204, 210, 220-22.[11]

**RESPONSE:** Disputed to the extent the word "freedom" does not occur 100 times in the

Virality Report. Rather, it occurs 92 times, and it does not always occur in connection with a

discussion of "health freedom" or "medical freedom" groups.

1332.    The VP defines "Medical freedom influencers" as actors who "are averse to government interference in individuals' personal lives. While they explicitly advocate for "health freedom" or "vaccine choice," these actors often propagate vaccine doubt by contextualizing the choice with misleading claims of vaccines' adverse medical consequences." *Id.* at 82 (75).

**RESPONSE:** Undisputed.

1333.   Fox News host Tucker Carlson, who has wide audiences in Missouri and Louisiana, is cited 42 times in the Virality Project report. *See id.* at 57, 73, 87, 91-92, 98, 115, 119-20, 122-23, 193, 201, 208, 215-16, 218.[12]

**RESPONSE:** Disputed to the extent Plaintiffs cite to no record support for the alleged

breadth of former Fox News host Tucker Carlson's audiences in Missouri or Louisiana. In

addition, the Virality Project does not appear to cite to Tucker Carson 42 times in its report, but

rather 36 times.

1334.   In fact, the VP report cites the entire Fox News channel as a source of vaccine misinformation: "Fox News has played a particularly pivotal role in spreading vaccine misinformation and anti-vaccine beliefs during the COVID-19 pandemic…. [B]etween June 28 and July 11, 2021, Fox News ran 129 segments about the COVID-19 vaccine on its cable broadcast; more than half of those segments included unverified claims that undermined vaccination efforts." *Id.* at 91 (84).

**RESPONSE:** Undisputed.

1335.   According to VP, "Fox News television host Tucker Carlson has been one of the most prominent and sensationalist spreaders of false or misleading information about vaccines throughout the COVID-19 pandemic." *Id.*; *see also id.* at 91 (describing "Right-wing media

---

[11] Report pages iii, 2, 13, 16, 52-55, 59, 63, 67, 70, 75, 77-79, 86-89, 98, 110-11, 114-115, 123-24, 130-31, 134, 136, 180, 190-91, 194, 197, 203, 213-15.

[12] Report pages 50, 66, 80, 84-85, 91, 108, 112-13, 115-16, 186, 194, 201, 208-09, 211.

personality Tucker Carlson" as part of a "cast of recurring characters" that influenced vaccine hesitancy in Spanish- and Chinese-speaking communities).

**RESPONSE:** Undisputed.

1336.   The VP also cites Candace Owens and The Daily Wire as purveyors of vaccine misinformation. *See, e.g., id.* at 86, 92 (79, 85).

**RESPONSE:** Undisputed.

1337.   The VP cites Robert F. Kennedy, Jr., a well-known anti-vaccine activist with wide followings in Missouri and Louisiana, as one of the most influential purveyors of vaccine misinformation. *Id.* at 83 (76). The VP describes Kennedy as "especially pernicious" because he has a large audience: "RFK Jr.'s activism is especially pernicious because, like other long-standing influencers, he has a large and committed following and has become somewhat of a household name in the US." *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs' claim that Robert Kennedy, Jr. has "wide followings in Missouri and Louisiana" lacks record support.

1338.   The VP also cites America's Frontline Doctors and its founder, Dr. Simone Gold, as a source of vaccine misinformation. *Id.* at 87-88 (80-81).

**RESPONSE:** Undisputed.

1339.   The VP notes that "Simone Gold, a licensed emergency room physician, was the second most prominent PMI across Virality Project's tickets. Gold is the leader of America's Frontline Doctors…. Gold has been influential since the summer of 2020, when the White Coat Summit, an event broadcast online in which members of America's Frontline Doctors spoke on the steps of the Supreme Court. The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19." *Id.*

**RESPONSE:** Disputed to the extent that Plaintiffs fail to provide the full sentence quoted from the Virality Project report, which reads: "The White Coat Summit promoted hydroxychloroquine both as a preventative measure and as a cure for COVID-19; one speaker at the event, Dr. Stella Immanuel, had previously been best known for claiming that gynecological issues are caused by having sex with witches and demons." Waldo Ex. 28 at 88 (81). The Virality Project report further notes that Dr. Gold "persistently amplified false information about the 2020

election and voter fraud and was also arrested for participating in the January 6, 2021, storming of the U.S. Capitol." *Id.*

1340. The VP treats Dr. Joseph Mercola, another anti-vaccine speaker with wide audiences in Missouri and Louisiana, as a purveyor of vaccine misinformation. *Id.* at 87 (80). Again, the VP criticizes Mercola precisely because his speech reaches wide audiences. *Id.*

**RESPONSE:** Disputed to the extent Plaintiffs cite to no record support for the alleged breadth of Dr. Mercola's audiences in Missouri and Louisiana. Also disputed that the Virality Project report criticizes Dr. Mercola "because" of his audience size. That assertion is unsupported by the cited passages or the report as a whole, to which Defendants refer the Court for a complete and accurate statement of its contents.

1341. The VP asserts that Gold's "false and misleading claims about the COVID-19 vaccine" include core political speech like "encouraging her followers to boycott companies for their vaccine protocols" and "organizing a cross-country tour to fight back against 'censorship, chaos, and the undeniable slide towards communism that lurks beneath the tyrannical lockdowns for governmental 'public health' policy'." *Id.* at 88 (81). To the VP, political "organizing" to oppose vaccine mandates and lockdowns constitutes a "false and misleading claim[]." *Id.*

**RESPONSE:** Disputed. Dr. Gold's "false and misleading claims about COVID-19" that the Virality Project referred to in its report was not about "organizing" to oppose vaccine mandates, but the statement she made on Twitter in seeking to organize the boycott: "The founder of Shake Shack says his company will require proof of vaccination for both employees AND their customers. I encourage everyone to boycott this business. No corporation or government has a right to demand to see your private health documents." Scully Ex. 2 at 88 (81), 116, n.47 (109, n.47).

1342. The VP asserts that "the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." *Id.* at 91 (84).

**RESPONSE:** Disputed to the extent Plaintiffs mischaracterize the quoted statement. The statement, in full, states: "Yochai Benkler, co-director of the Berkman Klein Center for Internet

and Society, has joined other scholars in analyzing and documenting these dynamics, describing how the right-leaning media ecosystem differs from the rest of the media environment in ways that make it especially vulnerable to the spread of mis- and disinformation." Waldo Ex. 28 at 91 (84).

1343.   The VP states that "[t]he newest iteration of medical freedom, adapted for COVID-19, challenges the legitimacy of government or corporate vaccine mandates and public health interventions specific to COVID-19, including vaccine passport systems and masking requirements." *Id.* at 93 (86).

**RESPONSE:** Undisputed.

1344.   The VP states that "medical freedom" groups spread misinformation "across all 50 states": "Medical freedom influencers (MFIs) active in the anti-COVID-19-vaccine movement were fairly distinct from other categories of influencer in that rather than hinging on a handful of key (and often celebrity-status) individuals, they spread their narratives via a franchise model *across all 50 states*." *Id.* (emphasis added).

**RESPONSE:** Undisputed.

1345.   The VP indicates that it tracked and flagged "medical freedom" groups "at a messaging and organizing level," *i.e.*, the level where Jill Hines was targeted: "As medical freedom activists have fought requirements imposed by states, cities, or private employers, they have learned from each others' successes and failures—at a messaging and an organizing level—and have brought those lessons to their local communities. What one state does, another state will often echo." *Id.* at 94 (87).

**RESPONSE:** Dispute the assertion that the Virality Project "flagged" "medical freedom" groups" as unsupported by the quoted statement or the record as a whole. Also dispute the suggestion that the Virality Project "tracked" or "flagged" Plaintiff Jill Hines or her group as unsupported by the quoted statemen or the record as a whole. Defendants refer the Court to the Virality Project report for a full and accurate statement of its contents.

1346.   Like Andrew Mr. Slavitt, the VP treats Alex Berenson as one of the "most significant influencer[s]" who opposes vaccines: "Alex Berenson is perhaps the most significant influencer who defies categorization. A former New York Times reporter and a bestselling novelist with no specific anti-vaccine background …, Berenson … over time evolved into a key player in repeatedly spreading false and misleading information about the COVID-19 pandemic and vaccines. He underplayed the danger of the virus and challenged the efficacy of vaccines and masks, even as evidence supported their value as life-saving public health measures." *Id.* at 96 (89) (providing an image of Berenson's tweets).

**RESPONSE:** Undisputed, except to the extent that Plaintiffs cite no evidence, in the quoted statements or elsewhere, for the assertion that Mr. Slavitt "treats Alex Berenson as one of the 'most significant influencer[s]' who opposes vaccines."

1347.   The VP disfavors Berenson because he reaches wide audiences and criticizes the government: "Berenson's popular posts on Twitter notably claimed to be "digging up" or "uncovering" information that was hidden from the public about vaccine safety or effectiveness. In one incident in July 2021, Berenson amplified a conspiracy theory from a statement filed with a lawsuit from America's Frontline Doctors stating that the government was covering up more than 45,000 vaccine-related deaths. Berenson's 17-tweet thread, which received over 16,000 interactions on July 21, 2021, claimed that the CDC had "quietly more than DOUBLED" the number of deaths reported in VAERS, suggesting the CDC had misled the public." *Id.* at 96-97 (89-90).

**RESPONSE:** Undisputed, except Plaintiff's statement that "[t]he VP disfavors Berenson *because* he reaches wide audiences and criticizes the government" (emphasis added) is unsupported by the quoted statements or the record as a whole. Rather, the Virality Project expressed concerns about Mr. Berenson because he was "a key player in repeatedly spreading false and misleading information about the COVID-19 pandemic and vaccines." Waldo Ex. 28 at 96 (89).

1348.   The VP notes that Berenson had wide audiences nationwide when he was censored: "Twitter permanently deplatformed Berenson in August 2021 for repeated violations of Twitter's COVID-19 falsehoods policy. At the time he lost his account, he had more than 200,000 followers." *Id.* at 97 (90).

**RESPONSE:** Undisputed, except to the extent that Plaintiffs characterize Mr. Berenson's de-platforming as censorship rather than application of Twitter's terms of service, to which all users must agree.

1349.   The VP states that the government pushed for "accountability" from platforms in successfully pressuring them to adopt vaccine-related censorship policies in the years leading up to COVID-19: "During and after the [2018-19 measles] outbreaks, scientists and congressional leaders sought accountability from the platforms, inquiring about the extent to which vaccine hesitancy among impacted communities had been exacerbated by misinformation on their products." *Id.* at 131 (124).

**RESPONSE:** Undisputed that the Virality Project report contains the quoted statement. Dispute Plaintiffs' characterization of "inquir[ies]" by "congressional leaders" about measles vaccine hesitancy in 2018 and 2019 as "pressuring [social media companies] to adopt vaccine-related censorship policies." Plaintiffs' characterization is unsupported by the quoted statement.

1350.   The VP provides a timeline of policy changes becoming more restrictive of vaccine-related misinformation that shows repeated tightening of policies by Facebook, Twitter, and YouTube once President Biden had been elected. *Id.* at 133 (126) fig.5.1.

**RESPONSE:** Undisputed, except to the extent Plaintiffs mean to suggest that President Biden's election was responsible for social media companies' policy changes reflected in the referenced chart, which is unsupported by the record.

1351.   The VP calls for more aggressive censorship policies to target speech that is not false or incorrect and that constitutes core political speech: "While progress has been made since platforms first developed vaccine-related policies in 2019, clear gaps in platform policy exist with respect to moderating vaccine-related content, including posts that employ personalized stories, medical freedom claims, and misleading headlines and statistics." *Id.* at 143 (136).

**RESPONSE:** Undisputed that the quoted statement appears in the Virality Project report. However, dispute Plaintiffs' characterization of social media platforms' terms of service, to which all users must agree, as "censorship policies." Dispute the characterization of the report's observation about "gaps in platform policy" as a "call[ ] for more aggressive . . . policies" as unsupported by the quoted statement. Also dispute the assertion that the Virality Project sought "to target speech that is not false or incorrect and that constitutes core political speech," as unsupported by the quoted statement, any other statement in the report cited in Plaintiffs' PFOFs above, or the record as a whole.

1352.   The VP also calls for more aggressive action to "suppress content" and "deplatform accounts": "In addition, policies about the actions platforms can take to suppress content, promote trusted voices, and deplatform accounts vary widely from platform to platform and are still not enforced consistently, both within and across platforms." *Id.*

**RESPONSE:**  Undisputed, except that Plaintiffs' characterization of the report's observations about the variance in and inconsistent enforcement of platforms' terms of service as a "call[ ] for more aggressive action" is unsupported by the quoted statement or the report as a whole.

