**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

| | |
|---|---|
| STATE OF MISSOURI, STATE OF LOUISIANA, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>  *Defendants*. | Case No. 3:22-cv-01213-TAD |

## SUPPLEMENTAL DECLARATION OF TAMMY GLENN

1.      My name is Tammy Glenn.  I am over the age of 18 years and competent to testify to the matters expressed herein.  I am a paralegal employed by the Missouri Attorney General's Office.

2.      I have previously submitted a Declaration in this case, which is filed with the Court as Doc. 10-1.  That prior Declaration is incorporated by reference herein.

3.      The following documents are among those that have been filed with the Court by Plaintiffs in this case and are identifiable by ECF numbers.

4.      Docs. 10-1 through 10-15 are witness declarations of Tammy Glenn, Michael Senger, Jay Bhattacharya, Martin Kulldorff, Jim Hoft, Patrick Flesch, Aaron Kheriaty, Jeff Allen, Mark Changizi, Daniel Kotzin, AJ Kitchen, Jill Hines, Ashley Bosch, Joshua McCollum, and Jessica Marie Gulmire, respectively, in support of the Motion for Preliminary Injunction.

5.      Doc. 45-1 is a collection of CDC emails produced through FOIA and publicly available on the internet, and Docs. 45-2 through 45-15 are witness declarations of Michael Senger,

Page 1

Jay Bhattacharya, Martin Kulldorff, Jim Hoft, Patrick Flesch, Aaron Kheriaty, Jeff Allen, Mark Changizi, Daniel Kotzin, AJ Kitchen, Jill Hines, Ashley Bosch, Joshua McCollum, and Jessica Marie Gulmire, respectively.

6.     Doc. 71-1 is Defendants' Interrogatory responses, produced by Defendants in discovery.  Doc. 71-2 is a collection of emails involving the CDC, Census, Treasury Department, and State Department produced by Defendants in discovery.  Doc. 71-3 is a collection of emails produced by Defendants in discovery.  Doc. 71-4 is a collection of emails between Facebook executives and the White House and Office of the Surgeon General produced by Defendants in discovery.  Doc. 71-5 is a collection of text messages between Facebook and Microsoft executives and Dr. Murthy and Jen Easterly produced by Defendants in discovery.  Docs. 71-6 and 71-7 are collections of CDC emails produced by Defendants in discovery.  Doc. 71-8 is a collection of CISA emails produced by Defendants in discovery.  Doc. 71-9 is a collection of CDC, Census, and CISA emails produced by Defendants in discovery.  Docs. 71-10, 71-11, and 71-13 are requests-for-production responses produced by Karine Jean-Pierre, Dr. Fauci and NIAID, and HHS, respectively.

7.     Doc. 84-1 is a collection of HHS and White House emails produced by Defendants in discovery.  Doc. 84-2 is a collection of CISA emails and documents produced by Defendants in discovery.

8.     Doc. 86-2 is a letter from Congressmen James Comer and Jim Jordan to HHS Secretary Becerra, along with Dr. Fauci emails, which is publicly available on the internet.  Doc. 86-3 is Defendants' Amended Interrogatory Responses.  Doc. 86-5 is a collection of White House emails produced by Defendants in discovery.  Doc. 86-6 is a collection of Elvis Chan emails produced by third-party LinkedIn in discovery.  Doc. 86-7 is a collection of CISA documents

produced by Defendants in discovery.  Doc. 86-8 is a collection of Lauren Protentis emails produced by Defendants in discovery.  Doc. 86-9 is a collection of Dr. Murthy documents produced by Defendants in discovery.  Doc. 86-10 is a collection of Carol Crawford documents produced by Defendants in discovery.

9.      Doc. 106-1 is a letter from counsel for Plaintiffs to counsel for third-party Meta. Doc. 106-2 is a letter from counsel for third-party Meta to counsel for Plaintiffs.  Doc. 106-3 is a copy of a November 2, 2022 New York Post article, "How the government hid the truth behind Hunter Biden's laptop."  Doc. 106-4 is the December 17, 2020 declaration of Yoel Roth filed before the Federal Election Commission, which is publicly available.

10.     Doc. 137-1 is a collection of Rob Flaherty emails produced by Defendants in discovery.  Doc. 137-2 is a collection of Lauren Protentis emails produced by Defendants in discovery.  Doc. 137-3 is a copy of the EIP's report, "The Long Fuse: Misinformation and the 2020 Election," which is publicly available on the internet.  Doc. 137-4 is a collection of Brian Scully emails produced by Defendants in discovery.  Doc. 137-5 is a copy of the VP's report, "Memes, Magnets, and Microchips: Narrative Dynamics Around Covid-19 Vaccines," which is publicly available on the internet.  Doc. 137-6 is a collection of Eric Waldo emails produced by Defendants in discovery.

11.     Doc. 146-1 is the transcript of the November 29, 2022 deposition of Elvis Chan. Doc. 146-2 is the transcript of the November 23, 2022 deposition of Dr. Fauci.  Doc. 146-3 is the transcript of the November 10, 2022 deposition of Daniel Kimmage.

12.     Doc. 174-1 is a collection of White House emails produced by Defendants in discovery.

13.     Doc. 179-1 is Plaintiffs' First Set of Preliminary-Injunction-Related Interrogatories to CISA.  Doc. 179-2 is Plaintiffs' First Set of Preliminary-Injunction-Related Interrogatories to Jen Easterly.  Doc. 179-3 is Plaintiffs' First Set of Preliminary-Injunction-Related Requests for Production to CISA and Jen Easterly.  Doc. 179-4 is Defendants' Interrogatory Responses.  Doc. 179-5 is CISA's and Jen Easterly's Requests-for-Production Responses.  Doc. 179-6 is a transcript of the January 12, 2023 deposition of Brian Scully.  Doc. 179-7 contains emails between counsel for Plaintiffs and counsel for Defendants.

14.     Doc. 184-1 is a collection of CISA documents produced by Defendants in discovery.  Doc. 184-2 is a collection of Brian Scully emails produced by Defendants in discovery.

15.     Doc. 204-1 is the transcript of the November 29, 2022 deposition of Elvis Chan. Docs. 204-2 through 204-9 are the deposition exhibits.

16.     Doc. 205-1 is the transcript of the November 15, 2022 deposition of Carol Crawford.  Docs. 205-2 through 205-44 are the deposition exhibits.

17.     Doc. 206-1 is the transcript of the November 23, 2022 deposition of Dr. Fauci. Docs. 206-2 through 206-36, Doc. 207, and Docs. 207-1 through 207-27 are the deposition exhibits.

18.     Doc. 208-1 is the transcript of the November 10, 2022 deposition of Daniel Kimmage.  Docs. 208-2 through 208-17 are the deposition exhibits.

19.     Doc. 209-1 is the transcript of the January 12, 2023 deposition of Brian Scully. Docs. 209-2 through 209-30 are the deposition exhibits.

20.     Doc. 210-1 is the transcript of the December 22, 2022 deposition of Eric Waldo. Docs. 210-2 through 210-46 are the deposition exhibits.

21.     Doc. 227-2 is a collection of CISA emails produced by Defendants in discovery. Docs. 227-3 through 227-9 are declarations of John Vecchione, Esq., John Burns, Esq., Jay Bhattacharya, Martin Kulldorff, Aaron Kheriaty, Jim Hoft, and Jill Hines, respectively, in support of the Motion for Class Certification.

22.     Additionally, attached hereto as Exhibit A is an audio transcription of excerpts from the October 7, 2020 event "CISA Cybersecurity Summit 2020: Combatting Disinformation," which audio transcription includes words from speakers Clint Watts and Alex Stamos.  This same document is cited in Plaintiffs' Proposed Findings of Fact (Doc. 214-1) as "Scully Ex. 3."

23.     Attached hereto as Exhibit B is an audio transcription of excerpts from the November 10, 2020 event "Atlantic Council: Initial Reactions: Disinformation in the 2020 Elections," which audio transcription includes words from speaker Alex Stamos.  This same document is cited in Plaintiffs' Proposed Findings of Fact (Doc. 214-1) as "Scully Ex. 4."

24.     Attached hereto as Exhibit C is an audio transcription of excerpts from the March 3, 2021 event "Atlantic Council: The Long Fuse: Misinformation and the 2020 Election," which audio transcription includes words from speaker Emerson Brooking.  This same document is cited in Plaintiffs' Proposed Findings of Fact (Doc. 214-1) as "Scully Ex. 5."

25.     Attached hereto as Exhibit D is an audio transcription of excerpts from the November 17, 2021 event "Digital Media Research Centre 2021 Digital Publics Symposium," which audio transcription includes words from speaker Kate Starbird.  This same document is cited in Plaintiffs' Proposed Findings of Fact (Doc. 214-1) as "Scully Ex. 8."

26.     Attached hereto as Exhibit E is an email of Twitter's Global Policy Communications Chief Emily Horne that is publicly available at: Matt Taibbi, Twitter Files #14: The RussiaGate Lies, Tweet 14, *at* https://twitter.com/mtaibbi/status/1613589069023383575.

27.     Attached hereto as Exhibit F is an email of Twitter's Head of Trust and Safety Yoel Roth that is publicly available at: Matt Taibbi, Twitter Files # 14: The RussiaGate Lies, Tweet 15, *at* https://twitter.com/mtaibbi/status/1613589072777285641.

28.     Attached hereto as Exhibit G is an email of Twitter's Head of Trust and Safety Yoel Roth that is publicly available at: Matt Taibbi, Twitter Files # 14: The RussiaGate Lies, Tweet 17, *at* https://twitter.com/mtaibbi/status/1613589077906919432.

29.     Attached hereto as Exhibit H is an internal Twitter communication that is publicly available at: Matt Taibbi, Twitter Files # 14: The RussiaGate Lies, Tweet 18, *at* https://twitter.com/mtaibbi/status/1613589080096350208.

30.     Attached hereto as Exhibit I is correspondence submitted on behalf of Twitter, Inc., to the Federal Election Commission, dated December 21, 2020, by its lawyers at Covington & Burling, LLP, in FEC matter number MUR 7827.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed On:  May 20, 2023                    */s/ Tammy Glenn*

                                              Tammy Glenn

# EXHIBIT A



🇺🇸 An official website of the United States government    Here's how you know ⌄

REPORT    SUBSCRIBE    CONTACT    SITE MAP

# 3RD ANNUAL NATIONAL CYBERSECURITY SUMMIT FOR 2020



The 3rd Annual National Cybersecurity Summit took place September 16 - October 7, 2020, a series of seminars conducted virtually each Wednesday for four weeks due to the COVID-19 pandemic. There were more than 15,000 virtual attendees.

The 2020 Cybersecurity Summit brought together infrastructure stakeholders from around the world and provided a forum for meaningful conversations and collaboration on cybersecurity.

Each series had a different theme that focused on CISA's mission, with presentations from targeted leaders across government, academia, and industry.

The themes were:

- Sept 16: Key Cyber Insights
- Sept 23: Leading the Digital Transformation
- Sept 30: Diversity in Cybersecurity
- Oct 7: Defending our Democracy



EXHIBIT
3

## Frequently Asked Questions (FAQ)

```
 1

 2

 3                    AUDIO TRANSCRIPTION

 4             IN RE: STATE OF MISSOURI, ET AL.

 5                         VS.

 6             JOSEPH R. BIDEN, JR., ET AL.

 7                 CASE NO. 322CV01213

 8    EVENT: CISA CYBER SECURITY SUMMIT 2020: COMBATTING

 9                     DISINFORMATION

10                    OCTOBER 7, 2020

11

12

13

14    (Due to the quality of the recorded media, portions

15    were unable to be transcribed and include inaudible

16    portions.  The transcript may also include

17    misinterpreted words and/or unidentified speakers.

18    The transcriber was not present at the time of the

19    recording; therefore, this transcript should not be

20    considered verbatim.)

21

22    TRANSCRIBED BY: MELISSA LANE

23

24

25
```

**AUDIO TRANSCRIPTION  1/10/2023**

**Page 2**

```
 1              (CLIP: 6:17-6:50)

 2              CLINT WATTS:  And I think what's

 3    interesting in this time around is how we -- we kind

 4    of talked about Russia having the playbook in 2016,

 5    and sort of leading the way in terms of how to do

 6    disinformation and -- and election manipulation.  Now

 7    everyone has adopted that approach, and in the

 8    domestic scene, it -- it is overwhelmingly more domestic

 9    than foreign this time around in 2020, and I think

10    from the Russian, Chinese or Iranian perspective, they

11    must wonder what they can possibly say that would

12    change anyone's mind that's not already being said in

13    the American landscape.

14

15

16

17

18

19

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION  1/10/2023**

```
 1                (CLIP: 12:43-13:18)

 2                ALEX STAMOS:  The bigger issue in 2020, is

 3      going to be domestic, and to be honest, like, it's --

 4      it is domestic and the -- the things that we're

 5      seeing, so we have set up this thing called the

 6      election integrity partnership, so we went and hired a

 7      bunch of students.  We're working with the University

 8      of Washington, Graphika, and DFRLab, and the vast, vast

 9      majority of the contact we see we believe is domestic.

