**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION**

|  |  |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*, | |
| Plaintiffs, | |
| v. | No. 3:22-cv-01213-TAD-KDM |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

RESPONSE TO DEFENDANTS' STATEMENT OF FACTS .................................................. 1

   I.   Defendants' Introduction Is Rife With "Disinformation." ................................................. 1

   II.  Defendants' Proposed Statement of Facts Mischaracterizes the Evidence. ........................ 6

       A.   Platforms are not "economically incentivized" to censor disfavored content. ........... 6

       B.   Federal officials pressured platforms to censor "borderline content." ..................... 11

       C.   Defendants use the calls for Section 230 reform as an explicit threat. ..................... 12

   III.  Defendants' Agency-Specific Statements of Facts Mischaracterize the Evidence. ........... 15

       A.   The White House Perpetrates an Egregious Pressure Campaign. ............................ 15

       B.   The Surgeon General's Office Joins the White House Pressure Campaign. ............ 31

       C.   The CDC and Census Bureau Conspire with Platforms on Censorship. ................. 40

       D.   Dr. Fauci Perpetrates Campaigns of Deception to Censor Disfavored Viewpoints. .................................................................................................................. 45

       E.   CISA Engages in Extensive, Ongoing Social-Media Censorship Activities. ........... 47

       F.   The FBI Pressures and Colludes With Platforms to Remove Domestic Speech. ................................................................................................................. 58

ARGUMENT ......................................................................................................................... 68

   I.   Plaintiffs Have Demonstrated Immediate Irreparable Injury. ......................................... 70

       A.   Plaintiffs Experience Both Ongoing and Imminent Irreparable Injury .................... 70

   II.  The Evidence Demonstrates That State and Private Plaintiffs Have Standing. ................ 80

   III. Plaintiffs Are Likely To Prevail on Their First Amendment Claims. .............................. 82

       A.   There Is Overwhelming Evidence of "Significant Encouragement." ...................... 83

B.      There Is Overwhelming Evidence of Coercion...................................................... 88

C.      Deceiving Platforms Into Censoring Speech Constitutes State Action. ................... 95

D.      There Is Overwhelming Evidence of Joint Participation and Conspiracy. ............... 99

IV. Plaintiffs Are Likely to Succeed on Their APA and *Ultra Vires* Claims.......................... 111

V.  Plaintiffs' Proposed Injunction Is Sufficiently Precise. .................................................... 111

VI. The Proposed Injunction Is Not Overbroad and Does Not Interfere With Legitimate
    Government Speech or Functions. .................................................................................... 113

CONCLUSION............................................................................................................................ 117

CERTIFICATE OF SERVICE .................................................................................................... 119

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
    458 U.S. 592 (1982) ............................................................................... 73

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85 (2013) ................................................................................. 75

*Am. Family Ass'n v. City and County of San Francisco*,
    277 F.3d 1114 (9th Cir. 2002) ............................................................... 92

*Arc of California v. Douglas*,
    757 F.3d 975 (9th Cir. 2014) ................................................................. 80

*Ashcroft v. ACLU*,
    535 U.S. 564 (2002) ............................................................................... 16

*Backpage.com, LLC v. Dart*,
    807 F.3d 229, 235 (7th Cir. 2015) ............................................... 5, 84, 90

*Ballard v. Wall*,
    413 F.3d 510 (5th Cir. 2005) ................................................................. 99

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ........................................................................... 89, 90

*Changizi v. HHS*,
    602 F. Supp. 3d 1031 (S.D. Ohio 2022) ........................................... 87, 88

*Cuviello v. City of Vallejo*,
    944 F.3d 816 (9th Cir. 2019) ................................................................. 80

*Doe v. Google LLC*,
    No. 21-16934, 2022 WL 17077497 (9th Cir. Nov. 18, 2022) ........... 90, 93

*Elrod v. Burns*,
    427 U.S.347 (1976) ......................................................................... 70, 79

*Fogel v. Collins*,
    531 F.3d 824 (9th Cir. 2008) ............................................................... 116

*George v. Edholm*,
    752 F.3d 1206 (9th Cir. 2014) ..................................................... 95, 96, 97

*Hammerhead Enterprises v. Brezenoff*,
    707 F.2d 33 (2d Cir. 1983) .................................................................... 91

*Hart v. Facebook, Inc.*,
    No. 22-cv-737, 2022 WL 1427507 (N.D. Cal. May 5, 2022) ................. 87

*Howard Gault Co. v. Texas Rural Legal Aid, Inc.*,
    848 F.2d 544 (5th Cir. 1988) ..................................................... 100, 101, 103

*Jones v. City of Chicago*,
    856 F.2d 985 (7th Cir. 1988) ................................................................. 96

*La. Div. Sons of Confederate Veterans v. City of Natchitoches*,
   821 F. App'x 317 (5th Cir. 2020) ......................................... 83

*Matal v. Tam*,
   582 U.S. 218 (2017)...................................................... 5, 69

*Moody v. Farrell*,
   868 F.3d 348 (5th Cir. 2017) ....................................... 85, 99

*Norwood v. Harrison*,
   413 U.S. 455 (1973)........................................................ passim

*O'Handley v. Weber*,
   62 F.4th 1145 (9th Cir. 2023) ........................................ 84

*Opulent Life Church v. City of Holly Springs, Miss.*,
   697 F.3d 279 (5th Cir. 2012) ......................................... 80

*Planned Parenthood of Se. Pennsylvania v. Casey*,
   505 U.S. 833 (1992)....................................................... 117

*Playboy Enterprises v. Meese*,
   639 F. Supp. 581 (D.D.C. 1986) .................................... 91

*R.C. Maxwell Co. v. Borough of New Hope*,
   735 F.2d 85 (3d Cir. 1984)............................................. 91

*Rattner v. Netburn*,
   930 F.2d 204 (2d Cir. 1991)........................................... 92

*Robinson v. Maruffi*,
   895 F.2d 649 (10th Cir. 1990) ....................................... 97

*Ry. Emp. Dep't v. Hanson*,
   351 U.S. 225 (1956)....................................................... 95

*Schmidt v. Lessard*,
   414 U.S. 473 (1974)............................................... 111, 112

*Scott v. Schedler*,
   826 F.3d 207 (5th Cir. 2016) ....................................... 111

*Skinner v. Railway Labor Execs. Ass'n*,
   489 U.S. 602 (1989).................................................. 94, 95

*Smiddy v. Varney*,
   803 F.2d 1469 (9th Cir. 1986) ....................................... 97

*Trump v. Twitter Inc.*,
   602 F. Supp. 3d 1213 (N.D. Cal. 2022) ......................... 93

*United States v. Alvarez*,
   567 U.S. 709 (2012)........................................ 16, 69, 104

*United States v. Rashwan*,
   328 F.3d 160 (4th Cir. 2003) ......................................... 97

*United States v. Stevens*,
559 U.S. 460 (2010) ................................................................................................ 16, 69

*VDARE Foundation v. City of Colorado Springs*,
11 F.4th 1151 (10th Cir. 2021) .............................................................................. 91

*Virginia v. Black*,
538 U.S. 343 (2003) ................................................................................................ 15, 16

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ................................................................................................ 16

*West Virginia v. E.P.A.*,
142 S. Ct. 2587 (2022) ........................................................................................... 75

*Young v. Brand Scaffold Servs.*, LLC,
2009 WL 4674053 (E.D. Texas 2009) .................................................................. 7

**Statutes**

5 U.S.C. § 706(2)(A)-(C) ............................................................................................. 111

18 U.S.C. § 241 ............................................................................................................. 104

La. Const. Ann. art. I, § 7 ............................................................................................ 72

Mo. Const. art. I, § 8 ................................................................................................... 72

**Regulations**

83 Fed. Reg. 46,843 ..................................................................................................... 98

87 Fed. Reg. 12713 ...................................................................................................... 113

## INTRODUCTION

Suppose that the Trump White House, backed by Republicans controlling both Houses of Congress, publicly demanded that all libraries in the United States burn books criticizing the President, and the President made statements implying that the libraries would face ruinous legal consequences if they did not comply, while senior White House officials privately badgered the libraries for detailed lists and reports of such books that they had burned—and the libraries, after months of such pressure, complied with those demands and burned the books.

Suppose that, after four years of pressure from senior congressional staffers in secret meetings threatening the libraries with adverse legislation if they did not cooperate, the FBI started sending all libraries in the United States detailed lists of the books the FBI wanted to burn, requesting that the libraries report back to the FBI by identifying the books that they burned—and the libraries complied by burning about half of those books.

Suppose that a federal national security agency teamed up with private research institutions, backed by enormous resources and federal funding, to establish a mass-surveillance and mass-censorship program that uses sophisticated techniques to review hundreds of millions of American citizens' electronic communications in real time, and works closely with tech platforms to covertly censor millions of them.

The first two hypotheticals are directly analogous to the facts of this case.  And the third is not hypothetical at all—it is a description of the Election Integrity Partnership and Virality Project.

### RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

**I.    Defendants' Introduction Is Rife With "Disinformation."**

Defendants' Introduction repeatedly advances factual claims that the evidence contradicts—what one might call "disinformation."  This trend persists throughout their brief.

Factually, Defendants' brief goes off the rails in its very first sentence.  There, Defendants claim that their censorship activities were designed to prevent "hostile *foreign* assaults on critical election infrastructure."  Doc. 266, at 1 (emphasis added).  The evidence demonstrates, however, that federal censorship overwhelmingly targets *domestic* speech by American citizens, not "foreign" disinformation.  For example, Renee DiResta states that "the vast majority of voting related misinformation in the 2020 election was domestic."  Doc. 214-1, ¶ 1056 (quoting Scully Ex. 7, at 6).  The EIP Report agrees that supposed election "misinformation" "was pushed by authentic, domestic actors."  *Id.* ¶ 1220.  Alex Stamos stated that "almost all of this is domestic, right?  … It is all domestic," *id.* ¶ 1231, and "the vast, vast majority … is domestic."  *Id.* ¶ 1233.  Kate Starbird states that the misinformation is "largely domestic coming from inside the United States."  *Id.* ¶ 1235.  The Virality Project admits that, for supposed COVID misinformation, "[f]oreign … actors' reach appeared to be far less than that of domestic actors."  *Id.* ¶ 1241.  The FBI's censorship of supposedly "foreign" speech—in just a tiny handful of examples—swept into the censorship net hundreds of thousands of social-media posts and engagements by American citizens, as well as organic content by American freelance journalists.  *Id.* ¶¶ 918-922.  When CISA reports misinformation for censorship, it does not bother to determine whether the speech is foreign or domestic—CISA does not "take steps to see whether this came from foreign or domestic sources," but "would just pass it along to the social-media platforms."  *Id.*, ¶ 1033.

Defendants' second sentence makes a key admission—that "various agencies and officials spoke publicly and privately with social media companies to … call the companies' attention to misinformation spreading on their platforms."  Doc. 266, at 1.  This sentence admits that Defendants are the but-for cause of the censorship.  Until Defendants flagged the disfavored

content, the platforms did not censor it.  As Brian Scully candidly admits, "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Doc. 214-1, ¶ 974.

Next, Defendants claim that each federal official and agency should be treated as acting independently from the others.  Doc. 266, at 1; *see also id.* at 23.  On Defendants' view, it is just a stunning coincidence that dozens of federal agencies and officials, all acting in isolation, simultaneously decided to pressure social-media platforms to remove disfavored content. Not so. The evidence shows extensive coordination among Defendants on social-media censorship.

For example, the White House's pressure campaign is closely integrated with the Office of Surgeon General.  *See, e.g.,* Doc. 214-1, ¶¶ 212, 246, 253, 259, 281, 293, 365, 369.  Likewise, the censorship campaign of the CDC and the Census Bureau draws directly from White House pressure.  *Id.* ¶¶ 395-396, 424, 426, 455-458, 467.   NIAID and NIH censorship efforts are intertwined and reinforced by CDC.  *Id.* ¶ 827.   CISA, FBI, DOJ, ODNI, and other federal agencies are jointly involved in pressuring and colluding with platforms, even participating in the same joint meetings, the same collusive activities, and the same campaigns of pressure and deception.  *Id.* ¶¶ 861-866.   CISA, the FBI, and other federal law-enforcement and national-security agencies colluded on the suppression of the Hunter Biden laptop story.  *Id.* ¶¶ 880-894.   NIAID and NIH, through their directors Dr. Fauci and Dr. Francis Collins, conspired together on a series of censorship campaigns, including relating to the lab-leak theory and the Great Barrington Declaration.  *Id.* ¶¶ 596, 598-756, 777-808. NIAID is embedded in the White House's censorship activities, as Dr. Fauci reinforced the White House's attempts to deplatform Alex Berenson.  *Id.* ¶¶ 596, 840-852.  CISA and the GEC coordinate both with each other and with private entities in a massive surveillance and censorship project, the Election Integrity Partnership.  *Id.* ¶¶ 1132, 1135, 1153-54, 1175, 1197.  OSG, the CDC, and other federal officials coordinate with each other

and with the same private entities as CISA and the GEC through the Virality Project.  *Id.* ¶¶ 1279, 1284.  High-level congressional staffers coordinate with the FBI on pressuring platforms to increase censorship in secret meetings conducted in Silicon Valley.  *Id.* ¶¶ 950-958.  The White House's campaign of public threats against platforms demanding greater censorship, reinforced by its political allies in Congress and other senior federal officials, grants coercive force to the censorship efforts of all the federal agencies involved.  *Id.* ¶¶ 1-30.  Director Easterly's text messages state that CISA wants to "play a coord role" so that relevant agencies can try to prebunk/debunk" the "mis/dis trends," in order to prevent the "chaos" that would result if every federal department and agency "is independently reaching out to platforms."  *Id.* ¶ 1108.  Indeed, Secretary Mayorkas aptly describes the censorship campaign as occurring "across the federal enterprise."  Doc. 268, ¶ 285.

Next, Defendants claim that "much of the challenged conduct occurred in the previous Administration," as if this is somehow a "factual deficienc[y] in their theory."  Doc. 266, at 1.  It is not clear why Defendants think so.  Federal social-media censorship violates the First Amendment regardless of which Administration or political party does it.  Moreover, the evidence demonstrates an aggressive acceleration of federal social-media censorship activities, and the direct involvement of the White House, once the Biden Administration took office.  Many of the most egregious acts of censorship in 2020—such as Dr. Fauci's campaigns to discredit the lab-leak theory and the Great Barrington Declaration, CISA's launching of the Election Integrity Partnership, CISA's "switchboarding," and the FBI's and CISA's campaign to censor the Hunter Biden laptop story—were achieved without no White House involvement.  In fact, when attacking the Great Barrington Declaration, Dr. Collins secretly noted to Dr. Fauci that the White House would disapprove, and Dr. Fauci assured him that they have other things to worry about.

Once the Biden Administration took office, the White House became directly involved in censorship, and the censorship activities dramatically accelerated "across the federal enterprise." Doc. 268, ¶ 285. White House officials started flagging "misinfo" for censorship at 1:04 a.m. on their third day in office. Doc. 214-1, ¶ 34. The White House immediately launched a pressure campaign on social-media platforms to suppress supposed COVID "misinformation." *Id.* ¶¶ 341-344. Federal officials' collaboration with Stanford Internet Observatory and its censorship cartel moved out into the open, as Dr. Murthy launched his signature "disinformation" initiative—the Surgeon General's Health Advisory—at a Virality Project event at the Stanford Internet Observatory. *Id.* ¶¶ 1285, 1359. The President himself publicly pressured the platforms on July 16, 2021, one day after Jennifer Psaki and Dr. Murthy publicly pressured them. *Id.* ¶ 153.

Defendants claim that Plaintiffs' censorship injuries are "far outweighed by the Government's interest in speaking and taking action to promote the public interest." Doc. 266, at 4. This argument turns the First Amendment doctrine on its head. The First Amendment protects private speech, not government speech, so the government's free-speech interest gives way:

> [W]hile the Government may certainly select the messages it wishes to convey, this freedom is limited by the more fundamental principle that a government entity may not employ threats to limit the free speech of private citizens. *See Backpage.com, LLC*, 807 F.3d at 235. Plaintiffs are not, as Defendants argue, seeking a "judicial gag order to prevent the Executive Branch from expressing its views on important matters of public concern." As the Supreme Court explained: "[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017). The Complaint alleges more than the exercise of permissible government speech. It alleges extensive and highly effective efforts by government officials to "silence or muffle the expression of disfavored viewpoints." *Id.*

Doc. 224, at 63 (footnote call omitted).

Finally, Defendants claim that an injunction would "prevent the dissemination of vital public health information, communications with social media companies about criminal activity

in process on their platforms, and efforts to act on national security threats relating to international terrorism and election security."  Doc. 266, at 5.  This is flatly wrong.  Plaintiffs' proposed injunction would not prevent Defendants making public statements on policy issues, or prevent the reporting of ongoing criminal and terrorist activity on platforms.  *See* Doc. 214, at 67-68. Instead, it would prevent Defendants from pushing platforms to censor other peoples' First Amendment-protected speech. *See id.*  Defendants can communicate about public health, ongoing crimes, and national-security threats without violating Americans' freedom of speech.

## II.     Defendants' Proposed Statement of Facts Mischaracterizes the Evidence.

Defendants' Proposed Statement of Facts, Doc. 266, at 5-102, mischaracterizes the evidence and is unconvincing.

### A.      Platforms are not "economically incentivized" to censor disfavored content.

First, citing Dr. Gurrea's declaration, Defendants claim that platforms are "economically incentivized to moderate content on their platforms." Doc. 266, at 5-9.  This is unconvincing.  Dr. Gurrea argues that social-media platforms have an economic incentive to engage in content-moderation of some *unspecified* amount of "low quality" content, and therefore (he argues) the platforms would have moderated *all the content* that federal officials flagged or demanded anyway, because of "economic incentives."  Doc. 266-2, at 42-43, ¶¶ 79-81.  This does not follow.

First, no one disputes that social-media platforms have an economic incentive to engage in *some* level of content moderation.  But Dr. Gurrea never provides any convincing reason to conclude that economic incentives would have caused the specific content-moderation decisions flagged, demanded, or urged by federal officials in this case.  *See id.*  This omission is not surprising, because Dr. Gurrea evidently did not review the discovery produced by Defendants in this case.  His Exhibit 2 lists the 111 items he reviewed, and it does not include the factual discovery produced by Defendants.  *See id.* at 62-71.  Dr. Gurrea is thus in no position to opine

that platforms were independently going to moderate all the content that federal officials demanded—he has not reviewed the relevant factual evidence.  *See Young v. Brand Scaffold Servs.*, LLC, 2009 WL 4674053 (E.D. Texas 2009) (excluding the opinion of an economic expert because he did not "use any facts or data reflective of" the actual issue an "not sufficiently tied to the facts or supported by other evidence in the record").  As in *Young*, "[h]ere, the gap is an abyss."

Plaintiffs' evidence abounds in examples where it is obvious that platforms would not have moderated content unless federal officials had pressured, colluded, coerced, or tricked them.  To list just 19 examples (there are many others):

- Facebook's emails with the White House make clear that it deboosted and suppressed Tucker Carlson's and Tomi Lahren's videos in response to White House demands, *see* Doc. 214-1, ¶¶ 81-82, 93-97, 100;
- Twitter removed a doctored video of Jill Biden, despite concluding that it did not violate its terms of service, after Flaherty accused them of "Calvinball," *id.* ¶¶ 180-187;
- Nick Clegg stated that Facebook would acquiesce to particular White House demands for greater censorship, such as moderating non-English vaccine "misinformation," ending group recommendations for anti-vaccine groups, *id.* ¶¶ 118-121;
- Facebook deplatformed the Disinformation Dozen in direct response to White House pressure, after insisting for months that they did not violate the terms of service, *id.* ¶ 170;
- Twitter suspended Alex Berenson immediately after public pressure on platforms from the White House in July 2021, after declining to so since April 2021, *id.* ¶¶ 103-104, 163, 171;
- Facebook advises Flaherty that they "remove claims public health authorities tell us have been debunked," *id.* ¶ 46;
- Facebook promises to censor speech about vaccines for children at the White House's request, *id.*¶¶ 198-199;
- YouTube updated Dr. Murthy on new and additional censorship actions that YouTube took as a result of the Surgeon General's Health Advisory, *id.* ¶¶ 280;
- Facebook updated Dr. Murthy on new and additional censorship actions that Facebook took, *id.* ¶¶ 281-282;
- Nick Clegg provided lengthy updates to the Surgeon General's office of additional actions taken to implement "what the White House expects of us on misinformation going forward," *id.* ¶ 349, including censorship of new claims, new enforcement policies, and additional steps against accounts associated with the "Disinformation Dozen," *id.* ¶¶ 354-358, 371, 374-376;
- Nick Clegg provides lists of Facebook's extensive additional censorship actions as a result of Facebook's reaction to White House and OSG pressure that "we hear your call for us to do more," *id.* ¶ 358;
- The CDC noted that Facebook removed all posts flagged in a previous week's "slide deck," *id.* ¶ 470;

- Social-media platforms repeatedly engaged in censorship of content disfavored by Dr. Fauci immediately after Dr. Fauci's public attacks on that content, *id.* ¶¶ 742-745, 771, 801-803;
- Brian Scully admits that "switchboarding" and other flagging by federal officials causes censorship that would not otherwise have occurred: "if it hadn't been brought to their attention then they obviously wouldn't have moderated it." *Id.* ¶ 974;
- Exchanges of "switchboarding" emails repeatedly confirm that platforms took actions in response to flagging communications by federal officials and others, *see, e.g., id.* ¶¶ 1068, 1076, 1081, 1082, 1101, 1104, 1187, 1212;
- The FBI induced the social-media censorship of the Hunter Biden laptop story by pushing the platforms to adopt censorship policies to remove "hacked materials" and then repeatedly providing deceptive warnings to the platforms about an expected "hack and leak" operation without any investigative basis, *id.* ¶ 880-904;
- Elvis Chan claims that the FBI has a "50 percent success rate" in getting reported content taken down or censored by platforms, *id.* ¶ 928;
- Elvis Chan concludes that pressure from federal officials resulted in a dramatic expansion of censorship of election-related speech from 2017 onward, *id.* ¶¶ 946-958;
- The Election Integrity Partnership's founders boast that they successfully pushed platforms to adopt new, more restrictive content-moderation policies for election-related speech in 2020, and then successfully pushed the platforms to enforce those policies against domestic speakers and content, *id.* ¶¶ 1148-1149;
- The Election Integrity Partnership also claims a high censorship success rate, stating that "the four major platforms we worked with all had high response rates to our tickets" and "took action on 35% of URLs that we reported to them," *id.* ¶ 1187.

By contrast, Defendants cite no specific evidence to show that any particular act of censorship or suppression sought by federal officials would have happened anyway.

Likewise, Defendants' own witnesses directly contradict Dr. Gurrea's conclusion.  For example, based solely on the companies' public statements, Dr. Gurrea contends that platforms began censoring election-related content in 2018 solely because of economic incentives.  But Elvis Chan testifies the opposite.  Doc. 214-1, ¶¶ 946-958.  This conclusion, unlike Dr. Gurrea's, is based on Chan's direct participation in meetings between federal officials and social-media platforms, and direct conversations with platform employees who admitted that federal officials were putting "a lot of pressure" on them.  *Id.* ¶ 956.  Likewise, federal officials repeatedly claim that "economic incentives" alone do *not* induce platforms to censor enough disfavored speech.  *See, e.g., id.* ¶ 10 (Rep. Doyle threatening adverse legislation because "[i]is now painfully clear

8

that neither the market nor public pressure will force these social media companies to take the aggressive action they need to take to eliminate disinformation and extremism from their platforms"). Defendants' own evidence reinforces this theme. *See* Doc. 266-2, at 114 (Rep. Cori Bush stating that "Twitter's top priority seems to be to maximize its profit," such that calls for greater censorship "were consistently steamrolled by executives pursuing profit").

Similarly, a main theme of the Surgeon General's Health Advisory is that platforms lack sufficient economic incentives to censor the speech that the Surgeon General disfavors. *See id.* ¶¶ 297-300. President Biden himself contradicts Dr. Gurrea's analysis, publicly claiming that platforms do not have sufficient economic incentive to censor disfavored speech: "these companies are making money by ped[dling] lies and allowing misinformation that can kill their own customers and their own supporters." *Id.* ¶ 28.

Further, Defendants admit that "*[d]emands for action from Congress … had a profound impact on behavior of social media companies*," and that "Congressional committees … repeatedly called social media executives to testify in public hearings about what had gone wrong on their platforms in 2016, and how the companies would adjust their policies." Doc. 266, at 10 ¶ 7 (emphasis added). As a result, "Twitter understood that *it was being told* in no uncertain terms, by the public and *by Congress*, that it had a responsibility to do a better job protecting future elections." *Id.* ¶ 8 (cleaned up). Even Defendants don't think "economic incentives" did the trick.

So does the testimony of Elvis Chan and the public statements of Alex Stamos and the Virality Project – among others. Chan testified—based on personal observation and conversations with both the congressional staffers and platform officials involved—that "pressure from Congress, specifically HPSCI and SSCI," including *threats of adverse legislative action*, induced platforms to censor election-related speech after 2016. Doc. 214-1, ¶ 946. As Defendants admit

here, Chan testified that this pressure involved public pressure as "the CEOs for the companies" were called "to testify in front of their committees," including "Mark Zuckerberg and Jack Dorsey and Sundar Pichai." *Id.* ¶ 947.  It also involved secret meetings in which high-level congressional staffers flew to Silicon Valley and threatened platforms with adverse legislation if they did not increase censorship. *Id.* ¶¶ 950-958.  According to Chan, these threatening meetings "put a lot of pressure on" the platforms to censor more speech. *Id.* ¶ 956 (quoting Chan Dep. 122:18-25).  Chan specifically testified that federal pressure *caused* policies to increase censorship of election-related speech, admitting that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns." *Id.* ¶ 947 (quoting Chan Dep. 117:7-14).  Chan testified that "intense pressure from U.S. lawmakers and the media … eventually forced the social media companies to examine what had taken place on their platforms in 2016 and strive to ensure that it did not happen in the future." *Id.* ¶ 958 (quoting Chan Dep. 127:3-23; Chan Ex. 1, at 42).

Defendants argue that Chan's testimony is based on mere personal opinion, but in fact, Chan personally observed these events take place, directly participated in many meetings between platforms and federal officials, and discussed these meetings with participants on both sides in real-time. *See id.*  As a result, when CISA stood up its "switchboarding" activities in 2020, it was not writing on a blank slate – platforms had been subjected to years of federal-government pressure to cooperate in such activities, including with the FBI, since 2017. *Id.* ¶¶ 949, 955.

Alex Stamos, likewise, attributes the platforms' willingness to increase censorship to the "huge potential regulatory impact" that the platforms face from the government in the United States.  Doc. 214-1, ¶ 1234.  He states that "pushing the platforms to do stuff" is possible here because "they will always be more responsive in the places that … have *huge potential regulatory impact*, most notably right now that would be the United States…." *Id.*  The Virality Project

10

emphasizes that government pressure induced platforms to censor vaccine-related speech, even before COVID-19.  *See* Scully Ex. 2, at 21 (14) (noting that "[p]latforms … started adapting their policies to address vaccine misinformation in 2019, spurred by public outcry, negative press coverage, and *government inquiries*").

When asked on July 16, 2021, whether Facebook's removal of 18 million pieces of COVID misinformation was enough, Jennifer Psaki answered, "Clearly not, because we're talking about additional steps that should be taken."  Doc. 214-1, ¶ 162.  Likewise, responding to the White House's and Surgeon General's joint pressure campaign, Nick Clegg of Facebook responded: "We hear your call for us to do more."  *Id.* ¶ 358.  Clearly, the White House and other Defendants do not believe that "economic incentives" provide enough reason for platforms to censor all the disfavored speech they wish to remove.[1]

Thus, no one—not even the Government itself—actually believes Dr. Gurrea's theory.  Most notably, none of the *Defendants* who pressure, deceive, badger, collude, and threaten social-media platforms to censor disfavored viewpoints believe that platforms would do so anyway.

