```
1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF LOUISIANA
2                          MONROE DIVISION

3
     THE STATE OF MISSOURI,                   :NO. 3:22CV01213
4    by and through its Attorney General,
     ERIC C. SCHMITT;                         :
5
     THE STATE OF LOUISIANA,                  :
6    by and through its Attorney General,
     JEFF LANDRY                              :
7
                         PLAINTIFFS,          :
8
     VERSUS                                   :
9
     JOSEPH R. BIDEN,JR., in his official     :
10   capacity as President of the United States;
                                              :
11   JENNIFER RENE PSAKI, in her official
     capacity as White House Press Secretary; :
12
     VIVEK H. MURTHY, in his official         :
13   capacity of Surgeon General of the
     United States                            :
14
     XAVIER BECERRA, in his official          :
15   capacity as Secretary of the Department of
     Health and Human Services;               :
16
     DEPARTMENT OF HEALTH AND HUMAN SERVICES; :
17
     DR. ANTHONY FAUCI, in his official       :
18   capacity as Director of the National
     Institute of Allergy and Infectious Diseases :
19   and as Chief Medical Advisor to the President;
                                              :
20   NATIONAL INSTITUTE OF ALLERGY AND
     INFECTIOUS DISEASES;                      :
21
     CENTER FOR DISEASE CONTROL AND           :
22   PREVENTION;
                                              :
23   ALEJANDRO MAYORKAS, in his official
     capacity as Secretary of the Department  :
24   of Homeland Security;
                                              :
25
```

```
1    DEPARTMENT OF HOMELAND SECURITY;              :

2    JEN EASTERLY, in her official capacity as    :
     Director of the Cybersecurity and
3    Infrastructure Security Agency;              :

4    CYBERSECURITY AND INFRASTRUCTURE             :
     SECURITY AGENCY; and
5                                                 :
     NINA JANKOWICZ, in her official capacity
6    as director of the so-called                :
     "Disinformation Governance Board"
7    within the Department of Homeland Security   :

8                         DEFENDANTS.             :

9         REPORTER'S OFFICIAL TRANSCRIPT OF  THE MOTION HEARING
               BEFORE THE HONORABLE TERRY A. DOUGHTY
10                UNITED STATES DISTRICT CHIEF JUDGE
                         MAY 26, 2023
11

12   APPEARANCES:

13   FOR THE PLAINTIFFS: MR. DEAN JOHN SAUER
     STATE OF MISSOURI    SPECIAL ASSISTANT ATTORNEY GENERAL
14   STATE OF LOUISIANA   STATE OF MISSOURI AND STATE OF LOUISIANA
                          231 South Bemiston Avenue, #800
15                        St. Louis, Missouri

16
     FOR THE PLAINTIFF:   MR. KENNETH C. CAPPS
17   STATE OF MISSOURI    JAMES OTIS LAW GROUP
                          13321 North Outer Forty Road, Suite 300
18                        St. Louis, Missouri

19
     FOR THE PLAINTIFF:   MR. JOSHUA M. DIVINE
20   STATE OF MISSOURI    MISSOURI SOLICITOR GENERAL
                          207 West High Street
21                        Jefferson City, Missouri

22                   DEBBIE LOWERY, RPR CCR
                   FEDERAL OFFICIAL COURT REPORTER
23                201 Jackson Street, Suite 312
                     Monroe, Louisiana 71201
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription
```

```
 1    FOR THE PLAINTIFF:  MR. TODD SCOTT
      STATE OF MISSOURI   MISSOURI ATTORNEY GENERAL'S OFFICE
 2                        207 West High Street
                          Jefferson City, Missouri
 3

 4    FOR THE PLAINTIFF:  MR. TRACY L. SHORT
      STATE OF LOUISIANA  LOUISIANA ATTORNEY GENERAL'S OFFICE
 5                        1885 North Third Street
                          Baton Rouge, Louisiana
 6

 7    FOR THE PLAINTIFF:  MS. ELIZABETH BAKER MURRILL
      STATE OF LOUISIANA  LOUISIANA ATTORNEY GENERAL'S OFFICE
 8                        SOLICITOR GENERAL
                          1885 North Third Street
 9                        Baton Rouge, Louisiana

10
      FOR THE PLAINTIFFS: MS. ZHONETTE M. BROWN
11    AARON KHERIATY      NEW CIVIL LIBERTIES ALLIANCE
      JAYONTA             1225 19th SN W Suite 450
12    BHATTACHARYA        Washington, DC
      JILL HINES
13    MARTIN KULLDORF

14
      FOR THE DEFENDANTS: MR. JOSHUA E. GARDNER
15                        UNITED STATES DEPARTMENT OF JUSTICE
                          SPECIAL COUNSEL
16                        1100 L Street NW
                          Washington, DC
17

18                        MS. KYLA SNOW
                          UNITED STATES DEPARTMENT OF JUSTICE
19                        1100 L Street NW
                          Washington, DC
20

21                        MR. INDRANEEL SUR
                          UNITED STATES DEPARTMENT OF JUSTICE
22                        1100 L Street NW
                          Washington, DC
23

24

25
```

```
 1                        MS. KUNTAL CHOLERA
                          UNITED STATES DEPARTMENT OF JUSTICE
 2                        1100 L STREET NW
                          Washington, DC
 3


 4
                          MS. AMANDA CHUZI
 5                        UNITED STATES DEPARTMENT OF JUSTICE
                          1100 L Street NW
 6                        Washinton, DC


 7
                          MR. BRIAN NETTER
 8                        UNITED STATES DEPARTMENT OF JUSTICE
                          1100 L Street NW
 9                        Washington, DC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  P-R-O-C-E-E-D-I-N-G-S
 2   (Court Called to Order)
 3          THE COURT:  Good morning, everybody.  Be seated.
 4   Welcome to Monroe if you haven't ever been here before.  Thank
 5   you for coming.
 6       This is the case of Missouri versus Biden, 3:22-1213.
 7   First of all, I'd like to ask that -- starting with the
 8   plaintiffs, I'd like the attorneys for each side to identify
 9   themselves for the record, please.
10          MR. SAUER:  Thank you, Your Honor.  John Sauer,
11   Special Assistant Attorney General for the State of Louisiana,
12          MS. MURRILL:  Your Honor, Liz Murrill, Solicitor
13   General for the State of Louisiana.
14          MR. DIVINE:  Your Honor, Joshua Divine, Solicitor
15   General for the State of Missouri.
16          MS. BROWN:  Your Honor, Zhonette Brown.  I am
17   representing four of the individual plaintiffs.
18          MR. SHORT:  Good morning, Judge.  Tracy Short on
19   behalf of the State of Louisiana Attorney General Jeff Landry.
20          THE COURT:  Okay.
21          MR. SCOTT:  Your Honor, Todd Scott with the Missouri
22   Attorney General's Office.
23          MR. CAPPS:  Kenneth Capps for the State of Missouri.
24          THE COURT:  Is that all of you?  Just that few?  I'm
25   kidding.  Go ahead.  All right.  How about the defendants?
```

```
1              MR. GARDNER:  Good morning, Your Honor, Josh Gardner

2    with the United States Department of Justice Special Counsel.

3    With me today is Amanda Chuzi, Kyla Snow, Indraneel Sur, Kuntal

4    Cholera, our Deputy Assistant Attorney General Brian Netter and

5    then an AUSA Shannon Brown.

6              THE COURT:  I think they've got you outnumbered,

7    though.

8              MR. GARDNER:  Always, Your Honor.

9              THE COURT:  Okay.  And our rules prohibit recording

10   or taking a photograph during the session.  I told the CSOs,

11   they came in, no problem bringing your phones; even have it on

12   silent.  I don't care.  Just don't take video or anything

13   during the session or take photographs.

14        Our court reporter down here is Debbie Lowery.  The

15   courtroom deputy here is Amy Crawford.  Over here is law clerks

16   Dakota Stephens and Stephanie Stone and we've got Caitlin

17   Huettemann remotely if she can hear.  And we've also got Mary

18   Kyle Allen interning with us today.

19        So just to let you know, the court reporter is going on a

20   vacation after today.  And so if you need a transcript of

21   today's proceedings, she won't be able to get that done until

22   about three weeks, something like that, depending on how long

23   y'all talk today, but something like that.

24        So and kind of the way I was going to proceed, I know I

25   gave everybody -- each side an hour.  And I'm going to try to
```

```
 1    refrain from asking questions during the time you're doing it,
 2    but I may not be able to do that.  I may -- you know, something
 3    you say I might need to ask you.  I'm not going to take any
 4    time you take to answer questions against your time.
 5         So and then at the end, and if plaintiff wants to reserve
 6    some time, you can do that of your hour for rebuttal.  And,
 7    after the hour, I'll, you know, ask you some more questions so
 8    -- after that.  Okay.
 9         Everybody ready to proceed?
10              MR. SAUER:  Yes, Your Honor.
11              MR. GARDNER:  (Affirmative nod.)
12              THE COURT:  Okay.  Let's go begin with the
13    plaintiffs.  Thank you.
14              MR. SAUER:  Thank you, Your Honor.  May it please the
15    Court, Special Assistant Attorney General for Louisiana John
16    Sauer appearing on behalf of the plaintiffs.
17         On August 2nd, 2021, Secretary Mayorkas of DHS stated that
18    the efforts to combat disinformation on social media are
19    occurring, quote, "across the federal enterprise."  And that's
20    exactly what the evidence in this case shows.
21         It shows efforts by senior federal officials to get
22    control, to get the social media platforms to knuckle under and
23    essentially to kind of take over what the social media
24    platforms are letting Americans say about core topics of great
25    political sensitivity, like, elections, COVID and various other
```

1    topics like that.

2        This is a systemic and systematic campaign.  It began

3    seven years ago in 2017, at least, based on testimony of Elvis

4    Chan.  It has proceeded relentlessly since then.  It has

5    radically expanded over time, including steady expansions over

6    the years, and then two quantum leaps that occur in the

7    beginning of 2020 and then, again, in 2021 as it expands to new

8    federal officials and  agencies getting involved in these

9    social media censorship activities, new topics of censorship

10   that are being demanded, new techniques and ways of influencing

11   what the social media platforms are doing and pressuring them.

12   And then just a sort of radical expansion over time and a kind

13   of a cone shape until we get to the current day where we have

14   67 defendants and federal officials and agencies in this case

15   alone.

16       This relentless expansion shows no signs of stopping on

17   its own.  In fact, every objective indicator, both in their

18   private communications, their public statements, and in their

19   conduct, shows that the federal defendants in this case have

20   every intention of continuing to engage in these

21   unconstitutional activities and continuing to expand them at

22   every opportunity absent court intervention.

23       And, for that reason, we're here today to ask the Court to

24   enter the preliminary injunction that we propose that will go a

25   long way towards putting a stop to what is really the most

1   systematic and likely the most egregious violations of the

2   First Amendment in the history of the United States of America.

3        So, Judge, as I talk today, what I'd like to do is go

4   through a kind of chronological presentation of the evidence

5   starting back in 2017 when this starts ramping up.

6        Yes, Your Honor.

7             THE COURT:  I don't want to mess you up.  Did you

8   want to reserve any time for rebuttal?

9             MR. SAUER:  I'd like to reserve 15 minutes.

10            THE COURT:  Okay.

11            MR. SAUER:  I figured I'd go for about 45 now.

12            THE COURT:  Okay.  Thank you.  I just wanted to make

13  sure.

14            MR. SAUER:  And, Judge, we've submitted, both to

15  opposing counsel and Court, a binder that the Court may want to

16  consult while I'm talking.  There's about 34 tabs in there.  32

17  of them are excerpts from the evidence.  They're the same as

18  what's filed with the Court, but there's some yellow

19  highlighting we added just to sort of call the Court's

20  attention to particular key phrases and so forth.

21       Tab 1 is a -- actually a statute.  It's not evidence.  And

22  Tab 17 is a summary of a bunch of evidence about the Election

23  Integrity Partnership that's essentially copied from pages 51

24  and 52 of our reply brief.  So that's what's before the Court

25  there.

1    And, as I said, I'd like to start -- I said I wanted to

2  start in 2017, but I actually go back further to 1998.  1998,

3  this is where the roots of all this start when Congress enacts

4  the Section 230 of the Communications Decency Act.

5    Section 230 does at least three relevant things:  It

6  immunizes the social media platforms for speech that other

7  people post on their platforms.  They can't be held liable if

8  something (sic) posts something -- even something egregious.

9  If they leave it up, they're not liable for that; the speaker

10  is liable.

11    But it also immunizes them for taking stuff down.  It says

12  anything you take down in good faith, for whatever reason, is

13  itself also immunized under Section 230 of the CDA.  So the

14  platforms have the best of both worlds.  And there's a third

15  provision which is they preempt state law to the contrary.

16    So the federal government, when it passes this statute

17  essentially creates the conditions that, you know, 19 years

18  later in 2017 make the social media platforms particularly

19  vulnerable to the campaign of threats and coercion,

20  intimidation and pressure that we see in the evidence in this

21  case.  And it does it in at least two ways.

22    Number 1, as Justice Thomas said in his separate opinion

23  for the Court in Knight versus First Amendment -- or *Biden*

24  *versus Knight First Amendment Center,* it creates a

25  concentration of sort of power in the platforms where this sort

```
 1    of platform industry is concentrated in a tiny number of key
 2    players.  And those key players are not really just
 3    corporations, it's individuals.
 4         If you want to control what people say on social media,
 5    you know right where to go if you're a federal official.  You
 6    go to the same three people every time:  Mark Zuckerberg, Jack
 7    Dorsey, Sunder Pichai.  That's an exaggeration.  There's a few
 8    more, but there's this tight concentration.  So it's really
 9    easy to find who you need to pressure to get control of what
10    Americans can say on social media.
11         And, also, you've created two huge potential liabilities
12    for the platforms.  You've given this -- this immunity that's
13    been aptly described as a hidden subsidy worth billions of
14    dollars.  And the federal government has created the conditions
15    for what is something like where they have vulnerability, at
16    least, to antitrust enforcement.  And those are the threats
17    that get raised and raised again and again in the evidence in
18    this case.
19         Then fast forward to 2017, something happens seismic in
20    2017 politically in --
21              COURT REPORTER:  I'm sorry.  Can you slow down.
22              MR. SAUER:  I'm sorry.  Fast forward to 2017,
23    something seismic politically happens in 2016, President Trump
24    is elected to the White House using social media very
25    effectively in his own campaign.  And there are allegations of
```

1   foreign interference where foreign nationals are supposedly

2   supposed to be putting a lot of disinformation on social media

3   during that campaign.

4        And, as a reaction to that, very senior federal officials

5   immediately commence a pressure campaign to get control of what

6   people can say about election-related speech on social media.

7   This begins, based on the testimony of Elvis Chan, in 2017, and

8   it's a three-pronged pressure campaign.

9        So one prong is there's a whole series of public

10  statements.  And we've put, like, 30 of these in evidence in

11  the Court in our first 30 paragraphs of our proposed findings

12  of fact, where senior federal officials are saying again and

13  again they're making explicit threats.  They're linking the

14  threat of we are going to take away things that are very

15  valuable to you:  Antitrust enforcement, CDA 230 immunity.

16  We're going to go after those things unless you censor more.

17       So it isn't just sort of your standard public statement

18  like I think this statute should be repealed.  It's, like if,

19  the platforms don't step up to the plate and take down the

20  disfavored viewpoints that we don't like, then there's going to

21  be these adverse legal consequences.

22       So it's that linking of a demand with a threat, a demand

23  for something that would be unconstitutional if the government

24  did it itself, which is take down speech that we don't like,

25  link to a threat of adverse legal consequences.  You get that

1    in the public statements.

2         And you also get it in these congressional hearings.

3    That's the second prong.  They call in the same CEOs again and

4    again and again in 2017 and 2018.  Elvis Chan refers, like,

5    four or five of these in hearings in his master's thesis.  And,

6    again, we have more of them that go on in '20 and 2021 and so

7    forth.

8         So, for a period of years, the CEOs of key tech companies

9    are called in to Congress.  They are raked over the coals, and

10   they're put under public pressure.  And these same threats are

11   made, "We're going to go after these things that are very

12   valuable to you legally unless you knuckle under to the federal

13   demands for greater censorship."

14        And then there's a third prong to this which is happening

15   in secret at the time.  Senior federal congressional officials,

16   senior staffers from HPSCI and SSCI, the committees that

17   oversee the national security apparatus in the United States,

18   are flying out to Silicon Valley every year bringing adverse

19   proposed legislation in their hands to sit down with senior

20   representatives from the platforms and say, "These are the

21   bills that we're going to try to pass if you guys don't do more

22   to censor the speech that we don't like."

23        So this three-pronged campaign starts in 2017, and it does

24   nothing but accelerate as the years go by if you look at the

25   evidence in this case.

```
 1          Well, that's what's going on on kind of the threat side.
 2     Now, leveraging these threats, you have executive officials
 3     almost immediately working with these threats in the background
 4     going to the platforms with specific demands to have content
 5     taken down.  And in 2018, this includes at least CISA and the
 6     FBI.  CISA said on its website until March of this year that we
 7     started switchboarding in 2018 and we expanded it in 2020.
 8          So in the midterm election cycle of 2018, CISA is going to
 9     the platforms and saying, "Take down this speech we don't
10     like."  In the background, they've already been under a couple
11     years of pressure from very senior people in Congress to make
12     sure that they're going to be knuckling under.
13          At the same time, the FBI is starting its campaign of just
14     relentless flagging.  The FBI insists they're having meeting
15     after meeting after meeting.  They're countless, incessant
16     meetings with the platforms to talk about disinformation.
17          And at the same time, --
18               THE COURT REPORTER:  I'm sorry.  You're going to
19     fast.  You need to slow down.
20               MR. SAUER:  Sorry.  To talk about disinformation.
21     And then, in addition to that, the FBI starts sending them one
22     to five times per month, list after list after list of specific
23     speakers, accounts and content, URLs, websites, posts on social
24     media saying, "We want you to take this stuff down."
25          So, in 2018, they take the position, "This was all
```

1    foreign.  We're not really going after domestic speech at all."

2        Now, by 2020, that's completely thrown out the window, but

3    even in 2018 that's wrong.  How do we know that?  CISA -- Brian

4    Scully testified CISA does not do attribution.  It makes no

5    effort -- when it reports disinformation to a platform, it

6    doesn't even try to determine whether or not that came from a

7    domestic American speaker, as protected by the First Amendment,

8    or a foreign national who might be outside the First Amendment,

9    makes no effort, just reporting it, please take it down.

10       And the FBI, in a sense, is even worse.  Elvis Chan says,

11   "The FBI is as infallible as the Pope."  He says, "We never got

12   it wrong."  Hundreds and hundreds and hundreds of speakers that

13   we flagged, he said, "Every single one was a foreign national."

14       The problem with that is they submitted in their response

15   briefings Exhibit 2 is the congressional testimony from

16   February of this year of Yole Roth, who is the senior content

17   moderation person at Twitter at the time.  And he was asked by

18   Congress, "Hey, was the FBI getting it right when they said all

19   these accounts come from foreign nationals?"  And he said, "It

20   was a bit of a mixed bag."  Right?  Actually the question was,

21   "Isn't it true the FBI always got it wrong?"  And he said, "No,

22   sometimes they did get it right."

23       So what you're looking at is the FBI is secretly sending

24   these encrypted lists to the platforms saying, "We've

25   identified with a high degree of" content -- or "confidence

1   that all this content comes from maligned foreign actors, and

2   we want you to take it down from social media."  When, in fact,

3   what's actually going on is they've got a mix.

4        In that list, there's tons and tons of domestic foreign

5   speech that's completely protected by the First Amendment.  If

6   the FBI is giving false information to the platforms saying,

7   "Hey, that's Russia, that's Iran, that's China," when really

8   it's, you know, maybe, you know, a trucker in Nebraska or a

9   housewife in Ohio who just has political opinions.

10       In addition to that, when the FBI -- even when the FBI got

11  it right, they're going after First Amendment-protected speech.

12  And there's great examples of this.  They're actually in, I

13  think, Tab 3 of the binder, sorry, Tab 2 of the binder.  Elvis

14  Chan --

15            THE COURT:  10 or 2?

16            MR. SAUER:  I'm sorry.  It's Tab 2 of the binder.  I

17  apologize.

18            THE COURT:  2.  Okay.

19            MR. SAUER:  Elvis Chan gives examples in his master's

20  thesis of here's stuff that the FBI flagged and got taken down

21  because it was foreign, Russian originated.  One example is,

22  like, an ad that says, "Boo, to Hillary" you know, Hillary

23  Clinton with a black slash over her face.  Another one is

24  "Secure the borders," right, just kind of standard, very simple

25  red meat messages.  "Defend the Second Amendment."

1        And the FBI determined these all came from Russians, and
2   we went to the platforms and got them taken down.  But if you
3   look at their own exhibits, in the bottom left corner of each
4   one, it says, oh, look, a Hillary one had already been reacted
5   to 763 times by American citizens.  The secure the borders one
6   134,943 Americans had liked that, which means they've taken
7   that -- when you click, "like," it's posted in your own news
8   feed.  It kind of becomes your own message.  And that's a First
9   Amendment-protected activity.

10       The FBI says, "Oh, that secure borders message, that came
11  from the Russians.  You've got to take that down."  And they
12  bragged that 50 percent of the time they do get stuff taken
13  down when, in fact, there's talking about stuff that Americans
14  have interacted with exercising their own First Amendment right
15  to like, to comment, to repost or reply on literally hundreds
16  of thousands of occasions.

17       The FBI in this case says, "We're in an information war
18  with Russia and with China and with maligned foreign actors."
19  But it's perfectly clear, in the FBI's view, hundreds of
20  thousands of acts of First Amendment protected activity are
21  acceptable collateral damage in that information war.  And
22  that's what that, I think, vividly shows.

23       So that's where we are in 2018.  We already have the FBI
24  and CISA actively involved in targeting First Amendment
25  protected speech on a very large scale against the backdrop of

1    these powerful threats from the congressional staffers that

2    oversee the FBI and CISA saying, "We want you to take down this

3    stuff.  Take down the stuff that the federal government doesn't

4    like."  And this radically expands when we get to the 2020

5    election cycle.

6         So in that particular cycle, there's at least five things

7    going on in 2020.

8         So CISA switchboarding expands.  We've already talked

9    about that.  And there's this -- in the 2020 cycle, we've got

10   dozens and dozens of emails and spreadsheet of all their

11   flagging operations and so forth.  CISA is very active directly

12   in switchboarding.

13        In addition to that, the FBI is continuing, and probably

14   accelerating its own flagging activity that it had done in

15   2018.  Again, Elvis Chan is saying "We're sending these things

16   one to five times per month, one to six times per month."  And

17   they're just having endless meetings, big group meetings with

18   all the platforms, one on one bilateral meetings out in

19   Silicone Valley where you get a whole crew of FBI agents

20   sitting down with a whole crew of, you know, Twitter and

21   Facebook and Google and YouTube, and so forth, again and again

22   with seven or eight platforms.

23        But, in addition to that, three new things happen.  One,

24   of course, is COVID-19 breaks out in the beginning of 2020.

25   And there's immediately an aggressive move by federal officials

1   to get control of what Americans and others are allowed to say

2   on social media about COVID-19.

3       And, now, in 2021, this goes all the way up to the top of

4   the White House.  But in 2020, what we see is senior federal

5   officials operating essentially independently and at odds with

6   the White House engaging in deceptive techniques to try and get

7   control of what the platforms are actually censoring.

8       So the matter obviously circulates the evidence, in this

9   case, around Dr. Fauci and Dr. Collins' multiple campaigns in

10  2020.  I think the crown jewel of them, so to speak, is their

11  deceptive campaign to get the lab leak hypothesis censored,

12  which was so effective, I think, that they just decided to do

13  the same thing again and again.

14      You know, and you get to October of 2020 when they're

15  going after the Great Barrington Declaration, getting that

16  pulled down from social media.

17      So you have COVID becoming a new, hot topic in the

18  censorship space.  And you have Dr. Fauci and Dr. Collins, in

19  particular NIAD and NIH, very actively involved.  And there's a

20  new technique there because what they're doing is they're

21  engaging in deception.

22      Previously FBI and CISA had been involved in pressure.

23  But what Dr. Fauci and Dr. Collins do is they engage in

24  deliberately sowing, laying out false and misleading

25  information with the intent of inducing the platforms to censor

1    stuff.

2         And there's -- there's a series of tabs, you know, that --

3    Tab 6 to Tab 13, the binder, are all bits of evidence from that

4    particular campaign.  There's obviously dozens and dozens of

5    exhibits in the record relating to that.

6         One really interesting is in Tab 7 where there's an

7    internal email where Dr. Fauci, who said in his deposition, you

8    know, kind of probably a dozen times, "I don't know anything

9    about social medial.  I don't follow social media.  I don't

10   have an account.  I don't pay attention to it," and so forth.

11   But what he's saying in early 2020 in internal emails is, "We

12   have got to stop further distortions on social media about the

13   origins of COVID-19 from a lab."  So his internal

14   communications at the time speak much louder.

15        There's multiple other emails in there with him and

16   Dr. Collins and Jeremy Farrar, who are all kind of

17   collaborating to get the lab leak hypothesis squelched, where

18   they talk about, "What we really want is to control what's

19   being said on," quote, "mainstream and social media."

20        But, in addition to that -- so there's two other really

21   kind of just watershed events in 2020 in this censorship space.

22   In addition to the COVID stuff, you also have CISA and the GEC

23   collaborating, especially CISA, collaborating to set up the

24   Election Integrity Partnership.  And the Election Integrity

25   Partnership is in many ways the most jaw dropping of the

1    federal censorship activities in this case.

2        In addition to that, you also have the FBI engaging in its

3    particular campaign of deception, you know, quite similar in

4    many ways to what Dr. Fauci and Dr. Collins do in the lab leak

5    theory to seed, to plant false and misleading information with

6    the platforms to induce them to censor the Hunter Biden laptop

7    story.

8        So there's tabs about -- in our binder about all of those.

9    I'm going to focus particularly on the Election Integrity

10   Partnership, which is just in many ways, shocking in its scope.

11   It is a mass surveillance operation that involves 120 analysts

12   in 2020 alone, serving 16 hours a day using machine learning

13   and artificial intelligence to surveil the literally hundreds

14   of millions, possibly billions of electronic communications in

15   real time.

16       Their report talks about how we surveiled 859,000,000

17   tweets during the four-month period in the 2020 election cycle.

18   And that's just one platform.  Right.  859,000,000 tweets were

19   surveiled and reviewed.  21 were classified as involved in

20   their tickets potentially involving misinformation and tracked.

21   And some very large subset of that, probably in the millions,

22   is flagged and removed from social media as a result of their

23   activity.

24       From the very beginning, the Election Integrity

25   Partnership is a federal project.  It is a CISA project.  The

1    very idea from the project is placed in the minds of CISA

2    interns who are simultaneously working for the Stanford

3    Internet Observatory by Brian Scully.

4        He says, "I told the interns about the gap, the gap that

5    this, you know, EIP is designed to fill."  And then they say,

6    "Well, why don't we do this about the gap?" and so forth.

7        So what is that gap?  Well, it's got two elements.  One

8    element that Brian Scully emphasizes is we, the federal

9    government, and the state and local government officers, don't

10   have the resources to police all the misinformation that's on

11   the social media and identify it for the platforms.  So he

12   said, "We lack the resources."  But also they candidly admit,

13   "We don't have the legal authority to do it.  We can't do that

14   under the First Amendment, and there is no statute that

15   authorizes us to do that.

16       So if you look at their internal documents or their public

17   documents, the public EIP report is quite explicit about this.

18   They said, "Well, one of the reasons we set up the EIP is

19   because CISA and the other national security agencies and

20   intelligence agencies lack the legal authority.  And if these

21   activities were directed to American citizens, they would

22   likely violate the First Amendment."

23       So the whole idea of the EIP is to kind of bring in the

24   nonprofits:  Stanford, Graphika, Atlanta Counsel and University

25   of Washington, to bring them in and kind of do the dirty work

1    that the federal government is not willing to do.

2        And if you look at Tab 14 in your binder is the

3    operational time line from the CISA report where right there at

4    the top they say what's one of the first key dates in their

5    operational time line?  Number 2 is meeting with CISA to

6    present the EIP concept.  It's almost like they're meeting with

7    their shareholders, right, or their investors.  Hey, here's

8    something we'd really like to do.  We're going to go and get

9    your approval for it.

10       And the evidence strongly indicates that CISA is right

11   there at the beginning directly involved in launching this

12   thing.  That's reflected in the testimony of Brian Scully and

13   actually they go on to say in the report, once we had that

14   meeting to present the concept, in consultation with CISA, we

15   launched the Election Integrity Partnership.

