# DEFENDANTS' EXHIBIT 2

2023 WL 4002951
Only the Westlaw citation is currently available.
Supreme Court of the United States.

Deb HAALAND, Secretary of
the Interior, et al., Petitioners
v.
Chad Everet BRACKEEN, et al.
Cherokee Nation, et al., Petitioners
v.
Chad Everet Brackeen, et al.
Texas, Petitioner
v.
Deb Haaland, Secretary of the Interior, et al.
Chad Everet Brackeen, et al., Petitioners
Deb Haaland, Secretary of the Interior, et al.

No. 21-376, No. 21-377
|
No, 21-378
|
No. 21-380
|
Argued November 9, 2022
|
Decided June 15, 2023 [1]

Syllabus [*]

**\*1** This case arises from three separate child custody proceedings governed by the Indian Child Welfare Act (ICWA), a federal statute that aims to keep Indian children connected to Indian families. ICWA governs state court adoption and foster care proceedings involving Indian children. Among other things, the Act requires placement of an Indian child according to the Act's hierarchical preferences, unless the state court finds "good cause" to depart from them. 25 U. S. C. §§ 1915(a), (b). Under those preferences, Indian families or institutions from any tribe (not just the tribe to which the child has a tie) outrank unrelated non-Indians or non-Indian institutions. Further, the child's tribe may pass a resolution altering the prioritization order. § 1915(c). The preferences of the Indian child or her parent generally cannot trump those set by statute or tribal resolution.

In involuntary proceedings, the Act mandates that the Indian child's parent or custodian and tribe be given notice of any custody proceedings, as well as the right to intervene. §§ 1912(a), (b), (c). Section 1912(d) requires a party seeking to terminate parental rights or to remove an Indian child from an unsafe environment to "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent breakup of the Indian family," and a court cannot order relief unless the party demonstrates, by a heightened burden of proof and expert testimony, that the child is likely to suffer "serious emotional or physical damage" if the parent or Indian custodian retains custody. §§ 1912(d), (e). Even for voluntary proceedings, a biological parent who gives up an Indian child cannot necessarily choose the child's foster or adoptive parents. The child's tribe has "a right to intervene at any point in [a] proceeding" to place a child in foster care or terminate parental rights, as well as a right to collaterally attack the state court's custody decree. §§ 1911(c), 1914. The tribe thus can sometimes enforce ICWA's placement preferences against the wishes of one or both biological parents, even after the child is living with a new family. Finally, the States must keep certain records related to child placements, see § 1915(e), and transmit to the Secretary of the Interior all final adoption decrees and other specified information, see § 1951(a).

Petitioners—a birth mother, foster and adoptive parents, and the State of Texas—filed this suit in federal court against the United States and other federal parties. Several Indian Tribes intervened to defend the law alongside the federal parties. Petitioners challenged ICWA as unconstitutional on multiple grounds. They asserted that Congress lacks authority to enact ICWA and that several of ICWA's requirements violate the anticommandeering principle of the Tenth Amendment. They argued that ICWA employs racial classifications that unlawfully hinder non-Indian families from fostering or adopting Indian children. And they challenged § 1915(c)— the provision that allows tribes to alter the prioritization order —on the ground that it violates the nondelegation doctrine.

**\*2** The District Court granted petitioners' motion for summary judgment on their constitutional claims, and the en banc Fifth Circuit affirmed in part and reversed in part. The Fifth Circuit concluded that ICWA does not exceed Congress's legislative power, that § 1915(c) does not violate the nondelegation doctrine, and that some of ICWA's placement preferences satisfy the guarantee of equal protection. The Fifth Circuit was evenly divided as to whether ICWA's other preferences—those prioritizing "other Indian families" and "Indian foster home[s]" over non-Indian families—unconstitutionally discriminate on the basis

of race, and thus affirmed the District Court's ruling that these preferences are unconstitutional. As to petitioners' Tenth Amendment arguments, the Fifth Circuit held that § 1912(d)'s "active efforts" requirement, § 1912(e)'s and § 1912(f)'s expert witness requirements, and § 1915(e)'s recordkeeping requirement unconstitutionally commandeer the States. And because it divided evenly with respect to other challenged provisions (§ 1912(a)'s notice requirement, § 1915(a) and § 1915(b)'s placement preferences, and § 1951(a)'s recordkeeping requirement), the Fifth Circuit affirmed the District Court's holding that these requirements violate the Tenth Amendment.

*Held*:

1. The Court declines to disturb the Fifth Circuit's conclusion that ICWA is consistent with Congress's Article I authority. Pp. 10–17.

(a) The Court has characterized Congress's power to legislate with respect to the Indian tribes as "plenary and exclusive," *United States* v. *Lara*, 541 U. S. 193, 200, superseding both tribal and state authority, *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56. The Court has traced that power to multiple sources. First, the Indian Commerce Clause authorizes Congress "[t]o regulate Commerce ... with the Indian Tribes," U. S. Const., Art. I, § 8, cl. 3, and the Court has interpreted the Indian Commerce Clause to reach not only trade, but also certain "Indian affairs," *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163, 192. The Treaty Clause provides a second source of power. The treaty power "does not literally authorize Congress to act legislatively," since it is housed in Article II, but "treaties made pursuant to that power can authorize Congress to deal with 'matters' with which otherwise 'Congress could not deal.' " *Lara*, 541 U. S., at 201. Also, principles inherent in the Constitution's structure may empower Congress to act in the field of Indian affairs. See *Morton* v. *Mancari*, 417 U. S. 535, 551–552. Finally, the "trust relationship between the United States and the Indian people" informs the exercise of legislative power. *United States* v. *Mitchell*, 463 U. S. 206, 225–226. In sum, Congress's power to legislate with respect to Indians is well established and broad, but it is not unbounded. It is plenary within its sphere, but even a sizeable sphere has borders. Pp. 10–14.

(b) Petitioners contend that ICWA impermissibly treads on the States' traditional authority over family law. But when Congress validly legislates pursuant to its Article I powers, the Court "has not hesitated" to find conflicting state family

law preempted, "[n]otwithstanding the limited application of federal law in the field of domestic relations generally." *Ridgway* v. *Ridgway*, 454 U. S. 46, 54. And the Court has recognized Congress's power to displace the jurisdiction of state courts in adoption proceedings involving Indian children. *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 390 (*per curiam*). Pp. 14–15.

(c) Petitioners contend that no source of congressional authority authorizes Congress to regulate custody proceedings for Indian children. They suggest that the Indian Commerce Clause, for example, authorizes Congress to legislate only with respect to Indian tribes as government entities, not Indians as individuals. But this Court's holding more than a century ago that "commerce with the Indian tribes, means commerce with the individuals composing those tribes," *United States* v. *Holliday*, 3 Wall. 407, 417, renders that argument a dead end. Petitioners also assert that ICWA takes the "commerce" out of the Indian Commerce Clause because "children are not commodities that can be traded." Brief for Individual Petitioners 16. This point, while rhetorically powerful, ignores the Court's precedent interpreting the Indian Commerce Clause to encompass not only trade but also other Indian affairs. Petitioners next argue that ICWA cannot be authorized by principles inherent in the Constitution's structure because those principles "extend, at most, to matters of war and peace." Brief for Petitioner Texas 28. Again, petitioners make no argument that takes this Court's cases on their own terms. The Court has referred generally to the powers "necessarily inherent in any Federal Government" and has offered non-military examples, such as "creating departments of Indian affairs." *Lara*, 541 U. S., at 201–202. Petitioners next observe that ICWA does not implement a federal treaty, but Congress did not purport to enact ICWA pursuant to its treaty power and the Fifth Circuit did not uphold ICWA on that rationale. Finally, petitioners turn to criticizing this Court's precedent as inconsistent with the Constitution's original meaning, but they neither ask the Court to overrule the precedent they criticize nor try to reconcile their approach with it. If there are arguments that ICWA exceeds Congress's authority as precedent stands today, petitioners do not make them here. Pp. 15–17.

**\*3** 2. Petitioners' anticommandeering challenges, which address three categories of ICWA provisions, are rejected. Pp. 18–29.

(a) First, petitioners challenge certain requirements that apply in involuntary proceedings to place a child in foster care

or terminate parental rights, focusing on the requirement that an initiating party demonstrate "active efforts" to keep the Indian family together. § 1912(d). Petitioners contend this subsection directs state and local agencies to provide extensive services to the parents of Indian children, even though it is well established that the Tenth Amendment bars Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz* v. *United States*, 521 U. S. 898, 935. To succeed, petitioners must show that § 1912(d) harnesses a State's legislative or executive authority. But the provision applies to "any party" who initiates an involuntary proceeding, thus sweeping in private individuals and agencies as well as government entities. A demand that either public or private actors can satisfy is unlikely to require the use of sovereign power. *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___–___. Petitioners nonetheless insist that States institute the vast majority of involuntary proceedings. But examples of private suits are not hard to find. And while petitioners treat "active efforts" as synonymous with "government programs," state courts have applied the "active efforts" requirement in private suits too. That is consistent with ICWA's findings, which describe the role that both public and private actors played in the unjust separation of Indian children from their families and tribes. § 1901. Given all this, it is implausible that § 1912(d) is directed primarily, much less exclusively, at the States.

Legislation that applies "evenhandedly" to state and private actors does not typically implicate the Tenth Amendment. *Murphy*, 584 U. S., at ___. Petitioners would distinguish the Court's precedents so holding on the grounds that those cases addressed laws regulating a State's *commercial* activity, while ICWA regulates a State's "core sovereign function of protecting the health and safety of children within its borders." Brief for Petitioner Texas 66. This argument is presumably directed at situations in which only the State can rescue a child from neglectful parents. But the State is not necessarily the only option for rescue, and § 1912(d) applies to other types of proceedings too. Petitioners do not distinguish between these varied situations, much less isolate a domain in which only the State can act. If there is a core of involuntary proceedings committed exclusively to the sovereign, Texas neither identifies its contours nor explains what § 1912(d) requires of a State in that context. Petitioners have therefore failed to show that the "active efforts" requirement commands the States to deploy their executive or legislative power to implement federal Indian policy. And as for petitioners' challenges to

other provisions of § 1912—the notice requirement, expert witness requirement, and evidentiary standards—the Court doubts that requirements placed on a State as litigant implicate the Tenth Amendment. But regardless, these provisions, like § 1912(d), apply to both private and state actors, so they too pose no anticommandeering problem. Pp. 18–23.

**\*4** (b) Petitioners next challenge ICWA's placement preferences, set forth in § 1915. Petitioners assert that this provision orders state agencies to perform a "diligent search" for placements that satisfy ICWA's hierarchy. Just as Congress cannot compel state officials to search databases to determine the lawfulness of gun sales, *Printz*, 521 U. S., at 902–904, petitioners argue, Congress cannot compel state officials to search for a federally preferred placement. As with § 1912, petitioners have not shown that the "diligent search" requirement, which applies to both private and public parties, demands the use of state sovereign authority. Moreover, § 1915 does not require *anyone*, much less the States, to search for alternative placements; instead, the burden is on the tribe or other objecting party to produce a higher-ranked placement. *Adoptive Couple* v. *Baby Girl*, 570 U. S. 637, 654. So, as it stands, petitioners assert an anticommandeering challenge to a provision that does not command state agencies to do anything.

State courts are a different matter. ICWA indisputably requires them to apply the placement preferences in making custody determinations. §§ 1915(a), (b). But Congress can require state courts, unlike state executives and legislatures, to enforce federal law. See *New York* v. *United States*, 505 U. S. 144, 178–179. Petitioners draw a distinction between requiring state courts to entertain federal causes of action and requiring them to apply federal law to state causes of action, but this argument runs counter to the Supremacy Clause. When Congress enacts a valid statute, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372. That a federal law modifies a state law cause of action does not limit its preemptive effect. See, *e.g.*, *Hillman* v. *Maretta*, 569 U. S. 483, 493–494 (federal law establishing order of precedence for life insurance beneficiaries preempted state law). Pp. 23–25.

(c) Finally, petitioners insist that Congress cannot force state courts to maintain or transmit records of custody proceedings involving Indian children. But the anticommandeering doctrine applies "distinctively" to a state court's adjudicative responsibilities. *Printz*, 521 U. S., at 907. The Constitution

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

allows Congress to require "state judges to enforce federal prescriptions, insofar as those prescriptions relat[e] to matters appropriate for the judicial power." *Ibid.* (emphasis deleted). In *Printz*, the Court indicated that this principle may extend to tasks that are "ancillary" to a "quintessentially adjudicative task"—such as "recording, registering, and certifying" documents. *Id.*, at 908, n. 2. *Printz* described numerous historical examples of Congress imposing recordkeeping and reporting requirements on state courts. These early congressional enactments demonstrate that the Constitution does not prohibit the Federal Government from imposing adjudicative tasks on state courts. *Bowsher* v. *Synar*, 478 U. S. 714, 723. The Court now confirms what *Printz* suggested: Congress may impose ancillary recordkeeping requirements related to state-court proceedings without violating the Tenth Amendment. Here, ICWA's recordkeeping requirements are comparable to the historical examples. The duties ICWA imposes are "ancillary" to the state court's obligation to conduct child custody proceedings in compliance with ICWA. *Printz*, 521 U. S., at 908, n. 2. Pp. 25–29.

3. The Court does not reach the merits of petitioners' two additional claims—an equal protection challenge to ICWA's placement preferences and a nondelegation challenge to § 1915(c), the provision allowing tribes to alter the placement preferences—because no party before the Court has standing to raise them. Pp. 29–34.

(a) The individual petitioners argue that ICWA's hierarchy of preferences injures them by placing them on unequal footing with Indian parents who seek to adopt or foster an Indian child. But the individual petitioners have not shown that this injury is "likely" to be "redressed by judicial relief." *TransUnion LLC* v. *Ramirez*, 594 U. S. ___, ___. They seek an injunction preventing the federal parties from enforcing ICWA and a declaratory judgment that the challenged provisions are unconstitutional. Yet enjoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements. §§ 1903(1), 1915(a), (b). The state officials who implement ICWA are "not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 569 (plurality opinion). Petitioners' request for a declaratory judgment suffers from the same flaw. The individual petitioners insist that state courts are likely to defer to a federal court's interpretation of federal law, thus giving rise to a substantial likelihood that a favorable judgment will redress their injury.

But such a theory would mean redressability would be satisfied whenever a decision might persuade actors who are not before the court—contrary to Article III's strict prohibition on "issuing advisory opinions." *Carney* v. *Adams*, 592 U. S. ___, ___. It is a federal court's judgment, not its opinion, that remedies an injury. The individual petitioners can hope for nothing more than an opinion, so they cannot satisfy Article III. Pp. 29–32.

**\*5** (b) Texas has no equal protection rights of its own, *South Carolina* v. *Katzenbach*, 383 U. S. 301, 323, and it cannot assert equal protection claims on behalf of its citizens against the Federal Government, *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U. S. 592, 610, n. 16. The State's creative arguments for why it has standing despite these settled rules also fail. Texas's argument that ICWA requires it to "break its promise to its citizens that it will be colorblind in child-custody proceedings," Reply Brief for Texas 15, is not the kind of "concrete" and "particularized" "invasion of a legally protected interest" necessary to demonstrate an injury in fact, *Lujan*, 504 U. S., at 560. Texas also claims a direct pocketbook injury associated with the costs of keeping records, providing notice in involuntary proceedings, and producing expert testimony before moving a child to foster care or terminating parental rights. But these alleged costs are not "fairly traceable" to the placement preferences, which "operate independently" of the provisions Texas identifies. *California* v. *Texas*, 593 U. S. ___, ___. Texas would continue to incur the complained-of costs even if it were relieved of the duty to apply the placement preferences. Because Texas is not injured by the placement preferences, neither would it be injured by a tribal resolution that altered those preferences pursuant to § 1915(c). Texas therefore does not have standing to bring either its equal protection or its nondelegation claims. And although the individual petitioners join Texas's nondelegation challenge to § 1915(c), they raise no independent arguments about why they would have standing to bring this claim. Pp. 32–34.

994 F. 3d 249, affirmed in part, reversed in part, vacated and remanded in part.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and JACKSON, JJ., joined. GORSUCH, J., filed a concurring opinion, in which SOTOMAYOR and JACKSON, JJ., joined as to Parts I and III. KAVANAUGH,

2023 WL 4002951

J., filed a concurring opinion. THOMAS, J., and ALITO, J., filed dissenting opinions.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**Opinion**

Justice Barrett delivered the opinion of the Court.

This case is about children who are among the most vulnerable: those in the child welfare system. In the usual course, state courts apply state law when placing children in foster or adoptive homes. But when the child is an Indian, a federal statute—the Indian Child Welfare Act—governs. Among other things, this law requires a state court to place an Indian child with an Indian caretaker, if one is available. That is so even if the child is already living with a non-Indian family and the state court thinks it in the child's best interest to stay there.

Before us, a birth mother, foster and adoptive parents, and the State of Texas challenge the Act on multiple constitutional grounds. They argue that it exceeds federal authority, infringes state sovereignty, and discriminates on the basis of race. The United States, joined by several Indian Tribes, defends the law. The issues are complicated—so for the details, read on. But the bottom line is that we reject all of petitioners' challenges to the statute, some on the merits and others for lack of standing.

I

A

In 1978, Congress enacted the Indian Child Welfare Act (ICWA) out of concern that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies." 92 Stat. 3069, 25 U. S. C. § 1901(4). Congress found that many of these children were being "placed in non-Indian foster and adoptive homes and institutions," and that the States had contributed to the problem by "fail[ing] to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." §§ 1901(4), (5). This harmed not only Indian parents and children, but also Indian tribes. As Congress put it, "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children." § 1901(3). Testifying before Congress, the Tribal Chief of the Mississippi Band of Choctaw Indians was blunter: "Culturally, the chances of Indian survival are significantly reduced if our children, the only real means for the transmission of the tribal heritage, are to be raised in non-Indian homes and denied exposure to the ways of their People." Hearings on S. 1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong., 2d Sess., 193 (1978).

**\*6** The Act thus aims to keep Indian children connected to Indian families. "Indian child" is defined broadly to include not only a child who is "a member of an Indian tribe," but also one who is "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." § 1903(4). If the Indian child lives on a reservation, ICWA grants the tribal court exclusive jurisdiction over all child custody proceedings, including adoptions and foster care proceedings. § 1911(a). For other Indian children, state and tribal courts exercise concurrent jurisdiction, although the state court is sometimes required to transfer the case to tribal court. § 1911(b). When a state court adjudicates the proceeding, ICWA governs from start to finish. That is true regardless of whether the proceeding is "involuntary" (one to which the parents do not consent) or "voluntary" (one to which they do).

Involuntary proceedings are subject to especially stringent safeguards. See 25 CFR § 23.104 (2022); 81 Fed. Reg. 38832–38836 (2016). Any party who initiates an "involuntary proceeding" in state court to place an Indian child in foster care or terminate parental rights must "notify the parent or Indian custodian and the Indian child's tribe." § 1912(a). The parent or custodian and tribe have the right to intervene in the proceedings; the right to request extra time to prepare for the proceedings; the right to "examine all reports or other documents filed with the court"; and, for indigent parents or custodians, the right to court-appointed counsel. §§ 1912(a), (b), (c). The party attempting to terminate parental rights or remove an Indian child from an unsafe environment must first "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." § 1912(d). Even then, the court cannot order a foster care placement unless it finds "by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by

the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." § 1912(e). To terminate parental rights, the court must make the same finding "beyond a reasonable doubt." § 1912(f ).

The Act applies to voluntary proceedings too. Relinquishing a child temporarily (to foster care) or permanently (to adoption) is a grave act, and a state court must ensure that a consenting parent or custodian knows and understands "the terms and consequences." § 1913(a). Notably, a biological parent who voluntarily gives up an Indian child cannot necessarily choose the child's foster or adoptive parents. The child's tribe has "a right to intervene at any point in [a] proceeding" to place a child in foster care or terminate parental rights, as well as a right to collaterally attack the state court's decree. §§ 1911(c), 1914. As a result, the tribe can sometimes enforce ICWA's placement preferences against the wishes of one or both biological parents, even after the child is living with a new family. See *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U. S. 30, 49–52 (1989).

ICWA's placement preferences, which apply to all custody proceedings involving Indian children, are hierarchical: State courts may only place the child with someone in a lower-ranked group when there is no available placement in a higher-ranked group. For adoption, "a preference shall be given" to placements with "(1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." § 1915(a). For foster care, a preference is given to (1) "the Indian child's extended family"; (2) "a foster home licensed, approved, or specified by the Indian child's tribe"; (3) "an Indian foster home licensed or approved by an authorized non-Indian licensing authority"; and then (4) another institution "approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs." § 1915(b). For purposes of the placement preferences, an "Indian" is "any person who is a member of an Indian tribe," and an "Indian organization" is "any group ... owned or controlled by Indians." §§ 1903(3), (7). Together, these definitions mean that Indians from any tribe (not just the tribe to which the child has a tie) outrank unrelated non-Indians for both adoption and foster care. And for foster care, institutions run or approved by any tribe outrank placements with unrelated non-Indian families. Courts must adhere to the placement preferences absent "good cause" to depart from them. §§ 1915(a), (b).

**\*7** The child's tribe may pass a resolution altering the prioritization order. § 1915(c). If it does, "the agency or court

effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child." *Ibid.* So long as the "least restrictive setting" condition is met, the preferences of the Indian child or her parent cannot trump those set by statute or tribal resolution. But, "[w]here appropriate, the preference of the Indian child or parent shall be considered" in making a placement. *Ibid.*

The State must record each placement, including a description of the efforts made to comply with ICWA's order of preferences. § 1915(e). Both the Secretary of the Interior and the child's tribe have the right to request the record at any time. *Ibid.* State courts must also transmit all final adoption decrees and specified information about adoption proceedings to the Secretary. § 1951(a).

B

This case arises from three separate child custody proceedings governed by ICWA.

1

A. L. M. was placed in foster care with Chad and Jennifer Brackeen when he was 10 months old. Because his biological mother is a member of the Navajo Nation and his biological father is a member of the Cherokee Nation, he falls within ICWA's definition of an "Indian child." Both the Brackeens and A. L. M.'s biological parents live in Texas.

After A. L. M. had lived with the Brackeens for more than a year, they sought to adopt him. A. L. M.'s biological mother, father, and grandmother all supported the adoption. The Navajo and Cherokee Nations did not. Pursuant to an agreement between the Tribes, the Navajo Nation designated A. L. M. as a member and informed the state court that it had located a potential alternative placement with nonrelative tribal members living in New Mexico. ICWA's placement preferences ranked the proposed Navajo family ahead of non-Indian families like the Brackeens. See § 1915(a).

The Brackeens tried to convince the state court that there was "good cause" to deviate from ICWA's preferences. They presented favorable testimony from A. L. M.'s court-appointed guardian and from a psychological expert who described the strong emotional bond between A. L. M. and his

foster parents. A. L. M.'s biological parents and grandmother also testified, urging the court to allow A. L. M. to remain with the Brackeens, " 'the only parents [A. L. M.] knows.' " App. 96.

The court denied the adoption petition, and the Texas Department of Family and Protective Services announced its intention to move A. L. M. from the Brackeens' home to New Mexico. In response, the Brackeens obtained an emergency stay of the transfer and filed this lawsuit. The Navajo family then withdrew from consideration, and the Brackeens finalized their adoption of A. L. M.

The Brackeens now seek to adopt A. L. M.'s biological sister, Y. R. J., again over the opposition of the Navajo Nation. And while the Brackeens hope to foster and adopt other Indian children in the future, their fraught experience with A. L. M.'s adoption makes them hesitant to do so.

2

Altagracia Hernandez chose Nick and Heather Libretti as adoptive parents for her newborn daughter, Baby O. The Librettis took Baby O. home from the hospital when she was three days old, and Hernandez, who lived nearby, visited Baby O. frequently. Baby O.'s biological father visited only once but supported the adoption.

Hernandez is not an Indian. But Baby O.'s biological father is descended from members of the Ysleta del Sur Pueblo Tribe, and the Tribe enrolled Baby O. as a member. As a result, the adoption proceeding was governed by ICWA. The Tribe exercised its right to intervene and argued, over Hernandez's objection, that Baby O. should be moved from the Librettis' home in Nevada to the Tribe's reservation in El Paso, Texas. It presented a number of potential placements on the reservation for Baby O., and state officials began to investigate them. After Hernandez and the Librettis joined this lawsuit, however, the Tribe withdrew its challenge to the adoption, and the Librettis finalized their adoption of Baby O. The Librettis stayed in the litigation because they planned to foster and possibly adopt Indian children in the future.

3

**\*8**  Jason and Danielle Clifford, who live in Minnesota, fostered Child P., whose maternal grandmother belongs to the White Earth Band of Ojibwe Tribe. When Child P. entered state custody around the age of three, her mother informed the court that ICWA did not apply because Child P. was not eligible for tribal membership. The Tribe wrote a letter to the court confirming the same.

After two years in the foster care system, Child P. was placed with the Cliffords, who eventually sought to adopt her. The Tribe intervened in the proceedings and, with no explanation for its change in position, informed the court that Child P. was in fact eligible for tribal membership. Later, the Tribe announced that it had enrolled Child P. as a member. To comply with ICWA, Minnesota placed Child P. with her maternal grandmother, who had lost her foster license due to a criminal conviction. The Cliffords continued to pursue the adoption, but, citing ICWA, the court denied their motion. Like the other families, the Cliffords intend to foster or adopt Indian children in the future.

C

The Brackeens, the Librettis, Hernandez, and the Cliffords (whom we will refer to collectively as the "individual petitioners") filed this suit in federal court against the United States, the Department of the Interior and its Secretary, the Bureau of Indian Affairs (BIA) and its Director, and the Department of Health and Human Services and its Secretary (whom we will refer to collectively as the "federal parties"). The individual petitioners were joined by the States of Texas, Indiana, and Louisiana—although only Texas continues to challenge ICWA before this Court. Several Indian Tribes intervened to defend the law alongside the federal parties.

Petitioners challenged ICWA as unconstitutional on multiple grounds. They asserted that Congress lacks authority to enact ICWA and that several of ICWA's requirements violate the anticommandeering principle of the Tenth Amendment. They argued that ICWA employs racial classifications that unlawfully hinder non-Indian families from fostering or adopting Indian children. And they challenged § 1915(c)— the provision that allows tribes to alter the prioritization order —on the ground that it violates the non-delegation doctrine.[1]

The District Court granted petitioners' motion for summary judgment on their constitutional claims, and a divided panel of the Fifth Circuit reversed. *Brackeen v. Bernhardt*, 937 F. 3d 406 (2019). After rehearing the case en banc, the Fifth Circuit affirmed in part and reversed in part. 994 F.

3d 249 (2021) (*per curiam*). The en banc court concluded that ICWA does not exceed Congress's legislative power, that § 1915(c) does not violate the nondelegation doctrine, and that some of ICWA's placement preferences satisfy the guarantee of equal protection. *Id.*, at 267–269. The court was evenly divided as to whether ICWA's other preferences —those prioritizing "other Indian families" and "Indian foster home[s]" over non-Indian families—unconstitutionally discriminate on the basis of race. *Id.*, at 268. The Fifth Circuit therefore affirmed the District Court's ruling that these preferences are unconstitutional.

