# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al.*,<br><br>*Defendants*. | Case No. 3:22-cv-01213-TAD-KDM |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY REGARDING RECENT SUPREME COURT DECISIONS

Defendants' "Notice of Supplemental Authority Regarding U.S. Supreme Court Decisions of June 15 and June 23, 2023," argues that two recent decisions "confirm that the State Plaintiffs here lack standing." Doc. 289, at 1. Defendants' arguments are meritless.

### A. *United States v. Texas* Confirms That the States Have Standing.

First, Defendants argue that *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), undermines the States' standing. Doc. 289, at 1-3. Defendants are incorrect.

*Texas* addressed two States' challenge to the Department of Homeland Security's guidelines stating that DHS will not arrest criminal aliens whom Congress provided "shall" be arrested. *Texas*, 2023 WL 4139000, at *2. The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)) (emphasis added).

1

This holding was based solely on the rule that a party typically lacks standing to compel the arrest and prosecution of another—a rule that has no application in this case. *See id.* The majority emphasized the narrowness of this holding. The Court noted that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at *8. The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.* It emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at *9 (citing *Linda R.S.*, 410 U.S. at 619). And it described the case as an "extraordinarily unusual lawsuit." *Id.* at *9.

This case, by contrast, does not involve any attempt to compel the arrest or prosecution of anyone, so *Texas* does not undermine standing here. Quite the contrary—*Texas* identified "[s]everal good reasons" supporting its holding, *id.* at *5-6, and all of these support the States' standing here. First, the Supreme Court emphasized that "when the Executive Branch elects *not* to arrest or prosecute, it does not exercise coercive power over an individual's liberty or property, and thus does not infringe upon interests that courts often are called upon to protect." *Id.* at *5.

Here, federal officials *do* "exercise coercive power over an individual's liberty," *id.*, by pressuring social-media platforms with threats to induce censorship. *See, e.g.,* Doc. 214-1, ¶¶ 1-30.

Second, the *Texas* majority held that judicially mandating arrests and prosecutions would "run up against the Executive's Article II authority to enforce federal law," a core aspect of executive power. *Id.* Here, by contrast, federal social-media censorship lies so far afield from any plausible constitutional or statutory authority that it is plainly *ultra vires*. *See* Doc. 224, at 71-72.

Third, *Texas* stressed the traditional deference due to the Executive Branch in matters relating to immigration policy, which implicates "foreign-policy objectives." *Id.* Here, no "foreign-policy objectives" are at issue, where the targeted speech is overwhelmingly *domestic*. *See, e.g.,* Doc. 276, at 2; Doc. 214-1, ¶¶ 918-922, 1033, 1056, 1220, 1231, 1233, 1235, 1241.

Fourth, the *Texas* majority held that "courts generally lack meaningful standards for assessing the propriety of enforcement choices." *Id.* at *6. Here, the First Amendment case law provides extensive, well-established "meaningful standards" for assessing the lawfulness of Executive officials' actions. *See, e.g.,* Doc. 214, at 4-8, 14, 18-19, 29-31, 41-42.

Finally, the *Texas* majority emphasized that "the Executive Branch must balance many factors when devising arrest and prosecution policies." *Id.* at *6. Here, the Executive Branch does not need to "balance many factors" when deciding whether to comply with the First Amendment—it has a categorical obligation to do so.

Defendants argue that *Texas* supports them on two points. First, they claim that *Texas* jettisoned the "special solicitude" granted to States in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497 (2007). Doc. 289, at 1-2. This argument is plainly incorrect, as the *Texas* majority never used the phrase "special solicitude" or addressed it in its analysis. As Justice Gorsuch noted, "the Court says nothing about 'special solicitude' in this case." *Texas*, 2023 WL

3

4139000, at *10 (Gorsuch, J., concurring in the judgment).  Both *Massachusetts v. EPA* and subsequent Fifth Circuit case law recognizing the doctrine of "special solicitude" remain good law.  *See* Doc. 224, at 21-22 (citing *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015)).  In any event, as discussed in prior briefs, the States have standing even without "special solicitude."

Second, Defendants argue that "in *Texas*, the Supreme Court rejected a theory that Defendants' alleged actions denied them the benefits of the federal system."  Doc. 289, at 3.  But nothing in the *Texas* majority opinion addresses any such theory – which, presumably, is why Defendants only cite the *concurring* opinion, not the majority opinion, for this point.  *See id.*  In fact, there is nothing *State-specific* about *Texas*'s holding on standing—it applies equally to private citizens as well as States.  Notably, the Court held "that *a citizen* lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution."  *Id.* at *2 (emphasis added) (quoting *Linda R.S.*, 410 U.S. at 619).

