IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

STATE OF LOUISIANA, *et al.*,

   *Plaintiffs*,

v.

JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*,

   *Defendants*.

Civil Action No. 22-cv-1213

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
NOTICE OF SUPPLEMENTAL AUTHORITY**

**I.   The Supreme Court's Recent Decisions Confirm that Plaintiff States Lack Standing.**

As stated in Defendants' Notice of Supplemental Authority ("Notice"), Dkt. 289, *United States v. Texas*, No. 22-58, 2023 WL 4139000 (U.S. June 23, 2023), and *Haaland v. Brackeen*, 143 S. Ct. 1609 (2023), clarify Article III standing principles that foreclose the States' theories in this case. In *Texas*, the Supreme Court explained that the standing analysis in *Massachusetts v. EPA*, 549 U.S. 497 (2007), must be understood in light of the particular claim asserted there: "a challenge to the denial of a statutorily authorized petition for rulemaking[.]" *Texas*, 2023 WL 4139000, at *8 n.6. The Supreme Court also emphasized that standing theories premised on "indirect effects" to States "can become more attenuated" and that, especially when such attenuated theories are at issue, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at *6 n.3. In *Brackeen*, the Supreme Court reiterated that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," 143 S. Ct. at 1640 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982))), and rejected the State's

1

"thinly veiled attempt to circumvent the limits on *parens patriae* standing," *id.* at 1640 n.11. As explained in Defendants' Notice, the principles articulated in both decisions confirm that the States lack Article III standing here.

Plaintiffs fail to overcome the import of these recent decisions. *First*, the Plaintiff States assert that *Texas* is inapposite because it involves a failure-to-prosecute claim, and no such claim is asserted here. Pls.' Resp. to Defs.' Notice ("Pls.' Resp.") 2, Dkt. 291. But *Texas* stressed that "bedrock Article III constraints" compel skepticism in *every* case, regardless of the specific claim asserted, in which a State's standing theories turn on the alleged "indirect effects" of federal policies or actions. *Texas*, 2023 WL 4139000, at *6 n.3. Here, as in *Texas*, the States assert attenuated theories of standing that turn on the incidental effects of social media companies' alleged moderation of content posted by certain users of the companies' platforms. *See* Defs.' MTD Reply 11, Dkt. 199; *see also* Notice 2. As in *Texas*, those "indirect effects" are too attenuated to satisfy Article III's requirements that an injury be "concrete" and "particularized." And, as in *Texas*, Plaintiffs have "not cited any precedent, history, or tradition of courts" recognizing Article III standing of the kind Plaintiffs have asserted. 2023 WL 4139000, at *4. Thus, Plaintiffs' discussion of the various other factors the *Texas* Court considered relating to standing in failure-to-prosecute claims, Pls.' Resp. 2-3, are beside the point.

*Second*, the Plaintiff States assert that *Texas* does not undermine their reliance on "special solicitude" because the Supreme Court there did not use the phrase "special solicitude" in its decision. But regardless of whether the Supreme Court used that phrase, it clarified that the case on which Plaintiffs rely in invoking "special solicitude," *Massachusetts v. EPA*, arose from and is confined to a "challenge to the denial of a statutorily authorized petition for rulemaking." *Texas*, 2023 WL 4139000, at *8 n.6. Here, as in *Texas*, where no such challenge is at issue, the States

cannot resort to *Massachusetts v. EPA*'s context-specific reference to "special solicitude" to satisfy or water down Article III's standing requirements. Indeed, as Justice Gorsuch stressed in his concurrence, "special solicitude" has not "played a meaningful role in th[e] Court's decisions in the years since" *Massachusetts v. EPA* was decided, and "it's hard not to think, too, that lower courts should just leave that idea on the shelf in future" cases. *Id.* at *10.

