# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | |
|---|---|
| STATE OF LOUISIANA, STATE OF MISSOURI, *et al*.<br><br>*Plaintiffs*,<br><br>v.<br><br>JOSEPH R. BIDEN, JR., in his official capacity as President of the United States, *et al*.,<br><br>*Defendants*. | Case No. 3:22-cv-01213-TAD-KDM |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL AND, ALTERNATIVELY, <u>FOR ADMINISTRATIVE STAY</u>

The Court's preliminary injunction, Doc. 294, prevents Defendants only from doing what the First Amendment plainly forbids—*i.e.*, "urging, encouraging, pressuring, or inducing … the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms." *Id.* at 4. Before the injunction was entered, Defendants spent months attempting to identify areas of *legitimate* government conduct that such an injunction might disrupt. They submitted five declarations from senior federal officials identifying areas of government speech and conduct with which, they claimed, an injunction enforcing First Amendment rights might interfere. *See, e.g.,* Doc. 266, at 258. The Court carefully addressed all those concerns by providing eight clear and specific exclusions to the injunction, which specify areas of legitimate government speech and conduct that the injunction does *not* prohibit. Doc. 294, at 5-6 (listing conduct that is "**NOT** prohibited by this Preliminary Injunction").

1

Defendants now seek to stay the preliminary injunction, claiming that the injunction "may" cause "grave harm" by "prevent[ing] the Government from engaging in a vast range of lawful and responsible conduct." Doc. 297-1, at 1. But, after months of searching on this very issue, Defendants do not identify a single specific example of supposedly "grave harm" that the injunction might cause, or a single specific example of "lawful and responsible" government conduct that the injunction prevents. *See id.* at 1-6. By its plain terms, the injunction permits Defendants to engage in the full range of *permissible* Government speech and conduct—such as "(1) informing social-media companies of postings involving criminal activity or criminal conspiracies;" "(2) contacting and/or notifying social-media companies of national security threats, extortion, or other threats posted on its platform;" "(3) contacting and/or notifying social-media companies about criminal efforts to suppress voting, to provide illegal campaign contributions, of cyber-attacks against election infrastructure, or foreign attempts to influence elections;" "(4) informing social-media companies of threats that threaten the public safety or security of the United States;" and "(5) exercising permissible public government speech promoting government policies or views on matters of public concern," among others. Doc. 294, at 5-6. In the face of these clear and specific authorizations, Defendants' conclusory, speculative assertion of "grave harm" that the injunction "*may* be read" to cause, Doc. 297-1, at 1—devoid of any specific examples or evidence of such harm—does not warrant an extraordinary stay.

In fact, Defendants identify only two vague categories of supposedly legitimate government conduct that the injunction supposedly "may be read" to prevent: "[1] speaking on matters of public concern" and "[2] working with social media companies on initiatives to prevent grave harm to the American people and our democratic processes." *Id.* As to the first, the injunction explicitly authorized the Government to "speak[] on matters of public concern." Doc.

294, at 6 (permitting Defendants to "(5) exercise[e] permissible public government speech promoting government policies or views on matters of public concern"). The second point, therefore, reflects the Government's only real concern—*i.e.*, that the injunction will prevent Defendants from "working with social media companies on initiatives to prevent grave harm to the American people and our democratic processes." Doc. 297-1, at 1. But the evidence in this case overwhelmingly shows that the *way* the Government supposedly "prevent[s] grave harm to the American people and our democratic processes" is to pressure and induce social-media platforms to censor disfavored viewpoints on COVID-19, elections, and other core political speech. The Government's assertion of "grave harm," therefore, boils down to the claim that it should be allowed to continue violating the First Amendment. In the end, their position is fundamentally defiant toward the Court's judgment. It demonstrates that the Government will continue violating First Amendment rights by censoring core political speech on social media as soon as it can get away with it. The motion to stay should be denied.

