# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 23-1116

BLUEPRINT CAPITAL ADVISORS, LLC,

– v. –

STATE OF NEW JERSEY DIVISION OF INVESTMENT; BLACKROCK, INC.; BLACKROCK ALTERNATIVE ADVISORS; CLIFFWATER, LLC; TIMOTHY WALSH, in his individual and professional capacities; SAMANTHA ROSENSTOCK, in her individual and professional capacities; JASON MACDONALD, in his individual and professional capacities; CHRISTOPHER MCDONOUGH, in his individual and professional capacities; COREY AMON, in his individual and professional capacities; DINI AJMANI, in her individual and professional capacities; PHILIP MURPHY, in his official capacity as Governor of the State of New Jersey; OWL ROCK CAPITAL CORPORATION; DERRICK GREEN; GEORGE HELMY; MATTHEW PLATKIN, in their individual and professional capacities

TIMOTHY WALSH,

*Appellant.*

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY IN CASE NO. 2:20-CV-07663 HONORABLE JULIEN X. NEALS, DISTRICT JUDGE

## BRIEF FOR PLAINTIFF-APPELLEE BLUEPRINT CAPITAL ADVISORS LLC

MICHAEL J. BOWE
LAUREN TABAKSBLAT
BROWN RUDNICK LLP
*Attorneys for Plaintiff-Appellee*
Seven Times Square
New York, New York 10036
(212) 209-4800
mbowe@brownrudnick.com
ltabaksblat@brownrudnick.com

## CORPORATE DISCLOSURE STATEMENT

Blueprint Capital Advisors, a non-governmental party, has no parent corporation, no publicly held company holds 10% or more of its stock, and no publicly held company has a financial interest in the outcome of this proceeding.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................C-1

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS .............................4

STATEMENT OF THE CASE...................................................................4

      A.    Tim Walsh Works With The DOI To Misappropriate
           BCA's FAIR Program.................................................4

      B.    In 2017, BCA and Walsh's Trust Execute an Investment
           Agreement. ...........................................................7

      C.    Procedural History. .................................................8

SUMMARY OF THE ARGUMENT .........................................................9

STANDARD OF REVIEW ...................................................................11

ARGUMENT ..................................................................................12

   I.    THE DISTRICT COURT PROPERLY DECIDED THE
       THRESHOLD QUESTIONS OF ARBITRABILITY ......................12

      A.    District Courts Presumptively Decide Threshold
           Questions of Arbitrability. .......................................12

      B.    The Transaction Agreement Does Not Provide "Clear
           and Unmistakable" Intent To Delegate Threshold
           Questions of Arbitrability for Claims Between Walsh and
           BCA Arising From Walsh's 2015 and 2016 Conduct. .............14

   II.   THE DISTRICT COURT CORRECTLY DETERMINED
       THAT BCA'S CLAIMS FALL OUTSIDE THE SCOPE OF
       THE ARBITRATION CLAUSE ......................................22

      A.    The Arbitration Clause Extends Only To Disputes
           Related To The Transaction Agreement. ...................................23

i

B.    The District Court Correctly Found that BCA's Claims Against Walsh Do Not "Arise Out Of" or "Relate To" the Transaction Agreement. ............................................................28

C.    At a Minimum, BCA's Racketeering Claims Fall Outside the Scope of the Arbitration Clause. .........................................32

CONCLUSION ........................................................................................33

# TABLE OF AUTHORITES

**Page(s)**

**Cases**

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
  183 F.3d 568 (7th Cir. 1999)....................................................... 29

*Archer & White Sales, Inc. v. Henry Schein, Inc.*,
  935 F.3d 274 (5th Cir. 2019)....................................................... 19

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986)................................................................... 14

*Awuah v. Coverall N.A., Inc.*,
  554 F.3d 7 (1st Cir. 2009) .......................................................... 17

*Bell v. Se. Pennsylvania Transp. Auth.*,
  733 F.3d 490 (3d Cir. 2013)........................................................ 29

*Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*,
  181 F.3d 435 (3d Cir. 1999)........................................................ 13

*Blanton v. Domino's Pizza Franchising LLC*,
  962 F.3d 842 (6th Cir. 2020)....................................................... 21

*CardioNet, Inc. v. Cigna Health Corp.*,
  751 F.3d 165 (3d Cir. 2014)................................................. passim

*Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*,
  809 F.3d 746 (3d Cir. 2016)...................................... 13, 14, 16

*Chevron Corp. v. Ecuador*,
  795 F.3d 200, 202 (D.C. Cir. 2015) .......................................... 17

*China Minmetals Materials Imp. and Exp. Co., Ltd. v. Chi Mei Corp.*,
  334 F.3d 274 (3d Cir. 2003)........................................................ 22

*Contec Corp. v. Remote Sol., Co., Ltd.*,
   398 F.3d 205 (2d Cir. 2005)........................................................ 17

*DCK N.A., LLC v. Burns & Roe Servs. Corp.*,
   218 F. Supp. 3d 465 (W.D. Pa. 2016) ....................................... 18

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
   6 F.4th 308 (2d Cir. 2021).......................................................... 20

*Dish Network L.L.C. v. Ray*,
   900 F.3d 1240 (10th Cir. 2018)................................................... 17

*Ehleiter v. Grapetree Shores, Inc.*,
   482 F.3d 207 (3d Cir. 2007)................................................. 13, 16

*EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc.*,
   982 A.2d 1194 (N.J. Sup. Ct. 2009)........................................... 31

*Fallo v. High-Tech Inst.*,
   559 F.3d 874 (8th Cir. 2009)...................................................... 17

*Field Intelligence Inc. v. Xylem Dewatering Sols., Inc.*,
   49 F.4th 351 (3d Cir. 2022)........................................................ 27

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995)...................................................... 14, 21, 22

*FlagHouse, Inc. v. ProSource Dev. Inc.*,
   528 F. App'x 186 (3d Cir. 2013) ............................................... 33

*Flintkote Co. v. Aviva PLC*,
   769 F.3d 215 (3d Cir. 2014)....................................................... 11

*Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*,
   168 N.J. 124, 773 A.2d 665 (2001)............................................ 32

*HealthplanCRM, LLC v. AvMed, Inc.*,
   458 F. Supp. 3d 308 (W.D. Pa. 2020)..................................... 2, 16

iv

*Herzfeld v. 1416 Chancellor, Inc.*, 2015 WL 4480829
  (E.D. Pa. July 22, 2015) ........................................................... 16

*Holick v. Cellular Sales of N.Y., LLC*,
  802 F.3d 391 (2d Cir. 2015) ..................................................... 25

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002) ................................................................... 13

*In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*,
  835 F.3d 1195 (10th Cir. 2016) ........................................... 25, 26

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
  938 F.3d 515 (3d Cir. 2019) ..................................................... 31

*In re Rotavirus Vaccines Antitrust Litig.*,
  30 F.4th 148 (3d Cir. 2022) ..................................................... 31

*Lenox MacLaren Surgical Corp. v. Medtronic Inc.*,
  449 F. App'x 704 (10th Cir. 2011) ........................................... 29

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
  473 U.S. 614 (1985) ................................................................. 28

