IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

## MOTION FOR LEAVE TO INTERVENE AS PLAINTIFF

**Introduction:**

The issues at stake in this case transcend the individual interests of the parties involved.

Movant's unique perspective, as articulated in the accompanying Motion for Leave to Proceed Under Pseudonym and as detailed in Supplements A through E, offers valuable insights that can aid the court in addressing complex constitutional questions surrounding the application of the Third Amendment in the digital age.

No other party presents this perspective. Granting leave to intervene will serve the public interest by facilitating the presentation of diverse viewpoints on these critical matters.

I. **INTERVENTION AS OF RIGHT UNDER RULE 24(a)**

A. Interest in the Subject Matter: Movant possesses a unique interest in the subject matter of this litigation. As detailed in Supplements A through E, Movant's perspective is related to the interpretation of the Third Amendment and its application to digital domains.

B. Impairment of Interest: Denial of intervention may impair or impede Movant's ability to protect the interests articulated herein.

C. Adequacy of Representation: Existing parties do not adequately represent Movant's unique perspective on the application of the Third Amendment in the digital realm.

## II. PERMISSIVE INTERVENTION UNDER RULE 24(b)

A. Common Questions of Law and Fact: Movant's claims share common questions of law and fact with the main action.

B. Discretionary Consideration: In the alternative to intervention as of right, Movant respectfully requests that the Court exercise its discretion to grant leave to intervene. The intervention will not unduly delay or prejudice the adjudication of the original parties' rights.

**Conclusion:**

Movant respectfully requests that this Court grant this Motion for Leave to Intervene. The unique perspective offered by Movant is essential for a comprehensive examination of the Third Amendment's application in today's digital age.

DATED: August 13, 2023


Respectfully submitted,
Brandon Q. Doe

Attachments:

**Supplements Supporting Intervention**

    **Supplement A:** "Soldiers without Faces:   The Deployment of Algorithmic Agents and the Legacy of Digital Redcoats"

    **Supplement B:** "From Cave to Cloud: A Historical Examination of the Concept of a House"

    **Supplement C:** "The Digital House:  Establishing Legal Definitions and Boundaries"

    **Supplement D:** "Quartering Digital Agents in Modern Coffee Houses: The Invasion of Social Media and Erosion of Democratic Discourse"

    **Supplement E:** "Personal Sovereignty in Digital Domains and the Third Amendment's Protections"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

**SUPPLEMENT TO MOTION TO INTERVENE**

**Supplement A**
**Soldiers Without Faces: The Deployment of Algorithmic Agents
and the Legacy of Digital Redcoats**

I. **Introduction**

In an age where algorithmic agents are becoming an essential part of governmental operations, understanding their deployment and control is critical. A historical parallel can be drawn between these faceless soldiers and King George's redcoats, illuminating critical questions about autonomy and liberty.

II. **King George's Redcoats: A Historical Perspective**

During the reign of King George, the deployment of redcoats into the colonies was seen as a direct assertion of sovereignty and control. This act symbolized the erosion of personal sovereignty and liberty among the colonists and ignited a struggle for independence.

III. **Modern Deployment of Algorithmic Agents**

Today, governments deploy algorithmic agents into data warehouses and other digital domains, echoing the deployment of redcoats in a new technological context. These algorithmic agents, like redcoats, serve the interests of those in power and can be seen as an intrusion into the virtual houses of citizens.

## IV. Autonomy and Liberty in the Digital Age

Just as the deployment of redcoats symbolized a loss of autonomy and liberty for the colonists, the deployment of algorithmic agents raises similar concerns. The unregulated use of these agents threatens individual privacy, autonomy, and liberty. Without clear legal boundaries, citizens may find their virtual sovereignty violated in ways analogous to the physical intrusion of redcoats into colonial houses.

## V. Ethical and Legal Considerations

The deployment of algorithmic agents requires careful consideration of ethics and legality. There must be a balance between governmental interests and individual rights to ensure that the historical lessons learned from the deployment of redcoats are not forgotten. Legal frameworks must evolve to address this new form of intrusion, recognizing the unique attributes of virtual sovereignty and the potential abuses that may arise.

## VI. Conclusion

The parallels between King George's redcoats and the deployment of algorithmic agents offer a poignant reminder of the fundamental values of autonomy and liberty. As we navigate this new technological landscape, we must be vigilant in safeguarding these principles, recognizing the lessons of the past, and striving for a future where individual sovereignty is respected both in physical and virtual domains.

