IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,

    *Plaintiffs*

v.

JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,

    *Defendants*

Civil Action No. 3:22-cv-1213

## SUPPLEMENT TO MOTION TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM
### Supplement A

Pursuant to the motion to reconsider the denial of Movant's motion for leave to file under pseudonym, Movant respectfully submits this supplement to clarify a specific harm that justifies the request for pseudonymity.

1. **Necessity of Pseudonymity Due to Specific Claim of Tyranny**: Movant's claim in the underlying case centers on the tyranny of modern quartering, a form of government intrusion that directly impacts his personal privacy and security. The very nature of this claim creates a unique harm that justifies the use of a pseudonym.

2. **Inextricable Link Between Claim and Need for Anonymity**: The refusal to grant the motion without ruling on the Third Amendment issue creates an inextricable dilemma. Movant is experiencing a form of tyranny that he seeks to protest, yet the denial of anonymity would further expose him to the very harm he is challenging. This situation underscores the necessity of granting the motion to protect Movant's rights and interests.

3. **Conclusion**: The specific nature of Movant's claim, the tangible harm that could result from the denial of anonymity, and the constitutional implications under the Third Amendment, balanced against the limited public interest in Movant's true identity, compel the granting of the motion for leave to file under pseudonym. The Court's recognition of the unique and serious circumstances presented in this case is vital to preserving and protecting Movant's rights as they pursue their constitutional claim.

Respectfully submitted,
Brandon Q Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA, MONROE DIVISION

| | |
|---|---|
| STATE OF MISSOURI; STATE OF LOUISIANA; AARON KHERIATY; MARTIN KULLDORFF; JIM HOFT; JAYANTA BHATTACHARYA; JILL HINES,<br><br>*Plaintiffs*<br><br>v.<br><br>JOSEPH R. BIDEN, JR.; VIVEK H. MURTHY; XAVIER BECERRA; DEPARTMENT OF HEALTH & HUMAN SERVICES; ANTHONY FAUCI et al.,<br><br>*Defendants* | Civil Action No. 3:22-cv-1213 |

**SUPPLEMENT TO MOTION
TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM**

**Supplement B
Relevance of Third Amendment to Underlying Motion**

**INTRODUCTION**

Pursuant to the motion to reconsider the denial of Movant's motion for leave to file under pseudonym, Movant respectfully submits this supplement to clarify relevance of underlying Third Amendment claims to the underlying Motion.

Pending before this Honorable Court is a Motion For Leave to Proceed under Pseudonym [Doc. No. 325] ("Motion for Leave") and a Motion to Seal Attached Document [Doc. No. 326], filed under the name "Doe". In the Motion for Leave, Doe alleges that anonymity is necessary because the Government's actions have created an environment where the revelation of Doe's true identity could exacerbate the harm already inflicted and further stifle Doe's freedom of speech. Doe's motions, filed pro se, were lacking in an important way.

The Court's Memorandum Order denying these motions was issued August 17, 2023. Pursuant to the Court's guidance, Doe respectfully submits this Motion to Reconsider, seeking to highlight a critical perspective that was not previously explored and that uniquely connects the Third Amendment's principles to the underlying case.

This supplement to the Motion to Reconsider seeks to underscore the relevance of the Third Amendment perspective in the context of the motion to proceed under pseudonym and shed light on the potential weaponization of narratives by powerful entities including defendants. By examining the historical intent of the Third Amendment and its contemporary implications, this

supplement will demonstrate the necessity for pseudonymity as a safeguard against the very encroachments that the Third Amendment seeks to prevent.

## I. CONNECTION TO THE MOTION

The Third Amendment, often overshadowed in constitutional discussion, prohibits the quartering of soldiers in any house and provides essential protection against the encroachments of tyranny. Its significance extends to the broader principle safeguarding individual autonomy and privacy from undue government intrusion.

In the context of the 1700s, imagine a bustling pub, a central gathering place where colonists engage in lively discussions about their grievances, rights, and the direction of their society. This vibrant exchange of ideas mirrors the discourse that unfolds today on social media platforms. Now, picture redcoat soldiers strategically positioned within these pubs, silently observing and influencing conversations.

