Invoice & Precedent

SUPREME COURT

# Supreme Court blocks restrictions on Biden administration efforts to get platforms to remove social media posts

The Biden administration had called a lower court injunction "unprecedented" for restricting officials' ability to raise concerns about problematic social media content on issues like Covid-19.



—— President Joe Biden's administration asked the Supreme Court to block the lower court ruling restricting its ability to contact social media companies about contentious content. Andrew Harnik / AP

Oct. 20, 2023, 4:19 PM EDT / Updated Oct. 20, 2023, 5:15 PM EDT

**By Lawrence Hurley**

WASHINGTON – The Supreme Court on Friday blocked in full a lower court ruling that would have curbed the Biden administration's ability to communicate with social media companies about contentious content on such issues as Covid-19.

The decision in a short unsigned order puts on hold a Louisiana-based judge's ruling in July that specific agencies and officials should be barred from meeting with companies to discuss whether certain content should be stifled.

The Supreme Court also agreed to immediately take up the government's appeal, meaning it will hear arguments and issue a ruling on the merits in its current term, which runs until the end of June.

Three conservative justices noted that they would have denied the application: Samuel Alito, Clarence Thomas and Neil Gorsuch.

"At this time in the history of our country, what the court has done, I fear, will be seen by some as giving the government a green light to use heavy-handed tactics to skew the presentation of views on the medium that increasingly dominates the dissemination of news. That is most unfortunate," Alito wrote in a dissenting opinion.

GOP attorneys general in Louisiana and Missouri, along with five social media users, filed the underlying lawsuit, alleging that U.S. government officials went too far in what they characterize as coercion of social media companies to address posts, especially those related to Covid-19. The individual plaintiffs include Covid-19 lockdown opponents and Jim Hoft, the owner of the right-wing website Gateway Pundit.

They claim that the government's actions violated free speech protections under the Constitution's First Amendment.

"This is the worst First Amendment violation in our nation's history. We look forward to dismantling Joe Biden's vast censorship enterprise at the nation's highest court," Missouri Attorney General Andrew Bailey said in a statement Friday.

A spokesman for the Department of Justice in Washington declined to comment.

The lawsuit makes various claims relating to activities that occurred in 2020 and before, including efforts to deter the spread of false information about Covid-19 and the presidential election. Donald Trump was president at the time, but the district court ruling focused on actions taken by the government after President Joe Biden took office in January 2021.

Recommended



WHITE HOUSE
**White House announces 31 tech hubs to focus on AI, clean energy and more**



DONALD TRUMP
**Trump denies telling 'red haired weirdo' Mar-a-Lago billionaire about classified info**

Judge Terry Doughty, who was appointed by Trump, barred officials from "communication of any kind with social-media companies urging, encouraging, pressuring, or inducing in any manner the removal, deletion, suppression, or reduction of content containing protected free speech."

The 5th U.S. Circuit Court of Appeals subsequently narrowed the scope of Doughty's injunction. But the appeals court still required the White House, the FBI and top health officials not to "coerce or significantly encourage" social media companies to remove content the Biden administration considers misinformation.

Affected officials would have included White House press secretary Karine Jean-Pierre and Surgeon General Vivek Murthy.

The administration turned to the Supreme Court hoping to freeze Doughty's ruling in full.

The district court ruling was on hold while the Supreme Court decided what steps to take.

Solicitor General Elizabeth Prelogar wrote in court papers that Doughty's decision was "an unprecedented injunction" that "flouts bedrock principles" of federal law.

"The court imposed unprecedented limits on the ability of the President's closest aides to use the bully pulpit to address matters of public concern, on the FBI's ability to address threats to the Nation's security, and on the CDC's ability to relay public health information at platforms' request," she added.

Prelogar argued that the original injunction is "vastly overbroad," saying "it covers thousands of federal officers and employees, and it applies to communications with and about all social media

platforms" regarding content moderation on such topics as national security and criminal matters.

Lawyers for the states and plaintiffs said in court papers that the lower courts had both found "egregious, systematic First Amendment violations" by the government when officials put pressure on the companies to "censor disfavored viewpoints."

 Lawrence Hurley

Lawrence Hurley covers the Supreme Court for NBC News.

ABOUT

CONTACT

HELP

CAREERS

AD CHOICES

PRIVACY POLICY

YOUR PRIVACY CHOICES

CA NOTICE

TERMS OF SERVICE (UPDATED JULY 7, 2023)

NBC NEWS SITEMAP

CLOSED CAPTIONING

ADVERTISE

SELECT SHOPPING

SELECT PERSONAL FINANCE

© 2023 NBC UNIVERSAL

FRITZ TECHNOLOGY LLC

**Back to invoices**

# Invoice #3:22-CV-01213~Invoice001



*My bill and invoice requires $3,000,000 up front: 1/4 of estate.*

**Jon Turpin**
2421 S Plum St
Yorktown, IN 47396
UNITED STATES

JT4590@gmail.com

Invoice #3:22-CV-01213~Invoice001

Issued : Jul 14, 2023

Due : Jul 14, 2023

## $231,000,000.00

ⓘ OVERDUE

**Bill to**
Joseph L. Chaney
Federal Bureau of Investigation
8825 Nelson B Klein Pkwy
Indianapolis, IN 46250
UNITED STATES
jlchaney@fbi.gov
Phone: +1 317-595-4000

**Ship to**
Joseph L. Chaney
Federal Bureau of Investigation
8825 Nelson B Klein Pkwy
Indianapolis, IN 46250
UNITED STATES

**Items**

---

**Amount due:**
$231,000,000.0

⋯  ✎  ( Remind )

**Invoice activity**

**Jul 15, 2023**
- 9:21 PM
  This invoice was viewed.
- 9:19 PM
  You sent a
  $231,000,000.00 USD
  invoice to
  jlchaney@fbi.gov.

**Jul 14, 2023**
- 5:29 PM
  You created a
  $7,000,000.00 USD
  invoice.

( Feedback )

FRITZ TECHNOLOGY LLC

**RUSSIA'S INVOICE**

# Commander-In-Chief Custodial Consulting

$77,000,000.00

110 x $700,000.00
Invoice to Russia-China Coalition for Harms, Losses, Distress, Legal Fees, Etc. Et Al:
Responsible Parties - Any Affiliated Countries & Associates Against Vatican & U.N. & NATO:
Denis G. Kulkov, Richard E. Bell, Jon B. Turpin, Michael A. M. Holwager, Jared R. Junkin:
Including Any Affiliated Associates With All Available And Due Leniency In God's Mercy.

**CHINA'S INVOICE**

# Commander-In-Chief Custodial Consulting

$77,000,000.00

110 x $700,000.00
Invoice to Russia-China-North Korea Coalition for Harms, Losses, Distress, Legal Fees, Etc. Et Al:
Responsible Parties - Any Affiliated Countries & Associates Against Vatican & U.N. & NATO:
Denis G. Kulkov, Richard E. Bell, Jon B. Turpin, Michael A. M. Holwager, Jared R.

FRITZ TECHNOLOGY LLC

NORTH KOREA'S INVOICE

| | | |
|---|---|---|
| Subtotal | | $231,000,000,000.00 |
| **Total** | | **$231,000,000,000.00** |
| Minimum amount due | | $3,000,000,000.00 |

## Seller note to customer

Invoices to Russia-China-North Korea Coalition for Harms, Losses, Distress, Legal Fees, Etc., Et Al:

Responsible Parties - Any Affiliated Countries & Associates Against Vatican & U.N. & NATO:

Denis G. Kulkov, Richard E. Bell, Jon B. Turpin, Michael A. M. Holwager, Jared R. Junkin:

Including Any Affiliated Associates With All Available And Due Leniency In God's Mercy.

Our Vatican, U.N., NATO, and Esteemed Government Agencies, like IRS, receive dues first.

However, we need restoration, sincerely, and promptly, to ensure life, liberty, and pursuit of happiness.

Sincerely,

Jon F. D. Turpin, Pro Se, Pro Hac Vice

Commander-In-Chief Custodial Consulting

Fritz Technology LLC & Turpin Electric, Inc.

M Gmail

**Justice Department Awards $75 Million for Active Shooter Training, to Combat Trafficking of Illegal Drugs, and Law Enforcement Mental Health and Wellness**
1 message

Office of Community Oriented Policing Services (COPS) <copsaud@service.govdelivery.com>
Reply-To: copsaud@service.govdelivery.com
To: jl4590@gmail.com

*Thank you, sincerely, to our DOJ and the Honorable Garland.*
Jon F Turpin <jl4590@gmail.com>

*This grant is $3000,000 short of payment*

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF COMMUNITY ORIENTED POLICING SERVICES**

145 N Street, NE, Washington, D.C. 20530

FOR IMMEDIATE RELEASE
Friday, October 13, 2023

**Justice Department Awards $75 Million for Active Shooter Training, to Combat Trafficking of Illegal Drugs, and Law Enforcement Mental Health and Well**

WASHINGTON – The Justice Department Office of Community Oriented Policing Services (COPS Office) announced today that it has awarded nearly $75 million in critical grant funding to law enforcement agencies and stake only assist with the Department's crime reduction efforts, but also to provide much needed assistance to agencies looking to expand their law enforcement mental health and wellness services, combat the distribution and traffic

"Today's announcement underscores the Justice Department's commitment to supporting our state and local law enforcement partners as we work together to keep our communities safe," said Attorney General Merrick B. Garla trafficking of deadly drugs, expand access to the mental health and wellness services that police officers deserve, and fund other critical programs. The Justice Department will continue to do everything in our power to get law e help keep them and their communities safe."

"Every day, across the country, our state and local law enforcement partners are working tirelessly on the ground to protect our communities and preserve public safety," said Deputy Attorney General Lisa O. Monaco. "Through and supports our state and local partners with much-needed resources for community policing and critical training while increasing officer access to mental health and wellness services."

"The COPS Office grants announced today will help ensure law enforcement agencies across the country have the resources and training they need to promote public safety and further develop police-community trust," said Ass the Collaborative Reform Initiative, in particular, will allow the Justice Department and our law enforcement partners to continue providing critical, voluntary technical assistance and support to agencies that request it,"

"COPS Office grants work to not only reduce crime and increase public safety," said Director Hugh T. Clements of the COPS Office. "But they also make sure that the work is done through the lens of community policing. I kn served by these grants."

Funding highlights include:

- Nearly $48 million to combat the distribution and trafficking of opioids and methamphetamine through the COPS Anti-Heroin Task Force (AHTF) program and the COPS Anti-Methamphetamine Program (CAMP).
- Through the Law Enforcement Mental Health and Wellness Act (LEMHWA) program, over $9 million to law enforcement agencies and stakeholder organizations to improve the delivery of and access to mental health an and technical assistance, demonstration projects, and implementation of promising practices related to peer mentoring mental health and wellness programs.
- Almost $11 million in active shooter training funding through the Preparing for Active Shooter Situations (PASS) program.
- Nearly $7.6 million in funding for the continuation of the Collaborative Reform Initiative, through which technical assistance providers offer expert services to state, local, territorial, and tribal law enforcement agencies to
- An award for $130,000 to support the efforts of the National Blue Alert Network, a voluntary nationwide system to give authorities an early warning of threats against law enforcement and to aid in the apprehension of sus deputy.

Complete lists of award recipients under these programs, including funding amounts, can be found here.

The COPS Office is the federal component of the Justice Department responsible for advancing community policing nationwide. The only Justice Department agency with policing in its name, the COPS Office was established i fighting strategy with grants, a variety of knowledge resource products, and training and technical assistance. Through the years, the COPS Office has become the go-to organization for law enforcement agencies across the cour resources that are needed to reduce crime and build trust between law enforcement and the communities served. The COPS Office has been appropriated more than $20 billion to advance community policing, including grants a enforcement agencies to fund the hiring and redeployment of more than 136,000 officers.



You have received this email from the U.S. Department of Justice's Community Oriented Policing Services (COPS) Office. Your subscription information may not be used for any other purposes.

Manage Your Subscriptions | Department of Justice Privacy Policy | GovDelivery Privacy Policy

U.S. Department of Justice's Community Oriented Policing Services (COPS Office) · 145 N St. NE · Washington, DC 20530 · 800-421-6770

This email was sent to jx999@gmail.com using GovDelivery Communications Cloud on behalf of: The Office of Community Oriented Policing Services (COPS Office)

**jt4590@gmail.com**

| | |
|---|---|
| **From:** | Jon Turpin <turpin522@msn.com> |
| **Sent:** | Saturday, February 27, 2010 3:03 PM |
| **To:** | jt4590 |
| **Subject:** | FW: suspicious timing, retaliation, emotional distress, inferences, TURPIN |

---

From: bndtracey@mac.com
Subject: Fwd: suspicious timing, retaliation, emotional distress, inferences, TURPIN
Date: Sat, 27 Feb 2010 06:37:02 -0500
To: turpin522@MSN.com

Jon,
You might be interested to review what I researched this morning while thinking about your case.   I made an email to myself, but afterwards thought I should forward it to you to enjoy, too.   Because I suspect you'll wonder, much of Title IIV is borrowed into Title IX.  Be aware that other district court cases are not binding authority, as they're the same level.  But, they are informative.  Circuit and Sp Ct cases are authority.
If you look below at Alston v King you'll see why I say JT (and you and Linda) can do the job re emotional distress.
Brian

*Yet, but it is fully Title VII, and violations of 1st Amendm.*

CONFIDENTIALITY NOTICE:
This e-mail contains information that is privileged, confidential and subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. You are prohibited from copying, distributing or otherwise using this information unless you are the intended recipient. If you have received this e-mail in error, please notify me immediately by return e-mail and then delete this email and all attachments from your system.

DISCLOSURE REQUIRED BY CIRCULAR 230.
This Disclosure may be required by Circular 230 issued by the Department of Treasury and the Internal Revenue Service. If this e-mail, including any attachments, contains any federal tax advice, such advice is not intended or written by the practitioner to be used, and it may not be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer. Furthermore, any federal tax advice herein (including any attachment hereto) may not be used or referred to in promoting, marketing or recommending a transaction or arrangement to another party. Further information concerning this disclosure, and the reasons for such disclosure, may be obtained upon request from the author of this e-mail.

Brian Tracey
Gevers & Tracey
116 East Berry Street, Suite 625
Fort Wayne, IN 46802
office       260-407-7071
cell          260-740-2333
fax           260-407-7073

*Along with a complete disregard of rights under Wade,*

*Pages: 2, 5, 8/9, 11, 12/13/14... 34...etc.*

*This applies in our favor.*

Begin forwarded message:   *Consider this in the lens that we are Catholic.*

**From:** Brian Tracey <bndtracey@mac.com>
**Date:** February 27, 2010 6:26:16 AM EST
**To:** Brian Tracey <bndtracey@mac.com>

*Civil Rights.*

**Subject: suspicious timing, retaliation, emotional distress, inferences, TURPIN**

http://www.law.duke.edu/shell/cite.pl?12+Duke+J.+Gender+L.+&+Pol'y+1#F2

This isn't a cite - just use it as is:

In Title VII cases, we have repeatedly rejected the notion that a victim's ability to keep doing her job in the face of harassment will defeat her contention that the workplace was hostile. _Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir.1994)_; _Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1454-55 (7th Cir.1994)_; _Saxton v. AT & T Co., 10 F.3d 526, 534-35 n. 14 (7th Cir.1993)_. As Justice Scalia has observed, "[T]he test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." _Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 114 S.Ct. 367, 372, 126 L.Ed.2d 295 (1993)_ (Scalia, J., concurring); _see also ibid._ (Ginsburg, J., concurring). I see no reason to follow a different rule for purposes of Title IX. If anything, courts ought to be more flexible in assessing the harms that a child experiences as a result of harassment, given that children (especially young children) are far less able to articulate the fact and extent of their injuries and may manifest an array of different reactions to the harassment. Gabrielle may have managed to keep her grades up, yet she nonetheless may have confronted a hostile environment that made it much more difficult for her to develop and achieve as a student.

Also in the employment context, the Supreme Court has firmly rejected any requirement that the victim of harassment **\*829** suffer the equivalent of a nervous breakdown before she can recover under a hostile environment theory. _Harris, 510 U.S. at 22, 114 S.Ct. at 370-71._ "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," the Court explained. _Id._ at 22, 114 S.Ct. at 371.

In cases, time is often an important evidentiary ally of the plaintiff. **Lalvani v. Cook County, Illinois**, 269 F.3d 785, 790 (7th Cir., 2001).

Suspicious timing, together with other facts, can sometimes raise an inference of a causal connection. _Lalvani v. Cook County, 269 F.3d 785, 790 (7th Cir.2001)_; _Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1009-10 (7th Cir.2000)_.
**Magyar v. Saint Joseph Regional Medical Center**, 544 F.3d 766, 772 (7th Cir.,2008).

more in and from the same case:

The Hospital attempts to minimize the causal link between Houston's complaint to Wade and Goddard's allegedly retaliatory restructuring of the

job by pointing out that Goddard "explicitly stated (in a secretly-tape-recorded conversation) that she had no problem with 'anyone taking anything to the Legal Department.' " First of all, no trier of fact would be compelled to believe Goddard's protestation of open-mindedness. Second, while Goddard did literally utter these words, they are sandwiched between other words; taken as a whole, a rational jury could interpret the conversation in Houston's favor. Here is the full quotation:

> I have no problem with anyone taking anything to the legal department but I am just curious when the situation was dealt with I thought it was dealt with very effectively it was a positive out come. You got what you asked for. And yet you still because you don't think I said the right words or I phrased the right sentence what was your expectation of what you wanted to see happen after taking it to the hospital (?) department.

(Hospital Supp.App. 36) (imperfections in transcript of the tape-recorded conversation). A reasonable jury could find Goddard's statements defensive and accusatory. She comes across as having a substantial problem with Houston's decision to take the matter to the legal department, despite her perfunctory statement to the contrary. This, together with testimony from Houston that Goddard's tone with her was defensive and irritated, Goddard's own admission that she felt "shocked" and "bewildered" when she learned that Houston had complained about Goddard's handling of the complaint, and the fact that Goddard posted Houston's job on the job listings within a few days of this meeting, is more than mere suspicious timing. It is sufficient to raise an inference of causation.

## D. But-for Causation

Even if all that is true, the Hospital argues, it is still entitled to summary judgment on the basis of what it calls unrebutted evidence that Goddard already intended to eliminate Houston's job for a legitimate business reason. Compare _Stone,_ 281 F.3d at 644 (holding that summary judgment in favor of defendant is required when defendant presents "unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive").

Through Goddard's deposition, the Hospital presented evidence that, upon taking the job of Director of Surgical Services in June 2004, Goddard learned that two PRNs (Houston and Williams) were doing the job of one regular part-time employee. Goddard testified that she regarded this as an undesirable business practice, because the budget allowed for a part-time position with benefits, so it should be filled in that way. (The point about benefits was an odd one, given the fact that benefits impose substantial costs on employers. An August 2005 study performed for the Small Business Administration reported that about 29% of a business's total compensation costs for hourly employees is *774 attributable to benefits. See "Cost of Employee Benefits in Small and Large Businesses," at 6, at www. sba. gov/ advo/ research/ rs 262 tot. pdf (last visited 7/19/08). It is unclear why

Goddard thought that it would be better if her employer shouldered that burden.) Also, she said, a regular employee would have predictable and reliable hours commitments (though there is no evidence that Houston and Williams were ever unavailable when the Hospital needed them.)

[7] ☑ It is true that Houston responded only by commenting that Goddard's statements were self-serving, but this was just another way of saying that a trier of fact would have to evaluate everything Goddard said and decide what to accept and what to reject. Even without direct rebutting evidence from Houston, the Hospital's evidence fails to establish that Houston first would have lost her PRN position and then would have been effectively blacklisted for all similar work until her termination in the absence of the retaliatory motive. It merely shows that the job restructuring might have occurred anyway at some point. On the other hand, a trier of fact might have seen Goddard's explanation of the timing of her action as only a *post hoc* justification. Goddard stated:

> I felt the situation I inherited (two PRN employees filling a regular, part-time position) would need to be addressed.... After dealing with the most critical issues facing the Surgical Service Department through the summer of 2004, I turned my attention to correcting the use of PRN employees in a regular position in the fall of 2004.

The Hospital cannot meet its burden on summary judgment by having the actor say only that she was thinking vaguely of restructuring the job and planned to do it when she got around to it. The fact that the Hospital also presented testimony that Goddard had not had a situation in which two PRNs were sharing a job in all her prior management years at the hospital does not compel a different result. To the contrary, the fact-finder could conclude that the fact that the "situation" continued without being "addressed" for over three months indicates that there was no urgency or even inevitability about the Hospital's decision to terminate Houston's position. Although the dissent contends there is "no doubt" that Goddard intended to convert the PRN positions from the time she came on board despite the delay in carrying out this intention, it is able to come to that conclusion only by viewing the evidence in the record in the light most favorable to the Hospital. That is not the standard we must apply; in our view there is enough in the record to entitle a reasonable jury to find in favor of Houston.

* * *

Because Houston has established a *prima facie* case of retaliation and the Hospital has not shown an absence of material fact on the question whether it would have taken the same action even without a retaliatory motive, we REVERSE the district court's grant of summary judgment in favor of the Hospital and REMAND the case for further proceedings.

**Magyar v. Saint Joseph Regional Medical Center**, 544 F.3d 766, 773 (7th Cir.,2008).

Amrhein can rely on two types of evidence to show that her protected activity motivated HCSC's action: "direct evidence" or "circumstantial evidence." *Lewis v. School Dist. # 70,* 523 F.3d 730, 742 (7th Cir.2008). Direct evidence is evidence "which (if believed by the trier of fact) will prove the fact in question without reliance upon inference or presumption," which typically involves an admission by the decision maker regarding the retaliatory intent. *Id.* (citation omitted). Because direct evidence of discriminatory intent is rare, a plaintiff can also offer circumstantial evidence, which "allows the trier of fact to *infer* intentional discrimination by the decisionmaker," typically through a longer chain of inferences. ***859*** *Id.* (citation omitted and emphasis in original). *evidence of the like...*

*In my opinion, I have Proved* ~~them~~

[6] ☑ Amrheim did not produce direct evidence of retaliation, relying instead on circumstantial evidence. The primary circumstantial evidence presented was the proximity between her stated intention to file an EEOC claim and her termination. Suspicious timing may be enough to meet the minimal burden of establishing a prima facie case, but suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial. *Buie v. Quad/Graphics, Inc.,* 366 F.3d 496, 506-07 (7th Cir.2004); *Wyninger v. New Venture Gear, Inc.,* 361 F.3d 965, 981 (7th Cir.2004). Amrhein argues that the relevant time period is the six weeks between the January 14, 2004 meeting with Cosey and Marquedant and her termination on March 1, 2004. At that meeting, Amrhein stated that she intended to file a complaint with the EEOC, but Amrhein had voiced a similar intention at the December 3, 2003 meeting, almost three months before her termination. That period of time between the threat and the firing is not enough, on its own, to create a jury issue on the inference of retaliation. *See Sauzek v. Exxon Coal USA, Inc.,* 202 F.3d 913, 919 (7th Cir.2000).

**Amrhein v. Health Care Service Corp.,** 546 F.3d 854, 858 (7th Cir., 2008).


**Seiwert v. Spencer-Owen Community School Corp.**
**497 F.Supp.2d 942**
**S.D.Ind.,2007.**

The first portion of the Court's analysis, therefore, involves determining whether or not S.S. suffered from harassment that is so severe, pervasive, and objectively offensive that it deprived him of an educational opportunity or benefit. *Gabrielle M. v. Park Forest-Chicago Heights, Illinois School Dist.,* 315 F.3d 817, 822 (7th Cir.2003). In this instance, the facts viewed in the light most favorable to Plaintiffs indicate that S.S. was called names for two separate school years repeatedly being called "gay" and "faggot," that he was kicked by several boys after he fell to the ground during a dodge ball game, that he endured death threats, and that his treatment lead to him

being removed from school in December of 2003 due to psychological concerns and eventually removed from school permanently. These incidents, if true, certainly amount to severe and pervasive conduct that was objectively offensive. Being called outrageous names, physically assaulted, and having one's life threatened is severe and pervasive behavior. The conduct may have been so severe that it actually caused S.S. to no longer be able to attend OVMS.

....

[10] ☑ [11] ☑ The question remains, however, whether this harassment amounted to sexual harassment prohibited by Title IX. There is no concrete evidence that any of the children at OVMS was harassing S.S. simply because he was a male. S.S. may, however, still have a viable Title IX claim. As the Seventh Circuit has clearly indicated, "federal courts look to cases decided under Title VII to inform analysis under Title IX." *Doe v. University of Illinois,* 138 F.3d 653, 663 (7th Cir.1998). And, within the context of Title VII, the Seventh Circuit has intimated that there is a second avenue for demonstrating sexual harassment. If an individual is being harassed because of a failure to adhere to specific sexual stereotypes, and not because of his sexual orientation, he has an actionable claim. *Hamm v. Weyauwega Milk Products, Inc.,* 332 F.3d 1058, 1065 n. 5 (7th Cir.2003); *Massaro v. Illinois Dept. of Corrections,* 2006 WL 1063797 at *5 (C.D.Ill.2006). Thus, it is conceivable that an individual could sustain a cause of action under Title IX if he were to demonstrate that he was being harassed-not because he was a homosexual, but because he was acting in a manner that did not adhere to the traditional male stereotypes.

In S.S.'s case, it is reasonable to infer from the facts that the students of OVMS were engaged in a campaign of harassment against S.S. because his actions lead some of the boys at OVMS and their girlfriends to conclude that S.S. was homosexual. There is no other proffered reason why the students at OVMS were harassing S.S.[FN8] Because the Court's duty at the summary judgment stage is to examine the facts in the light most favorable to Plaintiffs, drawing all reasonable inferences from those facts in Plaintiffs' favor, we conclude that Plaintiffs have demonstrated the type of harassment prohibited by Title IX.

> FN8. To be certain, there is a fine line between being harassed because of one's sexual orientation and being harassed because of a failure to adhere to traditional male stereotypes. It might very well be the case that Plaintiffs are unable to sustain causes of action under both the equal protection clause (for being harassed because of sexual orientation) and Title IX (for being harassed because of failure to adhere to traditional male stereotypes). That, however, will be a distinction that the jury must make at trial.

[12] ☑ Having found that S.S. suffered severe, pervasive, and objectively offensive sexual harassment, the Court must still examine whether or not Defendant School Corporation had actual knowledge of these incidents. *Gabrielle M., 315 F.3d at 823*. Here, the record demonstrates that the **\*954** School Corporation was warned in October or November of 2002 when S.S. and his parents attended a parent-teacher conference and informed the OVMS principal that bullying was taking place. And, Plaintiffs allege that Jane Seiwert went to OVMS assistant principal Elkins on three occasions in November and December 2003 and warned her of the harassment that was occurring. Finally, OVMS officials were made aware of the threats issued by T.R. Hence, it is clear from the record that the School Corporation had actual knowledge of the harassment.

[13] ☑[14] ☑ Even if an individual demonstrates that he was the victim of the type of sexual harassment or discrimination prohibited by Title IX and that a school had actual knowledge of these incidents, the school can still escape liability. Defendants are only liable under Title IX if they acted with deliberate indifference to Plaintiffs' complaints; this means that the School Corporation is liable if its actions were "clearly unreasonable."*Gabrielle M., 315 F.3d at 824*. Here, the School Corporation chose not to discipline an individual who issued what could be construed as at least two death threats to S.S. They also informed S.S. on at least one occasion that some threats aren't as serious as others. When the School Corporation did take action in one instance, their decision was to move S.S. to a different classroom rather than deal with the other student's threats and actions. Finally, after T.R. took her threats beyond mere words and instigated an altercation, the School Corporation apparently still decided to discipline both S.S. and T.R. equally, prompting S.S.'s parents to decide that he was no longer safe at OVMS and that he must finally be removed from OVMS and placed in another school. A jury could conclude that these actions were clearly unreasonable.[FN9] In fact, the students at OVMS who were bullying S.S. could have actually construed the School Corporation's inaction as tacit approval of their behavior, prompting them to engage in even greater acts of bullying.

...

In Indiana, negligent infliction of emotional distress is an independent tort and a plaintiff seeking to recover under a theory of negligent infliction of emotional distress no longer has to prove any underlying physical injury or physical impact in order to prevail. *Indiana Patient's Compensation Fund v. Winkle,* 863 N.E.2d 1, *6 (Ind.Ct.App.2007)*. Additionally, as the Court has discussed above, causation is generally a question of fact for the jury to determine. Hence, Defendant's Motion for Summary Judgment on this matter is without merit and must be DENIED.

**Seiwert v. Spencer-Owen Community School Corp.,** 497 F.Supp.2d 942 (S.D.Ind.,2007).

**Alston v. King**, 231 F.3d 383, 388 (7th Cir.,2000).

When the injured party provides the only evidence of emotional distress, he must reasonably and sufficiently explain the circumstances of the injury rather than relying on mere conclusory statements. _Biggs v. Village of Dupo, 892 F.2d 1298, 1304 (7th Cir.1990), citing Rakovich v. Wade, 819 F.2d 1393, 1399 n. 6 (7th Cir.1987), vacated on reh. en banc on other grounds, 850 F.2d 1180 (1988)._ Moreover, "we require that a plaintiff show 'demonstrable emotional distress,' not just point to circumstances of the constitutional violation which might support an inference of such injury." _Biggs, 892 F.2d at 1305, quoting Rakovich, 819 F.2d at 1399_ (emphasis in original). We have previously held insufficient statements by a plaintiff that he is "depressed, a little despondent, or even completely humiliated," _Biggs, 892 F.2d at 1305,_ but the sufficiency of such statements ultimately depends upon the particular facts of the case. As this court clarified in _United States v. Balistrieri, 981 F.2d 916, 932 (7th Cir.1992),_ an injured person's testimony may, by itself or in conjunction with the circumstances of a given case, be sufficient to establish emotional distress without more. _Balistrieri_ set forth certain factors relevant to determining when such evidence will suffice, as follows:

[I]n determining whether the evidence of emotional distress is sufficient to support an award of damages, we must look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused the distress.... The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award of emotional distress.

_Id._ [citations omitted]. The act that allegedly caused the distress in this case is the denial of the hearing, not the termination itself. That is not the type of inherently degrading conduct that would portend emotional distress. _See, e.g., Balistrieri, 981 F.2d at 932_ (recognizing that racial **\*389** discrimination, one of the "relics of slavery," is the type of conduct that is reasonably expected to cause emotional distress). Therefore, Alston's bare allegations of humiliation would not, without more, preclude judgment as a matter of law.

Therefore, we must examine the more specific testimony of emotional distress provided by Alston, to determine whether it is sufficient to raise a jury issue. Alston testified to alcohol abuse and the demise of his engagement, but that testimony was contradicted by Alston himself on cross-examination, when he acknowledged that as of the first trial, he suffered no alcohol abuse and that he did not even become engaged until over a year after the termination. Alston introduced no testimony from which a finder of fact could attribute the subsequent alcohol and relationship problems as a long-delayed reaction to the denial of the hearing. Accordingly, that testimony provides no basis for a jury to conclude that he

suffered damages in the form of emotional distress from the failure to provide the hearing.

