**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA**

THE STATE OF MISSOURI, *et al.*,

     *Plaintiffs,*

         v.

PRESIDENT JOSEPH R. BIDEN, JR., IN
HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE UNITED STATES OF AMERICA,
*et. al.,*

     *Defendants.*

Civil Action No. 3:22-cv-1213

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF FURTHER DISCOVERY AND IN
OPPOSITION TO DISMISSAL OF THE COMPLAINT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..............................................................................................................i

TABLE OF AUTHORITIES ......................................................................................................ii

INTRODUCTION AND BACKGROUND ................................................................................1

ARGUMENT ...............................................................................................................................5

I.   THE SUPREME COURT'S DETERMINATION ON PLAINTIFFS' STANDING TO OBTAIN A
     PRELIMINARY INJUNCTION IS NOT APPLICABLE AT THE PLEADINGS STAGE .................................5

II.  THE GOVERNMENT'S COVERT CENSORSHIP ENTERPRISE DEMONSTRATES THAT FURTHER
     DISCOVERY IS WARRANTED .....................................................................................................7

     A.   Legal Standards ................................................................................................7

     B.   Recent Evidence Further Confirms that the Government Has Taken Pains to Hide
          Evidence of its Unlawful Conduct ....................................................................7

          1.   Evidence Obtained Through Discovery in This Case .............................8

          2.   Evidence from a Congressional Investigation ......................................9

     C.   Further Discovery Will Buttress Plaintiffs' Standing .........................................12

          1.   Plaintiffs Have Concrete Reasons to Believe Further Discovery Will Tie Past
               Censorship to Government Conduct ......................................................13

          2.   Plaintiffs Can Demonstrate Ongoing Harms and the Threat of Future Harms ...........17

III. IN THE ALTERNATIVE, OR IN ADDITION, THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO
     AMEND THEIR COMPLAINT .....................................................................................................21

CONCLUSION ...........................................................................................................................25

CERTIFICATE OF SERVICE ..................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Behrens v. Pelletier,*
   516 U.S. 299 (1996)...................................................................................................6

*Chatham Condo. Ass'ns v. Century Village, Inc.,*
   597 F.2d 1002 (5th Cir. 1979)...................................................................................3

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983).................................................................................................17

*Cotton v. Certain Underwriters at Lloyd's of London,*
   831 F.3d 592 (5th Cir. 2016)...................................................................................21

*Davila v. United States,*
   713 F.3d 248 (5th Cir. 2013).................................................................................3, 7

*Dussouy v. Gulf Coast Inv. Corp.,*
   660 F.2d 594 (5th Cir. 1981)...................................................................................21

*Greater New Orleans Fair Hous. Action Ctr. v. Kelly,*
   364 F.Supp.3d 635 (E.D. La. 2019)...........................................................................6

*H & W Indus., Inc. v. Formosa Plastics Corp., USA,*
   860 F.2d 172 (5th Cir. 1988).....................................................................................6

*Hernandez v. W. Tex. Treasures Est. Sales, LLC,*
   79 F.4th 464 (5th Cir. 2023)....................................................................................21

*Hunter v. Branch Banking and Trust Co.,*
   No. 3:12-cv-2437-D, 2013 WL 607151 (N.D. Tex. Feb. 19, 2013)...........................23

*In re Am. Airlines, Inc., Priv. Litig.,*
   370 F.Supp.2d 552 (N.D. Tex. 2005).......................................................................23

*Jebaco, Inc. v. Harrah's Operating Co.,*
   587 F.3d 314 (5th Cir. 2009)...................................................................................21

*Jindal v. U.S. Dep't of Educ.,*
   No. 14-cv-534, 2015 WL 854132 (M.D. La. Feb. 26, 2015) ......................................4

*June Med. Servs., LLC v. Gee,*
   No. 17-00404-BAJ-RLB, 2018 WL 2656552 (M.D. La. June 4, 2018).......................23

*Kennedy v. Biden,*
   No. 3:23-cv-00381, 2024 WL 3879510 (W.D. La. Aug. 20, 2024).......................passim

*Kipp Flores Architects, LLC v. Mid-Continent Cas. Co.,*
   No. 4:14-cv-02702, 2015 WL 10557922 (S.D. Tex. Mar. 13, 2015) ..........................7

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992).................................................................................................12

*Malik v. U.S. Dep't of Homeland Security*,
   619 F.Supp.3d 652 (N.D. Tex. 2022) ....................................................................17

*MCG, Inc. v. Great W. Energy Corp.*,
   896 F.2d 170 (5th Cir.1990) ..............................................................................7

*Meese v. Keene*,
   481 U.S. 465 (1987) .........................................................................................20

*Missouri v. Biden*,
   662 F.Supp.3d 626 (W.D. La. 2023) .......................................................6, 15, 22

*Missouri v. Biden*,
   680 F.Supp.3d 630 (W.D. La. 2023) ..........................................................1, 2, 22

*Missouri v. Biden*,
   83 F.4th 350 (5th Cir. 2023) ........................................................1, 2, 9, 22

*Munaf v. Green*,
   553 U.S. 674 (2008) ..........................................................................................5

*Murthy v. Missouri*,
   144 S. Ct. 1972 (2024) ..............................................................................passim

*National Rifle Ass'n v. Vullo*,
   602 U.S. 175 (2024) .....................................................................................5, 23

*Norwood v. Harrison*,
   413 U.S. 455 (1973) .......................................................................................1, 5

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ..........................................................................................20

*Pickney v. Mid-State Mktg., LLC*,
   318 F.R.D. 330 (W.D. La. 2016) ..................................................................4, 22

*Spector v. Norwegian Cruise Line Ltd.*,
   No. H-00-2649, 2007 WL 2900584 (S.D. Tex. Sept. 30, 2007) ....................22

*Stringer v. Whitley*,
   942 F.3d 715 (5th Cir. 2019) ...........................................................................17

*Tex. All. for Retired Ams. v. Hughs*,
   976 F.3d 564 (5th Cir. 2020) ..........................................................................2, 6

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) .........................................................................3, 7

*Wiltz v. Am. Sec. Ins. Co.*,
   No. 10-635, 2010 WL 4668355 (E.D. La. Nov. 9, 2010) ...............................7

**Other Authorities**

@Jim_Jordan, X (Dec. 1, 2023, 2:26 PM) .............................................................10

@Jim_Jordan, X (July 27, 2023, 12:03 PM) ...........................................................10

@Jim_Jordan, X (July 28, 2024, 12:03 PM) ...........................................................11

@JudiciaryGOP, X, Letter from Mark Zuckerberg to House Judiciary Committee
    Chairman Jim Jordan (Aug. 26, 2024, 6:44 PM) ...................................................................11

House Judiciary Committee,
    *Jira Ticket Dataset* (Nov. 14, 2023) ...................................................................................14

Jackson Walker,
    *Top Harris Campaign Aide Involved in Biden Push to Censor Covid Posts*,
    THE NATIONAL DESK (Aug. 29, 2024) ...................................................................................20

Michael Shellenberger, Alex Gutentag, and Leighton Woodhouse,
    *New Facebook Files Expose Biden Censorship-For-Spying Scheme*, PUBLIC (Aug. 7, 2023) .......................10

Philip Hamburger,
    *Courting Censorship*, 4 J. FREE SPEECH L., 195 (2024)..........................................................24

Remarks by Vice President Harris,
    THE WHITE HOUSE (June 16, 2022)........................................................................................21

Robby Soave,
    *Tim Walz Was Dead Wrong About Misinformation and Free Speech*, REASON (Aug. 8, 2024) .................21

**Rules**

Fed. R. Civ. P. 15(a)(2)..........................................................................................................21

## INTRODUCTION AND BACKGROUND

Individual Plaintiffs, Drs. Jayanta Bhattacharya, Martin Kulldorff, and Aaron Kheriaty, Ms. Jill Hines and Mr. Jim Hoft, joined by the States of Missouri and Louisiana, alleged in their Complaint, Amended Complaints, and Motion for Preliminary Injunction, that federal government Defendants unlawfully pressured, coerced, induced, and encouraged major social media platforms to censor their posts about Covid-19, the Hunter Biden laptop report, and the 2020 election. *See* First, Second, and Third Am. Compls. and Pls.' Proposed Suppl. Br. in Support of Mot. for Prelim. Inj., ECF 45, 84, 268, 212-2, *Missouri v. Biden* (W.D. La.) (No. 3:22-cv-1213). *See also* U.S. Const. amend I (government is prohibited from "abridging the freedom of speech"); *Norwood v. Harrison*, 413 U.S. 455, 465 (1973) ("a state may not induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish.").

