# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| STATE OF MISSOURI, *et al.*, | |
| *Plaintiffs*, | No. 22-cv-1213 |
| v. | *Consolidated with No. 23-cv-381* |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, | Judge Terry A. Doughty<br>Mag. Judge Kayla D. McClusky |
| *Defendants*. | |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE TO COURT'S ORDER OF AUGUST 27, 2024

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 4

LEGAL STANDARD......................................................................................................... 6

ARGUMENT ..................................................................................................................... 7

I.     The Supreme Court's Determination On The Record Before It That Plaintiffs
       Lack Article III Standing Teaches That Dismissal For Lack Of Subject-Matter
       Jurisdiction Is Proper ............................................................................................ 7

       A.     The Supreme Court's Reasoning In Deciding Defendants' Factual
              Challenge To Subject-Matter Jurisdiction Applies Equally At This
              Procedural Stage ........................................................................................ 7

       B.     The Supreme Court's Reasoning Abrogates This Court's Prior Decision
              On Defendants' Rule 12 Motions ............................................................ 10

II.    If This Court Declines To Dismiss At This Time, Defendants Should Be
       Permitted To Test Plaintiffs' Allegations Through Rule 12 Motion Practice
       Before Any Discovery ......................................................................................... 13

III.   Plaintiffs' New Declarations Neither Show Article III Standing Nor Are
       Sufficient To Justify Discovery .......................................................................... 15

       A.     Plaintiffs Have Not Met Their Burden To Show Article III Standing To
              Seek Injunctive Relief Regarding COVID-19 Misinformation ........................... 16

       B.     Plaintiffs Have Not Met Their Burden To Show Article III Standing To
              Seek Injunctive Relief Regarding Election Misinformation.............................. 21

       C.     Further Discovery Is Unwarranted.......................................................... 24

              1.     Further jurisdictional discovery is unwarranted because Plaintiffs
                     already received extensive discovery and inadequately explain how
                     additional discovery will cure their standing deficiencies ....................... 24

              2.     Plaintiffs' additional allegations of Government
                     "misrepresentations" are unfounded ...................................... 31

              3.     There is no basis for merits discovery .................................... 32

IV.    The Court Should Deny Leave For Plaintiffs To File A Fourth Amended
       Complaint............................................................................................................ 34

CONCLUSION................................................................................................................ 37

i

# TABLE OF AUTHORITIES

## CASES

*Abdullah v. Paxton*,
 65 F.4th 204 (5th Cir. 2023) ................................................................. 16

*Barber v. Bryant*,
 860 F.3d 345 (5th Cir. 2017) ................................................................. 12

*Baxter v. Louisiana*,
 No. 21-cv-555, 2022 WL 1509118 (M.D. La. May 12, 2022) ............................... 15

*Behrens v. Pelletier*,
 516 U.S. 299 (1996) ............................................................................... 13

*Bell Helicopter Textron Inc. v. Am. Eurocopter, LLC*,
 729 F. Supp. 2d 789 (N.D. Tex. 2010) ............................................... 28, 30

*Brownback v. King*,
 592 U.S. 209 (2021) ........................................................................ 32, 33

*Carver v. Atwood*,
 18 F.4th 494 (5th Cir. 2021) ................................................................... 8

*Cheejati v. Blinken*,
 106 F.4th 388 (5th Cir. 2024) .................................................................. 7

*Cheney v. U.S. Dist. Ct. for D.C.*,
 542 U.S. 367 (2004) ................................................................ 27, 32, 33

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) .............................................................................. 22

*Ctr. for Biological Diversity v. EPA*,
 937 F.3d 533 (5th Cir. 2019) ............................................................ 20, 30

*DaimlerChrysler Corp. v. Cuno*,
 547 U.S. 332 (2006) ............................................................................... 7

*Davis v. United States*,
 417 U.S. 333 (1974) ............................................................................... 11

*Ex parte McCardle*,
 74 U.S. 506 (1868) ................................................................................. 7

*Food & Drug Admin. v. All. for Hippocratic Med.*,
 602 U.S. 367 (2024) ......................................................................... 6, 22

*Freeman v. United States*,
 556 F.3d 326 (5th Cir. 2009) ............................................................. 24, 25

*Gill v. Whitford*,
  585 U.S. 48 (2018) .................................................................................................. 21

*Greater New Orleans Fair Housing Action Center v. Kelly*,
  364 F. Supp. 3d 635 (E.D. La. 2019) ................................................................... 13

*H & W Indus., Inc. v. Formosa Plastics Corp., USA*,
  860 F.2d 172 (5th Cir. 1988) ............................................................................... 13

*In re Alabama & Dunlavy, Ltd.*,
  983 F.3d 766 (5th Cir. 2020) ............................................................................... 23

*In re FDIC*,
  58 F.3d 1055 (5th Cir. 1995) ............................................................................... 26

*In re Gee*,
  941 F.3d 153 (5th Cir. 2019) ................................................................................. 6

*In re Paxton*,
  60 F.4th 252 (5th Cir. 2023) ...................................................................... 6, 15, 33

*In re S. Recycling, LLC*,
  982 F.3d 374 (5th Cir. 2020) ............................................................................ 8, 33

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ........................................................................... 24, 25

*JPay LLC v. Burton*,
  No. 3:22-cv-1492, 2023 WL 5253041 (N.D. Tex. Aug. 15, 2023) ......................... 35

*Kelly v. Syria Shell Petro. Dev. B.V.*,
  213 F.3d 841 (5th Cir. 2000) ........................................................... 24, 25, 27, 31

*Kennedy v. N.C. State Bd. of Elections*,
  905 S.E.2d 55 ...................................................................................................... 23

*Kennedy v. Sec'y of State*,
  10 N.W.3d 632 (Mich. 2024) .............................................................................. 23

*Kennedy v. Wis. Elections Comm'n*,
  No. 20AP1872, 2024 WL 4315199 (Wis. Sept. 27, 2024) ...................................... 23

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ............................................................................................... 5

*Kling v. Hebert*,
  No. 19-cv-671, 2020 WL 4606869 (M.D. La. Aug. 11, 2020) ............................... 35

*Land v. Dollar*,
  330 U.S. 731 (1947) ............................................................................................... 9

*Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*,
    901 F.2d 404 (5th Cir. 1990) ........................................................................ 14

*Lewis v. Casey*,
    518 U.S. 343 (1996) ...................................................................................... 21

*Louisiana Acorn Fair Housing v. LeBlanc*,
    211 F.3d 298 (5th Cir. 2000) ........................................................................ 13

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
    751 F.3d 368 (5th Cir. 2014) ................................................................ 34, 35

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ...................................................................................... 21

*Mayeaux v. La. Health Serv. & Indem. Co.*,
    376 F.3d 420 (5th Cir. 2004) ........................................................................ 34

*Missouri v. Biden*,
    83 F.4th 350 (5th Cir. 2023) ..................................................................... 4, 29

*Missouri v. Biden*,
    662 F. Supp. 3d 626 (W.D. La. 2023) ........................................................... 11

*Missouri v. Biden*,
    680 F. Supp. 3d 630 (W.D. La. 2023) ...................................................... 4, 32

*Moran v. Kingdom of Saudi Arabia*,
    27 F.3d 169 (5th Cir. 1994) ............................................................................ 9

*Murthy v. Missouri*,
    144 S. Ct. 7 (2023) ......................................................................................... 4

*Murthy v. Missouri*,
    144 S. Ct. 1972 (2024) ........................................................................ *passim*

*National Rifle Association of America v. Vullo*,
    602 U.S. 175 (2024) ............................................................................ 4, 36, 37

*Pace v. Cirrus Design Corp.*,
    93 F.4th 879 (5th Cir. 2024) ........................................................... 24, 28, 29

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981) .......................................................................... 8

*Petrus v. Bowen*,
    833 F.2d 581 (5th Cir. 1987) ........................................................................ 14

*Rivera v. Wyeth-Ayerst Lab'y*,
    283 F.3d 315 (5th Cir. 2002) .......................................................................... 6

*Shemwell v. City of McKinney*,
    63 F.4th 480 (5th Cir. 2023) ........................................................................... 6

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ........................................................................................... 18

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................................... *passim*

*Superior MRI Servs. v. All. Healthcare Servs.*,
    778 F.3d 502 (5th Cir. 2015) ........................................................................... 8

*Texas All. for Retired Americans v. Hughs*,
    976 F.3d 564 (5th Cir. 2020) ......................................................................... 12

*Thole v. U.S. Bank N.A.*,
    590 U.S. 538 (2020) ......................................................................................... 6

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................. 16, 30

*United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*,
    336 F.3d 375 (5th Cir. 2003) ......................................................................... 35

*United States v. Egenberger*,
    424 F.3d 803 (8th Cir. 2005) ......................................................................... 11

*Von Drake v. Nat'l Broad. Co.*,
    No. 3:04-cv-652, 2004 WL 1144142 (N.D. Tex. May 20, 2004) ................... 14

*Watts v. SEC*,
    482 F.3d 501 (D.C. Cir. 2007) ....................................................................... 27

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ........................................................................... 8

*Wilson v. Burks-Klockner, Inc.*,
    602 F.3d 363 (5th Cir. 2010) ......................................................................... 36

*Young v. U.S. Postal Serv. ex rel. Donahoe*,
    620 F. App'x 241 (5th Cir. 2015) .................................................................. 35

**STATUTES**

50 U.S.C. § 3369 ................................................................................................ 23

**RULES**

Fed. R. Civ. P. 12 ................................................................................................ *passim*

Fed. R. Civ. P. 24 ...................................................................................................... 35

Fed. R. Evid. 201 ...................................................................................................... 23

**OTHER AUTHORITIES**

Kennedy Announces Suspension of Campaign (Aug. 23, 2024),
    https://www.kennedy24.com/kennedy_announces_suspension_of_campaign ....................... 23

Letter from Mark Zuckerberg to Hon. Jim Jordan (Aug. 26, 2024),
    https://perma.cc/T87F-Y5KG ....................................................................................... 28

## INTRODUCTION

After reviewing a factual record based on "extensive discovery," the Supreme Court held that the Plaintiffs in this action had not met their burden to show Article III standing and remanded for further proceedings consistent with that opinion. *Murthy v. Missouri*, 144 S. Ct. 1972, 1984-85 (2024). The only disposition consistent with that opinion is dismissal of this action without prejudice for lack of subject-matter jurisdiction. Absent Article III standing, there is no subject-matter jurisdiction. "Jurisdiction is power to declare the law, and when it ceases to exist, the *only* function remaining to the court is that of announcing the fact and *dismissing the cause*." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)) (emphasis added).

Plaintiffs' contrary arguments seeking to avoid dismissal are untenable.

