## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA

THE STATE OF MISSOURI, *et al.*,

    *Plaintiffs*,

        v.

PRESIDENT JOSEPH R. BIDEN, JR., IN
HIS OFFICIAL CAPACITY AS PRESIDENT
OF THE UNITED STATES OF AMERICA,
*et. al.,*

    *Defendants*.

Civil Action No. 3:22-cv-1213

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FURTHER DISCOVERY
AND IN OPPOSITION TO DISMISSAL OF THE COMPLAINT**

# TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................................... i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................... 1

    I.   CONTRARY TO DEFENDANTS' CLAIMS, THE SUPREME COURT'S DETERMINATION ON STANDING FOR A PRELIMINARY INJUNCTION DOES NOT WARRANT DISMISSAL OF THE CASE ...... 1

    II.  IF PLAINTIFFS' SUPPLEMENTAL DECLARATIONS DO NOT SUFFICE TO VERIFY THEIR STANDING, THEY AT LEAST WARRANT ADDITIONAL DISCOVERY ............. 10

    III.  CONTRARY TO DEFENDANTS' CONTENTIONS, PLAINTIFFS STATED SPECIFIC GROUNDS FOR FURTHER DISCOVERY ........... 16

    IV.  IF NEEDED, PLAINTIFFS SHOULD BE ALLOWED TO FILE A FOURTH AMENDED COMPLAINT ........... 20

    V.  DEFENDANTS' INTERPRETATION OF THE SUPREME COURT'S OPINION WOULD MEAN THERE IS NO REMEDY ........... 23

CONCLUSION .......................................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown,*
  88 F.4th 344 (2d Cir. 2023) ....................................................................................12

*Blum v. Yaretsky,*
  457 U.S. 991 (1982) ...............................................................................................23

*Boothe v. Equifax,*
  No. 3:21-cv-1766-D, 2021 WL 5630839 (N.D. Tex. Dec. 1, 2021) ......................20

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n,*
  531 U.S. 288 (2001) ...............................................................................................23

*Callier v. Unified Health,*
  No. EP-23-cv-375-KC, 2024 WL 3418778 (W.D. Tex. July 15, 2024) ................20

*Carson v. Polley,*
  689 F.2d 562 (5th Cir. 1982) ..................................................................................21

*Cent. Pines Land Co. v. United States,*
  274 F.3d 881 (5th Cir. 2001) ..................................................................................23

*Cervera v. Brennan,*
  No. EP–15–cv–11–PRM, 2015 WL 2250133 (W.D. Tex. May 12, 2015) .............20

*Gill v. Whitford,*
  585 U.S. 48 (2018) ....................................................................................................3

*Gould Elecs. v. United States,*
  220 F.3d 169 (3d Cir. 2000) ......................................................................................3

*Indian River County v. Rogoff,*
  201 F. Supp.3d 1 (D.D.C. 2016) ...............................................................................3

*Kennedy v. Biden,*
  No. 3:23-cv-00381, 2024 WL 3879510 (W.D. La. Aug. 20, 2024) ..........................1

*Kipp Flores Architects, LLC v. Mid-Continent Casualty Co.,*
  No. 4:14–cv–02702, 2015 WL 10557922 (S.D. Tex. Mar. 13, 2015) ....................20

*Lee v. Macon Cnty. Bd. of Educ.,*
  267 F. Supp. 458 (M.D. Ala. 1967) ........................................................................22

*Marbury v. Madison,*
  5 U.S. 137 (1803) ...................................................................................................24

*Mayeaux v. La. Health Srvs. and Indem. Co.,*
  376 F.3d 420 (5th Cir. 2004) ..................................................................................21

*Missouri v. Biden,*
  680 F. Supp.3d 630 (W.D. La. 2023) ........................................................................9

*Missouri v. Biden,*
  83 F.4th 350 (5th Cir. 2023) .....................................................................................9

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) .....................................................................................passim

*Nat'l Press Photographers Ass'n v. McGraw,*
  90 F.4th 770 (5th Cir. 2024) ..................................................................................16

*Nat'l Rifle Ass'n v. Vullo,*
  602 U.S. 175 (2014) ...............................................................................................22

*Norwood v. Harrison,*
  413 U.S. 455 (1973) ...............................................................................................22

*Obama v. Klayman,*
    800 F.3d 559 (D.C. Cir. 2015) ............................................................3

*OnAsset Intelligence, Inc. v. Freightweight Int'l (USA), Inc.,*
    No. 3:11-cv-3148, 2012 WL 5409660 (N.D. Tex. Nov. 6, 2012) ..................22

*Schuchardt v. President of the U.S.,*
    839 F.3d 336 (3d Cir. 2016) ............................................................3

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) ..........................................................16

*Texas v. Becerra,*
    577 F. Supp.3d 527 (N.D. Tex. 2021) ..............................................12

*Trinity Lutheran v. Comer,*
    582 U.S. 449 (2017) ......................................................................24

*United States v. Umbrella Fin. Servs.,*
    No. 3:22-cv-2759-D, 2023 WL 4109697 (N.D. Tex. June 21, 2023) ............2

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ........................................................................5

*Whitman-Walker Clinic, Inc. v. HHS,*
    485 F. Supp.3d 1 (D.D.C. Sept. 2, 2020) ..........................................12

## Other Authorities

@Jim_Jordan, X (July 28, 2024, 12:03 PM) ............................................4

@JudiciaryGOP, X, Letter from Mark Zuckerberg to House Judiciary Committee
    Chairman Jim Jordan (Aug. 26, 2024, 6:44 PM) ....................................13

Adam Cancryn,
    *The anti-vaccine movement is on the rise. The White House is at a loss over what to do about it,*
    POLITICO (Sept. 20. 2023) ................................................................6

Fox News,
    *Hillary Clinton warns that allowing free speech on social media means 'we lose control,'*
    *reprinted in* NEW YORK POST (Oct. 6, 2024) ........................................7

Jeff Stein & Taylor Lorenz,
    *The viral $16 McDonald's meal that may explain voter anger at Biden,*
    THE WASHINGTON POST (Nov. 24, 2023) ............................................6

Jonathan Turley,
    *John Kerry says First Amendment is the enemy,*
    NEW YORK POST (Oct. 2, 2024) ........................................................7

Philip Hamburger,
    *Courting Censorship,*
    4 J. FREE SPEECH L. 195 (2024) ......................................................24

Staff of H.R. Comm. on the Judiciary, 118th Cong.,
    *Rep. on The Weaponization of the National Science Foundation* (2024) ........15

## INTRODUCTION

Defendants insist that this case should be dismissed because the Supreme Court held in *Murthy v. Missouri,* 144 S. Ct. 1972 (2024), that Plaintiffs failed to demonstrate standing—specifically traceability and redressability—sufficient to obtain a preliminary injunction.  But Defendants' response brief ultimately fails to refute Plaintiffs' core contention: that the Supreme Court's determination that Plaintiffs lacked standing to obtain a preliminary injunction on certain counts of the Amended Complaint does not warrant dismissal of the lawsuit, which has already survived an undisturbed motion to dismiss. *See* Pls. Br., ECF 391, at 5-6.

