IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

THE STATE OF MISSOURI, *et al.*,

    *Plaintiffs*,

v.

PRESIDENT JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et. al.,*

    *Defendants*.

Civil Action No. 3:22-cv-1213

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO PROPOSED JURISIDICTIONAL DISCOVERY PLAN**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................................... ii
TABLE OF AUTHORITIES .................................................................................................................... iii
INTRODUCTION ....................................................................................................................................... 1
ARGUMENT ............................................................................................................................................... 1
    I.    Contrary to Defendants' Claims, Plaintiffs' Jurisdictional Discovery Plan Addresses Future Conduct .................................................................................................. 2
    II.    Plaintiffs' Proposed Requests for Discovery Are Targeted At Establishing Standing ................................................................................................................................... 5
    III.    Plaintiffs' Proposed Depositions Are Proper .................................................................. 6
    IV.    Plaintiffs' Requests Are Not Unreasonably Duplicative ............................................. 12
        A.    Plaintiffs' Requests for Documents and Interrogatories ................................. 13
        B.    Plaintiffs' Requests for Depositions ..................................................................... 13
CONCLUSION ......................................................................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Hines v. Stamos*,
   3:23-cv-571, slip op. (W.D. La. Dec. 18, 2024) ................................................................... 1, 3

*In re Digit. Advert. Antitrust Litig.*,
   555 F. Supp. 3d 1372, 1376 (J.P.M.L. 2021) ........................................................................... 2

*Missouri v. Biden*,
   680 F. Supp. 3d 630 (W.D. La. 2023) ....................................................................................... 7

*Missouri v. Biden*,
   83 F.4th 350 (5th Cir. 2023) ....................................................................................................... 7

*Murthy v. Missouri*,
   603 U.S. 43 (2024) .................................................................................................... 1, 4, 7, 9, 12

*United States v. Sensient Colors, Inc.*,
   649 F. Supp. 2d 309 (D.N.J. 2009) ........................................................................................... 10

*United States v. Umbrella Fin. Servs.*,
   No. 3:22-cv-2759-D, 2023 WL 4109697 (N.D. Tex. June 21, 2023) ..................................... 14

**Other Authorities**

@Jim_Jordan, X (July 27, 2023, 12:03 PM) ....................................................................................... 8

@quay_dr, X (Oct. 18, 2024, 4:44 PM) ............................................................................................ 14

Alex Gutentag and Michael Shellenberger,
   *Department of Homeland Security Illegally Targeted Covid Dissent, New Documents Suggest*, PUBLIC
   (Dec. 19, 2024) .................................................................................................................. 3, 10

Benjamin Mueller,
   *Health Officials Tried to Evade Public Records Laws, Lawmakers Say*, THE NEW YORK TIMES
   (May 28, 2024) ........................................................................................................................ 13

Emil Sayegh,
   *The Departure of Jen Easterly*, FORBES, (Nov. 21, 2024) .................................................... 11

Lev Facher,
   *'All the shrapnel that's in my back': Defiant Robert Redfield blasts former CDC directors for criticism
   during Covid-19*, STAT NEWS (Apr. 5, 2022) ......................................................................... 8

# INTRODUCTION

Defendants' objections to Plaintiffs' proposed discovery plan are predicated upon two general misconceptions. First, Defendants err in arguing that evidence of past injury is largely irrelevant to demonstrating potential future harm. The Supreme Court itself, addressing the issue in the context of Plaintiffs' preliminary injunction, explained that past harm *is* pertinent because it is predictive of future harm. *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). Indeed, it is impossible to demonstrate harm that has not yet occurred, so it makes sense that Plaintiffs' discovery requests seek substantial information about past harm (as well as likely future intentions regarding such harm).

The second main fallacy upon which Defendants' analysis rests is that the only evidence in existence was before the Supreme Court when it determined Plaintiffs' entitlement to a preliminary injunction. But a plethora of evidence has surfaced since the close of limited preliminary discovery that substantiates Plaintiffs' claims and serves as a basis for additional discovery requests. Indeed, that is precisely why judicial decisions on a preliminary injunction are not considered final rulings on the merits: because the parties have not had the opportunity to conduct thorough discovery. *See Hines v. Stamos*, 3:23-cv-571, slip op. at 8 (W.D. La. Dec. 18, 2024) (denying Defendants' motions to dismiss prior to jurisdictional discovery) ("*Murthy* did not say that those plaintiffs did not have standing to maintain suit. Instead, *Murthy* held that those plaintiffs failed to show standing sufficient for a preliminary injunction."). As they have throughout the course of this litigation, Defendants take a "heads the government wins, tails Plaintiffs lose" approach. Despite the vast quantity of evidence that has ultimately surfaced over the past two and a half years validating Plaintiffs' original Complaint, Defendants continue to insist both that there is nothing to see here, and that Plaintiffs should be prevented from taking discovery in order to see it.