1353.   Just like the Surgeon General, the VP demands "more transparency" for "external researchers" (like those at the VP, working closely with government) to oversee the platforms' censorship efforts: "It should be noted that understanding the impact of platform policy is limited by what information is publicly available. It is crucial that platforms provide more transparency on each moderation approach and allow external researchers the ability to independently verify the success and impacts of these interventions." *Id.*

**RESPONSE:**  Undisputed that the Virality Project report contains the quoted statement. Dispute the assertions that the Surgeon General made "demands" of social media companies, that the Virality Project "work[ed] closely with [the] government," and that platforms' enforcement of their terms of service, to which all users must agree, constitute "censorship efforts," as unsupported by the quoted statement or any other in the Virality Project's report, or the record as a whole.

1354.   Like the Surgeon General, the VP argues that "a whole-of-society effort is needed" to stop the spread of so-called misinformation: "[A] whole-of-society effort is needed in which stakeholders build robust and persistent partnerships to ensure that significant high-harm claims can be addressed as they arise." *Id.* 147 (140).

**RESPONSE:**  Undisputed.

1355.  This "whole-of-society" effort includes an active role for the government in censoring disfavored speech: "The Virality Project sought to do just that by bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms. Our recommendations recognize the collective responsibility that all stakeholders have in mitigating the spread of mis- and disinformation…" *Id.*

**RESPONSE:**  Undisputed, except Plaintiffs' characterization of the Virality Project as advocating for the government to "censor[ ] disfavored speech" is unsupported by the record, as is any assertion that Defendants in fact did so. Moreover, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any

assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg.

§ II.B.4.e.ii.

1356.   According to the VP, "The Virality Project offers an early template for structuring interaction between research institutions and nonacademic stakeholders (including government entities, health practitioners, and private companies)." *Id.*

**RESPONSE:** Undisputed, but note that this PFOF contains no evidence that Defendants

worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to

that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1357.   According to the VP, it used "ingenuity" to facilitate "the *intake* of tips from … government partners": "An area that required ingenuity was creating a framework for facilitating the *intake* of tips from civil society and government partners…. However, their tips are often highly valuable, so overcoming this challenge is a priority for future efforts." *Id.* at 148 (141) (emphasis added).

**RESPONSE:** Disputed. Plaintiffs have mischaracterized the cited portion of the Virality

Project report. The "ingenuity" referred to in the report was "creating a framework for facilitating

the *intake* of tips," because "many civil society organizations are understaffed or unfamiliar with

workflows like task management or ticketing software." Waldo Ex. 28 at 148 (141). Moreover,

the Office of the Surgeon General never provided any tip, flag, ticket, report, or other form of

notification or input to the Virality Project concerning posts or accounts on social media. Lesko

Decl. ¶ 16 (Ex. 63). In addition, this PFOF contains no evidence that Defendants worked or

collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is

unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii

1358.   The VP recommends an even more "streamlined" process for "government partners" to provide "tips" of misinformation to be reported for censorship, and it notes that it received tips through "informal exchanges, such as Zoom meetings or calls with our partners": "Streamline tip line processes for civil society and government partners. Set up an efficient channel for intaking external tips…. The Virality Project often had to leverage informal exchanges, such as Zoom meetings or calls with our partners, to receive the tips verbally or encourage additional reporting. In future projects, external reporting channels should be strengthened via an easier

means of reporting and increased access to the reporting channels, especially for partners on the ground (such as health practitioners or government health officials)." *Id.*

**RESPONSE:** Undisputed, except that Plaintiffs' characterization of the Virality Project as recommending "censorship" is unsupported by the cited statement or the record as a whole. In addition, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1359.   The VP repeatedly cites the work of Surgeon General Murthy, noting that "[d]uring a July 15, 2021, panel with the Virality Project, US Surgeon General Vivek Murthy discussed the importance of vaccination by sharing his own story about COVID-19 … alongside data around the effectiveness of the vaccines." *Id.* at 149 (142). "In the context of vaccine misinformation specifically, some examples of engagement best practices can be found in the Virality Project's July 15, 2021, hosted discussion with Surgeon General Vivek Murthy…" *Id.* at 150 (143).

**RESPONSE:** Disputed to the extent that the Office of Surgeon General did not understand the July 2021 panel to be a Virality Project event; rather, it understood that the event was hosted by the Stanford Internet Observatory. Lesko Decl. ¶ 15 (Ex. 63).

1360.   According to VP, "While the federal government (through DHHS, the CDC, and the Surgeon General) has ramped up its engagement and communications, more can be done moving forward. There are several areas where government officials can focus to improve their ongoing response to mis- and disinformation surrounding the COVID-19 vaccines." Id. at 149-50 (142-43).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1361.   These include "real-time response" to misinformation on the model provided by CIS and the EI-ISAC for election speech: "Federal, state, and local government officials should coordinate real-time response to emerging mis- and disinformation. … For example, as voting-related mis- and disinformation arose in the 2020 presidential election, the Election Infrastructure Information Sharing and Analysis Center (EI-ISAC) served a critical role in sharing information with the Election Integrity Partnership and pushing its rapid response analysis back out to election stakeholders across all states… Moving forward, the government should support the establishment of such an information-sharing mechanism." *Id.* at 150 (143).

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1362.   The VP recommends that the federal government "[i]mplement a Misinformation and Disinformation Center of Excellence (CoE) housed within the federal government," which "would centralize expertise on mis- and disinformation within the federal government at the Cybersecurity & Infrastructure Security Agency (CISA) with its existing mis- and disinformation team," *i.e.*, Brian Scully's group. *Id.*

**RESPONSE:** Undisputed. However, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1363.   The VP's "Recommendations to Platforms" reflect near-verbatim language used by the Surgeon General's Health Advisory: "Consistently enforce policies against recurrent actors. … While many platforms have improved transparency around content moderation, there is still inconsistent enforcement of policies, notably in the case of recurring actors. More consistency and transparency is needed around enforcement practices, particularly when prominent or verified accounts are involved. While past policy environments have been slower to enforce policies against prominent accounts, these are the accounts with the greatest potential for impact. If anything, they may merit closer scrutiny." *Id.* at 152 (145).

**RESPONSE:** Undisputed, except Plaintiffs' statement that the Virality Project's "Recommendations to Platforms" reflects "near-verbatim" language used by the Surgeon General's Health Advisory is unsupported by the record. In any event, this PFOF contains no evidence that Defendants worked or collaborated with the Virality Project to achieve "censorship goals." Any assertion to that effect is unsupported by and contrary to the evidence as a whole. *See* Defs.' Arg. § II.B.4.e.ii.

1364.   Likewise, the VP recommends that platforms "[c]ontinue to prioritize and improve data sharing. The Virality Project's research would not have been possible without access to public platform data. For privacy reasons, some data understandably may be limited, but in general, establishing standardized guidelines about how platforms can share data with research institutions is needed." *Id.* at 153 (146).

**RESPONSE:**  Undisputed.

1365.  "Notably, engagement numbers are the closest proxy that researchers have to understand what content users see on social media platforms. However, engagement is not the same thing as impressions, or user views—how many times a piece of content is seen by users. Ideally, access to user impression data would be available, allowing researchers to directly measure when and how content is surfaced to users by social media platforms. Unfortunately, social media platforms often do not make impression data available to researchers; as a result of this chronic gap, assessing impact and reach, or the dynamics of platform curation, remains a significant challenge." *Id.*

**RESPONSE:** Undisputed that this PFOF accurately quotes a portion of the Virality Project report.

## X.   Federal Censorship Inflicts Grave, Imminent, and Ongoing Injuries on Plaintiffs.

1366.  The foregoing conduct has inflicted and continues to inflict ongoing and imminent injuries on both the private Plaintiffs and the States of Louisiana and Missouri.

**RESPONSE:** Disputed. The assertion that Defendants have engaged in conduct that inflicted or continues to inflict injuries on Plaintiffs is unsupported by any evidence cited by Plaintiffs and is contrary to the record as a whole. In particular, as detailed in the responses below, Plaintiffs rely primarily on stale assertions contained in declarations that are nearly a year old, and thus provide no evidence for the assertion that any of their alleged injuries are "ongoing" or "imminent."

### A.   Defendants Gravely Injure the Individual Plaintiffs.

1367.  The individual Plaintiffs provide undisputed evidence of how they have suffered from federally-induced censorship. Docs. 10-3 (Declaration of Dr. Jayanta Bhattacharya), 10-4 (Declaration of Dr. Martin Kulldorff), 10-5 (Declaration of Jim Hoft), 10-7 (Declaration of Dr. Aaron Kheriaty), 10-12 (Declaration of Jill Hines). The Government does not dispute this evidence.

**RESPONSE:** Disputed. None of the cited evidence—much of which is, in fact, disputed by Defendants, as the following paragraphs make clear—supports the characterization that any of the individual Plaintiffs "have suffered from federally-induced censorship."[13]

1368.   Dr. Bhattacharya attests that, "Because of my views on COVID-19 restrictions, I have been specifically targeted for censorship by federal government officials." Doc. 10-3, ¶ 5. He notes that "[t]he Great Barrington Declaration received an immediate backlash from senior government officials who were the architects of the lockdown policies, such as Dr. Anthony Fauci…" *Id.* ¶ 13. "Because it contradicted the government's preferred response to COVID-19, the Great Barrington Declaration was immediately targeted for suppression by federal officials." *Id.* ¶ 14. "Instead, what followed was a relentless *covert* campaign of social-media censorship of our dissenting view from the government's preferred message." *Id.* ¶ 15.

**RESPONSE:** Undisputed that Dr. Bhattacharya included the quoted statements in the cited declaration. Disputed as to the substance of the quoted statements, all of which are unsupported by the record, and so far as they attribute the alleged acts of "censorship" to "federal government officials," lack apparent basis in Dr. Bhattacharya's personal knowledge. Also disputed to the extent that portions of the PFOF appear to be contradicted by other language in the same declaration, undermining the credibility of each of the contradictory theories. *See* Bhattacharya Dec. ¶ 31 (Dkt. 10-3) (Dr. Bhattacharya endorsing a statement from Dr. Kulldorff, without

---

[13] For reasons explained above in Defendants' introductory objection, *see supra* at 1, Defendants object to the consideration of any evidence other than the evidence that Plaintiffs have expressly identified in support of their preliminary-injunction motion. *See* Plaintiffs' Memorandum in Support of Motion for a Preliminary Injunction, Dkt. 15; Plaintiffs' Supplemental Brief in Support of Motion for a Preliminary Injunction, Dkt. 214; Plaintiffs' Proposed Findings of Fact, Dkt. 214-1. As relevant to Plaintiffs' PFOF ¶¶ 1367-1426, Defendants thus respond only with respect to the evidence cited therein, which primarily consists of a series of witness declarations that were originally submitted as attachments to Dkt. 10. Some of those witnesses, however, recently submitted new, but substantially overlapping declarations as attachments to Plaintiffs' motion for leave to amend to add class-action allegations, Dkt No. 227. Those new and updated declarations are not cited or referenced in any of Plaintiffs' preliminary-injunction filings, including their Proposed Findings of Fact. Accordingly, Defendants object to the consideration of that evidence in connection with Plaintiffs' motion for a preliminary injunction, and these responses do not otherwise address those new declarations. Regardless, none of those new declarations contains evidence of threats or pressure by Defendants to censor speech, or communications that social-media platforms regarded (or acted on) as such.

evidence, that "they sort of kind of randomly select who they censor, what they censor, because they want people to be uncertain about what they can and cannot say").

1369.  As a result of this "covert campaign," Dr. Bhattacharya experiences ongoing injuries, including the de-boosting of search results in Google, *id.* ¶16; the removal of links to the Great Barrington Declaration in Reddit discussions, *id.*; the ongoing removal of a YouTube video discussing the Great Barrington Declaration and related issues with Governor DeSantis, *id.* ¶¶ 17-18; the removal of personal Tweets, *id.* ¶¶ 25-26; the removal of LinkedIn posts, *id.* ¶¶ 28-29; and account termination by LinkedIn, *id.* ¶ 30.

**RESPONSE:** Disputed that Dr. Bhattacharya "experiences ongoing injuries" attributable to any conduct by Defendants, an assertion that is unsupported by the record and about which Dr. Bhattacharya has no evident personal knowledge. The remainder of this PFOF improperly purports to summarize eight paragraphs of Dr. Bhattacharya's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. None of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has experienced or imminently will experience censorship as a result of any conduct by Defendants. In addition, Dr. Bhattacharya's description of an "account termination by LinkedIn" appears to be in reference to actions taken by LinkedIn with respect to the LinkedIn account of another individual, Dr. Martin Kulldorff—not with respect to any LinkedIn account maintained by Dr. Bhattacharya. *See* Bhattacharya Dec. ¶ 31 (Dkt. 10-3). Finally, because Dr. Bhattacharya's declaration, executed on June 4, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any "ongoing" or threatened injury from alleged censorship.

1370.  Dr. Bhattacharya observes that he lacks access to his colleagues' speech and viewpoints as well, because "social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration, but has swept in many other scientists as well: Twitter, LinkedIn, YouTube, Facebook, they have permanently suspended many accounts—including scientists." *Id.* ¶ 31.