10      You know, some of it you can't tell, but a lot of it

11      is coming from domestic blue checkmark verified

12      elites; right?  And so I think a much bigger issue for

13      the platforms is elite disinformation.  The stuff that

14      is being driven by people who are verified that are

15      Americans who are using their real identities.

16

17

18

19

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION  1/10/2023**

```
 1                 (CLIP:  29:24-30:00)

 2                 ALEX STAMOS:  I think we talk way too much

 3     about foreign influence, and let's be honest.  I think

 4     we talk too much about it.  It's sexy, and it's fun.

 5     And it's a little bit cold wary, but the truth is,

 6     that the vast majority of these problems or the kind

 7     of problems in the information environment are domestic

 8     problems. They're problems in how we interact with each

 9     other of the norms that have been created by online

10     political speech, about amplification issues, about how now

11     politicians are utilizing platforms, and so I think

12     we -- we have like an 80/20 breakdown of 80 percent we

13     talk about foreign and 20 domestic.  I think that

14     needs to be flipped.  And I think the quantitative

15     social science research supports that idea.

16                 (Audio ended.)

17

18

19

20

21

22

23

24

25
```

Case 3:22-cv-01213-TAD-KDM   Document 274-2   Filed 05/20/23   Page 14 of 85 PageID #: 25577
**AUDIO TRANSCRIPTION  1/10/2023**

Page 5

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Melissa J. Lane, Certified Court

 4    Reporter of Missouri, Certified Shorthand Reporter of

 5    Illinois and Registered Professional Reporter, do

 6    hereby certify that I was asked to prepare a

 7    transcript of proceedings had in the above-mentioned

 8    case, which proceedings were held with no court

 9    reporter present utilizing an open microphone system

10    of preserving the record.

11            I further certify that the foregoing pages

12    constitute a true and accurate reproduction of the

13    proceedings as transcribed by me to the best of my

14    ability and may include inaudible sections or

15    misidentified speakers of said open microphone

16    recording.

17

18

19            Melissa J. Lane, CCR, CSR, RPR

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION 1/10/2023**

**A**

ability 5:14
above-me... 5:7
accurate 5:12
adopted 2:7
AL 1:4,6
ALEX 3:2 4:2
American 2:13
Americans 3:15
amplific... 4:10
and/or 1:17
anyone's 2:12
approach 2:7
asked 5:6
Audio 1:3 4:16

**B**

believe 3:9
best 5:13
BIDEN 1:6
bigger 3:2 3:12
bit 4:5
blue 3:11
breakdown 4:12
bunch 3:7

**C**

called 3:5
case 1:7 5:8
CCR 5:19
CERTIFICATE 5:1
Certified 5:3,4
certify 5:6 5:11
change 2:12
checkmark 3:11
Chinese 2:10

CISA 1:8
CLINT 2:2
CLIP 2:1 3:1 4:1
cold 4:5
COMBATTING 1:8
coming 3:11
considered 1:20
constitute 5:12
contact 3:9
court 5:3,8
created 4:9
CSR 5:19
CYBER 1:8

**D**

DFRLab 3:8
disinfor... 1:9 2:6 3:13
domestic 2:8 2:8 3:3,4 3:9,11 4:7 4:13
driven 3:14
Due 1:14

**E**

election 2:6 3:6
elite 3:13
elites 3:12
ended 4:16
environment 4:7
ET 1:4,6
EVENT 1:8

**F**

flipped 4:14
foregoing 5:11
foreign 2:9 4:3,13
fun 4:4
further 5:11

**G**

going 3:3
Graphika 3:8

**H**

held 5:8
hired 3:6
honest 3:3 4:3

**I**

idea 4:15
identities 3:15
Illinois 5:5
inaudible 1:15 5:14
include 1:15 1:16 5:14
influence 4:3
information 4:7
integrity 3:6
interact 4:8
interesting 2:3
Iranian 2:10
issue 3:2,12
issues 4:10

**J**

J 5:3,19
JOSEPH 1:6
JR 1:6

**K**

kind 2:3 4:6
know 3:10

**L**

landscape 2:13
Lane 1:22 5:3,19
leading 2:5
let's 4:3
little 4:5

lot 3:10

**M**

majority 3:9 4:6
manipula... 2:6
media 1:14
Melissa 1:22 5:3,19
microphone 5:9,15
mind 2:12
misident... 5:15
misinter... 1:17
Missouri 1:4 5:4

**N**

needs 4:14
norms 4:9

**O**

OCTOBER 1:10
online 4:9
open 5:9,15
overwhel... 2:8

**P**

pages 5:11
partnership 3:6
people 3:14
percent 4:12
perspective 2:10
platforms 3:13 4:11
playbook 2:4
political 4:10
politicians 4:11
portions 1:14,16
possibly

2:11
prepare 5:6
present 1:18 5:9
preserving 5:10
problems 4:6 4:7,8,8
proceedings 5:7,8,13
Professi... 5:5

**Q**

quality 1:14
quantita... 4:14

**R**

R 1:6
real 3:15
record 5:10
recorded 1:14
recording 1:19 5:16
Registered 5:5
reporter 5:1 5:4,4,5,9
reproduc... 5:12
research 4:15
right 3:12
RPR 5:19
Russia 2:4
Russian 2:10

**S**

scene 2:8
science 4:15
sections 5:14
SECURITY 1:8
see 3:9
seeing 3:5
set 3:5
sexy 4:4

**AUDIO TRANSCRIPTION  1/10/2023**

Shorthand
  5:4
social 4:15
sort 2:5
speakers
  1:17 5:15
speech 4:10
STAMOS 3:2
  4:2
STATE 1:4
students 3:7
stuff 3:13
SUMMIT 1:8
supports
  4:15
system 5:9

**T**
talk 4:2,4
  4:13
talked 2:4
tell 3:10
terms 2:5
thing 3:5
things 3:4
think 2:2,9
  3:12 4:2,3
  4:11,13,14
time 1:18
  2:3,9
transcribed
  1:15,22
  5:13
transcriber
  1:18
transcript
  1:16,19
  5:7
TRANSCRI...
  1:3
true 5:12
truth 4:5

**U**
unable 1:15
unidenti...
  1:17
University
  3:7

utilizing
  4:11 5:9

**V**
vast 3:8,8
  4:6
verbatim
  1:20
verified
  3:11,14
VS 1:5

**W**
wary 4:5
Washington
  3:8
WATTS 2:2
way 2:5  4:2
we're 3:4,7
went 3:6
wonder 2:11
words 1:17
working 3:7

**X**

**Y**

**Z**

**0**

**1**
12:43-13:18
  3:1

**2**
20 4:13
2016 2:4
2020 1:8,10
  2:9 3:2
29:24-30:00
  4:1

**3**
322CV01213
  1:7

**4**

**5**

**6**
6:17-6:50
  2:1

**7**
7 1:10

**8**
80 4:12
80/20 4:12

# EXHIBIT B

Case 3:22-cv-01213-TAD-KDM Document 274-2 Filed 05/30/23 Page 18 of 85 PageID #: 25581

## Initial Reactions: Disinformation in the 2020 Elections

**TUE, NOVEMBER 10, 2020 • 11:00 AM ET**

Leaders of the Election Integrity Partnership discuss the mis- and disinformation they saw on election day and how the partnership is fighting against election-related disinformation.

As the global community continues to grapple with the coronavirus (COVID-19), the Atlantic Council is open for business. Our business, meetings, and events, however, are occurring virtually. For more information, please <u>read an update</u> from our President and CEO.



What happened: Disinformation in 2020 elections





### America's role in the world

Join the Atlantic Council for conversations on the most critical issues at the intersection of domestic and international affairs that will influence this year's US elections.



Disinformation was a central vulnerability throughout 2020 U.S. elections.

A coalition of premier research institutions came together in the Election Integrity Partnership to detect and mitigate disinformation focused on the election, in particular attempts to delegitimize the voting process and election results.

The Partnership conducted monitoring, including 24/7 during the week of the election, of the information space. It also worked to directly support information exchange between state and local election officials, federal government agencies, social media platforms, civil society organizations, and media.  Working together, the Partnership was committed to nonpartisan analysis and building resilience against disinformation — and other online harms — in the 2020 US presidential election.

Please join us on Tuesday, November 10 at 11 AM EST for a critical discussion with representatives from each of the organizations included in the Election Integrity Partnership: the Atlantic Council's Digital Forensic Research Lab, the Stanford Internet Observatory, Graphika, and the University of Washington's Center for an Informed Public.

While the Partnership will be publishing a comprehensive report of analysis and findings encapsulating the entirety of our effort in the coming months, this discussion is meant to provide insight into initial, expert reactions and lessons learned on disinformation's role in American democracy and what to expect going forward...just as soon as the experts have benefited from a full night of sleep.

The **Election Integrity Partnership** is a coalition of premier research teams focused on supporting real-time monitoring and information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms. The Partnership, made up of the Atlantic Council's **Digital Forensic Research**



Lab (DFRLab), the Stanford Internet Observatory, Graphika, and the University of Washington Center for an Informed Public, was created to detect and mitigate the impact of election and voting related misinformation.

## Speakers

**Graham Brookie**
*Director and Managing Editor*
Digital Forensic Research Lab, Atlantic Council

**Emerson Brooking**
*Resident Fellow*
Digital Forensic Research Lab, Atlantic Council

**Camille François**
*Chief Innovation Officer*
Graphika

**Alex Stamos**
*Director*
Stanford Internet Observatory

**Kate Starbird**
*Associate Professor*
Human Centered Design & Engineering

## The Election Integrity Partnership coalition







**AUDIO TRANSCRIPTION**

Page 1

1

2

3

4                    AUDIO TRANSCRIPTION

5            IN RE: STATE OF MISSOURI, ET AL.

6                         VS.

7            JOSEPH R. BIDEN, JR., ET AL.

8                 CASE NO. 322CV01213

9       EVENT: ATLANTIC COUNCIL: INITIAL REACTIONS:

10          DISINFORMATION IN THE 2020 ELECTIONS

11                 NOVEMBER 10, 2020

12

13

14

15    (Due to the quality of the recorded media, portions

16    were unable to be transcribed and include inaudible

17    portions.  The transcript may also include

18    misinterpreted words and/or unidentified speakers.

19    The transcriber was not present at the time of the

20    recording; therefore, this transcript should not be

21    considered verbatim.)

22

23    TRANSCRIBED BY: MELISSA LANE

24

25

## AUDIO TRANSCRIPTION

```
 1               (CLIP: 22:34-23:25)

 2               ALEX STAMOS:  You know, an interesting

 3     thing is almost all of this is domestic: right?  So

 4     you know, to pre-empt the question that we've got

 5     every single day since election day, there has been

 6     some foreign action.  There's obviously a lot of overt

 7     foreign activity, you know, overt, meaning the, you

 8     know, declared media outlets and Twitter accounts and

 9     the like of foreign governments.  There has been a

10     little bit of covert.  We're going to talk about it

11     but nothing that's very interesting.  It is all

12     domestic, and the second point on the domestic, a huge

13     part of the problem is well-known influencers, and I

14     think that was a theme that we saw during the entire

15     week is that you have a -- a relatively small number

16     of people with very large followings who have the

17     ability to go and find a narrative somewhere, pick it

18     out of obscurity and harden -- you know, some kind of

19     a little idea, one tweet, one photo, one video and

20     then to harden it into these narratives.

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

```
 1              (CLIP: 49:34-49:50)

 2              ALEX STAMOS:  So, you know, on effectively

 3    pushing the platforms to do stuff.  So, yes, there's a

 4    basic problem that they will always be more

 5    responsive in the places that are both economically

 6    highly important and that have huge potential

 7    regulatory impact, most notably right now that would

 8    be the United States and Europe.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

```
 1               (CLIP: 50:06-50:56)
 2               ALEX STAMOS:  My suggestion, if people want
 3    to get the platforms to do stuff is, first, you've got
 4    to push for written policies that are specific and
 5    that give you predictability; right?  And so this is
 6    something we started in the summer, in August, is as
 7    Kate talked about Carly Miller led a team from all
 8    four institutions to look at the detailed policies
 9    of the big platforms and to measure them against
10    situations that we expected to happen.
11               Now we're not going to take credit for all
12    of the changes they made, but there -- we had to
13    update this thing, like, eight or nine times; right?
14    And so like putting these people in a grid to say,
15    you're not handling this, you're not handling this,
16    you're not handling this, creates a lot of pressure
17    inside of the companies and forces them to kind of
18    grapple with these issues, because you want specific
19    policies that you can hold them accountable for.  The
20    second is, when you report stuff to them, report how
21    it's violating those written policies; right?  So
22    there's two steps here.  Get good policies, and then
23    say, this is how it's violated it.
24               (Audio ended.)
25
```

**AUDIO TRANSCRIPTION**

1               CERTIFICATE OF REPORTER

2

3            I, Melissa J. Lane, Certified Court

4    Reporter of Missouri, Certified Shorthand Reporter of

5    Illinois and Registered Professional Reporter, do

6    hereby certify that I was asked to prepare a

7    transcript of proceedings had in the above-mentioned

8    case, which proceedings were held with no court

9    reporter present utilizing an open microphone system

10   of preserving the record.

11           I further certify that the foregoing pages

12   constitute a true and accurate reproduction of the

13   proceedings as transcribed by me to the best of my

14   ability and may include inaudible sections or

15   misidentified speakers of said open microphone

16   recording.