### B.    Federal officials pressured platforms to censor "borderline content."

Defendants' discussion of so-called "borderline" content, Doc. 266, at 15-19, ¶¶ 15-20, reinforces the platforms' vulnerability to federal pressure.  Defendants claim that platforms already engage in censorship of borderline content—content that does not violate policies but raises concerns—by deboosting it, to limit the "low quality" content on their sites.  But, once again, the fact that platforms deboost *some* "borderline" content does not prove that they deboost all the

---

[1] The fact that social-media platforms respond to "economic incentives" is part of what makes them susceptible to federal pressure.  *See, e.g.,* Doc. 214-1, ¶ 272 (noting that Eric Waldo admitted that the White House and Surgeon General's public pressure campaign placed economic pressure on Facebook, and that the company was engaging with Dr. Murthy to "keep Dr. Murthy from saying … any other things that might be viewed as bad for their business").

"borderline" content that federal officials want them to—and, in fact, Rob Flaherty's emails vividly demonstrate the opposite. Doc. 174-1. Moreover, according to Defendants, quoting Mark Zuckerberg, platforms have a strong incentive *not* to moderate so-called "borderline" content, because it drives engagement, which drives advertising revenues: "when left unchecked, people will engage disproportionately with more sensationalist and provocative content. … [A]s a piece of content gets close to that line, people will engage with it more on average…." Doc. 266, at 16-17, ¶ 16. Defendants also admit that "[t]he companies' approaches to borderline content have been extensively scrutinized—and, at times, criticized—by scholars and observers, in part because of a lack of transparency." Doc. 266, at 18, ¶ 19. Thus, Defendants portray a situation at the platforms with vague policies, highly engaged content, and strong incentives *not* to moderate "borderline" content—the "perfect storm" of factors to cause federal officials to push hard for greater censorship. And that is exactly what the evidence portrays. *See infra*, Part II.

### C. Defendants use the calls for Section 230 reform as an explicit threat.

Defendants contend that there is nothing unlawful about their calls to repeal or reform Section 230, because they point out that "[b]ipartisan concerns about § 230 have been expressed for years." Doc. 266, at 20, ¶ 23. This argument misses the point. To call for reform of Section 230, without more, does not violate the First Amendment. What violates the First Amendment is to *threaten* Section 230 reform as a cudgel to pressure platforms to censor disfavored speech—and that is what Defendants and their political allies have done.

There is a stark contrast between the calls for reform by others that Defendants cite and their own statements about Section 230 reform (and other consequences, like antitrust scrutiny). The public statements of others about Section 230 cited by Defendants *do not involve demands for greater censorship*. For example, Defendants' Exhibit 29 is a letter from Senator John Thune to Facebook accusing Facebook of engaging in *too much* censorship. Doc. 266-3, at 278-280.

Defendants' Exhibit 30 is the transcript of a congressional hearing entitled *Stifling Free Speech: Technological Censorship and the Public Discourse*.  Doc. 266-3, at 282-308.  Defendants' Exhibit 31 is a tweet by Donald Trump on May 29, 2020 that states, "REVOKE 230!"  Doc. 266-3, at 310.  Defendants' Exhibit 32 is a tweet by then-Missouri Attorney General Eric Schmitt stating, "Get rid of section 230 protections, treat them like common carriers, bust up #Big Tech."  Doc. 266-3, at 312.  The other statements cited by Defendants are all in the same vein—they call for reform because there is *too much* censorship on social media, not too little.  *See id.* at 315 (Def. Ex. 33, calling for Section 230 reform for "citizens … whose speech has been banned or restricted by these platforms"); *id.* at 319 (Def. Ex. 34, calling for Section 230 reform to "foster innovation and free speech"); *see also* Doc. 266, at 21-22 n.11 (noting Republican calls for reform to prevent platforms' "selective censorship" of disfavored viewpoints).

These statements contrast starkly with the statements of Defendants and their allies.  *See* Doc. 214-1, ¶¶ 1-30.  These statements constitute threats of Section 230 reform or antitrust enforcement explicitly linked to demands for greater censorship.  Then-Candidate Biden called for Mark Zuckerberg to face civil liability and even criminal prosecution because Facebook supposedly does not censor enough speech that Biden disfavors.  Doc. 214-1, ¶¶ 20-22 (Biden: Section 230 "should be revoked … because … [i]t is propagating falsehoods they know to be false," and criminal prosecution of Mark Zuckerberg for "collusion that in fact caused harm … That's possible. That's possible – it could happen.").  Vice President Harris stated that "[w]e will hold social media platforms responsible for the hate infiltrating their platforms … if you act as a megaphone for misinformation …, we are going to hold you accountable…."  *Id.* ¶ 22.  Biden's top technical advisor stated during the presidential transition, "it's long past time to hold the social media companies accountable for what's published on their platforms."  *Id.* ¶ 26.  President Biden

stated that social-media platforms "are making money by … allowing misinformation that can kill their own customers … It's wrong…. Stop it now." *Id.* ¶ 28.  In September 2022, the White House "reiterate[d] [its] call for Congress to fundamentally reform Section 230," to prevent "hate-fueled content mobilizing users … to be amplified on large tech platforms." *Id.* ¶ 29.  On May 5, 2021, Jennifer Psaki stated that President Biden "supports … a robust anti-trust program" because "there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." *Id.* ¶ 124.  Four days after President Biden said that platforms are "killing people" by failing to censor enough misinformation, the White House communications director stated that "[t]he White House is assessing whether social media platforms are legally liable for misinformation spread on their platforms. We're reviewing that, and certainly, they should be held accountable." *Id.* ¶ 164.  She then "specified the White House is examining how misinformation fits into the liability protections granted by Section 230 of the Communications Decency Act, which shields online platforms from being responsible for what is posted by third parties on their sites." *Id.* ¶ 165.  Many other threats from Defendants and their political allies communicate the same overtly threatening message.  *See, e.g., id.* ¶ 6 (calling for Section 230 reform to push platforms to "police harmful content by users"), ¶ 8 (calling for Section 230 reform to prevent platforms "elevating blatantly false information to … online audiences" and "allow[ing] … misinformation and disinformation"); ¶ 9 (stating that Congress is "preparing to move forward with regulation and legislation" to "hold platforms accountable when they are used to … spread misinformation," and "[t]hey must be held accountable for allowing misinformation and disinformation to spread"); ¶ 11 (calling tech platforms a "slavetocracy … of our Nation's shameful and inhumane and most difficult dark days" because they allow "misinformation, outlandish conspiracy theories, and incendiary content");

¶ 14 (calling for anti-trust scrutiny of Facebook because "there's no competition forcing you to police your own platform" to remove "misinformation"); *see also id.* ¶¶ 4, 5, 10, 12, 15, 16.  As one Member of Congress put it, threatening platforms with such adverse legal consequences to pressure them to censor disfavored viewpoints is a deliberate strategy: "Let's see what happens by just pressuring them."  *Id.* ¶ 18.  In fact, Defendants' evidence demonstrates that this steady drumbeat of threats from Defendants' political allies continues unabated.  *See* Doc. 266-2, at 114 (Rep. Bush threatening government takeover of platforms to force greater censorship).

## III.    Defendants' Agency-Specific Statements of Facts Mischaracterize the Evidence.

Defendants offer their version of facts for specific federal agencies involved.  Doc. 266, at 22-102.  These statements mischaracterize the evidence.

### A.    The White House Perpetrates an Egregious Pressure Campaign.

Defendants struggle mightily to put a positive spin on the White House's unconstitutional behavior, especially in Rob Flaherty's emails.  Doc. 266, at 23-40.  These efforts fail.

First, Defendants suggest that censorship of COVID misinformation is necessary and appropriate to save lives during the pandemic.  Doc. 266, at 23-24, ¶¶ 26-27.  Defendants' implied premise—that censorship makes the public safer—is profoundly wrong.  The fundamental premise of the First Amendment is that the free marketplace of ideas, not government command-and-control, is the most powerful engine for truth-seeking; thus, Americans can be trusted to reach their own conclusions about what is true and false on consequential issues.  *See, e.g., Virginia v. Black*, 538 U.S. 343, 358 (2003) ("The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting.").  Censorship, not free speech, interferes with truth-seeking and harms the public.

In any event, the First Amendment lacks a "pandemic" exception.  The Supreme Court has recognized only a tiny list of "well-defined and narrowly limited classes of speech" in "a few

limited areas" that lie outside First Amendment protection, such as "fighting words," inciting "imminent lawless action," and "true threats." *Id.* "Health misinformation" is not such a category. *Id.* Quite the contrary—the Supreme Court instructs that even false statements of fact are protected by the First Amendment. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "[T]he First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (quotations omitted). "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme Court "has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an ad hoc balancing of relative social costs and benefits.'" *Alvarez*, 567 U.S. at 717 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

Defendants also wrench the evidence from context by separating its discussion of the White House's "public statements" (Doc. 266, at 23-30) from its discussions of the "private statements" (*id.* at 30-40). In fact, the "public" and "private" statements were both part of an integrated pressure campaign that succeeded in crushing the platforms' resistance to White House demands. When private pressure failed to achieve its desired results, the White House pivoted to a public pressure campaign, then followed up the public pressure with batteries of more private demands. *See, e.g.,* Doc. 214-1, ¶¶ 123-125 (Jennifer Psaki states that "there's more that need to be done to ensure that this type of misinformation … is not going out the American public," and raises the threat of a "robust anti-trust program," immediately after Facebook first refused to deplatform the "Disinformation Dozen," and Rob Flaherty follows up the next day with more demands for

16

censorship information); *id.* ¶¶ 139-165 (Flaherty attacks Facebook private, "Are you guys f**king serious? I want an answer on what happened here and I want it today," the same day that Jennifer Psaki and Surgeon General Murthy publicly attack Facebook and other platforms at the July 15, 2021); *id.* ¶ 163 (Twitter suspends Alex Berenson "a few hours after Biden's comment" that platforms are "killing people"); *id.* ¶ 170 (Facebook deplatforms the "Disinformation Dozen" after the July 15-16 pressure campaign).

  ***The White House's Public Statements.*** Regarding the White House's public statements, Defendants argue that "Ms. Psaki and others have emphasized that, as private entities, *platforms* bear the responsibility for settling and enforcing their own policies concerning misinformation." Doc. 266, at 25, ¶ 29. But merely acknowledging that "*platforms* bear the responsibility," *id.*, did not stop Psaki and other White House officials from illegally pressuring the platforms to exercise that responsibility to censor disfavored viewpoints. The White House's public statements convey that (1) platforms must remove more "misinformation" reflecting viewpoints that the White House disfavors; and (2) if platforms do not do so, they could face ruinous legal consequences.

  In her May 5, 2021, press conference, Psaki directly linked the White House's demand that platforms "stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19, vaccinations, and elections," and that "that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public," to the threat of "a robust anti-trust program." Doc. 214-1, ¶ 123-124. In the July 15, 2021, press conference, Psaki identified the White House's "asks" to platforms, including that they create "a robust enforcement strategy that bridges their properties," "take faster action against harmful posts," and "move more quickly to remove harmful, violative posts." *Id.* ¶¶ 148-152. The next day, President Biden stated,

"They're killing people," *id.* ¶ 153, and immediately afterward, Kate Bedingfield stated that the Administration was "reviewing" Section 230 reform "and certainly [platforms] should be held accountable," and that "you heard the president speak very aggressively about this." *Id.* ¶ 167.  In the April 25, 2022, press conference, Psaki called for "fundamental reforms … including reforms to Section 230 [and] antitrust reforms … and he's encouraged that there's bipartisan interest in Congress." *Id.* ¶ 194.  She then linked these "concerns" to the allegation that the platforms "spread misinformation," stating that "our concerns are not new. We've long talked about and the President has long talked about his concerns about the power of social media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." *Id.* ¶ 195.  And, as Defendants helpfully note, on October 6, 2021, Psaki "reaffirmed the President's view that 'tech platforms must be held accountable for the harms that they cause' and expressed that the President 'has been a strong supporter of fundamental reforms to achieve that goal, . . . includ[ing] Section 230 reforms [and] privacy and antitrust reforms as well as more transparency.'" Doc. 266, at 28.  "Ms. Psaki concluded, '[the President] looks forward to working with Congress on these bipartisan issues.'" *Id.*

With respect to the Disinformation Dozen, Defendants claim that Psaki "did not recommend removing content relating to these twelve people's accounts," but merely "made a factual statement about those accounts in support of her recommendation that platforms have strategies for … applying consistent rules across multiple platforms…." Doc. 266, at 27, ¶ 32. This is pure revisionism.  In fact, what Psaki said was:

> [W]e have recommended -- proposed that they create a robust enforcement strategy that bridges their properties and provides transparency about the rules. So … there's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including … ones that Facebook owns.

18

Doc. 214-1, ¶ 149.  Thus, Psaki's message was clear: The White House has "recommended" that platforms have a "robust enforcement strategy" that would prevent the "12 people who are [supposedly] producing 65 percent of anti-vaccine misinformation on social media platforms" from "remain[ing] active on Facebook, despite some even being banned on other platforms."  *Id.* Moreover, Psaki's public statement reinforced the private demands that Andy Slavitt had made in meetings with Facebook to deplatform the "Disinformation Dozen."  *Id.* ¶¶ 121-122 (Nick Clegg email to Andy Slavitt responding to the privately voiced concern that "**12 accounts are responsible for 73% of vaccine misinformation,**" and stating that Facebook "realise[s] our position on this [*i.e.*, the Disinfo Dozen] continues to be a particular concern to you"); Doc. 214-14, at 1 (email from Rob Flaherty to Facebook stating that "12 accounts are responsible for 73% of vaccine misinformation on Facebook," and calling for "transparent, progressively severe penalties" for such accounts, and urging that "[b]ans for COVID-19 misinformation should be cross-platform").  Facebook certainly got the message—after Psaki's public statements, it took aggressive action against these twelve speakers whom the White House demanded that it deplatform.  Doc. 214-1, ¶¶ 170, 356 (email from Nick Clegg one week later, assuring the White House and OSG that "[w]e removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen").

Regarding President Biden's statement that "They're killing people," Defendants argue that Biden clarified three days later—after the damage had been done—that he was referring to the Disinformation Dozen, not Facebook itself.  That contradicts what he said at the time, and no one interpreted it that way—least of all Facebook.  *See* Doc. 71-5, at 1 (July 18, 2021 text message from Nick Clegg to Dr. Murthy stating that "the FB team" was feeling "aggrieved" because "it's not great to be accused of killing people"); Doc. 214-1, ¶ 351.  In any event, Biden's July 18

"clarification" actually reinforced the White House's demand for greater censorship, as Biden stated that Facebook, "instead of taking the comment personally," should "do something about the misinformation" spread by the Dozen.  Doc. 266, at 29, ¶ 35.

Defendants argue that Bedingfield "did not threaten any legal or regulatory action against, or make any demands of, social media platforms" on July 20, 2021.  Doc. 266, at 30, ¶ 36.  The record tells a different story.  Coming just a few days after Psaki's threats at the July 15 press conference and President Biden's statement that "They're killing people," Bedingfield's July 20 comments are carefully calculated to drive home the threat: The Administration was "reviewing" Section 230 reform "and certainly [platforms] should be held accountable," and that "you heard the president speak very aggressively about this."  Doc. 214-1, ¶ 167.

*The White House's Private Communications.*  The Government's principal defense of its private emails to platforms is that they merely sought to "better understand" platform policies, without seeking any action from the platforms or to influence platforms' behavior.  Doc. 266, at 24, ¶ 27; *see also id.* at 30, ¶¶ 37, 42, 46.  Not so.  No rational reader could interpret Flaherty's emails as a mere exercise in armchair philosophy, and the platforms certainly did not do so.  They got the clear message: the White House's demand that they "do more" to censor.  As Nick Clegg stated after months of this pressure: "We hear your call for us to do more."  Doc. 214-1, ¶ 358.

The very first email the White House sent, barely two days into the Biden Administration, demanded not to "better understand," but to *remove* supposed "misinformation."  Citing a post about Hank Aaron's death after taking the COVID vaccine, Clarke Humphry wrote at 1:04 a.m. on January 23, 2021: "Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP."  Doc. 214-1, ¶ 34.  She requested ongoing monitoring and enforcement against future posts on the same topic: "And then if we can keep an eye out for

tweets that fall in this same ~genre that would be great." *Id.*  Rob Flaherty's first White House email to a platform likewise demanded the immediate removal of content: "Please remove this account immediately. … Cannot stress the degree to which this needs to be resolved immediately." *Id.* ¶¶ 37-38.  Twitter responded by noting that it was already being bombarded by such requests from the White House: "In a given day last week for example, we had more than four different people within the White House reaching out for issues."  *Id.* ¶ 40.

Shortly thereafter, Flaherty launched his campaign of badgering, harassment, and pressure—all designed toward a single end: to push platforms (especially Facebook) to take more aggressive action against viewpoints disfavored by the White House.  When Facebook reported to the White House on steps it was taking to "Combat[] Vaccine Misinformation," Flaherty responded with a barrage of questions seeking detailed information about Facebook's censorship practices, including "How are you handling things that are dubious, but not provably false?"  *Id.* ¶¶ 42-43.  Like all subsequent questions, the tenor of these questions was not merely to "better understand" Facebook's practices, but to scrutinize and pressure them to take more aggressive action.  Flaherty drove this point home by accusing Facebook of fomenting "political violence" by not censoring enough speech: "especially given the Journal's reporting on your internal work on political violence spurred by Facebook groups, I am also curious about the new rules as part of the 'overhaul.'"  *Id.* ¶ 44.  Facebook, again, got the message—its response explained to Flaherty that it was removing content that the White House disfavored, and it promised to begin "enforcing this new policy immediately."  *Id.* ¶ 45.

That exchange is typical of a long series of such exchanges between Flaherty and platforms. In each case, Flaherty badgers the platforms for more detailed information about why they are not taking *more* steps and *more* aggressive action against disfavored speech, and the platforms respond

by assuring him and other White House officials that they *will* do more and censor more disfavored speech. *See, e.g., id.* ¶¶ 50, 51 (Twitter: "As we discussed, we are building on our continued efforts to remove the most harmful COVID-19 misleading information from the service…."); ¶ 52 (Facebook: "We've expanded penalties for individual Facebook accounts that share misinformation."); ¶ 57 (demanding more information on how Facebook is censoring "borderline" content); ¶ 58 (advising Facebook that the White House was demanding information because "[w]e are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period.");

¶ 67 (long series of questions from Flaherty to Facebook about how to reduce "sensational" and "skeptical" content that is truthful); ¶ 68 (long series of questions about how Facebook is censoring misinformation on WhatsApp); ¶ 72 (badgering Facebook for more information about censorship on the private messaging app WhatsApp); ¶ 74 (similar); ¶ 77 (follow-up email badgering Facebook for more information about censoring COVID speech on WhatsApp); ¶ 97 (Flaherty demanding to know how Carlson's video was non-violative, even after Facebook stated that it would label and demote it); ¶ 98 (another, similar battery of questions about the Tucker Carlson and Tomi Lahren videos); ¶ 112-113 (long series of demands for information to YouTube on how they can increase censorship of "borderline" content, and requesting "bi-weekly" meetings to discuss them); ¶¶ 125-128 (barrage of demands to Facebook about borderline content, the "Disinformation Dozen," and other topics); ¶ 175 (Flaherty to YouTube on demoting "borderline" content: "I see that's your goal - what is the actual number right now?"); ¶ 191 (demanding of Facebook, "as we have long asked for, [of] how big the problem is, what solutions you're implementing, and how effective they've been").

Flaherty's barrages of questions are interspersed with abusive, sarcastic, accusatory, and unprofessional language, frequently accusing the platforms of acting in bad faith. Andy Slavitt

does the same. *See, e.g., id.* ¶ 55 ("You are hiding the ball."); ¶ 58 (accusing Facebook of "a shell game" and stating, "This would all be a lot easier if you would just be straight with us"); ¶ 60 (Slavitt accusing Facebook of "highly scrubbed party line answers….  100% of the questions I asked have never been answered and weeks have gone by"); ¶ 67 ("the problem does not sit in 'microchips'-land"); ¶ 69 (stating that Facebook's "commitment to honest, transparent conversations … hasn't worked so far"); ¶ 77 ("Really couldn't care less about products unless they're having measurable impact. And while the product safari has been interesting…"); ¶ 93 (Slavitt to Nick Clegg, re Tucker Carlson's video: "Number one of Facebook. Sigh. Big reveal call with FB and WH today. No progress since we spoke. Sigh."); ¶ 99 (Flaherty to Facebook, two days after sending an email with a battery of demands: "These questions weren't rhetorical."); ¶ 130 ("Hard to take any of this seriously when you're actively promoting anti-vaccine pages in Search."); ¶ 126 ("Not to sound like a broken record, but how much content is being demoted…?"); ¶ 134 ("Sure." [sarcastically]); ¶ 135 ("If you're not getting *that* right…."); ¶ 135 (accusing Facebook of giving itself "wiggle room" and concluding: "Not sure what else there is to say"); ¶ 136 ("I don't know why you guys can't figure this out."); ¶ 173 (Flaherty to YouTube: "You were pretty emphatic that you are not. This seems to indicate that you are. What is going on here?"); ¶ 178 ("not even sure what to say at this point"); ¶ 186 ("Total Calvinball.").

Flaherty accuses the platforms of fomenting insurrection by not censoring private speech. *Id.* ¶ 97 (Flaherty to Facebook, regarding its failure to completely remove Tucker Carlson's content: "Not for nothing but last time we did this dance, it ended in an insurrection."); ¶ 78 ("You only did this, however, after an election that you helped increase skepticism in, and an insurrection which was plotted, in large part, on your platform. … I want some assurances, based in data, that

you are not doing the same thing again here.").  Flaherty demands, "Are you guys f**king serious? I want an answer on what happened here and I want it today."  *Id.* ¶ 139.

Quite obviously, none of this verbal abuse is designed solely to "better understand" the issues.  It is designed to pressure the platforms to censor speech disfavored by the White House. Flaherty himself says this quite explicitly: "[A]t the end of the day, I care mostly about *what actions and changes you're making* to ensure sure you're not making our country's vaccine hesitancy problem worse."  *Id.* ¶ 77 (emphasis added); *see also id.* ¶ 103 (Twitter employees noting that the White House posed "one really tough question about why Alex Berenson hasn't been kicked off the platform," and that Andy Slavitt "really wanted to know about Alex Berenson" because "he was the epicenter of disinfo that radiated outwards to the persuadable public").

To achieve this goal of pressuring the platforms to censor disfavored viewpoints, Flaherty and Slavitt intersperse their private communications with thinly veiled threats of adverse legal consequences—echoing the public statements of Psaki, President Biden, and Bedingfield.  *See, e.g., id.* ¶ 61 ("Internally we have been considering our options on what to do about it."); ¶ 108 (Flaherty asking YouTube to report on how it was preventing "vaccine hesitancy" and "working toward making the problem better," and warning: "This is a concern that is shared at the highest (and I mean highest) levels of the WH"); ¶¶ 114-115 (Flaherty sending Facebook a "Misinformation Brief" calling for "progressively severe penalties," "comprehensive enforcement," and "cross-platform" bans, and stating, "spirit of transparency – this is circulating around the building and informing thinking").

Flaherty and other White House officials also demand the censorship of specific speakers and content, such as posts about Hank Aaron's death, videos of Tucker Carlson and Tomi Lahren, Alex Berenson, the "Disinformation Dozen," and many others.  *See, e.g., id.* ¶¶ 180-187

(demanding the censorship of a comedic video of Jill Biden reading to schoolchildren); ¶ 81 ("[I]f 'reduction' means 'pumping our most vaccine hesitant audience with tucker Carlson saying it doesn't work' then ... I'm not sure it's reduction!"); ¶ 85 (requesting "a 24 hour report-back" to see if "the news about J&J" would "spin off misinformation").

The *platforms* clearly understand that the White House is not engaging in a mere academic exercise to "better understand" misinformation, but demanding that they increase censorship of disfavored viewpoints.  They repeatedly respond by assuring the White House that they will, in fact, ratchet up their censorship efforts against COVID "misinformation" on their platforms.  *See, e.g., id.* ¶ 64 (in response to the White House "ask[ing] about our levers for reducing virality of vaccine hesitancy content," Facebook assuring Flaherty that "[i]n addition to policies previously discussed, these include the additional changes that were approved late last week and that we'll be implementing over the coming weeks"); *id.* (Facebook assuring the White House that it was taking steps to "reduc[e] the virality of content discouraging vaccines that does not contain actionable misinformation. This is often-true content … but it can be framed as sensation, alarmist, or shocking. We'll remove these Groups, Pages, and Accounts when they are disproportionately promoting this sensationalized content…"); *id.* ¶ 65 (assuring the White House that Facebook was limiting message forwards on the private messaging app WhatsApp to reduce the spread of disfavored messages); *id.* ¶ 86-87 (Facebook giving a detailed report on censorship in response to oral inquiries from Courtney Rowe); *id.* ¶ 88-89 (Facebook assuring the White House it will censor truthful, non-violative content such as "discussing the choice to vaccinate in terms of personal or civil liberties," "true but shocking claims or personal anecdotes," and "concerns related to mistrust in institutions," by using "a spectrum of levers"); *id.*  ¶¶ 93-94 (Nick Clegg responding to Andy Slavitt within hours to assure him that, while Tucker Carlson's content was non-violative,

Facebook would label and demote the content); *id.* ¶ 100 (Facebook assuring the White House, in response to their demands about Tucker Carlson's content, that it "will continue to be demoted even though it was not ultimately fact checked"); *id.* ¶ 104 (Twitter suspended Alex Berenson immediately after the President said, "They're killing people"); *id.* ¶¶ 118-121 (Facebook stating that it would follow White House recommendations to censor non-English-language COVID speech, to increase steps to censor content that leads to vaccine hesitancy, to "monitor events that host … COVID disinformation," and to "continue to review" the accounts of the "Disinformation Dozen"); ¶ 131 (Facebook responding, "both of the accounts featured in the tweet [flagged by Flaherty] have been removed from Instagram entirely"); ¶ 132 (Facebook assuring Flaherty it would increase the removal of "accounts on Instagram that discourage vaccines"); ¶ 137 (Facebook assuring the White House that "[w]e're expanding penalties for individual Facebook accounts that share misinformation."); ¶ 177 (YouTube assuring Flaherty that it will "limit the visibility" and "reduce the spread" of "borderline content").

This pressure campaign reached its apogee on July 15-16, 2021, with the "triple punch" of Psaki, Dr. Murthy, and President Biden putting maximal pressure on platforms to censor disfavored viewpoints.  Facebook responded by desperately scrambling to assure the White House and OSG that it would censor virtually any piece of COVID speech the White House wanted. Other platforms likewise ramped up censorship of disfavored viewpoints to appease the White House.  Facebook immediately deplatformed the "Disinformation Dozen."  *Id.* ¶ 170.  Twitter suspended Alex Berenson.  *Id.* ¶ 171.  Nick Clegg assured the Surgeon General that Facebook was "keen to find a way to deescalate and work together collaboratively."  *Id.* ¶ 351.  Facebook met with the White House and Surgeon General's Office to learn "what the White House expects of us on misinformation going forward."  *Id.* ¶ 349.  One week after the President's remarks, Clegg

emailed to ensure that the White House and OSG "saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation as well as steps taken to further address the 'disinfo dozen.'"  *Id.* ¶ 354.  Facebook reported to the Government that it "removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)."  *Id.* ¶ 356.  Facebook also "expanded the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing."  *Id.* ¶ 357.  Clegg promised that this was only the beginning of its efforts to remove more COVID "misinformation" at the White House's behest: "We hear your call for us to do more and, as I said on the call, we're committed to working toward our shared goal," and "we will strive to do all we can to meet our shared goals."  *Id.* ¶¶ 358, 361.  OSG responded to Facebook by demanding a specific report in two weeks on "any new/additional steps you are taking with respect to health misinformation."  *Id.* ¶ 364.  Two weeks later, Facebook provided a detailed report of its "further policy work to enable stronger action against persistent distributors of vaccine misinformation."  *Id.* ¶ 374.  Among other things, Facebook reported to the Government that it was "expanding our COVID policies to further reduce the spread of potentially harmful content"; "increasing the strength of our demotions for COVID and vaccine-related content that third-party fact-checkers rate as 'Partly False' or 'Missing Context'"; "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation"; and "strengthening our existing demotion penalties for websites that are repeatedly fact-checked for COVID or vaccine misinformation content shared on our platform."  *Id.* ¶ 375.  Clegg also included a report of additional actions taken against the "Disinformation Dozen."  *Id.*  Thereafter, Facebook

and other platforms provided frequent reports to the White House and OSG on additional steps they were taking to censor disfavored viewpoints.  *See, e.g., id.* ¶¶ 379, 381, 395, 398.