16       And the Election Integrity Partnership isn't just -- CISA

17   is not involved just in the launch, but they have ongoing

18   collaboration in its operations.  And, in fact, at Tab 15 in

19   your binder, they have like a handy dandy flow chart where they

20   say we formalize the role of government, government there they

21   identify in a later page as CISA, the GEC, the Global

22   Engagement Center, also a defendant in this case, and the

23   EI-ISAC, which is a kind of clearing house of state and local

24   officials also subject to the First Amendment that is funded by

25   CISA.  Right?

1          So you see the government is there, and the platforms are

2     there and everyone has got their role in the flow chart.  It's

3     like a nice, you know, encapsulation of ongoing collaboration

4     involved in Election Integrity Partnership.

5          And, of course, if you flip to the next tab in your

6     binder, Tab 17, we highlighted that statement right at the

7     beginning of the Election Integrity Partnership report about

8     why do we stand this up?  That sentence says, "This is

9     especially true for election disinformation that originates

10    from within the United States which would likely be excluded

11    from law enforcement action under the First Amendment and not

12    appropriate for study by intelligence agencies restricted from

13    operating inside the United States.

14         Renee DiResta, who is one of the key, you know,

15    implementers Election Integrity Partnership at the same time

16    said publicly, you know, if the federal government did this,

17    there would be very real First Amendment questions.

18         The whole idea of the EIP is to evade the First Amendment

19    and have private parties team up with the government to do what

20    the government cannot do.

21         And the platforms who, by now, have been subjected to four

22    years of continuous pressure to do what the national security

23    agencies want on election-related speech, they play ball too.

24    So even the EIP is conducted.

25         One of the really important reasons why Stanford needs

1   CISA and that's what Scully -- Brian Scully said in his
2   deposition, that Alex Stamos who's organizing this for Stanford
3   realizes he needs CISA's involvement is when they go to the
4   platforms with CISA behind them, behind all that is all those
5   threats that have come out since 2017 and will continue.
6   So -- and, of course, this is just -- I just did a couple,
7   touch base.
8       The next tab in your binder, Tab 17, is actually based in
9   the evidence 15 points of significant collaboration between
10  federal officials and the Election Integrity Partnership,
11  almost all CISA.  CISA's main defense in their briefs is,
12  "Well, we didn't flag any disinformation for them."  Well,
13  actually, they're cross-pollinating their disinformation
14  reports because they're both -- they're the same human beings
15  at CISA who are -- who are flagging -- they basically work for
16  -- you know, they've got the CISA hat on during the day.  So
17  they're a federal national security agent during the day.  And
18  then at night, they put on their Stanford hat.
19      And during the 2020 election cycle, they are flagging this
20  information for both of them.  They are crossing over in their
21  emails.  And an email they flag for the EIP turns up in the
22  CISA inbox.  You have a spreadsheet where CISA is reporting
23  misinformation to platforms under EIP tracking numbers.  And,
24  of course, CISA now says, "Well, we never actually flagged
25  anything directly to the EIP."

1    CISA is actually funding the EI-ISAC.  CISA has put the

2    EIP in connection with NASS and NASED and the various state

3    officials who are making the reports.  CISA is coordinating

4    with the platforms on how to have CISA and the EIP report at

5    the same time and again and again and again.

6    And, of course, their main defense is we never flagged

7    anything directly to the EIP.  But in the affidavit from

8    Ms. Bray that they submitted with their response brief, they

9    admit that the GEC did, which we did not elicit from Daniel

10   Kimmage in his deposition because he professed no knowledge of

11   it.

12   But what she says on 21 occasions that GEC, which is also

13   federal officials, directly was flagging in 2020

14   misinformation, but not just posts but also narratives she says

15   to the EIP for censorship.

16   So you're looking at this sort of highly integrated,

17   interconnected, interwoven system of federal officials and

18   social media platforms linked by these -- by the Stanford

19   Internet Observatory and similar entities.  And this, the scope

20   of the surveillance and censorship is absolutely staggering.

21   I mentioned before, and this is Tab 19 in the binder, that

22   they say they had -- looks like they had quite privileged

23   access.  They said we had access to Twitter Streaming API.  In

24   context, it appears that the Election Integrity Partnership had

25   kind of the same access that internal Twitter people would do

1    to read people's tweets and to read -- in some cases it looks

2    like they're reading DMs and so forth.

3        And they said they collected over a four-month period

4    859,000,000 tweets, almost a billion social media posts on one

5    platform alone.  If you multiply that by Facebook, they were

6    looking at Facebook and Instagram and Tik Tok and YouTube.

7    We're looking at surveillance of literally billions of realtime

8    electronic communications by Americans on core political

9    speech.

10        And they say on Twitter alone, if you go down in there,

11    the other highlighted thing says we tracked in our tickets.

12    The tickets are their organization of narratives that they

13    think are misinformation.  They bundle into them these 21

14    million tweets.  And some significant subset of that they're

15    going to the platforms and getting it taken down.

16        Keep in mind that they also brag that back in the early

17    summer and late summer of 2020 they went to the platforms and

18    pressured them to change their policies to make their policies

19    more stringent and more restrictive so they could get more core

20    political speech censored.

21        And so that -- in addition to that, Your Honor, because of

22    constraints of time, I'll touch briefly on the fifth major

23    thing that's going on in our evidence in 2020, which is the

24    Hunter Biden laptop story.

25        We've submitted I think overwhelming evidence that there

1    was a deliberate campaign of deception similar to the -- as I

2    said before, the campaign by Dr. Fauci and Dr. Collins to plant

3    with the platforms deceptive information.

4         What did the FBI do?  They're having these endless

5    meetings again and again and again in the 2020 election cycle

6    with the platforms.  And again and again they say, "You guys

7    watch out for a hack-and-leak operation."

8         They've admitted in testimony there was no investigative

9    basis for that.  They had no actual reason to think that there

10   might be a hack-and-leak operation based on any active

11   investigation.  But they kept warning it again and again.

12        Those warnings come from Brian Scully, Matt Masterson at

13   CISA.  They also come from Laura Dehmlow who is the head of

14   FITF, the Foreign Influence Task Force at the FBI; Elvis Chan,

15   other FBI agents.  They come in the big group meetings, the USG

16   industry meetings.  They also come in the bilateral meetings

17   with the platforms.

18        And, in fact, Tab 21 is just a couple of the internal

19   emails that reflect that.  You've got an email from September

20   where the platforms are saying, "Hey, we talked about, quote,

21   "preparing for a so-called hack-and-leak operation.

22        And from July of 2020, a deep dive topic for 40 minutes at

23   one of these meetings was hack/leak in U.S.G. attribution

24   speed/process.

25        So you've got the testimony of Elvis Chan and Brian Scully

1  admitting to this.  And you also have the contemporaneous
2  emails that corroborate it.
3      What's the result of that?  This misleading information it
4  seeded?  And, Judge, there's, like, an evidentiary dispute that
5  I've included here as Tab 22 paragraph 11 of your Yoel Roth's
6  contemporaneous declaration which appears to provide the best
7  and clearest accurate account of what happens in those
8  meetings.
9      So, in that, he says during these weekly meetings, the
10 federal law enforcement agencies communicated that they
11 expected hack-and-leak operations and that he was told that the
12 intelligence community expected they would try hacking attacks
13 and that it would -- it would -- these would likely occur in
14 October when magically it actually happened, right.
15     The *New York Post* ran the Hunter Biden's story in October.
16 And the kicker at the end, as I also learned in these meetings,
17 that there were rumors that a hack-and-leak operation would
18 involve Hunter Biden.
19     Now, more recently, a couple months ago, Mr. Roth, who
20 filed this with the FEC in December 2020, tried to retreat from
21 a that in his congressional testimony.  And he said, "Well,
22 might have been the platforms, not the federal law enforcement
23 agencies who said that it would come -- involve Hunter Biden.
24     That facially doesn't make a lot of sense.  I mean,
25 obviously it's the federal law enforcement agents who know what

1    hack-and-leak might be done by foreign agents.  But, in any

2    event, when he was pressed in his congressional testimony by

3    Representative Jordan, he said, "Who actually said this?"  He

4    admitted, "I truly don't recall."  So his attempt to kind of,

5    like, spin that in 2023 fell through.

6         And if you look back to the contemporaneous documents in

7    2020, this declaration that's excerpted here at Tab 22 of the

8    binder, actually was filed by lawyers from Covington & Burling,

9    the whitest of white shoe firms in Washington D.C.  And they

10   said in their cover letter that included these declarations

11   exhibit at the time, that, quote, "These reports from law

12   enforcement agencies, not from other platforms, suggested that

13   the rumor would involve Hunter Biden."

14        So I think the only possible inference from that evidence

15   is that when Yole Roth said in December of 2020, it's true; and

16   that it was federal law enforcement agencies who were saying,

17   "Hey, there's going to be a hack and leak, you should expect it

18   likely in October, and, you know what, we are hearing rumors it

19   might involve Hunter Biden."

20        So, of course, the FBI at this time has been in possession

21   of the Hunter Biden laptop since 2019.  They know it wasn't

22   hacked.  They got it from the store owner.  Right?  So they

23   know that they're laying the foundation, deceptively laying the

24   foundation for the future censorship of that story, which was a

25   politically seismic event in the history of censorship in the

1    United States.

2        So that gets us to -- that's a summary of the sort of five

3    main pillars we see of federal social media censorship

4    activities in 2020.  And that is, like, the first of what I

5    call the two quantum leaps.  In the 2020 election cycle, you've

6    got, you know, a huge flurry or expansion of activity.

7        And then when President Biden enters the White House, you

8    get a second quantum leap.  All of a sudden what was being done

9    kind under the nose of the White House, you know, through the

10   FBI -- The FBI, keep in mind, you know, by suppressing the

11   Hunter Biden laptop story is acting directly against the

12   interest of the president at that time.

13       But then you have in 2021 President Biden enters the White

14   House.  President Biden, who, while he was a candidate, said,

15   Mark Zuckerberg should face not just civil liability but

16   possible criminal prosecution for colluding with people to

17   allow them to post stuff on his website that President Biden

18   doesn't like.  And that's one of dozens of threats like that

19   that come, not just from him, but from others.

20       And when he enters the White House, then all of a sudden

21   that notion that the platforms had better fall in line or

22   they're going to endure serious legal pressure, that becomes

23   not just the statement of the candidate, but the official

24   policy of the White House.

25       And you see in 2021 threat after threat after threat.  At

1   least six occasions in '21 and '22, from Jen Psaki where she's

2   making these public statements where again and again she's

3   closely linking the threat of adverse legal consequences,

4   robust antitrust program.

5       You know, a great example of this is in the binder.  It's

6   the May 5th, 2021, comment where she says, "The president

7   supports a robust antitrust program for social media

8   platforms."  That's sandwiched between two statements that are

9   demanding more censorship.  "They're not doing enough to take

10  down the censorship.  Hey, the President supports a robust

11  antitrust program."

12      We have statements like that in May of 2021, on July 15th

13  and July 16th of 2022 -- or 2021 from Ms. Psaki, October 6th of

14  2021, February of 2022, April of 2022.  It's this constant

15  theme.

16      And also there's similar statements from Kate Bedingfield,

17  the White House communications director.  And also in private

18  now you're getting threats from senior White House Officials

19  that are communicating in private, like, Rob Flaherty, Andy

20  Slavitt, and so forth.  They're now making these ominous

21  communications in their emails to the platform.

22      There's a very clear message coming out of the

23  administration, play ball with us on censorship or you're going

24  to pay some serious consequences.

25      And, of course, what we see in the evidence is the social

1   media platforms falling in line.  And what is most vividly

2   displayed I think in the sort of joint pressure campaign from

3   the Surgeon General's Office and the White House, Rob Flaherty

4   and Surgeon General Murthy, Andy Slavitt, Eric Wall, they're

5   all involved in these -- this sort of ongoing private campaign

6   of communications against the backdrop of two big public

7   statements on May 5th of 2021 and July 15th and 16th of 2021

8   from the White House.

9       And we see the platforms' kind of resistance to some of

10  the White House demands essentially collapse.  By late July of

11  2021, you have Nick Clegg who is the senior C-suite of Facebook

12  emailing Surgeon General Murthy and saying, "We hear your call

13  for us to do more, and here are all the new censorship actions

14  we're going to take."

15      In addition to that, we see not just Nick Clegg -- not

16  just that, you see Twitter all of a sudden holding off for

17  several months to White House pressure to deplatform Alex

18  Berenson.  And, all of a sudden, they just collapse.  They

19  suspend him within hours of July 16th, the President's

20  comments, "They're killing people," on July 16th.

21      The exact same thing happens with -- to other specific

22  speakers Facebook, for example, the disinformation dozen

23  Facebook was saying in emails in May to Andy Slavitt, "I know

24  you're not going to be happy with our position, but we really

25  can't take him down.  They don't violate our policies.  Then

1    after July 16th, boom, they're immediately deplatformed.

2         And there's a series of three or four different emails

3    where Facebook is going back to the surgeon general's office

4    and the White House saying, "Look at all the stuff we did to

5    take down the disinformation dozen.  Look at all the stuff we

6    did."

7         And this brings us to two additional points I want to

8    emphasize for the Court.  One is if -- one of the things they

9    say in their response brief is really the White House is just

10   going after parity accounts and impersonation accounts.

11        Absolutely not.  What you see is the White House going

12   after and trying to procure, and successfully procuring, the

13   censorship of those speakers that the White House believes are

14   the most persuasive and influential in contradicting the

15   viewpoints that the White House wants to push.

16        So they're going after the disinformation dozen who they

17   think are responsible for 73 percent of the vaccine-related

18   speech that they don't like.  They're going after Alex

19   Berenson.  And the documents say that the White House said that

20   they think Alex Berenson is the epicenter of disinformation

21   that radiates out to the persuadable public.  So they're going

22   after the key strategic speakers.

23        Tucker Carlson, the journalist who's probably the most

24   prominent critic of the Biden administration, they're secretly

25   emailing Facebook saying, "Take down his content from" -- you

1    know, "from social media."  So they're going after the most

2    persuasive and powerful voices expressing the very viewpoints

3    that most disfavor.  So it is a sort of like really core

4    violation of the First Amendment.

5        In addition to that, in addition to that, another comment

6    I want to point out is one of the tabs in the binder is

7    actually -- I think it's Tab 24, is actually a document

8    received from Twitter in February of this year.  It's a

9    supplement.

10       Last -- last September Twitter, under its prior

11   management, under our subpoena, we said, "Please disclose

12   federal officials who communicate with you about

13   disinformation, misinformation and censorship."

14       Twitter, under its prior leadership, disclosed 11 names.

15   After the change of ownership of Twitter, we went back to them

16   in December and said, "We think that this is understated

17   because we got 45 names from Facebook and we don't think that

18   your 11 names is plausible in light of the fact that we got 45

19   names from Facebook.

20       Under its new leadership, Twitter put together a new list

21   and that has 83 names on it.  Now, the names we've highlighted

22   on this list include 15 names who are senior White House

23   officials.  Those are the highlighted names.  There's an open

24   source review.  Those are the ones.  There could be more on

25   here because some of these names we don't know who they are.

1    Right?

2         There's at least 15 here, and there's more on the Facebook

3    list that are not on the Twitter's list.  So we're looking at

4    something that's at least 20 White House officials who are

5    communicating with platforms about misinformation,

6    disinformation and censorship.

7         And so far in this case, we've actually received written

8    documentary discovery from one of them, just Rob Flaherty.

9    We've never gotten -- now, some of these people are copied on

10   Rob Flaherty's emails, you know, and copied on emails with HHS.

11   But for a lot of these, you know, I just want to emphasize to

12   the Court, we're at the preliminary injunction stage.  We're

13   just scratching the surface.  We're just looking at the tip of

14   the censorship iceberg here.

15        So, anyway, moving on, I have a limited amount of time.  I

16   do want to emphasize a few other points.

17        So if you look at this White House campaign, what -- and,

18   again, it's a multipronged campaign, just like back in 2017

19   you've got the multiprongs of federal pressure coming from --

20   then coming from congressional hearings, coming from public

21   statements from senior federal officials, and then you've got

22   these private meetings.  You see the same dynamic with this

23   White House campaign of pressure.

24        You've got basically the public statements, the public

25   threats coming from Jennifer Psaki, coming from Kate

1    Bedingfield and so forth.  And then you've got these private

2    threats.  And the private threats are really an abusive

3    campaign of demand after demand after demand from Rob Flaherty.

4         And, again, he's the only White House official that we've

5    got documents from directly so far in this case.  But if he's

6    any example of what's going on, we're talking about levels of

7    censorship that should make your eyeballs burn.

8         So, for example, Tab 25 of your binder is just a selection

9    of the Rob Flaherty emails we received in discovery in lieu of

10   his deposition rather late in the case.  And just highlighting

11   in there just gives you a flavor of what he's saying in these

12   communications.

13        He's making, for example, implied threats like, you know,

14   "Hey, here's a document that's informing our thinking

15   internally and is not necessarily the lower bounds of what

16   we're expecting.  Or, again, Andy Slavitt in one of these

17   emails saying internally we don't like how you have not been

18   giving us all the information we're demanding and not censoring

19   what we're asking for internally.  Quote, "We're considering

20   our options what to do about it."

21        So when you juxtapose these, I think the Court really very

22   very aptly summarized these in your motion to dismiss order

23   when you said, "We've alleged threats, some implied and some

24   quite blatant."  And you see that here in the Flaherty emails.

25   You also see it in the public statements from senior White

1    House officials.

2        And then what you see is essentially a kind of collapse of

3    resistance.  The platforms are really brought to heel by mid

4    2021.  And they appear to be essentially, you know, falling

5    over themselves to do whatever the White House demands.  As

6    Nick Clegg says, we want to do -- "We hear your call for us to

7    do more.  We want to meet with you and understand what the

8    White House expects from us on disinformation going forward.

9        And then you see these emails, for example.  Some of these

10   are tabbed in the binder where the Surgeon General's Office

11   says, "Hey, please report back in 14 days about what new or

12   additional steps you've taken to go after disinformation in

13   your platform."  And, sure enough, 14 days later you have an

14   email back from Nick Clegg from Facebook.  And he's saying,

15   "Oh, here's all the new and additional steps we've taken."

16   They said, "No, it's all only old stuff," that directly

17   contradicts the text of the email.

18       That email says, here's a long list.  He's got five bullet

19   points with four sub bullet points of here's all the new --

20   here's the new stuff we've done to go after the disinformation

21   dozen.  We've expanded the list of claims we're going after.

22   We expanded penalties for repeat spreaders, etcetera etcetera,

23   etcetera.

24       And you see this also reflected in the CDC's documents

25   because the CDC at this time, after that July 2021 exchange

1   where Facebook who had been kind of resisting some of the White
2   House's demands, is now kind of saying, "We'll do whatever you
3   want."  What you see is the CDC -- you see the Facebook content
4   moderation officer reaching out to the CDC again and again with
5   long list of claims of supposed misinformation saying -- and
6   first they say, hey, CDC our content moderation policy says
7   we'll take down stuff that's false and could lead to vaccine
8   hesitancy.

9        And then they email and they say, here's a long list of
10  claims for each one of these.  Could you please tell us whether
11  or not it's false and leads to vaccine hesitancy?  And the CDC
12  is delighted to oblige.  They say, yes, we'll be happy to do
13  it, you know.  And we'll go through the list and this is false
14  and this is false, and this is false.

15       And the response, you know, Carol Crawford discloses stock
16  statement one sentence, no support, "All this could lead to
17  vaccine hesitancy."  And then Facebook reports back and says,
18  "As a result of our work together, we're taking down all those
19  claims that you guys have debunked.

20       So essentially Facebook is outsourcing.  And they're doing
21  this for prospective claims as well.  So when you get to the
22  vaccines are approved for late childhood, the vaccines are
23  approved for early childhood, you get Facebook going back to
24  the CDC and saying, "We're anticipating that people are going
25  to say a bunch of stuff when this happens.  Could you please

1    prebunk them for us.  Tell us whether they're false or

2    misleading, and then we're just going to do whatever you tell

3    us.

4         So you almost have an outsourcing of content moderation

5    from Facebook to the CDC that goes on in late 2021 and going on

6    into 2022.  And some of those are tabbed in the binder.

7         I want to jump forward a little bit, Judge.  There's other

8    tabs in the binder.  But in the last few minutes of my time I

9    just want to emphasize that I take the principal defense in

10   this case is we're not doing it anymore.  Right?  Their

11   argument is they say our evidence is stale.  Right?  They say,

12   "Well, you're evidence is old.  Well, we got documents from you

13   a year ago.  And the censorship activities go right up to the

14   time you produced your documents.

15        And you're saying, you know, you don't have any documents

16   since, you know, August or September of 2020 when we made our

17   major document production.  That should be no surprise to

18   anyone.

19        As I said at the beginning, what you actually see is every

20   objective indicator, both in their private emails, their

21   private text messages between Jen Easterly and Matt Masterson,

22   their public statements, their leaked documents, and in their

23   conduct, shows a firm commitment to this censorship enterprise,

24   a firm commitment to continue engaging in these censorship

25   activities.

 1     And I'm just going to highlight just a few examples of

 2     this.  For example, you've got a long series of public

 3     statements from the White House saying we want to have the

 4     social media platform start censoring on new topics we're

 5     concerned about.

 6     For example, in the summer of 2020, gender information,

 7     disinformation campaigns against female and LGBDQ plus

 8     journalists, whatever that means.  Right?  Abortion-related

 9     speech.  Climate change is a big one.  Actually it's very

10     timely.  If you were on Twitter yesterday, you may have seen a

11     republican presidential candidate reporting that Linkedin had

12     booted him off Linkedin for saying climate disinformation.

13     That's something that the White House and other senior

14     federal officials in the record have been hammering and

15     demanding more censorship of going back at least to Gina

16     McCarthy's public comments in the summer of 2022.

17     You see this in CISA.  And CISA last -- late last fall --

18     there's a -- or early last fall, there's a leaked document that

19     says that CISA wants to expand its disinformation efforts to

20     address things like the war in Ukraine, racial justice, the

21     U.S. withdrawal from Afghanistan.  Why does CISA want to pull

22     down misinformation about that, I wonder, you know, financial

23     services and so forth.

24     If that was a leaked document report, when Brian Scully

25     was asked about those in his deposition, he confirmed almost

every single one of them.  He said, "Yeah, we've got a program with treasury to go after disinformation about the financial services industry.  Yes, we have people detached to a task force to talk about mis and disinformation relating to the war in Ukraine, and so forth.

The FBI.  Elvis Chan did a wonderful public statement at the end of the 2020 election cycle.  He said, "As soon as 2020 was over, we jumped right in 2022."  There's no indication the FBI has ever stopped in its flagging activities.  In fact, it shows every indication that it's ongoing.

The Election Integrity Partnership.  The Election Integrity Partnership posted 14 updates on its website about its activity last year in the 2022 election cycle.  So it's humming along strong.  They set it up in 2020 and it's going on.

I didn't talk about the Virality Project.  There's some tabs about that.  So it calls itself the Election Integrity Partnership through 2020; then in early 2021, starts calling itself the Virality Project.  It's the same people using the same techniques interfacing with the same partners and federal agencies and platforms, and so forth, doing the same kind of surveillance; and engaging in the same kind of censorship activities.

They gave it a new name.  Now we're the Virality Project. Then fast forward a year, you know, we're the Election

1    Integrity Partnership again are we're still doing it all
2    throughout 2020.  And you have public statements from Renee
3    DiResta that say this problem is not going away and we've got
4    to keep doing it.  So there's a firm expression of commitment
5    that it's going to keep going on in the next election cycle
6    that's coming at us next year and so forth.
7        I think two facts here are extremely telling.  Eight days
8    before we filed this lawsuit, DHS announced the Disinformation
9    Governance Board, Exhibit 1 to Glenn declaration that's filed
10   way back last summer when we first moved for PI doc 10-1
11   Exhibit 1 are the leaked documents from DHS that relate to the
12   Disinformation Governance Board.
13       And what they show, what they show is that the DGB was not
14   a new censoship program.  It was created to impose a
15   bureaucratic structure on the censorship that was already going
16   on that was so big and so extensive it needed to create another
17   whole new federal agency within DHS to oversee it essentially.
18       So the DGB itself that they then retreated from after the
19   public backlash was evidence of this firm commitment and the
20   fact that the censorship activities are expanding relentlessly.
21       And then, finally, you have from February of 2022, again,
22   two months before the lawsuit, you have the text messages from
23   Jen Easterly -- this is last tab in your binder -- from Jen
24   Easterly to Matt Masterson where she's saying, "You know, on
25   this call we're having the platforms, I'm looking to play a

1     coordination role, a coord role, a coordination role because it
2     would cause a lot of chaos if every department and agency is
3     independently communicating with the platforms."
4          So what does that reflect?  She knows there is -- this is
5     going on in Mayorkis' words, "across the federal enterprise,"
6     and that it's so big that DHS wants to, kind of like, come in
7     and take control of it all because censorship activities are
8     going on throughout the federal government.
9          So, Your Honor, that's 45 minutes by my watch.  So I'll
10    stop there and just invite the Court's questions.
11              THE COURT:  You reserve 15 minutes after that.  So
12    I'm going to wait on my questions until everybody finishes and
13    try to do it that way.  I'm going to try to lay off the
14    questions, but I'm not going to promise.  Okay.
15              MR. SAUER:  Thank you, Your Honor.
16              THE COURT:  Go ahead.  Anybody need a break or are
17    you ready to go?  Y'all ready to proceed?
18              MR. GARDNER:  We're ready, Your Honor.
19              THE COURT:  Okay.  Go ahead and proceed.
20              MR. GARDNER:  Unless -- if anyone else needs a break.
21              THE COURT:  Ma'am?  Sir?  Oh, you need one?  If you
22    need one.  Okay.  Go ahead and proceed.  Thank you.  My
23    understanding is you're going to break it up.  However you want
24    to do it, that's fine.
25              MR. GARDNER:  Yes, Your Honor.  Just so you're aware.

1    We're going to break it three ways.  My colleague Kyla Snow is

2    going to begin.  Then my colleague Indraneel Sur will go, and

3    then I will finish up.

4             THE COURT:  Sure that's fine.

5             MR. GARDNER:  Thank you.

6             THE COURT:  Go ahead.  Good morning.

7             MS. SNOW:  Good morning, Your Honor.  And may it

8    please the Court, I'm Kyla Snow on behalf of the federal

9    defendants.

10        In today's hearing, as in plaintiffs' briefing, you've

11   been presented with an assortment of out-of-context quotes and

12   select portions of documents that distort the record to build a

13   narrative that the bare facts simply do not support.

14        What you haven't heard today, but which defendants'

15   briefing lays out in detail, is all of the context and

16   additional evidence contradicting plaintiffs' narrative that

17   plaintiffs either mischaracterize or ignore.  For instance, in

18   response to defendants' paragraph by paragraph refutation of

19   plaintiffs' proposed findings of fact which illustrate the vast

20   deficiencies in the evidence, plaintiffs largely say nothing.

21        And, in response to defendants' proposed findings of fact

22   in our PI opposition brief, plaintiffs refuse to give the

23   paragraph by paragraph answers that parties typically provide.

24   Instead they simply restate their narrative, obfuscating the

25   facts and repeating the word "censor."

1        But stripped of plaintiffs' labels and hyperbole, the
2    record does not show the First Amendment violations they ask
3    the Court to read into it.  Instead what it shows, in the face
4    -- is that in the face of urgent crises, a once-in-a-generation
5    pandemic and bipartisan findings of foreign interference with
6    U.S. elections, the government responsibly exercised its
7    prerogative to speak on matters of public concern.
8        It promoted accurate information to protect the public and
9    our democracy from these threats.  And it used the bully pulpit
10   to call on various sectors of society, including social media
11   companies, to make efforts to reduce the spread of
12   misinformation.
13       It is that legitimate, government speech that plaintiffs
14   seek to silence in a sweeping preliminary injunction that would
15   effectively preclude the government from taking action in the
16   public interest, including as relates to matters of national
17   security.
18       The evidence here is far from sufficient to justify that
19   preliminary relief, and plaintiffs do not even -- counsel on
20   the other side does not even mention the preliminary injunction
21   factors, which is why we are here today to determine whether
22   they are entitled to a preliminary injunction.  But as my
23   colleagues and I will discuss today, plaintiffs fail to carry
24   their burden on any of the PI factors.
25       I will begin by discussing irreparable harm.  And my

1    colleague, Mr. Sur, will address the merits of plaintiffs'
2    First Amendment claims, and my colleague Mr. Gardner will
3    address the bounds of harm and scope of relief.  And he will
4    also address some issues relating to plaintiffs' motion for
5    class certification.
6        So turning to irreparable harm, and before jumping into my
7    main points about the evidence on irreparable harm, I want to
8    emphasize that to obtain the extraordinary remedy of a
9    preliminary injunction, plaintiffs bear the burden of pointing
10   to evidence making a clear showing of imminent, irreparable
11   harm.  And that is critical to the question of whether they're
12   entitled to a PI because a PI is -- the purpose of a PI is to
13   preserve the status quo and to prevent further harm before the
14   Court can rule on the merits.
15       As the Fifth Circuit said in *Google versus Hood,* this
16   principle applies in First Amendment cases as well.  It said,
17   "Invocation of the First Amendment cannot substitute for the
18   presence of an imminent, nonspeculative, irreparable injury.
19       And here when you're before the Court in PI proceedings,
20   unlike the motion to dismiss proceedings, plaintiffs cannot
21   simply rely on the allegations in their complaint, and their
22   allegations are not entitled to a presumption of truth.  They
23   must substantiate their assertions with evidence.  And that
24   evidence must show that the harms purportedly caused by
25   defendants are of such an immediate nature that a PI is

1   necessary to preserve the status quo.  And plaintiffs fail to

2   make that showing.