**\*9** Petitioners' Tenth Amendment arguments effectively succeeded across the board. The Fifth Circuit held that § 1912(d)'s "active efforts" requirement, § 1912(e)'s and § 1912(f )'s expert witness requirements, and § 1915(e)'s recordkeeping requirement unconstitutionally commandeer the States. *Ibid.* It divided evenly with respect to the other provisions that petitioners challenge here: § 1912(a)'s notice requirement, § 1915(a) and § 1915(b)'s placement preferences, and § 1951(a)'s recordkeeping requirement. *Ibid.* So the Fifth Circuit affirmed the District Court's holding that these requirements, too, violate the Tenth Amendment.

We granted certiorari.[2] 595 U. S. ____ (2022).

## II

### A

We begin with petitioners' claim that ICWA exceeds Congress's power under Article I. In a long line of cases, we have characterized Congress's power to legislate with respect to the Indian tribes as " 'plenary and exclusive.' " *United States* v. *Lara,* 541 U. S. 193, 200 (2004); *South Dakota* v. *Yankton Sioux Tribe,* 522 U. S. 329, 343 (1998) ("Congress possesses plenary power over Indian affairs"); *Washington* v. *Confederated Bands and Tribes of Yakima Nation,* 439 U. S. 463, 470 (1979) (Congress exercises "plenary and exclusive power over Indian affairs"); *Winton* v. *Amos,* 255 U. S. 373, 391 (1921) ("It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations"); *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 565 (1903) ("Congress possesse[s] a paramount power over the property of the Indians"); *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 478 (1899) ("Congress possesses plenary power of legislation in regard to" the Indian tribes). Our cases leave

little doubt that Congress's power in this field is muscular, superseding both tribal and state authority. *Santa Clara Pueblo* v. *Martinez,* 436 U. S. 49, 56 (1978) ("Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess"); *Dick* v. *United States,* 208 U. S. 340, 353 (1908) ("Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any State within whose limits are Indian tribes").

To be clear, however, "plenary" does not mean "free-floating." A power unmoored from the Constitution would lack both justification and limits. So like the rest of its legislative powers, Congress's authority to regulate Indians must derive from the Constitution, not the atmosphere. Our precedent traces that power to multiple sources.

The Indian Commerce Clause authorizes Congress "[t]o regulate Commerce ... with the Indian Tribes." Art. I, § 8, cl. 3. We have interpreted the Indian Commerce Clause to reach not only trade, but certain "Indian affairs" too. *Cotton Petroleum Corp.* v. *New Mexico,* 490 U. S. 163, 192 (1989). Notably, we have declined to treat the Indian Commerce Clause as interchangeable with the Interstate Commerce Clause. *Ibid.* While under the Interstate Commerce Clause, States retain "some authority" over trade, we have explained that "virtually all authority over Indian commerce and Indian tribes" lies with the Federal Government. *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44, 62 (1996).

The Treaty Clause—which provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties"—provides a second source of power over Indian affairs. Art. II, § 2, cl. 2. Until the late 19th century, relations between the Federal Government and the Indian tribes were governed largely by treaties. *Lara,* 541 U. S., at 201. Of course, the treaty power "does not literally authorize Congress to act legislatively," since it is housed in Article II rather than Article I. *Ibid.* Nevertheless, we have asserted that "treaties made pursuant to that power can authorize Congress to deal with 'matters' with which otherwise 'Congress could not deal.' " *Ibid.* And even though the United States formally ended the practice of entering into new treaties with the Indian tribes in 1871, this decision did not limit Congress's power "to legislate on problems of Indians" pursuant to pre-existing treaties. *Antoine* v. *Washington,* 420 U. S. 194, 203 (1975) (emphasis deleted).

**\*10** We have also noted that principles inherent in the Constitution's structure empower Congress to act in the field of Indian affairs. See *Morton* v. *Mancari*, 417 U. S. 535, 551–552 (1974) ("The plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from the Constitution itself "). At the founding, " 'Indian affairs were more an aspect of military and foreign policy than a subject of domestic or municipal law.' " *Lara*, 541 U. S., at 201. With this in mind, we have posited that Congress's legislative authority might rest in part on "the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government, namely, powers that this Court has described as 'necessary concomitants of nationality.' " *Ibid.* (quoting *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 315–322 (1936)).

Finally, the "trust relationship between the United States and the Indian people" informs the exercise of legislative power. *United States* v. *Mitchell*, 463 U. S. 206, 225–226 (1983). As we have explained, the Federal Government has " 'charged itself with moral obligations of the highest responsibility and trust' " toward Indian tribes. *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 176 (2011); *Seminole Nation* v. *United States*, 316 U. S. 286, 296 (1942) ("[T]his Court has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people"). The contours of this "special relationship" are undefined. *Mancari*, 417 U. S., at 552.

In sum, Congress's power to legislate with respect to Indians is well established and broad. Consistent with that breadth, we have not doubted Congress's ability to legislate across a wide range of areas, including criminal law, domestic violence, employment, property, tax, and trade. See, *e.g.*, *Lara*, 541 U. S., at 210 (law allowing tribes to prosecute nonmember Indians who committed crimes on tribal land); *United States* v. *Bryant*, 579 U. S. 140, 142–143 (2016) (law criminalizing domestic violence in Indian country); *Mancari*, 417 U. S., at 537 (policy granting Indians employment preferences); *United States* v. *Antelope*, 430 U. S. 641, 648 (1977) (law establishing a criminal code for Indian country); *Yankton Sioux Tribe*, 522 U. S., at 343 (law altering the boundaries of a reservation); *Sunderland* v. *United States*, 266 U. S. 226, 231–232 (1924) (agency action removing the restrictions on alienation of a homestead allotted to an Indian); *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685, 691, n. 18 (1965) (law granting tribe immunity from state taxation); *United States* v. *Algoma Lumber Co.*, 305 U. S.

415, 417, 421 (1939) (law regulating the sale of timber by an Indian tribe). Indeed, we have only rarely concluded that a challenged statute exceeded Congress's power to regulate Indian affairs. See, *e.g.*, *Seminole Tribe*, 517 U. S., at 72–73.

Admittedly, our precedent is unwieldy, because it rarely ties a challenged statute to a specific source of constitutional authority. That makes it difficult to categorize cases and even harder to discern the limits on Congress's power. Still, we have never wavered in our insistence that Congress's Indian affairs power " 'is not absolute.' " *Delaware Tribal Business Comm.* v. *Weeks*, 430 U. S. 73, 84 (1977); *United States* v. *Alcea Band of Tillamooks*, 329 U. S. 40, 54 (1946) ("The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute"); *United States* v. *Creek Nation*, 295 U. S. 103, 110 (1935) (plenary power is "subject to limitations inhering in such a guardianship and to pertinent constitutional restrictions"). It could not be otherwise—Article I gives Congress a series of enumerated powers, not a series of blank checks. Thus, we reiterate that Congress's authority to legislate with respect to Indians is not unbounded. It is plenary within its sphere, but even a sizeable sphere has borders. [3]

## B

**\*11** Petitioners contend that ICWA exceeds Congress's power. Their principal theory, and the one accepted by both JUSTICE ALITO and the dissenters in the Fifth Circuit, is that ICWA treads on the States' authority over family law. Domestic relations have traditionally been governed by state law; thus, federal power over Indians stops where state power over the family begins. Or so the argument goes.

It is true that Congress lacks a general power over domestic relations, *In re Burrus*, 136 U. S. 586, 593–594 (1890), and, as a result, responsibility for regulating marriage and child custody remains primarily with the States, *Sosna* v. *Iowa*, 419 U. S. 393, 404 (1975). See also *Moore* v. *Sims*, 442 U. S. 415, 435 (1979). But the Constitution does not erect a firewall around family law. On the contrary, when Congress validly legislates pursuant to its Article I powers, we "ha[ve] not hesitated" to find conflicting state family law preempted, "[n]otwithstanding the limited application of federal law in the field of domestic relations generally." *Ridgway* v. *Ridgway*, 454 U. S. 46, 54 (1981) (federal law providing life insurance preempted state family-property law); see also *Hillman* v. *Maretta*, 569 U. S. 483, 491

(2013) ("state laws 'governing the economic aspects of domestic relations ... must give way to clearly conflicting federal enactments' " (alteration in original)). In fact, we have specifically recognized Congress's power to displace the jurisdiction of state courts in adoption proceedings involving Indian children. *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 390 (1976) (*per curiam*).

Petitioners are trying to turn a general observation (that Congress's Article I powers rarely touch state family law) into a constitutional carveout (that family law is wholly exempt from federal regulation). That argument is a nonstarter. As James Madison said to Members of the First Congress, when the Constitution conferred a power on Congress, "they might exercise it, although it should interfere with the laws, or even the Constitution of the States." 2 Annals of Cong. 1897 (1791). Family law is no exception.

### C

Petitioners come at the problem from the opposite direction too: Even if there is no family law carveout to the Indian affairs power, they contend that Congress's authority does not stretch far enough to justify ICWA. Ticking through the various sources of power, petitioners assert that the Constitution does not authorize Congress to regulate custody proceedings for Indian children. Their arguments fail to grapple with our precedent, and because they bear the burden of establishing ICWA's unconstitutionality, we cannot sustain their challenge to the law. See *Lujan* v. *G & G Fire Sprinklers, Inc.*, 532 U. S. 189, 198 (2001).

Take the Indian Commerce Clause, which is petitioners' primary focus. According to petitioners, the Clause authorizes Congress to legislate only with respect to Indian tribes as government entities, not Indians as individuals. Brief for Individual Petitioners 47–50. But we held more than a century ago that "commerce with the Indian tribes, means commerce with the individuals composing those tribes." *United States* v. *Holliday*, 3 Wall. 407, 416–417 (1866) (law prohibiting the sale of alcohol to Indians in Indian country); *United States* v. *Nice*, 241 U. S. 591, 600 (1916) (same). So that argument is a dead end.

 **\*12**  Petitioners also assert that ICWA takes the "commerce" out of the Indian Commerce Clause. Their consistent refrain is that "children are not commodities that can be traded." Brief for Individual Petitioners 16; Brief for Petitioner

Texas 23 ("[C]hildren are not commodities"); *id.*, at 18 ("Children are not articles of commerce"). Rhetorically, it is a powerful point—*of course* children are not commercial products. Legally, though, it is beside the point. As we already explained, our precedent states that Congress's power under the Indian Commerce Clause encompasses not only trade but also "Indian affairs." *Cotton Petroleum*, 490 U. S., at 192. Even the judges who otherwise agreed with petitioners below rejected this narrow view of the Indian Commerce Clause as inconsistent with both our cases and "[l]ongstanding patterns of federal legislation." 994 F. 3d, at 374–375 (principal opinion of Duncan, J.). Rather than dealing with this precedent, however, petitioners virtually ignore it.

Next, petitioners argue that ICWA cannot be authorized by principles inherent in the Constitution's structure because those principles "extend, at most, to matters of war and peace." Brief for Petitioner Texas 28. But that is not what our cases say. We have referred generally to the powers "necessarily inherent in any Federal Government," and we have offered examples like "creating departments of Indian affairs, appointing Indian commissioners, and ... 'securing and preserving the friendship of the Indian Nations' "—none of which are military actions. *Lara*, 541 U. S., at 201–202. Once again, petitioners make no argument that takes our cases on their own terms.

Finally, petitioners observe that ICWA does not implement a federal treaty. Brief for Petitioner Texas 24–27; Brief for Individual Petitioners 56–58. This does not get them very far either, since Congress did not purport to enact ICWA pursuant to the Treaty Clause power and the Fifth Circuit did not uphold ICWA on that rationale.

Presumably recognizing these obstacles, petitioners turn to criticizing our precedent as inconsistent with the Constitution's original meaning. Yet here too, they offer no account of how their argument fits within the landscape of our case law. For instance, they neither ask us to overrule the precedent they criticize nor try to reconcile their approach with it. They are also silent about the potential consequences of their position. Would it undermine established cases and statutes? If so, which ones? Petitioners do not say.

We recognize that our case law puts petitioners in a difficult spot. We have often sustained Indian legislation without specifying the source of Congress's power, and we have insisted that Congress's power has limits without saying

what they are. Yet petitioners' strategy for dealing with the confusion is not to offer a theory for rationalizing this body of law—that would at least give us something to work with.[4] Instead, they frame their arguments as if the slate were clean. More than two centuries in, it is anything but.

If there are arguments that ICWA exceeds Congress's authority as our precedent stands today, petitioners do not make them. We therefore decline to disturb the Fifth Circuit's conclusion that ICWA is consistent with Article I.

### III

**\*13** We now turn to petitioners' host of anticommandeering arguments, which we will break into three categories. First, petitioners challenge certain requirements that apply in involuntary proceedings to place a child in foster care or terminate parental rights: the requirements that an initiating party demonstrate "active efforts" to keep the Indian family together; serve notice of the proceeding on the parent or Indian custodian and tribe; and demonstrate, by a heightened burden of proof and expert testimony, that the child is likely to suffer "serious emotional or physical damage" if the parent or Indian custodian retains custody. Second, petitioners challenge ICWA's placement preferences. They claim that Congress can neither force state agencies to find preferred placements for Indian children nor require state courts to apply federal standards when making custody determinations. Third, they insist that Congress cannot force state courts to maintain or transmit to the Federal Government records of custody proceedings involving Indian children.[5]

### A

As a reminder, "involuntary proceedings" are those to which a parent does not consent. § 1912; 25 CFR § 23.2. Heightened protections for parents and tribes apply in this context, and while petitioners challenge most of them, the "active efforts" provision is their primary target. That provision requires "[a]ny party" seeking to effect an involuntary foster care placement or termination of parental rights to "satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." § 1912(d). According to petitioners, this subsection directs state and local agencies to provide extensive services to the parents of Indian children. It is well established that the Tenth Amendment bars Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz* v. *United States*, 521 U. S. 898, 935 (1997). The "active efforts" provision, petitioners say, does just that.

Petitioners' argument has a fundamental flaw: To succeed, they must show that § 1912(d) harnesses a State's legislative or executive authority. But the provision applies to "any party" who initiates an involuntary proceeding, thus sweeping in private individuals and agencies as well as government entities. A demand that either public or private actors can satisfy is unlikely to require the use of sovereign power. *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___–___ (2018) (slip op., at 19–20).

Notwithstanding the term "any party," petitioners insist that § 1912(d) is "best read" as a command to the States. See *id.*, at ___ (slip op., at 21) (whether a federal law directly regulates the States depends on how it is "best read"). They contend that, as a practical matter, States—not private parties—initiate the vast majority of involuntary proceedings. Despite the breadth of the language, the argument goes, States are obviously the "parties" to whom the statute refers.

The record contains no evidence supporting the assertion that States institute the vast majority of involuntary proceedings. Examples of private suits are not hard to find, so we are skeptical that their number is negligible. See, *e.g.*, *Adoptive Couple* v. *Baby Girl*, 570 U. S. 637, 644–646 (2013) (prospective adoptive parents); *In re Guardianship of Eliza W.*, 304 Neb. 995, 997, 938 N. W. 2d 307, 310 (2020) (grandmother); *In re Guardianship of J. C. D.*, 2004 S. D. 96, ¶4, 686 N. W. 2d 647, 648 (2004) (grandparents); *In re Adoption of T. A. W.*, 186 Wash. 2d 828, 835–837, 850–851, 383 P. 3d 492, 494–495, 501–502 (2016) (en banc) (mother and stepfather); *J. W.* v. *R. J.*, 951 P. 2d 1206, 1212–1213 (Alaska 1998) (same). Indeed, Texas's own family code permits certain private parties to initiate suits for the termination of parental rights. Tex. Fam. Code Ann. § 102.003(a) (West Cum. Supp. 2022); see Reply Brief for Texas 27. And while petitioners treat "active efforts" as synonymous with "government programs," state courts have applied the "active efforts" requirement in private suits too. See, *e.g.*, *In re Adoption of T. A. W.*, 186 Wash. 2d, at 851–852, 383 P. 3d, at 502–503; *S. S.* v. *Stephanie H.*, 241 Ariz. 419, 424, 388 P. 3d 569, 574 (App. 2017); *In re N. B.*, 199 P. 3d 16, 23–24 (Colo. App. 2007). That is consistent with

ICWA's findings, which describe the role that both public and private actors played in the unjust separation of Indian children from their families and tribes. § 1901. Given all this, it is implausible that § 1912(d) is directed primarily, much less exclusively, at the States.[6]

 *14  Legislation that applies "evenhandedly" to state and private actors does not typically implicate the Tenth Amendment. *Murphy*, 584 U. S., at ___ (slip op., at 20). In *South Carolina* v. *Baker*, for example, we held that a generally applicable law regulating unregistered bonds did not commandeer the States; rather, it required States "wishing to engage in certain activity [to] take administrative and sometimes legislative action to comply with federal standards regulating that activity." 485 U. S. 505, 514–515 (1988). We reached a similar conclusion in *Reno* v. *Condon*, which dealt with a statute prohibiting state motor vehicle departments (DMVs) from selling a driver's personal information without the driver's consent. 528 U. S. 141, 143–144 (2000). The law regulated not only the state DMVs, but also private parties who had already purchased this information and sought to resell it. *Id.*, at 146. Applying *Baker*, we concluded that the Act did not "require the States in their sovereign capacity to regulate their own citizens," "enact any laws or regulations," or "assist in the enforcement of federal statutes regulating private individuals." 528 U. S., at 150–151. Instead, it permissibly "regulate[d] the States as the owners of data bases." *Id.*, at 151.

Petitioners argue that *Baker* and *Condon* are distinguishable because they addressed laws regulating a State's *commercial* activity, while ICWA regulates a State's "core sovereign function of protecting the health and safety of children within its borders." Brief for Petitioner Texas 66. A State can stop selling bonds or a driver's personal information, petitioners say, but it cannot withdraw from the area of child welfare —protecting children is the business of government, even if it is work in which private parties share. Nor, of course, could Texas avoid ICWA by excluding only Indian children from social services. Because States cannot exit the field, they are hostage to ICWA, which requires them to implement Congress's regulatory program for the care of Indian children and families. *Id.*, at 64–65; Reply Brief for Texas 27.

This argument is presumably directed at situations in which only the State can rescue a child from neglectful parents. But § 1912 applies to more than child neglect—for instance, it applies when a biological mother arranges for a private adoption without the biological father's consent. See, *e.g.*,

*Adoptive Couple*, 570 U. S., at 643–644. And even when a child is trapped in an abusive home, the State is not necessarily the only option for rescue—for instance, a grandmother can seek guardianship of a grandchild whose parents are failing to care for her. See, *e.g.*, *In re Guardianship of Eliza W.*, 304 Neb., at 996–997, 938 N. W. 2d, at 309–310. Petitioners do not distinguish between these varied situations, much less isolate a domain in which only the State can act. Some *amici* assert that, at the very least, removing children from imminent danger in the home falls exclusively to the government. Brief for Academy of Adoption and Assisted Reproduction Attorneys et al. as *Amici Curiae* 14 ("Amici are aware of no state in which a private actor may lawfully remove a child from his existing home"). Maybe so—but that does not help petitioners' commandeering argument, because the "active efforts" requirement does not apply to emergency removals. § 1922. If ICWA commandeers state performance of a "core sovereign function," petitioners do not give us the details.

When a federal statute applies on its face to both private and state actors, a commandeering argument is a heavy lift—and petitioners have not pulled it off. Both state and private actors initiate involuntary proceedings. And, if there is a core of involuntary proceedings committed exclusively to the sovereign, Texas neither identifies its contours nor explains what § 1912(d) requires of a State in that context. Petitioners have therefore failed to show that the "active efforts" requirement commands the States to deploy their executive or legislative power to implement federal Indian policy.

 *15  As for petitioners' challenges to other provisions of § 1912—the notice requirement, expert witness requirement, and evidentiary standards—we doubt that requirements placed on a State as litigant implicate the Tenth Amendment. But in any event, these provisions, like § 1912(d), apply to both private and state actors, so they too pose no anticommandeering problem.

B

Petitioners also raise a Tenth Amendment challenge to § 1915, which dictates placement preferences for Indian children. According to petitioners, this provision orders state agencies to perform a "diligent search" for placements that satisfy ICWA's hierarchy. Brief for Petitioner Texas 63; Reply Brief for Texas 24; see also Brief for Individual Petitioners 67–

68. Petitioners assert that the Department of the Interior understands § 1915 this way, 25 CFR § 23.132(c)(5), and the Tribes who intervene in proceedings governed by ICWA share that understanding—for example, "the Librettis' adoption of Baby O was delayed because the Ysleta del Sur Pueblo Tribe demanded that county officials exhaustively search for a placement with the Tribe first." Reply Brief for Texas 24–25. Just as Congress cannot compel state officials to search databases to determine the lawfulness of gun sales, *Printz*, 521 U. S., at 902–904, petitioners argue, Congress cannot compel state officials to search for a federally preferred placement.

As an initial matter, this argument encounters the same problem that plagues petitioners with respect to § 1912: Petitioners have not shown that the "diligent search" requirement, which applies to both private and public parties, demands the use of state sovereign authority. But this argument fails for another reason: Section 1915 does not require *anyone*, much less the States, to search for alternative placements. As the United States emphasizes, petitioners' interpretation "cannot be squared with this Court's decision in *Adoptive Couple*," which held that " 'there simply is no "preference" to apply if no alternative party that is eligible to be preferred ... has come forward.' " Brief for Federal Parties 44 (quoting 570 U. S., at 654); *Adoptive Couple*, 570 U. S., at 654 ("§ 1915(a)'s preferences are inapplicable in cases where no alternative party has formally sought to adopt the child"). Instead, the burden is on the tribe or other objecting party to produce a higher-ranked placement. *Ibid.* So, as it stands, petitioners assert an anticommandeering challenge to a provision that does not command state agencies to do anything.

State courts are a different matter. ICWA indisputably requires them to apply the placement preferences in making custody determinations. §§ 1915(a), (b). Petitioners argue that this too violates the anticommandeering doctrine. To be sure, they recognize that Congress can require state courts, unlike state executives and legislatures, to enforce federal law. See *New York* v. *United States*, 505 U. S. 144, 178–179 (1992) ("Federal statutes enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of federal 'direction' of state judges is mandated by the text of the Supremacy Clause"). But they draw a distinction between requiring state courts to entertain federal causes of action and requiring them to apply federal law to state causes of action. They claim that if state law provides the cause of action— as Texas law does here—then the State gets to call the shots,

unhindered by any federal instruction to the contrary. Brief for Individual Petitioners 62–63, 66–67.

**\*16**  This argument runs headlong into the Constitution. The Supremacy Clause provides that the "Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. Thus, when Congress enacts a valid statute pursuant to its Article I powers, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372 (2000). End of story. That a federal law modifies a state law cause of action does not limit its preemptive effect. See, *e.g.*, *Hillman*, 569 U. S., at 493–494 (federal law establishing an " 'order of precedence' " for beneficiaries of life insurance preempted state law); *Egelhoff* v. *Egelhoff*, 532 U. S. 141, 151–152 (2001) (Employee Retirement Income Security Act preempted state law regarding the economic consequences of divorce); *Wissner* v. *Wissner*, 338 U. S. 655, 660–661 (1950) (federal military benefits law preempted state community-property rules).

C

Finally, we turn to ICWA's recordkeeping provisions. Section 1951(a) requires courts to provide the Secretary of the Interior with a copy of the final order in the adoptive placement of any Indian child. The court must also provide "other information as may be necessary to show" the child's name and tribal affiliation, the names and addresses of the biological parents and adoptive parents, and the identity of any agency with information about the adoptive placement. Section 1915(e) requires the State to "maintai[n]" a record "evidencing the efforts to comply with the order of preference" specified by ICWA. The record "shall be made available at any time upon the request of the Secretary or the Indian child's tribe." Petitioners argue that Congress cannot conscript the States into federal service by assigning them recordkeeping tasks. [7]

The anticommandeering doctrine applies "distinctively" to a state court's adjudicative responsibilities. *Printz*, 521 U. S., at 907. As we just explained, this distinction is evident in the Supremacy Clause, which refers specifically to state judges. Art. VI, cl. 2. From the beginning, the text manifested in practice: As originally understood, the Constitution allowed Congress to require "state judges to enforce federal prescriptions, insofar as those prescriptions

related to matters appropriate for the judicial power." *Printz,* 521 U. S., at 907 (emphasis deleted). In *Printz,* we indicated that this principle may extend to tasks that are "ancillary" to a "quintessentially adjudicative task"—such as "recording, registering, and certifying" documents. *Id.,* at 908, n. 2.

Petitioners reject *Printz*'s observation, insisting that there is a distinction between rules of decision (which state courts must follow) and recordkeeping requirements (which they can ignore). But *Printz* described numerous historical examples of Congress imposing recordkeeping and reporting requirements on state courts. The early Congresses passed laws directing state courts to perform certain tasks fairly described as "ancillary" to the courts' adjudicative duties. For example, state courts were required to process and record applications for United States citizenship. Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103–104. The clerk (or other court official) was required "to certify and transmit" the application to the Secretary of State, along with information about "the name, age, nation, residence and occupation, for the time being, of the alien." Act of June 18, 1798, § 2, 1 Stat. 567. The clerk also had to register aliens seeking naturalization and issue certificates confirming the court's receipt of the alien's request for registration. Act of Apr. 14, 1802, § 2, 2 Stat. 155. [8]

**\*17** Federal law imposed other duties on state courts unrelated to immigration and naturalization. The Judiciary Act of 1789, which authorized "any justice of the peace, or other magistrate of any of the United States" to arrest and imprison federal offenders, required the judge to set bail at the defendant's request. § 33, 1 Stat. 91. Congress also required state courts to administer oaths to prisoners, to issue certificates authorizing the apprehension of fugitives, and to collect proof of the claims of Canadian refugees who had aided the United States in the Revolutionary War. Act of May 5, 1792, ch. 29, § 2, 1 Stat. 266 ("any person imprisoned ... may have the oath or affirmation herein after expressed administered to him by any judge of the United States, or of the general or supreme court of law of the state in which the debtor is imprisoned"); Act of Feb. 12, 1793, ch. 7, § 1, 1 Stat. 302 ("governor or chief magistrate of the state or territory" shall "certif[y] as authentic" an indictment or affidavit charging a "fugitive from justice"); Act of Apr. 7, 1798, § 3, 1 Stat. 548 ("proof of the several circumstances necessary to entitle the applicants to the benefits of this act, may be taken before ... a judge of the supreme or superior court, or the first justice or first judge of the court of common pleas or country court of any state").