### B.   *Haaland v. Brackeen* Does Not Undermine the States' Standing.

Defendants' reliance on *Haaland v. Brackeen*, No. 21-376, 2023 WL 4002951 (U.S. June 15, 2023), is likewise misplaced.  In *Haaland*, the Supreme Court held that Texas lacked standing to challenge the placement provisions of the Indian Child Welfare Act, which give preference to Indian families in custody disputes involving Indian children.  *Id.* at *19.  *Haaland* held that Texas "cannot assert equal protection claims on behalf of its citizens because '[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'"  *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982)).  Defendants claim that this statement forecloses *parens patriae* standing here.  Doc. 289, at 2.  Not so.

In its brief discussion of *parens patriae* standing, *Haaland* merely quoted footnote 16 of *Alfred L. Snapp*, which itself merely restated the so-called "*Mellon* bar."  *See Haaland*, 2023 WL

4

4002951, at *19; *Alfred L. Snapp*, 458 U.S. at 610 n.16 (quoting *Massachusetts v. Mellon*, 262 U.S. 47, 485-86 (1923)). Though both cases use admittedly broad language, neither *Haaland* nor *Alfred L. Snapp* expounds the scope of that "*Mellon* bar," and the Supreme Court has made clear elsewhere that *parens patriae* suits are allowed against the federal government outside the *Mellon* bar. *See Massachusetts v. EPA*, 549 U.S. at 520 n.17 (explaining the "critical difference" between *parens patriae* suits barred by *Mellon* and *parens patriae* suits against the federal government otherwise permitted). Consistent with *Massachusetts v. EPA*, this Court has already held that the *Mellon* bar applies to "third-party *parens patriae* suits," but not to "quasi-sovereign-interest suits." Doc. 224, at 215-26 (quoting *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022)). In *Haaland*, Texas asserted a "third-party *parens patriae* suit," rather than a "quasi-sovereign-interest suit," *see id.*, because Texas asserted the equal-protection rights of only a tiny minority of its population (*i.e.*, non-Indian foster or adoptive parents who wish to foster or adopt Indian children over the objections of relevant Indian tribes), which was plainly insufficient to qualify as a quasi-sovereign interest. *See Haaland*, at *19 & n.11. Here, by contrast, Louisiana and Missouri each assert the rights of a *very* "substantial segment of its population," *Alfred L. Snapp*, 458 U.S. at 607—*i.e.*, the hundreds of thousands or millions of their citizens who are potential audience members of the social-media speech suppressed by the federal government.

  Moreover, in holding that Texas lacked third-party standing, *Haaland* emphasized that Texas lacked either a "'concrete injury' to the State" or "some hindrance to the third party's ability to protect its own interests." *Haaland*, at *19 n.11 (quoting *Georgia v. McCollum*, 505 U.S. 42, 55-56 (1992)). Here, by contrast, the States have suffered numerous concrete injuries from federal social-media censorship. *See, e.g.,* Doc. 214-1, ¶¶ 1427-1442. And there is clearly "some hindrance to the third party's ability to protect its own interests," because the First Amendment

5

injury to each individual audience member in Louisiana and Missouri is too diffuse to incentivize litigation through thousands of individual lawsuits. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963) (holding that "pragmatic considerations argue strongly for … standing … in cases such as the present one," where a person suffering First Amendment injuries "is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights").

Defendants also argue that *Haaland* rejected Texas's claim that the ICWA's placement provisions required Texas to "break its … promise to its citizens that it will be colorblind in child-custody proceedings." Doc. 289, at 3 (quoting *Haaland*, 2023 WL 4002951, at \*19). But the Supreme Court rejected this argument for a specific reason: "Were it otherwise, a State would always have standing to bring constitutional challenges when it is complicit in enforcing federal law." *Haaland*, 2023 WL 4002951, at \*19. Here, Missouri and Louisiana do not claim that the federal government requires them to be "complicit" in "enforcing federal" social-media censorship, *id.*, so *Haaland*'s reasoning has no application here. Instead, the States argue that federal censorship prevents the States from giving effect to their own laws favoring freedom of speech. This Court has held that the States assert "injuries to the States' sovereign interest in the power to create and enforce a legal code," and that "Defendants' alleged censorship program would be a federal assertion of authority to regulate matters that the States seek to control." Doc. 224, at 29 (citing *Texas v. United States*, 809 F.3d 134, 149 (5th Cir. 2015)). These holdings remain valid.