*Third*, the Plaintiff States contend that the "settled rule[]" that States "do not have standing as *parens patriae* to bring an action against the Federal Government" is not as settled as the Supreme Court stated in *Brackeen*, 143 S. Ct. at 1640. Pls.' Resp. 4-5. The States reiterate their meritless argument that *Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022), supports their *parens patriae* theory to the extent it is based on the assertion of a quasi-sovereign interest rather than the invocation of third-party interests. Pls.' Resp. 4-5. But *Brackeen* casts serious doubt about *Kentucky*'s validity. In any event, as Defendants explained, *see* MTD Reply 14-15, even accepting the *parens patriae* distinctions articulated in *Kentucky*, the States' efforts to establish standing fail. The States have not plausibly alleged (or documented with evidence) any quasi-sovereign interest that exists apart from their citizens' private interests in free speech; therefore, the States act as nothing more than "nominal part[ies]" whose role is only to support the "[i]nterests of private parties." *Snapp*, 458 U.S. at 592. Moreover, Plaintiffs wrongly suggest that *Brackeen* rejected the State of Texas's standing in *parens patriae* simply because Texas asserted rights belonging to "only a tiny minority of its population." Pls.' Resp. 5. The Court in *Brackeen* nowhere discusses the proportion of the State's population affected by the constitutional claim there, nor otherwise suggests that a State may circumvent the bar against *parens patriae* standing if it brings claims on behalf of enough people. *See Brackeen*, 143 S. Ct. at 1640 n.11 (rejecting Texas's "thinly veiled attempt to circumvent the limits on *parens patriae* standing").

3

Finally, the Plaintiff States assert that it is irrelevant that *Brackeen* rejected Texas's theory that it was injured because federal law allegedly "required" the State to "break its [constitutional] promise to its citizens that it will be colorblind in child-custody proceedings." Pls.' Resp. at 6; *see Brackeen*, 143 S. Ct. at 1640. But the States' own arguments underscore the relevance of that outcome. As the Plaintiff States emphasize, the Supreme Court rejected that theory of injury because it would mean that a State "*always* ha[s] standing to bring constitutional challenges when it is complicit in enforcing federal law." *Id.* at 6 (emphasis added) (quoting *Brackeen*, 143 S. Ct. at 1640). As the Supreme Court explained, such a broad theory is "not the kind of 'concrete' and 'particularized' 'invasion of a legally protected interest' necessary to demonstrate an 'injury in fact.'" *Brackeen*, 143 S. Ct. at 1640 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (plurality op.)). The same is true here. The States' standing theories are overly broad grievances that, if accepted, would mean that any State has standing based on any alleged interference to an individual citizen's free speech. *See* Defs.' Mot. to Dismiss 24, 27-28, ECF No. 128-1.[1]

## II. Plaintiffs Inappropriately Attempt to Introduce New Arguments and Evidence That are Unrelated to Article III Standing and That Lack Merit Regardless.

Plaintiffs next contend that the Defendants "ignore other recent authorities that undercut their arguments," citing to the Supreme Court's recent decision in *United States v. Hansen*, No. 22-179, 2023 WL 4138994 (U.S. June 23, 2023), and an Interim Majority Staff Report issued by the Committee on the Judiciary and the Select Subcommittee on the Weaponization of the Federal Government ("Interim Majority Staff Report"). Pls.' Resp. 7. The Court should reject this after-

---

[1] Plaintiffs also assert that "only one Plaintiff need have standing" for the case to proceed. Pls.' Resp. 6. But no Article III precedent permits a single plaintiff who possesses standing to litigate the claims of others who do not, or to seek relief on behalf of others that is unrelated to the redress of that plaintiff's injury. Thus, the States must show that they satisfy each element of Article III standing, independent of injury to any individual Plaintiff. *See* Defs.' MTD 5-6.

the-last-minute attempt by Plaintiffs to supplement the record and refuse to accept the Interim Majority Staff Report as suitable evidence on which to base preliminary injunctive relief.

As an initial matter, neither of these sources relates to the States' Article III standing, which was the sole issue addressed in Defendants' Notice. Accordingly, Plaintiffs lack any basis for accusing Defendants of "ignor[ing]" sources that undercut their arguments relating to Article III standing. Instead, Plaintiffs present these new sources to bolster their arguments concerning the scope of their proposed injunction and the merits of their claims. But neither *Hansen* nor the Interim Majority Staff Report supports Plaintiffs' arguments.