**I.     The Injunction Is Not Vague and Imposes No Cognizable Injury on Defendants.**

First, Defendants claim that they "will suffer irreparable harm absent a stay of the preliminary injunction." Doc. 297-1, at 3. This argument rests entirely on their claim that the injunction is "sweeping in scope and vague in its terms." *Id.* This argument is meritless.

First, Defendants' objection that the injunction is supposedly too "broad" and "sweeping," *id.* at 1, 3, is meritless. The injunction addresses a great deal of unlawful conduct because Defendants have *committed* a great deal of unlawful conduct, as the Court's 82 pages of detailed factual findings demonstrate. Doc. 293, at 4-86. The scope of the injunction matches the scope of the ongoing First Amendment violations found by the Court, *see id.* at 153-155, and Defendants cite no evidence to the contrary. Because the unlawful conduct it itself "broad" and "sweeping,"

the Court has properly "tailor[ed] the injunction to remedy the specific action[s] which give[] rise to the order." *Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC*, 710 F.3d 579, 586 (5th Cir. 2013) (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)). As the D.C. Circuit has stated, "[t]hese injunctions may be broad, but breadth is warranted to prevent further violations where, as here, a proclivity for unlawful conduct has been shown." *United States v. Philip Morris USA Inc*., 566 F.3d 1095, 1137 (D.C. Cir. 2009).

Moreover, the injunction is not overbroad because the conduct it prohibits is plainly unlawful. The injunction prevents Defendants from communicating with social-media platforms "for the purpose of urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms." Doc. 294, at 4. Similar language appears in each of the injunction's ten paragraphs defining the conduct prohibited by the injunction. *Id.* at 4-5 (Paragraphs (1)-(10)). Notably, this prescribed conduct of "urging, encouraging, pressuring, or inducing … the removal, deletion, suppression, or reduction of content containing protected free speech" is conduct that federal officials obviously should not be performing because it plainly violates the First Amendment. The only surprising thing about this ruling is that an injunction was needed to stop them from doing it in the first place. Defendants will suffer no cognizable harm from complying with an order that prohibits only plainly unconstitutional conduct.

Next, Defendants argue that the injunction is "vague." Doc. 297-1, at 3. This argument is meritless. The injunction is admirably detailed and specific. It includes ten paragraphs specifying prohibited conduct in detail, and eight paragraphs specifying government conduct that is *not* prohibited. Doc. 294, at 4-6. The injunction uses common words readily understandable by ordinary speakers of the English language, and whose meanings are easily ascertainable from the

4

dictionary. Defendants do not identify any particular term anywhere in the injunction that they contend is too vague for persons of common intelligence to grasp. *See* Doc. 297-1, at 3-4.

Instead, Defendants fault the injunction for referring to "protected free speech," which the injunction defines as "speech that is protected by the Free Speech Clause of the First Amendment to the United States Constitution with jurisprudence of the United States Supreme Court" and other federal courts. Doc. 294, at 4 & n.3. The Government thus claims that it is incapable of discerning whether speech is protected by the First Amendment, Doc. 297-1, at 4—which does not inspire confidence in the Government's ability to comply with the First Amendment in other contexts.

The injunction is not vague on this point. As the Supreme Court has long held, speech is protected by the First Amendment unless it falls within certain clearly defined, "long familiar," "historic and traditional," "well-defined and narrowly limited" exceptions, such as obscenity, fraud, incitement, and speech integral to criminal conduct:

> From 1791 to the present, … the First Amendment has permitted restrictions upon the content of speech in a few limited areas and has never included a freedom to disregard these traditional limitations. These historic and traditional categories long familiar to the bar—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.