*MLB Umpires Ass'n v. Am. League of Pro. Baseball Clubs*,
  357 F.3d 272 (3d Cir. 2004) ..................................................... 14

*Moon v. Breathless Inc.*,
  868 F.3d 209 (3d Cir. 2017) ................................................. 24, 33

*MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*,
  974 F.3d 386 (3d Cir. 2020) ................................... 12, 13, 14, 22

*NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*,
  770 F.3d 1010 (2d Cir. 2014) ............................................. 18, 20

*Nationwide Ins. Co. of Columbus v. Patterson*,
  953 F.2d 44 (3d Cir. 1991) ....................................................... 11

*NCR Corp. v. Korala Assocs., Ltd.*,
   512 F.3d 807, 814 (6th Cir. 2008) ............................................................. 32

*Opalinski v. Robert Half Int'l Inc.*,
   761 F.3d 326 (3d Cir. 2014) .......................................................... 13, 14, 21

*Petrofac, Inc. v. DynMcDermott Petrol. Operations Co.*,
   687 F.3d 671 (5th Cir. 2012) ........................................................................ 17

*Richardson v. Coverall N.A., Inc.*,
   811 F. App'x 100 (3d Cir. 2020) ............................................................... 15

*Robert D. Mabe, Inc. v. OptumRX*,
   43 F.4th 307 (3d Cir. 2022) .................................................................. 11, 12

*Sandvik AB v. Advent Intern. Corp.*,
   220 F.3d 99 (3d Cir. 2000) ........................................................................... 13

*Sec. Watch, Inc. v. Sentinel Sys., Inc.*,
   176 F.3d 369 (6th Cir. 1999) ...................................................................... 26

*Simply Wireless, Inc. v. T-Mobile US, Inc.*,
   877 F.3d 522 (4th Cir. 2017) ...................................................................... 17

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010) ..................................................................................... 13

*Tamburino v. Madison Square Garden, L.P.*,
   115 A.D.3d 217 (N.Y. App. Div. 2014) .................................................... 32

*Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*,
   432 F.3d 1327 (11th Cir. 2005) ................................................................. 17

*Thomas v. Carnival Corp.*,
   573 F.3d 1113 (11th Cir. 2009) ................................................................. 24

*TradeComet.com LLC v. Google, Inc.*,
   435 F. App'x 31 (2d Cir. 2011) ................................................................. 24

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
   489 U.S. 468 (1989) ...................................................................................... 23

*Voorhees v. Tolia*,
   761 F. App'x 88 (3d Cir. 2019) ................................................................ 23

*Wachovia Bank, Nat. Ass'n v. Schmidt*,
   445 F.3d 762 (4th Cir. 2006) .................................................................... 24

*Walgreen Co. v. Johnson & Johnson*,
   950 F.3d 195 (3d Cir. 2020) .................................................................... 31

*Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
   13 F.3d 330 (10th Cir. 1993) .................................................................... 25

## PRELIMINARY STATEMENT

Defendant Tim Walsh was at the center of a coordinated scheme to misappropriate a confidential and proprietary business model from Black-owned asset manager, Blueprint Capital Advisors ("BCA"), so that the New Jersey Division of Investment ("DOI") could implement that program with one of the preferred white members of its old-boys network.  Under the guise of serving as a financial advisor to BCA, Walsh extracted confidential information about BCA's FAIR Program – which BCA had spent years developing and had gone to great lengths to protect – which he then used to broker a deal between the DOI and BlackRock.  As a *quid pro quo* for his work, Walsh secured a $600 million dollar anchor investment for Owl Rock – whom Walsh was simultaneously illegally working for as an undisclosed third-party marketer.  Owl Rock, in turn, awarded Walsh with the position of Managing Director.

The District Court properly sustained BCA's claims against Walsh for breach of fiduciary duty, racketeering, fraud, and civil conspiracy.  Moreover, the District Court correctly held that Walsh could not invoke a 2017 investment agreement between his trust and BCA to compel arbitration of claims asserted against him personally arising from misconduct that occurred years earlier.

On appeal, Walsh argues that this later-in-time agreement, between different parties, which expressly limits the scope of its arbitration clause to claims arising

from that investment agreement, divests the District Court of jurisdiction over BCA's claims against him.  The District Court correctly rejected this argument, and this Court should affirm.

*First*, contrary to Walsh's claim, the District Court had the authority to decide whether BCA's claims were arbitrable, as it did.  That inherent authority is strongly presumed and may only be overcome by "clear and unmistakable evidence" that the parties intended to delegate questions of arbitrability to an arbitrator.  There is no such evidence, let alone "clear and unmistakable" evidence, here, where the agreement was not even entered into by Walsh personally and where the plain terms of the arbitration clause in the agreement evinces the parties' intent to limit its reach.  Relying exclusively on a single unpublished decision, Walsh argues that the agreement's reference to the "AAA Rules" supplies the requisite intent to refer questions of arbitrability to an arbitrator.  But this Court has never adopted the bright-line rule that Walsh insists.  Instead, this Court employs a "more nuanced approach" that "requires the Court to do more than scour the relevant contract for the magic letters 'AAA'."  *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 323 (W.D. Pa. 2020).  Walsh points to these magic letters as *a fortiori* evidence of the parties' clear intent.  This is not the law in this Circuit.

*Second*, the District Court correctly determined that BCA's claims fall outside the scope of the arbitration clause.  The arbitration clause applies only to disputes

arising out of or relating to "this agreement," and courts interpret the term "this agreement" as a limiting principle. Moreover, where an arbitration clause is limited to claims related to "this agreement," courts refuse to apply the provision retroactively, especially where the earlier conduct was of a different nature than the agreement containing the arbitration clause. It is undisputed that the 2017 investment agreement post-dated Walsh's role as an advisor to BCA and BCA's claims against Walsh center on conduct unrelated to that investment or related contract.

Walsh goes to great lengths to argue that the terms "arise out of" or "relate to" should be construed broadly and that such language encompasses any disputes that are "connected in any way with" the contract. (Br. at 2-3.) But this Court determines whether a claim "arises out of or relates to" an agreement by asking whether resolving the claim "require[s] construction of, or even reference to, any provision in the Agreement." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 175 (3d Cir. 2014). And where the defendant's performance under the agreement has no bearing on plaintiff's claims, the arbitration clause does not govern. *Id.* Resolving BCA's claims against Walsh indisputably does not require reference to the 2017 investment agreement because as the District Court properly concluded, BCA's claims "are well beyond Walsh's obligation to maintain confidentiality" under the agreement. (MTD Op. at A92.)

3

Accordingly, for all these reasons and those set forth below, this Court should affirm the District Court's ruling.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has never been before this Court, nor are there any related cases and proceedings. The full District Court record is located at *Blueprint Capital Advisors, LLC v. State of New Jersey, et al.*, No. 2:20-cv-07663 (D.N.J.).