Respectfully submitted,

Brandon Q. Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

**SUPPLEMENT TO MOTION TO INTERVENE**

**Supplement B**
**From Cave to Cloud: A Historical Examination of the Concept of a House**

**I. Introduction**

The history of the concept of a house extends beyond mere physical structures to encompass personal sovereignty, privacy, and the relationship between individuals and the state. This examination will explore the evolution of housing from the caves of our ancestors to today's virtual dwellings and data warehouses, elucidating the multi-faceted essence of what constitutes a house.

**II. The Primitive House: A Nexus of Shelter and Sovereignty**

Dwellings in the earliest human societies marked more than shelter; they were manifestations of ownership and personal sovereignty. The cave, a primal dwelling, represented private space respected by others, laying the foundation for complex societal norms.

**III. From Castles to Colonists: The Evolution of Sovereignty in Housing**

The feudal era's castles were fortifications of power, but even humble huts of serfs embodied personal sovereignty. This sovereignty was challenged in Colonial America with the Quartering Acts, a violation of personal space that contributed to the American Revolution.

### IV. The Modern House: Physical and Virtual

Today's concept of a house transcends physical boundaries. Alongside traditional dwellings, virtual spaces serve as personal houses, sacred as any physical structure. For some, these virtual spaces may be their primary or only house, echoing themes of personal sovereignty. Simultaneously, the advent of data warehousing adds a new dimension to the physical concept of a house. Data warehouses, housing vast amounts of information, can be seen as a modern iteration of physical structures. They not only store data but also safeguard the virtual homes of individuals, merging the physical and virtual concepts of housing. This intersection presents novel legal challenges, necessitating a reevaluation of laws protecting the rights and privacy of citizens in both realms.

### V. Conclusion

From caves to clouds, and from physical structures to virtual environments and data warehouses, the concept of a house has evolved, reflecting broader societal and legal shifts. Recognizing these changes challenges us to adapt our understanding of housing in our increasingly complex world.

Respectfully submitted,

Brandon Q. Doe

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

## SUPPLEMENT TO MOTION TO INTERVENE

### Supplement C
### The Digital House: Establishing Legal Definitions and Boundaries

## I. Introduction

The emergence of virtual spaces as central aspects of modern life has prompted a need to reconsider the traditional understanding of privacy, personal autonomy, and property. The idea that a digital space can be considered a "house" demands careful scrutiny within a legal framework. This document seeks to delineate the legal definitions and boundaries surrounding the concept of a digital house.

## II. The Evolution of Legal Boundaries in Property Law

### A. Physical Property to Intellectual Property

Historically, property law focused primarily on tangible assets. However, with the advent of intellectual property rights, such as copyrights and patents, the law expanded its view to encompass non-tangible assets. This historical shift sets the stage for recognizing virtual spaces as legitimate domains of personal sovereignty.

### B. The Right to Privacy in the Digital Age

In the landmark case of *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court established that the Fourth Amendment protection against unreasonable searches extends to electronic communications. The Court's reasoning offers a pathway to viewing digital spaces as extensions of physical spaces, deserving of similar legal protections.

### III. The Concept of a Digital House

#### A. Defining the Digital House

The digital house can be considered an online space where an individual has a reasonable expectation of privacy, control, and autonomy. This includes personal email accounts, social media profiles, and private online communities.

#### B. Legal Precedents in Recognizing Virtual Spaces

In cases such as *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017), the Supreme Court acknowledged the significance of virtual spaces as public forums. Extending this recognition to personal digital domains logically follows from the principles underlying the First and Fourth Amendments.

#### C. Digital Houses and Data Warehouses

The physical locations where digital data is stored, known as data warehouses, further blur the line between physical and virtual spaces. These data centers are physical "houses" of virtual information, adding another layer of complexity to the definition of a digital house.

### IV. Conclusion

The concept of a digital house aligns with the evolving understanding of property and privacy rights within American law. By recognizing digital spaces as personal domains equivalent to physical houses, the law can adapt to protect individual autonomy and privacy in the contemporary digital age. This recognition carries profound implications for law enforcement, regulatory oversight, and personal freedoms in a rapidly changing technological landscape.

Respectfully submitted,

Brandon Q. Doe

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

## SUPPLEMENT TO MOTION TO INTERVENE

### Supplement D
### Quartering Digital Agents in Modern Coffee Houses:
### The Invasion of Social Media and Erosion of Democratic Discourse

### I. Introduction

The parallel between the quartering of soldiers in coffee houses in the time of King George III and the current deployment of digital agents in social media platforms is both striking and troubling. This supplement explores the way in which the modern practice mirrors the historical abuses that led to the Third Amendment's creation and the profound impact it has on democratic discourse.