The presence of these redcoats, while not actively participating in discussions, casts a shadow of surveillance over the pub. Colonists, well aware of the soldiers' allegiance to the British Crown, would naturally moderate their speech, fearing reprisal or repercussions. The soldiers' mere presence has a chilling effect on the free and open exchange of ideas. As a result, colonists may refrain from discussing their concerns about the oppressive policies of the British government, or they may alter their words to avoid drawing the attention of the soldiers.

The Quartering act of 1774 reads in part

> "… persons authorized by the commanding officer, in His Majesty's service, to take, hire, and make fit for the reception of His Majesty's forces, such and so many uninhabited houses, outhouses, barns, or other buildings as he shall think necessary, to quarter therein the officers and soldiers in His Majesty's service."

This act ended in March of 1776, and proposals regarding its renewal were met with significant objection which peaked a few months later.

People were rightly afraid to speak freely in 1775, when there was always a Redcoat provisioned nearby.

People today are rightly afraid to speak freely in 2023, when The Algorithm is always listening[1].

Perhaps it's irony that Orwell was also British. Today, "Big Brother is Listening" more than ever.

The Court's denial of pseudonymity prevents Doe from fully engaging in the legal discourse surrounding issues that pertain directly to the nature of modern tyranny he perceives.

## II. CONSTITUTIONAL RIGHTS AND OBLIGATIONS

Doe's interpretation of the Third Amendment is not an arbitrary perspective; it stems from a deeply held conviction that certain forms of modern government overreach can only occur if such tyrannical actions are taken. Doe's case seeks to challenge the legality of specific

---

[1] Movant does not allege any "One Algorithm" theory. This is a rhetorical device to represent the complex web of monitoring and surveillance being revealed in the underlying case.

coordinated attacks aimed at suppressing dissent, distorting narratives, and infringing upon personal privacy.

By allowing Doe to proceed under a pseudonym, the Court is enabling them to engage in a broader discussion about the evolving threats to individual freedoms. The issues Doe aims to confront - the *mechanisms* of digital surveillance, manipulation of information, and suppression of dissent - are emblematic of the very concerns the Third Amendment was designed to address.

## III. PUBLIC INTEREST IN PSEUDONYMITY

The public is aware of "Doe" litigants, and Movant's entire point is that the public has an interest in Doe's specific challenge. Placing Movant's name on the case as "Doe" serves the public interest by bringing attention to these critical issues. The fundamental principles enshrined in the Third Amendment's protections acquire heightened significance when a concerned citizen, represented by 'Doe,' seeks redress against the backdrop of potential government intrusion. This accentuates the essential nature of shielding individuals from overbearing state authority, reminiscent of a colonist seeking to address grievances while a redcoat looms nearby.

By granting pseudonymous participation, the Court aligns itself with the broader interests of transparency and justice. It recognizes that the public's understanding of contemporary threats and their implications is integral to the legal discourse.

## IV. NARRATIVE WEAPONIZATION: FROM THE UNDERLYING CASE AND BEYOND

Modern technology has enabled powerful entities, including defendants, to weaponize narratives to silence dissent, distort information, and infringe upon personal liberties. Through coordinated actions, these entities undermine the principles of autonomy, privacy, and freedom that the Third Amendment seeks to protect.

The attachments provide illustrative examples of these insidious tactics, showcasing instances where narratives have been twisted and wielded to advance particular agendas. From orchestrated lies propagated by authoritative agencies to silencing of marginalized voices, the curated samples in Attachments B1-B4 offer a glimpse into the vast spectrum of narrative manipulation. These examples are not exhaustive but serve as compelling evidence of the tactics at play.

In a chilling parallel to the days when red-coated soldiers symbolized state dominion, modern censorship techniques wielded by powerful entities echo a similar, but invisible, suppression of discourse.  As Movant's case demonstrates, these practices are not confined to the annals of history; they are increasingly prevalent in the modern, digital age.