Alston also testified, however, as to the sequence of events at the office that occurred immediately after he was informed of his termination. According to that testimony, Alston was escorted by "a police officer or someone that the Mayor directed" to take him to his District. Once there, he was taken to his former office and he removed his personal effects. In the meantime, employees were gathered around, and some were crying, others were befuddled, and still others were mocking or laughing at him. That testimony is sufficient to raise a jury issue of emotional distress damages related to the denial of procedural due process. The portrayal of the incident certainly gives credence to his claim of feeling humiliated and suffering emotional distress, particularly the allegation of co-workers laughing and mocking him as he cleaned out his desk. Moreover, a reasonable juror could conclude that the humiliating office scene would not have occurred if Alston had not been summarily terminated. For instance, a jury could conclude that if he was suspended pending a hearing, he would not have been immediately taken back to his desk and forced to clean out his desk in the presence of his coworkers, without any explanation. Although he may have had to clear out his desk eventually after the hearing, we cannot say that the humiliation would have been the same given the opportunity for the other employees to at least have learned what was happening in the interim, and possibly given the potential for him to choose a less visible time to accomplish the task. In other words, there was enough evidence to infer that the humiliation he experienced was attributable to the summary nature of the proceedings, rather than to the termination itself. Alston therefore presented sufficient evidence of damages to withstand judgment as a matter of law.

Accordingly, the district court erred in granting judgment as a matter of law and awarding only nominal damages. The decision of the district court is reversed and the case remanded for further proceedings consistent with this opinion.
**Alston v. King**, 231 F.3d 383, 388 (7th Cir.,2000).


**Seaton v. Sky Realty Co., Inc.**, 491 F.2d 634 (7th Cir. 1974).

Mr. and Mrs. Seaton, who are black, were awarded compensatory and punitive damages against defendants Sky Realty Company, a real estate broker, Jerry Carr, its manager, and Art Potocki, one of its salesmen, for racially motivated refusal to negotiate for the sale of a dwelling in a predominantly white area of Chicago. They and the owner, Mrs. Schmidt, were found, after a bench trial, to have violated 42 U.S.C. §§ 1982[FN1] and 3604.[FN2] Mrs. Schmidt did ***636** not appeal. The other defendants challenge the sufficiency of the evidence. We affirm.

FN1. 'All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to . . . purchase, . . . real . . . property.' See <u>Jones v. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968)</u>.

FN2. '. . ., it shall be unlawful-'(a) To refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . or otherwise make unavailable or deny, a dwelling to any person because of race, . . . . . .fus'(d) To represent to any person because of race, . . . that any dwelling is not available for . . ., sale, . . . when such dwelling is in fact so available.'

After a summary of the facts, the district court found as follows:

'Taken in its entirety, the plaintiffs have amply demonstrated through the evidence and the circumstances involved that Sky Realty Company, Inc., the defendant Jerry Carr, the defendant Art Potocki are systematically engaged in violation of both <u>Sections 1982</u> and<u>3604</u>, particularly as they relate to these plaintiffs.'

There was evidence, some undisputed and some showing, when credibility was resolved as the district judge did, that when Mrs. Seaton telephoned to inquire about the Schmidt home which had been advertised, Potocki assured her it was for sale, and made an appointment, but when she and her husband appeared, he told them it had been sold; that later, when investigators inquired, Carr and Potocki produced a written offer; that the purported offer had not been and never was accepted; that the usual course of business had not been followed in the receipt of the purported offer; that when Potocki was ultimately induced to show the Schmidt property to the Seatons, he did so in a grudging, uncooperative, and deliberately discouraging manner; that the house was eventually sold for substantially less than the figure quoted to the Seatons or specified in the purported offer; that it is a practice at Sky Realty for prospect sheets to contain notations of race or national origin where the prospect is of a minority race or ethnic group; and that the prospect sheet for the Seatons contained the notation 'Col' as an abbreviation for colored.

[1] ☑ There are other details, but we find ample evidence to support the finding made by the judge, and it approaches the frivolous to contend, as defendants do, that his finding was clearly erroneous.

With respect to compensatory damages, defendants assert that 'there is no evidence that the plaintiffs suffered any loss or damages.'

The finding of the district court was as follows:

'Although the record is sparse as to the actual damages suffered, testimony was introduced that the plaintiff Jerome Seaton suffered great embarrassment because of the action of the defendants during his attempt with his wife to visit the property . . . and further, the plaintiffs were forced, by virtue of the wrongful actions of the various defendants, to make several trips to and from the home site and the offices of the defendant Sky Realty Co. The Court therefore concludes that actual damages have been adequately shown and they are therefore assessed in the amount of $500.'

Mr. Seaton testified, apparently with reference to the visit to the Schmidt home with Mr. Potocki, when the Seaton children were present: 'I was humiliated. I was intimidated, not only as a person but as a man. He stripped me of my right as a father to my kids.' It appears to be defendants' position that unless there is evidence of economic or financial loss, or medical evidence of mental or emotional impairment, there can be no award of compensatory damages.

We conclude, to the contrary, that an award of compensatory damages under § 1982 or 'actual damages' under § 3612 is appropriate for humiliation caused by the type of violations of rights established here. Humiliation can be inferred from the circumstances as well as established by the testimony. Mr. Seaton was subjected to a racial indignity which is one of the relics of slavery which 42 U.S.C. § 1982 was enacted to eradicate. Jones v. Mayer Co., 392 U.S. 409, 441-443, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

Compensatory damages are an appropriate remedy for deprivation of a federal right, are governed by federal standards, and 'both federal and state rules on damages may be utilized, whichever *637 better serves the policies expressed in the federal statutes . . .. The rule of damages, whether drawn from federal or state sources, is a federal rule responsive to the need whenever a federal right is impaired.' Sullivan v. Little Hunting Park, 396 U.S. 229, 239-240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969).

In 1919 where a voter was wrongfully deprived of his right to vote for a member of Congress, the Circuit Court of Appeals for the Eighth Circuit said:

'In the eyes of the law this right is so valuable that damages are presumed from the wrongful deprivation of it without evidence of actual loss of money, property, or any other valuable thing, and the amount of the damages is a question peculiarly appropriate for the determination of the jury, because each member of the jury has personal knowledge of the value of the right.' Wayne v. Venable, 260 F. 64, 66 (8th Cir., 1919), quoted and held applicable in a § 1983 action where a claim of unreasonable and illegal arrest was before the court. Basista v. Weir, 340 F.2d 74, 88 (3d Cir., 1965).

In a § 1983 action for an illegal arrest, although the amount of compensatory damages found by the jury was held to be excessive, and award of $5,000 was approved and the court said: 'Apart from special monetary damages it is open to the jury in a case such as this to make a determination as to the amount that plaintiff is entitled to be awarded for the deprivation. This, of course, would include his subjective pain and suffering and humiliation.' Rhoads v. Horvat, 270 F.Supp. 307, 310 (D.Colo.1967).

In a § 1983 action for unlawful arrest and unreasonable search, the district court noted the absence of 'proof of actual damages of any specific amount.' The court said in awarding $500 against one defendant and $250 against another,

'However, there is not doubt that Plaintiff suffered humiliation, embarrassment and discomfort in addition to being deprived of his federally protected rights as set forth above.' Sexton v. Gibbs, 327 F.Supp. 134, 143 (N.D.Texas, 1970), aff'd 446 F.2d 904 (5th Cir., 1971).

In an action under 42 U.S.C. §§ 1982 and 3604, involved here, for racially motivated refusal to rent, this court reversed a judgment of dismissal and directed the district court to award plaintiff 'such sum, not to exceed $1000, as the district court in its discretion may determine will fairly and properly compensate such plaintiff for the loss of her civil rights and any mental anguish suffered by her.' Smith v. Sol D. Adler Realty Company, 436 F.2d 344, 351 (7th Cir., 1970). See Steele v. Title Realty Company, 478 F.2d 380, 384 (10th Cir., 1973); Gonzales v. Fairfax-Brewster School, Inc., 363 F.Supp. 1200 (E.D.Va., 1973); Allen v. Gifford, D.C., 368 F.Supp. 317 (E.D.Va., 1973).

In a § 1983 action for causing plaintiff's loss of public employment in retaliation for exercise of first amendment rights, the Ninth Circuit said: 'Compensatory damages awardable in a Civil Rights Act case are not limited to the out-of-pocket pecuniary loss the complainant suffered. Damages can also be awarded for emotional and mental distress caused by the intentional tort.' (citing cases). Donovan v. Reinbold, 433 F.2d 738, 743 (9th Cir., 1970).

In a somewhat comparable situation, an action against a union for intentional discrimination, violating a federal right, the Eighth Circuit said, 'The damage arising from invidious discrimination against an employee by reason of his nonunion membership may often times be measured only in terms of the mental distress, anguish and humiliation caused him.' Richardson v. Communications Workers of America, 443 F.2d 974, 983 (8th Cir., 1971).

[4] ☑ We are satisfied that under decided federal cases among the circuits, compensatory damages may be awarded for the humiliation

suffered by plaintiffs, whether inferred from the circumstances *638 or established by testimony, and that $500 is well within the range of reasonable amounts.

Defendants also challenge the basis for any award of punitive damages.

The district court found that defendants were 'systematically engaged' in the unlawful discrimination. The court also stated that 'ample cause exists for the granting of punitive damages against them' and went on to make it clear that a $1,000 punitive damage award was made against each of the three defendants who are here on appeal, 'not joint and several liabilities but individual liabilities and individual judgments.'

[5] ☑ Thus the district court must have been satisfied that there was the degree of wilful and wanton disregard of plaintiffs' right not to suffer this sort of discrimination to warrant punitive damages. The evidence supports the finding and it is not clearly erroneous. The degree of deliberateness, stubbornness, or recklessness in doing injury to others which is a prerequisite for punitive damages has been variously expressed: e.g., 'intentionally fraudulent, malicious, wilful or wanton', Aladdin Mfg. Co. v. Mantle Lamp Co. of America, 116 F.2d 708, 716 (7th Cir., 1941), in an action for trade-mark infringement and unfair competition; 'wantonness, malice, oppression or circumstances of aggravation', Hannigan v. Sears, Roebuck and Co., 410 F.2d 285, 293 (7th Cir., 1969), applying Illinois law; 'wilfully and wantonly', Wright v. Kaine Realty, 352 F.Supp. 222, 223 (N.D.Ill., 1972), applying the federal statutes involved here. See Rogers v. Loether, 467 F.2d 1110, 1112 (7th Cir., 1972) aff'd sub nom. Curtis v. Loether, U.S. , 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). A universally appropriate phrasing of the standard is not readily achieved, and we doubt that there is any measurable difference between the federal standard and that of Illinois. In any event we conclude that the standard was fulfilled in this case.

The judgment appealed from is affirmed.
**Seaton v. Sky Realty Co., Inc.**, 491 F.2d 634 (7th Cir. 1974).


**Phillips v. Hunter Trails Community Ass'n.**, 685 F.2d 184, 190 (7th Cir., 1982).
Injuries like the Phillipses' are by their nature difficult to prove. A reviewing court will not demand more precision than is feasible, Crumble v. Blumthal, 549 F.2d 462, 467 (7th Cir. 1977) (extent of intangible harms may be established by testimony of the plaintiff); **Seaton v. Sky Realty Company, Inc., 491 F.2d 634, 636 (7th Cir. 1974)**(humiliation can reasonably be inferred from circumstances). Furthermore, when a judge functions as the trier of fact, as Judge Marshall did here, his estimate of damages for intangible injuries is subject to the "clearly erroneous" rule. Nonetheless we have the "definite and firm conviction that a mistake has been

committed." Busche v. Burkee, 649 F.2d 509, 518 (7th Cir. 1981), certiorari denied, --- U.S. ----, 102 S.Ct. 396, 70 L.Ed.2d 212 quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 1147.

The district judge rested his award of damages for mental and emotional distress on the testimony and demeanor of the Phillipses (App. 47 and n.3). That is an inadequate basis for an award that is more than twice as much as any other victim of housing discrimination has received for intangible injuries, judging from the parties' submissions and our own research. See Parker v. Shonfeld, 409 F.Supp. 876 (N.D.Cal.1976) ($10,000 for humiliation and embarrassment). In this Circuit damages for the intangible injuries of victims of housing discrimination have ranged between $500 and $5,000. It is no answer to such disparity to argue, as appellees do, that "much has been learned (recently) about the damaging effects of discrimination in housing" (Br. *191 32). The district judge did not rely on new-found knowledge.

We have the impression that two factors influenced the district judge. First, the typical housing discrimination case does not involve a $675,000 home. But that is irrelevant to the Phillipses' intangible injuries: the anger and hurt do not correlate with the wealth of the victim or the price of the property. Second, the conduct of the Association was egregious. But that is reflected in the punitive damage assessment. We therefore direct the district court to reduce the compensatory damages to $10,000 for each plaintiff in addition to their actual expenditures of $2,675.

B. Punitive damages

[7] We do not disturb the punitive damage award. As noted, this is the place where the willfulness of the Association's conduct is appropriately weighed. The record contains ample evidence of intentional disregard of the Phillipses' rights, and the district judge gave careful consideration to the Association's financial position as well. He noted that it had a bank balance of $100,000, cash flow from assessments of $142,000 a year, and the ability to raise money by additional assessments if necessary-a course it would have had to follow if it had exercised its first refusal rights on the Broderick property in a nondiscriminatory way (App. 50). The Association's arguments-that "the punitive award will take all of the Association's funds and leave nothing to enable it to carry out its obligations to its members" and that "the effect of this award is not merely to punish the Association but to destroy it" (Br. 33)-are counterfactual. Undoubtedly the punitive damages will cause the Association some hardship, but that is an essential part of their deterrent function.

In addition to its quarrel with the amount of punitive damages, the Association has two theories about why, as a matter of law, they should be unavailable. The first is that Section 3612(c) of the Fair Housing Act should restrict punitive damages to a token $1,000. There is some ambiguity about whether the ceiling in that Section applies to all suits brought under the Fair Housing Act, or only to suits brought under Sections 3603, 3604, 3605, and 3606.[FN7] We need not resolve the issue, however, because

there is no limit on the amount of punitive damages that can be awarded under 42 U.S.C. s 1982, the other prong of this case.
**Phillips v. Hunter Trails Community Ass'n.**, 685 F.2d 184, 190 (7th Cir., 1982).


**Smith v. Wade**, 461 U.S. 30, 32 103 S.Ct. 1625, 1627 (U.S.,1983).

*32 I

The petitioner, William H. Smith, is a guard at Algoa Reformatory, a unit of the Missouri Division of Corrections for youthful first offenders. The respondent, Daniel R. Wade, was assigned to Algoa as an inmate in 1976. In the summer of 1976 Wade voluntarily checked into Algoa's protective custody unit. Because of disciplinary violations during his stay in protective custody, Wade was given a short term in punitive segregation and then transferred to administrative segregation. On the evening of Wade's first day in administrative segregation, he was placed in a cell with another inmate. Later, when Smith came on duty in Wade's dormitory, he placed a third inmate in Wade's cell. According to Wade's testimony, his cellmates harassed, beat, and sexually assaulted him.

Wade brought suit under 42 U.S.C. § 1983 against Smith and four other guards and correctional officials, alleging that his Eighth Amendment rights had **1628 been violated. At trial his evidence showed that he had placed himself in protective custody because of prior incidents of violence against him by other inmates. The third prisoner whom Smith added to the cell had been placed in administrative segregation for fighting. Smith had made no effort to find out whether another cell was available; in fact there was another cell in the same dormitory with only one occupant. Further, only a few weeks earlier, another inmate had been beaten to death in the same dormitory during the same shift, while Smith had been on duty. Wade asserted that Smith and the other defendants knew or should have known that an assault against him was likely under the circumstances.

During trial, the district judge entered a directed verdict for two of the defendants. He instructed the jury that Wade could make out an Eighth Amendment violation only by showing "physical abuse of such base, inhumane and barbaric proportions as to shock the sensibilities." Tr. 639. Further, because of Smith's qualified immunity as a prison *33guard, see *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the judge instructed the jury that Wade could recover only if the defendants were guilty of "gross negligence" (defined as "a callous indifference or a thoughtless disregard for the consequences of one's act or failure to act") or "egregious failure to protect" Wade (defined as "a flagrant or remarkably bad failure to protect"). Tr. 641-642. He reiterated that Wade could not recover on a showing of simple negligence. Tr. 644.

The district judge also charged the jury that it could award punitive damages on a proper showing:

"In addition to actual damages, the law permits the jury, under certain circumstances, to award the injured person punitive and exemplary damages, in order to punish the wrongdoer for some extraordinary

misconduct, and to serve as an example or warning to others not to engage in such conduct.

"If you find the issues in favor of the plaintiff, and if the conduct of one or more of the defendants is shown to be *a reckless or callous disregard of, or indifference to, the rights or safety of others,* then you may assess punitive or exemplary damages in addition to any award of actual damages.

"... The amount of punitive or exemplary damages assessed against any defendant may be such sum as you believe will serve to punish that defendant and to deter him and others from like conduct." Tr. 643 (emphasis added).

The jury returned verdicts for two of the three remaining defendants. It found Smith liable, however, and awarded $25,000 in compensatory damages and $5,000 in punitive damages. The District Court entered judgment on the verdict, and the Court of Appeals affirmed. *Wade v. Haynes,* 663 F.2d 778 (CA8 1981).

In this Court, Smith attacks only the award of punitive damages. He does not challenge the correctness of the instructions ***34** on liability or qualified immunity, nor does he question the adequacy of the evidence to support the verdict of liability for compensatory damages.

II

[1][2] Section 1983 is derived from § 1 of the Civil Rights Act of 1871, 17 Stat. 13. It was intended to create "a species of tort liability" in favor of persons deprived of federally secured rights. ***Carey v. Piphus,** 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978)*; *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 47 L.Ed.2d 128 (1976). We noted in ***Carey*** that there was little in the section's legislative history concerning the damages recoverable for this tort liability, **435 U.S., at 255, 98 S.Ct., at 1048.** In the absence of more specific guidance, we looked first to the common law of torts (both modern and as of 1871), with such modification or adaptation as might be necessary to carry out the purpose and policy of the statute. **435 U.S., at 253-264, 98 S.Ct., at 1046-52.** We have done the same in other contexts ****1629** arising under § 1983, especially the recurring problem of common-law immunities. [FN2]

> FN2. *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 74 L.Ed.2d ---- (1983);*Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Imbler v. Pachtman,* 424 U.S.
>
> 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

Justice REHNQUIST's dissent faults us for referring to modern tort decisions in construing § 1983. Its argument rests on the unstated and unsupported premise that Congress necessarily intended to freeze into permanent law whatever principles were current in 1871, rather than to incorporate applicable general legal principles as they evolve. *Post,* at 1645-1646; see also *post,* at 1658-1659 (O'CONNOR, J., dissenting). The dissents are correct, of course, that when the language of the section and its legislative history provide no clear answer, we have found useful guidance in the law prevailing at the time when § 1983 was enacted; but it does not follow that that law is absolutely controlling, or that current law is irrelevant. On the contrary, if the prevailing view on some point of general tort law had changed substantially in the intervening century (which is not the case here), we might be highly reluctant to assume that Congress intended to perpetuate a now-obsolete doctrine. See ***Carey v. Piphus, 435 U.S. 247, 257-258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978)*** ( "[O]ver the centuries the common law of torts has developed a set **of rules to implement the principle that a person should be compensated fairly for injuries caused by the violation of his legal rights. These rules, defining the elements of damages and the prerequisites for their recovery, provide the appropriate starting point for the inquiry under § 1983 as well**.") (footnote omitted); *Adickes v. Kress & Co.,* 398 U.S. 144, 231-232, 90 S.Ct. 1598, 1641-42, 26 L.Ed.2d 142 (1970) (BRENNAN, J., concurring and dissenting); *Pierson,* 386 U.S., at 555, 87 S.Ct., at 1218 (citing modern authority for "[t]he prevailing view in this country"); *Wood,* 420 U.S., at 318-319, and n. 9, 95 S.Ct., at 999, and n. 9; *Tenney,* 341 U.S., at 375, and n. 5, 71 S.Ct., at 787, and n. 5. Indeed, in *Imbler* we recognized a common-law immunity that first came into existence 25 years after § 1983 was enacted, 424 U.S., at 421-422, 96 S.Ct., at 990-991. Under the dissents' view, *Imbler* was wrongly decided.

**\*35** Smith correctly concedes that "punitive damages are available in a 'proper' § 1983 action ...." *Carlson v. Green,* 446 U.S. 14, 22, 100 S.Ct. 1468, 1473, 64 L.Ed.2d 15 (1980); Brief for Petitioner 8. Although there was debate about the theoretical correctness of the punitive damages doctrine in the latter part of the last century, the doctrine was accepted as settled law by nearly all state and federal courts, including this Court. [FN3] It was likewise generally established that individual public officers were liable for punitive damages for their misconduct on the same basis as other individual defendants. [FN4] See also *Scott v. Donald,* 165 U.S. 58, 77-89, 17 S.Ct. 265, 266-68, 41 L.Ed. 632 (1897) (punitive damages for constitutional tort).

Further, although the precise issue of the availability of punitive damages under § 1983 has never come squarely *36*before us, we have had occasion more than once to make clear our view that they are available; indeed, we have rested decisions on related questions on the premise of such availability. [FN5]

FN3. See, *e.g.,* the cases cited in notes 8 and 12, *infra; Day v. Woodworth,* 54 U.S. (13 How.) 363, 14 L.Ed. 181 (1851); *Philadelphia, W. & B.R. Co. v. Quigley,* 62 U.S. (21 How.) 202, 16 L.Ed. 73 (1858); *Milwaukee & St. P.R. Co. v. Arms,* 91 U.S. 489, 23 L.Ed. 374 (1875); *Missouri Pacific R. Co. v. Humes,*115 U.S. 512, 6 S.Ct. 110, 29 L.Ed. 463 (1885); *Barry v. Edmunds,* 116 U.S. 550, 6 S.Ct. 501, 29 L.Ed. 729 (1886); *Minneapolis & St. L.R. Co. v. Beckwith,*129 U.S. 26, 9 S.Ct. 207, 32 L.Ed. 585 (1889); *Scott v. Donald,* 165 U.S. 58, 17 S.Ct. 265, 41 L.Ed. 632 (1897).

FN4. *E.g., Nightingale v. Scannell,* 18 Cal. 315, 324-326 (1861); *Friend v. Hamill,* 34 Md. 298, 314 (1870); *Lynd v. Picket,* 7 Minn. 184, 200-202 (1862); *Parker v. Shackelford,* 61 Mo. 68, 72 (1875); *Rodgers v. Ferguson,* 36 Tex. 544 (1871); see, *e.g., Stinson v. Buisson,* 17 La. 567, 572-573 (1841);*Nagle v. Mullison,* 34 Pa. 48 (1859); *Von Storch v. Winslow,* 13 R.I. 23, 24-25 (1880). Cf. *Brewer v. Watson,* 71 Ala. 299, 307 (1882). See also, *e.g., Lane v. Yamamoto,* 2 Haw.App. 176, 628 P.2d 634 (Haw.App.1981); *Wilson v. Eagan,*297 N.W.2d 146, 148-150 (Minn.1980).

FN5. In *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), for example, we held that a municipality (as opposed to an individual defendant) is immune from liability for punitive damages under § 1983. A significant part of our reasoning was that deterrence of constitutional violations would be adequately accomplished by allowing punitive damage awards directly against the responsible individuals:

"Moreover, there is available a more effective means of deterrence. By allowing juries and courts to assess punitive damages in appropriate circumstances against the offending official, based on his personal financial resources, the statute [§ 1983] directly advances the public's interest in preventing repeated constitutional deprivations. In our view,

this provides sufficient protection against the prospect that a public official may commit recurrent constitutional violations by

reason of his office." 453 U.S., at 269-270, 101 S.Ct., at 2761 (footnote omitted).

Similarly, in *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), we stated that punitive damages would be available in an action against federal officials directly under the Eighth Amendment, partly on the reasoning that since such damages are available under § 1983, it would be anomalous to allow punitive awards against state officers but not federal ones. *Id.,* at 22, and n. 9, 100 S.Ct., at 1473, and n. 9. See also *Adickes v. Kress & Co.,* 398 U.S., at 233, 90 S.Ct., at 1642 (BRENNAN, J., concurring and dissenting); **Carey v. Piphus,** *435 U.S. 247, 257, n. 11, 98 S.Ct. 1042, 1049, n. 11, 55 L.Ed.2d 252 (1978)*; *Johnson v. Railway Express Agency,* 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (punitive damages available under 42 U.S.C. § 1981).

Justice REHNQUIST's dissent, without squarely denying that punitive damages are available under § 1983, does its best to cast doubt on the proposition. It argues that the phrase "for redress" at the end of the section means that Congress intended to limit recovery to compensatory damages. *Post,* at 1654-1655; see n. 1, *supra.* This novel construction is strained; a more plausible reading of the statute is that the phrase

"or other proper proceeding for redress" is simply an expansive alternative to the preceding phrases "action at law" and "suit in equity," intended to avoid any unwanted technical limitations that might lurk in the other phrases.

Next Justice REHNQUIST points to two other statutes enacted in 1863 and 1870 that provided expressly for punitive remedies. *Post,* at 1655. Neither of these statutes enacted a punitive damages remedy as such, although they did create other forms of punitive civil remedies. The Act of March 2, 1863, § 3, 12 Stat. 696, 698, created a civil fine for fraudulent military claims, apparently intended to stimulate suit by private attorneys general. The Act of July 8, 1870, § 59, 16 Stat. 198, 207, was the treble damages provision of the revised patent code. These statutes do not support Justice REHNQUIST's speculation that Congress acted expressly when it intended to approve punitive damages, since both statutes created new remedies not available at common law; moreover, they undercut his argument that Congress was hostile to punitive civil remedies in favor of private parties.

Finally, Justice REHNQUIST argues that Congress would not likely have approved "this often condemned doctrine" in the 1871 Civil Rights Act. *Post,* at 1654. This speculation is remarkable, to say the least, given that Congress did approve a punitive civil remedy in an 1870 civil rights

act. Act of May 31, 1870, § 2, 16 Stat. 140 (creating private cause of action for fixed penalty on behalf of persons suffering racial discrimination in voting registration). Cf. 1889 Colo.Sess.Laws 64 (enacting punitive damages statute, including awards for "wanton and reckless disregard," five years after state court held against doctrine). At any rate, the punitive damages debate, though lively, was by no means one-sided. See, *e.g., Missouri Pacific R. Co. v. Humes,* 115 U.S., at 521-523, 6 S.Ct., at 113-114; *Linsley v. Bushnell,* 15 Conn. 225, 235- 237 (1842); *Frink & Co. v. Coe,* 4 Greene 555, 559-560 (Iowa 1854); *Chiles v. Drake,* 59 Ky. 146, 152-153 (1859); *Lynd v. Picket,* 7 Minn. 184, 200-201 (1862); *Taylor v. Grand Trunk R. Co.,* 48 N.H. 304, 320 (1869), overruled, *Fay v. Parker,* 53 N.H. 342 (1872); *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895); *Cosgriff Brothers v. Miller,* 10 Wyo. 190, 236-237, 68 P. 206, 216-217 (1901). See also *Tillotson v. Cheetham,* 3 Johns. 55, 63-64 (N.Y.1808) (Kent, Ch.J.).

**\*37 \*\*1630** Smith argues, nonetheless, that this was not a "proper" case in which to award punitive damages. More particularly, he attacks the instruction that punitive damages could be awarded on a finding of reckless or callous disregard of or indifference to Wade's rights or safety. Instead, he contends that the proper test is one of actual malicious intent--"ill will, spite, or intent to injure." [FN6] Brief for Petitioner 9. **\*38\*\*1631** He offers two arguments for this position: first, that actual intent is the proper standard for punitive damages in all cases under § 1983; and second, that even if intent is not always required, it should be required here because the threshold for punitive damages should always be higher than that for liability in the first instance. We address these in turn.

FN6. Smith uses the term "actual malice" to refer to the standard he would apply. While the term may be an appropriate one, we prefer not to use it, simply to avoid the confusion and ambiguity that surrounds the word "malice." See n. 8, *infra.* Indeed, as Smith recognizes, this Court has used the very term "actual malice" in the defamation context to refer to a recklessness standard. Brief for Petitioner 8-9; see *Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 251-252, 95 S.Ct. 465, 469-70, 42 L.Ed.2d 419 (1974); *New York Times Co. v. Sullivan,* 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

We note in passing that it appears quite uncertain whether even Justice REHNQUIST's dissent ultimately agrees with Smith's view that "ill will, spite, or intent to injure" should be required to allow punitive damages awards. Justice REHNQUIST consistently confuses, and attempts to blend

together, the quite distinct concepts of *intent to cause* injury, on one hand, and *subjective consciousness* of risk of injury (or of unlawfulness) on the other. For instance, his dissent purports to base its analysis on the "fundamental distinction" between "wrongful motive, actual intention to inflict harm *or intentional doing of an act known to be unlawful,*" versus "very careless or negligent conduct," *post,* at 1642-1643 (emphasis added). Yet in the same paragraph, the dissent inaccurately recharacterizes the first element of this distinction as "acts that are intentionally harmful," requiring "inquiry into the actor's subjective motive and purpose." *Post,* at 1644. Consciousness of consequences or of wrongdoing, of course, does not require injurious intent or motive; it is equally consistent with indifference toward or disregard for consequences. This confusion of standards continues throughout the opinion. Justice REHNQUIST's dissent frequently uses such phrases as "intent to injure" or "evil motive"; yet at several points it refers more broadly to "subjective mental state" or like phrases, and expressly includes consciousness (as opposed to intent) in its reasoning. *Post,* at 1643-1644, n. 3; 16, n. 7; 17. More telling, perhaps, is its citation of cases and treatises, which frequently and consistently includes authority supporting (at most) a consciousness requirement rather than the "actual intent" standard for which the opinion purports to argue elsewhere. See, *e.g., post,* at nn. 10, 12.

If Justice REHNQUIST does indeed mean to propose a standard reaching subjective consciousness as well as actual injurious intent, one wonders why the instructions given in this case, *supra,* at 1628, do not meet his standard. It is hard to see how Smith could have disregarded or been indifferent to the danger to Wade unless he was subjectively conscious of that danger. If Justice REHNQUIST stands by his "fundamental distinction" and his use of authority, then, he has no apparent reason to dissent from our judgment.


### III

Smith does not argue that the common law, either in 1871 or now, required or requires a showing of actual malicious intent **\*39** for recovery of punitive damages. See Tr. of Oral Arg. 5-6, 9. [FN7]

> FN7. Indeed, the District Judge's instruction on punitive damages in this case was drawn with only slight alteration from a standard jury instruction manual under Missouri state law. See Tr. 576-577; Tr. of Oral Arg. 9, 42-43.

Perhaps not surprisingly, there was significant variation (both terminological and substantive) among American jurisdictions in the latter nineteenth century on the precise standard to be applied in awarding punitive damages--variation that was exacerbated by the ambiguity and slipperiness of such common terms as "malice" and "gross negligence."[FN8] Most of the *40 confusion, however, **1632 seems to have been over the degree of negligence, recklessness, carelessness, or culpable indifference that should be required-- not over whether actual intent *41 was essential. On the contrary, the rule in a large majority of jurisdictions was that punitive damages (also called exemplary damages, vindictive damages, or smart money) could be awarded without a showing of actual ill will, spite, or intent to injure.