The lawsuit was initially filed based upon public statements of government officials boasting about working with social media platforms to censor disfavored speech, accompanied by open threats to punish noncompliant companies. *See* Compl., ECF 1, ¶¶ 116–240. As a result of this Court's award of limited, expedited preliminary injunction-related discovery, Plaintiffs uncovered a coordinated censorship operation emanating from the highest levels of government. *See Missouri v. Biden*, 83 F.4th 350, 392 (5th Cir. 2023) ("[T]he Supreme Court has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life."), *reversed and remanded on other grounds sub nom. Murthy v. Missouri*, 144 S. Ct. 1972 (2024); *Missouri v. Biden*, 680 F.Supp.3d 630, 707 (W.D. La. 2023) (describing the government's conduct as amounting to "arguably the most massive attack against free speech in United States history"), *reversed and remanded on other grounds sub nom. Murthy v. Missouri*, 144 S. Ct. 1972 (2024). *See also* Pls.' Proposed Finding of Fact, ECF 212-3.

After this Court granted Plaintiffs' motion for a preliminary injunction, *Missouri v. Biden*, 680 F.Supp.3d at 729, which the Fifth Circuit upheld in large part,[1] *Missouri v. Biden*, 83 F.4th at 392, the Supreme Court reversed.  But the six-member majority—in contrast to the lower courts—did not determine the merits of the case, as it explicitly acknowledged.  *See Murthy*, 144 S. Ct. at 1985 n.3. Rather, the Supreme Court held that no plaintiff demonstrated standing necessary to keep *a preliminary injunction* in place because Plaintiffs had not adequately proven that their harm is traceable to (caused by) the Government.  At no point did the Supreme Court find that Plaintiffs failed to allege standing adequate to maintain the lawsuit.  *See Murthy*, 144 S. Ct. at 1985–97.

Plaintiffs have a significantly higher burden at the preliminary injunction stage when it comes to proving all aspects of their claims, including that they have standing for the specific relief sought. Thus, the Supreme Court's determination on the motion for preliminary injunction neither necessitates nor favors dismissal. *See Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 567 n.1 (5th Cir. 2020) (differentiating between "minimal showing of standing that a plaintiff must show to overcome a motion to dismiss[] [and] 'clear showing' of standing required to maintain a preliminary injunction") (quoting *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017)).

Now, this Court asks whether Plaintiffs should be permitted to engage in further discovery to establish the Court's jurisdiction or whether dismissal is appropriate.  *See* Aug. 27, 2024 Order, ECF 389.  On this record, the answer is clear: Plaintiffs have already prevailed on Defendants' motion to dismiss on Fed. R. Civ. P. 12(b)(1) and 12(b)(6) grounds, so they are entitled to further discovery to demonstrate that they have standing, as the previous, limited expedited discovery focused on establishing Plaintiffs' likelihood of success on the merits concerning the censorship enterprise and

---

[1] Although the Fifth Circuit reduced the number of officials subject to the injunction, it echoed this Court's concern about government censorship.  "[T]he Supreme Court has rarely been faced with a coordinated campaign of this magnitude …. Therefore, the district court was correct in its assessment—'unrelenting pressure' from certain government officials likely 'had the intended result of suppressing millions of protected free speech postings by American citizens.' We see no error or abuse of discretion in that finding."  83 F.4th at 392.

not Article III jurisdiction.  *See Davila v. United States*, 713 F.3d 248, 263–64 (5th Cir. 2013) (explaining that courts have discretion to permit discovery crafted to establish standing); *Kennedy v. Biden*, No. 3:23-cv-00381, 2024 WL 3879510, at *3 (W.D. La. Aug. 20, 2024) (observing that in circumstances such as those present here, standing will almost always be impossible to prove absent discovery because evidence of the censorship scheme is derived from emails and other, similar forms of communication).

The Supreme Court's decision, in fact, supports additional discovery because the holding rested on allegedly insufficient evidence presented to establish that the harm Plaintiffs suffered—censorship of their social media accounts—resulted from the Government's interference with content moderation on major social media platforms, as opposed to those platforms' independent decision-making processes (traceability and redressability).  The determination was *not* based on failure to state a claim upon which relief could be granted.  For that reason, additional discovery has a strong likelihood of providing Plaintiffs with the evidence needed to prove their claims.

Indeed, through the limited discovery already conducted in this case and others, as well as a congressional investigation, evidence of a coordinated government effort to pressure, coerce, induce, and encourage social media platforms to censor disfavored speech was unveiled.  *See, e.g.*, Pls.' Proposed Finding of Fact, ECF 212-3; First Am. Compl., ECF 80-2 ¶ 117, *Berenson v. Biden* (S.D.N.Y. Sept. 4, 2024) (No. 1:23-cv-03048).  Accordingly, Plaintiffs have tangible, nonspeculative reasons to believe that further discovery will be fruitful.  *See Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981) ("Insofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence").  Plaintiffs also urge the Court to permit them to proceed with regular Fed. R. Civ. P. 26 discovery.  Since the question of standing (causation) and merits are intertwined, there is no need to limit discovery and prolong the proceedings.  *See Chatham Condo. Ass'ns v. Century Village, Inc.*, 597 F.2d 1002, 1012 (5th Cir. 1979) (cautioning against dismissing for lack of subject matter

jurisdiction prior to providing plaintiff with ample opportunity for discovery in cases where the questions of jurisdiction and merits are intertwined); *Jindal v. U.S. Dep't of Educ.*, No. 14-cv-534, 2015 WL 854132, at *3 n.35 (M.D. La. Feb. 26, 2015) (internal quotation marks omitted) (quoting *Wiltz v. Am. Sec. Ins. Co.*, No. 10-635, 2010 WL 4668355, at *6 (E.D. La. Nov. 9, 2010) ("[T]o the extent that the jurisdictional question and the merits are intertwined, a plaintiff who has yet to undertake discovery almost certainly has not had the chance to fully ascertain the jurisdictional facts.").