*First*, Plaintiffs rely on this Court's March 2023 denial of the motions to dismiss the Second Amended Complaint and argue that this pleadings-stage win entitles them to proceed further in this action. But the Supreme Court's analysis of the facts and legal standards in *Missouri* controls Plaintiffs' claims. The Supreme Court's determinations supersede this Court's earlier findings, so this Court's prior ruling on Defendants' motion to dismiss is not the law of the case. In opposing Plaintiffs' motion for a preliminary injunction, Defendants brought a factual challenge to Plaintiffs' standing, requiring Plaintiffs to prove standing by a preponderance of the evidence. The Supreme Court found Plaintiffs' evidence inadequate. Plaintiffs now seek to rely on the same evidence and the same legal arguments that the Supreme Court has already rejected. Because the Supreme Court's determinations are binding, this Court should dismiss the case for lack of subject-matter jurisdiction under Rule 12(b)(1) or 12(h)(3).

*Second*, alternatively, if the Court does not dismiss the case outright, it should stay any discovery pending the filing by Defendants and disposition by this Court of Rule 12 motions directed to the operative Third Amended Complaint, to which Defendants have not yet had opportunity to respond, or an amended pleading if this Court allows one. Discovery should not resume until the operative pleading is properly examined under the controlling legal standards the

Supreme Court reiterated in *Missouri*.  And those standards may further be clarified in the pending appeal from the preliminary injunction in the consolidated *Kennedy* action (argued before the Fifth Circuit today).

*Third*, Plaintiffs offer supplemental declarations from two plaintiffs, Jill Hines and Dr. Jayanta Bhattacharya, and argue that those declarations establish standing and warrant further jurisdictional and merits discovery.  But whether taken as proffered evidence or as factual allegations presumed true on a motion to dismiss, the new submissions fail to show "real and immediate threat of repeated injury" any more than the record previously did.  *Missouri*, 144 S. Ct. at 1986.  In assessing the future injury requirement, the Supreme Court emphasized that, "without proof of an ongoing pressure campaign" by Defendants against social media platforms, "it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants."  *Id*. at 1993.  That speculation doomed Plaintiffs' prior standing submissions.  And the Supreme Court concluded that "[o]n this record"—the record that, apart from the new declarations, is the only record in this case—the alleged "frequent, intense communications that took place in 2021 between the Government defendants and the platforms had considerably subsided by 2022," such that "[b]y August 2022, . . . the officials' communications about COVID-19 misinformation had slowed to a trickle."  *Id.* at 1994.  None of the declarations addresses any ongoing (much less future) "pressure" on platforms by any Defendant regarding Plaintiffs' social media content.

In the new declarations, Plaintiffs also appear to assume that each time they describe a content moderation incident, they have shown "that the platforms continue to suppress their speech according to policies initially adopted under Government pressure."  *Id.* at 1995.  But even on the assumption that Plaintiffs' factual assertion "may be true," *id.*, the Supreme Court concluded Plaintiffs "have a redressability problem" because they lack "evidence of continued pressure from the defendants."  *Id.*  Without such evidence, there remains no basis to conclude that an injunction "stopping certain Government agencies and employees from coercing or encouraging the platforms to suppress speech" would affect the platforms' future content-moderation decisions.

2

*See id.* at 1995-1996 & n.11.  In sum, Plaintiffs have done nothing to solve the fundamental redressability problem that led the Supreme Court to find jurisdiction lacking.

In any event, Plaintiffs' bid for additional jurisdictional and merits discovery is unavailing. In what the Supreme Court characterized as "extensive" discovery in service of the preliminary injunction motion, *Murthy*, 144 S. Ct. at 1984, Plaintiffs obtained what they count as "almost 20,000" pages of documents, nearly 100 pages of interrogatory responses, and depositions of six witnesses.  Hence, Plaintiffs had ample opportunity to obtain information about their standing, and they fail to identify what specific facts they would reasonably expect to uncover that would cure the serious defects in standing identified by the Supreme Court if authorized to conduct jurisdictional discovery.  Nor can a plaintiff lacking Article III standing simply proceed to the merits as though the defect in its showing of subject-matter jurisdiction could be assumed away. *See Steel Co.*, 523 U.S. at 101 (Article III jurisdiction is "always an antecedent question" because "[h]ypothetical jurisdiction produces nothing more than a hypothetical judgment").

*Fourth*, Plaintiffs seek leave to amend, *i.e.*, to file a Fourth Amended Complaint, which would add as plaintiffs unidentified members of the so-called "Disinformation Dozen."  That request is procedurally deficient because Plaintiffs have not filed a proposed amended pleading that would allow Defendants and the Court to assess the particular allegations they propose to add. The request reflects undue delay, because Plaintiffs have made allegations about the "Disinformation Dozen" as early as their original complaint in this action in May 2022, and have no explanation for why they waited more than two years to propose including those unidentified parties as plaintiffs in this action.  Amendment would also be futile, because the proposed addition of members of the "Disinformation Dozen" would not cure the fundamental deficiencies that the Supreme Court identified—the absence of evidence of content moderation traceable to any ongoing government conduct and redressable by a court order against Defendants.  And, in any event, any such amended pleading would fail under Rule 12(b)(6) because the Government's communications with platforms did not constitute a "threat" in violation of the First Amendment

under the test for "coercion" recently clarified in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024).

In sum, the Court should dismiss this action without prejudice for lack of subject-matter jurisdiction, consistent with the analysis of the Supreme Court. If the Court declines to dismiss and returns this action to the pleading stage, the Court should set a briefing schedule for Defendants to file a Rule 12 motion on the operative complaint, including if amendment is authorized, and additional discovery should not proceed until after that Rule 12 motion has been resolved. In all events, further discovery should not occur until after the Fifth Circuit has issued its decision on appeal from the preliminary injunction in the consolidated *Kennedy* action.

## BACKGROUND

In *Missouri*, two States and several individuals sued an array of federal defendants relating to content moderation on social-media platforms.[1] On June 26, 2024, the Supreme Court held in *Missouri* that "neither the individual nor the state plaintiffs have established Article III standing to seek an injunction against any defendant." 144 S. Ct. at 1985. Accordingly, the Supreme Court "reverse[d] the judgment of the Fifth Circuit." *Id*. at 1997.

As to a speaker theory of standing, the Supreme Court held that "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id*. at 1986. "And even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content." *Id*. at 1988.

The Supreme Court determined that the plaintiffs had failed to make that showing. First, the Supreme Court concluded that the plaintiffs had not established "specific causation" because each plaintiff failed to show "that a particular defendant pressured a particular platform to censor

---

[1] This Court entered a preliminary injunction on July 4, 2023, after granting plaintiffs extensive discovery. *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023). The Fifth Circuit affirmed in part, reversed in part, vacated in part, and modified the injunction. 83 F.4th 350 (5th Cir. 2023). The Supreme Court granted certiorari and stayed the modified injunction pending its review. *Murthy v. Missouri*, 144 S. Ct. 7 (2023).

a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 1986, 1988. Assessing the asserted "direct censorship injuries" on a plaintiff-by-plaintiff, defendant-by-defendant, and platform-by-platform basis, the Supreme Court concluded that no plaintiff had established past injuries traceable to the government conduct at issue. The Supreme Court rejected the contention that plaintiffs' episodes of content moderation sufficed to confer Article III standing because there was no evidence that any of those episodes of content moderation had been caused by any action of the government. *Id.* at 1991-92.

Second, the Supreme Court emphasized that plaintiffs failed to show "'a real and immediate threat of repeated injury,'" as required to obtain prospective relief, *id.* at 1986 (citation omitted). The Court first disposed of plaintiffs who "fail[ed] to establish traceability for past harms," because that failure "substantially undermines" standing for future relief. *Id.* at 1993 (citation omitted). And even for Jill Hines, the plaintiff with "the best showing of a connection" that could constitute traceable past injury, the Supreme Court concluded that she lacked standing because "[b]y August 2022, when [that plaintiff] joined the case, the officials' communications about COVID-19 misinformation had slowed to a trickle." *Id.* at 1994. Thus, as to all plaintiffs, "without proof of an ongoing pressure campaign," the Supreme Court determined it was "entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id.* at 1993.

The Supreme Court also rejected plaintiffs' "right to listen" theory of standing. *Id.* at 1996-97 (citation omitted). Such a "startlingly broad" theory, the Court explained, "would grant all social-media users the right to sue over *someone else's* censorship," and the Court before "ha[d] 'never accepted such a boundless theory of standing.'" *Id.* at 1996 (citation omitted). The Court emphasized that a cognizable injury occurs "only where the listener has a concrete, specific connection to the speaker." *Id.* (citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)). The Court held that plaintiffs did not satisfy this requirement with a general assertion that access to "unfettered speech on social media is critical to their work as scientists, pundits, and activists." *Id.*

## LEGAL STANDARD

"A district court's obligation to consider a challenge to its jurisdiction is non-discretionary," *In re Paxton*, 60 F.4th 252, 256 (5th Cir. 2023) (quoting *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019)), and "standing 'is perhaps the most important of [the jurisdictional] doctrines,'" *see Gee*, 941 F.3d at 159.  "To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020).  "And when a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). When seeking to enjoin alleged government participation in the content-moderation decisions of third-party platforms, for "direct censorship injuries," under *Missouri*, "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Missouri*, 144 S. Ct. at 1986.  Likewise, for a listener theory of standing, "the listener" must identify a "specific instance of content moderation that caused them identifiable harm," *id.* at 1996-97, in addition to satisfying the standard traceability and redressability elements for any such injury, *id.* at 1987-96.

A "[f]ailure to establish any" of the elements of standing "deprives the federal courts of jurisdiction to hear the suit." *Rivera v. Wyeth-Ayerst Lab'y*, 283 F.3d 315, 318-19 (5th Cir. 2002). When a challenge to standing is asserted via a motion to dismiss for lack of subject-matter jurisdiction, the "burden of proof . . . is on the party asserting jurisdiction," here, the plaintiffs. *Shemwell v. City of McKinney*, 63 F.4th 480, 483 (5th Cir.  2023) (per curiam).  Each "plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id*.  A court cannot rule on the merits "when it has no jurisdiction" because "to do so is, by very definition, for a court to

act *ultra vires*." *See Cheejati v. Blinken*, 106 F.4th 388, 397 (5th Cir. 2024) (Oldham, J., concurring in part) (quoting *Steel Co.*, 523 U.S. at 101-02).

**ARGUMENT**

**I.    The Supreme Court's Determination On The Record Before It That Plaintiffs Lack Article III Standing Teaches That Dismissal For Lack Of Subject-Matter Jurisdiction Is Proper**

On essentially the same record as the one currently before this Court, the Supreme Court held that Plaintiffs failed to "establish[] standing to seek an injunction against any defendant." *Murthy*, 144 S. Ct. at 1985; *see also id.* at 1997 ("The plaintiffs, without any concrete link between their injuries and the defendants' conduct, ask us to conduct a review of the years-long communications between dozens of federal officials, across different agencies, with different social-media platforms, about different topics.  This Court's standing doctrine prevents us from exercising such general legal oversight of the other branches of Government.") (alterations omitted).  The Supreme Court's reasoning and analysis warrants dismissal of the action.