The standard required to withstand a motion to dismiss is less than that needed to obtain a preliminary injunction. *Id.*  And the Supreme Court had before it only a limited record, which did not (to take just one example) include later uncovered internal Facebook emails where company executives admitted to censoring content "[b]ecause we were under pressure from the [Biden] administration." ECF 391 at 11.  The appropriate next step is discovery or, at the very least, amending the Complaint— not dismissal.  *See Kennedy v. Biden*, No. 3:23-cv-00381, 2024 WL 3879510, at *3 (W.D. La. Aug. 20, 2024) (observing that in circumstances such as those present here, standing will almost always be impossible to prove absent discovery because evidence of the censorship scheme is derived from emails and other, similar forms of communication).

## ARGUMENT

## I.    CONTRARY TO DEFENDANTS' CLAIMS, THE SUPREME COURT'S DETERMINATION ON STANDING FOR A PRELIMINARY INJUNCTION DOES NOT WARRANT DISMISSAL OF THE CASE

Initially, Defendants argue that no further discovery is warranted because Plaintiffs already had the opportunity to conduct "extensive" discovery, pointing to their own provision of over 15,000 pages of material in response to requests for documents, and Plaintiffs' taking of six depositions.  Defs. Br., ECF 394 at 25 (citations omitted).  According to Defendants, "the Supreme Court decided the

1

question of standing on the full evidentiary record that Plaintiffs themselves assembled through discovery," meaning their challenge is "factual" rather than "facial." *Id.* at 8.

This claim obfuscates the incompleteness of the evidentiary record before the Supreme Court, because Plaintiffs had the opportunity to conduct only limited discovery for the purpose of substantiating their motion for emergency relief. Neither this Court nor Plaintiffs understood this expedited discovery process to necessarily suffice to prove the merits of the case. Nor could they have anticipated the Supreme Court's application of existing standing doctrine to a novel fact-pattern involving a "whole of government" assault on disfavored speech, which Plaintiffs have not had the opportunity to address through discovery requests crafted for that purpose. Plaintiffs and the lower courts had interpreted existing law to allow traceability and redressability to be demonstrated through the cumulative actions of various agencies. In light of *Murthy*, Plaintiffs need the opportunity to plead allegations and obtain discovery consistent with the Court's segmented causality requirement.

Furthermore, as discussed in Plaintiff's Opening Brief, *see* ECF 391 at 19, the number of depositions and documents Plaintiffs were able to obtain through narrow, targeted, preliminary-injunction-related discovery was nowhere near what would normally be permitted in a case of this magnitude and significance. *See United States v. Umbrella Fin. Servs.*, No. 3:22-cv-2759-D, 2023 WL 4109697, at *2 (N.D. Tex. June 21, 2023) (permitting government to take up to 20 depositions in case "alleg[ing] widespread fraud, affecting many customers over many years, resulting in millions of dollars in tax harm. It has already established that more than 10 depositions will be necessary to meet its burden of proof[.]"). And what Plaintiffs did manage to obtain was over the objections of Defendants, who fought discovery every step of the way. *See, e.g.,* Defendants' Combined Objections and Response to Plaintiffs' First Set of Expedited Preliminary-Injunction Related Interrogatories, ECF 71-1; Joint Statement Regarding Witness Depositions, ECF 86.

The Supreme Court's *Murthy* decision, addressing Defendants' "factual" challenge to standing, pertained *only* to the preliminary injunction, not the entire lawsuit. The Supreme Court did not say that there was no conceivable means by which Plaintiffs could demonstrate standing for purposes of prosecuting their claims under its clarified rubric that focused on individualized, as opposed to aggregated, conduct. Nor did the Supreme Court direct this Court to dismiss the case. *See generally Gill v. Whitford*, 585 U.S. 48, 72–73 (2018) (citation omitted) ("In cases where a plaintiff fails to demonstrate Article III standing, we usually direct the dismissal of the plaintiff's claims. … This is not the usual case. It concerns an unsettled kind of claim this Court has not agreed upon, the contours and justiciability of which are unresolved. … We therefore remand the case to the District Court so that the plaintiffs may have an opportunity to prove concrete and particularized injuries using evidence[]").

This case is also unique because it involves a coordinated, unprecedented federal government effort to suppress Americans' politically disfavored views on social media. While adequate evidence existed to infer the presence of this operation given the public statements of various government officials, the precise nature and extent of the enterprise, as well as identity of specific government actors and agencies and their targets, was intentionally kept hidden from the public. For this reason, dismissal prior to Plaintiffs having an opportunity to conduct discovery designed to show that they have standing, as well as to substantiate the merits of their claims, and/or to amend their Complaint, would be improvident and unjust. *See Schuchardt v. President of the U.S.*, 839 F.3d 336, 343 (3d Cir. 2016) (quoting *Gould Elecs. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)) (explaining that [in the Third Circuit], if the defendant contests the pleaded jurisdictional facts, "the court must permit the plaintiff to respond with evidence supporting jurisdiction."); *Obama v. Klayman*, 800 F.3d 559, 561 (D.C. Cir. 2015) (vacating district court's preliminary injunction, but panel divided on whether to remand for jurisdictional discovery or to dismiss); *Indian River County v. Rogoff*, 201 F.Supp.3d 1, 8 (D.D.C. 2016)

(denying defendants' motion to dismiss fourteen months after denying plaintiffs' motion for preliminary injunction as "[t]he present record—compiled following jurisdictional discovery and viewed in light of developments since the Court's prior ruling—calls [the findings leading to denial of preliminary injunction for lack of standing] into doubt.").[1]

Defendants next allege, in a conclusory fashion, that Plaintiffs lack standing because none has demonstrated "a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." ECF 394 at 9 (quoting *Murthy*, 144 S. Ct. at 1986). While Defendants concede that the Supreme Court recognized Ms. Jill Hines might have demonstrated "traceable past injury," they allege that she cannot show future harm because "[b]y August 2022 … the officials' communications about COVID-19 misinformation had slowed to a trickle." *Id.* at 5 (alteration in original) (quoting *Murthy*, 144 S. Ct. at 1994). Acknowledging that Ms. Hines submitted a supplemental declaration attesting to ongoing censorship on social media of posts about vaccines—both Covid-19 vaccines and others—Defendants nevertheless allege that Plaintiffs' case should be dismissed because this does not establish proof of continuing government involvement.