# ARGUMENT

Initially, Defendants fault Plaintiffs for outlining their proposed discovery plan and schedule, as opposed to submitting to the Court specific requests for documents and interrogatories. Plaintiffs understood the Court's Order, ECF 404, to request the information that they provided in their proposed jurisdictional

1

discovery plan, so that the Court could approve it prior to Plaintiffs serving interrogatories and document requests themselves. *See* Plaintiff's Proposed Discovery Plan ("Pls.' Plan"), ECF 408. Furthermore, to the extent Defendants object to the rather tight timeline Plaintiffs have suggested, Plaintiffs only proposed concluding depositions by March 25, 2025—not all jurisdictional discovery. Nevertheless, Plaintiffs are amenable to accommodating Defendants' requests for a longer discovery schedule, insofar as it suits the Court.

Defendants also fault Plaintiffs for neglecting to coordinate with the *Kennedy* plaintiffs, as the two cases have been consolidated. This Court gave no such instruction, however, when directing Plaintiffs to propose a discovery plan and schedule, and consolidation does not require coordination of discovery requests. Moreover, the *Kennedy* case has been stayed pending *en banc*—and possibly Supreme Court—review of this Court's grant of a preliminary injunction. *See* Order Issuing Administrative Stay, *Kennedy v. Biden*, No. 24-30252 (5th Cir. Sept. 10, 2024). Plaintiffs understood the Court's Order to intend jurisdictional discovery to proceed imminently, which could not be the case if Plaintiffs wait until the *Kennedy* preliminary injunction is ironed out in the higher courts. Finally, since discovery to establish standing is plaintiff-specific, it makes more sense for Plaintiffs to proceed on their own at this stage, and then conduct discovery jointly at the merits stage. *See In re Digit. Advert. Antitrust Litig.*, 555 F. Supp. 3d 1372, 1376 (J.P.M.L. 2021) ("[T]he transferee court may account, at his discretion, for any differences among the actions by using appropriate pretrial devices, such as separate tracks for discovery or motion practice.") (internal citations and quotation marks omitted).

## I. CONTRARY TO DEFENDANTS' CLAIMS, PLAINTIFFS' JURISDICTIONAL DISCOVERY PLAN ADDRESSES FUTURE CONDUCT

Defendants, mischaracterizing Plaintiffs' requests and arguments, accuse Plaintiffs of "ignor[ing]" the Supreme Court's standard for establishing Article III jurisdiction from *Murthy v. Missouri*, 603 US. 43 (2024) by focusing on past conduct, as opposed to demonstrating potential future harm. *See* Defs.' Resp. to Plfs.' Proposed Jurisdictional Discovery Plan ("Defs.' Br."), ECF 417, at 4.

For example, Plaintiffs specifically stated that they seek discovery from major technology companies, because they expect the evidence to establish, *inter alia*, "whether and to what extent Defendants' coercion, pressure, encouragement, or joint participation with social media companies *continues and/or has ongoing impacts*."

2

Pls.' Plan, ECF 408, at 4-5 (emphasis added). The government has not always been forthcoming about its activities; thus, some of the most valuable information Plaintiffs have obtained came from the companies, as opposed to Defendants. *See* Pls.' Br. Opposing Dismissal and Supporting Discovery ("Pls.' Br."), ECF 391, at 7-12. Similarly, the limited internal communications between tech employees revealed through other investigations—mainly after completion of briefing on the preliminary injunction—bolsters Plaintiffs' claims. *See id.* at 9-11. Yet what has surfaced is, from a logical standpoint, merely the tip of the iceberg, given that Plaintiffs have not yet had the opportunity to engage in significant discovery of internal communications between tech employees, and not at all in the context of establishing their standing. Nor have they had the chance to conduct depositions of technology companies' executives, which is of paramount importance in terms of discerning the nature and extent of government influence on social platforms' content moderation decisions, as well as whether such conduct is ongoing and would cease were government influence enjoined.

The same applies to Plaintiffs' requests to seek information from individuals who ran the Stanford Internet Observatory ("SIO"), and two of its projects, the Election Integrity Partnership ("EIP") and Virality Project ("VP"). *See* Pls.' Plan, ECF 408, at 6-7.[1] Notably, a leader of SIO stated, according to a very recent report, that its function is to "fill in the gap of things the government couldn't do[]"—exactly what Plaintiffs have claimed all along. *See* Alex Gutentag and Michael Shellenberger, *Department of Homeland Security Illegally Targeted Covid Dissent, New Documents Suggest*, PUBLIC (Dec. 19, 2024), *available at* https://www.public.news/p/department-of-homeland-security-illegally (last viewed Dec. 20, 2024).