**RESPONSE:** Disputed. As the cited paragraph of the declaration makes clear, a portion of the quoted statement that is attributed to Dr. Bhattacharya in Plaintiffs' PFOF in fact is a double-

hearsay statement from another individual, Dr. Martin Kulldorff. That statement is unsupported by the record. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Plaintiffs' PFOF itself makes clear that it is private social-media companies who have "permanently suspended many accounts," not Defendants. Finally, because Dr. Bhattacharya's declaration, executed on June 4, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1371.   As Dr. Bhattacharya observers, "[t]hese censorship policies have driven scientists and others to self-censorship, as scientists … restrict what they say on social-media platforms to avoid suspension and other penalties." *Id. ¶ 31.*

**RESPONSE:** Disputed. As the cited paragraph of the declaration makes clear, the quoted statement that is attributed to Dr. Bhattacharya in Plaintiffs' PFOF in fact is a double-hearsay statement from another individual, Dr. Martin Kulldorff, lacking any evident basis in Dr. Bhattacharya's personal knowledge. That statement is unsupported by any other evidence adduced by Plaintiffs or the record as a whole. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1372.   Dr. Bhattacharya attests based on personal experience: "Having observed and lived through the government-driven censorship of the Great Barrington Declaration and its co-authors, it is clear to me that these attacks were politically driven by government actors. … One of the motivations for that was a motivation to create … an illusion of consensus within the public that there was no scientific dissent against lockdowns. [T]he Great Barrington Declaration … posed a political problem for them because they wanted to tell the public that there was no dissent. And so, they had to destroy us. They had to do a devastating takedown." *Id. ¶ 32.*

**RESPONSE:** Disputed. Despite the assertion of "personal experience," as the cited paragraph of the declaration makes clear, in fact, a portion of the quoted statement that is attributed to Dr. Bhattacharya in Plaintiffs' PFOF is a double-hearsay statement from another individual, Dr. Martin Kulldorff. In addition, the assertions that the "censorship of the Great Barrington Declaration and its co-authors" was "government-driven," and "politically driven by government actors" lack any evident basis in Dr. Bhattacharya's personal knowledge. These statements are all unsupported by any other evidence adduced by Plaintiffs or the record as a whole. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Bhattacharya has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1373.   Dr. Kulldorff likewise attests that there is "an organized campaign against the Great Barrington Declaration," Doc. 10-4, ¶ 14. He notes that the GBD "was censored on social media in an apparent attempt to prevent it from … 'getting a lot of attention,'" *id.* ¶ 15; including Google deboosting search results, *id.*, and Facebook removing content related to it, *id.* ¶ 16.

**RESPONSE:** Undisputed that Dr. Kulldorff made the quoted statements in the cited declaration. Disputed to the extent that what Dr. Kulldorff characterizes as an "organized campaign" of "censorship" in fact represents nothing more than private companies acting to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. None of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Plaintiffs' PFOF itself makes clear that it is Google and Facebook who have "deboost[ed] search results" or "remov[ed] content," not Defendants. Finally, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1374.  Dr. Kulldorff also identifies an ongoing campaign of censorship against his personal social-media accounts, including censored personal Tweets on Twitter, *id. ¶¶ 17-18;* censored posts criticizing mask mandates, *id. ¶ 19;* ongoing self-censorship to avoid further censorship penalties, *id. ¶¶ 20, 27;* removal of YouTube content, *id. ¶ 21;* removal of LinkedIn posts, *id. ¶¶ 22-25;* and the ongoing permanent suspension of his LinkedIn account, *id. ¶ 26.*

**RESPONSE:** Disputed. This PFOF improperly purports to summarize eleven paragraphs of Dr. Kulldorff's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, all of the examples offered by Dr. Kulldorff in the cited portions of his declaration happened long ago (some as early as March of 2021, and the most recent of which was January of 2022), and thus offer no support for the characterization of an "ongoing campaign of censorship." Indeed, the declaration itself does not even attempt to describe any "ongoing" activities. For example, although Plaintiffs' PFOF describes "the ongoing permanent suspension of his LinkedIn account," in fact, Dr. Kulldorff's Declaration acknowledges that "LinkedIn restored [his] account." Kulldorff Decl. ¶ 26 (Dkt. 10-4). As of the date of this filing, Dr. Kulldorff has a LinkedIn account that is visible to the general public: https://www.linkedin.com/in/martin-kulldorff-8a31a775. *See* Declaration of Jasmine Robinson ¶ 2 (Ex. 139) ("Robinson Decl."). Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Plaintiffs' PFOF itself makes clear that it is private companies who have taken the actions that Plaintiffs complain of, not Defendants. Finally, because Dr. Kurlldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened or "ongoing" injury from alleged censorship.

1375.  Dr. Kulldorff has experienced direct censorship of his social-media speech in addition to the Great Barrington Declaration. For example, his Tweets questioning the efficacy of masking and criticizing government mask mandates have been censored and caused him to be suspended from Twitter. *Id. ¶¶ 18-19.*

**RESPONSE:** Disputed that Dr. Kulldorff "has experienced direct censorship" or that his Tweets "have been censored." In fact, Dr. Kulldorff describes (and the record reflects) nothing more than private companies acting to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that these decisions were made by Twitter, not by any of the Defendants.

1376. Dr. Kulldorff has also engaged in self-censorship to avoid being suspended or removed from social media: "Twitter is an important venue for communicating accurate public health information to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on the platform." *Id.* ¶ 20.

**RESPONSE:** Undisputed that "Twitter is an important venue for communicating accurate public health information to the public" and that Dr. Kulldorff asserts he has chosen to engage in what he describes as "self-censorship." Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that, to the extent that Dr. Kulldorff has ever been "censored," he has been "censored by Twitter," rather than Defendants. Kulldorff Decl. ¶ 20 (Dkt. 10-4).

1377. Dr. Bhattacharya and Dr. Kulldorff's roundtable discussion with Governor Ron DeSantis—which featured all three co-authors of the Great Barrington Declaration—was removed from YouTube. The roundtable discussion addressed the Great Barrington Declaration and its premises in detail. As Dr. Kulldorff recounts, "On March 18, 2021, I participated in a two-hour roundtable discussion with Governor Ron DeSantis in Florida, along with Dr. Sunetra Gupta at Oxford, Dr. Jay Bhattacharya at Stanford and Dr. Scott Atlas at Stanford. In this discussion, we made remarks critical of COVID-19 restrictions, including mask mandates on children. I stated that 'children should not wear face masks, no. They don't need it for their own protection, and

they don't need it for protecting other people either.' … Dr. Gupta stated that "to force [children] to wear masks and distance socially, all of that to me is in direct violation of our social contract.' In the same roundtable, we also argued against vaccine passports. 'Let's try to argue against that from the very beginning before it sort of takes off.' Unfortunately, the video of the roundtable was removed by YouTube, which is owned by Google." *Id.* ¶ 21.

**RESPONSE:** Disputed insofar as this PFOF consists of Dr. Kulldorff's recollections and self-serving characterizations of his remarks at an event that was apparently recorded on video, but for which no transcript or video appears in the record. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to censor speech or to force social media companies to censor speech, or that Dr. Bhattacharya or Dr. Kulldorff have experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that the video in question was not "censored" by the federal government, but in fact was "removed by YouTube," which is "owned by Google," not Defendants. Kulldorff Decl. ¶ 21 (Dkt. 10-4).

1378.   Dr. Kulldorff also experiences ongoing censorship on "LinkedIn, which is a popular communications platform among scientists and other professionals." *Id.* ¶ 22-26. LinkedIn has blocked and removed his posts opposing vaccine mandates and promoting the benefits of natural immunity. *Id.* These included posts in which he and Dr. Bhattacharya "criticized the official Covid-19 response as formulated by Dr. Anthony Fauci." *Id.* ¶ 25.

**RESPONSE:** Disputed, except the statements that "LinkedIn is a popular communications platform" that has "blocked and removed" some of Dr. Kulldorff's posts, including some in which he criticized COVID-19 policies. This PFOF improperly purports to summarize five paragraphs of Dr. Kulldorff's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, all of the examples offered by Dr. Kulldorff in the cited portions of his declaration happened long ago (some as early as 2021, and the most recent of which was January of 2022), and thus offer no support for the characterization of there being any "ongoing censorship." Indeed, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a

year old, it furnishes no evidence that he continues to suffer any present or threatened or "ongoing" injury from alleged censorship. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration makes clear that all of the actions that Dr. Kulldorff describes as "censorship" were taken by LinkedIn, a private company, rather than Defendants. *See* Kulldorff Decl. ¶ 22 (Dkt. 10-4) ("LinkedIn censored a post . . . ."); *id.* ¶ 23 ("LinkedIn also censored me when . . . ."); *id.* ¶ 24 ("LinkedIn censored a post . . . ."); *id.* ¶ 25 (". . . it was removed by LinkedIn, which is owned by Microsoft.").

1379.   Dr. Kulldorff states that he and other scientists engage in self-censorship to avoid being terminated from social-media platforms: "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public. Because of the censoring, and the suspension of other scientists, I have had to self-censor myself on both platforms. Sometimes by not posting important public health information." *Id.* ¶ 27.

**RESPONSE:**   Undisputed that "Twitter and LinkedIn are important venues for communicating accurate public health information to other scientists and to the public" and that Dr. Kulldorff asserts he has chosen to engage in what he describes as "self-censorship." Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship as a result of any conduct by Defendants. Indeed, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or what he describes as "self-censorship."

1380.   Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy: "Social-media censorship has not focused solely on the co-authors of the Great Barrington Declaration but has

swept in many other scientists as well. These censorship policies have driven scientists and others to self-censor, as scientists like me restrict what we say on social-media platforms to avoid suspension and other penalties. In fact, the most devastating consequence of censoring is not the actual posts or accounts that are censored or suspended, but the reluctance of scientists to openly express and debate scientific questions using their varied scientific expertise. Without scientific debate, science cannot survive." *Id.* ¶ 28.

**RESPONSE:** Disputed. There is no portion of the cited declaration in which "Dr. Kulldorff notes that social-media censorship directly affects him as a *reader* of other scientists' speech on social media, on an ongoing basis, by reducing his access to the thoughts and views of scientists who dissent from the government-mandated orthodoxy." As for the quoted statements, they are unsupported by the record and lack any evident basis in Dr. Kulldorff's personal knowledge. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kulldorff has experienced or imminently will experience censorship (whether as a reader or otherwise) because of any conduct by Defendants. Indeed, because Dr. Kulldorff's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship "on an ongoing basis."

1381.  Dr. Kheriaty, also, describes ongoing injuries from social-media censorship of views dissenting from the government-preferred narratives about COVID-19. He experiences an ongoing pattern of censorship and removals lasting over years: "I have always shared peer-reviewed research findings as well as my own opinions and perspectives on Twitter and LinkedIn. It was not until I began posting information about covid and our covid response policies, however, that I encountered censorship on the Twitter platform. This began in 2020 when I published an article on the adverse mental health consequences of lockdowns. The problem became more pronounced in 2021 when I shared my Wall Street Journal article and other information on ethical issues related to vaccine mandates." Doc. 10-7, ¶ 11.

**RESPONSE:** Disputed that Dr. Kheriaty "describes ongoing injuries from social-media censorship." There is no portion of the cited declaration in which Dr. Kheriaty "describes ongoing injuries from social-media censorship" or states that he "experiences an ongoing pattern of censorship." To the contrary, all of the examples offered by Dr. Kheriaty in the cited portions of

his declaration happened long ago (some as early as 2020), and thus offer no support for the characterization of there being any "ongoing pattern of censorship." Indeed, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship. Moreover, Dr. Kheriaty speculates (also without evidence) that Twitter "may have been walking back some of its censorship tendencies" around the time "after it was announced that Elon Musk would buy twitter." Kheriaty Decl. ¶ 13 (Dkt. 10-7). Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1382.   As Dr. Kheriaty notes, "[t]he Twitter censorship took several forms."  *Id.* He describes suffering artificial limitations on the number of followers on his social-media accounts, *id.* ¶¶ 12-13; "shadow banning" of social-media posts that "challenge[] the federal government's preferred covid policies," *id.* ¶¶ 14-15; self-censorship to avoid further adverse consequences or permanent bans, *id.* ¶ 16; and removal of content from YouTube, *id.* ¶ 17. Dr. Kheriaty specifically notes that the problem of "shadow banning" his social-media posts is ongoing and increasing, as it "intensified in 2022."  *Id.* ¶ 15. Further, he notes that "[t]he pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies."  *Id.* ¶ 18.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize seven paragraphs of Dr. Kheriaty's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, all of the examples offered by Dr. Kheriaty in the cited portions of his declaration happened long ago (some as early as 2020), and thus offer no support for the characterization of there being any "censorship" that is "ongoing and increasing." Indeed, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer

any present or threatened injury from alleged censorship, let alone any that is "ongoing and increasing." To the contrary, Dr. Kheriaty speculates (also without evidence) that Twitter "may have been walking back some of its censorship tendencies" around the time "after it was announced that Elon Musk would buy twitter." Kheriaty Decl. ¶ 13 (Dkt. 10-7). Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1383.   Dr. Kheriaty describes the ongoing experience of shadow-banning: "I encountered evidence of this shadow-banning in 2021 before I was let go from the University after I started posting on covid topics, and the problem intensified in 2022 following my dismissal, as I continued to post frequently on the ethics of vaccine mandates for competent adults." *Id.* ¶ 15.