17

18

19           Melissa J. Lane, CCR, CSR, RPR

20

21

22

23

24

25

**AUDIO TRANSCRIPTION**

**A**

ability 2:17
   5:14
above-me...
   5:7
accountable
   4:19
accounts 2:8
accurate
   5:12
action 2:6
activity 2:7
AL 1:5,7
ALEX 2:2  3:2
   4:2
and/or 1:18
asked 5:6
ATLANTIC 1:9
Audio 1:4
   4:24
August 4:6

**B**

basic 3:4
best 5:13
BIDEN 1:7
big 4:9
bit 2:10

**C**

Carly 4:7
case 1:8  5:8
CCR 5:19
CERTIFICATE
   5:1
Certified
   5:3,4
certify 5:6
   5:11
changes 4:12
CLIP 2:1  3:1
   4:1
companies
   4:17
considered
   1:21
constitute
   5:12
COUNCIL 1:9

**D**

court 5:3,8
covert 2:10
creates 4:16
credit 4:11
CSR 5:19

**D**

day 2:5,5
declared 2:8
detailed 4:8
DISINFOR...
   1:10
domestic 2:3
   2:12,12
Due 1:15

**E**

economic...
   3:5
effectively
   3:2
eight 4:13
election 2:5
ELECTIONS
   1:10
ended 4:24
entire 2:14
ET 1:5,7
Europe 3:8
EVENT 1:9
expected
   4:10

**F**

find 2:17
first 4:3
followings
   2:16
forces 4:17
foregoing
   5:11
foreign 2:6
   2:7,9
four 4:8
further 5:11

**G**

give 4:5
go 2:17

**going** 2:10
   4:11
good 4:22
governments
   2:9
grapple 4:18
grid 4:14

**H**

handling
   4:15,15,16
happen 4:10
harden 2:18
   2:20
held 5:8
highly 3:6
hold 4:19
huge 2:12
   3:6

**I**

idea 2:19
Illinois 5:5
impact 3:7
important
   3:6
inaudible
   1:16  5:14
include 1:16
   1:17  5:14
influencers
   2:13
INITIAL 1:9
inside 4:17
institut...
   4:8
interesting
   2:2,11
issues 4:18

**J**

J 5:3,19
JOSEPH 1:7
JR 1:7

**K**

Kate 4:7
kind 2:18
   4:17

**know** 2:2,4,7
   2:8,18  3:2

**L**

Lane 1:23
   5:3,19
large 2:16
led 4:7
little 2:10
   2:19
look 4:8
lot 2:6  4:16

**M**

meaning 2:7
measure 4:9
media 1:15
   2:8
Melissa 1:23
   5:3,19
microphone
   5:9,15
Miller 4:7
misident...
   5:15
misinter...
   1:18
Missouri 1:5
   5:4

**N**

narrative
   2:17
narratives
   2:20
nine 4:13
notably 3:7
NOVEMBER
   1:11
number 2:15

**O**

obscurity
   2:18
obviously
   2:6
open 5:9,15
outlets 2:8
overt 2:6,7

**P**

pages 5:11
part 2:13
people 2:16
   4:2,14
photo 2:19
pick 2:17
places 3:5
platforms
   3:3  4:3,9
point 2:12
policies 4:4
   4:8,19,21
   4:22
portions
   1:15,17
potential
   3:6
pre-empt 2:4
predicta...
   4:5
prepare 5:6
present 1:19
   5:9
preserving
   5:10
pressure
   4:16
problem 2:13
   3:4
proceedings
   5:7,8,13
Professi...
   5:5
push 4:4
pushing 3:3
putting 4:14

**Q**

quality 1:15
question 2:4

**R**

R 1:7
REACTIONS
   1:9
record 5:10
recorded
   1:15

**AUDIO TRANSCRIPTION**

recording
  1:20 5:16
Registered
  5:5
regulatory
  3:7
relatively
  2:15
report 4:20
  4:20
reporter 5:1
  5:4,4,5,9
reproduc...
  5:12
responsive
  3:5
right 2:3
  3:7 4:5,13
  4:21
RPR 5:19

___ S ___

saw 2:14
second 2:12
  4:20
sections
  5:14
Shorthand
  5:4
single 2:5
situations
  4:10
small 2:15
speakers
  1:18 5:15
specific 4:4
  4:18
STAMOS 2:2
  3:2 4:2
started 4:6
STATE 1:5
States 3:8
steps 4:22
stuff 3:3
  4:3,20
suggestion
  4:2
summer 4:6
system 5:9

___ T ___

take 4:11
talk 2:10
talked 4:7
team 4:7
theme 2:14
thing 2:3
  4:13
think 2:14
time 1:19
times 4:13
transcribed
  1:16,23
  5:13
transcriber
  1:19
transcript
  1:17,20
  5:7
TRANSCRI...
  1:4
true 5:12
tweet 2:19
Twitter 2:8
two 4:22

___ U ___

unable 1:16
unidenti...
  1:18
United 3:8
update 4:13
utilizing
  5:9

___ V ___

verbatim
  1:21
video 2:19
violated
  4:23
violating
  4:21
VS 1:6

___ W ___

want 4:2,18
we're 2:10
  4:11

we've 2:4
week 2:15
well-known
  2:13
words 1:18
written 4:4
  4:21

___ X ___

___ Y ___

___ Z ___

___ 0 ___

___ 1 ___

10 1:11

___ 2 ___

2020 1:10,11
22:34-23:25
  2:1

___ 3 ___

322CV01213
  1:8

___ 4 ___

49:34-49:50
  3:1

___ 5 ___

50:06-50:56
  4:1

# EXHIBIT C

Case 3:22-cv-01213-TAD-KDM Document 274-2 Filed 05/30/23 Page 29 of 85 PageID #: 25592

# The long fuse: Misinformation and the 2020 election

**WED, MARCH 3, 2021 • 3:00 PM ET**

A conversation on the release of the Election Integrity Partnership's report, "The Long Fuse: Misinformation and the 2020 Election"

> As the global community continues to grapple with the coronavirus (COVID-19), the Atlantic Council is open for business. Our business, meetings, and events, however, are occurring virtually. For more information, please <u>read an update</u> from our President and CEO.



The long fuse: Misinformation and the 2020 election

Please join us on **Wednesday March 3, 2021** from **3:00-4:30 pm EST (12:00-1:30 PST)** for **The Long Fuse: Misinformation in the 2020 Election,** the public launch of a comprehensive report tracking mis- and disinformation in the 2020 election cycle. The report was produced by the **Election Integrity Partnership** (EIP), a coalition of research institutions that worked together to detect and mitigate viral misinformation and to support the real-time information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms.

The Partnership was set up to monitor false information about the process and results of the 2020 election, in line with the Department of Homeland Security's designation of elections as critical infrastructure in democracies. In particular, the EIP identified and traced the false "stolen election" narrative which would culminate in the 1/6 attack on the US Capitol.

The event will begin with a fireside chat with **Chris Krebs**, the former director of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA), who led the effort to secure electoral infrastructure and the response to mis- and disinformation during the election period. The conversation will contextualize the role and findings of EIP within the government's efforts to prevent the spread of malign information. Mr. Krebs will share his lessons learned securing this election and will discuss how to build resilient electoral systems going forward.

Next, this event will feature a discussion with representatives from each of the EIP Partners: the **Stanford Internet Observatory**, **Graphika**, the **University of Washington's Center for an Informed Public**, and the Atlantic Council's **Digital**



EXHIBIT
5

**Forensic Research Lab**. Panelists will discuss the origins and amplification of voting-related misinformation, charting how these narratives evolved over time. The panel will also discuss the evolution of social media platforms' civic integrity policies and the effectiveness of their implementation. Finally, the panel will consider how the EIP can serve as a model for future mis- and disinformation monitoring efforts.

**READ THE REPORT**

## Introductory remarks

**Graham Brookie**
*Director*
DFRLab

**Alex Stamos**
*Director*
Stanford Internet Observatory

## Fireside Chat

**Chris Krebs**
*Founding Partner*
Krebs Stamos Group LLC

## Moderated by

**Isabella Garcia-Camargo**
*Project Manager*
Election Integrity Partnership

## Presentation featuring

**Emerson Brooking**
*Resident Senior Fellow*
DFRLab

**Camille Francois**
*Chief Innovation Officer*
Graphika

**Renee DiResta**
*Research Manager*
Stanford Internet Observatory

**Kate Starbird**
*Associate Professor*
Department of Human Centered Design and Engineering
University of Washington

1/5/23, 3:05 PM
The Long Fuse: Misinformation and the 2020 Election - Atlantic Council
Case 3:22-cv-01213-TAD-KDM Document 274-2 Filed 05/30/23 Page 31 of 85 PageID #: 25594

**Joe Bak-Coleman**
*Postdoctoral Scholar*
Information School
University of Washington

**Andrew Beers**
*Graduate Student*
Human Centered Design & Engineering (HCDE)
University of Washington

**Nicole Buckley**
*Research Analyst*
School of Law
University of Washington

**Alyssa Kann**
*Research Assistant*
DFRLab

**Ian Kennedy**
*Graduate Student*
Sociology
University of Washington

**Carly Miller**
*Research Analyst*
Stanford Internet Observatory

**Kyle Weiss**
*Research Analyst*
Graphika

## Moderated by

**Alex Stamos**
*Director*
Stanford Internet Observatory



The **Election Integrity Partnership** is a coalition of premier research teams focused on supporting real-time monitoring and information exchange between the research community, election officials, government agencies, civil society organizations, and social media platforms. The Partnership, made up of the Atlantic Council's **Digital Forensic Research Lab (DFRLab)**, the **Stanford Internet Observatory**, **Graphika**, and the **University of Washington Center for an Informed Public**, was created to detect and mitigate the impact of election and voting related misinformation.

**The Election Integrity Partnership coalition**

 

 

**On Twitter? Follow @DFRLab and @AtlanticCouncil to join the conversation**



**AUDIO TRANSCRIPTION**

```
 1

 2

 3

 4

 5

 6                    AUDIO TRANSCRIPTION

 7            IN RE: STATE OF MISSOURI, ET AL.

 8                         VS.

 9             JOSEPH R. BIDEN, JR., ET AL.

10                 CASE NO. 322CV01213

11    EVENT: ATLANTIC COUNCIL: THE LONG FUSE: MISINFORMATION

12                AND THE 2020 ELECTION

13                    MARCH 3, 2021

14

15

16    (Due to the quality of the recorded media, portions

17    were unable to be transcribed and include inaudible

18    portions.  The transcript may also include

19    misinterpreted words and/or unidentified speakers.

20    The transcriber was not present at the time of the

21    recording; therefore, this transcript should not be

22    considered verbatim.)

23

24    TRANSCRIBED BY: MELISSA LANE

25
```