Defendants' other arguments fare no better.  First, Defendants claim that "[t]he record does not show a single instance in which these individuals threatened legal or regulatory action against companies that chose not to heed the Administration's calls to address the COVID-19 misinformation circulating on their platforms."  Doc. 266, at 24.  This is incorrect.  The record shows both public threats from Psaki, Bedingfield, and President Biden; and thinly veiled private threats from Flaherty and Slavitt; and numerous threats from the President's political allies.  *See supra*.  Defendants argue that the record does not "show that White House officials demanded that the companies change their content moderation policies or take action (regardless of existing policies) to address particular content that they view as potentially harmful COVID-19 misinformation."  *Id.* at 24.  Again, this is false.  The record shows White House officials aggressively pressuring platforms to change their policies and enforcement practices to target and remove disfavored speech, and it shows repeated attempts by the White House to pressure platforms to remove specific disfavored content, accounts, and speakers—such as Alex Berenson, Tucker Carlson and Tomi Lahren, the Disinformation Dozen, the comedic video of Jill Biden, etc.

Defendants argue that Flaherty sought to know "what the Government could do to *assist* social media companies in their efforts to address the spread of misinformation on their platforms."  Doc. 266, at 30.  That statement virtually admits guilt, as the White House has no business "assisting" private media companies in censoring viewpoints disfavored by the White House.  Yet that is what the White House did.  *See, e.g.,* Doc. 214-1, ¶ 102 (White House calendar invite to Twitter for Twitter to brief "on vaccine misinfo," including "the tangible effects of recent policy changes, what interventions are currently being implemented in addition to previous policy

28

changes, and ways the White House (and our COVID experts) can partner in product work"); ¶ 105 (White House meeting with YouTube on "vaccine misinformation" to discuss "the empirical effects of YouTube's efforts to combat misinfo, what interventions YouTube is currently trying, and ways the White House (and or COVID experts) can partner in product work").

Defendants admit that "White House officials did flag some content—mainly, imposter accounts—for social media companies." Doc. 266, at 31.  The phrase set off by dashes is woefully misleading.  The content the White House flagged was *not* "mainly, imposter accounts"—the White House deliberately flagged the speakers and content that it thought were the *most influential and persuasive voices* expressing viewpoints the White House disfavored.  They included Alex Berenson, whom the White House viewed as "the epicenter of disinfo that radiated outwards to the persuadable public," Doc. 214-1, ¶ 103; the top-rated cable news host (and sharp Biden Administration critic) Tucker Carlson, whose content was then the most-viewed post on Facebook that day, *id.* ¶¶ 81, 93-100; another extremely popular cable news host, particularly influential among young people, Tomi Lahren, *id.* ¶ 81; Robert F. Kennedy, Jr., one of the most influential anti-vaccine voices in the nation, *id.* ¶ 34; the "Disinformation Dozen," whom the White House believed were responsible for "73% of vaccine misinformation" on Facebook, *id.* ¶ 121.  And what Defendants treat as "imposter accounts" include political parody and satire lampooning the President and his family, *i.e.*, core political speech mocking the heads of government—such as a comedic video of Jill Biden receiving profane heckling while reading to schoolchildren.  *See* Doc. 266, at 37, ¶ 49 (including "a doctored video of the First Lady" as an "imposter account").

Defendants argue that "on one occasion when Mr. Flaherty shared specific proposals with Facebook," he "emphasized that the White House was *not* asking Facebook to adopt those recommendations."  Doc. 266, at 36 ¶ 47 (discussing Doc. 214-14).  In fact, in that email, Flaherty

ominously hinted that the White House could impose *greater* requirements on Facebook than the "specific proposals" he shared.  *See* Doc. 214-14.  He stated: "Here is the crux of their recs.  Don't read this as White House endorsement of these suggestions (*or, also, as the upper bound of what our thoughts on this may be*).  But – spirit of transparency – this is circulating around the building informing thinking."  *Id.* at 1 (emphasis added).  The "recs" included aggressive demands for the censorship of disfavored viewpoints, including express prior restraints for disfavored speakers, monitoring private events "hosting anti-vaccine and COVID disinformation," censoring non-English vaccine speech, censoring the Disinformation Dozen, and imposing "progressively severe penalties" and "comprehensive enforcement for pages, accounts, and groups."  *Id.* at 1-2.

Finally, the Government argues that the White House's censorship of COVID speech is old news, and that "[s]ince the start of 2023, the landscape of White House COVID-19 efforts has changed dramatically."  Doc. 266, at 39, ¶ 53.  Once again, the evidence tells a different story.  On the topic of COVID speech, the White House continued to demand ongoing reports from Facebook on "misinformation" on its platforms throughout 2022.  *See* Doc. 214-1, ¶¶ 198-199.  During June 2022, Flaherty demanded that Facebook continue providing bi-weekly "COVID-19 insights reports" about "misinformation" on its platforms, so that the White House could monitor Facebook's censorship of speech about early childhood vaccines (age 6 months to 5 years).  *Id.* Facebook got the message, continued to provide the reports, and assured the White House that it would expand its censorship to include speech expressing doubt about early-childhood COVID vaccines—a highly controversial topic.  *Id.*

Moreover, the White House's public statements demonstrate that it is expanding its frontiers to include whole new topics of social-media censorship, such as climate change, "gendered disinformation," abortion, and economic policy.  *Id.* ¶¶ 200-211.  The White House

Climate Advisor publicly demands that "the tech companies have to stop allowing specific individuals over and over again to spread disinformation," because "misinformation and disinfo around climate" is "a threat to public health itself." *Id.* ¶ 202. She ties this demand to the threat of legislation to "hold companies accountable." *Id.* ¶ 203. The White House creates a task force to address "gendered disinformation" and "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists." *Id.* ¶ 204-206. The task force carries the threat of regulation against platforms; it must submit "periodic recommendations to the President on policies, regulatory actions, and legislation on technology sector accountability to address … online harassment and abuse." *Id.* ¶ 207. The White House employs the same tactics it employed for COVID speech on other topics.

**B.     The Surgeon General's Office Joins the White House Pressure Campaign.**

The Government's discussion of facts regarding the Surgeon General's Office, Doc. 266, at 41-51, distorts the facts and ignores highly probative evidence.

***OSG coordinates closely with the White House.*** First, the Government treats the Surgeon General's activities as if they were conducted in isolation from the White House's pressure campaign, *see id.*, but that is incorrect. Dr. Murthy met jointly with Andy Slavitt of the White House and Nick Clegg of Facebook. Doc. 214-1, ¶ 253. Three days after this meeting, Facebook announced "policy updates" to "expand penalties for individual Facebook accounts that share misinformation." *Id.* ¶ 281. Dr. Murthy and Waldo also met jointly with DJ Patil of the White House and Nick Clegg of Facebook to respond to the Health Advisory. *Id.* ¶ 259. Eric Waldo was routinely included on emails and calls with Rob Flaherty and social-media platforms. *Id.* ¶ 246. Waldo communicated directly with Flaherty "before" speaking with Facebook. *Id.* The Surgeon General launched the Health Advisory in a joint press conference with the White House. *Id.* ¶ 293. OSG connected Facebook with DJ Patil of the White House to discuss giving researchers access

31

to Facebook's internal data on misinformation. *Id.* ¶ 365.  Flaherty connected Dr. Murthy with Jiore Craig, an anti-disinformation operative from the DNC. *Id.* ¶ 369.

Facebook certainly understood that OSG and the White House were working in tandem, because Nick Clegg met with Dr. Murthy to "better understand the scope of what the *White House* expects of us on misinformation going forward." *Id.* ¶ 349 (emphasis added).  When the White House said, "They're killing people," Clegg reached out to the *Surgeon General* to "find a way to deescalate and work together collaboratively." *Id.* ¶ 351.  Following the pressure from Psaki and Biden, Facebook reported to Dr. Murthy and OSG on the additional steps it was taking to censor disfavored viewpoints—such as "adjust[ing] policies" to remove "misinformation," "steps taken to further address the 'disinfo dozen,'" "expand[ing] the group of false claims we remove." *Id.* ¶¶ 354-357.  Clegg also told Dr. Murthy, referring to the White House, "[w]e hear your call for us to do more and … we're committed to working toward our shared goal of helping America get on top of this pandemic." *Id.* ¶ 358.

OSG and White House personnel are routinely included on the same email threads, jointly communicating with platforms about misinformation. *See, e.g., id.* ¶ 370 (Facebook jointly reporting to OSG and White House on additional steps taken against the "Disinformation Dozen"); ¶ 375 (lengthy report from Facebook to both White House and OSG on additional steps taken to increase censorship after the Advisory and the President's comments); *see also id.* ¶¶ 379, 380, 382 (Flaherty copying Waldo while asking platforms to report on plans to censor "misinformation" on childhood vaccines), 391, 395, 421, 424-425.

***The Surgeon General demands specific censorship actions.***  Next, the Government claims that "OSG … has not demanded particular actions from the companies…"  Doc. 266, at 41. On the contrary, OSG has repeatedly done so, both in public and in private.  First, the Surgeon

General's Health Advisory demands a long series of "particular actions" on censorship from the platforms. The Advisory, and the public attention associated with it, placed economic pressure on the platforms to comply with these demands. Doc. 214-1, ¶ 272. In announcing the Advisory, Dr. Murthy described disfavored viewpoints as "an imminent and insidious threat to our nation's health," *id.* ¶ 294; stated that it "cost[s] us lives," *id.* ¶ 296; and that social-media platforms "poison our information environment," *id.* ¶ 297. He stated, "we expect more from our technology companies. … We're asking them to monitor misinformation more closely. *We're asking them to consistently take action against misinformation super-spreaders on their platforms*." *Id.* ¶ 300 (emphasis added). He stated that "much, much more has to be done" by platforms, "and we can't wait longer for them to take aggressive action because it's costing people their lives." *Id.* ¶ 307.

Having publicly accused platforms of "cost[ing] lives," the Advisory makes a long series of specific demands. It calls misinformation "a serious threat to public health" and states that platforms have a "moral and civic imperative" to stop the spread of misinformation. *Id.* ¶ 319. It blames social-media platforms and their "product features" and "algorithms" for the spread of misinformation. *Id.* ¶¶ 321-323. It calls on platforms to take a series of specific actions, including: "Implement product design and policy changes on technology platforms to slow the spread of misinformation." ¶ 324; "Build in 'frictions' … to reduce the sharing of misinformation," ¶ 326; "[A]ddress misinformation in live streams, which are more difficult to moderate due to their temporary nature and use of audio and video," *id.*; "Prioritize early detection of misinformation 'super-spreaders' and repeat offenders," *id.*; and "Impose clear consequences for accounts that repeatedly violate platform policies," *id.*

The Health Advisory also explicitly threatens regulation and legislation of platforms. It calls for "federal, state, local, territorial, tribal, private, nonprofit, and research partners" to devise

"appropriate *legal and regulatory measures* that address health misinformation." *Id.* ¶ 325 (emphasis added). Dr. Murthy's repeated use of the word "accountable" and "accountability" to apply to platforms carries with it an implied threat of adverse consequences. *Id.* ¶ 302. As Eric Waldo concedes, the word "accountable" carries a threat of legal consequences, because "accountability includes accepting the consequences for when you do something wrong." *Id.*

In private, OSG asked major platforms to report back on what "new" and "additional" steps they were taking to censor disfavored viewpoints in light of the Advisory. Dr. Murthy himself asked Nick Clegg of Facebook to do so: "on the call with Dr. Murthy he'd mentioned seeing if you were able to send an update of any new/additional steps you are taking with respect to health misinformation in light of the advisory." Doc. 214-1, ¶ 364. In fact, Waldo noted, "we are asking all platforms for this type of update," and requested a report within two weeks. *Id.* These requests went to "Facebook, Twitter, Instagram, and YouTube, and Google." *Id.* ¶ 368.

The platforms responded. Two weeks later, Facebook provided a long list of *new* actions taken to crack down on "misinformation." *Id.* ¶¶ 373-376. This included five bullet points and four sub-bullet points listing specific new policies and enforcement actions, as well as detailed new actions taken against the "Disinformation Dozen." *Id.* ¶ 375; *see also id.* ¶ 381 (Google emailing Waldo to report new actions taken against "misinformation"). Facebook also provided a detailed report to OSG and the White House on its policies and actions taken against "misinformation" on childhood vaccines. *Id.* ¶ 395. Facebook continued to report back to OSG on censorship until Defendants produced OSG's documents. *See id.* ¶¶ 424-425.

The Surgeon General constantly reinforced his public message pressuring platforms to comply with his demands. On October 29, 2021, Dr. Murthy issued a series of tweets stating that "tech platforms have a responsibility to improve our health information ecosystem," that "[w]hat

continues to be lacking from Facebook and other tech companies is transparency and accountability," and that "[w]e must *demand* Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake." *Id.* ¶ 387 (emphasis added).

**The Surgeon General threatens regulation if platforms do not comply.**  The Government contends that the Surgeon General did not threaten platforms with adverse legal consequences. Doc. 266, at 43, ¶ 59.  This is not correct.  As noted above, the Health Advisory explicitly raises the threat of future regulation.  In the ensuing months, the Surgeon General reinforced this threat, culminating in the March 3, 2022 Request for Information (RFI).

After the Advisory, Dr. Murthy's public statements in 2022 continued to call for platforms to take "aggressive action against people who are intentionally spreading misinformation," *id.* ¶ 401, and to "go after people who are superspreaders of misinformation on these sites." *Id.* ¶ 407. Dr. Murthy's public statements in 2022, leading up to the RFI, called for the Government to "set safety standards" for social-media speech, stating that "there's a role for government here to set safety standards," and that "[t]here are steps we are working on now" in that area.  *Id.* ¶ 410.

Shortly thereafter, Dr. Murthy issued the formal Request for Information.  *Id.* ¶ 411.  The RFI seeks detailed information from "technology platforms" about their censorship policies and how they are enforced.  *Id.* ¶ 415.  It also seeks detailed information about disfavored speakers on social media, demanding "[i]nformation about sources of COVID–19 misinformation," including "[i]nformation about the major sources of COVID–19 misinformation associated with exposure," where "source" refers to speakers on platforms, *i.e.*, "specific, public actors that are providing misinformation." *Id.* ¶ 416.  The OSG sent a pointed letter signed by Dr. Murthy to at least seven

major social-media platforms requesting that they submit information to the RFI.  *Id.* ¶¶ 419-420.

Shortly after the RFI, Dr. Murthy reinforced his reference to the government setting "safety

standards" for online speech by describing the issue in terms of "speed limits," *i.e.*, *government-*

issued safety standards: "We have speed limits on the road because we know that sometimes if

you drive too fast, that can have an impact on somebody else's health and wellbeing. …  That's

true here as well."  *Id.* ¶ 423.  Dr. Murthy's message was clear:  The RFI is a precursor to "safety

standards" or "speed limits" for social-media speech.

　　　　*The Surgeon General collaborates with the Virality Project.*  The Government contends

"OSG was not—and is not—involved in a coalition of researchers known as the 'Virality Project.'"

Doc. 266, at 41.  This statement is demonstrably incorrect.

　　　　The Virality Project touts its close relationship with the OSG.  The Virality Project states

that: "**Federal government agencies** served as coordinators for national efforts. The Virality

Project built strong ties with several federal government agencies, most notably the *Office of the*

*Surgeon General (OSG)* and the CDC, to facilitate bidirectional situational awareness around

emerging narratives."  Doc. 214-1, ¶ 1279 (bold in original, italics added).  The Virality Project

states that it "provided strategic insights to government entities such as the *OSG*, CDC, and the

Department of Health and Human Services."  *Id.* ¶ 1284 (emphasis added).   Contrary to

Defendants' representations, the Virality Project claims that it hosted the same-day rollout of the

Surgeon General's Advisory: "Stanford Internet Observatory and the *Virality Project* also hosted

Surgeon General Vivek Murthy for a seminar on vaccine mis- and disinformation, including the

rollout of the Surgeon General's advisory on health misinformation."  *Id.* ¶ 1285 (emphasis added).

The Surgeon General's messaging echoes verbatim the Virality Project's message of demanding

"transparency and accountability" from platforms on censorship, and demanding "data sharing

relationships with researchers" (such as the VP's own researchers). *Id.* ¶¶ 1247, 1248, 1251, 1293, 1353-54. The Virality Project notes that the "Office of the Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," and it specifically cites the Surgeon General's Health Advisory on this point. *Id.* ¶ 1249. The Virality Project repeatedly cites the work of the Surgeon General in its report, *id.* ¶ 1359, just as the Surgeon General's Health Advisory cites the VP's work, Doc. 266, at 49, ¶ 69.

The Surgeon General's evidence confirms the close coordination between the OSG and the Virality Project. As Defendants admit, "[o]ne of the lead entities responsible for the Virality Project is the Stanford Internet Observatory." Doc. 266, at 50. Dr. Murthy launched the Health Advisory in an event at the Stanford Internet Observatory. Doc. 214-1, ¶ 330. Waldo admits that the OSG coordinated with SIO in launching the Surgeon General's Health Advisory. *Id.* ¶ 228. In Dr. Murthy's remarks, he stated that he had multiple "conversations" with the VP's lead researcher, Renee DiResta, who was "such a great partner" and would continue "being a partner in the future." *Id.* ¶ 336. He stated that the OSG had been "partnered with" the Stanford Internet Observatory "over the last many months" before the rollout of the Health Advisory. *Id.* ¶ 337.

The OSG parrots the phrasing of the Virality Project, using phrases like "all-of-society approach," Doc. 214-1, ¶ 216, and "accountable" and "accountability," *id.* ¶ 301. The OSG's repeated demand for greater data-sharing from Facebook echoes a key demand of the Virality Project. Doc. 214-1, ¶ 226. Renee DiResta of the SIO is one of the "external researcher[s]" that the OSG demanded Facebook give access to its internal data. *Id.* ¶ 228. Moreover, Kyla Fullenwider, the OSG's "subject matter expert" on disinformation, communicated directly with Renee DiResta about the Health Advisory and "misinformation." *Id.* ¶¶ 230-232. Kyla was the chief architect of both of the Surgeon General's major disinformation initiatives—the Health

Advisory and the RFI.  *Id.* ¶ 244, 412.  She was the "primary driver on the RFI from a content expert perspective."  *Id.* ¶ 412.

Defendants contend that "[t]he Virality Project has not been active since 2022."  Doc. 266, at 51, ¶ 72.  This statement is, at best, misleading.  The "Virality Project" is simply another moniker for the ongoing "Election Integrity Project," which is the same consortium of censorship entities (Stanford Internet Observatory, University of Washington's Center for an Informed Public, Graphika, and the Atlantic Council's Digital Research Lab), performing the same censorship activities, cooperating with the same partners, and using the same surveillance and censorship techniques and methods.  *See* Doc. 214-1, ¶¶ 1223, 1236.  This project continues to operate under the "EIP" moniker.  For example, in a July 31, 2022 blog post, the EIP stated that "[t]he EIP is continuing its nonpartisan and collaborative work in the 2022 election cycle."  *See* https://www.eipartnership.net/blog/about-eip-2022.  The EIP briefed Brian Scully in 2022 and indicated that "they were going to do something similar to what they did in 2020…."  Doc. 214-1, ¶ 998.  On July 27, 2022, Renee DiResta gave congressional testimony indicating that the consortium plans to continue its censorship activities into 2024 and beyond:

> Doing nothing is not an option. While the Election Integrity Partnership was intended to meet an immediate need, the conditions that necessitated its creation have not abated, and in fact may have worsened. Academia, tech platforms, civil society, and state and local election officials … must be committed to collaborative models for understanding and responding to rumors and false and misleading claims in the modern information environment.

Written Testimony of Renee DiResta, Committee on House Administration (July 27, 2022), *at* https://fsi-live.s3.us-west-1.amazonaws.com/s3fs-public/2022-07-27_elections-cha_testimony_renee_diresta.pdf.

***Defendants' other arguments lack merit.***  Defendants argue that the Surgeon General cannot threaten regulation because he "does not have independent regulatory authority."  Doc.

266, at 40, ¶ 54.  But the Surgeon General's Office is a department within HHS, which does have regulatory authority.  *Id.*  If OSG gathers information, HHS can use it to regulate.  *Id.*

Defendants rely heavily on the Declaration of Max Lesko, which they submitted for the first time in their response brief.  Doc. 266-4, at 131-138.  In a carefully phrased paragraph, Lesko denies that the OSG "direct[ed] a specific post or user be removed, suppressed, demonetized, or subject to other adverse action" or "made a specific, non-voluntary demand that a particular social-media company change its algorithms or content-moderation policies."  *Id.* at 134.  But there is overwhelming evidence that the OSG repeatedly and publicly demanded that platforms change their algorithms and content-moderation policies, and ramp up enforcement, to target disfavored viewpoints.  *See supra.*  Lesko claims that the OSG never "threatened a social media company with legal action for failure to comply with recommendations or requests from Dr. Murthy or OSG," Doc. 266-4, at 134, but the evidence cited above demonstrates a long series of explicit and implied threats.  *See supra.*  With respect to the Health Advisory rollout at Stanford Internet Observatory, Lesko stretches credulity by stating that "OSG did not understand that to be a Virality Project event," Doc. 266-4, at 136—even Defendants admit that "[o]ne of the lead entities responsible for the Virality Project is the Stanford Internet Observatory."  Doc. 266, at 50.  Suffice to say that the Virality Project said the exact opposite at the time—*i.e.*, that the "Virality Project" hosted Dr. Murthy's Advisory rollout.  Doc. 214-1, ¶ 1285.  Lesko claims that "OSG never provided any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning posts or accounts on social media."  Doc. 266-4, at 136.  But there is extensive evidence of many other forms of collusion and collaboration between OSG and the Virality Project,

including Dr. Murthy's public statement on July 15, 2021 that the OSG had been "partnered with" the Stanford Internet Observatory "over the last many months."  Doc. 214-1, ¶ 337.[2]

C.     **The CDC and Census Bureau Conspire with Platforms on Censorship.**

*The CDC "proactively" flags disfavored speech for censorship.*  First, Defendants admit that the CDC "proactively alert[s] Facebook, Twitter, and YouTube about false COVID-19 claims the agency observed on the platforms that could adversely affect public health."  Doc. 266, at 52. This includes the fact that the CDC "received bi-weekly summaries (in what were called 'CrowdTangle reports') from Facebook about high-volume COVID-19 content circulating on its platform."  *Id.* at 53.  Defendants admit that the CDC repeatedly "flagged" posts for censorship to the CDC, both by identifying trending topics and providing lists of sample posts.  Doc. 266, at 59. And they admit that the "goal" of such "flagging" is to "be sure that people have credible health information," *i.e.*, to suppress the information the CDC views as non-credible.  *Id.* at 59-60.

There is overwhelming evidence of such "flagging" activity.  *See, e.g.,* Doc. 214-1, ¶¶ 459-460 (slide decks prepared by Census); ¶¶ 469-470; ¶¶ 481-483 (topics with lists of 16 sample

---

[2] Defendants (Doc. 266, at 168) dispute the New York Times report of July 16, 2021, stating that Dr. Murthy had a series of "tense" meetings with platforms beginning in January 2021 where Dr. Murthy "angrily" demanded greater censorship and accused Facebook of not "do[ing] enough to defend against bad information."  Doc. 214-1, ¶¶ 338-344.  Defendants claim that there is "*no* evidence" that Dr. Murthy met with social-media platforms prior to the first meeting disclosed in their interrogatory responses—the May 25, 2021 meeting between Nick Clegg, Dr. Murthy, and Andy Slavitt, which was supposedly just a quick introductory meeting.  Doc. 266, at 168.  Yet Nick Clegg's contemporaneous emails plainly refer to meetings with Dr. Murthy that occurred *before* the May 25, 2021 meeting—corroborating the New York Times' reporting and contradicting Defendants' interrogatory responses.  *See* Doc. 214-1, ¶ 283 (Clegg emailing Dr. Murthy on May 27, 2023, and stating that "[w]e're committed to addressing the defensive work that you've called on us to address."); *see also id.* ¶ 350 (Clegg indicating that he has "understood for some time … that there is disagreement on some of our policies").  Against this evidence, Defendants rely on Eric Waldo's statement that he is "skeptical" of the New York Times report, Doc. 266, at 168, based on Waldo's view that Dr. Murthy never "get[s] angry or even express[es] anger."  Waldo Dep. 223:20-224:2.  But Waldo was not employed by the OSG until June 20, 2021, he has no first-hand knowledge whether such meetings occurred at all.  *See* Waldo Dep. 12:5-6.

Facebook posts), ¶ 486 (BOLO meetings); ¶ 515 (BOLO email); ¶¶ 536-537 (Census slide deck to YouTube); ¶¶ 549-557 (BOLO meetings); ¶¶ 555-556 (BOLO slide decks); ¶ 565 (spreadsheet of claims flagged for Twitter); ¶ 567 (list of sample posts to Twitter); ¶¶ 568-573 (BOLO meetings with Twitter); ¶ 586 (BOLO email to Twitter).  In her supplemental declaration, Carol Crawford admits that "a CDC employee used a Facebook reporting portal to identify four Facebook and Instagram posts containing vaccine misinformation."  Doc. 266-5, at 74, ¶ 18.

Defendants argue that the flagging was innocuous because "the social media companies themselves 'made decisions about' how to handle misinformation on their platforms."  Doc. 266, at 60; *see also* Doc. 266-5, at 70.  But the mere fact of "flagging" ensures that something that was not censored may be censored—if the platforms had already censored it, there would be no need to "flag" it for them.  The officials both *intend* and *cause* the censorship.  Moreover, the CDC did not just "flag" disfavored speech—it consistently flagged and *debunked* the disfavored speech, in a manifest attempt to have it taken down.

In doing so, the CDC knew and intended that it was inducing the platforms to censor.  Doc. 214-1, ¶ 484.  Crawford admits that "[w]hat we did provide was scientific information that I did assume that they might use to do those things," *i.e.*, censor speech by removing, deboosting, or labeling it.  *Id.* ¶ 489; *see also id.* ¶ 499 (Crawford admitting that she knew Facebook would apply content-moderation policies to claims the CDC debunked); ¶ 517 (Crawford flagged posts to Facebook "understand[ing] that potentially removing posts was something they might do").  In flagging misinformation, the CDC "knew their policy teams or their trust teams or misinfo teams … would evaluate it," and "knew that removal was one of the options that they had."  *Id.* ¶ 589.

***The CDC serves as a de facto censor on specific health claims.***  "Flagging" is only one of CDC's censorship activities.  The CDC also serves as the platforms' *de facto* censor, with the

final authority dictating what health claims platforms will censor.  Defendants admit that platforms routinely submitted lists of health-related "claims" to the CDC for debunking, and that "[a]fter checking with the relevant subject-matter experts as necessary, Ms. Crawford would respond by indicating whether the claims were false and harmful, and sometimes directing the company to information available on CDC's website that directly responded to the false claim."  Doc. 266, at 57.  Once the CDC stated that a claim was "false and harmful," the platform would censor it.