3       They attempt to substantiate their claims of irreparable

4   harm in the briefing by submitting several declarations from

5   the plaintiffs.  But the declarations set forth only past

6   content moderation decisions by social media companies and fail

7   to link any of those decisions to the conduct of the defendant.

8       And, in fact, the record shows that much of the conduct of

9   defendants that plaintiffs challenge here is not currently

10  ongoing or likely to occur during the pendency of the lawsuit.

11      Considering all of that, plaintiffs' asserted harms caused

12  by allegedly caused by defendants' lawful conduct are not

13  actual or imminent.  They are speculative and hypothetical and

14  are insufficient to support a preliminary injunction.

15      So as to the declarations, plaintiffs rely primarily on

16  declarations that were submitted one year ago with their

17  initial motion for -- nearly one year ago with their

18  preliminary injunction motions submitted in June of last year.

19  These declarations are stale.

20      Despite having the opportunity to supplement them and

21  having access to voluminous discovery, many documents and

22  testimony, plaintiffs have largely not supplemented them.  They

23  have submitted two additional declarations.  I will discuss

24  those in a moment.

25      But as to the remainder of the nearly year old

1    declarations, these are -- point to conduct that occurred far

2    in the past.  Social media company content moderation decisions

3    that occurred a long time ago, many of them point to decisions

4    occurring in 2020 and in 2021.  The most recent decision,

5    content moderation decision that Dr. Bhattacharyna points to,

6    for instance, is in March of 2021, more than two years ago; and

7    Mr. Kulldorff says -- points to conduct occurring up to January

8    of 2022.  The same is true of Mr. Kheriaty who asserts that

9    content moderation became, quote, "more pronounced in 2022."

10       And the same is true also for the States of Missouri and

11   Louisiana who submitted declarations that included instances of

12   YouTube moderating videos that they've asserted that they've

13   posted to YouTube in the fall of 2021.  And they don't point to

14   anything affecting their own speech since then.

15       And this is important because, in the absence of any

16   social media content moderation decisions affecting the

17   plaintiffs, much less any that can be traced to the conduct of

18   the defendant, occurring in the last year or more, there is

19   insufficient evidence to sustain a finding that a preliminary

20   injunction is necessary now to preserve the status quo while

21   the Court considers the case on the merits.  And, again, that

22   is the central purpose of a preliminary injunction.

23       The plaintiffs implicitly acknowledge the deficiencies in

24   the evidence and try to rectify it by submitting the two new

25   declarations that I referenced earlier.  Those come from

1    Mr. Hoft and Ms. Hines.

2        And I want to note the fact that the fact that they have

3    only submitted two new declarations is telling about the

4    -- their ability to point to any more recent conduct as to the

5    other declarants.  It suggests that the evidence is simply not

6    there.

7        Even so, these two declarations, like all the others, are

8    insufficient to show irreparable harm for another reason that I

9    mentioned earlier, and that is that they fail to link any of

10   the asserted instances of content moderation affecting their

11   speech to any conduct of a particular defendant.  And that

12   makes their assertions of irreparable harm even more

13   speculative.

14       So take, for instance, Ms. Hines' supplemental

15   declaration.  She is one of the only declarants who points to

16   particular conduct of the defendant.  And she says in her

17   declaration at paragraph 15 that, according to her, the

18   evidence shows that the Surgeon General's Office cooperated

19   with the Virality Project to target health freedom groups such

20   as hers.

21       But, in fact, as outlined in defendants' responses to

22   plaintiffs' proposed findings of fact at paragraphs 330 through

23   337, and 1,266 through 1,323, which plaintiffs ignore, there's

24   no evidence that the surgeon general collaborated with the

25   Virality Project.

1      The Virality Project does not mention Health Freedom

2  Louisiana or Ms. Hines.  And, most importantly, the Virality

3  Project has not been active since 2022, with its final report

4  being issued in February of that year.  And the Surgeon

5  General's Office does not currently have any contact with the

6  Virality Project, as is documented in defendants' declaration

7  from Mr. Max Lesko at Exhibit 63 paragraph 14.

8      Any content moderation decisions of which Ms. Hines

9  complains from Facebook in 2023 in her declaration cannot

10  possibly be liked to any alleged involvement of the Surgeon

11  General's Office with the Virality Project.

12      And, as to the remainder of the declarations, again, none

13  of them link any of the conduct -- the content moderation

14  decisions at issue to any conduct of defendants.  The only

15  other one that points to any conduct of a defendant comes

16  -- well, there's two of them, Doctors Bhattacharya and

17  Dr. Kulldorff.  They both discuss the same conduct.

18      And they say in their declarations that in October of

19  2020, there was an internal email between Doctors Fauci and

20  Collins that referenced the Barrington Declaration that they

21  coauthored.  And they attribute that internal email to content

22  moderation decisions that companies took concerning the

23  Barrington Declaration.

24      But that internal email is not evidence of a communication

25  with a social media company.  And that was -- that internal

1   email was from October of 2020, more than two and a half years

2   ago.  And Dr. Fauci is no longer in government.  And there is

3   no assertion that Mr. Auchincloss's successor was in any way

4   involved with that communication.

5        These assertions of eminent harm based on content

6   moderation decisions occurring long in the past are -- do not

7   show any imminent harm today that can be traced to the conduct

8   of any ongoing conduct by a defendant in this case.  And,

9   otherwise, the declarations are purely speculative.

10        And plaintiffs' fear of imminent, irreparable harm is even

11   more speculative given that the record shows that much of what

12   plaintiffs challenge is past government speech and action that

13   is not ongoing and is unlikely to recur during the pendency of

14   the lawsuit.

15        And in enjoining past conduct is not necessary to preserve

16   the status quo while the Court considers the case on the

17   merits.  Instead enjoining past conduct would amount to an

18   advisory opinion that courts lack power to issue under Article

19   III as the Supreme Court said in *Transunion*.

20        But plaintiffs spend a substantial portion of their

21   discussion on conduct occurring -- occurring long in the past

22   in the 2022 -- 2020 election cycle and in 2021 and 2022

23   relating to COVID-19.

24        And I'll just point out just a couple examples.

25   Plaintiffs again reference conduct of Dr. Fauci in 2020.  They

1    basically acknowledge in their briefing that the only reason

2    that NIAID is in this case relates to conduct by Dr. Fauci.

3    Again, Dr. Fauci is no longer in government.  They assert that

4    they are still irreparably harmed because his -- Dr. Fauci's

5    successor received an email, again, an internal email in 2020.

6        But receiving an email, an internal email, three years ago

7    has nothing to do with content moderation decisions that social

8    media companies are taking today, and is not the basis for any

9    irreparable harm or a preliminary injunction.

10        And, as to CISA, plaintiffs, again, reference conduct

11    occurring long in the past.  They reference switchboarding in

12    the 2020 election cycle.  Again, conduct occurring in 2020

13    cannot be the basis for finding irreparable harm or enjoining

14    the CISA today.

15        As the evidence shows, and plaintiffs do not really

16    dispute, CISA has not been engaged in switchboarding since

17    2020.  Regardless of whether -- you know, when CISA made a

18    decision about whether to engage in switchboarding in the

19    future, the fact is that that conduct has not occurred since

20    2020.  And that is enough to conclude that there is no

21    irreparable harm here.

22        But, in any event, the government has submitted a sworn

23    declaration from CISA stating that it does not plan to engage

24    in further switchboarding in the 2020 election cycle.

25        Again, this conduct was lawful and responsible and helpful

1  to the public to protect against threats to national security

2  and to election infrastructure.  But the fact is when the Court

3  is considering whether to enter a preliminary injunction,

4  regardless of what the Court concludes about the merits of the

5  case, the question is whether it is necessary to enjoin conduct

6  that is -- has any likelihood of causing ongoing or eminent

7  harm to plaintiffs at this time.  And it does not show that.

8      In the absence of that evidence, plaintiffs say that

9  defendants have decided to expand the -- into other realms.

10  And they suggest that if they had more discovery, they could

11  show more.  But the record that the Court has now, and the

12  sworn testimony from the defendants shows the contrary.  And

13  all of the, you know, additional or, quote, "additional

14  conduct" that plaintiffs refer to does not have any link to the

15  activities of social media companies today.

16      For instance, plaintiffs point to a memorandum on the

17  establishment of the White House Task Force to address on line

18  harassment and abuse.  And they, you know, pull the phrase

19  "gender misinformation" from this.  But they do not assert that

20  this memorandum imposes any requirements on social media

21  companies or that social media companies have taken any action

22  against particular content because of this memorandum.

23      And plaintiffs have not drawn that link with respect to

24  any of the other subjects of which the government has spoken

25  about generally using the bully pulpit or exercising its

executive authority to take, you know, policy actions or make
policy decisions, they have not linked it to particular actions
of social media companies.  And that just underscores the fact
that plaintiffs here seek to challenge of government speech in
the abstract with which they disagree.  But neither Article
III, nor the First Amendment, opens the door to this
unprecedented challenge to government speech to which they
disagree.

Again, they must show irreparable harm that stems from the
conduct of social media companies that can be traced directly
to the conduct of a defendant, and they cannot do so.

Finally, Your Honor, I will just mention -- I just want to
touch on one more thing that was an issue in the briefing that
I wanted to make sure that defendants have an opportunity to
address today.  And that is the evidence submitted by
Dr. Gurrea and other evidence that illustrates the myriad
factors that social media companies are considering when they
make content moderation decisions on their platforms.

Plaintiffs' theory of causation in this case essentially
requires assuming that all content moderation decisions made by
separate, private social media companies in the past and in the
future can necessarily be traced to the conduct of 67 different
federal defendants.  And, on that basis, they have shown
imminent, irreparable harm.

But that fails for several -- for much of the evidence

1    that defendants have presented, including an expert report by

2    Dr. Gurrea, who is an economist, who shows that companies are

3    -- the social media companies are intrinsically economically

4    incentivised to moderate content on their platforms.  They have

5    done so since their existence.

6         And they have moderated or modified their content

7    moderation policies in response to current events.  And that

8    includes, you know, bipartisan findings of interference with

9    the 2016 U.S.  elections when social media companies responded

10   by modifying their content moderation policies to focus on

11   election-related misinformation.

12        That also includes at the start of COVID-19 when social

13   media companies took their existing public health

14   misinformation policies, many of the social media companies

15   already moderated content relating to public health, as

16   defendants' briefing and evidence submitted shows, well before

17   COVID-19.  But during COVID-19, social media companies modified

18   their content moderation decisions, their policies to apply

19   those public health misinformation policies to COVID-19.

20        And plaintiffs have not rebutted this evidence.  They

21   attribute instead to Dr. Gurrea an opinion that he did not

22   reach.  And the Court should disregard plaintiffs' assertions

23   on that score.  Dr. Gurrea, contrary to what plaintiffs have

24   asserted in the briefing, Dr. Gurrea did not conclude that

25   platforms would have moderated all the content the federal

1    officials flagged or demanded because of economic incentives,

2    as plaintiffs argue.

3        Dr. Gurrea opined instead, quote, "Social media platforms

4    have strong market-based economic incentives to moderate the

5    content on their platforms," unquote, at paragraph 12.

6        And that plaintiffs have not rebutted the economic

7    incentives that exist with any particular evidence showing

8    that, despite these other factors, that social media companies

9    consider the economic concerns or, you know, public calls for

10   social media companies to do more, that -- that in spite of all

11   these other factors that they have considered, that they have

12   taken particular content moderation decisions or that they will

13   do so in the future that affects any particular plaintiff here

14   because of defendants.

15       And in the absence of their ability to do that, they have

16   not shown any irreparable harm that warrants a preliminary

17   injunction here.

18       Again, plaintiffs bear the burden of submitting evidence

19   making a clear showing that they are suffering or will suffer

20   irreparable harm before the Court can rule on the merits, and

21   they have not done so.

22       And so I will turn it over to my colleague Mr. Sur to

23   address the merits.

24           THE COURT:  Okay.  Thank you, Ms. Snow.  Okay.  Go

25   ahead.

1    Good morning.

2         MR. INDRANEEL:  Good morning, Your Honor.  I will

3    address the merits of the First Amendment arguments.

4         THE COURT:  Okay.

5         MR. INDRANEEL:  And I'll begin with the Free Speech

6    Clause, of course, which concerns how the government may

7    respond to private speech.  But that clause does not limit the

8    government's own speech.

9    And, under the Government Speech Doctrine, there's a

10   recognition that it is the very business of government to favor

11   and disfavor points of view.  As the Supreme Court explained in

12   *Pleasant Grove City, Utah versus Summun*, that was a 2009 case,

13   where the Court was quoting Justice Scalia's opinion from

14   *National Endowment For The Arts versus Finley,* which was a 1998

15   case.

16   And what this means is that when the government is the

17   speaker, it is entitled to say what it wishes.  That's a phrase

18   from *Rosenberger versus the University of Virginia* from 1995.

19   So bearing that in mind, and consistent with that

20   doctrine, the free speech clause does not preclude the

21   government from, for example, making information available to

22   platforms on topics such as scientific and medical information

23   about a deadly virus and the vaccines that counter that virus;

24   or about -- again, just as another example -- the government's

25   views about what might be covert, foreign, malign efforts to

1   influence American elections and other American discussions

2   about major problems.

3       And that's essentially what the plaintiffs are arguing for

4   here on the merits.  They would have this Court reduce the

5   Government Speech Doctrine to what would essentially be a

6   triviality.  And, instead, they've seemed to argue that the 67

7   defendants here embarked on a monolithic, quote, "censorship

8   enterprise," closed quote, across two administrations.  But the

9   plaintiffs lack evidence sufficient to support a finding that

10  would give them likelihood of success on the merits of that

11  sprawling claim.

12      Instead the conduct of each defendant is properly examined

13  on its own.  And, under the State Action Doctrine, it's also

14  appropriate to keep in mind the need to maintain the essential

15  dichotomy between private conduct and public conduct, which is

16  subject to the Constitution.

17      The plaintiffs simply lack evidence as to any agency

18  demonstrating the type of significant encouragement or coercion

19  or joint action or pervasive entwinement that turns private

20  decisions into state action under the established Supreme Court

21  precedent.

22      Rather, what we have here in the record is evidence that

23  each platform made its own decisions under the terms of its own

24  content moderation policies and using its own independent

25  judgment.  And for similar analysis, we've relied on our brief

1   in the analysis of the Ninth Circuit in the *O'Handley* case from

2   2023.

3       Importantly the platforms are very large, independent

4   corporations.  And they decided for themselves what content to

5   allow and what not to allow through their terms of service.

6   The major platforms, including Facebook Google and Twitter,

7   have long imposed content moderation measures through those

8   user terms of service because they depend on advertising

9   revenue.  This is explained well by Dr. Gurrea.  And major

10  companies do not want their brand names to be tarnished by

11  appearing next to objectionable, user-generated content.

12      I might add, Your Honor, that we did hear this morning

13  about some of the submissions that the plaintiffs made along

14  with their reply brief.  And one of those submissions was, as

15  counsel for the plaintiffs mentioned, a letter that the law

16  firm of Covington and Burling put in in addition to the

17  declaration of Mr. Roth before the Federal Election Commission.

18      In that letter, Twitter explained some of its business

19  imperatives for its policies for content moderation including

20  the content moderation policy from 2018 on hacked materials

21  that Twitter applied to some *New York Post* coverage which

22  Twitter then within 24 hours decided was a mistake.

23      So that letter from Covington and Burling, considered as a

24  whole, confirms this point that the platforms have their own

25  terms of service on users for content moderation.  And there

1    are business imperatives for the platforms to moderate content

2    in quite that fashion.

3        And that's exactly what we saw the platforms do, according

4    to the evidence.  For example, when the health experts around

5    the world, including the World Health Organization, pointed out

6    that misinformation concerning the COVID-19 pandemic threatened

7    to become a danger on its own terms, the platforms quickly

8    turned to moderating user-generated posts that contained what

9    the platforms viewed as misinformation about the virus and then

10   about the vaccines.

11       So what we submit the record will show is a lack of

12   sufficient evidence for this assertion that the government

13   communications in the record was what spurred the platforms to

14   somehow meaningfully alter the content moderation policies, be

15   it against misinformation concerning COVID-19, or the U.S.

16   elections or other topics.

17       The plaintiffs also lack factual support for this notion

18   that they've met the stringent requirements of the State Action

19   Doctrine by somehow pointing to legislative proposals and other

20   discussions about possible amendments to Section 230 of the

21   Communications Decency Act and antitrust enforcement actions

22   which, you know, at various points have been discussed as a

23   potentially appropriate response to the rising economic power

24   of the major platforms.

25       To begin with, the representatives and senators who made

1    those proposals are not parties here.  And, even apart from

2    that, there's insufficient evidence to support a finding that

3    any defendant warned of any platform that if the platform

4    failed to moderate certain user-generated content or if the

5    platform failed to change a policy that the result would be

6    some concrete change to Section 230, or some actual antitrust

7    proceeding.

8         Statutes such as Section 230 are always susceptible to

9    amendment.  And the mere possibility of reform of a statute

10   couldn't be enough to turn the conduct of private firms

11   affected by a statute into state affection.  If that -- if it

12   were the case that mere possibility of statutory change were

13   sufficient, practically every business would become a state

14   actor.  And that undermines, if not eliminate, the essential

15   dichotomy between the private and public entities.

16        So I would turn briefly to the merits, as I said.  But I

17   just want to simply reiterate the point that the plaintiffs put

18   in approximately 1,440 proposed findings of fact, counting each

19   paragraph separately.  And, in response, the defendants did

20   provide a response to each of those.

21        The plaintiffs' presentation this morning essentially

22   assumed or proceeded as though the defendants had not put in

23   the opposition paragraph by paragraph.  And so many of the

24   assertions that we did hear on the merits this morning, the

25   defendants' response to the proposed findings of fact by the

1  plaintiffs do explain why the record does not support the kinds
2  of characterizations that the plaintiffs are relying on.
3      And so, with that observation, I will try to give a
4  -- some of the high points of the defendants' views on the lack
5  of merits on the First Amendment point.
6      So we heard, for example, about some of Mr. Flaherty's
7  communications.  He was the White House digital director.  And
8  there's insufficient evidence that his comments coerced
9  platform.
10     Now, Mr. Flaherty was asking questions about the content
11 moderation policies and how they worked in practice.  And those
12 questions did not become demands for adverse action, whether it
13 was removal or demotion or labeling.  He was trying to
14 understand how those different kinds of content moderation are
15 actually working in practice.
16     So he asked such questions as, "Can you share more about
17 your framework here?"  At one point, he asks Facebook, as we
18 have long asked for, how big the problem is, what solutions
19 you're implementing and how effective they've been.  And that
20 was consistent, as an aside, with the administration's public
21 statements of where, for example, the press secretary had
22 called for companies to measure and publicly share the impact
23 of the misinformation on their platforms.
24     And one of the reasons that it's helpful to think about
25 the inquiry that was at issue here is that the platforms

1    themselves were saying that there were content moderations,

2    other than removal, that would apply to certain kinds of

3    content.

4         So some things were essentially so dangerous, in the

5    platform's view, that that would be appropriate for removal.

6    But other kinds of content, which goes by the umbrella term

7    "borderline content," was subjected by the platforms to other

8    types of content moderation measures, such as reducing the

9    distribution of a post or applying a fact check label to it.

10        And the plaintiffs seem to assume that anything that isn't

11   removed must therefore be permissible and allowed.  And that's

12   simply not the case because the platforms, clearly on the

13   borderline content area, reserved under their own terms of

14   service the right to apply other kinds of moderation measures

15   short of removal to various posts.

16        But the trouble is that the platforms were never exactly

17   clear about what moderation, short of removal, exactly meant

18   and where it was being applied.

19        So, for example, the Defense Exhibit 20 is -- has a

20   statement from Facebook in February of 2021, this is February

21   8th.  And Facebook announced that the claims about COVID-19 or

22   vaccines that do not violate these policies, will still be

23   eligible for review by our third-party fact checkers.  And if

24   they are rated false, they will be labeled and demoted.

25        So there was what Facebook calls at another point, a

1  spectrum of content moderation measures that they would apply.

2  And it was not clear which measure applied, where and for what

3  reason.  And that's what Mr. Flaherty, among others, were

4  asking questions about.

5      I will offer just one more illustration of the open

6  endedness of some of the terms of these policies where Facebook

7  said that it would focus on content that does not violate the

8  misinformation and harm policy, but may contribute to vaccine

9  hesitancy or present a barrier to vaccination.  And this

10  includes, for example, content that contains sensational or

11  alarmist vaccine misrepresentation.  So that kind of content

12  would be subject to some of their content moderation measures

13  possibly short of removal.

14      And, as I say, and I think what's clear is, terms like

15  "sensational" or "alarmist" are obviously open ended ones.  And

16  it was legitimate and appropriate for government officials to

17  ask exactly what platforms meant by terms of that sort.

18      The platforms themselves said that they were interested in

19  combating the problem of vaccine hesitancy.  The White House

20  shared that broad policy preference.  But sharing that broad

21  policy preference is a far cry from the conclusion that the

22  particular content moderation decisions that the platforms were

23  making were at the behest of the White House or did not reflect

24  the independent judgment of the platforms.

25      As one example that I -- that I will point to there where,

1    you know, there were questions for Mr. Flaherty.  But when the

2    platform gave an answer and there wasn't -- there's no record

3    evidence of retributive action against the platform for not

4    answering the questions, let alone for not applying any

5    particular content moderation decision, is the Mr. Tucker

6    Carlson example that plaintiffs raised this morning that arises

7    in an April 14, 2021 exchange.  And after the White House

8    officials, you know, ask questions about a Tucker Carlson post

9    about vaccines, Facebook's response was clear.  Facebook said,

10   "Regardless of popularity, the Tucker Carlson video does not

11   qualify for removal under Facebook's policies."  And that's

12   docket 174-1 at 34.

13          THE COURT:  Didn't they say, though, that they were

14   going to reduce it?

15          MR. INDRANEEL:  It prompted further questions from

16   Mr. Flaherty.  How was this Tucker Carlson video not violative?

17   What exactly is the rule for removal verses demoting, moreover,

18   you say reduced and demoted.  What does that mean?

19          So to Your Honor's point, I think that was part of the

20   discussion, you know, what is -- what is reduction and what is

21   demotion?

22          But if what the plaintiffs are saying is that anything

23   that was not removed was something that the platforms were

24   somehow required to keep up in the way that the -- you know,

25   the poster wanted, I don't think that this exchange supports

1   that view because qualify for removal is a judgment that

2   Facebook made, but it could have made other judgments about,

3   you know, the distribution.

4        And there's no technical means that the government had to

5   influence that.  And there's also, you know, nothing in the

6   record that even -- even suggests that, you know -- Again, the

7   government's reasons for asking these questions was that the

8   levers, the spectrum of responses were the platform's spectrum

9   of responses and not the government's.

10        Related to the White House correspondence, we also heard

11   this morning about the surgeon general's advisory.  And I just

12   want to note there that Facebook made what we think is quite a

13   telling response in the public setting in July of 17 -- July

14   17th of 2021.  This was after the rollout of the surgeon

15   general's advisory.

16        Facebook announced that it was already taking on the eight

17   recommendations from the surgeon general.  And Facebook then

18   -- it's a four-page document at Exhibit 71.  Facebook is

19   pointing to measures that it had in place since April 2020,

20   more than a year prior to the advisory.

21        And in that document, Facebook is not listing a single new

22   action that the company said it was taking in response to the

23   advisory.  Again, what it was describing was conduct that it

24   was already doing to address the recommendations.

25        So that shows that the decisions that the platform was

1   making was not significantly encouraged.  It wasn't a change in

2   policy that resulted from the advisory, because it had already

3   been working on the problems that it felt the surgeon general

4   was, you know, issuing these recommendations for; let alone

5   that those eight resulted from the government's coercive power.

6        I'll turn briefly, then, to some of the other defendants.

7   We did hear about the CDC.  The CDC was not a joint participant

8   in platform decisions.  Rather the platform is voluntarily

9   elected to treat CDC as one of several authoritative sources of

10  scientific information when the platforms were evaluating the

11  user posts containing potential COVID-19 misinformation.

12       The plaintiffs have assigned to this the label of CDC

13  dictating platform content moderation decisions.  That does not

14  align with the evidence that's in this record.  We have

15  Facebook asking questions to the CDC about whether certain

16  claims in the abstract, for example, the claims that the

17  vaccines cause magnetism had been debunked by the scientific

18  sources or were false and could lead to harm or were false and

19  can lead to vaccine hesitancy.

20       But when CDC gave its responses, CDC was transparent about

21  whether the existing research that CDC had access to answered

22  that question, or whether there was just insufficient

23  information to give a response to Facebook's question.  And CDC

24  was not asking the platform in response to take any particular

25  action against any particular content.  CDC was providing

1   factual information.  And an example of that is the exchange

2   that's an exhibit to the Crawford deposition at Exhibit 26.

3        I'll turn also then to the Cyber Security and

4   Infrastructure Security Agency also not a joint participant in

5   the platform's decisions.

6        The switchboarding operations in 2020 had a particular

7   focus, which was to relay election-related potential

8   misinformation that had been identified by state and local

9   election officials; or other stakeholders, including the

10  National Association of the Secretaries of State, across the 50

11  states, and the National Association of Election Directors,

12  also at the state level.  And it was up to the platforms to

13  decide how to handle that forwarded content based on their own

14  policies.

15       So CISA made that clear at the outset that its position

16  was to never ask the companies to take any specific actions.

17  And that was in Mr. Scully's deposition made clear.

18       And then the communications themselves, Your Honor, bear,

19  according to CISA's protocol, a very clear -- I don't know if

20  it's -- if we should call it a statement or a disclaimer, but

21  it's very clear notice provided to anyone who reads CISA's

22  correspondence that CISA is not making any recommendations,

23  "about how the information it is sharing should be handled or

24  used by social media companies."

25       "Additionally, CISA will not take any action, favorable or

1    unfavorable, toward social media companies based on decisions

2    about how whether to use this information."  One example is

3    Exhibit 106 at 1, also discussed in the Hale declaration at

4    paragraph 72.

5        And the record, consistent with that representation,

6    contains numerous examples of posts where CISA conveyed it to

7    the platform on behalf of the election officials who raised the

8    concern, and the platforms declined to act.  So just one

9    example, Exhibit 108 at 1, is a Twitter email where Twitter is

10   stating that the tweet was not in violation of our civic

11   integrity policy.  And there are many more such in the record.

12   So, again, illustrating that the platforms were using their

13   independent judgment.

14       We did also hear this morning about the EIP at great

15   length.  So I do think it is worth mentioning to the Court

16   CISA's involvement with the EIP did not include founding the

17   EIP.  CISA did not fund the EIP.  And CISA did not have a role

18   in the management or operation of the EIP.  That's explained in

19   the Hale declaration in particular at paragraph 52.

20       The EIP's researchers made clear they were making, quote.

21   "Independent decisions about what to pass on to platforms, just

22   as the platforms made their own decisions about what to do with

23   our tips."  That's a statement from the University of

24   Washington, which is one of the academic institutions that's

25   part of the EIP.  And that's at Exhibit 122 at 6.

1       Indeed only 35 percent of the time that EIP shared

2   potential misinformation with the companies was the

3   misinformation, quote, "labeled removed or soft blocked."

4   That's explained at Scully Exhibit 1 at 27 and 40.  Apparently

5   no action was taken on the other 65 percent.

6       So the record is clear that CISA did not send content to

7   the EIP to analyze, and the EIP did not flag content to social

8   media platforms on behalf of CISA.  Again, that's Exhibit 122.

9       We did hear about the GEC's declaration that makes clear

10  that the GEC did put in 21 tickets.  But, again, because of the

11  EIP's own process for operating, it was entirely up to the EIP;

12  and then at a next step entirely up to the platform what to do

13  with those tickets.

14      Taken as a whole, we understand that plaintiffs have

15  various characterizations of the communications that were here

16  at issue.  But when applying the State Action Doctrine, the

17  courts have traditionally taken these kinds of

18  characterizations and, to use the DC Circuit's language in the

19  *Penthouse* case, which we relied on for its discussion of

20  coercion, drawn out the rhetoric.