There is more. Shortly after ratification, Congress passed a detailed statute that required state-court judges to gather and certify reports. Act of July 20, 1790, § 3, 1 Stat. 132. The Act authorized commanders of ships to request examinations of their vessels from any "justice of the peace of the city, town or place." *Ibid.* The judge would order three qualified people to prepare a report on the vessel's condition, which the judge would review and "endorse." *Ibid.* Then, the judge was required to issue an order regarding "whether the said ship or vessel is fit to proceed on the intended voyage; and if not, whether such repairs can be made or deficiencies supplied where the ship or vessel then lays." *Ibid.*

These early congressional enactments "provid[e] 'contemporaneous and weighty evidence' of the Constitution's meaning." *Bowsher* v. *Synar,* 478 U. S. 714, 723 (1986). Collectively, they demonstrate that the Constitution does not prohibit the Federal Government from imposing adjudicative tasks on state courts. This makes sense against the backdrop of the Madisonian Compromise: Since Article III established only the Supreme Court and made inferior federal courts optional, Congress could have relied almost entirely on state courts to apply federal law. *Printz,* 521 U. S., at 907. Had Congress taken that course, it would have had to rely on state courts to perform adjudication-adjacent tasks too.

We now confirm what we suggested in *Printz*: Congress may impose ancillary recordkeeping requirements related to state-court proceedings without violating the Tenth Amendment. Such requirements do not offload the Federal Government's responsibilities onto the States, nor do they put state legislatures and executives "under the direct control of Congress." *Murphy,* 584 U. S., at ___ (slip op., at 18). Rather, they are a logical consequence of our system of "dual sovereignty" in which state courts are required to apply federal law. See *Gregory* v. *Ashcroft,* 501 U. S. 452, 457 (1991).

Here, ICWA's recordkeeping requirements are comparable in kind and in degree to the historical examples. Like the naturalization laws, § 1951(a) requires the state court to transmit to the Secretary a copy of a court order along with basic demographic information. Section 1915(e) likewise requires the State to record a limited amount of information —the efforts made to comply with the placement preferences —and provide the information to the Secretary and to the child's tribe. These duties are "ancillary" to the state

court's obligation to conduct child custody proceedings in compliance with ICWA. *Printz,* 521 U. S., at 908, n. 2. Thus, ICWA's recordkeeping requirements are consistent with the Tenth Amendment.

IV

Petitioners raise two additional claims: an equal protection challenge to ICWA's placement preferences and a nondelegation challenge to the provision allowing tribes to alter the placement preferences. We do not reach the merits of these claims because no party before the Court has standing to raise them. Article III requires a plaintiff to show that she has suffered an injury in fact that is " 'fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *California* v. *Texas,* 593 U. S. ___, ___ (2021) (slip op., at 4). Neither the individual petitioners nor Texas can pass that test.

A

**\*18**  The individual petitioners argue that ICWA injures them by placing them on "[un]equal footing" with Indian parents who seek to adopt or foster an Indian child. *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656, 666 (1993). Under ICWA's hierarchy of preferences, non-Indian parents are generally last in line for potential placements. According to petitioners, this "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Ibid.*; see also *Turner* v. *Fouche,* 396 U. S. 346, 362 (1970) (the Equal Protection Clause secures the right of individuals "to be considered" for government positions and benefits "without the burden of invidiously discriminatory disqualifications"). The racial discrimination they allege counts as an Article III injury.[9]

But the individual petitioners have not shown that this injury is "likely" to be "redressed by judicial relief." *TransUnion LLC* v. *Ramirez,* 594 U. S. ___, ___ (2021) (slip op., at 7). They seek an injunction preventing the federal parties from enforcing ICWA and a declaratory judgment that the challenged provisions are unconstitutional. Yet enjoining the federal parties would not remedy the alleged injury, because state courts apply the placement preferences, and state agencies carry out the court-ordered placements. §§ 1903(1), 1915(a), (b); see also Brief for Individual Petitioners

63 ("There is no federal official who administers ICWA or carries out its mandates"). The state officials who implement ICWA are "not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced." *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 569 (1992) (plurality opinion). So an injunction would not give petitioners legally enforceable protection from the allegedly imminent harm.

Petitioners' request for a declaratory judgment suffers from the same flaw. See *Skelly Oil Co.* v. *Phillips Petroleum Co.,* 339 U. S. 667, 671–672 (1950). This form of relief conclusively resolves " 'the legal rights *of the parties.*' " *Medtronic, Inc.* v. *Mirowski Family Ventures, LLC,* 571 U. S. 191, 200 (2014) (emphasis added). But again, state officials are nonparties who would not be bound by the judgment. *Taylor* v. *Sturgell,* 553 U. S. 880, 892–893 (2008). Thus, the equal protection issue would not be settled between petitioners and the officials who matter—which would leave the declaratory judgment powerless to remedy the alleged harm. 994 F. 3d, at 448 (Costa, J., concurring in part and dissenting in part) ("What saves proper declaratory judgments from a redressability problem—but is lacking here—is that they have preclusive effect on a traditional lawsuit that is imminent"). After all, the point of a declaratory judgment "is to establish a binding adjudication that enables the parties to enjoy the benefits of reliance and repose secured by res judicata." 18A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4446 (3d ed. Supp. 2022). Without preclusive effect, a declaratory judgment is little more than an advisory opinion. *Ibid.*; see *Public Serv. Comm'n of Utah* v. *Wycoff Co.,* 344 U. S. 237, 242–243 (1952).

The individual petitioners do not dispute—or even address—any of this. Instead, they insist that state courts are likely to defer to a federal court's interpretation of federal law, thus giving rise to a substantial likelihood that a favorable judgment will redress their injury. Brief in Opposition for Individual Respondents 19–20; Reply Brief for Individual Petitioners 29. They point out that, in the Brackeens' ongoing efforts to adopt Y. R. J., the trial court stated that it would follow the federal court's ruling on the Brackeens' constitutional claims. *Ibid.* Thus, they reason, winning this case would solve their problems.

**\*19**  But "[r]edressability requires that the court be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Franklin*

v. *Massachusetts*, 505 U. S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment) (emphasis in original); see also *United States v. Juvenile Male*, 564 U. S. 932, 937 (2011) (*per curiam*) (a judgment's "possible, indirect benefit in a future lawsuit" does not preserve standing). Otherwise, redressability would be satisfied whenever a decision might persuade actors who are not before the court—contrary to Article III's strict prohibition on "issuing advisory opinions." *Carney* v. *Adams*, 592 U. S. ___, ___ (2020) (slip op., at 4). It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability. The individual petitioners can hope for nothing more than an opinion, so they cannot satisfy Article III. [10]

B

Texas also lacks standing to challenge the placement preferences. It has no equal protection rights of its own, *South Carolina* v. *Katzenbach*, 383 U. S. 301, 323 (1966), and it cannot assert equal protection claims on behalf of its citizens because "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U. S. 592, 610, n. 16 (1982). [11] That should make the issue open and shut.

Yet Texas advances a few creative arguments for why it has standing despite these settled rules. It leads with what one might call an "unclean hands" injury: ICWA "injures Texas by requiring it to break its promise to its citizens that it will be colorblind in child-custody proceedings." Reply Brief for Texas 15; *id.*, at 14 ("ICWA forces Texas to violate its own constitutional obligations"). This is not the kind of "concrete" and "particularized" "invasion of a legally protected interest" necessary to demonstrate an " 'injury in fact.' " *Lujan*, 504 U. S., at 560. Were it otherwise, a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law. Texas tries to finesse this problem by characterizing ICWA as a "fiscal trap," forcing it to discriminate against its citizens or lose federal funds. Brief for Petitioner Texas 39–40. But ICWA is not a Spending Clause statute—Texas bases this argument on a vague reference to a *different* Spending Clause statute that it does not challenge. And Texas has not established that those funds, which the State has accepted for years, are conditioned on compliance with the placement preferences anyway. See 42 U. S. C. § 622; Brief for Federal Parties 49, n. 6.

Texas also claims a direct pocketbook injury associated with the costs of keeping records, providing notice in involuntary proceedings, and producing expert testimony before moving a child to foster care or terminating parental rights. Reply Brief for Texas 13–14. But these alleged costs are not "fairly traceable" to the placement preferences, which "operate independently" of the provisions Texas identifies. *California*, 593 U. S., at ___ (slip op., at 15). The provisions do not rise or fall together; proving that the placement preferences are unconstitutional "would not show that enforcement of any of these other provisions violates the Constitution." *Ibid.* In other words, Texas would continue to incur the complained-of costs even if it were relieved of the duty to apply the placement preferences. The former, then, cannot justify a challenge to the latter.

**\*20** Because Texas is not injured by the placement preferences, neither would it be injured by a tribal resolution that altered those preferences pursuant to § 1915(c). Texas therefore does not have standing to bring either its equal protection or its nondelegation claims. [12]

* * *

For these reasons, we affirm the judgment of the Court of Appeals regarding Congress's constitutional authority to enact ICWA. On the anticommandeering claims, we reverse. On the equal protection and nondelegation claims, we vacate the judgment of the Court of Appeals and remand with instructions to dismiss for lack of jurisdiction.

It is so ordered.

Justice Gorsuch, with whom Justice Sotomayor and Justice Jackson join as to Parts I and III, concurring.
In affirming the constitutionality of the Indian Child Welfare Act (ICWA), the Court safeguards the ability of tribal members to raise their children free from interference by state authorities and other outside parties. In the process, the Court also goes a long way toward restoring the original balance between federal, state, and tribal powers the Constitution envisioned. I am pleased to join the Court's opinion in full. I write separately to add some historical context. To appreciate fully the significance of today's decision requires an understanding of the long line of policies that drove Congress to adopt ICWA. And to appreciate why that law

surely comports with the Constitution requires a bird's-eye view of how our founding document mediates between competing federal, state, and tribal claims of sovereignty.


I

The Indian Child Welfare Act did not emerge from a vacuum. It came as a direct response to the mass removal of Indian children from their families during the 1950s, 1960s, and 1970s by state officials and private parties. That practice, in turn, was only the latest iteration of a much older policy of removing Indian children from their families—one initially spearheaded by federal officials with the aid of their state counterparts nearly 150 years ago. In all its many forms, the dissolution of the Indian family has had devastating effects on children and parents alike. It has also presented an existential threat to the continued vitality of Tribes—something many federal and state officials over the years saw as a feature, not as a flaw. This is the story of ICWA. And with this story, it pays to start at the beginning.


A

When Native American Tribes were forced onto reservations, they understood that life would never again be as it was. M. Fletcher & W. Singel, Indian Children and the Federal–Tribal Trust Relationship, 95 Neb. L. Rev. 885, 917–918 (2017) (Fletcher & Singel). Securing a foothold for their children in a rapidly changing world, the Tribes knew, would require schooling. *Ibid.* So as they ceded their lands, Tribes also negotiated "more than 150" treaties with the United States that included "education-related provisions." Dept. of Interior, B. Newland, Federal Indian Boarding School Initiative Investigative Report 33 (May 2022) (BIA Report). Many tribal leaders hoped these provisions would lead to the creation of "reservation Indian schools that would blend traditional Indian education with the needed non-Indian skills that would allow their members to adapt to the reservation way of life." R. Cross, American Indian Education: The Terror of History and the Nation's Debt to the Indian Peoples, 21 U. Ark. Little Rock L. Rev. 941, 950 (1999).

**\*21** At first, Indian education typically came in the form of day schools, many of them "established through the ... efforts of missionaries or the wives of Army officers stationed at military reservations in the Indian country." Annual Report of the Commissioner of Indian Affairs to the Secretary of Interior, p. LXI (1886) (ARCIA 1886). At those day schools, "Indian children would learn English as a second language," along with "math and science." Fletcher & Singel 917–918. But the children lived at home with their families where they could continue to learn and practice "their languages, beliefs, and traditional knowledge." *Id.*, at 918. At least in those "early decades," schooling was "generally ... not compulsory" anyway. *Id.*, at 914.

The federal government had darker designs. By the late 1870s, its goals turned toward destroying tribal identity and assimilating Indians into broader society. See L. Lacey, The White Man's Law and the American Indian Family in the Assimilation Era, 40 Ark. L. Rev. 327, 356–357 (1986). Achieving those goals, officials reasoned, required the "complete isolation of the Indian child from his savage antecedents." ARCIA 1886, at LXI. And because "the warm reciprocal affection existing between parents and children" was "among the strongest characteristics of the Indian nature," officials set out to eliminate it by dissolving Indian families. Annual Report of the Commissioner of Indian Affairs to the Secretary of Interior 392 (1904).

Thus began Indian boarding schools. In 1879, the Carlisle Indian Industrial School opened its doors at the site of an old military base in central Pennsylvania. Carlisle's head, then-Captain Richard Henry Pratt, summarized the school's mission this way: "[A]ll the Indian there is in the race should be dead. Kill the Indian in him, and save the man." The Advantages of Mingling Indians With Whites, in Proceedings of the National Conference of Charities and Correction 46 (I. Barrows ed. 1892). From its inception, Carlisle depended on state support. The school "was deeply enmeshed with local governments and their services," and it was "expanded thanks to the Pennsylvania Legislature." Brief for American Historical Association et al. as *Amici Curiae* 11 (Historians Brief ). Ultimately, Carlisle became the model for what would become a system of 408 similar federal institutions nationwide. BIA Report 82. "The essential feature" of each was, in the federal government's own words, "the abolition of the old tribal relations." Annual Report of the Commissioner of Indian Affairs to the Secretary of Interior 28 (1910).

Unsurprisingly, "[m]any Indian families resisted" the federal government's boarding school initiative and "refus[ed] to send their children." S. Rep. No. 91–501, pt. 1, p. 12 (1969). But Congress would not be denied. It authorized the Secretary of the Interior to "prevent the issuing of rations or the furnishing of subsistence" to Indian families who would not

surrender their children. Act of Mar. 3, 1893, 27 Stat. 628, 635; see also, *e.g.*, Act of Feb. 14, 1920, 41 Stat. 410. When economic coercion failed, officials sometimes resorted to abduction. See BIA Report 36. As one official later recounted, officers would "visit the [Indian] camps unexpectedly with a detachment of [officers], and seize such children as were proper and take them away to school, willing or unwilling." ARCIA 1886, at 199. When parents "hurried their children off to the mountains or hid them away in camp," agents "chase[d] and capture[d] them like so many wild rabbits." *Ibid.* Fathers were described as "sullen," mothers "loud in their lamentations," and the children "almost out of their wits with fright." *Ibid.*

**\*22** Upon the children's arrival, the boarding schools would often seek to strip them of nearly every aspect of their identity. The schools would take away their Indian names and give them English ones. See BIA Report 53. The schools would cut their hair—a point of shame in many native communities, see J. Reyhner & J. Eder, American Indian Education 178 (2004) —and confiscate their traditional clothes. ARCIA 1886, at 199. Administrators delighted in the process, describing the "metamorphosis [a]s wonderful," and professing that, in the main, "the little savage seems quite proud of his appearance." *Ibid*. After intake, the schools frequently prohibited children from speaking their native language or engaging in customary cultural or religious practices. BIA Report 53. Nor could children freely associate with members of their own Tribe. Schools would organize dorms by the "[s]ize of cadets, and not their tribal relations," so as to further "br[eak] up tribal associations." ARCIA 1886, at 6.

Resistance could invite punishments that included "withholding food" and "whipping." BIA Report 54 (internal quotation marks omitted). Older boys faced "court-martial," with other Indian children serving as prosecutors and judges. Annual Report of the Commissioner of Indian Affairs to the Secretary of Interior 188 (1881). Even compliant students faced "[r]ampant physical, sexual, and emotional abuse; disease; malnourishment; overcrowding; and lack of health care." BIA Report 56. Given these conditions, it is unsurprising that many children tried (often unsuccessfully) to flee. *Id.*, at 55, n. 176 (recounting incidents). State officials played a key role in foiling those efforts. "[P]olice from a variety of jurisdictions" assisted in "captur[ing] and return[ing] runaway school children." Historians Brief 11–12. For "the runaways," school administrators believed "a whipping administered soundly and prayerfully, helps greatly towards bringing about the desired result." BIA Report 55

(internal quotation marks omitted). As one Commissioner of Indian Affairs put it, while "[t]he first wild redskin placed in the school[s] chafes at the loss of freedom and longs to return to his wildwood home," that resistance would fade "with each successive generation," leaving a "greater desir[e] to be in touch with the dominant race." *Id.*, at 51–52 (internal quotation marks omitted).

Adding insult to injury, the United States stuck Tribes with a bill for these programs. At points, as much as 95% of the funding for Indian boarding schools came from "Indian trust fund monies" raised by selling Indian land. *Id.*, at 44. To subsidize operations further, the boarding schools frequently required children not even 12 years old to work on the grounds. *Id.*, at 62–63. Some rationalized this experience as a benefit to the children. *Id.*, at 59–63. But in candor, Indian boarding schools "could not possibly be maintained ... were it not for the fact that students [were] required to do ... an amount of labor that ha[d] in the aggregate a very appreciable monetary value." L. Meriam, Institute for Government Research, The Problem of Indian Administration 376 (1928) (Meriam Report).

To lower costs further and promote assimilation, some schools created an "outing system," which sent Indian children to live "with white families" and perform "household and farm chores" for them. R. Trennert, From Carlisle to Phoenix: The Rise and Fall of the Indian Outing System, 1878–1930, 52 Pacific Hist. Rev. 267, 273 (1983). This program took many Indian children "even further from their homes, families, and cultures." Fletcher & Singel 943. Advocates of the outing system hoped it would be "extended until every Indian child was in a white home." D. Otis, The Dawes Act and the Allotment of Indian Lands 68 (1973). In some respects, outing-system advocates were ahead of their time. The program they devised laid the groundwork for the system of mass adoption that, as we shall see, eventually moved Congress to enact ICWA many decades later.

**\*23** In 1928, the Meriam Report, prepared by the Brookings Institution, examined conditions in the Indian boarding schools. It found, "frankly and unequivocally," that "the provisions for the care of the Indian children ... are grossly inadequate." Meriam Report 11. It recommended that the federal government "accelerat[e]" the "mov[e] away from the boarding school" system in favor of "day school or public school facilities." *Id.*, at 35. That transition would be slow to materialize, though. As late as 1971, federal boarding schools continued to house "more than 17 per cent of the

Indian school-age population." W. Byler, The Destruction of American Indian Families 1 (S. Unger ed. 1977) (AAIA Report).

B

The transition away from boarding schools was not the end of efforts to remove Indian children from their families and Tribes; more nearly, it was the end of the beginning. As federal boarding schools closed their doors and Indian children returned to the reservations, States with significant Native American populations found themselves facing significant new educational and welfare responsibilities. Historians Brief 13–18. Around this time, as fate would have it, "shifting racial ideologies and changing gender norms [had] led to an increased demand for Indian children" by adoptive couples. M. Jacobs, Remembering the "Forgotten Child": The American Indian Child Welfare Crisis of the 1960s and 1970s, 37 Am. Indian Q. 136, 141 (2013). Certain States saw in this shift an opportunity. They could "save ... money" by "promoting the *adoption* of Indian children by private families." *Id.*, at 153.

This restarted a now-familiar nightmare for Indian families. The same assimilationist rhetoric previously invoked by the federal government persisted, "voiced this time by state and county officials." L. George, Why the Need for the Indian Child Welfare Act?, 5 J. of Multicultural Social Work 165, 169 (1997). " 'If you want to solve the Indian problem you can do it in one generation,' " one official put it. *Ibid.* " 'You can take all of [the] children of school age and move them bodily out of the Indian country and transport them to some other part of the United States.' " *Ibid.* This would allow " 'civilized people' " to raise the children, instead of their families or their tribal communities. *Ibid.*

In this respect, "[t]he removal of Indian children by [S]tates ha[d] much in common with Indian boarding schools." Fletcher & Singel 952. Through the 1960s and 1970s, Indian-child removal reached new heights. Surveys conducted in 1969 and 1974 showed that "approximately 25–35 per cent of all Indian children [were] separated from their families." AAIA Report 1. Often, these removals whisked children not only out of their families but out of their communities. Some estimate that "more than 90 per cent of non-related adoptions of Indian children [were] made by non-Indian couples." *Id.*, at 2.

These family separations frequently lacked justification. According to one report, only about "1 per cent" of the separations studied involved alleged physical abuse. *Ibid.* The other 99 percent? "[V]ague grounds" such as "neglect" or 'social deprivation.' " *Ibid.* These determinations, often "wholly inappropriate in the context of Indian family life," came mainly from non-Indian social workers, many of whom were "ignorant of Indian cultural values and social norms." *Id.*, at 2–3. They routinely penalized Indian parents for conditions of "[p]overty, poor housing, lack of modern plumbing, and overcrowding." *Id.*, at 3. One 3-year-old Sioux child, for instance, was removed from her family on the State's "belief that an Indian reservation is an unsuitable environment for a child." *Ibid.* So it was that some Indian families, "forced onto reservations at gunpoint," were later "told that they live[d] in a place unfit for raising their children." *Id.*, at 3–4.

***24** Aggravating matters, these separations were frequently "carried out without due process of law." *Id.*, at 4. Children and their parents rarely had counsel. *Ibid.* For that matter, few cases saw the inside of a courtroom. Welfare departments knew that they could threaten to withhold benefit payments if Indian parents did not surrender custody. *Id.*, at 4–5. Nor were threats always necessary. After all the Tribes had suffered at the government's hands, many parents simply believed they had no power to resist. *Ibid.* One interviewed mother "wept that she did not dare protest the taking of her children for fear of going to jail." *Id.*, at 7. For those Indian parents who did resist, "simple abduction" remained an option. *Id.*, at 5. Parents were, for instance, sometimes tricked into signing forms that they believed authorized only a brief removal of their children. *Ibid.* Only later would they discover that the forms purported to surrender full custody. *Ibid.*

Like the boarding school system that preceded it, this new program of removal had often-disastrous consequences. "Because the family is the most fundamental economic, educational, and health-care unit" in society, these "assaults on Indian families" contributed to the precarious conditions that Indian parents and children already faced. *Id.*, at 7–8. Many parents came to "feel hopeless, powerless, and unworthy"—further feeding the cycle of removal. *Id.*, at 8. For many children, separation from their families caused "severe distress" that "interfere[d] with their physical, mental, and social growth and development." *Ibid.* It appears, too, that Indian children were "significantly more likely" to experience "physical, sexual, [and] emotional" abuse in foster and adoptive homes than their white counterparts. A. Landers, S. Danes, A. Campbell, & S. White Hawk, Abuse After Abuse:

The Recurrent Maltreatment of American Indian Children in Foster Care and Adoption, 111 Child Abuse & Neglect 104805, p. 9 (2021).

All that often translated into long-lasting adverse health and emotional effects. See M. Yellow Horse Brave Heart, The Historical Trauma Response Among Natives and Its Relationship with Substance Abuse: A Lakota Illustration, 35 J. of Psychoactive Drugs 1, 7–13 (2003); U. Running Bear et al., The Impact of Individual and Parental American Indian Boarding School Attendance on Chronic Physical Health of Northern Plains Tribes, 42 Family & Community Health 1, 3–7 (2019). As one study warned: "[E]fforts to make Indian children 'white,' " by removing them from their Tribes, "can destroy them." AAIA Report 9.

C

Eventually, Congress could ignore the problem no longer. In 1978, it responded with the Indian Child Welfare Act. 92 Stat. 3096. The statute's findings show that Congress was acutely aware of the scope of the crisis. "[A]n alarmingly high percentage of Indian families," Congress observed, were being "broken up by the removal, often unwarranted, of their children from them by nontribal [state] public and private agencies." 25 U. S. C. § 1901(4). And "an alarmingly high percentage of such children" were "placed in nonIndian foster and adoptive homes and institutions." *Ibid.* Removal at that scale threatened the "continued existence and integrity of Indian [T]ribes." § 1901(3).

The statute Congress settled upon contains various provisions aimed at addressing this crisis. At bottom, though, the law's operation is simple. It installs substantive and procedural guardrails against the unjustified termination of parental rights and removal of Indian children from tribal life.

The touchstone of the statute is notice. In any involuntary removal proceeding involving an Indian child, the initiating party must inform (1) the parent or custodian; and (2) the child's Tribe. § 1912(a). Either or both can intervene. § 1911(c). ICWA also makes it harder for the moving party to win an involuntary removal proceeding. The party must show that "active efforts" have been made to avoid removing the Indian child. § 1912(d). It must show the status quo is "likely to result in serious emotional or physical damage to the child." § 1912(e), (f ). And it must prove that fact by "clear and convincing evidence," § 1912(e) (for placement in

foster services), or "beyond a reasonable doubt," § 1912(f ) (for termination of parental rights).

**\*25** Even when it comes to voluntary removal proceedings, ICWA sets certain "minimum Federal standards" for "the placement of [Indian] children in foster or adoptive homes." § 1902. In any adoptive placement, a court by default must give preference to "(1) a member of the child's extended family; (2) other members of the Indian child's [T]ribe; or (3) other Indian families." § 1915(a). This priority governs unless the initiating party can show "good cause." *Ibid.* A similar regime applies by default to foster-care or preadoptive placements. § 1915(b). But note that "by default." ICWA gives Tribes a voice. It allows them to establish a "different order of preference by resolution," provided it is "the least restrictive setting appropriate to the particular needs of the child." § 1915(c).

Recognizing that coercion remains possible even with these protections, ICWA also allows for postplacement relief. It lets the Indian child, the parent, or the Tribe "petition any court of competent jurisdiction" to "invalidate" an order that violated key provisions of ICWA. § 1914. Of special relevance, an Indian parent consenting to adoption has two years to withdraw consent on "the grounds that consent was obtained through fraud or duress." § 1913(d).

ICWA is not a panacea. While "[a]dopting ICWA marked one step toward upholding tribal rights," "many [S]tates" have struggled with "effective implementation." Maine Wabanaki–State Child Welfare Truth & Reconciliation Commission, Beyond the Mandate: Continuing the Conversation 12 (2015). Others resist ICWA outright, as the present litigation by Texas attests. See generally M. Fletcher & W. Singel, Lawyering the Indian Child Welfare Act, 120 Mich. L. Rev. 1755 (2022). Still, the statute "has achieved considerable success in stemming unwarranted removals by state officials of Indian children from their families and communities." B. Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance, 51 Emory L. J. 587, 621 (2002). And considerable research "[s]ubsequent to Congress's enactment of ICWA" has "borne out the statute's basic premise"—that "[i]t is generally in the best interests of Indian children to be raised in Indian homes." Brief for American Psychological Association et al. as *Amici Curiae* 10–24.

II

This history leads us to the question at the heart of today's cases: Did Congress lack the constitutional authority to enact ICWA, as Texas and the private plaintiffs contend? In truth, that is not one question, but many. What authorities do the Tribes possess under our Constitution? What power does Congress have with respect to tribal relations? What does that mean for States? And how do those principles apply in a context like adoption, which involves competing claims of federal, state, *and* tribal authority?

Answering these questions requires a full view of the Indian-law bargain struck in our Constitution. Under the terms of that bargain, Indian Tribes remain independent sovereigns with the exclusive power to manage their internal matters. As a corollary of that sovereignty, States have virtually no role to play when it comes to Indian affairs. To preserve this equilibrium between Tribes and States, the Constitution vests in the federal government a set of potent (but limited and enumerated) powers. In particular, the Indian Commerce Clause gives Congress a robust (but not plenary) power to regulate the ways in which non-Indians may interact with Indians. To understand each of those pieces—and how they fit together—is to understand why the Indian Child Welfare Act must survive today's legal challenge.