### C. Neither *Texas* Nor *Haaland* Affects Private Plaintiffs' Standing or the States' Other Bases for Standing.

Furthermore, only one Plaintiff need have standing. Doc. 224, at 19 (citing *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006)). Here, Defendants do not contend that *Texas* and *Haaland* have any bearing on the Private Plaintiffs' standing, which this Court has already upheld. Doc. 224, at

34-38. Likewise, neither *Texas* nor *Haaland* has any bearing on the multiple *other* injuries asserted by the States—such as (1) the States' direct experience of censorship of their own speech, (2) the States' asserted interest in being able to read their constituents' uncensored thoughts and opinions on social media, and (3) the States' interest in maintaining fair and open processes for petitioning government for redress of grievances. *See*, *e.g.*, Doc. 214-1, ¶¶ 1428-1440; Doc. 224, at 30-32.

### D.   Recent Authorities Undercut Defendants' Arguments.

Finally, Defendants ignore other recent authorities that undercut their arguments. For example, on June 23, 2023, the Supreme Court decided *United States v. Hansen*, No. 22-179 (U.S. June 23, 2023) (Slip opinion attached as Exhibit A). *Hansen* reinforced the longstanding rule that "speech integral to unlawful conduct" is not protected by the First Amendment. *Id.* at 18. "Speech intended to bring about a particular unlawful act … is unprotected." *Id.*

*Hansen* contradicts the Government's heavy reliance on the "government speech" doctrine. *See, e.g.,* Doc. 266, at 1, 3-4, 147. Under *Hansen*, the First Amendment does not protect *private* "[s]peech intended to bring about a particular unlawful act." *Hansen*, Slip op. at 18. *A fortiori*, the doctrine does not protect *government* speech "intended to bring about a particular unlawful act," *id.*—here, the suppression of private speech in violation of the First Amendment. Second, *Hansen* undermines the Government's extensive complaints about the supposed "overbreadth" of the requested injunction. Doc. 266, at 5, 258-261, 264-273. Most of the Government's supposed "overbreadth" constitutes examples of federal officials requesting platforms to remove "speech integral to unlawful conduct" and "speech intended to bring about a particular unlawful act," *Hansen*, Slip op. at 18—such as fraud, malicious cyber activity, live-streamed child sex abuse, terrorism, and true threats. *See* Doc. 276, at 114-117. *Hansen* reaffirms that such speech is not

protected by the First Amendment, and an injunction prohibiting federal officials from interfering with First Amendment-protected speech would not apply to such conduct.

In addition, on June 26, 2023, the House Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government issued a report on the federal censorship activities of Defendant CISA.  *See* U.S. House of Representatives, Interim Staff Report of the Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government, *The Weaponization of CISA: How a "Cybersecurity" Agency Colluded With Big Tech and 'Disinformation' Partners To Censor Americans* (June 26, 2023), *available at* https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/cisa-staff-report6-26-23.pdf (attached as Exhibit B).  Among other things, the report concludes that "CISA has attempted to conceal its unconstitutional activities and remove evidence of wrongdoing." *Id.* at 28.  It concludes that "[f]earing public pressure and legal risks," including this lawsuit, "CISA outsourced its censorship activities to the EI-ISAC." *Id.*  It concludes that CISA's "MDM Subcommittee tried to disguise its recommendations by removing references to surveilling and censorship." *Id.* at 29.  It concludes that "CISA purged its website of references to domestic MDM and its First Amendment violations in response to public pressure." *Id.* at 32.  And it concludes that "[t]he Biden Justice Department interfered with records requests in order to shield CISA from public scrutiny of its unconstitutional practices." *Id.* at 34.  These conclusions contradict the Government's contention that CISA voluntarily ceased censorship activities.

8

Dated: June 28, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Todd A. Scott*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
kenneth.capps@ago.mo.gov
*Counsel for State of Missouri*

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer (Mo #58721)*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ John J. Vecchione*
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns *
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\* admitted *pro hac vice*

9

## CERTIFICATE OF SERVICE

I hereby certify that, on June 28, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*