To start, Plaintiffs rely on *Hansen* to rehash their arguments that the broad injunction they seek would not interfere with legitimate government speech or law enforcement objectives. Pls.' Resp. 7-8. Their arguments lack merit. In *Hansen*, the Supreme Court concluded that a federal statute criminalizing the act of "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such [activity] is or will be in violation of law," was not unconstitutionally overbroad in violation of the First Amendment. 2023 WL 4138994, at *4 (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)). The Supreme Court's holding that this criminal statute does not violate the First Amendment has no bearing on the state action analysis or government speech doctrine at issue here. In other words, *Hansen* does not address the circumstances in which speech by a government official renders private conduct state action for which the government may be held responsible. Nor does *Hansen* clarify the limits of the government speech doctrine or otherwise support Plaintiffs' assertion that their requested injunction is not overly broad.

Indeed, Plaintiffs continue to insist that their requested injunction is not overly broad and preserves the government's ability to carry out legitimate and important law enforcement activities

without explaining how that is the case. Plaintiffs assert that *Hansen* confirms that speech amounting to "fraud, malicious cyber activity, live-streamed child sex abuse, terrorism, and true threats" "is not protected by the First Amendment." Pls.' Resp. 7-8. Therefore, Plaintiffs contend, "an injunction prohibiting federal officials from interfering with First Amendment-protected speech would not apply to such conduct." *Id.* The problem is that Plaintiffs' challenge to virtually any communication between a government official and social media company, together with their vaguely worded proposed injunction, *would* prohibit government activities designed to prevent these unlawful activities that Plaintiffs agree the First Amendment does not protect. Defendants explained the problems with the scope of Plaintiffs' proposed injunction at length in their briefing and at oral argument. *See* Defs.' PI Resp. 261-75, Dkt. 266.

Next, Plaintiffs' reliance on the Interim Majority Staff Report is likewise misplaced. As an initial matter, the Report does not qualify as "supplemental authority" on which the Court can rely. It is not an "authority" in any sense of the word, but rather reflects interim findings relating to a congressional oversight investigation made by one side of the Committee's staff. And even the findings detailed in the report have no bearing on the facts relating to Plaintiffs' preliminary injunction motion. First, the Interim Majority Staff Report is not a set of final conclusions; it is, as its name indicates, "interim." Moreover, whatever Congress's authority to conduct fact-finding in service of its legislative function—which has long been recognized to require far less than a "precise reconstruction of past events," *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 732 (D.C. Cir. 1974)—Congress has no authority to find facts for an Article III Court. *Cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 225-26 (1995) (holding that statute that instructed federal courts to reopen final judgments violated separation of powers principles); *Gonzales v. Carhart*, 550 U.S. 124, 165, (2007) ("The Court retains an independent constitutional

duty to review factual findings where constitutional rights are at stake"). In addition, a congressional committee is not bound by the Federal Rules of Evidence or Civil Procedure that ordinarily guarantee the trustworthiness of the evidence relied on and the conclusions reached in a judicial proceeding. Indeed, the citations to documents in the Report are unquestionably selective but, even worse, there is no way for the Defendants or for this Court to determine what contrary evidence was left out of the report or, even, in many cases, to review the underlying documents relied upon by the majority staff. The Interim Majority Staff Report is also doubly one-sided: CISA was given no opportunity to respond to it *and* it reflects the work product of only one side of the Committee's partisan divide. These factors, individually and in concert, disqualify the Interim Majority Staff Report as a reliable basis on which to make factual findings in support of Plaintiffs' preliminary injunction motion.[2]

Plaintiffs' contentions would fail as a factual matter even if the Report were sufficiently trustworthy as evidence. Plaintiffs contend that the conclusions in this one-sided report by the majority staff of a House of Representatives Select Subcommittee "contradict the Government's contention that CISA voluntarily ceased censorship activities." Pls.' Resp. 8. Putting to one side that none of Plaintiffs' claimed evidence—including this Interim Majority Staff Report—supports their claim that CISA ever engaged in "censorship activities," this Report certainly does not show