*United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (citations, alterations, and quotation marks omitted); *see also, e.g., United States v. Alvarez*, 567 U.S. 709, 715–18 (2012) (plurality op.). The Supreme Court's doctrine of First Amendment exceptions is not unconstitutionally vague. Speech that does not fall into these "historic and traditional," "long familiar," "well-defined," and "narrowly limited" exceptions is protected by the First Amendment, *id.*—especially where, as here, the speech is core political speech addressing topics of enormous public concern:

> [T]he Government has used its power to silence the opposition. Opposition to COVID-19 vaccines; opposition to COVID-19 masking and lockdowns; opposition to the lab-leak theory of COVID-19; opposition to the validity of the 2020 election; opposition to

5

> President Biden's policies; statements that the Hunter Biden laptop story was true; and opposition to policies of the government officials in power. All were suppressed. It is quite telling that each example or category of suppressed speech was conservative in nature. This targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech. American citizens have the right to engage in free debate about the significant issues affecting the country.

Doc. 293, at 154. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Stevens*, 559 U.S. at 468 (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)). Outside the narrow, longstanding, well-defined First Amendment "categories [that] have a historical foundation in the Court's free speech tradition," the "vast realm of free speech and thought always protected in our tradition can still thrive." *Alvarez*, 567 U.S. at 715-718.

Notably, in their stay motion, Defendants fail to identify a single instance of social-media speech for which they claim they cannot discern whether it falls within the well-established First Amendment exceptions. *See* Doc. 297-1, at 3-4. But even if they did, it would not matter. As the Fifth Circuit has held, mathematical precision is neither possible nor required for injunctions: "[I]t is impossible for courts to craft injunctions that address all hypotheticals." *Daniels Health Sciences*, 710 F.3d at 586. Instead, as both the Supreme Court and Fifth Circuit have held, the mere *possibility* of some future marginal application does not suffice to invalidate an injunction. *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 15 (1945) (Jackson, J.); *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 (5th Cir.1969); *Daniels Health Sciences*, 710 F.3d at 586. Where Defendants have failed to identify any specific scenarios that fall within the supposed ambiguity, their claim of vagueness is purely speculative and hypothetical. *Daniels Health Sciences*, 710 F.3d at 586 (rejecting a claim of vagueness where the defendant "has not alleged an intent to enter into such transactions" that might raise questions about the injunction's scope).

Defendants also suggest that it is improper for the Court to incorporate First Amendment legal standards in defining the injunction's prohibited conduct. Doc. 297-1, at 3 & n.2. This is incorrect. An injunction may refer to established legal standards to define prohibited conduct. For example, in *Gulf King Shrimp*, the Fifth Circuit upheld an injunction that prohibited a company from engaging in "oppressive child labor," where "oppressive child labor" under the injunction was "as defined in Section 3(l) of the [Fair Labor Standards] Act." *Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 517 n.10 (5th Cir. 1969). The Fifth Circuit held that the injunction's "interdiction of oppressive child labor is not vague." *Id.* at 517. "The fact that the decree includes specific references to sections of the Fair Labor Standards Act is not, as here used, inconsistent with the requirements of Rule 65(d)." *Id.* "It is significant that the injunction does not engraft the statute in gross, or rely on the statute for clarification of what is otherwise unclear in the decree itself." *Id.* So also here, the injunction's reference to "protected conduct" does not merely "engraft [the First Amendment] in gross" or "rely on" the First Amendment "for clarification of what is otherwise unclear in the decree itself." *Id.* Indeed, if anything, the injunction's reference to "protected" speech is far more specific, and less vague, than the phrase "oppressive child labor" upheld by the Fifth Circuit in *Gulf King Shrimp*.

Likewise, many other cases have upheld injunctions that include references to legal standards in defining the prohibited conduct. *See, e.g., U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009) (upholding an injunction preventing defendants "from committing any act of racketeering, as defined in 18 U.S.C. § 1961(1)"); *id.* ("Even if it tracks statutory language, a general injunction is not too vague if it relates the enjoined violations to the context of the case."); *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) (holding that "a broad, but properly drafted injunction, which largely uses the statutory or regulatory language may satisfy the

7

specificity requirement of Rule 65(d) so long as it clearly lets the defendant know what he is ordered to do or not do"); *Perez v. Gulf Coast Management Co., LLC*, 2015 WL 895098, at *9-12 (S.D. Ala. Mar. 3, 2015) (enjoining the employment of any employee in commerce "within the meaning of the [FLSA]" for more than 40 hours unless compensated appropriately, and citing specific statutory provisions in the FLSA).