## STATEMENT OF THE CASE

### A. Tim Walsh Works With The DOI To Misappropriate BCA's FAIR Program.

In 2015, New Jersey's pension funds were in financial crisis. (Am. Compl. at A149-50, ¶¶ 39-40.) They were underfunded and underperforming, and both Governor Christie and the New Jersey Division of Investment ("DOI") were being accused of contributing to their depletion via systemic "pay to play" practices and backroom deals, whereby outside investments were doled out to large Wall Street firms and other politically connected managers. (*Id.*) Jacob Walthour and Carrie Pickett founded BCA, the only Black-owned asset manager in New Jersey, in direct response to this crisis. (*Id.* at A146-49, ¶¶ 30-38.) Based on extensive research, analysis, and industry experience, BCA developed a unique, proprietary investment model (the "FAIR" program) tailored for public pension funds that would dramatically lower their asset management expenses and improve their returns. (*Id.*

4

at A147, ¶ 32.)  Realizing the competitive value of its proprietary FAIR program,
BCA took exhaustive steps to protect its model.  (*Id.* at A149, ¶ 38.)

Because BCA was a new fund in New Jersey, it hired Tim Walsh, a former
director of the DOI and close friends with key DOI officials.  (*See id.* at A155, ¶ 57.)
Walsh also knew Walthour from Walthour's prior time at Cliffwater and presented
himself to Walthour as someone who was excited about the innovation that BCA
had created and could advise BCA in its negotiations with the DOI.  (*Id.*)  Based on
those representations, BCA added Walsh to its advisory board in August 2015,
shared BCA's proprietary FAIR model, and involved him in every aspect of
discussions with the DOI.  (*Id.* at A154-56, ¶¶ 53, 57.)

Throughout the summer of 2015, Walthour sent the DOI numerous materials
on BCA's FAIR program and presented how it would work, based on representations
by the DOI and Walsh that the DOI wanted to implement the FAIR Program with
BCA by year-end.  (*Id.* at A152-54, ¶¶ 49-54; A155-56, ¶¶ 57-58.)  In truth,
however, the DOI and Walsh induced BCA to share its proprietary FAIR program
only so it could execute the program with a different partner who was a member of
an exclusive, white, old-boys "pay-to-play" network that Walsh and the DOI had
worked with for years.  (*Id.* at A155-56, ¶¶ 55-59.)

Walsh had his own personal motives.  He was planning to cash in on his DOI
relationships by brokering deals between the DOI and the usual Wall Street firms

that the DOI preferred to deal with.  (*Id.* at A156, ¶ 59.)  Simultaneously with his work with BCA, Walsh was working as an undisclosed third-party marketer to the investment firm Owl Rock, which wanted New Jersey to be one of the firm's anchor investors and had secretly retained Walsh to facilitate that investment.  (*Id.* at A157, ¶ 60.)  To that end, Walsh purported to serve as an advisor to BCA, while simultaneously working with the DOI to misappropriate BCA's proprietary model for the DOI's preferred partner as a *quid pro quo* to securing an investment for Owl Rock.  (*Id.* at A158, ¶ 62.)

Once the DOI had extracted the information it needed to pursue the FAIR program without BCA, it began working with Walsh to secure a replacement firm. (*Id.* at A160, A162-64, A165, A167-68, ¶¶ 69, 75-79, 82, 91.)  Walsh had a thorough and intimate knowledge of BCA's FAIR program, and used this knowledge to backchannel to BlackRock the program's proprietary models.  (*Id.* at A167-68, ¶ 91.) Ultimately, in August 2016, New Jersey's State Investment Council ("SIC") approved the FAIR program with BlackRock.  (*Id.* at A170, ¶ 102.)  That same day, the SIC also approved a $600 million commitment to Owl Rock, exactly as Walsh had planned.  (*Id.*)  And less than two weeks later, Owl Rock announced that Walsh had been hired as its managing director.  (*Id.*)

### B.    In 2017, BCA and Walsh's Trust Execute an Investment Agreement.

Prior to the misappropriation of its FAIR program, BCA had informed the entire market that it intended to launch with the DOI as its anchor investor.  (*Id.* at A171-72, ¶ 104.)  To maintain its market credibility, BCA had no other choice but to pursue other opportunities with the DOI, and ultimately was forced to accept a deal on unfavorable terms.  (*Id.* at A172, A175, A176-77, ¶¶ 105-06, 114, 117-19.)  The SIC approved that deal in January 2017, but the DOI has failed to perform under that contract ever since.  (*Id.* at A177-94, ¶¶ 120-73.)

Almost one year after the SIC approved BCA's FAIR program with BlackRock, BCA entered into an investment agreement with a trust owned by Walsh (the "Transaction Agreement").  The parties to the Transaction Agreement are expressly defined as "Blueprint Capital Advisors LLC" and the "Walsh Living Trust Dated 2-2-2000."  (*See* Transaction Agreement at A245, A264.)  Tim Walsh is not a party to the Agreement.  The Trust agreed to invest $75,000 with BCA (*id.* at A245, § 2.01(a)), and to keep BCA's information confidential (*id.* at A250, § 5.01).

The Transaction Agreement includes an arbitration clause, which provides:

> Any controversy or claim arising out of or relating to this Agreement or the breach thereof, that cannot be settled between the Parties, shall be settled by arbitration in accordance with AAA and pursuant to the AAA Rules; *provided*, that each Party shall retain his or its right to commence an action to obtain specific performance or other equitable relief from any court of competent jurisdiction.

(*Id.* at A257, § 12.05(a).)  The arbitration clause therefore limits arbitration to only those "controversies" or "claims" that "arise out of or relate" to the 2017 Agreement, which governs only the investment relationship between BCA and the Trust.

## C.    Procedural History.

BCA commenced this action on June 23, 2020.  (R. 1 at 1.)[1]  BCA's Amended Complaint, the operative complaint in this action, filed on November 23, 2020, alleges claims against Walsh for violations of federal and state RICO statutes, fraud, breach of contract, breach of fiduciary duty, and civil conspiracy.  (Am. Compl. At A212-27,  ¶¶ 246-298;  A229-30,  ¶¶ 305-311;  A234, ¶¶  331-336;  A234-35, ¶¶ 337-341; A238-39, ¶¶ 357-363.)

On February 15, 2021, Walsh moved to dismiss BCA's Amended Complaint, or in the alternative to compel arbitration pursuant to an arbitration clause in the Transaction Agreement.  (R. 123-1.)  In support of his motion to compel, Walsh argued that BCA's claims fall squarely within the scope of the arbitration clause, but at a minimum, the case should be referred to arbitration to determine the question of arbitrability.  (*Id.* at 26-30.)  The District Court rejected both of Walsh's arguments and denied his motion.

---

[1]    Citations in the format "R. __" refer to the document number from the District Court docket.

After examining the arbitration clause and the Transaction Agreement as a whole, the Court properly determined that the "parties not only anticipated potential court action but also expressly reserved the right to pursue such action outside of an arbitration proceeding." (MTD Op. at A92.) Accordingly, the District Court determined that the parties intended to "limit[] the potential scope of the arbitration clause" to claims arising from a breach of Walsh's duty of confidentiality under that Agreement. (*Id.*) The District Court concluded that the factual underpinnings supporting BCA's claims "are well beyond Walsh's obligation to maintain confidentiality." (*Id.*)

## SUMMARY OF THE ARGUMENT

The District Court properly decided the threshold question of arbitrability, which presumptively lies with the District Court, and not an arbitrator. As this Court has repeatedly held, that "onerous" presumption should not be disturbed absent "clear and unmistakable evidence" that parties to an arbitration agreement intended to delegate that power to the arbitrator. No such delegation was made here. Walsh's contrary position, based solely on the unrelated 2017 Transaction Agreement's reference to the "AAA Rules," which permit an arbitrator to decide arbitrability questions, is insufficient to overcome this strong presumption and is in conflict with the law of this Circuit, which scrutinizes the exact language and intent of the clause.