### II. The Historical Context: Quartering of Soldiers in Coffee Houses

During the colonial era, the British government's practice of quartering soldiers in public places like coffee houses led to the stifling of free speech, as citizens feared eavesdropping and retaliation.

This had the predictable effect of suppressing Free Speech and Autonomy, as was intended.

The presence of soldiers in coffee houses – hubs of political discourse and community engagement – had a chilling effect on the free exchange of ideas, undermining autonomy and democratic principles.

### III. The Modern Parallel: Digital Agents in Social Media Platforms

Here, the defendants have engaged in the quartering of digital agents, including algorithmic systems and paid human electronic operatives, within the social media platforms.

#### A. Invasion of Social Media Spaces

The quartering of digital agents in these modern coffee houses has allowed for the government's intrusion into private discourse, chilling free speech, and eroding democratic dialogue.

#### B. Algorithmic Systems and Human Operatives

The use of both automated algorithms and human operatives has created a complex web of manipulation and control, far-reaching in its implications for individual liberties and the integrity of public discourse.

#### C. Chilling Effect on Free Speech

The modern practice of quartering digital agents in social media platforms stifles authentic discourse, suppresses dissent, and undermines the fundamental principles of democracy.

### IV. Conclusion

The defendants' engagement in digital quartering within social media platforms, reminiscent of King George's intrusion into coffeehouses and brew houses, amounts to a profound violation of the principles enshrined in the Third Amendment. The protection against such intrusion must be recognized in the digital realm to preserve the sanctity of democratic discourse and the core values of our Constitution.

Respectfully submitted,

Brandon Q. Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

## SUPPLEMENT TO MOTION TO INTERVENE

### Supplement E
### Personal Sovereignty in Digital Domains:
### From Castle Doctrine to Virtual Fortresses

### A. The Evolution of Personal Sovereignty: From Castles to Data Warehouses

The term "Castle Doctrine" has historical significance not for its relation to literal castles, but as an embodiment of personal sovereignty. It represents the idea that an individual has the right to protect their private domain, be it a physical home or a virtual space. The Third Amendment's prohibition against the quartering of soldiers in any house echoes this principle, extending beyond physical dwellings to encompass data warehouses and virtual coffeehouses such as social media platforms. The amendment thus serves as a contemporary guardian of digital autonomy and liberty, reflecting the evolution of personal sovereignty in the age of technology.

### B. Movant's Unique Perspective and Fear

With decades of experience in computer networking, the Movant is uniquely positioned to analyze the government's use of technologies, rendering Movant more fearful of their potential misuse. This experience also shapes the Movant's distinctive legal perspective, which complements the broader dialogue surrounding the issues in this case.

### C. Standing on Behalf of Those Without Physical Space

The Movant's argument also represents a voice for those without physical space of their own. For many, the concept of digital sovereignty is even more vital than physical sovereignty. In an increasingly interconnected world, where personal information and identity are intertwined with

digital platforms, the Third Amendment's protection extends to these virtual realms. The intrusion of digital agents threatens this sanctuary, making the Movant's advocacy crucial for preserving these rights.

### D. The Fear and Experience of All Citizens

All citizens, regardless of their technological expertise or physical dwelling, are affected by the government's digital activities. The Movant's fears are shared by many who see the government's digital practices as an intrusion into their personal and virtual lives. The ubiquity of this fear underscores the importance of addressing the issue and justifies the Movant's intervention in this case.

Respectfully submitted,

Brandon Q. Doe

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

## ORDER GRANTING MOTION FOR LEAVE TO INTERVENE AS PLAINTIFF

THIS MATTER came before the Court on Movant's Motion for Leave to Intervene as Plaintiff, and the Court having considered the Motion, the supporting Memorandum, any opposition or response thereto, and the applicable law,

IT IS HEREBY ORDERED:

Granting of Motion: The Motion for Leave to Intervene as Plaintiff is GRANTED. Brandon Quixote Doe is permitted to intervene in the above-captioned case as a plaintiff, in accordance with Rule 24 of the Federal Rules of Civil Procedure.

Filing of Pleadings: Movant shall file all appropriate pleadings, including a complaint in intervention, in conformity with the Federal Rules of Civil Procedure and the Local Rules of this Court, within_____ days of the entry of this Order.

Service: Movant shall serve copies of the complaint in intervention and all future pleadings upon all parties in accordance with the Federal Rules of Civil Procedure.

No Prejudice: The intervention of Movant in this litigation shall not prejudice the rights of any existing party, nor shall it unduly delay the proceedings.

Other Relief: All other relief requested in the Motion for Leave to Intervene is DENIED, without prejudice to renewal as appropriate.

IT IS SO ORDERED.
DONE and ORDERED in Chambers, at _____, this _____.