Consider the case of a high-profile elected official subjected to relentless government manipulation of their narrative, supported by Defendants' actions across years. This disturbing incident illustrates the extent to which authoritative agencies are willing to deploy narrative manipulation against prominent figures, raising serious concerns about the limits of their power.  (**Attachment B1**). Movant Doe reasonably fears targeting by these same agencies.

Equally alarming are the many cases of a defendant muting the speech of ordinary individuals on a public platform, reinforcing the notion that such powerful entities possess the means and intent to curtail individual voices, even if those voices pose no significant threat. The impact of this action reverberates beyond its immediate consequences, illustrating the potential for

broader suppression. **Attachment B2** provides examples of why Doe reasonably fears for the security of their social media platforms and access to banking and participation in other societal services.

Just as British troops stifled dissent by placing redcoat soldiers wherever they chose, defendants place algorithmic tools wherever they choose. **Attachment B3** provides an overview of such indiscriminate use of digital agents. Movant reasonably fears that such monitoring and surveillance would be encouraged and enabled unless allowed to proceed under pseudonym.

Specifically or algorithmically targeted, in each case, discourse is constrained. These insidious manipulations infringe upon autonomy, chill our speech, and undermine the very fabric of democracy. These soldiers don't have coats that are red: they are invisible tyranny.

In another case, described in **Attachment B4**, defendant agents, presumably wearing grey colored coats, were tasked to investigate and monitor private citizens data accounts, their social media accounts which are, arguably "houses" of influence, and the defendants did this for ostensibly political reasons. This reinforces the broader pattern of behavior by the defendants, which involves targeting private citizens who seek to exercise their right to petition the government. The interference with the normal course of the petitioning process is evident through the defendant's actions and raises the legitimate question of whether Doe should reasonably expect to be treated any differently by the defendants, given their demonstrated disposition to obstruct individuals engaging in their constitutionally protected activities.

By examining these few examples in the context of the Third Amendment's principles, this supplement resonates with the genuine concern that Movant harbors for his personal autonomy, safety, and the preservation of constitutional values.

## V. BALANCING TEST RECONSIDERED

Doe's perspective on the Third Amendment not only elevates the relevance of his pseudonym request but also illustrates that this is not a theoretical exercise. Doe's concerns are grounded in a genuine fear of the very encroachments that the Third Amendment aims to prevent. The denial of pseudonymity not only undermines his participation but also restricts the Court's ability to fully explore the dynamics of the modern tyranny Doe seeks to challenge.

## CONCLUSION

In view of the intersection of Doe's concerns with the principles embodied in the Third Amendment, the Motion to Reconsider emphasizes the pressing need to revisit the Court's prior decision. Granting pseudonymous participation will not only uphold individual rights but also contribute to a deeper understanding of the evolving nature of threats to liberty in the modern era.

DATED: August 21, 2023

Respectfully submitted,

Brandon Q. Doe

# SUPPLEMENT TO MOTION
# TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM

## Supplement B
## Relevance of Third Amendment to Underlying Motion

## Attachment B1
## Defendants gleefully promoted disinformation narrative against even the most powerful interests

Defendants attacked a sitting President with years of false narrative, it stands to reason that Doe has concern they would do the same to a much less powerful litigant. The most glaring example of this in recent times is the saga of the 45th President and his alleged relationship with Russia.

In recent years, the political landscape has been marked by the emergence of intricate narratives and allegations, often shaping public perceptions and influencing policy decisions. The 'Russiagate' saga serves as a prominent example, characterized by claims of collusion and foreign interference that captivated the nation's attention. However, as new revelations come to light, a different dimension of this narrative emerges, revealing the potential manipulation of information and the misuse of government resources to propagate a defamatory narrative.

The political narrative began with allegations of Russian interference in the 2016 U.S. presidential election, leading to the appointment of a special counsel to investigate the matter. Claims of collusion between the Trump campaign and Russia dominated headlines, sparking debates and inquiries that persisted for years. Central to this narrative were the Steele Dossier, a collection of unverified claims about President Trump's ties to Russia, and the CrowdStrike reports, which alleged Russian hacking into Democratic servers. These allegations, while not substantiated, had a significant impact on public perception and political discourse.