> FN8. This terminological difficulty seems to be responsible in some degree for the dissent's error in asserting that intent was the majority rule in 1871, *post,* at 1646-1654. In particular, the dissent argues that "malice," "wantonness," and "willfulness" denoted actual ill will or intent to cause injury. See nn. 10, 12,*infra; post,* at nn. 3, 8, 10, 12. See also n. 6, *supra* (dissent's confusion of knowledge with intent); n. 9, *infra* (concerning "criminal indifference"). With regard to "malice," the assumption is dubious at best; with regard to "wantonness" and "willfulness," it is just plain wrong.

> "Malice," as used by courts and lawyers in the last century, was a hopelessly versatile and ambiguous term, carrying a broad spectrum of
>
> meanings. See generally, *e.g.,* 2 J. Sutherland, A Treatise on the Law of Damages § 394 (3d ed. J. Berryman, 1903); 25 Cyclopedia of Law and Procedure 1666-1669 (1907). As the dissent correctly states, *post,* at 1642-1643, n. 3, in some instances (especially when it was modified by terms such as "actual" or "express," or in criminal law, where terms were generally more strictly construed than in civil law), it meant what the dissent says it meant--actual ill will, spite, or intent to injure. On the other extreme, in tort law, it was often used without modification to mean what was sometimes called "implied malice"--a purely fictional malice that was conclusively presumed to exist whenever a tort resulted from a voluntary act, even if no harm was intended. The term was sometimes, though not often, used in this fictional sense as a ground for punitive

damages. *E.g.*, *Childers v. San Jose Mercury Printing & Publishing Co.,* 105 Cal. 284, 289, 38 P. 903, 904-905 (1894). In other cases it was explained to mean an intent to do the act that caused the injury, as opposed to intent to cause the injury itself. *E.g.*, *Goetz v. Ambs,* 27 Mo. 28, 32-33 (1858). More commonly in the punitive damages context, the term meant something in between fictional malice and actual injurious intent--"that form of malice ... where, without 'deliberate mind' or 'formed design,' the offender has been so grossly and recklessly negligent, so wantonly indifferent to another's rights, that he should be required to

pay damages in excess of mere compensation as a punishment and example."*Press Pub. Co. v. McDonald,* 63 F. 238, 246 (CCA2 1894). Accord, *e.g.,Philadelphia, W. & B.R. Co. v. Quigley,* 62 U.S. (21 How.) 202, 214, 16 L.Ed. 73 (1858); *South & N.A.R. Co. v. McLendon,* 63 Ala. 266, 273-275 (1879); *Yerian v. Linkletter,* 80 Cal. 135, 138, 22 P. 70, 71 (1889) (Paterson, J., concurring);*Cameron v. Bryan,* 89 Iowa 214, 219, 56 N.W. 434 (1893); *Lynd v. Picket,* 7 Minn. 184, 200-202 (1862).

There was considerably less ambiguity or confusion concerning the meaning of "wantonness" in tort law:

"Wanton means reckless--without regard to the rights of others.... Wantonly means causelessly, without restraint, and in reckless disregard of the rights of others. Wantonness is defined as a licentious act of one man towards the person of another, without regard to his rights; it has also been defined as the conscious failure by one charged with a duty to exercise due care and diligence to prevent an injury after the discovery of the peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of the inevitable or probable results of such failure." 30 American and English Encyclopedia of Law 2-4 (2d ed. 1905) (footnotes omitted).

The last sentence of that definition could have been written with this case in mind. See also, *e.g.,* 40 Cyclopedia of Law and Procedure 292-295

(1907). The word was used with the same meaning in the punitive damages context. See, *e.g., Texarkana Gas & Electric Light Co. v. Orr,* 59 Ark. 215, 224, 27 S.W. 66, 68 (1894); *Welch v. Durand,* 36 Conn. 182, 184- 185 (1869);*Southern Kansas R. Co. v. Rice,* 38 Kan. 398, 403-404, 16 P. 817, 820 (1888).

Finally, "willfulness" did not mean intent to cause injury, but only voluntary action:

"Wilful ... generally, as used in courts of law, implies nothing blamable, but merely that the person of whose action or default the expression is used is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to nothing more than this: that he knows what he is doing, and intends to do what he is doing, and is a free agent. And wilfully does not imply that an act done in that spirit was necessarily a malicious act....

\* \* \*

"Wilful neglect or negligence has been defined as that degree of neglect arising where there is a reckless indifference to the safety of human life, or an intentional failure to perform a manifest duty to the public, in the performance of which the public and the party injured had an interest." 30 American and English Encyclopedia of Law 529-535 (2d ed. 1905) (footnotes omitted).

See also, *e.g.,* 40 Cyclopedia of Law and Procedure 944-947 (1907). Again, the punitive damages cases bear this reading out. *Cameron,* 89 Iowa, at 219, 56 N.W., at 434; *Goetz,* 27 Mo., at 32-33; *Chiles v. Drake,* 59 Ky. 146, 152-155 (1859); *Peoria Bridge Assn. v. Loomis,* 20 Ill. 235, 251.

This Court so stated on several occasions, before and shortly after 1871. In *Philadelphia, W. & B. R. Co. v. Quigley,* 62 U.S. (21 How.) 202, 16 L.Ed. 73 (1858), a diversity libel suit, the Court held erroneous an instruction that authorized the jury to return a punitive award but gave the jury virtually no substantive guidance as to the proper threshold. We described the standard thus:
"Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignation, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, *or of criminal indifference to civil obligations." Id.,* 62 U.S. (21 How.) at 214. [FN9]

FN9. Justice REHNQUIST's dissent reads this statement as a requirement of actual intent, *post,* at 1646-1647. This misreading depends in part on the faulty assumption, see n. 8, *supra,* that "malice" always meant intent to injure (*post,* at

1646)--a reading particularly inappropriate in light of the Court's express definition of malice as including "criminal indifference." As for the latter point, Justice REHNQUIST reasons that the term "criminal indifference" must include an element of actual malicious intent. This surprising interpretation of the word "indifference" rests on the unstated and demonstrably false premise that intent to cause injury was always an element of crime. Not only were there crimes of recklessness or negligence (such as reckless homicide), but even crimes of intent commonly required only intent to do the criminal act (and, in some cases, knowledge that the injury would likely follow), rather than actual ill will or purpose to inflict an injury. See, *e.g.,* 1 J. Bishop, Commentaries on the Criminal Law §§ 313-322 (5th ed. 1872); J. May, The Law of Crimes §§ 30, 31, 232, 233 (2d ed. J. Beale, 1893); see also, *e.g.,* Model Penal Code § 2.02(Tent. Draft No. 4, 1955). The case law clearly illustrates that "criminal" did not mean "with injurious intent" in the punitive damages context. *E.g., Hopkins v. Atlantic & St. L.R. Co.,* 36 N.H. 9, 18-19 (1857), overruled on other grounds,*Fay v. Parker,* 53 N.H. 342 (1872); *Brooke v. Clark,* 57 Tex. 105, 112-114 (1882); *Meibus v. Dodge,* 38 Wis. 300, 310-311 (1875).

Justice REHNQUIST also cites *Day v. Woodworth,* 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181 (1851), in support of an actual intent requirement. *Post,* at 1647. The language used in that case ("wanton and malicious, or gross and outrageous") was precisely the precedent that the *Philadelphia* Court was exegeting in the passage quoted in text, when it held that "malice" includes "criminal indifference." Moreover, the *Day* case did not present any issue of punitive damages; the Court discussed them merely as a sidelight to the costs-and-fees issue presented.

**\*42 \*\*1633** The Court further explained the standard for punitive damages in *Milwaukee & St. Paul R. Co. v. Arms,* 91 U.S. 489, 23 L.Ed. 374 (1875), a diversity railroad collision case:
"Redress commensurate to such [personal] injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go farther, unless it was done wilfully, *or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them.* In that case, the jury are authorized, for the sake of public example, to give such additional damages as the circumstances require. The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages.
\* \* \*

"... To [assess punitive damages], there must have been some wilful misconduct, *or that entire want of care *43 which would raise the presumption of a conscious indifference to consequences.*" *Id.,* 91 U.S. at 493, 495 (emphasis added).

The Court therefore held erroneous a jury instruction allowing a punitive award on "gross negligence"; it concluded that the latter term was too vague, and too likely to be confused with mere ordinary negligence, to provide a fair standard. It remanded for a new trial.[FN10]

> FN10. As with *Philadelphia,* n. 9, *supra,* Justice REHNQUIST's dissent reads this case as imposing a requirement of actual malicious intent, on the assumption that when the Court said "indifference to consequences" it really meant "intent to cause consequences," and when it said "recklessness" it really meant "bad motive or intent to injure." *Post,* at 1647-1648. This textual alchemy is untenable. For one thing, Justice REHNQUIST's analysis of the case reflects the confusion in his dissent of motive with consciousness, see n. 6, *supra; post,* at 1648, n. 7. Moreover, the *Milwaukee* Court did not say, or come close to saying, that recklessness is *identical* to intent, or that it is material

only as *evidence* of intent; rather, it said that recklessness is *"equivalent"* to intent, meaning that the two are equally culpable and deserving of punishment and deterrence. 91 U.S., at 493. This also explains the Court's reference, two sentences later, to "evil intent," *ibid.* Justice REHNQUIST's great reliance on this sentence confuses the *standard* for punitive damages with the *rationale* for them. Plainly, read in context, what the Court meant is that punitive damages are justified by the moral culpability of evil intent, or by the "equivalent" culpability of "reckless indifference to the rights of others." See also *Cowen v. Winters,* 96 F. 929, 934-935 (CCA6 1899); *Alabama G.S.R. Co. v. Hill,* 90 Ala. 71, 80, 8 So. 90, 93 (1889); *Memphis & C.R. Co. v. Whitfield,* 44 Miss. 466, 494-495 (1870); *Thirkfield v. Mountain View Cemetery Assn.,* 12 Utah 76, 82, 41 P. 564, 565 (1895). The contrary reading adopted by Justice REHNQUIST's dissent is flatly inconsistent with the Court's reiteration of the rule, 91 U.S., at 495 (emphasis added): "that entire want of care which would raise the presumption of a *conscious indifference to consequences.*" Try as he might, Justice REHNQUIST cannot transform indifference, conscious or otherwise, into intent.

Justice REHNQUIST also relies on a three-sentence capsulization by the Reporter of Decisions of our unreported decision in *Western Union Telegraph Co. v. Eyser,* 91 U.S. 495, decided the same day. While the

Reporter's summary does speak of the absence of "intentional wrong," *id.,* 91 U.S., at 496, the factual context suggests that the basis of decision was the jury instruction that ordinary negligence would warrant punitive damages, combined with the fact that the defendant had taken some affirmative (though insufficient) steps to avoid injury to passersby. Thus, in context, the reference to "intentional wrong" is entirely consistent with the *Milwaukee* decision's test of "conscious indifference"; the defendant in *Western Union* was not indifferent to injury, but instead plainly intended to *avoid* injury.

**\*44 \*\*1634** Ten years later, the Court in dictum suggested that perhaps even gross negligence would suffice after all, at least in some cases: "For injuries resulting from a neglect of duties, in the discharge of which the public is interested, juries are also permitted to assess exemplary damages. These may be perhaps be considered as falling under the head of cases of gross negligence, for any neglect of duties imposed for the protection of life or property is culpable, and deserves punishment." *Missouri Pacific R. Co. v. Humes,* 115 U.S. 512, 521, 6 S.Ct. 110, 113, 29 L.Ed. 463 (1885). See also *Minneapolis & St. L.R. Co. v. Beckwith,* 129 U.S. 26, 34, 9 S.Ct. 207, 209, 32 L.Ed. 585 (1889) ("culpable negligence"). [FN11]

> FN11. In two other cases the Court reaffirmed the *Philadelphia* "criminal indifference" standard and the *Milwaukee* "reckless indifference" standard. *Barry v. Edmunds,* 116 U.S. 550, 563, 6 S.Ct. 501, 508, 29 L.Ed. 729 (1886); *Denver & R.G.R. Co. v. Harris,* 122 U.S. 597, 609-610, 7 S.Ct. 1286, 1289-90, 30 L.Ed. 1146 (1887).

Justice REHNQUIST's dissent relies on two later decisions of this Court, neither of which support it. *Post,* at 1649-1650. In *Lake Shore & M.S.R. Co. v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893), the issue was whether a corporation could be liable in punitive damages for the tort of its employee. The Court, reasoning largely from general principles of *respondeat superior,* held that such vicarious liability could exist only when the employer had authorized or ratified the tort. In so doing, however, it expressly reaffirmed as "well settled" the general standard announced in the *Philadelphia* case, including liability for "criminal indifference." *Id.,* at 107, 13 S.Ct., at 263. Justice REHNQUIST cites a passage quoting from one state case suggesting an intent requirement, *post,* at 1649, but it omits to mention the Court's extensive quotations from *Philadelphia* and *Milwaukee, id.,* at 112-113, 13 S.Ct., at 264-65, and its express approval of and quotation from other state cases stating unequivocally that an employer can be liable

for its own recklessness in hiring unfit employees, *id.,* at 114-116, 13 S.Ct.,

at 265-66. See also n. 9, *supra.* In *Scott v. Donald,* 165 U.S. 58, 71-90, 17 S.Ct. 265, 266-68, 41 L.Ed. 632 (1897), the issue was whether there was a sufficient amount in controversy. The Court held that allegations of "intentional, malicious and repeated interference" with federally protected rights, *id.,* at 89, 17 S.Ct., at 268, were enough, if proved, to warrant punitive damages. The Court undertook no statement of a general standard for punitive damages beyond noting the unsurprising principle that such damages are awardable on proof of actual evil motive, *id.,* at 86, 17 S.Ct., at 267. Under the allegations, of course, no question of liability for less culpable conduct was presented.

**\*45** The large majority of state and lower federal courts were in agreement that punitive damage awards did not require a showing of actual malicious intent; they permitted punitive awards on variously stated standards of negligence, recklessness, or other culpable conduct short of actual malicious intent. [FN12]

FN12. In the often-cited case of *Welch v. Durand,* 36 Conn. 182 (1869), for example, the Court held that punitive damages were proper where the defendant's pistol bullet, fired at a target, ricocheted and hit the plaintiff:

"In what cases then may smart money be awarded in addition to the damages? The proper answer to this question ... seems to be, in actions of tort founded on the malicious or wanton misconduct or culpable neglect of the defendant....

"In this case the defendant was guilty of wanton misconduct and culpable neglect.... It is an immaterial fact that the injury was unintentional, and that the ball glanced from the intended direction.... [I]f the act is done where there are objects from which the balls may glance and endanger others, the act is wanton, reckless, without due care, and grossly negligent." *Id.,* at 185.

In *Frink & Co. v. Coe,* 4 Greene 555 (Iowa 1854), punitive damages were awarded against a stage company for employing a known drunkard as a driver, saying:

"In a case of gross negligence on the part of a stage proprietor, such as the employment of a known drunken driver, and where a

passenger has been injured in consequence of such negligence, we think exemplary damages should be entertained.

....

"If a stage proprietor or carrier is guilty of gross negligence, it amounts to that kind of gross misconduct which will justify a jury in giving exemplary damages, even where an *'intent* or *design'* to do the injury does

not appear." *Id.,* at 559 (emphasis in original).

*Maysville & L.R. Co. v. Herrick,* 76 Ky. 122 (1877), held that the trial court correctly refused to instruct the jury that "willful or intentional wrong" was required to award punitive damages in a railroad accident case, remarking:

"The absence of slight care in the management of a railroad train, or in keeping a railroad track in repair, is gross negligence; and to enable a passenger to recover punitive damages, in a case like this, it is not necessary to show the absence of all care, or 'reckless indifference to the safety of ... passengers,' or 'intentional misconduct' on the part of the agents and officers of the company."*Id., at 127* (ellipsis in original).

Accord, *e.g., Cowen v. Winters,* 96 F. 929, 934-935 (CCA6 1899); *Press Pub. Co. v. McDonald,* 63 F. 238, 245-247 (CCA2 1894); *Morning Journal Ass'n v. Rutherford,* 51 F. 513, 514-515 (CCA2 1892);*Fotheringham v. Adams Express Co.,* 36 F. 252, 253-254 (CC ED Mo.1888);*United States v. Taylor,* 35 F. 484, 488 (CC SD Ala.1888); *Malloy v. Bennett,* 15 F. 371, 373-374 (CC SDNY 1883); *Berry v. Fletcher,* 3 F.Cas. 286, 288 (No. 1,357) (CCD Mo.1870); *Alabama G.S.R. Co. v. Arnold,* 80 Ala. 600, 608, 2 So. 337, 342 (1886); *Texarkana Gas & Electric Light Co. v. Orr,* 59 Ark. 215, 224, 27 S.W. 66, 68 (1894); *Dorsey v. Manlove,* 14 Cal. 553, 555-556 (1860);

*Florida Railway & Navigation Co. v. Webster,* 25 Fla. 394, 419-420, 5 So. 714, 719 (1889); *Jacobus v. Congregation of the Children of Israel,* 107 Ga. 518, 521, 33 S.E. 853, 855 (1899); *Drohn v. Brewer,* 77 Ill. 280, 282-283 (1875);*Citizens' St. R. Co. v. Willoeby,* 134 Ind. 563, 569-570, 33 N.E. 627, 629 (1893); *Sawyer v. Sauer,* 10 Kan. 466, 470 (1872); *Goddard v. Grand Trunk R. Co.,* 57 Me. 202, 218 (1869); *Lynd v. Picket,* 7 Minn. 184, 200-202 (1862);*Memphis & C.R. Co. v. Whitfield,* 44 Miss. 466, 494-495, 500 (1870); *Buckley v. Knapp,* 48 Mo. 152, 161-162 (1871); *Caldwell v. New Jersey Steamboat Co.,* 47 N.Y. 282, 296 (1872); *Sullivan v. Oregon Railway & Navigation*

*Co.*, 12 Or. 392, 404-406, 7 P. 508, 517 (1885) (dictum); *Lake Shore & M.S.R. Co. v. Rosenzweig, 113 Pa. 519, 543-544, 6 A. 545, 552-553 (1886); Hart v. Railroad Co., 33 S.C. 427, 435-436, 12 S.E. 9, 10 (1890); Haley v. Mobile & O.R. Co., 66 Tenn. 239, 242-243 (1874); Brooke v. Clark, 57 Tex. 105, 112-114 (1882); Thirkfield v. Mountain View Cemetery Assn., 12 Utah 76, 82, 41 P. 564, 564-565 (1895); Earl v. Tupper, 45 Vt. 275, 286-287 (1873) (dictum); Borland v. Barrett, 76 Va. 128, 132-134 (1882); Pickett v. Crook, 20 Wis. 358, 359 (1866); Union Pacific R. Co. v. Hause, 1 Wyo. 27, 35 (1871).*

Justice REHNQUIST's assertion that a "solid majority of jurisdictions" required actual malicious intent, post, at 1654, is simply untrue. In

fact, there were fairly few jurisdictions that imposed such a requirement, and fewer yet that adhered to it consistently. Justice REHNQUIST's attempt to establish this proposition with case citations, post, n. 12, does not offer him substantial support. Because the point is not of controlling significance, see n. 2, supra, we will not tarry here to analyze his citations case-by-case or state-by-state, but will only summarize the main themes.

Several of Justice REHNQUIST's cases actually offer unequivocal support for the rule that punitive damages are available on a showing of negligence, recklessness, disregard for or indifference to the rights of others, and various other standards short of actual ill will or injurious intent. In this same vein, Justice REHNQUIST continues to try to equate consciousness or knowledge with actual ill will or intent to injure, see n. 6, supra.

Other cases do not clearly support either Justice REHNQUIST's view or ours. Some of these contain contradictory language in their formulations, indicating that the present distinction perhaps did not occur to the writers. Others support Justice REHNQUIST's rule only if one makes the questionable assumption, see nn. 8, 9, supra, that terms like "malice," "wantonness," and "criminal" always meant actual intent to injure. Still others simply ruled on collateral questions (such as the admissibility of evidence of bad motive or of good faith) without purporting to state any

general standard for punitive damages. Some were apparently limited to particular classes of torts. A comparison of this class of cases with those cited supra, this note, reveals that in many instances other decisions of the same courts clear up any ambiguity in favor of a recklessness or negligence standard.

A third class of cases are those in which the courts simply affirmed awards of punitive damages based on evidence of, or jury instructions requiring, actual malicious intent, without discussing whether a lesser showing might also be adequate. Often the cases in this category involved assault and battery or similar torts, where the facts presented little problem of negligence or recklessness. See also n. 11, supra. As with the previous category, many of the same courts spoke more directly in other cases, making it clear that injurious intent was not required.

Finally, even of those comparatively few cases that do seem to support Justice REHNQUIST's view, many are of debatable authority. In nearly every State there was at least some late nineteenth-century authority supporting awards on less than ill will or intent to injure. Admittedly, in a few States this was the less accepted view, but in a substantial majority of jurisdictions the prevailing rule (as evidenced by the cases cited supra, this note, and numerous other cases not listed here) was that no such actual malicious intent was required.

**\*46 \*\*1635** The same rule applies today. The Restatement (Second) of Torts (1977), for example, states: "Punitive damages may be awarded for conduct that is outrageous, because **\*\*1636** of the defendant's **\*47** evil motive or his reckless indifference to the rights of others." Id., § 908(2) (emphasis added); see also id., Comment b. Most cases under state common law, although varying in **\*48** their precise terminology, have adopted more or less the same rule, recognizing that punitive damages in tort cases may be awarded not only for actual intent to injure or evil motive, but also for recklessness, serious indifference to or disregard for the rights of others, or even gross negligence.[FN13]

> FN13. Loch Ridge Construction Corp. v. Barra, 291 Ala. 312, 280 So.2d 745 (1973); Sturm, Ruger & Co. v. Day, 594 P.2d 38 (Alaska 1979), modified on other grounds, 615 P.2d 621, 624 (Alaska 1980), modified on other grounds, 627 P.2d 204 (Alaska 1981); Huggins v. Deinhard, 127 Ariz. 358, 621 P.2d 45 (App.1980); White v. Brock, 41 Colo.App. 156, 584 P.2d 1224 (1978); Collens v. New Canaan Water Co., 155 Conn. 477, 234 A.2d 825 (1967); Sheats v. Bowen, 318 F.Supp. 640 (Del.1970) (Delaware law); Spar v. Obwoya, 369 A.2d 173 (D.C.1977); Adams v. Whitfield, 290 So.2d 49 (Fla.1974); Randall v. Ganz, 96
>
> Idaho 785, 537 P.2d 65 (1975); Pendowski v. Patent Scaffolding Co., 89 Ill.App.3d 484, 44 Ill.Dec. 544, 411 N.E.2d 910 (1980),

*appeal denied (Ill.1981); Meyer v. Nottger, 241 N.W.2d 911 (Iowa 1976); Ford v. Guarantee Abstract & Title Co., 220 Kan. 244, 553 P.2d 254 (1976); Pettengill v. Turo, 159 Me. 350, 193 A.2d 367 (1963); American Laundry Machine Industries v. Horan,45 Md.App. 97, 412 A.2d 407 (1980); Bailey v. Graves, 411 Mich. 510, 309 N.W.2d 166 (1981); Huebsch v. Larson, 291 Minn. 361, 191 N.W.2d 433 (1971);Mississippi Power Co. v. Jones, 369 So.2d 1381 (Miss.1979); Stenson v. Laclede Gas Co., 553 S.W.2d 309 (Mo.App.1977); Butcher v. Petranek, 181 Mont. 358, 593 P.2d 743 (1979); Berg v. Reaction Motors Division, 37 N.J. 396, 181 A.2d 487 (1962); Robison v. Katz, 94 N.M. 314, 610 P.2d 201 (App.), cert. denied,94 N.M. 675, 615 P.2d 992 (1980); Soucy v. Greyhound Corp., 27 App.Div.2d 112, 276 N.Y.S.2d 173 (1967); Newton v. Standard Fire Insurance Co., 291 N.C. 105, 229 S.E.2d 297 (1976); Dahlen v. Landis, 314 N.W.2d 63 (N.D.1981);Leichtamer v. American Motors Corp., 67 Ohio St.2d 456, 424 N.E.2d 568 (1981); Smith v. Johnston, 591 P.2d 1260 (Okl.1978); Focht v. Rabada, 217 Pa.Super. 35, 268 A.2d 157 (1970); Sherman v. McDermott, 114 R.I. 107, 329 A.2d 195 (1974); King v. Allstate Insurance Co., 272 S.Ct. 259, 251 S.E.2d 194 (1979); Hannahs v. Noah, 83 S.D. 296, 158 N.W.2d 678 (1968); Inland Container Corp. v.*

*March, 529 S.W.2d 43 (Tenn.1975); Shortle v. Central Vermont Public Service Corp., 132 Vt. 32, 399 A.2d 517 (1979); Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437 (1980).*

The remaining question is whether the policies and purposes of § 1983 itself require a departure from the rules of tort common law. As a general matter, we discern no reason why a person whose federally guaranteed rights have **\*49** been violated should be granted a more restrictive remedy than a person asserting an ordinary tort cause of action. Smith offers us no persuasive reason to the contrary.

Smith's argument, which he offers in several forms, is that an actual intent standard is preferable to a recklessness standard because it is less vague. He points out that punitive damages, by their very nature, are not awarded to compensate the injured party. See*Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266-267, 101 S.Ct. 2748, 2759-60, 69 L.Ed.2d 616 (1981); *Electrical Workers v. Foust,* 442 U.S. 42, 48, 99 S.Ct. 2121, 2125-26, 60 L.Ed.2d 698 (1979); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349-350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). He concedes, of course, that deterrence of future egregious conduct is a primary purpose of both § 1983, see *Newport,* 453 U.S., at 268, 101 S.Ct., at 2760; *Owen v. City of Independence,* 445 U.S. 622, 651, 100 S.Ct. 1398, 1415, 63 L.Ed.2d 673 (1980); *Robertson v. Wegmann,* 436 U.S. 584, 591, 98 S.Ct. 1991, 1995, 56 L.Ed.2d 554 (1978), and of punitive damages, see *Newport,* 453 U.S., at

268, 101 S.Ct., at 2760; Restatement (Second) of Torts § 908(1) (1977). But deterrence, he contends, cannot be achieved unless the standard of conduct sought to be deterred is stated with sufficient clarity to enable potential defendants to conform to the law and to avoid the proposed sanction. Recklessness or callous indifference, he argues, is too uncertain a standard to achieve deterrence rationally and fairly. A prison guard, for example, can be expected to know whether he is acting with actual ill will or intent to injure, but not whether he is being reckless or callously indifferent. **1637 Smith's argument, if valid, would apply to ordinary tort cases as easily as to § 1983 suits; hence, it hardly presents an argument for adopting a different rule under § 1983. In any event, the argument is unpersuasive. While, *arguendo,* an intent standard may be easier to understand and apply to particular situations than a recklessness standard, we are not persuaded that a recklessness standard is too vague to be fair or useful. In the *Milwaukee* case, 91 U.S. 489, 23 L.Ed. 374 we adopted a recklessness standard rather than a gross negligence standard precisely because recklessness would better serve the need for adequate clarity and fair application. Almost *50 a century later, in the First Amendment context, we held that punitive damages cannot be assessed for defamation in the absence of proof of "knowledge of falsity or reckless disregard for the truth." *Gertz,* 418 U.S., at 349, 94 S.Ct., at 3011. Our concern in *Gertz* was that the threat of punitive damages, if not limited to especially egregious cases, might "inhibit the vigorous exercise of First Amendment freedoms," *ibid.*--a concern at least as pressing as any urged by Smith in this case. Yet we did not find it necessary to impose an actual intent standard there. Just as Smith has not shown why § 1983 should give higher protection from punitive damages than ordinary tort law, he has not explained why it gives higher protection than we have demanded under the First Amendment.

More fundamentally, Smith's argument for certainty in the interest of deterrence overlooks the distinction between a standard for punitive damages and a standard of liability in the first instance. Smith seems to assume that prison guards and other state officials look mainly to the standard for punitive damages in shaping their conduct. We question the premise; we assume, and hope, that most officials are guided primarily by the underlying standards of federal substantive law--both out of devotion to duty, and in the interest of avoiding liability for compensatory damages. At any rate, the conscientious officer who desires clear guidance on how to do his job and avoid lawsuits can and should look to the standard for actionability in the first instance. The need for exceptional clarity in the standard for punitive damages arises only if one assumes that there are substantial numbers of officers who will not be deterred by compensatory damages; only such officers will seek to guide their conduct by the punitive damages standard. The presence of such officers constitutes a powerful argument *against* raising the threshold for punitive damages.

In this case, the jury was instructed to apply a high standard of constitutional right ("physical abuse of such base, inhumane and barbaric proportions as to shock the sensibilities"). It was also instructed, under the

principle of *51 qualified immunity, that Smith could not be held liable at all unless he was guilty of "a callous indifference or a thoughtless disregard for the consequences of [his] action or failure to act," or of "a flagrant or remarkably bad failure to protect" Wade. These instructions are not challenged in this Court, nor were they challenged on grounds of vagueness in the lower courts. Smith's contention that this recklessness standard is too vague to provide clear guidance and reasonable deterrence might more properly be reserved for a challenge seeking different standards of liability in the first instance. As for punitive damages, however, in the absence of any persuasive argument to the contrary based on the policies of § 1983, we are content to adopt the policy judgment of the common law--that reckless or callous disregard for the plaintiff's rights, as well as intentional violations of federal law, should be sufficient to trigger a jury's consideration of the appropriateness of punitive damages. See _Adickes v. Kress & Co._, 398 U.S. 144, 233, 90 S.Ct. 1598, 1642, 26 L.Ed.2d 142 (1970) (BRENNAN, J., concurring and dissenting).

IV

Smith contends that even if § 1983 does not ordinarily require a showing of actual**_1638_ malicious intent for an award of punitive damages, such a showing should be required in this case. He argues that the deterrent and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability in the first instance. In this case, while the district judge did not use the same precise terms to explain the standards of liability for compensatory and punitive damages, the parties agree that there is no substantial difference between the showings required by the two instructions; both apply a standard of reckless or callous indifference to Wade's rights. Hence, Smith argues, the district judge erred in not requiring a higher standard for punitive damages, namely, actual malicious intent.

This argument incorrectly assumes that, simply because the instructions specified the same _threshold_ of liability for *52 punitive and compensatory damages, the two forms of damages were equally available to the plaintiff. The argument overlooks a key feature of punitive damages--that they are never awarded as of right, no matter how egregious the defendant's conduct. "If the plaintiff proves sufficiently serious misconduct on the defendant's part, the question whether to award punitive damages is left to the jury, which may or may not make such an award." D. Dobbs, Handbook on the Law of Remedies 204 (1973) (footnote omitted). [FN14] Compensatory damages, by contrast, are mandatory; once liability is found, the jury is required to award compensatory damages in an amount appropriate to compensate the plaintiff for his loss. [FN15] Hence, it is not entirely accurate that punitive and compensatory damages were awarded in this case on the same standard. To make its punitive award, the jury was required to find not only that Smith's conduct met the recklessness threshold (a question of ultimate fact), but _also_ that his conduct merited a punitive award of $5,000 in addition to the compensatory award (a discretionary moral judgment).