In the alternative (or better yet, in addition), this Court should grant Plaintiffs leave to amend their Complaint to add members of the "Disinformation Dozen" who want to join the lawsuit.  As this Court recognized in *Kennedy*, the White House, Surgeon General's Office, and Cybersecurity and Infrastructure Security Agency (CISA) explicitly targeted these twelve individuals for removal from social media platforms.   After officials within the Administration relentlessly harangued and threatened X (formerly known as Twitter) and Meta (which owns Instagram and Facebook)—and potentially other companies whose involvement remains unknown—despite initially refusing to take down the accounts, the companies caved. *See* 2024 WL 3879510 at *8 ("The injury is traceable to the Government Defendants, as there were numerous orders that social-media companies censor the "Disinformation Dozen.").   This Court correctly observed that the Administration's express, successful pursuit of these individuals enhanced their showing of standing.  *Id.*

Amendment would not be futile, because Plaintiffs' claims are meritorious.  *See Pickney v. Mid-State Mktg., LLC*, 318 F.R.D. 330, 331 (W.D. La. 2016) (internal quotation marks omitted) (quoting *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000)) (holding that in the Fifth Circuit, futility means the "amended complaint would fail to state a claim upon which relief could be granted"). The three dissenters, in contrast to the majority of the Court, addressed the substance of Plaintiffs' claims and concluded that the government's conduct violated the First Amendment.  So did the three-judge panel in the Fifth Circuit, as well as this Court.  In other words, all judges who have reached the

merits in this case concluded that the government's conduct appeared to have violated the First Amendment. That demonstrates that, should Plaintiffs be given the opportunity to get the discovery they need to establish standing under the Supreme Court's clarified rubric, they are likely to prevail on the merits of their claims. *See, e.g., Norwood*, 413 U.S. at 465 (quoting *Lee v. Macon Cnty. Bd. of Educ.,* 267 F.Supp. 458, 475–76 (M.D. Ala. 1967)) ("'a state may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish'"). The strength of their claims is yet more evident given the Supreme Court's recent decision in *National Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024), which affirmed that the First Amendment prohibits government actors from using their power to coerce or pressure private parties in order to suppress undesirable viewpoints.

If the Court dismisses the case without permitting Plaintiffs to undergo additional discovery, and/or to amend their Complaint to cure the alleged jurisdictional defects, it will effectively reward government actors for flouting Americans' First Amendment rights, provided they do so in secret. As the *Murthy* dissenters observed, "Officials who read today's decision together with *Vullo* will get the message. If a coercive campaign is carried out with enough sophistication, it may get by. That is not a message this Court should send." *Murthy*, 144 S. Ct. at 1999 (Alito, J., dissenting). It is not a message that this Court should send, either.

## ARGUMENT

### I.   THE SUPREME COURT'S DETERMINATION ON PLAINTIFFS' STANDING TO OBTAIN A PRELIMINARY INJUNCTION IS NOT APPLICABLE AT THE PLEADINGS STAGE

Discovery to verify Plaintiffs' Article III standing is warranted. First, that the Supreme Court held that Plaintiffs did not demonstrate standing for a preliminary injunction—an "extraordinary and drastic remedy," *Munaf v. Green*, 553 U.S. 674, 689–90 (2008) (internal quotation marks omitted) (quoting 11A C. Wright, A Miller, & M. Kane, Federal Practice and Procedure § 2948, p. 129 (2d ed. 1995))—does not translate into a lack of standing at the pleadings stage, which is the current posture of this case. The burden is far higher at the preliminary injunction phase, at which plaintiffs must

make a "clear showing" to substantiate standing, as opposed to the pleadings stage, where allegations are accepted as true. *See Tex. All. for Retired Ams.*, 976 F.3d at 567 (differentiating between "minimal showing of standing that a plaintiff must show to overcome a motion to dismiss, [and] 'clear showing' of standing required to maintain a preliminary injunction") (quoting *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017)). *See generally Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (noting that the "legally relevant factors" on a motion to dismiss and summary judgment motion differ because the former involves mere allegations and the latter requires evidence). *Cf. Murthy*, 144 S. Ct. at 1990 ("Of all the plaintiffs, Hines makes the best showing … That said, most of the lines she draws are tenuous, *particularly given her burden of proof at the preliminary injunction stage*—recall that she must show that her restrictions are *likely* traceable to the White House and the CDC.") (emphasis added).

Another reason this Court should not dismiss this case is that it has already denied Defendants' motion to dismiss Plaintiffs' Second Amended Complaint, finding, *inter alia*, that Plaintiffs have standing to bring their claims. *See Missouri v. Biden*, 662 F.Supp.3d 626, 636, 683 (W.D. La. 2023) (denying Defendants' motion to dismiss on Fed. R. Civ. P. 12(b)(1) and 12(b)(6) grounds). The Supreme Court's decision did not overrule this holding. Nor, as a matter of law or logic, does the Supreme Court's reversal of the preliminary injunction ruling necessitate dismissal of the action. *See H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 177 (5th Cir. 1988) (citing *Comm'ns Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir. 1985) ("it is a 'risky approach' to assume that the often incomplete evidence adduced at a preliminary injunction hearing is sufficient to determine whether a claimant is entitled to judgment as a matter of law."); *Greater New Orleans Fair Hous. Action Ctr. v. Kelly*, 364 F.Supp.3d 635, 647–48 (E.D. La. 2019) (citations omitted) (distinguishing a case with similar facts to it on grounds that "the case here is merely at the pleading stage," so "plaintiff need not *prove* that its efforts have led to a drain on its resources. Plaintiff need only allege facts demonstrating each element of standing.").

## II. THE GOVERNMENT'S COVERT CENSORSHIP ENTERPRISE DEMONSTRATES THAT FURTHER DISCOVERY IS WARRANTED

### A. Legal Standards

Courts of the Fifth Circuit acknowledge that sometimes discovery is needed to establish jurisdiction. *See Williamson*, 645 F.2d at 414 ("Insofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence"); *Kipp Flores Architects, LLC v. Mid-Continent Cas. Co.*, No. 4:14-cv-02702, 2015 WL 10557922, at *8 (S.D. Tex. Mar. 13, 2015) ("Among the justifications for postponing the jurisdictional question in this case, is the fact that the parties have not yet engaged in discovery, if necessary."). Plaintiffs bear the burden of demonstrating the necessity of such discovery by alleging "well-pleaded facts or evidence." *Davila*, 713 F.3d at 264.

The district court must not "den[y] 'an opportunity for discovery ... that is appropriate to the nature of the motion to dismiss.'" *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 176 (5th Cir.1990). For this reason, "it may be more appropriate to address the jurisdiction question on a motion for summary judgment or at trial, as opposed to at a pretrial evidentiary hearing[,]" *Wiltz*, 2010 WL 4668355 * 6 (citing *Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 219 (5th Cir. 1989)), to "ensure[] not only that a plaintiff may present his case in a coherent, orderly fashion ... but also that adequate time is given to complete discovery and all the jurisdictional facts are fully developed[.]" *Id.* (cleaned up).