**A.    The Supreme Court's Reasoning In Deciding Defendants' Factual Challenge To Subject-Matter Jurisdiction Applies Equally At This Procedural Stage**

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  *Id.*  And a "proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'"  *Id.*  Accordingly, because no Plaintiff had established standing to seek prospective relief, this court lacks subject-matter jurisdiction over the action, and the only permissible course is to dismiss without prejudice.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines *at any time* that it lacks subject-matter jurisdiction, the court *must dismiss the action*.") (emphasis added).  "If a dispute is not a proper case or controversy, the courts have no business deciding it."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).  That is, "[j]urisdiction is power to declare the law, and when it ceases to exist, the *only function* remaining to the court is that of announcing the fact and *dismissing the cause*."  *Steel Co.*, 523 U.S. at 94 (quoting *McCardle*, 74 U.S. at 514) (emphasis added).  This action should be dismissed.

Plaintiffs err in contending (Pls. Supp. 6) that the Supreme Court's analysis can be shelved

7

on their theory that this Court must still "accept[] as true" Plaintiffs' "allegations" in the currently-operative Third Amended Complaint. That misunderstands Defendants' challenge to Article III standing and the Supreme Court's resulting holding.

The sum of the legal and factual conclusions the Supreme Court reached from the record is that Plaintiffs failed to carry their burden to establish standing as a factual matter. Indeed, the Supreme Court decided the question of standing on the full evidentiary record that Plaintiffs themselves assembled through discovery. When this Court applies the Supreme Court's legal reasoning and factual conclusions in *Missouri* to Plaintiffs based upon the current record under Rules 12(b)(1) and 12(h)—as it must—the correct result is dismissal without prejudice. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *see also Carver v. Atwood*, 18 F.4th 494, 497 (5th Cir. 2021) ("*[S]ua sponte* dismissal is mandatory when a court discovers that it lacks subject-matter jurisdiction."). That is because Defendants raised a factual challenge to standing, based on the record, in opposing the preliminary injunction motion, PI Opp. 128-36 (Dkt. 266), and in responding to Plaintiffs' proposed findings of fact, including on their standing (Dkt. 266-8).

Challenges to subject-matter jurisdiction can be "facial" or "factual": A facial challenge to jurisdiction requires the court "merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true." *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981); *see Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981). By contrast, in a factual challenge to jurisdiction, the defendant "submits affidavits, testimony, or other evidentiary materials." *Paterson,* 644 F.2d at 523. To "defeat" a factual challenge, the plaintiff "must prove the existence of subject-matter jurisdiction by a preponderance of the evidence" and is "obliged to submit facts through some evidentiary method to sustain his burden of proof." *See Superior MRI Servs. v. All. Healthcare Servs.*, 778 F.3d 502, 504 (5th Cir. 2015). Such a "'factual attack' . . . may occur at any stage," *In re S. Recycling, LLC*, 982 F.3d 374, 386 (5th Cir. 2020), and on such a challenge the court "resolve[s] factual disputes," and "devise[s] a method for making a determination with regard to the jurisdictional issue," *Moran v. Kingdom of Saudi Arabia*, 27 F.3d

169, 172 (5th Cir. 1994) (citing, *inter alia*, *Land v. Dollar*, 330 U.S. 731, 735 & n.4 (1947)).

The Supreme Court reviewed the available record and reached conclusions that are equally applicable at this procedural stage. In particular, in reviewing the Fifth Circuit's judgment affirming in part this Court's preliminary injunction and accompanying jurisdictional findings, the Supreme Court noted that "[t]he Fifth Circuit relied on the District Court's factual findings, many of which unfortunately appear to be clearly erroneous." *Id*. at 1988 n.4. For example, the Supreme Court explained that this Court "erroneously stated that Facebook agreed to censor content that did not violate its policies." *Id.* The Supreme Court's analysis of the record thus reflected the Court's review of the entire factual record.

The present record for Defendants' motion to dismiss under Rule 12(b)(1) or 12(h)(3) is materially identical to the one before the Supreme Court. Part III, *infra*. And because Defendants have raised a "factual attack" on jurisdiction, Plaintiffs must rely on the evidentiary record rather than on mere pleadings. *S. Recycling*, 982 F.3d at 386. That record is insufficient to demonstrate any plaintiff's standing, because no plaintiff can "show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Missouri*, 144 S. Ct. at 1986. Plaintiffs therefore fail to carry their burden necessary to maintain this suit.

But even if the correct focus were on pleadings rather than evidence, Plaintiffs fail to identify any factual allegations in the Third Amended Complaint that cure the jurisdictional deficiencies the Supreme Court identified. Nor could they. The allegations in the Third Amended Complaint reflect the same deficiencies that the Supreme Court identified with the record Plaintiffs assembled at the preliminary-injunction stage. For example, the Third Amended Complaint continues to "treat the defendants as a monolith," when the Supreme Court explained that a court "must confirm that *each* Government defendant continues to engage in the challenged conduct," *Missouri*, 144 S. Ct. at 1993. *Compare id.* (faulting Plaintiffs for "claiming broadly that 'the government[t]' continues to communicate with the platforms about 'content-moderation issues'"), *with, e.g.*, 3d Am. Compl. ¶ 185 ("Defendants have leveraged these threats to secure such increased

censorship of speakers, content, and viewpoints that they disfavor on social-media platforms; and
they have now moved into a phase of open collusion with the threatened companies . . .").
Similarly, the Third Amended Complaint fails to plausibly allege ongoing Government conduct,
as the Supreme Court emphasized it must.  *See Missouri*, 144 S. Ct. at 1993 ("without proof of an
ongoing pressure campaign, it is entirely speculative that the platforms' future moderation
decisions will be attributable, even in part, to the defendants").  To take one example, Plaintiffs
allege that CISA in the present "receives reports of perceived 'disinformation,' often from state
and local government officials, and forwards them to social-media companies for censorship." 3d
Am. Compl. ¶ 365.  That allegation merely repeats factual argument that the Supreme Court held
to be incorrect because, as the Supreme Court explained, CISA "stopped switchboarding . . . , and
the Government has represented that it will not resume operations for the 2024 election." *Missouri*,
144 S. Ct. at 1993.

Indeed, it is unsurprising that Plaintiffs' allegations contain the same deficiencies as the
record that the Supreme Court reviewed:  Plaintiffs repeatedly amended their pleading to
incorporate some of the very evidence that the Supreme Court examined in concluding they failed
to show standing.  *See, e.g.*, Jt. Statement on Discovery Disputes, Dkt. 71 at 25 (Plaintiffs argued
in request for leave to file Second Amended Complaint that "discovery provided so far has
produced an avalanche of revelations about new federal officials").  Plaintiffs' argument now,
focused on pleadings rather than the record, thus fails even on its own terms.

### B.  The Supreme Court's Reasoning Abrogates This Court's Prior Decision On Defendants' Rule 12 Motions

To be sure, the judgment the Supreme Court reviewed was the Fifth Circuit's affirmance
in part of this Court's preliminary injunction, not this Court's denial of the motions to dismiss.
But the Supreme Court's analysis of Article III standing abrogated this Court's analysis of Article
III standing.

For example, in denying Defendants' November 2022 Rule 12(b)(1) motion, this Court
concluded that the State Plaintiffs "have *parens patriae* standing because the Complaint has

adequately alleged injuries to the States' quasi-sovereign interests." *Missouri v. Biden*, 662 F. Supp. 3d 626, 652-53 (W.D. La. 2023). The Supreme Court disagreed: It underscored that "States do not have 'standing as *parens patriae* to bring an action against the Federal Government.'" *Missouri*, 144 S. Ct. at 1997.

Similarly, in analyzing the causation (or traceability) element of Article III standing, the Supreme Court faulted the Fifth Circuit and this Court for "attributing *every* platform decision at least in part to the defendants." *Id.* at 1988. Rather, Article III requires Plaintiffs to make a "threshold showing that a particular defendant pressured a particular platform to censor a particular topic before that platform suppressed a particular plaintiff's speech on that topic," *id.*, which Plaintiffs did not do either in any complaint or in their preliminary injunction motion. Indeed, Plaintiffs continue to ignore the Supreme Court's instruction. Even their latest submission (*e.g.*, Pls. Supp. 20) refers to Plaintiff Hines's standing "to pursue her claims against Defendants" without identifying any particular Defendant's conduct resulting in moderation of any particular speech on a particular platform. That is contrary to the Supreme Court's rationale in *Missouri*, which "untangle[d] the mass of the plaintiffs' injuries and Government communications," and rejected the notion that Defendants can be regard "as a monolith," *i.e.*, without analyzing whether "each Government defendant continues to engage in the challenged conduct." 144 S. Ct. at 1988, 1993; *see also* Part III, *infra*.

In other words, the Court's prior Rule 12(b)(1) denial rested on mistaken legal premises the Supreme Court corrected in *Missouri*. Hence, this Court's prior Rule 12(b)(1) denial does not preclude dismissal now. *See United States v. Egenberger*, 424 F.3d 803, 805 (8th Cir. 2005) ("The district court does not continue to be bound by prior interpretations of the law that are contrary to the Supreme Court's most recent announcement."); *cf. Davis v. United States*, 417 U.S. 333, 342 (1974). The proper outcome is to dismiss the action for lack of subject-matter jurisdiction based upon on the factual record that the Supreme Court already considered and found wanting.

To elevate this Court's prior holdings at the motion to dismiss stage above those made by the Supreme Court, Plaintiffs attempt to downplay the significance of the Supreme Court's holding

by arguing that the Supreme Court merely assessed the likelihood that Plaintiffs will prove "all aspects of their claims, including that they have standing for the specific relief sought." Pls. Supp. 2.  But when the Supreme Court addressed standing, it made legal determinations that Plaintiffs' factual submissions were insufficient to satisfy Article III.  Plaintiffs are now offering the same evidence—and the same legal theories—but are asking this Court to reach conclusions that are diametrically opposed to the Supreme Court's.  Plaintiffs cannot meet their burden to demonstrate standing under the standard articulated by the Supreme Court.  Thus, this Court should dismiss this case for lack of jurisdiction under Rule 12(b)(1) or 12(h)(3).

Plaintiffs' authorities are not to the contrary.  Plaintiffs err in relying (Pls. Supp. 2, 6) on *Texas Alliance for Retired Americans v. Hughs*, where the Fifth Circuit stayed a preliminary injunction despite raising "some concerns about whether Plaintiffs have standing."  976 F.3d 564, 567 n.1 (5th Cir. 2020).  An appellate decision to stay an injunction does not imply that this Court has subject-matter jurisdiction to proceed in an action where the Supreme Court has already held the Plaintiffs lack Article III standing.  Indeed, the Fifth Circuit in *Texas Alliance* repeated the familiar principle that the "merits panel will need to address standing before reaching the merits because standing is jurisdictional." *Id.*  Here, the Supreme Court addressed standing, and found it lacking.

*Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) (cited at Pls. Supp. 6), also undermines Plaintiffs' position.  On appeal from the grant of a preliminary injunction there, the Fifth Circuit held that "under th[e] current record, the plaintiffs have not shown an injury-in-fact," and accordingly rendered "a judgment of dismissal for want of jurisdiction."  860 F.3d at 358.  The Fifth Circuit emphasized that it did "not foreclose the possibility that a future plaintiff may be able to show clear injury-in-fact that satisfies the 'irreducible constitutional minimum of standing,' but the federal courts must withhold judgment unless and until that plaintiff comes forward." *Id.* Plaintiffs have not come forward with new evidence here that would compel a conclusion different from the Supreme Court's. *See* Part III, *infra*.  Similarly, here, then, this Court should issue a judgment of dismissal for lack of subject-matter jurisdiction.

12

Plaintiffs' other authorities (Pls. Supp. 6) are inapposite.  In *H & W Indus., Inc. v. Formosa Plastics Corp., USA*, 860 F.2d 172, 176 (5th Cir. 1988), the Fifth Circuit held that claims should not be dismissed "on the merits" based on evidence adduced at a preliminary injunction hearing. Defendants are not seeking such a dismissal "on the merits"; instead, the point is this Court *cannot reach* the merits because it *lacks* subject-matter jurisdiction.  *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996), held that a district court's assessment of qualified immunity "on summary judgment" will differ from one "on an earlier motion to dismiss."  But that holding does not imply that a plaintiff who fails to establish jurisdiction at the preliminary-injunction stage can avert Rule 12(b)(1) dismissal.  Nor is *Greater New Orleans Fair Housing Action Center v. Kelly*, 364 F. Supp. 3d 635, 647-48 (E.D. La. 2019), instructive.  In concluding that the organizational plaintiff there sufficiently alleged standing at the pleadings stage, the District Court rejected analogy to *Louisiana Acorn Fair Housing v. LeBlanc*, 211 F.3d 298, 304-06 (5th Cir. 2000), which held that an entirely different organization had failed to prove standing *at trial*.  Of course, the pleadings stage and trial are different stages with different stages of proof, but that cannot support proceeding in the teeth of the Supreme Court's holding in this action based upon a well-developed factual record.

*        *        *        *        *

The Supreme Court has held that the Plaintiffs in this action, on the current record (minus Plaintiffs' supplemental submissions, addressed in Part III below) failed to establish Article III standing.  Applying those factual findings and legal conclusions, this Court should reach the same result under Rule 12(b)(1) or 12(h)(3).

## II.    If This Court Declines To Dismiss At This Time, Defendants Should Be Permitted To Test Plaintiffs' Allegations Through Rule 12 Motion Practice Before Any Discovery

If this Court instead returns this action to the pleading stage where Plaintiffs' factual allegations (but not their legal conclusions) are accepted as true, the appropriate next step would be for Defendants to respond to the Third Amended Complaint (Dkt. 268), and for Rule 12 motion practice to precede authorization of any discovery.  Plaintiffs may not return this action to the pleading stage to escape the direct consequences of the Supreme Court's conclusions based on the

record, while simultaneously pushing into jurisdictional (let alone merits) discovery, without subjecting their most recent allegations to Rule 12 motions.  What Plaintiffs propose would have this Court exercise "hypothetical jurisdiction," which is prohibited.  *See Steel Co.*, 523 U.S. at 101.

Rule 12 motions practice should precede burdensome discovery given the high likelihood that the Supreme Court's decision in *Missouri* will, at a bare minimum, significantly bolster Defendants' arguments and dispose of this action entirely.  Good cause therefore would support a stay of discovery until this Court decides Rule 12 motions directed to the Third Amended Complaint (or a further amended pleading if Plaintiffs obtain leave to replead, which they should not, as Part IV explains).  *See, e.g.*, *Von Drake v. Nat'l Broad. Co.*, No. 3:04-cv-652, 2004 WL 1144142, at *1 (N.D. Tex. May 20, 2004) (stay of discovery appropriate where "the disposition of a motion to dismiss 'might preclude the need for the discovery altogether thus saving time and expense'") (quoting *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 436 (5th Cir. 1990)); *Petrus v. Bowen*, 833 F.2d 581, 583 (5th Cir. 1987) ("[T]he district court properly deferred discovery while deciding whether the defendants were proper parties to the action.").[2]

Moreover, because this action is consolidated with *Kennedy*, the controlling legal standard for Plaintiffs' claims may shortly be furthered clarified by the Fifth Circuit when it decides the pending appeal from the preliminary injunction in that action, in which the court of appeals heard oral argument on October 8, 2024.  *Cf.* Pls. Supp. 3-4, 8, 12-13, 15, 19-20, 24 (relying on this Court's August 2024 decision in *Kennedy*, which is on appeal in No. 24-30252 (5th Cir.)).  Accordingly, it would be prudent to await decision on that appeal before setting a Rule 12 briefing schedule.

---

[2] Through a Rule 12 motion, for example, Defendants would seek dismissal of multiple agency defendants and their employees named as Defendants but as to which Plaintiffs do not allege conduct constituting "coercion" or "significant encouragement" toward platform content moderation choices.  *See* Defs. Rule 12 Mem. 71 (Dkt. 128-1) (seeking dismissal of such agencies and defendants, including the Treasury Department and the Administrator of the U.S. Digital Service within the Office of Management and Budget).

Conversely, discovery *without* requiring Plaintiffs' most recent allegations to satisfy Rule 12 through motions practice would be improvident. That is particularly true given the threshold and immunity issues that Defendants have preserved, and the significant burdens of subjecting the Government to further discovery in such a "sprawling" action, in light of the Supreme Court's decision that, at a minimum, calls into question Plaintiffs' standing. *Missouri*, 144 S. Ct. at 1988; *see Baxter v. Louisiana*, No. 21-cv-555, 2022 WL 1509118, at *1 (M.D. La. May 12, 2022) ("This Court, relying on Fifth Circuit precedent, routinely stays discovery pending resolution of motions to dismiss raising threshold issues"); *see also Paxton*, 60 F.4th at 256 ("[W]e have vacated the perfunctory denial of a motion to dismiss predicated on sovereign immunity and remanded for consideration of the motion before any further litigation, even though the district court preferred to put off the motion until 'other legal issues were resolved and further discovery was conducted.'").

### III. Plaintiffs' New Declarations Neither Show Article III Standing Nor Are Sufficient To Justify Discovery

In an attempt to wipe the slate clean from their Supreme Court loss on the fundamental question of Article III standing and to lurch ahead to discovery, Plaintiffs present two new declarations from individual Plaintiffs Hines and Bhattacharya, whose previous submissions the Supreme Court found insufficient to establish standing. Whether treated as evidence or factual allegations if Plaintiffs were to "incorporate[]" them in an amended pleading (Pls. Supp. 24), the declarations do not cure the deficiencies that the Supreme Court identified. Once again, Hines and Bhattacharya do not satisfy their burden to establish a "real and immediate threat of repeated injury" any more than the record previously did. *Missouri*, 144 S. Ct. at 1986. And, contrary to Plaintiffs' contention (Pls. Supp. 21), the new declarations are properly analyzed in the manner the Supreme Court proceeded—under the doctrine of Article III standing—rather than under principles of mootness, which would only be an appropriate line of inquiry if Defendants concentrated solely on events post-dating Plaintiffs' entry into this action, which occurred at various points in 2022.

Moreover, Hines and Bhattacharya are the only Plaintiffs who offer new declarations, meaning that Plaintiff States (Louisiana and Missouri) and three Individuals (Martin Kulldorff, Aaron Kheriaty, and Jim Hoft) do not even attempt through new submissions to solve the problems the Supreme Court identified with their standing submissions.[3]  But new declarations as to Hines and Bhattacharya cannot show standing for *all* Plaintiffs because "standing is not dispensed in gross." *Missouri*, 144 S. Ct. at 1988 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)); *see also id.* at 1990 ("It is unclear why" plaintiff "Jim Hoft would have standing to sue for *his brother's* injury" stemming from content moderation of past post by Hoft's brother) (emphasis added); *Abdullah v. Paxton*, 65 F.4th 204, 210 (5th Cir. 2023).  So even if those two Plaintiffs have now shown standing, any injunctive relief could only run in their favor, and only against the *particular* Defendants that have allegedly injured them, and the remaining Plaintiffs and *uninvolved* Defendants should be dismissed.

### A. Plaintiffs Have Not Met Their Burden To Show Article III Standing To Seek Injunctive Relief Regarding COVID-19 Misinformation

The new declarations from Hines and Bhattacharya do not solve the problems the Supreme Court identified in the standing of all Plaintiffs, including Bhattacharya and Hines, which required a "concrete link between [plaintiffs'] injuries and the defendants' conduct" both in the past and on an ongoing basis. *Missouri*, 144 S. Ct. at 1997; *see id.* at 1989-92 (addressing causation for past injury); *id.* at 1993-96 (addressing causation and redressability for future injury).  And the focus must be on "particular" conduct—for example, as to a past injury, the plaintiff must show that a "particular defendant pressured a particular platform to censor a particular topic before that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 1988.

---

[3] For example, Kulldorff's new assertion (Pl. Supp. 14-15) seeking to predicate further discovery on one of his Twitter posts that, allegedly, "the Virality Project flagged" is not found in the record.  Nor does it rectify the lack of record evidence from which that nongovernmental research group's conduct could be attributed to the Defendants.  PI Opp. 49-51.  Additionally, it does not purport to describe any content moderation decisions by Twitter, let alone decisions warranting prospective relief against any Defendant.

The new declarations describe various decisions by certain social media platforms as to posts by Hines and Bhattacharaya concerning COVID-19 misinformation. But critically, neither puts forward *any* new evidence that such moderation decisions are traceable to Defendants or that any ongoing or future injury from those decisions is capable of redress via an injunction against Defendants.  They do not heed the Supreme Court's instruction that "even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content."  *Id.* at 1988.

As to causation:  In assessing the future injury requirement, the Supreme Court emphasized that, "without proof of an ongoing pressure campaign" by Defendants against platforms, "it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants."  *Id.* at 1993.  The Court concluded that "[o]n this record" that the alleged "frequent, intense communications that took place in 2021 between the Government defendants and the platforms had considerably subsided by 2022," such that "[b]y August 2022, . . . the officials' communications about COVID-19 misinformation had slowed to a trickle."  *Id.* at 1994. And for purposes of prospective relief, evidence of governmental communications *in 2021* cannot show a present likelihood of future injury caused by any of the Defendants (much less all of them) and redressable by an injunction against them.  Because "the Federal Government has wound down its own pandemic response measures," an injunction directed at the government "is unlikely to affect the platforms' content-moderation decisions" in the future.  *Id.* at 1995-96.