But there is virtually no way Plaintiffs can demonstrate ongoing and/or future harm without additional discovery. Defendants fault Plaintiffs for failing to provide evidence of censorship after 2022, even though discovery concluded in early 2023 and Plaintiffs' supplemental preliminary injunction brief and accompanying Proposed Findings of Fact was filed March 6, 2023. This meant

---

[1] Defendants also claim that the prior decisions of this Court and the Fifth Circuit contained erroneous factual findings, citing as an example "that Facebook agreed to censor content that did not violate its policies." *See* ECF 394 at 9 (quoting *Murthy*, 144 S. Ct. at 1988 n.4). If the Supreme Court did not believe that the record before it demonstrated that Facebook changed its policies to appease the government, certainly evidence that surfaced after briefing before the Fifth Circuit was completed proved as much. *See* Plaintiff's Br., ECF 391 at 10–11 (emphasis in original) (quoting @Jim_Jordan, X (July 28, 2024, 12:03 PM), *available at* https://x.com/Jim_Jordan/status/1684957664265031681) (Facebook employee stating, in response to his superior's question, that the company had censored the lab-leak hypothesis "*Because we were under pressure from the* [*Biden*] *administration and others to do more …. We shouldn't have done it.*"). This illustrates the danger of dismissal prior to Plaintiffs having the opportunity to fully develop the record.

that the record before the Supreme Court, which was based on the appeal of this Court's grant of a preliminary injunction, could not have contained evidence from occurrences after March of 2023 and, as a practical matter, did not contain much evidence obtained after the end of 2022, as productions had mostly wrapped up by then.  To the extent that the Supreme Court concluded the White House and Centers for Disease Control and Prevention (CDC) had stopped communicating with social media companies about Covid-19 by August of 2022, that conclusion was not based on a complete evidentiary record.  This is not to suggest that the Court was at fault, but it illustrates why determinations on an emergency motion are not considered final judgments, and why preliminary injunctions require only a showing of "*likelihood* of success on the merits," as opposed to an actual determination of the merits.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394, 395 (1981) (emphasis added) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing.").

Nor is the hypothesis that government Defendants continue to unlawfully interfere in social media censorship (or, euphemistically, content moderation) anything close to speculation.  As this Court knows well, Plaintiffs were able to prove the reach and significance of Defendants' censorship efforts only through preliminary-injunction-related discovery here.  While in the past some government Defendants, especially in the White House, have openly boasted about these efforts—leading to facts sufficient to file a complaint and obtain expedited discovery—it undoubtedly dawned on government officials that secrecy is the key to their success.  Given their past conduct, Plaintiffs have every reason to believe that Defendants are still involved in operations to stifle government-disfavored speech on social media—and that further discovery will confirm this inference.  Moreover,

none of the individual government Defendants or Defendant agencies has renounced working with social media companies, nor have they indicated to the public or to the Court that they would stop doing so.[2] They have not conceded that their prior engagement with social media companies was improper, let alone that it violated the Constitution.

To the contrary, news reports indicate that the Biden Administration continues to suppress speech that questions its policies on social media. For example, a *Washington Post* article from November 24, 2023, reported that the Administration sought to combat "economic misinformation" about inflation by—according to a White House official—"working with social media platforms to counter misinformation." *See* Jeff Stein & Taylor Lorenz, *The viral $16 McDonald's meal that may explain voter anger at Biden*, THE WASHINGTON POST (Nov. 24, 2023), *available at* https://www.washingtonpost.com/business/2023/11/24/bigmac-price-tiktok-biden-economy-inflation/. Likewise, *Politico* reported last fall that "Biden officials have felt handcuffed for the past two years by [this] lawsuit … . That suit, they believe, has limited their ability to police disinformation online." *See* Adam Cancryn, *The anti-vaccine movement is on the rise. The White House is at a loss over what to do about it,* POLITICO (Sept. 20. 2023), *available at* https://www.politico.com/news/2023/09/20/biden-anti-vax-movement-00116516. The article specifically discusses *all* vaccine misinformation, not merely that related to Covid-19 vaccines—material that Ms. Hines has attested to posting on a regular basis. *See* Hines Suppl. Decl., ECF 391-10.

---

[2] Even at oral argument before the Supreme Court, the Principal Deputy Solicitor General acknowledged that he was not arguing the case was moot, with the clear implication that there was no claim that the government Defendants had ceased their unlawful activity. Tr. of Oral Arg. at 43:2–44:5, *Murthy v. Missouri*, 144 S. Ct. 1972 (2024) (No. 23-411). Also, the Government stated before this Court during oral argument that they were not committing to ending their censorship activities. Tr. of Oral Arg. at 122:6–124:12 (May 26, 2023).

Thus, that the pandemic is "over" does not mean federal government efforts to censor health "misinformation"—including Plaintiffs' speech—have also ended.  In fact, these articles strongly indicate that the Biden Administration, and more broadly, the Defendant agencies and individuals, believe they should be able to police misinformation online on a wide variety of subjects, and consider this Court's and the Fifth Circuit's decision to have unfairly restrained their efforts.  They have expanded the topics on which they are demanding censorship to include "misinformation" and "disinformation" about such topics as gender affirming care, climate change, gas prices, and abortion. *See* Proposed Finding of Fact, ECF 214-1, ¶¶ 208–11.  And, as discussed in Plaintiffs' Opening Brief, both the Democratic nominee for president and her running mate have openly stated they believe the government should be able to police "misinformation."  *See* ECF 391 at 21 n.12.  These sentiments have recently been echoed by other prominent, influential members of the Democratic Party, including, for example, former Secretaries of State and nominees for president Hillary Clinton and John Kerry.  For these reasons, if Ms. Harris wins the upcoming presidential election, Plaintiffs have every reason to believe the government's censorship efforts will continue and even intensify.  At the very least, this disturbing likelihood warrants further discovery.  *See* Jonathan Turley, *John Kerry says First Amendment is the enemy*, NEW YORK POST (Oct. 2, 2024), *available at* https://nypost.com/2024 /10/02/opinion/john-kerry-says-first-amendment-is-the-enemy-as-elites-try-to-stamp-out-free-speech/ (reporting that Kerry described the First Amendment as a "major block" to fighting disinformation efforts, in the context of climate change); Fox News, *Hillary Clinton warns that allowing free speech on social media means 'we lose control,'* *reprinted in* NEW YORK POST (Oct. 6, 2024), *available at* https://nypost.com/2024/10/06/us-news/hillary-clinton-warns-that-allowing-free-speech-on-social-media-means-we-lose-control/ (during a CNN interview, Clinton stated that government needs to get involved in content moderation efforts on social media otherwise "we lose total control.").

Even if Ms. Harris does not win, Defendant agencies are likely to continue their unlawful involvement in social media content moderation. After all, the FBI, CISA, CDC, and others began these efforts at least as early as 2020, apparently acting without the knowledge of the Trump White House. *See id.* ¶¶435–39, 443–52, 783–808, 861–955, 972–1092. And CISA has stated that it intends to expand its efforts to fight "disinformation" heading into the 2024 election cycle. *See* Proposed Findings of Fact, ECF 214-1 ¶ 1106.[3] All of this adds up to a very reasonable inference that the Administration has not ceased its conduct, that such conduct will continue regardless of the results of the presidential election.