Because the VP flagged Dr. Kulldorff's tweet for removal—an instruction Twitter followed—the past *and present* involvement of these groups in social media censorship, as well as the nature and extent of entanglement with government agencies, is critical to Plaintiffs' claims. *See* Pls.' Reply Br. ("Pls.' Reply"), ECF 399, at 13-14. For similar reasons (and contrary to Defendants' contentions, *see* Defs.' Br., ECF 417, at 10), it is important

---

[1] While thus far Defendants have maintained that SIO, EIP, and VP are not governmental entities, other information indicates that the entwinement with government was substantial, raising questions about the degree to which these organizations were actually performing at the government's behest. And as Plaintiffs have explained before, and this Court recently held in *Hines*, previous judicial determinations finding inadequate evidence that these organizations were effectively arms of the government were not based upon a complete view of the record—that is why these determinations are "preliminary." *See* 3:23-cv-571, slip op. at 8.

that Plaintiffs are permitted to obtain information from Adele Ruppe and Will Beebe, since both worked at the State Department's Global Engagement Center ("GEC"), as well as with the EIP. Acting Special Envoy and Coordinator for GEC Daniel Kimmage mentioned these two individuals during his deposition in this case over two years ago, identifying them as GEC employees who worked with the EIP. *See* Pls.' Reply, ECF 399, at 17. That means they are highly likely to be in possession of relevant information about government work with SIO entities.[2]

To the extent that Plaintiffs' requests are focused upon previous misconduct, the Supreme Court did *not* state that past injuries are irrelevant. Rather, it explained that:

> because the plaintiffs are seeking only forward-looking relief, the past injuries are relevant only for their predictive value … . If a plaintiff demonstrates that a particular Government defendant was behind her past social-media restriction, it will be easier for her to prove that she faces a continued risk of future restriction that is likely to be traceable to that same defendant.

*Murthy*, 603 U.S. at 59 (internal citations and quotation marks omitted). Indeed, the Court devoted around 10 of its 27-page majority opinion to assessing ties between Plaintiffs' past censorship and government conduct, illustrating that the Court considered evidence of prior harm significant. And it makes sense that Plaintiffs seek substantial evidence of past government censorship, as they cannot obtain evidence of censorship that has not yet occurred—but only evidence that the government has not ceased the challenged conduct.

Relatedly, underlying many of Defendants' retorts to Plaintiffs' proposed discovery requests is their claim that Plaintiffs' focus on censorship of Covid matters renders their discovery requests unreasonable, because Covid is "over," and so the government no longer seeks to control discourse on the subject. *See* Defs'. Br., ECF 417, at 5-13. But Defendants fail to address Plaintiffs' theory that the past and future censorship need not be on the same topic. *See* Pls.' Reply, ECF 399, at 11. All five individual Plaintiffs engaged and continue to engage in opposition speech—that is, speech that questions the policies of some of the most powerful people

---

[2] Defendants argue that another reason to deny these requests is that it appears that GEC's funding will not be renewed and the agency will no longer exist after December 23, 2024. *See* Defs.' Br., ECF 417, at 11 n.3. That does not change Plaintiffs' arguments. *First*, Defendants have not affirmed that GEC's activities will not simply be reallocated to other agencies. *Second*, it is clear that GEC was not the only agency that the SIO entities worked with. These employees are likely to know the identities of other agencies and individuals involved with SIO, since the purpose of GEC was to coordinate "mis" and "disinformation" efforts between executive agencies.

in the country, including the President of the United States. Thus, if the White House and other agencies have not stopped leaning on social media companies to censor speech that conflicts with their preferred policies— and they have explicitly stated that they have not—Plaintiffs remain at risk of future government-induced censorship. *See* Pls.' Proposed Findings of Fact, ECF 214-1, ¶¶ 200-211, 460, 526, 536, 564; *see also* Pls.' Reply, ECF 399, at 6.[3]

Finally, the impending change in administration does not provide assurance that Plaintiffs will not be censored in the future. Plaintiffs' theory has always been that the government censorship apparatus came into being during President Trump's first administration (and possibly even before, under former President Obama). While the Trump White House does not appear to have directed the censorship, various agencies engaged with platforms independently to effectuate censorship on social media. In any event, even if this case ultimately results in a settlement, any additional discovery will help to establish the nature of the agreement and to delineate the type of government activities that are prohibited. For that reason, a judicial order is necessary to halt government involvement in social media censorship and safeguard Plaintiffs' (and all Americans') rights.

## II. PLAINTIFFS' PROPOSED REQUESTS FOR DISCOVERY ARE TARGETED AT ESTABLISHING STANDING

Defendants ignore common sense to contend that Plaintiffs' proposed document requests to Dr. Fauci and others at the NIAID constitute a "fishing expedition" because Dr. Fauci no longer holds government office. *See* Defs.' Br., ECF 417, at 7-8. Since this Court last allowed discovery, congressional testimony of Dr. David Morens made it public knowledge that Dr. Fauci purposefully evaded FOIA requests and the creation of government records by deleting emails and using a personal email account. *See* Pls.' Br., ECF 391, at 15-17. While Defendants downplay the importance of this revelatory information, arguing that it bears only on attempts to conceal proof favoring the lab-leak hypothesis of Covid's origins, Dr. Morens never said that was the only subject on which Dr. Fauci and others eluded detection. If Dr. Fauci evaded FOIA in this context, he probably circumvented it in others.

---

[3] Defendants have never argued that this case is moot, despite Justice Alito explicitly asking whether it was at oral argument in the Supreme Court. *See* Pls.' Reply Br., ECF 399, at 6 n.2. That undercuts their unsubstantiated representation that Plaintiffs have no valid reason to believe Defendants' conduct is ongoing.