**RESPONSE:** Disputed. Dr. Kheriaty does not purport to describe any "ongoing experience of shadow-banning" as he describes no "evidence" of shadow-banning, whether based on his personal knowledge or otherwise. And because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022— it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or any "ongoing experience" with alleged shadow-banning. Moreover, Dr. Kheriaty speculates in his Declaration (also without evidence) that Twitter "may have been walking back some of its censorship tendencies" around the time "after it was announced that Elon Musk would buy twitter." Kheriaty Decl. ¶ 13 (Dkt. 10-7). Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship because of any conduct by Defendants.

1384.   Dr. Kheriaty also experiences ongoing injury as a *reader* of other speakers' content on social media, as government policies cause censorship and self-censorship of their content as well: "I have several of my friends and colleagues—including Dr. Peter McCollough and Dr. Robert Malone—who were temporarily (McCollough) or permanently (Malone) banned from Twitter for posing peer-reviewed scientific findings regarding the covid vaccines." *Id.* ¶ 16.

**RESPONSE:** Disputed. Dr. Kheriaty does not describe any "ongoing injury as a *reader*" in the cited passage or elsewhere in his declaration. The only example offered of any "ongoing injury" relates to the fact that, apparently, someone other than Dr. Kheriaty (Dr. Robert Malone) was banned from Twitter "permanently." But in fact, as of the date of this filing, Dr. Malone appears to have an active Twitter account through which he has tweeted more than 12,000 times to his approximately 1 million followers, which is publicly available at the following link: https://twitter.com/RWMaloneMD. *See* Robinson Decl. ¶ 11. Indeed, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened or "ongoing" injury from alleged censorship. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship (whether as a reader or otherwise) as a result of any conduct by Defendants.

1385.   Dr. Kheriaty also engages in self-censorship to avoid more severe penalties from the platforms: "Even though the ethics of vaccine mandates is among my areas of expertise, and an area that has impacted me personally and professionally, I am extremely careful when posting any information on Twitter related to the vaccines, to avoid getting banned. This self-censorship has limited what I can say publicly on topics where I have specific scientific and ethical expertise and professional experience." *Id.* ¶ 16.

**RESPONSE:** Undisputed that Dr. Kheriaty asserts he has chosen to engage in what he describes as "self-censorship." Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to censor speech, or communications that any social-media

platforms regarded (or acted on) as such. To the contrary, the quoted statement confirms that, to the extent that Dr. Kheriaty is engaged in "self-censorship," it is part of an effort "to avoid more severe penalties from the platforms," *i.e.*, private social-media companies—not any of the Defendants. Finally, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship or self-censorship.

1386.   Dr. Kheriaty observes a close link between this ongoing pattern of social-media censorship and speech that criticizes government policies: "The pattern of content censored on these social media platforms mirrors closely the CDC and Biden administration policies. In my experience using these platforms to discuss covid topics, any content that challenges those federal policies is subject to severe censorship, without explanation, on Twitter and YouTube—even when the information shared is taken straight from peer-reviewed scientific literature." *Id.* ¶ 18.

**RESPONSE:** Undisputed that Dr. Kheriaty "observes" what he believes is a "close link" between these subjects, but the actual existence of such a "link" is disputed, and Dr. Kheriaty's suggestion to the contrary is conclusory and unsupported by any evidence provided elsewhere in his Declaration or the record as a whole. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Dr. Kheriaty has experienced or imminently will experience censorship because of any conduct by Defendants. Finally, because Dr. Kheriaty's declaration was executed on an unknown date no later than August of 2022—the signature says "3 June 2020," but the declaration purports to describe events occurring after 2020, and was filed on the docket in August of 2022—it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or that any "ongoing pattern of social-media censorship" exists.

1387.   Plaintiff Jim Hoft attests both ongoing injuries and the imminent expectation of future injuries. Doc. 10-5. Hoft is the "founder, owner, and operator of the popular news website The Gateway Pundit ('GP'), gatewaypundit.com. … Since its founding in 2004, the Gateway Pundit has grown from a one-man blog to one of the internet's largest destinations for conservative news and commentary. In 2021, The Gateway Pundit was ranked fourth on a list of top ten conservative news websites, ranked by monthly web searches, with over 2 million searches per month." *Id.* ¶ 2. The Gateway Pundit has large social-media followings on multiple platforms: "In particular, GP's Twitter account had over 400,000 followers before it was suspended. GP's Facebook account has over 650,000 followers. GP's Instagram account has over 205,000 followers. GP's YouTube account has over 98,000 followers." *Id.* ¶ 3.

**RESPONSE:** Disputed, for the reasons stated in the responses to Plaintiffs' PFOFs that follow, that Mr. Hoft "attests both ongoing injuries and the imminent expectation of future injuries." The remainder of this PFOF is undisputed, although Defendants note that neither this PFOF nor any of those that follow contain evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. Finally, because Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any "ongoing" or "imminent" injury from alleged censorship.

1388.   Hoft notes that The Gateway Pundit's "social media accounts have experienced censorship on all major social-media platforms," which "has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. These acts of censorship include suspensions from his Twitter account and another personal Twitter account, *id.* ¶¶ 6-7, 10; a permanent ban from his Twitter account, *id.* ¶ 8; labels applied to Twitter posts on personal accounts, *id.* ¶ 9; warning labels imposed on Facebook posts and other restrictions on his Facebook account, *id.* ¶ 12; permanent removal of content posted on Facebook, *id.* ¶ 13; prevention of sharing of Facebook-posted content, *id.*; removal of content from YouTube, *id.* ¶ 14; imposition of sanctions on Mr. Hoft's followers for re-posting or amplifying his speech, *id.* ¶ 15; engaging in self-censorship to avoid permanent bans or other more serious sanctions from the social-media platforms, *id.* ¶ 16; and demonetization by Google, *id.* ¶ 19; *see also id.* ¶¶ 18-20.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize fourteen paragraphs of Mr. Hoft's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. For example, Mr. Hoft claims that his Twitter account was "permanently banned,"

when in fact, as of the date of this filing, the Twitter account in question is publicly available at the following link, where Mr. Hoft appears to tweet (often several times per hour) to over 500,000 followers: https://twitter.com/gatewaypundit. *See* Robinson Decl. ¶ 4. Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration repeatedly makes clear that the conduct of which Mr. Hoft complains was carried out by private social-media companies, not Defendants. *See, e.g.*, Hoft Decl. ¶ 10 (Dkt. 10-5) ("Twitter suspended the account . . . ."); *id.* ¶ 11 ("Facebook's censorship was so aggressive . . . ."); *id.* ¶ 14 ("YouTube removed a video we had posted."). Finally, because Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship.

1389.   Hoft observers that "GP's social media accounts have experienced censorship on all major social-media platforms, including its speech regarding COVID-19 issues and election security. In many instances, we have noticed that this censorship has followed and reflected the calls for censorship from federal government officials, including in the Biden Administration." *Id.* ¶ 4. "For example, the current Administration has repeatedly called for censorship of social media speech regarding election integrity and so-called 'COVID-19 misinformation.' GP has experienced significant social-media censorship regarding its speech on both of those issues, including on Twitter, Facebook, and YouTube." *Id.* ¶ 5.

**RESPONSE:** Disputed. The quoted statements are unsupported by the record to the extent that they assert without evidence (other than Mr. Hoft's own characterizations) that there have been "calls for censorship from federal government officials," or that "the Current Administration has repeatedly called for censorship." Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. Finally, because Mr. Hoft's declaration, executed on June 6, 2022,

is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship.

1390.  Hoft has experienced censorship for COVID speech that is now widely acknowledged to be true, such as a suspension from Twitter for claiming that the vaccines do not prevent infection, and the claim that COVID deaths are overcounted by including deaths from other causes: "On or about January 2, 2021, Twitter suspended GP's Twitter account (@gatewaypundit) after it posted a tweet that stated, "Then It's Not a Vaccine: Crazy Dr. Fauci Says Early COVID Vaccines Will Only Prevent Symptoms and NOT Block the Infection …What?" *Id.* ¶ 6; *see also id.* ¶ 9.

**RESPONSE:** Disputed to the extent that Plaintiffs' PFOF appears to mischaracterize the tweet in question, for which Mr. Hoft claims to have received a 12-hour suspension from his Twitter account. *See* Hoft Decl. ¶ 6 (Dkt. 10-5). Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway has experienced or imminently will experience censorship because of any conduct by Defendants.

1391.  The Gateway Pundit also experienced censorship under Twitter's "hacked materials" policy by retweeting the contents of Hunter Biden's laptop. After a GP blogger "tweeted content related to Hunter Biden's laptop," "Twitter suspended the account on the ground that he 'Violat[ed] our rules against posting or sharing privately produced/ distributed intimate media of someone without their express consent.'" *Id.* ¶ 10.

**RESPONSE:** Undisputed, but immaterial to any issue in this case. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited language confirms that the conduct of which Mr. Hoft complains was based upon "Twitter's 'hacked materials' policy," rather than any federal government policy, and that "Twitter suspended the account," rather than Defendants.

1392.  Hoft also experiences a long list of acts of censorship from Facebook: "Facebook frequently imposed warning labels and other restrictions on our content, particularly content

related to election integrity and COVID-19. Facebook's censorship was so aggressive that I was forced to hire an assistant to monitor and address censorship on Facebook." *Id.* ¶ 11; *see also id.* ¶ 12. Facebook imposes labels on Hoft's content that require the reader, before viewing Hoft's content, to click-through a Facebook-imposed screen that states: "The Gateway Pundit is an American far-right news and opinion website. The website is known for publishing falsehoods, hoaxes, and conspiracy theories." *Id.* at 12. It also labels Hoft's postings as "Missing Context" even when their truth is undisputed. *Id.* at 20-23. And it labels expressions of core political opinion as "Partly False." *Id.* at 28; *see also id.* 29-58 (many other examples of such labeling and blocking from reposting on Facebook and Twitter).

**RESPONSE:** Disputed. This PFOF improperly purports to summarize lengthy portions of Mr. Hoft's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In addition, the PFOF purports to cite many paragraphs of the Declaration (up to Paragraph 58) that do not exist—the Declaration contains only 20 numbered paragraphs. Defendants are thus unable to respond meaningfully to this PFOF, given Plaintiffs' failure to adequately identify the evidence on which it is based. Regardless, even if all of the content summarized in Plaintiffs' PFOF appeared in Mr. Hoft's Declaration, none of it contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Plaintiffs' PFOF itself repeatedly makes clear that the conduct of which Mr. Hoft complains was carried out by private social-media companies, rather than Defendants. *See, e.g.*, *supra* (purporting to describe "a long list of acts of censorship from Facebook"). Finally, because Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship.

1393. As Hoft notes, Facebook also prevents Hoft's audiences from reposting or amplifying his content: "Facebook also [dis]courages (or otherwise outright prohibits) the public from sharing our content with their social networks." *Id.* ¶ 13. Hoft describes this second-order censorship in detail: "The social-media platforms have extended their censorship policies to our followers as well. We have received numerous reports from followers that they have received temporary suspensions or other adverse actions from social-media platforms (such as seven-day

suspensions of their Facebook accounts) for re-posting or amplifying our content. This chills our followers from re-posting, re-tweeting, or otherwise amplifying our content. The risk of being locked out of Facebook for seven days, or suffering other forms of censorship, deters our followers from amplifying our content on social media platforms, which reduces the reach of our message." *Id.* ¶ 15.

**RESPONSE:** Disputed. Nothing in the cited or quoted portions of Mr. Hoft's declaration shows that "Facebook . . . prevents Hoft's audiences from reposting or amplifying his content," that "followers" of the Gateway Pundit have been "chilled" as a result from "amplifying" its content, or that Mr. Hoft has any personal knowledge of these matters. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the PFOF itself repeatedly makes clear that the conduct of which Mr. Hoft complains was carried out by Facebook, not Defendants. Finally, because Mr. Hoft's declaration, executed on June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1394.  Hoft also describes ongoing self-censorship to avoid more severe penalties on social media: "These social-media censorship policies chill GP's freedom of expression on social media platforms as well. To avoid suspension and other forms of censorship, we frequently avoid posting content that we would otherwise post on social-media platforms, and we frequently alter content to make it less likely to trigger censorship policies."  *Id.* ¶ 16.

**RESPONSE:** Disputed. The cited and quoted statements are unsupported by the record. Undisputed that Mr. Hoft asserts he has chosen to engage in what he describes as "self-censorship," but that is immaterial to any issue in this case. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants. Finally, because Mr. Hoft's declaration, executed on

June 6, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship, or engages in any "ongoing self-censorship."