**AUDIO TRANSCRIPTION**

```
 1              (CLIP: 1:21:42-1:22-30)

 2              EMERSON BROOKING:  I think the EIP really

 3    helped push the envelope with things like just the

 4    notion that this pre -- this delegitimization of

 5    electoral processes that we were seeing in the summer

 6    and early fall that this should be against content

 7    moderation policies on these platforms, and

 8    begin to take proactive steps there, but I -- it was

 9    to me a bit disappointing that there was tons of this

10    misinformation that would continue to circulate,

11    because bottom line, these platforms are companies,

12    and they had to hedge their bets a little bit.  They

13    couldn't outlaw the speech of one competitor in a

14    political process, but after November 3rd, we saw that

15    market shift where content moderation actions that

16    were -- we could hardly contemplate a few weeks before

17    began to be taken.  There was a much stronger emphasis

18    on cracking down on the sort of content we've been

19    tracking from the beginning.

20              (Audio ended.)

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, Melissa J. Lane, Certified Court

 4   Reporter of Missouri, Certified Shorthand Reporter of

 5   Illinois and Registered Professional Reporter, do

 6   hereby certify that I was asked to prepare a

 7   transcript of proceedings had in the above-mentioned

 8   case, which proceedings were held with no court

 9   reporter present utilizing an open microphone system

10   of preserving the record.

11            I further certify that the foregoing pages

12   constitute a true and accurate reproduction of the

13   proceedings as transcribed by me to the best of my

14   ability and may include inaudible sections or

15   misidentified speakers of said open microphone

16   recording.

17

18

19            Melissa J. Lane, CCR, CSR, RPR

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

**A**

ability 3:14
above-me... 3:7
accurate 3:12
actions 2:15
AL 1:7,9
and/or 1:19
asked 3:6
ATLANTIC 1:11
Audio 1:6 2:20

**B**

began 2:17
beginning 2:19
best 3:13
bets 2:12
BIDEN 1:9
bit 2:9,12
bottom 2:11
BROOKING 2:2

**C**

case 1:10 3:8
CCR 3:19
CERTIFICATE 3:1
Certified 3:3,4
certify 3:6 3:11
circulate 2:10
CLIP 2:1
companies 2:11
competitor 2:13
considered 1:22
constitute 3:12
contemplate 2:16

content 2:6 2:15,18
continue 2:10
COUNCIL 1:11
court 3:3,8
cracking 2:18
CSR 3:19

**D**

delegiti... 2:4
disappoi... 2:9
Due 1:16

**E**

early 2:6
EIP 2:2
ELECTION 1:12
electoral 2:5
EMERSON 2:2
emphasis 2:17
ended 2:20
envelope 2:3
ET 1:7,9
EVENT 1:11

**F**

fall 2:6
foregoing 3:11
further 3:11
FUSE 1:11

**G**

**H**

hedge 2:12
held 3:8
helped 2:3

**I**

Illinois 3:5
inaudible

1:17 3:14
include 1:17 1:18 3:14

**J**

J 3:3,19
JOSEPH 1:9
JR 1:9

**K**

**L**

Lane 1:24 3:3,19
line 2:11
little 2:12
LONG 1:11

**M**

MARCH 1:13
market 2:15
media 1:16
Melissa 1:24 3:3,19
microphone 3:9,15
misident... 3:15
misinfor... 1:11 2:10
misinter... 1:19
Missouri 1:7 3:4
moderation 2:7,15

**N**

notion 2:4
November 2:14

**O**

open 3:9,15
outlaw 2:13

**P**

pages 3:11
platforms 2:7,11

policies 2:7
political 2:14
portions 1:16,18
pre 2:4
prepare 3:6
present 1:20 3:9
preserving 3:10
proactive 2:8
proceedings 3:7,8,13
process 2:14
processes 2:5
Professi... 3:5
push 2:3

**Q**

quality 1:16

**R**

R 1:9
really 2:2
record 3:10
recorded 1:16
recording 1:21 3:16
Registered 3:5
reporter 3:1 3:4,4,5,9
reproduc... 3:12
RPR 3:19

**S**

saw 2:14
sections 3:14
seeing 2:5
shift 2:15
Shorthand 3:4

sort 2:18
speakers 1:19 3:15
speech 2:13
STATE 1:7
steps 2:8
stronger 2:17
summer 2:5
system 3:9

**T**

take 2:8
taken 2:17
things 2:3
think 2:2
time 1:20
tons 2:9
tracking 2:19
transcribed 1:17,24 3:13
transcriber 1:20
transcript 1:18,21 3:7
TRANSCRI... 1:6
true 3:12

**U**

unable 1:17
unidenti... 1:19
utilizing 3:9

**V**

verbatim 1:22
VS 1:8

**W**

we've 2:18
weeks 2:16
words 1:19

**AUDIO TRANSCRIPTION**

| | | | | |
|---|---|---|---|---|
| **X** | | | | |
| **Y** | | | | |
| **Z** | | | | |
| **0** | | | | |
| **1** | | | | |
| 1:21:42-... 2:1 | | | | |
| **2** | | | | |
| **2020** 1:12 **2021** 1:13 | | | | |
| **3** | | | | |
| **3** 1:13 **322CV01213** 1:10 **3rd** 2:14 | | | | |

# EXHIBIT D

 QUT Digital Media Research Centre

## November, 2021

**17**
**NOV**   2021 Digital Publics Symposium – Information Disorders

 **Digital Media Research Centre**



# 2021 Digital Publics Symposium

## INFORMATION DISORDERS

EXHIBIT
**8**

### Event Details

From the continuing COVID-19 pandemic through the aftermath of the US election to the influence of problematic state and commercial actors, 2021 has been marked by substantial concerns about the impact of mis- and disinformation on individuals, groups, and society as a whole.

Case 3:22-cv-01213-TAD-KDM Document 274-2 Filed 05/20/23 Page 40 of 85 PageID #: 25603

The 2021 symposium of the Digital Publics programme presents the latest work by researchers in the QUT Digital Media Research Centre that tackles these information disorders: applying innovative mixed-methods research approaches to trace the dynamics of mis- and disinformation in online and social media; exploring the role of initiatives that seek to combat the spread of problematic information; examining the public discourse around 'fake news'; and assessing regulatory approaches to mitigating the threat from mis- and disinformation.

Please join us for a one-day symposium that showcases our latest research and plots the course for the coming year!

## VIEW THE FULL PROGRAM

## Registration

## Online Attendee     In-person Attendee

### Keynote Speaker



**Kate Starbird, University of Washington**

*Unraveling the Big Lie: Participatory Disinformation and its Threat to Democracy.*

Kate Starbird is an Associate Professor at the Department of Human Centered Design & Engineering (HCDE) at the University of Washington (UW). Kate's research is situated within human-computer interaction and the emerging field of crisis informatics—the study of the how social media and other information-communication technologies are used during crisis events.

### Time
*(Wednesday)* 9:00 AM - 5:00 PM

### Location
*Online and In-person Event*
*In Person Location:*

Calendar    GoogleCal

**AUDIO TRANSCRIPTION**

Page 1

1

2

3

4

5                AUDIO TRANSCRIPTION

6          IN RE: STATE OF MISSOURI, ET AL.

7                       VS.

8          JOSEPH R. BIDEN, JR., ET AL.

9               CASE NO. 322CV01213

10    EVENT: DMRC 2021 DIGITAL PUBLICS SYMPOSIUM

11               NOVEMBER 17, 2021

12

13

14

15   (Due to the quality of the recorded media, portions

16   were unable to be transcribed and include inaudible

17   portions.  The transcript may also include

18   misinterpreted words and/or unidentified speakers.

19   The transcriber was not present at the time of the

20   recording; therefore, this transcript should not be

21   considered verbatim.)

22

23   TRANSCRIBED BY: MELISSA LANE

24

25

**AUDIO TRANSCRIPTION**

```
 1            (CLIP: 18:29-19:20)

 2            KATE STARBIRD:  Now fast forward to 2020,

 3   we saw a very different story around disinformation in

 4   the U.S. election.  It was largely domestic coming

 5   from inside the United States.  There were foreign

 6   activities that were a part of these conversations,

 7   but they weren't playing a major role.  Most of the

 8   accounts perpetrating this -- not even the accounts,

 9   most of the entities perpetrating this disinformation

10   campaign as we and Benkler colleagues saw it were --

11   they're authentic accounts.  They were often blue

12   check and verified accounts.  They were pundits on

13   cable television shows that were who they said they

14   were along with, you know, some other anonymous

15   members of the connected crowd online, but a lot of

16   the major spreaders were blue check accounts, and it

17   wasn't entirely coordinated, but instead, it was

18   largely sort of cultivated and even organic in places

19   with everyday people creating and spreading

20   disinformation about the election.

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

```
 1                    (CLIP: 29:30-29:49)

 2                    KATE STARBIRD:  So we see this -- the

 3      disinformation campaign was top down and Benkler

 4      colleagues talk about it as a top-down elite driven

 5      disinformation campaign, but this campaign was also

 6      bottom up with everyday people sharing their own

 7      experiences, their own misperceptions of being

 8      disenfranchised or finding what they thought to be

 9      evidence of voter fraud.

10                    (Audio ended.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

```
 1                    CERTIFICATE OF REPORTER

 2

 3              I, Melissa J. Lane, Certified Court

 4   Reporter of Missouri, Certified Shorthand Reporter of

 5   Illinois and Registered Professional Reporter, do

 6   hereby certify that I was asked to prepare a

 7   transcript of proceedings had in the above-mentioned

 8   case, which proceedings were held with no court

 9   reporter present utilizing an open microphone system

10   of preserving the record.

11              I further certify that the foregoing pages

12   constitute a true and accurate reproduction of the

13   proceedings as transcribed by me to the best of my

14   ability and may include inaudible sections or

15   misidentified speakers of said open microphone

16   recording.

17

18

19              Melissa J. Lane, CCR, CSR, RPR

20

21

22

23

24

25
```

**AUDIO TRANSCRIPTION**

**A**

ability 4:14
above-me... 4:7
accounts 2:8 2:8,11,12 2:16
accurate 4:12
activities 2:6
AL 1:6,8
and/or 1:18
anonymous 2:14
asked 4:6
Audio 1:5 3:10
authentic 2:11

**B**

Benkler 2:10 3:3
best 4:13
BIDEN 1:8
blue 2:11,16
bottom 3:6

**C**

cable 2:13
campaign 2:10 3:3,5 3:5
case 1:9 4:8
CCR 4:19
CERTIFICATE 4:1
Certified 4:3,4
certify 4:6 4:11
check 2:12 2:16
CLIP 2:1 3:1
colleagues 2:10 3:4
coming 2:4
connected

2:15
considered 1:21
constitute 4:12
conversa... 2:6
coordinated 2:17
court 4:3,8
creating 2:19
crowd 2:15
CSR 4:19
cultivated 2:18

**D**

different 2:3
DIGITAL 1:10
disenfra... 3:8
disinfor... 2:3,9,20 3:3,5
DMRC 1:10
domestic 2:4
driven 3:4
Due 1:15

**E**

election 2:4 2:20
elite 3:4
ended 3:10
entirely 2:17
entities 2:9
ET 1:6,8
EVENT 1:10
everyday 2:19 3:6
evidence 3:9
experiences 3:7

**F**

fast 2:2

finding 3:8
foregoing 4:11
foreign 2:5
forward 2:2
fraud 3:9
further 4:11

**G**

**H**

held 4:8

**I**

Illinois 4:5
inaudible 1:16 4:14
include 1:16 1:17 4:14
inside 2:5

**J**

J 4:3,19
JOSEPH 1:8
JR 1:8

**K**

KATE 2:2 3:2
know 2:14

**L**

Lane 1:23 4:3,19
largely 2:4 2:18
lot 2:15

**M**

major 2:7,16
media 1:15
Melissa 1:23 4:3,19
members 2:15
microphone 4:9,15
misident... 4:15
misinter... 1:18

misperce... 3:7
Missouri 1:6 4:4

**N**

NOVEMBER 1:11

**O**

online 2:15
open 4:9,15
organic 2:18

**P**

pages 4:11
part 2:6
people 2:19 3:6
perpetra... 2:8,9
places 2:18
playing 2:7
portions 1:15,17
prepare 4:6
present 1:19 4:9
preserving 4:10
proceedings 4:7,8,13
Professi... 4:5
PUBLICS 1:10
pundits 2:12

**Q**

quality 1:15

**R**

R 1:8
record 4:10
recorded 1:15
recording 1:20 4:16
Registered 4:5

reporter 4:1 4:4,4,5,9
reproduc... 4:12
role 2:7
RPR 4:19

**S**

saw 2:3,10
sections 4:14
see 3:2
sharing 3:6
Shorthand 4:4
shows 2:13
sort 2:18
speakers 1:18 4:15
spreaders 2:16
spreading 2:19
STARBIRD 2:2 3:2
STATE 1:6
States 2:5
story 2:3
SYMPOSIUM 1:10
system 4:9

**T**

talk 3:4
television 2:13
thought 3:8
time 1:19
top 3:3
top-down 3:4
transcribed 1:16,23 4:13
transcriber 1:19
transcript 1:17,20 4:7
TRANSCRI...

**AUDIO TRANSCRIPTION**