Both Facebook and YouTube participated in this process with the CDC.  Again and again, Facebook emailed Crawford lists of specific claims for the CDC to debunk, making it perfectly clear that, if the CDC debunked them, they would be censored.  *See, e.g.,* Doc. 214-1, ¶ 490-494, 496-498, 511-514, 520-522, 525-528 (asking the CDC, for a long list of claims, to confirm whether "the claim is false," and "[i]f believed, could this claim contribute to vaccine refusals").  Facebook's content-moderation officer made very clear that she was asking the CDC to provide a definitive answer on the two factors that determine whether Facebook censors something: whether the claims "are false and can lead to harm."  *Id.* ¶ 501; *see also id.* ¶ 502 (Liz Lagone advising the CDC that "[w]e remove … posts on the ground that the claim is false and that it is harmful," where "harmful" includes claims that might induce vaccine hesitancy).  Crawford admits that the CDC's input would guide Facebook's decisions about what specific claims to censor.  *Id.* ¶ 502.

Google participated in this practice through oral meetings.  Defendants admit that "Google (which owns YouTube) likewise requested CDC's input on claims about COVID-19 vaccines circulating on YouTube's platform. For instance, in March 2021, Google reached out to CDC to ask if a "vaccine expert[]" from CDC could join a call where Google "'plan[ned] to share a new list of . . . vaccine misinformation claims' that the company had compiled."  Doc. 266, at 58.  Defendants admit that platforms such as Google continue to consult with the CDC to seek

justification to censor supposedly "misinformation" on other health-related topics.  Doc. 266, at 58-59.  This *de facto* censorship occurred in oral meetings; for example, Google emailed Crawford stating, "we plan to share a new list of common vaccine misinformation claims and would love it if [a CDC 'subject-matter expert'] or other vaccine experts could join."   Doc. 214-1, ¶¶ 539; *see also id.* ¶¶ 541-542, 547-548, 559-560 (evidence of many such meetings where the CDC's experts debunked claims for Google).

Defendants argue that "[w]hen responding to Facebook, CDC did not instruct the company to remove or take any other action against posts or users promoting claims that CDC concluded were false and hazardous to public health."  Doc. 266, at 57.  But the whole point of these inquiries was for the platform to outsource to the CDC its decision on whether or not to censor specific health claims, and the CDC knew that and embraced the role.  For example, Crawford understood, and was "happy," that the CDC's information would cause disfavored viewpoints to be censored: "I'm happy that providing the scientific information led to less spread of misinformation."  Doc. 214-1, ¶ 522.  Crawford admits that the CDC's input would "determine" how Facebook applied its content-moderation policy: "I know that they're using our scientific information to *determine their policy*."  *Id.* ¶ 529 (emphasis added).  Facebook openly stated that its decision to censor claims about childhood vaccines was "as a result of our work together" with the CDC.  *Id.* ¶ 519.  On the "causes harm" prong of Facebook's test for censorship, Crawford simply provided a blanket statement without any support from her "subject-matter experts": "It appears that any of these could potentially cause vaccine refusal."  *Id.* ¶ 525. In 2022, Facebook notified Crawford of "updates" to its policies that Facebook made "as a result of our work together."  *Id.* ¶ 526.

**The Census Bureau used the platforms' misinformation-reporting portals.**  Defendants contend that no one at the CDC much used Facebook and Twitter's misinformation-reporting

portals, Doc. 266, at 62, and they downplay the Census Bureau's involvement in the CDC's censorship activities, *id.* at 63-64.  Both claims are incorrect.  Facebook evidently gave four Census Bureau employees and contractors access to its "COVID-19 misinfo reporting channel."  *Id.* ¶ 476.  Likewise, Census contractor Christopher Lewitzke emailed Twitter to ask for access to Twitter's misinformation-reporting channel, the "Partner Support Portal," for a long list of Census employees and contractors.  *Id.* ¶ 581.  Using these portals was consistent with Census's past practices with platforms.  *Id.* ¶ 582.  The CDC also asked Facebook to give Census personnel access to CrowdTangle.  *Id.* ¶ 471.  The Census Bureau and its contractors, rather than CDC officials, were submitting reports through the special misinformation reporting portals.

*The CDC continues to engage in censorship of health-related speech.*  Defendants contend that the "CDC no longer has regular meetings with any social media company except for Google, and it has no regular or direct communications with any social media company about misinformation."  Doc. 266, at 55.  But in fact, Defendants admit that the CDC engages in ongoing activities regarding misinformation: "CDC has some occasional, indirect contact with personnel from social media or technology companies that may relate to misinformation. … CDC also funds and attends conferences that discuss misinformation and infodemic management, and personnel from social media companies may attend or speak at those conferences."  *Id.* at 56.  The CDC admits to meeting with Google about "misinformation" in March 2022, shortly before this suit was filed, without explaining nature of the meeting.  Doc. 266-5, at 72, ¶ 11.

Further, the CDC continued to engage in censorship until Defendants produced the CDC's documents.  For example, on June 29, 2022, Google emailed Crawford and sought the CDC's input to debunk and censor claims about the safety and effectiveness of administering progesterone to reverse chemical abortion.  *Id.* ¶ 561.  Crawford responded by offering to assist the agency.  *Id.*

With respect to such censorship requests, Crawford admits that the CDC's "focus is not solely on COVID.  We're focusing on other topics."  *Id.* ¶ 562.  In her supplemental declaration, Crawford admits that the CDC received such requests "in summer 2022."  Doc. 266-5, at 74, ¶ 19.

### D.  Dr. Fauci Perpetrates Campaigns of Deception to Censor Disfavored Viewpoints.

Defendants' statement of facts with respect to Dr. Fauci does not dispute the vast majority of Plaintiffs' exhaustively supported Proposed Findings of Fact.  *See* Doc. 266, at 64-68; *contrast* Doc. 214-1, ¶¶ 596-852.  The factual claims they do make are not well-supported.

For example, Defendants claim that "Dr. Fauci had only limited interactions with Facebook during 2020."  Doc. 266, at 66, ¶ 102.  In fact, Defendants' interrogatory responses detail *thirteen* meetings and communications between Dr. Fauci and Mark Zuckerberg over a nine-month period in 2020.  Doc. 214-1, ¶ 755 (citing Scully Ex. 12, at 53-54).  These emails reflect close coordination between Zuckerberg and Fauci.  *See id.* ¶¶ 750-755.  And, in early 2020, Zuckerberg already has Fauci's email address and addresses him by his first name.  *Id.* ¶ 748.

Defendants parrot Dr. Fauci's repeated claims in his deposition that he does not "pay attention to" anything to do with social media and does not have social-media accounts.  Doc. 266, at 67.  This claim is not credible.  In fact, Dr. Fauci's daughter was then a software engineer at Twitter, Fauci Dep. 99:23-100:15; Dr. Fauci has done numerous podcasts and interviews on social media, including with Mark Zuckerberg, Fauci Dep. 99:16-19, 101:1-6; Dr. Fauci had specifically expressed concern about "the threat of further distortions on social media" about the lab-leak theory, *id.* ¶ 683, Fauci Ex. 8, at 2 (emphasis added); and Dr. Fauci's communications staff repeatedly emailed Twitter to try to remove postings critical of Dr. Fauci."  Doc. 214-1, ¶ 685.  Dr. Fauci is keenly attuned to the importance of controlling speech on social media.  As he stated in a private email to co-conspirators plotting to discredit and censor the lab-leak theory, "given … *the*

*threat of further distortions on social media*, it is essential that we move quickly."  *Id.* ¶ 683 (emphasis added).  Dr. Fauci's private words and conduct demonstrate a great deal of concern about what is said on social media, and how federal officials like himself can control it.  *See id.* ¶¶ 742-745 (social-media censorship of the lab-leak theory that Dr. Fauci plotted to discredit); ¶¶ 771-775 (social-media censorship of speech advocating for hydroxychloroquine, which Dr. Fauci plotted to discredit);  ¶¶ 799-804 (social-media censorship of the Great Barrington Declaration, which Dr. Fauci plotted to discredit); ¶ 841 (social-media censorship of Alex Berenson, whom Dr. Fauci plotted to discredit).  "When Dr. Fauci spoke, social media censored." Written Testimony of U.S. Senator Eric S. Schmitt (March 30, 2023), *at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/schmitt-testimony.pdf.[3]

Defendants point out that Dr. Fauci has retired and been replaced as NIAID Director by Dr. Hugh Auchincloss.  Doc. 266, at 66 & n.34.  But Dr. Auchincloss, Dr. Fauci's former chief deputy, worked hand-in-glove with Dr. Fauci on censorship.  Dr. Auchincloss is the man who, at the beginning of the lab-leak plot, received the email from Dr. Fauci at 12:29 a.m. on a Saturday morning marked "IMPORTANT," which stated: "Hugh: It is essential that we speak this AM. Keep your cell phone on … You will have tasks today that must be done."  *Id.* ¶ 640.  The email attached the research paper by Ralph Baric and Shi Zhengli detailing NIAID-funded gain-of-function research on bat coronaviruses at the Wuhan Institute of Virology.  *Id.* ¶ 641.

---

[3] Further, internal Twitter documents reveal that, in 2021, "Dr. Anthony Fauci did an account takeover of @WHCovidResponse," the White House's COVID response Twitter account, and answered 32 user questions with over 4 million impressions.  *See* https://twitter.com/thackerpd/status/1649037545630494720/photo/1.  Dr. Fauci, evidently, is not quite the social-media neophyte he claims to be.

### E.    CISA Engages in Extensive, Ongoing Social-Media Censorship Activities.

CISA attempts to downplay its involvement in such censorship activities as the USG-Industry meetings, "switchboarding," and the EIP.  Doc. 266, at 69-86.  These attempts fail.

***Switchboarding.***    Defendants admit that, during 2020, CISA engaged in extensive "switchboarding" activities to flag disfavored content for censorship to platforms.  Doc. 266, at 74-77; *see also* Doc. 214-1, ¶ 972; Doc. 266-5, at 173 (Hale Decl.).  Defendants try to frame CISA's switchboarding as a merely passive activity.  Relying heavily on a preprinted, boilerplate disclaimer in their emails to platforms (which only seems to appear during the Trump Administration), Defendants contend that it would "leave it to the companies to make decisions based on their terms of service."  Doc. 266, at 78.  Even if it had been purely passive, CISA's "switchboarding" would still be the but-for cause of censorship; as Scully admits, "if it hadn't been brought to their attention then they obviously wouldn't have moderated it."  Doc. 214-1, ¶ 974.

Further, CISA's "switchboarding" was not the merely passive exercise that Defendants portray.  It involved active lobbying of platforms to remove disfavored content.  Scully commonly performed such fact-checking for platforms to support CISA's requests for censorship.  *Id.* ¶¶ 1076-1077.  This included both doing open-source research and affirmatively obtaining information from state and local officials to "debunk" social-media claims to platforms.  *Id.* ¶ 1077.  In doing so, CISA always assumed that the government official's account, not the private citizen's account, was accurate.  *Id.* ¶ 1078.  Defendants admit that "CISA would ask social media platforms to report back on how … they had addressed misinformation CISA had flagged on behalf of [state and local] officials."  Doc. 266, at 77.

Switchboarding was extensive.  At least six members of CISA's MDM team "took shifts" in reporting putative "misinformation" to social-media platforms in 2020.  Doc. 214-1, ¶ 1063.

Platforms treated CISA, a federal national-security agency, as a privileged reporter of misinformation, often responding within minutes to reports, even late at night.  *Id.* ¶ 1081.

CISA's flagging included long lists of tweets to remove, and it included obvious parody accounts.  *Id.* ¶ 1102.  CISA also pushed for censorship of content that its Director particularly disfavored.  For example, Scully asked platforms for a detailed report on their censorship of the "Hammer and Scorecard" narrative, because "Director Krebs is particularly concerned about the hammer and scorecard narrative."  *Id.* ¶ 1104.  Twitter responded by inviting CISA to flag "high-profile examples of tweets" on this topic that CISA wanted censored.  *Id.*

Defendants contend that CISA stopped "switchboarding" after the 2020 election cycle.  But Scully testified that CISA's decision to stop "switchboarding" was made in late April or early May 2022, *i.e.*, just after the filing of this lawsuit.  *Id.* ¶ 975.  Thus, CISA suddenly decided to stop "switchboarding" once that practice was challenged in this lawsuit.  *See id.*; *see also* Doc. 266, at 77 (admitting that the decision to stop switchboarding was made in "April or May 2022").  Hale's declaration does not dispute this timeline, and it does not dispute Plaintiffs' longstanding insistence that CISA decided to stop "switchboarding" *because of this lawsuit*.  *See* Doc. 266-5, at 175 (Hale Decl. ¶ 78).  In fact, through the filing of Plaintiffs' supplemental brief in February 2023, CISA continued to proclaim on its website that its "MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms."  Doc. 214-1, ¶ 976.

In addition, once CISA stopped "switchboarding," it took careful steps to ensure that the same "flagging" activities would occur through other channels.  In the spring and summer of 2022, Lauren Protentis urged platforms to prepare "one-pagers" for state and local election officials and lobbied the platforms to ensure that they included instructions for how to report misinformation

for censorship, *i.e.*, "steps for flagging or escalating MDM content," "steps to … report MDM,"
and "how to report disinformation." *Id.* ¶¶ 1094-1096.

    ***USG-Industry Meetings and other meetings***.  Defendants contend that CISA's continuous
battery of meetings with platforms about mis- and disinformation are wholly innocuous.  Doc. 266,
at 80-84.  The facts contradict this narrative.  First, the "USG-Industry meetings" are large,
extensive, and ongoing.  Geoff Hale admits that, during 2022, "CISA participated in regular
meetings often referred to as USG-Industry meetings," which "included CISA, DHS, FBI, U.S.
Department of Justice, the Office of the Director of National Intelligence, Google, Facebook,
Twitter, Reddit, Microsoft, and Verizon Media."  Doc. 266-5, ¶ 68.  As Elvis Chan (who attends
the meetings) testified, the meetings are attended by representatives of CISA, the Department of
Homeland Security's Intelligence & Analysis division ("I&A"), the Office of the Director of
National Intelligence (ODNI), the FBI's Foreign Influence Task Force (FITF), as well as DOJ's
National Security Division.  Doc. 214-1, ¶ 861.

    CISA is the organizer and plays a leading role in these meetings.  First Matt Masterson,
and now Brian Scully, are "regular attendees" who "usually emcee[]" the USG-Industry meetings.
Doc. 214-1, ¶ 863.  CISA leads a bilateral "coordination call" with Facebook to plan for each USG-
Industry meeting.  *Id.* ¶ 978.  CISA also leads an interagency planning meeting for each USG-
Industry meeting.  *Id.* ¶ 984.  CISA "oversee[s]" and "facilitate[s]" the USG-Industry meetings.
*Id.* ¶ 981.  Both CISA and DHS's Office of Intelligence & Analysis participate in them.  *Id.*

    The meetings have occurred regularly since 2018.  *Id.* ¶ 983.  They occurred throughout
the 2022 election cycle.  *Id.* ¶ 987.  "[C]oncerns about misinformation and disinformation on social
media platforms were discussed in these meetings in the 2022 timeframe."  *Id.*  The USG-Industry
meetings are monthly, but they become biweekly and then weekly as election day approaches.  *Id.*

¶ 1087.  The meetings "were continuing" at the time of Elvis Chan's deposition, and he expected that they would continue through the 2024 election cycle.  *Id.* ¶ 866.

Defendants argue that the USG-Industry meetings did not involve pushing platforms to censor speech.  Doc. 266, at 81.  But Defendants then admit that the meetings involve "upcoming 'watch outs,'" *i.e.*, future disinformation topics to be on the lookout for, like the CDC's "BOLO" meetings.  *Id.* at 80.  Elvis Chan admits that the parties discuss "disinformation content" at the USG-Industry meetings.  Doc. 214-1, ¶¶ 865-866.

Moreover, the USG-Industry meetings were used to push the platforms to censor the Hunter Biden laptop story.  At the USG-Industry meetings, FBI and CISA issued baseless warnings about imminent "hack and leak" operations that led to the censorship of the Hunter Biden laptop story.  *Id.* ¶¶ 881-883.  Both Elvis Chan and Laura Dehmlow of the FBI raised such warnings at the USG-Industry meetings.  *Id.* ¶¶ 882-883.  So did other FBI officials.  *Id.* ¶ 889.  Matt Masterson and Brian Scully of CISA also raised warnings about "hack and leak" operations during the USG-Industry meetings.  *Id.* ¶ 894.  As a result of these warnings, some platforms adopted new censorship policies to provide for the censorship of hacked materials.  *Id.* ¶ 884.  The "impetus" for these changes was the repeated warnings from the FBI and CISA about the likelihood of imminent "hack and leak" operations.  *Id.*  In addition to raising warnings, the FBI repeatedly inquired of the platforms whether they "had changed their terms of service" to censor hacked materials, effectively urging them to adopt these policy changes.  *Id.* ¶¶ 885-887.

The FBI had no investigative basis to believe that any "hack and leak" operation was imminent.  *Id.* ¶ 893 ("we were not aware of any hack-and-leak operations that were forthcoming or impending").  Yet CISA's emails planning the USG-Industry meetings in 2020 included agenda items such as "preparing for so-called 'hack and leak' operations attempting to use platforms and

traditional media for unauthorized information drops," *id.* ¶ 1090; and "Deep Dive Topic … Hack/Leak and USG Attribution Speed/Process," *id.* ¶ 1091.

Defendants claim that their other meetings—such as those of the Cybersecurity Advisory Committee and its MDM Subcommittee do not involve pushing for censorship of social-media speech.  This is incorrect.  For example, on June 22, 2022, CISA's Cybersecurity Advisory Committee issued a "Draft Report to the Director" calling for an extremely broad view of CISA's mandate to expand censorship into new areas.  Doc. 214-1, ¶ 1118. The report states that "[t]he spread of false and misleading information poses a significant risk to critical functions like elections, public health, financial services, and emergency response." *Id.*  It claims: "Pervasive MDM diminishes trust in information, in government, and in democratic processes more generally."  *Id.* The report states that "CISA should consider MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources."  *Id.*  Further, CISA also has a long series of *bilateral* meetings with platforms about misinformation that were not disclosed in interrogatory responses and are not addressed in the Government's response brief.  *Id.* ¶¶ 1084-1085.

***The Election Integrity Partnership.***  Defendants contend that CISA had "limited involvement with the Election Integrity Partnership."  Doc. 266, at 84.  On the contrary, CISA's involvement in the EIP included at least the following: (1) the EIP was formed to address a "gap" in the government's surveillance and censorship activities that *CISA* identified to its Stanford-affiliated interns; (2) CISA interns originated the idea for the EIP; (3) CISA had a series of meetings with Alex Stamos and Renée DiResta about forming the EIP before it began, including one meeting listed on the EIP's "Operational Timeline" as "Meeting with CISA to present EIP concept"; (4) CISA connected the EIP with the Center for Internet Security, which runs a CISA-

funded clearinghouse for state and local government officials to communicate about misinformation; (5) CISA connected the EIP directly with NASS and NASED, organizations of state and local government officials, so they could report misinformation to the EIP; (6) CISA had ongoing communications with the EIP about its public reports on misinformation as the EIP operated in 2020; (7) CISA collaborated closely with the Center for Internet Security on flagging misinformation to platforms, while CISA knew that CIS was collaborating with the EIP; (8) CISA flagged misinformation to social-media platforms using EIP tracking numbers; (9) CISA interns, who were working for CISA and the EIP at the same time, flagged "misinformation" to platforms simultaneously on behalf of CISA and on behalf of the EIP; (10) CISA mediated and coordinated between the EIP, CIS, and the platforms on reporting misinformation to address the platforms' concerns about duplicative reports; (11) the EIP debriefed CISA after the 2020 election cycle about its activities and public report; and (12) there is extensive overlap of personnel between CISA and the EIP, including interns working simultaneously for both groups, and key EIP leaders such as Alex Stamos, Renee DiResta, and Kate Starbird having formal roles at CISA.  Further, as discussed below, (13) CISA funds the EI-ISAC, which is a clearinghouse used to report misinformation to the EIP; (14) the EIP's operations were directly financed by federal funding; and (15) federal officials at the Global Engagement Center flagged misinformation directly to the EIP.

When EIP was starting up, CISA's "involvement" included at least the following:

(1) "a couple of our [CISA] interns came up with the idea and … [CISA] had some communications with" the EIP. Scully Depo. 49:8-10. (2) CISA "received some briefings on the work that they were doing." Scully Depo. 49:13-14. (3) CISA "had some communications early on in the process, when they were making decisions, when Stanford was trying to figure out what the gap was." Scully Depo. 49:18-21. (4) CISA "connected them [EIP] with the Center For Internet Security," which is a CISA-funded nonprofit that channels reports of disinformation from state and local government officials to social-media platforms. Scully Depo. 50:5-6. (5) CISA also "connected them [EIP] with some of the election official groups," i.e., "the National Association of Secretaries of State [NASS] and the National Association of State Election Directors [NASED]," both of which are

groups of state and local government officials who would report misinformation through CIS to the EIP. Scully Depo. 50:6-10. (6) And CISA "facilitated some meetings between those three." Scully Depo. 50:10-11.

Doc. 214-1, ¶ 993.  The CISA interns who originated the idea of the EIP "worked for the Stanford Internet Observatory, as well." *Id.* ¶ 994.  Scully identified the "gap," *i.e.*, the problem that federal and state officials lack authority and capacity to monitor and report misinformation to platforms effectively, to the interns, who devised the EIP as a solution to bridge that "gap." *Id.* ¶¶ 995-996. Scully and other CISA officials "had some initial conversation with the interns" about this "gap," and then they also "had a conversation with the Stanford Internet Observatory folks about the gap." Scully Depo. 52:3-6. Then, CISA "received a briefing from them [EIP], or two, on kind of what they were putting together." Scully Depo. 52:7-9. Scully and other CISA officials then "facilitated some meetings between Stanford folks, the Center For Internet Security, and election officials, where they had discussions about how they would work together." Scully Depo. 52:10-13. As the EIP progressed, CISA "had some conversations, kind of throughout, when they were -- particularly when they were putting out public reporting about what they were seeing." Scully Depo. 52:14-17. In addition, Scully "wouldn't be surprised if there were some other kind of brief conversations in there." *See* Doc. 214-1, ¶ 997.  The EIP continued operating during the 2022 election cycle, and the SIO briefed CISA on the EIP's activities during that cycle. *Id.* ¶ 998.

CISA funds the Center for Internet Security in its activity of overseeing the EI-ISAC, which is an organization for information-sharing among state and local government election officials. Scully Depo. 61:9-10, 62:1 ("CISA provides funding for the EI-ISAC"). *See* Doc. 214-1, ¶ 1002. The EI-ISAC receives reports of misinformation and forwards them to the EIP.  CIS continued to report misinformation and disinformation for censorship during the 2022 election cycle. *Id.* ¶ 1098.  Defendants contend that DHC does not fund CIS's disinformation work, but they admit

that CISA "has provided financial assistance to CIS through a series of cooperative agreement awards to provide specified cybersecurity services … through the MS- and EI-ISACs." Doc. 266, at 73. In other words, CISA admits that it funds the EI-ISAC, which is the platform through which CIS conducts its disinformation work, in cooperation with the EIP. *Id.*

CISA established a triangular relationship of cooperation on censorship among CISA, CIS, and the EIP. CISA connected the EIP with CIS because "the EIP was working on the same mission," so "we wanted to make sure that they were all connected." Doc. 214-1, ¶ 1004. CISA served a mediating role between CIS, the EIP, and the platforms, to coordinate their efforts in reporting misinformation to the platforms and avoid "duplicate reporting." *Id.* ¶ 1007. There was also direct email communication between EIP and CISA about misinformation reporting. *Id.* ¶ 1008.

Key personnel of the EIP, such as Alex Stamos, Renee DiResta, and Kate Starbird, also have formal roles with CISA. *Id.* ¶¶ 1011-1012, 1170-1171. CISA political appointee Matt Masterson communicated directly with the EIP, and Geoff Hale may have done so as well. *Id.* ¶ 1014. When he left CISA, Masterson did a one-year fellowship at the Stanford Internet Observatory. *Id.* ¶ 1021. CISA Director Christopher Krebs had a relationship with Alex Stamos. *Id.* ¶ 1015. When he left CISA, Krebs started a consulting firm with Stamos called the "Krebs/Stamos Group." *Id.* While he was still CISA Director, Krebs met with Stamos as Stamos was setting up the EIP. *Id.* ¶ 1016. Two CISA interns who "took shifts" in reporting misinformation to platforms on behalf of CISA were also working for the Stanford Internet Observatory and flagging misinformation to platforms on behalf of the EIP. *Id.* ¶¶ 1064, 1066.

Masterson and Scully engaged with the EIP on their "public reporting" about election-related misinformation. *Id.* ¶ 1018. Masterson was also involved in the initial discussions with

Stanford about staring the EIP, including "clarifying the gap … for the folks at the Stanford Internet Observatory early on in the process." *Id.* CIS and the EIP had a relationship and shared information. *Id.* ¶ 1032. The Virality Project reports that the EI-ISAC "served a critical role in sharing information with the Election Integrity Partnership." *Id.* ¶ 1045. CISA's "tracking spreadsheet" for its "switchboarding" reports contains at least 13 entries where CISA flagged misinformation to platforms using EIP ticket numbers. Doc. 214-35, Lines 86-96, 115, 123.

CISA's involvement was critical to the launching and operation of the EIP. Alex Stamos consulted with CISA because he needed CISA to connect him with state and local election officials to obtain misinformation reports. Doc. 214-1, ¶ 1022. Scully connected the EIP with state and local election officials through NASS and NASED, and "facilitate[d] some meetings between" EIP and local election officials. *Id.* ¶¶ 1024-1025. Scully also connected the EIP to the Center for Internet Security, which runs the CISA-funded EI-ISAC, and "set up a direct line of communication between CIS and EIP." *Id.* ¶ 1024. Scully understands that, once this "direct line" was set up, CIS forwarded misinformation reports to EIP. *Id.* ¶ 1026. Scully testifies that "EI-ISAC is a part of CIS and we do fund the EI-ISAC." *Id.* ¶ 1027. CIS reported misinformation to CISA and the EIP simultaneously, which CISA would then forward to platforms. *Id.* ¶ 1070. CIS, like CISA, used EIP ticket numbers in its misinformation reports to CISA. *Id.* ¶ 1075.

Geoff Hale contends that "CISA's involvement in the creation and operation of the EIP has been very limited," Doc. 266-5, at 170, but Hale admits that (1) CISA officials told the SIO interns about the "gap," *id.* at 171; (2) "CISA personnel had a conversation with the SIO personnel" about the gap, *i.e.*, that "state and local election officials lacked the resources and capability to identify and respond to potential election security-related disinformation impacting their jurisdictions," after which "SIO … launched the EIP," *id.*; (3) "CISA connected the EIP with election

stakeholders, such as NAASS, NASED, and CIS," *id.*; (4) "both CISA and the EIP received reports of potential election security-related disinformation from state and local election officials through CIS," *id.*; (5) "the EIP briefed CISA regarding EIP's plans for the 2022 election cycle," *id.* at 172; (6) "[c]ertain Stanford University students have interned for CISA and also the SIO, and "[t]hrough their SIO work, I understand they may have supported the EIP," *id.*; and (7) "CISA … has attended public briefings the EIP has provided," *id.*

Hale contends that "CISA has never provided funding to the EIP," Doc. 166-5, ¶ 176, but in fact, the federal government funds the EIP through other sources: "Researchers who contributed to the EIP … receive partial support from the U.S. National Science Foundation (grants 1749815 and 1616720)." Doc. 214-1, ¶ 1164.  Further, the Atlantic Council is federally funded.  *Id.* ¶ 1165.