21      And what the plaintiffs characterize as demands or

22  threats, in our respectful view, when the rhetoric is drawn

23  out, will show questions, you know, sometimes frustrated

24  language on both sides possibly.  But that with the rhetoric

25  drawn out, does not amount to coercion.  It does not amount to

```
 1    significant encouragement or to joint action or persuasive

 2    entwinement of the kind that the Supreme Court has made clear

 3    has a very high bar for a plaintiff to turn private action into

 4    action that's constrained by the Constitution.

 5              THE COURT:  Okay.  Thank you.

 6              MR. INDRANEEL:  Thank you, Your Honor.

 7              THE COURT:  Thank you.

 8              MR. GARDNER:  Good morning, Your Honor.

 9              THE COURT:  Good morning.

10              MR. GARDNER:  Let me reintroduce myself, Josh Gardner

11    on behalf of the United States.

12         One of the overarching defects that pervades this case is

13    the incredible breadth and lack of specificity as to the First

14    Amendment violations by each defendant that is currently

15    causing harm to each plaintiff.

16         And while these defects are fatal to the first two

17    preliminary injunction factors, as my colleagues explained this

18    morning, it is particularly acute with respect to the bounds of

19    the harms, the scope of the injunction and plaintiffs' motion

20    for class certification.

21         With that, I want to start with the bounds of the harms.

22    As we explained in detail in our opposition and through the

23    submission of five detailed declarations, from the FBI, from

24    CISA, from the GEC, from the Office of the Surgeon General and

25    from the CDC, the harms to national security, law enforcement,
```

1   public health and election integrity that would result if

2   plaintiffs' injunction were to issue.

3        Plaintiffs' reply brief and their presentation today do

4   not even address the bounds of the harms, let alone dispute any

5   of the evidence presented by the defendants.  And because

6   plaintiffs bear the burden to show that the bounds of the harms

7   justifies the extraordinary remedy of a preliminary injunction,

8   their failure to even address the government's arguments should

9   alone justify denial of the preliminary injunction.

10        Nevertheless, I do want to address a few additional points

11   about the bounds of the harm.

12        First, as my colleague Ms. Snow explained earlier this

13   morning, much of the defendants' conduct, the plaintiffs'

14   challenge, is no longer ongoing.  But there are a few discreet

15   categories of conduct that are still occurring by certain

16   defendants.  And those defendants have identified significant

17   harm to the United States's national security, law enforcement,

18   public health and election integrity interests if they were to

19   be enjoined in engaging in that conduct.

20        The second bucket, Your Honor, and, frankly, the bigger

21   bucket results from the extreme overbreadth of plaintiffs'

22   proposed injunction, which would capture completely legitimate

23   conduct by the defendants that do not appear to relate to any

24   of plaintiffs' claims and, if enjoined, would significantly

25   harm the interest of the United States.

1      I will address the first bucket in the context of the
2  bounds of the harms.  And then I'm going to address the second
3  bucket when we talk about the problems of overbreadth with the
4  scope of the injunction.

5      But before I get into this first bucket, just a few brief
6  additional points.  First, both the Supreme Court in *Winter* and
7  the Fifth Circuit in *Defense Distributed* have held that a
8  preliminary injunction may be denied based exclusively on the
9  bounds of the harms.  And the Fifth Circuit decision in *Defense*
10 *Distributed* explained that even where First Amendment speech
11 rights are at issue, a district court does not err in
12 concluding that the public interest may weigh against the
13 imposition of a preliminary injunction.

14     The *Defense Distributed* case I think is particularly
15 instructive here.  In that case, the plaintiffs sought to
16 enjoin enforcement of certain laws governing the export of
17 unclassified technical data related to prohibited munitions
18 claiming that the state department's regulations constituted an
19 impermissible prior restraint.

20     The Fifth Circuit in that case said that ordinarily the
21 protection of constitutional rights would be the highest public
22 interest at issue in a case.  Nevertheless, the state
23 department had, quote, "asserted a very strong interest in
24 national defense and national security," unquote and,
25 therefore, based on the bounds of the interests, the denial of

1    the preliminary injunction was affirmed.

2        The same is true in this case.  Like in *Defense*

3    *Distributed*, the harms identified by the United States would be

4    irreversible if the Court issued a preliminary injunction;

5    whereas, any harm to plaintiffs if a PI did not issue would be

6    temporary at best.

7        For example, Larissa Napp, the FBI's executive director,

8    explained in paragraph 15 of her declaration, which is Exhibit

9    157, Your Honor, that plaintiffs' proposed injunction would

10   prohibit the FBI from identifying for social media companies

11   covert foreign malign influence operations.

12       Now, importantly here, Your Honor, former President Trump

13   issued an executive order, E013848, that was then reissued by

14   President Biden expressing the United States's strong interest

15   in preventing the ability of persons located outside the United

16   States to interfere or undermine confidence in U.S. elections

17   and recognize that this would threaten both national security

18   and foreign affairs.

19       And, as reflected in EAD Knapp's declaration, covert

20   foreign malign actors operating under a false identity may be a

21   violation of criminal law, including the Foreign Agents

22   Registration Act or FARA, as well as other federal laws.

23   That's her declaration at paragraph 15 note 9.

24       Despite plaintiffs' acknowledgment that, quote, "content

25   that itself constitutes criminal activity not protected by the

1    First Amendment," unquote, should be exempted from the scope of

2    the injunction, they nevertheless directly challenged the FBI's

3    efforts to combat covert, foreign, malign influence.

4        But plaintiffs fail to explain how any potential First

5    Amendment interest that they might have in liking or commenting

6    on posts by foreign malign actors outweighs the United States's

7    substantial national security and foreign affairs interests in

8    combating such influence operations.

9        Accordingly, Your Honor, the balance of the harms with

10   respect to the FBI's interactions with social media companies

11   to combat foreign maligned influence tip sharply against the

12   imposition of an injunction.

13       Similarly, Your Honor, as explained in the declaration of

14   Office of Surgeon General's Chief of Staff Mark Lesko, that's

15   Exhibit 63, plaintiffs' proposed injunction could be construed

16   to limit the core public health mission of the office by

17   preventing the surgeon general from issuing public statements

18   encouraging social media companies to take steps to address the

19   adverse effects of, for example, children and the use of social

20   media.   Indeed, as Your Honor may be aware, just this week

21   the surgeon general issued a new advisory on this precise

22   topic.  And, in that advisory, made recommendations to social

23   media companies about steps they could take to reduce those

24   harms to children.

25       Plaintiffs cannot show how they have a First Amendment

1    interest in curtailing what is paradigmatic government speech.

2    And any possible First Amendment interest plaintiffs may have

3    is greatly outweighed by the United States's interest in using

4    the bully pulpit to advance critical public health messages.

5    Plaintiffs' proposed injunction would substantially harm those

6    interests.

7         The third area, Your Honor, of ongoing agency action, the

8    plaintiffs appear to challenge, relates to the GEC's meetings

9    with social media companies where the topic of foreign malign

10   influence may be raised.

11        As Leah Bray, the GEC's deputy coordinator, explained in

12   her declaration, which is Exhibit 142, the GEC has a statutory

13   mandate to, quote, "direct, lead, synchronize, integrate and

14   coordinate the efforts of the federal government to recognize

15   and expose foreign states and nonstate propaganda and

16   disinformation."

17        The GEC effectuates this mission by, among other things,

18   meeting with social media companies where foreign malign

19   influence concerns may be broadly addressed.

20        Now, plaintiffs appear to challenge the GEC's

21   participation in these meetings despite the fact that they

22   cannot identify any specific action taken by a social company

23   resulting from these meetings, let alone any coercion from the

24   GEC during these meetings to take any particular action, let

25   alone any harm to the plaintiffs themselves as a result of

1    these meetings.

2         Yet, any First Amendment interest plaintiffs may have, if

3    any, again, is greatly outweighed by the GEC's substantial

4    interest in performing its critical, statutorily-mandated

5    national security mission.

6         Accordingly, Your Honor, the Court should conclude that

7    the bounds of the harms tip sharply in favor of the defendants.

8    And, for that reason alone, the motion for preliminary

9    injunction should be denied.

10        With that, I'd like to turn to the scope of the

11   injunction.  And for many of the same reasons that the bounds

12   of the harms tip sharply in favor of the United States, so too

13   is plaintiffs' injunction defective, both because it is

14   overbroad and because it lacks the specificity required by Rule

15   65(d).  And I want to turn to overbreadth first.

16        Again, as reflected in the five detailed declarations from

17   the various agencies, the proposed injunction would preclude

18   the United States from engaging in plainly lawful conduct that

19   plaintiffs may or may not be challenging.  Again, it is

20   somewhat unclear from their allegations.

21        But just as an example, in the FBI's declaration, again,

22   that's Exhibit 157, EAD Napp explains that the plaintiffs'

23   professed injunction could be rigged to bar, among other

24   things, the following conduct:  One, the FBI's ability to

25   notify social media companies of objectively false

1   election-related time, place and manner disinformation crimes;

2        Two, the FBI's ability to notify social media companies of

3   classified information posted on their accounts;

4        Three, the FBI's ability to notify social media companies,

5   including by working with the National Center for Missing and

6   Exploited Children concerning crimes against children;

7        Four, the FBI's ability to notify social media companies

8   of terrorist organizations using social media platforms to

9   spread propaganda; and,

10       Five, the FBI's ability to notify social media companies

11  of threats against federal officials such as FBI agents and

12  federal judges.

13       Now, with respect to the FBI in particular, plaintiffs

14  seem to concede in their reply that the injunction should have

15  a carve-out for, and I'm reading this here, "content that

16  itself constitutes criminal activity not protected by the First

17  Amendment."  That's found in their reply brief on pages 116 and

18  117.

19       But this does not go nearly far enough to protect the

20  United States's legitimate law enforcement and national

21  security interests.

22       As EAD Napp explains in here declaration, paragraph 7,

23  "Criminal prosecution is just one of several means the FBI uses

24  to protect national security.  It also uses investigative and

25  intelligence capabilities to neutralize terrorist cells and

1   operatives in the U.S., to help dismantle extremist networks

2   worldwide, and to cut off financing and other forms of support

3   provided by terrorist sympathizers."

4         For example, in EAD Napp's declaration in paragraph 30,

5   she explains that the use of social media activity by foreign

6   terrorist organizations may or may not constitute a crime.

7         Nevertheless, the FBI has a strong interest in informing

8   social media companies of the use of their platforms by foreign

9   terrorist organizations.  And plaintiffs fail to explain how

10  such notifications by the FBI harm any interests that they may

11  have.

12        Another example.  In paragraph 46 of the Napp declaration,

13  she explains that there are circumstances where the FBI has

14  asked platforms to remove personal information about FBI

15  personnel and federal judges where it appears the purpose is to

16  encourage violence against those individuals.  Depending on the

17  circumstances, this may not necessarily amount to a violation

18  of criminal law.  Nevertheless, the FBI has an obvious interest

19  in protecting the safety of federal officials.   And there may

20  be circumstances where the posting of classified information is

21  not necessarily a criminal offense, for example, when posted by

22  a journalist who received the information unsolicited.

23  Nevertheless, I don't understand plaintiffs to be suggesting

24  that the FBI doesn't have obvious national security interests

25  in preventing the spread of such classified information.

1        More generally, Your Honor, it may not be apparent at the

2   beginning of a law enforcement investigation whether certain

3   conduct constitutes criminal activity.  So, in short, while

4   accepting -- exempting criminal activity from the preliminary

5   injunction is a step in the right direction, it does not go

6   nearly far enough to address the defendants' legitimate

7   overbreadth concerns.

8        Second, Your Honor, plaintiffs contend that our concerns

9   about the scope of the injunction are misplaced because we have

10  identified activities that are not covered by the injunction.

11  This contention is at war with plaintiffs' legal theory.

12       For example, as explained in the declaration of Carol

13  Crawford, the CDC's director for the Division of Digital

14  Management, that's Exhibit 80, the proposed injunction could be

15  construed to prevent the CDC from publishing accurate health

16  information on its website to the extent the CDC is aware that

17  social media companies rely upon that information in applying

18  their terms of service.

19       And, as reflected in the declaration of Brandon Wells from

20  CISA and Leah Bray of the GEC, those agencies also publish

21  accurate information on their websites that may be used by

22  social media companies when they apply their terms of service.

23       Plaintiffs cannot square why this conduct would be

24  permissible under the injunction while at the same time

25  alleging that the CDC acting as a, quote, "privileged fact

1    checker," is violative of the First Amendment.

2        Now, plaintiffs contend that the actions identified in the

3    agency declarations would not violate plaintiffs' proposed

4    injunction despite its plain terms because, and I'm quoting

5    here, "a federal agency that makes a public statement on a

6    policy issue without directing the statement to platforms or

7    crafting the statement to influence the removal of disfavored

8    viewpoints from social media would not violate the proposed

9    injunction."  They make this statement on page 115 of their

10   reply brief.

11       But why not?  Why wouldn't that violate the injunction

12   when plaintiffs' entire theory is that otherwise lawful

13   statements or actions made under the alleged backdrop of

14   statements early in this administration concerning Section 230

15   reform of antitrust liability somehow take on a coercive

16   character?

17       Given plaintiffs' novel and legally unsupported legal

18   theory, it is entirely unclear what types of conduct would be

19   swept under the proposed injunction.

20       And let me give you an example that came up this morning.

21   I heard my colleague on the other side argue that CISA's work

22   with the Treasury Department to create publicly available

23   pamphlets for the financial sector somehow shows an expansion

24   of a censorship enterprise.  It is absolutely unclear, Your

25   Honor, how CISA's development of public pamphlets that could be

1    shared with the financial industry could possibly violate the

2    First Amendment.  But, yet, as plaintiffs' identify their

3    theory of the case is that is an expansion of censorship and

4    just highlights why their proposed injunction is so unworkable.

5         Your Honor, I recognize that I am running out of time.  So

6    I want to highlight just a very few quick things if I may.

7         One, I think it's useful analytically to consider

8    plaintiffs' proposed injunction in comparison to the cases they

9    cite to where injunctions have issued to show the complete

10   overbreadth and lack of proportionality.

11        So, for example, in *Bantam Books*, one of the seminal cases

12   they rely upon, the injunction precluded the commission to

13   encourage morality in youth from issuing notifications to book

14   distributors.

15        In *Brentwood Academy*, the injunction sought to enjoin

16   enforcement of a rule.  In *Backpages.com*, which I think is fair

17   to characterize as the central case plaintiffs rely upon, the

18   conduct enjoined involved a sheriff sending letters to credits

19   card companies.

20        And then in the Fifth Circuit's *Texans For Free Enterprise*

21   case, the junction was against portions of Texas's -- Texas's,

22   pardon me, election code.

23        Plaintiffs have not identified a single case imposing such

24   a broad, amorphising injunction in the context of First

25   Amendment speech claims.

1          Now, Your Honor, may I have just a minute to address the

2     class certification arguments?

3                THE COURT:  Yeah, I'll go ahead and give you that.

4     And I'll give the -- whatever extra time you have, I'm going to

5     also add that to the plaintiffs' rebuttal time.  So go ahead.

6                MR. GARDNER:  I appreciate the indulgence, Your

7     Honor.

8          With plaintiffs' class certification motion, I want to

9     address it here because they contend in their reply brief on

10    page 81 that any defects in their irreparable harm and standing

11    could somehow be cured by a certified class, which they claim

12    will result in their classwide representation of all current

13    and future speakers allegedly targeted by defendants.  But

14    plaintiffs cannot establish a viable class.

15         Plaintiffs' challenge differing actions by 67 separate

16    different defendants spanning multiple administrations over the

17    course of three years.  And, as I heard my colleague on the

18    other side say today, or as they admitted today, there are

19    different techniques used, different actors used, different

20    topics addressed and different alleged threats by different

21    congressional executive officials over the course of a

22    three-year period.

23         There is simply no combination that can be resolved in the

24    stroke of a pen that would materially advance the resolution of

25    this case.  In fact, this case reflects a much less cohesive

1    class than the one rejected by Justice Scalia in *Wal-Mart*.

2    Remember in *Wal-Mart*, the plaintiffs contended that even

3    promotion decisions were made at the local level and were

4    inherently subjective, the discrimination to which they were

5    subjected was common to all female Wal-Mart employees, and that

6    a uniform corporate culture permitted bias to infect all

7    promotion decisions of women, which tied the class together.

8        The Court rejected that argument and noted it wasn't

9    enough to simply claim that each plaintiff suffered from a

10   Title VII violation or even a Title VII injury.  Rather, the

11   plaintiffs had to show a common contention that was capable of

12   classwide resolution such as discriminatory bias by the same

13   supervisor.

14       And this had to be based on more than contentions.  It had

15   to be based on evidence.  The only evidence plaintiffs

16   presented in *Wal-Mart* was a policy of discretion by local

17   managers, which was the antithesis of a common, uniform

18   employment practice to satisfy commonality under Rule 23.

19       These shortcoming are even more apparent here.  Plaintiffs

20   contend that there is class cohesiveness because the classes

21   include audience members rather than just speakers.  But just

22   as in *Wal-Mart* rejecting the contention that alleging a Title

23   VII injury was sufficient to establish commonality, the Court

24   here would still need to make an individualized determination

25   of whether a particular defendants' conduct violated the First

1    Amendment under a particular level of constitutional scrutiny,

2    and that the alleged conduct actually harmed a class member

3    either as a speaker or as a receiver.

4         And just briefly, Your Honor, let me give you a very

5    concrete example of how this would work.  Plaintiffs are

6    challenging, among other things, the CDC's holding of several

7    be-on-the-lookout meetings.  Those be-on-the-lookout meetings

8    have nothing to do with Dr. Fauci's attempts to address the

9    pandemic, or CISA's switchboarding efforts in service of the

10   2020 election cycle, switchboarding efforts, which I may add,

11   plaintiffs were direct participants in which they never

12   acknowledge throughout their briefing or their presentation

13   today; or it has anything to do with the FBI's flagging of

14   potential covert malign influence narratives for social media

15   companies.

16        So, simply put, concluding that the CDC's actions may have

17   violated the First Amendment would tell the Court nothing about

18   whether another agency's separate actions also violated the

19   First Amendment.

20        And the final here, Your Honor, is, and I think this is

21   worth emphasizing, the sheer size of plaintiffs' proposed class

22   highlights the lack of commonality.  For example, the Supreme

23   Court last week in *Twitter versus Taamneh* held, or recognized,

24   I should say, that Facebook, YouTube and Twitter combined have

25   over 3 billion active users each month.  And some public

1    sources report that there are approximately 300 million

2    Americans that use social media.  Under plaintiffs' broad class

3    definitions, these would all be class members.

4         In contrast, in Wal-Mart, the Supreme Court noted, and I'm

5    quoting here, "that this was one of the most expansive class

6    actions ever, which was comprised of 1.5 million current and

7    former female Wal-Mart -- Wal-Mart employees."

8         It is telling that neither plaintiffs' class certification

9    motion, nor their reply brief, cite to a single case, not one

10   case in which a class was certified for a First Amendment

11   speech challenge.  And I think the likely reason for that, Your

12   Honor, is that courts rarely certify class actions in this

13   context because the claims are inherently individualized; and a

14   class action is rarely superior to individualized

15   adjudications.

16        For that reason, or for those reasons, I should say, the

17   Court should deny plaintiffs' motion for class certification.

18   In addition, the Court should deny the plaintiffs' motion for a

19   preliminary injunction.

20        And the very last thing I just wanted to say or

21   reemphasize, Your Honor, as we mention in our brief in the

22   conclusion, to the extent the Court is inclined to issue a

23   preliminary injunction, we respectfully request that the Court

24   administratively stay the injunction for seven days to provide

25   the United States time to consider moving for a stay pending

1    appeal.

2         Thank you, Your Honor.

3              THE COURT:  Thank you.  Madam clerk, how much -- how

4    many minutes was the other one roughly?

5              COURT CLERK:  He's keeping the time.  I'm not keeping

6    it.

7              THE COURT:  Okay.  I'll give you five more minutes.

8    I'm not sure.  It's five extra minutes if you need --

9              MR. SAUER:  Sure.  Thank you, Your Honor.

10             THE COURT:  -- for the rebuttal.

11             MR. SAUER:  May it please the Court.

12        There's a lot of points there that I'd like to address.

13   It might be easier if I just start addressing Mr. Gardner's

14   comments at the end.

15        Very briefly on the class certification.  I think we'd

16   stand on our briefing on that.  I think we explained very

17   clearly how there clearly are common questions here.  This case

18   is radically different from *Wal-Mart* against *Dukes*, which is

19   essentially a whole bunch of individualized damages, actions,

20   against -- challenging discreet individual acts of

21   discrimination.

22        Paragraphs 1 to 30 of our proposed findings of fact set

23   forth a campaign of threats that overarches every single one of

24   our claims.  That alone is a common question, and so forth.

25   And then when you look at each kind of federal agency, each one

1    raises a whole host of common questions for everyone who is

2    affected by that federal agency.  So you've got one huge

3    overarching common question; then a whole bunch of other common

4    questions that is set for each agency, the White House Surgeon

5    General's office and so forth.  And then we briefed that, and I

6    think I'll just stand on that for now.

7        I do want to address what Mr. Gardner said about the

8    alleged overbreadth and vagueness of the injunction and the

9    notion that it's going to sweep in what they contend is lawful

10    and important conduct.

11        Mr. Garner didn't actually address the actual language of

12    our injunction in his comments, so I'll read the key part to

13    the Court.  We've got a series of verbs that we're asking the

14    Court to enjoin the defendants from doing.  And that is to stop

15    them from, quote, "demand, urge, encourage, pressure, coerce,

16    deceive, collude or induce."  Those are the verbs.  That's the

17    conduct we're asking the Court to enjoin, federal officials who

18    use those verbs to get platforms to take down disfavored

19    content and speakers from social media.

20        Where did we get those verbs?  Well, Mr. Gardner cited the

21    *Backpage* decision.  If you read to the bottom of that decision,

22    Judge Posner actually directs the district court to enter an

23    injunction.  At the end of that decision, he uses two of our

24    verbs.  He doesn't stay, don't send letters, as

25    Mr. Gardner said.  He says, they're under -- Sheriff Dart is

1   under an injunction not to, quote, "coerce or threaten."

2       Likewise, the *Norwood* decision that this Court quoted in

3   its motion to dismiss order says that it violates the First

4   Amendment to induce, encourage or promote.  *Adickes* against

5   *S.H. Kress,* one of the seminal cases on state action, says that

6   it plainly constitutes state action to engage in a conspiracy

7   and reach an understanding.  And that's what we're doing with

8   collude.

9       So if you look at the verbs in our injunction, they're the

10  very verbs that courts like the U.S. Supreme Court, the Seventh

11  Circuit and others have used to describe what conduct actually

12  violates the First Amendment.

13      So I don't know if they're claiming that the U.S. Supreme

14  Court is unconstitutionally vague when it writes its opinions

15  to give people guidance as to what does violate the First

16  Amendment.

17      So we tried to hue closely and have verbs, conduct that's

18  described be specific to be clear.  These are all verbs that

19  are clearly understandable from the dictionary and tracks the

20  actual guidance we've been given by the U.S. Supreme Court and

21  other decisions.

22      They claim, however, well, this is -- you know, it's too

23  vague.  Again, I think that the dictionary refutes that

24  question.  And so their main argument is this is every

25  overbroad.  And they say we didn't address this in our brief.

1    Then he admits that we talk about it in detail in pages 113 to

2    117 of our reply brief.

3        They put in five declarations from -- from federal

4    officials from the FBI, CISA, the GEC, CDC and OSG.  And all of

5    these declarations say two things.  First they say -- or most

6    of them say, we don't actually ask them to take down anything.

7    And they go on to say, but please don't enjoin us from telling

8    them to take anything down because then the world will end.

9    Right?  It's a parade of horribles that they say.

10       If you actually pick apart what they're -- what they're

11   doing is that all their complaints really fall into two

12   buckets.

13       One bucket is we want to be allowed to make public policy

14   statements, like on our website or in a press release, that

15   aren't directed toward social media platforms, that aren't, you

16   know, calculated to get content taken down.  We just want to be

17   able to engage in what we think of as garden variety government

18   speech.  And we concede that is not covered by these verbs.

19   Each one of these verbs denotes an intentional action to get

20   speech taken down from social media.

21       So if the CDC, you know, or the Surgeon General's Office

22   puts a health advisory on their website that says the vaccines

23   work; or, you know, smoking is dangerous or whatever it is,

24   just that act of posting on their website and making a public

25   statement about an important issue does not in itself

1    constitute demanding, encouraging, pressuring, coercing,
2    deceiving, colluding and inducing, you know, within the meaning
3    of our objections.
4        We say, they're kind of creating a problem that doesn't
5    exist.  They're allowed to do that.  And I don't think anyone
6    -- any fair reader of what we're asking the injunction to do
7    would say they can't make public statements.
8        So they pivot heavily to their second bucket.  And their
9    second bucket is there's a lot of stuff we do want them to take
10   down.  And there's two subsets.  There's stuff that's First
11   Amendment protected; which, you know what, some of it may be
12   bad, but under the First Amendment, they really shouldn't be
13   asking to take it down.  Right?  So the injunction should cover
14   that.  Right?
15       And then, on the other side of that, you have stuff that's
16   not protected by the First Amendment.  And almost all -- they
17   have basically two buckets there.  There's true threats, right,
18   or incitement to true threats.  And then there is -- there is
19   speech that itself constitutes criminal activity, so malicious
20   cyber activity set forth in the CISA injunction, you know,
21   spear fishing attacks, you know, infiltrating someone's
22   computer and issuing command control directions and stuff like
23   that, live streaming of the abuse of children.  That's not
24   protected by the First Amendment, right, you know, and various
25   other arguments like that.

1     So and we, again, concede in the reply brief that this

2  injunction is defending the First Amendment.  And if you want

3  to look at what the exceptions are in the First Amendment,

4  they're really clearly spelled out in Justice Kennedy's opinion

5  in *Alverez*.  And conduct that is integral to criminal activity,

6  that's a well-established First Amendment exception.  So we

7  agree that the injunction does not stop them from going to the

8  platforms and saying take down stuff that is unprotected by the

9  First Amendment because the speech itself is criminal conduct,

10  like, livestreaming abuse of children, you know, and the

11  various other things, malicious cyber activity, the various

12  other things listed in their brief.

13     But what you heard Mr. Gardner do is trying to blur the

14  lines a little.  Right?  So he wants to say, "Well, here's

15  stuff -- here's some things that we're a little worried about

16  because it might be on the borderline.  And what he's actually

17  pivoting to is at the very beginning of his presentation, is

18  "We've got to be allowed to go to the platforms and flag malign

19  foreign influence actions."

20     But that's refuted by Tab 2.  What they actually mean by

21  that in practice, based on the evidence in this case, is, you

22  know, a Russian speaker has posted, "Hooray for the Second

23  Amendment."  And 96,000 Americans say, "We agree with that.

24  We're reposting that."  And they go, "Take it down."  That's a

25  First Amendment problem.  Right?

1        So what you have is they're trying to take this concern

2    about actual criminal activity that's not protected by the

3    First Amendment.  It raises no First Amendment problem for

4    federal officials to say, "Hey, we're flagging that for you,"

5    you know.  "Turn off that livestreaming of child abuse."

6    Right?  Versus stuff that clearly does raise a First Amendment

7    problem.  They're trying to blur those categories.  It's very

8    kind of artfully presented.

9        But the Court's injunction, the language we proposed to

10   the Court clearly delineates those, can clearly delineate them.

11   So essentially you have you saying, "Please don't do this."

12   First of all, they say -- most of their declarants say, "We

13   don't do this.  We don't ever ask them to take anything down."

14       It's actually kind of surprised me they say that the FBI

15   doesn't go and ask them to take down child pornography, which

16   is a First Amendment exception.  Right?  And they say actually

17   don't ask them to take stuff down.  But don't stop us from

18   doing it because then there'll be this parade raid of

19   horribles.  There's an inconsistency there.

20       And all their complaints can be addressed by observing

21   that, number 1, those verbs that we recite in there do not

22   direct them not to make public statements on important issues.

23   And the scope of the injunction does not affect stuff that

24   clearly falls within established First Amendment exceptions

25   which is not First Amendment protected speech.  And that

1    includes, among other things, in *Alverez*, there's a specific

2    list provided by the Supreme Court.

3         The Supreme Court says, contrary to the arguments you

4    heard today, the Court's lack freewheeling authority to

5    recognize new First Amendment exceptions and they're clearly

6    out of an *Alverez* decision.  That includes speech integral to

7    criminal conduct, in other words, where the speaking itself is

8    part of them perpetrating the crime, and true threats.

9         So that's our response to the questions about both the

10   vagueness and the overbreadth -- supposed overbreadth of the

11   injunction.  It's really they're trying to create problems.

12        There's something really telling here.  Right?  We have

13   evidence of just astonishing, sweeping violations to the First

14   Amendment.  And the government's response to that is

15   essentially too bad.  Anything you might do to stop us from

16   doing that is going to cause us some problems at the margin,

17   and, therefore, you can never enjoin us at all.  That's an

18   astonishing proposition.