This is all much more straightforward than it sounds. Take each piece of the puzzle in turn. Then, with the full constitutional picture assembled, return to ICWA's provisions. By then, you will have all you need to see why the Court upholds the law.

A

**\*26** Start with the question how our Constitution approaches tribal sovereignty. In the years before Jamestown, Indian Tribes existed as "self-governing sovereign political communities." *United States* v. *Wheeler*, 435 U. S. 313, 322–323 (1978). They employed "sophisticated governmental models," formed "[c]onfederacies" with one another, and often engaged in decisionmaking by "consensual agreement." 1 B. Pritzker, Native Americans: An Encyclopedia of History, Culture, and Peoples xii (1998).

When the British crossed the Atlantic, they brought with them their own legal understandings. A seasoned colonial power, Britain was no stranger to the idea of "tributary" and "feudatory" states. E. de Vattel, Law of Nations 60–61 (1805) (Vattel). And it was a long-held tenet of international law that such entities do not "cease to be sovereign and independent" even when subject to military conquest—at least not "so long as self government and sovereign and independent authority are left in the[ir] administration." *Worcester* v. *Georgia*, 6 Pet. 515, 561 (1832). For that reason, early "history furnishes no example, from the first settlement of our country, of any attempt on the part of the [C]rown to interfere with the internal affairs of the Indians." *Id.*, at 547; see also Vattel 60. Instead, the "settled state of things" reflected the British view that Tribes were "nations capable of maintaining the relations of peace and war; [and] of governing themselves." 6 Pet., at 548–549.

Consistent with that understanding, the British regarded "the Indians as owners of their land." S. Banner, How the Indians Lost Their Land: Law and Power on the Frontier 12 (2005). Britain often purchased land from Tribes (at least nominally) and predicated its system of legal title on those purchases. *Ibid.* The Crown entered into all manner of treaties with the Tribes too—just as it did with fellow European powers. See, *e.g.*, Letter from Gov. Burnet to Lords of Trade, Nov. 21, 1722, concerning the Great Treaty of 1722 Between the Five Nations, the Mahicans, and the Colonies of New York, Virginia, and Pennsylvania, in 5 Documents Relative to the Colonial History of the State of New York 655–681 (E. O'Callaghan ed. 1955); Deed in Trust From Three of the Five Nations of Indians to the King in 1726, in *id.*, at 800–801; A Treaty Held at the Town of Lancaster with the Indians of the Six Nations in 1744, in Indian Treaties, Printed by Benjamin Franklin, 1736–1762, pp. 43–49 (1938).

Ultimately, "the American Revolution replaced that legal framework with a similar one." *Oklahoma* v. *Castro-Huerta*, 597 U. S. ___, ___ (2022) (GORSUCH, J., dissenting) (slip op., at 2). The newly independent Nation wasted no time entering into treaties of its own—in no small part to secure its continued existence against external threats. See, *e.g.*, Articles of Agreement and Confederation, Sept. 17, 1778, 7 Stat. 13. In practice, too, "[t]he new Republic" broadly recognized "the sovereignty of Indian [T]ribes," even if it did so "sometimes grudgingly." W. Quinn, Federal Acknowledgment of American Indian Tribes: The Historical Development of a Legal Concept, 34 Am. J. L. Hist. 331, 337 (1990). As we will see, the period under the Articles of Confederation was marred by significant conflict, driven by state and individual intrusions on tribal land. But the

Constitution that followed reflected an understanding that Tribes enjoy a power to rule themselves that no other governmental body—state or federal—may usurp.

**\*27** Several constitutional provisions prove the point. One sure tell is the federal government's treaty power. See Art. II, § 2, cl. 2. Because the United States "adopted and sanctioned the previous treaties with the Indian nations, [it] consequently admit[ted the Tribes'] rank among those powers who are capable of making treaties." *Worcester*, 6 Pet., at 559. Similarly, the Commerce Clause vests in Congress the power to "regulate Commerce with foreign Nations," "among the several States," and "with the Indian Tribes," Art. I, § 8, cl. 3—conferrals of authority with respect to three separate sorts of sovereign entities that do not entail the power to eliminate any of them. Even beyond that, the Constitution exempts from the apportionment calculus "Indians not taxed." § 2, cl. 3. This formula "ratified the legal treatment of tribal Indians [even] within the [S]tates as separate and sovereign peoples, who were simply not part of the state polities." R. Clinton, The Dormant Indian Commerce Clause, 27 Conn. L. Rev. 1055, 1150 (1995) (Clinton 1995). (The Fourteenth Amendment would later reprise this language, Amdt. 14, § 2, confirming both the enduring sovereignty of Tribes and the bedrock principle that Indian status is a "political rather than racial" classification, *Morton* v. *Mancari*, 417 U. S. 535, 553, n. 24 (1974).)

Given these express provisions, the early conduct of the political branches comes as little surprise. From the beginning, the "Washington Administration acknowledged considerable Native autonomy." G. Ablavsky, Beyond the Indian Commerce Clause, 124 Yale L. J. 1012, 1067 (2015) (Ablavsky 2015). Henry Knox, President Washington's Secretary of War, described the Tribes as akin to "foreign nations, not as the subjects of any particular [S]tate." Letter to G. Washington (July 7, 1789), in 3 Papers of George Washington: Presidential Series 134–141 (D. Twohig ed. 1989). Thomas Jefferson spoke of them as maintaining "full, undivided, and independent sovereignty as long as they chose to keep it," commenting also "that this might be for ever." Notes on Cabinet Opinions (Feb. 26, 1793), in 25 Papers of Thomas Jefferson 271–272 (J. Catanzariti ed. 1992). This view would later feature in a formal opinion of the Attorney General, who explained that, "[s]o long as a [T]ribe exists ... its title and possession are sovereign and exclusive; and there exists no authority to enter upon their lands, for any purpose whatever, without their consent." 1 Op. Atty. Gen. 465, 466 (1821).

What went for the Executive went for Congress. In the first few decades of the Nation's existence, the Legislative Branch passed a battery of statutes known as the Indian Trade and Intercourse Acts. See, *e.g.*, Act of July 22, 1790, ch. 33, 1 Stat. 137; Act of Mar. 1, 1793, ch. 19, 1 Stat. 329; Act of May 19, 1796, ch. 30, 1 Stat. 469; Act of Mar. 30, 1802, ch. 13, 2 Stat. 139; Act of June 30, 1834, 4 Stat. 729. Without exception, those Acts "either explicitly or implicitly regulated only the non-Indians who venture[d] into Indian country to deal with Indians," and "did not purport to regulate the [T]ribes or their members" in any way. R. Clinton, There is No Federal Supremacy Clause for Indian Tribes, 34 Ariz. St. L. J. 113, 134 (2002) (Clinton 2002).

This Court recognized many of these same points in its early cases. For example, in *Worcester*, the State of Georgia sought to seize Cherokee lands, abolish the Tribe and its laws, and apply its own criminal laws to tribal lands. 6 Pet., at 525–528. Holding Georgia's laws unconstitutional, this Court acknowledged that Tribes remain "independent political communities, retaining their original natural rights." *Id.*, at 559. While "necessarily dependent on" the United States, *id.*, at 555, under "the settled doctrine of the law of nations," the Court held, "a weaker power does not surrender its independence—its right to self-government, by associating with a stronger and taking its protection," *id.*, at 560–561. The Cherokee, like other Tribes, remained "a distinct community occupying its own territory ... in which the laws of [the State] can have no force, and which the citizens of [that State] have no right to enter, but with the assent of the [Tribe] themselves, or in conformity with treaties, and with the acts of [C]ongress." *Id.*, at 561. Justice McLean, concurring, put it succinctly: "All the rights which belong to self-government have been recognized as vested in [the Tribes]." *Id.*, at 580.

**\*28** In the end, President Jackson refused to abide by the Court's decision in *Worcester*, precipitating the Trail of Tears. He is quoted as saying: " 'John Marshall has made his decision; now let him enforce it.' " F. Cohen, Handbook of Federal Indian Law 123 (1942). But just as this Court had no power to enforce its judgment, President Jackson had no power to erase its reasoning. So the rule of *Worcester* persisted in courts of law, unchanged, for decades. Recognizing the inherent sovereignty of Tribes, this Court held that States could not tax Indian land. See, *e.g.*, The Kansas Indians, 5 Wall. 737, 751–761 (1867); The New York Indians, 5 Wall. 761, 771–772 (1867). It held that the Fourteenth Amendment did not apply on Indian land. See *Elk* v. *Wilkins*, 112 U. S.

94, 99–109 (1884). And it sharply limited even the power of the federal government to prosecute crimes between Indians on Indian land where the Tribe had stepped in to resolve the dispute. See *Ex parte Crow Dog*, 109 U. S. 556, 572 (1883).

Nor did later developments call this original understanding into doubt. To be sure, in 1871, Congress declared that Tribes (prospectively) are no longer parties "with whom the United States may contract by treaty." Act of Mar. 3, 1871, 16 Stat. 566, codified at 25 U. S. C. § 71; but see *United States v. Lara*, 541 U. S. 193, 218 (2004) (THOMAS, J., concurring in judgment) (describing the Act as "constitutionally suspect"); M. Pearl, Originalism and the Indians, 93 Tulane L. Rev. 269, 330–331 (2018) (Pearl) (similar). But the sponsors of that Act sought only to increase the role of bicameral legislation in managing Indian affairs. See *Antoine v. Washington*, 420 U. S. 194, 202–203 (1975). The law did not purport to "invalidat[e] or impai[r]" any existing "obligation of any treaty lawfully made and ratified." 25 U. S. C. § 71. And the law did not abridge, nor could it have validly abridged, the long-settled view of tribal sovereignty. In fact, the United States proceeded to enter into roughly 400 further executive agreements with the Tribes practically indistinguishable from the treaties that came before. See generally V. Deloria & R. DeMallie, Documents of American Indian Diplomacy: Treaties, Agreements, and Conventions, 1775–1979 (1999). Keep this original understanding of tribal sovereignty in mind. It provides an essential point of framing.

B

Just as the Constitution safeguards the sovereign authority of Tribes, it comes with a "concomitant jurisdictional limit on the reach of state law" over Indian affairs. *McClanahan v. Arizona Tax Comm'n*, 411 U. S. 164, 171 (1973). As this Court has consistently recognized, "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U. S. 786, 789 (1945). Instead, responsibility for managing interactions with the Tribes rests exclusively with the federal government. To appreciate this point, walk through time once more.

Since the first days of British rule, the Crown oversaw— and retained the power to dictate—the Colonies' engagement with the Indian Tribes. See Clinton 1995, at 1064–1098. In response to a pattern of conflict arising out of colonial intrusion on tribal land, that supervision grew increasingly exacting. *Ibid.*; see also R. Clinton, The Proclamation of 1763: Colonial Prelude to Two Centuries of Federal-State Conflict Over the Management of Indian Affairs, 69 B. U. L. Rev. 329, 331–337 (1989) (Clinton 1989). In 1743, for example, a British royal commission rejected an effort by the colony of Connecticut to exercise independent jurisdiction over a Tribe within its borders. *Id.*, at 335–336. The decision rested on a now-familiar logic: "The Indians, though living amongst the king's subjects in these countries, are a *separate and distinct people from them*, they are treated with as such, *they have a polity of their own*, they make peace and war with any nation of Indians when they think fit, *without controul* from the English." Opinion of Comm'r Horsmanden, Aug. 1, 1743, in Governor and Company of Connecticut, and Mohegan Indians, By Their Guardians 126 (1743).

**\*29** The mere suggestion of colonial management of tribal relations catalyzed further "centralization of oversight and control of colonial Indian regulation by the British government," culminating in the Proclamation of 1763. Clinton 1989, at 336. That proclamation announced the Crown's intent to manage all "land cessions, diplomatic and other relations, and trade with the Indian [T]ribes," and to displace contrary colonial practice. *Id.*, at 357. Britain never had a chance to iron out the kinks of that approach before the Revolutionary War broke out. But "[i]mmediately prior to 1776, the stage was set" for "complete imperial control over the management of Indian matters." *Id.*, at 362.

After the Revolution, the Articles of Confederation gave the newly formed "[U]nited [S]tates ... the sole and exclusive right and power of ... managing all affairs with the Indians, not members of any of the [S]tates." Art. IX (1777). In providing that grant of authority, the Articles' drafters may have meant to codify the centralized approach the British had pursued. But the "byzantine" document the drafters created, Ablavsky 2015, at 1034, came with a pair of easily exploited loopholes. First, the language of its Indian affairs clause allowed some to claim that various Tribes were " 'members' " of the States and thus "exclusively or principally subject to state legislative control." Clinton 1995, at 1103, 1150. Second, owing to a fear that the phrase "sole and exclusive" could give the misimpression that States lacked power to manage their own affairs, the Articles' drafters added another clause stipulating that "the legislative right of any [S]tate within its own limits be not infringed or violated." Art IX. Taken literally, that provision meant only that the Articles left to States what belonged to the States and to the Tribes what belonged to the Tribes. But some States saw in that language too an

opportunity to assert their own control. See Clinton 1995, at 1103, 1107, 1113–1118, 1128–1131.

The result? A season of conflict brought about by state and private encroachments on tribal authority. G. Ablavsky, The Savage Constitution, 63 Duke L. J. 999, 1035–1036 (2014) (Ablavsky 2014). By the time the Constitutional Convention rolled around, "Indian uprisings had occurred ... in the Ohio River Valley and Virginia," "the Creeks and Georgia were on the brink of open warfare," and there was significant turmoil "on the western frontier." Clinton 1995, at 1147. Those events were not lost on the framers. As they debated how to broker enduring peace, two predominant schools of thought emerged. Madison and his followers favored preventing intrusions on Indian land and interests; Hamilton and his adherents favored resort to military might. Ablavsky 2014, at 1035–1038. Both sides, however, found agreement on the "need for a stronger federal government" presence, without the impediment of state interference. Id., at 1038.

Even as the Constitutional Convention assembled, a committee of the Continental Congress noted that it "had been long understood and pretty well ascertained" that the Crown's absolute powers to "manag[e] Affairs with the Indians" passed in its "entire[ty] to the Union" following Independence, meaning that "[t]he laws of the State can have no effect upon a [T]ribe of Indians or their lands within the limits of the [S]tate so long as that [T]ribe is independent." 33 Journals of the Continental Congress 1774–1789, p. 458 (R. Hill ed. 1936). That had to be so, the committee observed, for the same reason that individual States could not enter treaties with foreign powers: "[T]he Indian [T]ribes are justly considered the common friends or enemies of the United States, and no particular [S]tate can have an exclusive interest in the management of Affairs with any of the [T]ribes." Id., at 459.

**\*30** This understanding found its way directly into the text of the Constitution. The final version assigned the newly formed federal government a bundle of powers that encompassed "all that is required for the regulation of [the Nation's] intercourse with the Indians." Worcester, 6 Pet., at 559. By contrast, the Constitution came with no indication that States had any similar sort of power. Indeed, it omitted the nettlesome language in the Articles about the "legislative right" of States. Not only that. The Constitution's express exclusion of "Indians not taxed" from the apportionment formula, Art. I, § 2, cl. 3, threw cold water on some States' attempts to claim that Tribes fell within their territory—and therefore their

control. And, lest any doubt remain, the Constitution divested States of any power to "enter into any Treaty, Alliance, or Confederation." § 10, cl. 1. By removing that diplomatic power, the Constitution's design also divested them of the leading tool for managing tribal relations at that time.

The Constitution's departure from the Articles' articulation was praised by many and criticized by some. Federalists (such as James Madison) applauded the fact that the new federal government would be "unfettered" by the Articles' constraints. The Federalist No. 42, p. 268 (C. Rossiter ed. 1961). Certain Anti-Federalists (including Abraham Yates Jr.) disfavored the "tota[l] surrender into the hands of Congress [of] the management and regulation of the Indian affairs." Letter to Citizens of New York (June 13–14, 1788), in 20 Documentary History of the Ratification of the Constitution 1153, 1158 (J. Kaminski et al. eds. 2004) (emphasis added). At bottom, however, no one questioned that the Constitution took a view about where the power to manage Indian affairs would reside in the future. And no one doubted that it selected the federal government, not the States.

Early practice confirmed this understanding. "The Washington Administration insisted that the federal government enjoyed exclusive constitutional authority" over managing relationships with the Indian Tribes. Ablavsky 2015, at 1019. As President Washington put it, the federal government "possess[ed] the only authority of regulating an intercourse with [the Tribes], and redressing their grievances." Letter to T. Mifflin (Sept. 4, 1790), in 6 The Papers of George Washington: Presidential Series 396 (D. Twohig ed. 1996) (emphasis added). Even "many state officials agreed" with President Washington's assessment. Ablavsky 2015, at 1019. South Carolina Governor Charles Pinckney acknowledged that "the sole management of India[n] affairs" is "committed" to "the general Government." Letter to G. Washington (Dec. 14, 1789), in 4 Papers of George Washington: Presidential Series 404 (D. Twohig ed. 1996). Other leading proponents of States' rights reluctantly drew the same conclusion. "[U]nder the present Constitution," Thomas Jefferson lamented, States lack any "right to Treat with the Indians without the consent of the General Government." Letter to H. Knox (Aug. 10, 1791), in 22 Papers of Thomas Jefferson 27 (C. Cullen ed. 1986).

For its part, this Court understood the absence of state authority over tribal matters as a natural corollary of Tribes' inherent sovereignty. Precisely because Tribes exist as a "distinct community," this Court concluded in Worcester, the

"laws of [States] can have no force" as to them. 6 Pet., at 561. States could no more prescribe rules for Tribes than they could legislate for one another or a foreign sovereign. More than that, this Court recognized that "[t]he *whole* intercourse between the United States and [each Tribe], is by our [C]onstitution and laws, vested in the government of the United States." *Ibid.* (emphasis added). State laws cannot "interfere forcibly with the relations established between the United States and [an Indian Tribe], the regulation of which, according to the settled principles of our [C]onstitution, are committed *exclusively* to the government of the [U]nion." *Ibid.* (emphasis added). That principle, too, has endured. No one can contest the " 'historic immunity from state and local control' " that the Tribes enjoy, nor the permissibility of constitutional provisions enacted to protect the Tribes' "sovereign status." *New Mexico* v. *Mescalero Apache Tribe,* 462 U. S. 324, 332 (1983). Tuck that point away too.

C

**\*31** We now know that, at the founding, the Tribes retained their sovereignty. We know also that States have virtually no role to play in managing interactions with Tribes. From this, it follows that "[t]he only restriction on the power" of Tribes "in respect to [their] internal affairs" arises when their actions "conflict with the Constitution or laws of the United States." *Roff* v. *Burney,* 168 U. S. 218, 222 (1897). In cases like that, the Constitution provides, federal law must prevail. See Art. VI. This creates a hydraulic relationship between federal and tribal authority. The more the former expands, the more the latter shrinks. All of which raises the question: What powers does the federal government possess with respect to Tribes?

1

Because the federal government enjoys only "limited" and "enumerated powers," we look to the Constitution's text. *McCulloch* v. *Maryland,* 4 Wheat. 316, 405 (1819). Notably, our founding document does not include a plenary federal authority over Tribes. Nor was this an accident, at least not in the final accounting. The framers considered a general Indian Affairs Clause but left it on the cutting-room floor. See L. Toler, The Missing Indian Affairs Clause, 88 U. Chi. L. Rev. 413, 444–476 (2021) (Toler). That choice reflects an important insight about the Constitution's Indian-law bargain: "Without an Indian affairs power," any

assertion of unbounded federal authority over the Tribes is "constitutionally wanting." *Id.,* at 476.

Instead of a free-floating Indian-affairs power, the framers opted for a bundle of federal authorities tailored to "the regulation of [the Nation's] intercourse with the Indians." *Worcester,* 6 Pet., at 559. In keeping with the framers' faith in the separation of powers, they chose to split those authorities "between the [E]xecutive and the [L]egislature." Toler 479. "The residue of Indian affairs power"—all those Indian-related powers not expressly doled out by the Constitution—remained the province of "the sovereign [T]ribes." *Id.,* at 481.

What was included in the federal government's bundle of enumerated powers? In the early years, the most important component was the authority to "make Treaties" with the Tribes. Art. II, § 2, cl. 2. But other provisions also facilitated the management of Indian relations. The Constitution vested in Congress the power to "declare War" against the Tribes. Art. I., § 8, cl. 11. It gave Congress authority to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States," allowing it considerable power over Indians on federal territory. Art. IV, § 3, cl. 2. The Constitution also authorized Congress to employ its spending power to divert funds toward Tribes. Art. I, § 8, cl. 1. Where all those powers came up short, the Constitution afforded the federal government the power to "regulate Commerce with foreign Nations and among the several States, and *with the Indian Tribes.*" § 8, cl. 3 (emphasis added). Much of modern federal Indian law rests on that commerce power. It demands a closer look.

2

Contained in a single sentence, what we sometimes call "the" Commerce Clause is really three distinct Clauses rolled into one: a Foreign Commerce Clause, an Interstate Commerce Clause, and an Indian Commerce Clause. To be sure, those Clauses share the same lead word: "Commerce." And, viewed in isolation, that word might appear to sweep narrowly—encompassing activities like "selling, buying, and bartering, as well as transporting for these purposes." *United States* v. *Lopez,* 514 U. S. 549, 585–586 (1995) (THOMAS, J., concurring) (citing founding-era definitions). But it is "well established" that the individual Commerce Clauses have "very different applications," *Cotton Petroleum Corp.* v. *New Mexico,* 490 U. S. 163, 192 (1989), a point the framers themselves acknowledged, see, *e.g.,* Letter from E. Randolph

to G. Washington (Feb. 12, 1791), in 7 Papers of George Washington: Presidential Series 330, 331–337 (D. Twohig 1998).

**\*32** Start with the word "Commerce." From the Nation's earliest days, Indian commerce was considered "a special subject with a definite content," quite "distinct and specialized" from other sorts of "commerce." A. Abel, The Commerce Clause in the Constitutional Convention and in Contemporary Comment, 25 Minn. L. Rev. 432, 467–468 (1941). A survey of founding-era usage confirms that the term "Commerce," when describing relations with Indians, took on a broader meaning than simple economic exchange. See Ablavsky 2015, at 1012–1032 (compiling primary sources); Brief for Gregory Ablavsky as *Amicus Curiae* 8–11; App. to *id.*, at 1–18 (same); see also A. Amar, America's Constitution: A Biography 107 (2005). Instead, the word was used as a "term of art," Pearl 322, to encompass all manner of "bilateral relations with the [T]ribes," Clinton 1995, at 1145; see also Toler 422 (noting that "Indian commerce" was a "legal ter[m] of art" that was "informed by the practicalities of Indian affairs").

This special usage likely emerged out of an international-law idea widely shared "at the time of the founding": When dealing with a foreign sovereign, the "commercial and noncommercial aspects" of bilateral interactions were "inevitably intertwined" because *any* intercourse carried potential diplomatic consequences and could even lead to war. J. Balkin, Commerce, 109 Mich. L. Rev. 1, 25 (2010) (Balkin); see also Ablavsky 2015, at 1028–1032 (demonstrating that "trade with the Indians was understood almost solely through this political and diplomatic lens"); Clinton 1989, at 362–363 (observing that, at the founding, Indian "trade" was "intertwined" with concerns of "peace and diplomacy" and with the threat of "war"). Nor was that a speculative possibility when it came to Tribes. As we have seen, even the noncommercial conduct of settlers in the early years was a "continual source of violent conflict [with] Indians," partially motivating the move away from the Articles of Confederation framework. M. Fletcher & L. Jurss, Tribal Jurisdiction—A Historical Bargain, 76 Md. L. Rev. 593, 597 (2017); see also Ablavsky 2014, at 1033–1038.

At least two terms in the Commerce Clause confirm this special usage. For one thing, the Constitution speaks of "Commerce ... *among*" when discussing interstate dealings, but "Commerce *with*" when addressing dealings with tribal and foreign sovereigns. Art. I, § 8, cl. 3 (emphases added).

This language suggests a shared framework for Congress's Indian and foreign commerce powers and a different one for its interstate commerce authority. See R. Monette, A New Federalism for Indian Tribes: The Relationship Between the United States and Tribes in Light of Our Federalism and Republican Democracy, 25 U. Toledo L. Rev. 617, 629, n. 82 (1994). More than that, the term "with" suggests that Congress has the authority to manage "all interactions or affairs ... with the Indian [T]ribes" and foreign sovereigns —wherever those interactions or affairs may occur. Balkin 23. By contrast, the term "among" found in the Interstate Commerce Clause most naturally suggests that Congress may regulate only activities that "extend in their *operation* beyond the bounds of a particular [S]tate" and into another. *Id.*, at 30. All this goes a long way toward explaining why "Congress's powers to regulate domestic commerce are more constrained" than its powers to regulate Indian and foreign commerce. *Id.*, at 29.

For another thing, as nouns, "States" and "Indian Tribes" are not alike—and they were not alike at the founding. "States" generally referred then, as it does today, to a collection of *territorial* entities. Not so "Tribes." That term necessarily referred to collections of *individuals*. See C. Green, Tribes, Nations, States: Our Three Commerce Powers, 127 Pa. St. L. Rev. 643, 649, 654–669 (2023) (Green); see also 1 W. Crosskey, Politics and the Constitution in the History of the United States 77 (1953). Want proof? Dust off most any founding-era dictionary and look up the definition of "Tribe." See, *e.g.*, 2 J. Ash, The New and Complete Dictionary of the English Language (1775) ("[a] family, a body of the people distinguished by family or fortune"); 2 S. Johnson, A Dictionary of the English Language (4th ed. 1773) ("[a] di[s]tinct body of the people as divided by family or fortune, or any other characteri[s]tick"); T. Dyche, A New General English Dictionary (14th ed. 1771) ("the particular descendants or people [s]prung from [s]ome noted head, or a collective number of people in a colony"); N. Bailey, An Universal Etymological English Dictionary (22d ed. 1770) ("a [c]ompany of [p]eople dwelling together in the [s]ame [w]ard or [l]iberty").

**\*33** This observation sheds light on why ordinary speakers use the two terms differently. It explains, for instance, why it is grammatical to say you are vacationing "*in* Colorado," but not to say you are vacationing "*in* Navajo." It explains why it is sensible to say you are meeting "*with* some Cherokee," but not to say you are meeting "*with* some New Jersey." But this point also helps us make sense of why the Legislative Branch

may regulate commerce with Indian Tribes differently than it may regulate commerce among the States. Because Tribes are collections of *people*, the Indian Commerce Clause endows Congress with the "authority to regulate commerce with Native Americans" as individuals. *McGirt* v. *Oklahoma*, 591 U. S. ___, ___ (2020) (slip op., at 7). By contrast, Congress's power under the Interstate Commerce Clause operates only on commerce that involves "more States than one." *Gibbons* v. *Ogden*, 9 Wheat. 1, 194 (1824). In other words, commerce that takes place "among" (or between) two or more *territorial* units, and not just any commerce that involves *some* member of *some* State. See Green 649–654.