---

[2] For example, the public record shows that Plaintiffs are coordinating with the House Majority Staff in connection with this case. On March 30, 2023, lead counsel for Plaintiffs testified before the Select Subcommittee on the Weaponization of the Federal Government and advanced the same factually unsupported arguments about alleged government censorship that Plaintiffs advance in this lawsuit. *See* Ex. B (testimony of D. John Sauer). And notably, one of Plaintiffs' former counsel recently withdrew from this lawsuit to work for the Weaponization Select Subcommittee on its investigation in this matter. *See* Dkt. 243 (motion to withdraw), Ex. C. This evident coordination between Plaintiffs and the Committee is reason alone to discount any of the factually unsupported conclusions by the Select Subcommittee's Majority staff. In any event, repetition by the Committee majority of Plaintiffs' unsupported characterizations does not add to their weight.

that any of CISA's challenged actions are ongoing. Moreover, by all appearances the Interim Staff Majority Report does not take into consideration the extensive, uncontradicted and publicly available record produced by Defendants in this case. To be sure, congressional staff were under no obligation to address the evidence and record in this case. But that is the point.

For example, Plaintiffs note that the Interim Majority Staff Report concludes that "CISA has attempted to conceal its unconstitutional activities and remove evidence of wrongdoing." Pls.' Resp. 8 (citing Interim Majority Staff Report 28). This conclusion is unsupported even by the evidence cited by the report. The Interim Majority Staff Report cites meeting minutes from the CISA Cybersecurity Advisory Committee (CSAC) Protecting Critical Infrastructure from Misinformation and Disinformation Subcommittee Meeting (MDM Subcommittee)[3] in April 2022, where certain subcommittee members discussed the use of CISA to "amplify trusted information" and discussed designating the EI-ISAC as a clearing house for trusted information.[4]

---

[3] Established under the *National Defense Authorization Act for Fiscal Year 2021*, Pub. L. No. 116-283, 134 Stat. 3388 (NDAA), the CSAC operates as a federal advisory committee governed by the *Federal Advisory Committee Act*. PI Resp. 81 (citing Defs.' Exs. 119 & 120). The CSAC, including its subcommittees, is comprised entirely of non-federal experts who convene to consider, deliberate on, and ultimately deliver non-binding advice and recommendations to CISA. *Id.* (citing Defs' Ex. 120). Contrary to the assertions of Plaintiffs and the Interim Majority Staff Report, CSAC reports and recommendations, not to mention subcommittee deliberative discussions, are not federal policy and do not reflect the position of the U.S. government.

[4] Like the Plaintiffs in this case, the Interim Staff Majority Report claims that the "EI-ISAC is federally funded by CISA." Interim Majority Staff Report 8, 22 ("[t]he CISA-funded EI-ISAC"). That characterization ignores the undisputed evidence presented in Defendants' opposition to Plaintiffs' preliminary injunction motion that "CISA did not fund CIS or the EI-ISAC for any of the work they provided in relation to the reporting of potential election security related disinformation to social media or technology companies during the 2020 election cycle," PI Resp. at 239 n.109 (citing Ex. 97 at ¶¶ 50-51). Nor did DHS fund CIS or the EI-ISAC for any reporting of potential election security-related disinformation to social media or technology companies they may have done during the 2022 election cycle. Defs' Ex. 97 at ¶ 79. Furthermore, it is undisputed that CISA was not involved in any efforts by CIS or the EI-ISAC to report potential election security-related disinformation to social media or technology companies in relation to the 2022 election cycle. *Id.* at ¶ 81. The evidence on which the Interim Majority Staff Report relies are

Interim Majority Staff Report 28. But as Defendants explained in undisputed submissions, rather than attempt to "conceal" its activities, the MDM Subcommittee "operated transparently[,] and details about the MDM Subcommittee, its memberships, reports, and recommendations, are posted on CISA's website." PI Resp. 82-83 (citing Defs' Ex. 123). More fundamentally, the unrebutted evidence shows that the MDM Subcommittee—which was directed to stand down in December 2022 because it had completed the tasks for which it was created and provided its recommendations to CISA (and therefore cannot be the basis for any alleged ongoing or imminent harm to Plaintiffs)—did not discuss whether or how social media platforms should moderate content, either in specific cases or more generally. *Id.* (citing Ex. 122 at 9). The MDM Subcommittee meeting minutes cited by the Interim Majority Staff Report do not show otherwise; to the contrary, they document a discussion not about "censoring" speech but rather about promoting and amplifying speech. *See* Interim Majority Staff Report 28 (citing April 12, 2022, meeting minutes where "Subcommittee members returned to the recommendation for CISA to amplify trusted information").