Such injunctions are particularly appropriate where, as here, the reference to legal standards is linked to prohibitions of specific conduct and backed by extensive factual findings detailing the types of violations enjoined. *Philip Morris USA*, 566 F.3d at 1137. In *Philip Morris*, "[t]he district court did not abstractly enjoin Defendants from violating RICO or making false statements, but instead specified the matters about which Defendants are to avoid making false statements or committing racketeering acts… This is not a generalized injunction to obey the law, especially when read in the context of the district court's legal conclusions and … findings of fact about fraud …." *Id.* The same logic applies here.

Defendants claim that "[t]he Court's list of carve-outs only injects further uncertainty," Doc. 297-1, at 3, but their argument cannot withstand scrutiny. Again, the eight paragraphs specifying conduct that is *not* prohibited by the injunction are clear, specific, and cast in terms whose meanings are readily understandable to ordinary English speakers with access to a dictionary. *See* Doc. 294, at 5-6. Defendants quibble with the language of only one of them—Paragraph (5), which permits Defendants to "exercis[e] permissible public government speech promoting government policies or views on matters of public concern." Doc. 294, at 6. Yet even here, Defendants do not claim that this language is unclear or vague (in fact, they use virtually the same language, Doc. 297-1, at 1). Instead, they claim that this exception is "at odds with the

8

Court's conclusion that public statements by the White House Press Secretary and the Surgeon General likely violate the First Amendment." Doc. 297-1, at 4.

This supposed inconsistency is baseless. As the Court's opinion explains in detail, backed by overwhelming evidence, the White House Press Secretary went beyond "exercising permissible public government speech" by using the "threat of legal consequences" to "push[] Facebook and other social-media platforms to censor COVID-19 misinformation." Doc. 293, at 22; *see also id.* at 23-24, 26, 98. The Court explicitly found that the Press Secretary raised "the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation." *Id.* at 26. Likewise, the Court explicitly found that Surgeon General Murthy made public and private demands for censorship of disfavored views on COVID-19, understanding that the platforms would feel "feel pressured" to increase censorship in response. *Id.* at 30; *see also id.* at 23, 28-36. The Court specifically found that the Surgeon General used threats of adverse consequences to pressure platforms, and that his frequently used word "'accountable' carries with it the threat of consequences." *Id.* at 33. The Court also specifically found that "[t]he Office of the Surgeon General collaborated and partnered with the Stanford Internet Observatory and the Virality Project" to censor Americans' speech. *Id.* at 34.

In short, the Court's findings demonstrate that both the Press Secretary and the Surgeon General went far beyond merely expressing their views on public policy issues—they used pressure and threats to induce social-media platforms to silence ordinary Americans' speech. The Press Secretary's and Surgeon General's unlawful conduct involved "urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech posted on social-media platforms," and it was done "for the

9

purpose of" censoring First Amendment-protected speech. Doc. 294, at 4. Even the Government, despite its professed obtuseness, should be capable of understanding this distinction.