As set forth below, the arbitration clause in the Transaction Agreement expressly qualifies which claims are subject to the AAA Rules: "Any controversy or claim *arising out of or relating to this Agreement or the breach thereof*, that cannot be settled between the Parties, shall be settled by arbitration in accordance with AAA and pursuant to the AAA Rules." (Transaction Agreement at A257, § 12.05(a).) (emphasis added). Thus, the contracting parties expressly limited the arbitration clause—including the applicability of the AAA Rules—to only those disputes "arising out of" or "relating to" the Transaction Agreement, to the exclusion of all other claims. As the District Court correctly found, Walsh's alleged liability does not "arise from" or "relate to" the 2017 Transaction Agreement. (MTD Op. at A92.) Rather, it arises from his role as a member of BCA's Board of Advisors in 2015 and 2016, which predated and has no nexus to that Agreement. (*See id.* at A89, A92.)

Moreover, the Transaction Agreement cannot establish Mr. Walsh's and BCA's "clear and unmistakable" intent to arbitrate claims between them because Mr. Walsh is not even a party to that Agreement – his Trust is. Thus, there is no agreement between Mr. Walsh and BCA to arbitrate – let alone a clear and unmistakable one.

After properly concluding it had the power to decide the threshold arbitrability question, the District Court correctly found that BCA's claims are not subject to the arbitration clause. In so ruling, the District Court considered "the breadth of the

arbitration clause" and "the nature of the given claim" and correctly determined that BCA's factual allegations go "well beyond" the scope of the arbitration clause, which by its plain terms governs only those claims that arise from that Agreement.

Finally, at a minimum, this Court should affirm the District Court's denial of the motion to compel arbitration with respect to BCA's federal and state law racketeering claims. The law in this Circuit is clear that statutory claims are not arbitrable unless the parties clearly and unmistakably manifested an intent to arbitrate those claims. There is no such intent here. The arbitration clause is silent with respect to statutory claims and the courts have routinely declined to read such intent into an agreement.

## STANDARD OF REVIEW

This Court exercises plenary review over the District Court's order on a motion to compel arbitration. *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219 (3d Cir. 2014). Because Mr. Walsh filed his motion to compel at the motion to dismiss stage, this Court should apply the Rule 12 standard on this appeal. *See Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 325 (3d Cir. 2022); (*see also* R.123-1 at 7 ("A complaint is also subject to dismissal under Rule 12(b)(6) when arbitration is required." (citing *Nationwide Ins. Co. of Columbus v. Patterson*, 953 F.2d 44, 45 n.1 (3d Cir. 1991) ("Dismissal . . . because the dispute is covered by an arbitration provision is generally effected under Rule 12(b)(6)[.]")))).

Under the Rule 12 standard, "[i]n reviewing a district court's refusal to compel arbitration at the pleadings stage," this Court "accept[s] as true the factual allegations in the complaint and draw[s] all reasonable inferences in favor of the party opposing arbitration." *MZM Constr. Co., Inc. v. N.J. Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 395 (3d Cir. 2020). In other words, this Court "look[s] to the complaint and the documents on which it relies and will compel arbitration only if it is clear, when read in the light most favorable to the respondents, that the parties agreed to arbitrate." *Mabe*, 43 F.4th at 325.

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY DECIDED THE THRESHOLD QUESTIONS OF ARBITRABILITY

The District Court properly decided the arbitrability of BCA's claims against Walsh. The power to decide such questions presumptively lies with the District Court—not an arbitrator—and that presumption controls unless there is "clear and unmistakable evidence" that parties to an arbitration agreement intended to delegate that power to the arbitrator. There simply is no such evidence here, and certainly not enough to overcome this strong presumption.

### A. District Courts Presumptively Decide Threshold Questions of Arbitrability.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Opalinski v. Robert*

*Half Int'l Inc.*, 761 F.3d 326, 331 (3d Cir. 2014) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). "[A]s with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (noting that "an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private resolution"). Thus, if "a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999).

Courts—not arbitrators—are presumptively empowered to decide threshold questions of the parties' intent to arbitrate. *See Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 756 (3d Cir. 2016) ("It is presumed that courts must decide questions of arbitrability . . . ."); *Opalinski*, 761 F.3d at 335 (same). That is because these threshold determinations are "'a necessary prerequisite' in fulfilling the court's gatekeeping function." *MZM*, 974 F.3d at 398 (quoting *Sandvik AB v. Advent Intern. Corp.*, 220 F.3d 99, 107 (3d Cir. 2000)).

As this Court has explained time and again, the "burden of overcoming the presumption is onerous." *Chesapeake*, 809 F.3d at 756; *see also Ehleiter v. Grapetree Shores, Inc.*, 482 F.3d 207, 221 (3d Cir. 2007) (holding arbitrator did not have power to resolve arbitrability question because the agreement "fail[ed] to satisfy this onerous standard" of overcoming the presumption); *MLB Umpires Ass'n*

*v. Am. League of Pro. Baseball Clubs*, 357 F.3d 272, 280 (3d Cir. 2004) (noting "substantive arbitrability determinations are to be made by a court and not an arbitrator" absent "a clear expression to the contrary in the parties' contract").

This strong presumption that only courts can decide threshold questions of arbitrability can only be overcome where there is "'clea[r] and unmistakabl[e]' evidence" that the parties "agreed to arbitrate arbitrability." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)); *MZM*, 974 F.3d at 398 (describing the Supreme Court's "admonition" that courts "should not assume" that the parties agreed to delegate arbitrability questions to the arbitrator); *Chesapeake*, 809 F.3d at 761 (same). "Silence or ambiguous contractual language is insufficient to rebut the presumption." *Opalinski*, 761 F.3d at 335. To the contrary, courts "hesitate to interpret" ambiguity in an agreement as giving the arbitrator the power to decide threshold arbitrability questions, because "doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide." *First Options*, 514 U.S. at 945.

**B.     The Transaction Agreement Does Not Provide "Clear and Unmistakable" Intent To Delegate Threshold Questions of Arbitrability for Claims Between Walsh and BCA Arising From Walsh's 2015 and 2016 Conduct.**

Walsh contends that because the arbitration clause in the 2017 Transaction Agreement between his Trust and BCA references the "AAA Rules," that alone is

dispositive to delegate the threshold question of arbitrability to the arbitrator. (Br. at 18-20.) This argument fails as a matter of law because reference to the AAA Rules does not constitute "clear and unmistakable evidence" of an intent to delegate those questions.