Fast forward to the present day, where new information has cast doubt on the credibility of key elements in the 'official' narrative. Recent revelations suggest that the Steele Dossier and the CrowdStrike reports may have been funded by partisan interests, raising concerns about their accuracy and integrity. These allegations, once accepted as factual by many, have come under scrutiny due to potential bias and political motives behind their creation. As a result, the public's perception of these claims is shifting, revealing a narrative landscape that is more complex and questionable than previously understood.

This evolution in the Russiagate narrative highlights the need for careful examination of the sources and motivations behind allegations that shape public opinion. It also underscores the potential for narratives to be manipulated and weaponized for political purposes, sometimes involving the misuse of government resources and influence. As the intricacies of this narrative continue to unfold, it prompts us to consider the broader implications of how information is disseminated, the role of partisan interests, and the importance of maintaining the integrity of public discourse in the face of evolving narratives.

**Third Amendment Perspective**

The concept of quartering soldiers in the Third Amendment takes on a modern twist when applied to the activities of the political soldiers. Just as British Army soldiers were quartered in various houses during colonial times, the idea of soldiers being quartered in various types of "houses" today mirrors the pervasive influence of a politically aligned network. In this analogy,

the "houses" encompass schoolhouses, courthouses, and even data warehouses, as the places where the Defendant's agents are strategically positioned.

The 21st-century equivalent of quartering can be seen in the way political operatives, aligned against the elected president, occupy various spaces of influence to promote their narratives. These "soldiers" are quartered in schoolhouses, influencing curricula and fostering ideological perspectives. These "soldiers" are present in courthouses, where legal battles are being fought to shape election outcomes. Similarly, their digital agents and avatars reside in online forums and data warehouses, where information is manipulated to advance their cause.

The modern ideological soldiers, metaphorically quartered in these diverse "houses," leverage their positions to exert influence over public discourse, education, legal proceedings, and information dissemination. Just as the Third Amendment sought to prevent government overreach by quartering soldiers in private houses, a concern arises about the potential overreach of a politically motivated network quartered in various spheres of influence. This analogy highlights the importance of safeguarding spaces from undue ideological control, ensuring a balance between different perspectives and preserving the integrity of public discourse.

The idea of quartering in modern context underscores the need to examine how powerful ideological networks can manipulate narratives and occupy influential spaces, potentially impacting individual autonomy and the democratic exchange of ideas. By drawing this analogy, the complaint about quartering in the context of the Trump narrative offers a unique lens to view the dynamics of modern information warfare and the potential challenges it poses to democratic values.

The pervasive, ubiquitous nature of this digital tyranny lends further weight towards Doe for pseudonymous participation.

# SUPPLEMENT TO MOTION
# TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM

## Supplement B
## Relevance of Third Amendment to Underlying Motion

## Attachment B2
## Defendants use full force of government to intimidate private citizens

Chronicled in this Attachment are examples of recent government willingness to attack and intimidate, some would say tyrannize, those who would try to counter its preferred narratives.

Each of these strategies is technically feasible only if there is a digital agent, quartered in the relevant data warehouse. Defendants might call it a "misinformation algorithm" but it operates exactly as a team of redcoats would.

**Revelations in The Twitter Files revealed targeting of individual accounts**

The list of incidents is voluminous but to pick two examples:

> First from an internal Slack message at Twitter:
> … in an internal SIP-PES memo from October 2022, after her seventh suspension, the committee acknowledged that "LTT [@libsoftiktok] has not directly engaged in behavior violative of the Hateful Conduct policy."

> Second, designated "Twitter files" handler posted summaries published at https://twitter.com/mtaibbi/status/1603857546099449869
> 4. Between January 2020 and November 2022, there were over 150 emails between the FBI and former Twitter Trust and Safety chief Yoel Roth.
> 6. But a surprisingly high number are requests by the FBI for Twitter to take action on election misinformation, even involving joke tweets from low-follower accounts.

The underlying case has revealed extensive malfeasance by multiple parties. The breadth of their effort to retain their powers is enough to scare any citizen into pseudonymity.