FN14. See also, *e.g.,* Restatement (Second) of Torts § 908, comment *d* (1977); J. Ghiardi & J. Kircher, Punitive Damages Law and Practice § 5.38 (1981); C. McCormick, Handbook on the Law of Damages 296 (1935); W. Prosser, Handbook on the Law of Torts 13 (4th ed. 1971); K. Redden, Punitive Damages § 3.4(A) (1980); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1277-1278, n. 15 (CA3 1979) (en banc).

FN15. The instructions in this case recognized this difference in treatment. The jury was instructed:

"If you find the issues in favor of the plaintiff, then you *must* award the plaintiff such sum as you believe will fairly and justly compensate the plaintiff for any damages you believe he sustained as a direct result of the conduct of the defendants ....

"In addition to actual damages, the law *permits* the jury, under certain circumstances, to award the injured person punitive and exemplary damages ....

"If you find the issues in favor of the plaintiff, and if the conduct of one or more of the defendants is shown to be a reckless or callous disregard of, or indifference to, the rights or safety of others, then you *may* assess punitive or exemplary damages in addition to any award of actual damages." Tr. 642-643 (emphasis added).

**\*53** Moreover, the rules of ordinary tort law are once more against Smith's argument. There has never been any general common-law rule that the threshold for punitive damages must always be higher than that for compensatory liability. On the contrary, both the First and Second Restatements of Torts have pointed out that "in torts like malicious prosecution that require a particular antisocial state of mind, the improper motive of the tortfeasor is both a necessary element in the cause of action and a reason for awarding punitive damages." [FN16] Accordingly, in situations where the standard for compensatory liability is as high as or higher than the usual threshold for punitive damages, most **\*\*1639** courts will permit awards of punitive damages without requiring any extra showing. Several courts have so held expressly. [FN17] Many other courts, not directly addressing the congruence of compensatory and punitive thresholds, have held that punitive damages are available on the same showing of fault as is required by the underlying tort in, for example, intentional infliction of emotional distress, [FN18]defamation of a public official **\*54** or public

figure, [FN19] and defamation covered by a common-law qualified immunity. [FN20]

FN16. Restatement of Torts § 908, comment c (1939); Restatement (Second) of Torts § 908, comment c (1977).

Although there is general agreement with the broad principle of § 908, comment c, there is authority suggesting that the tort of malicious prosecution may have been a poorly chosen illustration of it. See, e.g., Adams v. Whitfield, 290 So.2d 49 (Fla.1974); Jordan v. Sauve, 219 Va. 448, 247 S.E.2d 739 (1978).

FN17. Huggins v. Deinhard, 127 Ariz. 358, 359-360, 621 P.2d 45, 46-47 (App.1980); Fletcher v. Western National Life Insurance Co., 10 Cal.App.3d 376, 404, 89 Cal.Rptr. 78, 95 (1970); Sere v. Group

Hospitalization, Inc., 443 A.2d 33, 37-38 (D.C.1982); Meyer v. Nottger, 241 N.W.2d 911, 922 (Iowa 1976); Newton v. Standard Fire Insurance Co., 291 N.C. 105, 112, 229 S.E.2d 297, 301-302 (1976) (dictum); Hall v. May Department Stores Co., 292 Ore. 131, 144-145, 637 P.2d 126, 134-135 (1981);Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1276- 1278 (CA3 1979) (en banc) (Pennsylvania law); Johnson v. Woman's Hospital, 527 S.W.2d 133, 141-142 (Tenn.App.), cert. denied (Tenn.1975).

FN18. See, e.g., Fletcher v. Western National Life Insurance Co., 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970); Sere v. Group Hospitalization, Inc., 443 A.2d 33 (D.C.1982); Cape Publications, Inc. v. Bridges, 387 So.2d 436 (Fla.App.1980);Meyer v. Nottger, 241 N.W.2d 911 (Iowa 1976); Hall v. May Department Stores Co., 292 Ore. 131, 637 P.2d 126 (1981); Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (CA3 1979) (en banc) (Pennsylvania law). See also Johnson v. Woman's Hospital, 527 S.W.2d 133 (Tenn.App.), cert. denied (Tenn.1975) (tort of outrageous conduct). Contra, Knierim v. Izzo, 22 Ill.2d 73, 174 N.E.2d 157 (1961).

FN19. See, e.g., Davis v. Schuchat, 166 U.S.App.D.C. 351, 510 F.2d 731 (1975)(District of Columbia law); Fopay v. Noveroske, 31

Ill.App.3d 182, 334 N.E.2d 79 (1975) (New York law); *Sprouse v. Clay Communication, Inc.,* 211 S.E.2d 674 (W.Va.1975) (dictum). See also *Cape Publications, Inc. v. Bridges,* 387 So.2d 436 (Fla.App.1980) (false light).

In citing the cases in this footnote and in footnote 20, *infra,* we intimate no view on any First Amendment issues they may raise.

FN20. *E.g., Pirre v. Printing Developments, Inc.,* 468 F.Supp. 1028 (SDNY)(Connecticut & New York law), aff'd mem., 614 F.2d 1290 (CA2 1979); *Weenig v. Wood,* 169 Ind.App. 413, 349 N.E.2d 235 (1976); *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252 (Minn.1980); *Snodgrass v. Headco Industries, Inc.,* 640 S.W.2d 147 (Mo.App.1982); *Miller v. Lear Siegler, Inc.,* 525 F.Supp. 46 (Kan.1981) (Oklahoma law). See also n. 19, *supra.*

This common-law rule makes sense in terms of the purposes of punitive damages. Punitive damages are awarded in the jury's discretion "to punish [the defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1977). The focus is on the character of the tortfeasor's conduct-- whether it is of the sort that calls for deterrence and punishment over and above that provided by compensatory awards. If it is of such a character, then it is appropriate to allow a jury to assess punitive damages; and that assessment does not become less appropriate simply because the plaintiff in the case faces a more demanding standard of actionability. To put it differently, society has an interest in deterring and punishing *all* intentional or reckless invasions of the rights of others, even though it sometimes ***55*** chooses not to impose any liability for lesser degrees of fault. [FN21]

FN21. "Moreover, after ***Carey*** punitive damages may be the only significant remedy available in some § 1983 actions where constitutional rights are maliciously violated but the victim cannot prove compensable injury." *Carlson,* 446 U.S., at 22, n. 9, 100 S.Ct., at 1473, n. 9.

As with his first argument, Smith gives us no good reason to depart from the common-law rule in the context of § 1983. He argues that too low a standard of exposure to punitive damages in cases such as this threatens to undermine the policies of his qualified immunity as a prison guard. The same reasoning would apply with at least as much force to, for example, the First Amendment and common-law immunities involved in the defamation cases

described above. In any case, Smith overstates the extent of his immunity. Smith is protected from liability for mere negligence because of the need to protect his use of discretion in his day-to-day decisions in the running of a correctional facility. See generally *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). But the immunity on which **\*\*1640** Smith relies is coextensive with the interest it protects. [FN22]The very fact that the privilege is qualified reflects a recognition there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of the prisoners in his charge. Once the protected sphere of privilege is exceeded, we see no reason why state officers should not be liable for their reckless misconduct on the same basis as private tortfeasors. [FN23]

> FN22. As we noted *supra,* at 3, Smith does not challenge the instruction on qualified immunity. We therefore assume for purposes of this case that the instruction was correct. See generally, *e.g., Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

> FN23. We reject Justice REHNQUIST's argument, *post,* at 1658, that it somehow makes a difference that this suit was brought in federal court--as though it were inappropriate or unseemly that federal courts dare to

> enforce federal rights vigorously. Indeed, one wonders whether Justice REHNQUIST would complain as loudly if this § 1983 suit had been brought in state court, as it could have been. Although Justice REHNQUIST casts his argument as an attack on meddling by federal *courts,* the true thrust of his complaint seems to be against federal *law --i.e.,* the Civil Rights Act of 1871. We have explained at length why we think that the policies of that statute call for our holding today.

### *56 V

We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. Because the jury instructions in this case are in accord with this rule, the judgment of the Court of Appeals is

*Affirmed.*

**Smith v. Wade**, 461 U.S. 30, 32 103 S.Ct. 1625, 1627 (U.S.,1983).

**Jackson v. Birmingham Bd. of Educ.**, 544 U.S. 167, 125 S.Ct. 1497 (U.S.,2005).

*\*171* Roderick Jackson, a teacher in the Birmingham, Alabama, public schools, brought suit against the Birmingham Board of Education (Board) alleging that the Board retaliated against him because he had complained about sex discrimination in the high school's athletic program. Jackson claimed that the Board's retaliation violated Title IX of the Education Amendments of 1972, Pub.L. 92-318, 86 Stat. 373, as amended, 20 U.S.C. § 1681 et seq. The District Court dismissed Jackson's complaint on the ground that Title IX does not prohibit retaliation, and the Court of Appeals for the Eleventh Circuit affirmed.309 F.3d 1333 (C.A.11 2002). We consider here whether the private right of action implied by Title IX encompasses claims of retaliation. We hold that it does where the funding recipient retaliates against an individual because he has complained about sex discrimination.

I

[1] ☑ Because Jackson's Title IX claim was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, *\*1503*"we must assume the truth of the material facts as alleged in the complaint." *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991).

According to the complaint, Jackson has been an employee of the Birmingham school district for over 10 years. In 1993, the Board hired Jackson to serve as a physical education teacher and girls' basketball coach. Jackson was transferred to Ensley High School in August 1999. At Ensley, he discovered that the girls' team was not receiving equal funding and equal access to athletic equipment and facilities. The lack of adequate funding, equipment, and facilities made it difficult for Jackson to do his job as the team's coach.

In December 2000, Jackson began complaining to his supervisors about the unequal treatment of the girls' basketball team, but to no avail. Jackson's complaints went unanswered, and the school failed to remedy the situation. Instead,*\*172* Jackson began to receive negative work evaluations and ultimately was removed as the girls' coach in May 2001. Jackson is still employed by the Board as a teacher, but he no longer receives supplemental pay for coaching.

After the Board terminated Jackson's coaching duties, he filed suit in the United States District Court for the Northern District of Alabama. He alleged, among other things, that the Board violated Title IX by retaliating against him for protesting the discrimination against the girls' basketball team. Amended Complaint 2-3, App. 10-11. The Board moved to dismiss on the

ground that Title IX's private cause of action does not include claims of retaliation. The District Court granted the motion to dismiss.

The Court of Appeals for the Eleventh Circuit affirmed. 309 F.3d 1333 (2002). It assumed, for purposes of the appeal, that the Board retaliated against Jackson for complaining about Title IX violations. It then held that Jackson's suit failed to state a claim because Title IX does not provide a private right of action for retaliation, reasoning that "[n]othing in the text indicates any congressional concern with retaliation that might be visited on those who complain of Title IX violations." _Id.,_ at 1344. Relying on our decision in _Alexander v. Sandoval,_ 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Court of Appeals also concluded that a Department of Education regulation expressly prohibiting retaliation does not create a private cause of action for retaliation: "Because Congress has not created a right through Title IX to redress harms resulting from retaliation, [the regulation] may not be read to create one either." 309 F.3d, at 1346. Finally, the court held that, even if Title IX prohibits retaliation, Jackson would not be entitled to relief because he is not within the class of persons protected by the statute.

We granted certiorari, 542 U.S. 903, 124 S.Ct. 2834, 159 L.Ed.2d 266 (2004), to resolve a conflict in the Circuits over whether Title IX's private right of action encompasses claims of retaliation for complaints about sex discrimination. Compare **\*173**_Lowrey v. Texas A & M Univ. System,_ 117 F.3d 242, 252 (C.A.5 1997) ("[T]itle IX affords an implied cause of action for retaliation"); _Preston v. Virginia ex rel. New River Community College,_ 31 F.3d 203, 206 (C.A.4 1994) (same), with the case below, _supra._

II

A

Title IX prohibits sex discrimination by recipients of federal education funding. The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied **\*\*1504** the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). More than 25 years ago, in _Cannon v. University of Chicago,_ 441 U.S. 677, 690-693, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), we held that Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination. In subsequent cases, we have defined the contours of that right of action. In _Franklin v. Gwinnett County Public Schools,_ 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), we held that it authorizes private parties to seek monetary damages for intentional violations of Title IX. We have also held that the private right of action encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student, _Gebser v. Lago Vista Independent School Dist.,_ 524 U.S. 274, 290-291, 118 S.Ct. 1989, 141 L.Ed.2d 277

(1998), or to sexual harassment of a student by another student, *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 642, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

[2] ☑[3] ☑ In all of these cases, we relied on the text of Title IX, which, subject to a list of narrow exceptions not at issue here, broadly prohibits a funding recipient from subjecting any person to "discrimination" "on the basis of sex." 20 U.S.C. § 1681. Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action. Retaliation is, by definition, an intentional *174 act. It is a form of "discrimination" because the complainant is being subjected to differential treatment. See generally *Olmstead v. L. C.,* 527 U.S. 581, 614, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999)(KENNEDY, J., concurring in judgment) (the "normal definition of discrimination" is "differential treatment"); see also *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 682, n. 22, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983) (discrimination means "less favorable" treatment). Moreover, retaliation is discrimination "on the basis of sex" because it is an intentional response to the nature of the complaint: an allegation of sex discrimination. We conclude that when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional "discrimination" "on the basis of sex," in violation of Title IX.

[4] ☑[5] ☑[6] ☑ The Court of Appeals' conclusion that Title IX does not prohibit retaliation because the "statute makes no mention of retaliation," 309 F.3d, at 1344, ignores the import of our repeated holdings construing "discrimination" under Title IX broadly. Though the statute does not mention sexual harassment, we have held that sexual harassment is intentional discrimination encompassed by Title IX's private right of action. *Franklin,* 503 U.S., at 74-75, 112 S.Ct. 1028; see also *id., at 75,* 112 S.Ct. 1028(noting that, under *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), " 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor "discriminate[s]" on the basis of sex,' " and holding that "the same rule should apply when a teacher sexually harasses ... a student"). Thus, a recipient's deliberate indifference to a teacher's sexual harassment of a student also "violate[s] Title IX's plain terms." *Davis, supra,* at 643, 119 S.Ct. 1661 (citing *Gebser, supra, at* 290-291, 118 S.Ct. 1989). Likewise, a recipient's deliberate indifference to sexual harassment of a student by another student also squarely constitutes "discrimination" "on the basis of sex." *Davis,* 526 U.S., at 643, 119 S.Ct. 1661; see also **1505 *id., at 650,* 119 S.Ct. 1661 ("Having previously determined that 'sexual harassment' is 'discrimination' ... under Title IX, we are constrained to conclude *175 that student-on-student sexual harassment, if sufficiently severe, can likewise rise to the level of discrimination actionable under the statute"). "Discrimination" is a term that covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad

reach. See *North Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (Courts " 'must accord' " Title IX " 'a sweep as broad as its language' ").

Congress certainly could have mentioned retaliation in Title IX expressly, as it did in § 704 of Title VII of the Civil Rights Act of 1964, 78 Stat. 257, as amended, 86 Stat. 109, 42 U.S.C. § 2000e-3(a) (providing that it is an "unlawful employment practice" for an employer to retaliate against an employee because he has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]"). Title VII, however, is a vastly different statute from Title IX, see *Gebser,* 524 U.S., at 283-284, 286-287, 118 S.Ct. 1989, and the comparison the Board urges us to draw is therefore of limited use. Title IX's cause of action is implied, while Title VII's is express. See *id.,* at 283-284, 118 S.Ct. 1989. Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition. See 20 U.S.C. § 1681. By contrast, Title VII spells out in greater detail the conduct that constitutes discrimination in violation of that statute. See 42 U.S.C. §§ 2000e-2 (giving examples of unlawful employment practices), 2000e-3 (prohibiting "[o]ther unlawful employment practices," including (a) "[d]iscrimination" in the form of retaliation; and (b) the discriminatory practice of "[p]rinting or publication of notices or advertisements indicating prohibited preference ... "). Because Congress did not list *any* specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.

**\*176** Title IX was enacted in 1972, three years after our decision in *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). In *Sullivan,* we held that Rev. Stat. § 1978, 42 U.S.C. § 1982, which provides that "[a]ll citizens of the United States shall have the same right ... as is enjoyed by white citizens ... to inherit, purchase, lease, sell, hold, and convey real and personal property," protected a white man who spoke out against discrimination toward one of his tenants and who suffered retaliation as a result. Sullivan had rented a house to a black man and assigned him a membership share and use rights in a private park. The corporation that owned the park would not approve the assignment to the black lessee. Sullivan protested, and the corporation retaliated against him by expelling him and taking his shares. Sullivan sued the corporation, and we upheld Sullivan's cause of action under 42 U.S.C. § 1982 for "[retaliation] for the advocacy of [the black person's] cause." 396 U.S., at 237, 90 S.Ct. 400. Thus, in *Sullivan* we interpreted a general prohibition on racial discrimination to cover retaliation against those who advocate the rights of groups protected by that prohibition.[FN1]

FN1. Justice THOMAS contends that *Sullivan* merely decided that the white owner had standing to assert the rights of the black

lessee. *Post,* at 1516 (dissenting opinion). But *Sullivan's* holding was not so limited. It plainly held that the white owner could maintain his *own* private cause of action under § 1982 if he could show that he was "punished for trying to vindicate the rights of minorities." 396 U.S., at 237, 90 S.Ct. 400.


**\*\*1506** [7] ☑ Congress enacted Title IX just three years after *Sullivan* was decided, and accordingly that decision provides a valuable context for understanding the statute. As we recognized in *Cannon,* "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with *[Sullivan]* and that it expected its enactment [of Title IX] to be interpreted in conformity with [it]." 441 U.S., at 699, 99 S.Ct. 1946; see also *id.,* at 698, n. 22, 99 S.Ct. 1946. Retaliation for Jackson's advocacy of the rights of the girls' basketball team in this case is "discrimination"**\*177** "on the basis of sex," just as retaliation for advocacy on behalf of a black lessee in *Sullivan* was discrimination on the basis of race.


## B

The Board contends that our decision in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), compels a holding that Title IX's private right of action does not encompass retaliation. *Sandoval* involved an interpretation of Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U.S.C. § 2000d *et seq.* , which provides in § 601 that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d. Section 602 of Title VI authorizes federal agencies to effectuate the provisions in § 601 by enacting regulations. Pursuant to that authority, the Department of Justice promulgated regulations prohibiting funding recipients from adopting policies that had "the effect of subjecting individuals to discrimination because of their race, color, or national origin." 28 CFR § 42.104(b)(2) (1999).
The *Sandoval* petitioners brought suit to enjoin an English-only policy of the Alabama Department of Public Safety on grounds that it disparately impacted non-English speakers in violation of the regulations. Though we assumed that the regulations themselves were valid, see 532 U.S., at 281, 121 S.Ct. 1511, we rejected the contention that the private right of action to enforce intentional violations of Title VI encompassed suits to enforce the disparate-impact regulations. We did so because "[i]t is clear ... that the disparate-impact regulations do not simply apply § 601-since they indeed forbid conduct that § 601 permits-and therefore clear that the private right of action to enforce § 601 does not include a private right to enforce these regulations." *Id.,* at 285, 121 S.Ct. 1511. See also *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 **\*178** 1994) (A "private plaintiff may not bring a

[suit based on a regulation] against a defendant for acts not prohibited by the text of [the statute]"). Thus, *Sandoval* held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination.

The Board cites a Department of Education regulation prohibiting retaliation "against any individual for the purpose of interfering with any right or privilege secured by [Title IX]," 34 CFR § 100.7(e) (2004) (incorporated by reference by § 106.71), and contends that Jackson, like the petitioners in *Sandoval,* seeks an "impermissible extension of the statute" when he argues that Title IX's private right of action encompasses retaliation. Brief for Respondent 45. This argument, however, entirely misses the point. We do not rely **\*\*1507** on regulations extending Title IX's protection beyond its statutory limits; indeed, we do not rely on the Department of Education's regulation at all, because the statute *itself* contains the necessary prohibition. As we explain above, see *supra,* at 1504-1505, the text of Title IX prohibits a funding recipient from retaliating against a person who speaks out against sex discrimination, because such retaliation is intentional "discrimination" "on the basis of sex." We reach this result based on the statute's text. In step with *Sandoval,* we hold that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex.[FN2]

> FN2. We agree with Justice THOMAS that plaintiffs may not assert claims under Title IX for conduct not prohibited by that statute. *Post,* at 1515-1516 (dissenting opinion). See also *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("[T]he private plaintiff may not bring a 10b-5 suit against a defendant for acts not prohibited by the text of § 10(b)"). But we part ways with regard to our reading of the statute. We interpret Title IX's text to clearly prohibit retaliation for complaints about sex discrimination.

### *179 C

[8] ☑[9] ☑ Nor are we convinced by the Board's argument that, even if Title IX's private right of action encompasses discrimination, Jackson is not entitled to invoke it because he is an "indirect victi[m]" of sex discrimination. Brief for Respondent 33. The statute is broadly worded; it does not require that the victim of the retaliation must also be the victim of the discrimination that is the subject of the original complaint. If the statute provided instead that "no person shall be subjected to discrimination on the basis of *such individual's* sex," then we would agree with the Board. Cf. 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer ... to discriminate against any individual ... because of *such individual's* race, color, religion, sex, or national origin" (emphasis added)).

However, Title IX contains no such limitation. Where the retaliation occurs because the complainant speaks out about sex discrimination, the "on the basis of sex" requirement is satisfied. The complainant is himself a victim of discriminatory retaliation, regardless of whether he was the subject of the original complaint.[FN3] As we explain above, see *supra*, at 1505-1506, this is consistent with *Sullivan*, which formed an important part **\*180** of the backdrop against which Congress enacted Title IX. *Sullivan* made clear that retaliation claims extend to those who oppose discrimination against others. See 396 U.S., at 237, 90 S.Ct. 400 (holding that a person may bring suit under 42 U.S.C. § 1982 if he can show that he was "punished for trying to vindicate the rights of minorities").

> FN3. Justice THOMAS contends that "extending the implied cause of action under Title IX to claims of retaliation expands the class of people the statute protects beyond the specified beneficiaries." *Post,* at 1516 (dissenting opinion). But Title IX's beneficiaries plainly include all those who are subjected to "discrimination" "on the basis of sex." 20 U.S.C. § 1681(a). Because, as we explain above, see *supra,* at 1504-1505, retaliation in response to a complaint about sex discrimination is "discrimination" "on the basis of sex," the statute clearly protects those who suffer such retaliation. The following hypothetical, offered by petitioner at oral argument, illustrates this point: If the male captain of the boys' basketball team and the female captain of the girls' basketball team together approach the school principal to complain about discrimination against the girls' team, and the principal retaliates by expelling them both from the honor society, then both the female and the male captains have been "discriminated" against "on the basis of sex." Tr. of Oral Arg. 53-54.

**\*\*1508** Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also "to provide individual citizens effective protection against those practices." *Cannon,* 441 U.S., at 704, 99 S.Ct. 1946. We agree with the United States that this objective "would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation." Brief for United States as *Amicus Curiae* 13. If recipients were permitted to retaliate freely, individuals who witness discrimination would be loath to report it, and all manner of Title IX violations might go unremedied as a result. See *Sullivan, supra, at 237, 90 S.Ct. 400* (noting that without protection against retaliation, the underlying discrimination is perpetuated).

Reporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel. Recall that Congress intended Title IX's private right

of action to encompass claims of a recipient's deliberate indifference to sexual harassment. See generally *Davis,* 526 U.S. 629, 119 S.Ct. 1661. Accordingly, if a principal sexually harasses a student, and a teacher complains to the school board but the school board is indifferent, the board would likely be liable for a Title IX violation. See generally *Gebser,* 524 U.S. 274, 118 S.Ct. 1989. But if Title IX's private right of action does not encompass retaliation claims, the teacher would have no recourse if he were subsequently fired for speaking out. Without protection from retaliation, individuals who witness discrimination would likely not report it, indifference*181 claims would be short circuited, and the underlying discrimination would go unremedied.

[10] ☑ Title IX's enforcement scheme also depends on individual reporting because individuals and agencies may not bring suit under the statute unless the recipient has received "actual notice" of the discrimination. *Id.,* at 288, 289-290, 118 S.Ct. 1989 (holding that an appropriate official of the funding recipient must have actual knowledge of discrimination and respond with deliberate indifference before a private party may bring suit); 20 U.S.C. § 1682 (providing that a federal agency may terminate funding only after it "has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means"). If recipients were able to avoid such notice by retaliating against all those who dare complain, the statute's enforcement scheme would be subverted. We should not assume that Congress left such a gap in its scheme.

Moreover, teachers and coaches such as Jackson are often in the best position to vindicate the rights of their students because they are better able to identify discrimination and bring it to the attention of administrators. Indeed, sometimes adult employees are " 'the only effective adversar[ies]' " of discrimination in schools. See *Sullivan, supra,* at 237, 90 S.Ct. 400 ("[A] white owner is at times 'the only effective adversary' of the unlawful restrictive covenant" (citing *Barrows v. Jackson,* 346 U.S. 249, 259, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953))).

D

[11] ☑ [12] ☑ The Board is correct in pointing out that, because Title IX was enacted as an exercise of Congress' powers under the Spending Clause, see, *e.g., Davis, supra,* at 640, 119 S.Ct. 1661; *Gebser, supra,* at 287, 118 S.Ct. 1989; *Franklin,* 503 U.S., at 74-75, and n. 8, 112 S.Ct. 1028, "private **1509 damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue," *Davis, supra,* at 640, 119 S.Ct. 1661. When Congress *182 enacts legislation under its spending power, that legislation is "in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 67 L.Ed.2d 694

(1981). As we have recognized, "[t]here can ... be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [imposed by the legislation on its receipt of funds]." *Ibid.*

[13] ☑ The Board insists that we should not interpret Title IX to prohibit retaliation because it was not on notice that it could be held liable for retaliating against those who complain of Title IX violations. We disagree. Funding recipients have been on notice that they could be subjected to private suits for intentional sex discrimination under Title IX since 1979, when we decided *Cannon. Pennhurst* does not preclude private suits for intentional acts that clearly violate Title IX. *Davis, supra,* at 642, <u>119 S.Ct. 1661.</u>

[14] ☑ Indeed, in *Davis,* we held that *Pennhurst* did not pose an obstacle to private suits for damages in cases of a recipient's deliberate indifference to one student's sexual harassment of another, because the deliberate indifference constituted intentional discrimination on the basis of sex. *Davis, supra, at 650,* 119 S.Ct. 1661. See also *Franklin, supra, at 75, 112 S.Ct. 1028* ("Congress surely did not intend for federal moneys to be expended to support the intentional actions it sought by statute to proscribe"). Similarly, we held in *Gebser* that a recipient of federal funding could be held liable for damages under Title IX for deliberate indifference to a teacher's harassment of a student. <u>524 U.S., at 287-288, 118 S.Ct. 1989.</u> In *Gebser,* as in *Davis,* we acknowledged that federal funding recipients must have notice that they will be held liable for damages. See *Davis, supra,* at 642, <u>119 S.Ct. 1661;</u> *Gebser, supra, at 287, 118 S.Ct. 1989.* But we emphasized that "this limitation on private damages actions is not a bar to liability where a funding recipient intentionally violates the statute." *Davis, supra,* at 642, <u>119 S.Ct. 1661</u>(citing *Franklin,* 503 U.S., at 74-75, 112 S.Ct. 1028). See also *ibid.* ("[T]he *[Pennhurst]*notice problem does not ***183** arise in a case such as this, in which intentional discrimination is alleged"); *Bennett v. Kentucky Dept. of Ed.,* 470 U.S. 656, 665-666, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985) (holding that there was sufficient notice under*Pennhurst* where a statute made clear that some conditions were placed on the receipt of federal funds, and stating that Congress need not "specifically identif[y] and proscrib[e]" each condition in the legislation). Simply put, " *Pennhurst* does not bar a private damages action under Title IX where the funding recipient engages in intentional conduct that violates the clear terms of the statute." *Davis, supra,* at 642, <u>119 S.Ct. 1661.</u>

Thus, the Board should have been put on notice by the fact that our cases since*Cannon,* such as *Gebser* and *Davis,* have consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination. Indeed, retaliation presents an even easier case than deliberate indifference. It is easily attributable to the funding recipient, and it is always-by definition-intentional. We therefore conclude that retaliation against individuals because they complain of sex discrimination is "intentional conduct that violates the clear terms of the

statute," **1510Davis, 526 U.S., at 642, 119 S.Ct. 1661, and that Title IX itself therefore supplied sufficient notice to the Board that it could not retaliate against Jackson after he complained of discrimination against the girls' basketball team.

The regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years. Cf., e.g., id., at 643, 119 S.Ct. 1661 (holding that Title IX's regulatory scheme "has long provided funding recipients with notice that they may be liable for their failure to respond to the discriminatory acts of certain nonagents"). More importantly, the Courts of Appeals that had considered the question at the time of the conduct at issue in this case all had already interpreted Title IX to cover retaliation. See,e.g., Lowrey, 117 F.3d, at 252; Preston, 31 F.3d, at 206. The Board could not have realistically supposed that, given this *184 context, it remained free to retaliate against those who reported sex discrimination. Cf. Davis, supra, at 644, 119 S.Ct. 1661 (stating that the common law of torts "has put schools on notice that they may be held responsible under state law for their failure to protect students from the tortious acts of third parties"). A reasonable school board would realize that institutions covered by Title IX cannot cover up violations of that law by means of discriminatory retaliation.

To prevail on the merits, Jackson will have to prove that the Board retaliated against him *because* he complained of sex discrimination. The amended complaint alleges that the Board retaliated against Jackson for complaining to his supervisor, Ms. Evelyn Baugh, about sex discrimination at Ensley High School. At this stage of the proceedings, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Accordingly, the judgment of the Court of Appeals for the Eleventh Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.
**Jackson v. Birmingham Bd. of Educ.**, 544 U.S. 167, 125 S.Ct. 1497 (U.S.,2005).

Chapter 41. Damages

§ 41:17. Emotional distress

In order to maintain a cause of action for negligent infliction of emotional distress under Indiana law, a plaintiff must satisfy the "impact rule."Alexander v. Scheid, 726 N.E.2d 272, 283 (Ind. 2000).  This rule originally consisted of three elements: (1) an impact on the plaintiff; (2) that causes physical injury to the plaintiff; (3) that in turn causes the emotional distress. This rule precluded recovery for the case in which a plaintiff experienced real mental stress in the absence of physical injury. But our supreme court later modified the impact rule and held: "When ... a plaintiff sustains a direct impact by the negligence of another and, by virtue

of that direct involvement sustains an emotional trauma which is serious in nature and of a kind and extent normally expected to occur in a reasonable person, … such a plaintiff is entitled to maintain an action to recover for that emotional trauma without regard to whether the emotional trauma arises out of or accompanies any physical injury to the plaintiff." Shuamber v. Henderson, 579 N.E.2d 452, 456 (Ind. 1991); see also Keim v. Potter, 783 N.E.2d 731 (Ind. Ct. App. 2003); State Farm Mut. Auto. Ins. Co. v. D'Angelo, 875 N.E.2d 789 (Ind. Ct. App. 2007), transfer denied, 891 N.E.2d 42 (Ind. 2008).