### B. Recent Evidence Further Confirms that the Government Has Taken Pains to Hide Evidence of its Unlawful Conduct

Discovery to establish Article III standing is warranted in this case. As discussed below, a series of crucial developments that occurred after this lawsuit was filed, and even since it reached the Supreme Court, support Plaintiffs' contention that discovery, rather than dismissal, is in order. On an ongoing basis, evidence—much that the Government has been unwilling to produce in this case

for the Court's consideration—has been uncovered substantiating Plaintiffs' claims, which they initially based primarily on public remarks and threats.  If the past is at all predictive of the future, discovery will yield proof substantiating not only the merits of Plaintiffs' claims, but also of their standing.  *See Kennedy*, 2024 WL 3879510 at *6 ("in a case like this, where the alleged Government coercion or involvement came from numerous people at numerous Federal agencies and/or the White House, it is almost impossible for most plaintiffs to prove standing without conducting discovery. Much of the alleged pressure asserted by Plaintiffs came through meetings, private conversations, and emails.").[2]

### 1.   *Evidence Obtained Through Discovery in This Case*

As the Court is aware, the limited preliminary injunction-related discovery that occurred in this case demonstrated the existence of a coordinated censorship enterprise, the significance of which the government intentionally kept secret.  The shameless nature of the government actors effectuating this regime—by coercing, pressuring, inducing, colluding with, and jointly participating with social media companies to censor speech through covert communications—not to mention the size of it, exceeded Plaintiffs' expectations and shocked every judge in this case who has addressed the merits. *See* Plaintiff-Appellees' Br. at 3, ECF 126-1, *Missouri v. Biden* (5th Cir.) (No. 23-30445) ("The results [of expedited discovery] were astonishing. Defendants ultimately produced almost 20,000 pages of documents reflecting federal officials' communications with platforms about censorship. Platforms disclosed the identities of nearly 100 such officials, including at least 20 White House officials.").  *See also Murthy*, 144 S. Ct. at 1998–99 (Alito, J., dissenting) ("A coterie of officials at the highest levels of the Federal Government continuously harried and implicitly threatened Facebook with potentially crippling consequences if it did not comply with their wishes …. [This] Court, however, shirks [its]

---

[2] This case has been consolidated with *Kennedy* at the merits stage.  *See* July 24, 2023 Order Granting Consolidation, ECF 316.

duty and thus permits the successful campaign of coercion in this case to stand as an attractive model for future officials who want to control what the people say, hear, and think."); *Missouri v. Biden,* 83 F.4th at 392 ("[T]he Supreme Court has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life.")

That the government was not forthcoming about the existence of this enterprise, instead repeatedly denying that there had been a covert censorship campaign, is all the more reason to discredit any claims that further discovery will not be fruitful in establishing Plaintiffs' Article III standing as well as the merits in this case.

## 2. *Evidence from a Congressional Investigation*

An investigation by the House Judiciary Committee's Weaponization of the Federal Government Select Subcommittee[3] uncovered internal Meta documents, in which company employees explicitly admitted that certain narratives and perspectives were censored on Facebook and Instagram because of government pressure, and that this speech otherwise would not have been suppressed.[4] These findings demonstrate unequivocally that the companies had, in fact, changed their policies and escalated enforcement of existing policies due to Government coercion and pressure, a fact that Defendants repeatedly—and dishonestly—denied before the documents in question came to light.

For example, on April 19, 2021, Meta executive Nick Clegg sent an email to his team at Facebook stating that Andy Slavitt, former White House Covid-19 Advisor was "outraged – not too strong a word to describe his reaction" that Facebook did not remove a humorous meme implying

---

[3] The subcommittee was formed in January 2023, after much of the preliminary injunction related discovery had been conducted and some of it had been publicized. The specific evidence cited here surfaced after this Court's grant of a preliminary injunction.

[4] That Meta altered its content moderation policies and escalated enforcement of those policies to appease the White House was evident from the communications and other information obtained through discovery in this case. However, the internal emails were the first to expressly state that the company had only suppressed certain speech because of pressure from the Biden Administration.

that, in a decade, personal injury lawyers would be seeking to represent and receive compensation on behalf of those who had received Covid vaccines.  @Jim_Jordan, X (July 27, 2023, 12:03 PM), *available at* https://x.com/Jim_Jordan/status/1684595382871785472.  Clegg recounted that he had retorted to Slavitt, "removing content like that would represent a significant incursion into traditional boundaries of free expression in the US" but Slavitt "replied that the post was directly comparing Covid vaccines to asbestos poisoning in a way which demonstrably inhibits confidence in Covid vaccines amongst those the Biden Administration is trying to reach."  @Jim_Jordan, X (July 27, 2023, 12:03 PM), *available at* https://x.com/Jim_Jordan/status/1684595385199734784.  In other words, Slavitt—then White House Senior Covid-19 Advisor and named Defendant in this matter—was unconcerned about Americans' constitutional rights insofar as they interfered with the Administration's aspirations.

The pressure continued—and was fruitful.  At one point, Clegg explained to colleagues that "Sheryl [Sandberg] is keen that we continue to explore some moves that we can make to show that we are trying to be responsive to the WH."  He went on:  Facebook's "current course - in effect explaining ourselves more fully, but not shifting on where we draw the lines or on the data we provide" is "a recipe for protracted and increasing acrimony with the WH."  Clegg concluded, "Given the bigger fish we have to fry with the Administration – data flows etc – that doesn't seem a great place for us to be, so grateful for any further creative thinking on how we can be responsive to their concerns."[5]  @Jim_Jordan,       X       (Dec.    1,       2023,       2:26       PM),       *available       at* https://twitter.com/Jim_Jordan/status/1730669742891888854?s=20.    During   this   time   period,

---

[5] Apparently, Clegg was referring to the European Union's (EU) demand that Facebook stop transferring data outside of Europe, which is antithetical to the company's business model.  Clegg understood that the company's survival depended on the Biden Administration siding with it against the EU—and that the Administration would not do so unless Facebook censored in accordance with the government's demands.  *See* Michael Shellenberger, Alex Gutentag, and Leighton Woodhouse, *New Facebook Files Expose Biden Censorship-For-Spying Scheme*, PUBLIC (Aug. 7, 2023), *available at* https://www.public.news/p/new-facebook-files-expose-biden-censorship.

Clegg also asked a colleague why the company had censored the lab leak theory of Covid's origins. The colleague responded, "*Because we were under pressure from the* [*Biden*] *administration* and others to do more ....   *We shouldn't have done it.*" @Jim_Jordan, X (July 28, 2024, 12:03 PM), *available at* https://x.com/Jim_Jordan/status/1684957664265031681 (emphasis added).

And very recently, Meta's Founder and Chief Executive Officer, Mark Zuckerberg, conceded in a publicly available letter that the government "repeatedly pressured our teams for months to censor certain COVID-19 content, including humor and satire, and expressed a lot of frustration with our teams when we didn't agree." @JudiciaryGOP, X, Letter from Mark Zuckerberg to House Judiciary Committee   Chairman   Jim   Jordan   (Aug.   26,   2024,   6:44   PM),   *available   at* https://x.com/JudiciaryGOP/status/1828201780544504064.  Likewise, Zuckerberg wrote, "the FBI warned us about a potential Russian disinformation operation about the Biden family and Burisma in the lead up to the 2020 election. ... It's since been made clear that the reporting [on the Biden laptop] was not Russian disinformation, and in retrospect, we shouldn't have demoted the story." *Id.*

Zuckerberg expressed regret for caving to government pressure ("I believe the government pressure was wrong, and I regret that we were not more outspoken about it.  I also think we made some choices that, with the benefit of hindsight and new information, we wouldn't make today."). *Id.* Although the letter was carefully worded, presumably in an attempt to avoid subjecting Meta to legal liability as a state actor, the evidence as well as Zuckerberg's letter make clear that the government was responsible for significant amounts of censorship.

Yet Defendants insisted, and continue to maintain, that the social media companies simply implemented their own policies and while government officials might have given them some ideas along the way, they did nothing beyond making innocent suggestions.  *See, e.g.*, Def. Mot. to Dismiss at 34, ECF 128-1 ("There is no plausible, *non-speculative* allegation that social media companies are or were responding to Defendants' alleged 'threats,' rather than enforcing their own content-moderation

policies…."); Def. Opp. to Pls.' Mot. for Prelim. Inj. at 24–25, ECF 266 ("[A]lthough the Administration has long urged the companies to combat misinformation on their platforms and has provided general recommendations to that effect, it has made 'crystal clear' its view that '[a]ny decision about platform usage and who should be on the platform is orchestrated and determined by private-sector companies,' and 'not the federal government.'") (citing July 16, 2021 press briefing statement of Jennifer Psaki).