Hines does not cure those Article III deficiencies.  She attests that her "commentary on social media, both on Facebook and Instagram, continue[s] to encounter censorship and suppression" by the platforms (4th Hines Decl. ¶ 6 (Dkt. 391-10)), and describes platform content moderation decisions regarding "posts . . . made after the Biden Administration supposedly considered" the COVID-19 "emergency to have ended" (*id.* ¶ 24).[4]  But the new Hines declaration

_____

[4] The content moderation incidents she describes include:  September 2024 and June 2024 Facebook moderation of personal page posts on COVID-19 vaccines (4th Hines Decl. ¶¶ 8-9); June 2024 Instagram moderation of a Health Freedom Louisiana ("HFL") page post on COVID-

provides no evidence or reason to believe that Defendants "played a role" in the "moderation choices" described. *See Missouri*, 144 S. Ct. at 1988.  Indeed, the Hines declaration is silent about any action by any Defendant.

  Hines therefore supplies no basis for characterizing the instances of purported content moderation as anything other than incidents in which the platforms "exercise[d] their independent judgment" under their terms of service and policies. *See id.* at 1987-88 ("the platforms continued to exercise their independent judgment even after communications with the defendants began," and that "evidence indicates that the platforms had independent incentives to moderate content and often exercised their own judgment"). The new declaration thus provides no basis for departing from the Supreme Court's analysis of the record.

Nor does Hines address redressability:  The company that owns Facebook and Instagram, Meta, is a "third party not before the court," and the "independent action" of Meta, even when it results in injury to a plaintiff, is one "a federal court *cannot redress*" in this suit against the government. *Missouri*, 144 S. Ct. at 1986 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41-42 (1976)) (emphasis added).  In contending that Hines's new declaration shows standing, Plaintiffs apparently further assume that each incident described shows "that the platforms continue to suppress their speech according to policies initially adopted under Government pressure." *Missouri*, 144 S. Ct. at 1995.  But even positing that such a factual assertion "may be true," *id.*, the Supreme Court concluded Plaintiffs still "have a redressability problem" because they lack "evidence of *continued pressure from the defendants*." *Id.* (emphasis added).  Without such evidence, there remains no basis to conclude that an injunction "stopping certain Government

---

19 vaccines (*id.* ¶ 11); April 2024 Instagram moderation of a post on infant vaccinations (*id.* ¶ 12); March 2024 Facebook moderation of an HFL page March 2021 post on masking during the pandemic (*id.* ¶ 13); January 2024 Instagram moderation of a post on infant vaccinations (*id.* ¶ 16); September 2023 Facebook moderation of a post on COVID-19 deaths (*id.* ¶ 19); May 2023 Facebook moderation of an Reopen Louisiana page post on COVID-19 vaccines (*id.* ¶ 22); September 2023 Facebook notification, in response to Hines's sharing "from my HFL page to my personal page" of post regarding "government overreach," that the HFL page "has repeatedly shared false information" (*id.* ¶ 18); and August 2023 Facebook moderation of a post on COVID-19 vaccines (*id.* ¶ 20).

agencies and employees from coercing or encouraging the platforms to suppress speech" would affect the platforms' future content-moderation decisions.  *See id.* at 1995-1996 & n.11.  Plaintiffs therefore have done nothing to rectify that dispositive "redressability problem" before this Court.

Nor can Hines predicate standing on the content moderation incidents she describes about posts concerning *unspecified* topics or topics *other than* COVID-19 misinformation.[5]  Given that the past injuries upon which Hines attempts to found her prospective relief claim concern platform *COVID-19 misinformation* policies, *id.* at 1990-92, incidents on *other* topics cannot meet the Article III obligation to "line up" the "plaintiff, platform, time, *content*, and defendant," *id.* at 1988 (emphasis added).  But Hines offers no allegations, much less evidence, of government involvement in moderation of content concerning topics other than COVID-19.  The lack of "past restrictions likely traceable to the Government defendants" "substantially undermines [the plaintiffs'] standing theory."  *Id.* at 1993.

Bhattacharya's new declaration also does not fix the problems the Supreme Court identified as to his standing.  Unlike Hines, Bhattacharya does not describe any incidents of platform moderation of his content not mentioned in previous declarations (Dkt. 10-3; Dkt. 227-5).  Bhattacharya's new declaration furnishes no evidence of any ongoing communications by any Defendant with any platform regarding Bhattacharya's posts about COVID-19 misinformation (or any other topic).

Instead, he describes a December 2022 Twitter post in which a writer perceived "an indication in the Twitter databases" that the platform "had placed" Bhattacharya "on a 'trends blacklist' to prevent the broader public from seeing" his content.  3d Bhattacharya Decl. ¶ 10 (Dkt. 391-11).  Bhattacharya then describes his subsequent "visit" to Twitter headquarters at an "invitation from Elon Musk" in which Bhattacharya "confirmed" that December 2022 report, "indicating that I had indeed been placed by the pre-Elon Musk Twitter on a 'blacklist,'" "when I

---

[5] *See* 4th Hines Decl. ¶¶ 10, 15, 17, 21.  The posts described there implicate platform policies concerning such varied issues as "trademark rights" (*id.* ¶ 17) and advertising sales (*id.* ¶ 15).

first joined Twitter in August 2021." *Id.* ¶ 11.  But Bhattacharya "was *unable to determine*," even after discussion with "the Twitter engineer assigned to" him, "why Twitter had taken this action with respect to my account, and in particular," Bhattacharya "was unable to determine whether Twitter had done this at the behest of prodding by the Biden Administration or as an independent action." *Id.* (emphasis added).  Such a conceded inability to determine the basis for the platform's past decisions cannot possibly count as evidence that Defendants are responsible for those decisions moving forward.  And Bhattacharya's subjective belief that his "ideas on" COVID-19 "management place" him "at risk for ongoing harm from social media censorship efforts by the Federal [G]overnment" (*id.* ¶ 12) is a speculative and "conclusory assertion[]" that cannot satisfy Plaintiffs' burden.  *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 545 (5th Cir. 2019).

Plaintiffs continue to offer mere "guesswork as to how" the "third-party platforms," who are "independent decisionmakers," will "exercise their judgment." *Missouri*, 144 S. Ct. at 1986. Plaintiffs must instead "show that the third-party platforms will likely react in predictable ways to the defendants' conduct." *See id*.  And the new declarations supply no evidence of "ongoing" conduct *by Defendants* against platforms concerning the declarant's posts concerning COVID-19 misinformation, leaving "it . . . *entirely speculative* that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id*. at 1993 (emphasis added).  The new declarations thus fail to show "a substantial risk that, in the near future, at least one platform will restrict the speech of" Hines or Bhattacharya "in response to the actions of at least one Government defendant," and hence they do not support Article III standing for either of the declarants, or for any other Plaintiff. *Id*. at 1986.  And Hines and Bhattacharya cannot establish standing by relying on alleged conduct toward nonparty speakers, such as Alex Berenson or members of the so-called "Disinformation Dozen." *See id.* at 1990 (rejecting notion that Hoft could predicate standing on alleged conduct toward his brother).

In any event, even if this Court were to set aside *Missouri* and hold that either Hines or Bhattacharya has shown sufficient standing, that would still warrant dismissal of the remaining Plaintiffs under Rule 12(b)(1).  Such a dismissal would necessarily include the Plaintiff States

given their failure to file any new declarations or put forward any other evidence to rectify the deficiencies the Supreme Court identified in their standing—both as direct speakers purportedly injured by past government conduct, *id.* at 1989, and as sovereigns lacking *parens patriae* standing against the Federal Government, *id.* at 1996-97.  Importantly, the Supreme Court reached those conclusions even while accounting for the guidance that "state plaintiffs are 'entitled to special solicitude' when it comes to standing."  *See id.* at 1996 n.11 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)).

Moreover, Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury."  *Gill v. Whitford*, 585 U.S. 48, 73 (2018).   At most, only Hines or Bhattacharya could possibly remain as Plaintiffs predicated on their new declarations.  Hence, the relief they seek (and the complaint itself, should it survive the Rule 12 motions described above in Part II) would have to be limited to an injunction tailored to actions by the pertinent Defendants "specifically target[ing]" content posted by *those* Plaintiffs—not social media platform users at large.  *Cf.* Pls. Supp. 13.  An injunction so limited to those individuals would largely or entirely eliminate any irreparable harm that they might face without burdening a vast universe of Government actions disconnected from those Plaintiffs.  In Article III courts, "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *see Gill*, 585 U.S. at 72 ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it.").

### B.  Plaintiffs Have Not Met Their Burden To Show Article III Standing To Seek Injunctive Relief Regarding Election Misinformation

None of the new declarations attests to facts or even allegations about the past or present conduct of the FBI or CISA (let alone DHS as a whole) in communicating with platforms concerning election-related misinformation.  Nor have Plaintiffs otherwise plausibly alleged, much less established, likely *future* conduct of the kind that would support injunctive relief against FBI or CISA (a point that, if necessary, Defendants would present in a Rule 12 motion directed to the

operative complaint, as Part II explains). *See Missouri*, 144 S. Ct. at 1993. The declarations also do not show any risk, let alone "a substantial risk," that "in the near future, at least one platform will restrict the speech of" any Plaintiff "in response to the actions of" the FBI or CISA. *Id.* at 1986; *see id.* at 1993 (holding as to FBI that Hoft "cannot satisfy his burden with . . . conjecture"). Such a harm, unaddressed in the declarations, is "too speculative," *All. for Hippocratic Med.*, 602 U.S. at 383, and cannot be "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

In that regard, Plaintiffs' reliance (Pls. Supp. 20-21) on the new Bhattacharya declaration is incorrect. Bhattacharya states that he posted in April 2024 "on YouTube and on Twitter/X" a video of an interview he conducted with "Nicole Shanahan, the vice-presidential candidate running with Robert F. Kennedy Jr.," and that Shanahan posted in August 2024 "on Twitter/X and elsewhere" an interview she conducted with Bhattacharya. 3d Bhattacharya Decl. ¶ 7. But Bhattacharya does not state that those platforms subjected those posts to *any* moderation measures, let alone that the FBI or CISA coerced or "significantly encouraged" any such measures.

Also unavailing is Bhattacharya's statement that his "public engagement with" Shanahan "on topics related to pandemic management and vaccines, places [him] at particular risk for ongoing censorship, *as RFK Jr.* has been the specific target of censorship activities by the federal government." 3d Bhattacharya Decl. ¶ 12 (emphasis added). Bhattacharya's effort to derive his Article III standing from Kennedy's speech boils down to repetition of the prior contention that Bhattacharya has standing as a Kennedy listener. *See* 2d Bhattacharya Decl. ¶ 5 (he "frequently read and listen[ed] to the speech and writings on social media" of Kennedy, among others). That repeats the listener theory of standing *rejected* in *Missouri*. *See* 144 S. Ct. at 1996 (considering averment "that hearing unfettered speech on social media is critical to" some plaintiffs' "work as scientists, pundits, and activists," Court disallowed "assert[ed] injuries based on the restrictions that . . . other social-media users have experienced"); *see also id.* at 1990 ("It is unclear why" Hoft "would have standing to sue for his brother's injury" stemming from Twitter moderation of past post by Hoft's brother) (emphasis added).