To substantiate their claim that government involvement in social media censorship has ceased, Defendants cite an August 8, 2024, memo from the FBI's website, stating that agents may provide information about foreign malign influence threats to social media companies, but must leave the decision about removal to companies' independent decision-making processes. *See* ECF 394 at 23–24, n.7. First, this memo only applies to the FBI, and thus does not speak to the internal instructions provided to employees of any other agency. Second, the mere existence of this document does not establish that government actors are abiding by its strictures. Indeed, the government always had an obligation to adhere to the First Amendment, yet as this Court, the Fifth Circuit, and the *Murthy* dissenters (the only judges to reach the merits of the case) determined, Defendants flagrantly flouted Americans' constitutional rights by coercing and significantly encouraging social media companies to censor government-disapproved views. It defies common sense to simply take the government at its self-serving word when Plaintiffs allege—and have uncovered the existence of—a censorship operation conducted mainly under cover of darkness. *See Missouri v. Biden*, 83 F.4th 350, 392 (5th Cir.

---

[3] Though the Supreme Court noted that "the Government has represented that it will not resume operations for the 2024 election[,]" this is flatly contradicted by other statements made by CISA officials, and warrants additional factfinding. *See Murthy*, 144 S. Ct. at 1993. It further demonstrates the danger of drawing final conclusions from an incomplete, preliminary record.

2023) ("[T]he Supreme Court has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life."), *reversed and remanded on other grounds sub nom. Murthy*, 144 S. Ct. 1972; *Missouri v. Biden*, 680 F. Supp.3d 630, 707 (W.D. La. 2023) (describing the government's conduct as amounting to "arguably the most massive attack against free speech in United States history"), *reversed and remanded on other grounds sub nom. Murthy*, 144 S. Ct. 1972. *See also Murthy*, 144 S. Ct. at 1998–99 (Alito, J., dissenting) ("A coterie of officials at the highest levels of the Federal Government continuously harried and implicitly threatened Facebook with potentially crippling consequences if it did not comply with their wishes …. [This] Court, however, shirks [its] duty and thus permits the successful campaign of coercion in this case to stand as an attractive model for future officials who want to control what the people say, hear, and think.").

For similar reasons, it is disingenuous for Defendants to urge the Court to dismiss the Third Amended Complaint because it did not allege adequate facts to establish Plaintiffs' standing at that stage. *See* ECF 394 at 10–11. Assuming *arguendo* that Defendants are correct that the Complaint did not suffice to verify Plaintiffs' standing at that phase—which they are not—once again, that is an argument for further discovery and amendment of the Complaint to address ostensible deficiencies identified by the Supreme Court's reasoning—not dismissal.

The Third Amended Complaint was filed on May 5, 2023. *See* ECF 268. Because litigation at the merits stage was put on hold pending Defendants' appeal of the preliminary injunction, Plaintiffs have not had an opportunity to update the Complaint to include allegations of ongoing harm, or to provide greater detail to establish traceability of each Plaintiff's harm to particular Defendants, as the Supreme Court later required. It was reasonable for Plaintiffs to rely on this Court's assessment of standing in both the denial of Defendants' motion to dismiss and grant of Plaintiffs' motion for preliminary injunction prior to the Supreme Court's decision in *Murthy*, as they could not have foreseen the Supreme Court's decision. Defendants now seek to prevent them from filing an amended

complaint in order to address this alleged deficit, essentially advocating for a "heads the government wins, tails you lose" approach to this litigation. Plaintiffs must be afforded the opportunity to supplement their case through discovery and amendment of the Complaint in view of the Supreme Court's ruling. For the same reason, they should be permitted to proceed with discovery—at the very least, to establish the Court's Article III jurisdiction—and amendment of the Complaint prior to commencement of Rule 12 motions practice. The only question is whether it makes sense to amend the Complaint now and add plaintiffs, or whether it would be in the interest of judicial economy to engage in jurisdiction-related discovery first and then to amend the Complaint to include additional evidence.[4] Plaintiffs will leave resolution of the question to the wisdom of the Court.

## II.    IF PLAINTIFFS' SUPPLEMENTAL DECLARATIONS DO NOT SUFFICE TO VERIFY THEIR STANDING, THEY AT LEAST WARRANT ADDITIONAL DISCOVERY

Defendants erroneously fault Plaintiffs' supplemental declarations for failing to demonstrate that their social media censorship is traceable to them and any future injury would be redressed by an injunction and declaratory relief. ECF 394 at 17–18. Once again, without the opportunity to conduct discovery into recent occurrences, it is impossible for Plaintiffs to prove Defendants' current and future involvement, although as just explained, there is more than enough publicly available information to demonstrate that government Defendants continue their unlawful censorship enterprise. In any event, that Defendants unquestionably involved themselves in social media content moderation in the past, and Plaintiffs are still being censored now, establishes a *prima facie* case that entitles them to further discovery.

Additionally, Defendants' argument is based upon the flawed premise that Plaintiffs must show that any future censorship will address exactly the same topic as past censorship. ECF 394 at

---

[4] Incidentally, the Court has not yet issued a Rule 26 scheduling order, which normally establishes a deadline for adding parties. Here, no such deadline has been put in place because there has been no order.

19. So, they contend, because Ms. Hines's past censorship was mainly on Covid-19 related topics, and the government claims (without evidence) they have stopped pressuring the companies on that particular subject, she cannot show traceability of her injury to government action, or that a favorable ruling would redress her injury. Presumably, they would make the same argument about Mr. Hoft's supplemental declaration, in which he attests to continuing online censorship of articles on his website, the Gateway Pundit, by Defendants in the White House, Department of Homeland Security (DHS), Department of Defense (DoD) and Department of Justice (DoJ), as well as Defendants in CISA and FBI given those agencies' past involvement in censoring Mr. Hoft and the Gateway Pundit. *See* Exhibit 1, Suppl. Decl. of Jim Hoft ¶¶ 5, 14, 16, 22, 25, 29.

This is an artificially constrained view of the standing requirement. The government suppressed Plaintiffs' Covid-19 speech because it challenged its policies. That censorship therefore should not be understood to narrowly concern the virus. Rather, it was just one instance of a broader, successful effort to censor opposition speech. Therefore, any future censorship of these Plaintiffs' opposition speech would not actually concern a different topic than the earlier censorship of their Covid-19 speech. The Supreme Court did not say otherwise. Indeed, in *Kennedy*, this Court properly interpreted the standard derived from *Murthy*: Kennedy's past censorship was mainly on Covid-related topics, and he alleged likely future censorship on election-related matters, as a presidential contender. That is the only interpretation that makes sense, as the subject of discussion on social media changes rapidly, as does the news cycle, along with government's interest in censoring any given topic. The rule Defendants urge would permit the government to censor with impunity since in reality, an injunction could rarely be obtained in time. And finally, even if Defendants' tortured interpretation of the Supreme Court's standing doctrine is correct, Mr. Hoft's past and ongoing censorship pertains to election-related speech and therefore satisfies their test.