Given Dr. Fauci and Dr. Francis Collins's articulated desire to "takedown" Drs. Bhattacharya and Kulldorff, the latter are entitled to find out whether Fauci, Collins, and others at NIH and NIAID participated in efforts to censor them on technology platforms. While it is true that Dr. Fauci is no longer in government, if other individuals at the agency are involved in ongoing efforts to silence non-approved views on scientific and medical subjects about which Drs. Bhattacharya and Kulldorff post, that confers standing. And in light of the unsavory conduct in which NIH and NIAID employees *already* engaged, including covering up evidence of participation in gain-of-function research, lying to the public about the evidence for Covid's origins, and silencing opposing views on the appropriate response to Covid-19, Plaintiffs have every reason to believe such an operation continues.

Defendants argue that Plaintiffs no longer have a basis to request information from current and former employees of the Centers for Disease Control ("CDC"), because the Supreme Court in *Murthy* found that the agency stopped meeting with social media platforms by March of 2022. *See* Defs.' Br., ECF 417, at 7-8. In addition to the fact that the Court's decision was neither a final ruling nor based on merits discovery, there has been a discrepancy between what Defendants revealed about the number of people who had contact with social media companies and the information the companies themselves provided. *See* Pls.' Reply, ECF 399, at 17. Given CDC's past involvement in social media censorship, as well as the fact that Plaintiffs all continue to post information and views that depart from the agency's positions on many subjects, they are entitled to find out if CDC remains involved in suppressing "health misinformation." That is especially true since CDC has never renounced this activity. Moreover, that regular meetings with technology companies ceased—a representation Defendants simply make without evidence—does not mean CDC's involvement in content moderation has entirely stopped.

### III. PLAINTIFFS' PROPOSED DEPOSITIONS ARE PROPER

Plaintiffs' requests to depose high-ranking government officials are, contrary to Defendants' arguments, anchored in a proper showing of exceptional circumstances and otherwise justified. *See* Defs'. Br., ECF 417, at 13, 22-23.

First, as Plaintiffs have pointed out and this and other courts have recognized numerous times, this case *is* exceptional. Never before in this country's history has a government censorship regime coordinated at the highest levels been exposed through litigation. *See Missouri v. Biden*, 83 F.4th 350, 392 (5th Cir. 2023) ("[T]he Supreme Court has rarely been faced with a coordinated campaign of this magnitude orchestrated by federal officials that jeopardized a fundamental aspect of American life."), *reversed and remanded on other grounds sub nom. Murthy*, 603 U.S. 43 (2024); *Missouri v. Biden*, 680 F. Supp. 3d 630, 707 (W.D. La. 2023) (describing the government's conduct as amounting to "arguably the most massive attack against free speech in United States history"). *See also Murthy*, 603 U.S. at 79 (Alito, J., dissenting) ("A coterie of officials at the highest levels of the Federal Government continuously harried and implicitly threatened Facebook with potentially crippling consequences if it did not comply with their wishes.").

As to their specific objections: Defendants protest Plaintiffs' proposed deposition of former Executive Director of the Disinformation Governance Board ("DGB") Nina Jankowicz on the grounds that the agency was dismantled. *See* Defs.' Br., ECF 417, at 12. But Jankowicz presumably has valuable information about how the government intended to use the Board to fight "disinformation," whether those methods were reallocated to other agencies, whether they continue operating through existing agencies, and which agencies remain involved in the efforts.

Contrary to Defendants' contentions, *see* Defs.' Br., ECF 417, at 16, as the former CDC Director, Rochelle Walensky is uniquely positioned to provide information about the agency's attempts to dictate content moderation efforts on social media from January 2021 to June 2023, when she held that office. Given her direct involvement in firing Plaintiff Kulldorff, which occurred in the midst of his silencing on social media and may be related to it, she has important information that bears on Plaintiffs' standing in this case. Furthermore, as discussed above, *supra* at 3-4, Dr. Kulldorff's tweet was censored by Twitter at the behest of the VP, because it conflicted with CDC's position. *See* Pls.' Reply, ECF 399, at 13-14. It would be valuable to know how Twitter came to adopt the policy that tweets contradicting CDC policies would be censored, who made such determinations, and whether or not such operations were halted during Dr. Walensky's tenure. If they were not, there are reasonable grounds to suppose that CDC's activities have not ceased.

7

Former CDC Director Robert Redfield, another of the individuals Plaintiffs seek to depose, served in that position immediately before Dr. Walensky. Dr. Redfield, accordingly, has information about the agency's involvement in social media content moderation prior to President Biden assuming office. There has been significant confusion over the CDC's role in 2020, when it appeared the agency was working with social media companies to stifle "mis" and "disinformation" surrounding Covid-19, albeit potentially not at the direction of the White House. Indeed, Dr. Redfield expressed his view that the CDC, not the White House, should guide Covid policy, which opens up a line of questioning about how those beliefs informed the CDC's efforts to dictate content moderation on social media—*especially* because Defendants have repeatedly claimed that social media companies' content moderation policies (having preceded President Biden assuming office) proves that censorship in 2020 and before could not have been induced by government entities. *See* Lev Facher, '*All the shrapnel that's in my back': Defiant Robert Redfield blasts former CDC directors for criticism during Covid-19*, STAT NEWS (Apr. 5, 2022), *available at* https://tinyurl.com/ykv6jmjy (last visited 18 Dec. 2024). In sum, Dr. Redfield is in a unique position to convey information on this topic, which is important to understanding the operation, who guided it, and how it was conducted. It also bears on the nature of injunctive relief to be granted.