1395.   Hoft observes that the censorship of his content on social media closely tracks the censorship preferences of federal officials: "Based on my close observation of the patterns of censorship of GP's social-media accounts and related accounts in recent years, I have strong reason to infer that federal government officials are directly involved in the censorship of our speech and content." *Id.* ¶ 17. Hoft's posts that have faced censorship include posts criticizing the FBI, *id.* at 9; and criticizing the administration of the 2020 election, *id.* at 11;

**RESPONSE:** Undisputed that Mr. Hoft believes that he "observes" this phenomenon, but disputed that it actually exists; the cited and quoted statements are conclusory and unsupported by any evidence provided elsewhere in Mr. Hoft's Declaration or the record as a whole. None of them shows that any "censorship" of Mr. Hoft's "content on social media closely tracks the censorship preferences of federal officials," nor that federal officials have any "censorship preferences" at all. Moreover, Mr. Hoft provides no factual or evidentiary basis for the statement that he has "strong reason to infer that federal government officials are directly involved in the censorship of our speech and content," which is unsupported by the record. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1396.   Hoft continues to experience censorship, including up to the date he executed his declaration. For example, he received a strike on YouTube on May 14, 2022, and YouTube removed the video he had posted, for speech regarding election integrity that discussed the problem of election fraud and raised questions about the outcome of the 2020 Presidential election, including money Idaho illegally received from Mark Zuckerberg and other problems relating to voter fraud. *Id.* ¶ 14.

**RESPONSE:** Undisputed that Mr. Hoft "received a strike on YouTube on May 14, 2022," and that "YouTube removed the video" in question. The remainder of this PFOF is disputed, including that Mr. Hoft "continues to experience censorship." Indeed, because Mr. Hoft's

declaration is nearly a year old, it furnishes no evidence that he continues to suffer any ongoing or imminent injury from alleged censorship, or that he "continues to experience censorship" in any way. In any event, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Hoft or The Gateway Pundit has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration confirms that "YouTube removed the video he had posted," rather than Defendants.

1397.   Plaintiff Jill Hines is the "Co-Director of Health Freedom Louisiana, a consumer and human rights advocacy organization." Doc. 10-12, ¶ 2. Hines's "organization engages in public advocacy on behalf of Louisiana citizens on issues of health freedom and fundamental human rights. [Hines] ha[s] testified before the Louisiana legislature approximately 20 times on such issues." *Id.* ¶ 3. Hines attests that, "Because our organization recognizes the need to educate and inform the public of their rights regarding state and federal laws concerning vaccinations, we have experienced social media censorship of our speech regarding vaccine information." *Id.* ¶ 2. Hines has "approximately 13,000 followers each on Health Freedom Louisiana and Reopen Louisiana." *Id.* ¶ 2. Among other things, Hines' organization "advocate[s] against the imposition of mask mandates on children, especially during prolonged periods, as in schools." *Id.* ¶ 4. Hines also "launched a grassroots effort called Reopen Louisiana on April 16, 2020 to help expand our reach on social media and take on the issues surrounding the continued government shutdown." *Id.* ¶ 6.

**RESPONSE:** Undisputed, except for the statement that Ms. Hines has "experienced social media censorship," which is conclusory and unsupported by evidence presented elsewhere in Ms. Hines' declaration or the record as a whole. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1398.   Hines describes continuous and ongoing censorship on social media from pressure wielded by federal officials: "In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media." *Id.* ¶ 5. Hines continues to suffer ongoing social-media censorship, and the acts of censorship include application of warnings on Facebook content, *id.* ¶ 8; the reduction of her

reach to audiences on Facebook, *id.*; removal of content and sanctions, including 30-day suspensions, from Facebook, *id.* ¶ 9; 24-hour suspensions that prevented her from organizing people to advocate to the Louisiana legislature, *id.* ¶ 10; shadow-banning and dramatically restricting the reach of her speech to its audiences, id. ¶ 10; and the complete de-platforming of Facebook groups intended to organize Louisianans to petition their government, id. ¶¶ 13-14. Ms. Hines states that "[r]emoving our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." Id. ¶ 14. "To say the cards are stacked against me is an understatement." Id. ¶ 16.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize lengthy portions of Ms. Hines's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, nothing in the declaration shows either "continuous" or "ongoing censorship on social media," and certainly not as a result of "pressure wielded by federal officials." Those statements find no factual or evidentiary support in the declaration or the record as a whole. To the contrary, the Declaration describes a handful of specific incidents dating back to 2020, in which private companies acted to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. Hines Decl. ¶¶ 8-14 (Dkt. 10-12) Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. None of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Ms. Hines's own declaration (and Plaintiffs' mischaracterization of that declaration in this PFOF) repeatedly make clear that the conduct of which she complains was carried out by private social-media companies, not Defendants. *See, e.g.*, Pls.' PFOF ¶ 1388 (purporting to describe "removal of content and sanctions, including 30-day suspensions, from Facebook").

1399.  Hines attests that the censorship campaign against her social-media speech is ongoing, noting that "[p]osts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data." Id. ¶ 9. She

continues to suffer specific, new acts of censorship, including right up to the time when she executed her Declaration on June 9, 2022: "The most recent restriction [was] in late May 2022." *Id.* Ms. Hines notes that "[m]y personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days." Id. ¶ 12.

**RESPONSE:** Disputed. The cited statements are unsupported by the record, and none of them show that any "censorship campaign against her social-media speech is ongoing," nor that Ms. Hines "continues to suffer specific, new acts of censorship, including right up to the time when she executed her Declaration." Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. As of the date of this filing, Ms. Hines and Health Freedom Louisiana each appear to have active Facebook pages. *See* Robinson Decl. ¶¶ 3, 8. In any event, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration makes clear that the conduct of which she complains was carried out by private social-media companies, rather than Defendants.

1400.  Hines reports that acts of censorship of her COVID-19-related speech have occurred continuously up to the present: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations." *Id.* ¶ 11.

**RESPONSE:** Disputed. Ms. Hines's declaration does not, in fact, "report[] that acts of censorship of her COVID-19-related speech have occurred continuously up to the present." The cited language refers only to events "beginning in October 2020" and taking place approximately over the next "year and a half since" October of 2020. Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. Regardless, none of the cited or quoted

690

language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1401.   Hines has observed a link between the censorship that her groups have experienced and the public demands for censorship from federal officials: "Many similar threats from federal officials followed … especially as covid became a public concern. In the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation.' Dr. Anthony Fauci has used the term repeatedly and it has been adopted by the press and media." *Id.* ¶ 5.

**RESPONSE:** Disputed. Ms. Hines's declaration does not, in fact, demonstrate "a link between the censorship that her groups have experienced and the public demands for censorship from federal officials"—indeed, it does not even assert the existence of such a link, nor does she claim to have any personal knowledge about why private social-media companies took the actions that she complains of. Nor is there any support in the record for the statement that, "[i]n the last two years, any information that was not positive in nature or conveyed adverse events associated with shutdown or mitigation efforts was deemed 'misinformation,'" or that any such labeling was caused by Dr. Anthony Fauci. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants.

1402.   Social-media censorship dramatically reduces the reach of Hines's speech: "our analytics showed that we were reaching approximately 1.4 million people in a month's time on one of our Facebook pages, but after sharing photos of the mouths of children suffering from impetigo from long-term mask use, our page received a warning and our reach was reduced to thousands." *Id.* ¶ 8.

**RESPONSE:** Disputed. Ms. Hines's declaration does not show that "[s]ocial-media censorship dramatically reduces the reach of Hines's speech," nor does it substantiate any of the statistics including in this paragraph, which otherwise find no support in the record. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to

force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. And because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

1403.   Hines experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration: "This began a long series of attempts to censor our posts on Facebook and other social-media platforms. Posts pointing to lack of safety of masking were and are targeted, as well as articles that mention adverse events of vaccinations, including VAERS data. I was completely restricted from Facebook for 30 days starting in January 2022 for sharing the image of a display board used in a legislative hearing that had Pfizer's preclinical trial data on it. The most recent restriction, in late May 2022, was for re-posting an Epoch Times article that discussed a pre-print study detailing increased emergency calls for teens with myocarditis following covid vaccination." *Id.* ¶ 9.

**RESPONSE:** Disputed. Ms. Hines's declaration does not show that she "experiences an ongoing campaign of social-media censorship that extends to the present, the date she executed her declaration." That statement is logically incoherent; her declaration cannot be evidence of present injury, as she executed her declaration in June of 2022, which was almost nine months before this assertion was made in Plaintiffs' PFOF in March of 2023. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants.

1404.   Censorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies: "One post in particular that was hit with a 'community standards' warning on October 6, 2020, was a 'call to action' asking people to contact their legislators to end the governor's mask mandate. On the same day, we were asking people to testify during the Legislature's Second Extraordinary Session regarding a bill … that would prohibit a covid vaccine employee mandate. I was prohibited from posting for 24 hours on all pages, including my own. When I was finally able to post again, our reach was significantly diminished, compared with our 1.4 million per month rate beforehand. Our page engagement was almost non-existent for months. It felt like I was posting in a black hole. Each time you build viewership up, it is knocked back down with each violation. Our current analytics show Reopen Louisiana is reaching around 98,000 in the last month and Health Freedom Louisiana is only reaching 19,000. There are warnings when you search for Health Freedom Louisiana. People that

regularly interacted with our page were never heard from again. Some people who did find the page later on, asked us where we went." *Id.* ¶ 10.

**RESPONSE:**  Disputed. Ms. Hines's declaration does not show that "[c]ensorship of Hines's social-media speech directly impairs her efforts to engage in political organization to petition her government to change its policies." Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship. In any event, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants.

1405.   Hines suffers repeated censorship on individual posts as well, including undisputedly truthful information: "Over the last year and a half since we noticed social-media censorship beginning in October 2020, my pages have been hit with numerous 'fact checks' and 'community standards' violations. Articles with health concerns related to mask wearing have been targeted … as well as articles relating to pregnant women being vaccinated. … Data taken directly from VAERS was flagged as misinformation and we received 'fact checks' for that as well, even if it contained a disclaimer about causation." *Id.* ¶ 11.

**RESPONSE:** Disputed. Ms. Hines's declaration does not establish any "censorship" at all, let alone of any "undisputedly truthful information"—only that private companies have acted to enforce the terms of service of their own private social-media platforms, to which their users agreed as a condition of using those platforms. None of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

1406.   Hines attests that she is under current and constant threat of more severe censorship penalties, including deplatforming: "My personal Facebook page, and the Facebook pages of both Health Freedom Louisiana and Reopen Louisiana, are all under constant threat of being completely deplatformed. My personal account is currently restricted for 90 days." *Id.* ¶12.

**RESPONSE:** Disputed. The cited and quoted statements are based on Ms. Hines's unsupported speculation about how private companies might respond to her future social-media activity. In addition, Ms. Hines' declaration furnishes no evidence that she is under a "current" or "constant" threat of de-platforming, or other "penalties," because the declaration was executed nearly one year ago. (As of the date of this filing, Ms. Hines and Health Freedom Louisiana each appear to have active Facebook pages. *See* Robinson Decl. ¶¶ 3, 8. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1407.   Hines engages in self-censorship to avoid more severe penalties: "On many occasions, I have altered the spelling of words, used emoji's, or placed links in comments to avoid censorship." *Id.* ¶ 12.

**RESPONSE:** Undisputed, but what Ms. Hines characterizes as "self-censorship" in response to the policies of private companies is immaterial to any issue in this case. Moreover, her declaration, executed nearly one year ago, furnishes no evidence that she currently "engages" in what she describes as self-censorship, or otherwise suffers any ongoing or imminent injury. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1408.   Hines's health-freedom groups were completely deplatformed, inflicting a severe and direct injury on her ability to engage in political organization to amplify her message and petition the government: "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions. There were two groups that were

deplatformed: HFL Group and North Shore HFL. … HFL Group had almost 2,000 people, and North Shore HFL had less than 500 before it was taken down." *Id.* ¶ 13.

**RESPONSE:** Disputed that Ms. Hines's health-freedom groups suffered the "severe and direct injury" due to de-platforming asserted in this PFOF, as her statement that the groups were "effectively disbanded" is a characterization of events for which neither Ms. Hines's declaration nor the record as a whole provides any evidence. In addition, Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her groups continue to be deplatformed. or suffer any other present or threatened injury. (As of the date of this filing, Ms. Hines and Health Freedom Louisiana each appear to have active Facebook pages. *See* Robinson Decl. ¶¶ 3, 8. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration describes actions taken only by Facebook, a private social-media company, not Defendants.

1409.   This censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans: "The last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation. During the regular legislative session, we had two bills that were passed successfully, but both were vetoed by the governor, including a hugely popular bill that prohibited the addition of vaccine information on a state issued driver's license. The other bill provided immunity from liability for businesses that did not impose a covid vaccine mandate. Removing our closed group at such a crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.* ¶ 14.