```
   1:5
true 4:12
_____
        U
U.S 2:4
unable 1:16
unidenti...
   1:18
United 2:5
utilizing
   4:9
_____
        V
verbatim
   1:21
verified
   2:12
voter 3:9
VS 1:7
_____
        W
wasn't 2:17
weren't 2:7
words 1:18
_____
        X
_____
        Y
_____
        Z
_____
        0
_____
        1
17 1:11
18:29-19:20
   2:1
_____
        2
2020 2:2
2021 1:10,11
29:30-29:49
   3:1
_____
        3
322CV01213
   1:9
```

# EXHIBIT E

On 23 January 2018 at 17:05, ██████████████████> wrote:

Got all, reordered slightly. Deploying the below:

**- attributed to a Twitter spokesperson:** "Twitter is committed to addressing malicious activity on our platform, and we take any assertions of such activity very seriously. We look forward to working closely with Senator Feinstein and Congressman Schiff to address their questions."

**Deep background/not for attribution:** We've been monitoring closely since #releasethememo started trending late last week, but thus far both hashtags appear to be organically trending.

We have not seen any indications that the accounts engaging in this activity for either hashtag are predominately Russian, or that Russian accounts are driving the engagement. The vast majority of what we're seeing here is appears to be organic in nature. Lots of prominent conservative Twitter accounts are using one or both of these hashtags, including DJT Jr, Rep. Steve King, Rep. Mark Meadows, and many others. This is inspiring a lot of both RTs and organic engagement.

We'll have more in our official response to the Congressional request.

**Off the record:** I encourage you to be skeptical of Hamilton 68's take on this, which as best I can tell is the only source for these stories. 1) Hamilton 68 does not release the accounts that make up their dashboard, so no one can verify the accounts they include are in fact Russian automated accounts, and 2) it is extraordinarily difficult for outside researchers, who do not have access to our full API and internal account signals, to say with any degree of certainty that an account they believe is behaving suspiciously is 1) automated and 2) Russian. If you speak with them, I encourage you to press them on how they can be sure of both of these claims when they do not have access to internal signals and data.

# EXHIBIT F

**YR** | **Yoel Roth**
**Re: please read: response to Schiff/Feinstein letter re: ASD**
To: [REDACTED]  Cc: Carlos Monje,  Colin Crowell,  [REDACTED]

January 24, 2018 at 8:21 AM

Details

Another thought: Is now the time we go public with the fact that any given user only counts once towards a trend? Given all the swirl around #releasethememo is based on Hamilton, which is based on raw tweet count, we'd be able to broadly refute it without actually sharing anything too sensitive.

I'd suggest something along the lines of:

- We've built many protections into our trending algorithms, including only counting any given user once towards a trend. Tweeting repeatedly would not cause a topic to trend.

- We saw approx X unique users tweeting with this trend, for whom the average number of tweets posted were Y. Most users posted fewer than Z times. A small number (Q%) posted more than U times - often in violation of our spam rules. We successfully caught and hid V% of these tweets before they ever affected the conversation on Twitter.

- We continue to invest in IQ, including: tweetdeck change to limit tweeting from multiple accounts; expanding detection of duplicate and coordinated activity across accounts; etc

# EXHIBIT G

On Jan 24, 2018, at 12:26 PM, Yoel Roth ███████████████ wrote:

Case 3:22-cv-01213-TAD-KDM  Document 274-2  Filed 05/2023  Page 52 of 85 PageID #: 25815

I think we can push back strongly on the Russian component here. I just reviewed the accounts that posted the first 50 tweets with #releasethememo, and while a few of them definitely look spammy, none of them have any signs of being tied to Russia. We can very easily produce a number like we did for the Brexit analysis that says "we found less than X% of accounts tweeting with this hashtag showed signs of affiliation to Russia." Though, to Dave's earlier point, the deeper we go here analysis-wise, the more we lend credence to the whole discussion.

# EXHIBIT H

**TL;DR:** Schiff and Feinstein have released a statement calling on us to investigate what ASD/Hamilton 68 says is "Russian bots" driving #ReleaseTheMemo and submit a report by Friday 1/26 (full letter below). Yoel and the IQ team have been monitoring engagement around both #ReleaseTheMemo and now #SchumerShutdown and **engagement appears to be organic/not driven by "Russian bots."**

**Background:** Comms started getting media queries on #ReleaseTheMemo last Friday when ASD issued a press release saying this hashtag was being driven by Russian bots. We investigated, found that engagement was overwhelmingly organic and driven by strong VIT engagement (including Wikileaks, DJT Jr., Rep. Steve King, and others).

Because the initial wave of news coverage did not include us (reporters who initially did not reach out to Twitter and ran with ASD as a single source), we've been in reactive mode since. Comms has been pushing back on background and cautioning off the record why reporters should be very skeptical of ASD's claims here (underline: ASD does not know that we have reverse-engineered their dashboard and we're being careful to not hint at this in our pushback)

We were just starting to see see a virtually identical pattern playing out with #SchumerShutdown when we started getting press inquiries about the Hill letter.

# EXHIBIT I

# COVINGTON

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Robert K. Kelner

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5503
rkelner@cov.com

**Via Electronic Mail**                                    December 21, 2020

Mr. Jeff S. Jordan
Federal Election Commission
Office of Complaints Examination
   and Legal Administration
1050 1st Street NE
Washington, DC 20463

Re:  **MUR 7827**

Dear Mr. Jordan:

We write on behalf of our clients Twitter, Inc., Jack Dorsey, and Brandon Borrman, in response to the complaint filed by the Tea Party Patriots Foundation in the above-captioned matter under review.  The complaint asserts that Twitter made an impermissible corporate in-kind contribution to Biden for President, the principal campaign committee for President-elect Joe Biden, when Twitter removed from its platform two articles published by the New York Post that violated Twitter's pre-existing, politically neutral Rules and policies.

The complaint filed by Tea Party Patriots Foundation is based on the same set of events at issue in MUR 7821.  For the reasons specified in Twitter's response to MUR 7821, which we incorporate here by reference and have attached, the Commission should find that there is no reason to believe that Twitter, Mr. Dorsey, or Mr. Borrman violated the Federal Election Campaign Act of 1971, as amended ("FECA"), and should dismiss the complaint with no further action.

*First,* as set out more fully in Twitter's attached response in MUR 7821, Twitter blocked potentially hacked content that contained private information such as email addresses, phone numbers, and personal photographs for bona fide commercial reasons and to enforce pre-existing Rules and policies intended to protect the safety, integrity, and commercial viability of its social media platform.  The complaint alleges that Twitter, Mr. Dorsey, and Mr. Borrman instead blocked the N.Y. Post articles because the articles were "deemed by them to be detrimental to the presidential candidacy/campaign of" Joe Biden.[1]  Complainant provides no evidence whatsoever in its sworn complaint to support this false allegation.  In actual fact, Twitter determined at the time that the articles violated its then-current policy on Distribution

---

[1] Complaint at 2, MUR 7827.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 2

of Hacked Materials and its policy on Private Information.[2]  Accordingly, Twitter did not make an impermissible in-kind contribution because it did not exclude the articles for the purpose of influencing a federal election.

While the Tea Party Patriots Foundation misleadingly cites to a later version of Twitter's Distribution of Hacked Materials Policy,[3] the version of that policy in place on October 14, 2020, when the New York Post published the relevant articles, prohibited the distribution of "hacked materials," including by "posting hacked content on Twitter (*e.g.*, in the text of a Tweet, or in an image)" or "linking to hacked content hosted on other websites."[4]  The policy explicitly applied only to republished hacked materials and not to *discussion of* "a hack that has taken place (including reporting on a hack, or sharing press coverage of hacking)," if such discussions did not include "private information, information that could put people at risk of physical harm or danger; and/or information related to trade secrets."[5]

The Tea Party Patriots Foundation complaint also fails to mention that Twitter has a "Private Information Policy" that prohibits sharing "other people's private information without their express authorization and permission," regardless of whether release of the private information is associated with hacking.[6]  Personally identifying information subject to this policy includes non-public personal phone numbers and email addresses.[7]

---

[2] *See* Declaration of Yoel Roth ¶¶ 13-17 (attached as Exhibit A to Twitter's response in MUR 7821).

[3] The complaint filed by the Tea Party Patriots Foundation cites to the revised version of Twitter's Distribution of Hacked Materials Policy that became effective on October 15, 2020. *See* Complaint at 4 n.6, MUR 7827.  An earlier version of the Distribution of Hacked Materials Policy was in effect on October 14, when Twitter executed the policy enforcement action that is the subject of the complaint.  *See* Natasha Lomas, *Twitter Changes Its Hacked Materials Policy in Wake of New York Post Controversy*, TechCrunch, Oct. 16, 2020, https://techcrunch.com/2020/10/16/twitter-changes-its-hacked-materials-policy-in-wake-of-new-york-post-controversy.  Presumably, the Tea Party Patriots Foundation was aware that it was citing to an inapplicable version of the policy in its sworn complaint, as its complaint specifically noted that the Distribution of Hacked Materials Policy had been changed following the events at issue.  *See* Complaint at 4, MUR 7827.

[4] Twitter, Distribution of Hacked Materials Policy (effective Mar. 2019), https://web.archive.org/web/20200930214928/https://help.twitter.com/en/rules-and-policies/hacked-materials.

[5] *Id.*

[6] Twitter, Private Information Policy (effective Mar. 2019), https://help.twitter.com/en/rules-and-policies/personal-information.

[7] *Id.*

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 3

The content blocked by Twitter plainly violated the Private Information Policy, as it contained non-public personal phone numbers and email addresses.[8]  Twitter also determined in good faith that the content violated the Distribution of Hacked Materials Policy.  By contrast, the September 2020 New York Times story regarding President Trump's tax returns that the Tea Party Patriots Foundation cites as "proof" of a FECA violation[9] only discussed, and *did not republish*, those tax returns, and so it did not violate the Distribution of Hacked Materials Policy in effect at the time.  Nor did that story contain any of the specified private information covered by Twitter's Private Information Policy.

The Commission's precedents provide that a "corporation's bona fide commercial activity is neither 'for the purpose of influencing any election for federal office' nor 'in connection with any election' and thus is not a contribution or otherwise subject to regulation under the Act."[10]  The Tea Party Patriots Foundation offers no evidence to call into question the fact that Twitter excluded the articles from its platform based on its commercial interests reflected in pre-existing, politically neutral Rules and policies.  Instead, remarkably, the complaint alleges that a FECA violation occurred based on Mr. Dorsey's and Mr. Borrman's personal political contribution history, emphasizing that Mr. Dorsey "has given to *no* Republican candidates for office this cycle" and that Mr. Borrman "has not contributed to <u>any</u> Republican candidates."[11]  This is legally irrelevant, to say the least.  There is no Commission precedent for taking into account any respondent's personal political contributions or affiliations, nor should there ever be.  It would clearly violate the First Amendment for such factors to be considered in connection with any agency action.

*Second*, Twitter's content moderation decision was not coordinated with the Biden campaign.  The Tea Party Patriots Foundation does not allege any coordination in its complaint, and none occurred.

---

[8] *See* Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-Gun Email Reveals How Hunter Biden Introduced Ukrainian Businessman to VP Dad*, N.Y. Post, Oct. 14, 2020, https://nypost.com/2020/10/14/email-reveals-how-hunter-biden-introduced-ukrainian-biz-man-to-dad; Emma-Jo Morris & Gabrielle Fonrouge, *Hunter Biden Emails Show Leveraging Connections with His Father to Boost Burisma Pay*, N.Y. Post, Oct. 14, 2020, https://nypost.com/2020/10/14/hunter-biden-emails-show-leveraging-connections-with-dad-to-boost-burisma-pay/.

[9] *See* Complaint at 5, MUR 7827 (citing Russ Buettner, Susanne Craig & Mike McIntire, *Long Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance*, N.Y. Times, Sept. 27, 2020, https://www.nytimes.com/interactive/2020/09/27/us/donald-trump-taxes.html).

[10] Advisory Opinion 2014-06 (Ryan, Ryan for Congress, and Prosperity Action) at 9 (citing MUR 5474 and 5539 (Dog Eat Dog Films, Inc.), First General Counsel's Report at 13-17; Advisory Opinion 1994-30 (Conservative Concepts/Pence) at 3-7; Advisory Opinion 1989-21 (Create-a-Craft) at 4); *see also* MUR 5485 (Conversagent, Inc.), First General Counsel's Report; MUR 5485, Certification (voting 4-0 to find no reason to believe).

[11] *See* Complaint at 7-8, MUR 7827 (emphasis in original).

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 4

*Third,* Twitter's enforcement of its Rules and policies falls within the Commission's media exemption.  The Tea Party Patriots Foundation asserts that the media exemption is inapplicable to Twitter "because it does not publish original content."[12]  This is, first of all, incorrect as a factual matter.  Twitter does create headlines and summaries for certain trending topics on the platform.[13]  And the Commission has held repeatedly that the media exemption applies to websites and other internet publications that, like Twitter, mostly distribute content created by third parties.[14]

*Fourth*, Section 230 of the Communications Decency Act precludes any finding of liability for Twitter's content moderation decisions, as does the First Amendment.  The Tea Party Patriots Foundation even acknowledges that Twitter is an "interactive service provider" covered by Section 230.[15]

---

[12] *Id.* at 10.

[13] *See* @TwitterSupport, Twitter (Sept. 8, 2020, 4:01 PM), https://twitter.com/TwitterSupport/status/1303423326065487878.

[14] Advisory Opinion 2000-13 (iNEXTV) (determining that an internet video service that "does not create programming under its own name" but "operates its own network of specialized news and information sites" qualified for the media exemption)*; see also* Advisory Opinion 2005-16 (Fired Up) (determining that websites qualified for the media exemption when "a primary function of the websites is to provide news and information to readers through Fired Up's commentary on, quotes from, summaries of, and hyperlinks to news articles appearing on other entities' websites and through Fired Up's original reporting"); Advisory Opinion 1996-16 (Bloomberg) (determining that an online candidate forum in which non-journalist online guests asked questions of the candidates qualified for the media exemption).

[15] *See* Complaint at 10, MUR 7827.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 5

***

     For the reasons stated above, as well as in Twitter's response in MUR 7821, we respectfully request that the Commission dismiss the Complaint.

Respectfully submitted,

Robert K. Kelner
Brendan Parets
Elizabeth Upton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
*Counsel for Twitter, Inc., Jack Dorsey, and Brandon Borrman*

Attachment

MUR782700033

# Attachment

**COVINGTON**

BEIJING   BRUSSELS   DUBAI   FRANKFURT   JOHANNESBURG
LONDON   LOS ANGELES   NEW YORK   PALO ALTO
SAN FRANCISCO   SEOUL   SHANGHAI   WASHINGTON

Robert K. Kelner

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T   +1 202 662 5503
rkelner@cov.com

**Via Electronic Mail**                                    December 21, 2020

Mr. Jeff S. Jordan
Federal Election Commission
Office of Complaints Examination
   and Legal Administration