The EIP's public report, *The Long Fuse*, confirms CISA's extensive involvement in the launching and operation of the EIP.  The EIP states that it was created "in consultation with CISA." Doc. 214-1, ¶ 1138.  It agrees that CISA interns originated the EIP to fill a perceived "gap" in government authority to conduct social-media censorship activities.  *Id.* ¶¶ 1139-1140, 1166.  It admits that federal officials could not conduct the EIP's activities directly, because they "would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States."  *Id.* ¶ 1141. The EIP did not just report misinformation; it pushed platforms to adopt more restrictive censorship policies, and pushed for aggressive enforcement of those policies.  *Id.* ¶¶ 1148-1151.

The EIP lists "Government" as a "Major Stakeholder," and makes clear that "stakeholders" who could submit "tickets" included "trusted" partners such as CISA, the GEC, and the EI-ISAC. *Id.* ¶¶ 1151-1153.  As a key point in its "Operational Timeline," the EIP lists a July 9, 2020, "Meeting with CISA to present EIP concept."  *Id.* ¶ 1169.  One of the EIP's stated goals was to

"flag policy violations to platforms." *Id.* ¶ 1172.  The GEC submitted "tickets" to the EIP to flag misinformation for platforms. *Id.* ¶ 1179, 1197.  The CIS was a major reporter of misinformation to the EIP. *Id.* ¶ 1188.  The EIP aptly states that "in its structure and its operations," the EIP "*united government, academia, civil society, and industry*." *Id.* ¶ 1228 (emphasis added).

     ***CISA's Censorship Activities Are Ongoing.***  Defendants suggest that CISA no longer engages in censorship activities—for example, by ceasing its "switchboarding" activities and disbanding the "MDM Subcommittee" of the CSAC.  These *post-litigation* decisions contrast with CISA's longstanding, publicly avowed stance in favor of expanding its censorship activities.

     DHS's Office of Inspector General reported in late 2022 that CISA "counters all types of disinformation, to be responsive to current events." *Id.* ¶ 1113.  Leaked DHS documents indicate that CISA is expanding its counter-disinformation efforts to address "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine." *Id.* ¶ 1110.  Scully confirms that CISA has initiatives targeting misinformation about COVID-19 vaccines and the war in Ukraine. *Id.* ¶ 1111.  Scully believes that the "Unified Coordination Group" about the war in Ukraine, which included a member of CISA's MDM team, communicated with social-media platforms. *Id.*  Scully confirms that CISA is working with Department of Treasury to address misinformation that undermines "public confidence" in "financial services" and "financial systems." *Id.* ¶¶ 1115-1116.  Hale's declaration confirms that CISA engages in disinformation work regarding COVID-19, the war in Ukraine, and the financial services industry.  Doc. 266-5, at 163 (¶¶ 17-19).  In late November 2021, Director Easterly stated that "I am actually going to grow and strengthen my misinformation and disinformation team." *Id.* ¶ 1114.  Easterly makes clear that she interprets CISA's mandate to protect "infrastructure" to include "cognitive infrastructure," and that it is

"really, really dangerous if people get to pick their own facts." *Id.* On February 26, 2022—two months before this lawsuit was filed—Easterly's private text messages with Matt Masterson state that she believes CISA is "looking to play a coord role so not every [department and agency] is independently reaching out to platforms which could cause a lot of chaos." *Id.* ¶ 1108. Her text messages also state that DHS is planning "to look at potential new areas of confronting MDM, but it doesn't change or impact anything we [CISA] are doing or have already established." Doc. 71-5, at 2. And, on February 26, 2022, she texted that she is "[j]ust trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful." *Id.* at 3. Masterson responded: "We'll get there. … Platforms have got to get more comfortable with gov't." *Id.* at 4.

### F.    The FBI Pressures and Colludes With Platforms to Remove Domestic Speech.

The FBI contends that, in its censorship activities, it is fighting back against "information warfare" waged by foreign enemies. Doc. 266, at 92. But there is no "information warfare" exception to the First Amendment. The FBI has many lawful tools to fight this "warfare," but it may not employ unconstitutional tools. Yet that is what the FBI does, on a grand scale.

***The FBI's Mass-Flagging Operations.*** First, the FBI engages in flagging operations on a massive scale. The FBI admits that it shares "tactical" information with platforms, *i.e.*, "describing attributes, or indicators, of particular social media accounts indicating they were being operated by foreign malign actors." Doc. 266, at 95. In practice, this means bombarding platforms with long lists of specific speakers, accounts, and content, "one to five times per month," that the FBI wants to censor. Doc. 214-1, ¶¶ 905-911. "Tactical information" means "IP addresses, email accounts, social media accounts, website domain names, and file hash values." *Id.* ¶ 906. These are targeted for "account takedowns," *i.e.*, "knocking down accounts" and "knocking down

misinformation content." *Id.* ¶¶ 907-908.  The FBI targets these accounts *because* Americans engage with them on social media, and to prevent Americans from doing so.  *Id.* ¶¶ 915-917.

Using Teleporter, an encrypted messaging service, the FBI sends platforms lists of speakers, accounts, websites, URLs, etc. to be censored about "one to five times per month," and also flags such speakers and content at the regular meetings with platforms.  *Id.* ¶¶ 931-935.  Each flagging communication may include anywhere from "one account or one selector to … a whole spreadsheet full of them."  *Id.* ¶ 933.  Such messages may flag "dozens" or "hundreds of accounts" for censorship.  *Id.* ¶¶ 935, 941.  "In general," these messages go to seven major social-media platforms.  *Id.* ¶ 936.  The FBI then requests that the platforms report back to them on the actions taken on the reported URLs "at every quarterly meeting."  *Id.* ¶ 937.

The FBI treats First Amendment-protected speech by American citizens on core political topics as acceptable collateral damage in its "information war."  *See* Doc. 214-1, ¶¶ 917-924.  For example, the FBI induced platforms to take down a supposedly Russian-originated "Secure the Border" post that had 134,943 "likes," a pro-Second Amendment message that had 96,678 "likes," and a "Black matters" post that had 223,799 "likes."  *Id.* ¶ 919.  Every one of those "likes" was an act of First Amendment-protected expression.  The FBI also induced platforms to block a supposedly Russian-originated website that hosted content from 20 freelance journalists, including Americans, *id.* ¶ 922; and a website to which many ordinary Americans posted content, *id.* ¶ 923.

In addition, the FBI runs a "command post" on and around election day, which flags domestic "disinformation" for platforms in real-time.  *Id.* ¶ 925.  In reporting such supposed "disinformation," the FBI makes no attempt to determine whether it is foreign or domestic in origin.  *Id.* ¶ 926.  The FBI has about a "50 percent success rate" in getting reported content taken down or censored by platforms.  *Id.* ¶ 928.

***The FBI's mass-flagging operations leverage pressure from federal officials.***  Based on personal observation and conversations with both federal officials and social-media platforms, Chan testifies that pressure from federal officials—including threats of adverse legal consequences—forced social-media platforms to censor election-related speech more aggressively between 2017 and 2020.  Doc, 214-1, ¶¶ 945-961.  Chan testifies that "pressure from Congress, specifically HPSCI and SSCI," induced platforms to adopt more aggressive censorship policies and enforcement.  *Id.* ¶ 946. This includes congressional hearings where the CEOs of Twitter, Facebook, and Google were publicly pressured and raked over the coals.  *Id.* ¶¶ 947-949.  It also includes covert pressure where high-level congressional staffers flew to Silicon Valley to meet privately with platforms and threaten them with adverse legislation in secret meetings.  *Id.* ¶¶ 950-961.  Chan testifies that the platforms involved viewed these meeting as "exercising a lot of pressure" on them.  *Id.* ¶ 951.  The platforms' "changes in takedown policies … resulted from that kind of pressure from Congress."  *Id.* ¶ 953.

Citing Yoel Roth's congressional testimony, Doc. 266, at 88, the Government argues that the FBI was careful not to cross the line into pressuring Twitter to take specific actions on the accounts it flagged.  But the FBI did not need to pressure the platforms to induce them to comply with its requests—the platforms had already been receiving years of public and private pressure from other federal officials to expand their censorship on these very issues.  Doc. 214-1, ¶¶ 945-961. Thus, when asked whether Twitter's increased efforts "[b]eginning in 2017" to "invest really heavily in building out an election integrity function" were "driven in part by … concerns raised by Congress and the US government," Yoel Roth answered, "Yes."  Doc. 266-2, at 89.

***The FBI's censorship operations continue unabated.***  The FBI's censorship operations are ongoing; as Elvis Chan publicly stated, "post-2020, we've never stopped … as soon as

60

November 3rd happened in 2020, we just pretty much rolled into preparing for 2022." Doc. 214-1, ¶ 967. The FBI is "working with social media companies" to ensure "they can knock down accounts, knock down disinformation content … as they're building up to" election day. *Id.*

**The FBI's deception censored of the Hunter Biden laptop story.** The censorship of the Hunter Biden laptop story provides a dramatic case-study of the FBI's censorship of private American political speech. As discussed above, the FBI meets extensively with social-media platforms about disinformation, both through the USG-Industry meetings and frequent bilateral meetings. Doc. 214-1, ¶¶ 861-866 (USG-Industry meetings); *id.* ¶¶ 867-877 (FBI's regular bilateral meetings with at least eight major technology platforms' content-moderation officers); *id.* ¶ 878 (FBI communicates with platforms routinely through encrypted and self-deleting channels such as Signal and Teleporter). These meetings were the vehicle for the FBI's campaign of deception to censor the Hunter Biden laptop story.

As discussed above, during the 2020 election cycle, the FBI repeatedly warned platforms to expect a possible "hack and dump" or "hack and leak" operation, both in the USG-Industry meetings and in the FBI's bilateral meetings with seven social-media platforms, and CISA did so as well. *Id.* ¶¶ 880-883, 894. There was no investigative basis for these warnings, as Chan admits: "Through our investigations, we did not see any competing intrusions to what had happened in 2016," and the FBI was "not aware of any hack-and-leak operations that were forthcoming or impending" at the time. *Id.* ¶ 893. The FBI also induced platforms to change their content-moderation policies in 2020 to specify that they would censor hacked materials, by repeatedly raising the bogus warning about hack-and-leak operations and then repeatedly inquiring of the platforms whether they would censor such materials when they emerged. *Id.* ¶¶ 884-889. Thus, the FBI—which had the laptop in its possession since 2019 and knew that its contents were not

hacked—repeatedly seeded the platforms with false warnings of imminent "hack and leak" operations and pushed the platforms to adopt policies to censor "hacked materials." Then, when the laptop story was published, the FBI refused to confirm whether the laptop was genuine or contained hacked materials, thus dooming the story to censorship. *See* Doc. 266, at 100.

The Government states that "[t]he Russians' 2016 hack-and-leak operation provided an impetus for some platforms to change their service terms" on hacked materials. Doc. 266, at 96 (citing Chan Dep. 205:4-17, 248:10-16). In fact, it was the FBI who "provided" that "impetus." The Government admits that "ASAC Chan testified that what the FBI would have done was to ask the platform 'how their terms of service would handle a situation' involving materials released from such an operation." Doc. 266, at 101 n.51. In fact, the FBI constantly raised the issue, and repeatedly inquired about platforms' hacked-materials policy during 2020, which induced the platforms to change their policies. Doc. 214-1, ¶¶ 884-889. That is why these policy changes were made *in 2020*, when the FBI induced them—not in 2016 when the Russian "hack-and-leak operation" allegedly occurred.

To dispute this account, the Government relies heavily on Yoel Roth's 2023 congressional testimony on February 8, 2023, *see* Doc. 266-2, at 73-119; but in fact, that hearing corroborates virtually every key detail of the FBI's involvement in suppressing the Hunter Biden laptop story. Roth confirms that the FBI conveyed no investigative basis for the warning—the suppression was not based on "any specific information from any government source." *Id.* at 79. The hearing confirms that "the FBI had Hunter Biden's laptop since December of 2019," *id.* at 81, and thus the FBI knew the laptop's contents were not "hacked materials." *See id.* at 106 (noting that the FBI "had it … for a year," and "if anyone knows [it's] real, it's them"). The hearing confirms that the censorship of the story lasted two weeks (not 24 hours, as the Government misleadingly

suggests)—the "New York Post story was down for two weeks, give or take." *Id.* at 86.  It confirms that Roth and others at Twitter "communicate with government officials by means of disappearing messaging systems like Signal…." *Id.* at 96.  It confirms that Twitter collaborates closely with federal government agencies to suppress so-called foreign disinformation: "There is a considerable amount of work to address foreign disinformation at Twitter and also at other companies. And this work was reliant in part on intelligence shared with companies by law enforcement and by the intelligence community." *Id.* at 99.  It confirms that, in 2020, Roth and others at Twitter "were having regular interactions with national intelligence, Homeland Security and the FBI." *Id.* at 100. "Twitter met quarterly with the FBI Foreign Interference task force, and we had those meetings running for a number of years…" *Id.*  Roth "had ongoing conversations with the FBI for years…" *Id.*  It confirms that, in 2020, internal Twitter communications referred to "a sustained effort by the intelligence community to push Twitter," including Elvis Chan.  *Id.* at 100.  Roth agreed that Twitter was "following … national security experts on Twitter as a reason to take down the New York Post story on Hunter Biden's laptop." *Id.*  Roth admits that "Twitter met with the FBI, I would estimate several dozen times over the course of multiple years. These meetings happened in person in the Twitter office, in the offices of other technology companies, and at times they happened virtually." *Id.* at 107.  These meetings occurred "somewhere between weekly and monthly." *Id.* at 117.  Roth confirms that "[t]he subject of possible hack and leak was raised by a number of representatives of the FBI," including "Mr. Chan." *Id.* at 114.

In fact, the only detail of the account that Roth now disputes, over two years after the fact, is his own December 2020 statement that federal officials warned him that the long-expected hack-and-leak operation *might involve Hunter Biden*.  Even without this detail, the evidence of the FBI's

deceptive interference is compelling.  But in any event, Roth's December 2020 declaration to the FEC clearly indicates that this warning came *from federal officials*:

> [1] Since 2018, I have had regular meetings with the Office of the Director of National Intelligence, the Department of Homeland Security, the FBI, and industry peers regarding election security. [2] During these weekly meetings, the federal law enforcement agencies communicated that they expected 'hack-and-leak operations' by state actors [i.e., Russians or other foreign governments] might occur in the period shortly before the 2020 presidential election, likely in October. [3] I was told in these meetings that the intelligence community expected that individuals associated with political campaigns would be subject to hacking attacks and that material obtained through those hacking attacks would likely be disseminated over social media platforms, including Twitter.  [4] These expectations of hack-and-leak operations were discussed throughout 2020.  [5] I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden.

Doc. 214-1, ¶ 895 (numbers in square brackets added).  Each sentence of the declaration refers to something told to Roth *by federal officials*.  The first sentence identifies the federal officials involved in the meetings—ODNI, DHS, the FBI.  *Id.*  The second sentence explicitly identifies "the federal law enforcement agencies" as the ones who "communicated" warnings that "they expected 'hack-and-leak operations' by state actors."  *Id.*  The third sentence switches to passive voice ("I was told…"), but still makes clear that the speakers were still the federal officials ("I was told in these meetings that *the intelligence community* expected…").  *Id.* (emphasis added).  The fourth sentence stays in passive voice but continues to make clear that Roth is describing communications from federal agencies.  *See id.* ("These expectations of hack-and-leak operations were discussed throughout 2020.").  And the fifth sentence stays in passive voice, indicating that Roth is still describing what *federal officials* told him: "I also learned in these meetings that there were rumors that a hack-and-leak operation would involve Hunter Biden."  *Id.*  No rational reader could interpret this declaration as stating or implying that *other platforms* said that the hack-and-leak operation would involve Hunter Biden.  Rather, the text is entirely dedicated to describing what *federal officials* told Roth.

At the time Roth filed this Declaration, there was no mystery about what this meant.  In fact, *Twitter's own lawyers*, who filed the Roth Declaration with the FEC on December 21, 2020, described Roth's testimony as follows: "Reports **from the law enforcement agencies** even suggested there were rumors that such a hack-and-leak operation would be related to Hunter Biden."  Ex. I to Ex. 1 (Suppl. Glenn Decl. ¶ 30), at 12 (emphasis added).

To be sure, over two years later, in February 2023 congressional testimony, Roth attempted to retreat from his prior testimony by testifying that he believed *other platforms*, not federal officials, may have been the ones who warned that "there were rumors that a hack-and-leak operation would involve Hunter Biden." *Id.*; *see* Doc. 266-2, at 109.  But this new, revisionist account of the 2020 meetings should be dismissed as less credible, for at least four reasons.  First, when pressed under oath in 2023, Roth admitted that *he actually doesn't remember* who raised the warnings: "Who told you about Hunter Biden in these meetings? ... YOEL ROTH: My recollection is that a representative of another tech company may have mentioned it, but those meetings were several years ago. *I truly don't recall.*"  Doc. 266-2, at 109 (emphasis added).  Second, Roth's much-later revision emerged only after the significance of this detail was raised and emphasized *in this lawsuit*, which was expressly referenced in the congressional testimony.  *See, e.g.,* Doc. 266-2, at 109 (referring to Roth's Dec. 2020 FEC declaration as raised in "Missouri v. Biden").  Roth, who has described the Trump Administration as "actual Nazis in the White House," *id.* at 81, has every incentive *now* to color or shade his account to protect the FBI officials who were actively sabotaging the Trump campaign.  In 2020, he had no such incentive to color or skew his account of those statements.  Third, Roth's 2020 account was specific and detailed, while his 2023 revision is vague and fails to provide any detail.  *See id.*  Fourth, Roth's revisionist account is implausible on its face—*federal officials* are the natural source to provide intelligence about

investigations into what they perceived as upcoming threats.  *Other platforms* would not be the natural source for specific intelligence about upcoming Russian hack-and-leak operations.  The Court should treat Roth's detailed, specific, contemporaneous, and credible account, made when he had no incentive to shade his testimony, as more credible than his years-later, vague, admittedly poorly recollected, and facially implausible account of this detail, made when he had obvious incentives to color his testimony.

***The Government's Other Arguments Lack Merit.***  First, the Government contends that "[g]overnment concern about foreign influence efforts directed to United States elections has continued beyond the 2016 election into the 2020 election season and beyond."  Doc. 266, at 92.  On the contrary, the overwhelming majority of speech targeted by federal officials and their co-conspirators for censorship since the 2020 election cycle was *domestic* in origin, not foreign. *See supra*, Introduction; *see also* Doc. 214-1, ¶¶ 1033, 1056, 1220, 1231, 1233, 1235, 1241.

The Government quotes statements by President Trump and Attorney General Barr calling for intelligence agencies to assess whether foreign nationals are attempting to influence U.S. elections, and that Americans should be alert to false information and propaganda disseminated by foreign nationals.  Doc. 266, at 93-94.  But none of these statements directed intelligence agencies to violate American citizens' First Amendment rights by procuring their censorship on social media; and if they had done so, they would be unconstitutional.  *See id.*

Third, the Government contends that the FBI "only shared information concerning accounts it attributed with *high confidence* to a foreign-state actor, and to date the FBI's attributions *have always proven correct*."  Doc. 266, at 96 (quoting Chan Dep. at 112:21-113:6) (second emphasis added).  But Chan's blithe, self-serving optimism about the FBI's supposed infallibility is obviously baseless; the FBI routinely targets domestic speech for censorship.

The Government relies on Yoel Roth's congressional testimony to bolster Chan's see-no-evil assessment of the FBI's accuracy, but in fact, Roth's testimony directly contradicts it.  When asked, "Mr. Roth, Twitter usually found little evidence that the accounts the FBI flagged had ties to foreign influence.  Is that correct?" Roth responded: "In part, but we received many reports from the FBI, particularly related to malign foreign interference that were highly credible and were constructive. So I would say *it was a bit of a mixed bag*."  Doc. 266-2, at 88 (emphasis added).  Thus, on Roth's view, the FBI was correct in "many reports," but there was often "little evidence that the accounts the FBI flagged had ties to foreign influence," so the FBI's accuracy was a "mixed bag."  *Id.*  Given its huge volume of reporting, this "mixed bag" means that the FBI is routinely flagging huge numbers of domestic, First Amendment-protected speakers and content.

One vivid example from Chan's public statements illustrates that the FBI was not "always proven correct," Doc. 266, at 96, but in fact, was colossally mistaken—with an overt political bias.  Chan's master's thesis indicates that the FBI flagged the conservative-oriented "#ReleaseTheMemo" hashtag (supporting Congressman Devin Nunes's investigation regarding Russia collusion) as supposed Russian inauthentic activity, and it suggests that the FBI induced Twitter to remove thousands of Tweets amplifying that hashtag.  Doc. 214-1, ¶ 943; *see also* Chan Ex. 1, at 71 (including the hashtag in a pie chart of 929,000 tweets removed as from "IRA-controlled accounts," including "#ReleaseTheMemo").   But at the time, Twitter's Global Policy Communications Chief Emily Horne wrote privately that this hashtag and a related hashtag "appear to be organically trending," and that Twitter "ha[s] not seen any indications that the accounts engaging in this activity for either hashtag are predominately Russian, or that Russian accounts are driving the engagement.  The vast majority of what we're seeing here … appears to be organic in nature.  Lots of prominent conservative Twitter accounts are using one or both of

these hashtags … This is inspiring a lot of both RTs and organic engagement."  *See* Ex. E to Supplemental Declaration of Tammy Glenn, ¶ 26 ("Glenn Supp. Decl.," attached as Exhibit 1). Yoel Roth himself suggested that Twitter could "broadly refute" the "swirl around #releasethememo" suggesting that the hashtag was Russian in origin, which evidently the FBI erroneously bought into.  Ex. F to Ex. 1 (Glenn Supp. Decl. ¶ 27).   Yoel Roth wrote at the time, "I just reviewed the accounts that posted the first 50 tweets with #releasethememo, and … none of them have any signs of being tied to Russia."  Ex. G to Ex. 1 (Glenn Supp. Decl. ¶ 28).  Another Twitter executive wrote, "Yoel and the IQ team have been monitoring engagement around both #ReleaseTheMemo and #SchumerShutdown and **engagement appears to be organic/not driven by "Russian bots."** … We investigated, found that engagement was overwhelmingly organic and driven by strong VIT [Very Important Tweeter] engagement (including Wikileaks, DJT Jr., Rep. Steve King, and others)."  Ex. H to Ex. 1 (Suppl. Glenn Decl. ¶ 29).

## ARGUMENT

The Government argues that the Court should prioritize protecting the freedom of *government officials* to speak freely to "promote government policies," instead of protecting private citizens' speech from government interference.  Doc. 266, at 102.  This argument is meritless.  The Government's description of its speech as merely "promot[ing] government policies" is manifestly contrary to the evidence.  *See supra*; *see also, e.g.,* Doc. 214-1, ¶ 34 (White House to Twitter on Tweet about Hank Aaron's death: "Hey folks – Wanted to flag the below tweet and am wondering if we can get moving on the process for having it removed ASAP."); *id.* ¶¶ 37-38 (White House to Twitter: "Please remove this account immediately…. Cannot stress the degree to which this needs to be resolved immediately.").  In fact, all the Government's examples in the following paragraph involve federal officials trying to suppress private citizens' speech, not

express their own messages.  Doc. 266, at 103.  And this Court has rejected the Government's legal argument: "[W]hile the government-speech doctrine is important—indeed, essential—it is a doctrine that is susceptible to dangerous misuse.  If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints."  Doc. 224, at 63 (quoting *Matal v. Tam*, 582 U.S. 218, 235 (2017)).  Here, the evidence shows much "more than the exercise of permissible government speech.  It alleges extensive and highly effective efforts by government officials to 'silence or muffle the expression of disfavored viewpoints.'"  *Id.* (quoting *Matal*, 582 U.S. at 235).

The Government also argues that it was combating false or incorrect information "during a pandemic that cost over a million Americans their lives," Doc. 266, at 102—implying that the First Amendment was suspended during COVID-19.  That argument is meritless.  The Supreme Court has made clear that even false or incorrect speech is protected by the First Amendment—precisely because the Government cannot be trusted to be a fair or accurate arbiter of truth and falsity, especially when it involves politically controversial questions.  "In light of the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme "Court has rejected as 'startling and dangerous' a 'free-floating test for First Amendment coverage ... [based on] an ad hoc balancing of relative social costs and benefits.'"  *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality op.) (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).  "Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth."  *Id.* at 728.  Just two days ago, Justice Gorsuch decried the fact that, "[a]long the way, it seems federal officials may have pressured social-media companies to suppress information about pandemic policies with which they disagreed."  *Arizona v. Mayorkas*, No. 22-592, Slip op. 6 (May 18, 2023 (Statement of Gorsuch, J.).

69

## I.     Plaintiffs Have Demonstrated Immediate Irreparable Injury.

Defendants argue that Plaintiffs have failed to demonstrate ongoing or imminent irreparable injury.  This argument fails.

### A.     Plaintiffs Experience Both Ongoing and Imminent Irreparable Injury.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  The evidence shows Plaintiffs are facing both ongoing and imminent irreparable injuries of this kind. *See* Doc. 214-1, ¶¶ 1366-1442.

#### 1.     The Private Plaintiffs face ongoing and imminent irreparable injury.

First, the Private Plaintiffs face ongoing and imminent irreparable injuries.  *See* Doc. 214-1, ¶¶ 1367-1411.  Every time the private Plaintiffs execute Declarations, they face both ongoing and imminent future acts of censorship.  *See* Docs. 10-3 (Bhattacharya Decl.); 10-4 (Kulldorff Decl.); 10-5 (Hoft Decl.); 10-7 (Kheriaty Decl.); 10-12 (Hines Decl.) (Declarations from June 2022).  The Court has held that the statements in these Declarations, which the Complaint incorporates, establish both ongoing and imminent irreparable injury.  Doc. 224, at 8-13 (detailing the evidence in these Declarations); *id.* at 34 (holding that "the Private Plaintiffs allege a substantial risk of future censorship injuries"); *id.* at 36 (noting that "Private Plaintiffs each allege that they have suffered past *and* ongoing censorship").  This Court held that the course of past censorship "raise[s] an inference that [Bhattacharya] is imminently likely to experience future acts of censorship," and that Kulldorff's Declaration "attests to ongoing injuries and support an expectation of imminent future injuries."  *Id.* at 36. Kheriaty, likewise, "attests to ongoing and expected future injuries."  *Id.* at 36-37.  And "Hoft and Hines attest to similar past, ongoing, and expected future censorship injuries."  *Id.* at 37.  These Declarations "are more than complaints of past wrongs," and "[t]he threat of future censorship is substantial, and the history of past censorship

70

is strong evidence that the threat of future censorship is not illusory or merely speculative." *Id.*  In addition, "Plaintiffs' request for an injunction does not merely seek to redress the initial imposition of their censorship penalties, but rather their continued maintenance and enforcement." *Id.*; *see also, e.g.,* Docs. 10-2 (Senger Decl.); 10-8 (Allen Decl.); 10-9 (Changizi Decl.); 10-10 (Kotzin Decl.); 10-11 (Kitchen Decl.); 10-14 (McCollum Decl.); 10-15 (Gulmire Decl.).

Further, on March 20, 2023, the Private Plaintiffs filed supplemental declarations attesting to the injuries that they experience, on a continuing and imminent basis, as *audiences* of the speech of others on social media.  *See* Docs. 227-5 (Bhattacharya Supp. Decl.); 227-6 (Kulldorff Supp. Decl.); 227-7 (Kheriaty Supp. Decl.); 227-8 (Hoft Supp. Decl.); 227-9 (Hines Supp. Decl.). Moreover, the Private Plaintiffs continue to experience ongoing, active, and imminent future censorship injuries to this day—including extensive injuries that have occurred since Plaintiffs filed their supplemental brief on March 6, 2023, including harms experienced up to the date of this filing.  *See* Second Supplemental Declaration of Jill Hines, ¶¶ 6-14 (attached as Exhibit 2); Second Supplemental Declaration of Jim Hoft, ¶¶ 5-14 (attached as Exhibit 3).