19        That, like their argument about government speech that Mr.

20   Sur presented, and as the Court has said, flips the First

21   Amendment on its head, they're saying you've got to let us

22   destroy all these First Amendment interests of private American

23   citizens posting about COVID-19 and elections and the whole

24   panoply of other topics.

25        Destroy their First Amendment rights so that we can keep

1   doing these tiny, little things that are at the margin that
2   aren't really concerns on the thing.  And that is the proper
3   balancing of harms that the Court should engage in here.

4       The First Amendment interests of private American citizens
5   to speak freely on social media on questions of core political
6   significance with our viewpoint discrimination overwhelms the
7   interest that they're asserting on margins of potential
8   confusion about marginal applications that lie in the shadow of
9   the borderlines between what constitutes criminal activity.

10      So having addressed that, I want to pivot back to just
11  discuss some things that Ms. Snow and Mr. Sur said.

12      Ms. Snow argues that our declarations are stale.  Actually
13  we've submitted now three rounds of declarations from the
14  private plaintiffs.  Every time they've submitted a
15  declaration, their injuries have continued up to the time of
16  the declaration.  This includes the declaration we filed last
17  week with our reply brief of Ms. Hines and Ms. Hoft.

18      Ms. Hines is present in the courtroom today, you know,
19  lives down the street, attests how she was having the continued
20  censorship on social media on the very topics that the Virality
21  Project has called out her type of group for as recently as a
22  few days before the declaration was executed.

23      So, in other words, the notion that, oh, this is stale.
24  It all ended a year ago.  Okay.  Here's a declaration in
25  support of our reply brief that shows that our private

1    plaintiffs continue to experience these same kinds of

2    censorship right up until the date they executed their latest

3    round of declarations.

4         And they completely ignore their second round of

5    declarations, which is the one we submitted in support of class

6    certification.

7         And what those say is those private plaintiffs have

8    interests as audience members in listening to and reading the

9    speech of all the other private speakers that federal officials

10   and their partners have targeted in this case.

11        So you go through and you read those declarations.  And

12   they're saying all these people that the White House is

13   targeting, that the Election Integrity Partnership is

14   targeting, you know, the disinformation dozen that the Virality

15   Project is targeting, we listen to and read all those people,

16   not literally all, but, like, dozens of them.

17        If you read -- again, you read Ms. Hines' second

18   declaration and she talks about following all of the

19   disinformation dozen, all of them.

20        So the notion that, like, oh, we don't have any current

21   censorship injuries, these censorship injuries are clearly

22   ongoing.

23        And I would add what -- something that really ties all

24   this notion of imminent harm all together, in my mind, is what

25   the Court said at page 37 of the motion to dismiss order, "They

1    history of past censorship" -- which, based on the evidence

2    here is enormous -- "The history of past censorship is strong

3    evidence of the threat of future censorship."  And so that is

4    exactly what the evidence shows here.

5        Secondly, Ms. Snow said we failed to link the instances of

6    particular censorship conduct to -- sorry -- instances of acts

7    of censorship to the censorship injuries to the conduct of the

8    defendants.

9        We addressed this in the reply brief.  We identify five

10   ways that that's not correct.  First, there's direct censorship

11   injuries where it says experienced by the private plaintiffs,

12   you know, where the Great Barrington Declaration gets

13   deplatformed right after the campaign from Dr. Fauci and so

14   forth.  You have Mr. Hoft attesting, who's been flagged again

15   and again and again by CISA's partners in the Election

16   Integrity Partnership, experiencing censorship up to -- you

17   know, as the declaration we filed last week and so forth.

18       So there's the direct censorship injuries that the private

19   plaintiffs have continued to experience at the hands of federal

20   censors.

21       Then there's the interests of the private plaintiffs to --

22   as audience members.  I referred to that a minute ago in their

23   second round of declarations in support of class certification.

24   They read and follow -- all these people are -- large numbers

25   of these people are being targeted for federal censorship.

1      Third, the Court recognized, as upheld multiple times, the
2  state's standing to represent the millions of Missourians and
3  Louisianians who are not hearing speech on social media because
4  there's an active campaign by federal officials to censor it.
5      Finally, the states have their own direct interests here
6  to uphold their -- you know, their policy, their fundamental
7  policy set forth in their state constitutions that promote
8  freedom of speech, as well as their interest in hearing what
9  their constituents actually have to say, what they actually
10  think, on social media.  And that's reinforced by Carrol
11  Crawford's declaration.
12      And then, fifth, and I think that's why Mr. Gardener
13  brought it up, we pointed out that also the private plaintiffs
14  are seeking class certification to represent a class of all the
15  people who are affected by these censorship activities.
16      So for all those five reasons, this notion that there's no
17  link between the federal censorship and the injuries to the
18  plaintiffs is -- is indefensible.
19      Ms. Snow said a few other things.  She said there's no
20  evidence that the Surgeon General's Office collaborated with
21  the Virality Project.  That's refuted at the highlighted text
22  in Tab 33 of your binder, among other things.  She said,
23  "There's no evidence that the Virality Project targeted
24  Ms. Hines' group, Health Freedom Louisiana."
25      The Virality Project report talks about health freedom

1    groups which it said it targeted on a, quote, "nationwide

2    basis."  And it mentions them 100 times as, you know, the sort

3    of information they're citing.  So that inference is compelling

4    that Ms. Hines has been targeted by it.

5        Ms. Snow made a comment that Dr. Fauci's successor,

6    Dr. Auchincloss or Auchincloss, all he did was receive a email

7    in 2020.  That email is in Tab 6 of your binder.  That's an

8    email that says at 12:30 in the morning on February 1st, 2020,

9    "important."  And then it attaches the article, *The Nature*

10   *Medicine* article about the gain of function research that NIAD

11   had financed at the Woohan Institute of Virology.  And says,

12   "You keep your cell phone on.  You will have tasks to do

13   today."  That -- that email speaks volumes about the

14   involvement of Dr. Auchincloss and Dr. Fauci's campaign to

15   censor the lab leak theory.

16       They rely in their papers and Ms. Snow's presentation in

17   their representation that CISA stopped its switchboarding

18   activities after the 2020 election cycle.  They neglect to

19   mention that Brian Scully's testimony, which they had the

20   opportunity to contradict or explain, and did not do so, when

21   they submitted the CISA declaration.

22       Brian Scully said -- I said, "When did you make that

23   decision?"  He said, "Late April or May of 2022."  "Oh, really.

24   Right after you got sued by us?  Right?"  And, of course, the

25   standard there is set forth in the Supreme Court's decision in

1    *Already, Inc. versus NIKE,* which is voluntary cessation of

2    challenged conduct after you got sued is viewed with extreme

3    skepticism.

4         The person that, here CISA, engaging in voluntary

5    cessation has a formidable burden to establish that it's

6    absolutely clear that there's no reasonable prospect of that

7    conduct to recur.

8         And, in fact, you see the exact opposite.  What you see is

9    Lauren Protentis, as they're terminating their own

10   switchboarding activity, aggressively lobbying the platforms to

11   create an alternative channel for the exact same switchboarding

12   to go, just bypassing CISA.  So the notion that, we're getting

13   out of this business, that's old news is just directly

14   contradicted why the evidence.

15        They refer to Dr. Gurrea's declaration.  I think we refute

16   that in great detail in the reply brief.  I just want to quote

17   the Northern District, the fact that Dr. Gurrea apparently

18   didn't even read all the emails and other communications the

19   defendants produced in evidence that show social media

20   platforms again and again and again caving to federal demands

21   for greater censorship, as the Northern District of Texas says,

22   his failure to look at -- even look at the relevant evidence,

23   quote, "The gap is an abyss when it comes to his analysis."

24        Mr. Sur made a series of questions -- or made a series of

25   comments.  He started his presentation by invoking the

1    Government Speech Doctrine.  And that's exactly what the

2    government gets dead wrong in this case.

3        They say, we have to be able to say whatever we want, even

4    when what we're saying is, for example, you know, -- Tab 23,

5    for example, is the first flagging email we have from the White

6    House 1:04 a.m. on January 23rd, 2021, you know, just basically

7    two days and a few minutes after inauguration day, you have

8    Clark Humphrey emailing Twitter linking a tweet by Robert F.

9    Kennedy, Jr., discussing the death of Hank Aaron after taking a

10   vaccine.

11       And there this White House official is saying, "Hey, can

12   we have this removed ASAP?"  Right?  That's the Government

13   Speech Doctrine that they want to invoke.  We've got to be free

14   to say that, hey, we dislike this viewpoint that's being

15   expressed on social media.  Will you please take it down right

16   away?  And, by the way, it would be nice if you kept monitoring

17   these and take down other ones as well.

18       That is totally -- we're right in the heartland of the

19   concern expressed in Metal against Tam, an opinion that you

20   quoted at length in your motion to dismiss saying that it says

21   the Government Speech Doctrine is subject to dangerous misuse.

22   And, in fact, it can be used to suppress disfavored viewpoints.

23   It should not be used that way.

24       That's exactly -- that's essentially the government's

25   playbook in this case, say no, no, we -- And it expresses

1    itself again in Mr. Gardner's presentation where he says, "No,

2    no, there's a lot speech that we've got to be able to engage

3    in."

4         And what the Supreme Court says is you've got that

5    completely upside down.  The private First Amendment protected

6    speech, ordinary American citizens, is much more important than

7    the government's assertion of its right to say whatever it

8    wants, even if what it wants to say is a whole bunch of threats

9    and pressure and collusion and deception to go after disfavored

10   speech on social media.

11        They said each platform -- I think Mr. Sur said the record

12   shows that each platform made its own decisions.  Just to

13   refute that, I'd direct the Court's attention to Tabs 28 and 30

14   of the binder.  Those are the emails from Nick Clegg right

15   after the White House's pressure campaign where he says things

16   like, "We hear your call for us to do more."  And, "We've got

17   to meet with you to understand what the White House expects of

18   us as censorship going forward."  I mean, the internal

19   communications here directly contradict that narrative.

20        You have the same thing when you talk about Facebook

21   entering a public -- making a public statement saying, "We're

22   already doing the things that the White House calls us to do.

23   And he says, "Aha, they would have done it anyway.  If we

24   actually look at the private communications, those emails from

25   Nick Clegg say, "Here's the new and additional things we're

1   doing, you know, in response to what you've told us to do.  We

2   hear your call for us to do more."  So and that's the probative

3   evidence here.

4        Mr. Sur said, "The mere prospect of a statutory change

5   cannot create state action."  That just mischaracterizes the

6   evidence here.  We don't have here just, hey, we might change a

7   statute.  What we have here is take down disfavored viewpoints

8   or else we'll make a statutory change that you don't like.

9        And, again, that's not the only threat.  We've identified

10  that the Court said in again doc 224 that's there's a long

11  theory -- series of threats, you know, thinly veiled and some

12  quite blatant.  These are threats of antitrust enforcement, for

13  example, and then other threats as well.  For example, the

14  Court -- as the Court noted in that order the RFI from the

15  surgeon general as well as the health advisory previously are

16  both freighted with the threat of regulation.  And there's

17  others threats as well, as well as internal and applied threats

18  as well.

19       Mr. Sur said that the -- Facebook said Tucker Carlson's

20  post didn't qualify removal.  You asked him, "Well, didn't they

21  deboost it?"  That's at Tab 26 where you have Nick Clegg

22  emailing, or Brian Rice, one of the Facebook officials,

23  emailing back to the White House saying, "This was deboosted

24  for seven days to be fact checked and we will continue to

25  deboost it even though it was not ultimately fact checked.

1    In other words, they had no reason to remove it all.  But
2  since the White House wants it deboosted -- here deboosted
3  means they've reduced its circulation by 50 percent.
4    Just imagine if that was a senior official in the Trump
5  administration who had sent that email to, you know, Twitter
6  saying, Hey, you know, here Rachel Maddow, the most prominent
7  -- whoever the most prominent journalist then criticizing the
8  Biden administration was, and they were saying to Facebook, "We
9  don't like this video from this person.  Take it down."  And
10 Facebook responds and says, "Well, we can't really take it
11 down.  And, in fact, it doesn't violate any of our polices.
12 But, at your request, we will deboost it and reduce his
13 circulation by 50 percent," what's being viewed by tens of
14 thousands or hundreds of thousands of people.  That violates
15 the First Amendment.
16    And I'm at my allotted time.  And so I'll stand down and
17 invite the Court's questions.
18         THE COURT:  Thank you.  Debbie, do you need a break?
19         COURT REPORTER:  Yes, sir.
20         THE COURT:  You need a break.  Okay.  Let's take a
21 little, quick break, about a ten-minute recess on that clock.
22 I think it's a little fast.  But it says 11:20.  But we'll take
23 about a ten-minute recess, come back.  I'll ask some questions.
24 We're not going to go to 12:00 and I'm going to take a lunch
25 break and come back.  We're going to finish.

```
1        So, you know, I have a fair number of questions, but I
2   don't know how long your answer is going to be.  But, you know,
3   I don't anticipate it's going to be, you know, just
4   tremendously long.  So let's take a quick break.  We'll start
5   back at 11:30.  We may go to 12:30 or so to finish.  Okay.
6   (Recess)
7             THE COURT:  I was a state court judge.  We didn't do
8   that.  So I keep forgetting.  So anyway.
9        All right.  Let me start my questions, and some of them
10  I'll address to both; some of them I'll address to one person,
11  I mean, one side.
12       Let me make sure -- I want to make sure what the -- we're
13  on the same page with regard to what's protected free speech.
14  And I'm primarily going to ask this to the defendants.  Whoever
15  wants to answer it, you know, feel free to do that.
16       The United States Supreme Court has recognized some
17  well-known exceptions to free speech:  Incitement, which
18  includes, you know, clear and present danger, fighting words.
19  They've been modified to some extent:  Threats, obscenity,
20  child pornography, defamation, criminal conspiracy, criminal
21  solicitation.  Those are not protected.
22       But I'm going to make some statements and you tell me
23  whether you think it's protected free speech or not.  The COVID
24  vaccine does not work.  Is that -- I'm asking defendant.  Is
25  that protected free speech?
```

```
 1              MR. GARDNER:  I'm happy -- Do you want me to approach
 2   the podium, Your Honor or should I do it --
 3              THE COURT:  You can stay right there.
 4              COURT CLERK:  Speak into the mic.
 5              THE COURT:  Yeah.  Depends on if you're mad at me or
 6   not with these questions.
 7              MR. GARDNER:  Yeah.
 8              THE COURT:  Is that protected free speech?
 9              MR. GARDNER:  Thank you, Your Honor.  Josh Gardener
10   for the defendants.
11              THE COURT:  Yeah.
12              MR. GARDNER:  So, again, I'm going to try and answer
13   your question as directly as possible.  But the whole question
14   here is whether there was undue coercion or significant
15   encouragement such that the government's relationships with
16   social media companies resulted in a First Amendment violation.
17              THE COURT:  And I do understand that y'all are not --
18   I'm going to ask some questions about that.  I'm not at all
19   saying -- I'm not asking you to admit you did that and are
20   these free speech?  I'm asking you just that.  Is this
21   protected free speech, that statement?
22              MR. GARDNER:  Well, understood, Your Honor.  That
23   statement standing alone, depending on who the speaker is,
24   could be protected by the First Amendment.
25              THE COURT:  Could be?
```

1                MR. GARDNER:  Yeah.  So, for example, --

2                THE COURT:  Could it not be?  Is there any --

3     anything you could see at all that, the COVID vaccine does not

4     work, that that's not protected free speech?  Any --

5                MR. GARDNER:  Yeah, absolutely, Your Honor.  Let's

6     say it was spoken by a covert Russian operative, that would not

7     be protected by free speech.  And plaintiffs acknowledge that.

8     Now, what plaintiffs say is that liking that statement may have

9     First Amendment implications.

10               THE COURT:  Okay.  And this was, like, during COVID.

11    I don't know if the Russians were involved in that or not.  But

12    I know y'all said in the elections --

13         All right.  Well, how about this:  Masks don't work to

14    stop COVID from spreading.

15               MR. GARDNER:  Same response, Your Honor.  It could be

16    protected speech depending on who the speaker is.

17               THE COURT:  Okay.  And let me just assume they're

18    American citizens making these statements.  Okay.  The 2020

19    election was stolen.

20               MR. GARDNER:  So, again, if it came from a American

21    citizen, then that speech itself could be protected, but,

22    again, it doesn't answer the question whether there's a First

23    Amendment violation.

24               THE COURT:  Okay.  Tell me how that statement could

25    not be protected.  What possibly could go wrong with that

1    statement that it's not free speech?

2              MR. GARDNER:  If it came from a -- for example, a

3    Russian -- a covert foreign operative like a Russian

4    government.

5              THE COURT:  Okay.

6              MR. GARDNER:  And plaintiffs concede that.

7              THE COURT:  All right.  Climate change is a hoax.

8              MR. GARDNER:  Same response.

9              THE COURT:  Okay.

10             MR. GARDNER:  President Biden is responsible for

11   inflation and high gas prices.

12             MR. GARDNER:  Same response.

13             THE COURT:  Okay.  All right.  Okay.  And I just

14   wanted to kind of, you know, go through what free speech was.

15   And I'm not -- like I say, I'm not, you know, assuming that you

16   admit that there's significant encouragement or coercion, but I

17   did want to ask the question to both sides.  Do you agree that

18   the test for determining whether a government is responsible

19   for private -- another private company's decisions is whether

20   there's coercion and/or significant encouragement?

21             MR. GARDNER:  Yes, Your Honor, that is the test the

22   Supreme Court has recognized.

23             THE COURT:  Okay.

24             MR. SAUER:  Actually, that's one of multiple tests

25   because there's also joint participation and conspiracy or

1   collusion.  So and I would point out that that test is actually

2   two different things because the case laws makes clear that

3   there's coercion.  And then significant encouragement that

4   falls short of coercion still counts.

5          THE COURT:  Okay.

6          MR. SAUER:  So we've presented five tests to the

7   Court.  And we think they're all supported in the case law.

8          THE COURT:  Okay.  All right.  And there's -- you

9   know, we had an issue that we ruled on before, I think in the

10  motion to dismiss, about there's no longer a preliminary

11  injunction against President Biden.  I understand that.  I

12  think we all are on the same page on that part.

13      Is there any constitutional or separation of powers issues

14  that would prohibit a preliminary injunction against White

15  House officials other than President Biden?  Okay.  I'll let

16  both sides respond to that.

17         MR. GARDNER:  Would you like me to go first, Your

18  Honor?

19         THE COURT:  Sure.  Well, sure, it's fine.  It doesn't

20  matter.

21         MR. GARDNER:  So we have not directly briefed that

22  issue, Your Honor.  We would be happy to do so.  I do think

23  there is some significant constitutional questions with

24  enjoining senior advisers to the president to provide advice

25  and information to the president so that he can make decisions

111

1    under, you know, the Take Care Clause of the Constitution.

2    But we have not directly addressed that.

3        But what we do address in our opposition is that any

4    injunction in this case should not run against individuals in

5    their official capacity.  It should run against the agencies

6    because, again, those claims merge against the agencies.

7              THE COURT:  Okay.  All right.

8              MR. SAUER:  My response to that is the only concern

9    -- they've never raised this, so it's waived.  And the only

10   concern he just raised is the concern that an injunction that

11   would interfere with the kind of advice that the senior

12   advisors could give the President might raise separations of

13   powers concerns.

14       But going all the way to doc 34, the Court's order grants

15   a preliminary injunction related to discovery.  This injunction

16   is targeted at White House officials' communications with

17   external third parties, the social media platforms.  And

18   there's absolutely no reason they can't be enjoined there.  If

19   they're violating the First Amendment, they fall within

20   *Armstrong* and the longstanding case law that says they can be

21   enjoined from violating the Constitution.

22             THE COURT:  All right.  And the next question is

23   going to be -- and let me just say this first:  I do want to

24   complement both sides.  I don't want any more briefs, you know.

25   I don't know why they call it -- why it's called a brief or why

1   this was called a brief, you know.  I'm going to call it -- I

2   don't know what I'm going to call it, but I won't call it that.

3   But because, you know, they were all -- everybody's was long, I

4   mean, and I've read it all.  I mean, I'm not just, "Law clerks,

5   y'all tell me what it says."  You know, I mean, they look at it

6   too.  But I've spent a lot of time reading it, so I'm pretty up

7   on it.

8      But there's a lot that, you know, I have to look at again,

9   and things, because I think -- I know, it's several thousand

10   pages, you know, or something like that.  But, anyway, the

11   -- you covered pretty well irreparable harm issue.

12      But I did want to ask how a -- both sides, if a

13   preliminary injunction is issued -- Now, I'm not saying I'm

14   going to issue one.  I'm just asking these questions.  If a

15   preliminary injunction is issued of any type, how would you

16   avoid the government speech problem?  I see that as the biggest

17   part of what Mr. Gardner talked -- we talked about the

18   government speech issue.  Like, can the government get up and

19   say -- you know, get up and make some speech, you know, if he's

20   -- you know, I mean, there was a lot of questions -- President

21   Biden said, "They're killing people."

22      Surgeon General Murthy said -- you know, he gave his

23   advisory and, you know, social media Jen Psaki said, "The

24   social media companies need to do a whole lot better," and gave

25   a specific, quote, "ask," A-S-K-S, ask about what they were

1   wanting them to do.  So it was a lot of government speech

2   there.  But it was other things too more than that.

3       So how do you avoid the government speech issue, like, if

4   there is something that the government needs to say, how would

5   you avoid that?  I'll let the plaintiffs go first on this one.

6           MR. SAUER:  Yeah, and I'd say in the language of the

7   injunction we proposed, we try to do that in two ways.  First,

8   in that list of verbs.  That's really the operative portion of

9   the injunction.  We're asking the Court to enjoin them from

10  taking very specifically defined actions.  There's a specific

11  list of verbs there.

12      Again, it's -- well, I don't have it right -- demand,

13  urge, encourage, pressure, coerce, deceive collude, induce.

14  And craft from that list of verbs, we try to hue to the very

15  verbs that, as I said before, in opinions like *Norwood* and

16  opinions like *Backpage*, those are the very verbs that the

17  courts have said this is what violates the injunction.  Verbs

18  like:  Coerce, you know, encourage induce are right there in

19  *Norwood*.  They're right there in *Backpage*.

20      So, in other words, we want the scope of the conduct

21  that's enjoined to reflect what courts have already held is

22  what the First Amendment doesn't let you do.  And if the First

23  Amendment doesn't let you do it, it doesn't fall within the

24  Government Speech Doctrine.  That's *Metal*.

25      And then, in addition to that, later in the injunction we

114

1    say it's whether -- deceive, encourage, induce, so forth, to do

2    what?  To take private American speech down from social media.

3         So the government can say lots and lots of things.  But

4    what it can't do is engage in communications with platforms

5    that are deliberately calculated to get disfavored speech,

6    disfavored viewpoints taken down.  So those are the two

7    elements.  That's how we tried to craft it in the proposed

8    injunction.

9              THE COURT:  Okay.  Defendants.

10             MR. GARDNER:  Thank you, Your Honor.

11        So a few things.  First, I do have the language of

12   plaintiffs' injunction in front of me.  And some of the verbs

13   they use are inherently not violative of the First Amendment.

14   For example, there's nothing constitutionally inappropriate

15   about urging a private entity to do something or to encourage a

16   private entity to do something.  And that is one of the precise

17   concerns the United States has here.

18        Plaintiffs' entire theory of the case is so at odds with

19   the previous case law.  So, for example, in the previous cases

20   or the other cases plaintiffs have cited to, the one who made

21   the alleged threat is the one who actually took the coercive

22   action.  Right?

23        So in *Backpages*, the sheriff is the one who made the

24   threat, and he did it in a letter.  That letter was enjoined

25   despite the broader language of the injunction.

115

1     What plaintiffs are arguing here is that CISA, in

2  switchboarding in 2020, despite no coercion whatsoever, in

3  fact, it's the opposite, as my colleague said, there are

4  statements in all those emails, that say, "We're not asking you

5  to do anything."

6     But what plaintiffs argue is those actions somehow take on

7  a coercive effect, almost like the Mosaic Theory of the First

8  Amendment.  That is the exact problem we had.  And if I'm not

9  answering your question directly, it's because I can't answer a

10  question directly because of the nature of plaintiffs' broad

11  and amorphous claims paired with its even broader injunction.

12     THE COURT:  My question may have been a little

13  overbroad.  But go ahead.  Go ahead, Mr. Sauer.

14     MR. SAUER:  May I just briefly reply to that.  Three

15  points.  One is Mr. Gardner said to urge or encourage doesn't

16  violate the Constitution.  Here's what the Supreme Court said

17  about that in Norwood.  "It is axiomatic that the state may not

18  induce, encourage or promote private parties to engage in

19  contact that would be unconstitutional if the government did

20  it.  The adverb "encourage" we've lifted right out of *Norwood*.

21  That does violate the Constitution.

22     THE COURT:  Well, let me ask you this question on

23  that:  Is -- All right.  So an injunction was issued.  And it

24  says you cannot, you know, meet and send emails and meet and go

25  over content and flag these posts; you can't do that.  And you

116

1   can't meet with the election -- can't work with the Election

2   Integrity Partnership or the Virality, Project if it ever comes

3   up again, or you can't work with these ones who are -- don't

4   have First Amendment concerns.

5        All right.  And then the government wants to -- you know,

6   at a press conference, the press secretary says, you know,

7   something like these social media companies are just -- these

8   social media companies are just -- they just keep on at it.

9   Something needs to change.  We need to amend Section 230 of the

10  Communications Decency Act, you know, and that's all they do.

11  They say that.

12       Would that be a -- would that elicit a motion for contempt

13  by the plaintiffs in that case?  They didn't meet with them;

14  they just said that.

15            MR. SAUER:  Yeah.  It would depend on the nature and

16  content of the statement.  And I think the way we describe it

17  at the very end of the reply brief, we talk about public

18  statements that are not sort of directed to platforms, that are

19  not deliberately intended to induce platforms to take action is

20  not violating the First Amendment.

21       So if they just made a statement saying, "Hey, Section 230

22  is really bad.  We need to amend it."  They can even say, "Hey,

23  COVID misinformation is bad.  But if they're taking that

24  additional step of having a statement that's deliberately

25  crafted to pressure or induce the platforms to take down social

```
1    media speech, that's where you get into the First Amendment
2    problem.
3         And, again, we've tried to craft the injunction so it
4    exactly mirrors what courts have said, you know, what really
5    does violate the First Amendment.
6              THE COURT:  Okay.
7              MR. GARDNER:  And, Your Honor, if I may.
8              THE COURT:  Mr. Gardner.  Yeah.
9              MR. GARDNER:  If I may just briefly respond.
10             THE COURT:  No, that's fine.
11             MR. GARDNER:  My colleague --
12             THE COURT:  I asked a different question, so go
13   ahead.
14             MR. GARDNER:  I understood.  I just want to be
15   totally clear about this.
16        To the extent that plaintiffs are suggesting that the
17   encouragement of a social media company to take action violates
18   the First Amendment without state action, plaintiffs cannot
19   establish an injury to themselves from that conduct.  It may be
20   the social media company can argue that it's violated their
21   First Amendment rights.  But plaintiffs have to establish state
22   action here, which is why they spend, I think you acknowledge,
23   many many pages of briefing arguing for state action because
24   they recognize that merely asking a social media company to do
25   something standing alone can't violate the plaintiffs' rights.
```

1    So I just wanted to be clear about that.

2        But their *Norwood* discussion is really no bearing on their

3    theory of the case here.

4            THE COURT:  Okay.  All right.  I'm going to go to

5    something a little less catchy, standing.  I hate to bring up

6    standing again.  The only question I have is:  There is a

7    discussion in the briefs -- not briefs, sorry.  I wish I could

8    think of another word to call them.  I don't want to call them

9    briefs.  But, anyway, whatever it was that y'all filed, the

10   long, long documents with all these attachments that you filed,

11   that's what they are.  No, I'm kidding.  It's a detailed case.

12   I really do complement the attorneys on the job done by both

13   sides.  Really interesting case to me, really interesting.  And

14   y'all did a great job on it.

15       But my question is this:  There's a question about whether

16   there's a different standard for standing in a motion to

17   dismiss, which I've ruled on, versus a preliminary injunction.

18   And I think the -- I'll let the defendants go first because

19   they brought that up.  They said there's a different standard.

20   But you didn't really say what it was, that I remember.  But so

21   is there a different standard?  Does it just have to have

22   evidence backing it up, or what's the standard?