This Court has long appreciated these points of distinction. For example, in *United States* v. *Holliday*, 3 Wall. 407 (1866), the Court upheld a federal statute that prohibited the sale of alcohol by non-Indians to Indians—on or off tribal land. *Id.*, at 416–417. Giving the Indian Commerce Clause its most natural reading, the Court concluded that the power to regulate commerce with Indian Tribes must mean the power to regulate "commerce with *the individuals* composing those [T]ribes." *Id.*, at 417 (emphasis added). For that reason, too, "[t]he locality of the [commerce could] have nothing to do with the [scope of the] power." *Id.*, at 418; see also *Henderson* v. *Mayor of New York*, 92 U. S. 259, 270 (1876) (quoting *Holliday* and echoing this point in the context of the Foreign Commerce Clause). More than that, *Holliday* recognized that this focus on individuals means that Indian commerce must cover "something more" than just economic exchange. 3 Wall., at 417 (internal quotation marks omitted). While it includes "buying and selling and exchanging commodities," it also extends to the entire "intercourse between the citizens of the United States and those [T]ribes." *Ibid*. That "intercourse," the Court recognized, is "another branch of commerce" with Indians, "and a very important one" at that. *Ibid*.

If the Constitution's text left any uncertainty about the scope of Congress's Indian commerce power, early practice liquidated it. The First Congress adopted the initial Indian Trade and Intercourse Act, which prohibited the "sale of lands made by any Indians" to non-Indians absent a public treaty. Act of July 22, 1790, ch. 33, § 4, 1 Stat. 138. The law also extended criminal liability to non-Indians who "commit[ted] any crime upon, or trespass against, the person or property of any peaceable and friendly Indian" in Indian country. § 5, *ibid*. The first of these provisions arguably addressed a narrow question of commerce. But the second "plainly regulated noneconomic" interaction. A. Amar, *America's Constitution and the Yale School of Constitutional Interpretation*, 115 Yale L. J. 1997, 2004, n. 25 (2006).

Despite that fact, the Act (and its successors) were "not controversial exercises of congressional power." N. Newton, *Federal Power Over Indians: Its Sources, Scope, and Limitations*, 132 U. Pa. L. Rev. 195, 201, n. 25 (1984). Any doubt about their validity "would have been quieted by the [C]ommerce Clause's commitment of commerce with the Indian [T]ribes to Congress." *Ibid*. As Justice McLean (riding circuit) recognized, punishing non-Indians for "committing violence upon the persons or property of the Indians," fell "clearly within the scope of the power to regulate commerce with the Indian [T]ribes." *United States* v. *Bailey*, 424 F. Cas. 937, 939 (No. 14,495) (CC Tenn. 1834). Of course, the kinds of criminal trespasses Congress regulated as early as 1790 were not *themselves* commercial. But a trespass against even one individual Indian could disrupt commerce with that individual. See Green 660–661, and n. 76. By extension, such a trespass could disrupt dealings with other members of the Tribe and with other allied Tribes too. See Balkin 24–26. Recognizing this, the framers entrusted Congress with the power previously exercised by the British Parliament to "restrain the disorderly and licentious from intrusions" by non-Indians against even individual Indians— all to preserve functioning channels of trade and intercourse "with the Indians." *Worcester*, 6 Pet., at 552, 556.

3

**\*34** If Congress's powers under the Indian Commerce Clause are broader than those it enjoys under the Interstate Commerce Clause, "broader" does not mean "plenary." Even the federal government's "power to control and manage" relations with the Tribes under the Indian Commerce Clause comes with "pertinent constitutional restrictions." *United States* v. *Creek Nation*, 295 U. S. 103, 110 (1935). Congress cannot, for example, expand the scope of its own power by arbitrarily labeling non-Indians as Indians. See *United States* v. *Sandoval*, 231 U. S. 28, 46 (1913). Nor can it regulate in peripherally related fields merely by identifying some incidental connection to non-Indians' dealings with Indians. Instead, Congress's actions must still bear a valid "nexus" to Indian commerce to withstand constitutional challenge. *Lopez*, 514 U. S., at 562 (quoting *United States* v. *Bass*, 404 U. S. 336, 347 (1971)). As we have seen, too, "the scope of congressional authority" over the Tribes under the Indian Commerce Clause is "best construed as a negative one." Pearl

325. Its text "limits the legislative reach to creating federal restrictions concerning what United States citizens and States may do in the context of Indian [T]ribes." *Ibid.* Nothing in the Clause grants Congress the affirmative power to reassign to the federal government inherent sovereign authorities that belong to the Tribes.

In that way, the Indian Commerce Clause confirms, rather than abridges, principles of tribal sovereignty. As it must. It is "inconceivable" that a power to regulate non-Indians' dealings with Indians could be used to "dives[t Tribes] of the right of self-government." *Worcester*, 6 Pet., at 554. Otherwise, a power to manage relations with a party would become an instrument for "annihilating the political existence of one of the parties." *Ibid.* No one in the Nation's formative years thought that could be the law. They understood that Congress could no more use its commerce powers to legislate away a Tribe than it could a State or a foreign sovereign. Cf. *National League of Cities* v. *Usery*, 426 U. S. 833, 855 (1976); *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 523–526 (1926); *Lane County* v. *Oregon*, 7 Wall. 71, 76–77 (1869). The framers appreciated, too, that they possessed no more "authority to delegate to the national government power to regulate the [T]ribes directly" than they possessed authority to "delegate power to the federal government over other peoples who were not part of the federal union." Clinton 2002, at 254; see also R. Barsh, Book Review, *Felix S. Cohen's Handbook of Federal Indian Law, 1982 Ed.*, 57 Wash. L. Rev. 799, 803 (1982).

D

As we have now seen, the Constitution reflected a carefully considered balance between tribal, state, and federal powers. That scheme predated the founding and it persisted long after. It is not, however, the balance this Court always maintained in the years since. More than a little fault for that fact lies with a doctrinal misstep. In the late 19th century, this Court misplaced the original meaning of the Indian Commerce Clause. That error sent this Court's Indian-law jurisprudence into a tailspin from which it has only recently begun to recover. Understanding that error—and the steps this Court has taken to correct it—are the last missing pieces of the puzzle.

In 1885, during the period of assimilationist federal policy, Congress enacted the Indian Major Crimes Act, § 9, 23 Stat. 385. Among other things, that law extended federal-court jurisdiction over various crimes committed by Indians against Indians on tribal lands. *Ibid.* In *United States* v. *Kagama*, 118 U. S. 375 (1886), this Court upheld the constitutionality of that Act. In the process, though, it stepped off the doctrinal trail. Instead of examining the text and history of the Indian Commerce Clause, the Court offered a free-floating and purposivist account of the Constitution, describing it as extending broad "power [to] the General Government" over tribal affairs. *Id.*, at 384. Building on that move, the Court would later come to describe the federal power over the Tribes as "plenary." See, *e.g.*, *Winton* v. *Amos*, 255 U. S. 373, 391 (1921); *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565 (1903).

*35 Perhaps the Court meant well. Surely many of its so-called "plenary power" cases reached results explainable under a proper reading of the Constitution's enumerated powers. Maybe the turn of phrase even made some sense: Congress's power with regard to the Tribes is "plenary" in that it leaves no room for State involvement. See Ablavsky 2015, at 1014 ("[T]he Court use[d] the term [plenary] interchangeably with 'exclusive' "). But as sometimes happens when this Court elides text and original meaning in favor of broad pronouncements about the Constitution's purposes, the plenary-power idea baked in the prejudices of the day. Cf. *Plessy* v. *Ferguson*, 163 U. S. 537 (1896). The Court suggested that the federal government's total power over the Tribes derived from its supposedly inherent right to "enforce its laws" over "th[e] remnants of a race once powerful, now weak." *Kagama*, 118 U. S., at 384–385. Of course, nothing of the sort follows from "a reasoned analysis derived from the text [or] history ... of the United States Constitution." Clinton 2002, at 163. Instead, the plenary-power idea "constituted an unprincipled assertion of raw federal authority." *Ibid.* It rested on nothing more than judicial claims about putative constitutional purposes that aligned with contemporary policy preferences.

Nor was anachronistic language the only consequence of this Court's abandonment of the Constitution's original meaning. During what has been called the "high plenary power era of U. S. Indian law," this Court sometimes took the word "plenary" pretty literally. S. Cleveland, *Powers Inherent in Sovereignty: Indians, Aliens, Territories, and the Nineteenth Century Origins of Plenary Power Over Foreign Affairs*, 81 Texas L. Rev. 1, 62 (2002) (Cleveland). It assumed that Congress possesses a "virtually unlimited authority to regulate [T]ribes" in every respect. M. Steele, *Plenary Power, Political Questions, and Sovereignty in Indian Affairs*, 63 UCLA L. Rev. 666, 670 (2016); see Cleveland 62–

74. Perhaps most notably, the Court even suggested that Congress's "plenary authority" might allow it to "limit, modify, or eliminate the powers of local self-government which the [T]ribes otherwise possess." *Santa Clara Pueblo v. Martinez*, 436 U. S. 49, 56–57 (1978). It is an "inconceivable" suggestion for anyone who takes the Constitution's original meaning seriously. *Worcester*, 6 Pet., at 554.

The Court's atextual and ahistorical plenary-power move did not just serve to expand the scope of federal power over the Tribes. It also had predictable downstream effects on the relationship between States and Tribes. As Congress assumed new power to intrude on tribal sovereignty, the Constitution's "concomitant jurisdictional limit on the reach of state law" began to wane. *McClanahan*, 411 U. S., at 171. It is not hard to draw a through-line between these developments. This Court itself has acknowledged that its plenary-power cases embodied a "trend ... away from the idea of inherent Indian sovereignty as a bar to state jurisdiction." *Id.*, at 172, and n. 7.

It is no coincidence either that this Court's plenary-power jurisprudence emerged in the same era as Indian boarding schools and other assimilationist policies. See D. Moore & M. Steele, Revitalizing Tribal Sovereignty in Treatymaking, 97 N. Y. U. L. Rev. 137, 142 (2022). Rather, "[f]ederal bureaucratic control over Indian leadership and governments ran parallel to the government's control over Indian children" during this period. Fletcher & Singel 930. Indian boarding schools and other intrusive "federal educational programs ... could not have been implemented without federal control of reservation governance." *Ibid.* Nor could any of these federal intrusions on internal tribal affairs have been possible without this Court's plenary-power misadventure.

I do not mean to overstate the point. Even in the heyday of the plenary-power theory, this Court never doubted that Tribes retain a variety of self-government powers. It has always acknowledged that Tribes are "a separate people, with the power of regulating their internal and social relations." *Kagama*, 118 U. S., at 381–382. They may "make their own substantive law in internal matters." *Martinez*, 436 U. S., at 55. They may define their own membership. *Roff*, 168 U. S., at 222. They may set probate rules of their choice. *Jones v. Meehan*, 175 U. S. 1, 29 (1899). And—especially relevant here—they may handle their own family-law matters, *Fisher v. District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 387 (1976) (*per curiam*), and domestic disputes, *United States v. Quiver*, 241 U. S. 602, 605 (1916). But for a period at least, this Court let itself drift from the "basic policy of

*Worcester,*" and with it the Constitution's promise of tribal sovereignty. *Williams v. Lee*, 358 U. S. 217, 219 (1959).

**\*36** Doubtless, too, the rise of the plenary-power theory injected incoherence into our Indian-law jurisprudence. Many scholars have commented on it. See, *e.g.*, P. Frickey, Doctrine, Context, Institutional Relationships, and Commentary: The Malaise of Federal Indian Law Through the Lens of *Lone Wolf*, 38 Tulsa L. Rev. 5, 9 (2002) (describing our doctrine as "riddled with ... inconsistency"); F. Pommersheim, A Path Near the Clearing: An Essay on Constitutional Adjudication in Tribal Courts, 27 Gonz. L. Rev. 393, 403 (1991) (calling our doctrine "bifurcated, if not fully schizophrenic"). So have Members of this Court. JUSTICE THOMAS has put the problem well: "[M]uch of the confusion reflected in our precedent arises from two largely incompatible" assumptions: That Congress "can regulate virtually every aspect of the [T]ribes"; and that "Indian [T]ribes retain inherent sovereignty." *Lara*, 541 U. S., at 214–215 (opinion concurring in judgment). Those two propositions of course clash. That is because only one is true. Yes, Tribes retain the inherent sovereignty the Constitution left for them. But no, Congress does not possess power to "calibrate 'the metes and bounds of tribal sovereignty.' " *Ibid.*

In recent years, this Court has begun to correct its mistake. Increasingly, it has emphasized original meaning in constitutional interpretation. See, *e.g.*, *Kennedy v. Bremerton School Dist.*, 597 U. S. ___, ___–___ (2022) (slip op., at 23–24); *Ramos v. Louisiana*, 590 U. S. ___, ___, ___–___ (2020) (slip op., at 6, 11–17). In the process, it has come again to recognize the Indian Commerce Clause provides the federal government only so much "power to deal with the Indian Tribes." *Mancari*, 417 U. S., at 551–552. But to date, these corrective steps have not yielded all they should. While this Court has stopped overreading its own plenary-power precedents, it has yet to recover fully the original meaning of the Indian Commerce Clause.

Today, the Court takes further steps in the right direction. It recognizes that Congress's powers with respect to the Tribes "derive from the Constitution, not the atmosphere." *Ante*, at 11. It engages in a robust history-driven analysis of the various fonts of congressional authority without relying only on platitudes about plenary power. *Ante*, at 11–13. It notes that, as an original matter, the Indian Commerce Clause is "broad" and covers more than garden-variety commercial activity. *Ante*, at 11–16. In the process, it reaffirms that "

'commerce with the Indian [T]ribes' " necessarily covers commerce with "Indians as individuals." *Ante*, at 15–16.

No less importantly, the Court acknowledges what the federal government *cannot* do. "Article I gives Congress a series of enumerated powers, not a series of blank checks." *Ante*, at 13. And that means that "Congress's authority to legislate with respect to Indians is not unbounded," but instead comes with concrete limitations. *Ibid.* To resolve the present dispute, the Court understandably sees no need to demarcate those limitations further. But I hope that, in time, it will follow the implications of today's decision where they lead and return us to the original bargain struck in the Constitution—and, with it, the respect for Indian sovereignty it entails.

### III

With all the historical pieces of this puzzle assembled, only one task remains. You must decide for yourself if ICWA passes constitutional muster.

By now, the full picture has come into view and it is easy to see why ICWA must stand. Under our Constitution, Tribes remain independent sovereigns responsible for governing their own affairs. And as this Court has long recognized, domestic law arrangements fall within Tribes' traditional powers of self-governance. See, *e.g.*, *Fisher*, 424 U. S., at 387; *Quiver*, 241 U. S., at 605. As " 'a separate people' " Tribes may " 'regulat[e] their internal and social relations' " as they wish. *Wheeler*, 435 U. S., at 322 (quoting *Kagama*, 118 U. S., at 381–382). In enacting ICWA, Congress affirmed this understanding. It recognized that "there is no resource that is more vital to the continued existence and integrity of Indian [T]ribes than their children." 25 U. S. C. § 1901(3). Yet it also recognized that the mass-removal of Indian children by States and other outsiders threatened the "continued existence and integrity of Indian [T]ribes." *Ibid.*; see also § 1901(4). By setting out to eliminate that practice, Congress sought to preserve the Indian-law bargain written into the Constitution's text by securing the continued viability of the "third sovereign." S. O'Connor, Remark, Lessons From the Third Sovereign: Indian Tribal Courts, 33 Tulsa L. J. 1 (1997).

**\*37** No doubt, ICWA sharply limits the ability of States to impose their own family-law policies on tribal members. But as we have seen, state intrusions on tribal authority have been a recurring theme throughout American history. See Ablavsky 2014, at 1009–1037. Long ago, those intrusions

led the framers to abandon the loophole-ridden Indian affairs provision in the Articles of Confederation and adopt in the Constitution a different arrangement that commits the management of tribal relations *solely* to the federal government. *Id.*, at 1038–1051; see also Clinton 1995, at 1098–1165. Recognizing as much, this Court has consistently reaffirmed the Tribes' "immunity from state and local control." *Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U. S. 545, 571 (1983) (internal quotation marks omitted). If that immunity means anything, it must mean that States and others cannot use their own laws to displace federal Indian policy.

Nor is there any serious question that Congress has the power under the Indian Commerce Clause to enact protections against the removal of Indian children. Thankfully, Indian children are not (these days) units of commerce. Cf. Fletcher & Singel 897–898 (describing an early practice of enslaving Indian children). But at its core, ICWA restricts how non-Indians (States and private individuals) may engage with Indians. And, as we have seen, that falls in the heartland of Congress's constitutional authority. Recall that the very first Congresses punished non-Indians who "commit[ted] any crime upon [any] friendly Indian." Act of July 22, 1790, ch. 33, § 5, 1 Stat. 138. ICWA operates in much the same way. The mass removal of Indian children by States and private parties, no less than a pattern of criminal trespasses by States and private parties, directly interferes with tribal intercourse. More than that, it threatens the Tribes' "political existence." *Worcester*, 6 Pet., at 536. And at the risk of stating the obvious, Indian commerce is hard to maintain if there are no Indian communities left to do commerce with.

### IV

Often, Native American Tribes have come to this Court seeking justice only to leave with bowed heads and empty hands. But that is not because this Court has no justice to offer them. Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life. It promises them sovereignty for as long as they wish to keep it. And it secures that promise by divesting States of authority over Indian affairs and by giving the federal government certain significant (but limited and enumerated) powers aimed at building a lasting peace. In adopting the Indian Child Welfare Act, Congress exercised that lawful authority to secure the right of Indian parents to raise their families as they please; the right of Indian children to grow in their culture; and the right of Indian communities to resist fading into the twilight

Haaland v. Brackeen, --- S.Ct. ---- (2023)
2023 WL 4002951

of history. All of that is in keeping with the Constitution's original design.

Justice Kavanaugh, concurring.
I join the Court's opinion in full. I write separately to emphasize that the Court today does not address or decide the equal protection issue that can arise when the Indian Child Welfare Act is applied in individual foster care or adoption proceedings. See *ante*, at 29, 32, n. 10. As the Court explains, the plaintiffs in this federal-court suit against federal parties lack standing to raise the equal protection issue. So the equal protection issue remains undecided.

In my view, the equal protection issue is serious. Under the Act, a child in foster care or adoption proceedings may in some cases be denied a particular placement because of the child's race—even if the placement is otherwise determined to be in the child's best interests. And a prospective foster or adoptive parent may in some cases be denied the opportunity to foster or adopt a child because of the prospective parent's race. Those scenarios raise significant questions under bedrock equal protection principles and this Court's precedents. See *Palmore* v. *Sidoti*, 466 U. S. 429 (1984). Courts, including ultimately this Court, will be able to address the equal protection issue when it is properly raised by a plaintiff with standing—for example, by a prospective foster or adoptive parent or child in a case arising out of a state-court foster care or adoption proceeding. See *ante*, at 29, 32, n. 10.

Justice Thomas, dissenting.
 **\*38**  These cases concern the Federal Government's attempt to regulate child-welfare proceedings in state courts. That should raise alarm bells. Our Federal "[G]overnment is acknowledged by all to be one of enumerated powers," having only those powers that the Constitution confers expressly or by necessary implication. *McCulloch* v. *Maryland*, 4 Wheat. 316, 405 (1819). All other powers (like family or criminal law) generally remain with the States. The Federal Government thus lacks a general police power to regulate state family law.

However, in the Indian Child Welfare Act (ICWA), Congress ignored the normal limits on the Federal Government's power and prescribed rules to regulate state child custody proceedings in one circumstance: when the child involved happens to be an Indian. As the majority acknowledges, ICWA often overrides state family law by dictating that

state courts place Indian children with Indian caretakers even if doing so is not in the child's best interest. See *ante*, at 2. It imposes heightened standards before removing Indian children from unsafe environments. See *ante*, at 3–4. And it allows tribes to unilaterally enroll Indian children and then intervene in their custody proceedings. See *ante*, at 4, 6–8.

In the normal course, we would say that the Federal Government has no authority to enact any of this. Yet the majority declines to hold that ICWA is unconstitutional, reasoning that the petitioners before us have not borne their burden of showing how Congress exceeded its powers. This gets things backwards. When Congress has so clearly intruded upon a longstanding domain of exclusive state powers, we must ask not whether a constitutional provision prohibits that intrusion, but whether a constitutional provision authorizes it.

The majority and respondents gesture to a smorgasbord of constitutional hooks to support ICWA; not one of them works. First, the Indian Commerce Clause is about commerce, not children. See *Adoptive Couple* v. *Baby Girl*, 570 U. S. 637, 659–665 (2013) (THOMAS, J., concurring). Second, the Treaty Clause does no work because ICWA is not based on any treaty. Third, the foreign-affairs powers (what the majority terms "structural principles") inherent in the Federal Government have no application to regulating the domestic child custody proceedings of U. S. citizens living within the jurisdiction of States.

I would go no further. But, as the majority notes, the Court's precedents have repeatedly referred to a "plenary power" that Congress possesses over Indian affairs, as well as a general "trust" relationship with the Indians. I have searched in vain for any constitutional basis for such a plenary power, which appears to have been born of loose language and judicial *ipse dixit*. And, even taking the Court's precedents as given, there is no reason to extend this "plenary power" to the situation before us today: regulating state-court child custody proceedings of U. S. citizens, who may never have even set foot on Indian lands, merely because the child involved happens to be an Indian.

I

State courts usually apply state law when resolving child custody issues. This would normally be true for most Indians, too. Today, Indians are citizens of the United States; the vast majority of them do not live on any

reservation or Indian lands, but live (as most citizens) on lands that are wholly within a State's jurisdiction. See ch. 233, 43 Stat. 253; Dept. of Health and Human Services, Office of Minority Health, Profile: American Indian/Alaska Native (Feb. 24, 2023), https://minorityhealth.hhs.gov/omh/ browse .aspx?lvl=3&lvlid=62 (87% live off Indian lands). Thus, one might expect that when a child custody issue regarding an Indian child arises in a state court, that court would apply the same laws that it would for any other citizen.

**\*39**  But ICWA displaces the normal state laws governing child custody when it comes to only one group of citizens: Indian children. ICWA defines "Indian child" capaciously: It includes not only children who are members of an Indian tribe, but also those children who are merely *eligible* for membership in a tribe and are the biological child of a tribal member. See 25 U. S. C. § 1903(4). If the child resides on Indian tribal lands, then the Indian tribal court has jurisdiction. § 1911(a). But, if the child resides within a State, ICWA requires state courts to transfer any proceedings to a tribal court, absent "good cause to the contrary," upon petition by the child's parent, custodian, or tribe. § 1911(b).

Even when the state court retains the proceedings, ICWA replaces state law with a strict set of federal rules. For example, if the State fears that a child is suffering physical or sexual abuse, it must clear a set of hurdles before placing the child in foster care or terminating the parent's rights. §§ 1912(a)–(e). If the parent wishes to voluntarily relinquish his or her rights and facilitate an adoption, the child's tribe has a right to intervene "at any point" and to collaterally attack the court's decree. §§ 1911(c), 1914. Moreover, it appears that tribes can enroll children unilaterally, without the parent's consent. Accordingly, even if the biological parents, the child, the adoptive parents, and the court all agree on what is best for the child, the tribe can intervene at the eleventh hour, without any consent from the parents or child, and block the proceedings. In fact, that is exactly what happened here—the children were unilaterally designated as tribal members by tribes, which then sought to block adoptions that everyone else thought were best for the children involved. And, even though some of those adoptions have now been finalized, it appears that the tribes can collaterally attack them for an indefinite period of time. § 1914.

Besides these procedural hurdles, ICWA dictates the preferences a court must adhere to when deciding where to place the child. In the typical case, the primary consideration would be the best interests of that child. *E.g.,* Tex. Fam. Code Ann. § 153.002 (West 2014); American Law Institute, Principles of the Law of Family Dissolution § 2.02 (2002); *Friederwitzer* v. *Friederwitzer*, 55 N. Y. 2d 89, 92, 432 N. E. 2d 765, 767 (1982); *Karner* v. *McMahon*, 433 Pa. Super. 290, 302, 640 A. 2d 926, 932 (1994). That makes sense; as the majority notes, these children are some of the most vulnerable among us, and their interests should be a court's primary concern. See *ante*, at 1. But ICWA displaces that standard with its own hierarchy of preferences, requiring a court to prefer any placements with (1) a member of the child's extended family; (2) other members of the child's tribe; and (3) other Indian families of any tribe, anywhere in the country. § 1915(a). Similar rules govern foster-care placements. § 1915(b). As the majority notes, these preferences collectively ensure that any Indian from any tribe in the country outranks all non-Indians for adopting and fostering those whom ICWA deems to be Indian children. See *ante*, at 5.

Again, these detailed rules govern the child custody proceedings of U. S. citizens in state courts only because the child is also either a member of an Indian tribe or merely eligible for membership in a tribe. (The child or parents need never have set foot on Indian lands or have any desire to affiliate themselves with a tribe.[1]) The child and his or her biological parents and relatives can all support an adoption, yet ICWA may stand in the way.

**\*40**  Normally, we would say that the Federal Government plainly lacks the authority to enact a law like this. The only question is thus whether Congress has some additional authority that allows it to regulate the adoption process for U. S. citizens in state courts merely because the child involved happens to be an Indian. To answer that question, I turn first to the text and original meaning of the Constitution.

## II

To explain the original understanding of the Constitution's enumerated powers with regard to Indians, I start with our Nation's Founding-era dealings with Indian tribes. Those early interactions underscore that the Constitution conferred specific, enumerated powers on the Federal Government which aimed at specific problems that the Nation faced under the Articles of Confederation. The new Federal Government's actions with respect to Indian tribes are easily explained by those enumerated powers. Meanwhile, the States continued to enjoy substantial authority with regard to tribes. At each turn, history and constitutional text thus point to a set of

enumerated powers that can be applied to Indian tribes—not some sort of amorphous, unlimited power than can be applied to displace all state laws when it comes to Indians.

A

Before the Revolution, most of the Thirteen Colonies adopted their own regulations governing Indian trade. See *Adoptive Couple*, 570 U. S., at 660 (THOMAS, J., concurring); R. Natelson, The Original Understanding of the Indian Commerce Clause, 85 Denver U. L. Rev. 201, 219, and n. 121 (2007) (Natelson) (collecting laws). These regulations were necessary because colonial traders abused their Indian trading partners, often provoking violent Indian retaliation. See *Adoptive Couple*, 570 U. S., at 660–661; 1 F. Prucha, The Great Father 18–21 (1984) (Prucha). Most colonial governments thus imposed licensing systems of some form both to protect Indians and to maintain trading relationships with them. See *id.*, at 19. However, the colonial laws were not uniform, leading to rivalries between the Colonies, corruption, fraud, and other abuses by traders. *Id.*, at 21. Then, once the Nation had achieved independence, it "faced innumerable difficulties," *id.*, at 46, from finding ways to uphold its treaties with foreign nations to economic upheaval at home, J. Marshall, The Life of George Washington 313–316 (R. Faulkner & P. Carrese eds. 2000). Peace with the Indians, rather than conflicts sparked by unscrupulous traders, was imperative. Prucha 46.