Plaintiffs next claim that the Interim Majority Staff Report found that "CISA purged its website of reference to domestic MDM and its First Amendment violations in response to public pressure" and that the website now focuses exclusively on foreign malign influence operations. Pls.' Resp. 8 (citing Interim Majority Staff Report 32). Notably, the Report cites no evidence establishing why CISA updated its website, let alone any evidence that it updated its website "in response to public pressure." *Id.*[5]

---

emails between state and local election officials, CIS, and social media platforms. Notably, CISA is not included on these emails. *See* Interim Majority Staff Report 23-25.

[5] Rather, CISA's website overhaul, which was announced in February 2023, and was the result of several months of development, was based on feedback CISA had received that its website "wasn't organized in a way to easily find resources," and that the reorganization "makes our agency's

9

Finally, Plaintiffs observe that the Interim Majority Staff Report found that "[t]he Biden Justice Department interfered with records requests in order to shield CISA from public scrutiny of its unconstitutional practices." Pls.' Resp. 8 (citing Interim Majority Staff Report at 34). Putting to one side that this finding has nothing to do with any alleged irreparable harm to Plaintiffs, it also lacks any evidentiary support. The document cited by the Interim Majority Staff Report reflects a request under Washington State's Public Records Act ("PRA") for documents from the University of Washington. After CISA was notified of various PRA requests that potentially implicated CISA equities, CISA, through the Department of Justice, sought the opportunity to review the information intended for release to consider whether any federal law would be implicated by its release. At this time, CISA and the Department have not opposed the release of any documents by the University of Washington.[6] Contrary to its conclusion, nothing in the documents cited in the Interim Majority Staff Report supports "interference" by the Department of Justice with public record requests or an attempt to "shield CISA from public scrutiny of its unconstitutional practices."

For all of these reasons, the Interim Majority Staff Report fails to include reliable evidence supportive of Plaintiffs' request for the extraordinary remedy of a preliminary injunction, and Plaintiffs' implicit request to supplement the record with this report should be denied.

---

resources and tools easier to find." *See* Ex. A (CISA, "It's a new Dawn, It's a New Day, It's a New Website for CISA"). The website overhaul sought to "consolidate[e] all CISA services, tools, and sites into one place [to] make[] it easier for our partners and stakeholders to find what they need" and to "simpl[y] the process of reporting information to us." *Id.* Plaintiffs fail to explain how a revision to CISA's website to include, among other things, an emphasis on CISA's focus on foreign malign influence operations and disinformation possibly supports their claim of irreparable injury justifying the extraordinary remedy of a preliminary injunction.

[6] In certain circumstances, the Washington PRA authorizes a third party objecting to disclosure to file a lawsuit to prevent the release of information. *See* RCW § 42.56.540. CISA and the Department have not initiated a lawsuit to prevent the release of information by the University.

Dated:  June 29, 2023        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES J. GILLIGAN
Special Litigation Counsel, Federal Programs Branch

JOSHUA E. GARDNER (FL Bar No. 0302820)
Special Counsel, Federal Programs Branch

*/s/ Kyla M. Snow*
KYLA M. SNOW (OH Bar No. 96662)
INDRANEEL SUR (D.C. Bar No. 978017)
KUNTAL CHOLERA (D.C. Bar No. 1031523)
AMANDA K. CHUZI (D.C. Bar No. 1738545)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington D.C. 20005
Tel: (202) 514-3259
kyla.snow@usdoj.gov

*Attorneys for Defendants*

11