Next, Defendants object that the injunction "names entire agencies, such as the Department of Justice, which are composed of many sub-components whose actions are not challenged by Plaintiffs in this case." Doc. 297-1, at 4. From the beginning of this case, consistent with ordinary practice, Plaintiffs have consistently sought injunctive relief against both the agency defendants and the federal officers involved. *See, e.g.,* Doc. 10, at 2; Doc. 214, at 68. During all this time, Defendants never objected that only federal *officers* can be enjoined and that federal *agencies* are somehow exempt from injunction; the argument is therefore waived. It is also meritless. A legion of cases supports the practice of enjoining federal agencies involved in unlawful conduct. *See, e.g., Utah v. United States*, 420 U.S. 304 (1975) (enjoining "the United States of America, its departments and agencies"); *Louisiana v. Becerra*, 577 F.Supp.3d 483 (W.D. La. 2022) (enjoining the Department of Health and Human Services); *Arizona by and through Brnovich v. CDC*, 2022 WL 1276141 (W.D. La. Apr. 7, 2022) (issuing a TRO against the Department of Homeland Security "and all of its subdivisions, agencies, and employees"); *Nevada v. U.S. Dep't of Labor*, 218 F.Supp.3d 520 (E.D. Tex. 2016) (enjoining the U.S. Department of Labor); *Scholl v. Mnuchin*, 494 F.Supp.3d 661 (N.D. Cal. 2020) (enjoining the Department of Treasury, the IRS, and the "United States of America"). There is no basis to object to an injunction against agencies here.

Defendants also complain that the injunction applies to HHS but then exempts the FDA, which is a part of HHS. Doc. 297-1, at 4. On the contrary, there is nothing inherently confusing or contradictory in enjoining a federal agency, while exempting a component of that agency. *See* Doc. 294, at 1, 6. An order that applies to all high-school seniors but then exempts the seniors who are on the basketball team is not self-contradictory; neither is the Court's injunction.

Defendants argue that "[t]he potential breadth … covered by the injunction … will chill a wide range of lawful government conduct relating to Defendants' law enforcement responsibilities, obligations to protect national security, and prerogative to speak on matters of public concern." Doc. 297-1, at 4.  Yet, as noted above, this concern is vague, hypothetical, and speculative, because Defendants fail to identify *a single specific instance* of lawful government conduct that they contend will be "chill[ed]" by the injunction. *See id.*  The Court fully addressed their concerns about "law enforcement," "national security," and the "prerogative to speak on matters of public concern," *id.*, by providing specific exemptions authorizing lawful government activity on these very matters in Paragraphs (1), (2), (3), (4), (5), (6), and (7) of the exceptions to the injunction.  *See* Doc. 294, at 5-6 (specifically exempting, *inter alia*, "(1) informing social-media companies of postings involving criminal activity or criminal conspiracies;" "(2) contacting and/or notifying social-media companies of national security threats, extortion, or other threats posted on its platform;" "(4) informing social-media companies of threats that threaten the public safety or security of the United States;" and "(5) exercising permissible public government speech promoting government policies or views on matters of public concern," among others). Defendants fail to explain how any law-enforcement, national-security, and government-speech interests are not adequately protected by these specific exceptions—in fact, Defendants do not identify any *specific* conduct that they claim is lawful but prevented by the injunction.  *See* Doc. 297-1, at 3-4.  In their preliminary-injunction briefing, Defendants spent months attempting to identify lawful government conduct that the injunction would supposedly interfere with, and filed five declarations advancing such claims along with extensive briefing. *See* Doc. 266, at 258 (citing Knapp Decl. ¶¶ 5-50 (Def. Ex. 157); Wales Decl. ¶¶ 27-30 (Def. Ex. 167); Crawford Decl. ¶¶ 20-23 (Def. Ex. 80); Lesko Decl. ¶¶ 18-19 (Def. Ex. 63); Bray Decl. ¶¶ 12-15 (Def. Ex. 142)).  The

11

Court carefully considered those concerns and thoroughly addressed them with its list of eight exclusions.  Doc. 294, at 5-6.

Now that the injunction is entered, Defendants fail to identify any specific concern from those five declarations, or any new specific concern, that the injunction will supposedly interfere with.  *See Regal Knitwear*, 324 U.S. at 15-16 (Jackson, J.) (refusing to strike words from an injunction where the enjoined party had not identified any specific conduct that those words would prevent).  As *Regal Knitwear* held, "No concrete case is before us. We have here an abstract controversy over the use of these words, and it is as sterile as abstract controversies usually are. The [Government] objects to the words of the order merely as words."  *Id.* at 15.  Such "hypotheticals" provide no basis for a stay.  *Daniels Health Sciences*, 710 F.3d at 586.