Relying on a single unpublished Third Circuit case, Walsh attempts to argue that an agreement's reference to the AAA Rules constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability. (*See* Br. at 19 (citing *Richardson v. Coverall N.A., Inc.*, 811 F. App'x 100, 103 (3d Cir. 2020).) But the *Richardson* Court did *not* reach that conclusion. *See Richardson*, 811 F. App'x at 103 n.2 ("[W]e need not determine whether such a rule always applies."). That is because, as this Court acknowledged, "[e]ven where an agreement incorporates the AAA Rules, a contract might still otherwise muddy the clarity of the parties' intent to delegate." *Id.* Ultimately, the *Richardson* court looked to "the rest of [the] contract" and determined that the *particular agreement at issue* was not "so ambiguous or unclear" as to the parties' intent to delegate. *Id.* at 103.

Other Third Circuit cases affirm that mere reference to the AAA Rules does not *per se* constitute "clear and unmistakable evidence." In *Chesapeake*, the arbitration provision stated that "the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association," and in turn, the AAA's Supplemental Rules permitted an arbitrator to

"determine[] whether the proceeding should go forward as a class arbitration." 809 F.3d at 749-51. Nevertheless, this Court held the provision did *not* clearly and unmistakably delegate this threshold question to the arbitrator, and instead was "susceptible to more than one reasonable interpretation." *Id.* at 761-63 (finding such "a daisy-chain of cross-references" was not clear evidence of delegation); *see also Ehleiter*, 482 F.3d at 221-22 (finding provision delegating "the issue of arbitrability of any claim or dispute" not clear and unmistakable evidence of intent to delegate question of waiver, a "procedural[] question of arbitrability," because "[t]here are no references to waiver of arbitration in this or any other provision of the Agreement").

Contrary to Walsh's contention, this Court takes a "more nuanced approach" that "requires the Court to do more than scour the relevant contract for the magic letters 'AAA'." *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 323 (W.D. Pa. 2020). Instead, courts in this Circuit "must scrutinize the precise language of the arbitration clause at issue and ensure that it truly manifests a clear intent to delegate arbitrability to the arbitrator." *Id.*; *see also Herzfeld v. 1416 Chancellor, Inc.*, 2015 WL 4480829, at *6 (E.D. Pa. July 22, 2015) ("[W]e cannot find the three-word reference to AAA 'rules and regulations' incorporates a panoply of collective

and class action rules applied by AAA."), *aff'd*, 666 F. App'x 124 (3d Cir. 2016).[2]

Examining the arbitration clause here, it is clear that the Transaction Agreement's

reference to AAA arbitration did not unambiguously manifest an intent to delegate

questions of arbitrability concerning BCA's claims against Walsh.

    *First*, the arbitration clause expressly qualifies which claims are subject to

arbitration and the AAA Rules, and which are not.  The clause provides that: "Any

controversy or claim *arising out of or relating to this Agreement or the breach*

*thereof*, that cannot be settled between the Parties, shall be settled by arbitration in

---

[2]    Notwithstanding that the out-of-Circuit cases Walsh cites (Br. at 19 n.4) are not controlling, and indeed, conflict with this Court's approach, they are also distinguishable.  *See, e.g.*, *Awuah v. Coverall N.A., Inc.*, 554 F.3d 7, 9 (1st Cir. 2009) (broader arbitration clause covering all claims "arising out of or related to the relationship of the parties, this Agreement, any related agreement between the parties, and/or any specification, standard or operating procedure of Coverall"); *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005) (no carve-out for equitable claims); *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 528-29 (4th Cir. 2017) (basing decision in part on the "wholly groundless" exception, under which courts could override a clear and unmistakable delegation where "the claim of arbitrability is wholly groundless," and which has since been rejected by the Supreme Court); *Petrofac, Inc. v. DynMcDermott Petrol. Operations Co.*, 687 F.3d 671, 674 (5th Cir. 2012) (no language qualifying applicability of AAA Rules or carve-out for equitable claims); *Fallo v. High-Tech Inst.*, 559 F.3d 874, 876 (8th Cir. 2009) (no carve-out for equitable claims); *Dish Network L.L.C. v. Ray*, 900 F.3d 1240, 1241-42 (10th Cir. 2018) (no language qualifying applicability of AAA Rules or carve-out for equitable claims); *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1329 n.1 (11th Cir. 2005) (broader arbitration clause covering "all matters in dispute between" the parties); *Chevron Corp. v. Ecuador*, 795 F.3d 200, 202, 207-08 (D.C. Cir. 2015) (involving international treaty between U.S. and Ecuador incorporating United Nations Commission on International Trade Law Rules, not AAA Rules).

accordance with AAA and pursuant to the AAA Rules." (Transaction Agreement at A257, § 12.05(a) (emphasis added).)  The contracting parties thus expressly limited the arbitration clause—including the applicability of the AAA Rules—to only those disputes "arising out of" or "relating to" the Transaction Agreement, to the exclusion of those that predated the Agreement, such as BCA's claims here. Thus, because the arbitration clause "provides for AAA rules to apply to such arbitrations as may arise under the Agreement" (not other, unrelated disputes), the AAA Rules do not apply "until a decision is made as to whether [BCA's claims] do[] or do[] not fall within the intended scope of arbitration, in short, until arbitrability is decided." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014) (holding district court properly decided arbitrability questions); *see also DCK N.A., LLC v. Burns & Roe Servs. Corp.*, 218 F. Supp. 3d 465, 474 (W.D. Pa. 2016) (holding reference to AAA Rules not clear and unmistakable evidence because "the parties only agreed to arbitrate under the Rules for disputes that arise during the course of performance of the contracts" and distinguishing cases "referring all disputes" to arbitration).  Accordingly, "this case is not akin to those in which . . . the incorporation of AAA rules into an agreement with a broad arbitration clause . . . signal[s] the parties' clear and unmistakable intent to submit arbitrability disputes to arbitration." *NASDAQ*, 770 F.3d at 1032; *see also Archer & White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 281-82 (5th Cir.

2019) ("The plain language incorporates the AAA rules—and therefore delegates arbitrability—for all disputes *except* those under the carve-out.  Given that carve-out, we cannot say that the Dealer Agreement evinces a 'clear and unmistakable' intent to delegate arbitrability.").

Walsh's liability as alleged in BCA's Amended Complaint does not "arise from" or "relate to" his Trust's investment relationship with BCA or its contractual obligations under the 2017 Transaction Agreement; rather, it arises from his conduct as a member of BCA's Board of Advisors in 2015 and 2016, which predated and has no nexus whatsoever to the Transaction Agreement.  (*See infra* Section II.)  The District Court properly concluded that the "factual assertions supporting [BCA's] claims are well beyond the mere assertion that Walsh breached his duty of confidentiality under the Transaction Agreement," including because BCA has brought additional claims of fraud, racketeering and civil conspiracy against Walsh that are not contemplated by the Agreement.  (MTD Op. at A92.)  Even Walsh concedes that "Blueprint does not base its breach of contract claim on that [2017 Transaction] Agreement.  Instead, Blueprint premises this claim on an alleged unwritten contract Blueprint and Walsh entered into when Walsh joined Blueprint's advisory board."  (Br. at 11 n.1.)  There simply is no "clear and unmistakable" evidence that BCA and Walsh's Trust entered into the Transaction Agreement with the intent to delegate arbitrability questions regarding an entirely unrelated dispute.