**Defendant misuse of data warehouses to stalk and harass**

In a June 12 letter from the Judiciary Committee, they note:

> In a transcribed interview, retired FBI Supervisory Intelligence Analyst George Hill testified that BoA, "with no directive from the FBI, data-mined its customer base" and compiled a list of BoA customers who used a BoA product during a specified date range.2 Mr. Hill further noted that "on top of that list, they put anyone who had purchased a firearm during any date." 3 Mr. Hill also testified that the list that BoA provided targeted transactions in Washington D.C. and the surrounding area.

That data, stored in a specific form of house, and used by a specific form of government agent, deserves consideration in a third-amendment context, as does the transmission and storage of that data. These third-amendment issues remain to be resolved, outside the context of pseudonymity and this sort of consideration is the basis of the underlying motion to intervene.

### Canceling Credit / De-Banking as Social Coercion

In an August 17, 2023 letter, the House Oversight Committee wrote:

> In addition, the Committee and Select Subcommittee have recently obtained documents that raise new concerns regarding the extent to which financial institutions, including Citibank, may have shared customer information with federal law enforcement despite the customers having no individualized nexus to criminal conduct.
>
> … Federal law enforcement's use of back-channel discussions with financial institutions as a method to investigate and obtain private financial data of Americans is alarming.

These "back-channel discussions" are precisely the sort of coordinations Doe moves to explore. These back-channel discussions are the modern incarnation of the tyranny of quartering, here within the bank's data warehouse.

Redcoats had a chain of command to communicate orders provisioning in various houses. Today's tyrants have "back-channel discussions" to provision agents in data warehouses.

### Willingness to act outside norms to protect narrative

The House Oversight Committee has posted the following excerpts from recent hearings:

> IRS whistleblowers have faced retaliation from the federal government for providing evidence of politicization, misconduct, and wrongdoing.
>
> Special Agent Ziegler stated, "DOJ-Tax have a clear target on me and my supervisors back and I believe that they are just waiting for an opportunity to pounce on us. My own agency retaliated against me and threatened me with criminal conduct in response to an internal email I sent to IRS leadership, even years after of essentially being left on an island when it came to this investigation."
>
> Supervisory Special Agent Shapley stated, "The senior leaders who are my immediate supervisors are currently making the mistake of retaliating against me for simply reporting outside the chain of command what I genuinely believed was wrong and could not be addressed internally. IRS senior leadership is allowing this retaliation and possibly assisting. My direct supervisor has not spoken with me in six weeks. Suddenly, all kinds of unusual scrutiny came down on me and my agents."

The recent trends in government actions, as highlighted in various cases including the investigation involving the current administration, have raised concerns about a perceived tendency to target individuals who step forward to expose wrongdoing or challenge established narratives. This phenomenon is rooted in the fear that those who raise their voices against powerful entities may face retaliation, hindering their ability to bring about positive change.

These events give rise to a legitimate concern that seeking justice or raising awareness about perceived misconduct could result in adverse consequences for individuals who are simply "doing the right thing." This pattern of behavior creates an environment in which individuals might reasonably fear repercussions for expressing their concerns or pursuing actions that challenge the status quo. Such concerns underpin the need for pseudonymity as a means of safeguarding individuals from potential harm or retaliation when they seek to address perceived wrongs within the system.

## SUPPLEMENT TO MOTION
## TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM

### Supplement B
### Relevance of Third Amendment to Underlying Motion

### Attachment B3
### Defendant's indiscriminate use of digital redcoats
### to surveil and manipulate

The man who paid $44 Billion dollars to purchase a defendant, remarked that he bought "a crime scene" in direct reference to the behaviors under consideration in the underlying action.

The below tweet was sent in the days following this court's order of 8/17/2023.

While this post by Mr. Musk is not the basis for this motion to reconsider, it succinctly captures the essence of the problem at hand.



Elon Musk
@elonmusk

Twitter is both a social media company and a crime scene

2:56 PM · Dec 10, 2022



Elon Musk X
@elonmusk

Facebook is manipulating the public almost everywhere on Earth.

That is why they won't open source their algorithm.