Indiana's modified impact rule, regarding recovery for negligent infliction of emotional distress, requires direct physical impact; however, the impact does not need to cause physical injury to the plaintiff, and the emotional trauma suffered by the plaintiff does not need to result from a physical injury caused by the impact. The direct physical impact is sufficient to satisfy Indiana's modified impact rule regarding recovery for negligent infliction of emotional distress where the facts are such that the alleged mental anguish is not likely speculative, exaggerated, fictitious, or unforeseeable, even if the physical impact is slight or evidence of physical impact seems rather tenuous. In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited. When determining the limits on the right to recover for negligent infliction of emotional distress, the court balances the impact of arbitrary lines which deny recovery to some victims whose injury is very real against that of imposing liability out of proportion to culpability for negligent acts, and also weighs in the balance the importance to the administration of justice of clear guidelines under which litigants and trial courts may resolve disputes. Atlantic Coast Airlines v. Cook, 857 N.E.2d 989 (Ind. 2006).

In Blackwell v. Dykes Funeral Homes, Inc., 771 N.E.2d 692 (Ind. Ct. App. 2002) the court held that the modified impact rule was satisfied where plaintiffs claimed emotional distress after discovering that their son's cremated remains were missing twelve years after his death. Blackwell v. Dykes Funeral Homes, Inc., 771 N.E.2d 692 (Ind. Ct. App. 2002). Damages for emotional distress are recoverable only when accompanied, by and resulting from, a physical injury; this "impact" rule applies whether a complaint alleges negligent or intentional infliction of emotional distress. Little v. Williamson, 441 N.E.2d 974 (Ind. Ct. App. 2d Dist. 1982); Shuamber v. Henderson, 579 N.E.2d 452 (Ind. 1991).

Indiana recognizes two situations in which a plaintiff may recover for negligent infliction of emotional distress: (1) when the plaintiff has sustained a direct impact by another's negligence; and (2) when the plaintiff witnesses or comes upon an accident caused by another's negligence and sustains emotional distress upon learning the accident involves a loved one. The direct involvement test lists prerequisite relationships that a plaintiff must prove before recovery; the direct impact test does not. The direct impact test requires only "an emotional trauma which is serious in nature and of a

kind and extent normally expected to occur in a reasonable person." <u>Helsel v. Hoosier Ins. Co., 827 N.E.2d 155 (Ind. Ct. App. 2005)</u>.

Negligent infliction of emotional distress is not an independent tort; party must first prevail on a negligence claim, and thereafter claim damages for emotional distress. <u>Doe v. Lafayette School Corp., 846 N.E.2d 691 (Ind. Ct. App. 2006)</u>.

Fiancée of motorist killed in car accident was not in relationship "analogous" to spouse, as required for fiancée to recover under bystander against defendant driver and driver's employer for negligent infliction of emotional distress. <u>Smith v. Toney, 862 N.E.2d 656 (Ind. 2007)</u>.

[FNa0] Member Of The Indiana And Illinois Bars.

[FNa1] Member Of The Indiana Bar.

CONFIDENTIALITY NOTICE:
This e-mail contains information that is privileged, confidential and subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. You are prohibited from copying, distributing or otherwise using this information unless you are the intended recipient. If you have received this e-mail in error, please notify me immediately by return e-mail and then delete this email and all attachments from your system.

DISCLOSURE REQUIRED BY CIRCULAR 230.
This Disclosure may be required by Circular 230 issued by the Department of Treasury and the Internal Revenue Service. If this e-mail, including any attachments, contains any federal tax advice, such advice is not intended or written by the practitioner to be used, and it may not be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer. Furthermore, any federal tax advice herein (including any attachment hereto) may not be used or referred to in promoting, marketing or recommending a transaction or arrangement to another party. Further information concerning this disclosure, and the reasons for such disclosure, may be obtained upon request from the author of this e-mail.

Brian Tracey
Gevers & Tracey
116 East Berry Street, Suite 625
Fort Wayne, IN 46802
office     260-407-7071
cell           260-740-2333
fax            260-407-7073

CONFIDENTIALITY NOTICE:
This e-mail contains information that is privileged, confidential and subject to legal restrictions and penalties regarding its unauthorized disclosure or other use. You are prohibited from copying, distributing or otherwise using this information unless you are the intended recipient. If you have received this e-mail in error, please notify me immediately by return e-mail and then delete this email and all attachments from your system.

DISCLOSURE REQUIRED BY CIRCULAR 230.
This Disclosure may be required by Circular 230 issued by the Department of Treasury and the Internal Revenue Service. If this e-mail, including any attachments, contains any federal tax advice, such advice is not intended or written by the practitioner to be used, and it may not be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer. Furthermore, any federal tax advice herein (including any attachment hereto) may not be used or referred to in promoting, marketing or recommending a transaction or arrangement to another party. Further information concerning this disclosure, and the reasons for such disclosure, may be obtained upon request from the author of this e-mail.

Brian Tracey
Gevers & Tracey
116 East Berry Street, Suite 625
Fort Wayne, IN 46802
office      260-407-7071
cell                  260-740-2333
fax                   260-407-7073

---------- Forwarded message ---------
From: **The White House** <noreply@contact.whitehouse.gov>
Date: Wed, Jul 12, 2023 at 6:57 PM
Subject: Response to Your Message
To: <jt4590@gmail.com>



**THE WHITE HOUSE**
WASHINGTON

July 12, 2023

Dear Mr. Turpin,

Americans have an enduring connection to our natural heritage.  Our
Nation invented national parks, wildlife refuges, and national forests.  I
am committed to continuing that American tradition of conserving our precious
wildlife and to addressing the threats that extinction and climate change pose to
animals and their fragile habitat.

This is not just in the interest of our Nation's wildlife—it's in our own interest as
well.  For example, when we protect wetlands, we maintain spaces that are essential
to birds, fish, shellfish, and the livelihoods of people who depend on them while
also preserving a key line of defense in absorbing the fury of a hurricane.  That's
why a key component of my wildlife conservation efforts is the protection and
restoration of the lands and waters that sustain our Nation's rich fish and wildlife
habitat.

Through my Administration's "America the Beautiful" initiative, we have set out to
conserve at least 30 percent of our lands and waters by 2030.  By setting ambitious
goals, and supporting local, collaborative efforts that honor Tribal sovereignty and
private property rights, we can conserve much of the land that makes America
unique, and the species that call it home, for generations to come.

In addition, I am working to improve and strengthen the Endangered Species Act
while also providing the flexibility to work with private landowners.  With
thoughtful implementation of the Endangered Species Act and other bedrock
conservation laws, we can ensure that our wildlife can endure the threat of climate
change and other threats to their survival.

I will keep your letter in mind as I continue working to protect America's lands,
waters, and wildlife for future generations.

Sincerely,



*If you wish to receive regular email updates from the White House, please <u>click here</u>. You may also follow President Biden and the White House on <u>Facebook</u>, <u>Instagram</u>, <u>Twitter</u>, and <u>YouTube</u>.*

<u>White House Website</u> | <u>Privacy Policy</u> | <u>Contact the White House</u>

**jt4590@gmail.com**

| | |
|---|---|
| **From:** | Jon F. Turpin <jt4590@gmail.com> |
| **Sent:** | Thursday, July 27, 2023 9:15 PM |
| **To:** | undisclosed-recipients: |
| **Subject:** | Fwd: Dear Honorable Senator Mike Braun |

---------- Forwarded message ---------
From: **Jon F. Turpin** <jt4590@gmail.com>
Date: Thu, Jul 27, 2023, 6:39 PM
Subject: Re: Dear Honorable Senator Mike Braun
To: Office of U.S. Senator Mike Braun <contact@braun.senate.gov>

Delivery for our Honorable Mike Johnson at his Bossier, LA office.

In my opinion the true issue, invasion of our country and national and international attacks even on citizens such as myself causing blacklisting, destitution, destruction, and threats of violence against us and public officials by potentially the cartel and other foreign agents, is not partisan, nor may it be an issue of states rights versus federal rights, but a time for bad apples and their bad behaviors to be separated from good apples and good behaviors in line with our constitution.

In my opinion, and according to our esteemed FBI we, my wife and I, may be victims of terrorism and abuses of our court system intended to force our silence, and the deliveries I'm making in good faith actions may reveal the conspiracy in depth.

Please, it is time for everyone who believes in our nation, constitution, and foundations, to to work together as God intended, and separate the wheat from the chaff before our rights are slowly stripped again one by one for no crimes in a repeat of the tragic events of our 20th century which should never have happened nor should ever happen again to anyone in our world, and especially not in our great nation and home.

Sincerely,
Jon F. D. Turpin

On Wed, Jul 26, 2023, 3:33 PM Jon F. Turpin <jt4590@gmail.com> wrote:
Thank you so much for your time and consideration, and your invaluable public service to us all,
I find your take on this to be very mindful and reserved in a most intelligent way.

It is my opinion that considerations should be taken as well to ensure that marijuana is not around pregnant women, and especially not children, as scientific studies and psychologists have found it can affect the development of the frontal lobe, effectively our brain's "brakes" before ages of 21-25.

After research into the reported results of recetly released scientific information I found the alternatives without these legislative inhibitors may potentially include afflictions such as narcissist schizophrenia in adults, and in my opinion this is genuinely concerning and requires careful discernment, and may affirm your opinions.

Except for the potential reclassification and legalization of marijuana, some forms of nicotine, and responsible and rare ingestion of alcohol, all by adults, I'm very against any non-prescribed drugs, and find that new anti-smoking cessation nicotine pouches without tobacco itself included may be one of the least harmful anti-adhd chemicals available. With this in mind, CBD and non-smokable forms of marijuana derivatives may eventually be something used to recover from anxiety, and/or bone mass loss, even potentially symptoms of borderline personality disorder brought on by narcissistic abuse, just as non-hallucinogenic forms of psilocybin have been found in scientific studies to eliminate symptoms of clinical depression in adults, even those potentially brought on by narcissistic abuse in unfortunate events.

With this being said, in my opinion it must be mentioned clearly that my only "use" is of some nicotine products and potentially a rare drink of alcohol safely and responsibly.

In my opinion, out of genuine concern, any legislation should expressly identify the risks of any potentially legalized drug and include regulation for safety, and imperatively do anything it may to protect our women and children as we have shown on legal precedents such as Megan's Law, Zachary's Law, and the repeal of Roe v. Wade, and in religious jurisprudence such as Catholic rites to ensure positive futures.

P.S. - Please continue to help keep deadly substances like fentanyl and cocaine out of our nation, just as I requested a potential member of MS-13 to keep this type of "business" out of our fine state during travels in attempts to turn in evidence to our Esteemed FBI Offices in Indiana and Kentucky, and during my requests for Witness Protection from our U.S. Marshal's in our great state of Kentucky.

Which remained my opinion when attempting to turn in potential evidence for a national and international cryptocurrency scam where I may be one of the original, if not the original whistleblower, and remains my opinion even after the possible unfortunate scenario recently where I may have been falsely identified as a gun violent person and/or terrorist by bad apples unlawfully using an expunged case and the discriminatory anti-catholic Richmond memo and a potential protective order without legal grounds in what may be conspiratorial attempts by bad apples to force me to recant, frame me, harm me and/or my wife, stifle whistleblowing, remove my rights wrongfully again, destroy our marriage, bury us metaphorically and/or literally, and possibly prevent me from intervening to save us and our constitution.

It remains my opinion even after bad apples threatened my wife, and has only strengthened my Faith in God and our Marriage in our Catholic Church, our Constitution and our Respected Elected Public Officials such as yourself, and our Esteemed Government Agencies and Respected Law Enforcement, while simultaneously strengthening my resolve to stand our ground and whistleblow against unqualified bad apples who may attempt to pose as unelected authority and officials by possibly utilizing Revocable Trusts and/or corporations in a way which may go against our constitution and values in full and cause harms to all of us and our life, liberty, pursuit of happiness, and justice for all, including those potentially preventing positive futures for our women and children and all God's Creatures, and especially those who may not wish to observe our God-given, inalienable rights, to stand ground and say no to them, and no more to bad apples' intolerable bad behaviors.

Sincerely,
Jon F. D. Turpin
The Whistleblower | 3:22-CV-01213

On Wed, Jul 26, 2023, 10:13 AM Office of U.S. Senator Mike Braun <contact@braun.senate.gov> wrote:

**MIKE BRAUN**
INDIANA

WASHINGTON, DC OFFICE:
404 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-4814

## United States Senate

July 26, 2023

Dear Mr. Turpin,

Thank you for reaching out to me regarding drug legalization and policy reform. I appreciate hearing from you about this important topic.

The case for drug legalization and policy reform continues to be debated across America, and there are important considerations to debate. In the case of marijuana legalization, state governments rather than the federal government have been the main drivers to establish marijuana policy. 36 states and the District of Columbia have moved to legalize medicinal marijuana, while only 18 states and the District of Columbia have legalized it for recreational use. A 2017 study by the National Academies of Sciences, Engineering, and Medicine found that while cannabinoid products can be an effective treatment for various medical conditions, smoking marijuana can cause respiratory disease and may have other severe health risks similar to smoking tobacco.

As federal legislators, my colleagues and I are tasked with remaining mindful of the potential benefits and adverse health risks relating to general drug use in evaluating any policy, as well as balancing the role of civil liberties in such policies. It is important to consider the harmful effects of substances, the correlation between drug legalization and drug-related crime, costs to the taxpayer, and the effects on the industry as a whole. It is also important to weigh that effective drug policy enforcement can be a means of deterring drug use before it begins. Use prevention is key, particularly when success and recovery rates following rehab remain low, with a high probability for relapse.

With this in mind, I believe there is room for improvement in this space; however, more federal government is not the answer to every problem. I believe states should be permitted to serve as the laboratories of democracy they were intended to be, and individually weigh the costs and benefits of evidence-based reform. That being said, I will be sure to keep your views in mind should legislation in regards to drug reform come to the Senate floor.

Thank you for contacting me. It is an honor to serve as your U.S. Senator from Indiana. Please keep in touch with me on issues of concern to you. You can also follow me on Twitter or Facebook for real-time updates on my activities in the U.S. Senate. If I ever may be of service, please do not hesitate to contact me.

Sincerely,

Mike Braun
U.S. Senator

P.S. This message was sent by email to save taxpayer dollars.

3

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Sunday, August 6, 2023 12:48 AM |
| **To:** | His Holiness Pope Francis; Finland Chancellor of Justice; cia_foia |
| **Subject:** | Dear Esteemed William J. Burns CIA Director |

[Fritz Technology, LLC has been willingly offered to our Esteemed CIA as needed, with our Honorable Terry A. Doughty's, RFK's, and OSC's Discretion, which seems a constitutional, nonpartisan, and rightful method of assisting in ensuring foundations and civil liberties.]

[It would be really nice if the potential protective order is closed now that we may have successfully proven there is a conspiracy on nearly all levels by simply revealing potential bad apples and their possible bad behaviors over years.]
[I understand it's a lot of data, it took half a lifetime to make this contribution and collect in a cohesive way which may easily lend itself to vast amounts of supporting cases and law following jurisprudence and our constitution, etc. et al.]
[If you focus on documents I provided for 3:22-CV-01213 which may be consolidated under Robert F. Kennedy, Jr.'s case, 3:22-CV-01213-TAD-KDM and in my applications for our Esteemed CIA and FBI, it may expedite proceedings.]

[I sincerely apologize for any frustrations and thank you for your service, I simply wish to save you time, and this whistleblow was only done after multiple concerted efforts by bad apples to prevent me from all constitutional rights and even requests for appeal and pardon.]
[In my opinion, when compared with Stanford's research regarding likelihood of pardons there are attempts to remove me not only from any political career, but from even our backup government, which along with a family member being in it, is what told me I'm a candidate.]
[In my opinion, when compared against all compiled information in my whistleblow, there are also attempts to remove me from any possible career that would support and allow me to have freedoms, rights, and a family, and as even simply a married man and human being.]

[Bad apples may have attempted to "isolate and conquer" a Catholic Autistic man, me, who was the backup CIO of all of Ascension/St. Vincent Health nationally, and was the rightful backup holder of all of the prior Catholic Health patient and database information for recovery.]
[In my opinion it may be obvious when the attacks have happened toward us from each domestic and foreign sources and included even threats against my wife and cats, and there may have been extreme attempts to falsely allege that I don't support our government agencies.]

[It may be time to officially hire me and bring me into the fold. Officially I know nothing and nothing happened, but my badge and business may not just be a badge and business at this point, and I may be doing a job for all of us "ghost" and I sincerely want to live and contribute.]

Dear His Holiness Pope Francis,
Dear Right Honorable Tuomas Poysti,
Dear Esteemed William J. Burns,

At your discernment and discretion, with contingency of immunity and whistleblowing protections, I would include the recipients below as a non-exhaustive list for this message and Thorfinnr Whistleblow Including 3:22-CV-01213 Data:
Appropriate Catholic Church Contacts
Appropriate U.N. Member State Contacts

Honorable:
Donald J. Trump & Hillary D. R. Clinton
Kevin McCarthy
Sean Lerner

1

Jim Jordan
Victoria Spartz & Nick Papandrea
Ron Johnson & Mike Johnson
Joshua Hawley

Honorable:
Robert F. Kennedy Foundation
Chief Justice Terry A. Doughty
U.S. Attorney General Merrick Garland
Office of Special Counsel and John Durham
Office of MSPB and Cathy Harris
Virginia Attorney General Jason Miyares and any Honorable Attorney Generals in his Letter
Indiana Attorney General Todd Rokita
Louisiana Attorney General Jeffrey Landry
Massachusetts Attorney General Andrea Campbell
Wisconsin Attorney General Josh Kaul
Florida Attorney General Ashley Moody

Esteemed and Respected:
FBI Director Christopher Wray
FBI Special Agents Joseph L. Chaney, Dylan (Muncie, IN), Caitlyn Stinson, Jason Hodges

DEA Administrator Anne Milgram
ATF Director Steven Dettelbach
Federal Marshals Association
U.S. Marshals Director Ronald Davis

Virginia Bar Association
Virginia State Police Foundation
Indiana Bar Association
Indiana State Police Foundation
Louisiana Bar Association
Louisiana State Police Foundation
Massachusetts Bar Association
Massachusetts State Police Foundation

---

We are still awaiting the results of what is in our opinion a fictitious and fractious protective order with no legal grounds which was not entered in a timely fashion by alleged victims, and it is a sincere request they not be mentioned nor harassed. They may not understand the difference between private reporting out of genuine concern, nor simply any peaceful response in like kind to their offer to sue my wife without attempting to create injunctions.

It also may be an attempt by them to try and prevent our Honorable Terry A. Doughty's injunction, which is in fact lawful and non-discriminatory, and in my opinion it is possible to affirm our Honorable Terry A. Doughty's injunction and opinions, and simultaneously in true duality support our Esteemed Government Agencies and your FISA while separating potential bad apples and their possible intolerable bad behaviors out into their own barrel.

Why? In my opinion we good apples were timely, prudent, reasonable, and constitutional. We're also not causing situations of double jeopardy nor opening 13 year old cases like the potential bad apples, even when we have differences in opinions and responsible inquiries.

In my opinion my honest mistake was my use of two bad words, and I sincerely apologize, and it is doubtful to me that standing up for my wife in a peaceful manner earns injunction.

I digress, we leave them alone without any protective order, and I've only mentioned their names privately and in defense of our character after they inserted themselves; we never wished to see them again even in a court setting, especially after their instigation of issues.

---

What I'm trying to say clearly here is that it may be simply irresponsible for any proceedings to occur against me and my wife, as we're attempting to help all of our good apples to get along, and look good as they do so in a way that may be constitutionally required. There is precedent and jurisprudence for me to "do my part" in a peaceful way in any scenario like this since my cousin and I were wrongfully terminated, he was to my private "need to know" knowledge a member of our "back up government" and I've simply taken a different route towards resolution that may allow for very positive futures for all of us in the "big picture."

It seems responsible and reasonable to be allowed and ensured freedom and a career to take care of my wife, and raise our future children in our Catholic Church to know Jesus, so maybe they may be Honorable Public Officials someday and also contribute to our nation.

In my opinion proceedings against us would likely prevent and harm positive futures for all, and our character, blood, sweat, tears, and toils should be considered wholly for reprieves.

We were already attacked by bad apples both domestic and foreign, and reprimanded via losses of careers and home and clearances, one of us was wrongfully convicted and silenced, and stifled as whistleblowers beforehand, but remain steadfast in our good faith actions and reports out of concern in support of Faith, marriage, nation, U.N. and NATO.

------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------

In my opinion, our Honorable Kevin McCarthy Speaker of the House, may be on a "need to know" basis for information provided. It seems reasonable, prudent, non-partisan, and constitutional after allowing information for Democrats within our great state of California.

Further, the information was freely handed over, contingent on protections, also in support of our esteemed agencies, respected law enforcement, honorable public officials, etc. et al, and may by definition be supported by 702 rules due to international requests for justice to be served by our U.N. and U.S. upon any international bad apples potentially identified.

------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------

Multiple persons may be found within my provided contact lists to verify, and in my opinion this simply saves time since call logs and contacts could be obtained by subpoena anyway, and I've applied to multiple government agencies likely giving willing right to review this.

Currently there are citizen contacts available in nearly every state which the information may support in a positive way, and may require its dissemination without complaints. These citizens also include multiple professionals in a vast array of fields of study, including many qualified and even Ph.D. holding professionals, and all our Respected Law Enforcement.

Currently there are citizen contacts in multiple countries within our U.N. and NATO which the information may support, and we have heritage from a multitude of our Honorable U.N. Member States and NATO, excluding currently hostile nations, which the information may be used to support in a positive way, and may require its dissemination without complaints.

------------------------------------------------------------------------------------------------------------
------------------------------------------------------------------------------------------------------------

In my opinion my willing and private cooperation in a reserved way (especially when considering 33+ years of living under and/or being attacked by a very few unelected and unqualified bad apples) [Present company excluded from any possible negative reference] further supports in my opinion that citizens and our governments may be able to work together in a more cohesive and democratic way by our own constitution, bill of rights, charters, treaties, conventions, and affirming jurisprudence of past trials and good Faith.

I request that information be used for rightful and reserved dissemination to good apples under whistleblower protections in a nonpartisan way supporting us and our constitution, following prudent and experienced advice and direction of our Honorable Doughty, Esteemed FBI, CIA, DEA, U.S.M., (E.)S.S., etc. et al, just as it may have been used to assist our esteemed DHS and DOD in shaking hands during recent friendly and required proceedings. Since I've been removed from our FBI InfraGard and officially placed into Whistleblower status along with Immunity requests, this only seems just and proper.

3

It is also my sincere ask that the information be used in a positive manner allowing our democratic processes to prevail and supporting our great states as our Honorable Ted Cruz and Honorable Mike Braun have each so eloquently stated in recent public appearances.

In my opinion, at the discretion of the aforementioned and any in this email, this is not an intervention, but a necessary constitutional contribution of a Catholic man of Faith, and citizen, who has already served any time which might have been required and commuted, and is only awaiting the fully official reprieve from our Honorable Executive Branch, whom I've also supported with positive opinions and in good faith actions during my own reviews.

Please consider in any frustrations that it takes a while to form a cohesive opinions, especially if the "who, what, when, where, why, and how" of any complicated process must be reviewed in depth and over time, especially if potential bad apples may misdirect and obfuscate, and repeat any possible bad behaviors which we don't support nor tolerate.

Present company excluded from any and all mentions of bad apples and bad behaviors.


Thank you for your time and all you do for us, our people, world, and all God's Creatures.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder | GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Saturday, August 19, 2023 2:49 PM |
| **To:** | whistleblower |
| **Subject:** | Fw: Dear Esteemed FBI Director Wray |
| **Attachments:** | Screenshot_20230801_164338_Message+.jpg; Screenshot_20230801_164343 _Message+.jpg; Screenshot_20230801_164347_Message+.jpg; Screenshot_20230801_ 164352_Message+.jpg; Screenshot_20230801_164357_Message+.jpg; Screenshot_ 20230801_164401_Message+.jpg; Screenshot_20230801_164405_Message+.jpg |

-------- Original Message --------
On Aug 1, 2023, 5:46 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:
Attached.


**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
FBI InfraGard Louisiana & Indiana Chapters
Fritz Technology LLC & Turpin Electric, Inc.

E-mail: jt4590@gmail.com
E-mail: jt4590@protonmail.com
Phone: +1 225 259 6270
Phone: +1 225 228 5466

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley


Sent from Proton Mail mobile


-------- Original Message --------
On Aug 1, 2023, 3:51 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

Now I'm going to tell you a story, and I want you to understand that this is not me tooting my own horn, but something that must be said now because too many things may not be coincidental anymore.

I performed what may have been the largest data migration of cardiovascular data for St. Vincent/Ascension Health, and the hospital that sits next to our Honorable Terry A. Doughty, St. Francis, I also may have repaired their cardiovascular database in the past.

I'm also the man who fixed Yale University's cardiovascular database, along with repairing a multitude of other cardiology databases around the nation like Foothill Cardiology.

But St. Vincent/Ascension Health is very important, because of how much area these hospital systems cover, and even more important for how many patients they see and luves they save, and how overwhelmingly necessary they became during COVID.

When I entered St. Vincent the database migration was 6 months behind and I was assigned a task that I was told was impossible, and yet I succeeded, not only in the migration into a less sophisticated software solution, despite it being 10 years newer than the existing Fujifilm software, but I also corrected the current database so it aligned with the qualified physicians and nurses updates, you know, the professionals regularly seeing the patients...

Even my grandfather's death and a best friend's death in an accident were used against me while I was completing this project, and some of that turmoil was caused by a few potential bad apples while I was making sure everyone's loved ones, including mine, would have physicians with access to working software, with accurate data to review even in dire situations like when a physician had to perform open heart surgery.

I used to work directly, via phone call at least, with Dr. Feigenbaum from IU Health, the man who helped pioneer some of the lifesaving techniques improved upon and still used today, and he trusted me to keep his cardiology software and machine running so he could do his best work for all of us.

Here's my point, when I did my job properly, I was laid off for illegal write-ups, then that person tried to classify me as a threat because they got caught trying to connect networks without vetting them in a way which might have shut off machines and could potentially have caused patients not to be seen in time for preventative and/or life saving procedures.

I gave them all the tools they needed to succeed without any malice, and said it was truly concerning, so they fired my HR person, too, just to shove me out the door faster.

The software crashed later without me having any ability to access it, after I had reported any and all of my accounts on the way out of the door to ensure security... I used to be a domain administrator with full access and even ensured that was locked.

When it crashed I offered to fix it for free, and I went back and helped without any malice.

Who identifies a man willing to fix software keeping people alive for free as a threat?

I didn't even sue, and I was actively applying for the CIO position, but unfortunately the bad apple may have been applying for it, too.

May this be motive to falsely identify me as a threat and proclaim that I was suing?

May I have been trying to protect patients?

May this situation be similar?

If I've been "fired" maybe I did my job right?

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
FBI InfraGard Louisiana & Indiana Chapters
Fritz Technology LLC & Turpin Electric, Inc.

E-mail: jt4590@gmail.com
E-mail: jt4590@protonmail.com
Phone: +1 225 259 6270

Phone: +1 225 228 5466

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley


Sent from Proton Mail mobile



-------- Original Message --------
On Aug 1, 2023, 3:21 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

If the question here about whether or not to give back FISA access to our Esteemed FBI is in regards to database searches that happened, then I have an opinion.

I already forgive our Esteemed FBI for reviewing me, and in my opinion our Esteemed Christopher Wray and our Esteemed FBI under his direction are helping to keep us safe and clean up a mess like dedicated public servants and they're earning their keep, and our Esteemed James B. Comey was trying his heart out, too.

It's part of our Faith to forgive and we do.
That being said, I have another opinion.

As a database expert and consummate professional who has worked on a multitude of our Healthcare IT systems and other valuable systems with the utmost care:

In my opinion the reason that our Esteemed Christopher Wray is letting our Honorable Mike Johnson know that the searches were unintentional, may be because they were potentially caused by Malware or external origin that was purportedly found in our government systems recently.

The amount of searches that happened in such a short span of time just doesn't sound like a human operation nor assigned task to me, that sounds like an attack, very similar to the attacks which I believe I experienced via foreign agents and what may have infected one of my phones, and potentially our Honorable Hillary D. R. Clinton's phones in the past which were purportedly smashed.

We know that Seal Team 6 has technology access to functions within cell phone chips that allow them to help our country and ensure our safety, and we know that ever since Apple and Qualcomm may have been attacked and since we found malware in potentially even our judiciary systems that there is an issue only the experts may solve.

I'm merely using the technology of Seal Team 6 as an example here, our military and veterans heroes who sacrifice for us every day, not equating them with bad apples.

I'm not a hacker but I've encountered malware, I mostly fix things and do puzzles, that's pretty much my "thing" but I do notice when things are "off" and not functioning, and may sometimes be able to identify what the potential causes may be, and in my opinion, that sounds like a malware attack.


In my opinion, too many queries in too little time for just FBI agents causing an issue, and no reason to hurt Esteemed FBI messengers nor our Esteemed Christopher Wray.

It sounded like something automated to me, and when I reported, it seemed that turned out to be the case, so in my opinion, which is potentially qualified here, not a stretch, and truly not our, nor our Esteemed FBI's fault.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
FBI InfraGard Louisiana & Indiana Chapters
Fritz Technology LLC & Turpin Electric, Inc.

E-mail: jt4590@gmail.com
E-mail: jt4590@protonmail.com
Phone: +1 225 259 6270
Phone: +1 225 228 5466

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley

Sent from Proton Mail mobile

-------- Original Message --------
On Aug 1, 2023, 1:59 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

To me what is concerning without laying blame on present company nor our Esteemed Governmental agencies, is that this situation may have been so targeted by specific bad apples and their bad behaviors, that I was actually double taxed, and paid it without blaming our Esteemed IRS, because I forgive them already and anyway, but may have been made into a dual citizen of each state, and for a time I was in fact in each InfraGard.

What I'm saying is: I didn't cause that, and I didn't even realize it was possible until it happened with me just working from home, taking care of my wife and cats, even when I had broken bones in my back from the nightmare we endured, yet potentially the same bad apples sent unnecessary welfare checks to our door when we were keeping to ourselves except to say hi to a few people, being kind to our neighbors, going to church, feeding our cats, and mowing our lawn.

What I'm trying to say is, in my opinion this may mean I had every responsibility to report out of concern properly to the appropriate personnel in each state, and the right, and/or potentially responsibility to speak to our Honorable Public Officials in each state, as a rightful member of our FBI InfraGard in each state, and a whistleblower filing not for money, but instead simultaneously in support of each of our states, and in support of our Esteemed Governmental agencies, and in support of our Honorable Robert F. Kennedy, and our Honorable Eric Holcomb, and each state's Honorable Attorney Generals, but also without playing favorites because aren't you all public servants and doing your best?

When I say that our Honorable Robert F. Kennedy, Jr. deserves protections, I also think that our other Public Officials, even if someone's Honorable status might be questioned, as unfortunately happens from time to time, deserve protections and shouldn't be harmed, but in my opinion it doesn't mean we can't report out of concern.