The new evidence, in conjunction with Defendants' misrepresentations throughout the course of this litigation, again shows that Defendants are not forthcoming about their illicit activities, supporting Plaintiffs' motion for further discovery.[6]

### C.   Further Discovery Will Buttress Plaintiffs' Standing

Given that the majority of the government's censorship operation was conducted in private and would never have come to light absent this litigation and a congressional investigation, Plaintiffs have good reason to believe that, if they are permitted to undertake further discovery, it will demonstrate that they can trace their harm to government action, and that an injunction and declaratory relief will provide redress.  As this Court has explained, the Supreme Court required evidence that "a particular defendant pressured a particular platform to censor a particular topic before the platform suppressed a particular plaintiff's speech on that topic."  *See Kennedy*, 2024 WL 3879510 at * 4.  Evidence that a specific plaintiff was targeted by government officials for censorship and then suppressed on social media, along with ongoing suppression, also would suffice to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Kennedy*, 2024 WL 3879510 at * 5–9. Moreover, because Plaintiffs seek forward-looking relief—declaratory and injunctive—as opposed to

---

[6] To be clear, Plaintiffs are not accusing opposing counsel of wrongdoing but suggesting that government actors were not forthcoming with anyone about the nature of their activities.

damages, they must show a substantial risk that, in the near future, at least one defendant will restrict the rights of at least one plaintiff.  *Id.* (quoting *Murthy*, 144 S. Ct. at 1977).

1. *Plaintiffs Have Concrete Reasons to Believe Further Discovery Will Tie Past Censorship to Government Conduct*

As discussed above, internal Meta emails proved among the most fruitful, as employees within a company tend to communicate with a degree of candor they do not use in written discussions with individuals outside of it.  Plaintiffs in this case have had neither the opportunity to acquire internal communications from the companies in regular discovery nor to depose social media company employees.  Thus, it is crucial that Plaintiffs have a chance to subpoena the tech companies for internal documents and depose knowledgeable employees and executives.   And there are additional government actors that, based on the information they now have, Plaintiffs would seek to depose to obtain information they did not get during preliminary injunction-related discovery, including Rob Flaherty (former Director of Digital Strategy in the White House), Andy Slavitt (former White House Covid-19 Advisor), Clarke Humphrey (former Digital Director for the Covid-19 Response Team and currently Senior Advisor of Digital Persuasion for President Biden), Lauren Protentis (former CISA Advisor), Nina Jankowicz (former Executive Director of the dismantled Disinformation Governance Board), and Kate Bedingfield (former White House Communications Director).

Plaintiffs also require the opportunity to craft discovery requests to find out whether they were specifically targeted for censorship by government actors, which is probable or likely. As this Court knows, officials in the White House, Surgeon General's Office, and CISA demanded that social media platforms remove Mr. Kennedy along with the other 11 members of the "Disinformation Dozen." *See Kennedy*, 2024 WL 3879510 at *6, 8.  Shortly afterward, Facebook and Instagram accounts of the Disinformation Dozen were shut down.  *See id.* at *6.

Similarly, Alex Berenson, a journalist known for his skepticism of lockdowns and Covid-19 vaccines, obtained internal X emails discussing a meeting with the White House in which "[they] had

one really tough question about why Alex Berenson hadn't been kicked off the platform; ...."  First Am. Compl., ECF 80-1 ¶ 117, *Berenson v. Biden* (S.D.N.Y. Sept. 4, 2024) (No. 1:23-cv-03048).  The X employees did not believe Berenson's posts warranted disciplinary action, even giving him personal assurances that his account was safe.  Nevertheless, the company eventually removed his account under intense pressure from members of the Biden Administration, especially Andy Slavitt, who continued to use his government email address and title to pressure X even after ostensibly ending his tenure at the White House.  *Id.* ¶¶ 78–83, 88–95, 115, 122, 156–57, 165–74, 183–213.  This evidence points to the fact that the government directed social media platforms to get rid of specific individuals and groups, and that after being harangued and threatened relentlessly, the social media companies complied.

And Plaintiffs here have good reason to believe government officials targeted them for censorship, as they did the "Disinformation Dozen" and Alex Berenson.  Since the filing of the Complaint in this case—and as a result of Elon Musk giving him access to the "Twitter Files"—Dr. Bhattacharya discovered that when he joined X in August of 2021, the company placed him on a "Trends Blacklist," meaning that the platform throttled the reach of his account.  *See* Bhattacharya Suppl. Decl., Ex. 11, ¶¶ 10–11.  Dr. Bhattacharya seeks further discovery to find out if government Defendants, including but not limited to Dr. Fauci, were behind censorship of his account and if any continuing suppression is attributable to government actors.  *See id.* ¶ 12.

Similarly, Dr. Kulldorff learned late last year, through the House Judiciary Committee investigation, that the Virality Project flagged his Tweet stating that children and the naturally immune do not need the vaccine, on the grounds that the post "contradict[ed] CDC's advice." *See* House Judiciary Committee, *Jira Ticket Dataset* (Nov. 14, 2023), *available at* https://judiciary.house.gov/media/in-the-news/jira-ticket-dataset. Since the Virality Project worked closely with the government, arguably to the point where it effectively became a state actor, Dr.

14

Kulldorff seeks discovery to determine the extent of government involvement in his censorship.  *See Kennedy*, 2024 WL 3879510 at *6 ("Although not a government agency, the Virality Project coordinated with the State Department, Global Engagement Center, and CISA. The Virality Project is a 'multistakeholder collaboration' including government entities among its key stakeholders.").

Also important: the Supreme Court determined that Drs. Bhattacharya and Kulldorff had not established a likelihood that their past censorship was traceable to Defendants in the White House and CDC, one of the reasons they allegedly did not establish standing for purposes of the preliminary injunction. *Murthy*, 144 S. Ct. at 1989.  The Supreme Court noted that Drs. Bhattacharya and Kulldorff pointed to individuals at the National Institutes of Health (NIH) and National Institute of Allergy and Infectious Diseases (NIAID), including Drs. Anthony Fauci and Francis Collins, as instrumental in effectuating their censorship, but that the Fifth Circuit had reversed this Court's grant of a preliminary injunction as to those individuals. *Id.*  Yet NIH and NIAID remain Defendants in this lawsuit, even if they were not included in the Fifth Circuit's injunction; this Court denied Defendants' motion to dismiss claims against NIH, NIAID, and Dr. Fauci.  *See Missouri v. Biden*, 662 F.Supp.3d at 682–83.

The allegations Drs. Bhattacharya and Kulldorff made in their declarations warrant further discovery to find out whether Drs. Fauci and Collins's efforts to suppress their speech involved an abuse of their authority as government actors.  As Drs. Bhattacharya and Kulldorff explained, after they co-authored the widely publicized Great Barrington Declaration condemning lockdowns in October of 2020, Drs. Fauci and Collins corresponded to strategize a published "take-down."  *See* Bhattacharya Decl. (Supporting First Am, Compl., Aug. 2, 2022), ECF 45-3, ¶¶ 5–14; Kulldorff Decl. (Supporting First Am. Compl.), ECF 45-4, ¶¶ 9–11.  Shortly afterward, Drs. Bhattacharya and Kulldorff, as well as the Declaration itself, were extensively censored online.  *See* Bhattacharya Decl., ECF 45-3, ¶¶ 15–16, 22–33; Kulldorff Decl., ECF 45-4, ¶¶ 15–19, 22–28.  Discovery aimed at establishing the role government actors at NIAID and NIH played in censoring these Plaintiffs and

potentially in the government's censorship enterprise more broadly, and that these agencies continue to play in censoring Plaintiffs and others, will assist the Court in determining whether they have standing at the merits phase of this case.