Additionally, Kennedy has suspended his presidential campaign, *see* Kennedy Announces
Suspension of Campaign (Aug. 23, 2024), https://www.kennedy24.com/kennedy_
announces_suspension_of_campaign, and has sought removal of his name from ballots in multiple
states.[6] Those are facts this Court should take judicial notice of under Fed. R. Evid. 201(b)(2).
*See In re Alabama & Dunlavy, Ltd.*, 983 F.3d 766, 773 n.1 (5th Cir. 2020). In light of that
suspension, this Court's prior conclusions regarding Kennedy's showing of standing predicated on
his previous status as a Presidential candidate (conclusions Defendants challenge in the pending
appeal in *Kennedy*) do not warrant extension to Bhattacharya or any other Plaintiff in this action.

Nor does Hines's statement that she is "likely to comment upon the upcoming presidential
election," 4th Hines Decl. ¶ 25, show any of the four components *Missouri* clarified were required
for Hoft to show standing to seek forward-looking relief as to FBI: (1) his "future posts
(presumably about the 2024 Presidential election) must contain content that falls within a
misinformation trend that the FBI has identified or will identify in the future"; (2) the "FBI must
pressure the platforms to remove content within that category"; (3) that "platform must then
suppress Hoft's post"; and (4) that platform "must do so at least partly in response to the FBI,
rather than in keeping with its own content-moderation policy." *Missouri*, 144 S. Ct. at 1994.

Indeed, as to the second and fourth of those components, the FBI's standard operating
procedures as recently summarized underscore the insurmountable difficulties Plaintiffs would
face in making the required showing.[7] Here, "the challenged conduct . . . is 'coercion' and

---

[6] *See, e.g.*, *Kennedy v. N.C. State Bd. of Elections*, 905 S.E.2d 55, 58 (N.C. 2024)
(prevailing on North Carolina removal); *Kennedy v. Sec'y of State*, 10 N.W.3d 632 (Mich. 2024)
(not prevailing on Michigan removal); *Kennedy v. Wis. Elections Comm'n*, No. 20AP1872, 2024
WL 4315199 (Wis. Sept. 27, 2024) (not prevailing on Wisconsin removal); *see also In re
Nomination Papers of Robert F. Kennedy, Jr.*, No. 386MD2024 (Comm. Ct. Penn. Aug. 23, 2024)
(requesting dismissal of nomination papers so as not to appear on ballot).

[7] The FBI's summary of those procedures is attached as Ex. A. As the summary explains,
the FBI's meetings with platforms respect "the sense of Congress," in 50 U.S.C. § 3369, "[that]
information from law enforcement and the intelligence community is . . . important in assisting
efforts by these social media companies to identify foreign information warfare operations."
Importantly, the standard operating procedures provide that "[a]ll communications to and with" a
pertinent platform "are made in a way that makes clear," among other things, that "the FBI is *not*

'significant encouragement,' not mere 'communication.'" *Id.* at 1993. The record contains no evidence or reason to believe that the FBI, or that CISA, had any communication with platforms regarding Bhattacharya or Hines or, for that matter, went beyond "mere 'communication'" concerning anyone else. *Id.*; *see* Defs. Prelim. Inj. Opp. 91-101, Dkt. 266.

Moreover, as the Supreme Court reasoned in *Missouri* in rejecting Hoft's standing for prospective relief as to CISA, that agency "stopped switchboarding . . . , and the Government has represented that it will not resume operations for the 2024 election." *Missouri*, 144 S. Ct. at 1993.

And, for its part, Meta's recent communication reinforces that the company does not view itself as bound to heed requests from the Government. P. 28, *infra*.

Hence, even as supplemented, no Plaintiff has shown standing to obtain an injunction against the FBI or CISA, even assuming, *arguendo*, the new declarations are sufficient to show standing as to other Defendants (which they are not).

**C. Further Discovery Is Unwarranted**

    1.<u>Further jurisdictional discovery is unwarranted because Plaintiffs already received extensive discovery and inadequately explain how additional discovery will cure their standing deficiencies</u>

Plaintiffs' supplemental brief simply does not satisfy the established standards for jurisdictional discovery. A federal court "is not required to defer ruling on a jurisdictional motion until all discovery contemplated by the plaintiff has been accomplished; instead, an *opportunity* for discovery is required." *Kelly v. Syria Shell Petro. Dev. B.V.*, 213 F.3d 841, 855 (5th Cir. 2000). "The party seeking discovery must establish its necessity." *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 902 (5th Cir. 2024) (quoting *Freeman v. United States*, 556 F.3d 326, 341 (5th Cir. 2009)). Such a discovery proponent must make "clear which *specific facts*" the proponent "expects . . . to find." *Id.* (quoting *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 326 (5th Cir. 2021))

---

asking the Platform to take any action in response to the sharing of the information, and the Platform has *no* obligation to do so," that "the FBI is *not* asking the Platform to change or amend its terms of service," and that "*no* adverse action will be taken by the FBI based on the Platform's decision about whether or how to respond to the information being shared." Ex. A (emphasis added).

(emphasis added). By contrast, "vague assertions that additional discovery will produce needed, but unspecified facts" are "insufficient to allow jurisdictional discovery." *Id.* at 902-03 (quoting *Freeman*, 556 F.3d at 341-42). Plaintiffs fail to meet those requirements.

*First*, the extraordinary and intensive expedited discovery, spanning nearly seven months, provided Plaintiffs with more than sufficient "*opportunity* for discovery." *Kelly*, 213 F.3d at 855. Indeed, the Supreme Court itself characterized the discovery Plaintiffs received at the preliminary-injunction phase as "extensive." *Missouri*, 144 S. Ct. at 1984. When this Court granted Plaintiffs' motion for expedited preliminary injunction-related discovery, it authorized Plaintiffs to serve written discovery on the Defendants concerning "the identity of federal officials who have been and are communicating with social-media platforms about disinformation, misinformation . . . and/or any censorship or suppression of speech on social media, *including the nature and content of those communications*," within five days of the Court's order. Dkt. 34 at 13 (emphasis added). Defendants rapidly "produced more than 15,000 pages of discovery . . . , including communications between federal officials and social-media platforms about misinformation and disinformation," *In re Murthy I*, Order at 2, No. 22-30697 (5th Cir. Nov. 21, 2022), and interrogatory responses totaling nearly 100 pages.[8]

Additionally, Plaintiffs took full-day depositions of four witnesses (employees of the State Department, CDC, FBI, and Dr. Anthony Fauci, then of NIAID), and, following two Fifth Circuit orders on mandamus petitions requiring adherence to precedent on depositions of high-ranking government officials, Plaintiffs took full-day depositions of *two* more witnesses (employees of the Office of the Surgeon General and CISA). *Id.*; *see In re Murthy II*, Order at 7, No. 22-30697 (5th

---

[8] Defendants explained that, subject to their objections, they produced non-privileged e-mail communications between Defendants and employees of Facebook, Twitter, LinkedIn, Instagram, and YouTube concerning misinformation "located within a review population consisting of e-mail files that (i) are collected from custodians who, having been identified through Defendants' internal inquiry, are believed to have communicated with employees of the Social-Media Platforms; and (ii) contain one or more of Plaintiffs' Search Terms." Dkt. 179-5 at 6-7. Those Search Terms included, in turn, the names of individual Plaintiffs, *i.e.*, "Hines" and "Bhattacharya."

Cir. Jan. 5, 2023) (observing, in requiring consideration of alternatives to depositions of three high-ranking officials, that "[t]he federal government has produced *thousands of pages of written discovery*, and four depositions have already taken place"—all during an "early" stage, before resolution of the motion to dismiss) (emphasis added).  And in lieu of a deposition of Robert Flaherty, then White House Director of Digital Strategy, Defendants additionally produced more than 500 documents totaling nearly 2,000 pages, while also providing detailed interrogatory responses verified by Mr. Flaherty.  *See* Mem. Order at 9, Dkt. 148. Plaintiffs also obtained Government records through other means, such as agency releases under the Freedom of Information Act.

Against that backdrop, Plaintiffs err in contending (Pls. Supp. 13) that they have not had "the opportunity to craft discovery requests to find out whether they were specifically targeted for censorship by government actors."  Even with all of that Government-provided material, Plaintiffs failed to show Article III standing for their preliminary injunction.  That failure bespeaks the weakness of their arguments and hardly equips Plaintiffs with grounds for yet more discovery.

Nor can jurisdictional discovery be supported by Plaintiffs' plan (Pls. Supp. 13) to "seek to depose" six former government officials, including such former White House officials as Flaherty and a former White House communications director.  That plan ignores Fifth Circuit orders underscoring that, as to high-ranking government officials (including Flaherty), "less intrusive" means of discovery must be explored first, such as alternative witnesses.  *Murthy I*, Order at 3 (applying *In re FDIC*, 58 F.3d 1055, 1062 (5th Cir. 1995)).  And the Fifth Circuit clarified that the traditional limitations on such high-ranking government official depositions are "equally applicable to former officials," such as the White House Press Secretary, "lest they be ensnared in unnecessary discovery upon leaving office," and also that "'unexceptional, public statements'" by such officials "cannot supply the basis for compelled testimony without rendering the 'exceptional circumstances test' a hollow doctrine."  *Murthy II*, Order at 3, 5.  Moreover, as to former White House officials, Plaintiffs do not address the Supreme Court's warning about "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from

26

the energetic performance of its constitutional duties." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004); *see id.* at 385 (teaching "that the Executive's 'constitutional responsibilities and status [are] factors counseling judicial deference and restraint' in the conduct of litigation against it"). Plaintiffs' plan to pursue depositions of former officials, including former White House officials, without so much as acknowledging the Fifth Circuit rulings limiting such depositions, including in this action, shows further that they have no valid ground for jurisdictional discovery. And testimony or documents about those officials' past communications still would not fix Plaintiffs' Article III problems as to causation and redressability for forward-looking relief against the Government, as described above.

Plaintiffs' interest in obtaining internal documents and depositions from nonparty platforms (Pls. Supp. 13) also does not undermine the sufficiency of the "*opportunity* for discovery" already provided. *Kelly*, 213 F.3d at 855. This Court authorized, among other things, Plaintiffs to serve "third party-subpoenas on up to five major social-media platforms." Dkt. 34 at 13. Plaintiffs apparently chose not to fully pursue that pathway under Rule 45, which mandates "general[] sensitiv[ity]" to burdens on non-parties. *See Watts v. SEC*, 482 F.3d 501, 509 (D.C. Cir. 2007) (Kavanaugh, J., for the Court). Instead, when Plaintiffs argued they needed a deposition of the Surgeon General to question him about discussions with Facebook executive Nick Clegg, Plaintiffs stated that "[s]erving and enforcing a third-party subpoena on Clegg, a senior Facebook executive based in London, is *not a realistic alternative* to deposing" the Surgeon General." Dkt. 137 at 20 (emphasis added). Plaintiffs' prior assertion that such a deposition was not a "realistic alternative" forecloses their contention that they did not have an "opportunity" for such a deposition before.