Defendants fail to contend with Plaintiffs' theory—not addressed by the Supreme Court—that even if the government has stopped attempting to influence social media content moderation, its prior involvement in shaping the policies and algorithms constitutes an ongoing harm. Courts typically find that if the defendant's unlawful action continues to have ripple effects that injure the plaintiff, the forward-looking component of traceability and redressability has been satisfied. Getting the government out of third parties' decision-making processes effectively redresses Plaintiffs' injuries, since the government is no longer violating their rights. Moreover, this incentivizes third parties to revert to their original practice. *See generally Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 350–53 (2d Cir. 2023) (holding that town's prior coordination with a third party plausibly resulted in plaintiff's loss of contract, thereby endowing plaintiff with standing); *Texas v. Becerra*, 577 F. Supp.3d 527, 560 (N.D. Tex. 2021) (determining that plaintiffs had adequately established a threat of future harm stemming from actions of federal government defendants, who required plaintiffs' employers to implement a vaccine mandate, as the requirement would likely cause employers to fire plaintiffs should they refuse the vaccine); *Whitman-Walker Clinic, Inc. v. HHS*, 485 F. Supp.3d 1 (D.D.C. Sept. 2, 2020) (holding that continuing financial and operational damage to LBGTQ health providers resulting from HHS regulation sufficed to establish ongoing harm for purposes of assessing standing).

Here, the Court could provide the following relief to the Plaintiffs: a declaratory judgment that the Defendants cannot coerce, pressure, or significantly encourage social media companies to suppress social media posts of Plaintiffs (and Americans broadly). This would address the harm Plaintiffs suffered, *which is not due to the independent decisions of social media companies*. The harm is the Government's influence on those companies to do what they otherwise would not. As noted in Plaintiffs' Opening Brief, executives from Meta, one of the world's largest social media companies, have said publicly and in private that they succumbed to pressure from the Government and did not make censorship decisions free of Government influence. *See* @JudiciaryGOP, X, Letter from Mark Zuckerberg to

12

House Judiciary Committee Chairman Jim Jordan (Aug. 26, 2024, 6:44 PM), *available at* https://x.com/JudiciaryGOP/status/1828201780544504064 (stating that government "repeatedly pressured our teams for months to censor certain COVID-19 content, including humor and satire, and expressed a lot of frustration with our teams when we didn't agree[]" and acknowledging that the company made decisions as a result that it otherwise would not have). The injunction could also compel the government to rescind its demand to alter their policies.

Additionally, Dr. Kulldorff explains in his supplemental declaration that his posts remain censored on LinkedIn. *See* Exhibit 2, Suppl. Decl. of Dr. Martin Kulldorff ¶ 3. For example, a LinkedIn post from August of 2021 *still* (as of October 22, 2024) bears a warning label stating that "[o]nly you can see this post. It's been removed because it goes against our Professional Community Policies." The post states, "it's a very strange time we have entered into … Basic principles of public health are thrown out the window while the working class is thrown under the bus." *Id.*[5] The fact that Dr. Kulldorff's posts *remain suppressed* constitutes an ongoing harm resulting from the government's involvement in social media censorship. As revealed through discovery, LinkedIn had extensive communications with government Defendants in the FBI and CISA, at least. Proposed Findings of Fact, ECF 214-1, ¶¶ 867, 870, 876, 986, 1086, 1090, 1130. While the fruits of expedited discovery mainly focused on contacts between those agencies (the FBI and CISA), at the very least, that constitutes an adequate reason to conduct further discovery into LinkedIn's engagement with the government to find out whether Dr. Kulldorff's posts were suppressed as a result of government

---

[5] In their response brief, Defendants fault Plaintiffs Hoft, Kheriaty and Kulldorff for failing to supply supplemental declarations, claiming that means they have essentially surrendered their standing. That is an unwarranted conclusion to draw. *See* ECF 394 at 15–16. Plaintiffs do not need declarations at all to survive a motion to dismiss and even without supplemental declarations they are entitled to discovery. Rather, the supplemental declarations submitted are illustrative of the reasons why discovery is warranted. Since Defendants have opened the door to this additional evidence by accusing these three plaintiffs of abandoning their case by not submitting supplemental declarations, Plaintiffs ask the Court to accept the supplemental declarations filed with this motion.

action and which Defendants were involved.[6]   Dr. Kulldorff also alleges ongoing harm to his reputation as a scientist "because it conveys to others that I am not trustworthy with unorthodox pseudo-scientific views, even though I was censored for truthful statements in accordance with the basic principles of public health."  *See* Exhibit 2, Suppl. Decl. of Dr. Kulldorff ¶ 15.  If the White House, CISA, CDC, and/or Surgeon General's Office[7] remain involved in censoring him—a reasonable inference warranting additional discovery, especially given that X (Twitter) censored his post after it was flagged by the Virality Project—Dr. Kulldorff has another plausible theory of ongoing/future harm.

Defendants unreasonably characterize the allegations of government-induced censorship in Dr. Bhattacharya's declaration as "speculative."  ECF 394 at 20.  As Dr. Bhattacharya explained, when granted access to the "Twitter Files," he discovered that he had been placed on the company's "Trends Blacklist."  Given the fact that Dr. Bhattacharya is a public figure who was targeted for a "takedown" by Dr. Anthony Fauci, a Defendant in this case, and earned criticism from countless other government actors, it is more than reasonable to presume that his blacklisting occurred at the behest of government Defendants in the NIH, NIAID, the White House, Surgeon General's Office, and/or the CDC, and that the related algorithms may still be in place, resulting in reducing visibility of his account.  These facts—which are included in the record—at least entitle him to further discovery on the matter.

Finally, Dr. Kheriaty attests to ongoing harm due to continued censorship on social media, as well as specific material he no longer posts on specific platforms—of the type on which Defendants

---

[6] Despite its name, CISA did not limit its influence in content moderation to national security threats, but involved itself in efforts to limit the spread of, *inter alia*, election and Covid-19 "misinformation" and "disinformation," and worked closely with the Virality Project, which orchestrated censorship of at least one of Dr. Kulldorff's posts on Twitter.  *See* Proposed Finding of Fact, ECF 214-1 ¶¶ 853, 968–69; Exhibit 1, Suppl. Decl. of Dr. Kulldorff ¶¶ 6–7.  The FBI also participated in meetings with CISA and social media platforms to address content moderation issues. Proposed Finding of Fact, ECF 214-1 ¶ 861, 1101–02.

[7] All of which were involved in efforts to effectuate social media censorship of Covid-19 "misinformation" and disinformation."

14

have demanded censorship in the past. Dr. Kheriaty explains that he no longer posts his own articles on numerous major social media sites, especially Facebook, YouTube, and LinkedIn, because of continuing censorship. *See* Exhibit 3, Suppl. Decl. of Dr. Aaron Kheriaty ¶¶ 7–11. He has done interviews on the topic of vaccine mandates with Emmy Award winning journalist Alyson Morrow, which are not even posted to YouTube due to the almost certain suspension that will result. *See id.*, ¶ 9. Moreover, Dr. Kheriaty was unable to post a recorded discussion held by his own lawyers about this case just last year, because YouTube removed the video. *See id.* ¶ 10. As documented extensively in earlier filings, YouTube was (and likely still is) in close contact with Defendants in the White House, Surgeon General's Office, Census Bureau, NIAID, GEC, CDC, as well as individuals at the "Election Integrity Partnership" (EIP),[8] and often agreed to censor Covid-related speech (as well as speech on other topics) in accordance with their requests and demands. *See* Plaintiff's Proposed Findings of Fact, ECF 214-1, ¶¶ 32, 43, 101, 105–110, 112–13, 173–77, 217, 280, 289, 531, 535, 537, 547–49, 562, 822, 1101, 1185–90. In Dr. Kheriaty's words, suppression of the video about this case "suggests that the government is trying to sway public opinion not just on covid, election integrity, and the other issues … but that the government is pressuring social media companies to censor in order to sway public opinion *on this case itself.*" *See id.*, ¶ 11. At a minimum, Dr. Kheriaty deserves the opportunity