Emails from Former White House Director of Digital Strategy Robert Flaherty and Former White House Covid-19 Advisor Andy Slavitt demonstrated their significant involvement in suppressing speech on social media related to the Covid-19 vaccines. Flaherty's conduct in particular, revealed through emails obtained in discovery in this case, stunned many of those who read them. Slavitt also played a major role in the operation, as a congressional investigation revealed, which included giving ominous warnings to social media companies if they did not censor according to his liking.[4] *See* @Jim_Jordan, X (July 27, 2023, 12:03 PM), *available at* https://x.com/Jim_Jordan/status/1684595382871785472 (in which Meta executive Nick Clegg recounted to his team that Slavitt was "outraged–not too strong a word to describe his reaction," that Twitter did not remove a humorous meme implying that in the future personal injury lawyers would seek compensation on behalf of Covid-19 vaccine recipients). Slavitt successfully bullied Twitter into removing journalist Alex Berenson from the platform due to Berenson's articulated skepticism of Covid-19 vaccines, and continued using his White

---

[4] *Available at* https://www.wsj.com/public/resources/documents/17623-0314.pdf?mod=article_inline

House email address even after he left government employment, presumably in an attempt to wield the authority of an office that he no longer held. *See* First Am. Compl., ECF 80-1 ¶ 166, *Berenson v. Biden*, No. 1:23-cv-03048 (S.D.N.Y. Sept. 4, 2024). If Slavitt abused his position, Plaintiffs—especially Drs. Bhattacharya and Kulldorff, who were the subject of much negative attention from government and media during the height of Covid-19—have every reason to believe that he was involved in efforts that led to censorship of their social media accounts.

Defendants now claim that Flaherty and Slavitt are not in possession of unique information on the subject of the White House's Covid-19 censorship program. This argument is nothing short of astonishing. Only Flaherty and Slavitt can attest to whose orders they were implementing, what their mindsets were when they communicated with social media platforms, and off-the-record conversations they had with personnel from the companies. (Indeed, given what they were willing to put in writing, one can only speculate about what was said on the phone.). Flaherty and Slavitt can also answer questions about the topics on which they demanded censorship, when those demands were made, and when the companies acquiesced, which bears directly on the Court's Article III jurisdiction in this case: the Supreme Court's holding in *Murthy* indicated that Plaintiffs can establish standing by demonstrating that a platform began censoring on a topic on which the plaintiff posted *only after* the government made demands to do so. *See Murthy*, 603 U.S. at 59-60. Flaherty continues to work with high-profile government actors, as he recently served as Kamala Harris's Deputy Campaign Manager. Accordingly, he is likely in a position to shed light on continuing governmental efforts and plans to police speech on social media.

Defendants correctly point out that the Fifth Circuit previously foreclosed depositions of Easterly, Flaherty, and Surgeon General Vivek Murthy (whom Plaintiffs do not now seek to depose), in the context of preliminary-injunction related discovery. *See* Defs.' Br., ECF 417, at 14-15. But this does not bar conducting these depositions *now*. First, the rationales for protecting them do not apply now since Easterly and Flaherty (and Redfield and Walensky, who were not previously the subject of the Fifth Circuit's rulings), no longer hold government offices. Thus, some of the sensitivities that come into play in assessing the need for deposing *current* government employees are inapplicable to these individuals. *See United States v. Sensient Colors, Inc.*, 649

9

F. Supp. 2d 309, 316 (D.N.J. 2009) (permitting depositions of *former* high-ranking officials). Second, that the Fifth Circuit's analysis deemed the depositions unwarranted for expedited, limited preliminary injunction discovery does not render them unnecessary at this stage. Perhaps most importantly, these rulings were made over two years ago, prior to a significant volume of facts from discovery and other sources being uncovered in this case. For example, the emails from Slavitt and Flaherty were obtained through discovery and a congressional investigation *after* these rulings. Had the Fifth Circuit decided the question in light of the evidence available now, it would likely have reached a different conclusion.