**RESPONSE:** Disputed that any "censorship directly interfered with the core political speech and advocacy of Hines and thousands of Louisianans," as Ms. Hines's statement that her closed group was "effectively stopped" from communicating with state legislators is a characterization of events for which neither Ms. Hines's declaration nor the record as a whole provides any evidence. In addition, Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her group continues to be removed or suffer any other present or threatened injury.

Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the Declaration describes actions taken only by Facebook, a private social-media company, not Defendants.

1410.   To this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship: "After North Shore was deplatformed, we looked for alternatives for daily communication. We were to the point of speaking in code on Facebook, so moving away from traditional social media was the only option. We currently have 80 members in a chat app called GroupMe. We have no statewide reach with that tool." *Id.* ¶ 15.

**RESPONSE:** Disputed. The cited and quoted statements do not support that "[t]o this day, Hines's political message, and those of thousands of Louisianans, is greatly diminished from this censorship." The quoted language says nothing about the unidentified group of "thousands of Louisianans" to which Plaintiffs' PFOF refers, and Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her message or others' continues to be "diminished," or that she or other Louisianans suffer any other present injury. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants. Indeed, because Ms. Hines's declaration, executed on June 9, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

1411.   Censorship undercuts Hines's ability to "effectively communicate with people," including Louisiana state officials, about her political views: "It has been incredibly frustrating knowing that the government's narrative is going unchallenged and that we have not been able to effectively communicate with people. Knowing that government agencies colluded with Facebook to suppress the messaging of groups like mine while paying exorbitant amounts to promote vaccinations and covid policies has been especially disheartening. To say the cards are stacked against me is an understatement." *Id.*¶ 16.

**RESPONSE:** Disputed. The cited and quoted statements do not show that "[c]ensorship undercuts Hines's ability to 'effectively communicate with people,' including Louisiana state officials, about her political views." That is a characterization of events for which neither the cited statements, nor any other evidence in the record, provides support. Also disputed is Ms. Hines's mistaken belief that "government agencies colluded with Facebook to suppress the messaging of groups like mine," for which she provides no evidence and which is contradicted by the record. In addition, Ms. Hines's declaration, executed nearly a year ago, furnishes no evidence that her group continues to be removed or suffer any other present or threatened injury. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Hines has experienced or imminently will experience censorship as a result of any conduct by Defendants.

## B.    Defendants Gravely Injure Similarly Situated Speakers and Listeners.

1412.   Plaintiffs' unrebutted evidence demonstrates that other similarly situated speakers have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media.

**RESPONSE:** Disputed that "other" speakers "have suffered and are suffering similar, ongoing, and imminent injuries from government-induced censorship on social media," as Plaintiffs have adduced no evidence of "government-induced censorship" on social media, that they or any other speakers they identify have suffered injury as a result, or that they or any other speakers they identify are currently suffering ongoing or imminent injuries as a result. Neither this PFOF nor any others that precede it or follow provide evidence to the contrary. *See generally* Defs.' PFOF §§ I., II., Arg. §§ I., II. Defendants also note in general that allegations of harm to individuals and organizations not party to this suit are irrelevant to the questions whether Plaintiffs

have suffered, or imminently will suffer, injury in fact or irreparable harm attributable to Defendants' conduct.

1413.   For example, Michael Senger had over 112,000 followers on Twitter, including in Missouri and Louisiana; he attests that he was twice suspended from Twitter and then permanently banned for posting Tweets critical of government policies for responding to COVID-19. Doc. 10-2, ¶¶ 4-8. He was temporarily suspended twice for tweets criticizing the FDA's emergency approval of COVID vaccines and for posting a video document public officials' statements on vaccine effectiveness. *Id.*¶ 4-6. On March 8, 2022, he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy, stating that "every COVID policy—from the lockdowns and masks to the tests, death coding, and vaccine passes—has been one, giant fraud." *Id.*¶ 7-8. This permanent suspension was inconsistent with Twitter's own policies. *Id.*¶ 10. Senger attests that the censorship inflicts ongoing harm on him, both "personally and professionally": "I discovered a gift that I had for writing and developed a network of thousands of intelligent people from all over the world with whom I had a close relationship discussing these and other issues. Now I have been silenced and cut off from all of them, with no viable way of getting that network back or promoting my work, seemingly for the sole crime of being too articulate in vocalizing my beliefs." *Id.* ¶ 13.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize six paragraphs of Mr. Senger's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, none of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Senger has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, Mr. Senger's own declaration repeatedly makes clear that the conduct of which he complains was carried out by Twitter, a private social-media company, not Defendants. Moreover, the central premise of Plaintiffs' PFOF—that "he was permanently suspended from Twitter for posting a statement of core political opinion criticizing government policy"—is false and is contradicted by the record. As of the date of this filing, Mr. Senger maintains an active Twitter account, where he appears to tweet (often several times per hour) to his more than 148,000 followers. That account is available at the following link: https://twitter.com/MichaelPSenger. *See* Robinson Decl. ¶ 7. Indeed, because Mr. Senger's declaration, executed on May 25, 2022, is nearly

a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1414.   Jeff Allen is the proprietor of "NewsTalkSTL, a popular news talk radio station in the St. Louis, Missouri region," which "enjoys a substantial Missouri audience." Doc. 10-8, ¶¶ 2-3. His station posts content on YouTube, and he describes how the station "has been targeted by YouTube from the moment of its launch in July 2021" through the present, including flagging the station's first promotional video, and issuing "strikes" for "COVID-related and election-related 'misinformation.'" *Id.* ¶¶ 4-6. These include removing a video of a show that "featured discussion of timely COVID issues, including testing and vaccines and treatments," and issuing a strike for that posting. *Id.* ¶¶ 9-10. His station "continued to receive strikes" from YouTube "in the first week of January and into February, 2022" for COVID-related content, *id.* ¶ 12. On March 14, 2022, Allen's station aired a show on "election integrity" that did not claim any election was stolen, but discussed polling data indicating that many Americans have grave concerns about election integrity. *Id.* ¶¶ 13-14. On March 21, 2022, YouTube permanently removed the station's channel as a result of that posting. *Id.* ¶ 15. "In so doing, YouTube deleted all of our content and prevented any more posts, silencing our voice and our expression from the platform entirely." *Id.* ¶ 16.

**RESPONSE:** Disputed, except that "Jeff Allen is the proprietor of "NewsTalkSTL, a popular news talk radio station in the St. Louis, Missouri region," which "enjoys a substantial Missouri audience," and that "[h]is station posts content on YouTube." This PFOF improperly purports to summarize twelve paragraphs of Mr. Allen's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, none of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Allen has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Mr. Allen's own declaration repeatedly makes clear that the conduct of which he complains was carried out by private social-media platforms, rather than Defendants. *See, e.g.*, *supra* (describing how he has purportedly been "targeted by YouTube," and asserting that "YouTube deleted all of our content"). In addition, because Mr. Allen's declaration, executed on June 11, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1415.  Allen has also experienced significant and ongoing censorship from Facebook: "Facebook has also targeted our content, pulling advertisements and issuing temporary suspensions, also for COVID and election-related 'misinformation.'" *Id.* ¶ 18.

**RESPONSE:** Disputed. Nothing in the cited paragraph of the declaration supports the assertion that "Allen has . . . experienced significant and ongoing censorship from Facebook." Instead, the declaration confirms that Facebook "ha[s] not permanently banned our content." Allen Decl. ¶ 18 (Dkt. 10-8). In any event, none of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Allen has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, Mr. Allen's own declaration repeatedly makes clear that the conduct of which he complains was carried out by Facebook, a private social-media company, not Defendants. In addition, because Mr. Allen's declaration, executed on June 11, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any "ongoing" or threatened injury from alleged censorship.

1416.  Mark Changizi is a commentator on Twitter with 37,000 followers, including many in Missouri and Louisiana. Doc. 10-9, ¶ 7, 38. Changizi experiences longstanding and ongoing censorship on Twitter, including a first suspension on April 20, 2021 "for linking to an article on the safety and efficacy of face masks," *id.* ¶ 18; additional suspension on June 25, 2021, *id.* ¶ 19; having his account secretly "heavily censored and deboosted," meaning that "the user's tweets are de-platformed—they appear in Twitter feeds much less frequently and replies to other posts may be hidden," *id.* ¶ 20; covert loss of followers, much like Dr. Kheriaty, ¶ 21; and a permanent Twitter suspension on December 18, 2021, for tweets comparing the danger of COVID-19 to the flu and promoting the benefits of natural immunity, *id.* ¶ 23. He experiences similar shadow-banning by YouTube, as his "follower-ships at YouTube also plateaued and reversed despite the fact that [he] was very active," *id.* ¶ 31. He observes that Twitter is also censoring his *private* direct messages to other Twitter users, *id.* ¶¶ 32-35. And two of his YouTube videos are also censored with their content removed from YouTube. *Id.* ¶ 36.

**RESPONSE:** Disputed, except that "Mark Changizi is a commentator on Twitter," a true statement that itself contradicts later assertions in Plaintiffs' PFOF. This PFOF improperly purports to summarize twelve paragraphs of Mr. Changizi's Declaration, rather than identifying

(let alone substantiating) any particular fact that appears therein. In any event, none of the cited or quoted statements contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Changizi has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, Mr. Changizi's own declaration repeatedly makes clear that the conduct of which he complains was carried out by private social-media companies, not Defendants. *See, e.g.*, *supra* (claiming "Twitter is . . . censoring his private direct messages to other Twitter users," and that he has experienced "shadow-banning by YouTube"). Moreover, the central premise of Plaintiffs' PFOF—that Mr. Changizi received a "permanent Twitter suspension"—is false and is contradicted by the record. As of the date of this filing, Mr. Changizi maintains an active Twitter account, where he appears to tweet (often several times per hour) to his more than 52,000 followers, accumulating over 110,000 tweets. That account is available at the following link: https://twitter.com/MarkChangizi. *See* Robinson Decl. ¶ 10. Indeed because Mr. Changizi's declaration, executed on May 25, 2022, is nearly a year old, it furnishes no evidence that he presently "experiences longstanding and ongoing censorship," or any other present or threatened injury from alleged censorship.

1417.   Changizi engages in self-censorship on social media to avoid more severe penalties, *id.* ¶¶ 39-42, and he has "become very careful about what I say on Twitter and YouTube (and Facebook and Instagram) to avoid suspension." *Id.* ¶ 39.

**RESPONSE:** Disputed. The quoted statement (and Plaintiffs' characterization of that statement) is unsupported by the record. Because Mr. Changizi's declaration, executed on May 25, 2022, is nearly a year old, it furnishes no evidence that he continues to "engage[ ] in self-censorship," or suffer any other present or threatened injury from alleged censorship. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Changizi has experienced or imminently will

701

experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statement confirms that, to the extent that Mr. Changizi, at the time he signed his declaration, was engaged in what he characterizes as "self-censorship," it was part of an effort "to avoid more severe penalties" from private social-media companies—not from Defendants.

1418.   Changizi perceives a link between the censorship he experiences and pressure from federal officials, *id.*¶¶ 43-47. He observes: "Twitter notoriously suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines." *Id.*¶ 50. He also observes the pro-government bias in social-media censorship decisions: "there are no examples of Twitter suspending individuals who have spread misinformation from the other side—by, for example, exaggerating the efficacy of masks or the threat the virus poses to children." *Id.*¶ 51.

**RESPONSE:** Undisputed that Mr. Changizi "perceive[d] a link" of the kind he describes, but disputed that there is any such "link," or that any "censorship" by private companies is attributable to any "pressure from federal officials," all of which is contradicted by the record. This PFOF improperly purports to summarize twelve paragraphs of Mr. Changizi's declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. In any event, the quoted statements (and Plaintiffs' characterizations of those statements) are unsupported by the record. Mr. Changizi offers no foundation in personal knowledge (or otherwise) for his assertion that "Twitter . . . suspends only those who question the wisdom and efficacy of government restrictions, or who cast doubt on the safety or efficacy of the vaccines," or his assertion that "there are no examples of Twitter suspending individuals who have spread misinformation from" what Mr. Changizi describes as "the other side." Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Changizi has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the quoted statement confirms that the conduct of

which Mr. Changizi complains was carried out by Twitter, a private social-media company, not Defendants.

1419.   Daniel Kotzin observes that his censorship at Twitter began in September 2021, after which he was suspended by Twitter four times, including a 24-hour suspension, two seven-day suspensions, and a permanent ban. Doc. 10-10, ¶¶ 11-12. He received these penalties for tweets questioning whether COVID vaccines reduce infection and transmission, referring to natural immunity, and criticizing government policies on lockdowns and mask mandates. *Id.* ¶¶ 13, 15, 17. He was permanently suspended on April 29, 2022, for a truthful tweet stating: "Myocarditis, pericarditis, blood clots, and strokes are known potential side effects of covid vaccination. That is not my idea of safe." *Id.* ¶ 19.