1050 1st Street NE
Washington, DC 20463

        Re:  **MUR 7821**

Dear Mr. Jordan:

        We write on behalf of our client, Twitter, Inc., in response to the complaint filed by the Republican National Committee ("RNC") in the above-captioned matter under review.  The complaint asserts that Twitter made an impermissible corporate in-kind contribution to Biden for President, the principal campaign committee for President-elect Joe Biden, when Twitter removed from its platform two articles published by the New York Post ("N.Y. Post") that violated Twitter's pre-existing, politically neutral Rules and policies.  For the reasons stated below, Twitter's enforcement of its Rules and policies concerning hacked materials and private information did not constitute an in-kind contribution or in any way violate the Federal Election Campaign Act of 1971, as amended ("FECA").

        *First*, the decision by Twitter to block potentially hacked content that contained private information such as email addresses, phone numbers, and personal photographs was not an impermissible in-kind contribution because it was not undertaken for the purpose of influencing a federal election.  Rather, Twitter undertook, for bona fide commercial reasons, to enforce pre-existing Rules and policies intended to protect the safety, integrity, and commercial viability of its social media platform.

        *Second*, Twitter's content moderation decision was not coordinated with the Biden campaign.  Because there was no coordination, nor even an expenditure, there was no in-kind contribution.

        *Third,* Twitter's enforcement of its Rules and policies falls within the Commission's media exemption, and therefore the decision to remove the N.Y. Post articles could not constitute a contribution or expenditure.

        *Fourth*, Section 230 of the Communications Decency Act, as well as the First Amendment to the United States Constitution, preclude any finding of liability for Twitter's content moderation decisions.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 2

The RNC's premise, that enforcement of a social media company's content moderation policies causes an in-kind contribution when the content at issue relates even indirectly to a campaign committee, is also troubling as a matter of policy.  It would call for the Commission to micromanage, through enforcement actions rather than rule-making, the social media industry's judgments regarding the balance to be struck between safety of their platforms on the one hand and unfettered political speech on the other.  The Commission need not reach those uncharted waters here, for under current law, no violation occurred.

Accordingly, the Commission should find that there is no reason to believe that Twitter violated FECA and should dismiss the complaint with no further action.

## I.      Factual Background

Twitter is a publicly traded corporation that allows users to communicate through 280-character messages called "Tweets" that are posted on its website and through its associated mobile apps.  Many users employ Twitter to share and consume news and commentary on current events.[1]  Twitter, which is free to use for all users, is designed "to serve the public conversation."[2]  Like many media organizations, it derives the vast majority of its revenue from advertising.[3]

### A.      Content Moderation Policies

In keeping with industry standards, Twitter enforces its own Rules and policies to ensure that all people can participate in the public conversation freely and safely.  This content moderation entails reviewing and, if necessary, removing content that may implicate concerns ranging from user safety, individual privacy, and sexually explicit content, to threats of violence, hacking, and foreign disinformation campaigns.  Twitter's Terms of Service, which all users acknowledge when they open their accounts, specifies that Twitter may "remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames."[4]  The Terms of Service therefore provide a contractual basis for the steps Twitter needs to take to enforce its Rules and policies when they appear to have been violated.

In its public securities filings, Twitter has identified a significant risk to its business if "there is a decrease in the perceived quality, usefulness, trustworthiness or relevance of the content generated by people on Twitter or content partners."[5]  Twitter also sees a business risk

---

[1] *See, e.g.*, Elisa Shearer & Elizabeth Grieco, *News Use Across Social Media Platforms 2018*, Pew Research Center (Sept. 10, 2018).

[2] Twitter, The Twitter Rules, https://help.twitter.com/en/rules-and-policies/twitter-rules (last visited Dec. 20, 2020).

[3] Twitter, Inc. Quarterly Report (Form 10-Q), at 14 (Oct. 30, 2020).

[4] Twitter, Terms of Service, https://twitter.com/en/tos (effective June 18, 2020).

[5] Form 10-Q, *supra* note 3 at 46.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 3

from negative publicity based on the "quality and reliability" of content shared on the platform and from lax policy enforcement.[6]  In fact, advertisers have pressed for Twitter to take greater steps to police content on the platform.[7]  Recognizing the expectations of its users and advertisers, Twitter has undertaken efforts "to improve the health of the public conversation on Twitter," and as a core commercial objective, it has concentrated on the "reduction of abuse, harassment, spam, manipulation and malicious automation on the platform."[8]

The company has established a variety of policies that seek to balance its commercial interest in promoting a free and active dialogue among its users with the reputational imperative to address false, misleading, and harmful content on its platform.  Enforcement of Twitter's politically neutral policies has resulted in actions against content posted by users across the political spectrum, Democrats and Republicans alike.[9]

Twitter's Site Integrity Team is responsible for creating and enforcing the content moderation policies, and it reviews all content identified for review, for compliance with these policies.[10]  Content may be flagged for review to determine compliance with Twitter's Rules and policies based on reports from visitors to the website or users of the mobile application, or through internal machine-learning processes that identify content that may violate Twitter Rules and policies.[11]

---

[6] *Id.* at 52.

[7] *See, e.g.*, Kurt Wagner & Thomas Buckley, *Facebook, Twitter Tumble on Unilever's Social-Media Pullback*, Bloomberg, June 26, 2020, https://www.bloomberg.com/news/articles/2020-06-26/unilever-will-halt-us-ads-on-facebook-twitter-through-2020.

[8] Form 10-Q, *supra* note 3 at 49.

[9] *See, e.g.*, @TwitterComms, Twitter (Oct. 2, 2020, 7:09 PM), https://twitter.com/TwitterComms/status/1312167835783708672; Matt Keeley, *Twitter Fact-Checks Debra Messing Trump-Hitler Tweet after Newsweek Query*, Newsweek, June 2, 2020, https://www.newsweek.com/twitter-fact-checks-debra-messing-trump-hitlertweet-after-newsweek-query-1508253; Cristiano Lima, *Twitter Forces Democratic Candidate to Delete Post Flouting Voter Suppression Rules*, Politico, Sept. 1, 2020, https://www.politico.com/news/2020/09/01/texas-democrat-deleted-twitter-post-407031; Derrick Bryson Taylor, *Twitter Permanently Suspends Accounts of Ilhan Omar's Potential Challenger*, N.Y. Times, Nov. 30, 2019, https://www.nytimes.com/2019/11/30/us/Danielle-Stella-Twitter-Ilhan-Omar.html.

[10] Declaration of Yoel Roth ("Roth Decl.") ¶ 5 (attached as Exhibit A).

[11] *Id.* ¶¶ 3-4.  Officeholders, candidates, campaigns, and party committees may submit requests for Tweets to be reviewed for compliance with Twitter's Rules and policies to the Public Policy group, their primary point of contact at Twitter.  *See* Declaration of Lauren Culbertson ("Culbertson Decl.") ¶¶ 3-5 (attached as Exhibit B).  The Public Policy teams forward these requests to the Site Integrity Team for review.  *Id.* ¶ 5.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 4

### 1.    Distribution of Hacked Materials Policy

In 2018, partly in response to events during the 2016 election, Twitter instituted a "Distribution of Hacked Materials Policy"[12] to discourage and mitigate harms associated with hacks and unauthorized exposure of private information (referred to below as the "Hacked Materials Policy").[13]  The version of the Hacked Materials Policy in place on October 14, 2020, when the N.Y. Post published its articles about Hunter Biden, prohibited the distribution of "hacked materials," including by "posting hacked content on Twitter (*e.g.*, in the text of a Tweet, or in an image)" or "linking to hacked content hosted on other websites."[14]  The policy explicitly applied only to republished hacked materials and not to *discussion of* "a hack that has taken place (including reporting on a hack, or sharing press coverage of hacking)" if such discussions did not include someone's "private information, information that could put people at risk of physical harm or danger; and/or information related to trade secrets."[15]  In other words, a news article or Tweet that only described hacked materials would not violate the policy, but one reproducing those materials would.  Under this policy, "hacked materials" included materials obtained in any way by "compromis[ing] or infiltrat[ing] computer systems for malicious purposes."[16]

Twitter's Site Integrity Team assesses content on Twitter's platform and makes a determination regarding whether material should be considered "hacked" for purposes of the policy.[17]  In many cases, content distributors will assert publicly that the information was hacked, thus eliminating the need for a determination.[18]  In other cases, the Site Integrity Team looks for indicia of hacking to evaluate whether the materials being shared appear to have been hacked.[19]  Per the version of the Hacked Materials Policy in effect on October 14, 2020, violations of the Hacked Materials Policy were enforced, depending on whether the user participated in the underlying hack, either by permanently suspending the user from Twitter or

---

[12] Twitter, Distribution of Hacked Materials Policy (effective Oct. 30, 2020), https://help.twitter.com/en/rules-and-policies/hacked-materials.

[13] Twitter, Distribution of Hacked Materials Policy (effective Mar. 2019), https://web.archive.org/web/20200930214928/https://help.twitter.com/en/rules-and-policies/hacked-materials; *see also* @TwitterSafety, Twitter (Oct. 15, 2020, 10:06 PM), https://twitter.com/vijaya/status/1316923552549998594.

[14] Distribution of Hacked Materials Policy (effective Mar. 2019), *supra* note 13.

[15] *Id.*

[16] *Id.*

[17] Roth Decl. ¶¶ 2, 9.

[18] *Id.* ¶ 9.

[19] *Id.*

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 5

by preventing the user's account from sending new Tweets until the offending Tweet was deleted by the user.[20]

### 2.      Private Information Policy

In addition to the Hacked Materials Policy, Twitter has a "Private Information Policy" that prohibits sharing "other people's private information without their express authorization and permission," regardless of whether release of the private information is associated with hacking.[21]  Personally identifying information subject to this policy includes: home address or physical location information; identity documents, including government-issued IDs and social security or other national identity numbers; contact information, including non-public personal phone numbers or email addresses; financial account information, including bank account and credit card details; and other private information, including biometric data or medical records.[22] First-time violations of the Private Information Policy are enforced by preventing the user's account from tweeting until the offending Tweet is deleted, and subsequent violations are enforced by permanent suspension from Twitter.[23]

### B.      Twitter's Response to Tweets Disseminating the N.Y. Post Articles

On October 14, 2020, the N.Y. Post, a daily tabloid publication, published two articles on its website regarding emails and other personal materials said to have been found on a hard drive allegedly belonging to Hunter Biden, the son of then-presidential candidate Joe Biden (together, "the N.Y. Post articles").[24]  The N.Y. Post articles republished unredacted copies of emails that clearly included personal email addresses and phone numbers, along with personal photographs of Hunter Biden and his family.[25]

Twitter had been warned throughout 2020 by federal law enforcement agencies to be on the alert for expected "hack-and-leak operations" undertaken by malign state actors, in which those state actors might hack electronic communications of individuals associated with political

---

[20] Distribution of Hacked Materials Policy (effective Mar. 2019), *supra* note 13.

[21] Twitter, Private Information Policy (effective Mar. 2019), https://help.twitter.com/en/rules-and-policies/personal-information.

[22] *Id.*

[23] *Id.*

[24] Emma-Jo Morris & Gabrielle Fonrouge, *Smoking-Gun Email Reveals How Hunter Biden Introduced Ukrainian Businessman to VP Dad*, N.Y. Post, Oct. 14, 2020, https://nypost.com/2020/10/14/email-reveals-how-hunter-biden-introduced-ukrainian-biz-man-to-dad [hereinafter *Smoking Gun*]; Emma-Jo Morris & Gabrielle Fonrouge, *Hunter Biden Emails Show Leveraging Connections with His Father to Boost Burisma Pay*, N.Y. Post, Oct. 14, 2020, https://nypost.com/2020/10/14/hunter-biden-emails-show-leveraging-connections-with-dad-to-boost-burisma-pay/ [hereinafter *Hunter Biden Emails*].

[25] Smoking Gun, *supra* note 24; Hunter Biden Emails, *supra* note 24.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 6

campaigns and seek to disseminate the leaked materials over Twitter and other social media
platforms.[26]  Reports from the law enforcement agencies even suggested there were rumors that
such a hack-and-leak operation would be related to Hunter Biden.[27]  Significant questions about
the provenance of the materials arose immediately after the N.Y. Post published the articles.[28]
The N.Y. Post asserted in the articles that it obtained the materials from Rudolph Giuliani who,
per Mr. Giuliani's lawyer, received them from the owner of a Delaware computer repair shop.[29]
According to the N.Y. Post, the computer shop owner said that a customer, whom the "shop
owner couldn't positively identify," brought in a "water-damaged MacBook Pro for repair" but
"never paid for the service or retrieved it or a hard drive on which its contents were stored."[30]
The N.Y. Post reported that the shop owner said that he alerted federal law enforcement to the
existence of the hard drive, but, before it was seized by law enforcement, he made a copy of the
hard drive and gave it to Mr. Giuliani's lawyer.[31]

On October 14, 2020, the same day the N.Y. Post articles were published and
disseminated by the N.Y. Post on its Twitter account, Twitter's Site Integrity Team, led by Yoel
Roth, reviewed the articles for compliance with Twitter's content moderation policies.[32]  Given
the prior warnings of a hack-and-leak operation and doubts about the provenance of the
materials republished in the N.Y. Post articles, the Site Integrity Team preliminarily determined
that the materials could have been obtained through hacking, as defined in the Hacked
Materials Policy.[33]  Additionally, the published materials contained unredacted private email
addresses, including one that appeared to belong to Hunter Biden, and phone numbers, in clear
violation of the Private Information Policy.

Mr. Roth escalated the matter internally, and Twitter determined that, based on then-
available information, the N.Y. Post articles violated the policies on Hacked Materials and

---

[26] *See* Roth Decl. ¶¶ 10-11*; see also* Alfred Ng, *How Social Networks Are Preparing for a
Potential October Hack-and-Leak*, CNET, Oct. 9, 2020, https://www.cnet.com/news/how-tech-
platforms-are-preparing-for-a-potential-october-hack-and-leak.

[27] Roth Decl. ¶ 11.

[28] *See id.* ¶¶ 10-11; *see also* Devin Coldewey, *Suspect Provenance of Hunter Biden Data Cache
Prompts Skepticism and Social Media Bans*, TechCrunch, Oct. 14, 2020,
https://techcrunch.com/2020/10/14/suspect-provenance-of-hunter-biden-data-cache-
prompts-skepticism-and-social-media-bans/.

[29] *See* Smoking Gun, *supra* note 24.

[30] *Id.*

[31] *Id.*

[32] Roth Decl. ¶¶ 12-14.

[33] *Id.* ¶ 13.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 7