**2.     The Plaintiff States face ongoing and imminent future injuries.**

Likewise, the Plaintiff States face ongoing and imminent future injuries.  *See* Doc. 214-1, ¶¶ 1427-1442 (detailing injuries to Plaintiff States).  The evidence demonstrates "extensive federal censorship limiting the free flow of information on social-media used by 'millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State."  Doc. 224, at 26.  The evidence demonstrates a "federal regime of mass censorship," *id.* at 27, which is ongoing and expanding on every front.  *See supra*.  The States have every reason to expect that their injuries, and the injuries to their citizens, are both ongoing, imminent, and continuing.  This includes ongoing "injuries to the States' sovereign interest in the power to create and enforce a legal code." Doc. 224, at 29.  Defendants' "censorship program" is

"a federal assertion of authority to regulate matters that the States seek to control." *Id.* "[B]oth Louisiana and Missouri have adopted fundamental policies favoring the freedom of speech." *Id.* (citing Mo. Const. art. I, § 8 *and* La. Const. Ann. art. I, § 7). The evidence demonstrates "extra-legal, unauthorized action by Defendants" that interferes with these fundamental policies favoring their citizens' freedom of speech. *Id.*

The Declarations of Patrick Flesch, Doc. 10-6, and Ashley Bosch, Doc. 10-13, attest to the States' ongoing and imminent future injuries from large-scale federal censorship. *See also* Doc. 224, at 7. Mr. Flesch and Ms. Bosch explain that large-scale federal censorship obstructs state agencies' ability to access and understand their constituents' true beliefs and thoughts on matters of public concern, which is essential for the States to craft messages and public policies that are responsive to the States' concerns. *See* Doc. 10-6, ¶¶ 4-10; Doc. 10-13, ¶¶ 4-7. The Government's witness, Carol Crawford, attests to the very same injuries—that social-media censorship interferes with a government agency's ability to craft messages that are responsive to its constituents' actual thoughts and concerns. *See* Doc. 214-1, ¶¶ 590-595. She testifies that it is important for government "communicators to know what conversations occurs on social media because it helps us identify gaps in knowledge, or confusion, or things that we're not communicating effectively that we need to adjust." *Id.* ¶ 591. Social-media censorship interferes with this interest because "if they were deleting content we would not know what the themes are," and they could not "update communication activity" to address them. *Id.* ¶ 593.

Likewise, this Court has determined that the States have *parens patriae* standing to defend the diffuse censorship injuries experienced by a "substantial segment" of each States' population—*i.e.*, the millions of Missourians and Louisianans who no longer have access to a free and open public square on social media. *See* Doc. 224, at 22-28. Here, the evidence shows "extensive

federal censorship limiting the free flow of information on social-media platforms used by 'millions of Missourians and Louisianans, and very substantial segments of the populations of Missouri, Louisiana, and every other State," which afflicts "enormous segments of [the States'] populations." *Id.* at 26. Further, while this censorship continues, "the States and a substantial segment of their population are being 'excluded from the benefits that flow from participation in the federal system.'" *Id.* at 27 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,* 458 U.S. 592, 608 (1982)). The First Amendment is "one of the most important benefits bestowed by the federal Constitution." *Id.* The evidence shows ongoing federal censorship activities, which necessarily "are excluding the States and their residents form an important benefit 'meant to flow from participation in the federal system.'" *Id.* at 27-28 (quoting *Snapp,* 458 U.S. at 608).

### 3.    Defendants' censorship activities are continuing.

There is overwhelming evidence that Defendants' censorship activities are ongoing and will continue unabated, and expand, absent court intervention. These activities present an immediate, present, and imminent threat of future censorship injuries to Plaintiffs and virtually all citizens of Missouri and Louisiana.

Defendants argue that Plaintiffs cannot infer from Defendants' *past* misfeasance that they will continue to inflict future injuries. *See* Doc. 266, at 113-114. This argument is both factually and legally meritless. It is factually meritless because Defendants have engaged in widespread, repeated, and ongoing censorship activities, coupled with numerous public statements and private testimony indicating that they intend to continue and expand their censorship activities. *See, e.g.,* Doc. 214-1, ¶¶ 29-30, 193-197 (public threats from the White House of adverse legal consequences if platforms do not increase censorship of disfavored viewpoints, made throughout 2022); ¶¶ 188-199 (evidence that the White House continued to pressure platforms to censor speech through 2022); ¶¶ 200-211 (public statements from the White House indicating its intent to censor a whole

range of new topics); ¶¶ 424-425 (the Surgeon General's Office continues to pressure platforms into 2022); ¶¶ 561-562 (the CDC continues to engage with platforms on censoring "misinformation" on health-related topics, stating that its "focus is not solely on COVID. We're focusing on other topics" as well); ¶¶ 966-967 (Chan testifies that the FBI "just pretty much rolled into preparing for 2022"); ¶¶ 1094-1122 (extensive evidence that CISA is continuing, and intends to continue, its censorship activities, and expand them to address a wide range of new topics).  This Court has already drawn the compelling inference that these facts raise: "Plaintiffs easily satisfy the substantial risk standard. The threat of future censorship is substantial, and *the history of past censorship is strong evidence that the threat of further censorship is not illusory or merely speculative*."  Doc. 224, at 37 (emphasis added).  Here, the lengthy "history of past censorship," *id.*, that continues right up to the present day, combined with numerous statements of intention to increase and expand these efforts, demonstrates that Defendants pose an imminent threat of future censorship injuries on Plaintiffs.  Moreover, as this Court has also held, "Plaintiffs' request for an injunction does not merely seek to redress the initial imposition of their censorship penalties, but rather their continued maintenance and enforcement."  *Id.*

Defendants' argument is also legally meritless, because it relies almost entirely on acts of voluntary cessation that occurred after Defendants were sued, which courts appropriately view with great skepticism.  As their primary example of supposedly long-past conduct, Defendants argue that "CISA discontinued its switchboarding activities after the 2020 election …. Switchboarding efforts that ceased over two years ago … do not show ongoing or imminent irreparable harm."  Doc. 266, at 114.  But, as Scully admitted in his deposition and Geoff Hale's declaration concedes, CISA supposedly discontinued its "switchboarding" activities in "late April or early May 2022," *i.e.*, just after it had been sued in this case challenging its switchboarding

activities.  *See supra*; *see also* Doc. 214-1, ¶ 975; Doc. 266, at 77; Doc. 266-5, at 175.   Further, the record demonstrates that CISA took careful steps to ensure that its "switchboarding" would continue through alternative channels, as Lauren Protentis of CISA lobbied the platforms in the spring and summer of 2022 to provide state and local officials with alternative channels to submit their misinformation reports.   Doc. 214-1, ¶¶ 1094-1096.   "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is *absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur*." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (emphasis added).  Defendants cite no evidence that to show that it is "absolutely clear" that their censorship activities "could not reasonably be expected to recur," *id.*, and there is a mountain of evidence to the contrary.  *See also, e.g., West Virginia v. E.P.A.*, 142 S. Ct. 2587, 2607 (2022).

Defendants' agency-specific arguments fare no better.   In each case, the evidence demonstrates that the particular agency is fully committed to its federal censorship activities and intends to expand them as soon as it can get away with it.

First, Defendants claim that the White House poses no imminent threat of future censorship because Plaintiffs' claims "are based almost exclusively on public and private statements that occurred in 2021."  Doc. 266, at 115.  This argument fails for two reasons.  First, the evidence of the White House's COVID-19 censorship is not "based exclusively on … statements that occurred in 2021," *id.*; it includes extensive evidence of public and private demands for censorship that continued throughout 2022, up until Defendants made their document production.  *See* Doc. 214-1, ¶¶ 29-30 (White House statements calling for Section 230 reform unless platforms increase censorship in September 2022); ¶¶ 192-197 (Psaki making similar public threats in 2022); ¶¶ 198-199 (Flaherty insisting that platforms continue to send COVID insight reports so that the White

House could monitor their censorship of claims about early-childhood COVID vaccines).  Second, the evidence of White House censorship is not confined to speech about COVID vaccines.  Tthe White House has made a long series of recent public statements indicating that they are aggressively engaged in pushing for social-media censorship on other topics, like abortion, climate change, "misinformation" about "gender-affirming care," "gendered disinformation," "disinformation campaigns targeting women and LGBTQI+ individuals who are public and political figures, government and civic leaders, activists, and journalists," and so forth.  *See id.* ¶¶ 201-211.  In fact, the Government's brief *avows* that the White House will continue to push social-media platforms to censor disfavored viewpoints.  *See* Doc. 266, at 115 ("Urging … social media companies … to accept their role in the Nation's collective effort to combat the coronavirus was (and remains) an essential element of the Government's duty and responsibility…").  Here, "[t]he threat of future censorship is substantial, and the history of past censorship is strong evidence that the threat of further censorship is not illusory or merely speculative."  Doc. 224, at 37.

Next, the Government argues that CISA poses no imminent threat of future censorship because "CISA decided in April or May 2022 not to provide switchboarding services for the 2022 election cycle and has no intention of engaging in switchboarding for the next election."  Doc 266, at 116.  Defendants also note that "CISA has not participated in the USG-Industry meetings since the 2022 general election," *id.* at 118—thus conceding that CISA *did* participate in them during the most recent election cycle.  And Defendants note that CISA has ordered its unfortunately named "MDM Subcommittee" to "stand down in December 2022."  *Id.* at 118.  As noted above, all these are merely evidence of *post-litigation* voluntary cessation.  CISA's *pre-litigation* conduct and public statements demonstrate an extremely strong commitment and plan to expand its censorship activities.  *See, e.g.,* Doc. 214-1, ¶¶ 1094-1122 (extensive evidence of CISA's ongoing

commitment to and involvement in social-media censorship); ¶¶ 1094-1096 (Lauren Protentis lobbying platforms to set up an alternative channel for "switchboarding" in 2022); ¶ 1097 (CISA "regularly" sets up an "operation center" each election day that reports supposed "misinformation" to platforms in real time); ¶ 1098 (CISA continues to fund the Center for Internet Security's EI-ISAC, which continues to report election-related "misinformation" to platforms through 2022); ¶ 1114 (Director Easterly stated in November 2021 that CISA is "beefing up its misinformation and disinformation team"); ¶ 1107 (Easterly met with Facebook about the 2022 election cycle in January 2022); ¶ 1108 (Easterly's text messages in February 2022 state that she wants CISA to "play a coord role" on federal censorship "so that not every D/A is independently reaching out to platforms which could cause a lot of chaos," and that "[p]latforms have got to get comfortable with gov't"); ¶ 1110 (leaked copy of September 2022 quadrennial-review document for DHS calls for DHS to target "inaccurate information" on topics like "the origins of the COVID-19 pandemic and the efficacy of COVID-19 vaccines, racial justice, U.S. withdrawal from Afghanistan, and the nature of U.S. support to Ukraine"); ¶¶ 1111, 1115-1116  (Scully's testimony confirming that CISA is, in fact, working on disinformation projects on the efficacy of COVID vaccines, the origins of the COVID virus, the war in Ukraine, and "misinformation" that affects the "financial services industry," since all that "misinformation" supposedly threatens "critical infrastructure"); ¶ 1118 (CISA's Cybersecurity Advisory Committee recommending to Easterly that CISA expand its efforts to stop "the spread of false and misleading information" by "consider[ing] MD across the information ecosystem," including "social media platforms of all sizes, mainstream media, cable news, hyper partisan media, talk radio, and other online resources").  And, as of March 6, 2023, CISA's website continued to proclaim that "[t]he MDM team serves as a switchboard for routing disinformation concerns to appropriate social media platforms." *Id.* ¶ 1120.

As to the CDC, Defendants contend that "Plaintiffs' challenge looks to past actions."  Doc. 266, at 118.  Once again, the evidence tells a different story.  As late as June 29, 2022—shortly before Defendants made their document production—Crawford corresponded with YouTube about finding a government agency to debunk and censor claims about using progesterone to reverse chemical abortion.  Doc. 214-1, ¶ 561.  About this exchange, Crawford testified that the CDC's involvement in censorship is not limited to COVID and did not end with COVID: the CDC's "focus is not solely on COVID.  We're focusing on other topics. …  [YouTube] though we might be able to help with this topic as well," *id.* ¶ 562—which Crawford's response indicates that she did.  In response, Defendants point to the Crawford Declaration (Def. Ex. 80) to claim that the CDC has stopped communicating with platforms about misinformation, but that Declaration states: "To the best of my knowledge, since *March 2022*, there has not been a meeting between CDC personnel and personnel from a social media or technology company where misinformation has been discussed…."  Doc. 266-5, at 72 (Crawford Decl. ¶ 12) (emphasis added).  Thus, the CDC continued to meet with platforms about misinformation until just before this lawsuit was filed.

Next, Plaintiffs claim that NIAID poses no threat of future censorship because Dr. Fauci has now retired.  Doc. 266, at 121.  But Dr. Fauci has been replaced by Dr. Hugh Auchincloss, his former chief deputy, who was a key co-conspirator in Dr. Fauci's plots to discredit and suppress disfavored viewpoints through deception.  Dr. Auchincloss was the recipient of Dr. Fauci's notorious email at 12:29 a.m. on February 1, 2020, stating "Hugh: It is essential that we speak this AM.  Keep your cell phone on … You will have tasks today that must be done." Doc. 214-1, ¶ 640.  That email launched Dr. Fauci's conspiracy to censor the lab-leak theory on social media.

As to the GEC, Defendants argue that the GEC is no longer involved in flagging misinformation through the Election Integrity Partnership.  As the EIP report states, "groups that

78

reported tickets include *the State Department's Global Engagement Center*."  Doc. 214-1, ¶ 1197 (emphasis added).  Defendants rely on the Declaration of Leah Bray, Doc. 266-6, at 199-206 (Def. Ex. 142), but Bray makes a series of damning admissions that confirm the GEC's heavy involvement in censorship activities, including the EIP, and do nothing to allay the threat of future censorship.  Bray states that the GEC intends to "flag for social media companies examples of propaganda and disinformation … aimed at harming U.S. interests."  *Id.* at 204.  And Bray admits that, "[d]uring the 2020 U.S. election cycle, the GEC discovered certain posts an narratives on social media that originated from, were amplified by, or ***likely to be amplified*** by foreign malign influence actors … that sought to spread propaganda or disinformation about the 2020 election," and "the GEC flagged these posts and narratives for the Election Integrity Partnership (EIP) on ***approximately 21 occasions***."  *Id.* at 205 (emphasis added).  In other words, the GEC flagged— not just foreign-originated speech—but *domestic* speech, just because the GEC predicted that such domestic content was "likely to be amplified" by malign foreign actors.  *Id.*  This is a stunning admission.  So, too, is Bray's admission that the GEC flagged "posts or *narratives*" to the Election Integrity Partnership on "21 occasions."  *Id.*  Defendants also contend that the GEC has ceased its censorship activities with the EIP, but actually, Bray makes only one terse statement on this point: "Presently, the GEC is not doing any work with EIP."  *Id.* at 206.  That statement fails to provide any evidence of any firm commitment to withdraw from such activities in the future.

### 4.   Plaintiffs did not "unreasonably delay" in seeking relief.

Defendants argue that Plaintiffs engaged in "substantial delay in seeking relief" that "undermines any assertion that such harms are irreparable."  Doc. 266, at 126.  This argument contradicts black-letter law.  Ongoing First Amendment violations constitute irreparable injury, regardless of how long the injuries have already been occurring; "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod*

*v. Burns*, 427 U.S. 347, 373 (1976).  In any event, Plaintiffs did not unreasonably delay, but filed suit diligently when public evidence became available of Defendants' censorship activities. Indeed, the Government made this very argument in opposing Plaintiffs' motion for expedited preliminary-injunction-related discovery, Doc. 26, at 15-17, but the Court rejected it, and it is no more persuasive now.  Plaintiffs decisively refuted this argument in their reply in support of the motion for preliminary injunction, Doc. 30, at 12-14, and they incorporate by reference that refutation here.  *See id.* (citing, *inter alia*, *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012); *Arc of California v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014); and *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019)).

## II.    The Evidence Demonstrates That State and Private Plaintiffs Have Standing.

Defendants admit that their arguments on standing re-hash the lengthy arguments on standing in their motion to dismiss, which the Court has already rejected.  *See* Doc. 266, at 128-129 (acknowledging the Court's ruling on standing and stating that "Defendants respectfully disagree with the Court's analysis … and hereby incorporate by reference and reassert those arguments in opposition to Plaintiffs' request for preliminary relief").  Plaintiffs incorporate by reference their prior briefing on standing, and the Court's thorough, detailed, and well-reasoned analysis of Plaintiffs' standing in its order denying the motion to dismiss.  *See* Doc. 224, at 18-48. On the question of Article III injury, Defendants' additional arguments in their preliminary-injunction response largely rehash their arguments regarding irreparable injury.  Doc. 266, at 130-132.  These arguments are refuted in detail above.  *See supra*.

On both irreparable harm and standing, Defendants argue that Plaintiffs cannot show any link between their injuries and acts of censorship of third parties, such as Tucker Carlson, Tomi Lahren, Alex Berenson, the "Disinformation Dozen," and other speakers that are and continue to be targeted for censorship.  This argument is wrong for at least five reasons.  First, there is

extensive evidence that the Private Plaintiffs, like those other speakers, are directly targeted by federal censors: Drs. Bhattacharya and Kulldorff, as co-authors of the Great Barrington Declaration, were directly targeted by Drs. Fauci and Collins, Doc. 214-1, ¶¶ 783-808; Jim Hoft's *The Gateway Pundit* is constantly targeted by CISA, the Election Integrity Partnership, and the Virality Project, *id.* ¶¶ 1069, 1156, 1192, 1207-1216, 1324; and the Virality Project aggressively targets "health freedom" groups like Jill Hines's "Health Freedom Louisiana," *id.* ¶¶ 1266-1268, 1316-1323; among others.  Second, the Private Plaintiffs also attest that they follow and read the speech of many speakers explicitly targeted by federal censorship, such as Tucker Carlson, Alex Berenson, members of the Disinformation Dozen, dozens mentioned in the EIP and VP reports, and many others.  *See* Doc. 227-5, ¶ 5 (Bhattacharya Supp. Decl.); Doc. 227-6, ¶ 5 (Kulldorff Supp. Decl.); Doc. 227-7, ¶¶ 5-6 (Kheriaty Supp. Decl.); Doc. 227-8, ¶¶ 6-7 (Hoft Supp. Decl.); Doc. 227-8, ¶¶ 5-6 (Hines Supp. Decl.).  The censorship of any of these dozens of speakers by federal officials inflicts ongoing irreparable injury on the Private Plaintiffs as their audience members.  Third, the Court has upheld the *parens patriae* standing of the States to represent the interests of their millions of citizens who read and follow speakers on social media, who receive highly diffuse injuries each time federal officials squelch speakers and content they would otherwise read.  Doc. 224, at 22-28.  Fourth, the States suffer an ongoing battery of direct injuries from widespread social-media censorship, including direct censorship injuries, the loss of the ability to follow their constituent's views on politically sensitive topics, and the distortion of processes through which citizens petition them for redress of grievances.  *See id.* at 7-8 (describing the States' assertion of these injuries).  Fifth, Plaintiffs are likely to succeed in their motion for class certification, Doc. 227, which will result in their class-wide representation of all current and future speakers targeted by federal censorship activities, on an ongoing basis.

On the question of traceability and redressability, Defendants argue that "Plaintiffs must show that those content moderation actions would not occur 'in the absence of' those communications." Doc. 266, at 131. Plaintiffs have established this abundantly, by pointing to undisputed evidence of dozens of instances where it is perfectly clear that the content moderation would not have happened if federal officials had not flagged it or been involved. *See supra*. Finally, Defendants rely again on the woefully unconvincing analysis of Dr. Gurrea. Doc. 266, at 135-136. Dr. Guerra's analysis is refuted in detail above. *See supra*.

### III.   Plaintiffs Are Likely To Prevail on Their First Amendment Claims.

Defendants provide a lengthy discussion of state action that rehashes arguments made in their motion to dismiss on the same points. *See* Doc. 266, at 136-250. This Court has already considered and rejected most of these arguments. *See* Doc. 244, at 56-68.

As both the Supreme Court and this Court have stated, "[i]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish." Doc. 224, at 57 (quoting *Norwood v. Harrison*, 413 U.S. 455 (1973)). Defendants argue the exact opposite—that it is perfectly acceptable for federal officials to induce, encourage, and promote private persons to accomplish what they are constitutionally forbidden to accomplish, *i.e.*, the censorship of free speech on social media. That is incorrect.

Defendants argue that President Biden merely "exercise[s] … his bully pulpit" to encourage social-media platforms to censor disfavored viewpoints. But as this Court has noted, President Biden has done much more than that, including threatening the CEO of a major social-media platform with civil liability and criminal prosecution for not censoring disfavored speech. *See* Doc. 224, 62 (noting that, "almost directly on point with the threats in *Carlin* and *Backpage*, that President Biden threatened civil liability and criminal prosecution against Mark Zuckerburg

if Facebook did not increase censorship of political speech"); Doc. 214-1, ¶¶ 20-21 (quoting Biden's public threats).

Defendants argue that Plaintiffs' contention that the federal officials' pressure and collusion occurs "against the backdrop" of such public threats "suffers from a fatal chronological contradiction," because the lawsuit challenges many actions that occurred in 2020. Doc. 266, at 139. This argument is specious. Plaintiffs' evidence includes many such threats occurring in 2019 and before, *see* Doc. 214-1, ¶¶ 1-30—including now-President Biden's threat of civil liability and criminal prosecution for platforms that do not censor enough political speech, which were made in early 2020, which Biden was a candidate. *Id.* ¶ 20. Elvis Chan's testimony reveals a pressure campaign of public and private threats from federal officials against social-media platforms to induce them to censor election-related speech going back to 2017. *Id.* ¶¶ 945-961. Alex Stamos of the EIP, working closely with national-security agencies like CISA, pressured platforms to adopt more aggressive censorship policies in August 2020, *id.* ¶¶ 1147-1149, and attributes success to the fact that platforms (in 2020) feared "huge potential regulatory impact" in "the United States," *id.* ¶ 1234. Defendants' threats accelerated and became more menacing once they controlled the White House and both Houses of Congress in 2021—and censorship then accelerated too.

## A.    There Is Overwhelming Evidence of "Significant Encouragement."

In its discussion of "significant encouragement," the Government relies on *La. Div. Sons of Confederate Veterans v. City of Natchitoches*, 821 F. App'x 317, 320 (5th Cir. 2020). Doc. 266, at 144. But that case involved only a simple request from a local mayor to a private association to forbid the display of the Confederate battle flag in an annual parade, backed by no threat of legal sanctions or any other factor amounting to "significant encouragement." *See id.* Here, by contrast, the evidence includes "threats, some thinly veiled and some blatant, made by Defendants,"

including "threats that far exceed, in both number and coercive power, the threats at issue," Doc. 224, at 61, in cases like *Louisiana Division of Sons of Confederate Veterans*.

Defendants also rely heavily on the Ninth Circuit's recent decision in *O'Handley v. Weber*, 62 F.4th 1145, 1154 (9th Cir. 2023), which involved a state government office flagging posts to Twitter.  *See* Doc. 266, at 143-144.  This Court has already addressed *O'Handley* in detail, noting that the Ninth Circuit held that the government did "not threaten adverse consequences" and the plaintiff "failed to allege any threat or attempt at coercion aside from the takedown request."  Doc. 224, at 60; *see also id.* at 65 ("[T]he allegations here are distinguishable from those in *O'Handley*.").  The opposite is true here, and this case resembles *Backpage.com*, which endorsed "the more fundamental principle that a government entity may not employ threats to limit the free speech of private citizens."  Doc. 224, at 63 (citing *Backpage.com*, LLC, 807 F.3d at 235).  Thus, even if "significant encouragement" required a showing of "essential compulsion" as the Government contends, Doc. 266, at 145—an argument which would abolish the distinction between significant encouragement and compulsion—Plaintiffs have made a strong showing of "compulsion" here.  Defendants claim that "Plaintiffs are unable to cite a single factually analogous case supporting their position," Doc. 266, at 146, but in fact, *Backpage.com*, *Bantam Books*, *Carlin Communications*, and many other cases are directly analogous to Plaintiffs' position—as the Court has already held.  Doc. 224, at 62 (holding that the facts here are "almost directly on point with the threats in *Carlin* and *Backpage*").

Defendants also argue that "significant encouragement" can only be established by a showing of "positive incentives."  Doc. 266, at 146.  The Government cites no case so holding, but even if that were so, it would be satisfied here.  As the Court has noted, each of Defendants' threats carries with it an implied reward: "The Defendants' alleged use of Section 230's

immunity—and its obvious financial incentives for social-media companies—as a metaphorical carrot-and-stick *combined* with the alleged back-room meetings, hands-on approach to online censorship, and other factors discussed above transforms Defendants' actions into state action." Doc. 224, at 68; *see also* Doc. 84, ¶ 18 ("The flip side of such threats, of course, is the implied 'carrot' of retaining Section 230 immunity and avoiding antitrust scrutiny, allowing the major social-media platforms to retain their legally privileged status that is worth billions of dollars of market share.") (quoted at Doc. 224, at 5).

### 1.    The White House engages in significant encouragement.

Defendants' arguments that each individual agency's conduct falls short of "significant encouragement" applies an impossibly stringent version of the "significant encouragement" test that lacks support in the case law.  *See* Doc. 266, at 148-193.  They are factually meritless too.

Defendants argue that, to invoke the "significant encouragement" test, Plaintiffs must identify the "specific conduct of which the plaintiff complains."  Doc. 266, at 149 (quoting *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017)).  Even if that were the standard, Plaintiffs easily satisfy it.  They have submitted extensive evidence of specific actions of censorship by social-media platforms that are attributable to government pressure.  *See supra*.  Defendants argue that "the platforms have been moderating COVID-19 content … since at least January 2020, well before the White House Defendants took office."  Doc. 266, at 150.  But the evidence shows that, once the White House Defendants took office, the censorship that the platforms imposed on their own was not nearly enough for them, and they aggressively demanded more.

Defendants argue that Flaherty merely "requested information" to "better understand" their policies.  Doc. 266, at 151-152.  This gravely mischaracterizes the evidence.  *See supra*.

Defendants argue that "the Government has … an interest in urging social media companies to help in that effort [against COVID] by curbing the spread of potentially harmful

misinformation on their platforms."   Doc. 266, at 153.   On the contrary, under the First Amendment, the Government has no valid interest in pressuring private publishers to censor the private speech of American citizens.   This is especially true when the Government's "urging" of social-media platforms, *id.*, is backed by "threats, some thinly veiled and some blatant."   Doc. 224, at 61.   Defendants cite no case holding that the Government's alleged "power" to "encourage … actions deemed to be in the public interest" includes actions that would violate the Constitution if performed by the Government.   As *Norwood* stated: "[I]t is axiomatic that a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."   *Norwood*, 413 U.S. at 455 (quoted in Doc. 224, at 57).

Defendants argue that private citizens may flag perceived misinformation to social-media platforms, and they contend that "[i]t would be remarkable if the Government would be powerless to do the same."   Doc. 266, at 176.   Quite the contrary—the Government is bound by the First Amendment, and private citizens acting independently of government are not, so there is nothing "remarkable" about the fact that the Government is held to different standards than private persons.

Defendants argue that the White House requested the removal of posts "with no strings attached," Doc. 266, at 156.   On the contrary, the White House's communications with platforms are marked by a long series of express and implied threats, as discussed above.   *See supra*.

Defendants' discussion of the suspension and deplatforming of Alex Berenson, Doc. 266, at 159-160, gravely distorts the evidence.   As discussed above, the White House pushed Twitter to deplatform Alex Berenson in a private meeting in April 2022, but Twitter declined to do so, since Berenson was not violating their policies.   Doc. 214-1, ¶ 103.   Then, the White House and Dr. Fauci put coordinated public pressure to deplatform Berenson, and Twitter suspended him for the first time within hours of the culmination of that pressure campaign.   *Id.* ¶ 163.