23       Ms. Snow.

24           MS. SNOW:  Yes, Your Honor.  The difference at this

25   stage in evaluating the preliminary injunction motion versus

1    evaluating the motion to dismiss is that when the Court was
2    evaluating the motion to dismiss, it's taking the allegations
3    as a stand.  And the Court gave the allegations a presumption
4    of truth and was determining whether the allegations in the
5    compliant plausibly alleged that the plaintiffs had standing.
6        And the Supreme Court has said in *Lujan v. Defenders of*
7    *Wildlife* that the evidence, that the standard of review for the
8    issue of standing, as with all other issues in the case, varies
9    depending on the proceedings and which part of the case you are
10   in.
11       And so, you know, there the Court was considering on
12   motion for summary judgment whether the evidence then at that
13   point, as distinct from earlier in the case when, you know,
14   plaintiffs only have to plausibly allege standing, whether they
15   had presented sufficient evidence to establish standing
16   according to the standards that would apply in summary
17   judgment.
18       Here at the preliminary injunction stage, courts also
19   evaluate whether plaintiffs have actually presented evidence
20   that make a, quote, "clear showing."  And the Supreme Court
21   said in *Winters* that the plaintiffs bear the burden of
22   providing -- of making a clear showing that they meet all the
23   standards for obtaining preliminary relief, and that would
24   apply to the irreparable portion which does overlap
25   substantially with standing.

 1          And, in the Fifth Circuit, I believe it is *Stringer V*
 2  *Whitley*.  We cited the case in our brief which I had written
 3  down and now I am not seeing it.  But we had -- that case also
 4  echoed the clear standing language -- or, sorry, clear showing
 5  language.  And it reviewed whether the plaintiffs had actually
 6  presented evidence that showed whether they were eminently
 7  harmed, whether they'd be eminently harmed absent a preliminary
 8  injunction.  I believe that case is *Barber*.
 9          THE COURT:  Well, that's kind of what I was -- my
10  thoughts were kind of that what you're talking about in that
11  was that -- you got evidence backing it up.  That's kind of
12  what I thought --
13          MS. SNOW:  Yes.
14          THE COURT:  -- the standard would be.  Basically the
15  legal standard is the same except, you know, you're not doing
16  the -- just basing it on the pleadings anymore.  You've got to
17  have evidence backing it up.
18          MS. SNOW:  Right --
19          THE COURT:  That's kind of what I thought, but I was
20  just going to ask that and see.  Go ahead, Ms. Snow.  I'll let
21  you finish and then Mr. Sauer.
22          MS. SNOW:  Yes.  Thank you.  Sorry.  I just wanted to
23  add one more thing that in this case in particular where we
24  have a -- almost a year in between when the plaintiffs had
25  submitted their initial motion for preliminary injunction and

1    where we are now, where the Court is considering all the

2    evidence that has been presented to it and where plaintiffs

3    have access to thousands of pages of documents, testimony from

4    multiple officials, the requirement that they make a clear

5    showing that they are imminently harmed and that -- and that

6    they will be irreparably harmed without a preliminary

7    injunction, you know, the Court should hold them to -- it

8    shouldn't be hard for them to point to evidence --

9            THE COURT:  Right.

10           MS. SNOW:  -- if they -- if it's true.

11           THE COURT:  And let me ask you this -- and, Mr. Saur,

12   I'm not trying to keep you -- I'll let you answer two -- both

13   questions at the same time.  But I went to Del Rio recently,

14   Del Rio, Mexico.  I volunteered to kind of go down there and

15   help out some of the judges down there.  I had, like, 200

16   sentencings in four days.  And every one of them told me, every

17   one of them told me -- they're mostly border crossing cases.

18   They did something.  Every one of them told me, "I apologize to

19   you, to the United States Government.  I'm never going to do it

20   again," every one of them.  I felt like I'd kind of solved the

21   border crisis after I got back.  But, unfortunately, some of

22   them, you know, even now, still getting rearrested.

23       So the government is saying, "Don't worry.  We're not

24   going to ever do any of this again."  You've got a 2024

25   election that's going to be a hotly contested election coming

1    up.  So how can I be sure that this is not going to happen

2    again, that the government is not going to tie up with the

3    Election Integrity Project again and start suppressing or

4    asking this stuff to be suppressed?

5         Y'all are telling me it's not going to happen.

6         MS. SNOW:  Your Honor, two responses to that.  And,

7    first of all, it is not the government's argument that, you

8    know, this, you know, will never happen again.  It is the

9    government's position that the conduct here, everything that

10   plaintiffs are challenging, they haven't shown a violation of

11   the First Amendment.  They haven't shown state action to even

12   get to the question of whether there's been a First Amendment

13   violation.  There's nothing unlawful about the government's use

14   of the bully pulpit or these communications with social media

15   companies.

16        But the question for the Court is whether plaintiffs have

17   presented evidence that they will be irreparably harmed.  And

18   they bear the burden of showing that the conduct is ongoing in

19   such a way that they will be irreparably harmed.

20        And they haven't shown that.  The record shows that much

21   of the conduct that they're challenging isn't currently

22   ongoing, and that's a critical question for the preliminary

23   injunction.  That's all the Court needs to determine at this

24   stage.

25        THE COURT:  Okay.  All right.  Mr. -- You can go

1    ahead now.

2           MR. SAUER:  Your Honor, I think she just conceded

3    that they are going to do it again.  I heard her say --

4           THE COURT:  She didn't say no, did she?  She didn't

5    say no, but she might want to say that.  Go ahead.

6           MR. SAUER:  I think she just said that, you know

7    what, there's nothing unlawful about this.  This is all A-OK.

8    And as soon as it makes sense to us, we will do it again.  And

9    that's a really important concession.

10          THE COURT:  And I'm -- if you want -- do you want to

11   say anything else?  I'll let Ms. Snow reply.  I'm not saying

12   she conceded that, but I'm just -- you know, I don't feel real

13   confident that the government won't do that again, I'll just

14   say that.

15          MR. GARDNER:  Your Honor, sorry.  Let me see if I can

16   address this directly.

17          THE COURT:  Okay.

18          MR. GARDNER:  The issue with a preliminary injunction

19   is:  Is there harm during the pendency of the lawsuit that we

20   need to stop to protect the status quo?  What my colleague was

21   saying is --

22          THE COURT:  Well, or that it's likely to occur.

23          MR. GARDNER:  Correct.  So, and again, we've got to

24   go defendant by defendant to think about this conduct.  But

25   what do we have in the record?  What we have in the record is a

1    declaration from Geoff Hale from CISA who says, "We won't be

2    switchboarding in 2024."  That's an unequivocal statement.

3    Plaintiffs don't challenge that statement.

4        And I think the more fundamental point to your example

5    about election issues, the election is, what, November of 2024?

6    The question then becomes is:  Is there conduct that may occur

7    between now, what is it, May of 2023, and the resolution of

8    this lawsuit that is likely to occur that will harm plaintiffs?

9        And we have put forth evidence that that challenged

10   action, which, by the way, mostly relates to COVID with a

11   pandemic that is now past us, is unlikely to occur during the

12   pendency of this lawsuit.  That's the -- that's the point.

13           THE COURT:  Okay.  My next question is going to be,

14   you know, one thing I noticed that, you know, -- y'all feel

15   free to point out something different -- is that, for example,

16   in the election issues, with the Election Integrity Project,

17   CISA, all those involved in that, every bit of postings and

18   things that they had, dealt with conservative speech.  I could

19   not -- I didn't see one post that -- you know, in fact, the

20   Election Integrity Project, EIP, said that almost all of the

21   information that they flagged or reported dealt with -- I think

22   they were, like, they worded it conservative, right-wing

23   followers of Donald Trump.  That's what they said.

24       And so I guess my question is:  Can y'all point to me some

25   posts that were flagged and/or removed, you know, by EIP

1    involving liberal left-wing supporters of Biden?

2            MR. GARDNER:  Thank you, Your Honor.  I don't have

3    the EIP Report immediately in front of me.  But we do note in

4    our response to plaintiffs' proposed findings of fact that the

5    EIP made several conclusions.

6        One of those conclusions was that the vast majority of mis

7    and disinformation that they were seeing did happen to come

8    from conservative sources.  That's just a fact.  But they also

9    say, and we note this in our response to proposed findings of

10   fact, that they did identify left-leaning posts as well for

11   targeting or flagging.

12       And, in fact, I mean, I would note this, you know, you

13   have another lawsuit in front of you right now by RFK, Jr. who

14   is running for the democratic nomination for president, who

15   claims that his materials were flagged by the EIP in connection

16   with the 2020 election.

17       So I think that's all the evidence you need, Your Honor,

18   to conclude that it wasn't necessarily viewpoint discrimination

19   at all.  And, of course, the EIP as a private entity can't

20   engage in --

21            THE COURT:  Well, his was not alleged to be election

22   because he wasn't running 'til I guess just recently.  But his

23   was COVID information.

24            MR. GARDNER:  No, that's correct.  But I think I took

25   your question to be were there, you know, liberal posters as

1    well as conservative posters whose information was flagged by

2    the EIP?  The EIP reports that, again, while I think there was

3    a significantly more flagging or tagging by conservatives

4    because conservatives were promulgating the most

5    disinformation, that they did also tag liberal information as

6    well.

7              THE COURT:  Do you know of any, any one single one

8    out of the millions or thousands, whatever it was they flagged?

9              MR. GARDNER:  Well, so to be clear, --

10             THE COURT:  Even one?

11             MR. GARDNER:  Yeah.  And I'm trying to be very direct

12   with you.  Neither party has taken any discovery from the EIP.

13   So we don't have the universe of what the EIP may have flagged

14   for social media companies, let alone what social media

15   companies may have done --

16             THE COURT:  Okay.

17             MR. GARDNER:  -- with that information.  But what we

18   do have, Your Honor, is a textual description in the EIP report

19   that explains they did in fact flag materials from liberal

20   viewpoints as well as conservative viewpoints.  What that

21   breakdown is, we don't know because we haven't taken that

22   discovery.

23             THE COURT:  And the viewpoints themselves that were

24   flagged, my understanding was from reading the EIC, whatever

25   that was, theirs wasn't brief either, but that their document

1    that they concluded, you know, what all happened, what all they

2    did and kind of patting themselves on the back and everything

3    about it, that what they were doing, they called it election

4    disinformation, which I understood to be people saying the

5    election was stolen or the democrats stole the election or

6    something happened like that.  That's what I understand that

7    they were talking about.

8         So getting back to is that protected free speech?  If I

9    put something on Facebook -- and I'm not even on Facebook or

10   any -- well, hardly anything.  I'm not going to put anything on

11   there, I promise.  I'm just giving you -- I'll put somebody

12   else.

13        If my law clerk Dakota Stephens puts something on there on

14   social media and he says the 20 -- and I'm not telling you his

15   political views or anything.  I'm just giving him as an

16   example.  But if he puts something on there that says, the 2020

17   election was stolen, is that -- it's coming directly from him.

18   It's not the Russians.  It's not Chinese, is that -- is that

19   protected free speech?

20             MR. GARDNER:  Well, if it is being flagged by the

21   EIP, a nongovernmental organization, then there's no First

22   Amendment violation.  And I think beyond that, Your Honor, as

23   my colleague Mr. Sur said, there's two steps here.  Right?

24   That someone has to flag or the EIP has to identify

25   information, and then they have to make a decision whether to

```
1    send it to a social media company.  And then the social media

2    company has to make a separate decision what to do with that.

3         And, again, as the plaintiffs concede, only 35 percent of

4    the time did the social media companies do anything with that

5    information.  That's exactly what O'Handley v. Weber was

6    talking about when they talked about the fact that social media

7    companies use their own independent judgment.

8              THE COURT:  Well, my question was:  Is that protected

9    free speech?

10             MR. GARDNER:  Yeah.  And my answer is the content

11   itself standing alone may be.  But if it's by a nonstate actor,

12   there's no First Amendment.

13             THE COURT:  Okay.  You said, "maybe."  Is there any

14   way -- if it comes directly from him.  He's an American

15   citizen.  I'll just tell you that.  Assume he is American.  He

16   is an American citizen.  He was born in Baskin.  So if -- home

17   of what's her name?  Lainey Wilson, Lainey Wilson.

18        But, anyway, if it turns out that he says that, didn't

19   come from the Russians, didn't come from the Chinese, didn't

20   come from Iran, is that protected free speech?

21             MR. GARDNER:  Sure.

22             THE COURT:  How could it not be?

23             MR. GARDNER:  Well, I know --

24             THE COURT:  Well, under what circumstance would that

25   not be protected free speech?
```

```
 1              MR. GARDNER:  Well, again, not trying to be coy with
 2     you.  The speech itself may be protected by the First
 3     Amendment.  But when it comes or is used by a nongovernmental
 4     actor, it doesn't violate the First Amendment.  And the EIP --
 5              THE COURT:  And I do understand that.
 6              MR. GARDNER:  Yes.
 7              THE COURT:  My next question is going to be:  What do
 8     you understand the relationship between CISA and the EIP to be?
 9              MR. GARDNER:  I'd be happy to --
10              THE COURT:  Okay.  Good.
11              MR. GARDNER:  -- address that, Your Honor.  So CISA's
12     role, as explained in the documents -- and I wrote this down.
13     Just give me one second here.
14              THE COURT:  And I'm pronouncing it CISA.
15              MR. GARDNER:  That's okay.
16              THE COURT:  So it's pronounced CISA?  That's the way
17     y'all pronounce it in D.C.?
18              MR. GARDNER:  Yes, sir.  Yeah, I refer you, Your
19     Honor, to Exhibits 74, 122 and 125, as well as the declaration
20     of Mr. Hale from CISA.
21          And what those are, they're statements from the Stanford
22     Internet Observatory, the University of Washington and the EIP
23     itself.  And what those statements say to a person is that CISA
24     did not found, did not fund, did not control and did not manage
25     the EIP.
```

1          What did CISA do with respect to the EIP?  Well, as the --

2     I think, I hope undisputed evidence shows there were Stanford

3     interns who spoke to Mr. Scully, a CISA employee.  Mr. Scully

4     identified an issue.  And that issue is there is a lack of

5     resources by states to identify misinformation for social media

6     companies.

7               THE COURT:  Which turns out to be conservative

8     speech?

9               MR. GARDNER:  I resist that, Your Honor.  That's not

10     the case.

11              THE COURT:  Okay.

12              MR. GARDNER:  If it happens to be the case that more

13     conservatives are disclosing disinformation, that may be the

14     case.  But there is no, as I understand the EIP report, I think

15     that's what we have right now, there's no intention to target

16     conservatives.

17              THE COURT:  Okay.

18              MR. GARDNER:  But, in any event, so what the evidence

19     shows is that Stanford interns went to Mr. Scully and said,

20     "You know, are there issues that can be addressed?"  Mr. Scully

21     identified that there was a lack of resources by states, states

22     like Missouri and Louisiana, who asked CISA to provide

23     disinformation to social media companies.

24          Mr. Scully identified that.  The interns then went back to

25     the Stanford Internet Observatory, shared that with Alex

1    Stamos.  And Alex Stamos said, "Hey, why don't we create an
2    organization that does this because there is a lack of
3    resources?"  The EIP then shared what they were going to do
4    with CISA, as they would with any partner.  Because, remember,
5    CISA's statutory mission is to partner.  I mean, it is in the
6    statute.
7         So they shared that information with CISA.  And then EIP,
8    without any funding from CISA, that's undisputed, created the
9    Election Integrity Project.
10        Now, did the EIP share what it was doing with CISA?  Of
11   course, but that doesn't create joint action.
12             THE COURT:  Well, is that significant encouragement?
13             MR. GARDNER:  No.  No.  Not -- not constitutionally.
14             THE COURT:  I knew you would say that, but I was
15   going to ask you anyway.
16             MR. GARDNER:  Yeah.  Yeah.  Yeah.  No, not for
17   constitutional purposes.  Absolutely.  The question is did CISA
18   somehow break the will of a private entity, the EIP?  No,
19   certainly not.  And, by the way, we know that because we know
20   that not everything flagged by states, the EIP even sent to
21   social media companies.
22        What do we also know?  We also know that CISA never
23   flagged posts for the EIP.  They had no involvement in what the
24   EIP was actually doing, which was flagging things for social
25   media companies.

1    So then what are we left with?  We're left with the notion

2    that former employees of CISA at one time then went to work for

3    the Stanford Internet Observatory?  Well, that tells the Court

4    nothing about control or dominion of the EIP by CISA.  And then

5    so what are we left with?  Nothing, Your Honor.

6    The fact is that EIP, on its own, created a process to

7    flag, you know, misinformation for social media companies that

8    they were then given the complete responsibility, the social

9    media companies, to decide what to do with that information.

10   THE COURT:  Why was CISA even involved in it?

11   MR. GARDNER:  Because CISA has a mission, Your Honor,

12   to protect critical infrastructure.

13   THE COURT:  And I'm going to ask about that, --

14   MR. GARDNER:  I know you are.

15   THE COURT:  -- but not right now.

16   MR. GARDNER:  And one aspect of critical

17   infrastructure is cyber security and, you know, cyber

18   infrastructure.  So CISA has been in the space --

19   THE COURT:  And cognitive -- don't forget that,

20   cognitive infrastructure.  But we'll talk about that in a

21   minute.

22   MR. GARDNER:  And then, by the way, again, Missouri

23   and Louisiana asked CISA to play this role.  They don't dispute

24   that.  And what CISA concluded after the 2020 election was,

25   this was a really resource intensive project.

1      Now, my colleague here says, well, that was then because

2   of the lawsuit.  I think we need to be a little clearer about

3   this.  What Mr. Scully said was two things, the decision

4   happened in either April or May.  Of course, the lawsuit was

5   filed in May, not April.  And, two, it was done, at least in

6   part, because of the resource intensive nature of the

7   switchboarding efforts which CIS and EIP were, you know,

8   performing.

9      So I think that is the most direct answer I have to the

10  question of why CISA's minimal involvement could possibly lead

11  to joint participation under the Constitution such that CISA

12  would be responsible for the actions of the EIP.

13          THE COURT:  Okay.  Mr. Sauer, you look like you're

14  ready to say something, so I'm going to let you say something.

15  I've been avoiding you -- I've been asking so many questions, I

16  didn't get -- let you in.  But you look like you're just about

17  to say something.  If you want to say something, so go ahead.

18          MR. SAUER:  Judge, I cannot leave unaddressed the

19  federal government's insinuation that conservatives are the

20  source of disinformation.  I heard Mr. Gardner parroting that

21  point that is made in the EIP report that, well, we end up

22  overwhelmingly targeting conservative speech.  But, of course,

23  that's because conservatives are liars, and liberals are not

24  liars.  I mean, that reeks of bias and viewpoint discrimination

25  right there.

1    And on your question about whether or not, you know, the

2    EIP overwhelmingly targeted conservative speech, there's a

3    really telling graphic where they list the top 22 super

4    spreaders of disinformation on Twitter.  And that list there,

5    you know, President Trump is number 3, his sons are number 5

6    and 6.  Our plaintiff Jim Hoft is number 2.  And then on the

7    right side of that chart, they list the political orientation

8    of everyone and every single one of them is conservative

9    Then on the question of whether or not CISA's involvement

10   in the EIP is minimal, I just refer you to Tab 17.  Tab 17 is

11   basically a cut and paste from pages 51 and 52 of our reply

12   brief where we point to 15 significant points of contact and

13   collaboration between CISA and EIP.

14   On the notion of funding, they say CISA did not fund the

15   EIP.  CISA funded the EI-ISAC, which is the clearing house

16   through which misinformation was reported to the EIP.  And

17   other federal agencies did directly fund the EIP.

18   The EIP report itself says it received funding for this

19   very project from the National Science Foundation.  EIP is

20   federally funded.  It's working closely with partners, the CIS

21   and the EI-ISAC that CISA directly funds.  And, in fact,

22   federal officials are flagging misinformation.

23   The GEC, you know, and the kind of stunning development in

24   their response brief, they submitted Leah Bray's declaration

25   where she admits there were 21 narratives flagged by -- by the

1    GEC, information that we somehow didn't manage to elicit from

2    Daniel Kimmage because he denied all knowledge of it in his

3    deposition, 21 narratives flagged by federal officials at the

4    GEC.

5            THE COURT:  Well, one thing that caught my attention

6    with the Election Integrity Project was that the one who was

7    running that, Renee DiResta, I may be pronouncing that wrong,

8    but, you know, that she stated in one of the statements that I

9    read that -- that the purpose of that and the Virality Project

10   was to get around First Amendment concerns that would tie up

11   government agencies.  That's the first thing -- first time I

12   ever have seen anybody even mention free speech in all this.

13   And I guess I was kind of, like, does the government have

14   somebody that talks to them about this?  Do they ask anybody?

15   I never saw Rob Flaherty, Andy Slavitt, anybody from these

16   agencies ever even mention any possibility that they could be

17   violating the Free Speech Clause.

18       So I guess -- I guess why in the world would the

19   government, CISA, collaborate?  And that's the word used by

20   Mr. -- Is it Stamy?

21           MR. GARDNER:  Scully?

22           THE COURT:  Scully.  I'm sorry.  In his deposition,

23   he said they collaborated.

24       Now, I know that can mean a lot of different things.  But

25   why would the government collaborate, or whatever they're

1   doing, with an organization whose goal is to get around First

2   Amendment concerns?

3          MR. GARDNER:  So, well, I'll say this, Mr. Scully

4   said in his deposition -- and we cite to this again in the

5   response to the proposed findings of fact, that collaboration

6   to him just means the partnership that they are, again,

7   statutorily obligated to engage in.  They partner with the

8   private sector.

9      So there's nothing, I think, untoward or problematic about

10  the use of the term "collaborated" in that context.  And,

11  again, in one of the 1,442 responses, we explain --

12         THE COURT:  Okay.

13         MR. GARDNER:  -- exactly what he meant there.

14         THE COURT:  Okay.  All right.  Are the defendants

15  arguing for a pandemic/emergency exception to free speech?

16         MR. GARDNER:  No.

17         THE COURT:  Okay.  Okay.  Thank you.  That's the

18  shortest answer you've given so far.  That's good.

19         MR. GARDNER:  It's getting late in the day.  The

20  longer we go, the shorter they are.

21         THE COURT:  I'm joking.  All right.  I'm really

22  interested in knowing why Rob Flaherty of the White House was

23  so interested and so concerned about the Tucker Carlson video.

24  It had Tomi Lahren on it.  And it was Tucker Carlson and Tomi

25  Lahren.

1    And Tucker Carlson basically said the vaccines don't work.

2 Then Tomi Lahren said, "I'm not taking it."  That's what it was

3 about.  And he was really concerned about that.

4    If, you know, I don't think you admitted that was

5 protected free speech.  But I don't see how it wouldn't be.  I

6 think somebody has got -- a United States citizen has got the

7 right to say something like that if they want to say it, you

8 know.

9    It turned out he was right.  When I took the vaccine, I

10 was told it was 80 -- no, 80 to 90 percent chance it was going

11 to prevent it.  I've had COVID three times, you know, since.

12 And I know -- you know, I know that's just me.  But all over

13 the nation people kept getting it and they're saying, "Well, I

14 don't know why they're getting it."  And then all of a sudden

15 -- then later they say, "I don't know why they're getting it,

16 but it does keep you from going in the hospital."  I don't know

17 if it did or not.  I haven't had to go in the hospital, but I

18 got it three times.

19    But why was Rob Flaherty so concerned about something that

20 I think is protected free speech spreading on the Internet?  I

21 don't understand -- on social media, I mean.  Why?

22    Okay.  You going to punt this time?  Okay.

23        MR. INDRANEEL:  Your Honor, if I may.

24        MR. GARDNER:  I'm done with the --

25        THE COURT:  I'm joking.  I'm joking.  I know he does

 1    the merits part.

 2              MR. INDRANEEL:  It's Mr. Sur for the United States,

 3    Your Honor, if I may.  Thank you.

 4              THE COURT:  Thank you.

 5              MR. INDRANEEL:  So I think because this

 6    presupposition all along has been that the contents of what

 7    appears on social media platforms are subject to the terms of

 8    service that the users of the platforms agree upon with the

 9    platforms, the Court noted that absence of discussion about

10    free speech.  I think it's explained by the understanding of

11    everyone involved that it was ultimately the platform's

12    decisions about that control about what would be removed, and

13    then what would be subject to these other various measures that

14    the platforms came up with using their technology.

15        They have so many posts that they have to deal with that

16    many of the posts are handled algorithmically.  And some of

17    them are then, from what I understand, reviewed also by humans.

18    But the point is that they have such a high volume, that they

19    have different measures that they apply.  So removal might be

20    one measure.  But others might be, as the Court suggested in

21    the exchange earlier with me when I was at the podium, noting

22    the reduction of the circulation.

23        And the -- before this administration began, the platforms

24    announced that they were going to use moderation measures short

25    of removal for claims that did -- their fact checkers did not

1    find to be true.  So that included removal of posts when the

2    posts also had a harm component.

3             THE COURT:  You're talked about Facebook's, that if

4    it caused vaccine hesitancy and was false.

5             MR. INDRANEEL:  Yes, that's right.  So they applied a

6    range of measures.  And one of the categories that Facebook

7    said that they were going to reduce the distribution of were

8    the posts that encouraged vaccine hesitancy.  And so --

9             THE COURT:  Who determines if it's true or false?

10            MR. INDRANEEL:  So, from my understanding, the

11   platforms had these third-party fact checkers.  And they also

12   were working with, for example, the World Health Organization,

13   other governmental and nongovernmental health organizations.

14        In some cases it's true the platforms in the domestic

15   setting did go to federal agencies.

16            THE COURT:  So the government decided, determined if

17   it was true or false?

18            MR. INDRANEEL:  I think if it was a particular claim

19   about a scientific -- if it was a scientific statement, then

20   they might ask CDC, among other entities.  But I think the

21   Court's question is pointing to this whole problem of

22   borderline content because a particular individual's experience

23   with the vaccine would -- that individual probably knows best

24   what their own symptoms were; but the platform may,

25   nevertheless, conclude that the particular post would promote

1     vaccine hesitancy and might be alarmist because it might

2     represent a side effect that only a small percentage of people

3     would have experienced.

4          THE COURT:  I think that one we talked about.  All

5     Tucker Carlson said -- he went through, you know, some

6     different scientific things.  And he said that the vaccines

7     don't work basically is what he's saying.  And Tomi Lahren

8     threw in there, "I'm not going to take it."  And that's what it

9     was about.  It wasn't about any adverse effects, I don't think.

10    I could be wrong, point it out if I'm wrong.

11         MR. INDRANEEL:  I haven't seen the video myself, Your

12    Honor.

13         THE COURT:  Okay.

14         MR. INDRANEEL:  But I think what I'm just trying to

15    provide as the important context here, is that both, in this

16    case, Facebook and the government, had a shared policy

17    preference that, you know, the vaccine hesitancy be controlled.

18    And the questions that Mr. Flaherty were asking were about sort

19    of the scope and the nature of Facebook's content moderation

20    that was, as we discussed, short of removal when Facebook was

21    addressing posts that Facebook thought might encourage vaccine

22    hesitancy.

23         THE COURT:  Okay.  And let me ask you about -- Did

24    you want to say something, Mr. Sauer?  You look like you want

25    to.

```
1              MR. SAUER:  Can't resist.

2              THE COURT:  You're kind of wiggling around over there

3       so I didn't know.

4              MR. SAUER:  I think Mr. Sur's comment raised a really

5       interesting, important point, which is that when you look at

6       the CDC communications, the CDC is saying this is false and it

7       could lead to vaccine hesitancy, therefore, it must be taken

8       down.

9          What you have from the White House or what you have from

10      the Rob Flaherty emails and other places insistence that

11      truthful content that could lead to vaccine hesitancy must be

12      taken down.

13         What Rob Flaherty really cares about is not false speech,

14      like, you know, there's magnetism or there's microchips in the

15      vaccine.  What he cares about is the truthful, but

16      sensationless, as he calls it -- sensationless is a synonym

17      here for effective in contradicting the proposed narratives.

18      The truthful speech needs to be taken down.

19         And that's what set the White House really on a hard core,

20      campaign against truthful content that contradicts their

21      narratives.

22             MR. INDRANEEL:  Well, if I may, Your Honor.  I think

23      that the whole point of trying to provide the context for this

24      discussion between Facebook and the White House and the

25      platforms generally in the White House is that it was not the
```

1    White House that was trying to impose on the platforms any one

2    definition of the truth or the falsity of whatever speech that

3    they were going to have on their platforms.  They were -- it

4    was the platforms that consulted these third-party fact

5    checkers.

6         And, as we pointed out in the brief, there were many

7    instances where, you know, the government asked a question

8    about whether a particular platform -- what approach they were

9    taking to certain kinds of posts.

10        And once the platform looked at the post and said that's

11   not a violation of our policies, that was essentially the end

12   of the discussion.

13            THE COURT:  Do you remember when Facebook changed

14   that policy to -- because they didn't have it at first.  Then

15   they changed it where it said, we're taking down things that

16   are -- that are -- cause vaccine hesitancy and/or not true or

17   something like that?  And then they talked -- asked the CDC

18   whether it was true or not.

19        So do you know when they did that?  Do you remember when

20   that was changed or what time?