The Articles of Confederation aimed to meet that need in part by giving Congress "the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians." Art. IX, cl. 4. However, that broad power came with two limitations: First, the Indians could not be "members of any of the states." *Ibid.* And, second, "the legislative right of any state within its own limits [could not] be infringed or violated." *Ibid.* In part because of those limitations, the Articles' solution proved to be less than ideal. As James Madison would later write, the two limits were "obscure and contradictory"; the new Nation had "not yet settled" on which Indians were "members" of a State or which state "legislative right[s]" could not be "infringe[d]." The Federalist No. 42, pp. 268–269 (C. Rossiter ed. 1961). [2] More broadly, the Confederation Congress lacked any robust authority to enforce congressional laws or treaties (in this or any other domain). For example, it had no power to make laws supreme over state law; there was no executive power

independent of the States; and state officers were not bound by oath to support the Articles.

**\*41** Under the Articles, Congress entered treaties with various tribes and sought to maintain a mostly peaceful relationship with the Indians—but its authority was undermined at every turn. See Prucha 44–50. Again and again, Congress entered treaties with Indians that established boundary lines and lands set apart for the Indians, and again and again, frontier settlers encroached on Indian territory and committed acts that violated those treaties. *Id.*, at 46–48; F. Cohen, Handbook of Federal Indian Law § 1.02[3], pp. 21–22 (2012) (Cohen). Such violations were taken seriously; as offenses against "the laws of nations," they provoked the Indians and provided "just causes of war." The Federalist No. 3, at 44 (J. Jay); see also 2 E. de Vattel, The Law of Nations §§ 71–76, pp. 161–163 (J. Chitty ed. 1876).

Yet the Confederation Congress was almost powerless to stop these abuses. After a committee noted confusion about the extent of congressional power over Indian affairs in 1787, Congress had to ask the States for their cooperation in curbing the abuses that their own citizens were perpetrating. Prucha 48–49. The weakness of Congress meant, however, that "federal attempts to check state intrusions were often ignored." Cohen § 1.02[3], at 22. The result was that, by the time of the Constitutional Convention, "the young nation [stood on] the brink of Indian warfare on several fronts." *Ibid.* Such a war, feared some Founders, could be destructive to the fledgling Republic. See G. Ablavsky, The Savage Constitution, 63 Duke L. J. 999, 1033 (2014).

The Constitution addressed those problems in several ways. First and most plainly, the Constitution made all federal treaties and laws "the supreme Law of the Land," notwithstanding the laws of any State. Art. VI. It empowered Congress not only to "declare War," but also to "raise and support Armies," "provide and maintain a Navy," and "provide for calling forth the Militia to execute the Laws of the Union." Art. I, § 8. It enabled Congress to "define and punish ... Offences against the Law of Nations." *Ibid.* And it granted Congress the authority to "make all Laws which shall be necessary and proper" for carrying out any of those powers. *Ibid.*

The Constitution also provided one power specific to Indian tribes: the power "[t]o regulate Commerce ... with the Indian Tribes." § 8, cl. 3. That power, however, came very late in the drafting process and was narrower than initially proposed.

See L. Toler, The Missing Indian Affairs Clause, 88 U. Chi. L. Rev. 413, 444–464 (2021) (Toler). At two separate points, James Madison and John Rutledge proposed a power to " 'regulate *affairs* with the Indians,' " a provision that would have mirrored the Articles. *Id.*, at 447–448, 464–465 (emphasis added). Neither proposal received much debate, and both were rejected. See *id.*, at 464–466. Instead, the Convention opted to include Indian tribes in a provision that had initially been drafted to include only power to " 'regulate commerce with foreign nations, and among the several States.' " See *ibid.* The Convention thus expanded the Commerce Clause to the form we know today, empowering Congress to " 'regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes.' " *Id.*, at 466.

On top of those powers, one more warrants note. As I have written previously, the Constitution vests the President with certain foreign-affairs powers including "[t]he executive Power," which includes a residual authority over war, peace, and foreign interactions. See Art. II; *Zivotofsky* v. *Kerry*, 576 U. S. 1, 35–40 (2015) (THOMAS, J., concurring in judgment in part and dissenting in part); *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 319 (1936). From the start, Presidents have exercised foreign-affairs powers not specifically enumerated on matters ranging from maintaining the peace and issuing passports to communicating with foreign governments and repelling sudden attacks on the Nation. S. Prakash, Imperial From the Beginning 119–132 (2015). In his Neutrality Proclamation, for example, President Washington declared that the United States would remain strictly neutral in the then-ongoing war between England and France. See A Proclamation (Apr. 22, 1793), reprinted in 1 American State Papers 140 (W. Lowrie & M. Clarke eds. 1833). Congress supported his Proclamation by imposing criminal penalties on anyone who, among other things, went "beyond the limits or jurisdiction of the United States with intent to be enlisted or entered in the service of any foreign prince or state." § 2, 1 Stat. 383. While this Court has at times debated whether those residual foreign-affairs powers are located in the Executive exclusively or the Federal Government more broadly, see *Zivotofsky*, 576 U. S., at 20–22, it has long recognized the powers as arising from our constitutional framework and residing at the federal level, see, *e.g.*, *Curtiss-Wright*, 299 U. S., at 318.

B

**\*42** After the Constitution's ratification, the new Federal Government exercised its enumerated powers with regard to Indian tribes. To start, the Government embarked on an era of treaty-making with Indian tribes. See Cohen § 1.03[1], at 23. That treaty-focused policy reflected the Washington administration's view that Indian tribes were best dealt with as mostly "foreign nations," with an eye towards peace lest frontier conflicts continue to plague the new Nation. See Letter from H. Knox to G. Washington (July 7, 1789), reprinted in 3 Papers of George Washington 138 (W. Abbot 1989); see also Toler 433–434. Many early treaties thus "were treaties of peace and friendship, often providing for the restoration or exchange of prisoners" or including "mutual assistance pacts." Cohen § 1.03[1], at 25. Others dealt with passports and commercial affairs. *Id.*, at 25–26. And many attested to the tribes' status as dependent nations, with the United States sometimes promising to protect the tribe. *Id.*, at 26.

Unlike the Confederation Congress, the new Federal Government was no longer powerless to maintain and enforce its treaties. Exercising its new military powers, the First Congress established a Department of War and vested the Department with authority over "Indian affairs." See § 1, 1 Stat. 50. War Secretary Henry Knox then called for, and obtained, "a line of garrisons in the Indian Country, in order to enforce the treaties and maintain the peace of the frontier." F. Prucha, American Indian Policy in the Formative Years 61 (1962) (Prucha, American Indian Policy). Those garrisons remained for years, working to prevent American settlers from illegally entering Indian country or otherwise stirring up conflicts. *Id.*, at 61–63.

Meanwhile, President Washington exercised his diplomatic authority to maintain peace on the frontier. For example, when Pennsylvania settlers killed two members of the Seneca Nation, Washington appointed a federal agent to meet with the Seneca and " 'give the strongest assurances of the friendship of the United States towards that Tribe; and to make pecuniary satisfaction.' " Letter to T. Mifflin (Sept. 4, 1790), reprinted in 6 Papers of George Washington 396 (D. Twohig ed. 1996). And, in line with his executive authority to "regulate all intercourse with foreign powers," see 4 J. Elliot, Debates on the Constitution 126–127 (1863), Washington instructed Pennsylvania's Governor to refer the Seneca " 'to the Executive of the United States, as possessing the only authority of regulating an intercourse with them, and redressing their grievances,' " Letter to T. Mifflin, in Papers of George Washington 396.

Congress too did its part, enacting a series of acts "to regulate Trade and Intercourse with the Indian Tribes, and to preserve Peace on the Frontiers." See, *e.g.*, 1 Stat. 469; 2 Stat. 139; 1 Stat. 137 (emphasis deleted). Those "Trade and Intercourse Acts" underscored the Federal Government's new powers and worked to establish a policy of peace and trade with Indian tribes. For example, the Acts threatened criminal penalties on any U. S. citizen who entered Indian lands and there committed crimes against Indians. See, *e.g.*, *id.*, at 137; see also Prucha, American Indian Policy 188–193. Though opponents of those provisions contended that they were unnecessary because state laws and some treaties already provided for criminal punishment, proponents explained that the provisions were needed for those who went "out of the limits of any of the States" and committed crimes that may not have been covered by a particular treaty. See 3 Annals of Cong. 751 (1792). [3] Thus, as with the border garrisons, these provisions were meant as "an answer to the charge that" the United States did not respect its treaties with Indian tribes, Prucha 92, while also securing "peace with the Indian tribes" on the frontier, 3 Annals of Cong. 751. In that respect, they were much like the criminal penalties that Congress levied on those who went abroad and enlisted with England or France and thereby threatened the United States' peace with those nations. See 1 Stat. 383.

**\*43** The Trade and Intercourse Acts further hammered out the Nation's diplomatic and territorial stance with respect to the Indian tribes. For example, reflecting the Federal Government's powers over commerce, territories, and foreign affairs, the Acts forbade U. S. citizens from purchasing, surveying, or settling on Indian lands. *E.g.*, *id.*, at 329–330. One of the Acts, enacted in 1796, then drew a boundary line with Indian tribes and required citizens to have passports when entering Indian lands. *Id.*, at 470. If an Indian came over the boundary line and committed a crime against a U. S. citizen, the Acts authorized the President to demand satisfaction from the tribe (while specifying that the Indian could be arrested "within the limits of any state"). See, *e.g.*, § 14, *id.*, at 472–473. Then, to prevent the tribes from allying themselves with European powers, Congress forbade people from conveying messages to Indian tribes from foreign states. 2 Stat. 6.

Congress also, of course, regulated trade with the Indian tribes. For example, the Acts continued the colonial practice of requiring licenses to trade with Indians and threatened penalties on anyone who sold or purchased goods from Indians without a license. See, *e.g.*, 1 Stat. 329–330. To facilitate trade, Congress also established a series of trading houses on the frontiers, appropriating federal funds to set up the houses and purchase goods from Indians. See, *e.g.*, *id.*, at 443, 453–454; 2 Stat. 173. And, "to promote civilization" and secure the tribes' "friendship," Congress appropriated funds for the President to furnish gifts to the Indians. See, *e.g.*, § 13, 1 Stat. 472.

To be sure, these measures were not entirely successful, and the Federal Government's policy was not always one of peace. American frontiersmen continued to push into Indian lands, and the military garrisons sometimes could not stem the tide. See Prucha 62–63, 112. The Indians (often supported by the British) engaged in intermittent raids and attacks against American settlers, and the Federal Government and several confederated tribes fought a significant war in the Northwest Territories. *Id.*, at 63–67; J. Yoo, Crisis and Command 75–79 (2011); M. Fletcher & W. Singel, Indian Children and the Federal-Tribal Trust Relationship, 95 Neb. L. Rev. 885, 904–905 (2017) (Fletcher & Singel). Additionally, the Federal Government often played tribes against each other to obtain land concessions by treaty, leading many tribes (again goaded by the British) to take up arms against the United States in the War of 1812. See Cohen § 1.03[3], at 39–41. In the aftermath of that conflict, Presidents Monroe and John Quincy Adams generally pursued a policy of assimilation or removing Indians west with their consent. Prucha, American Indian Policy 226–233. That policy then gave way to a more forceful policy of removing Indians west, particularly during the administration of President Andrew Jackson. *Id.*, at 233–249; Cohen § 1.03[4], at 41–51; Prucha 193–195, 239–240.

But, at least until the War of 1812 (and, in large part, in the years after it), Founding-era Presidents' primary goals in this area were to achieve peace with the Indians, sustain trade with them, and obtain Indian lands through treaties. See *id.*, at 32–33, 59, 61, 93. By establishing a peaceful and trade-oriented relationship with the Indians, the new country further hoped to exclude British Canada and other European powers that might seek alliances with the Indian tribes. See Cohen § 1.03[3], at 37–38, n. 102; 2 Stat. 6. During that time, the Federal Government's relationship with the Indians thus remained (as it did for nearly the first hundred years of our Nation) " 'more an aspect of military and foreign policy' " than simple domestic law. See *United States* v. *Lara*, 541 U. S. 193, 201 (2004).

C

Notably, neither President Washington nor the first Congresses were particularly "concerned with the remnants of tribes that had been absorbed by the states and had come under their direction and control." Prucha 92. The first Trade and Intercourse Acts specifically provided that "nothing in this act shall be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the jurisdiction of any of the individual states." § 13, 1 Stat. 331; § 19, *id.*, at 474. And the Constitution's Apportionment Clause provided that representatives would be apportioned by the population of each State, "excluding Indians not taxed"—implying that there were Indians who paid taxes and were incorporated into the bodies politic of the States. Art. I, § 2, cl. 3.

**\*44** The States accordingly enacted numerous laws to regulate Indians within their territorial boundaries, as well as those Indians' interactions with the States' citizens. See, *e.g.*, D. Rosen, American Indians and State Law 34, 52 (2007) (Rosen). For example, New York passed laws forbidding its citizens from suing to enforce contracts with Indians who lived on Indian lands, and Virginia regulated the sale of land held by Indians. See Laws of the Colonial and State Governments, Relating to Indians and Indian Affairs, From 1633 to 1831, pp. 65–67, 158–159 (1832). Massachusetts authorized its Governor to appoint guardians to oversee Indians and their property, while Ohio and Indiana forbade the sale of liquor to Indians. *Id.*, at 21–22, 232–234.

On the whole, States also generally applied both their civil and criminal laws to Indians, with many extending their criminal laws to all Indians anywhere in the State—including, sometimes, on Indian reservations within the State. See Rosen 53; see also, *e.g.*, Goodell v. Jackson ex dem. Smith, 20 Johns. 693 (N. Y. Ct. Corr. Errors 1823); State v. Doxtater, 47 Wis. 278, 2 N. W. 439 (1879) (collecting cases). To be sure, some of these laws may have conflicted with valid federal treaties or statutes on point, and courts at the time often did not precisely demarcate the constitutional boundaries between state and federal authority. Rosen 55–56. [4] But, when opponents of the Trade and Intercourse Acts' criminal provisions complained that state laws would take care of criminal offenses, the provisions' proponents did not reply that state laws were disabled on this point—they instead noted that citizens might go beyond the limits of States and commit crimes. See 3 Annals of Cong. 751. And notably, Congress' early statutes

did not purport to regulate Indians either on or off Indian lands —they instead regulated and penalized only U. S. citizens who were trading with Indians or committing acts on Indian lands that threatened the peace with the tribes.

Those statutory lines reflected the early dynamic of federal-Indian relations, with Indian affairs counting as both a matter of quasi-foreign affairs and of state jurisdiction. For example, the early Trade and Intercourse Acts only demanded satisfaction from Indian tribes if an Indian went onto a State's land and committed a crime. *E.g.*, 1 Stat. 472–473. Under that regime, the Federal Government asserted no authority over the acts of Indians who lived on tribal lands—much less over Indians who lived off tribal lands and within a State's sole jurisdiction.

That general jurisdictional line held until 1817, when Congress first enacted a statute to impose penalties on anyone who committed a crime against a U. S. citizen while on Indian lands. See 3 Stat. 383. But Justice McLean, riding circuit, held that statute unconstitutional in 1834—at least as it applied to Indian lands located within the territorial limits of a State. See *United States* v. *Bailey*, 24 F. Cas. 937 (No. 14,495) (CC Tenn.). As Justice McLean explained, "[t]hat the federal government is one of limited powers, is a principle so obvious as not to admit of controversy." *Id.*, at 938. Yet the Indian lands at issue were not located within a federal territory, and there had not been "any cession of jurisdiction by the state of Tennessee." *Id.*, at 939. [5] Nor was the criminal statute in any way related to "commerce" with the Indian tribes. *Ibid.* Indeed, Justice McLean asked, if Congress could enact this statute, "why may not [C]ongress legislate on crimes for the states generally?" *Id.*, at 940. He concluded that Congress "transcended their constitutional powers" in asserting a general criminal jurisdiction over tribal lands within the limits of a State. *Ibid.* And, given the limited nature of the Federal Government's authority, state laws thus played a significant role in regulating Indians within the territorial limits of States. See *id.*, at 939.

III

**\*45** The Constitution's text and the foregoing history point to a set of discrete, enumerated powers applicable to Indian tribes—just as in any other context. Although our cases have at times suggested a broader power with respect to Indians, there is no evidence for such a free-floating authority anywhere in the text or original understanding of

the Constitution. To the contrary, all of the Government's early acts with respect to Indians are easily explicable under our normal understanding of the Constitution's enumerated powers. For example, the Treaty Clause supported the Federal Government's treaties with Indians, and the Property Clause supported the gifts allocated to Indians. The powers to regulate territories and foreign affairs supported the regulation of passports and penalties for criminal acts on Indian lands. The various war-related powers supported military campaigns against Indian tribes. And the Commerce Clause supported the regulation of trade with Indian tribes.

Moreover, the Founders deliberately chose to enumerate one power specific to Indian tribes: the power to regulate "Commerce" with tribes. Because the Constitution contains one Indian-specific power, there is simply no reason to think that there is some sort of free-floating, unlimited power over all things related to Indians. That is common sense: *expressio unius est exclusio alterius*. And that is particularly true here, because the Founders adopted the "Indian Commerce Clause" while *rejecting* an arguably broader authority over "Indian affairs." See *Adoptive Couple*, 570 U. S., at 662. Accordingly, here as elsewhere, the Federal Government can exercise only its constitutionally enumerated powers. Because each of those powers contains its own inherent limits, none of them can support an additional unbounded power over all Indian-related matters. Indeed, the history of the plenary power doctrine in Indian law shows that, from its inception, it has been a power in search of a constitutional basis—and the majority opinion shows that this is still the case.

### A

As the majority notes, some of the candidates that this Court has suggested as the source of the "plenary power" are the Treaty Clause, the Commerce Clause, and "principles inherent in the Constitution's structure." See *ante*, at 10–13; *Lara*, 541 U. S., at 200. But each of those powers has clear, inherent limits, and not one suggests any sort of unlimited power over Indian affairs—much less a power to regulate U. S. citizens outside of Indian lands merely because those individuals happen to be Indians. I will discuss each in turn.

### 1

First, and most obviously, the Treaty Clause confers only the power to "make Treaties"; the Supremacy Clause then makes those treaties the supreme law of the land. Art. II, § 2, cl. 2; Art. VI. Even under our most expansive Treaty Clause precedents, this power is still limited to actual treaties. See *Bond* v. *United States*, 572 U. S. 844, 854–855 (2014); *id.*, at 893–894 (THOMAS, J., concurring in judgment) (the Treaty Power supports treaties only on matters of international intercourse); *Missouri* v. *Holland*, 252 U. S. 416, 433–435 (1920). It does not confer a free-floating power over matters that might involve a party to a treaty.

### 2

Second, the Commerce Clause confers only the authority "[t]o regulate *Commerce* ... with the Indian Tribes." Art. I, § 8, cl. 3 (emphasis added). "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *United States* v. *Lopez*, 514 U. S. 549, 585 (1995) (THOMAS, J., concurring); see also 1 S. Johnson, A Dictionary of the English Language 361 (4th rev. ed. 1773) (reprint 1978) (defining commerce as "Intercourse; exchange of one thing for another; interchange of any thing; trade; traffick"). And even under our most expansive Commerce Clause precedents, the Clause permits Congress to regulate only "economic activity" like producing materials that will be sold or exchanged as a matter of commerce. See *Lopez*, 514 U. S., at 560; *Gonzales* v. *Raich*, 545 U. S. 1, 22 (2005). [6]

**\*46**  The majority, however, suggests that the Commerce Clause could have a broader application with respect to Indian tribes than for commerce between States or with foreign nations. See *ante*, at 11, 16. That makes little textual sense. The Commerce Clause confers the power to regulate a single object—"Commerce"—that is then cabined by three prepositional phrases: "with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, § 8, cl. 3. Accordingly, one would naturally read the term "Commerce" as having the same meaning with respect to each *type* of "Commerce" the Clause proceeds to identify. See *Gibbons* v. *Ogden*, 9 Wheat. 1, 74 (1824). I would think that is how we would read, for example, the President's "appoint[ment]" power with respect to "Ambassadors, ... Judges of the supreme Court, and all other Officers of the United States." Art. II, § 2, cl. 2. There is no textual reason why the Commerce Clause would be different. Nor have the parties or the numerous *amici* presented any evidence that the Founders thought that the term "Commerce" in the Commerce Clause meant different things for Indian

tribes than it did for commerce between States. See S. Prakash, Our Three Commerce Clauses and the Presumption of Intrasentence Uniformity, 55 Ark. L. Rev. 1149, 1161–1162 (2003).

Rather, the evidence points in the opposite direction. See Adoptive Couple, 570 U. S., at 659–660 (THOMAS, J., concurring). When discussing "commerce" with Indian tribes, the Founders plainly meant buying and selling goods and transportation for that purpose. For example, President Washington once informed Congress of the need for "new channels for the commerce of the Creeks," because "their trade is liable to be interrupted" by conflicts with England. Statement to the Senate (Aug. 4, 1790), reprinted in 4 American State Papers 80. Henry Knox similarly referred to the "profits of this commerce" with the Creeks in the context of a "trading house which has the monopoly of the trade of the Creeks." Report (July 6, 1789), reprinted in id., at 15. And President Jefferson likewise discussed the "commerce [that] shall be carried on liberally" at "trading houses" with Indians. Statement to Congress (Jan. 18, 1803), reprinted in id., at 684.[7] All of this makes sense, given that the Founders both wanted to facilitate trade with Indians and rejected a facially broader "Indian affairs" power in favor of a narrower power over "Commerce ... with the Indian Tribes."

**\*47** As noted above, that omission was not accidental; the Articles of Confederation had contained that "Indian affairs" language, and that language was twice proposed (and rejected) at the Constitutional Convention. See Adoptive Couple, 570 U. S., at 662.[8] Then, as today, "affairs" was a broader term than "commerce," with "affairs" more generally referring to things to be done.[9] Thus, whatever the precise contours of a freestanding "Indian Affairs" Clause might have been, the Founders' specific rejection of such a power shows that there is no basis to stretch the Commerce Clause beyond its normal limits.[10]

3

**\*48** Third, the "structural principles" that the majority points to are only the foreign-affairs powers that the Constitution provides more generally. See Lara, 541 U. S., at 201 (citing Curtiss-Wright, 299 U. S., at 315–322). As detailed above, the Constitution plainly confers foreign-affairs powers on the Federal Government to regulate passports, offenses against the laws of nations, and citizens' acts abroad that threaten the Nation's peace. S. Prakash & M. Ramsey, The Executive Power Over Foreign Affairs, 111 Yale L. J. 231, 298–332 (2001). Those powers were brought to bear on Indian tribes, with whom the Federal Government maintained a government-to-government relationship. See, e.g., Cohen § 1.03[1], at 25–26; 1 Stat. 470 (passports on Indian lands); id., at 137 (crimes on Indian lands); id., at 383 (enlisting with foreign states).

But that authority is a foreign, not domestic, affairs power. It comprehends external relations, like matters of war, peace, and diplomacy—not internal affairs like adoption proceedings. The Court made that point explicit in Curtiss-Wright: The "power over external affairs [is] in origin and essential character different from that over internal affairs." 299 U. S., at 319; see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U. S. 579, 635, n. 2 (1952) (Jackson, J., concurring in judgment and opinion of Court) (recognizing this distinction). For external affairs, the Constitution grants the Federal Government a wider authority; but for internal affairs, the Constitution provides fewer, more discrete powers. See, e.g., Curtiss-Wright, 299 U. S., at 315, 319; Zivotofsky, 576 U. S., at 34–35 (opinion of THOMAS, J.).

Again, all those limits dovetail with the historical practices of the Founding era. As discussed above, the Founding-era Government undertook a wide array of measures with respect to Indian tribes. But, apart from measures dealing with commerce, most (if not all) of the Federal Government's actions toward Indians either treated them as sovereign entities or regulated citizens on Indian lands who might threaten to breach treaties with Indians or otherwise disrupt the peace.[11] For example, early treaties that dealt with questions of peace and war plainly involved some sort of sovereign-to-sovereign relationship. See, e.g., Treaty with the Cherokees (1791), 7 Stat. 39. And the early Trade and Intercourse Acts regulated only the criminal conduct of U. S. citizens on Indian lands.

This congruence—between the government's actions and the Constitution's enumerated powers—likely reflects the fact that those powers, collectively, responded to the most pressing concerns of the day: that Congress could not enforce its treaties with Indians, police the frontier, or regulate unscrupulous traders—all of which caused violence and raised the specter of war with Indian tribes. As noted, when Congress tried to expand its domain in 1817 to regulate the criminal acts of Indians, one Justice of this Court found it to be a palpable violation of Congress' limited powers. See

*Bailey*, 24 F. Cas., at 938–940. And, all the while, States continued to regulate matters relating to Indians within their territorial limits. The normal federalist dynamic thus extended to the domain of Indian affairs: The Federal Government was supreme with respect to its enumerated powers, but States retained all residual police powers within their territorial borders. See *id.*, at 938–939; *McCulloch*, 4 Wheat., at 405. And the Federal Government's enumerated powers were not unlimited, but confined to their plain meaning and limits.

B

**\*49** So where did the idea of a "plenary power" over Indian affairs come from? As it turns out, little more than *ipse dixit*. The story begins with loose dicta from *Cherokee Nation v. Georgia*, 5 Pet. 1 (1831). In that case, the Cherokee Nation petitioned this Court for an injunction to prevent Georgia from enforcing state laws in Cherokee territory and from seizing Cherokee lands. *Id.*, at 11. The Tribe asserted that Article III both allowed the suit and gave this Court original jurisdiction because the suit was one by a "foreign Stat[e]" against the State of Georgia. § 2, cls. 1–2. Writing for the Court, Chief Justice Marshall admitted that the Tribe's argument was "imposing": The Tribe was "a state, as a distinct political society," but it was "not a state of the union." 5 Pet., at 16. Nonetheless, the Court refused to hear the case. As Marshall reasoned, Indian tribes were not "foreign state[s] in the sense of the constitution," as shown in part by the Commerce Clause's delineation of States, foreign nations, and Indian tribes.[12] *Ibid.* Rather, Marshall reasoned that the Indian tribes occupied a unique status, which he characterized as that of "domestic dependent nations" whose "relation to the United States resembles that of a ward to his guardian." *Id.*, at 17.

Other than this opinion, I have been unable to locate any evidence that the Founders thought of the Federal Government as having a generalized guardianship-type relationship with the Indian tribes—much less one conferring any congressional power over Indian affairs. To the contrary, such a status seems difficult to square with the relationship between the Federal Government and tribes, which at times involved warfare, not trust. See, *e.g.*, Fletcher & Singel 904–907; F. Hutchins, Tribes and the American Constitution 104 (2000). And, if such a general relationship existed, there would seem to be little need for the Federal Government to have ratified specific treaties with tribes calling for federal protection. *E.g.*, Treaty with the Kaskaskia (1803), 7 Stat. 78;

Treaty with the Creeks (1790), *id.*, at 35. At bottom, *Cherokee Nation*'s loose dicta cannot support a broader power over Indian affairs.