Finally, the Government likens this case to *Louisiana v. Biden*, 45 F.4th 841, 845 (5th Cir. 2022), but that case is inapplicable here.  In *Louisiana*, the Fifth Circuit remanded an injunction that included the word "Pause" to describe the cessation of oil and gas leases on federal lands on the basis that the injunction did not define the word "Pause": "The order enjoins implementation of the 'Pause' but does not define that term. The district court's accompanying memorandum defines the Pause without precision, leading the parties to differ in their interpretation of the Pause's breadth."  *Id.*  Here, Defendants do not identify any specialized term in the injunction that is supposedly "define[d] … without precision," *id.*, so the issue is not presented here.

**II.     Staying the Injunction Would Inflict Irreparable Injury on Plaintiffs.**

Defendants contend that Plaintiffs will not suffer any irreparable injury from a stay of the injunction pending appeal.  Doc. 297-1, at 4-5.  This is wrong.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Both the Private Plaintiffs and the States will suffer grave

irreparable injury from a stay. The harms to the individual Plaintiffs from a stay are particularly acute, and the Government ignores them. The record is clear that Plaintiffs Jay Battacharya, Martin Kulldorff, Aaron Kheriaty, Jill Hines, and Jim Hoft have been repeatedly denied access to social media because their messages were the sort that the Government successfully sought to eliminate. Moreover, the Private Plaintiffs are also injured as *audience members* because they follow on social-media dozens of speakers specifically targeted by federal officials and their allies for censorship, as reflected in this case's discovery. *See* Doc. 227-5, ¶ 5 (Bhattacharya Decl.); Doc. 227-6, ¶ 5 (Kulldorff Decl.); Doc. 227-7, ¶¶ 5-6 (Kheriaty Decl.); Doc. 227-8, ¶¶ 5-7 (Hoft Decl.); Doc. 227-9, ¶¶ 5-6 (Hines Decl.). The injunction protects them while this case is appealed.

Defendants rehash their argument that "Plaintiffs' assertions of harm center almost entirely on conduct that is more than *one year old*." Doc. 297-1, at 5 (citing Doc. 266 at 106-25). This argument is wrong for the reasons Plaintiffs have repeatedly explained. *See, e.g.,* Doc. 276, at 70-80. Both States and the Private Plaintiffs continue to experience censorship injuries to the present. *See, e.g.,* Doc. 274-3 (Hines Decl.); Doc 274-4 (Hoft Decl.). Moreover, Defendants' social-media censorship activities continued up until the time they produced documents in discovery and beyond. The fact that much of this evidence—though by no means all of it—is up to "one year old" reflects the fact that Defendants produced the vast majority of their documents in August 2022—almost a year ago. Moreover, the limited document productions since then, the deposition testimony, and Defendants' own public statements all demonstrate their ongoing commitment to social-media censorship activities—as do their professions of innocence in the face of overwhelming evidence. "Such selfdelusions of innocence only underscore the urgent need, both now and in the future, for injunctive process." *Gulf King Shrimp*, 407 F.2d at 516.

### III. Defendants Are Unlikely To Succeed on the Merits.

Defendants contend that they will raise "serious legal questions" about Article III standing and the merits on appeal. Doc. 297-1, at 5. But they raise only two issues as to standing, and both are meritless. First, they claim that Plaintiff States lack *parens patriae* standing under the Supreme Court's recent decision in *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023). This contention is wrong for the reasons elucidated in the Court's opinion. Doc. 293, at 121-125. And the Government ignores multiple other bases for State standing—including direct censorship injuries to the States, injuries to the States' ability to *listen* to their own constituents on social media, and injuries to the States' sovereign interests, many of which the Court has upheld. Doc. 293, at 125-126; Doc. 224, at 20-33. Second, they contend that all Plaintiffs lack standing because of their supposed "failure to present any evidence of ongoing or imminent harm." *Id.* That is wrong for the reasons discussed above. Plaintiffs have submitted extensive evidence of ongoing and imminent future injuries.