*See NASDAQ*, 770 F.3d at 1031 (noting delegation of arbitrability questions not "clear and unmistakable" where even a "broad" arbitration clause "is subject to a qualifying provision that at least arguably covers the present dispute"); *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 322 (2d Cir. 2021) ("[W]here there is a qualifying provision (whether described as a carve-out or carve-in) that arguably excludes the present dispute from the scope of the arbitration agreement, that provision creates ambiguity regarding the parties' intent to delegate arbitrability to the arbitrator.").

*Second*, the District Court correctly interpreted the Agreement to create a limited role for an arbitrator. The Court determined that because BCA and Walsh's Trust expressly agreed to carve-out from the arbitration clause claims for "specific performance or other equitable relief"—permitting such claims to be submitted to "any court of competent jurisdiction"—the contracting parties "anticipated potential court action" and intended to "limit[] the potential scope of the arbitration clause." (MTD Op. at A92 (quoting Transaction Agreement § 12.05(a)).) The District Court determined that the carve-out signaled the contracting parties' intent to limit the arbitrator's jurisdiction for certain claims, creating at least some ambiguity as to whether the parties intended to delegate all questions of arbitrability. For that reason, Walsh's argument that the carve-out is "irrelevant" because BCA did not actually bring claims against Walsh for equitable relief is beside the point. (*See* Br. at 21.)

Ambiguity does not equate to "clear and unmistakable" evidence. *See Opalinski*, 761 F.3d at 335 (noting that "ambiguous contractual language is insufficient to rebut the presumption" that courts decide threshold arbitrability questions).[3]

**Third,** Walsh is not a party to the Transaction Agreement—the Walsh Living Trust Dated 2-2-2000 is—and thus Walsh could not evidence an unmistakable intent to arbitrate through that Agreement. "[T]he question 'who has the primary power to decide arbitrability' turns upon what the *parties* agreed about that matter." *First Options*, 514 U.S. at 943 (emphasis added). The Transaction Agreement defines the "Parties" as "Blueprint Capital Advisors LLC" and the "Walsh Living Trust Dated 2-2-2000." (Transaction Agreement at A245 (Preamble); *see also id.* at A264 (defining "Parties" as "the meanings set forth in the preamble of this Agreement").) Under the Transaction Agreement, BCA and Walsh did not agree to

---

[3]    Walsh cites the Sixth Circuit's decision in *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 848 (6th Cir. 2020), to argue that the carve-out "has no effect" on whether the arbitrator must decide threshold arbitrability questions because the carve-out "goes to the scope of the [arbitration] agreement—a question that the agreement otherwise delegates to the arbitrator—not the scope of the arbitrator's authority to decide questions of 'arbitrability'." (Br. at 21.) However, this case support's BCA's position that specific disputes can be carved out and not within an arbitrator's purview, because the *Blanton* court expressly acknowledged that a carve-out or qualifying language in an arbitration clause *does* signal that the parties intended to limit the arbitrator's authority to determine arbitrability. *See Blanton*, 962 F.3d at 848 ("[O]ne might think that the agreement incorporates the AAA rules—and therefore delegates arbitrability—for all disputes *except* those under the carve-out"). *See supra* at 18-21.

anything, much less to delegate arbitrability questions to an arbitrator. There simply is no arbitration agreement between BCA and Walsh that addresses BCA's claims against Walsh in his individual capacity. "[W]hen a party rightfully resists arbitration on grounds that it never agreed to arbitrate at all," "it can hardly be said that contracting parties clearly and unmistakably agreed to have an arbitrator decide" threshold arbitrability questions. *MZM*, 974 F.3d at 401; *see also First Options*, 514 U.S. at 941, 946-47 (holding party that allegedly did not sign arbitration agreement did not clearly and unmistakably agree to delegate arbitrability questions); *China Minmetals Materials Imp. and Exp. Co., Ltd. v. Chi Mei Corp.*, 334 F.3d 274, 288 (3d Cir. 2003) ("After all, a contract cannot give an arbitral body any power, much less the power to determine its own jurisdiction, if the parties never entered into it.").

For all these reasons, the District Court properly decided the question of arbitrability because the 2017 Transaction Agreement simply does not provide "clear and unmistakable" evidence that BCA and Walsh intended to delegate arbitrability questions related to the present, unrelated dispute.

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT BCA'S CLAIMS FALL OUTSIDE THE SCOPE OF THE ARBITRATION CLAUSE

The Court properly denied Walsh's motion to compel arbitration because BCA's claims against Walsh are not within the scope of the Transaction Agreement's arbitration clause.

In determining whether a claim falls within the scope of an arbitration clause, and is therefore arbitrable, this Court examines "the relationship between (1) the breadth of the arbitration clause, and (2) the nature of the given claim." *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014); (*see also* MTD Op. at A89-90.)  Applying *CardioNet*, the District Court carefully examined the "factual underpinnings" of BCA's claims and correctly decided that they "are well beyond" the scope of the arbitration clause in the Transaction Agreement.  (*See* MTD Op. at A92); *see also Voorhees v. Tolia*, 761 F. App'x 88, 90-91 (3d Cir. 2019) (reversing dismissal where district court "should have looked to the 'factual underpinnings' of each one of [plaintiff's] claims to determine whether it fell within the scope of this [arbitration] clause").

## A.    The Arbitration Clause Extends Only To Disputes Related To The Transaction Agreement.

As the District Court correctly acknowledged, "the fact that the parties have agreed to arbitrate some disputes does not necessarily manifest an intent to arbitrate every dispute that might arise between the parties, since '[u]nder the FAA, parties are generally free to structure their arbitration agreements as they see fit.'"  (MTD Op. at A89 (quoting *CardioNet*, 751 F.3d at 172).)  Thus, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*."  *Id.*; *see also Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).

There is no indication that the parties intended the 2017 Transaction Agreement to require arbitration for disputes relating to Walsh's earlier, unrelated role as a member of BCA's Board of Advisors.  The arbitration clause applies only to a "controversy or claim arising out of or relating to *this Agreement* or the breach thereof[.]"  (Transaction Agreement at A257, § 12.05(a) (emphasis added).)  The term "this agreement" in an arbitration clause is a "limiting principle" that narrows which claims are subject to arbitration.  *See Moon v. Breathless Inc.*, 868 F.3d 209, 216-17 (3d Cir. 2017) (arbitration clause covering disputes "under this Agreement" did not apply to plaintiff's claims and distinguishing cases lacking such "limiting reference to a contract").  Importantly, where an arbitration clause is limited to claims related to "this agreement," courts refuse to apply the provision retroactively.  *See TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31, 34 (2d Cir. 2011) (collecting cases); *Thomas v. Carnival Corp.*, 573 F.3d 1113, 1117-19 (11th Cir. 2009) (refusing to apply arbitration clause "retroactively"), *abrogated on other grounds by Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257 (11th Cir. 2011); *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 767-69 (4th Cir. 2006) (refusing to retroactively apply arbitration clause covering "any claim or controversy arising out of, or relating to the Note" where "the events giving rise to these claims occurred before the Note was even executed").  This is especially true where the earlier conduct was of a different nature than the agreement containing the

24

arbitration clause. *See Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 398 (2d Cir. 2015) (holding "[i]t would be inconsistent with the parties' conduct" to apply employment agreement with arbitration clause to time period before employment).