> Michael Shellenberger @shellenberger · 1d
> Mark Zuckerberg says Facebook has independent fact checkers, is open to all perspectives, and doesn't interfere in elections.
>
> But a new investigation found Facebook is fundin...

11:34 PM · 8/22/23 · 34.2M Views



Tim Pool Retweeted
Elon Musk X
@elonmusk                    Subscribe

A closed source, algorithm-only system means that manipulation of what information people see is essentially undetectable

6:25 PM · 7/6/23 · 1M Views



Kristen Ruby
@sparklingruby

We have an epidemic of AI practitioners who do not understand the tremendous societal power of the large scale military weapons they operate.

LLMs and Machine Learning have significant implications for the future of free speech and society at large.

Data labeling misclassification, poisoned language models, and overfitting are just some of the issues that have real world consequences.

We are trusting people to make black box decisions that impact the future training of algorithms at mass scale.

But who are these people and why should they be trusted in the first place?

## SUPPLEMENT TO MOTION
## TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM

### Supplement B
### Relevance of Third Amendment to Underlying Motion

### Attachment B4
### Defendant targets Concerned Parents for Political Purposes

In its Interim Staff Report dated March 21, 2023, the House Select Subcommittee on the Weaponization of the Federal Government wrote that it was

> "conducting oversight of the Biden Administration's use of federal law-enforcement and counterterrorism resources against parents voicing concerns about controversial curricula and education-related policies at local school board meetings."

It went on to note that once its initial phase was complete it found:

> "From the initial set of material produced in response to the subpoenas, it is apparent that the Biden Administration misused federal law-enforcement and counterterrorism resources for political purposes."

And:

> "This weaponization of law-enforcement powers against American parents exercising their First Amendment rights is dangerous."

Further finding:

> "The FBI later opened dozens of investigations into parents' conduct at school board meetings, using the EDUOFFICIALS threat tag, in almost every region of the country and relating to all types of educational settings.
>
> Whistleblower disclosures … showed how, as a direct result of … Garland's … directive, federal law enforcement is using counterterrorism resources to investigate protected First Amendment activity."

"Garland" here refers to Merrick Garland who remains, as of this writing, the Attorney General of the United States.

His pattern of behavior as documented here gives continuing cause to Doe's concern and request for pseudonymous participation.

# SUPPLEMENT TO MOTION
# TO RECONSIDER DENIAL OF MOTION TO PROCEED UNDER PSEUDONYM

## Supplement B
## Relevance of Third Amendment to Underlying Motion

## Attachment B5
## Modern Research on Political Censorship

As explained by independent researchers such as Mike Benz, the term of art for "political narrative" within the censorship industry is "information campaign" and the tools and techniques are designed to detect who is "participating in an information campaign".

Mike's research explains how the CIA has worked for years to organize and disrupt information campaigns, and how this broad scope has come to include actions by the defendants in the underlying case.

As just one example regarding similar encroachment in an effort to censor certain election information:

> On Jan 6, 2017 the CIA produced a memo overstating Russia's influence in the 2016 election.
> https://www.dni.gov/files/documents/ICA_2017_01.pdf
>
> A similarly-timed order from the DNI essentially federalized election infrastructure
> https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical
>
> This order from the DNI gave 'cover' to fully infiltrate all these private companies as police, under the purview of election security.

This procedural cover, and the related practical means by which "information campaigns" are monitored, searched, and silenced are subjects of Doe's underlying Third Amendment complaint.

Doe intends to present exhibits from researchers including Kristin Ruby detailing the mechanics of this tyranny in the modern age, essentially explaining how Digital Redcoats function.

Benz' research explains how the government uses digital redcoats to augment human agents. These are actual human Soldiers operating in the Public Houses of social media, "given quarter" therein by government edict, coercion, or cooperation.

Ruby's research explains how those digital redcoats operate in data warehouses. These are Human and Algorithmic Soldiers, given quarter within data Warehouses, or "any house" in Third-amendment parlance.

Doe's underlying motion serves to illuminate this tyranny of placing those digital redcoats within the modern public houses of social media.