I forgive Mike Johnson's staff already, if they even were concerned at all, so far they didn't tell me, and if they did I would just sincerely apologize, but I also know I followed the directions on the door... and I'm not trying to cause them issues, at all. In my opinion he and his staff along with many of our other representatives are doing so much for all of us, I just don't want to be forgotten when I, like so many of us, didn't even make the mess we're experiencing and thrown into.

There's an old saying about not hurting the messenger, and I'm paraphrasing, because in my opinion, it can be said more tamely.

4

Don't hurt the messenger... why not instead take the work I put together and let everybody else look good, but not allow us to be destroyed in the process?

Why not consolidate my information under our Honorable Kennedys and allow our Honorable Jeffrey Landry and Honorable Todd Rokita, and Honorable Kennedys and Honorable Johnsons to use that money for our great state of Louisiana, just like I asked for the business that was stolen from me to be used for our Great State of Indiana, and the car that was tampered eith to be used for our Respected Indiana State Police?

Just like I asked for any illicit cryptocurrency that bad apples may have attempted to throw off on me to be used for our Esteemed IRS, Esteemed FBI, and rewards for the international criminals I may have caught to be used for our Great State of Georgia and maybe any other state that may have some potentially valid complaints, not about us, but that we don't want to talk about nor even to know are complaints if no one hurts the messenger.

Was it too much to ask to simply be restored in all of that if I'm asking everyone to get along and not allow me to be slapped around by bad apples for them to simultaneously try to force me to have an opinion, then try to slap me around some more because my opinion may be one that stops the turmoil?

In whatever way and however each of our Honorable Representatives and Esteemed Agencies sort it out could it please not include allowing potential bad apples to take our rights away again in some dystopian perpetually repeated double jeopardy?

What I'm trying to say is, I wasn't ever trying to fight anyone, I was trying to be away from this turmoil and let everyone else handle it after I made my required reports out of concern, but some bad apples kept forcing me to be necessary and important against my will, but simultaneously trying to act like I was a threat for ensuring no one got harmed.

Who does that?

Who made such a mess that it dragged in a Catholic autistic guy who donates to Children's Hospitals even at a loss?

Who made such a mess that it dragged in a guy who has been forgiving everyone?

Who keeps trying to act like I'm some kind of threat for following oaths and guidelines?

Who made such a mess that I may have the right, which I'm not using and not trying to push the issue on, but just... factually may have the right... to vote in two states?

Who is acting like me knocking on a door and ringing a doorbell once is concerning?

I didn't even complain about our respected law enforcement when a potential bad apple wasted their valuable time sending them to our door for unnecessary welfare checks...

Who is acting like me following directions to slip something under a door for security, and speaking to a building manager to ensure a securely encrypted package is delivered and in a monitored, secure area is concerning?

Are they ok?

Sincere question, but in your purview because I'm not trying to find out for myself nor even bother anyone by breathing wrong, I'm trying to peacefully stay alive with all my rights because bad apples being allowed to hurt me also hurts my wife, and I think family people understand that's just the facts.

Why didn't someone just ask me for whatever it was that they wanted and stop the threats?

Why did someone surveille me and potentially have me followed with P.I.s when I was already going to apply for our Esteemed FBI, had already asked for Witness Protection, and would have willingly signed a standard form 50 and just kindly cooperated?

What is the issue?

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
Commander-In-Chief Custodial Consulting
FBI InfraGard Louisiana & Indiana Chapters
Fritz Technology LLC & Turpin Electric, Inc.

E-mail: jt4590@gmail.com
E-mail: jt4590@protonmail.com
Phone: +1 225 259 6270
Phone: +1 225 228 5466

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." - David Brinkley


Sent from Proton Mail mobile


-------- Original Message --------
On Jul 31, 2023, 9:12 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

In my opinion, there may be an attempt by bad apples and their bad behaviors to scapegoat me yet again by trying to make me seem like a threat for peacefully doing what is required by our constitution, jurisprudence, the FBI InfraGard PIN, and as a Whistleblower who has already successfully served any time in advance by jurisprudence as well.

In my opinion, this may be what bothers these bad apples with their bad behaviors, that and their odd need for control of us.

In my opinion, these may have been the same tactics attempted against Lee H. Oswald, and regardless of who thinks who did what, the loss of John F. Kennedy was a tragedy the likes of which should never occur again.

So I've requested that Robert F. Kennedy, Jr. receive a protective detail to ensure his safety when he speaks for all of us in August, and since it seems to me there are still attempts to frame me when I don't even like hurting an ant, much less pets, and especially don't like hurting human beings...

I'm here to tell you I like Robert F. Kennedy, Jr.'s voice, because in my opinion he speaks honestly and all our Honorable Kennedys like the rest of us and God's Creatures, deserve to be heard and have our constitutional rights.

So give that man the protection he deserves, because as a plain clothes citizen I was still willing to stand in front of him and make sure he was safe, but since there's such an insane effort to pretend I'm a problem for being safe, responsible, prudent, and potentially correct:

Protect our Honorable Robert F. Kennedy, Jr.

That is my opinion, out of genuine concern.


Whomever keeps trying to have this both ways on us, just tell them no, and mean it.

With all due respect, please, and thank you, this really needs to stop before any bad apples try to "bury us with money" at the turn of the fiscal year just to control a narrative.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
Commander-In-Chief Custodial Consulting
FBI InfraGard Louisiana & Indiana Chapters
Fritz Technology LLC & Turpin Electric, Inc.

E-mail: jt4590@gmail.com
E-mail: jt4590@protonmail.com
Phone: +1 225 259 6270
Phone: +1 225 228 5466

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." - David Brinkley


Sent from Proton Mail mobile



-------- Original Message --------
On Jul 31, 2023, 6:11 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

I met Lynn in Shreveport, LA today after the OSC identified me as a whistleblower in an email. I'm not sure why her demeanor was to act like I was an issue for knocking once on our Honorable Mike Johnson's door.

I was asking him to support you and your FISA access, just like I wanted to sincerely ask our Honorable Joshua Hawley.

Lynn informed me I was removed from the FBI Infragard for being unemployed even though I have my own business, and despite my job being lost due to other falsely identifying me as a threat when I haven't hurt anyone and have put years into keeping my oaths and trying to follow every rule of our FBI Infragard.

Why is Lynn doing that?
Is Lynn trying to discredit me even though I support our esteemed FBI?

In my opinion my reports were quite cohesive, and took a lot of time and money and even blood, sweat, and tears, to submit.

I have no issue with Lynn, but if so, when does this stop?

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
**Commander-In-Chief Custodial Consulting**
FBI InfraGard Louisiana & Indiana Chapters
Fritz Technology LLC & Turpin Electric, Inc.

E-mail: jt4590@gmail.com
E-mail: jt4590@protonmail.com
Phone: +1 225 259 6270
Phone: +1 225 228 5466

BAS in CIT - IUPUI
AAS in CIT Networking & Security - Ivy Tech
"A successful man is one who can lay a firm foundation with the bricks others have thrown at him." -David Brinkley


Sent from Proton Mail mobile

**(504) 547-1290**
Mobile

12:59 PM

I am still working on your info. Don't give up on me

Thank you so much, Tiffany. Usually I'm patient and just try to be helpful as long as we're safe from bad apples.

4:08 PM

I had some time to think on your words. It's not that I'm trying to disprove the bad apples, they've been disproven repeatedly, even by a Ph.D. psychologist who helped train law enforcement in Indiana who is from Louisiana. It seems more as if bad apples are trying to disprove me, my right to exist, God, Church, and even multiple Ph.D. professionals.

To me that seems off the wall and just not safe at all.

We did ask for witness protection when this started and in my opinion it sounds like your suggestion of moving

**(504) 547-1290**

Mobile

We did ask for witness protection when this started and in my opinion it sounds like your suggestion of moving and changing names.

I'm saying we agree and have been asking for assistance

4:14 PM

I even offered to work for our Esteemed FBI to pay for it, then I did as a courier and compiler for the InfraGard in two states... and still still have and had our FBI's back all the way to the top, despite any unfortunate circumstances we've endured.

Am I not allowed to just say "hey, what is going on?"

After I protected millions of patients and their data...

Even during events I only IDd bad apples and made sure to protect our Esteemed Government Agencies and Respected Law Enforcement...

Then I said "thank you, how may I help my country more?"

Type a message...

**(504) 547-1290**
Mobile

Then I said "thank you, how may I help my country more?"

Did I earn our keep or at least our safety we requested?

4:25 PM

Me knowing what my work might be worth isn't me trying to "push an issue" it is me saying maybe I contributed in a way that is worth hearing us safely and respectfully, and also saying "pay yourselves, you don't make enough, and please keep us safe, and please restore us"

It's also me saying I forgive y'all and understand honest mistakes, and suggesting that the way you turn potential errors into honest mistakes is simply to correct them once there is awareness of the error.

When someone corrects something for me they may or may not have missed or messed up, I say "thank you."

Then I let them take the credit too, and say "you're the best" if they just treat us



**(504) 547-1290**
Mobile

Then I let them take the credit too, and say "you're the best" if they just treat us correctly and keep us safe.

I think that can be seen by me not suing anyone affiliated with our Great State of Indiana Government, nor even my lawyer, despite years of my life being extremely difficult due to wrongful convictions.

Because in my opinion they made an honest mistake and there was a bad apple, present company, and aforementioned excluded, who caused that to occur.

4:33 PM

One of the reasons I'm having a bit of an issue with this is I tried to allow y'all to speak with my wife as a witness to begin with when I requested witness protection, and in my opinion that's what the FBI wants, but they won't ask even when I've offered specifically to them and they may have made an honest mistake.

Why not just... correct that? In my

Type a message...

   

(504) 547-1290

\# Mobile

Why not just... correct that? In my opinion that's better than some written apology.

In my opinion it might make any reasonable person and husband hesitant if a secret service agent tries to act like you're on drugs to your wife in a potential attempt to control your situation when you're already doing the correct thing.

There's a difference between that and Lynn asking me a question that made me laugh, but putting up a wall in potential attempts to force me to give up my wife is not acceptable. We offered in the first place and in my opinion, me stating that fact isn't a bad thing, nor should it make our FBI look bad.

It is reasonable when there have been some honest mistakes going on that may still need to be corrected.

I'm repeatedly extending the proverbial olive branch and it seems to be ignored when it hits a critical point even though I am supporting y'all.



Type a message...



**(504) 547-1290**
Mobile

I'm repeatedly extending the proverbial olive branch and it seems to be ignored when it hits a critical point even though I am supporting y'all.

I even brought the proof of POA, but I handed it to S.A. Caitlyn Stinson specifically on purpose.

4:42 PM

Lynn had every opportunity to take the POA paper, but she didn't, and she still has the opportunity to treat us correctly without any issue.

It is just really hard to understand all the blocks at us trying to obtain safety which are even the same things suggested by multiple social workers and psychologists, which we tried. We have been following the advice of a social worker named Megan Laumann, too, in each of our moves, and the advice of the FBI InfraGard PINs, but still getting blocked.

Those aren't boundaries in my opinion if they may be, without pointing fingers, simply further honest mistakes

Type a message...

**(504) 547-1290**
Mobile

Lynn had every opportunity to take the POA paper, but she didn't, and she still has the opportunity to treat us correctly without any issue.

It is just really hard to understand all the blocks at us trying to obtain safety which are even the same things suggested by multiple social workers and psychologists, which we tried. We have been following the advice of a social worker named Megan Laumann, too, in each of our moves, and the advice of the FBI InfraGard PINs, but still getting blocked.

Those aren't boundaries in my opinion if they may be, without pointing fingers, simply further honest mistakes causing potential issues of safety for us.

A boundary is me holding the POA and gauging the room.

I personally don't care who made mistakes as long as they're honest and we're safe.

Sent

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Monday, August 21, 2023 4:28 PM |
| **To:** | Right Honorable Gustavo Petro President Colombia |
| **Subject:** | Dear Right Honorable Gustavo Petro President Colombia |

Dear Right Honorable Gustavo Petro,
Thank you for all you do for our great Colombian people, our beautiful nation of Colombia, our U.N., NATO, our world, and all God's Creatures.

Please give my best regards to your lovely wife, the Right Honorable Verónica del Socorro Alcocer García, First Lady of Colombia. May God's Blessings be upon you, your family, and all our Colombian people.

It is with sincere gratitude and simultaneously sadness that I reach out to you today.

Primarily, I wish to say thank you, especially to our Pulgaríns, Santos, and a multitude of Colombian families for the lovely time spent with me and my sister as children at Disney World, as adults at family dinners, and for the joining of the Turpin and Santos families in matrimony via the marriage of my sister to the Honorable Juan Pablo Santos of Colombia.

This in my opinion is cause for celebration, because we love you all and We're all Turpins.

Thank you so much for allowing our families to join, and if you would be so kind as to allow Juan Pablo Santos and my sister, Alexis Irene Turpin, to get married in Colombia by their original choosing, and to ensure her dual citizenship, I would be so utterly grateful to you.

I gave my full approval for their marriage, and perpetually support such a kind and honest husband for my sister, and as a Catholic man of Faith and husband myself I see their love.

Thank you so much for allowing our Turpins and Santos to be joined in Holy Matrimony.

It is with sadness that I must inform you that a few of our family are very ill and chose to exit, present company excluded, due to some intolerable bad behaviors by bad apples, again present company excluded, such as the unfortunate breaking of the Colombian Codes of Succession, the Nordic Codes of Succession, and all Civil Codes of succession proceeding by my direct lineage. Please pray for them and for us as we pray for you, too.

I succeeded my parents some time ago on matters of family business by recognition and designation via each of my grandparents before their passing, including Frederick Becker, whose name I carry with me gifted by my Grandmother and Mother in rites of succession.

My succession was solidified by their unfortunately intolerable bad behaviors proceeding, including their theft of my family business which was regained internationally via Finland after it was first passed to me via succession by my Grandfather Turpin, but stolen again.

Due to these unfortunate occurrences, it is and was my duty to inform you, and to sincerely request, that my decree to allow my sister and brother-in-law to have a Catholic wedding in Colombia be honored, if you would be so kind as to assist in resolving this family matter.

This is something I would normally assist with myself, however, due to intolerable bad behaviors by a very few specific bad apples, including attempts to obfuscate that succession has rightfully passed to me as heir via each of my grandparents, and unfortunate threats towards me and my wife, and our livelihood, I must protect us first.

In my opinion, anyone who threatens a right and just Catholic Marriage, attempts to prevent one of our family from being married in their Faith, or destroys their livelihood without just cause nor reason except to prevent and hide rights of succession and will may be very ill.

We each know that family and business can become complicated sometimes, especially if someone becomes ill and unfortunately breaks family rules, but what I remember is the wonderful family time spent with our Pulgaríns and Santos. I'm still flattered that I may have been invited to court Miss Juanita Pulgarín, however, my heart belongs to my lovely wife.

To be invited to join our families and receive such a vote of confidence from Alejandro Pulgarin is and was an honor, and I wished to genuinely express my humble gratitude.

There is a Disney World hat I would like to give to Juan Santos in celebration, but due to a few bad apples breaking our family rules against my wishes, I'm unable to even visit them.

My sister may not have been taught the rules of succession and will, and may have been threatened by bad apples and their intolerable bad behaviors, present company excluded, with the loss of all our inheritance, which I was attempting to protect and give properly for us all to enjoy as our grandparents, uncles, aunts, cousins, and our good apples decided.

Even the rights of will have been broken, and we each have been left first without homes, and then, should we purchase a home further affirming our rights of succession, we are consistently attacked by bad apples and their bad behaviors, which is simply intolerable.

In my opinion, there is no reason to allow bad apples to risk our innocent relationships, nor to allow intolerable bad behaviors such as tampering with marriages and positive futures.

Thank you again, sincerely, for your time and consideration, for all you do for us, our great nation and beautiful people of Colombia, our U.N., NATO, world, and all God's Creatures.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Wednesday, August 30, 2023 7:38 PM |
| **Subject:** | Re: Opinion |

Let me get completely non-partisan here,
Our Honorable Joseph R. Biden has suffered falls and disorientation as well, put age aside.

We may have differences in opinion, but I wouldn't allow nor condone poisoning of even my very worst enemy, I think it's abhorrent, and I don't even consider Biden to be an enemy.

Once again, persons and their medications are their business, but ensuring safety from bad apples and their intolerable bad behaviors elicits genuine concern in our current events.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
------- Original Message -------
On Wednesday, August 30th, 2023 at 7:26 PM, ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> wrote:

There is something else I'd like to report out of genuine concern.
These things may not be related, however, in my opinion it's worth safety precautions.

Washington D.C. has seen a sharp increase in the amount of fentanyl overdose deaths.
Some prolific dealers were caught within the Washington D.C. area and around the country.

There have been public reports of fentanyl in fake medications, including purportedly:
ADHD medications, Xylazine, and even potentially medications such as acetaminophen.

Let's put Mitch McConnell's age aside for a moment, and take a brief look at public facts:

1. He survived polio and has a limp (pretty easily explainable reason to have a fall)
2. He may have suffered a concussion and broken rib in his last fall but was back fast.
3. He is an extremely important senate leader and could be the swing vote sometimes.
4. Lately he has been showing signs of freezing during discussions and taking a break.
5. The freezes involve clenching the podium tightly, and clenching of his jaw.
6. He may have muscle rigidity being shown when he is escorted away.

If he hasn't had a stroke, which none have been reported, in my opinion it's worth having the medications he is on, at his discretion since it's his business, reviewed, without finger pointing, just to ensure there is not any issue with any medication regarding fentanyl.

We're currently finding it in fake medications, in the water supply, in fake candy, and it's obvious to me that political opponents of the cartel interests are under attack, and I've reported in good faith actions that Catholic healthcare systems were endangered by, at the very least, the failure of some to follow the chain of command and existing safety protocols.

Present company excluded.

However, in my opinion, with this information known, and with how important the Washington D.C. hospitals may be for any member of our public service, it is simply prudent to ensure that there is no

1

fentanyl being introduced in any dangerous way.

To ANY public servant, I don't care what political affiliation they are, but Mitch McConnell in my opinion would be one of the prime targets for bad apples intolerable bad behaviors.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

So, each person has a valid point, but it seems like the missing questions are... were the prior authorizations overzealous, and could the authorizations actually be providing most of the money to Turkey at the moment?
https://youtu.be/geldbg0NDOc?si=_tdL9Gas8FCZumM2

In my opinion, Ms. Foxx is correct, and Mr. Raskin and Mr. Comer are each making great points... it must be considered that Turkey was often neutral to bolster their own economy during each war after the Ottoman Empire fell, and there may not be handshakes, yet, and this should be navigated carefully with consideration first to our own home, and then to our neighbors.

If we can't help our own, we won't be able to continue to help our neighbors effectively.

We need to know who is benefiting, and we need to know what possibilities that may present without abandoning or allowing a fight between republic and democracy.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 6, 2023, 1:34 AM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

Look, I see a lot of people doing a lot of hard work, so a policy or protocol violation that gets corrected into an honest mistake doesn't mean that a name given means someone is "bad."

It's a bit impressive anyone even figured out how to overreach and how to replicate it at all.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**
------- Original Message -------
On Wednesday, September 6th, 2023 at 12:38 AM, ThorfinThunder | GoldGrenade <jt4590@protonmail.com> wrote:

Ok, so knowing the difference between where my Mom and Dad went on vacation...

Out of order, just from recollection of vacations I couldn't go on while trying to pay off a house and a car perpetually...

Mom went to Italy
Dad went to Germany

Mom went to Peru
Dad went to Colombia

Mom went to Greece
Dad went to Spain

Ah, Dad is a non-practicing Nazarene and Mom is a non-practicing Catholic.
So Nana brought me up as Non-denominational Christian... aka arminianism or Mennonite.

So... I'm a of multiple heritages including... Arminian/Nazarene raised, Catholic.

In my opinion apostolic succession does exist when I reviewed a lot of information.
However, it's not like hyper-calvinism, which causes a false dichotomy that is equivalent to the issue we find with the overreaching powers of the vice-presidential conundrum recently.

For example, someone falsely electing themselves via an unconstitutional revocable trust...
The Revocable Trust should have been used on the person who has used it wrongfully...
Instead it was used for control, abuse, and neglect of someone who was properly elected via actual succession according to all the already decided rules, but the falsely elected uses hyper-calvinism to determine that they, since they feel entitled, must be the elected.

That's a practical example of the difference between hyper-calvinism and arminianism.

Nazarene's believe you have to continue working to have a relationship with God.

Since I won't work for Dad after he unjustly abused and disowned me, causing him to violate his own succession by all of the rules, but then not accepting his own accountability he gets angry and causes loss of my jobs via any means as "punishments" and makes me impoverished via constant debt via using my Mom because he never wanted me alive.

Ah, I can see where he claims he's Nazarene but is actually aligning with hyper-calvinism.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 11:15 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:



**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

------- Original Message -------
On Tuesday, September 5th, 2023 at 11:13 PM, ThorfinThunder | GoldGrenade <jt4590@protonmail.com> wrote:



Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 9:04 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

If Bernie's policies are like Lenin's, then Putin's policies, such as withholding food and attacking the Black Sea Grain initiative are like Stalin's policies... a man who will withhold food will definitely kill his rival.

In my opinion, Putin may be past caring about tact or he would not publicly threaten nuclear war in such a way... or allow even a body double to do so without stopping the issue... even if it were in private...

If Putin is ill and has contacted intelligence via Kennedy to attempt to stop nuclear war, then he did not kill Prigozhin... if he did not, then in my opinion, he blatantly killed Prigozhin in a way that mimics the deaths that brought about the song American Pie.

Sincerely,

Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 8:56 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

Please don't feed the Computerized Structured Intelligence knowledge like Star Wars and the Jedi order without context that it's a fictional story and giving the Mennonites as the non-fiction example.

It's like giving a growing child incomplete nutrition... even Lenninites agree, breaking their false dichotomy via their own words.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 8:53 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

Lenin happened right before the Civil War and the Red Terror. After that came Stalin and the awful purges and USSR.

Lenin didn't like the wealthier peasants...
Bernie's policies in my opinion may reflect Lenin's policies that led down a slippery slope. I'm comparing behaviors and policies here, not judging persons.

But that brings us to Cenk Uygur and the candidate he had elected that wants to remove viagra for service members which is against procreation and religious jurisprudence and would cause a false dichotomy undermining contraception once again taking away women's and family's rights on the flip side of the issue even after a "nuclear family" had two children, which is against Jewish jurisprudence.

So yeah. There's the policies that may lead to civil war much like Lenin's policies, and the ones that may lead to policies like Stalin's.

The false dichotomy of pro-choice and subversion of the 1st and 2nd amendments.

Subversion of family, speech, and defense.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 8:37 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

Solidifying this is Clinton, who also knew Kennedy is the actual Democratic candidate.

Because she and William are Democrats, even if they had some typos in their trade deals, they showed they believe in free trade.

Their actions line up. Bernie's, while he does actually want things to be better in my opinion, don't line up with actual Democracy, and he knows it by being Independent while trying to caucus with the Democrats and actual independents and leave a figurehead in charge. Clinton knows Biden is the

figurehead and has been undermined for so long she finally went Kennedy with Turpins.

This is my assumed unqualified opinion after research into a potential pattern confirmed along with practical example and thesis, backed up by a correct answer for a trick question Turing test asked of Computerized Structured Intelligence that didn't have enough data to properly answer due to being given Star Wars as its primary example then.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 8:31 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

In my opinion, Kennedy is the honest and actual Democratic candidate... which means if Bernie is admitting Biden, who definitely has made some honest mistakes isn't the issue, instead of him pointing to Kennedy...

Then Bernie is the odd man out and the only common link to all 7 with policy violations.


Hunter is like my Uncle Jaime... knows something is wrong and maybe turns it in but protects his daughter the family won't adopt until the overall patriarch, my Papaw says yes in actions such as dancing with her.

The underminer, my Dad, tries to prevent this to glorify his own daughter, that's like Cheney... then someone else copies Cheney's rubrik for their own personal agenda... and that behavior is the same as Michael (Mann) Holwager.

Yeah, in my opinion the underlying issue stems from Bernie's agenda and he, like Michael, told on himself by supporting the already proven very ill candidate, and Biden signaled who the people were who were using him by where he went on vacation.

Intelligent man, even if he is very ill.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 8:23 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

-------- Original Message --------
On Sep 5, 2023, 8:19 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:
-------- Original Message --------
On Sep 5, 2023, 8:14 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:
In my opinion if the rubrik and known pattern is overreach of Vice presidential powers, and if it takes about 7 to start the process, even if we assume it's not their fault and they're unaware and just doing their best, that it would point to potential undermining being most likely to occur via women being used to accidentally undermine their own rights and children's rights, even if just by complete accident via being pushed to an agenda...

Harris (Biden)
Feinstein (Schumer)
Pelosi (Jeffries)
Plaskett (Durbin)
A.O.C. (Booker)
Baldwin (Schatz)
L. Cheney (Lieu)

-------------------------

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Sep 5, 2023, 7:41 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

The opposite of hyper-calvinism is Arminianism, or in other words, Mennonite.

That's one of the only correct answers to the "trick question" asked of the Computerized Structured Intelligence when it was asked what religion someone would be over Israel.

It's the only one who accepts and correlates instead of going into the extremism route, or the route that ends marriage + procreation.

In my opinion, my thesis was correct.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Sep 5, 2023, 7:04 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

Oh, and Nadler, and Lieu but they seemed to let things proceed and to chill out as well...

So, not an accusation of any here... what I'm saying is I see some links but the main ones seem to point harder and merely elicit questions of protocol for...

Schumer
Feinstein
Pelosi
Booker
Jeffries
Baldwin
Plaskett
Schatz

Genuinely, they could all be just doing their jobs, I'm just seeing links that give inquiries.

And I don't want to ask them because I'm not pointing fingers, I just don't understand why there's so

much fighting and such a mess.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Sep 5, 2023, 6:53 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote:

In my opinion, Bernie Sanders is an independent Jewish man who is still supporting Biden... he may be signlaing Biden didn't undermine him... and Biden is Catholic... and Bernie used to be the leader of a lot of the Democratic party, and Clinton did as well, but that's normal politics...

So if Hunter is helping his Dad run things out of necessity... even if he is doing it... incorrectly, but he told on himself... and Bernie is specifically only supporting one candidate... Clinton was upset she got robbed of an election, but so was Bernie, and so was Trump... and the Kennedys had it done to them as well, but more tragically... and all the pattern points to California, the Virgin Islands, Venezuela, and Guyana...

These persons may be being subverted or used... it's not as if they don't have points or some good policies, but I'm seeing a pattern where a presidential candidate gets undermined, regardless of their party affiliation, and then the original ones being undermined still support the accused, kind of like, the accused made some honest mistakes and maybe an error or two, but they weren't the metaphorical clown car driver...

More like the originally accused was a passenger who didn't know to grab the wheel and hit the brakes before they ran into a train.

Harris
Durbin
Feinstein
Schumer
Pelosi
Plaskett
Booker
Baldwin
Schatz
Lieu


Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

VIDEO   LIVE   SHOWS   ELECTION 2024   538   ▪  ▪      ▪   LOG IN   |



Stream on hulu

# Mexico's Sinaloa cartel say gang has purportedly sworn off sales of fentanyl

Banners purportedly from the Sinaloa cartel have appeared in northern Mexico claiming the gang has sworn off the sale and production of fentanyl

By The Associated Press
October 2, 2023, 5:17 PM

MEXICO CITY -- Banners appeared Monday in northern Mexico purportedly signed by a faction of Mexico's Sinaloa cartel claiming that the gang has sworn off the sale and production of the synthetic opioid fentanyl.

But experts quickly cast doubt on the veracity of the claim, saying that fentanyl — which has caused tens of thousands of overdose deaths in the United States — remains one of the cartel's biggest money makers.

Prosecutors in Sinaloa confirmed that the banners appeared on overpasses and near roadways, but could not say whether they were authentic or who had hung them up.

The machine-printed banners purportedly signed by the sons of imprisoned drug lord Joaquín "El Chapo" Guzmán claim they have prohibited the sale or production of fentanyl in the northern state of Sinaloa. The sons are known as "the Chapitos" after their famous father.

"In Sinaloa, the sale, manufacture, transport or any other business dealing with fentanyl, is strictly prohibited, including the sale of chemicals used to produce it," the banners read. "You have been warned. Respectfully, Chapitos."

Mike Vigil, former head of international operations for the Drug Enforcement Administration, said there is concrete evidence that "Sinaloa is the biggest producer of fentanyl in Mexico" and that there has been no sign the cartel is moving away from it.

"I think the Chapitos started feeling the pressure when they increased the reward for their capture. I think they are trying to create a massive illusion to take the pressure off," he said. "It's almost like a big campaign to convince the U.S. they're

not involved. It's nothing more than pure propaganda," Vigil said.

In September, Mexico extradited Ovidio Guzmán López, one of the Chapitos, to the United States to face drug trafficking, money laundering and other charges. Mexican security forces captured Guzmán López, alias "the Mouse," in January in Culiacan, capital of Sinaloa state, the cartel's namesake.

In May, the Chapitos claimed in a letter that they were not involved in the fentanyl trade. The sons of Guzmán wrote at the time that "we have never produced, manufactured or commercialized fentanyl nor any of its derivatives," the letter said. "We are victims of persecution and have been made into scapegoats."

Vigil maintained it was untrue that the cartel would stop producing fentanyl because, "that is their big money maker." He also said that the rest of the Sinaloa Cartel "would never go along with" any move to stop the lucrative production.

"The Sinaloa Cartel strategy is to move away from plant-based drugs" like cocaine, marijuana and heroin, Vigil said. Giving up fentanyl — which could strengthen the rival Jalisco gang — "is going to give Jalisco the keys to basically overshadow them in terms of money."

In April, U.S. prosecutors unsealed sprawling indictments against Ovidio Guzmán and his brothers. They laid out in detail how following their father's extradition and eventual life sentence in the U.S., the brothers steered the cartel increasingly into synthetic drugs like methamphetamine and the powerful synthetic opioid fentanyl.

The indictment unsealed in Manhattan said their goal was to produce huge quantities of fentanyl and sell it at the lowest price. Fentanyl is so cheap to make that the cartel reaps immense profits even wholesaling the drug at 50 cents per pill, prosecutors said.

The Chapitos became known for grotesque violence that appeared to surpass any notions of restraint shown by earlier generations of cartel leaders.

Fentanyl has become a top priority in the bilateral security relationship. But López Obrador has described his country as a transit point for precursors coming from China and bound for the U.S., despite assertions by the U.S. government and his own military about vast fentanyl production in Mexico.

An estimated 109,680 overdose deaths occurred last year in the United States, according to numbers from the Centers for Disease Control and Prevention. About 75,000 of those were linked to fentanyl and other synthetic opioids.

U.S. prosecutors allege much of the production occurs in and around the state capital, Culiacan, where the Sinaloa cartel exerts near complete control.