Moreover, in light of information that has come to light in the past few months, Drs. Bhattacharya and Kulldorff would seek to obtain discovery from sources of which they had previously been unaware.  An investigation conducted by the House Oversight Committee's Select Subcommittee on the Coronavirus Pandemic revealed that Dr. Fauci and some of his colleagues resorted to email deletion and use of personal accounts to suppress evidence supporting the lab leak hypothesis of Covid-19's origins.  For example, Dr. David Morens, Senior Advisor to Dr. Fauci, wrote in an April 21, 2021 email to Dr. Peter Daszak, President of the EcoHealth Alliance, which is a recipient of government funds and implicated in the creation of coronavirus by virtue of its gain-of-function research, "i forgot to say there is no worry about FOIAs.  I can either send stuff to Tony [Fauci] on his private gmail, or hand it to him at work or at his house.  He is too smart to let colleagues send him stuff that could cause trouble."[7]  In another email to government contractors, Dr. Morens referred to Dr. Fauci's "'secret' back channel."[8]  Dr. Morens sent a plethora of other communications instructing recipients to use gmail or other non-official channels of communication.[9]  Dr. Morens also sent numerous emails indicating that he and others intentionally deleted emails, also a violation of the law.[10]

---

[7] *See* Email from Dr. David Morens to Dr. Peter Daszak, et. al. (April 21, 2021), *attached as* Ex. 1.

[8] *See* Email from Dr. Morens to Dr. Gerald Keusch, et. al. (May 13, 2021), *attached as* Ex. 2.

[9] *See* Email from Dr. Morens to Dr. Daszak (April 26, 2020), *attached as* Ex. 3; *see* Email from Dr. Morens to Dr. Keusch, et. al. (November 19, 2021), *attached as* Ex. 4 ("BOTH my gmail and phone calls are now safe.  Text is NOT, as it can be FOIA'd, as can my govt email"); *see* Email from Dr. Morens to Dr. Keusch (May 12, 2020), *attached as* Ex. 5 ("Please try to send only to my gmail"); *see* Email from Dr. Morens to Dr. Keusch (November 18, 2021), *attached as* Ex. 6 ("Basically, my gmail is now safe from FOIA … Thus it should be safe to communicate safely with you, Peter, and others, as long as we use my private gmail").

[10] *See* Email from Dr. Morens (February 24, 2021), *attached as* Ex. 7 ( "You are right, i need to be more careful.  However, as i mentioned once before, i learned from our foia lady here how to make emails disappear after i am foia'd but before the search starts, so i think we are all safe.  Plus i deleted most of those earlier emails after sending them to gmail.").  *See also* Email from Dr. Morens to Dr. Daszak (Oct. 5, 2021), *attached as* Ex. 8 ("However, Ron Johnson is all over it and now after me.  Tony will be pissed, rightly so.  I deleted that email but now I learn that every email I ever got/sent since 1998 is captured and will be turned over, whether or not I instantly deleted it.  Gmail, phone, text … i need to scrupulously rely on those exclusively."); Email from Dr. Morens to Dr. Daszak (June 16, 2020), *attached as* Ex. 9 ("We are all smart enough

The revelations from Dr. Morens's emails demonstrate that he, as well as Fauci, Collins, Daszak, and several others are or should be in possession or control of emails that Defendants did not produce in response to discovery in this case and that bear directly on Plaintiffs' claims.  Since Drs. Fauci and Morens were using gmail and email deletion as tools to avoid liability for unsavory and possibly unlawful conduct, it is entirely reasonable to presume that they used the same methods to avoid detection for unlawful efforts to censor Plaintiffs.  Because Dr. Morens, and possibly others, destroyed records and evidence by deleting government emails, should Plaintiffs be permitted to pursue additional discovery, they would seek to subpoena the servers that may have retained copies of deleted or inappropriately directed emails.

Finally, the State Plaintiffs remain "'entitled to special solicitude' when it comes to standing." *Murthy*, 144 S. Ct. at 1996 n.11.  That solicitude extends to both direct and quasi-sovereign-interest injuries claimed by Missouri and Louisiana in this case. To be sure, the Supreme Court concluded that the existing record did not show a sufficient "causal link" between the government's unlawful conduct and the States' injuries to support a preliminary injunction. *Id.* at 1989.  But the Court "express[ed] [no] view" on the question whether States sustain a direct injury when state officials' accounts are censored due to federal coercion. *Id.* at n.5.  The Court also suggested that the outcome may have been different if States "identified [] specific speakers or topics that they have been unable to hear or follow" due to federal coercion. *Id.* at 1996. Further discovery, therefore, would allow the State Plaintiffs to develop these bases for standing.

### 2. *Plaintiffs Can Demonstrate Ongoing Harms and the Threat of Future Harms*

In the Fifth Circuit, "plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury."

---

to know to never have smoking guns, and if we did we wouldn't put them in emails and if we found them we'd delete them.").

*Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019).  There must be at least a substantial risk that the threatened future injury will occur soon.  *Malik v. U.S. Dep't of Homeland Security*, 619 F.Supp.3d 652 (N.D. Tex. 2022).  Past harm can constitute an injury-in-fact for purposes of injunctive relief if it causes "continuing, present adverse effects."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

The Supreme Court determined that, on the record supporting the motion for preliminary injunction, Plaintiffs here could not "show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Murthy*, 144 S. Ct. at 1987.  At the same time, the Court acknowledged that Plaintiff Jill Hines had "one or two potentially viable links" tying her censorship in the past to government action, but that "Facebook was targeting her pages before almost all of its communications with the White House and the CDC" which "weakens the inference that her subsequent restrictions are likely traceable to 'government-coerced enforcement' of Facebook's policies[.]" *See Murthy*, 144 S. Ct. at 1992 (quoting *Missouri*, 83 F.4th at 370).

There are three remarkable things about the Court's statements:  First, the "one or two potentially viable links" phrase implies that the *quantity* of evidence was a factor weighing in the Court's adverse determination.  Put otherwise, if Ms. Hines had demonstrated six, eight, or ten "potentially viable links," especially showing *ongoing* harm traceable to the government, that could suffice to demonstrate traceability.  It also means that if Ms. Hines obtains additional discovery, she might well be able to establish standing for declaratory and permanent injunctive relief.

Second, the Court stated as a matter of fact that Facebook was targeting Ms. Hines prior to government involvement in social media censorship.  But that is precisely the sort of supposition that might turn out to be contradicted by further discovery.  Likewise, in analyzing Ms. Hines's standing, the Court observed that one of her groups had been removed in July of 2021, following requests from White House officials to "end group recommendations for groups with a history of COVID-19 or

vaccine misinformation." *Murthy*, 144 S. Ct. at 1990.  The Court went on to say: "A week later, Facebook replied that it had 'already removed all health groups from our recommendation feature.' *It is hard to know what to make of this.*  Facebook reported that it had *already* acted, which tends to imply that Facebook made its decision independently of the White House." *Id.* (emphasis added) (citation omitted).  But the fact that the Court was uncertain how to interpret this statement—"It is hard to know what to make of this"—demonstrates that this is precisely the type of evidentiary question that warrants further investigation—not dismissal.