Moreover, Plaintiffs' reliance (Pls. Supp. 9-11) on platform internal documents, such as a July 2021 internal Facebook discussion Meta disclosed to a congressional committee, further undermines their contention that they need jurisdictional discovery to obtain even more such documents. Members of a committee of the House of Representatives described those platform

documents in amicus briefs in support of Plaintiffs.[9]  Yet the internal platform documents Plaintiffs describe do not cure their standing problems—giving no basis for concluding that even more internal platform documents will be a cure.  In the discussion Plaintiffs quote, a Facebook employee opined that the platform "shouldn't have" moderated particular COVID-19-related content after communications from the Government.  Such internal debate about how the company exercised "independent judgment" in response to Government communications does not count as subservience to the Government.  *Missouri*, 144 S. Ct. at 1987.  If anything, the independence of that judgment is reinforced by a recent letter Plaintiffs quote from Meta's CEO, Mark Zuckerberg, to Members of Congress.  Pls. Supp. 11.  Although the letter states that government officials "pressured" Meta "to censor certain COVID-19 content," the letter goes on to emphasize that "it was [Meta's] decision whether or not to take content down."  Letter from Mark Zuckerberg to Hon. Jim Jordan (Aug. 26, 2024), https://perma.cc/T87F-Y5KG.  The letter also says Meta is "ready to push back if something like this happens again."  *Id.*  That statement shows that the platform feels free to "push back" against the Government, consistent with the Supreme Court's determination that Plaintiffs' standing theory improperly assumed "each platform acted due to 'government-coerced enforcement' of its policies, rather than in its own judgment as an independent actor."  *See Missouri*, 144 S. Ct. at 1988.

*Second*, Plaintiffs fail to make "clear which specific facts" they "expect[]" additional discovery will disclose to sustain standing, *Pace*, 93 F.4th at 902, and "[t]he court need not allow a plaintiff to conduct a jurisdictional fishing expedition," *Bell Helicopter Textron Inc. v. Am. Eurocopter, LLC*, 729 F. Supp. 2d 789, 798 (N.D. Tex. 2010).  Plaintiffs' self-serving and conclusory assertions that there is "good reason to believe" or that it is "probable or likely" that

---

[9] Br. of Rep. Jim Jordan et al., as Amici Curiae Supporting Plaintiffs-Appellees and Affirmance, *Missouri v. Biden*, No. 23-30445, 2023 WL 5275607 (5th Cir. Aug. 7, 2023).  That Fifth Circuit amicus brief anticipated a substantially similar amicus brief, dated Feb. 9, 2024, in the Supreme Court in *Missouri*.  Br. for Rep. Jim Jordan & 44 Other Members of Congress as Amici Curiae in Support of Respondents, *Murthy v. Missouri*, No. 23-411, 2024 WL 695116 (U.S.).

"government officials *targeted* them for censorship" (Pls. Supp. 13-14 (emphasis added)) lack objective support.  And such assertions misunderstand the standard for prospective relief. Plaintiffs never explain what discovery they would seek to undermine the Supreme Court's conclusion that the alleged "frequent, intense communications that took place in 2021" between the Government defendants and the platforms "*had considerably subsided by 2022*"—such that "[b]y August 2022, . . . the officials' communications about COVID-19 misinformation had *slowed to a trickle.*"  *Missouri*, 144 S. Ct. at 1994 (emphasis added).  Governmental communications with platforms in 2021, the Court stressed, cannot show a present likelihood of future injury caused by any Defendant and redressable by an injunction against that Defendant:  Because "the Federal Government *has wound down* its own pandemic response measures," the Court reasoned, an injunction directed at the government "is unlikely to affect the platforms' content-moderation decisions" in the future.  *Id.* at 1995-96 (emphasis added).

For example:  The Fifth Circuit rejected Plaintiffs' contentions at the preliminary-injunction stage concerning Dr. Fauci (then at NIAID), concluding his statements were "quintessential examples of government speech that do not run afoul of the First Amendment," 83 F.4th at 391, meaning those contentions were not before the Supreme Court.  Yet Plaintiffs still propose to seek unspecified *additional* discovery concerning past communications by Dr. Fauci. Pls. Supp. 15-17 & Exs. 1-9.  But he is a former government official about whom Plaintiffs already obtained discovery, prominently including a full-day deposition.  Here, again, Plaintiffs fail to explain how more discovery into past communications would establish that an injunction against the Government would change how a platform treated a Plaintiff's posts *by 2022*, when the pandemic "response measures" of the Government had "wound down."  *See Missouri*, 144 S. Ct. at 1995-96.

Rather than identify "specific facts" the requested jurisdictional discovery would furnish to cure the deficiencies the Supreme Court identified, *Pace*, 93 F.4th at 902, Plaintiffs simply attempt to convert each of those deficiencies into a broad discovery topic.  For example, although Plaintiffs acknowledge (Pls. Supp. 18) the Supreme Court's observation that "Facebook was

targeting" Hines's "pages before almost all of its communications with the White House and the CDC," *Missouri*, 144 S. Ct. at 1992, which the Court took to undercut the traceability of Facebook's moderation of her content to past Government conduct, Plaintiffs then characterize that Supreme Court observation as "the *sort of supposition* that might turn out to be contradicted by further discovery" (Pls. Supp. 18) (emphasis added).  But Plaintiffs point to no "specific facts" they currently have, or that they would reasonably expect to find through discovery, to "contradict[]" the Supreme Court's observation.

Similarly, Plaintiffs assert that "further discovery is warranted to gain a better understanding of the precise nature of the government's ongoing involvement in censorship."  Pls. Supp. 20.  But, again, Plaintiffs offer no facts that could undercut the Supreme Court's conclusion that, as "the Federal Government has wound down its own pandemic response measures," an injunction directed at the government "is unlikely to affect the platforms' content-moderation decisions" *in the future*.  144 S. Ct. at 1995-96.  No fact in the new declarations, apart from impermissibly "conclusory assertions," shows otherwise.  *Ctr. for Biological Diversity*, 937 F.3d at 545.  And given that Plaintiffs have no factual basis for disputing the Supreme Court's conclusion that there is no "ongoing pressure campaign" on which Plaintiffs can base standing, *Missouri*, 144 S. Ct. at 1993, their bare assertion that the discovery they seek will probe "ongoing" government "involvement in censorship" provides this Court no ground for allowing such discovery.  "[S]tanding doctrine prevents us from 'exercis[ing such] general legal oversight' of the other branches of Government."  *Id.* at 1997 (quoting *TransUnion*, 594 U.S. at 423-24).

Hence, given Plaintiffs' failure to describe discovery requests that would furnish "specific facts" fixing the problems the Supreme Court ruled critical to their standing, this Court should not "allow" Plaintiffs to launch a "jurisdictional fishing expedition."  *See Bell Helicopter Textron*, 729 F. Supp. at 797-98.

In any event, even if the Court were to conclude that the new declarations suffice to support further discovery, any such further discovery—logically sequenced following disposition of Rule 12 motions directed to the operative pleading, Part II, *supra*—would properly "be limited to *only*

that which is necessary to determine the preliminary jurisdictional issue." *Kelly*, 213 F.3d at 849. (As noted above, Defendants ask that any discovery await decision on a motion to dismiss the operative complaint.  Part II, *supra*.)

      2. <u>Plaintiffs' additional allegations of Government "misrepresentations" are unfounded</u>

Plaintiffs also level accusations of "dishonest[]" misconduct by the Government.  Pls. Supp. 9; *see id.* at 7-12.  Those baseless efforts to impugn the integrity of the Government's defense of this action do not justify further discovery and cannot compensate for the fundamental deficiencies in Plaintiffs' Article III standing that the Supreme Court pinpointed.

As described above, during the extensive expedited discovery period, Defendants furnished Plaintiffs with thousands of pages of Government communications with major platforms about misinformation concerning the COVID-19 pandemic and recent elections; nearly 100 pages of interrogatory responses; and six witnesses for depositions.  During that discovery period, Defendants twice obtained appellate relief to limit the depositions in the manner required by precedents governing depositions of high-ranking government officials and twice the Fifth Circuit required consideration of alternative sources of information rather than allow Plaintiffs to go directly to the high-ranking government depositions they sought.  In providing such "extensive" discovery, *Missouri*, 144 S. Ct. at 1984, Defendants were forthcoming.  And Plaintiffs' contrary accusations are unfounded.  Tellingly, the only factual support Plaintiffs offer for their accusations of "dishonest" misconduct is in their description of documents *internal to Meta* describing the deliberations *internal to* that company.  Conceding those documents were "internal Meta documents," which the company disclosed to Members of Congress (and which those Members then disclosed to the public and to the courts), Plaintiffs do not attempt to explain how Defendants could have produced those documents to Plaintiffs during expedited discovery in this action *against the Government.*

    Nor have the Defendants "intentionally" keep "secret," or made "misrepresentations" about, the purported "censorship enterprise" Plaintiffs allege.  Pls. Supp. 8-12.  In this action, Plaintiffs mischaracterized virtually every Government communication with a platform as an act

of "censorship," but those mischaracterizations are factually unsupported, as the Supreme Court explained in rejecting this Court's "factual findings, many of which unfortunately appear to be clearly erroneous"—findings predicated on Plaintiffs' preliminary injunction submissions. *Missouri*, 144 S. Ct. at 1988 n.4. For example, the Supreme Court noted that this Court stated "that Twitter set up a 'streamlined process for censorship requests' after the White House 'bombarded' it with such requests," but the Supreme Court meticulously explained that the "record . . . cite[d] says nothing about 'censorship requests.'" *Id.* Similarly: "[E]choing the plaintiffs' proposed statement of facts," this Court "erroneously stated that Facebook agreed to censor content that did not violate its policies," *id.* (citing 680 F. Supp. 3d at 714 n.655), but "[i]nstead, on several occasions, Facebook explained that certain content did not qualify for *removal* under its policies but did qualify for other forms of moderation," *id.*

More generally, "throughout the course of this litigation" (Pls. Supp. 12), Defendants disagreed with Plaintiffs' conclusory assertions that the Government communications Defendants disclosed constituted "censorship," and that disagreement was a fair response invited by Plaintiffs' allegations of a "censorship enterprise." Such disagreement does not constitute misrepresentation.

### 3. There is no basis for merits discovery

This Court's August 27, 2024 order directed submissions "on whether *further jurisdictional discovery limited to the issue of standing* could aid this court's evaluation of its continuing jurisdiction over this case, or alternatively, whether dismissal is appropriate." Dkt. 389 at 1 (emphasis added). Plaintiffs nevertheless argue that the Court should launch a foray into *merits* discovery as well. That is incorrect.