---

[8] As explained in previous filings, EIP, the earlier iteration of the Virality Project (VP), was created in consultation with CISA and worked very closely with it and other government actors. Plaintiff's Proposed Findings of Fact, ECF 214-1 ¶¶ 1151–53, 1139, 1169. The Supreme Court's only reference to the organization described it as "a private entity." *Murthy*, 144 S. Ct. at 1990. However, the Court did not otherwise grapple with Plaintiffs' arguments, based on a thorough, careful review of the facts, that EIP and VP are essentially government cutouts. Arguably more concerning than the government's early efforts to monitor and control vast swaths of social media posts through hastily created partnerships with entities such as EIP, which depended on human oversight, are the second-generation versions of these systems which harness the vast potential of complex algorithms to accomplish what was previously impossible. As noted by a recent House Judiciary Committee investigation, the federal government's National Science Foundation (NSF) has been actively funding the creation of new tools to automate censorship. "With the development of artificial intelligence and machine learning, governments are recognizing that censorship of speech online has the potential to be automated … government, researchers, and non-profits are seeking to develop similar tools to monitor and censor speech 'at scale' in the name of combatting so-called misinformation." Staff of H.R. Comm. on the Judiciary, 118th Cong., *Rep. on The Weaponization of the National Science Foundation* 7 (2024).

to conduct discovery into the government's ongoing involvement in censorship that has resulted in the removal of material about his case and caused him to stop posting his own work. *See Nat'l Press Photographers Ass'n v. McGraw*, 90 F.4th 770, 782 (5th Cir. 2024) ("[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief."); *Speech First, Inc. v. Fenves*, 979 F.3d 319, 332 (5th Cir. 2020) (holding that students, who had identified the specific types of discussions in which they wanted to engage and that they feared would subject them to discipline, had established standing to challenge university's Hate and Bias Incidents Policy because they had made an adequate showing their speech was chilled).

### III.    CONTRARY TO DEFENDANTS' CONTENTIONS, PLAINTIFFS STATED SPECIFIC GROUNDS FOR FURTHER DISCOVERY

As discussed in Plaintiffs' Opening Brief, *see* ECF 391 at 19, the expedited discovery permitted in support of their preliminary injunction motion was much narrower than what would normally be allotted in resolving the merits of a case of this magnitude and significance, alleging widespread unlawful and mostly covert government conduct that resulted in censorship of countless Americans, including Plaintiffs. *Cf. Umbrella Fin. Servs.*, 2023 WL 4109697, at *2 (allowing government to take up to 20 depositions in case "alleg[ing] widespread fraud, affecting many customers over many years, resulting in millions of dollars in tax harm. It has already established that more than 10 depositions will be necessary to meet its burden of proof[.]") While Defendants take issue with some of the individuals whom Plaintiffs indicated that they might seek to depose, on the ground that they are high-ranking government officials, *see* ECF 394 at 26, Plaintiffs' examples were not intended to constitute a formal discovery request. Rather, they provided the names of some specific individuals and other more general categories (for example, tech employees) to point out that there are many potential

witnesses—the identity of whom Plaintiffs were unaware when they initially sought depositions pursuant to the Court's Order.

For example, pursuant to third-party subpoenas, the social-media platform then known as Twitter (now named X) identified eleven federal officials with whom the company had communicated about misinformation, disinformation, and censorship on its platform. Then, near the end of discovery, Twitter's ownership changed hands, as it was purchased by free-speech champion Elon Musk. After Mr. Musk's acquisition of Twitter—and *after the close of preliminary-injunction-related discovery*—Twitter "revised" its previous disclosure of eleven federal officials to provide a list of *eighty-four* such officials who communicate with Twitter about misinformation, disinformation, and censorship. ECF 214-8 (Twitter's revised list of federal officials). This revised list includes numerous federal officials whose identities Plaintiffs previously did not know, and it includes at least *twenty* White House officials—demonstrating that Mr. Flaherty's egregious misconduct was just the tip of the censorship iceberg. *See id.*

To take another example, Plaintiffs deposed Daniel Kimmage, Director of GEC, in part to seek discovery regarding the agency's documented involvement in EIP. Yet, during his deposition, Kimmage revealed that he had no direct involvement in the EIP and disavowed any knowledge of GEC's involvement in the EIP, because his wife works at the Atlantic Council (one of the EIP's four constituent organizations); Kimmage instead provided names of GEC staff involved in the EIP—such as George Beebe and Adele Ruppe, *see* ECF 214-1 ¶ 1132, none of whom Plaintiffs have yet had the opportunity to depose. Likewise, the Court's authorization of narrow preliminary-injunction-related discovery permitted depositions only of federal officials, and so Plaintiffs have never had any opportunity to depose non-governmental witnesses with extensive knowledge of federal pressure for social-media censorship—such as Alex Stamos, Renee DiResta, and Kate Starbird of the EIP/VP,

and key personnel at Twitter, Facebook, and YouTube who communicated with federal officials about censorship on their platforms.

Furthermore, there is no bar in the Federal Rules of Civil Procedure to deposing high-ranking government officials. True, courts are protective of these individuals, requiring a strong showing of necessity to take such depositions. But this is a case involving an unprecedented abuse of government power to censor Americans' speech. While the Fifth Circuit did not allow Plaintiffs to depose some government officials, information that has surfaced since that time changes the equation. For example, Rob Flaherty's emails, in which he unquestionably pressured social media companies to censor vaccine "misinformation," were exposed *after* the litigation surrounding his subpoena concluded. Had the Fifth Circuit decided the question in light of this evidence, it might have reached a different conclusion.

Defendants allege that Plaintiffs fail to specify facts they expect additional discovery to disclose that will sustain standing. ECF 394, at 28. That contention simply belies the record. Plaintiffs described, over the span of nine pages, various particulars that provide fertile grounds for discovery. *See* ECF 391 at 12–21. To reiterate briefly, those include but are not limited to: private and deleted emails from individuals at NIAID and NIH, including Dr. Fauci, as a number of those individuals were implicated in a concerted attempt to delete incriminating emails; documents from Dr. Fauci and others at NIAID and NIH involving efforts to censor Drs. Kulldorff, Bhattacharya, and their Great Barrington Declaration; government involvement in blacklisting of Dr. Bhattacharya and censorship of Dr. Kulldorff on X (Twitter) and LinkedIn, and government ties to the Virality Project, which flagged at least one of Dr. Kulldorff's tweets; evidence of ongoing efforts by government Defendants to influence social media platforms' content moderation efforts, including those that have resulted in recent censorship of Plaintiffs' accounts; and specific topics or speakers that the State Plaintiffs could not follow due to censorship on social media and the traceability of their suppression to Government

18

Defendants. *See* ECF 391 at 12–21.  And Plaintiffs Hoft, Kheriaty, and Kulldorff have included additional areas of discovery in supplemental declarations, discussed above.