In a similar vein, just *days* ago, new information surfaced about the timing and extent of CISA's involvement in censoring Covid-related "misinformation" and "disinformation."[5] Among other things, documents show that CISA's efforts began earlier than previously believed, no later than February of 2020, not mid-2020, as the agency claimed. And crucially, this material provides substantial reason to believe that CISA was involved in efforts to censor Dr. Bhattacharya. Specifically, CISA internally cited Dr. Bhattacharya's Santa Clara seroprevalence study as an example of potentially dangerous misinformation about Covid-19 in early 2020. *See* Alex Gutentag and Michael Shellenberger, *Department of Homeland Security Illegally Targeted Covid Dissent, New Documents Suggest*, PUBLIC (Dec. 19, 2024), *available at* https://www.public.news/p/department-of-homeland-security-illegally. Accordingly, the depositions of current and former CISA officials Lauren Protentis, Matthew Masterson, and Jennifer Easterly, are warranted.[6]

Protentis was a key figure in *three* federal agencies involved in speech suppression efforts. These postings include a stint as Director of GEC and membership on CISA's "Mis, Dis, and Mal-information Team."

---

[5] In the newly publicized report, CISA also acknowledges that content moderation is antithetical to the companies' business models, which is further evidence that government played a significant role in escalating the amount of censorship on social media platforms. *See* "Covid-19 Countering Foreign Influence Task Force Reporting and Analysis" at 16, *available at* https://media.aflegal.org/wp-content/uploads/2024/12/19115013/COVID-19-CFITF-Reporting-and-Analysis-AFL.pdf

[6] This Court originally authorized depositions of either Lauren Protentis or CISA director, Jen Easterly, finding that exceptional circumstances outweighed considerations of their senior roles in the government. *See* Memorandum Order Regarding Witness Depositions, ECF 90. Plaintiffs chose Easterly, but asked in the alternative to depose both Protentis and Brian Scully. Defendants protested that Protentis was on maternity leave and the Court ultimately granted a deposition only of Scully. *See* Memorandum Order re: expedited preliminary injunction-related discovery (hereinafter "12/7/22 Order"), ECF 148.

Meta also identified Protentis pursuant to a third-party subpoena as a federal official potentially involved in content moderation. Defendants now assert her status at the White House (the National Security Council's Director of Foreign Malign Influence and National Security Communications) as a reason she cannot be deposed, citing deference to the separation of powers. *See* Defs.' Br., ECF 417, at 17. Yet in all likelihood there will be little carryover of White House staff under the new administration, so this justification is unpersuasive, especially given her unique role at the confluence of so many of the federal government's misinformation programs, which outweighs any interest Defendants have in shielding her.

One of the most central figures in the government's censorship efforts is CISA Director Jen Easterly, who infamously stated that she was expanding CISA's misinformation team following the 2020 election and declared that the thought processes of the public were under her purview to protect "cognitive" infrastructure. *See* Memorandum Ruling re Motion for Preliminary Injunction, ECF 293, at 77. News reports, as well as common practice during a change in Presidential administrations, indicate that Easterly will be stepping down from CISA in January, further supporting Plaintiffs' position that her deposition would not unduly burden a soon-to-be former, high-ranking official. *See* Emil Sayegh, *The Departure of Jen Easterly*, FORBES, (Nov. 21, 2024), *available at* https://www.forbes.com/sites/emilsayegh/2024/11/21/the-departure-of-jen-easterly-whats-next-for-cisa-under-trump/ (last visited Dec. 23, 2024).

Former Communications Director Kate Bedingfield, whom Defendants' claim Plaintiffs have no legitimate reason to depose, *see* Defs.' Br., ECF 417, at 16, may have unique information relating to the implementation of the government's censorship policies. Mere days after President Biden's infamous statement that social media companies were "killing people," Bedingfield publicly announced that the White House would be making legal determinations as to whether these companies had violated the law, insinuating that consequences, including revisions to Section 230, might follow. *See* Third Amend. Compl., ECF 268, ¶¶ 233, 236-237. Plaintiffs were prevented from deposing Psaki, and Bedingfield could provide critical information regarding the White House's censorship-related directives. If the Court determines that extraordinary circumstances are still needed and do not exist, Plaintiffs propose written interrogatories as an alternative to a deposition of Bedingfield.

11

Defendants urge the Court to deny Plaintiffs' requested deposition of Rob Silvers on the grounds that relevant knowledge can be obtained from other sources. *See* Defs.' Br., ECF 417, at 16. Yet as Plaintiffs have demonstrated, Silvers was a key figure in the creation of the DGB, a cross-department effort to combat "[c]onspiracy theories about the validity and security of elections" and "[d]isinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks" by coordinating between federal agencies. *See* Third Amend. Compl., ECF 268, ¶ 310. Silvers' knowledge of the formation of the DGB is critical since the "DGB's task was not to establish a censorship program, but to *oversee* the massive censorship program against free speech on these topics that already exists." *Id.*, ¶ 309.

Finally, Defendants offer baseless contentions that Plaintiffs lack justification to depose former FBI Foreign Influence Task Force (FITF) Section Chief Laura Dehmlow. *See* Defs.' Br., ECF 417, at 25. Dehmlow regularly met with social media platforms to discuss "disinformation," and according to FBI agent Elvis Chan (at his deposition a couple of years ago), raised warnings about a hack and leak operation. *See* Pls.' Proposed Findings of Fact, ECF 214-1, ¶ 883. This directly implicates Plaintiffs' core claims, as individuals at the FBI deceived social media companies into believing the Hunter Biden laptop report was Russian disinformation, and it was therefore repeatedly censored on Plaintiff Jim Hoft's website, the Gateway Pundit. *Id.*, ¶¶ 880-904, 1388, 1391-96.[7] Moreover, Meta identified Dehmlow as a potential source of communications leading to suppression of the Hunter Biden laptop story. That alone provides an adequate basis to warrant deposing her. *See* 10.26.2022 Letter from John Sauer to Reg Brown, ECF 96-1, at 6.