**RESPONSE:** Disputed. This PFOF improperly purports to summarize six paragraphs of Mr. Kotzin's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Mr. Kotzin complains was carried out by Twitter, a private social-media company, not Defendants. Moreover, the central premise of Plaintiffs' PFOF—that Mr. Kotzin received a "permanent ban" from Twitter—is contradicted by the record. As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet very day to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. Indeed because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1420.   Kotzin attests that "[p]ermanent expulsion from Twitter has been devastating for me. I had spent 2 years building my Twitter following. Two years ago, I had fewer than 100 followers, and at the time of my permanent suspension I had nearly 32,000. When my account is suspended, I am unable to communicate with my followers." *Id.* ¶¶ 21-23.

**RESPONSE:** Disputed. Mr. Kotzin has not received a "permanent expulsion from Twitter." As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet almost every day (often many times per day) to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. Mr. Kotzin's perception that the loss of his "nearly 32,000" followers was "devasting," is also contradicted by the record, given that he currently has more than 40,000 followers. Indeed because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship. None of the quoted or cited language in this PFOF contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants.

1421.   Kotzin observes an increase in censorship on Twitter after the Surgeon General's Request for Information issued on March 3, 2022. "Based on my observations and extensive Twitter use, many more accounts than usual have been suspended since the Surgeon General's RFI on March 3." *Id.* ¶ 25. This increase in censorship affected Kotzin directly: "Since the Surgeon General's Request for "health misinformation" in March [2022] I have been suspended four times by Twitter, and have now been permanently banned." *Id.* ¶ 35.

**RESPONSE:** Disputed. Mr. Kotzin has not been "permanently banned" from Twitter. As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet almost every day (often many times per day) to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. Indeed, because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship. In addition, Mr. Kotzin provides no foundation in personal knowledge or otherwise for his "observations" that "many more accounts than usual have been suspended".

Regardless, the number of accounts that are suspended in a given time period by Twitter, a private company, is immaterial to any issue in this case. None of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Mr. Kotzin complains was carried out by Twitter, a private social-media company, not Defendants.

1422.   Kotzin notes that suspension results in loss of one's own prior expression: "When an account is permanently suspended, everything the person ever wrote is erased and cannot be accessed by anyone." *Id.* ¶ 27.

**RESPONSE:**  Disputed. Mr. Kotzin has not been "permanently suspended" from Twitter. As of the date of this filing, Mr. Kotzin maintains an active Twitter account, where he appears to tweet almost every day (often many times per day) to his more than 40,000 followers, accumulating over 11,000 tweets. That account is available at the following link: https://twitter.com/danielkotzin. *See* Robinson Decl. ¶ 5. All of the material that Mr. Kotzin claims was permanently "erased and cannot be accessed by anyone" appears to be accessible to anyone with an internet connection, at the following link: https://twitter.com/danielkotzin. None of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship because of any conduct by Defendants. Indeed because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship.

1423. Kotzin describes that he "methodically self-censored" to avoid permanent suspension: "Since the [Surgeon General's] RFI, many of us who are critical of government covid policies have been regulating our speech more carefully than ever, because we have noticed that more of us are getting suspended than ever before, and we don't want to risk losing our audience. I considered the possibility of 'permanent suspension' to be such a devastating prospect that I methodically self-censored." *Id.* ¶¶ 28-29; *see also id.* ¶¶ 31-32.

**RESPONSE:** Disputed to the extent that Mr. Kotzin asserts that others "self-censored" to avoid permanent suspension, an assertion for which he offers no foundation in personal knowledge or otherwise. Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the quoted statement confirms that, to the extent that Mr. Kotzin ever engaged in "self-censorship" in the past, it was part of an effort to avoid a "permanent suspension" by Twitter, a private social-media company—not to avoid any adverse action by any of the Defendants. And because Mr. Kotzin's declaration, executed on May 26, 2022, is nearly a year old, it furnishes no evidence that he continues to suffer any present or threatened injury from alleged censorship or self-censorship.

1424.   Kotzin observes a close link between social-media censorship and the federal government's policies and preferred narratives: "Twitter suspends only those who question the wisdom and efficacy of government restrictions, or those who cast doubt on the necessity, safety or efficacy of the vaccines. If all or almost all suspensions are targeted at critics of the government and government policies, and no or almost no suspensions are targeted at purveyors of factually incorrect information, then it is not 'misinformation' that is being censored, but criticism of the government." *Id.* ¶¶ 34-35.

**RESPONSE:** Disputed. Mr. Kotzin offers no foundation in personal knowledge, or otherwise, for these "observ[ations]." Regardless, none of the quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. Kotzin has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statement confirms that the conduct of which Mr. Kotzin complains was carried out by Twitter, a private social-media company, not Defendants.

1425.   Joshua McCollum is a concerned parent in a school district in Missouri. Doc. 10-14, ¶¶ 1-4. Like Hines, he has experienced censorship that directly interferes with his ability to organize, associate with like-minded people, and petition his local government: "On or about July 28, 2021, in the midst of discussing with others a recent school board meeting related to masks, and whether FHSD would keep its policy of optional masking versus change their policy to

mandatory masking, [McCollum] decided to launch an online petition to encourage the board members to keep their optional masking policy and *not* change to mandatory masking." *Id.* ¶ 9. Through his account on Nextdoor (a Meta/Facebook platform), he posted this petition on change.org, and "[t]he posting of this petition on change.org was the beginning of the shadow-banning and blocking of my Nextdoor account." *Id.* ¶ 11. Comments were blocked from his Nextdoor account, and then his Nextdoor account was suspended for one month for "spreading misinformation." *Id.*¶¶ 12-14. This censorship prevented him from organizing, associating with others, and petitioning his local government, when those on the other side of the issue were allowed to do so: "Subsequently, on August 12, 2021, FHSD decided to reinstate their mandatory masking policy, shortly after the voice of myself and the 280 fellow petition signers was suppressed. There were petitions encouraging reinstatement of mandatory masking, but our contrary petition was suppressed by Nextdoor. I am a parent simply trying to have a voice in my local school district and its policies regarding my own children, but social media has stooped down to censor even my voice within my local community." *Id.*¶¶ 15-17.

**RESPONSE:** Disputed, except that "Joshua McCollum is a concerned parent in a school district in Missouri." This PFOF improperly purports to summarize the entirety of Mr. McCollum's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Mr. McCollum has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Mr. Kotzin complains was carried out by private social-media platforms, not Defendants. In addition, Mr. McCollum's declaration does not even purport to assert injury of an ongoing nature, and because it was executed on June 8, 2022, nearly one year ago, it cannot furnish evidence that he continues to suffer any present or threatened injury from alleged censorship.

1426.   Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana. Doc. 10-15, ¶¶ 1-3. Gulmire has "been censored numerous times by Facebook and Twitter even before I joined The Epoch Times in the summer of 2021," as her "personal posts regarding excessive COVID-19 measures and regarding the election were repeatedly flagged and taken down by Facebook and Twitter." *Id.* ¶¶ 7-8. Her journalism for the Epoch Times has also been censored by Facebook, including an article questioning the evidence for vaccinating pregnant women with COVID-19 vaccines that was later validated by Pfizer documents, *id.* ¶¶ 10-13; and an article in March 2022 for The Federalist about the People's Convoy of truckers in the United States supporting their Canadian counterparts, *id.*

18-19. She has also had eleven articles about "mask mandates, vaccines, lockdowns and mental health" censored on Pinterest, *id.* ¶ 17.

**RESPONSE:** Disputed, except that "Jessica Marie Gulmire is a freelance journalist for the Epoch Times who resides in Missouri, and has readership in Missouri and Louisiana." This PFOF improperly purports to summarize the entirety of Ms. Gulmire's Declaration, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the quoted or cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Ms. Gulmire has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the quoted statements confirm that the conduct of which Ms. Gulmire complains was carried out by private social-media companies, not Defendants. In addition, because Ms. Gulmire's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that she continues to suffer any present or threatened injury from alleged censorship.

### C.    Defendants Gravely Injure the State Plaintiffs, Louisiana and Missouri.

#### 1.    Fundamental policies favoring freedom of speech for their citizens.

1427.   Both Louisiana and Missouri have adopted fundamental policies favoring freedom of speech, without government-induced censorship, for their citizens. LA. CONST. art. I, § 7; MO. CONST. art. I, § 8.

**RESPONSE:** Undisputed, but immaterial to any issue in this case. This case is governed by the First Amendment to the United States Constitution, which is "the supreme Law of the Land," U.S. Const., art. VI, cl. 2, not by the laws of Louisiana or Missouri. This PFOF contains no evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Plaintiff States have experienced or imminently will experience censorship as a result of any conduct by Defendants.

#### 2.    Direct censorship of the States and their political subdivisions.

708

1428.   Both Louisiana and Missouri, and their political subdivisions, have experienced direct social-media censorship on COVID and related issues. For example, Louisiana's Department of Justice—the office of its Attorney General—was directly censored on YouTube for posting video footage of Louisianans criticizing mask mandates and COVID-19 lockdown measures on August 18, 2021—on August 18, 2021, just after the federal Defendants' most vociferous calls for censorship of COVID "misinformation."  Bosch Decl., Doc. 10-13, ¶ 7.

**RESPONSE:** Disputed that Louisiana or Missouri or its political subdivisions "have experienced direct social-media censorship" or were "directly censored" on any issue. Undisputed that YouTube, a private social-media company, concluded that a video posted by employees of the Louisiana Department of Justice "violated YouTube's 'medical misinformation policy,'" and was therefore removed from YouTube, by YouTube. None of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Plaintiff States have experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited paragraph confirms that the conduct of which Plaintiffs complain was carried out by YouTube, not Defendants, and was an application of a policy created and enforced by YouTube, not Defendants. In addition, because Ms. Bosch's declaration, executed on June 14, 2022, is nearly a year old, it furnishes no evidence that Louisiana continues to suffer any present or threatened injury from alleged censorship.

1429.   In addition, a Louisiana state legislator was censored by Facebook when he posted content addressing vaccinating children against COVID-19. Bosch Decl., Doc. 10-13, ¶ 9.

**RESPONSE:** Disputed. The cited paragraph of the declaration does not offer any evidence that "a Louisiana state legislator was censored by Facebook," it instead states—without identifying the post in question, or the date on which it was posted—that certain content was apparently "flagged as misleading and de-boosted by Facebook for violating its medical misinformation policy." Bosch Decl. ¶ 9 (Dkt. 10-13). Regardless, none of the cited language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the

Louisiana has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the cited paragraph confirms that the conduct of which Plaintiffs complain was carried out by Facebook, not Defendants, and was an application of a policy created and enforced by Facebook, not Defendants. In addition, because Ms. Bosch's declaration, executed on June 14, 2022, is nearly a year old, it furnishes no evidence that Louisiana continues to suffer any present or threatened injury from alleged censorship.

1430.   St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates. Flesh Decl., Doc. 10-6, ¶ 7. Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings, but YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective. *Id.*

**RESPONSE:**  Undisputed that "St. Louis County, a political subdivision of Missouri, conducted public meetings regarding proposed county-wide mask mandates, at which some citizens made public comments opposing mask mandates." The statement that "Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings," is a statement of law, not of fact, and is unsupported by any citation to any legal authority or any factual assertion in the cited declaration. In any event, that question of Missouri state law is immaterial to any issue in this case, and Plaintiffs do not assert that "Missouri's open-meetings law required St. Louis County to post publicly the videos of those meetings" on YouTube, or on any other particular social-media platform. To the contrary, the cited paragraph of the Flesch Declaration references St. Louis County's decision to "stop using YouTube." Finally, the statement that "YouTube censored the entire videos of four public meetings, removing the content, because some citizens publicly expressed views that masks are ineffective," is disputed, as it is unsupported by the cited Declaration, which describes the relevant video with insufficient specificity to determine whether the characterization in Plaintiffs' PFOF is supported by the record. Regardless, none of the cited

language contains evidence of threats or pressure by Defendants to force social media companies

to censor speech, or that the Missouri has experienced or imminently will experience censorship

because of any conduct by Defendants. To the contrary, the cited paragraph confirms that the

conduct of which Plaintiffs complain was carried out by YouTube, not Defendants. In addition,

because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no

evidence that Missouri continues to suffer any present or threatened injury from alleged

censorship.