Private Information that were in effect at the time.[34]  Accordingly, Twitter imposed the measures set out in those policies:  It prohibited users from sharing links to the articles, and it prevented the accounts of users who had previously shared the links from sending new Tweets until those users deleted the offending Tweet.[35]  Because Twitter does not delete users' Tweets, the company instead puts a restriction on accounts that have posted material that violates Twitter's policies.[36]  The restriction allows the user's profile and all non-offending Tweets to remain visible, but prevents the user from posting any additional Tweets until they themselves delete the Tweets that were found to violate the site's policies.[37]  None of these steps prevented users from discussing the N.Y. Post articles on Twitter, including the content of those articles, as long as the Tweets did not link to or show, and therefore further disseminate, the specific articles that Twitter had determined contained materials that violated its policies.

No one at Twitter, including the personnel responsible for applying and enforcing the content moderation policies, had any communications with the Biden presidential campaign, the Democratic National Committee, or their agents regarding the N.Y. Post articles before making the determination that the materials violated the Twitter Rules and policies.[38]

## II.    Analysis

Twitter's enforcement of its commercially reasonable, pre-existing content moderation policies did not cause the company to make an in-kind contribution to the Biden for President campaign committee.

### A.    Twitter's Actions Were Not "for the Purpose of Influencing" a Federal Election.

Temporarily blocking the N.Y. Post articles from the platform when enforcing its Hacked Materials Policy and Private Information Policy was not an expenditure by Twitter for the

---

[34] *Id.* ¶¶ 15-16; s*ee also* @TwitterSafety, Twitter (Oct. 14, 2020, 7:44 PM), https://twitter.com/TwitterSafety/status/1316525306656718848 ("The images contained in the articles include personal and private information — like email addresses and phone numbers — which violate our rules."); @TwitterSafety, Twitter (Oct. 14, 2020, 7:44 PM), https://twitter.com/TwitterSafety/status/1316525305796980737 ("As noted this morning, we also currently view[ed] materials included in the articles as violations of our Hacked Materials Policy.").

[35] Roth Decl. ¶ 17; Distribution of Hacked Materials Policy (effective Mar. 2019), *supra* note 13; Private Information Policy (effective Mar. 2019), *supra* note 21.

[36] Twitter, Our Range of Enforcement Options, https://help.twitter.com/en/rules-and-policies/enforcement-options (last visited Dec. 20, 2020).

[37] *Id.*

[38] *See* Roth Decl. ¶¶ 18-19; Culbertson Decl. ¶¶ 8-9.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 8

benefit of Biden for President.  Twitter enforced those policies for bona fide commercial reasons and not "for the purpose of influencing any election for Federal office."[39]

FECA and Commission regulations prohibit corporations from making contributions or expenditures in connection with federal elections.[40]  A "contribution" includes "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person *for the purpose of influencing any election for Federal office*."[41]  Prohibited corporate contributions also include, "any direct or indirect payment . . . or any services, or anything of value . . . to any candidate, campaign committee, or political party or organization, in connection with any [federal] election."[42]

Longstanding Commission precedents establish that a "corporation's bona fide commercial activity is neither 'for the purpose of influencing any election for federal office' nor 'in connection with any election' and thus is not a contribution or otherwise subject to regulation under the Act."[43]  These precedents reflect the Commission's prudent reluctance to second guess reasonable business judgments, absent evidence that they are made for the purpose of influencing a federal election rather than for legitimate commercial reasons.

An action taken by a corporation in the ordinary course of business does not become subject to FECA merely because it is alleged to provide an incidental benefit to a political candidate, as the RNC claims here.[44]  The Commission, for example, has determined that a business does not make a contribution or expenditure to a federal candidate when it uses corporate resources to demand a retraction to a negative news story about that candidate, if the purpose of the demand is "to defend its business reputation."[45]  A business may provide free services to federal candidates without making a contribution when it does so "based on commercial and not political considerations."[46]  A business may also mention federal candidates

---

[39] *See* 52 U.S.C. §§ 30101(8)(A), 30118(b)(2).

[40] *Id.* § 30118(a).

[41] *Id.* §§ 30101(8)(A), 30118(b)(2) (emphasis added).

[42] *Id.* § 30118(b)(2).

[43] Advisory Opinion 2014-06 (Ryan, Ryan for Congress, and Prosperity Action) at 9 (citing MUR 5474 and 5539 (Dog Eat Dog Films, Inc.), First General Counsel's Report at 13-17; Advisory Opinion 1994-30 (Conservative Concepts/Pence) at 3-7; and Advisory Opinion 1989-21 (Create-a-Craft) at 4); *see also* MUR 5485 (Conversagent, Inc.), First General Counsel's Report; MUR 5485, Certification (voting 4-0 to find no reason to believe).

[44] MUR 6586 (World Wrestling Entertainment, Inc.), Notification with Legal and Factual Analysis.

[45] *See id.*

[46] *See* Advisory Opinion 2018-11 (Microsoft) (determining that Microsoft's commercially reasonable efforts "to protect its brand reputation" did not amount to a prohibited in-kind

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 9

by name in paid advertisements to promote itself without those advertisements becoming contributions or expenditures.[47]  A vendor providing services to political committees "may establish objective business criteria to protect the commercial viability of its business without making contributions to the committees that meet those criteria."[48]  And "businesses that provide services to contributors . . . may also rely on commercial considerations to target customers and limit the range of services provided, without making any contributions themselves."[49]

In this case, Twitter enforced its Hacked Materials Policy and Private Information Policy for bona fide commercial reasons, in the ordinary course of business, and in accordance with its pre-existing policies.  Its enforcement action was fully consistent with its stated business purpose of "serving the public conversation."  Twitter engages in content moderation to maintain trust in the service and keep its users engaged, so that it can sell goods and services—advertising and data licensing.  As Twitter's federal securities filings recognize, non-enforcement of known violations of its content policies can lead to reputational and business risks, and Commission precedents rightly afford Twitter the needed latitude to take actions to minimize those risks.

That Twitter did not exclude the N.Y. Post articles for the purpose of influencing an election is particularly clear because the company simply implemented its pre-existing policies, which are politically neutral on their face.  The N.Y. Post articles plainly violated Twitter's Private Information Policy, as they reproduced materials containing personal email addresses and phone numbers.  That alone justified the enforcement action.  Additionally, the company reasonably agreed with other observers (and, apparently, with members of the N.Y. Post's own staff)[50] in its determination that the materials republished in the N.Y. Post articles appeared to have been obtained through hacking and thus violated the Hacked Materials Policy.  Once it was determined that sharing the N.Y. Post articles violated the policies, Twitter enforced the rules as

---

contribution when the company provided election-sensitive customers with free account security services that were "in the ordinary course of [its] business").

[47] *See* Advisory Opinion 2019-18 (IDF) (concluding that advertisements mentioning presidential candidates that are meant to drive internet traffic to a commercial website and that "do not espouse any public positions on any candidate or political party or contain express advocacy" are not contributions or expenditures).

[48] Advisory Opinion 2017-06 (Stein and Gottlieb); *see also* Advisory Opinion 2012-28 (CTIA) ("A change in business practices or rates would not necessarily result in an in-kind contribution.").

[49] Advisory Opinion 2017-06 (Stein and Gottlieb).

[50] Katie Robertson, *New York Post Published Hunter Biden Report amid Newsroom Doubts*, N.Y. Times, Oct. 18, 2020, https://www.nytimes.com/2020/10/18/business/media/new-york-post-hunter-biden.html (reporting that N.Y. Post "staff members questioned whether the paper had done enough to verify the authenticity of the hard drive's contents" and "also had concerns about the reliability of its sources and its timing").

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 10

set out in its policy documents, by preventing the user from sending new Tweets until the offending Tweet was deleted. Also consistent with its policies, Twitter did not take any action to block or minimize distribution of content that merely discussed the subject matter of the N.Y. Post articles without republishing the unredacted emails included within the articles.[51]

While the RNC complaint calls Twitter's enforcement of its policies "unprecedented actions,"[52] in actual fact Twitter constantly evaluates and takes action against material that violates its Rules and policies. In the last period for which data is publicly available, Twitter took down almost 16,000 Tweets per day.[53] Twitter enforces its Rules and policies without regard to political considerations. For example, when President Trump was diagnosed with COVID-19, Twitter announced that "tweets that wish or hope for death, serious bodily harm or fatal disease against *anyone* are not allowed and will need to be removed."[54] In August 2020, Twitter required a Democratic candidate for the House of Representatives to remove a Tweet for violating the platform's voter suppression rules.[55] In June 2020, Twitter labeled a Tweet by actress Debra Messing that compared "President Donald Trump's photo op at St. John's church to an edited image of Nazi dictator Adolf Hitler appearing to show a Bible in a similar pose" as "manipulated media."[56] The treatment of the N.Y. Post articles was nonpolitical and consistent with the version of Twitter's Hacked Materials Policy in effect on October 14, 2020, as well as with past content moderation decisions relating to potentially hacked materials.

---

[51] This treatment is consistent with the version of Twitter's Hacked Materials Policy in effect on October 14 and with past moderation decisions relating to potentially hacked materials. For instance, the September 2020 New York Times story regarding President Trump's tax returns cited by the RNC merely *discussed* but did not *republish* those tax returns and therefore was not subject to enforcement action. Nor did that story contain any of the specified private information covered by Twitter's Private Information Policy established in March 2019 and in effect at the time. *See* Complaint at 3-4, MUR 7821.

[52] *Id.* at 2.

[53] Twitter, Rules Enforcement (July – Dec. 2019), https://transparency.twitter.com/en/reports/rules-enforcement.html#2019-jul-dec.

[54] @TwitterComms, Twitter (Oct. 2, 2020, 7:09 PM), https://twitter.com/TwitterComms/status/1312167835783708672; *see also* Bobby Allyn, *Facebook, Twitter and TikTok Say Wishing Trump's Death from COVID-19 Is Not Allowed*, NPR, Oct. 2, 2020, https://www.npr.org/sections/latest-updates-trump-covid-19-results/2020/10/02/919778961/facebook-twitter-and-tiktok-say-wishing-trumps-death-from-covid-is-not-allowed.

[55] Lima, *supra* note 9. The violative Tweet was a reply Tweet that read, "Thank you! And remind all of your Trump supporting relatives to vote on Wednesday, November 4! (Since they're Trump supporters, they might fall for it. Just saying….)." *Id.*

[56] Keeley, *supra* note 9.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 11

The RNC has made no showing, beyond mere speculation, that Twitter's enforcement action excluding the N.Y. Post articles from its platform was made for any political purpose, let alone for the purpose of influencing the 2020 presidential election.  The RNC's blanket assertions about the partisan leanings of Twitter officers and employees are legally and factually irrelevant.  The Commission correctly disregards such speculative allegations, particularly where the respondent, as Twitter does here, refutes them.[57]

Twitter's actions were squarely consistent with the company's commercial interests and were undertaken in keeping with Twitter's pre-existing content moderation policies, resulting in no expenditure.

### B.    Twitter Did Not Coordinate with Any Federal Candidate or Political Party.

FECA treats a coordinated expenditure as an in-kind contribution.[58]  Here there was neither an expenditure nor coordination, however, and for this reason as well, there was no in-kind contribution.

The Commission's regulations provide that "any expenditure" by an individual or organization "that is coordinated" with a campaign or political party is "an in-kind contribution to . . . the candidate or political party committee with whom or with which it was coordinated."[59] An expenditure is "coordinated" with a campaign or political party committee if it is "made in cooperation, consultation or concert with, or at the request or suggestion of" the campaign or party.[60]

As explained below, Twitter's content moderation decisions with respect to the N.Y. Post articles are subject to the media exemption and therefore do not constitute an "expenditure" within the meaning of FECA.  Moreover, it is doubtful that any actual expenditure could be associated with Twitter's nearly automatic enforcement of its policies.  Regardless, there was no coordination.  Twitter did not receive a request from the Biden campaign to review (much less restrict) the N.Y. Post articles.[61]  Nor did decision-makers at Twitter, or to the best of the company's knowledge, anyone authorized to act on Twitter's behalf even communicate with the

---

[57] *See* MUR 5467 (Michael Moore), First General Counsel's Report at 5 ("Purely speculative charges, especially when accompanied by a direct refutation, do not form the adequate basis to find reason to believe that a violation of [the Act] has occurred.") (quoting MUR 4960 (Hillary Rodham Clinton et al.), Statement of Reasons at 3); *see also* MUR 4850 (Deloitte & Touche, LLP), Statement of Reasons of Chairman Darryl R. Wold and Commissioners David M. Mason and Scott E. Thomas at 2 ("[a] mere conclusory allegation without any supporting evidence does not shift the burden of proof to the respondents").

[58] 11 C.F.R. § 109.20(b).

[59] *Id.*

[60] *Id.* § 109.20(a).

[61] Culbertson Decl. ¶¶ 8-9.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 12

Biden campaign regarding Twitter's decision to enforce its content moderation policies with respect to the N.Y. Post articles.[62]

Accordingly, there was no coordinated expenditure resulting in an in-kind contribution to the Biden for President campaign committee.

### C. Twitter's Content Moderation Decisions Are Subject to the Media Exemption.

Twitter is a "media entity," as defined under the Commission's media exemption, carrying news and commentary. For this reason too, its decisions regarding moderation of the news and commentary posted on its website do not constitute contributions or expenditures subject to regulation by the Commission. Deciding what content to include or exclude from a media platform, including under applicable content policies, is a core function associated with any media entity, whether a newspaper, television station, or social media website. Twitter's enforcement of its pre-existing content moderation policies with respect to the N.Y. Post articles therefore falls squarely within the media exemption.

Commission regulations exclude from the definition of contribution or expenditure "[a]ny cost incurred in covering or carrying a news story, commentary, or editorial by any broadcasting station (including a cable television operator, programmer or producer), *Web site*, newspaper, magazine, or other periodical publication, including *any Internet or electronic publication*."[63] To determine whether this media exemption applies, the Commission uses a two-step analysis, first asking whether the entity engaging in the activity is a media entity. If it is, the Commission then asks whether it is owned or controlled by a political party, political committee, or candidate (which would take it outside the scope of the media exemption) and whether it is acting in its capacity as a media entity in conducting the activity at issue. The Commission has framed this latter inquiry as whether the activity at issue is within the entity's "legitimate press function."[64]