86

## 2.     The Surgeon General engages in significant encouragement.

Defendants argue that the Surgeon General's Health Advisory cannot be viewed as a threat because it "uses only precatory language." Doc. 266, at 161. Even viewed in complete isolation, the Advisory's urgent demands for greater censorship of disfavored viewpoints violate the First Amendment. *See Norwood*, 413 U.S. at 455. Moreover, the Health Advisory did not occur in isolation. It was announced at a press conference where Psaki made public demands against social-media platforms and Dr. Murthy accused them of "poisoning" and demanded "accountability" against them; it was closely followed by the President's comment "They're killing people" and a battery of threats of adverse legal consequences from Psaki and White House Communications Director Kate Bedingfield; and both preceded and followed by a long campaign of private pressure and threats in covert meetings between the platforms, the White House, and the Surgeon General and his staff. *See supra.* Defendants rely on the district courts' opinions in *Hart v. Facebook, Inc.*, No. 22-cv-737, 2022 WL 1427507, at *7 (N.D. Cal. May 5, 2022), and *Changizi v. HHS*, 602 F. Supp. 3d 1031, 1056 (S.D. Ohio 2022), *see* Doc. 266, at 161-162, but this Court has already rejected their reliance on those cases. Doc. 34, at 7-8; Doc. 224, at 42-43.

Defendants argue that there is no evidence that Facebook took any steps in response to the Advisory. Doc. 266, at 163. The evidence directly contradicts this claim, as it shows that Dr. Murthy and Eric Waldo specifically requested that Facebook (and other platforms) report back in two weeks to tell OSG what "new/additional steps you are taking with respect to health information in light of the advisory," Doc. 214-1, ¶ 364; and, exactly two weeks later, Facebook provided a long, detailed report on "new steps that Facebook is taking," including "further policy work to enable stronger action against persistent distributors of vaccine misinformation." *Id.* ¶¶ 374-377. Contrary to Defendants' reliance on Facebook's public statements, Doc. 266, at 164-165, this email to OSG details *additional* steps against the "Disinformation Dozen." Doc. 214-1, ¶ 375.

Defendants likewise err when they characterize the Surgeon General's statements as mere "broad stances" on policy that merely "embody the Government's right to speak for itself."  Doc. 266, at 166 (cleaned up) (quoting *Changizi*, 602 F. Supp. 3d at 1054).  The "Government's right to speak for itself" does not extend to demanding and pressuring private parties to silence disfavored viewpoints.

Defendants argue that the Surgeon General's RFI constituted neither a demand nor a threat.  Doc. 266, at 167-168.  As discussed above, both the plain text of the RFI and its context—coming after a long campaign of joint pressure from the White House and OSG—demonstrate the opposite.  *See supra*.  In particular, the Surgeon General both preceded and followed the RFI with public statements calling for government "safety standards" and "speed limits" to be imposed on platforms that host misinformation—a clear threat of government regulation, accompanied by a formal RFI that is an ordinary precursor to regulation.  Doc. 214-1, ¶ 410, 423.  *See also* Doc. 224, at 61 (noting that "the Surgeon General issued a formal 'Request for Information' to social-media platforms as an implied threat of future regulation to pressure them to increase censorship").

**B.    There Is Overwhelming Evidence of Coercion.**

Defendants argue that the evidence fails to demonstrate coercion under cases like *Bantam Books*.  Once again, the Court has already considered and rejected most of their arguments, holding that the facts alleged in the Complaint—which the evidence strongly supports—constitute coercion.  *See* Doc. 224, at 62 ("The Court finds that the Complaint alleges significant encouragement and coercion that converts the otherwise private conduct of censorship on social-media platforms into state action, and is unpersuaded by Defendants' arguments to the contrary."); *see also id.* (noting that Plaintiffs have identified "threats that far exceed, in both number and coercive power, the threats at issue" in other cases involving government coercion).

First, Defendants rehash their "specific conduct" argument.  Doc. 266, at 170.  This argument has no merit.  Plaintiffs allege extensive threats—both broad public threats providing the backdrop for the private pressure, and express and implied threats made in private—to induce social-media platforms to censor viewpoints disfavored by federal officials.  *See supra*; *see also, e.g.,* Doc. 214-1, ¶¶ 1-30.  Each time a federal official or agency pressures, colludes, or cajoles a platform to censor COVID or election-related speech, he or she does so against the backdrop of a clear message from the President, from a battery of senior White House officials, and from their allies in control of Congress: Comply with federal demands for censorship, or else suffer ruinous legal consequences.  *See id.*  Each specific demand, request, cajoling, or act of flagging draws coercive force from that ceaseless battery of threats.

Defendants argue that they "made no threats and instead sought to persuade."  Doc. 266, at 171.  But the evidence contains a long series of specific threats of adverse legal consequences.  The Court has described the same threats as follows: "Specifically, Plaintiffs allege and link threats of official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and suppression of speakers and viewpoints that government officials disfavor."  Doc. 224, at 61-62.  The evidence includes "blatant" threats "made by Defendants in an attempt to effectuate [the] censorship program."  *Id.* at 61.  Defendants claim that *Bantam Books*, 372 U.S. at 60-62, is distinguishable because "there is no evidence that any Defendant asserted that the content moderation choices of social media companies would result in criminal (or civil) proceedings, or retaliatory government action of any kind."  Doc. 266, at 171.  On the contrary, "President Biden threatened civil liability and criminal prosecution against Mark Zuckerburg if Facebook did not increase censorship of political speech," Doc. 224, at 62; and the evidence "link[s] threats of

89

official government action in the form of threats of antitrust legislation and/or enforcement and calls to amend or repeal Section 230 of the CDA with calls for more aggressive censorship and suppression of speakers and viewpoints that government officials disfavor." Doc. 224, at 61-62. As *Bantam Books* held, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." 372 U.S. at 68. So also here, private companies do not "lightly disregard," *id.*, demands and threats coming from "the highest (and I mean highest) levels of the WH." Doc. 214-1, ¶ 108.

Citing the Ninth Circuit's decision in *Doe v. Google LLC*, No. 21-16934, 2022 WL 17077497, at *2 (9th Cir. Nov. 18, 2022) (unpub.), Defendants argue that "remarks by government officials that 'lack force of law' are 'incapable' of sustaining a coercion theory." Doc. 266, at 173. On the contrary, "any suggestion that a threat must be enforceable in order to constitute coercive state action is clearly contradicted by the overwhelming weight of authority." Doc. 224, at 62 (citing numerous cases). As Judge Posner wrote in *Backpage.com*—where Sheriff Dart lacked legal authority to take any action against the credit-card companies that he pressured to stop doing business with Backpage, *see* 807 F.3d at 230—"the fact that a public-official defendant lacks direct regulatory or decisionmaking authority over a plaintiff, or a third party that is publishing or otherwise disseminating the plaintiff's message, is not necessarily dispositive." *Id.* "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Id.* at 230-31. "[S]uch a threat is actionable and thus can be enjoined even if it turns out to be empty—the victim ignores it, and the threatener folds his tent. But the victims in this case yielded to the threat." *Id.* at 231.

90

The facts of this case bear no resemblance to the cases cited by Defendants, which involved little or no evidence of pressure of any kind.  *See* Doc. 266, at 174.  In *VDARE*, as Defendants admit, the mayor had "publicly encouraged a resort to 'be attentive to the types of events they accept,' and the resort then cancelled its contract to host the … plaintiff's conference." *Id.* (citing *VDARE*, 11 F.4th at 1156-57, 1163-68, 1171-72).  *R.C. Maxwell* involved "a letter from the Borough Council" that "could brandish nothing more serious than civil or administrative proceedings under a zoning ordinance not yet drafted." *Id.* (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 86 n.2, 88 (3d Cir. 1984)).  *Hammerhead Enterprises* involved municipal "letters urging department stores not to sell a disfavored board game," where there was "no credible evidence … that any store decided not to carry the board game as a result of [the] letter." *Id.* (quoting *Hammerhead Enterprises v. Brezenoff*, 707 F.2d 33, 36-37 & n.2 (2d Cir. 1983)).  Here, by contrast, Defendants made repeated, credible threats to strip the platforms of Section 230 liability—a "hidden subsidy worth billions of dollars," and "a fearsome cudgel against ever untouchable companies," Doc. 214-1, ¶ 2; and to impose antitrust liability on them, which (according to Mark Zuckerberg) is an "existential threat" to the platforms, *id.* ¶ 3.

Defendants rely on *Playboy Enterprises v. Meese*, 639 F. Supp. 581, 583-85 (D.D.C. 1986). In that case, the government did not threaten adverse legal consequences, but merely threatened to engage in *further speech* about the plaintiffs' conduct—*i.e.*, it "sent retailers a letter suggesting that if they continued to sell adult magazines, they would be named in the Commission's public report." Doc. 266, at 175.  The evidence portrays a very different picture here.  A promise to speak publicly about a corporation's alleged misdeeds is not the same as a threat to impose ruinous legal consequences on a corporation.  The same principle distinguishes the Government's other cases, which Defendants admit involved "no actual or threatened imposition of government power or

sanction." Doc. 266, at 176 (quoting *Am. Family Ass'n*, 277 F.3d at 1120, 1125). Even an implied threat of consequences violates the First Amendment, *see Rattner v. Netburn*, 930 F.2d 204, 209-210 (2d Cir. 1991), while here the threats are "blatant." Doc. 224, at 61.

Defendants suggest that these threats are "fanciful," Doc. 266, at 178. Not so. They lie directly within Defendants' authority: "[T]he threats became more forceful once the Biden Administration took office and gained control of both Houses of Congress, indicating that the Defendants could take such actions with the help of political allies in Congress. Additionally, the Attorney General, a position appointed by and removable by the President, could, through the DOJ, unilaterally institute antitrust actions against social-media companies." Doc. 224, at 62.

Defendants rely on a series of statements from Jennifer Psaki that the platforms are the ones who "make decisions about what information should be on their platforms." Doc. 266, at 181. But the mere fact that the platforms make those decisions is fully consistent with federal officials exercising undue pressure and collusion on platforms to influence how they are made— which is exactly what they did, starting with Psaki herself. *See* Doc. 214-1, ¶¶ 123-124 (Psaki stating that the President "supports ... a robust anti-trust program. So his view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public.").

Defendants contend that federal officials have not "said they would refrain from advocating changes to § 230, or pursuing potential remedies under the antitrust laws, if social media companies intensified their content moderation measures." Doc. 266, at 185. Even if this were relevant, it is incorrect. One threat "warned Facebook and Google that they had 'better' restrict ... harmful content or face regulation." Doc. 214-1, ¶ 18. Another threatener aptly summarized the campaign of threats, "Let's see what happens just by pressuring them." *Id.*

Defendants complain that some of the cited threats come from "*nondefendant* Representatives and Senators," Doc. 266, at 186, but those threats from powerful members of Congress, in addition to having their own force, reinforce the Executive Branch's threats—especially because one of the chief threatened consequences, Section 230 reform, requires *joint* action by the President and Congress.  Defendants cite the Ninth Circuit's unpublished opinion in *Doe*, but that case challenged only a tiny handful of statements by individual legislators, not a coordinated, sustained campaign of threats from both the Executive Branch and its political allies in Congress.  *See Doe*, 2022 WL 17077497, at *2-3.

Defendants claim that statements in congressional hearings cannot be coercive because Congress is an "investigatory body" that "studies … proposed laws" and "surveys defects in our social, economic and political system."  Doc. 266, at 187 (quoting *Trump v. Twitter*, 602 F. Supp. 3d at 1224).  On the contrary, Defendants' own witness, Elvis Chan, testifies that Congress very effectively pressures social-media platforms to increase censorship by forcing their CEOs to testify and raking them over the coals.  *See* Doc. 214-1, ¶¶ 947-949.  Chan specifically concludes that "that kind of scrutiny and public pressure from Congress … motivated them to be more aggressive in the account takedowns."  *Id.* ¶ 947.  Defendants argue that Congress itself may be protected by the Speech and Debate Clause—but no Members of Congress are Defendants here, and Plaintiffs cite the congressional threats as part of an overarching campaign that is ultimately spearheaded by Executive officials, who are Defendants here.

Defendants contend that the congressional statements could not "reasonably have been understood by social media companies as 'threats.'"  Doc. 266, at 188.  On the contrary, that is the *only* way those statements could reasonably be understood.  *See, e.g.*, Doc. 214-1, ¶¶ 8, 9, 10, 11, 14, 15, 16, 18.  A couple examples illustrate: "There is only one comparison that remotely

approaches the avarice and moral discrepancy of your companies, and that is the slavetocracy burden of our Nation's shameful and inhumane and most difficult dark days in the past. … I can't wait until we come up with legislation that will deal with you and your cohorts in a very, very effective way." *Id.* ¶ 11.  "Let's see what happens by just pressuring them." *Id.* ¶ 18.

Defendants contend that the Attorneys General of Missouri and Louisiana have participated in anti-trust enforcement actions against social-media platforms.  Doc. 266, at 192-193.  But anti-trust enforcement, standing alone, does not violate the First Amendment.  What violates the First Amendment is leveraging the *threat* of antitrust enforcement to pressure private companies to censor First Amendment-protected speech.  That is what the federal Defendants have done. Defendants cite no evidence that the state Attorneys General have done so, and none exists.

Defendants argue that Plaintiffs "mischaracteriz[e] … § 230 as an unconstitutional subsidy." Doc. 266, at 193.  Defendants mistake the significance of the *de facto* subsidy of Section 230 immunity, which operates in conjunction with the other factors to support a finding of state action.  As this Court held:

> [S]imilarly to *Skinner* and *Hanson*, several specific factors combine to create state action. Section 230 of the CDA purports to preempt state laws to the contrary, thus removing all legal barriers to the censorship immunized by Section 230. Federal officials have also made plain a strong preference and desire to "share the fruits of such intrusions," showing "clear indices of the Government's encouragement, endorsement, and participation" in censorship, which "suffice to implicate the [First] Amendment." *Skinner*, 489 U.S. at 615– 16. … The Complaint further explicitly alleges subsidization, authorization, and preemption through Section 230, stating: "[T]hrough Section 230 of the Communications Decency Act (CDA) and other actions, the federal government subsidized, fostered, encouraged, and empowered the creation of a small number of massive social-media companies with disproportionate ability to censor and suppress speech on the basis of speaker, content, and viewpoint."  Section 230 immunity constitutes the type of "tangible financial aid," here worth billions of dollars per year, that the Supreme Court identified in *Norwood*, 413 U.S. at 466. This immunity also "has a significant tendency to facilitate, reinforce, and support private" censorship. *Id.* Combined with other factors such as the coercive statements and significant entwinement of federal officials and censorship decisions on social-media platforms, as in *Skinner*, this serves as another basis for finding government action.

Doc. 224, at 65-66; *see also Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989); *Norwood*, 413 U.S. at 466; *Ry. Emp. Dep't v. Hanson*, 351 U.S. 225, 231–32 (1956).

**C.    Deceiving Platforms Into Censoring Speech Constitutes State Action.**

Defendants argue that "'deception' is not an independent legal basis" to find state action. Doc. 266, at 194.  Thus, on Defendants' view, government officials are free to trick, deceive, and dupe private parties into violating others' constitutional rights with impunity.  This is incorrect. "It is axiomatic that a state may not induce … private persons to accomplish what it is constitutionally forbidden to accomplish."  *Norwood*, 413 U.S. at 455.  Deceiving someone into doing something is a common method of "inducing" them to do it.  Thus, government officials may not *deceive* private parties into violating others' constitutional rights.  *Id.*

That is the reasoning of *George v. Edholm*, 752 F.3d 1206 (9th Cir. 2014), where the Ninth Circuit held that police officers who provide false information to a doctor about an arrestee's medical condition, to fraudulently induce the doctor to perform a body-cavity search, are involved in state action.  *Id.* at 1213.  In *George*, there was evidence that the police officers had knowingly provided false information to the doctor that the plaintiff was suffering from cocaine toxicity and having seizures, to induce the doctor to perform an anal-cavity search for a concealed baggie of cocaine base.  *Id.*  The Ninth Circuit held that this evidence precluded summary judgment in the officers' favor, as the officers' act of deceiving the doctor rendered the doctor's conduct, induced by government deception, state action for which the officers were liable.  *Id.* at 1215.  The Ninth Circuit reasoned that "[a] reasonable jury could conclude that Officers Freeman and Johnson gave false information about George's medical condition to the hospital staff and to Dr. Edholm, with the intent of inducing Edholm to perform an invasive search."  *Id.*  "Based on this evidence, a reasonable jury could find that Freeman and Johnson provided 'significant encouragement, either

overt or covert,' to Dr. Edholm, and that they 'induced, encouraged or promoted' Edholm to do what he would not otherwise have done, such that Edholm's actions are attributable to the state." *Id.* at 1216 (cleaned up) (quoting, *inter alia*, *Norwood*, 413 U.S. at 455).

To be sure, as the Government insists, *George* also noted that the officers had provided "active physical assistance" while the doctor performed the search.  *Id.* at 1216.  But nothing in *George* suggests that "active physical assistance" is *required* to make state agents responsible for private conduct that they induce by fraud—the Ninth Circuit merely cited it as an additional factor supporting the finding of state action.  *See id.*

Judge Posner's opinion in *Jones v. City of Chicago* removes any doubts on this score.  856 F.2d 985, 994 (7th Cir. 1988).  *Jones* held that police officers who provided false information to prosecutors to induce them to arrest and prosecute a plainly innocent defendant were liable for the subsequent action of the prosecutors: "[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."  *Id.* (emphasis added).  Nothing in *Jones* indicates that, to be liable for the subsequent bad-faith prosecution, the officers must also "actively physically assist" the prosecution.  *Id.*   Rather, as Judge Posner wrote, "[i]f police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.  They cannot hide behind the officials whom they have defrauded."  *Id.*

This holding, moreover, is rooted in universal principles of agency law, which holds that individuals are responsible for actions that they deceive and manipulate others into performing. As the Fourth Circuit has stated, a person "cannot insulate himself from punishment by

96

manipulating innocent third parties to perform acts on his behalf that would be illegal if he performed them himself." *United States v. Rashwan*, 328 F.3d 160, 165 (4th Cir. 2003). "Whether or not Rashwan physically produced the false documents himself is irrelevant to his" legal responsibility, when he induced others to do so by providing false information. *Id.* Where third parties' actions "were dependent in that they relied upon the falsified statements and testimony produced by the defendants in making their respective decisions," the defendants are responsible for them. *Robinson v. Maruffi*, 895 F.2d 649, 656 (10th Cir. 1990); *see also Smiddy v. Varney*, 803 F.2d 1469, 1471 (9th Cir. 1986) (holding that "officers [who] knowingly submitted false information" are liable for prosecutorial decisions made in reliance on that false information).

Thus, as expounded in *George*, a federal official who [1] "gave false information" to a private party [2] "with the intent of inducing" the private party to engage in conduct that, if performed by the federal official directly, would violate constitutional rights, is himself responsible for that constitutional violation, and the private party's conduct is government action. *George*, 752 F.3d at 1215. The evidence shows that the FBI, Dr. Fauci, and others satisfy this test.

The Government contends that the FBI's conduct in orchestrating the suppression of the Hunter Biden laptop story was not deceitful. Doc. 266, at 196-200. The evidence regarding the FBI's and CISA's involvement in the deception is discussed in detail above, and it refutes the Government's arguments here. *See supra*. The Government (Doc. 266, at 196) disputes Plaintiffs' claim that the FBI had "no investigative basis" to anticipate a "hack-and-leak" operation, but the Government admits that Chan testified that "we were not aware of any hack-and-leak operations that were forthcoming or impending," *id.*, which is exactly what it means to lack any "investigative basis" for the deceitful warnings. The Government argues that the FBI did have a "factual basis" for the warnings, *id.* at 196-917, but the only factual basis it supplies is the assertion that there had

been a hack-and-leak operation in 2016, *id.*—which was the only factual basis that Chan supplied in his deposition.

The Government argues that the FBI warned only of "possible" hack-and-leak operations from "an abundance of caution," *id.* at 197, but the evidence tells a different story.  As Mark Zuckerberg described those warnings in October 2020, shortly after they were made, the FBI "in private meetings … suggested that we be on *high alert and sensitivity* that if a trove of documents appeared that we should view that with suspicion." Doc. 214-1, ¶ 902 (emphasis added).  That is a far cry from warning of "possible" hack-and-leak operations from "abundance of caution."  Clearly, the platforms were deceptively led to *expect* such an operation, and when the Hunter Biden laptop story appeared, it fit the bill precisely.

The Government argues that "statements during the Trump Administration … place the allegedly improper warning Chan described in proper context."  Doc. 266, at 197.  But those warnings referred only to "the covert distribution of propaganda or disinformation," *id.* (quoting 83 Fed. Reg. 46,843)—none refers to a supposed "hack and leak" operation involving Hunter Biden, and none calls for censorship of private speech on social media. *See id.* at 197-198.

Finally, the Government relies on Yoel Roth's congressional testimony from February 2023 to dispute his own prior statement from December 2020 that federal officials warned platforms that the hack-and-leak operation "would involve Hunter Biden."  Doc. 266, at 199-200. As discussed above, Yoel Roth's contemporaneous account from December 2020 is much more credible. *See supra*.  Moreover, that detail, while particularly damning, is not dispositive.  Given the undisputed facts that the FBI had the laptop in its possession and knew that the laptop was not "hacked materials," the evidence creates a compelling inference of deliberate deception regardless of whether the bogus "hack-and-leak" warnings mentioned Hunter Biden specifically.

**D.      There Is Overwhelming Evidence of Joint Participation and Conspiracy.**

Defendants argue that Plaintiffs' facts do not support a finding of joint participation or conspiracy/collusion between federal officials and platforms or third parties that could support a finding of state action.  Doc. 266, at 213-216.  On the contrary, the evidence demonstrates the Defendants' conduct satisfies all the factors that the Government cites.

As an initial matter, to the extent that Defendants contend that "conspiracy" with private parties is not a basis for finding state action, their own case contradicts them: "One way a private citizen may be a state actor is if she 'is involved in a conspiracy or participates in joint activity with state actors.'"  *Moody v. Farrell*, 868 F.3d 348, 352 (5th Cir. 2017) (quoting *Ballard*, 413 F.3d at 518).  The record contains extensive evidence of such "conspiracy," or meeting of the minds between federal officials and platforms to censor disfavored viewpoints.  It also shows the Government "acting as a joint participant" with platforms and third parties, establishing "position[s] of interdependence" with platforms and third parties, engaging in "interlocking" behavior and "heavy participation" with them, and playing a "meaningful role" in the censorship of private speech.  Doc. 266, at 214.  In Defendants' own words, federal officials "have played an affirmative role in the particular conduct underlying the plaintiff's grievance."  *Id.*

This Court came to the same conclusion based on the facts alleged in the Complaint, which the evidence here establishes.  *See* Doc. 224, at 62-68.  As the Court held, those facts "demonstrate more than an 'arms-length' relationship."  *Id.* at 66.  The evidence shows "a formal government-created system for federal officials to influence social-media censorship decisions."  *Id.*  "For example," the evidence shows "that federal officials set up a long series of formal meetings to discuss censorship, setting up privileged reporting channels to demand censorship, and funding and establishing federal-private partnership to procure censorship of disfavored viewpoints."  *Id.*  The evidence shows "that Defendants specifically authorized and approved the actions of the

social-media companies" and provides "dozens of examples where Defendants dictated specific censorship decisions to social-media platforms." *Id.* These facts "are a far cry from the complained-of action in *O'Handley*: a single message from an unidentified member of a state agency to Twitter." *Id.*

"Further, similarly to *Skinner* and *Hanson*, several specific factors combine to create state action." *Id.* Among other things, "[t]he Defendants' alleged use of Section 230's immunity—and its obvious financial incentives for social-media companies—as a metaphorical carrot-and-stick *combined* with the alleged back-room meetings, hands-on approach to online censorship, and other factors discussed above transforms Defendants' actions into state action." *Id.* The evidence now shows that "Section 230 … has …become a tool for coercion used to encourage significant joint action between federal agencies and social-media companies." *Id.*

Defendants' legal arguments to dispute these conclusions are meritless. Citing *O'Handley*, Defendants argue that there is no "meeting of the minds" and that each platforms "independently applies its terms of service," free from federal influence. Doc. 266, at 215. The evidence directly contradicts this claim, and this Court has already distinguished *O'Handley* on that basis. Doc. 224, at 66. Defendants argue that Plaintiffs rely only on "generalized statements about working together to counteract the dissemination of election misinformation," Doc. 266, at 215, but the evidence shows "dozens of examples where Defendants dictated specific censorship decisions to social-media platforms." Doc. 224, at 66.

Defendants rely heavily on *Howard Gault Co. v. Texas Rural Legal Aid, Inc*., 848 F.2d 544 (5th Cir. 1988), *see* Doc. 266, at 215-216, but that case strongly supports Plaintiffs. *Howard Gault* found state action in the conduct private growers opposing a strike by onion harvesters, where the private growers worked closely with government attorneys who were simultaneously representing

both the government and private interests. *See id.* at 552. The Fifth Circuit held that "[b]y acting together with various state officials, who must have been acting in their official capacities, and in obtaining significant aid therefrom, the growers acted under color of state law." *Id.* The Fifth Circuit cited "the growers' interlocking relationships" with the government officials as "sufficient to characterize the growers as state actors." *Id.* In so holding, the Fifth Circuit emphasized state action may be found based on unique circumstances that do not "fit neatly" into preexisting tests: "State action can manifest itself in a variety of ways and certain actions may not fit neatly into a particular category. This is a case where the activity simply does not fit squarely within any of the previously drawn categories." *Id.* The Fifth Circuit held that "[t]he action taken by the growers cannot be viewed in a vacuum." *Id.* at 555. Rather, "[t]he interlocking activities of the State … and the growers constituted a joint effort which justified the lower court's characterization of the growers as state actors," where there was "heavy participation of state and state officials" in the private conduct. *Id.*

The facts of *Howard Gault* are closely akin to what the evidence shows here—*i.e.*, "interlocking relationships" of federal officials, third parties, and platforms through the Election Integrity Partnership and Virality Project, as well as between the FBI and its endless meetings and flagging with platforms; "heavy participation" of federal officials in content-moderation decisions through the EIP, the VP, CISA, the FBI, and the CDC; federal officials "acting together" with private parties to procure the censorship of speech, extensively through the EIP and VP, the FBI and the CDC; and private parties obtaining "significant aid" from federal officials in such censorship, as when CISA took numerous steps with the Stanford Internet Observatory to launch the Election Integrity Partnership and Virality Project. *Id.*

### 1.      The CDC and Census Bureau engage in joint participation.

Notwithstanding the extensive evidence of serial flagging, "BOLO" meetings, slide decks of disfavored posts, privileged reporting channels, and *de facto* censor status for the CDC, Defendants contend that the CDC and its censorship partner, the Census Bureau, did not engage in any "joint participation" with platforms on censorship.  Doc. 266, at 216-224.  The evidence, as discussed above, contradicts the Government's account.  *See supra*.

Defendants argue that "Plaintiffs fail to identify any *specific* content moderation decision" involving the CDC and Census Bureau.  Doc. 266, at 217.  On the contrary, the evidence includes long lists of specific posts, example posts, and categories of claims that the CDC and the Census Bureau flagged or debunked and induced platforms to censor.

Defendants dispute that platforms effectively "ceded authority" to the CDC over whether claims would be censored.  Doc. 266, at 219.  But the evidence shows that Facebook's content-moderation official notified the CDC that Facebook would remove content that is (1) false, and (2) likely to cause harm or vaccine hesitancy; and then repeatedly asked the CDC to confirm that long lists of claims were (1) false, and (2) likely to cause harm or vaccine hesitancy.  Doc. 214-1, ¶¶ 489-505, 518-530.  Then, when the CDC happily obliged—knowing full well, on Carol Crawford's admission, that its input would necessarily cause the censorship of those claims— Facebook thanked the CDC and reported back that, "as a result of our work together," those claims had been censored.  *Id.* ¶ 519, *see also id.* ¶ 526 (Facebook "shar[ing] updates we made as a result of our work together").  The evidence shows the CDC played a similar role for other platforms. *See id.* ¶¶ 540-542, 547-548.  Defendants contend that the CDC merely "provide[d] input" and "factual information," Doc. 266, at 219, but Crawford admitted that, in fact, "I know that they're using our scientific information *to determine their policy*."  *Id.* ¶ 529 (emphasis added).