21            MR. INDRANEEL:  So --

22            THE COURT:  I just can't remember.  I mean, I've gone

23   through so many things I can't remember when.  But it was

24   during that time sometime, and I was thinking it had not been

25   changed at that time, but I don't know if that's true or not.

1          MR. INDRANEEL:  So in March of 2020.

2          THE COURT:  Okay.

3          MR. INDRANEEL:  This is Exhibit 18.  It's Defense

4    Exhibit 18.  It's a statement from Facebook where they say

5    that, quote, "We have removed harmful" -- and then, from the

6    context, it's clear they mean health related, so that was our

7    bracketed addition in the brief -- "misinformation since 2018

8    including false information about the measles and Samoa where

9    it could have furthered an outbreak.  And rumors about the

10   polio vaccine in Pakistan where it risked harmed to health and

11   aid workers."

12       And then they go on in the same document to say, beginning

13   in January 2020, quote, "Applied this policy to misinformation

14   about COVID-19 to remove posts that made false claims about

15   cures, treatments, the availability of essential services or

16   the location and severity of the outbreak."

17       So there was this category that they said, you know, based

18   on its falsity they would address.

19          THE COURT:  Yeah.

20          MR. INDRANEEL:  And then there were other posts that

21   essentially, even if they had not reached a determination about

22   truth or falsity, they would apply content moderation measures

23   to --

24          THE COURT:  Who did they ask for the truth or falsity

25   of it?  Who's the ministry of truth?  Have you ever read George

1  Orwell's *1984*?

2  　　　　MR. INDRANEEL:  We did have it as a required text in

3  high school, Your Honor.

4  　　　　THE COURT:  Good.  Good.  That's great.  Because, you

5  know, I just think that it applies here because, you know, the

6  whole -- to me, the whole purpose of the First -- not the whole

7  purpose, but a big part of the First Amendment, Free Speech

8  Clause, is that the government can't tell us what's true or

9  false.  We've got the right to make our own decisions.  And,

10  you know, here they're asking the government is this true or

11  false?

12  　　　　MR. INDRANEEL:  Your Honor, to that point, my

13  understanding is that the platforms had -- they refer in the

14  discussions to third-party fact checkers.  I'm not certain what

15  the total, you know, list might be of those entities or what

16  resources they have for that.

17  　　Among the sources that they do consult are, on occasion,

18  you know, across the world, the recognized local government or,

19  you know, national government health authorities.

20  　　　　THE COURT:  Okay.  Okay.  All right.  All right.  And

21  I promise I'm going to ask plaintiff some questions too.  I'm

22  not just picking on the defendants, but I've got more questions

23  for y'all, for some reason.  But I think it's just the nature

24  of it.

25  　　But all over the place it was talking about

 1    misinformation, misinformation.  How do you define

 2    misinformation, or how does the government define

 3    misinformation?

 4            MR. GARDNER:  So, thank you, Your Honor.  I mean, I

 5    think there's a couple ways it could be done.  But certainly

 6    CISA has definitions for misinformation, disinformation and

 7    malinformation.  Plaintiffs cite to those definitions in their

 8    brief.  We don't dispute that those are the definitions CISA

 9    has identified.  But -- or if you're asking me is there a

10    uniform definition across the federal government, I don't think

11    the record supports that.

12            THE COURT:  Okay.  All right.  Mr. Sauer, you're not

13    wiggling this time so I don't guess you want to say something.

14    So I'll ask you -- I'll go to something else and ask you

15    something else.  You can comment on that too.

16        I guess the disinformation question is, like, you know,

17    because disinformation is, like, what the government says it is

18    basically.  And, you know, it could be something that's true or

19    false.  And there's a lot of things that the government -- you

20    know, I've never understood why the government was so deadset

21    on everybody taking this vaccine and everybody putting masks on

22    after they first told us not to.

23        First press conference Dr. Fauci said, "Don't take masks.

24    They don't work" when it was President Trump.  And then -- you

25    know, then later he said, "Well, I was just trying to do that

146

1    so everybody wouldn't get all the masks that the hospitals

2    need."

3        After that, it's kind of downhill from there.  Nobody is

4    going to believe anything you say when you start off doing

5    that.

6        Why was the government so keen on just everybody has got

7    to take this vaccine and not listening to alternative views and

8    calling alternative views disinformation?  I don't understand.

9    You know, I just -- I think a lot of the Free Speech Clause, I

10   think that's one of the most important rights we have in the

11   United States.  And I just don't understand why you say, well,

12   my way or no way.

13           MR. GARDNER:  Your Honor, the government shares your

14   view that the First Amendment is one of the most important

15   constitutional protections.  So I don't think there's any

16   dispute between the parties there.

17           THE COURT:  Okay.

18           MR. GARDNER:  I deeply disagree with the notion that

19   we are telling social media companies what to do, that we have

20   somehow broken their will and told them how they need to apply

21   their terms of service.  The evidence just does not support

22   that.  There is simply nothing, Your Honor, violative of the

23   Constitution with flagging information for social media

24   companies and allowing them to apply their terms of service.

25           THE COURT:  But let me ask you about that since you

1   pointed that out there's no evidence of it.  But, and I'm going
2   to ask you about coercion in a minute, and some things Rob
3   Flaherty did.  I mean, it's pretty obvious he was wanting them
4   to take it down.  I mean, I don't see how anybody could read
5   all those texts and things and say, "Well, you know, the
6   government, I don't know what they want me to do."  They wanted
7   them to take them down.  And most of it was protected free
8   speech, if not all of it.  And I don't understand -- you know,
9   I noticed a big change.

10      I was kind of surprised because I thought that when some
11  of the stuff was kind of revealed, that the social media
12  companies were always, you know, liberal and they're kind of in
13  with the -- in with the government's view, or whatever -- not
14  the government, depends on who the government is.  But with
15  that view, and they kind of were on the same side.  But it
16  looked like they kind of fought back a little bit and said, no,
17  these don't violate our policies.

18      And then President Biden got on there in July, the middle
19  of July of 2020 or '21 -- '21, I think it's '21, is when it all
20  changed.  It was, like, they had this Jen Psaki got up there
21  and said here's the -- you know, "They've got to do better."
22  You know, all these problems, social media companies have got
23  to do, "Here's our ask.  We're in constant contact with them
24  telling them what our asks are."  And then President Biden
25  said, "They're killing people."

```
1        And they thought -- I know he tried to clarify that later

2   to say, "Well, I'm not talking about -- I'm talking about all

3   the disinformation does and not the media companies."  But I

4   think they took it as -- I think it's pretty clear they took it

5   as he was talking about them because they were upset about it.

6        And then the surgeon general did his -- I forget what it's

7   was called, some kind of advisory.  But it was the advisory

8   that said, oh, you've got -- you know, "We've got to do

9   something.  You've to -- we're going to have to change the

10  laws."

11       And then Kate, I forgot her last name.

12           MR. GARDNER:  Bedingfield, Your Honor.

13           THE COURT:  Yeah.  She said, you know, "We're going

14  to have" -- because every time they start doing this they pound

15  it in, "Oh, yeah, we've got to change this, you know.  We're

16  going to change Section 230.  We're looking at our options what

17  we can do to change all this."

18       So it looks like after all that, and that was all right

19  there two days -- within two days the middle of July.  And

20  after that, everything changed.  These social media companies

21  started falling in line like the Pied Piper.  And it just

22  -- they just all started, "What can we do -- what can we do to

23  help?  What can we do to get in your good graces?  What can we

24  do?"  You know, that's the way I saw it from looking at it.

25       Tell me if you think something different.  They started
```

149

1    doing everything the government asked them to do after that.

2         MR. INDRANEEL:  Your Honor, if I may.  So on the

3    disinformation dozen, as the Court pointed out, the President

4    did clarify his remarks.

5         And the Facebook response around that time that, you know,

6    we think it is probative is Exhibit 71 where Facebook publicly

7    announces that it has already been doing everything that the

8    surgeon general's advisory was recommending.

9         In addition, Exhibit 145 is a statement in August of 2021

10   where Facebook says that it did address some accounts and some

11   posts or pages that were linked to the disinformation dozen.

12   But it also made clear there that having reviewed the content,

13   as well as its own policies, that there were some -- you know,

14   there were posts and pages that did not violate its policies

15   and so it left those up.

16        So the -- that Exhibit 145, which it's, again, when I say

17   "exhibit," I just mean to the defense preliminary injunction

18   opposition brief.  That Exhibit 145 is a statement by Facebook

19   that confirms their independent judgment about what the

20   disinformation does and was posting and what it was not.

21        The other thing I will add that may help in the context

22   because of the volume of information that is posted on these

23   platforms, a point that was actually mentioned somewhat as part

24   of the background in the *Twitter* against *Taamneh* case the

25   Supreme Court handed down, the sheer volume is so high that

1    even a matter of days means that there are a lot of posts that

2    may be at issue.

3         And, from Exhibit 145, or from the rest of the record, we

4    don't actually know which are the posts that led to Exhibit

5    145, you know, led to Facebook's statement on that date in

6    August that the disinformation dozen had some of their, yo

7    know, content removed or otherwise subject to moderation, and

8    which ones, you know, they, you know left up and why, but we do

9    know it's a very high volume.

10        And so to infer just from sort of the timing that there

11   was some kind of relationship, I think would, you know, sort of

12   be contrary to that, that just the reality of the sheer number

13   of posts that these platforms are dealing with.

14        I think the Court may also have been suggesting or

15   inquiring about the discussions about Twitter and Alex

16   Berenson.  The record on that does not support the plaintiffs'

17   theories.  We have the interrogatory responses for Mr. Flaherty

18   clarify that, you know, as of the April 2021 meeting, Twitter

19   had concluded that at that time Mr. Berenson's posts hadn't

20   been, you know, something that Twitter was going to take action

21   on because it didn't violate the policies.  And that was the

22   end of that discussion.

23        Mr. Berenson was then later on suspended.  And that, I

24   think, came in July or August of 2021.  But it wasn't

25   permanent.  The documents that plaintiffs themselves have put

1    into the record show that, as of December, he was then back on.

2        And, again, we don't know what particular posts led to

3    Twitter's content moderation decisions in either July or August

4    of 2021.  But Mr. Berenson was not mentioned by the President.

5    Mr. Berenson was not mentioned by the surgeon general.

6        So all of that requires leaping into speculation.

7            THE COURT:  They kicked them all off, though, after

8    that July thing.  They kicked everybody off, disinformation

9    dozen, Great-- All of that stuff they just got rid of them, is

10   the way I understand.  But, anyway, well, I'll look at it

11   closer though and make sure.

12       Did you want to say anything?

13           MR. SAUER:  I was just going to address the

14   chronology of Alex Berenson.  There's an April 21st meeting

15   with the White House where the White House pushes Twitter to

16   deplat for him.  They resist.  They say, "Well, he's not really

17   violating our policies."

18       Then there's a pressure campaign from Dr. Fauci in early

19   July of 2021 where he's publicly attacking him and saying he's

20   risking people's lives.  Then July 16th, as the Court said,

21   2021, President Biden says, "They're killing people."  And Alex

22   Berenson is suspended by Twitter within a few hours after that

23   comment on the same day.

24       Later in August he's permanently deplatformed by Twitter.

25   And he gets back on after Elon Musk acquires the platform.

```
 1              THE COURT:  Okay.  All right.  And I'm going to ask
 2     the government some questions now, so I'll quit picking on
 3     y'all for a minute and ask the government some questions.
 4          When I reviewed a lot of this, things that NIAID -- I'm
 5     just going to go by the initials.  I can't remember what it all
 6     stands for now, but I know it's infectious diseases.  But
 7     Dr. Fauci and that NIAID, they made -- there was very little
 8     communication with Dr. Fauci's office, you know, saying -- you
 9     know, there was a lot of meetings and things like that between
10     these other agencies.
11          But I didn't see that with the HSS -- HHS or the NAIAD.  I
12     didn't see a lot of that.  I just saw they were making public
13     statements.  You know, Dr. Fauci made videos and he'd be on,
14     you know, different news channels and things, you know, saying,
15     "Wear your mask; stay six feet away from everybody; take your
16     vaccine," that kind of stuff.
17          So I guess what I'm getting at is:  How is there -- you
18     know, is this government speech, first of all?  And, like,
19     Dr. Fauci and them were -- it was different than some of the
20     other agencies.  You know, you'd have thought it would have
21     been similar, but it didn't appear to be, at least what
22     evidence you've got right now.
23          But it shows that they were making public statements,
24     which, you know, I kind of tend to think would be government
25     speech.  So how do you show significant encouragement and/or
```

1    coercion with regard to those defendants?

2              MR. SAUER:  Two responses to that.  First on your

3    first question, the factual question about the communications.

4    I agree with that to an extent.  You don't see anything like

5    from NIAID the constant meetings between the FBI and CISA.  You

6    do in their interrogatory responses, however, see under oath an

7    identification of 13 communications between Dr. Fauci and Mark

8    Zuckerberg in 2020 alone.  So there is communication with the

9    platforms, but there isn't communication, like, in the sheer

10   volume.

11        You also have Dr. Fauci repeatedly appearing with Mark

12   Zuckerberg in at least, I think, three different occasions -- I

13   want to say three different occasions, where they're on joint,

14   you know, Facebook Live chats to talk about COVID and so

15   forth.

16             THE COURT:  That's kind of government speech there,

17   isn't it?

18             MR. SAUER:  I agree.  We don't challenge anything in

19   the Facebook Live.  He's totally entitled allowed to,  do that.

20        Now, on the question of what's he allowed to say?  When

21   does the government speech cross the line?  For those 2020

22   communications involving Dr. Fauci and Dr. Collins, we have

23   argued that those violate -- fall into the deception bucket.

24   Right?

25        So I mention we have five tests here:  Deception.  We

1   relied on the case for *George* against *Edholm* from the 9th

2   Circuit that has two elements where a state official or a

3   federal official knowingly provides false information and does

4   so with the intent of inducing a private party to take an

5   action that the government would not be allowed to take.  That

6   violates the First Amendment.

7       So the *Edholm* case, for example, is a police officer

8   giving a doctor false information about a patient's medical

9   condition.  Oh, he's having some kind of, you know, septic

10  seizure to induce the doctor to engage an anal cavity search to

11  locate a baggy of crack cocaine, basically.

12      The fact the police officer knowingly gives false

13  information to induce the doctor to do something that would

14  violate the Constitution if the government did it itself, that

15  is state action.

16      And there's another opinion by Judge Posner *Jones* against

17  *City of Chicago* we discussed in our briefs that that really

18  powerfully reinforces this.  And they say they can't hide

19  behind the people they've defrauded.

20      So that -- and I'll focus my comments now on the largest

21  sort of chunk of evidence we have with respect to Dr. Fauci is

22  that campaign to discredit and get censored the lab leak

23  hypothesis that was enormously successful.

24      We contend Dr. Fauci is entitled to get on TV and give his

25  opinions about the lab leak hypothesis.  But we contend that if

155

1    you look at all that evidence and look at some highlights we've

2    included in Tab 6 to Tab 13 in your binder, that it was much

3    more than government speech.  It was a calculated campaign to

4    deceive the platforms, and in deceiving them, to induce them to

5    censor speech.  So we think that there's a compelling inference

6    to be drawn from those.

7        That is a very unique; it's very detailed.  That's why we

8    -- you know, there's hundreds of paragraphs in our proposed

9    finding of fact about it.  Because ordinarily those kind of

10   comments absolutely would be government speech.  It would be no

11   problem.  You know, ordinarily a government official can say,

12   "I don't think it came from the lab.  I think it came from

13   nature," or "I think it did."

14       But if you actually look at that entire course of conduct,

15   the contemporaneous communications, the ginning up of -- you

16   know, the *Nature of Medicine* article, Dr. Fauci's comments at

17   the April 17th press conference where he pretends to not know

18   who the authors are after they send him seven drafts to review

19   and thanked him for his advice and leadership and so forth.  We

20   say that all adds up to a campaign of deception.  And that

21   campaign of deception was intended to induce the platforms to

22   prevent what Dr. Fauci calls in his emails further distortions

23   on social media, to induce the censorship of that and it

24   succeeded.  We think that's state action on that theory.

25            THE COURT:  Okay.

```
 1          MR. SAUER:  To be clear, we do not contend that it's
 2   -- you know, that it's principally a coercion and compulsion
 3   issue or a joint participation, which doesn't require coercion.
 4   But because there isn't that same course of kind of
 5   communications about it.  It's a form of deception.
 6          THE COURT:  Okay.  And I've got -- I know in the
 7   Third Amended Complaint, in the first ones too, it talks about
 8   the Disinformation Governance Board and Nina Jankowicz.  And I
 9   know -- I understand the defendants' brief indicated that had
10   it had been disbanded, or something to that effect, and
11   attached something that said disbanded.
12       Is there any contention at all about that at all?  Do I
13   need to address any of that at all I guess what I'm trying to
14   figure out?
15          MR. SAUER:  Yeah, I believe that what's principally
16   relevant about the Disinformation Governance Board, keep in
17   mind that was announced, And the enormous public blowback eight
18   days before we filed this lawsuit.  The Disinformation
19   Governance Board, the fact that DHS was doing that right up to
20   the moment it got sued is powerful evidence of their intent to
21   continue these censorship activities.
22       The fact that right up to the moment they got sued they
23   were creating a whole bureaucracy to engage in this flagging
24   and taking down disinformation activities, I think it's the
25   most relevant --
```

```
1              THE COURT:  Yeah, I understand the relevance to that.

2              MR. SAUER:  Yeah.

3              THE COURT:  I guess I'm getting at:  Is there any

4    request for an injunction against them since they're disbanded,

5    I guess, you know?

6              MR. SAUER:  The government represents that

7    essentially Ms. Jankowicz no longer works there and the entity

8    doesn't exist anymore.  So we've sought an injunction against

9    the DHS defendants who are -- you know, who are named.  But we

10   don't have evidence to contradict the representation that it's

11   gone.

12             THE COURT:  That's what I'm trying to get at is I do

13   understand what you're saying about the relevance of that part

14   of it.

15        Okay.  In the Third Amended Complaint, I tried to go

16   through all these defendants.  And now it's complicated a

17   little more because some of them have left and been replaced

18   and some of them have not been replaced, you know, trying to

19   get them all straight.

20        But it listed the -- and I apologize this is taking so

21   long, but I'm going to finish the questions before I break for

22   lunch.  I'm not going to do break -- I'm not going to do

23   anybody like that, break for lunch and then come back.  I know

24   y'all probably have got flights out and things.  So we'll

25   finish and be done.
```

```
 1        All right.  But the U.S. Food and Drug Administration was
 2   a defendant; U.S. Department of Treasury; U.S. Election
 3   Assistance Commission, and Department of Commerce and several
 4   employees that worked for them.  I didn't see a lot in
 5   anybody's novel -- I'm going to start calling it a novel --
 6   about that, about those entities.  So I don't know -- I guess
 7   what I'm getting at is:  Are you requesting any injunction to
 8   those?  Do you have evidence of those?
 9            MR. SAUER:  We do have evidence, but we haven't
10   sought an injunction as to those.  The evidence that we have is
11   set forth in the compliant.  But in our preliminary injunction
12   papers, we have not sought an injunction against those
13   particular defendants.
14        So, yeah, if you want to know the defendants we are
15   seeking, we have in page 66 and 67 of our supplemental brief
16   doc 214.  We have specified the exact defendants we're seeking.
17   So it's the White House defendants as defined include these
18   people.
19            THE COURT:  I'll look at that.  I missed that.  I
20   guess I went to the end of the novel.  I read it all, I really
21   did, but sometimes it gets mixed up.
22        Let's see.  All right.  Okay.  And I'm going to go back to
23   the defendants.  You know, basically bottom line, most of these
24   agencies and the White House parties, employees, they were
25   flagging posts for social media platforms, emailing the flagged
```

1  posts to social media companies.

2       They were sending them emails saying, you know, "Why

3  hasn't this been removed?" things like that.  You all know what

4  all was said.  I'm not trying to go through the details, but

5  that's just -- I'm just generalizing.  And they even followed

6  up with them, to follow up with them to say, "What did you do

7  about that post we notified you about?"

8       I guess what I'm getting at is how can you say that's not

9  significant encouragement?  Explain to me how that wouldn't be

10 significant encouragement.

11            MR. INDRANEEL:  Your Honor, if I may, --

12            THE COURT:  You're giving him all the hard questions.

13 Okay.  Go ahead.

14            MR. GARDNER:  That's exactly right.

15            THE COURT:  I'm kidding.  I'm joking.

16            MR. INDRANEEL:  There are two points.  Just on the

17 first point, there were many instances were the platforms

18 didn't even get back to the government about what particular

19 action they took.  And I think sometimes there were just

20 follow-up questions to find out what the outcome was, not with

21 an objective of, you know, or an effect really of changing the

22 outcome, but just to learn if the platform had taken any

23 action, and sometimes to learn about the platform's application

24 of its policies.

25       So one instance that comes to mind of that is that it was

1    helpful for some of the agencies to understand how the terms of

2    service were being applied so they could -- you know, they

3    could figure out whether something, you know, was something

4    that the platform would, you know, use or consider relevant

5    when it was making its own content moderation decisions.  I

6    think that's where you saw some of the follow-up questions.

7         To a larger part of that significant encouragement, I

8    think what's challenging is that there are not large numbers of

9    cases that have focused on significant encouragement as a

10   distinctive prong of the State Action Doctrine.

11        And, in fact, when the opinion from the Court in *Bloom*

12   against *Yeretsky* 1982, announces the significant encouragement

13   or coercion formulation, it has a bunch of cases that it cites,

14   you know, previous instances.  But it doesn't break them down

15   or classify them as one or the other.

16        What I do think we know from the precedent is that in the

17   context of the state action requirement, right, which is the

18   threshold inquiry to decide and to preserve the line between

19   private conduct and public conduct that significant really

20   means significant.

21        So in *American Manufacturer's Insurance Company* against

22   *Sullivan*, which was a 1999 State Action Doctrine case, there

23   the Pennsylvania legislature had amended the workmen's

24   compensation statute to give the medical insurance companies a

25   remedy, right, that they didn't -- that they were foreclosed

1   necessarily from exercising before.

2       And the challenger was saying, well, look, the statute was

3   changed to give this new legal option of withholding these

4   disputed payments; therefore, that's encouragement.  That's

5   significant.

6       And the Court says, it may be encouragement in some sense,

7   but it's not significant encouragement consistent with our case

8   law that would be so significant as to turn the private

9   decision, in that case withholding the pending payments pending

10  further review, into the state action.

11      So I would offer that as one example of a reminder that

12  this -- although ordinarily we might say that something is

13  encouraging in a casual way, when the Court in the state action

14  context is using the phrase "significant encouragement,"

15  they're putting a lot of weight on it.  And they're saying even

16  enactment of a statute that might incentivize something to

17  happen, is not significant encouragement.

18      And I think *Sullivan* is a very useful case.

19          THE COURT:  Yeah, I read your cases.  You had some

20  good cases, and I read them.  One of them was -- one of them

21  was a very, you know, close factual case, the one in California

22  that they flagged, one flagging of a post was not enough for a

23  significant encouragement to send it to them.  I think it's one

24  time they flagged it, sent it to them and they deleted it or

25  something.  That wasn't enough.

1      And so it was a very close factual case, but all they said

2  was that wasn't enough.  And then the situation about, you

3  know, they said it was enough where they amended a statute to

4  allow -- I think they said it was --

5      Anyway, it looks like to me there's a whole lot more that

6  went on here than went on in those cases is the difference.  So

7  I just don't understand how -- It looks like to me, you know, I

8  didn't -- most of the cases you cited and, you know, I'm sure

9  you cited, did a excellent job on it, I mean, really very good

10 cases, very, you know, close.

11     But I didn't -- it didn't seem to me that they were -- the

12 cases were anything near what's happening here.  It didn't have

13 any -- just had just a couple of things.  It was just -- and

14 they said it was not enough for significant encouragement.  And

15 I agree with all those cases that you cited that said that.

16 They probably wouldn't have been enough, but there's a whole

17 lot more here.

18     So, I guess, why is there not, you know, all these

19 meetings, all these emails, all this pressure?  It was

20 pressure.  I mean, I don't see how anybody could read these

21 emails and come up with anything but the government was putting

22 pressure on them to do something about these emails.  I mean,

23 how do you see it?

24     MR. INDRANEEL:  Thank you, Your Honor.  So another

25 one of the cases that I think may be helpful here is *Bloom*

1    against *Yeretsky* itself where there were regulations about the

2    nursing homes that governed whether they were shift -- whether

3    the patients were shifted to higher levels of care or lower

4    levels of care.

5        And that was what the challenger was saying was the

6    relevant state action.  And then Justice Rehnquist in his

7    opinion clarifies that the ultimate judgment about whether the

8    patient would be moved from a higher level of care to a lower

9    level of care or vice versa was a private medical judgment that

10   was being done by private medical standards.

11       And I think the analogy here that's quite natural is the

12   analogy to the private platforms' content moderation which

13   remained firmly up to them to decide how to compose and how to

14   apply.

15       I think there may be instances where there were, you know,

16   repeated questions; but that did not turn the questions or, at

17   times, -- you know, at most, the efforts to persuade into, you

18   know, coercion of or significant encouragement that's required

19   for state action.  And, again, that's because it's a very high

20   bar to preserve that line between private and public conduct.

21           THE COURT:  And I apologize this is taking so long.

22   I just had a lot questions.  I mean, I really tried to read

23   through all this and I had a lot of questions I wanted to ask

24   you.

25       I don't normally do oral arguments on a lot of things I

1    decide unless I really need, you know, people to say; and I did

2    here so that's why I did.

3        But I know there in the response, 723 or whatever page it

4    was, response, you know, to all the 1,440 different, you know,

5    topics or whatever, paragraphs, it -- you know, it contested

6    basically some of the interpretations.  But is there any

7    contest of validity in any of these emails, like, Rob

8    Flaherty's emails?  I was a little confused about that.  I want

9    to make sure.

10        Is there any dispute that these emails, the contacts were

11    valid?  Is it just interpretation of it that you're contesting?

12            MR. GARDNER:  Sorry, I didn't mean to interrupt, Your

13    Honor.

14            THE COURT:  No, that's fine.

15            MR. GARDNER:  Okay.  Let me say up front we

16    appreciate your questions.  We are not troubled at all to stay

17    longer if it assists you.

18            THE COURT:  Okay.

19            MR. GARDNER:  If your question is do we dispute the

20    authenticity of any email?  No, they're genuine emails.  Do the

21    emails say what they say?  They absolutely do.  But to your

22    point, I think the largest dispute in the 1,442 proposed

23    findings of fact the plaintiffs submitted is that it isn't just

24    their quotation of these documents, it is their

25    characterizations, more importantly, their mischaracterizations

1    of what these emails say.

2        I hope that was responsive.

3        THE COURT:  Okay.  Yeah, basically you're arguing the

4    interpretation of it is what I understood.  Basically you're

5    not disputing that these emails are valid or authentic or they

6    say what you they said.  But you're saying that they're a

7    different interpretation?

8        MR. GARDNER:  That's right, Your Honor.  I mean, and

9    that's for the emails.  There are other proposed findings of

10   fact where they just simply have no evidence or they have

11   completely mischaracterized the evidence.  But with respect to

12   the emails, generally that's correct.

13       THE COURT:  Okay.  I just wanted to make sure.  And

14   then -- All right.

15       I know that the defendants filed -- and I forget what it

16   was called, but it was, like, a motion that kind of listed who

17   had left, was no longer working there anymore.  These are all

18   -- all the employees were sued in their official capacities.

19       So were they -- they were substituted -- you substituted,

20   like, for example, Dr. Fauci retired and Doctor something -- I

21   forgot his -- Hughes something took his place.  So you put that

22   in there.  And, you know, in different capacity.  Some of them

23   left and had been replaced; some of them hadn't been replaced.

24       So, as far as procedurally, would those be -- I'm going to

25   ask both sides this -- would those be the correct -- the ones

1    that have been substituted, are they the correct defendants

2    now; or, like, people like Jen Psaki that were alleged to have

3    done things or said things, but they're no longer there

4    anymore.  You know, I guess that's what I'm getting at.

5        Procedurally are they even involved in this suit?  I

6    understand you can use what they did.  I'm not questioning

7    that.

8        MR. GARDNER:  Thank you for your question, Your

9    Honor.  So, yes, we did file a notice of substitution, which of

10   course, we don't even have to do.  The Court can automatically

11   substitute, as you know.

12       The issue here is there are no individual capacity

13   allegations.  There are only official capacity claims against

14   individuals.  And, therefore, we thought it appropriate to

15   identify for the Court those individuals in their official

16   capacity who are either no longer employed by the federal

17   government at all or no longer employed by the agency for whom

18   they're alleged to be engaged in misconduct, or don't hold, you

19   know, those job responsibilities anymore.