Nevertheless, *Cherokee Nation*'s suggestion was picked up decades later in *United States v. Kagama*, 118 U. S. 375 (1886)—the first case to actually apply a broader, unenumerated power over Indian affairs. In *Kagama*, the Court considered the Major Crimes Act of 1885, which, similar to the 1817 Act held unconstitutional by Justice McLean while riding circuit, regulated crimes on Indian lands committed by Indians; the Major Crimes Act differed from the 1817 Act only in that it extended to crimes committed against other Indians. See § 9, 23 Stat. 385. Similarly to Justice McLean's *Bailey* opinion, the Court first rejected the idea that the Commerce Clause could support the Act—reasoning that "it would be a very strained construction of th[e] clause, that a system of criminal laws for Indians ... was authorized by the grant of power to regulate commerce with the Indian tribes." *Kagama*, 118 U. S., at 378–379.

But the Court determined that the Major Crimes Act was constitutional nevertheless. As the Court first noted, the Act was "confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation." *Id.*, at 383. The Court then cited several cases arising from congressional regulations of Indian lands located within federal territories, noting that Congress had previously punished offenses committed on such lands. See *id.*, at 380 (citing *United States v. Rogers*, 4 How. 567, 572 (1846); *Murphy v. Ramsey*, 114 U. S. 15, 44 (1885); *American Ins. Co. v. 356 Bales of Cotton*, 1 Pet. 511, 542 (1828)). Next, the Court reasoned that the Act "does not interfere with the process of the State courts within the reservation, nor with the operation of State laws upon white people found there." 118 U. S., at 383. Instead, the Act's "effect[s are] confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation." *Ibid.*

**\*50** That sort of language seems to view Indian lands as akin to quasi-federal lands or perhaps "external" to the Nation's normal affairs. But nothing the Court cited actually supported such a view. For example, the fact that the Federal Government could regulate Indians on federal territories does not justify such regulations for Indians within a State's limits. Nor does the fact that tribes were "external" at the Founding mean that they remained "external" in 1886.[13] Nor does the fact that Congress could regulate citizens who went onto Indian lands, see *Rogers*, 4 How., at 572, mean that Congress

automatically has the power to regulate Indians on those lands.

But the Court then subtly shifted its approach. Drawing on *Cherokee Nation*, the Court next asserted that "Indian tribes *are* the wards of the nation." *Kagama*, 118 U. S., at 383 (emphasis in original). Because of "their very weakness and helplessness," it reasoned, "so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power." *Id.*, at 384. This power "over th[e] remnants" of the Indian tribes, the Court stated, "must exist in [the federal] government, because it never has existed anywhere else," "because it has never been denied, and because it alone can enforce its laws on all the tribes." *Id.*, at 384–385.

These pronouncements, however, were pure *ipse dixit*. The Court pointed to nothing in the text of the Constitution or its original understanding to support them. Nor did the Court give any other real support for those conclusions; instead, it cited three cases, all of which held only that States were restricted in certain ways from governing Indians on Indian lands. *Id.*, at 384 (citing *Worcester* v. *Georgia*, 6 Pet. 515 (1832); *Fellows* v. *Blacksmith*, 19 How. 366 (1856) (only the Federal Government, not private parties, can enforce removal treaties); *The Kansas Indians*, 5 Wall. 737 (1867) (States cannot tax Indian lands)). It does not follow from those cases that the Federal Government has any additional authority with regard to Indians—much less a sweeping, unbounded authority over all matters relating to Indians. Cf. *Worcester*, 6 Pet., at 547 (suggesting that tribes had long been left to regulate their internal affairs). At each step, *Kagama* thus lacked any constitutional basis.

Nonetheless, in the years after *Kagama*, this Court started referring to a "plenary power" or "plenary authority" that Congress possessed over Indian tribes, as well as a trust relationship with the Indians. See, *e.g.*, *Stephens* v. *Cherokee Nation*, 174 U. S. 445, 478 (1899); *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565 (1903); *Winton* v. *Amos*, 255 U. S. 373, 391 (1921). And, in the decades since, this Court has increasingly gestured to such a plenary power, usually in the context of regulating a tribal government or tribal lands, while conspicuously failing to ground the power in any constitutional text and cautioning that the power is not absolute. See, *e.g.*, *ante*, at 13 (noting this problem); *United States* v. *Alcea Band of Tillamooks*, 329 U. S. 40, 54 (1946)

(opinion of Vinson, C. J.); *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56–57 (1978).

The majority's opinion today continues in that vein—only confirming its lack of any constitutional basis. Like so many cases before it, the majority's opinion lurches from one constitutional hook to another, not quite hanging the idea of a plenary power on any of them, while insisting that the plenary power is not absolute. See *ante*, at 10–13. While I empathize with the majority regarding the confusion that *Kagama* and its progeny have engendered, I cannot reflexively reaffirm a power that remains in search of a constitutional basis. And, while the majority points to a few actual constitutional provisions, like the Commerce and Treaty Clauses, those provisions cannot bear the weight that our cases have placed upon them.

**\*51** At bottom, *Kagama* simply departed from the text and original meaning of the Constitution, which confers only the enumerated powers discussed above. Those powers are not boundless and did not operate differently with respect to Indian tribes at the Founding; instead, they conferred all the authority that the new Federal Government needed at the time to deal with Indian tribes. When dealing with Indian affairs, as with any other affairs, we should always evaluate whether a law can be justified by the Constitution's enumerated powers, rather than pointing to amorphous powers with no textual or historical basis.

## IV

Properly understood, the Constitution's enumerated powers cannot support ICWA. Not one of those powers, as originally understood, comes anywhere close to including the child custody proceedings of U. S. citizens living within the sole jurisdiction of States. Moreover, ICWA has no constitutional basis even under *Kagama* and later precedents. While those cases have extended the Federal Government's Indian-related powers beyond the original understanding of the Constitution, this Court has never extended them far enough to support ICWA. Rather, virtually all of this Court's modern Indian-law precedents—upholding laws that regulate tribal lands, tribal governments, and commerce with tribes—can be understood through a core conceptual framework that at least arguably corresponds to Founding-era practices. To extend those cases to uphold ICWA thus would require ignoring the context of those precedents, treating their loose "plenary power" language as talismanic, and transforming that power into

the truly unbounded, absolute power that they disclaim. The basic premise that the powers of the Federal Government are limited and defined should counsel against taking that step.


A

ICWA lacks any foothold in the Constitution's original meaning. Most obviously, ICWA has no parallel from the Founding era; it regulates the child custody proceedings of U. S. citizens in state courts—not on Indian lands—merely because the children involved happen to be Indians. No law from that time even came close to asserting a general police power over citizens who happened to be Indians—by, for example, regulating the acts of Indians who were also citizens and who lived within the sole jurisdiction of States (and not on Indian lands). If nothing else, the dearth of Founding-era laws even remotely similar to ICWA should give us pause.

Nor can ICWA find any support in the Constitution's enumerated powers as originally understood. I take those powers in turn: First, the Property Clause cannot support ICWA because ICWA is not based on the disposition of federal property and is not limited to federal lands; in fact, the Federal Government owns very little Indian land. See Statistical Record of Native North Americans 1054 (M. Reddy ed. 1993); S. Prakash, Against Tribal Fungibility, 89 Cornell L. Rev. 1069, 1092–1093 (2004).

Second, the Treaty Clause cannot support ICWA because no one has identified a treaty that governs child custody proceedings—much less a treaty with each of the 574 federally recognized tribes to which ICWA applies. 25 U. S. C. §§ 1903(3), (8); 86 Fed. Reg. 7554 (2021). Nor could they; Congress declared an end to treaty-making with Indian tribes in 1871, and it appears that well over half of the tribes lack any treaty with the Federal Government. See 16 Stat. 566; Brief for Tribal Defendants 37–38; see also generally Vols. 1–2 C. Kappler, Indian Affairs: Laws and Treaties (2d ed. 1902, 1904). And, in part because one Congress can never bind a later Congress, the Federal Government retains the power to abrogate treaties and has done so for at least some Indian treaties. E.g., Lone Wolf, 187 U. S., at 566; accord, La Abra Silver Mining Co. v. United States, 175 U. S. 423, 460 (1899); 1 W. Blackstone, Commentaries on the Laws of England 90 (1765) (Blackstone). Whatever number of treaties remain in force, they cannot justify ICWA.

*52 Third, the Commerce Clause cannot support ICWA. As originally understood, the Clause confers a power only over buying and selling, not family law and child custody disputes. Even under our more modern, expansive precedents, the Clause is still limited to only "economic activity" and cannot support the regulation of core domestic matters like family or criminal laws. See Lopez, 514 U. S., at 560; United States v. Morrison, 529 U. S. 598, 610–611 (2000); National Federation of Independent Business v. Sebelius, 567 U. S. 519, 552 (2012) (opinion of ROBERTS, C. J.); id., at 657 (Scalia, J., dissenting). [14] And even Kagama itself rejected the Commerce Clause as a basis for any sort of expansive power over Indian affairs. 118 U. S., at 378–379. Therefore, nothing about that Clause supports a law, like ICWA, governing child custody disputes in state courts.

Fourth, the Federal Government's foreign-affairs powers cannot support ICWA. For today's purposes, I will assume that some tribes still enjoy the same sort of pre-existing sovereignty and autonomy as tribes at the Founding, thereby establishing the sort of quasi-foreign, government-to-government relationship that appears to have defined those powers at the Founding. Even so, the foreign-affairs powers can operate only externally, in the context of lands under the purview of another sovereign (like Indian tribal lands) or in the context of a government-to-government relationship (such as matters of diplomacy or peace). See Curtiss-Wright, 299 U. S., at 315, 319. But regulating child custody proceedings of citizens within a State is the paradigmatic domestic situation; the Federal Government surely could not apply its foreign-affairs powers to the domestic family-law or criminal matters of any other citizens merely because they happened to have citizenship or ancestral connections with another nation. [15] Apart from the single provision that allows tribal governments jurisdiction over proceedings for Indians on tribal lands, see § 1911(a), ICWA is completely untethered from any external aspect of our Nation that could somehow implicate these powers.

That should be the end of the analysis. Again, as the majority notes, our Federal Government has only the powers that the Constitution enumerates. See ante, at 10–11; McCulloch, 4 Wheat., at 405. Not one of those enumerated powers justifies ICWA. Therefore, it has no basis whatsoever in our constitutional system.


B

**\*53** Even taking our "plenary power" precedents as given (as the majority seems to do for purposes of these cases), nothing in those precedents supports ICWA. To be sure, this Court has repeatedly used loose language concerning a "plenary power" and "trust relationship" with Indians, and that language has been taken by some to displace the normal constitutional rules. See *ante*, at 10–15. But, even taken to their new limits, the Court's precedents have upheld only a variety of laws that either regulate commerce with Indians or deal with Indian tribes and their lands. Despite citing a veritable avalanche of precedents, respondents have failed to identify a single case where this Court upheld a federal statute comparable to ICWA.

As noted above, *Kagama* was careful to note that the Major Crimes Act at issue was "confined to the acts of an Indian of some tribe, of a criminal character, committed within the limits of the reservation." 118 U. S., at 383. In that vein, the opinion cited cases arising from congressional regulations of Indian lands located within Federal Territories. See *id.*, at 380 (citing *Rogers*, 4 How., at 572; citing *Murphy*, 114 U. S., at 44, and *356 Bales of Cotton*, 1 Pet., at 542). In other words, it is possible that *Kagama* viewed Congress as having the power to regulate crimes by Indians on Indian lands because those lands remained in a sense "external" to the Nation's normal affairs and akin to quasi-federal lands.

Again, that would be a non sequitur. Nevertheless, at a high level, it is possible to see how *Kagama* was rooted in the same foreign-affairs and territorial powers that authorized much of the early Trade and Intercourse Acts (and which Congress may have relied upon when passing the 1817 Act). See Cohen § 5.01[4], at 390, and nn. 47, 48 (linking *Kagama* with *Curtiss-Wright*, 299 U. S., at 318); *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978) (describing Indian tribes as possessing a pre-existing sovereignty, apart from the United States). And, viewed in that light, it would make sense to limit *Kagama* to that conceptual root, treating regulations of tribal lands and tribal governments as "external" to the normal affairs of the Nation.

Indeed, such a line explains almost all of the myriad cases that respondents have cataloged as showing an unqualified power over Indian affairs. See, *e.g.*, *Michigan* v. *Bay Mills Indian Community*, 572 U. S. 782, 789 (2014) (tribal government's sovereign immunity); *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 299, 308 (1902) (federal approval of mining leases on tribal lands); *Stephens*, 174 U. S., at 476–477 (federal court in Indian territory). Many, for example, dealt with federal laws

that purported to diminish a tribe's territory or jurisdiction. *South Dakota* v. *Yankton Sioux Tribe*, 522 U. S. 329 (1998); *Negonsott* v. *Samuels*, 507 U. S. 99 (1993); *Washington* v. *Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463 (1979); *United States* v. *Hellard*, 322 U. S. 363 (1944). Others dealt with state taxes on Indian lands. See, *e.g.*, *Cotton Petroleum Corp.* v. *New Mexico*, 490 U. S. 163 (1989); *Bryan* v. *Itasca County*, 426 U. S. 373 (1976); *Board of County Comm'rs* v. *Seber*, 318 U. S. 705 (1943); *Choate* v. *Trapp*, 224 U. S. 665 (1912). Others still have permitted the Federal Government to diminish a tribe's self-government. See *Santa Clara Pueblo*, 436 U. S., at 56–57. And yet others, in *Kagama*'s direct lineage, dealt with crimes on Indian lands. See, *e.g.*, *Lara*, 541 U. S., at 200; see also, *e.g.*, *United States* v. *Cooley*, 593 U. S. ___, ___ (2021) (slip op., at 1); *Wheeler*, 435 U. S., at 323–324.

In doing so, some of those criminal law cases reasoned that the Double Jeopardy Clause permits separate punishments by tribal governments and the Federal Government because of the tribe's separate sovereignty, underscoring *Kagama*'s conceptual root. See, *e.g.*, *Cooley*, 593 U. S., at ___ (slip op., at 1); *Lara*, 541 U. S., at 200. And, along the way, at least some of these cases clarified, like *Kagama*, that they dealt not with "Indians who have left or never inhabited reservations set aside for their exclusive use or who do not possess the usual accoutrements of tribal self-government," but only with Indians residing on Indian lands. *McClanahan* v. *Arizona Tax Comm'n*, 411 U. S. 164, 167–168 (1973); accord, *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 383 (1976) (*per curiam*) (dealing with "an adoption proceeding in which all parties are members of the Tribe and residents of the Northern Cheyenne Indian Reservation"); *United States* v. *Algoma Lumber Co.*, 305 U. S. 415, 417 (1939) (regulations of "contracts for the sale of timber on land of the Klamath Indian Reservation"). In case after case, the law at issue purported to reach only tribal governments or tribal lands, no more.

**\*54** To be sure, applying *Kagama*'s conceptual framework ultimately reveals a catch-22 of sorts: If Congress regulates tribal governments as a matter of external affairs, then such regulation seems to undercut the very tribal sovereignty that serves as the basis for that congressional power. See *Lara*, 541 U. S., at 214–215 (THOMAS, J., concurring in judgment). But that appears to be a hallmark of *Kagama* and its progeny, not a peculiarity. As Chief Justice Marshall once stated, Indians are neither wholly foreign nor wholly domestic, but are instead "domestic dependent nations," akin

to " '[t]ributary' " states. *Worcester*, 6 Pet., at 561; *Cherokee Nation*, 5 Pet., at 16–17. It may be that this contradiction is simply baked into our Indian jurisprudence. And, in any event, recognizing the proper conceptual root for these precedents makes the most sense of them as a textual and original matter—and it is surely preferable to continuing along this meandering and ill-defined path.

Yet, even confining *Kagama*'s conceptual error to its roots, the majority seems concerned that other precedents suggest that the Commerce Clause has broader application with respect to Indian affairs. But many of this Court's precedents, even when referring to some broader power, dealt with laws that governed trade with Indians, no more. See, *e.g.*, *United States* v. *Holliday*, 3 Wall. 407 (1866) (selling liquor to Indians); *Perrin* v. *United States*, 232 U. S. 478 (1914) (same); *United States* v. *Sandoval*, 231 U. S. 28 (1913) (same); *Dick* v. *United States*, 208 U. S. 340 (1908) (selling liquor on Indian lands). Thus, even if those cases suggest a broader power, they must be taken in context. And the cases that the majority cites for its proposition turn out to be the ones that do so in the most obvious dicta. For example, *Cotton Petroleum* considered state taxes on Indian lands; it had no need to opine on the Commerce Clause beyond explaining that Indian tribes are not States. See 490 U. S., at 192. In a similar vein, *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), held only that the Commerce Clause does not confer any authority to abrogate *state* sovereign immunity; any language about the breadth of the "Indian Commerce Clause" was wholly unnecessary to that result. *Id.*, at 62. Shorn of their dicta, all of these precedents reflect only the longstanding—and enumerated—authority to regulate commerce with Indian tribes.

Other precedents cited by the majority that do not fit into *Kagama*'s conceptual framework are easily explicable as supported by other, specific powers of Congress. For example, *Lone Wolf* held that Congress can enact laws that violate treaties with Indians; that holding was justified by Congress' general power to abrogate an existing law or treaty. 187 U. S., at 565–566; accord, *La Abra Silver Mining Co.*, 175 U. S., at 460; Blackstone 90. Another treaty-based case, *Delaware Tribal Business Comm.* v. *Weeks*, 430 U. S. 73 (1977), involved the disposition of funds paid pursuant to a treaty. It therefore makes sense as a matter of both the Property and Treaty Clauses. And yet another treaty-based case involved a promise by the United States to establish a discrete trust fund with $500,000 for a Tribe, with annual interest to be paid to the Tribe. See *Seminole Nation* v. *United States*, 316 U. S. 286, 293–294 (1942). Though that case spoke of historic trust obligations, it arose from an explicit promise to create a trust with $500,000.[16] There is little reason to view such cases as expanding Congress' powers.

**\*55** Accordingly, the context of all these cases points to lines that are at least plausibly rooted in Founding-era practices and the text of the Constitution. See *Brown* v. *Davenport*, 596 U. S. ___, ___−___ (2022) (slip op., at 20–21) (judicial opinions must be taken in context, not read like statutes). Congress can regulate commerce with Indian tribes; it may be able to regulate tribal governments and lands in *Kagama*'s vein; and it can make treaties, dispose of federal funds, and establish discrete trusts.[17]

ICWA does not remotely resemble those practices. It does not regulate commerce, tribal governments, or tribal lands. Nor is it based on treaties, federal funds, or any discrete trust. By regulating family-law matters of citizens living within the sole jurisdiction of States merely because they happen to be Indians, ICWA stands clearly outside the framework of our Indian-law precedents. To uphold ICWA therefore would drastically expand the context in which we have previously upheld Indian-related laws in *Kagama*'s framework.

But, even if that is so, the majority appears to ask "*why* Congress's power is limited to these scenarios." *Ante*, at 17, n. 4. The majority nearly answers itself: because our Constitution is one of enumerated powers, and limiting Congress' authority to those "buckets" would bring our jurisprudence closer to the powers enumerated by the text and original meaning of the Constitution. See *ante*, at 11, 14, 17, n. 4. While I share the majority's frustration with petitioners' limited engagement with the Court's precedents, I would recognize the contexts of those cases and limit the so-called plenary power to those contexts. Such limits would at least start us on the road back to the Constitution's original meaning in the area of Indian law.

\* \* \*

The Constitution confers enumerated powers on the Federal Government. Not one of them supports ICWA. Nor does precedent. To the contrary, this Court has never upheld a federal statute that regulates the noncommercial activities of a U. S. citizen residing on lands under the sole jurisdiction of States merely because he happens to be an Indian. But that is exactly what ICWA does: It regulates child custody

proceedings, brought in state courts, for those who need never have set foot on Indian lands. It is not about tribal lands or tribal governments, commerce, treaties, or federal property. It therefore fails equally under the Court's precedents as it fails under the plain text and original meaning of the Constitution.

If there is one saving grace to today's decision, it is that the majority holds only that Texas has failed to demonstrate that ICWA is unconstitutional. See *ante*, at 15, 17. It declines to disturb the Fifth Circuit's conclusion that ICWA is consistent with Article I, but without deciding that ICWA is, in fact, consistent with Article I. But, given ICWA's patent intrusion into the normal domain of state government and clear departure from the Federal Government's enumerated powers, I would hold that Congress lacked any authority to enact ICWA.

**\*56** I respectfully dissent.

Justice Alito, dissenting.
The first line in the Court's opinion identifies what is most important about these cases: they are "about children who are among the most vulnerable." *Ante*, at 1. But after that opening nod, the Court loses sight of this overriding concern and decides one question after another in a way that disserves the rights and interests of these children and their parents, as well as our Constitution's division of federal and state authority.

Decisions about child custody, foster care, and adoption are core state functions. The paramount concern in these cases has long been the "best interests" of the children involved. See, *e.g.*, 3 T. Zeller, Family Law and Practice §§ 32.06, 32.08 (2022); 6 *id.*, § 64.06. But in many cases, provisions of the Indian Child Welfare Act (ICWA) compel actions that conflict with this fundamental state policy, subordinating what family-court judges—and often biological parents—determine to be in the best interest of a child to what Congress believed is in the best interest of a tribe.

The cases involved in this litigation illustrate the distressing consequences. To its credit, the Court acknowledges what happened to these children, but its decision does nothing to prevent the repetition of similar events. Take A. L. M. His adoption by a loving non-Indian couple, with whom he had lived for over a year and had developed a strong emotional bond, was initially blocked even though it was supported by both of his biological parents, his grandmother, and the testimony of both his court-appointed guardian and

a psychological expert. Because a Tribe objected, he would have been sent to an Indian couple that he did not know in another State had the non-Indian couple not sought and obtained an emergency judicial order.

Baby O.'s story is similar. A non-Indian couple welcomed Baby O. into their home when she was three days old and cared for her for more than two years while seeking to adopt her. The couple ensured that Baby O.'s serious medical needs were met and maintained regular visits with Baby O.'s biological mother so that Baby O. could have a continuing relationship with her biological family. Even though both biological parents supported the couple's adoption of Baby O., a Tribe objected and sought to send Baby O. to live in foster care on a reservation in another State. Only after the couple joined this lawsuit did the Tribe agree to a settlement that would permit the couple to finalize the adoption.

After nearly two years moving between foster-care placements, Child P., whose maternal grandmother is a member of an Indian Tribe, was placed with a non-Indian couple who provided her a stable home. After the placement, the Tribe, which had told the state court years earlier that Child P. was not eligible for tribal membership, reversed its position without explanation and enrolled her as a member. The Tribe then objected to the couple's efforts to adopt Child P., even though her court-appointed guardian believed that the adoption was in Child P.'s best interest. "To comply with the ICWA," the state court removed Child P. from the couple's custody and placed her with her maternal grandmother, "who had lost her foster license due to a criminal conviction." *Ante*, at 8 (majority opinion).

**\*57** Does the Constitution give Congress the authority to bring about such results? I would hold that it does not. Whatever authority Congress possesses in the area of Indian affairs, it does not have the power to sacrifice the best interests of vulnerable children to promote the interests of tribes in maintaining membership. Nor does Congress have the power to force state judges to disserve the best interests of children or the power to delegate to tribes the authority to force those judges to abide by the tribes' priorities regarding adoption and foster-care placement.

I

The Court makes a valiant effort to bring coherence to what has been said in past cases about Congress's power in this

area, but its attempt falls short. At the end of a lengthy discussion, the majority distills only this nugget: Congress's power over Indian affairs is "plenary" but not "absolute." *Ante*, at 13–14. The majority in today's cases did not coin this formulation; it merely repeats what earlier cases have said. See, *e.g.*, *Delaware Tribal Business Comm.* v. *Weeks*, 430 U. S. 73, 84 (1977) (quoting *United States* v. *Alcea Band of Tillamooks*, 329 U. S. 40, 54 (1946) (plurality opinion)). But the formulation's pedigree cannot make up for its vacuity. The term "plenary" is defined in one dictionary after another as "absolute." See, *e.g.*, New Oxford American Dictionary 1343 (3d ed. 2010); Webster's Third New International Dictionary 1739 (2002); The Random House Dictionary of the English Language 1486 (2d ed. 1987). If we accept these definitions, what the Court says is that absolute ≠ absolute and plenary ≠ plenary, violating one of the most basic laws of logic. Surely we can do better than that.

We need not map the outer bounds of Congress's Indian affairs authority to hold that the challenged provisions of ICWA lie outside it. We need only acknowledge that even so-called plenary powers cannot override foundational constitutional constraints. By attempting to control state judicial proceedings in a field long-recognized to be the virtually exclusive province of the States, ICWA violates the fundamental structure of our constitutional order.

In reaching this conclusion, I do not question the proposition that Congress has broad power to regulate Indian affairs. We have "consistently described" Congress's "powers to legislate in respect to Indian tribes" as " 'plenary and exclusive.' " *United States* v. *Lara*, 541 U. S. 193, 200 (2004) (collecting cases). Reflecting this understanding, we have sanctioned a wide range of enactments that bear on Indian tribes and their members, sometimes (regrettably) without tracing the source of Congress's authority to a particular enumerated power. See, *e.g.*, *Santa Clara Pueblo* v. *Martinez*, 436 U. S. 49, 56–58 (1978) (modifying tribal governments' powers of self-government); *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565–566 (1903) (transferring tribal land). Nor do I dispute the notion that Congress has undertaken responsibilities that have been roughly analogized to those of a trustee. In exercising its constitutionally-granted powers, the Federal Government, "following 'a humane and self imposed policy,' " has committed itself to " 'moral obligations of the highest responsibility and trust' " to the Indian people. *United States* v. *Jicarilla Apache Nation*, 564 U. S. 162, 176 (2011). [1]

*58 Nevertheless, we have repeatedly cautioned that Congress's Indian affairs power is not unbounded. And while we have articulated few limits, we have acknowledged what should be one obvious constraint: Congress's authority to regulate Indian affairs is limited by other "pertinent constitutional restrictions" that circumscribe the legislative power. *United States* v. *Creek Nation*, 295 U. S. 103, 109–110 (1935); see also *New York* v. *United States*, 505 U. S. 144, 156 (1992) ("Congress exercises its conferred powers subject to the limitations contained in the Constitution").

For example, in *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), we held that Congress's power under the Indian Commerce Clause was limited by "the background principle of state sovereign immunity embodied in the Eleventh Amendment." *Id.*, at 72. We rejected the Tribe's argument that Congress's Indian affairs power could exceed other constitutional restrictions when "necessary" to " 'protect the tribes' " from state interference. *Id.*, at 60. Foundational constitutional principles like state sovereign immunity, we observed, are "not so ephemeral as to dissipate when the subject of the suit is [in] an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government." *Id.*, at 72. Even when we have sustained legislation, we have cautioned against congressional overreach. See *Lara*, 541 U. S., at 203–205. We have suggested that a law may exceed Congress's power to regulate Indian affairs if it has "an unusual legislative objective," brings about "radical changes in tribal status," or "interfere[s] with the power or authority of any State." *Ibid.*

We have rarely had occasion to enforce these limits, in part because the enactments before us have often fallen comfortably within the historical bounds of Congress's enumerated powers. See *ante*, at 33–38 (THOMAS, J., dissenting). But that does not mean that we should shy away from enforcement when presented with a statute that exceeds what the Constitution allows.