Finally, Defendants contend, in conclusory fashion, that "the Court's conclusion that Plaintiffs are likely to succeed on the merits of their First Amendment claim fails to properly apply state-action doctrine and ignores the voluminous evidence presented by Defendants." Doc. 297-1, at 5. They provide no citation or further argument to support these conclusory claims, which are clearly mistaken. The Court provided an extensive and detailed analysis of the state-action doctrine, Doc. 293, at 88-95, and Defendants provide no reason to question it. As for Defendants' claim that the Court "ignore[d] the voluminous evidence presented by Defendants," Doc. 297-1, at 5, the Court relied on the "voluminous evidence" *produced* by Defendants in discovery—*i.e.*, their own emails and other communications with social-media platforms, as well as the sworn testimony of six Government witnesses in depositions. Defendants do not cite a shred of evidence that contradicts a single one of the Court's 82 pages of factual findings. And even if they did, it is

this Court's role to weigh and consider the evidence that it considers probative, and to disregard evidence that it finds non-probative or unconvincing. The Court has done so here.

### IV. The Court Should Again Reject Defendants' Request for an Administrative Stay.

In the alternative, Defendants request "an administrative stay of the preliminary injunction for seven days to allow time for the Fifth Circuit to consider an emergency motion to stay and request for administrative stay." Doc. 297-1, at 6. Defendants requested the same relief—a seven-day administrative stay—in their opposition to the motion for preliminary injunction, Doc. 266, at 275, and the Court did not grant it. The Court should not revisit that decision and grant such a stay now. As discussed above, the injunction prevents ongoing irreparable injury to First Amendment interests, and maintaining the injunction will advance the public interest. "Injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). A stay of even a single day would extend First Amendment harms that "unquestionably constitute[] irreparable injury." *Elrod*, 427 U.S. at 373. The Government identifies no cognizable harm that will result from forbidding it to urge, pressure, encourage, or induce social-media platforms to censor Americans' First Amendment-protected speech. The equities weigh heavily against entering an administrative stay.

## CONCLUSION

In essence, Defendants argue that the injunction should be stayed because it might interfere with the Government's ability to continue working with social-media companies to censor Americans' core political speech on the basis of viewpoint. *See* Doc. 291-1, at 1. In other words, the Government seeks a stay of the injunction so that it can continue violating the First Amendment. The motion for stay should be denied.

Dated: July 9, 2023

Respectfully submitted,

**ANDREW BAILEY**
**Attorney General of Missouri**

**JEFFREY M. LANDRY**
**Attorney General of Louisiana**

*/s/ Joshua M. Divine*
Joshua M. Divine, Mo. Bar No. 69875*
  *Solicitor General*
Todd A. Scott, Mo. Bar No. 56614*
  *Senior Counsel*
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870
Josh.Divine@ago.mo.gov
*Counsel for State of Missouri*

*/s/ D. John Sauer*
Elizabeth B. Murrill (La #20685)
  *Solicitor General*
Tracy Short (La #23940)
  *Assistant Attorney General*
D. John Sauer (Mo #58721)*
  *Special Assistant Attorney General*
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, Louisiana
Tel: (225) 326-6766
murrille@ag.louisiana.gov
*Counsel for State of Louisiana*

*/s/ John J. Vecchione*
John J. Vecchione *
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20036
Direct: (202) 918-6905
E-mail: john.vecchione@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

*/s/ John C. Burns*
John C. Burns *
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

\*  admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 9, 2023, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*