It is undisputed that BCA's claims against Walsh, which arise from Walsh's breaches of his fiduciary duty, fraud, and other misconduct in his role as a BCA advisor in 2015 and 2016, pre-date the 2017 Transaction Agreement. Nor do those claims have anything to do with Walsh's Trust's role as an investor in BCA, which Walsh concedes. (*See* Br. at 28 (allegations relate to conduct after he "joined Blueprint as an advisor in order to learn Blueprint's confidential information").) Plainly, BCA's claims are based on conduct that is entirely unrelated and pre-dates Walsh's confidentiality obligations under the Transaction Agreement.

Walsh nevertheless argues that even though BCA's claims "involve conduct that predated [the Transaction Agreement]," that is "no basis to exclude the claims from the scope of the arbitration clause." (*Id.* at 30-31.) In support of this argument, Walsh relies entirely on two non-binding Tenth Circuit cases. (*Id.* at 31 (citing *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330 (10th Cir. 1993), and *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195 (10th Cir. 2016)).) Both cases are easily distinguishable insofar as the arbitration provisions at issue were significantly broader than that at issue here. *See Zink*, 13 F.3d at 331 (for broad clause requiring arbitration of "any controversy between [the

parties] arising out of [plaintiff's *business or* this agreement," interpreting word "or" to encompass disputes other than those related to the agreement) (emphasis added); *Cox*, 835 F.3d at 1201-02 (interpreting broad clause requiring arbitration of claims relating to "any services or goods that Cox or any of its affiliated entities provide to you *under any other agreement*") (emphasis added).  Here, BCA does not argue that contracting parties cannot agree to arbitrate a broader range of disputes than those arising out of a contract.  However, the parties here plainly did not agree to do so when they expressly limited arbitration to disputes "arising out of or relating to *this Agreement*."  (Transaction Agreement at A257, § 12.05(a).)  To the contrary, the parties to the Transaction Agreement specifically excluded BCA's claims here from the scope of the arbitration clause.  *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 372 (6th Cir. 1999) (refusing to retroactively apply arbitration clause absent some temporal language of the parties' intentions).

Walsh goes to great lengths to argue that the Transaction Agreement's confidentiality provision requires Walsh's Trust to "promise that [it] 'ha[d] not' disclosed any of Blueprint's confidential information or used it for [its] benefit." (Br. at 31.)  According to Walsh, "ha[d] not" means that the "clause relating to confidential information expressly covers past conduct." (*Id.*)  But Walsh omits key language from the confidentiality provision specifying that the provision is limited to information "disclosed to or obtained by the Investor *as a result of the relationship*

*evidenced by this Agreement*." (Transaction Agreement at A250, § 5.01 (emphasis added).) BCA's claims are based on information Walsh received as a result of his relationship with BCA as an advisor in 2015-2016, not through his Trust's relationship as a BCA investor two years later.

Finally, Walsh contends that the Transaction Agreement's integration clause supersedes his advisor agreement with BCA, and thus that is the only agreement setting forth Walsh's confidentiality obligations, which he alleges apply retroactively. (Br. at 31.) This is a complete red herring because as Walsh concedes, the integration clause applies only to "prior agreements and understandings . . . *with respect to the subject matter hereof*." (Br. at 27; Transaction Agreement at A258, § 12.09(a) (emphasis added).) The Transaction Agreement's subject matter is Walsh's Trust's investment with BCA; the 2015 agreement's subject matter is Walsh's advisory role with BCA. There is no indication that the parties intended the Transaction Agreement to supersede Walsh's advisor agreement given they cover two patently distinct subject matters. *See Field Intelligence Inc. v. Xylem Dewatering Sols., Inc.*, 49 F.4th 351, 358-59 (3d Cir. 2022) (finding service contract did not supersede an earlier non-disclosure agreement because agreements concerned different subject matters, and thus, the service contract's confidentiality

provisions "do not extend to information exchanged between the parties prior to their execution of the [later] contract").[4]

**B.      The District Court Correctly Found that BCA's Claims Against Walsh Do Not "Arise Out Of" or "Relate To" the Transaction Agreement.**

In finding that BCA's claims do not "arise out of or relate to" the Transaction Agreement, the Court reasoned that "[a]lthough [BCA's] claims may relate to the Transaction Agreement in some manner," "[t]he factual assertions supporting these claims are well beyond the mere assertion that Walsh breached his duty of confidentiality arising under the Transaction Agreement." (MTD Op. at A92.) That is evinced, as the District Court correctly observed, by the fact that "[t]here are multiple parties alleged to have divulged [BCA]'s confidential information"—none of whose liability arises under the Transaction Agreement, exactly as with Walsh. (*Id.*)

The District Court's reasoning is consistent with a long line of precedent. In *CardioNet*, this Court held that plaintiffs' claims were not arbitrable because (1) the "resolution of [plaintiffs'] claims does not require construction of, or even reference

---

[4] For the same reason, Walsh's contention that the arbitration clause covers all claims that "touch matters covered by the subject matter" of the Transaction Agreement is beside the point. (Br. at 25 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985)).) The agreements do not concern the same subject matters.

to, any provision in the Agreement"; and (2) whether the defendant "performed its obligations under the Agreement has no bearing" on the claims.  751 F.3d at 175; *see also Bell v. Se. Pennsylvania Transp. Auth*., 733 F.3d 490, 495-97 (3d Cir. 2013) (reversing dismissal where plaintiffs' claim did not "depend[] on the resolution of a disputed reading of the [agreements]"); *AlliedSignal, Inc. v. B.F. Goodrich Co*., 183 F.3d 568, 573 (7th Cir. 1999) (finding claims not arbitrable because defendants "could fully comply with [the agreement] and still cause [plaintiff] antitrust injury by charging uncompetitive prices," and thus, claims "do not arise under" the agreement); *Lenox MacLaren Surgical Corp. v. Medtronic Inc.*, 449 F. App'x 704, 705, 710 (10th Cir. 2011) (claims not arbitrable under "arising out of or relating to" language because defendants' alleged liability not "pursuant to duties imposed by the agreement and [plaintiff's] claims do not depend on whether [defendants'] conduct was proper under the Agreement") (citation omitted).

As the District Court properly concluded, resolving BCA's claims does not require "construction of, or even reference to, any provision" in the Transaction Agreement.  BCA does not make a single allegation in its Amended Complaint regarding the Transaction Agreement, and does not assert a claim for breach of that Agreement.  (*See* Br. at 11 n.1.)  Walsh could have fully complied with the Transaction Agreement and still breached his advisory agreement with BCA because the latter agreement imposed a distinct set of duties.  And critically, as the District

Court noted, BCA makes similar allegations against other defendants who are not parties to the Transaction Agreement.  (MTD Op. at A92.)  Resolving BCA's claims against those other defendants does not "require construction of, or even reference to" the Transaction Agreement—and the same is true with respect to Walsh.  *See CardioNet*, 751 F.3d at 175 ("Indeed, it is not even clear to us that the Agreement is a factual predicate to these claims.")  Simply put, Walsh's confidentiality obligations under the Agreement have no bearing on BCA's claims.