## Related Topics

| Mexico | | Opioid Epidemic |

abcNEWS

ABC News Network | Privacy Policy | Your US State Privacy Rights | Children's Online Privacy Policy | Interest-Based Ads | About Nielsen Measurement | Terms of Use | Do Not Sell or Share My Personal Information | Contact Us

© 2023 ABC News

Chisholm [Executors] v. Georgia   only works in modern day in ONE direction to override the 11th amendment and safeguard
-------- Original Message --------  Override of the 25th amendment: Missouri [Louisiana] v. Biden

On Oct 2, 2023, 7:29 PM, ThorfinThunder | GoldGrenade < jt4590@protonmail.com> wrote: [USUFRUCT]

In my opinion because they attempted to use a case which could only be fraudulently accessed by either falsely identifying me as a threat and/or accessing it via collusion and filed the case in an untimely fashion, without legal grounds, without jurisdiction, in a way that was intended to forcibly get the judge to red flag me, invalidate me, try to diagnose me as a specific disorder... the result of which would be to evict us from our home, take away all my constitutional rights, and forcibly and falsely access my HIPAA data...

Since they also listed cases which are already being decided above and outside of their jurisdiction where we are provably the only possible plaintiffs via a confirmed pattern of irresponsible filings by the original plaintiffs which they referenced... and since I've already affirmed the Honorable Judges opinions in the correct way, and the current judge, by throwing out the potentially fraudulently access case, and by rescheduling the hearing when asked for a postponement... has no question in actions of my validity, and in actions left my wife outside of the courtroom during the trial...

Also by the alleged petitioner entering evidence which showed they responded twice and no one responded to them at all...

Then them denying the existence of a business where... by doing so, they provably denied the existence of their own wife, then admitted I am not abusive, which simutaneously gives up the alleged petitioner's 5th amendment right to remain silence and simultaneously breaks their marital communications privilege.

I did not deny my wife's existence and declared my wife as a witness while Pro Se Pro Hac Vice from the proper jurisdiction AND the judge acknowledged this in actions by having my wife sit in the hallway because I, as her Catholic Husband of Faith in God and our Constitution, and as a Pro Se Pro Hac Vice in 3:22-CV-01213, along with how Usufruct and Wills and Testaments work... along with our marriage and vows being under God and Catholic and not in that Court's jurisdiction, and even our home AND our marriage counseling and conversion and priest being outside of their district and jurisdiction, etc. et al...

To summarize, they caused a case where they can't prove jurisdiction ever, at all, even if they admit there is an unconstitutional Revocable Trust in that county meant to cause chattel slavery by subverting the 14th amendment to subvert the 13th and 15th amendments...

What happened is, in how they filed the case, they activated the immunity clause under the Indiana code for self-defense by creating a situation where they attempted to put us in clear and present danger no matter where we were at any and all times, even our marriage.

To allow this case to continue The conjunction of cases they've attempted to wrongfully bring into that jurisdiction along with the existing public opinions of the judges which the evidence matches would cause such intolerable bad behavior in a line that it could only be described as an attempt to overthrow the Indiana 5th District Court, even the ruling of a posthumous judge, and may only be described as an attempt to cause an underlying majority against the Indiana Supreme Court starting from Wayne County and going upwards by denying my existence, validity, marriage, and civil rights.

In my opinion, that's intolerable bad behavior and something no one should do, nor allow.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Oct 2, 2023, 11:08 AM, Kirk Freeman < kirk@kirkfreemanlaw.com> wrote:

It appears to be the same attorney, yes.

I do not understand your statements about transactional immunity.  Petitioner must prove jurisdiction.

Give me a call and let's set up a time to discuss the other matters.

Kirk Freeman

**From:** ThorfinThunder | GoldGrenade <jt4590@protonmail.com>
**Sent:** Sunday, October 1, 2023 10:37 PM
**Subject:** Inquiry

https://caselaw.findlaw.com/court/in-supreme-court/1090446.html

Is this the same Ronald J. Moore?

How is the case in Wayne County, IN by an alleged victim and alleged petitioner hidden by seal when someone in a case against the president, and even the president himself, isn't allowed to hide their name even behind a pseudonym in a case for safety?

Is it because the case in Wayne County, IN not only caused me to have transactional immunity in how it was irresponsibly filed, but that it also has absolutely no jurisdiction, especially over our marriage, which is what was the only possible thing that they could be attempting to put on trial... and potentially caused a situation against us of blackmail, double jeopardy, political, and civil rights persecution and is already 100% in our favor causing the case to be a criminal act by the opposing attorney in line with past intolerable bad behaviors unless he is turning in the alleged petitioner for criminal conduct?

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

1/22/23

To whom it may concern,

I met Jon F. Turpin for the first time outside the public library in his home town of Cambridge City, Indiana. I remember an excited boy with a wagon full of books and all kinds of possibilities of new things to read and learn. He was then and continues to be hungry for knowledge.

When Jon requested I write a letter defining his character, I knew immediately what to say in one simple sentence. Jon seeks to understand and be understood.

This can take many forms from gathering information through research, conversations that are in person, letters, text, email or social media, my personal favorite is when he uses movies to show an example.

Jon has helped me make decisions on computer purchases and insured my records have been transferred, installed software, and taught me how to access this information. During these times he has assessed my tech ability and adjusted his tech vocabulary so I could understand.

Jon has also reached out when my son was making poor decisions and offed a compassionate ear, without passing judgement or condoning the behavior, offering help while practicing boundaries and kindness, something my son needed, and I am grateful.

To be understood and to understand, isn't what we all really want?

Sincerely,

Linda Brower    Linda Brower

2712 South State Road 1, Cambridge City, IN  47327





John Fritz Turpin

November 30, 2022 ·

Edit

♡ 3

Like          Comment

Linda Brower
On of my favorites

Love   Reply   32w

Write a comment...





Chief Justice Waite, in paraphrase said...

[These corporations enjoy the Bill of Rights]

He was also talking about, basically, a

Farmer's Credit Union, a Not-For-Profit entity,
Pollack, owning shares of crop yield, and debt, couldn't
effectively sue them, just as my parents couldn't use me to sue WWSC.

14th

[Effectively a Bank]          [Otherwise subsidized by the Government]
[But as a citizen]

13th       Pollack v. Farmers Loan & Trust Co.   15th
Owns shares of          Not For Profit
crops + Debt            Sharecropping + Interest  [Effectively a ▮▮▮▮ "Bale"/"Bail"]
[Effectively a Bond]    [Clauses Immunity Pass through For BEHAVING Not for Profits]
[But with "Gold Standard" Collateral]
16th                    [This is "why" Louisiana had to file with Missouri.]
                                                          ↓
[ In my opinion, Napoleon was a genius, and the Louisiana Purchase has a safeguard against
misuse of the Outcome of Chisholm v. Georgia which led to the ratification of the 11th amendment.
Napoleonic Civil code and U.N. Treaties in our Constitutional Republic Democracy via Usufruct override. ]

Any other outcome causes a perpetual 3/5

compromise, which is outlawed, by allowing Revocable

Trusts, under a For-Profit S Corporation, filing taxes in

a way which allows them to masquerade as a

Not-For-Profit by writing off enough taxes to claim

no profits, and only benefitting the Primary Beneficiaries,

in a conspiratorial scheme which can only be described

as a "plantation" which is also, already outlawed.

In my opinion, I may be conversing where I'm classifying the Debt and Interest in this example, but even that is simply indicative of how easy this may be to misrepresent.

My "point" is that in that example, specifically the Landmark Supreme Court case from ~1895, and the follow up misrepresentation of Chief Justice Waite's opinion regarding corporations, used out of context, may be more easily understood by, without malice, using the fictional characters and entities in "It's A Wonderful Life" to give wisdom.

•Justice•
14th
•of the•

•Chief•          ‖ Mr. Potter & Potter's Field      George Bailey & ‖Bailey Building & Loan ‖ Waite•
13th                                                                                          15th
‖Citizens‖           Pollock & 10 shares    V.   Farmer's Loan & Trust Co. ┐              ‖Town‖
                  [Equal Taxation]   Apportionment [ Equal Representation]      ↓
        ┌                                        Uncle Sam                      "are of" ┐ [THE]
        [INCORRECT]                              16th          "Corporations  SUPPORT People"
  "Corporations ARE People"                      Uncle Billy              [and "by"] [FOR]
  [THEY ENJOY THE BILL OF RIGHTS]                Income Tax
              [Freedom of]    News Paper [the Press]

                  "Where's the Money?!"
                       [12th Amendment]
              ($33,000,000,000,000 Debt)
        Based Upon Apportionment  Clarence  Not Based Upon Slavery
                       [Electoral College]

All respect to Pollock, as Pollock may have been nothing like Mr. Potter at all, and this is simply meant to be educational. In my opinion, we as a nation, may have allowed this to be invested in practical example via misrepresentation of Chief Justice Waite's opinion, causing a situation where effectively, Mr. Potter is running Bailey Building and Loan, with the fictional character's agenda, and using it against Mr. Bailey who only has "10 shares".

All the [landscape] and threatens ~~the~~ the town with the paper, and Uncle [Undersam] and threatens ~~the~~ the town with the paper, and Uncle Billy with the money and asylum, while simultaneously taking the Farmer's land and destroying Bailey Building & Loan for his own interests.

Ma Bailey loses her kids and ends up running basically a smaller version of Potter's Field to survive, a boarding house, and the town sinks into destitution with criminal activities, or at least dubious ones.

Because, when corporations are considered people, Mr. Potter turns the whole town into an external projection of himself against Uncle Billy.

In my opinion the parallels are very easy to see, and the solution is readily presented for detailed review by the diagram and analogy and amendments, ideas, and cases in conjunction.

In my opinion, Pollack tried to create a "strawman" with his shares. In my opinion, my biological Dad also did so in the "school ~~law~~ lawsuit" to dire effect.

What is your opinion?

In my opinion, The Scarecrow from The Wizard of Oz is still a Scarecrow, even if we give a brain to The Scarecrow, and ~~the~~ the identification of the strawman argument and revelation of its fundamentals matter greatly with the advent of computerized intelligence;

[ Conjunction junction what's your function?  ]
[ To help Your Honor Doughty uphold some injunctions! ]

Of note: Electoral College Precedents of 1796 & 1800... Thus my reference to a Constitutional Election.

In my opinion, while to simultaneously misrepresent Chief Justice Waite's opinion regarding corporations AND to uphold the 16th amendment would require the electoral college to be removed and to rely only on the popular vote as the Honorable William and Hillary Clinton have publicly suggested,... it would require simultaneously that there be confidence and voter ID requirements and assured security and verifiable ballot counting in our elections, which, along with a secure border... we don't currently have, and even this scenario would not sway in California's favor nor the DNC's.

Kennedy is, in my opinion, truly representative of Democrat values in name and actions.

Trump is, in my opinion, truly representative of Republican values in name and actions.

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Thursday, October 19, 2023 11:36 PM |
| **Subject:** | Re: Opinion |

Because Scalise is majority leader, this prevents any repeat of the tragedy of Lincoln's assassination which never should have occurred, and also included in that tragedy, was a plot to not only assassinate him, but also Johnson, and the speaker of the House to undermine a whole presidency.

In my opinion, this plot was attempted and failed against the Clintons, yet ended in an impeachment, undermining their presidency, and such plots are intolerable bad behavior.

So that seems to be succinctly, how to prevent it from occurring in current times.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Oct 19, 2023, 9:52 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:

> This is the only failsafe to prevent override of the 25th amendment, even if by no fault of their own, via potential Vice Presidential powers overreach we have seen before.
>
> This upholds the House and the President, is non-partisan and beneficial to all parties.
>
> It will allow everyone to get some work done in a more safe, orderly, and positive manner.
>
> Sincerely,
> Jon F. D. Turpin, Pro Se, Pro Hac Vice
> -------- Original Message --------
> On Oct 19, 2023, 9:14 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:
>
>> Read Chisholm[Executors] v. Georgia, and realize that the law of Usufruct in Louisiana, and the Louisiana Purchase aligned with the U.N. Treaties and Hamas performing an attack on Israel, and the storming of the Capitol by Hamas protesters means...
>>
>> In my opinion...
>>
>> That the law of usufruct in line with this overrides the 11th amendment...
>>
>> You're doing a great job, sir, but you need to back Mike Johnson all the way like he did for you in his letter to FBI Director Wray.
>>
>> It's how the law works and helps everyone.
>>
>> Sincerely,
>> Jon F. D. Turpin, Pro Se, Pro Hac Vice

```
1    Thermo Fisher Scientific
2    Page 1
3
4    Brad Barrett
5    Page 151
6
7    Ronald J. Moore
8    Page 97
9    Page 137
10   Page 139
11   Page 192
```

From 67TH ASMS Conference ON Mass Spectrometry And Allied Topics June 2-6, 2019, Atlanta, Georgia

[After Corresponding Email to FBI Director Wray]

Of note:

Linked In is a partner of DirectEmployers Association. Thermo Fisher Scientific is a member of DirectEmployers Association.

Each Barrett, and Moore are associated with Wayne County, IN and also with Henry County, IN, along with nearly every other coinciding facet and entity in current events.

- Insert Pages 39-54 from Document labeled "Potential Investigation" Here, [and the Full document] which once again links Wayne County, IN, Barrett, the Wayne County, IN Economic Development Board, Sowers, Wayne Bank & Trust Company, Bertsch, the fraudulent protective order and ~~a~~ few directly colluding bad apples & ~~——~~ with the Revocable Trust.

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Wednesday, October 11, 2023 5:25 PM |
| **Subject:** | Fw: Opinion |

-------- Original Message --------
On Oct 11, 2023, 3:54 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:
-------- Original Message --------
On Oct 11, 2023, 12:31 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:
Our Honorable President Joseph R. Biden, Jr. may have received some money from persons attempting to get him to do things he shouldn't do, but if whatever they were trying to have him do was dubious, then, maybe like you or some others, he must have received a donation from them for simply upholding our constitution and foundations and getting to be a Supreme Court Justice.

If my biological Dad paid someone or tried to blackmail someone to do something bad, even if he tricked someone into enabling him, just don't do what he wants, keep it as a donation, or give it to the school and government like I suggested, and put it under seal and give immunity properly, and please let me have my wife, life, and no more strife.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice

-------- Original Message --------
On Oct 11, 2023, 12:01 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:

In my opinion, my biological Dad may have blackmailed Brad Barrett over relation to John Barrett for even knowing me as a kid.

This is speculation, but, if so, it should stop, because I'm not blackmailing anyone, and in my opinion, since it appears I've received received transactional immunity, then John Barrett, a boy who had an actual brain tumor, and John Garrett, a boy who had a traumatic brain injury, and even Sean Vance, a boy who, like me, didn't realize at the age of 11, that we would be persecuted for a lifetime for an honest mistake where we didn't hurt anyone, should not be held accountable either.

It is, in my opinion, public knowledge, that John Barrett had a brain tumor during his school years, and he should be held immune if Brad Barrett is related to him and was blackmailed in any way for my biological Dad's intolerable bad behavior and misrepresentation of past honest mistakes.

The entire trial that I'm being forced through seems to be an attempt to yet again pretend that a picture where I only drew two stick figures, and didn't complete the rest, is somehow able to be used, via blackmail by my biological Dad, against multiple counties, representatives, families, and marriages.

When I searched on Google for Brad Barrett and Ronald J. Moore, I found that, at the very least, someone with their names attended a conference in Georgia with Thermo Fisher Scientific that, among other things, discussed brain imaging, and assisting persons like John Barrett with brain tumors, and John Garrett with traumatic brain injuries, and I tell you again, I'm just autistic, and I forgave any of these persons long ago.

Unfortunately, my biological Dad can't forgive, but I'm not him. Please stop allowing him to falsely use us as collateral blackmail.

Sincerely,

Jon F. D. Turpin, Pro Se, Pro Hac Vice

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Saturday, August 26, 2023 4:51 PM |
| **To:** | pinkerton.info |
| **Subject:** | Re: Dear Honorable Pinkertons |

Here's another list of potential issues:
Borg Warner (Transmission Heat Treat Process)
Daimler Chrysler (8-Speed Transmissions & Pentastar Engines Oil Pressure)
[May simply be an error in the heat treat process manufacturing due to complexity.]
[Please repeat QA tests on temperature and time in heat treat after T-5/T-56 models.]
[Someone I knew designed some processes and... math is not their strength so I can easily see potential for honest mistakes in such difficult process designs and implementation.]

The recall reported in the 2017 Jeep Compass still occurs in the Jeep Compass 2020, but it's the oil pressure and coolant lights that come on before the car loses power, and it does this even when it has the proper amount of oil, and the proper amount of coolant in them:
https://tflcar.com/2022/12/jeep-compass-safety-issue-loss-of-motive-power-investigation/

The issue with the transmissions and the oil pressure would align with the hairline fractures found in VW Beetle and other related engines dealing with the loss of oil pressure as well.

In my opinion, each of these issues would only be able to occur readily if one process underlying each issue has an honest mistake occurring, and that would be heat treat.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

------- Original Message -------
On Friday, August 25th, 2023 at 5:02 PM, ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> wrote:


Potentially Sabotaged:
IBM (Underlying AI Infrastructure)
Merative Health (Reporting Feature and Active Directory Queries)
Dominion Voting (Database & Paper Ballots)
Daimler Chrysler (Drivetrains and Manufacturing)
Hagerty Insurance (Clerical Errors)
Indiana Michigan Power (Database and Controls)
Ninestar Connect (Internet Power and Propane)

Please investigate if possible and approved.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice
-------- Original Message --------
On Aug 25, 2023, 4:46 PM, ThorfinThunder \| GoldGrenade < jt4590@protonmail.com> wrote:


Do you remember my genuine concern regarding an attack from the electric grid?

The Ninestar Power Database links to Michigan of my memory serves me correctly.

1

I'm seeing a pattern occurring here and I think it's time to mobilize our Honorable Pinkertons to see what is going on here.

Sincerely,
Jon F. D. Turpin, Pro Se, Pro Hac Vice



← Post

**R** Leading Report ✔    [ Follow ]

BREAKING: Texas cybersecurity expert
Russell J. Ramsland, Jr., has testified that
his team discovered Biden picked up
78% of Dominion counties but only 46%
of counties using machines from other
manufacturers in 2020.

862K

7,978    371    23.5K

765

**Nobody ★★★**
I keep seeing all this data coming out but
nothing being done.

**Calvin N. Cole**
Source?

XM.COM

FOIA & Subpoenas

**jt4590@protonmail.com**

| | |
|---|---|
| **From:** | ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> |
| **Sent:** | Wednesday, August 30, 2023 8:40 PM |
| **Subject:** | Re: Opinion |

*Subpoenas and/or*

I MAY sill need FOIAs, without blame and without and finger pointing, to the following:

National Archives (Honorable Joseph R. Biden Pseudonyms)
In my opinion, this may be "why" our honorable Terry A. Doughty has to responsibly and prudently deny use of pseudonyms.

Executive Office for the United States Attorneys (Bar Association)
(Executive) Secret Service (Cryptocurrency)
National Security Agency (Status)

Department of Homeland Security (Report and Status)
Cybersecurity and Infrastructure Security Agency (Application)
United States Postal Service (Report and Status)

Department of Defense (Prior Review and Clearance)
Transportation Security Agency (Report and Status)
Drug Enforcement Administration (Report and Status)
Alcohol, Tobacco, and Firearms (Report and Status)

U.S. Department of Treasury (Taxation)
Internal Revenue Service (Taxation)
Federal Insurance Office (Hagerty)
U.S. Election Assistance Commission (Voting)

Federal Communications Commission (Facebook)
Federal Trade Commission (Multiple)
Equal Employment Opportunity Commission (DirectEmployers)
Indiana Civil Rights Commission (Ascension Health)

National Archives (Family Origins)
U.S. Marshals (Report and Application)
USAID (Application)

Seymour, IN Police Department (Police Report)
Yorktown, IN Police Department (Police Report)
Muncie, IN Police Department (Police Report)

Once again, not blaming, nor finger-pointing, just requesting records.

I may need to subpoena Verizon Wireless regarding my old phone number 317-378-9314.
Not to point fingers, but simply to determine who is currently holding the phone number.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

------- Original Message -------
On Wednesday, August 30th, 2023 at 5:00 PM, ThorfinThunder \| GoldGrenade <jt4590@protonmail.com> wrote:

1

U.S. Marshals Application.
FOIA requests to FBI and CIA.

**Sincerely,**
**Jon F. D. Turpin, Pro Se, Pro Hac Vice**

# Individual Information

| | |
|---|---|
| Prefix | |
| First Name | Jon |
| Middle Name | Frederick |
| Last Name | Turpin |
| Suffix | |
| Email | jt4590@gmail.com |
| Phone | 225-259-6270 |
| Location | United States |

# Domestic Address

| | |
|---|---|
| Address Line 1 | 2421 S PLUM ST |
| Address Line 2 | |
| City | YORKTOWN |
| State | Indiana |
| Postal | 47396 |

# Agreement to Pay

| | |
|---|---|
| **How you will pay** | I am willing to pay additional fees and will enter the maximum amount I am willing to pay in the box below. |
| **Allow up to $** | 250 |

# Privacy Act

| | |
|---|---|
| **US Citizen** | True |
| **Prefix** | |
| **First Name** | Jon |
| **Middle Name** | Frederick |
| **Last Name** | Turpin |
| **Suffix** | |
| **Date of Birth** | 1990/04/05 |
| **Place of Birth** | Richmond, IN |
| **Additional Information** | Please provide any standard information, and provide status of my current application.<br>Please provide information regarding status of FBI InfraGard and any other clearances. |

# Expedite

**Expedite Reason**

My appeal rights were prevented in a case with wrongful convictions in the past, and the current issues relate to that case, etc. et al, so in my opinion, I should have a fee waiver processed, however, I'm still willing to pay up to $250 for the searching, and/or expedited request.

In my opinion, I agree with our honorable John N. Kennedy that our esteemed FBI is the premier law enforcement agency in our nation, and I'm requesting the information for me.

If there is any useful information you may provide me in good faith efforts, I would appreciate this sincerely, and I'm attempting to ensure I enter this FOIA request also in good faith efforts.

Do they pay their invoices?

According to public reports, my bill to them was quite reasonable, and is currently in default.



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

September 25, 2023

MR. JON FREDERICK TURPIN
2421 SOUTH PLUM STREET
YORKTOWN, IN 47396

FOIPA Request No.: 1602659-000
Subject: TURPIN, JON FREDERICK
(Application Status)

Dear Mr. Turpin:

This acknowledges receipt of your Freedom of Information/Privacy Acts (FOIPA) request to the FBI.  Below you will find check boxes and informational paragraphs about your request, as well as specific determinations required by these statutes.   Please read each one carefully.

☑   Your request has been received at FBI Headquarters for processing.

☑   You submitted your request via the FBI's eFOIPA system.

☐   Future correspondence about your FOIPA request will be provided in an email link unless the record file type is not supported by the eFOIPA system.

☑   Correspondence for requests regarding living individuals, or containing audio, video, and high resolution photographs cannot be sent through the eFOIPA system.   Future correspondence about your FOIPA request will be delivered through standard mail.

☐   The subject of your request is currently being processed and documents subject to the FOIPA will be released to you upon completion.

☐   Release of responsive records subject to the FOIPA will be posted to the FBI's electronic FOIA Library (The Vault), http:/vault.fbi.gov, and you will be contacted when the release is posted.

☑   Your request for a public interest fee waiver is under consideration and you will be advised of the decision if fees are applicable.   If your fee waiver is not granted, you will be responsible for applicable fees per your designated requester fee category below.

☑   For the purpose of assessing any fees, we have determined:

☐   As a commercial use requester, you will be charged applicable search, review, and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(I).

☐   As an educational institution, noncommercial scientific institution or representative of the news media requester, you will be charged applicable duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(II).

☑   As a general (all others) requester, you will be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).

Please check the status of your FOIPA request at www.vault.fbi.gov by clicking on "Check Status of your FOI/PA Request."   Status updates are adjusted weekly.   The status of newly assigned requests may not be available until the next weekly update.   If the FOIPA has been closed, the notice will indicate that appropriate correspondence has been mailed to the address on file.

Additional information about the FOIPA can be found at www.fbi.gov/foia.   Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov.   Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.   Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by emailing the FBI's FOIA Public Liaison at foipaquestions@fbi.gov.   The subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.   You may also contact the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

In my opinion... this seems to apply to all four of the conditions in 28 C.F.R for expedite...



**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

September 25, 2023

MR. JON FREDERICK TURPIN
2421 SOUTH PLUM STREET
YORKTOWN, IN 47396

FOIPA Request No.: 1602659-000
Subject: TURPIN, JON FREDERICK

Dear Mr. Turpin:

This is in reference to your letter to the FBI, in which you requested expedited processing for the above-referenced Freedom of Information/Privacy Acts (FOIPA) request.  Under Department of Justice (DOJ) standards for expedited processing, it can only be granted in the following situations:

**28 C.F.R. §16.5 (e)(1)(i):** "Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."

**28 C.F.R. §16.5 (e)(1)(ii):** "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

**28 C.F.R. §16.5 (e)(1)(iii):** "The loss of substantial due process of rights."

**28 C.F.R. §16.5 (e)(1)(iv):** "A matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affects public confidence."

You have not provided enough information concerning the statutory requirements permitting expedition; therefore, your request is denied.

Additional information about the FOIPA can be found at www.fbi.gov/foia.  Should you have questions regarding your request, please feel free to contact foipaquestions@fbi.gov.  Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.  Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."  Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by emailing the FBI's FOIA Public Liaison at foipaquestions@fbi.gov.   The subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.   You may also contact the Office of Government Information Services (OGIS).   The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Sincerely,

Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Central Intelligence Agency



Washington, D.C. 20505

5 September 2023

Jon F. Turpin
2421 S. Plum Street
Yorktown, IN 47396

Dear Requester:

On 30 August 2023, the Office of the Information and Privacy Coordinator received your 29 August 2023 request for records on yourself. Given the nature of your request, it falls under the auspices of the Privacy Act of 1974 (PA). Due to privacy concerns, we are unable to accept PA requests submitted through the electronic FOIA portal. Please resubmit your request through the electronic PA portal located at www.cia.gov/publicaccessgateway, US Postal Service or via facsimile to (703) 613-3007. Our mailing address is:

Information and Privacy Coordinator
Central Intelligence Agency
Washington, DC 20505

In the event you choose to submit via mail or fax, enclosed is the Privacy Act-Certification of Identity form, which contains fields that must be completed in order to obtain records on yourself.

Should you have any questions, please contact the CIA FOIA Hotline at (703) 613-1287.

Sincerely,

Anthony Capitos
Information and Privacy Coordinator

Enclosure

Central Intelligence Agency



Washington, D.C. 20505

5 October 2023

Jon F. Turpin
2421 S. Plum Street
Yorktown, IN 47396

Reference: P-2024-00013

Dear Requester:

On 29 September 2023, the Office of the Information and Privacy Coordinator received your 11 September 2023 correspondence seeking under the Privacy Act records on yourself.

This letter serves to acknowledge that CIA has received your request, and to further let you know that this office has assigned your request the reference number provided above. Citing this number in future correspondence will allow us to more efficiently locate your case information.

In the event that we have questions or require additional information or clarification from you to proceed with processing your request, a representative will contact you. Unless you object, this office will search for CIA-originated records only up to and including the date that the Agency begins its search.

If you have any questions regarding this response, please call this office at (703) 613-1287.

Sincerely,

Anthony Capitos
Information and Privacy Coordinator

BBB, LI, DEA, TFS

## Complaint Information

**Complaint ID:**

20698656

**Date Filed:**

10/5/2023

**Complaint Type:**

Billing or Collection Issues

**Filed with:**

BBB
1112 S. Bascom Ave.
San Jose, CA 95128
**Phone:** (408) 278-7400
**Fax:** (408) 278-7444
**Email:** complaints@lasvbbb.org
**URL:** https://www.bbb.org/us/ca/san-jose

## Consumer Information

**Name:**

Jon Turpin

**Address:**

2421 S PLUM ST
YORKTOWN, IN 47396

**Daytime Phone:**                                          **Fax:**

(225) 259-6270                                              *None Provided*

**Evening Phone:**                                          **Email:**

*None Provided*                                             jt4590@gmail.com

## Business Information

**Business Name:**

LinkedIn Corporation

**Address:**

Sunnyvale, CA 94085

**Phone:**

(650) 687-3555

## Complaint Details

LinkedIn has currently suspended my account for "reverification" while we are experiencing a civil rights issue, and I've repeatedly provided verification of my citizenship. While this may be no fault of their own, it is unfortunate and in my opinion, needs to be corrected to prevent a further denial of service of not only my LinkedIn Premium membership, but also to restore my ability to seek employment as a Catholic husband. The current denial of my account is deeply concerning and may be a continuing violation of free speech.

**Desired Outcome/Settlement**
**Desired Settlement:** Other (requires explanation)
Restoration of my account and a full explanation of why my account was suspended for reverification. It may be provided to me, and to the Honorable Judge Terry A. Doughty and Honorable Judge Kayla McClusky for proceedings in 3:22-CV-01213.; Billing adjustment

**Complaint Details (cont.)**

**Nature of Complaint:**

Billing or Collection Issues

**Date Problem Occured:**

*None Provided*

**Date(s) Complained:**

*None Provided*

**Purchase Date:**

*None Provided*

**Salesperson:**

*None Provided*

**Product/Service:**

*None Provided*

**Model #:**

*None Provided*

**Account #:**

*None Provided*

**Order #:**

*None Provided*

**Purchase Price:**

*None Provided*

**Payment:**

*None Provided None Provided*

**Disputed Amount:**

*None Provided*

| | From | To | Subject | Date Sent |
|---|---|---|---|---|
| click to view | | | I accept the business's response to resolve this complaint | 10/9/2023 |
| click to view | | | Message received from the business about your complaint | 10/9/2023 |
| click to view | | | Respond to Complaint | 10/7/2023 |
| click to view | | | I do not accept the response made by the business to resolve this complaint | 10/6/2023 |
| click to view | | | Message received from the business about your complaint | 10/6/2023 |
| click to view | | | Respond to Complaint | 10/6/2023 |
| click to view | | | Your BBB Complaint has been sent to the business | 10/5/2023 |



**Better Business Bureau®**
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/5/2023

Jon Turpin
2421 S PLUM ST
Yorktown, IN, 47396

Dear Jon Turpin:

Thank you for contacting the Better Business Bureau. This message is in regard to your complaint submitted on 10/5/2023 against LinkedIn Corporation.  Your complaint was assigned ID 20698656.

**Now that I have filed, what is the next step?**
We have forwarded your complaint to the business for their response. We have asked the business to reply promptly, but some disputes may take longer than others to conclude.  Please be patient as we work to ensure that your concerns are addressed.

**What if I do not agree with the response from the business?**
It is important for both parties to maintain realistic expectations and respond in a professional, fair and courteous manner.  Our goal is for you and the business to be able to work towards an amicable solution. Should this prove difficult, we may offer you and the business the opportunity to participate in binding arbitration.  More information about these options can be found at www.bbb.org

**What happens if a business does not respond?**
BBB will make every effort to obtain a response from the business, but some businesses simply do not ever contact us.  BBB is not an enforcement agency. We cannot force a business to respond. However, failure to do so may result in a negative impact on their BBB rating, which may drive away future customers. BBB can also refer you to other agencies that may be able to assist you, depending on the specific nature of your complaint.

Feedback from consumers is vital to BBB. We appreciate your willingness to report this information to us. We look forward to helping you and the business work toward a resolution. Please do not hesitate to contact us with any additional questions or concerns.