Indeed, in the limited, preliminary injunction related discovery Plaintiffs have undertaken, they were only ultimately permitted to serve interrogatories and document requests on the Defendants named in the initial Complaint, and up to five social media platforms, as well as to depose six Defendants.  *See* July 12, 2022 Order Granting Expedited Preliminary Injunction Related Discovery, ECF 34; Oct. 21, 2022 Order Regarding Witness Depositions, ECF 90.  Plaintiffs have not had the opportunity to conduct merits discovery, which, in a case of this magnitude and significance, would normally involve the opportunity to obtain documents from and to depose a far greater number of witnesses. Six depositions is typical in a personal injury lawsuit, not a case involving a government-wide effort to censor millions of Americans.  Thus, Plaintiffs should at least be permitted to engage in discovery to ascertain their standing.  Ideally, they would proceed with discovery under Rule 26 at the same time.

Third, the Supreme Court focused extensively on Plaintiffs' alleged failure to demonstrate a threat of future harm since a preliminary injunction seeks forward-looking relief.  In fact, the Court considered evidence of past harm traceable to the government relevant only insofar as it was predictive of future injury.  *See Murthy*, 144 S. Ct. at 1992.  This Court recently found in *Kennedy* that Children's Health Defense (CHD) had standing for a preliminary injunction because the organization had not only been censored on Facebook, Instagram, and YouTube in the past, but that this censorship was

ongoing.  *See Kennedy*, 2024 WL 3879510 at *9 ("Because the injury is ongoing, the Court need not determine whether a future injury is likely to occur.").

Ms. Hines has submitted a supplemental declaration attesting to the fact that she is *still* being censored on social media for alleged "health misinformation," as recently as a few days before she drafted her updated declaration.  *See* Hines Suppl. Decl., Ex. 10, ¶¶ 6–8.  *See Meese v. Keene*, 481 U.S. 465. 472 (1987) (explaining that a litigant must demonstrate "a claim of specific present objective harm or a threat of specific future harm.").  Ms. Hines's supplemental declaration puts her in a virtually identical position to Kennedy and CHD, meaning that on this record she has standing to pursue her claims against Defendants if she is permitted to amend the Complaint to include recent developments (*see infra,* Part III).  Nevertheless, further discovery is warranted to gain a better understanding of the precise nature of the government's ongoing involvement in censorship.  *See Kennedy*, 2024 WL 3879510 at *18 ("A 'continuing injury' is sufficient to create standing for injunctive relief.") (citing *Gonzalez v. Blue Cross Blue Shield Ass'n.*, 62 F.4th 891, 902 (5th Cir. 2023)).[11]

Dr. Bhattacharya has also submitted a supplemental declaration attesting that he still posts on X about pandemic management and free speech and has posted interviews that he has done with Robert F. Kennedy Jr.'s former vice-presidential candidate, Nicole Shanahan, on X, YouTube, and other websites.  As this Court noted, Mr. Kennedy's candidacy puts him at risk of government-induced censorship.  *See Kennedy*, 2024 WL 3879510 at *8–9. The same is true for a public figure like Dr. Bhattacharya, as well as Mr. Kennedy's running mate, both of whom remain publicly and politically engaged and hold various positions contrary to those of President Biden and Vice President Kamala

---

[11] Plaintiffs maintain that they have standing even if the government is not actively coercing, pressuring, inducing, or encouraging the companies to censor First Amendment protected speech, so long as they can show that the policies the platforms are currently implementing resulted from government influence. This question was not directly addressed by the Supreme Court and thus remains open.  *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) (explaining that past injury, accompanied by "continuing, present adverse effects" can suffice to establish standing).

Harris.  *See* Bhattacharya Suppl. Decl., Ex. 11, ¶¶ 4–9, 12.  Thus, Dr. Bhattacharya has a basis for believing he is still being censored, and he should have the opportunity to obtain discovery to discern whether he is and if the government is involved.[12]

Notably, at oral argument in the Supreme Court, Justice Alito asked the government rhetorically, "You've never argued that this case is moot?"  Tr. of Oral Arg. at 43:3–4, *Murthy v. Missouri*, (U.S.) (No. 23-411). Defendants' attorney responded, "We have not, no."  *Id.* at 43:5. Even the government does not claim to have stopped, another reason to find ongoing harm.

## III.    IN THE ALTERNATIVE, OR IN ADDITION, THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO AMEND THEIR COMPLAINT

If this Court declines to permit Plaintiffs to seek additional discovery, in the alternative, it should grant them leave to amend their Complaint to cure the alleged standing defects. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a complaint] when justice so requires."). "[L]eave to amend should be liberally granted, when the plaintiff might be able to state a claim based on the underlying facts and circumstances." *Hernandez v. W. Tex. Treasures Est. Sales, LLC*, 79 F.4th 464, 468 (5th Cir. 2023). A court should deny a motion for leave to amend only if there exists a "substantial reason" to do so, because the "policy of the federal rules is to permit liberal amendment to facilitate [the] determination of claims on the merits and to prevent litigation from becoming a

---

[12] Moreover, Rob Flaherty—whose conduct was one of the primary motivations for this lawsuit—is Vice President Kamala Harris's Deputy Campaign Manager.  *See* Jackson Walker, *Top Harris Campaign Aide Involved in Biden Push to Censor Covid Posts*, THE NATIONAL DESK (Aug. 29, 2024), *available at* https://mynbc15.com/news/nation-world/top-harris-campaign-aide-involved-in-biden-admins-push-to-censor-covid-related-content-rob-flaherty-white-house-house-digital-strategy-kamala-harris-joe-biden-donald-trump-facebook-meta-censorship-mark-zuckerberg-pandemic. In the event Ms. Harris wins the presidential election this November, given the lack of any legal consequences thus far for Flaherty's and others' behavior, Plaintiffs have every reason to believe that it will continue for the foreseeable future.  That is even more true given that both Ms. Harris and her running mate, Tim Walz, have stated that they believe "misinformation" is not First Amendment protected and should be policed by the government.  *See* Remarks by Vice President Harris, THE WHITE HOUSE (June 16, 2022), *available at* https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/16/remarks-by-vice-president-harris-announcing-the-launch-of-the-white-house-task-force-to-address-online-harassment-and-abuse/; Robby Soave, *Tim Walz Was Dead Wrong About Misinformation and Free Speech*, REASON (Aug. 8, 2024), *available at* https://reason.com/2024/08/08/tim-walz-was-dead-wrong-about-misinformation-and-free-speech/.

technical exercise in the fine points of pleading." *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597–98 (5th Cir. 1981). "Substantial reasons" include: if "the movant has acted in bad faith or with a dilatory motive, granting the motion would cause prejudice, or amendment would be futile." *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 322 (5th Cir. 2009). A court is authorized to grant leave to amend the pleadings and add plaintiffs if it determines that subject matter jurisdiction exists as to at least one of plaintiffs' original claims, even if it determines that plaintiffs lack standing to assert other claims. *See Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 595 (5th Cir. 2016).

Plaintiffs have not acted in bad faith, and Defendants would not be prejudiced if they are granted leave to amend the Complaint. *See Spector v. Norwegian Cruise Line Ltd.*, No. H-00-2649, 2007 WL 2900584, at *2 (S.D. Tex. Sept. 30, 2007) (reasoning that the addition of a new party to the lawsuit did not prejudice defendants; they "exaggerate[] the true effect of this amendment" and are "still defending against the same claims as stated in the First Amended Complaint"; likewise, amending complaint after defendants filed motion for summary judgment did not amount to bad faith on the plaintiffs' part).