 "Ordinarily, a court cannot issue a ruling on the merits 'when it has no jurisdiction' because 'to do so is, by very definition, for a court to act *ultra vires*." *Brownback v. King*, 592 U.S. 209, 218 (2021) (quoting *Steel Co.*, 523 U.S. at 101-02). That ordinary principle controls here. A "ruling on the merits" absent subject-matter jurisdiction would be "*ultra vires*," *id.*, and discovery premised on issuing such a ruling would likewise be invalid, especially when the purported merits discovery is directed at the White House, *see generally Cheney*, 542 U.S. at 382,

385.  Moreover, before any discovery, the court is obligated not only to assure that Plaintiffs have Article III standing, but also that the asserted claims fall within a waiver of sovereign immunity— and, here, the Agency Defendants argue Plaintiffs lack such a waiver as to them, *see* Defs.' Rule 12 Mem. 43-49 (Dkt. 128-1).  *Cf. In re Paxton*, 60 F.4th at 256-57 (describing obligation to "first rule[] on official's "assertion of immunity").

Yet Plaintiffs now strain (Pls. Supp. 3-4) to fit this action within the narrow category of actions in which, as the Supreme Court has put it, "the 'merits and jurisdiction will sometimes come intertwined,' and a court can decide 'all . . . of the merits issues' in resolving a jurisdictional question, or *vice versa*."  *See Brownback*, 592 U.S. at 217.  *Brownback* was one such action because it concerned provisions of the Federal Tort Claims Act under which "a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim."  *Id.* at 217-18.  "In cases such as" *Brownback*, "where a plaintiff fails to plausibly allege *an element that is both a merit element of a claim and a jurisdictional element*, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6).  Or both.  The label does not change the lack of subject-matter jurisdiction, and the claim fails on the merits because it does not state a claim upon which relief can be granted."  *Id.* at 218 n.8 (emphasis added); *see S. Recycling*, 982 F.3d at 380-82 (rejecting "intertwinement" argument in admiralty action after examining whether "the statutory source of jurisdiction differs from the source of the federal claim," "the jurisdictional issue can be extricated from the merits and tried as a separate issue," and "judicial economy favors early resolution of the jurisdictional issue").

But here, there is no valid argument that the jurisdictional inquiry and the merits inquiry are coextensive.  For that reason, the Supreme Court in *Missouri* "d[id] not reach the merits."  144 S. Ct. at 1985 n.3.  Even assuming that some jurisdictional discovery were warranted, then, there is no basis for allowing pure merits discovery at this juncture.  Rather, any discovery should be limited to facts pertinent to the jurisdictional inquiry set forth in the Supreme Court's *Missouri* opinion.  Should the Court nevertheless determine that additional discovery is warranted, the

Court should direct the parties to meet and confer and submit proposals for any such discovery, following the Rule 12 motions practice described above.  Part II, *supra*.

## IV.    The Court Should Deny Leave For Plaintiffs To File A Fourth Amended Complaint

Plaintiffs' additional argument that this Court should grant them leave to file a fourth amended complaint to add unspecified individual members of the so-called "Disinformation Dozen" should also be rejected.[10]  To decide whether to grant leave to replead, the Court "may consider a variety of factors including 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . ., and futility of the amendment.'"  *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014).  Denial of leave is also proper if the proposed amendment "would fundamentally alter the nature of the case." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004).  The request for leave to replead should be denied on at least three grounds: (1) procedural deficiency; (2) untimeliness; and (3) futility.

*First*, the request for leave to amend does not comply with Local Civil Rule 7.5, requiring that a "motion for leave to file a[n] . . . amended complaint . . . must be accompanied by the proposed pleading."  Without a proposed pleading, Defendants and the Court have no way to properly assess whether the proposed amendment would cure the jurisdictional deficiencies that the Supreme Court identified.   Plaintiffs do not even identify which members of the "Disinformation Dozen" they would add, precluding Defendants (and the Court) from conducting the "threshold" assessment of whether "a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed *a particular plaintiff's speech* on that topic," *Missouri*, 144 S. Ct. at 1988 (second emphasis added).  Nor do they provide allegations as

---

[10] Those individuals are named in PI Opp. Ex. 44 at 6 (Dkt. 264-5) (Ctr. For Countering Digital Hate, *The Disinformation Dozen, Why Platforms Must Act on Twelve Leading Online Anti-Vaxxers* (Mar. 24, 2021)).  They include Robert F. Kennedy, Jr., who is a Plaintiff in the action consolidated with this action, as well as Joseph Mercola and Ty and Charlene Bollinger.  This Court in January 2023 denied a motion to intervene in this action by Kennedy, Mercola, and the Bollingers but granted in part their motion for access to certain discovery materials.  Dkt. 171.

to specific Defendants.  Leave to replead should be denied for this procedural deficiency alone.  *See Young v. U.S. Postal Serv. ex rel. Donahoe*, 620 F. App'x 241, 245 (5th Cir. 2015) (where plaintiff "did not attach her proposed second amended complaint, as required by the rules," "[d]enial of leave to amend is reasonable," as plaintiff "fails to comply with the local rules"); *JPay LLC v. Burton*, No. 3:22-cv-1492, 2023 WL 5253041, at *11 (N.D. Tex. Aug. 15, 2023) (enforcing parallel local rule "requiring that requests for leave to amend be accompanied with the proposed amended pleadings").

**Second**, leave to amend should be denied because of undue delay.  *Marucci*, 751 F.3d at 378; *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003).  Plaintiffs offer no justification for their belated attempt to add unnamed individuals in the "Disinformation Dozen" as Plaintiffs.  Plaintiffs plainly knew about the existence of the "Disinformation Dozen" from the outset of the case:  When they first filed this action in May 2022, Plaintiffs included allegations in the initial complaint that the "Disinformation Dozen" "were singled out for censorship by the White House."  *See, e.g.*, Dkt. 1 ¶¶ 170-71.  Indeed, Plaintiffs have already amended their complaint three times over the past two years, and each amended pleading contained numerous allegations about those individuals.  *See* Dkt. 45 (Am. Compl.) ¶¶ 186, 189, 285, 309; Dkt. 84 (2d Am. Compl.) ¶¶ 237, 240, 336, 341, 480; Dkt. 268 (3d Am. Compl.) ¶¶ 238, 241, 337, 342, 481.  Yet Plaintiffs never previously sought to add the "Disinformation Dozen" as plaintiffs.  Moreover, if any of those individuals had decided to allege claims alongside Plaintiffs, those individuals could have moved to intervene in this action, *see* Fed. R. Civ. P. 24, or they could have filed their own action, as Robert F. Kennedy, Jr., did.  Plaintiffs should not be permitted to use their own delay in adding those individuals to their pleadings as a basis for delaying dismissal of this action for lack of subject-matter jurisdiction consistent with the Supreme Court's opinion in this action.  *See Kling v. Hebert*, No. 19-cv-671, 2020 WL 4606869, at *14 (M.D. La. Aug. 11, 2020) (denying leave to amend requested to "clarify any ambiguity" because "proving and maintaining jurisdiction is . . . Plaintiff's burden," and plaintiff "failed to meet [defendant's] evidence . . . to his detriment").

*Third*, even under the scanty description of the proposed amendments Plaintiffs have provided, those amendments would be futile. *Wilson v. Burks-Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010). Amendment merely to add some unspecified members of the "Disinformation Dozen" would introduce additional Plaintiffs whose grounds for Article III standing would be, at most, comparable to that of Hines, whose showing of standing the Supreme Court concluded was deficient: Hines had, at most, "eked out a showing of traceability for her past injuries," *Missouri*, 144 S. Ct. at 1992, but still failed to show causation and redressability for ongoing Government conduct as of her joining this action in 2022. The President's indirect reference to the "Disinformation Dozen" came amid remarks on COVID-19 in July 2021, *see* 3d Am. Compl. ¶¶ 341-42, and the Supreme Court emphasized that "[b]y August 2022, when Hines joined the case, the officials' communications about COVID-19 misinformation had slowed to a trickle." *Missouri*, 144 S. Ct. at 1990, 1994. Adding additional plaintiffs, even if they could place themselves in the same position as Hines, would not solve the problems the Supreme Court identified—a failure of any Plaintiff to show any *ongoing* conduct of any Defendant causing ongoing platform moderation and redressable by an order against any Defendant.

Moreover, even apart from the failure of any member of the "Disinformation Dozen" to cure Plaintiffs' standing deficiencies, the amended complaint would be futile because the claims asserted would not be facially plausible on the merits in light of *National Rifle Association v. Vullo*, 602 U.S. 175 (2024), and hence would warrant Rule 12(b)(6) dismissal. There the Court explained that the Government does not violate the First Amendment simply by communicating and attempting to persuade. The Government may not engage in coercion, either by threatening sanctions or by providing comparably compelling positive inducements. But Plaintiffs have not plausibly alleged the kind of Government conduct that would violate the First Amendment. Although this Court previously denied a Rule 12(b)(6) motion as to the Second Amended Complaint, under the subsequent decisions in *Missouri* and *Vullo*, the proposed amended complaint will not withstand such a motion. The Supreme Court emphasized in *Vullo* that government officials are entitled to express their views (even forcefully) in an effort to persuade

36

private actors, so long as they do not make an implicit or explicit threat. Thus, "[t]o state a claim that the government violated the First Amendment through coercion of a third party, a plaintiff must plausibly allege conduct that, viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." 602 U.S. at 191. Defendants made no such threats here, as the Government's brief in the pending Fifth Circuit explains. *See* Appellants' Op. Br., *Kennedy v. Biden*, No. 24-30252, Dkt. 93 at 25-26, (5th Cir. Sep. 11, 2024). Hence, an amended pleading adding one or more members of the "Disinformation Dozen" would not forestall Rule 12(b)(6) dismissal.

## CONCLUSION

For the foregoing reasons, under the Supreme Court's decision in *Missouri*, the Court lacks subject-matter jurisdiction to proceed further in this action because the Plaintiffs have not met their burden to establish Article III standing, and the proper course is to dismiss the action under Rule 12(b)(1). The Court should further reject any additional jurisdictional or merits discovery and should deny Plaintiffs leave to amend their complaint.

Dated: October 8, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JOSHUA E. GARDNER
Special Counsel, Federal Programs Branch

JOSEPH E. BORSON
Assistant Director, Federal Programs Branch

*/s/ Indraneel Sur*
INDRANEEL SUR (D.C. Bar No. 978017)
Senior Counsel
ALEXANDER W. RESAR (N.Y. Bar No. 5636337)
CATHERINE M. YANG (N.Y. Bar No. 5319736)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Washington D.C. 20005
Tel: (202) 616-8488
Indraneel.sur@usdoj.gov

*Attorneys for Defendants*