Next, Defendants take umbrage with Plaintiffs' contention they were less than forthcoming about the nature and extent of the government censorship program.  *See* ECF 394 at 31.  Here, they either misunderstand or mischaracterize Plaintiffs' reference to internal Meta documents on the grounds that the government did not have access to that material and so could not have produced it. As Plaintiffs explained, documents that the company provided revealed that there were individuals from the government involved *whom Defendants had not identified in response to interrogatories*. That suggests that Defendants obscured evidence of their wrongdoing and dictates against taking Defendants at their word about what additional proof exists and may yet be found, should Plaintiffs be able to conduct further discovery.

Even if jurisdictional discovery is warranted, Defendants argue, Plaintiffs have no basis for obtaining merits discovery.  They dispute Plaintiffs' position that here, the question of jurisdiction and merits are intertwined.  But Defendants' arguments unwittingly prove as much, because they claim that the government's communications with social media companies, urging them to take down speech, cannot be considered for purposes of assessing standing.

Plaintiffs continue to maintain that the government cannot use its authority to *abridge* the freedom of speech, including abridgment through coercion or pressure, *or* encouragement, cooperation, entwinement, coordination, or joint participation.  *See* Third Am. Compl., ECF 268 ¶¶114–17, 477–88, 502–21.  In other words, the question of whether the government violated Plaintiffs' rights cannot be separated from the question of whether or not the government was responsible for their injuries.  As the Supreme Court explicitly stated, it did not address this question since it did not reach the merits of the case.  *See Murthy*, 144 S. Ct. at 1985 n.3.

Accordingly, Plaintiffs should be permitted to proceed with Rule 26 discovery. *See Callier v. Unified Health*, No. EP-23-cv-375-KC, 2024 WL 3418778, at * 5 (W.D. Tex. July 15, 2024) (explaining that whether or not the plaintiff received unsolicited text messages from the defendant, or asked the defendant to call him, was crucial to determining both standing and merits); *Kipp Flores Architects, LLC v. Mid-Continent Casualty Co.*, No. 4:14–cv–02702, 2015 WL 10557922 (S.D. Tex. Mar. 13, 2015) (denying defendants' motion to dismiss both for lack of standing and for subject matter jurisdiction, as the two questions were "intertwined" and so should be dealt with at a later stage of proceedings).

## IV.    IF NEEDED, PLAINTIFFS SHOULD BE ALLOWED TO FILE A FOURTH AMENDED COMPLAINT

Initially, Defendants fault Plaintiffs for not attaching a proposed amended complaint. *See* ECF 394 at 34. But Plaintiffs are not yet making a formal motion to file an amended complaint, but rather are suggesting that form of relief as an alternative to discovery, should the Court determine that it makes more sense to proceed with amending the Complaint first. *See Cervera v. Brennan*, No. EP–15–cv–11–PRM, 2015 WL 2250133 (W.D. Tex. May 12, 2015) (granting leave to amend complaint, requested as alternative grounds for relief, if plaintiff chose to pursue that course, although complaint was not attached). *Accord Boothe v. Equifax*, No. 3:21-cv-1766-D, 2021 WL 5630839 (N.D. Tex. Dec. 1, 2021).

Defendants also claim that the request should be denied because Plaintiffs did not specify which members of the Disinformation Dozen are prepared to join the lawsuit. *See* ECF 394 at 34. But as both this Court and the Supreme Court recognized, the White House demanded the takedown of all members of the "Disinformation Dozen," so Defendants have not offered any reason why the specific identity of those seeking to join the suit is relevant at this juncture. *See* ECF 391 at 24.  In short, Plaintiffs summarized their proposed amendments in their opening brief, which include adding plaintiffs whom even the Supreme Court recognized had been targeted by the White House and

possibly other Defendants for censorship, as well as additional information that has surfaced since filing of the Third Amended Complaint about the censorship of existing Plaintiffs, and additional context pertaining to the government's involvement in "content moderation." *See* ECF 391 at 21–25.

The next ground on which Defendants claim this Court should deny Plaintiffs' request to amend their Complaint is undue delay. This contention is misguided. Proceedings were stayed in this Court while the appeal on the preliminary injunction went up to the Supreme Court per Defendants' petition for *certiorari,* which took about a year in total. During that time, substantial evidence was unearthed through congressional investigations and by the press. *See* ECF 391 at 9–11. As discussed previously, no Rule 16 scheduling order has yet been entered in this case, and Defendants did not object to deferral of this deadline. *See* Fed. R. Civ. P. 16(b)(3)(A) (providing that scheduling order "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions"). To conjure "undue delay" from Defendants' own litigation tactic is a novel argument indeed.

Now that the Supreme Court has clarified the standing requirements in a setting with multiple agency defendants from different departments, amending the Complaint to add the prospective plaintiffs would be mutually beneficial. Likewise, Plaintiffs seek the opportunity to refine their legal arguments in light of the Supreme Court's decision. This does not constitute undue delay, nor any other reason to deny Plaintiffs' motion for leave to amend the complaint. Defendants have plenty of time to prepare for trial, and Plaintiffs are not presenting entirely new theories that require them to alter their defense in a short amount of time. *See Mayeaux v. La. Health Srvs. and Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) ("delay alone is an insufficient basis for denial of leave to amend: The delay must be *undue*, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court."); *Carson v. Polley*, 689 F.2d 562, 584 (5th Cir. 1982) ("Merely because a claim was not presented as promptly as possible … does not vest the district court with authority to punish the litigant."). *Cf. OnAsset Intelligence, Inc. v. Freightweight Int'l (USA), Inc.*, No. 3:11-cv-3148, 2012 WL 5409660, at *2 (N.D.

Tex. Nov. 6, 2012) (explaining that the "usual case in which 'undue delay' supports a court's denial of leave to amend is where a party waits until the eve of trial to assert a new claim.").

Last—but not least—Defendants claim that amending the Complaint to add members of the "Disinformation Dozen" would not cure standing deficiencies, because according to *National Rifle Association v. Vullo*, 602 U.S. 175 (2024) "the Government does not violate the First Amendment simply by communicating and attempting to persuade." *See* ECF 394 at 36. Rather, according to Defendants, *Vullo* established that "Government may not engage in coercion, either by threatening sanctions or by providing comparably compelling positive inducements." *Id.* The assertion that Defendants did no more here than "communicate" and "attempt to persuade" is unsupported by the record before the Court. At the very least, it is a mixed question of law and fact that warrants additional consideration by the Court.