### IV. PLAINTIFFS' REQUESTS ARE NOT UNREASONABLY DUPLICATIVE

Defendants' arguments that a number of Plaintiffs' proposed discovery requests are duplicative, *see* Def. Br., ECF 417, at 18-25, are based on the convenient fiction that nothing has been learned since 2022 that bears on this case. As explicated previously, Plaintiffs have learned many things since preliminary discovery was initially conducted in this case and concluded nearly two years ago. Thus, their questions (depositions,

---

[7] To the extent the Supreme Court interpreted the existing record as inadequate to establish Hoft's standing with respect to the Hunter Biden laptop theory, that underscores the need for jurisdictional discovery. *Cf. Murthy*, 603 U.S. at 64.

12

interrogatories) and requests for documents would incorporate what they have learned in that time, which is substantial.

### A. Plaintiffs' Requests for Documents and Interrogatories

Included in the crucial information Plaintiffs have learned is that some Defendants, particularly at NIH and NIAID, have intentionally misspelled words in order to avoid production pursuant to FOIA requests; deleted emails; and used private emails. *See* Benjamin Mueller, *Health Officials Tried to Evade Public Records Laws, Lawmakers Say*, THE NEW YORK TIMES (May 28, 2024), https://www.nytimes.com/2024/05/28/health/nih-officials-foia-hidden-emails-covid.html (last visited 18 Dec. 2024). So, when conducting searches in order to turn up mentions of Plaintiffs and related subjects, such as the Great Barrington Declaration and Gateway Pundit, Plaintiffs will craft their requests with an eye towards catching intentional misspellings. Similarly, Plaintiffs have learned of the names and identities of many individuals that Defendants initially did not disclose. As an example, and as discussed previously, *see* Pls.' Reply, ECF 399, at 17, following Mr. Elon Musk's acquisition of Twitter and after preliminary injunction-related discovery closed, Twitter updated its disclosure of eleven federal officials with whom the company had communicated about misinformation, disinformation, and censorship to *eighty-four* such officials. *See* Twitter's revised list of federal officials, ECF 214-8. That and the other newly-learned evidence discussed above provide a basis for directing new questions and document requests to Defendants—agencies and individuals—who have already been the subject of such requests. Plaintiffs will, of course, not serve interrogatories or document requests that are duplicative of those previously sought—unless they have concrete reasons to believe the responses they received the first time around were incomplete, misleading, or dishonest.

### B. Plaintiffs' Requests for Depositions

Defendants fault Plaintiffs for requesting nearly 30 additional depositions, outside the limit allotted under Rule 30 absent leave of the Court. As discussed many times before, this is no ordinary case. The number of individuals involved in the censorship enterprise was far greater than Plaintiffs could have imagined when they filed the initial complaint. Most cases involve at most a few defendants, not dozens, as there are here.

13

Accordingly, this is a case in which depositions in excess of the standard number are warranted. And the Supreme Court required connecting past and future action *to each defendant*, which naturally entails discovery from a substantial number of individuals and agencies, even at the jurisdictional stage. *See United States v. Umbrella Fin. Servs.*, No. 3:22-cv-2759-D, 2023 WL 4109697, at *2 (N.D. Tex. June 21, 2023) (permitting government to take up to 20 depositions in case "alleg[ing] widespread fraud, affecting many customers over many years, resulting in millions of dollars in tax harm. It has already established that more than 10 depositions will be necessary to meet its burden of proof[.]"). In any event, the Federal Rules allow each plaintiff *twenty-five* interrogatories and *seven* depositions *for each agency*. The seven different Plaintiffs here (five individuals and two states) have not even come close to exceeding that number. Defendants are wrong to effectively argue that Plaintiffs must: 1) sue the exact agency that censored them; 2) identify the precise censorship of a specific message or individual *prior* to discovery; and 3) be limited to seven depositions and twenty-five interrogatories altogether throughout the entire litigation.

All the individuals whom Plaintiffs seek to depose have unique information that no one else can provide. The proper course is to set the depositions (for parties) and subpoena the non-parties, all of whom can oppose specific depositions with individualized briefing. Nevertheless, Plaintiffs will provide succinct reasons for the depositions Defendants contest on the grounds they are cumulative and duplicative.

Defendants claim that deposing former NIAID Principal Deputy Director Hugh Auchincloss is duplicative because Plaintiffs took Dr. Fauci's deposition. Given that Dr. Fauci has almost certainly lied and stated "I don't recall" 174 times during his deposition (almost certainly an evasion tactic), Defendants' claim that further depositions of NIAID officials are unwarranted is disingenuous.[8] As Dr. Fauci was on record asking to discuss various matters with Dr. Auchincloss over the phone, this deposition is needed to obtain information about conversations that Dr. Fauci did not want to put in writing. *See* Pls.' Reply, ECF 399, at 18.