### 3. The States' interest in following the uncensored discourse of their citizens.

1431. Patrick Flesch, Director of Constituent Services for the Missouri Attorney General's Office, explains that he is "personally involved in, receiving, reviewing, and responding to thousands of communications from Missouri constituents per year." Doc. 10-6, ¶ 3. He explains that being able to follow Missourians' uncensored speech on social media is essential for him to do his job effectively, as understanding Missourians' true thoughts and concerns on policy matters like election integrity and COVID-19 is necessary to craft policies and messages that are responsive to constituents' actual concerns. Doc. 10-6, ¶ 3-4. This "includes monitoring activity and mentions on multiple social media platforms, including Facebook, Twitter, and YouTube." *Id.* "I monitor these sorts of trends *on a daily or even hourly basis* when needed on behalf of the Office." *Id.* (emphasis added). For example, regarding the censorship of St. Louis County's video of its public meeting where citizens opposed mask mandates, Flesch notes: "This video is just the sort of information that is important for me to review, and yet it was unavailable for a critical period of time due to online censorship of speech questioning the efficacy of mask mandates." *Id.*¶ 7. Likewise, regarding YouTube censoring Jeff Allen's radio station NewsTalkSTL, and Nextdoor censoring Joshua McCollum's online petition, Flesch observes: "These examples are just the sort of online speech by Missourians that it is important for me and the Missouri Attorney General's Office to be aware of." *Id.* ¶¶ 9.

**RESPONSE:** Disputed, with the exception of the descriptions of Mr. Flesch's job

responsibilities, which are undisputed. This PFOF improperly purports to summarize four lengthy

paragraphs of Mr. Flesch's Declaration, rather than identifying (let alone substantiating) any

particular fact that appears therein. Regardless, none of the cited or quoted language contains

evidence of threats or pressure by Defendants to force social media companies to censor speech,

or that Missouri has experienced or imminently will experience censorship as a result of any

conduct by Defendants. To the contrary, the declaration confirms that the conduct of which

Plaintiffs complain was carried out by private social-media companies, not Defendants. In

addition, because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it

furnishes no evidence that Missouri continues to suffer any present or threatened injury from

alleged censorship.

1432.   As Flesch attests, "The kinds of speech discussed above and in the Complaint in
this case—such as speech about the efficacy of COVID-19 restrictions, and speech about issues of
election security and election integrity—are matters of core interest and high importance to me in
my work on behalf of the AGO. When such speech is censored on social media, it makes it much
harder for me to do my job and to understand what Missourians really are concerned about." *Id.*¶
10.

**RESPONSE:** Undisputed, except for Plaintiffs' implication that any of the examples

discussed in Mr. Flesch's declaration are examples of speech being "censored," which is disputed,

and is unsupported by the record, especially to the extent that the implication of Plaintiffs' PFOF

is that anything was "censored" by Defendants. None of the cited or quoted language contains

evidence of threats or pressure by Defendants to force social media companies to censor speech,

or that Missouri has experienced or imminently will experience censorship because of any conduct

by Defendants. To the contrary, the declaration confirms that the conduct of which Plaintiffs

complain was carried out by private social-media companies, not Defendants. In addition, because

Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence

that Missouri continues to suffer any present or threatened injury from alleged censorship.

1433.   As Mr. Flesch explains in detail: "Issues regarding COVID-19 responses (such as
mask mandates imposed by municipalities and school districts on schoolchildren) and election
security and integrity have been of critical importance to Missourians in recent months and years.
…   It is very important for me to have access to free public discourse on social media on these
issues so I can understand what Missourians are actually thinking, feeling, and expressing about
such issues, and so I can communicate effectively with them." *Id.* ¶ 5. "[O]nline censorship of
free public discourse on social-media companies has hampered my ability to follow Missourians'
speech on these issues." *Id.* ¶ 6.

**RESPONSE:** The language in this PFOF that quotes paragraph 5 of Mr. Flesch's declaration is undisputed. The remainder of this PFOF is disputed. There is no support in the record for the statement in paragraph 6 that "online censorship of free public discourse on social-media companies has hampered [Mr. Flesch's] ability to follow Missourians' speech on these issues," a conclusory assertion for which Mr. Flesch offers no factual substantiation. Regardless, none of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Missouri has experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the declaration confirms that the conduct of which Plaintiffs complain was carried out by private social-media companies, not Defendants. In addition, because Mr. Flesch's declaration, executed on June 8, 2022, is nearly a year old, it furnishes no evidence that Missouri continues to suffer any present or threatened injury from alleged censorship.

1434.   Ashley Bosch, Communications Officer for the Louisiana Department of Justice, attests on behalf of the State of Louisiana: "Part of my job is to gather and synthesize topical subject matters that are important to Louisiana citizens, on behalf of the Department." Doc. 10-13, ¶ 4. "Understanding what subject matters and issues are important to Louisianans is critical for the Department to formulate policies and messaging that will address the concerns expressed by our constituents." *Id.* This "includes monitoring activity and mentions on social media platforms, including Facebook, Instagram, Twitter, and YouTube." *Id.* Doc. 10-13, ¶ 4. "It is very important for me to have access to free public discourse on social media on these issues so I can understand what our constituents are actually thinking, feeling, and expressing about such issues, and so I can communicate properly with them." *Id.* ¶ 5. "Online censorship of Louisiana citizens by social media companies interferes with my ability to follow Louisianans' speech on these issues." *Id.* ¶ 6. Bosch notes that it is particularly important for her to follow Louisiana's speech on topics of federally-induced censorship: "For example, mask and vaccine mandates for students have been a very important source of concern and public discussion by Louisiana citizens over the last year." Doc. 10-13, ¶ 5. "Louisianans' speech about the efficacy of COVID-19 restrictions, and speech about issues of election security and election integrity are matters of great interest and importance to me in my work on behalf of the Louisiana Department of Justice." Doc. 10-13, ¶ 10.

**RESPONSE:** Undisputed, with the exceptions of (1) the statement that "[o]nline censorship of Louisiana citizens by social media companies interferes with [Ms. Bosch's] ability

to follow Louisianans' speech on these issues," and (2) the unexplained and unsupported reference to "federally-inducted censorship." The first is a conclusory assertion for which Ms. Bosch's declaration offers no factual substantiation, and the second is an allegation as to which she has no evident personal knowledge and that is contradicted by the record. None of the cited or quoted language contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that Louisiana has experienced or imminently will experience censorship as a result of any conduct by Defendants. To the contrary, the declaration confirms that the conduct of which Ms. Bosch complains was carried out by private social-media companies, not Defendants. In addition, because Ms. Bosch's declaration, executed on June 14, 2022, is nearly a year old, it furnishes no evidence that Louisiana continues to suffer any present or threatened injury from alleged censorship.

1435.  As noted above, Defendants' witness from the CDC, Carol Crawford, attests to exactly the same government interest in being able to read and follow the true, uncensored opinions of the government's constituents.

**RESPONSE:**  Disputed. There was no statement to that effect in Ms. Crawford's deposition testimony, which is presumably why this PFOF contains no citation to Ms. Crawford's deposition transcript.

1436.  Crawford admits that government communicators have a strong interest in tracking what their constituents are saying on social media: "It's helpful for communicators to know what is being discussed because it helps improve our communication materials." Crawford Dep. 53:10-12. Crawford emphasized this point multiple times: "as I mentioned before, it does help … for communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* 54:15-20.

**RESPONSE:**  Disputed. Plaintiffs mischaracterize Ms. Crawford's deposition testimony in several respects. The quoted testimony is not about "government communicators" in general (and certainly not about state government officials), it is about Ms. Crawford's experience working

at the CDC with respect to one particular report about social-media usage. In addition, Ms. Crawford never described a "strong interest" in this topic, let alone "emphasized this point multiple times."

1437.   Crawford said that CrowdTangle reports "would help us understand what was being discussed on social media about COVID, which helps us look for gaps in information, confusion about facts, things that we might need to adjust our communication materials for." *Id.* 57:24-58:3. Crawford specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were: She "was wondering if they delete the info will we know those myths or information so we could update communication activity. So if they were deleting content would we know what the themes were." *Id.* 75:14-18. Accordingly, Crawford wanted to know, "would [CDC] be able to see in CrowdTangle or other reports … what kind of themes were removed so we would still have the full picture of areas of confusion." *Id.* 75:23-76:1.

**RESPONSE:** The first sentence and the last sentence of this PFOF are undisputed. Disputed that Ms. Crawford "specifically expressed the concern that, if content was censored or removed from social-media platforms, government communicators would not know what the citizens' true concerns were," which is not what the quoted language says (certainly not "specifically"), and in fact no such statement appears anywhere else in Ms. Crawford's deposition testimony.

**4.      States' interest in fair, unbiased, open processes to petition state government.**

1438.   Social-media censorship directly interferes with the States' interest maintaining fair, even-handed, and open processes for petitioning their own governments and political subdivisions. When one side of a debate can organize on Facebook or Nextdoor and petition the government, and the other side cannot because of social-media censorship, that means that state officials never receive a fair, unbiased presentation of their constituents' views.

**RESPONSE:** Disputed. Plaintiffs provide no evidentiary support for this PFOF, which is argument based on hypothetical facts rather than a statement of fact. Defendants address Plaintiffs' legal arguments in their opposition to Plaintiffs' motion for preliminary injunction.

1439.   As noted above, social-media censorship has perverted state and local political processes by artificially restricting access to the channels of advocacy to one side of various issues. For example, social-media censorship prevented Louisiana advocacy groups from organizing

effectively to advocate in favor of legislative action on issues of great public import. Hines Decl., Doc. 10-12, ¶¶ 13-14. Likewise, social-media censorship prevented a Missouri parent from circulating an online petition to advocate against mandatory masking at his local school district, a political subdivision of the State. McCollum Decl., Doc. 10-14, ¶¶ 9-17; *see also* Doc. 10-12, ¶¶ 13-14; Doc. 10-14, ¶¶ 9-17; Doc. 10-15, ¶¶ 11-16, 18-19.

**RESPONSE:** Disputed. Plaintiffs provide no evidentiary support for this PFOF. To the extent that portions of this PFOF do include assertions of fact, they do so by improperly purporting to summarize the contents of sprawling portions of six different declarations, rather than identifying (let alone substantiating) any particular fact that appears therein. Regardless, none of the cited declarations contains evidence of threats or pressure by Defendants to force social media companies to censor speech, or that the Plaintiff States have experienced or imminently will experience censorship because of any conduct by Defendants. To the contrary, the declarations confirm that the conduct of which Plaintiffs complain was carried out by private social-media companies, not Defendants. In addition, to the extent the cited declarations were executed nearly a year ago, they furnish no evidence that the Plaintiff States continue to suffer any present or threatened injury from alleged censorship.

1440.   Plaintiff Jill Hines explains that "two of our Facebook groups were completely deplatformed, effectively disbanding a group of more than two thousand people who were organized to engage in direct advocacy to our state legislature, on two separate occasions." Doc. 10-12, ¶ 13. She attests that "[t]he last post I made in our HFL Group on July 13, 2021, was a 'call to action' for the upcoming Veto Session, asking people to contact legislators regarding health freedom legislation.." *Id.* ¶ 14. Suppressing these Facebook groups directly interfered with state officials' ability to receive free and fair communications of their constituents' concerns: "Removing our closed group at such crucial time effectively stopped our ability to communicate with our representatives in the state legislature." *Id.*

**RESPONSE:** This PFOF essentially repeats Plaintiffs' and Ms. Hines's assertions in Pls.' PFOF ¶¶ 1408 and 1409, above. Defendants incorporate their responses to Pls.' PFOF ¶¶ 1408 and 1409 as if fully set forth herein.

**5. State quasi-sovereign interests.**

1441.   The States also assert quasi-sovereign interests in protecting the freedom of speech of a substantial segment of their population—*i.e.*, their citizens who are both speakers and audiences of speech on social media; and in ensuring that their citizens receive the full benefit of participation in the federal system—which includes, among other benefits, the full protection of the First Amendment.

**RESPONSE:** Undisputed that the States assert the purported interests described. Whether those are judicially cognizable interests that States have standing to assert against the Federal Government is a legal issue addressed in Defendants' brief in opposition to Plaintiffs' motion for preliminary injunctive relief.

1442.   Based on the foregoing evidence, social-media censorship afflicts a substantial segment of the populations of both Missouri and Louisiana.

**RESPONSE:** Disputed. Plaintiffs provide no evidentiary support for this PFOF. In particular, Plaintiffs offer no evidence of threats or pressure by Defendants to force social media companies to censor speech, or that any segments of the populations of Missouri and Louisiana have been or imminently will be "afflict[ed]" by censorship as a result of any conduct by Defendants.

Dated:  May 2, 2023                    Respectfully submitted,

                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General

                                       JAMES J. GILLIGAN
                                       Special Litigation Counsel, Federal Programs Branch

                                       JOSHUA E. GARDNER (FL Bar No. 0302820)
                                       Special Counsel, Federal Programs Branch

                                       _/s/ Kyla M. Snow_
                                       KYLA M. SNOW (OH Bar No. 96662)
                                       INDRANEEL SUR (D.C. Bar No. 978017)
                                       KUNTAL CHOLERA (D.C. Bar No. 1031523)
                                       AMANDA K. CHUZI (D.C. Bar No. 1738545)
                                       Trial Attorneys
                                       U.S. Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L Street, NW
                                       Washington D.C. 20005
                                       Tel: (202) 514-3259
                                       kyla.snow@usdoj.gov

                                       _Attorneys for Defendants_