Twitter is a media entity because its platform is a "Web site" that is both an "Internet . . . publication" itself and a carrier of content posted by other Internet publications. The Commission "has not limited the definition of 'media entity' to 'traditional news outlets.'" Instead, it gives the term "media entity" a "broad interpretation."[65] This is especially so with respect to the Internet because the Commission has recognized the Internet to be "a unique and evolving mode of mass communication and political speech that is distinct from other media in

---

[62] Roth Decl. ¶¶ 18-19; *see also* Culbertson Decl. ¶¶ 8-9.

[63] *Id.* § 100.73 (addressing contributions) (emphasis added); *see also* 52 U.S.C. § 30101(9)(B)(i) (addressing expenditures); 11 C.F.R. § 100.132.

[64] *See* Advisory Opinion 2019-05 (System73) at 4 (citing Advisory Opinion 2016-01 (Ethiq) at 2-4 and *Reader's Digest Ass'n v. FEC*, 509 F. Supp 1210, 1215 (S.D.N.Y. 1981)).

[65] *Id.*

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 13

a manner that warrants a restrained regulatory approach."[66]  As "used in the Commission's media exemption regulations, '[t]he terms "Web site" and "any Internet or electronic publication" are meant to encompass a wide range of existing and developing technology, such as websites, "podcasts," etc.'"[67]

Media entities covered by the media exemption are entities that "cover *or carry* news stories, commentary, and editorials on the Internet."[68]  Twitter routinely carries news stories, commentary, and editorials on its website.[69]  Moreover, an entity does not need to create its own content to be covered by the media exemption.  To the contrary, the Commission has held repeatedly that a website or other internet publication, like Twitter, that mostly distributes content created by third parties is treated as a media entity for purposes of the media exemption.[70]  For example, in Advisory Opinion 2019-05 (System73), the Commission noted that it interprets the term "commentary" in its regulatory media exemption "broadly to include not only commentary by the media entity and its staff, but also guest commentary."[71]  The Commission has also indicated "that a characteristic of periodicals qualifying as press entities is that they derive revenues from the sale of subscriptions or advertising."[72]  Twitter derives the majority of its revenue from advertising.[73]  Accordingly, because Twitter is a website that carries third-party news and commentary to generate advertising revenue, it is a "media entity" within the meaning of the Commission's regulations.

---

[66] Advisory Opinion 2008-14 (Melothé) at 3-4.

[67] Advisory Opinion 2016-01 (Ethiq) (quoting Internet Communications, 71 Fed. Reg. at 18608 n.52).

[68] Internet Communications, 71 Fed. Reg. 18589, 18608 (Apr. 12, 2006) (emphasis added).

[69] *See, e.g.*, Shearer & Grieco, *supra* note 1.

[70] Advisory Opinion 2000-13 (iNEXTV) (determining that an internet video service that "does not create programming under its own name" but "operates its own network of specialized news and information sites" qualified for the media exemption); *see also* Advisory Opinion 1996-16 (Bloomberg) (determining that an online candidate forum in which non-journalist online guests asked questions of the candidates qualified for the media exemption); Advisory Opinion 2005-16 (Fired Up) (determining that websites qualified for the media exemption when "a primary function of the websites is to provide news and information to readers through Fired Up's commentary on, quotes from, summaries of, and hyperlinks to news articles appearing on other entities' websites and through Fired Up's original reporting").

[71] Advisory Opinion 2019-05 (System73).

[72] Advisory Opinion 2000-13 (iNEXTV).

[73] Form 10-Q, *supra* note 3 at 14.

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 14

To avail itself of the media exemption, a media entity must not be owned or controlled by a political party, political committee, or candidate.  Twitter, a publicly traded company, is not so owned or controlled.[74]

The Commission has interpreted the legitimate press function of media entities to encompass a broad range of activities, finding that a media entity providing coverage of campaign events would be a legitimate press function even if the media entity covered campaigns only from one political party and not the other.[75]  Likewise, the Commission has held that an Internet-based media entity that streamed campaign events consisting solely of content created by the campaign committees would be engaged in a legitimate press function.[76]  In contrast, the Commission has found activities by media entities *not* to be a legitimate press function only when they involve direct campaigning unrelated to any press function.  For example, in Advisory Opinion 2008-14 (Melothé), the Commission held that issuing awards to campaign volunteers, conducting regular fundraising drives for candidates, and holding daily briefings for campaign volunteers would not be "legitimate press function[s]."[77]

Twitter's enforcement of its content moderation policies with respect to the N.Y. Post articles, unlike conducting fundraising for a candidate or issuing awards to campaign volunteers, reflects a core function of any social media organization to ensure that news and commentary posted on its site conform to its Rules and policies intended to protect users of the site and third parties.  Traditional media organizations have long exercised the same editorial control over content they publish to preserve editorial standards and respect privacy interests of individuals.  Content moderation is a legitimate press function, and Twitter's decision to remove the N.Y. Post articles therefore falls within the media exemption.

> **D.** **Twitter's Content Moderation Decisions Are Protected under Section 230, and Requiring Twitter to Host Materials on Its Platform Would Violate the First Amendment.**

Section 230 of the Communications Decency Act provides a broad grant of immunity for "interactive computer services" such as Twitter.[78]  First, Section 230 provides that no interactive computer service "shall be treated as the publisher or speaker of any information" provided by a

---

[74] Twitter, 2019 Annual Report, Form 10-K, https://s22.q4cdn.com/826641620/files/doc_financials/2019/FiscalYR2019_Twitter_Annual_-Report-(3).pdf.

[75] Advisory Opinion 2008-14 (Melothé).

[76] Advisory Opinion 2019-05 (System73).

[77] Advisory Opinion 2008-14 (Melothé) at 5-6.

[78] Twitter is unquestionably an interactive computer service, as it "provides . . . computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2); *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014).

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 15

third party.[79]  Second, Section 230 provides that no "interactive computer service shall be held liable" on the basis of any action restricting access to material provided by a third party.[80]  In short, Section 230 bars legal action "seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content" created by third parties.[81]  Because "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230,"[82] decisions by Twitter to exclude the N.Y. Post articles from its platform are absolutely immune from civil liability, including federal civil enforcement.

Additionally, the First Amendment right to free speech extends to a right against compelled speech.[83]  Just as a newspaper cannot be compelled to host editorials by political candidates,[84] the First Amendment protects the right of social networks to decide what content to host.[85]  Finding reason to believe that Twitter violated the Act by moderating the N.Y. Post articles would essentially require Twitter to host that content.  Such a mandate would violate the First Amendment.

---

[79] 47 U.S.C. § 230(c)(1).

[80] *Id.* § 230(c)(2)(A).

[81] *Barrett v. Rosenthal*, 40 Cal.4th 33, 43 (2006) (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)).

[82] *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1171 (9th Cir. 2008).

[83] *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977) ("We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.").

[84] *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

[85] *See, e.g.*, *Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437 (S.D.N.Y. 2014) ("[T]he First Amendment's protections apply . . . whether or not the speaker generated the underlying content in the first place.").

**COVINGTON**

Mr. Jeff S. Jordan
December 21, 2020
Page 16

***

     For the reasons stated above, we respectfully request that the Commission dismiss the Complaint.

Respectfully submitted,

Robert K. Kelner
Brendan Parets
Elizabeth Upton
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
*Counsel for Twitter, Inc.*

# Exhibit A

# BEFORE THE FEDERAL ELECTION COMMISSION

|  | ) |
|---|---|
| **In re MUR 7821** | ) |
|  | ) |

## <u>DECLARATION OF YOEL ROTH</u>

1.     My name is Yoel Roth.  This declaration is made upon my personal knowledge and belief.

2.     I am Head of Site Integrity at Twitter, which is part of Twitter's Trust & Safety department.  In this role, I lead the company's Site Integrity Team, which assesses content posted on Twitter to determine whether it violates the company's policies.

3.     Visitors to the Twitter website and users of the mobile application can report content that may violate the company's policies.  Twitter also uses machine-learning programs to identify content that may violate Twitter policies.

4.     The Site Integrity Team also receives and reviews reports, including from security consultants, regarding hacking incidents.

5.     The Site Integrity Team assesses content flagged for review under Twitter's policies.

6.     Twitter regularly enforces its policies, including the Distribution of Hacked Materials Policy and Private Information Policy.  The TwitterService team assists with implementation of such enforcement actions.

7.      As a matter of practice, neither I nor the other members of the Site

Integrity Team communicate directly with persons outside Twitter that report content for

violating Twitter's policies.

8.      For routine content moderation decisions, the Site Integrity Team makes

enforcement decisions.  For high-profile matters and content that presents more complex

considerations, the Site Integrity Team performs an initial assessment and escalates the matter

internally for a final enforcement decision.

9.      When evaluating potentially hacked material to determine if there is a

violation of Twitter's Distribution of Hacked Materials Policy, the Site Integrity Team considers

public declarations of hacking as determinative.  If no such claim is made, the Site Integrity

Team considers other indicia of hacking to assess whether the material was obtained through

hacking based on the team's experience and expertise.

10.     Since 2018, I have had regular meetings with the Office of the Director of

National Intelligence, the Department of Homeland Security, the FBI, and industry peers

regarding election security.

11.     During these weekly meetings, the federal law enforcement agencies

communicated that they expected "hack-and-leak operations" by state actors might occur in the

period shortly before the 2020 presidential election, likely in October.  I was told in these

meetings that the intelligence community expected that individuals associated with political

campaigns would be subject to hacking attacks and that material obtained through those hacking

attacks would likely be disseminated over social media platforms, including Twitter.  These

expectations of hack-and-leak operations were discussed throughout 2020.  I also learned in

these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden.

12.    On October 14, 2020, I learned from media coverage that the New York Post had posted articles to its website that morning containing emails and other personal materials purportedly found on a hard drive that allegedly belonged to Hunter Biden.

13.    The Site Integrity Team preliminarily determined that the information in the articles could have been obtained through hacking, based on, among other things, the type of material, the sourcing described in the articles, and the information security community's initial reactions.

14.    The materials in the New York Post articles also contained personal email addresses and telephone numbers, and so sharing them on Twitter violated the Private Information Policy.

15.    Given the high-profile nature of the material and publisher, the Site Integrity Team escalated the New York Post articles for further review.

16.    Twitter's Trust & Safety leadership determined that the New York Post articles violated the Distribution of Hacked Materials Policy and the Private Information Policy and instructed the Site Integrity Team to execute enforcement of those policies.

17.    At approximately 10:20 a.m. Pacific time on October 14, 2020, the Site Integrity Team implemented the enforcement action.  Per the procedures and sanctions set out in the policies, the Site Integrity Team blocked Twitter users from sharing links over Twitter to the applicable New York Post articles and prevented users who had previously sent Tweets sharing those articles from sending new Tweets until they deleted the Tweets violating Twitter's policies.

MUR782700054

18.      I did not receive any communications from or have any communications with representatives of Biden for President, the Democratic National Committee, or any of their agents regarding the New York Post articles before Twitter implemented the enforcement actions on October 14, 2020.

19.      To the best of my knowledge, no Twitter employee received any communications from or had any communications with representatives of Biden for President, the Democratic National Committee, or any of their agents regarding the New York Post articles before Twitter implemented the enforcement actions on October 14, 2020.

\* \* \*

_Yoel Roth_
Yoel Roth (Dec 17, 2020 16:15 PST)

Yoel Roth

Date: Dec 17, 2020

**Signature:** _Yoel Roth_
Yoel Roth (Dec 17, 2020 16:15 PST)

**Email:** yoel@twitter.com

**Title:** Head of Site Integrity

**Company:** Twitter Inc.

# Exhibit B

BEFORE THE FEDERAL ELECTION COMMISSION

_____
                                                    )
**In re MUR 7821**                       )
_____)

## DECLARATION OF LAUREN CULBERTSON

1.       My name is Lauren Culbertson.  This declaration is made upon my personal knowledge and belief.

2.       I am employed by Twitter, Inc. as Head of U.S. Public Policy.  In that role, I lead Twitter's Public Policy team devoted to state and federal policy work.

3.       Twitter's Public Policy team serves as the primary point of contact at Twitter for officeholders, election officials, candidates, campaigns, and party committees.  At least one member of Twitter's legal team also worked with officeholders, election officials, candidates, campaigns, and party committees during the 2018 U.S. midterm election and the 2020 presidential campaign.

4.       The Public Policy team provides user support to governmental Twitter users, including executive branch agencies and officials, members of Congress, the President, and others in the administration.  The Public Policy team maintains a general email account (gov@twitter.com) for government contacts to direct questions and concerns and to report content that they believe violates Twitter policies.

5.       As the primary points of contact for officeholders, election officials, candidates, campaigns, and party committees, the Public Policy team receives requests from those persons for Tweets to be reviewed for compliance with Twitter's policies.  The Public

Policy team forwards these requests to review content to enforcement agents, including members of the TwitterService and the Trust & Safety teams.

6.      I am aware that the New York Post published a series of articles on October 14, 2020, containing images and emails purportedly sent and received by Hunter Biden (the "Articles").

7.      I am also aware that on October 14, 2020, Twitter's Trust & Safety leadership determined the Articles violated Twitter policies and enforced those policies against the Articles, removing associated content from the platform.

8.      I did not receive any communications from or have any communications with representatives of Biden for President, the Democratic National Committee, or any of their agents regarding the Articles before Twitter implemented the enforcement actions on October 14, 2020.

9.      To the best of my knowledge, no Twitter employee received any communications from or had any communications with representatives of Biden for President, the Democratic National Committee, or any of their agents regarding the Articles before Twitter implemented the enforcement actions on October 14, 2020.

***

*Lauren M Culbertson*
Lauren M Culbertson (Dec 17, 2020 18:43 EST)

Lauren Culbertson

Date:  Dec 17, 2020

Signature:  *Lauren M Culbertson*
Lauren M Culbertson (Dec 17, 2020 18:43 EST)

Email:  lculbertson@twitter.com

Title:  Head of U.S. Public Policy

Company:  Twitter

2