Defendants argue that having "regular meetings" and receiving CrowdTangle reports do not show state action, Doc. 266, at 218-219, but as *Howard Gault* held, such "regular meetings" and censorship-related reports "cannot be viewed in a vacuum."  848 F.2d at 555.  Moreover, Defendants effectively admit that those "regular meetings" involved the CDC repeatedly flagging misinformation and debunking it for censorship: "to the extent the meetings did touch on misinformation, the focus was on narratives that the companies or CDC observed circulating on platforms and the information available from CDC that would respond to those narratives."  Doc. 266, at 218.  Such "regular" flagging-and-debunking meetings, even in isolation, far exceed the conduct at issue in *O'Handley*.  Defendants argue that the evidence shows "mere acquiescence" in platforms' censorship decisions, Doc. 266, at 220-221, but that is insupportable.  The evidence shows the CDC and Census Bureau as a close partner, trusted flagger, and *de facto* censorship authority working in close conjunction with platforms over dozens upon dozens of meetings and communications, all geared toward removing disfavored viewpoints from social media.

## 2.    The FBI engages in conspiracy and joint participation.

The FBI, likewise, engages in extensive joint participation with platforms on censorship. This includes nearly endless meetings—including both frequent USG-Industry meetings, and equally frequent bilateral meetings with eight major tech platforms; serial flagging of content for removal, including detailed lists of accounts, URLs, content to be removed "one to five times per month"; real-time flagging operations from "command posts" on election day; frequent demands for reports from platforms on whether they have censored content flagged by the FBI; and a "50 percent success rate" in getting content removed.  *See supra*.

Defendants argue that the platforms never "ceded control" over their content-moderation decisions to the FBI.  Doc. 266, at 224.  Even if that were true, it would make no difference to the conspiracy and joint-participation theories of state action, neither of which requires domination or

"control" by the government actor.  In any event, Elvis Chan attests that the platforms' cooperation in the FBI's ceaseless demands to censor supposed malign foreign influence was a direct result of a coordinated campaign of pressure from federal officials.  Doc. 214-1, ¶¶ 945-961.

Defendants rely heavily on their claim that the FBI reports misinformation about the "time, place, and manner" of voting to platforms.  Doc. 266, at 226-227.  The FBI's interpretation of 18 U.S.C. § 241, which it relies on to justify this flagging, is textually strained, *see* Doc. 266-6, at 458-460 (Knapp Decl. ¶¶ 21-24), and raises grave constitutional questions under *Alvarez*, 567 U.S. at 717.  The Court need not decide these issues, however, because the overwhelming majority of the FBI's flagging activity addresses "tactical indicators," *i.e.*, disfavored speakers, accounts, and content—not information about the time, place, and manner of voting.

Finally, Defendants quote the Senate Select Committee on Intelligence (SSCI) to justify the FBI's joint participation in censorship.  Doc. 266, at 227-228.  Defendants neglect to mention that SSCI was directly involved in pressuring platforms to increase censorship and cooperate with the FBI's requests by threatening them with adverse legislation in a series of covert meetings since 2017.  Doc. 214-1, ¶ 946.  Itself an egregious violator of the First Amendment, SSCI is a poor advocate for Defendants' cause.

### 3.    CISA engages in joint participation and conspiracy.

Defendants argue that the evidence does not show CISA engaging in joint participation or conspiracy/collusion with platforms on censorship.  Doc. 266, at 228-236.  A mountain of evidence contradicts this claim, discussed in detail above.

Defendants admit that CISA engages in "regular meetings with social media companies about misinformation," including at least four different lines of recurring meetings.  Doc. 266, at 231.  But they argue that there is no evidence that federal officials "push for censorship" at such meetings.  *Id.*  The suppression of the Hunter Biden laptop story, orchestrated through the CISA-

led "USG-Industry" meetings, provides a vivid counterexample to this claim. Doc. 214-1, ¶¶ 880-904. Moreover, Defendants admit that these meetings involve "threat updates, and highlights and *upcoming watch outs*," Doc. 266, a 229 (emphasis added)—in other words, flagging content for censorship. Indeed, based on Defendants' description, the whole point of these meetings is for federal officials to lay the groundwork to ensure that social-media content will be censored. *Id.*

With regard to "switchboarding," the Government argues that CISA "include[d] a notice sating that it was not requesting that the company take any particular action." Doc. 266, at 234. But the actual course of conduct ignored that auto-generated boilerplate message in the switchboarding emails, as CISA repeatedly flagged content, debunked content, acted as a trusted flagger, asked for reports back on the censorship of content, and requested specific action on content disfavored by CISA's Director. *See supra.* The Court should give that boilerplate disclaimer no more weight than the participants—both CISA and platforms—did at the time.

Defendants argue that the platforms exercised "independent judgment" in responding to CISA's flagging requests, Doc. 266, at 235, but that is not correct. By 2020, the platforms had been under continuous pressure from federal officials to play ball with CISA's censorship regime for nearly four years. Doc. 214-1, ¶¶ 945-961. It is not surprising that platforms treated CISA as a highly privileged flagger, responding to late-night requests within minutes and repeatedly censoring flagged speech at CISA's requests. *See, e.g., id.* ¶ 1081. In any event, coercion is not required to establish conspiracy or joint participation, as noted above.

### 4.    The GEC engages in joint participation and conspiracy.

Defendants argue that the GEC has not participated in state action. Doc. 266, at 236-239. On the contrary, as discussed above, Defendants' own evidence demonstrates the GEC's involvement in unconstitutional censorship activities. The Declaration of Leah Bray, Doc. 266-6, at 199-206 (Def. Ex. 142), admits that the GEC flagged domestic speech to platforms for removal

merely if the GEC determined that it was "likely to be amplified" by foreign actors, and that "the GEC flagged … posts and *narratives* for the Election Integrity Partnership (EIP) on approximately 21 occasions." *Id.* at 205 (emphasis added).  These admissions attest to the GEC's extensive involvement in both its own flagging and in the EIP's censorship consortium.  Likewise, the meetings described in the Government's brief, Doc. 266, at 236-237—which involve discussing such things as "disinformation tools and techniques used by the United States' adversaries," and "advising social media companies about disinformation campaigns," *id.*—are geared toward laying groundwork for social-media censorship.  Indeed, Defendants admit that censorship is the whole point of this information-sharing: "help[ing] social media companies identify coordinated inauthentic activity" as a "first step in social media companies' ability to address foreign propaganda on their sites." *Id.* at 237.

### 5. The EIP and VP constitute joint participation, conspiracy, and pervasive entwinement.

The Election Integrity Partnership/Virality Project—which are just two names for the same ongoing public-private consortium—satisfies the joint participation, conspiracy, and pervasive entwinement tests.   Defendants' arguments to the contrary, Doc. 266, at 240-247, have no merit.

As noted above, federal officials' joint participation and entwinement with the EIP included at least the following twelve points: (1) the EIP was formed to address a "gap" in the government's surveillance and censorship activities that CISA identified to its SIO-affiliated interns; (2) CISA interns originated the idea for the EIP; (3) CISA had a series of meetings with Alex Stamos and Renée DiResta about forming the EIP before it began, including one meeting listed on the EIP's "Operational Timeline" as "Meeting with CISA to present EIP concept"; (4) CISA connected the EIP with the Center for Internet Security, which runs a CISA-funded clearinghouse for state and local government officials to communicate about misinformation; (5)

CISA connected the EIP directly with NASS and NASED, organizations of state and local government officials, so they could report misinformation to the EIP; (6) CISA had ongoing communications with the EIP about its public reports on misinformation as the EIP operated in 2020; (7) CISA collaborated closely with the CIS on flagging misinformation to platforms, while the CIS was collaborating with the EIP, setting up a "triangle" of collaboration; (8) CISA repeatedly flagged misinformation to social-media platforms using EIP tracking numbers; (9) CISA interns, who were working for CISA and the Stanford Internet Observatory at the same time, were flagging "misinformation" to platforms simultaneously on behalf of CISA and on behalf of the EIP; (10) CISA mediated and coordinated between the EIP, CIS, and the platforms on reporting misinformation to address the platforms' concerns about duplicative reports; (11) the EIP debriefed CISA after the 2020 election cycle about its activities and public report; and (12) there is extensive overlap of personnel between CISA and the EIP, including interns working simultaneously for both groups, and key EIP leaders such as Alex Stamos, Renee DiResta, and Kate Starbird having formal roles at CISA.  In addition, the Government's brief has now revealed that (13) "[t]he GEC flagged … posts and narratives for the EIP *on approximately 21 occasions*." Doc. 266, at 242 (emphasis added).  Further, as Defendants admit, (14) the EIP's work is partially federally funded, *id.*, and (15) the EIP relies on reports of misinformation from state and local officials through the EI-ISAC, which CISA funds.

Likewise, the entwinement of federal officials with the EIP/VP consortium continued unabated in the Virality Project.  The evidence shows

> the following six facts: (1) OSG "pushes platforms to share information with the Virality Project"; (2) OSG coordinated with the Virality Project on the Surgeon General's Health Advisory; (3) the Surgeon General "repeatedly echoes the key messaging from the Virality Project"; (4) the Surgeon General launched his Health Advisory on Misinformation at an event hosted by the Stanford Internet Observatory, which is one of the groups that leads the Virality Project; (5) the Virality Project had "strong ties with several federal

government agencies," including OSG, and was involved in "flagging vaccine-related content on social media"; and (6) OSG "incorporated [the Virality Project's] research and perspectives into its own vaccine misinformation strategy."

Doc. 266, at 244 (quoting Doc. 214, at 50).  And these facts are in addition to the conspiracy and pervasive entwinement of EIP/VP with CISA and the GEC, discussed above.

The Government disputes that the Surgeon General's Office pushed platforms to give "external researchers" access to their internal data on putative "misinformation" on their platforms. Doc. 266, at 245.  But the OSG did so on numerous occasions, in both public and private.  *See* Doc. 214-1, ¶¶ 226, 326, 334, 359, 387.  Moreover, "[o]ne such 'external researcher' that the OSG had in mind was 'Renee DiResta, from the Stanford Internet Observatory,' a leading organization of the Virality Project," which "hosted a 'rollout event' for the advisory featuring Dr. Murthy," about which Kyla Fullenwider "coordinat[ed]" with DiResta.  *Id.* ¶¶ 227-228.

Defendants claim that the Surgeon General did not "coordinate" with the Virality Project on his Health Advisory, but Waldo admits that "I know there was coordination with [DiResta] with respect to the launch …. So certainly there would have been coordination … with her."  Doc. 214-1, ¶ 228.  The Virality Project states that the "Office of Surgeon General incorporated VP's research and perspectives into its own vaccine misinformation strategy," specifically citing the Health Advisory on this point.  *Id.* ¶ 1249.  And Surgeon General Murthy himself stated, at the launch of the Advisory at Stanford, that the OSG had been "partnered with" DiResta "over the last many months," and that he had "personally learned a lot from [DiResta] … from our conversations together."  *Id.* ¶¶ 336-337.  He also stated that DiResta would continue to be "a partner in the future, because I know we have lots and lots more that we've got to do together."  *Id.* ¶ 336.

Defendants dispute that the OSG flagged misinformation to the Virality Project, Doc. 266, at 246, but they admit that the VP report states that the VP "built strong ties with several federal

government agencies, most notably [OSG] and the CDC, to facilitate bidirectional situational awareness around emerging narratives." *Id.*; *see also* Doc. 214-1, ¶ 1279. "Facilitating bidirectional situational awareness around emerging narratives" means "flagging emerging narratives"—in other words, flagging misinformation at the narrative level. The Lesko Declaration does not dispute that OSG engages in narrative-level flagging—it claims only that the OSG did not "provide[] any tip, flag, ticket, report, or other form of notification or input to the Virality Project concerning *posts or accounts* on social media." Doc. 266-4, at 136 (Lesko Decl. ¶ 16) (emphasis added). Lesko does not deny that OSG flagged "emerging narratives" to VP.

Finally, Defendants contend that, even if the conduct of the Election Integrity Partnership and Virality Project is state action, the content-moderation decisions of social-media platforms would not be state action because EIP/VP supposedly did not "threaten[] or pressure[]" platforms to censor content. Doc. 266, at 247. This is wrong for multiple reasons. First, it misunderstands the fundamental structure of the EIP/VP. The platforms are just as much conspirators and collaborators—*i.e.*, "Major Stakeholders"—with the EIP/VP as are the federal officials, the Stanford Internet Observatory, and the other third-party participators. *See, e.g.,* Doc. 214-1, ¶¶ 1151, 1175, 1259, 1276, 1280. The EIP states that it "established relationships with social media platforms to facilitate flagging of incidents for evaluation when content or behavior appeared to violate platform policies." *Id.* ¶ 1183. "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube, Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.* ¶ 1185. Platforms engaged with the EIP's analysts about flagging in real-time: "Analysts … added the platform representative to the ticket" and "a manager communicated with the platform representative in the ticket comments." *Id.* ¶ 1184. "The EIP onboarded the following social media companies: Facebook and Instagram, Google and YouTube,

Twitter, TikTok, Reddit, Nextdoor, Discord, and Pinterest." *Id.* ¶ 1185.  At least some platforms, such as Twitter, gave the EIP privileged access to internal data about speech on their platforms: EIP analysts collect data from Twitter "contemporaneously," and they also have access to "CrowdTangle and Facebook search functionality." *Id.* ¶ 1200.  The EIP "collected data from Twitter in real time from August 15 through December 12, 2020," and did so "[u]sing the Twitter Streaming API" to "track[] a variety of election-related terms. … The collection resulted in *859 million total tweets*." *Id.* ¶ 1203 (emphasis added).

Likewise, social media platforms serve as VP "stakeholders" alongside federal and state officials: "**Platforms** were the final stakeholders in the VP effort. Six social media platforms engaged with VP tickets—Facebook (including Instagram), Twitter, Google (including YouTube), TikTok, Medium, and Pinterest—acknowledging content flagged for review and acting on it in accordance with their policies." *Id.* ¶ 1280.  The VP describes itself as "a multistakeholder collaboration with civil society organizations, social media platforms, and government entities to respond to mis- and disinformation…." *Id.* ¶ 1259.  The VP states that it is "bringing together four types of stakeholders: (1) research institutions, (2) public health partners, (3) government partners, and (4) platforms." *Id.* ¶ 1355.  In short, as the EIP states, the EIP/VP "united government, academia, civil society, and industry," *id.* ¶ 1228, into a single mass-surveillance and mass-censorship consortium.

Second, there is strong evidence of pressure on platforms from the EIP as well.  Because the EIP was closely affiliated with CISA, the federal pressure on platforms to censor election speech assuredly influenced platforms to cooperate with the EIP as well.  Alex Stamos and other EIP participants publicly state that the EIP pressured platforms to change their content-moderation policies about election speech. *Id.* ¶¶ 1148-1150; *see also id.* ¶¶ 1217-1220.  Alex Stamos

110

explicitly attributes the success of his efforts in "pushing platforms to do stuff" to the threat of adverse regulatory consequences: "So, you know, on effectively pushing the platforms to do stuff … they will always be more responsive in the places … that have huge potential regulatory impact, most notably right now that would be the United States and Europe." *Id.* ¶ 1234.

## IV.    Plaintiffs Are Likely to Succeed on Their APA and *Ultra Vires* Claims.

Defendants argue that Plaintiffs are unlikely to succeed on their APA and *ultra vires* claims. Doc. 266, at 253-257.  These arguments fail for the reasons discussed in this Court's prior order. Doc. 224, at 51-54, 70-72.  In their response brief, Defendants argue that "Government officials … need no express statutory authorization to simply engage in basic speech," and their challenged "communications amount to routine government speech conveying a policy view, akin to public remarks made by any other government official." Doc. 266, at 253-254.  This echoes the argument in their motion to dismiss, which the Court has already rejected.  Doc. 224, at 70-72. Here, the evidence shows that "Defendants are engaged in *de facto* prior restraints," *id.* at 71, and "Defendants have not presented a statute that purports to provide any 'colorable basis' for these prior restraints," *id.* at 72—in fact, Defendants openly admit that none exists.  The evidence establishes "many instances of discrete agency action and [Plaintiffs] need not demonstrate the 'finality' of those agency actions." *Id.* at 72.  And the evidence is "more than sufficient to support the conclusion that Defendants acted 'not in accordance with law,' 'contrary to constitutional right,' and 'in excess of statutory . . . authority.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)-(C)).

## V.    Plaintiffs' Proposed Injunction Is Sufficiently Precise.

Defendants claim that Plaintiffs' proposed injunction is "too vague to be understood." Doc. 266, at 262 (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974)).  Not so.  The proposed injunction does not contain "broad generalities," but instead "describe[s] in reasonable detail the acts restrained." *Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016); *see also* Doc. 214, at 67-68.

First, Defendants contend that the prohibited verbs listed in the injunction are vague.  Doc. 266, at 263.  As Defendants note, the injunction would forbid federal officials to "demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce" social-media platforms to take certain actions.  *Id.*  None of these verbs is "too vague to be understood," *Schmidt*, 414 U.S. at 476; on the contrary, they all have common, easily understandable meanings that are easily found in the dictionary.  In fact, Defendants do not argue that these verbs are vague; instead, they argue that they potentially cover an "immense swath of conduct" that the evidence shows Defendants committing.  Doc. 266, at 263.  That observation reflects not the vagueness of the proposed injunction, but the enormity of the now-proven misconduct it seeks to prohibit.

Next, Defendants argue that the list of actions that the injunction would prevent Defendants from inducing social-media platforms from taking is vague: "censor, suppress, remove, de-platform, suspend, shadow-ban, de-boost, deamplify, issue strikes against, restrict access to, demonetize," or take "any similar adverse action" against disfavored speakers, content, and viewpoints.  Doc. 266, at 263 (quoting Doc. 214, at 67-68).  Again, each of these verbs has an ordinary, common meaning found in the dictionary, and the fact that the injunction includes a careful listing of terms renders it more clear and specific, not vague.  Defendants make no argument at all that most of these verbs are vague, but they make inconsistent objections as to a handful.  First, they argue that the words "censor" and "suppress" are merely "conclusory labels." Doc. 266, at 263.  Even if that were true—and the dictionary disagrees—Plaintiffs have defined those terms with great specificity in the Second Amended Complaint and all other Complaints. *See* Doc. 84, ¶ 130.  Defendants then pivot and complain that three other verbs—"shadow ban," "de-boost," and "de-amplify"—are "terms of art within the social media industry."  Doc. 266, at 263.  But the dictionary explains that a "term of art" is "a word or phrase that has *a specific or*

*precise meaning* within a given discipline or field." *Term of Art*, Dictionary.com, at https://www.dictionary.com/browse/term-of-art.   A "term of art" has a "specific or precise meaning," *id.*—the antithesis of a "vague" term.

Defendants contend that the phrases "otherwise induce" and "similar adverse action" are vague.  On the contrary, both those terms come at the end of significant lists of similar verbs, which clarify and constrain their meaning to include only relevantly similar actions to those already listed.  *See* Scalia & Garner, Reading Law: The Interpretation of Legal Texts, 195-198 (2012) (the "associated-meaning canon").   Finally, Defendants pretend to be unable to grasp the meaning of the phrases "social media companies" and "platforms for online speech." Doc. 266, at 263.  Because Defendants themselves have provided exhaustive, specific definitions of such terms, *see* 87 Fed. Reg. 12713 (Surgeon General's RFI using the phrase "social media platform" to define "technology platform"), this objection cannot be taken seriously.

## VI.    The Proposed Injunction Is Not Overbroad and Does Not Interfere With Legitimate Government Speech or Functions.

Defendants contend that the proposed injunction is overbroad and would interfere with their ability to communicate with social-media platforms and the public.  Doc. 266, at 258-261, 264-275.  Defendants argue that "Plaintiffs' proposed injunction would significantly hinder the Federal Government's ability to combat foreign malign influence campaigns, prosecute crimes, protect the national security, and provide accurate information to the public on matters of grave public concern such as health care and election integrity."  Doc. 266, at 258 (citing Knapp Decl. ¶¶ 5-50 (Ex. 157); Wales Decl. ¶¶ 27-30 (Ex. 167); Crawford Decl. ¶¶ 20-23 (Ex. 80); Lesko Decl. ¶¶ 18-19 (Ex. 63); Bray Decl. ¶¶ 12-15 (Ex. 142)).  This argument lacks merit.

As an initial matter, Defendants' evidence on this point is at war with itself.  Plaintiffs' proposed injunction would prevent Defendants from pressuring or inducing platforms to remove

First Amendment-protected speech from social media.  Doc. 214, at 67-68.  The Government's declarants first attest that their agencies do *not* do this, and then claim that an injunction preventing them from doing this would create a devastating parade of horribles.  *See, e.g.,* Doc. 266-6, at 456 (Knapp Decl. ¶ 15) (claiming that the FBI does not pressure or coerce platforms to remove content); Doc. 266-4, at 133-135 (Lesko Decl. ¶¶ 7-8, 10-11) (denying that the OSG asks, or has ever asked, any social-media platforms to suppress or take down content); Doc. 266-6, at 205 (Bray Decl. ¶ 16) (asserting that "[t]he GEC's practice is not to request social media companies to take any specific actions when sharing information with them").  Defendants cannot have it both ways.

In any event, Defendants' objections to the injunction's supposed overbreadth do not withstand scrutiny.  They fall into two categories: (1) actions that would not violate the proposed injunction, such as public statements on policy questions not directed to platforms or the suppression of speech; and (2) actions directed at content that is not protected by the First Amendment, such content where the speech itself constitutes criminal activity, including fraud, "malicious cyber activity," live-streamed child sexual abuse, terrorism, and true threats.

First, Defendants speculate that public statements by federal officials on matters of policy, not formulated as requests to suppress speech and not directed to social-media platforms, might violate the proposed injunction if platforms were to use such public statements as grounds to censor speech under their content-moderation policies.  For example, Crawford speculates that the proposed injunction "would prohibit CDC from publicly issuing a statement on a public health issue" that the platform, acting independently of the CDC, then relied on to moderate content.  Doc. 266-5, at 75 (Crawford Decl. ¶ 21).  She also speculates that "if a CDC-funded entity publicizes research that runs contrary to a narrative circulating on social media, and a social media company then takes steps consistent with its terms of service to limit that narrative," that might be

deemed to violate the proposed injunction. *Id.* at 75-76, ¶ 22.  Max Lesko raises similar concerns about the OSG making public statements about the safety of cigarettes, obesity, and youth mental health.  Doc. 266-4, at 137-138 (Lesko Decl. ¶¶ 19-20).   And Leah Bray raises the concern that "the GEC would be prevented from producing or disseminating reports exposing Russian or PRC malign influence."  Doc. 266-6, at 204 (Bray Decl. ¶ 15).

These objections attempt to manufacture concerns that do not exist.  A federal agency that makes a public statement on a policy issue, without more—specifically, without directing the statement to platforms or crafting the statement to influence the removal of disfavored viewpoints from social media—would not violate the proposed injunction.  The proposed injunction prevents Defendants from taking any steps to "demand, urge, encourage, pressure, coerce, deceive, collude with, or otherwise induce" platforms to censor speech on social media.  Doc. 214, at 67.  Every one of those verbs connotes intentional, deliberate action directed to the platforms.  If the platform makes public statements on policy issues that are not directed to the platforms and not intended to induce censorship of content on social media, those would not violate the terms of the injunction.

Second, Plaintiffs argue that the injunction is supposedly overbroad because it would prevent them from seeking the removal of social-media content where *the content itself is criminal activity* unprotected by the First Amendment.  For example, Larissa Knapp asserts that the FBI sometimes may seek the removal of a range of criminal activity, including "[c]yber-criminal syndicates and nation-states … selling malware as service or … targeting vendors to access scores of victims by hacking just one provider."  Doc. 266-6, at 463, ¶ 32.  She states that "[s]ocial media platforms are frequently used by cyber criminals to commit crimes," such as "spear phishing attacks," "economic espionage," stealing "trade secrets," "steal[ing] credentials," and "deceiv[ing] victims into downloading malware."  *Id.* ¶¶ 35-36.  She states that the FBI (which apparently does

*not* "routinely" seek removal of child pornography from social media, *id.* at 467, ¶ 43), might seek removal of content depicting child sexual abuse in real time—*i.e.*, "live streaming of sexual abuse of a child, a particular user in a chat room grooming children for sexual exploitation, or a particular user committing ongoing sexploitation crimes against children." *Id.* at 467, ¶ 43. She points to "cases where individuals have posted explicit threats against FBI personnel." *Id.* at 468, ¶ 46. And she states that the FBI may seek to remove speech by foreign terrorist organizations like ISIS and al-Qaeda seeking to recruit and organize terrorist attacks, *id.* at 460-463, ¶¶ 25-31.

Brandon Wales raises similar concerns about CISA's requests to remove "malicious cyber activity," which "include[s] malware, phishing, exploitation of software vulnerabilities." Doc. 266-6, at 555-556 (Wales Decl. ¶¶ 5-6). Wales helpfully notes that this "malicious cyber activity" is plainly distinct from protected speech: "Malicious cyber activity … relates only to unauthorized access to information systems and is distinct from the concept of mis-, dis-, and malinformation, which relates to the veracity and intent behind certain information." *Id.* at 556, ¶ 6. On Wales' description, "malicious cyber activity" is content that is itself criminal, such as "deliver[ing] malware or phishing communications," and "send[ing] command-and-control instructions to victim computers." *Id.* at 561, ¶ 23.

Such concerns have a common thread—they all involve situations where the targeted content itself involves ongoing criminal activity. As Defendants admit, such content is not protected by the First Amendment, and thus it would not violate the proposed injunction, which mandates compliance with the First Amendment. *See* Doc. 214, at 67-68. Likewise, true threats are both criminal and fall within a well-established First Amendment exception. *Fogel v. Collins*, 531 F.3d 824, 830 (9th Cir. 2008). Moreover, if the Court wished to make more explicit the fact that the proposed injunction does not include content that falls within well-established First

Amendment exceptions, it could simply insert, after the phrase "any speaker, content, or viewpoint expressed on social media," the phrase "except for content that itself constitutes criminal activity not protected by the First Amendment."

## CONCLUSION

The Government would have this Court believe that federal censorship activities are a thing of the past.  On the contrary, the evidence shows that federal officials are deeply enamored with their censorship powers and will continue to suppress disfavored viewpoints at every reasonable opportunity.  As Justice Scalia observed, "no government official is 'tempted' to place restraints upon his own freedom of action, which is why Lord Acton did not say 'Power tends to purify.'" *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 981 (1992) (Scalia, J., concurring in the judgment in part and dissenting in part), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).  The federal Censorship Enterprise's "temptation is in the quite opposite and more natural direction—towards systematically eliminating checks upon its own power; and it succumbs."  *Id.*  The Court should grant Plaintiffs' Motion for Preliminary Injunction, Doc. 10, and enter the proposed injunction requested by Plaintiffs, Doc. 214, at 67-68.

Dated: May 20, 2023

**ANDREW BAILEY**
**Attorney General of Missouri**

*/s/ Kenneth C. Capps*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Kenneth C. Capps, Mo. Bar No. 70908*
  *Assistant Attorney General*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
kenneth.capps@ago.mo.gov
*Counsel for State of Missouri*

*/s/ John J. Vecchione*
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty,*
*and Jill Hines*

Respectfully submitted,

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer (Mo #58721)*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ John C. Burns*
John C. Burns
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\*  admitted *pro hac vice*

118

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 20, 2023, I caused a true and correct copy of the foregoing to

be filed by the Court's electronic filing system, to be served by operation of the Court's electronic

filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*