20       And because plaintiffs are seeking an injunction against

21   individuals in their official capacity, it's even more

22   important that we identify that for the Court.  But, of course,

23   as you know, we don't believe it's appropriate to enjoin

24   individuals in their official capacity in the first place.

25       THE COURT:  Okay.  Mr. Sauer.

1           MR. SAUER:  Judge, we don't dispute that there should

2      be a substitution of, for example, federal officials who have

3      left and been replaced in their jobs.  So Jen Psaki left.  She

4      gets replaced by Kerine Jean-Pierre.  And that substitution, we

5      think, should occur.

6           The one quibble we have with the notice of substitution

7      that they filed is they contend that White Officials who have

8      been moved to slightly different roles are no longer proper

9      defendants.  They're still in the White House.  They're an

10     unspecified different job that may a be more senior job, more

11     influential job.  We think those are all absolutely still

12     proper defendants.

13          MR. GARDNER:  And if I could, Your Honor, just for

14     clarification.  It's not just that they changed jobs, they

15     changed responsibilities.  Let me give you an example.  Where

16     this typically comes up is with local sheriffs.  Right?

17          THE COURT:  The what?

18          MR. GARDNER:  Local sheriffs.

19          THE COURT:  Okay.  Yeah.

20          MR. GARDNER:  You sue a local sheriff in their

21     capacity, sheriff retires, new sheriff comes in, new sheriff in

22     town.  There's no dispute that that sheriff has the same

23     responsibilities as the old sheriff.  But, as you can imagine

24     in the White House, different people hold different

25     responsibilities and jobs.

```
1        And so when someone left the White House or took a
2   different job with different responsibilities, that's why it
3   was appropriate to substitute because that person does not have
4   the same responsibilities that are the subject of the
5   litigation.
6        THE COURT:  They're still in the lawsuit, though.
7   You're talking about the ones that are still in the lawsuit but
8   they were moved to a different capacity or something.  Is that
9   what you're --
10       MR. SAUER:  We think they are definitely still proper
11  defendants.  And they haven't even given any explanation what
12  the new job is.
13       THE COURT:  Okay.
14       MR. SAUER:  Rob Flaherty has been promoted from
15  deputy assistant to the President to, you know, digital
16  director.  That guy is still a threat to the First Amendment.
17  He is still a proper defendant.  The mere fact that he's got a
18  slightly different job title or description, which they haven't
19  even disclosed what it is, just an example.
20       You know, those people who are still in the White House,
21  still there, still capable of communicating with platforms,
22  with the full authority of the White House behind them, they
23  are proper defendants.  They should not be substituted.
24       MR. GARDNER:  And, Your Honor, I don't want to take a
25  lot of your time.  Mr. Flaherty is a terrible example.  We have
```

1    not identified Mr. Flaherty as someone who should be

2    substituted.  He's still at the White House.

3        But to say that someone was in the digital communications

4    department when the lawsuit was filed, and they have a

5    completely different job now, and because they're being sued in

6    their official capacity because of that job, it is completely

7    appropriate to substitute them out for someone else.

8            THE COURT:  Well, so, that clears that up.  Anyway,

9    I'm just kidding.  But that's a little confusing.  But I just

10   wanted to make sure what everybody's understanding of that was.

11       Okay.  Now, I was a little confused about -- and I'm

12   confused about a lot of things sometimes.  But the claim that

13   the previous administration did it.

14       First of all, you know, well, that was thrown in there,

15   the previous administration did it; so Trump did it kind of,

16   you know, defense.

17       First of all, is that -- are you saying that's a defense

18   even if they did?  I'm not even saying that it happened.  But

19   is that a defense?

20           MR. GARDNER:  No.  No.  It's not a defense, Your

21   Honor.  It's just to point out the plaintiffs' allegation of

22   coercion really makes no sense because this backdrop of

23   concerns about 230 have been going on virtually as long as

24   there's been Section 230.

25       And it's plaintiffs that say that somehow this

```
1    administration has, you know, entered into some censorship
2    enterprise when much of the conduct that they claim is part of
3    that enterprise in this administration were statements made in
4    previous administrations.  That's the point.
5              THE COURT:  Okay.  Well, but I also was saying that
6    -- Okay.  I didn't know if you were just saying that -- I think
7    both parties have said we want to repeal it or do something to
8    it.  They've said that.  But only one party has tied it to
9    threats to take stuff off social media or suggesting that, I'll
10   put it that way, suggesting.  I don't think they threatened.
11   Well, I don't know.  I don't know how you interpret it.
12       Anyway, they said -- they made it clear they wanted them
13   off, you know.  That was their -- They wanted them.  They're
14   not demanding it but they would like them off is what I --
15             MR. INDRANEEL:  If I may, Your Honor.
16             THE COURT:  Yeah.
17             MR. INDRANEEL:  The problem with the plaintiffs'
18   approach on the Section 230 question is that if it were the
19   case that, you know, repeal of the statute or substantially
20   narrowing it were as easy as the plaintiffs appear to suppose,
21   then logically if you added up their suggestion that, for
22   example, democrats -- some democratic legislators were calling
23   for Section 230 reform during the previous administration, if
24   you added that with the republicans who supported repealing
25   Section 230 with, for example, President Trump's preference for
```

1    revocation of Section 230, then you would get to revocation of

2    Section 230.

3        And the fact that that didn't turn out, I think not only

4    -- you know, it reinforces that statutory amendment,

5    particularly in this area, which has proven, you know, somewhat

6    controversial, is not as quick and easy as the plaintiffs'

7    theory seems to suppose.  And the platforms would have drawn

8    the same conclusion that there is no instant, you know, Section

9    230 repeal or narrowing that is kind of lurking and that would

10   be imposed if the platforms didn't somehow, you know, moderate

11   certain content one way or the other or change a policy.

12       So it's just an unrealistic depiction of how very dynamic

13   legislative process works.

14           THE COURT:  And how is *Google versus Gonzalez* going

15   to affect anything?  Does it affect anything?  I know, you

16   know, basically that case just came out with last week I think.

17           MR. INDRANEEL:  So, as I understand it, Your Honor,

18   in *Twitter* against *Taamen* the Court addressed the antiterrorism

19   statute and focused on that question.  And so it remanded the

20   Section 230 question *Google* against *Gonzalez* to the Ninth

21   Circuit.  So --

22           THE COURT:  Yeah.  And I haven't read it.  I just

23   kind of read the blurb.  And I thought that -- I thought it

24   kind of upheld that the 230 was valid, you know, in other

25   words, kind of what I thought, that it really is -- you know,

1    that makes it even more valuable, I would think, to the social

2    media companies to have it.

3        Repealing it may be the only thing Congress can agree on.

4    I don't know.  A lot of them call for that, so I don't know the

5    answer to that.

6        All right.  Great Barrington Declaration.  That was a

7    couple of the plaintiffs in the case, you know, were involved

8    in that.  It's a one-page treatise that says it opposed

9    reliance on lockdowns and advocated for a kind of focused

10   protection.  You know, I think the people that are most

11   vulnerable, the older ones that have diseases, kind of focus on

12   them.  That's kind of what that was, the way I read it.  And

13   it's a one-page document.

14       What was wrong with that?  I guess why would the

15   government want that taken down?  Why would they want to -- why

16   would they want to -- I guess all the government is saying is

17   they were kind of helping these social media companies to catch

18   this stuff that violated their policies, I guess.

19       But why did they want that down?  What did that do?

20   What's wrong with somebody saying that?

21           MR. INDRANEEL:  Your Honor, if I may.  I don't think

22   -- we didn't address that at great length in the brief, but it

23   is addressed in the response to the proposed findings of fact.

24   I believe it begins at 788.

25           THE COURT:  Okay.

1           MR. INDRANEEL:  And the phrase that I think is most

2    important is that in plaintiffs' selective recitation of the

3    facts in this area, they seem to be -- they seem to accuse

4    Dr. Collins of seeking the prompt publication of a takedown of

5    the Great Barrington Declaration, and the actual language

6    that's in the communications, again, this is from my

7    recollection, is the takedown of the premises.

8         So what he was calling for, as a scientist would, is that,

9    you know, if someone makes a scientifically questionable

10   assertion that there be a response in the scientific literature

11   that addresses, you know, why that -- why the initial assertion

12   might have incorrect premises.  So it's a takedown of a

13   premises and not a takedown of the Great Barrington Declaration

14   that I think plaintiffs seem to be taking it as a demand for --

15          THE COURT:  Any question that these men had the right

16   to say that as protected free speech?

17          MR. INDRANEEL:  I mean, I think that that question

18   was for the -- as we've tried to explain, that question was for

19   the platforms.  And, there isn't -- to our knowledge, there

20   isn't a communication, you know, that we have between, like,

21   NIAID and the platforms about that subject.

22          THE COURT:  All right.  And Health Freedom Louisiana,

23   that's one of the plaintiffs, Ms. Hines.  And it says that --

24   it didn't really say what she did.  Basically it was a

25   grassroot -- my understanding it was a grassroots effort to

1    reopen Louisiana, is what I understood it to be.  Kind of like

2    reopen the schools and reopen, you know, different things what

3    I understood it to be.

4        I guess what I was getting at is she was kind of -- the

5    government suggested this kind of -- this information be taken

6    down too.  I guess what I'm getting at was wrong was the --what

7    was wrong with that?  What was wrong with somebody saying that?

8             MR. GARDNER:  Your Honor, I can address that one.

9             THE COURT:  Okay.

10            MR. GARDNER:  There's no evidence whatsoever that the

11   government had any involvement in any of her posts.

12       Now, what plaintiffs say is her kinds of posts are a type

13   that the Virality Project may have flagged.  But they have no

14   evidence at all, out of 1,442 proposed findings of fact, the

15   government had anything to do with any of her speech.

16            THE COURT:  Did the Virality Project flag it?  I

17   can't remember.

18            MR. GARDNER:  All the Virality Project says is that

19   it flagged in general that type of information.  But it doesn't

20   say that it flagged anything that's in her declaration.  And I

21   would urge the Court to look at her declaration closely because

22   her declaration also doesn't say that the government was

23   directly involved, or even indirectly involved, in identifying

24   her information for a social media company.

25            THE COURT:  All right.  And EIP flagged Gateway

1    Pundit.  I think it was like, number 2 or 1, or something like

2    that, way up there of things.  And, you know, I can't remember

3    exact words that the Gateway Pundit said.  But it was more or

4    less aimed at the 2020 election was stolen, or something

5    happened, or something like that.  That's what it looked

6    -- appeared to be.      So I guess what I'm getting at, again,

7    like, you know,  what's protected free speech and what's not?

8    What was wrong with that?

9         MR. GARDNER:  Well, I think you'd have to ask the EIP

10   that question.  They're not a government entity.

11        THE COURT:  Well, you've got to admit there's a big

12   question of whether the government was involved in that.

13        MR. GARDNER:  I don't admit that, Your Honor.  I

14   actually think there's no question that CISA did not have

15   involvement sufficient to convert EIP's actions in a joint

16   action.

17      But, having said that, you would have to ask EIP why they

18   flagged the information they flagged.  And then you would have

19   to ask the social media companies if they did anything with the

20   information flagged in order to show harm to the plaintiffs.

21        THE COURT:  Okay.  Let me see.  I'm trying to get

22   through it.  Anybody knows, you know, the law viewpoint

23   discrimination is, you know, really looked at hard, strictly,

24   viewpoint discrimination, which is, more or less, a certain

25   point of view.

1         And I guess what I'm getting at -- and I'm conservative,
2    and I'm not standing up just for conservative speech.  I would
3    be the same way -- I mean, this could turn around in one
4    election.  You could have a republican president and a
5    republican congress, and they could be doing -- say, well, we
6    got away with it.  We're going to do the same thing.  They
7    could, you know, trying to do the same thing.  It could turn
8    around.
9         So, to me, all speech, it's important to protect all
10   speech wherever it -- You know, if it's protected free speech,
11   it should be protected whether it's liberal, whether it's
12   conservative, whatever.  I am conservative, but I'm, you know,
13   not looking at this so hard because I'm conservative.  I'm
14   looking at it because it's free -- you know, the old saying
15   that I don't agree with what you say, but I'll stand for your
16   right to say it, you know.  I don't know where that went, but
17   that went out the window a long time ago somewhere.
18        But viewpoint discrimination, why would it not be
19   viewpoint -- I mean, isn't it evidence of viewpoint
20   discrimination the fact that -- and I know I'll ask the EIP
21   this too, but that the EIP flagged pretty much all conservative
22   election speech posts?
23             MR. GARDNER:  Well, I mean, again, not to repeat
24   myself, Your Honor, but I think if you read the EIP report, it
25   didn't just flag conservative speech.  It happened to conclude

1   there was more conservative speech that identified

2   misinformation than nonconservative speech.  But I'll give you

3   an example:  You have a bag of marbles.  You've got nine black

4   marbles, one red marble.  The fact the EIP may have identified

5   nine black marbles doesn't necessarily mean that it's only

6   focused on black marbles.  It just happens to be more of them.

7          THE COURT:  All right.  Okay.  Cognitive

8   infrastructure.  Let me ask about that a minute.

9      Jen Easterly of CISA, now that I know how to pronounce it,

10  she said she -- who's the director of CISA, said she views the

11  word infrastructure, which is I in that acronym, to include

12  "cognitive infrastructure."  You know, cognitive means in the

13  mind and the way you -- knowledge and understanding.  Any idea

14  what that means by that?

15         MR. GARDNER:  Your Honor, I don't know that the

16  record has anything more than what her statement says.  But I

17  would refer the Court to the declarations of both Mr. Wails and

18  Mr. Hale who articulate the statutory basis for CISA's actions.

19         THE COURT:  Okay.  Well, I mean, I just wonder does

20  that mean, like, the government is going to try to control

21  mental process of acquiring knowledge, that type thing?  It's

22  just --

23         MR. GARDNER:  Your Honor, look, I'm not going to give

24  the answer that that doesn't appear in the record.  I feel

25  pretty confident the answer -- no, I feel 100 percent confident

1    the answer to that question is no.

2              THE COURT:  Okay.  Good.  I feel good now just like

3    when I went to Del Rio, you know, I felt like --

4              MR.  GARDNER:  As you should, Your Honor.

5              THE COURT:  -- I solved it.

6              MR. GARDNER:  I'm with the government.  I'm here to

7    help.

8         But in seriousness, Your Honor, whatever Director Easterly

9    may or may not have said two years ago, the fact is the

10   declarations explain exactly what CISA is doing right now and

11   exactly the statutory authority to support those actions.

12             THE COURT:  Okay.  And I realize that.  And I'm not

13   looking at the statutory authority, but I'd be very surprised

14   if Congress stated, you know, in their -- when they created

15   CISA that it would cover cognitive infrastructure.  I'd be very

16   surprised.  But, anyway, that's another day -- that's another

17   fight for another day.  Maybe it will be fought somewhere else,

18   but probably not now that I said that.  But, anyway, let's see.

19   All right.  Redressability.  There wasn't much talked about on

20   redressability too much in there.  It may not be a big issue,

21   but I think that's kind of what -- the standing part of

22   redressability.  If you'd kind of address that, the government

23   -- I mean, I'm sorry, the plaintiffs.  Would it be redressable?

24             MR. SAUER:  Yes, sure, Your Honor.  Redressability,

25   as the Court knows, tracability tend to be viewed very similar.

1   So where there is causation, usually an order stopping the

2   misconduct that's causing it will redress that injury.

3       So if you look at our injuries, we're alleging both

4   ongoing injuries where we have ongoing loss of access to speech

5   on social media and speech that's been taken down, remains

6   taken down and so forth, and imminent future injuries.

7       On the ongoing piece of that in the redressability

8   context, we only need to show the likelihood or possibility

9   that removing the government pressure will give us a chance --

10  you know, a fair shake at getting our speech back up on social

11  media.

12      And then as to the imminent future injuries.  As the Court

13  stated in its prior order, the evidence of prior acts of

14  censorship shows a strong -- a strong evidence of the risk of

15  future acts of censorship.  If they're stopped from engaging in

16  the future acts of censorship, that will redress the threat of

17  imminent future harms as well.

18      So the injunction would redress it both as to the -- both

19  as the ongoing harms and as the imminent future harms.

20          THE COURT:  Last set of questions I have.  I know it

21  will get somebody's attention when the preacher says the last

22  point is this.  This is kind of the last thing.  It's kind of

23  the most boring, but I feel like I need to ask it.

24      On the request for a class certification under Rule 23(b),

25  explain to me the class definitions that are proposed like how

1    that would work.

2              MR. SAUER:  Yeah.  And, Judge, I apologize, I didn't

3    carefully review that in preparation for this hearing.

4              THE COURT:  That's all right.

5              MR. SAUER:  But I'll address it from memory.  We've

6    proposed two class definitions that are really kind of

7    subclasses.  And each definition includes both, basically class

8    members as audience members, people who listen to other people

9    speaking on social media, and speakers.  Right?

10        And then the other division we've drawn in our class

11   definition is between people whose speech was censored because

12   it was directly flagged where there were some direct

13   communications saying, hey, take that down and take this down.

14        And then people who suffered censorship as a result of

15   more general, in other words hey, -- one great example of this,

16   for example, is the President says, "They're killing people;

17   you've got to do more."  So Facebook comes back.  That's

18   different than saying, "Hey, take down Tucker Carlson."  It's,

19   "Do more to go after the vaccine misinformation" generally.

20        And Facebook comes back in, you know, Tab 30, and your

21   email saying, "Here's all the new and additional actions we're

22   taking to go after this.  We've amended our policies to add a

23   new list of claims."  So that's the second aspect of the class

24   definition.

25        So we've done that to address the very concerns that they

```
 1    raised in the Wal-Mart against Dukes case which talks about
 2    making sure you've got commonality.  We kind of erred on the
 3    side of caution by slicing it up along those two axes.
 4              THE COURT:  In the first class, one in flagged.  I
 5    see how you could find that out if somebody fit in that class
 6    or not.  But the one about people who are -- didn't get to read
 7    something, for example, the people -- the voters who didn't get
 8    to read the Hunter Biden laptop story because it was suppressed
 9    and didn't see it before the election, they voted, didn't know
10    about that.  How are you possibly going to determine who's in
11    that class?
12              MR. SAUER:  You don't have to do that because only a
13    23(b)(2) class.  Right?  So we're only seeking injunctive
14    relief.  We're not seeking damages.  So, in other words, as
15    long as the class definition is sufficiently precise, the Court
16    never has to go down there and figure out every human being in
17    the United States of American who was actually adversely
18    affected --
19              THE COURT:  I mean, pretty much would be everybody in
20    the United States, wouldn't it?  Or American citizens in other
21    countries.  It would be everybody.
22              MR. SAUER:  We're talking about --
23              THE COURT:  A pretty big class.
24              MR. SAUER:  It would reach --
25              THE COURT:  I have the biggest class action in the
```

1    world.

2          MR. SAUER:  Millions upon millions of people, yeah.

3       And, of course, that's -- But, again, we have not sought

4    individualized determinations, which you had in *Wal-Mart*

5    against *Dukes*.  We're seeking classwide injunctive relief only.

6    And there's good case law for the Fifth Circuit we cite in our

7    papers that discuss how you don't have to figure out every

8    human being that's a member of the class.  You've just got to

9    enjoin the bad misconduct that's injuring those people.

10         THE COURT:  It's kind of like a nationwide

11   injunction, more or less, that covers everybody.  But I know

12   it's different.

13         MR. SAUER:  There is a difference, but it's in the

14   same -- it's in the same --

15         THE COURT:  It covers everybody?

16         MR. SAUER:  Yeah, yeah.

17         THE COURT:  Even nonparties?

18         MR. SAUER:  Right.  In other words, it would protect

19   -- and this is true of all 23(b) classes, they would protect

20   all the members of the class.  The injunction runs not just

21   against, say, listeners and speakers in Missouri or listeners

22   and speakers in Louisiana or just Mr. Hoft or Ms. Hines.  It

23   protects everyone else who is similarly situated to them.

24         THE COURT:  Okay.  And there's got to be a common

25   behavior or wrongful policy in each class.  So, like, what

1    would be the wrongful behavior?  And I realize you're going

2    from your memory.  I'm not trying to --

3              MR. SAUER:  Sure.

4              THE COURT:  What's the wrongful behavior in each

5    class?

6              MR. SAUER:  For all of the class members, for all the

7    classes, there's one common question that relates to whether or

8    not, you know, both factual and legal, about we allege that

9    there's this long campaign of threatening statements coming

10   from senior members of Congress, senior members of the White

11   House, senior members of the executive branch.  Do those rise

12   to the level of coercion?  That's common to everybody.  Right?

13       Then if you look at each of the silos, so to speak, that

14   the government has put forward where there's all this White

15   House communication that's inducing some censorship.  And

16   there's all this surgeon general communications that's inducing

17   more censorship.  There's all this CISA.  There's all this FBI

18   communications.  Each one of those is affecting virtually all

19   the members as well, and each one of those is involving a whole

20   host of common questions whose resolution are going to

21   determine whether or not there's a First Amendment violation.

22       So this is, like, right in the heartland of what *Wal-Mart*

23   and Justice Scalia is talking about in the *Wal-Mart* case which

24   is where we have the ability to achieve common answers at a

25   single stroke.  Here it's not one single stroke.  The case is

```
 1    very complex.  It's a series of single strokes.  We have more
 2    common questions.
 3         What they say in their briefing is you can only have one
 4    common question.  If you have more than that, then you're
 5    violating Wal-Mart against Dukes.  That is not right.
 6              THE COURT:  Okay.
 7              MR. GARDNER:  Your Honor, --
 8              THE COURT:  You can go ahead, yeah, sure.
 9              MR. GARDNER:  That grossly misrepresents the
10    government's position.
11              THE COURT:  Okay.
12              MR. GARDNER:  And let me just be clear.  I have the
13    class action briefing.  And what plaintiffs contend is the
14    common question, and I'm just going to read it, "Whether the
15    government is responsible for social media company censorship
16    of content that the government flags."  That is not possibly
17    capable of resolution in a single stroke given their theories
18    in this case.
19         And it isn't just a matter of multiple common questions.
20    It would be an individualized determination defended by
21    defendant and conduct by conduct in order to answer that
22    question.
23         Justice Scalia's decision in Wal-Mart expressly rejects
24    precisely that analysis.
25              THE COURT:  Okay.
```

```
 1              MR. SAUER:  And, Judge, I refer you to our reply

 2    brief where we address that and discuss the common questions in

 3    detail.

 4              THE COURT:  Okay.  I'll look at it more.

 5         Geographic scope.  Rule 65 doesn't absolutely require it.

 6    It says "scope."  It doesn't say geographic scope.  I usually

 7    put geographic scope in there.  But is there any need even to

 8    discuss geographic scope?

 9         Now, I understand if I granted the class, that that

10    wouldn't be a need to.  But I'm just asking in the event I

11    don't, and assuming I grant the injunction itself, would that

12    be any need to address geographic scope since you're -- would

13    it be limited to these plaintiffs and these states or would it

14    be --

15              MR. SAUER:  I refer the Court to the Fifth Circuit's

16    case law on injunctions in the context of the immigration

17    context.

18         There the Fifth Circuit has said, look, for this to be

19    fully effective, it is not going to work for just enjoining it

20    in this state or that state or doing it parcelwise.

21              THE COURT:  That's the one that allowed -- that was

22    Judge Tipton's case, I think, that allowed a nationwide

23    injunction.

24              MR. SAUER:  Yeah, exactly right.  And that was

25    affirmed by the Fifth Circuit.  And the Fifth Circuit has the
```

```
 1    power.  They say in many cases nationwide injunctions may be

 2    deeply problematic.  But we have a situation where less than

 3    nationwide relief would obviously defeat the purpose of

 4    injunctive relief.

 5               THE COURT:  All right.

 6               MR. SAUER:  That's the heartland we're in now.

 7               THE COURT:  So you're saying -- are you saying that

 8    if I did grant -- and I'm not telling anybody I'm going to do

 9    anything specific; I'm just asking these questions.

10        If there is a injunction issued, to some extent, and the

11    class action is not -- certification is not done, you're asking

12    for a nationwide injunction?

13               MR. SAUER:  I think so.  Now, in the alternative, if

14    the Court is more comfortable with a narrower injunction, but,

15    from our perspective, it's like if you say, "Hey, federal

16    government, you can't interfere with social media speech from

17    people in Missouri and Louisiana," that doesn't work.  Social

18    media is completely interconnected, you know.

19        If they're allowed to censor people in California and

20    Arizona, and Missourians and Louisianians are following them

21    and talking to them and interacting with them, they're just as

22    badly affected.  Given the incredibly interconnected nature of

23    social media, we don't see how a geographically limited

24    injunction is workable in this case.

25        And that's why I analogize to those --
```

1          THE COURT:  Right.

2          MR. SAUER:  -- Fifth Circuit decisions.

3      And, again, if class certification is granted, then we're

4  right in the heartland of 23(b)(2).

5          THE COURT:  And if a class certification was granted,

6  you know, -- and I'm not sure how this ties in with the laws on

7  MDLs, you know, multidistrict litigation, but I know that they

8  assign those to -- we were wanting one at one time 'til we got

9  all these hurricane cases.  Now we don't want one anymore.  But

10  we don't know if -- you know, could be -- I don't know if it

11  would go to a MDL or not.

12          MR. SAUER:  I think this is the only case pending

13  that presents these or maybe one of the very few cases, so I'd

14  be surprised.  I know there was a follow-up lawsuit that was

15  filed that was sought to be consolidated with this case.  But,

16  other than that, I'm not aware of other cases --

17          THE COURT:  And I know there's no judge -- judge

18  shopping involved here, but it may be sent off to some liberal

19  judge in California, you know.  You don't know.

20          MR. GARDNER:  Well, Your Honor, for everyone's

21  awareness, just so everyone is aware, there are multiple cases

22  raising similar concerns.  Just this week another lawsuit was

23  filed in the Southern District of Texas raising very similar

24  claims against similar defendants.

25      There's also a case in the Southern District of New York

1    brought by Mr. Berenson raising the exact same -- or not the

2    exact same, many of the same claims.

3         And then, of course, there's the case brought by R.F.K.,

4    Jr., who is before you; as well as the case brought by my

5    colleague, Mr. Sauer, against the EIP.  So there are a number

6    of cases.  And so I just wanted to be clear with the Court

7    about that.  This is not the only one.  It's not only one of

8    two.

9              THE COURT:  Okay.  And last question on

10   certification, and it's the last set of questions, so I'm going

11   to be done after this.

12        If they -- gosh, I went totally blank on what I was going

13   to ask.  Sorry.  I've been reading too many novels, these

14   novels.  I don't read other novels.

15        What was I going to ask?  Oh, is there any other case like

16   this that First Amendment, Second Amendment, you know, Fifth,

17   anything, Fourth Amendment, anything that's been certified like

18   Bill of Rights like this, like, free speech, gun right,

19   anything that's been certified as a class action that you're

20   aware of in the United States?

21             MR. SAUER:  I'd have to pull our briefs on that,

22   again.  I haven't read them recently.  But I would point out

23   what I rely on is that comment in the advisory committee notes

24   on Rule 23(b)(2) that says this is exactly what the purpose of

25   the amendments that enacted 23(b)(2) was.  Civil rights actions

1    where there's systematic government conduct that affects -- you

2    know, here millions of people or large numbers of people, all

3    of the diffuse injury and not enough incentive to sue the

4    government on their own.  This is exactly what that's all

5    about.

6              THE COURT:  All right.  And I think I misjudged how

7    long my questions were going to take because we're about an

8    hour -- well, 50 minutes over what I thought it was going to

9    take.

10        So that's all the questions I have.  Do you have any

11   questions for me?  I'm going to refer you to the EIP if you ask

12   me anything, but go ahead -- no, I'm joking.

13             MR. GARDNER:  Just on behalf of the United States, we

14   just thank you for your time and for holding this hearing and

15   for listening to us.  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             MR. SAUER:  Thank you, Your Honor.

18             THE COURT:  Thank you.  And I know a lot of you have

19   got flights.  Most of you probably stayed the weekend, Memorial

20   Day weekend in Monroe.  There's nothing like it.  But, anyway,

21   I'm sure we'll have some activities going on.  But, anyway,

22   have a good trip back.  And, by the way, the LSU Lady Tigers

23   are in Washington D.C. right now, so you better get back, I

24   think for winning the National Championship in women's

25   basketball.  So they're there now, so y'all better get on back

1    to see them.  All right.  Thank you all.  Enjoyed it.

2    Everybody did a good job on the briefs -- not briefs, novels.

3    Thank you.

4    (Court adjourned at 1:25 p.m.)

5

6

7                      * * * * *

8

9                    CERTIFICATE

10      I, Debbie Lowery, Certified Court Reporter, do certify

11    that the foregoing is, to the best of my ability and

12    understanding, a true and correct transcript from the

13    proceedings of this matter.

14

15

16                    _____

17                    /s/Debbie Lowery

18                    6/21/2023

19

20

21

22

23

24

25