## II

Congress's power in the area of Indian affairs cannot exceed the limits imposed by the "system of dual sovereignty between the States and the Federal Government" established by the Constitution. *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991). "The powers delegated ... to the federal government are few and defined," while "[t]hose which ... remain in the State governments are numerous and indefinite." The

Federalist 45, p. 292 (C. Rossiter ed. 1961) (J. Madison). The powers retained by the States constitute " 'a residuary and inviolable sovereignty,' " secure against federal intrusion. *Printz* v. *United States*, 521 U. S. 898, 919 (1997) (quoting The Federalist No. 39, at 245 (J. Madison)). This structural principle, reinforced in the Tenth Amendment, "confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York*, 505 U. S., at 157. The corollary is also true: in some circumstances, the powers reserved to the States inform the scope of Congress's power. *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___ (2018) (slip op., at 15). This includes in the area of Indian affairs. *Dick* v. *United States*, 208 U. S. 340, 353 (1908) (Congress's primacy over Indian tribes and States' "full and complete jurisdiction over all persons and things within [their] limits" are "fundamental principles ... of equal dignity, and neither must be so enforced as to nullify or substantially impair the other").

*\*59* While we have never comprehensively enumerated the States' reserved powers, we have long recognized that governance of family relations—including marriage relationships and child custody—is among them. It is not merely that these matters "have traditionally been governed by state law" or that the responsibility over them "remains primarily with the States," *ante*, at 14 (majority opinion), but that the field of domestic relations "has long been regarded as a *virtually exclusive* province of the States," *Sosna* v. *Iowa*, 419 U. S. 393, 404 (1975) (emphasis added). "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States, and not to the laws of the United States." *In re Burrus*, 136 U. S. 586, 593–594 (1890). "Cases decided by this Court over a period of more than a century bear witness to this historical fact." *Sosna*, 419 U. S., at 404. See, *e.g.*, *United States* v. *Windsor*, 570 U. S. 744, 766 (2013); *McCarty* v. *McCarty*, 453 U. S. 210, 220 (1981); *Simms* v. *Simms*, 175 U. S. 162, 167 (1899); *Pennoyer* v. *Neff*, 95 U. S. 714, 722, 734–735 (1878).

This does not mean that federal law may never touch on family matters. As the majority observes, *ante*, at 14, we have held that federal legislation that regulates certain "economic aspects of domestic relations" can preempt conflicting state law. *Ridgway* v. *Ridgway*, 454 U. S. 46, 55–56 (1981) (providing an order of precedence for beneficiaries of a service member's life insurance policy); see, *e.g.*, *Hillman* v. *Maretta*, 569 U. S. 483, 485–486 (2013) (allocating federal death benefits); *McCarty*, 453 U. S., at 211, 235–236 (allocating military retirement pay). But we have never

held that Congress under any of its enumerated powers may regulate the very nature of those relations or dictate their creation, dissolution, or modification. Nor could we and remain faithful to our founding. "No one denies that the States, at the time of the adoption of the Constitution, possessed full power over" ordinary family relations; and "the Constitution delegated no authority to the Government of the United States" in this area. *Haddock* v. *Haddock*, 201 U. S. 562, 575 (1906). It is a "most important aspect of our federalism" that "the domestic relations of husband and wife"—and parent and child—are "matters reserved to the States and do not belong to the United States." *Williams* v. *North Carolina*, 325 U. S. 226, 233 (1945) (internal quotation marks and citation omitted).

As part of that reserved power, state courts have resolved child custody matters arising among state citizens since the earliest days of the Nation. See, *e.g.*, *Nickols* v. *Giles*, 2 Root 461, 461–462 (Conn. Super. Ct. 1796) (declining to remove daughter from mother's care); *Wright* v. *Wright*, 2 Mass. 109, 110–111 (1806) (awarding custody of child to mother following divorce); *Commonwealth* v. *Nutt*, 1 Browne 143, 145 (Pa. Ct. Common Pleas 1810) (assigning custody of child to her sister). Then, as now, state courts' overriding concern was the best interests of the children. See, *e.g.*, *Commonwealth* v. *Addicks*, 5 Binn. 520, 521 (Pa. 1813) (court's "anxiety is principally directed" to the child's welfare); *In re Waldron*, 13 Johns. Cas. 418, 421 (N. Y. Sup. Ct. 1816) (court is "principally to be directed" by "the benefit and the welfare" of the child). By the mid-19th century, States had begun enacting statutory adoption schemes, enforceable through state courts, "to provide for the welfare of dependent children," starting with Massachusetts in 1851. S. Presser, The Historical Background of the American Law of Adoption, 11 J. Fam. L. 443, 453, 465 (1971) (Presser); 1851 Mass. Acts ch. 324. Over the next 25 years, 23 other States followed suit. Presser 465–466, and nn. 111, 112. As the cases before us attest, this historic tradition of state oversight of child custody and welfare through state judicial proceedings continues to the present day.

*\*60* The ICWA provisions challenged here do not simply run up against this traditional state authority, they run roughshod over it when the State seeks to protect one of its young citizens who also happens to be a member of an Indian tribe or who is the biological child of a member and eligible for tribal membership, herself. 25 U. S. C. § 1903(4). In those circumstances, ICWA requires a State to abandon the carefully-considered judicial procedures and standards it has

established to provide for a child's welfare and instead apply a scheme devised by Congress that focuses not solely on the best interest of the child, but also on "the stability and security of Indian tribes." § 1902. That scheme requires States to invite tribal authorities with no existing relationship to a child to intervene in judicial custody proceedings, §§ 1911(c), 1912(a), 1914. It requires States to replace their reasoned standards for termination of parental rights and placement in foster care with standards that favor the interests of an Indian custodian over those of the child. §§ 1912(e), (f ). It forces state courts to give Indian couples (even those of different tribes) priority in adoption and foster-care placements, even over a non-Indian couple who would better serve a child's emotional and other needs. §§ 1915(a), (b). And it requires state judges to subordinate the State's typical custodial considerations to a tribe's alternative preference. § 1915(c).

It is worth underscoring that ICWA's directives apply even when the child is not a member of a tribe and has never been involved in tribal life, and even when a child's biological parents object. As seen in the cases before us, the sad consequence is that ICWA's provisions may delay or prevent a child's adoption by a family ready to provide her a permanent home.

ICWA's mandates do not simply touch on family matters. They override States' authority to determine—and implement through their courts—the child custody and welfare policies they deem most appropriate for their citizens. And in doing so, the mandates harm vulnerable children and their parents. In my view, the Constitution cannot countenance this result. The guarantee of dual sovereignty embodied in the constitutional structure "is not so ephemeral as to dissipate" simply because Congress invoked a so-called plenary power. *Seminole Tribe of Fla.*, 517 U. S., at 72. The challenged ICWA provisions effectively "nullify" a State's authority to conduct state child custody proceedings in accordance with its own preferred family relations policies, a prerogative that States have exercised for centuries. *Dick*, 208 U. S., at 353. Congress's Indian affairs power, broad as it is, does not extend that far.[2]

The indicators we previously identified also signal that ICWA exceeds Congress's constitutional bounds. See *Lara*, 541 U. S., at 203–205. First, the law has "an unusual legislative objective." *Id.*, at 203. ICWA's attempt to control local judicial proceedings in a core field of state concern departs significantly from other Indian affairs legislation that we have sanctioned—laws that typically regulated actual commerce, related to tribal lands and governance, or fulfilled treaty obligations. See *ante*, at 33–38 (THOMAS, J., dissenting). Second, the law brings about "radical changes in tribal status," effectively granting tribes veto power over state judgments regarding the welfare of resident Indian children. *Lara*, 541 U. S., at 205. And third, the law "interfere[s] with the power [and] authority of [every] State" in the conduct of state judicial proceedings and determination of child custody arrangements. *Ibid.* That is, in fact, its express design. See, *e.g.*, §§ 1911(c), 1912, 1915. These indicators confirm that ICWA surpasses even a generous understanding of Congress's Indian affairs authority.

\* \* \*

**\*61** I am sympathetic to the challenges that tribes face in maintaining membership and preserving their cultures. And I do not question the idea that the best interests of children may in some circumstances take into account a desire to enable children to maintain a connection with the culture of their ancestors. The Constitution provides Congress with many means for promoting such interests. But the Constitution does not permit Congress to displace long-exercised state authority over child custody proceedings to advance those interests at the expense of vulnerable children and their families.

Because I would hold that Congress lacked authority to enact the challenged ICWA provisions, I respectfully dissent.

### All Citations

--- S.Ct. ----, 2023 WL 4002951

### Footnotes

1    Together with No. 21–377, *Cherokee Nation et al.* v. *Brackeen et al.,* No. 21–378, *Texas* v. *Haaland, Secretary of the Interior, et al.*, and No. 21–380, *Brackeen et al.* v. *Haaland, Secretary of the Interior, et al.*, also on certiorari to the same court.

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

1    Petitioners raised several other challenges that are not before this Court, including that ICWA's implementing regulations are arbitrary and capricious in violation of the Administrative Procedure Act.

2    Hernandez and the families, the State of Texas, the federal parties, and the Tribes all filed cross-petitions for certiorari. After the cases were consolidated, Hernandez, the families, and Texas proceeded as petitioners before this Court, and the federal parties and the Tribes proceeded as respondents.

3    JUSTICE ALITO's dissent criticizes the Court for "violating one of the most basic laws of logic" with our conclusion that "Congress's power over Indian affairs is 'plenary' but not 'absolute.' " *Post*, at 3–4. Yet the dissent goes on to make that very same observation. *Post*, at 4 ("[E]ven so-called plenary powers cannot override foundational constitutional constraints").

4    Texas floated a theory for the first time at oral argument. It said that, taken together, our plenary power cases fall into three buckets: (1) those allowing Congress to legislate pursuant to an enumerated power, such as the Indian Commerce Clause or the Treaty Clause; (2) those allowing Congress to regulate the tribes as government entities; and (3) those allowing Congress to enact legislation that applies to federal or tribal land. Tr. of Oral Arg. 55. According to Texas, ICWA is unconstitutional because it does not fall within any of these categories. We have never broken down our cases this way. But even if Texas's theory is descriptively accurate, Texas offers no explanation for *why* Congress's power is limited to these categories.

5    All petitioners argue that these provisions violate the anticommandeering principle. Since Texas has standing to raise these claims, we need not address whether the individual petitioners also have standing to do so.

6    To bolster their claim that the "active efforts" requirement is aimed at the States, petitioners point to a statement from the Department of the Interior asserting that the reference to "active efforts" reflects Congress's intent "to require *States* to affirmatively provide Indian families with substantive services and not merely make the services available." 81 Fed. Reg. 38791 (emphasis added). This statement does not move the needle. Neither § 1912(d) nor the regulations limit themselves to States; moreover, the regulations plainly contemplate that services will come from private organizations as well as the government. 25 CFR § 23.102 ("Agency means a nonprofit, for-profit, or governmental organization ... that performs, or provides services to biological parents, foster parents, or adoptive parents to assist in the administrative and social work necessary for foster, preadoptive, or adoptive placements"). The Department's statement is thus consistent with the plain language of § 1912, which applies to both private and state actors.

7    Though § 1915(e) does not specify that the records be retained by state courts, as opposed to state agencies, context makes clear that a "record of each such placement" refers to the state court's placement determination. See *Mississippi Band of Choctaw Indians* v. *Holyfield*, 490 U. S. 30, 40, n. 13 (1989). True, the provision leaves it up to the State whether to keep the records with a court or agency. See 25 CFR § 23.141(c) ("The State court or agency should notify the BIA whether these records are maintained within the court system or by a State agency"). But allowing the State to make that choice does not transform the documents into something other than a court record.

8    *Printz* noted uncertainty about whether the naturalization laws applied only to States that voluntarily "authorized their courts to conduct naturalization proceedings." 521 U. S., at 905–906. But on their face, these statutes did not require state consent. See Act of Mar. 26, 1790, ch. 3, § 1, 1 Stat. 103 (providing that an alien

could apply for citizenship "to any common law court of record, in any one of the states wherein he shall have resided for the term of one year at least"); Act of Apr. 14, 1802, ch. 28, 2 Stat. 153 (referring to "the supreme, superior, district or circuit court of some one of the states, or of the territorial districts of the United States, or a circuit or district court of the United States"). And as *Printz* recognized, this Court has never held that consent is required. 521 U. S., at 905–906; see *Holmgren* v. *United States*, 217 U. S. 509, 517 (1910) (holding that Congress could empower state courts to conduct naturalization proceedings, but because California had already authorized jurisdiction, reserving the question whether its consent was necessary); but see *United States* v. *Jones*, 109 U. S. 513, 520 (1883) (stating in dicta that the naturalization laws "could not be enforced" in state court "against the consent of the States"). In any event, while the naturalization laws are certainly not conclusive evidence, they are nonetheless relevant to discerning historical practice.

9    Respondents raise other objections to the individual petitioners' standing, including that the alleged injury is speculative because it depends on future proceedings to foster or adopt Indian children. Brief for Tribal Defendants 46–50; Brief for Federal Parties 49–52. Because we resolve the standing of all individual petitioners on the ground of redressability, we do not address respondents' other arguments.

10   Of course, the individual petitioners can challenge ICWA's constitutionality in state court, as the Brackeens have done in their adoption proceedings for Y. R. J. 994 F. 3d 249, 294 (2021) (principal opinion of Dennis, J.).

11   Texas claims that it can assert third-party standing on behalf of non-Indian families. This argument is a thinly veiled attempt to circumvent the limits on *parens patriae* standing. The case on which Texas relies, *Georgia* v. *McCollum*, 505 U. S. 42 (1992), allowed a State to represent jurors struck on the basis of race, because (among other reasons) "[a]s the representative of all its citizens, the State is the logical and proper party to assert the invasion of the constitutional rights of the excluded jurors in a criminal trial." *Id.*, at 56. But *McCollum* was not a suit against the Federal Government; moreover, it involved a "concrete injury" to the State and "some hindrance to the third party's ability to protect its own interests," neither of which is present here. *Id.*, at 55–56.

12   Although the individual petitioners join Texas's nondelegation challenge to § 1915(c), they raise no independent arguments about why they would have standing to bring this claim. Brief for Individual Petitioners 41, n. 6; Brief for Federal Parties 79, n. 14.

1    An analogous law might be if the Federal Government tried to regulate the child custody proceedings of U. S. citizens who are eligible for Russian, Mexican, Israeli, or Irish citizenship.

2    For example, though it was not exactly settled what it meant for an Indian to be a "member" of a State, the definition often turned on whether the Indian paid taxes in or was a citizen of that State. *Adoptive Couple* v. *Baby Girl*, 570 U. S. 637, 662, n. 2 (2013) (THOMAS, J., concurring).

3    As reflected in the debates on this statute, a majority of Congress thought that "the power of the General Government to legislate in all the territory belonging to the Union, not within the limits of any particular State, cannot be doubted; if the Government cannot make laws to restrain persons from going out of the limits of any of the States, and commit murders and depredations, it would be in vain to expect any peace with the Indian tribes." 3 Annals of Cong. 751.

4    The Constitution expressly denied certain powers to States, including the power to "enter into any Treaty," but it is silent on States' relationship with Indians. See Art. I, § 10; see also Letter from T. Jefferson to H. Knox (Aug. 10, 1791), in 22 Papers of Thomas Jefferson 27 (C. Cullen ed. 1986) (noting that States lack "a right to Treat with the Indians"). To be sure, in 1832, this Court held that Georgia could not extend its laws over the territory held by the Cherokee Nation. See *Worcester* v. *Georgia*, 6 Pet. 515. However, that opinion "yielded

to closer analysis," and Indian reservations have since been treated as part of the State they are within. See *Oklahoma* v. *Castro-Huerta*, 597 U. S. ___, ___ (2022) (slip op., at 5) (internal quotation marks omitted).

5    This decision thus was consistent with one issued 12 years later by this Court—which upheld the 1834 Trade and Intercourse Act's criminal provisions against a citizen of the United States, deemed not to be an Indian, who committed a crime on Indian lands within "a part of the territory of the United States, and not within the limits of any particular State." *United States* v. *Rogers*, 4 How. 567, 571–572 (1846).

6    Though the Court has only passingly discussed the Commerce Clause's application to commerce with foreign nations, see *Baston* v. *United States*, 580 U. S. ___, ___ (2017) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 3), it has still described that application in terms of economic measures like embargoes, see *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 434 (1932); *Buttfield* v. *Stranahan*, 192 U. S. 470, 493 (1904). See also R. Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101, 113–116, 128 (2001) (collecting Founding-era sources that equate foreign commerce with trade).

7    See also Statement of T. Jefferson to Congress (Jan. 18, 1803), reprinted in 4 American State Papers 684–685 (Officers may "have conferences with the natives, on the subject of commercial intercourse; get admission among them for our traders, as others are admitted; [and] agree on convenient deposites, for an interchange of articles ... "); Statement of T. Jefferson to Congress (Jan. 28, 1802), reprinted in *id.*, at 653 ("I lay before you the accounts of our Indian trading houses ... explaining the effects and the situation of that commerce ... "); Statement of S. Sibley et al. to Congress (Dec. 27, 1811), reprinted in *id.*, at 780–782 (in the Northwest Territory, formerly "[t]here was trade and commercial intercourse; no agriculture," but "[a]t present, the little commerce which remains is sufficiently safe. It is *agricultural* protection which is wanted"); Letter from J. Mason to W. Eustis (Jan. 16, 1812), reprinted in *id.*, at 782–784 ("[P]eltries (deer skins) are in most part received from the Indians .... The market is on the continent of Europe. Since the obstructions to our commerce in that quarter, peltries have not only experienced a depression in price ... "); Protest by J. Hendricks, J. Jackson, & J. Simms (June 28, 1796), reprinted in *id.,* at 613–614 ("No citizen is to be permitted to sell, or furnish by gift, spirituous liquors to the Indians, or to have any commercial traffic with them"); see also Natelson 214–215. Even one Founder who appears to have used the term more loosely (in the context of an opinion on the constitutionality of a national bank) focused only on trade and immigration restrictions. Letter from E. Randolph to G. Washington (Feb. 12, 1791), in 7 Papers of George Washington: Presidential Series 330, 334–335 (D. Twohig ed. 1998) ("The heads of [the commerce] power with respect to the Indian Tribes are 1. to prohibit the Indians from coming into, or trading within, the United States. 2. to admit them with or without restrictions. 3. to prohibit citizens of the United States from trading with them; or 4. to permit with or without restrictions").

8    To be sure, as respondents point out, the Constitution removed two limits on the Indian-affairs power found in the Articles of Confederation: that the Indians not be "members of any of the States," and that no State's "legislative right ... within its own limits be ... infringed." See Brief for Federal Parties 12–13. But removing those two limits in the Indian context cannot simultaneously expand the very meaning of "commerce," particularly because the Commerce Clause operates on two objects beyond Indian tribes. The Constitution's changes in this regard are thus best understood as narrowing the subject matter of Congress' power while omitting external constraints on that power.

9    Compare F. Allen, A Complete English Dictionary (1765) (Allen) ("something done," or "the concerns and transactions of a nation"); 1 S. Johnson, Dictionary of the English Language (6th ed. 1785) (Johnson); N. Bailey, A Universal Etymological English Dictionary (26th ed. 1789) (Bailey), with Allen ("the exchange of commodities, or the buying and selling [of] merchandize both at home and abroad; intercourse of any kind"); Johnson (similar); Bailey (similar).

Indeed, when the Founders referred to Indian "affairs," they were often referring to diplomatic relations— going far afield of their references to Indian "commerce." *E.g.*, G. Washington to Congress (Mar. 26, 1792), in 4 American State Papers 225 (referring to "the present crisis of affairs" with Indians and "managing the affairs of the Indian tribes" in a general sense, including inviting the Five Nations to the seat of the Federal Government and giving presents to the tribes); Report from H. Knox (Nov. 7, 1792), in *id.*, at 225 (referring to "the subject of Indian Affairs" in the context of measures "to procure a peace with the Indians" and troops); Natelson 217–218 (detailing preconstitutional references to the Department of Indian Affairs). As noted above, Congress tasked the *War Department* with duties "relative to Indian affairs." § 1, 1 Stat. 50. And a Committee of the Continental Congress once remarked that "the principal objects" of that Congress' power of "managing affairs with" Indians had encompassed "making war and peace, purchasing certain tracts of their land, fixing the boundaries between them and our people, and preventing the latter [from] settling on lands left in possession of the former." 33 Journals of the Continental Congress 458 (1936 ed.). Of course, it may be that the Constitution's other enumerated powers authorized many of those "objects." But, whatever the precise bounds of an "Indian affairs" power, it was decidedly broader than a power over Indian "commerce."

10    The historical record thus provides scant support for the view, advocated by some scholars, that the term "commerce" meant (in the context of Indians) all interactions with Indians. *E.g.*, G. Ablavsky, Beyond the Indian Commerce Clause, 124 Yale L. J. 1012, 1028–1032 (2015) (Ablavsky). The main evidence for that view appears to be (1) a few, fairly isolated references to "commerce" outside the context of trade, usually in the context of sexual encounters, (2) the fact that one definition of "commerce" was "intercourse" at the Founding, and (3) the fact that trade with Indians, at the Founding, had political significance. *Ibid.* But, as noted above, the Founders repeatedly used the term "commerce" when discussing trade with Indians. And just because that trade had political significance surely does not mean that all things of political significance were "commerce." Nor is the definition of "commerce" as "intercourse" instructive, because dictionaries from the era also defined "intercourse" as "commerce." *E.g.*, Johnson; Allen. Even some of these same scholars concede that the Founders overwhelmingly discussed "trade" with Indians—far more than either "intercourse" or "commerce" with them. See Ablavsky 1028, n. 81. And, again, when the Founders did discuss "commerce" specifically, they did so almost entirely in the context of trade. See *supra*, at 20–21, and n. 7.

11    The closest possible exception from this era was a provision in the Trade and Intercourse Act of 1822 (later enacted in the Act of 1834), which provided that, "in all trials about the right of property in which Indians shall be party on one side and white persons on the other, the burden of proof shall rest upon the white person, in every case in which the Indian shall make out a presumption of title in himself from the fact of previous possession and ownership." § 4, 3 Stat. 683; § 22, 4 Stat. 733. But even that statute appears to be merely part of the general "design" of the Acts: to "protect the rights of Indians to their properties" "[b]ecause of recurring trespass upon and illegal occupancy of Indian territory" by frontier settlers. See *Wilson* v. *Omaha Tribe*, 442 U. S. 653, 664 (1979). Viewed as such, this unremarkable provision only furthered the foreign-affairs and commerce powers of the Federal Government by preventing non-Indians from stealing Indian lands, circumventing Congress' trade-licensing scheme, and disrupting the peace with Indian tribes.

12    In dissent, Justice Thompson reasoned that the reference to "Indian tribes" was meant only to ensure that the Federal Government could regulate commerce with *tribes*, which were often subunits of Indian *nations*. Accordingly, he concluded that Indian nations were " 'foreign states' " under Article III. *Cherokee Nation*, 5 Pet., at 64.

13    As discussed more below, Congress declared in 1871 that "hereafter no Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." 16 Stat. 566.

14    Respondents insist that *Lopez* and *Morrison* did not hold that family law is insulated from federal law. But that misses the point. *Lopez* and *Morrison* held that the Commerce Clause cannot regulate a matter like family

law, and they did not consider whether some other constitutional power might do so. Cf. *Hillman* v. *Maretta*, 569 U. S. 483, 490–491, 497 (2013) (finding pre-emption of a state statute regarding beneficiaries and a change in marital status under a federal statute regulating the life insurance of federal employees). Here, no such independent power is to be found.

15    Indeed, ICWA stands in sharp contrast to statutes regarding international adoptions, in accordance with the Hague Convention. Those statutes generally regulate only adoptions by a foreign parent of a child residing in the United States, or vice versa. *E.g.*, 114 Stat. 825; 42 U. S. C. §§ 14931, 14932. In other words, there is a cross-border component; the statutes do not regulate adoption proceedings merely because the child's parents are, for example, dual Mexican-American citizens or dual Irish-American citizens. For ICWA to be comparable to those statutes, it could regulate only the adoption of children who reside on an Indian reservation by parents who live within the sole jurisdiction of a State, or vice versa. While I take no position on whether such a more limited law would be constitutional, that stark difference only underscores ICWA's lack of any external focus.

16    Still other cases fall somewhere in the middle of these powers, but they are still easily explicable by normal constitutional rules. For example, *United States* v. *Creek Nation*, 295 U. S. 103 (1935), held that the United States had to provide "just compensation" for the taking of Indian lands—which seems equally a measure of tribal lands as it does standard Takings Clause jurisprudence. *Id.*, at 110. And *Sunderland* v. *United States*, 266 U. S. 226 (1924), involved conditions imposed on the purchase of land by an Indian with funds held in trust by the Federal Government; the funds had been acquired from the previous sale of Indian lands that were themselves likely held in trust. *Id.*, at 231–232; see Cohen § 16.04[3], at 1090–1091. *Sunderland* thus seems equally a measure of Indian lands and conditions on spending.

17    Nor should we be unduly tripped up by broad language like "plenary" powers. Prior to our 1995 decision in *United States* v. *Lopez*, 514 U. S. 549, the Court for decades had stated that "the Commerce Clause is a grant of plenary authority" in the realm of interstate commerce. See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981); *Maryland* v. *Wirtz*, 392 U. S. 183, 198 (1968); *United States* v. *Darby*, 312 U. S. 100, 115 (1941). Yet we then clarified that the Commerce Clause's application to interstate commerce, rather than being unbounded, was limited only to economic activities. See *Lopez*, 514 U. S., at 560. Again, it is critical to read the Court's precedents in their context.

1    The state of affairs on many Indian reservations, however, does not speak well of the way in which these duties have been discharged by this putative trustee. See, *e.g.*, U. S. Commission on Civil Rights, Broken Promises: Continuing Federal Funding Shortfall for Native Americans 102–107, 135–138, 156–157, 165–166 (Dec. 2018) (discussing poor performance of students in tribal schools, substandard housing and physical infrastructure on reservations, and high rates of unemployment among Indians living on reservations).

2    Because ICWA's provisions comprise a comprehensive child custody scheme relevant only to state court proceedings, I generally do not believe they can be severed without engaging in "quintessentially legislative work." *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 329 (2006). An exception is § 1911(a), which gives Indian tribes exclusive jurisdiction over child custody proceedings involving Indian children living within a reservation; that section is not implicated by my analysis. See also *Fisher* v. *District Court of Sixteenth Judicial Dist. of Mont.*, 424 U. S. 382, 383, 388–389 (1976) (*per curiam*) (recognizing exclusive tribal court jurisdiction over adoption proceedings, where all parties are members of a tribe living on a reservation).

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.