Walsh nevertheless argues that the phrase, "[a]ny controversy or claim arising out of or relating to th[e Transaction] Agreement or the breach thereof" in the arbitration clause is "broad" and "makes explicit that all claims that have a connection with the Agreement are arbitrable."  (Br. at 24-25.)  In particular, Walsh highlights the phrase "arising out of or relating to" and attempts to distinguish it from terms such as "originate," "stem," or "result from" the Transaction Agreement.  (*Id.* at 24.)  He then contends that BCA's claims are purportedly "connected to his obligations under the Transaction Agreement" simply because that Agreement "included a clause relating to confidential information," and BCA's "core allegation is that Walsh did not respect the confidentiality of Blueprint's information."  (*See* Br. at 25-29.)

This theory has already been considered and rejected by this Court, when it held in *CardioNet* that mere "factual connections between the Agreement and the

factual underpinnings of the Complaint do not render these claims arbitrable"; rather, the question is "whether *these* [claims at issue] fall within the scope of *this* arbitration clause." *CardioNet*, 751 F.3d at 175-76; *cf. Walgreen Co. v. Johnson & Johnson*, 950 F.3d 195, 201-02 (3d Cir. 2020) ("The mere existence of a fact that is relevant to both the [] claims at issue and the [] Agreement does not transform those claims into 'rights under' the [] Agreement.").  For that reason, Walsh's related argument that the District Court suggested BCA's claims "may relate to the Transaction Agreement in some manner," in the sense they both involve Walsh's confidentiality obligations, is beside the point.  (Br. at 29.)  What matters is whether the factual underpinnings of BCA's claims relate to the arbitration clause, which limits arbitration to disputes arising from the investment relationship between BCA and Walsh's Trust.  Plainly, they do not.[5]

---

[5] Nor do the cases Walsh relies upon support his position.  Walsh relies on this Court's decision in *In re Remicade (Direct Purchaser) Antitrust Litigation*, 938 F.3d 515, 523 (3d Cir. 2019), to argue that the words "arising out of" or "relating to" require arbitration "of any dispute between the contracting parties that is connected in any way with their contract."  (Br. at 25.)  But the *Remicade* court compelled arbitration only because it found the plaintiff's claims were "'undeniably intertwined' with" and could not "be adjudicated without 'reference to, and reliance upon,'" the underlying agreement given that the agreement set the prices giving rise to the alleged anticompetitive injury.  *Remicade*, 938 F.3d at 523-25 (quoting *EPIX Holdings Corp. v. Marsh & McLennan Cos., Inc.*, 982 A.2d 1194, 1207 (N.J. Sup. Ct. 2009)).  The same is true with *In re Rotavirus Vaccines Antitrust Litigation*.  *See* 30 F.4th 148 (3d Cir. 2022) (claims centered on contracts with arbitration clause, and thus court could not adjudicate claims without reference to those contracts) (cited at Br. at 24-25).  *See also NCR Corp. v. Korala Assocs., Ltd*., 512 F.3d 807,

### C.    At a Minimum, BCA's Racketeering Claims Fall Outside the Scope of the Arbitration Clause.

With respect to BCA's claims of racketeering pursuant to 18 U.S.C. § 1962(c)-(d) and N.J. Stat. Ann. § 2C:41-29(c)-(d), the District Court's decision should be affirmed on the alternative ground that the parties did not clearly and unmistakably subject their statutory claims to arbitration. "[A] party's waiver of statutory rights must be clearly and unmistakably established, and contractual language alleged to constitute a waiver will not be read expansively." *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, 168 N.J. 124, 132, 773 A.2d 665, 670 (2001). Consistent with this blackletter law, a "court may not rewrite a contract to broaden the scope of arbitration" to include those statutory claims. *Id.* at 127, 132, 134, 773 A.2d at 667, 670, 672 (holding arbitration clause covering "any controversy arising out of, or relating to, this Agreement or the breach thereof" did not include statutory claims because "the language does not mention, either expressly or by general reference, statutory claims"); *see also Tamburino v. Madison Square Garden, L.P.*, 115 A.D.3d 217, 222-23 (N.Y. App. Div. 2014) ("A CBA cannot preclude a lawsuit concerning individual statutory rights unless the

---

814, 817 (6th Cir. 2008) (noting "the cornerstone of our inquiry rests upon whether we can resolve the instant case without reference to the agreement containing the arbitration clause" and finding claim not arbitrable because a court "would not need to reference the 1998 Agreement to determine whether [defendant] materially contributed to the [third parties'] infringement").

arbitration clause in the agreement is 'clear[] and unmistakable[]' that the parties intended to arbitrate such individual claims.").

In *Moon v. Breathless*, this Court was presented with a substantially similar arbitration clause as the one in the Transaction Agreement, requiring arbitration of "a dispute between [plaintiff] and [defendant] under this Agreement." 868 F.3d at 216-17. The Court found that the clause did not cover plaintiff's statutory claims under the FLSA and New Jersey Wage and Hour Law because the arbitration clause "reference[d] contract disputes—not statutory rights." *Id.*; *see also FlagHouse, Inc. v. ProSource Dev. Inc.*, 528 F. App'x 186, 190 (3d Cir. 2013) (holding statutory claims not arbitrable where clause did "not mention statutory claims, nor [did] it contain other indications that such claims are subject to arbitration").

Here, the Transaction Agreement's arbitration clause is limited to claims that arise from or relate to "this Agreement," without any express reference to statutory claims. For that additional reason, BCA's racketeering claims fall outside the scope of the clause and Walsh's attempt to arbitrate them must fail.

## CONCLUSION

For the foregoing reasons, this Court should affirm.

Respectfully submitted,

/s/ Michael J. Bowe
Michael J. Bowe
Lauren Tabaksblat
Brown Rudnick LLP
7 Times Square, 47th Floor
New York, New York  10036
(212) 209-4905
mbowe@brownrudnick.com
ltabaksblat@brownrudnick.com

May 24, 2023

## CERTIFICATION OF BAR MEMBERSHIP, IDENTICAL BRIEFS, VIRUS SCAN, TYPEFACE, AND WORD COUNT

I hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

I further certify that the text of the electronic copy of this Brief filed by ECF and the text of the hard copies filed or to be filed with the Court are identical. The electronic copy of this Brief has been scanned for viruses using Vipre Virus Protection, version 3.1.

I further certify that this Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the Brief exempted by Fed. R. App. P. (32)(f), this document contains 8,081 words.

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Times New Roman font in 14 point size.

_/s/ Michael J. Bowe_
Michael J. Bowe
Brown Rudnick LLP
7 Times Square, 47th Floor
New York, New York  10036
(212) 209-4905
mbowe@brownrudnick.com

May 24, 2023

35

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

/s/ Michael J. Bowe
Michael J. Bowe
Brown Rudnick LLP
7 Times Square, 47th Floor
New York, New York  10036
(212) 209-4905
mbowe@brownrudnick.com

May 24, 2023