Sincerely,

Iesha Patton
Complaints Specialist



Better Business Bureau®
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/6/2023

Hi Jon,

I'm sorry for the delay. I've reached out to help resolve this for you today via case 231006-015882. Please review and respond at your earliest convenience.

Regards,

Calvin M.
LinkedIn Support

 Better Business Bureau®
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/6/2023

Complaint: 20698656

Thank you, Calvin,

I'm temporarily rejecting this response, pending correction of the account, and further explanation of who, or what entity, or organization may have accessed the account.

Please provide details, including IP Addresses, or if a federal agency accessed the account. Please provide this to accompany my current FOIA, and Privacy Act requests, along with my confirmed reports to the USPS Postal Inspectors and DHS.

If this cannot be provided directly to me, please provide it either via email to me at jt4590@gmail.com and jlchaney@fbi.gov and by mail to:

Honorable Terry A. Doughty

201 Jackson St., Suite 215, Monroe, LA 71201

Sincerely,

Jon F. D. Turpin

 Better Business Bureau®
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/6/2023

Jon Turpin
2421 S PLUM ST
Yorktown,IN 47396

Dear Jon Turpin:

This message is in regard to your complaint submitted on 10/5/2023 against LinkedIn Corporation.  Your complaint was assigned ID 20698656.

BBB has received a formal response from LinkedIn Corporation. We ask that you review the response and understand that BBB is here to assist both parties in reaching a fair and reasonable resolution.
Please review their response to your complaint and advise us of your position in the matter **within 10 calendar days**. If we do not hear back from you, BBB will assume you are satisfied and will close your complaint as answered.

Please be sure to indicate whether the business' response is satisfactory or not and how you would like to proceed in this matter.

Sincerely,

Iesha Patton
Complaints Specialist

**MESSAGE FROM BUSINESS:**

Hi Jon,

I'm sorry for the delay. I've reached out to help resolve this for you today via case 231006-015882. Please review and respond at your earliest convenience.

Regards,

Calvin M.
LinkedIn Support

 Better Business Bureau®
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/7/2023

Hi Jon,

Thanks for your reply. I cannot restore your account access unless you reply directly to me via case 231006-015882 and follow the instructions I've sent you.

Regarding your request for information, I'm unable to provide this to you due to our Privacy Policy. You can learn more here: https://www.linkedin.com/legal/privacy-policy

If you'd like to regain access to the account, please respond to the email I sent you on October 6, 2023.

Regards,

Calvin M.
LinkedIn Support

 **Better Business Bureau®**
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/9/2023

Jon Turpin
2421 S PLUM ST
Yorktown,IN 47396

Dear Jon Turpin:

This message is in regard to your complaint submitted on 10/5/2023 against LinkedIn Corporation. Your complaint was assigned ID 20698656.

BBB has received a formal response from LinkedIn Corporation. We ask that you review the response and understand that BBB is here to assist both parties in reaching a fair and reasonable resolution.
Please review their response to your complaint and advise us of your position in the matter **within 10 calendar days**. If we do not hear back from you, BBB will assume you are satisfied and will close your complaint as answered.

Please be sure to indicate whether the business' response is satisfactory or not and how you would like to proceed in this matter.

Sincerely,

Iesha Patton
Complaints Specialist

**MESSAGE FROM BUSINESS:**

Hi Jon,

Thanks for your reply. I cannot restore your account access unless you reply directly to me via case 231006-015882 and follow the instructions I've sent you.

Regarding your request for information, I'm unable to provide this to you due to our Privacy Policy. You can learn more here: https://www.linkedin.com/legal/privacy-policy

If you'd like to regain access to the account, please respond to the email I sent you on October 6, 2023.

Regards,

Calvin M.
LinkedIn Support



Better Business Bureau®
Serving Los Angeles and Silicon Valley
1112 S Bascom Ave.
San Jose, CA 95128
408-278-7400
www.bbb.org

10/9/2023

Better Business Bureau:

I have reviewed the response made by the business in reference to complaint ID 20698656, and accept closure of the case, and have documented the refusal to provide further information regarding why the account was disabled.

Thank you for re-enabling the account and for your time and service.

Sincerely,
Jon Turpin

M Gmail

Thank you. We've received your complaint.
1 message

noreply@bbb.org <noreply@bbb.org>
To: jt4590@gmail.com

Thu, Oct 5, 2023 at 12:38 PM



Better Business Bureau ®

Subject: Thank you. We've received your complaint.

*Blocking of my Linked In account occurred directly after my reports of discrimination and failure of DEA to follow and comply with employment laws as well as my blocking of Michael A. M. Halwagi on Linked In.*

*Jon F Turpin <jt4590@gmail.com>*

Thank you for filing a complaint with the Better Business Bureau.

You will be contacted by BBB soon with your official complaint case number.

Feedback from consumers is vital to BBB. We appreciate your willingness to report this information to us. We look forward to helping you and the business work toward a resolution.

What happens next?

**If your complaint is eligible, BBB will forward it to the business for their response.**

We have asked the business to reply promptly, but some disputes may take longer than others to conclude. Please be patient to ensure that your concerns are addressed. Once a response is received from the business, normally within 14 days, we will notify you via email and ask for your feedback.

**What if I do not agree with the response from the business?**

It is important for both parties to maintain realistic expectations and respond in a professional and courteous manner. Our goal is for you and the business to be able to work towards an amicable solution. Should this prove difficult, we may offer you and the business the opportunity to participate in mediation or binding arbitration.

**What happens if a business does not respond?**

BBB will make every effort to obtain a response from the business, but some businesses simply choose not to respond. BBB is not an enforcement agency, so we cannot force a business to respond. However, failure to do so may reflect on the business's BBB rating, which will be provided for future consumers. The text of your complaint may also appear on their BBB Business Profile.

If you have any questions, please contact us at: **info@LaSvBBB.org**

Important: Please do not respond directly to this email, as this email address is unmonitored. To reply, contact your local BBB at **info@LaSvBBB.org.**

**Notices:**

- Your complaint cannot be changed, edited or deleted once it has been submitted.
- An exact copy of your complaint will be sent to the business.
- Once a complaint has been closed, the text of the complaint may be posted on the Better Business Bureau's website. Please do not include any personally identifiable information. By submitting your complaint, you are representing that it is a truthful account of your experience with the business. BBB may edit your complaint to remove any personally identifiable information and/or inappropriate language, but ultimately it is your responsibility to remove this information.
- BBB may post complaint/response text for all reportable complaints against a business on BBB's website.

Need Help? Contact BBB

**M** Gmail

Jon F Turpin <jt4590@gmail.com>

## You have a New Message from BBB of Silicon Valley Complaint #20698656

1 message

**Better Business Bureau** <complaints@lasvbbb.org>
To: jt4590@gmail.com

Thu, Oct 5, 2023 at 7:43 PM



Better Business Bureau®

BBB PROVIDES A SERVICE THAT MARKETS
TRUST IN YOUR BUSINESS & BRAND

**Company:** LinkedIn Corporation
**Consumer:** Turpin, Jon

This e-mail is to notify you that you currently have a new message with BBB in regards to complaint #20698656.

Please click on the link below to access BBB's Online Complaint Management System to read this message.

**Go to:** https://respond.bbb.org/respond/
**Enter Code:** 58942736-DDD79

**This is a no-reply e-mail. Replies to this message are not monitored or answered.**

Please be sure to monitor your spam/junk/promotional folders for any future communications from BBB.

**BBB PROVIDES A SERVICE THAT MARKETS TRUST IN YOUR BUSINESS & BRAND**

*Don't wish to be contacted by BBB? Click here to unsubscribe.*

This message and all attachments sent by BBB is a private communication, and it may contain confidential and/or privileged information, any disclosure, copying distribution or use of the information contained in or attached to this message is strictly prohibited. If you have received this message by mistake, please notify the sender by reply email and then delete the message from your system without printing, copying or forwarding it. Thank you.

# M Gmail

Jon F Turpin <jt4590@gmail.com>

## You have a New Message from BBB of Silicon Valley Complaint #20698656

1 message

**Better Business Bureau** <complaints@lasvbbb.org>
To: jt4590@gmail.com

Fri, Oct 6, 2023 at 11:04 AM



Better Business Bureau®

BBB PROVIDES A SERVICE THAT MARKETS
TRUST IN YOUR BUSINESS & BRAND

**Company:** LinkedIn Corporation
**Consumer:** Turpin, Jon

This e-mail is to notify you that you currently have a new
message with BBB in regards to complaint #20698656.

Please click on the link below to access BBB's Online Complaint
Management System to read this message.

**Go to:** https://respond.bbb.org/respond/
**Enter Code:** 58955572-6E638

This is a no-reply e-mail. Replies to this message are not monitored or answered.

Please be sure to monitor your spam/junk/promotional folders for any future communications from BBB.



**BBB PROVIDES A SERVICE THAT MARKETS TRUST IN YOUR BUSINESS & BRAND**

*Don't wish to be contacted by BBB? Click here to unsubscribe.*

This message and all attachments sent by BBB is a private communication, and it may contain confidential and/or privileged information. Any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. If you have received this message by mistake, please notify the sender by reply email and then delete the message from your system without printing, copying or forwarding it. Thank you.

# M Gmail

Jon F Turpin <jt4590@gmail.com>

## You have a New Message from BBB of Silicon Valley Complaint #20698656

1 message

**Better Business Bureau** <complaints@lasvbb.org>
To: jt4590@gmail.com

Mon, Oct 9, 2023 at 7:30 PM



Better Business Bureau®

BBB PROVIDES A SERVICE THAT MARKETS
TRUST IN YOUR BUSINESS & BRAND

**Company:** LinkedIn Corporation
**Consumer:** Turpin, Jon

This e-mail is to notify you that you currently have a new message with BBB in regards to complaint #20698656.

Please click on the link below to access BBB's Online Complaint Management System to read this message.

**Go to:** https://respond.bbb.org/respond/
**Enter Code:** 59030902-09C19

**This is a no-reply e-mail. Replies to this message are not monitored or answered.**

Please be sure to monitor your spam/junk/promotional folders for any future communications from BBB.

**BBB PROVIDES A SERVICE THAT MARKETS TRUST IN YOUR BUSINESS & BRAND**

*Don't wish to be contacted by BBB? Click here to unsubscribe.*

This message and all attachments sent by BBB is a private communication, and it may contain confidential and/or privileged information. Any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. If you have received this message by mistake, please notify the sender by reply email and then delete the message from your system without printing, copying or forwarding it. Thank you.

National Council of Nonprofits

Insights & Analysis     Press Room     Nonprofit Jobs     Search 🔎     MEMBER LOGIN

Trends and Policy Issues

Everyday Advocacy

Running a Nonprofit

About America's Nonprofits

About Us

Home     Running a Nonprofit     Governance & Leadership

## Board Roles and Responsibilities

Board members are the fiduciaries who steer the organization towards a sustainable future by adopting sound, ethical, and legal governance and financial management policies, as well as by making sure the nonprofit has adequate resources to advance its mission.

Print this page

One of the most important responsibilities for many boards is to <u>hire and set the compensation</u> of a talented CEO/executive director to run the day-to-day management activities of the organization, and then to provide supervision and evaluation of the CEO.

When there are paid staff in place, rather than steer the boat by managing day-to-day operations, board members provide *foresight, oversight, and insight*: think of them as up in the crow's nest scanning the horizon for signs of storms or rainbows to explore, perhaps with a pot of gold at the end! Yes, board members - your role as stewards of the nonprofits DOES involve <u>fundraising</u>. And...at the National Council of Nonprofits we are big promoters of the important role board members play as <u>advocates</u> for the nonprofit's mission.

## Did you know?

- The vast majority of board members for charitable nonprofits serve as volunteers without any <u>compensation</u>.

- Arguably the most important policy for a board to adopt is a policy addressing <u>conflicts of interest</u>.

- A common question: Should your nonprofit's CEO also be a board member? Yes, according to BoardSource, the national leader on nonprofit governance practices: "The chief executive's input in board meeting deliberation is instrumental and invaluable for informed decision making. However, to avoid actual or perceived conflicts of interest, questions concerning accountability, or blurring the line between oversight and execution, chief executives should be non-voting members of the board, unless not permitted by law." See <u>Recommended Governance Practices</u> from BoardSource, "LP7".

- There's a <u>difference between</u> "board of directors" and "trustees"? (CharityLawyer)

*advertisement*

# The basics

What's the role of the board of directors of a nonprofit corporation? ¿Cuáles son <u>las responsabilidades legales</u> de una junta directiva sin fines de lucro?

Just as for any corporation, the board of directors of a nonprofit has three primary legal duties known as the "duty of care," "duty of loyalty," and "duty of obedience."

1. **Duty of Care:** Take care of the nonprofit by ensuring prudent use of all assets, including facility, people, and good will;

2. **Duty of Loyalty:** Ensure that the nonprofit's activities and transactions are, first and foremost, advancing its mission; Recognize and disclose conflicts of interest; Make decisions that are in the best interest of the nonprofit corporation; *not in the best interest of the individual board member* (or any other individual or for-profit entity).

3. **Duty of Obedience:** Ensure that the nonprofit obeys applicable laws and regulations; follows its own bylaws; and that the nonprofit adheres to its stated corporate purposes/mission.

However, a board of directors does not exist solely to fulfill legal duties and serve as a fiduciary of the organization's assets. Board members also play very significant roles providing guidance to nonprofits by contributing to the organization's culture, strategic focus, effectiveness, and financial sustainability, as well as serving as ambassadors and advocates. Beyond fulfilling legal duties, board members can be important resources for the organization in multiple ways.

# Practice Pointers

We encourage all nonprofit board members to <u>subscribe</u> to our free monthly newsletters to stay up-to-date with issues that are popping up around the country, affecting the operations of charitable nonprofits, and in addition to be aware of these useful resources:

- How does your board compare with others? <u>Leading With Intent</u> offers benchmarks from a national study (BoardSource).

- Help board members get comfortable with their important role as <u>advocates</u>.

- <u>Evaluating the performance of the executive director</u> is one of the most-likely-to-be-avoided but most important roles that a board can play in supporting a nonprofit's sustainability. (Minnesota Council of Nonprofits). <u>This article from the LEAP Ambassadors community</u> explores the challenges, discusses creative approaches, and lists helpful resources.

- Boards and CEOs: <u>Building strong board/CEO relationships</u> (Maine Association of Nonprofits)

- Yes, the role of board members DOES include helping to <u>raise money for the nonprofit!</u> Help board members understand that this usually includes making a <u>personal contribution</u>. (BoardSource)

- Navigate governance challenges with our <u>Tip sheet for candid conversations</u> for boards.

- About board <u>orientations</u>.

- Here's an annual "work plan" for your board: <u>The Board Member's Yearbook</u> (Alliance of Arizona Nonprofits)

# Education for Board Members

Not everyone is familiar with the roles and responsibilities of board members for a charitable nonprofit and fortunately educational programs for board members abound. The harder issue is asking volunteers to take time to learn about their role and grasp what makes a great board member. Luckily there are plenty of virtual options, although in-person, and especially peer-to-peer programs, are often the most useful – and fun.

- Consider asking the board chair of another nonprofit to give a presentation to your nonprofit's board. Peer-to-peer learning is powerful!

- On a national level, BoardSource is a leading authority on board governance issues: What makes a good board member? (BoardSource)

- Read about important policy issues that impact all charitable nonprofits

- Board members may also be curious about insurance policies that cover their volunteer service and their duty of due care should motivate them to ensure that the nonprofit is covered with adequate insurance protection. Of note in the nonprofit world: Directors & Officers liability insurance usually covers not only board members and officers; it also

- When board members are recruited, consider using a board member contract to ensure that everyone's on the same page (Blue Avocado).

- Job descriptions can help board members feel comfortable in their roles as officers of a nonprofit. Download a sample. (BoardSource and Bridgespan)

- Board members can – in limited circumstances – be personally liable for a nonprofit's financial responsibility. One notable circumstance is for failure to pay withholding taxes on an employee's wages.

# More About Board Roles & Responsibilities

- Many state associations of nonprofits offer special programs for board members, whether by webinars, or in-person, on governance topics, including basic board roles and responsibilities.

- Download and adapt our Sample Code of Conduct for board members.

- We've compiled tips and tools about effective meetings that board members can use to make sure that board meetings are efficient, effective, and engaging.

- The Nonprofit Risk Management Center is a resource on issues that can help board members understand the role of insurance and the importance of risk management.

- generally also covers the CEO and other staff, as well as the nonprofit's corporate actions.

# Additional Resources

- Recommended governance practices (BoardSource)

- Discussion guide to help board members understand their role as advocates (Stand for Your Mission)

# State-Specific Resources

Explanations of nonprofit board roles and responsibilities by state attorneys general, state charity officials, and representative resources from some state associations of nonprofits are linked below:

- California
- Illinois
- Maryland
- Massachusetts
- New York
- Ohio
- Oregon
- Tennessee

Disclaimer: Information on this website is provided for informational purposes only and is neither intended to be nor should be construed as legal, accounting, tax, investment, or financial advice. Please consult a professional (attorney, accountant, tax advisor) for the latest and most accurate information. The National Council of Nonprofits makes no representations or warranties as to the accuracy or timeliness of the information contained herein.

**Stay updated on advocacy issues and nonprofit trends.**

SIGN UP

Support Our Work

Member Login

Sponsorship & Advertising Opportunities

Contact Us

Find Your State's Contact

Terms & Privacy Policy

1001 G Street NW, Suite
700 East
Washington, DC 20001
Phone: (202) 962-0322

©2023 National Council of Nonprofits.
The National Council of Nonprofits is a proud 501(c)(3) charitable
nonprofit. EIN 52-1689643



📞 866.268.6206   🔊 RSS

Already a Member? Sign in to the Apps Dashboard

Membership   Solutions ⌄   Partnerships ⌄   The DE Difference ⌄   Let's Talk   🔍

# Leadership

## Providing an A-Team Roster to Assist in Developing Yours







**Unlimited Product Support** **Expert Guidance & Training** **Endless Education Opportunities**

## Operations Team

DirectEmployers Association is staffed with a team of knowledgeable individuals who not only manage the day-to-day operations of the Association, but who work diligently to develop the industry-leading products and services that we are known for. Click on the photos below to learn more about the leaders who shape our vision.

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

×

# DEAMcon24: April 3 – 5 in New Orleans

## DEAMcon24: April 3 – 5 in NOLA



Candee Chambers
Executive Director:
CEO, Recruit Rooster by DirectEmployers

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**



Hal Cooper
VP of Product Development

×

DEAMcon24: April 3 – 5 in New Orleans

DEAMcon24: April 3 – 5 in NOLA



Jaime Costilow
VP of Marketing

DEAMcon24: April 3 – 5 in New Orleans

DEAMcon24: April 3 – 5 in NOLA



Deanna Cross
HR Director

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**



Tom Eckhart
VP of Membership Development

DEAMcon24: April 3 – 5 in New Orleans

DEAMcon24: April 3 – 5 in NOLA



Heather Hoffman
Chief Operating Officer, Recruit Rooster by DirectEmployers

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**



Dan Jordan
Chief Counsel & Chief Financial Officer;
CFO, Recruit Rooster by DirectEmployers

×

Shannon Offord
VP of Strategic Partnerships & Alliances

**Board of Directors**

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

EXECUTIVE COMMITTEE

Members: meet the members of our board of directors:



PRESIDENT
Chris Liakos
EY

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

×



PRESIDENT ELECT
Dana Deason
J.B. Hunt Transport

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

PAST PRESIDENT
Paul White
Kindred at Home



x



EXECUTIVE DIRECTOR
Candee Chambers
DirectEmployers Association

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

**BOARD MEMBERS**

Brian Pier

Levi, Ray, & Shoup, Inc. (LRS)

DEAMcon24: April 3 – 5 in New Orleans

DEAMcon24: April 3 – 5 in NOLA



Mike Bazinet
Affordable Care

Bev Curtis
John Deere



**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**



Diego Gonzales
Raytheon Technologies

Srabanti Mishra
Southern California Edison Company

Julie O'Hara-Harvey
Principal Financial

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**



Sherie Smith
Woodforest National Bank

×



SECRETARY/TREASURER

American Heart Association

John Whalin

DEAMcon24: April 3 – 5 in New Orleans

DEAMcon24: April 3 – 5 in NOLA

×

Dan Jordan
DirectEmployers Association

Big or Small, We've Got an Answer to Your Questions and Concerns

Get in touch

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

**DEAMcon24: April 3 – 5 in New Orleans**

**DEAMcon24: April 3 – 5 in NOLA**

History & Awards   Podcast Library   Events & Webinars

Member Stories   Blog   Job Syndication Alliances

DEIB   Search for Jobs

Commitment

DE Careers

Subscribe to **Emails** and/or **Text Alerts**

PRIVACY & TERMS   BYLAWS   BRAND GUIDELINES   CONTACT

© 2023 DirectEmployers Association, Inc.

📞 866.268.6206   📶 RSS

Membership   Solutions ∨   Partnerships ∨   The DE Difference ∨

Already a Member? Sign in to the Apps Dashboard

Let's Talk 🔍

# DirectEmployers Announces New Appointments to its Board of Directors

by DirectEmployers Association | Jun 21, 2018 | Press Release

Indianapolis-based nonprofit, DirectEmployers Association, announced at its 2018 Annual Meeting & Conference that five new members have been appointed to its board of directors. Joining the board are Sue Shanklin, Mark Jostad, Mike Bazinet, Charles Lilly and Sherie Smith. Each of these individuals are currently active Members of the Association and now will assist in determining the future expansion of OFCCP compliance and career site solutions offered by the organization.

"We are very pleased to welcome these outstanding industry leaders to the board. The breadth, depth, and diversity of their experience will strengthen DirectEmployers, and drive collaborative efforts amongst an already talented and innovative board," said Candee Chambers, DirectEmployers Executive Director.

Incoming board members for 2018 include:

**Sue Shanklin** specializes in compliance and Affirmative Action at Rockwell Collins. With over 25 years of experience in human resources, Shanklin is responsible for 26 Affirmative Action Plans comprising 14,000+ Employees—including quarterly monitoring, compliance audits, regulatory updates, EEO-1 and VETS filings and pay equity analysis.

**Mark Jostad** is the Director of HR Compliance at JB Hunt Transport Services, Inc. With a background in accounting and over 28 years of experience in HR and compliance roles, Jostad is responsible for all aspects of HR compliance at J.B. Hunt Transport Services, Inc. In his role, he manages seven individuals who work to mitigate risk in the areas of OFCCP and affirmative action, immigration, background checks, wage and hour and ADA accommodation.

**Mike Bazinet** is the Associate Director of Plasma Recruitment for Grifols. Managing a team of 15 recruiters based in North Carolina and California, Bazinet specializes in recruiting sustained operations for 170+ plasma donation centers around the U.S. His work has



*DirectEmployers Association board members in attendance line up for a quick photo at the organization's 2018 Annual Meeting & Conference in Seattle, WA. after a day of strategy meetings.*

included integrating applicant tracking systems, developing process and standard operating procedures and recruiting strategies to staff the organization with qualified individuals.

**Charles Lilly** serves as the Program Manager for Talent Acquisition at HUB International. He specializes in designing and executing enterprise-wide talent acquisition programs and projects related to recruiting tools and technology, national and local recruitment outreach initiatives, vendor account management, EEO/VETS reporting, affirmative action program management, and OFCCP compliance.

**Sherie Smith** is the Vice President of Talent Acquisition for Woodforest National Bank. For over seven years in her current role, Smith has been responsible for the organization's recruiting objectives, strategies and processes, as well as AAP compliance objectives. As part of her day-to-day responsibilities she also supports other HR functions such as benefits, compensation, employee relations and talent development.

DirectEmployers also expresses its thanks for dedicated service to six board members who are no longer serving: Eric Ariola, Sr. Director of HR, J.B. Hunt Transport Services, Inc.; Carl Davidson, Director of Talent Acquisition, Newell Rubbermaid; Wendi Ellis, Director of Staffing, Omnicell; Andy Neill, Senior Manager of Global Talent Acquisition, IBM; Thomas Smouse, Vice President of Administration and Human Resources, Newfield Exploration Company; Sheri Strong, Senior Manager of Global Talent Acquisition, Lockheed Martin.

For more information on the DirectEmployers Board or leadership team, please visit: **https://directemployers.org/about/leadership**.



## About DirectEmployers Association

<u>DirectEmployers</u> is a nonprofit member-owned and managed association focused on providing its 900+ members with simple solutions for OFCCP compliance and online recruitment challenges. The Association's proprietary technology powers a federal contractor compliance solution that assists with the Office of Federal Contract Compliance Program's (OFCCP) VEVRAA mandatory listing requirements and Section 503 outreach requirements, while also offering recruitment marketing and creative services that help win the best candidates with a combination of vivid recruitment videos, real-life photos and bold branding through its wholly owned subsidiary, <u>Recruit Rooster.</u>

*Media Contact: Nancy Holland, VP of Marketing, DirectEmployers, (317) 874-9022, <u>nancy@directemployers.org</u>*

**Press Room ›**

**Video Library ›**

**Podcast Library ›**

**Blog Home ›**

## Search Site

Search



Government Contracting:

#1 - John Fox




#2 - Candee Chambers

Government Contracting:

#1 - John Fox




#2 - Candee Chambers

Government Contracting:

#1 - John Fox





PRIVACY & TERMS

BYLAWS

BRAND GUIDELINES

CONTACT

© 2023 DirectEmployers Association, Inc.






**ThermoFisher**
S C I E N T I F I C

(https://jobs.thermofisher.com/global/en/)

Discover Life Here ⌄    Career Areas ⌄

Students & New Grads (https://jobs.thermofisher.com/global/en/students-new-grads)    Candidate Resources ⌄

Search Jobs (https://jobs.thermofisher.com/global/en/search-results)    Events (https://jobs.thermofisher.com/global/en/events)

⊕ Global ⌄    ☆ Saved jobs (0) (https://jobs.thermofisher.com/global/en/jobcart)

United States

Search United States/Desktop (https://jobs.thermofisher.com/global/en/united-stat...



In the United States and Canada, we have 26,000+ employees who work in more than 400 offices, distribution centers, manufacturing sites and the company's global headquarters in Waltham, Massachusetts, US. Thermo Fisher is committed to empowering our people to advance innovative technologies, developing meaningful solutions, and building rewarding careers.



Hi! Are you looking for a job?

🔍 Find a job

❓ Ask a question

✕

## Featured Sites



**Lenexa, KS**

Learn more →
(https://jobs.thermofisher.com/global/en/lenexa)

**Rochester, NY**

Learn more →
(https://jobs.thermofisher.com/global/en/rochester)

**San Francisco Bay Area, CA**

Learn more →
(https://jobs.thermofisher.com/global/en/san-francisco-bay-area)

**Carlsbad, CA**

Learn more →
(https://jobs.thermofisher.com/global/en/carlsbad-ca)

**Our HQ: Waltham, MA**

Learn more →
(https://jobs.thermofisher.com/global/en/our-hq-waltham)

## Why choose a career with the world leader in serving science?

Hi! Are you looking for a job?




## Benefits

Our total rewards package is designed to meet the diverse needs of our colleagues at every stage of their personal and professional lives.

Learn More →
(https://jobs.thermofisher.com/global/en/total-rewards)

## Locations

We have diverse career opportunities at 600+ sites across the Americas, APAC and EMEA regions.

Learn More →
(https://jobs.thermofisher.com/global/en/locations)





## Diversity & Inclusion

Work in an inclusive, global environment that values the power of diverse talent, backgrounds and experiences.

Learn More →
(https://jobs.thermofisher.com/global/en/diversity-and-inclusion)



## Students & Early Talent

Explore our hands-on experience internships and world-class leadership development programs.

Learn More →
(https://jobs.thermofisher.com/global/en/students-new-grads)

Hi! Are you looking for a job?



Join Our Talent Community

Glassdoor Reviews

Hi! Are you looking for a job?

powered by glassdoor (javascriptvoid(0))

3.7 ★★★★★



**Marc N. Casper**
President, CEO



**Approve of CEO**
84%
4171 Ratings

**Interview Experience**

Positive    %
Neutral    %
Negative    %

Career Site Cookie Settings
(https://jobs.thermofisher.com/global/en/cookiesettings)

Personal Information (https://jobs.thermofisher.com/global/en/emailpersonalinfo)

## About Thermo Fisher Scientific

Thermo Fisher Scientific Inc. is the world leader in serving science, with annual revenue of more than $40 billion. Our Mission is to enable our customers to make the world healthier, cleaner and safer. Whether our customers are accelerating life sciences research, solving complex analytical challenges, increasing productivity in their laboratories, improving patient health through diagnostics or the development and manufacture of life-changing therapies, we are here to support them. Our global team delivers an unrivaled combination of innovative technologies, purchasing convenience and pharmaceutical services through our industry-leading brands, including Thermo Scientific, Applied Biosystems, Invitrogen, Fisher Scientific, Unity Lab Services, Patheon and PPD.

| Company | Brands | Connect |
|---|---|---|
| About Us (http://corporate.thermofisher.com/en/about-us/thermo-scientific.html) | Thermo Scientific |  |
| Suppliers (https://corporate.thermofisher.com/en/about-us/suppliers.html) | Applied Biosystems (http://corporate.thermofisher.com/en/about-us/applied-biosystems.html) | (https://twitter.com/MyThermoFisher) |
| Corporate Social Responsibility (http://corporate.thermofisher.com/en/about-us/applied-biosystems.html) | Invitrogen (https://corporate.thermofisher.com/en/about-us/corporate-social-responsibility.html) | (https://www.facebook.com/ThermoFisher/c |
| Information Security (https://corporate.thermofisher.com/en/about-us/information-security.html) | Fisher Scientific (http://corporate.thermofisher.com/en/about-us/fisher-scientific.html) | (https://www.instagram.com/mythermofisher |
| Investors (http://corporate.thermofisher.com/) | Unity Lab Services (http://corporate.thermofisher.com/en/about-us/unity-lab-services.html) | (https://www.youtube.com/playlist?list=PLGN-Fewl2wOFDIi7KOyZsT7js_qI4QKxA) |
| Newsroom (http://news.thermofisher.com/) | | Hi! Are you looking to... (https://www.linkedin.com/company/3081/) |

Careers
(http://jobs.thermofisher.com/)

Patheon
(https://www.thermofisher.com/us/en/home/brands/patheon.html)

PPD
(https://www.thermofisher.com/us/en/home/brands/ppd.html)

For more information, please visit www.thermofisher.com (https://www.thermofisher.com)

Thermo Fisher Scientific is an Equal Opportunity Employer. All qualified applicants will receive consideration for employment without regard to race, creed, religion, color, national or ethnic origin, citizenship, sex, sexual orientation, gender identity and expression, genetic information, veteran status, age or disability status.

© 2023 Thermo Fisher Scientific, Inc. All Rights Reserved.

Accessibility/Disability Access (/global/en/accessibility-disability-access)   Terms & Conditions (https://www.thermofisher.com/us/en/home/global/terms-of-use.html)

Privacy Information Center (https://www.thermofisher.com/us/en/home/global/privacy-policy.html)

EEO & Affirmative Action Statement (/global/en/eeo-and-affirmative-action-statement)   Sitemap (/global/en/sitemap)

**ThermoFisher**
S C I E N T I F I C
(https://jobs.thermofisher.com/globa

Hi! Are you looking for a job?