Nor would amendment be futile. Along with several other circuits, the Fifth Circuit interprets "futility" to mean that the "amended complaint would fail to state a claim upon which relief could be granted." *Pickney*, 318 F.R.D. at 331 (quoting *Stripling*, 234 F.3d at 872–73). As discussed, the Supreme Court predicated its determination in *Murthy* solely upon standing and did not reach the merits. *See Murthy*, 144 S. Ct. at 1985 n.3 ("Because we do not reach the merits, we express no view as to whether the Fifth Circuit correctly articulated the standard for when the Government transforms private conduct into state action"). The dissenting justices, the three-judge panel in the Fifth Circuit, and this Court—the only judges to reach the merits—have all found that Plaintiffs were likely to prevail on the merits of their First Amendment claims. *See Murthy*, 144 S. Ct. at 2012–15 (Alito, J., dissenting); *Missouri v. Biden*, 83 F.4th at 373–93; *Missouri v. Biden*, 680 F.Supp.3d at 690–720. This Court also

determined that Plaintiffs had stated claims upon which relief could be granted for their *ultra vires* and APA claims when denying Defendants' motion to dismiss the Second Amended Complaint.  *Missouri*, 662 F.Supp.3d at 669–683.   Accordingly, the Supreme Court's finding with respect to Plaintiffs' standing has no bearing on whether they stated claims upon which relief could be granted.

Moreover, recent Supreme Court precedent confirms the meritorious character of Plaintiffs' claims.  In *National Rifle Association v. Vullo*, 602 U.S. 175 (2024), the plaintiffs alleged that Defendant Vullo, superintendent of the New York Department of Financial Services, had "pressured regulated entities to help her stifle the NRA's pro-gun advocacy by threatening enforcement actions against those entities that refused to disassociate from the NRA and other gun-promotion advocacy groups." *Id.* at 180–81.  The Court held that Vullo's "allegations, if true, state a First Amendment claim." [13]  *Id.* at 181.   In *Vullo*, the Court also rejected one of the defenses raised in this case, which is that government Defendants are simply exercising their own free speech rights when coercing, pressuring, inducing, or encouraging social media companies to censor content of which they disapprove.  *Id.* at 188 ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead. In doing so, she can rely on the merits and force of her ideas, the strength of her convictions, and her ability to inspire others. What she cannot do, however, is use the power of the State to punish or suppress disfavored expression."). This new decision from the Supreme Court, which directly addresses many of Plaintiffs' claims, indicates that Plaintiffs are even *more* likely to prevail on the merits of their claims than they were when this Court initially ruled on Defendants' Motion to Dismiss.

---

[13] But Plaintiffs' theory is not limited to coercion.  They maintain that the First Amendment prohibits the government from involving itself in social media censorship so as to "abridg[e]," or "reduce" speech.  *See* Third Am. Compl., ECF 268 ¶¶ 114–17, 477–88, 502–21. Since the majority of the Supreme Court did not address the question of what makes government conduct unlawful in this context, whether the Fifth Circuit's standard—prohibiting government actors from "coercing" or "significantly encouraging" social media platforms to censor speech—is correct remains undetermined by the nation's highest court. *See Murthy*, 144 U.S. at 1985 n.3.

Thus, if this Court declines to grant Plaintiffs the opportunity to obtain jurisdictional or merits discovery, it should permit them to add plaintiffs who currently have a stronger showing of traceability and redressability. *See, e.g., June Med. Servs., LLC v. Gee*, No. 17-00404-BAJ-RLB, 2018 WL 2656552 (M.D. La. June 4, 2018) (allowing plaintiffs to file an amended complaint, over defendants' objections, to plead facts with greater specificity and thereby show standing); *Hunter v. Branch Banking and Trust Co.*, No. 3:12-cv-2437-D, 2013 WL 607151 (N.D. Tex. Feb. 19, 2013) (granting plaintiffs opportunity to file second amended complaint to cure standing defects); *In re Am. Airlines, Inc., Priv. Litig.*, 370 F.Supp.2d 552, 567–68 (N.D. Tex. 2005) (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend … .").

Specifically, members of the Disinformation Dozen seek to join the lawsuit. This Court has previously held that a member of that group, Robert F. Kennedy, Jr., and his nonprofit organization, CHD, had standing because they were expressly targeted by the federal government. *Kennedy*, 2024 WL 3879510 at *8–18. Even the Supreme Court acknowledged, in *Murthy*, that "White House officials had pushed Facebook to remove the accounts of the 'disinformation dozen.'" *Murthy*, 144 S. Ct. at 1991.[14]

As discussed *supra*, Part II, Plaintiffs Hines and Bhattacharya attach supplemental declarations attesting to a likelihood of ongoing harm, curing standing defects that the Supreme Court identified. This material would be incorporated into an amended complaint. Plaintiffs would also welcome the opportunity to reframe their claims in light of the Supreme Court's decision, especially the First

---

[14] To be clear, Plaintiffs maintain the Supreme Court's decision does not alter this Court's determination that they have standing at the pleadings stage, and that further discovery would substantiate their standing. But if this Court disagrees, the addition of these plaintiffs would cure any alleged standing defects.

24

Amendment theory of listener's rights.  The Supreme Court rejected that theory of standing as "startlingly broad." *Id.* at 1996.  However, the Court noted that there is a "First Amendment right to 'receive information and ideas'" "where the listener has a concrete, specific connection to the speaker." *Id.* (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).  Thus, if Plaintiffs can show that individuals they not only followed on social media, but relied upon to frame their views as speakers, were censored, that should suffice to establish standing.  The opportunity to amend the complaint to reflect this theory, and to obtain discovery predicated upon the same, would allow them to establish standing.  *See* Philip Hamburger, *Courting Censorship*, 4 J. FREE SPEECH L., 195, 268 (2024) ("[W]hen government demands the suppression of some speech and chills even more, it reduces the diversity, value, and moderation of opinion—thereby diminishing the opportunity for each individual to develop and express his own considered views.").  Based upon this Court's analysis, then, as well as the Supreme Court's, amending the Complaint to include these plaintiffs would cure any outstanding jurisdictional defects.

## CONCLUSION

The Court should not dismiss this case but should provide for additional discovery both to establish jurisdiction, and under Rule 26.  Alternatively, or in addition, the Court should permit Plaintiffs to amend the Complaint to add members of the Disinformation Dozen as plaintiffs, refine their standing theories, and attest to ongoing harm.

Dated: September 17, 2024                                   Respectfully submitted,

/s/ Jenin Younes
JENIN YOUNES *
*Litigation Counsel*
JOHN J. VECCHIONE *
*Senior Litigation Counsel*
ZHONETTE BROWN*
*Senior Litigation Counsel*
New Civil Liberties Alliance
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Main: (202) 869-5210
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*


ELIZABETH B. MURRILL                    ANDREW BAILEY
*Louisiana Attorney General*            *Missouri Attorney General*

/s/ Zachary Faircloth                   /s/ Josh M. Divine
ZACHARY FAIRCLOTH                       JOSH M. DIVINE
*Principal Deputy Solicitor General*    *Solicitor General*
TRACY SHORT                             TODD A. SCOTT
*Ass't Attorney General*               *Senior Counsel*
D. JOHN SAUER                           207 W. High St.
*Sp. Ass't Attorney General*           P.O. Box 899
1885 N. Third St.                       Jefferson City, MO 65102
Baton Rouge, LA 70802                   (573) 751-8870
(225) 326-6766                          Joshua.Divine@ago.mo.gov
MurrillE@ag.louisiana.gov               *Counsel for Missouri*
*Counsel for Louisiana*

/s/ John C. Burns
JOHN C. BURNS *
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*

*Admitted pro hac vice

26

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 17, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ Jenin Younes*