Furthermore, *Vullo* is different from the present case in a crucial respect. The NRA alleged in *Vullo* that a government actor had pressured regulated companies to stop doing business with the organization by threatening sanctions if they did not comply, with the ultimate aim of stifling gun advocacy—a First Amendment protected view. *See Vullo*, 602 U.S. 175. The plaintiffs there did not contend that government was using the companies to accomplish what it could not directly: the government could, itself, choose to disassociate with the NRA. Here, by contrast, the claim is that the government used the social media companies to do what it could not accomplish itself—that is, to censor free speech on social media platforms. *See Norwood v. Harrison*, 413 U.S. 455, 465 (1973) (quoting *Lee v. Macon Cnty. Bd. of Educ.*, 267 F. Supp. 458, 475–76 (M.D. Ala. 1967)) (it is "axiomatic" that government "may not induce, encourage or promote private persons to accomplish what it is constitutionally forbidden to accomplish."). Therefore, the government action required to constitute a First Amendment violation is different, and the standard for showing a constitutional breach is lower: any means by which the government accomplishes its censorious aims—whether through

coercion, pressure, inducement, cooperation, coordination, joint participation, or entwinement—is unlawful. *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 294, 296 (2001) ("There is no single test to identify state actions and actors"); *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (explaining that the Constitution forbids government from coercing or significantly encouraging private entities to do what it cannot).

To draw an analogy using a different part of the Constitution, imagine if the government suspected someone of committing a crime but lacked the probable cause needed to obtain a search warrant, and then persuaded a private individual to break into the suspect's house and conduct the search himself.  Clearly, such an attempt to circumvent the Fourth Amendment would be entirely unlawful, and the government actors would be in violation of the suspect's constitutional right to be free of warrantless searches and seizures.  There is no reason the analysis should differ in the context of the First Amendment.  The government may not censor Americans; likewise, it may not use its power—hard or soft—to have private companies do the same on its behalf. *Vullo* did not say otherwise.  Finally, *Murthy* left the Fifth Circuit's merits analysis in *Missouri II* untouched. *See Murthy*, 144 S. Ct. at 1985 n.3.  That portion of the opinion thus is still the authoritative interpretation of the law of the circuit. *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001) (explaining that panel opinions are binding where—as here—the Supreme Court reverses but does not vacate the Court of Appeal's decision).  *See also Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 856 n.2 (5th Cir. 2022) ("circuit opinions in which the judgment was reversed on some but not all grounds are still precedential with respect to the portions not reversed.").

## V.    DEFENDANTS' INTERPRETATION OF THE SUPREME COURT'S OPINION WOULD MEAN THERE IS NO REMEDY

Defendants' theory of the Supreme Court's decision effectively means that the government can conduct a major censorship operation, as long as its actions affect large swaths of the American

population rather than target a single individual, and its actions are mostly hidden from the public. According to *Marbury v. Madison*, 5 U.S. 137, 163 (1803), although the United States "has been emphatically termed a government of laws," it "will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." That is especially true of a constitutional right.

Once, in order to punish Americans for their speech, Congress had to enact a statute criminalizing seditious libel, and the executive had to prosecute an individual in court for past speech. The government had the burden of proof and had to persuade a judge and jury. Now, however, the government does not just punish the speaker, but suppresses the speech itself, and does so outside the courts—thereby reversing the burden of bringing suit and presenting proof. Whereas Congress traditionally had to prove that an individual published unlawful speech, now the individual must prove that he was unconstitutionally censored.

In the government's vision, this means there is no remedy. An individual cannot get a remedy for past censorship because there is no claim for money damages against federal officials for violation of constitutional rights outside the extremely limited *Bivens* framework. And he cannot get a remedy for future censorship because, according to the government, he must meet an exaggerated version of the standard for an injunction.

To be precise, the government says that when an individual plaintiff seeks an injunction, he must show that the government sought censorship of that particular plaintiff's particular speech, thus allowing government to get away with seeking suppression of a class of speech or a class of speakers. The government says that the individual must show that his speech was suppressed with coercion—even though that is not the First Amendment standard, *see* Philip Hamburger, *Courting Censorship*, 4 J. FREE SPEECH L. 195, 251–56 (2024) (re "abridging"), and even though in another First Amendment case, *Trinity Lutheran v. Comer*, 582 U.S. 449 (2017), "indirect" coercion, which would not get the

plaintiff to abandon its religion, sufficed for standing and a constitutional violation. Moreover, Plaintiffs are entitled to participate on an even playing field on social-media platforms, not a playing field tilted by the heavy thumb of government pressure. The government also argues against the further discovery that is necessary to meet these standards—notwithstanding that the censorship is covert and continues to be sedulously covered up—thus requiring Plaintiffs to show ongoing or future harm without the discovery needed to demonstrate such harm. The plaintiff, moreover, allegedly must show that he is likely to be censored again on the narrowest vision of the topic, Covid-19, not considering that his oppositional attitude regarding the virus is part of his general oppositional stance against misgovernment and that he is likely to be censored again on that broader topic. Finally, the government says it can make the injunction go away by simply declaring it has no intention of continuing to censor. Thus, although an injunction for a handful of individuals is an utterly inadequate remedy for the censorship of millions, the government's posture eviscerates injunctive relief even for those few persons.

In sum, the government's positions mean that: (a) whereas government once could punish an individual for his speech only in criminal proceedings with a jury and the full due process of law, it now can suppress his speech extrajudicially, leaving him the burden of proving that his rights were violated; (b) there is no effective remedy for past censorship; and (c) there is no effective remedy for future censorship. So, the government needs to explain precisely what the remedy is for mass, covert censorship.

## CONCLUSION

For the reasons stated herein as well as in Plaintiffs' opening brief, they should be permitted to conduct jurisdictional, merits discovery, and to file a Fourth Amended Complaint.

Dated: October 29, 2024                                        Respectfully submitted,

*/s/ Jenin Younes*
JENIN YOUNES *
*Litigation Counsel*
JOHN J. VECCHIONE *
*Senior Litigation Counsel*
ZHONETTE BROWN*
*Senior Litigation Counsel*
New Civil Liberties Alliance
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Main: (202) 869-5210
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*


ELIZABETH B. MURRILL                ANDREW BAILEY
*Louisiana Attorney General*        *Missouri Attorney General*


*/s/ Zachary Faircloth*             */s/ Joshua M. Divine*
ZACHARY FAIRCLOTH                   JOSHUA M. DIVINE
*Principal Deputy Solicitor General*  *Solicitor General*
TRACY SHORT                         MICHAEL PATTON
*Ass't Attorney General*            *Deputy Solicitor General***
D. JOHN SAUER                       TODD A. SCOTT
*Sp. Ass't Attorney General*        *Senior Counsel*
1885 N. Third St.                   207 W. High St.
Baton Rouge, LA 70802              P.O. Box 899
(225) 326-6766                     Jefferson City, MO 65102
MurrillE@ag.louisiana.gov          (573) 751-8870
*Counsel for Louisiana*            Josh.Divine@ago.mo.gov
                                   *Counsel for Missouri*


*/s/ John C. Burns*
JOHN C. BURNS *
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*
*Admitted pro hac vice*
** *Pro hac vice application forthcoming*

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the foregoing was filed on October 29, 2024 via this Court's CM/ECF system. The notice of docket activity generated by this filing will constitute service on all counsel of record in this case.

/s/ Jenin Younes

27