---

[8] As one example of many, Dr. Fauci claimed during his November 2022 deposition that he doubted he had met Dr. Ralph Baric. *See* Fauci Dep. 32:15-33:3. However, an email obtained through a FOIA request shows Dr. Fauci arranging a meeting with Dr. Baric on February 6, 2020. *See* @quay_dr, X (Oct. 18, 2024, 4:44 PM), https://x.com/quay_dr/status/1847378192941928832.

Contending that Plaintiffs should not be permitted to depose former Senior Advisor to the Surgeon General, Kyla Fullenwider, Defendants claim that the Fifth Circuit disallowed deposition of the Surgeon General absent consideration of an alternative, and that Plaintiffs ultimately deposed Eric Waldo, Senior Advisor to the Surgeon General, as an alternative. *See* Defs.' Br., ECF 417, at 15-16. The basis for Defendants' objection is unclear, as Fullenwider *is* an alternative to the Surgeon General. Ms. Fullenwider was a crucial part of the government's efforts to outsource its censorship activities: it appears she may not have been a direct employee of the Surgeon General's Office, but rather worked for a non-profit called "US Digital Response," which was heavily involved with suppressing "misinformation" and "disinformation." *See* Pls.' Proposed Findings of Fact, ECF 214-1, ¶¶ 228-232, 241-46, 255-57, 290-92, 348; Eric Waldo Dep. 39:5-17; 41:22-42:8; 144:7-21; 372:3-374: 11. Thus, Ms. Fullenwider is uniquely positioned to provide information about the Surgeon General's relationship with third parties, and instrumentalization of such entities to perform government censorship operations. There is no rule prohibiting deposition of more than one person from an agency, particularly when different people are privy to different, pertinent information. And in any event, Ms. Fullenwider was not technically an employee of the Surgeon General's Office.

Defendants' also dispute the necessity of deposing former White House Covid-19 Response Coordinator Ashish Jha (Defs.' Br., ECF 417, at 28-29). But Dr. Jha worked very closely with President Biden, and presumably had private conversations with the President about the Covid-19 response—which in the words of the President and his Press Secretary, included efforts to suppress speech that undermined the White House's approach. *See* Pls.' Supp. Br. in Support of MPI, ECF 212-2, at 10, 15-16. As the President's close advisor, Dr. Jha is in a unique position to shed light on the extent to which the Administration's Covid-19 response included efforts to combat "misinformation" and "disinformation" on social media, what those efforts were, and which agencies were involved.

## CONCLUSION

Plaintiffs should be permitted to proceed with discovery according to the plan that they proposed.

Dated: December 24, 2024                                    Respectfully submitted,

*/s/ Jenin Younes*
JENIN YOUNES *
*Litigation Counsel*
JOHN J. VECCHIONE *
*Senior Litigation Counsel*
ZHONETTE BROWN*
*Senior Litigation Counsel*
New Civil Liberties Alliance
4250 N. Fairfax Drive, Suite 300
Arlington, VA 22203
Main: (202) 869-5210
Direct: (202) 918-6905
E-mail: jenin.younes@ncla.legal
*Counsel for Plaintiffs Dr. Jayanta Bhattacharya,*
*Dr. Martin Kulldorff, Dr. Aaron Kheriaty, and Jill Hines*

| | |
|---|---|
| ELIZABETH B. MURRILL<br>*Louisiana Attorney General* | ANDREW BAILEY<br>*Missouri Attorney General* |
| */s/ Zachary Faircloth*<br>ZACHARY FAIRCLOTH<br>*Principal Deputy Solicitor General*<br>TRACY SHORT<br>*Ass't Attorney General*<br>1885 N. Third St.<br>Baton Rouge, LA 70802<br>(225) 326-6766<br>MurrillE@ag.louisiana.gov<br>*Counsel for Louisiana* | */s/ Joshua M. Divine*<br>JOSHUA M. DIVINE<br>*Solicitor General*<br>MICHAEL PATTON<br>*Deputy Solicitor General*\*<br>TODD A. SCOTT<br>*Senior Counsel*<br>207 W. High St.<br>P.O. Box 899<br>Jefferson City, MO 65102<br>(573) 751-8870<br>Josh.Divine@ago.mo.gov<br>*Counsel for Missouri* |

*/s/ John C. Burns*
JOHN C. BURNS *
Burns Law Firm
P.O. Box 191250
St. Louis, Missouri 63119
P: 314-329-5040
F: 314-282-8136
E-mail: john@burns-law-firm.com
*Counsel for Plaintiff Jim Hoft*
\**Admitted pro hac vice*

16

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that the foregoing was filed on December 23, 2024 via this Court's CM/ECF system. The notice of docket activity generated by this filing will constitute service on all counsel of record in this case.

/s/ Jenin Younes